Patrick J. Feeley (PF-4931)
Christopher G. Karagheuzoff (CK-1122)
Stephen M. Raab (SR-0742)
DORSEY & WHITNEY LLP
250 Park Avenue
New York, New York 10177
(212) 415-9200

*Attorneys for Defendant and Third-Party Plaintiff*
*Phoenix Life Insurance Co.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALICE KRAMER, as Personal Representative of the Estate of Arthur Kramer,<br><br>          Plaintiff,<br><br>   – against –<br><br>LOCKWOOD PENSION SERVICES, INC., TALL TREE ADVISORS, INC., LIFE PRODUCTS CLEARING, LLC, TRANSAMERICA OCCIDENTAL LIFE INSURANCE CO., PHOENIX LIFE INSURANCE CO., LINCOLN LIFE & ANNUITY CO. OF NEW YORK, LORI CALLEGARI AND TD BANKNORTH INC.,<br><br>          Defendants. | Case No. 08 CV 2429 (DAB) (MHD)<br><br>ECF CASE<br><br>**ANSWER TO COMPLAINT WITH COUNTERCLAIMS, CROSS-CLAIMS AND THIRD-PARTY COMPLAINT** |
| PHOENIX LIFE INSURANCE CO.,<br><br>         Third-Party Plaintiff,<br><br>   – against –<br><br>STEVEN LOCKWOOD,<br><br>         Third-Party Defendant. | |

Defendant Phoenix Life Insurance Co. ("Phoenix"), by its undersigned attorneys, hereby answers the complaint of Alice Kramer, as Personal Representative of the Estate of Arthur Kramer ("Plaintiff" or "Estate"), in corresponding numbered paragraphs as follows:

-

**RESPONSE TO "PARTIES"**

1.      Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations concerning the citizenship and residency of Plaintiff, and otherwise, on information and belief, admits the allegations contained in Paragraph 1.

2.      Phoenix denies having knowledge or information sufficient to form a belief as to whether Mr. Kramer was "a citizen of the State of Connecticut" at the time of his death, and otherwise admits the allegations contained in Paragraph 2.

3.      Phoenix, on information and belief, admits that Lockwood Pension Services, Inc. is a New York corporation, and denies having knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations contained in Paragraph 3.

4.      Phoenix, on information and belief, admits the allegations contained in Paragraph 4.

5.      Phoenix, on information and belief, admits that Life Product Clearing, LLC is a Delaware limited liability company, and denies having knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations contained in Paragraph 5.

6.      Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 6.

7.      Phoenix admits that it is incorporated in New York.  The remainder of the allegations contained in Paragraph 7 state a conclusion of law to which no response is required.. To the extent that a response is required, Phoenix denies the remaining allegations contained in Paragraph 7.

8.      Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 8.

9.    Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 9.

10.    Phoenix, on information and belief, admits that TD Banknorth Inc. ("TD Bank") acquired Hudson United Bank ("Hudson") in 2006, offers no response to the legal conclusion that TD Bank is the "successor-in-interest" to Hudson because no such response is required, and denies having knowledge or information sufficient to form a belief as to the remainder of the allegations contained in Paragraph 10.

## RESPONSE TO "JURISDICTION AND VENUE"

11.    Phoenix states that the allegations contained in Paragraph 11 state a conclusion of law to which no response is required.

12.    Phoenix states that the allegations contained in Paragraph 12 state a conclusion of law to which no response is required.

## RESPONSE TO "BACKGROUND"

13.    Phoenix, on information and belief, admits that this action involves an arrangement to procure life insurance policies with the purpose of immediately transferring the beneficial interest in those policies to stranger investors, in contravention of the "insurable interest rule" as codified in the New York Insurance Law, and states that the remaining allegations contained in Paragraph 13 state conclusions of law to which no response is required. To the extent a response to the remaining allegations is deemed necessary, Phoenix denies that Plaintiff is entitled to the disgorgement of the payment of death benefits and that death benefits should in any event be paid to Plaintiff.

14.    Phoenix admits the allegations contained in Paragraph 14.

15.    Phoenix admits the allegations contained in Paragraph 15.

16.     Phoenix, on information and belief, admits the allegations contained in Paragraph 16.

17.     Phoenix states that the allegations contained in Paragraph 17 state a conclusion of law to which no response is required.  To the extent a response is deemed necessary, Phoenix admits that the entire "stranger-owned life insurance" ("SOLI") arrangements, including the putative assignments of the beneficial interests in the death benefits of the policies, are void under New York law.

### RESPONSE TO "FACTS"

18.     Phoenix, on information and belief, admits that Arthur Kramer was an attorney and died on January 26, 2008, and denies having knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations contained in Paragraph 18.

19.     Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 19 to the extent that it alleges that Mr. Lockwood may have first approached Mr. Kramer in 2003, but avers, on information and belief, that Messrs. Lockwood and Kramer participated in a SOLI scheme that resulted in the procurement of three Phoenix policies numbered 97303913, 97303935, and 97303936 (the "Phoenix Policies") for a total amount of $28,000,000.

20.     Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 20 to the extent that it suggests that Mr. Lockwood first introduced Mr. Kramer to the SOLI arrangement, but avers, on information and belief, that Messrs. Lockwood and Kramer participated in a SOLI scheme that resulted in the procurement of the Phoenix Policies.

21.     Phoenix, on information and belief, admits the allegations contained in

Paragraph 21, except denies having knowledge or information sufficient to form a belief as to the truth of those allegations that identify the children of Mr. Kramer and Mrs. Kramer.

22.     Phoenix, on information and belief, admits the allegations contained in Paragraph 22.

23.     Phoenix, on information and belief, admits the allegations contained in Paragraph 23, except denies having knowledge or information sufficient to form a belief as to the truth of those allegations concerning the total amount of the life insurance policies that are the subject of Plaintiff's suit.

**<u>Response to "The Transamerica Policies"</u>**

24.     Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 24.

25.     Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 25.

26.     Phoenix denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 26.

27.     Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 27.

28.     Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 28.

29.     Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 29.

30.     Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 30.

**Response to "The Phoenix Policies"**

31.    Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 31, but avers that the insurance application for the Phoenix Policies lists the "Arthur Kramer 2005 Insurance Trust" as the owner and beneficiary of the policies, and lists "Hudson United Bank" as trustee.

32.    Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 32.

33.    Phoenix, on information and belief, admits the allegations contained in Paragraph 33.

34.    Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 34.

35.    Phoenix, on information and belief, admits that Hudson was acquired by TD Bank in early 2006, and denies having knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 35.

36.    Phoenix admits the allegations contained in Paragraph 36, and avers that when Phoenix issued the Phoenix Policies on the life of Mr. Kramer, the ostensible owner and beneficiary of them were represented to be the "Arthur Kramer 2005 Insurance Trust**."**

37.    Phoenix, on information and belief, admits that the assignment or transfer of the beneficial interest in the Phoenix Policies occurred on or about when they were issued, and otherwise denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 37.

38.    Phoenix, on information and belief, admits the allegations contained in Paragraph 38.

**Response to "The Lincoln Policies"**

39.    Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 39.

40.    Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 40.

41.    Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 41.

**Response to "Arthur Kramer's Death"**

42.    Phoenix, on information and belief, admits the allegations contained in Paragraph 42.

43.    Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 43.

44.    Phoenix denies having paid death benefits under the Phoenix Policies, denies having knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations contained in Paragraph 44, and avers that it is in the process of investigating the claims made on the Phoenix Policies.

**RESPONSE TO FIRST CLAIM FOR RELIEF**

45.    Phoenix repeats and re-alleges its responses to Paragraphs 1 - 44 as though fully set forth herein.

46.    Phoenix admits that Plaintiff has accurately quoted New York Insurance Law Section 3205(b)(2) in Paragraph 46.

47.    Phoenix admits that Plaintiff has accurately quoted New York Insurance Law Section 3205(a)(1) in Paragraph 47.

48.    Phoenix admits the allegations contained in Paragraph 48.

49.    Phoenix admits the allegations contained in Paragraph 49, and avers that at this time it lacks information sufficient to form a belief as to whether additional actors were involved in procuring contracts of insurance upon the person of Mr. Kramer or causing such contracts of insurance to be procured.

50.    Phoenix admits the allegations contained in Paragraph 50.

51.    Phoenix admits the allegations contained in Paragraph 51.

52.    Phoenix denies the allegations contained in Paragraph 52.

<u>**RESPONSE TO SECOND CLAIM FOR RELIEF**</u>

53.    Phoenix repeats and re-alleges its responses to Paragraphs 1 - 52 as though fully set forth herein.

54.    Phoenix admits that Plaintiff has accurately quoted New York Insurance Law Section 3205(b)(4) in Paragraph 54.

55.    Phoenix denies the allegations contained in Paragraph 55.

<u>**DEFENSES**</u>

<u>**FIRST DEFENSE**</u>
**(Failure to State a Claim for Relief)**

56.    The Complaint fails to state a claim against Phoenix upon which relief may be granted.

<u>**SECOND DEFENSE**</u>
**(No Damage or Injury)**

57.    Plaintiff is barred from recovery against Phoenix, in whole or in part, by the lack of damage or injury to Plaintiff.

## THIRD DEFENSE
### (Unjust Enrichment)

58.     Plaintiff is barred from recovery against Phoenix, in whole or in part, because it would be unjustly enriched if permitted to collect the sums to which it claims it is entitled.

## FOURTH DEFENSE
### (Estoppel)

59.     Plaintiff is barred from recovery against Phoenix, in whole or in part, by the doctrine of estoppel.

## FIFTH DEFENSE
### (Unclean Hands)

60.     Plaintiff is barred from recovery against Phoenix, in whole or in part, by the doctrine of unclean hands.

## SIXTH DEFENSE
### (No Insurable Interest)

61.     Plaintiff is barred from recovery against Phoenix because there was no insurable interest at the time that the Phoenix Policies were procured, thereby rendering them void from their inception.

## SEVENTH DEFENSE
### (Void - Public Policy)

62.     Plaintiff is barred from recovery against Phoenix because the Phoenix Policies were procured pursuant to a fraudulent SOLI scheme in which Mr. Kramer knowingly participated, which relieves Phoenix of any obligation to pay death benefits.

## EIGHTH DEFENSE
### (No Standing)

63.     Plaintiff is barred from recovery because she lacks standing to sue Phoenix, inasmuch as N.Y. Ins. Stat. § 3205(b)(4) provides standing for a suit only against the party that

has received insurance policy proceeds, and not against the insurer, and even then only in circumstances where policy proceeds have been paid.

### NINTH DEFENSE
### (Failure to Join Required Parties)

64.    Plaintiff is barred from recovery against Phoenix, in whole or in part, because it has failed to join parties required by Federal Rule of Civil Procedure 19.

### RESERVATION OF RIGHT TO ASSERT ADDITIONAL DEFENSES

65.    Phoenix has not knowingly or voluntarily waived any applicable affirmative defenses and reserves the right to assert and rely upon such additional affirmative defenses to the Complaint as may become available or apparent as discovery commences and progresses in this action.

### COUNTERCLAIMS, CROSS-CLAIMS & THIRD-PARTY COMPLAINT

### GENERAL ALLEGATIONS

1.    Phoenix repeats and re-alleges Paragraphs 1-65 of its Answer as though fully set forth herein.

2.    On information and belief, Steven Lockwood ("Lockwood") is the owner and chief executive officer of Lockwood Pension Services, Inc. ("LPS") and Tall Tree Advisors, Inc. ("Tall Tree").

3.    On information and belief, Lockwood, LPS, and Tall Tree all reside at the same address: 2 Tall Tree Lane, Pleasantville, New York.

4.    Jonathan S. Berck ("Berck") has served, and continues to serve, as the trustee for various life insurance trusts that Lockwood helped to establish.

5.    On information and belief, Lockwood, LPS, Life Product Clearing LLC ("Life Product"), M&M Brokerage Services, Inc. ("M&M"), and Berck all have (or had during the time

period relevant to this action) offices located at 75 Rockefeller Plaza, New York, New York.

6.    On information and belief, Lockwood, LPS, Tall Tree, Life Product, and Berck have developed a formulaic method of circumventing New York's insurable interest rule. On information and belief, this method involves using elderly persons, and the trusts they encourage or aid them in establishing, as strawmen to acquire life insurance policies for the benefit of strangers who have no insurable interest in the lives of the insureds (*i.e.*, a "SOLI" scheme).

7.    On information and belief, Lockwood, LPS, Tall Tree, Life Product, and Berck have used fraudulent SOLI schemes to procure multiple life insurance policies worth hundreds of millions of dollars. On information and belief, all of the insurance policies at issue in this lawsuit were procured by means of fraudulent SOLI schemes formulated and perpetuated by Lockwood, LPS, Tall, Life Product, and Berck.

8.    On information and belief, Lockwood colluded with Arthur Kramer to participate in one or more fraudulent SOLI arrangements. In particular, Lockwood colluded with Mr. Kramer (a) to establish a life insurance trust, (b) to apply for one or more life insurance policies in which the trust would be both the policyholder and beneficiary of the policies, (c) upon the issuance of the policies, to immediately transfer the beneficial interest in the trust to Tall Tree and/or Life Product in exchange for monetary compensation, and (d) to replace the financial institution trustee of the trust with Berck.

9.    On or about July 1 2005, Lockwood and Phoenix entered into a contract pursuant to which Lockwood would serve as an independent producer of various Phoenix products, including life insurance policies.

10.    On or about August 30, 2005, Phoenix approved the Independent Producer Contract (the "IPC").

11.    On or about August 29, 2005, Mr. Kramer established the Arthur Kramer 2005 Insurance Trust (the "Kramer August Trust").

12.    On information and belief, the only advantage and purpose of the Kramer August Trust was to effectuate a transfer of the right to the death proceeds payable under the requested life insurance policies in a fraudulent manner that would not be apparent to Phoenix.

13.    Mr. Kramer submitted (through Lockwood) a life insurance application to Phoenix in early September 2005 (the "Phoenix Application").

14.    On information and belief, Mr. Kramer did not apply for life insurance on his own initiative, but rather was induced to do so by the offer of ready cash.

15.    On information and belief, at the time he submitted the Phoenix Application, Mr. Kramer had no intention of procuring life insurance for the benefit of himself or his family; rather, Mr. Kramer was attempting to procure a policy for the benefit of a stranger investor with no insurable interest in his life.

16.    On information and belief, the stranger investor on whose behalf Mr. Kramer procured the life insurance was Tall Tree.  Thus, Tall Tree was the true intended beneficiary of the requested policy.

17.    In Sections II and III of Part I of the Phoenix Application, Mr. Kramer represented that the owner and beneficiary of the policies applied for would be the Kramer August Trust.

18.    Mr. Kramer signed Part I of the Phoenix Application on or about September 2, 2005.

19.    Above Mr. Kramer's signature on Part I of the Phoenix Application, the application states, in relevant part:

I have reviewed this application, and the statements made herein are those of the proposed insured and all such statements made by the proposed insured in Part I or and in Part II of this application are full, complete, and true to the best knowledge and belief of the undersigned and have been correctly recorded . . .

I understand and agree that the Insurance applied for shall not take effect unless and until each of the following has occurred: the policy has been issued by the Company; the premium required for the issuance of the policy has been paid in full during the lifetime of the insured; all the representations made in the application remain true, complete and accurate as of the latest of such dates; and there has been no change in the health of any proposed insured that would change the answers to any of the questions in the application . . . .

20.    Lockwood signed Part I of the Phoenix Application as the producer of the Phoenix policies numbered 97303913, 97303935, and 97303936 (the "Phoenix Policies") for a total amount of $28,000,000.

21.    Above Lockwood's signature on Part I of the Phoenix Application, the Application states, in relevant part, that "The Producer hereby confirms he/she has truly and accurately recorded on the application the information supplied by the Proposed Insured; and that he/she is qualified and authorized to discuss the contract herein applied for."

22.    Given Section 3205 of the New York Insurance Law and New York's long-standing public policy against "wager" life insurance policies, Mr. Kramer, Lockwood, and the Trustee implicitly represented that (a) the Kramer August Trust would be the true owner and beneficiary of the requested Phoenix Policies (*i.e.*, not just a strawman), and (b) the Kramer August Trust and its intended beneficiary had an insurable interest in Mr. Kramer's life.

23.    While Phoenix was processing and underwriting Mr. Kramer's Phoenix Application, Lockwood informed Phoenix that Mr. Kramer would like a total of $28 million of life insurance, issued to the Kramer August Trust in three separate policies, based on the same Phoenix Application.

24.     In reliance upon the truth of the representations made in the Phoenix Application, Phoenix issued the Phoenix Policies.

25.     Phoenix delivered the Phoenix Policies to Lockwood in or about October 2005.

26.     On information and belief, the beneficial interest in the Kramer August Trust was transferred to Tall Tree on or about October 13, 2005.

27.     On October 21, 2005, Mr. Kramer signed three Policy Acceptance Forms acknowledging receipt of the Phoenix Policies.

28.     Above Mr. Kramer's signature on each Policy Acceptance Form, the Form stated, in relevant part, that "The insured(s) declares that the statements made in the application remain full, complete, and true as of this date . . . ."

29.     On information and belief, Berck was appointed the successor trustee of the Kramer August Trust on or about July 10, 2006.  On information and belief, Lockwood had a relationship with Berck that involved similar SOLI arrangements, and Berck's appointment as successor trustee allowed Lockwood to tightly control the Phoenix Policies.

30.     The application for the Phoenix Policies, the creation of the Kramer August Trust, and the transfer of the beneficial interest in the Kramer August Trust (and thus the beneficial proceeds of the Phoenix Policies), were all part of a single transaction, which had as its purpose the procurement of a policy of insurance on Mr. Kramer's life by a person having no insurable interest in his life.

31.     Indeed, while an insured may be permitted to apply for life insurance on his own initiative and for the benefit of a person with a valid insurable interest (*i.e.*, not for the benefit of a stranger) and then **after** the policy is issued**,** decide to transfer the beneficial interest in the policy, there is no chance that such a legitimate transfer occurred in this case.  That is, Plaintiff

cannot plausibly claim, and indeed does not claim, that Mr. Kramer just happened to decide – after the Phoenix Policies were issued – to transfer the beneficial interest in the Phoenix Policies to Tall Tree. *First*, the beneficial interest was transferred before Mr. Kramer even acknowledged receipt of the Phoenix Policies and before the first premium was paid. *Second*, with the assistance of Lockwood and within, at most, a six-month span, Mr. Kramer procured at least seven insurance policies from three different insurance companies, worth a total of $56 million. On information and belief, Mr. Kramer transferred the ultimate right to the proceeds of every single one of those policies on or about the time that they were issued.

32.     The identity of the parties, the clear characteristics of a SOLI scheme, the timing of the applications and transfers, and the sheer number and value of policies involved provide clear and convincing evidence of an intent to procure the Phoenix Policies for the benefit of a stranger-investor who had no valid insurable interest.

33.     Although Phoenix lacks information regarding the specific details of the transactions involving the Transamerica and Lincoln Life policies at issue in this lawsuit, on information and belief those policies were procured by virtually identical SOLI schemes involving Lockwood, LPS, an outside investor (either Tall Tree or Life Product), and Berck (as successor trustee to the relevant trusts).

34.     Therefore, the Phoenix Policies and the other policies were fraudulently procured in violation of Section 3205 of the New York Insurance Law.

## FIRST COUNTERCLAIM
### (Fraud)

35.     Phoenix repeats and re-alleges Paragraphs 1 - 65 of its Answer and 1 - 34 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

36.     On the Phoenix Application and by his reaffirmation thereof on October 21, 2005,

Mr. Kramer represented that the true owner and beneficiary of the Phoenix Policies was the Kramer August Trust and that the Kramer August Trust (and its true beneficiary) had a valid insurable interest in his life.

37.    These representations were incomplete and false when made, and Mr. Kramer knew they were incomplete and false when he made them.

38.    By making these misrepresentations Mr. Kramer intended to deceive Phoenix with respect to the identity of the true beneficiary of the Phoenix Policies and with respect to the true beneficiary's lack of an insurable interest in Mr. Kramer's life.

39.    Phoenix relied on Mr. Kramer's representations that the Kramer August Trust was the true owner and beneficiary of the Phoenix Policies and that the Kramer August Trust (and its true beneficiary) had a valid insurable interest in Mr. Kramer's life.

40.    As a result of Mr. Kramer's misrepresentation, Mr. Kramer knowingly induced Phoenix to issue life insurance policies that it would not have issued but for Mr. Kramer's misrepresentation.

41.    If Phoenix is required to pay any death benefits pursuant to the Phoenix Policies, Mr. Kramer – by his misrepresentation and his substantial participation in the fraudulent SOLI scheme described above – will have caused Phoenix to suffer damages in the amount of such payments.  He will also have caused Phoenix to suffer additional damages, including but not limited to commissions paid on the Phoenix Policies.  The Estate is liable for any damages caused by Mr. Kramer.

## SECOND COUNTERCLAIM
### (Aiding and/or Abetting Breach of Fiduciary Duty)

42.    Phoenix repeats and re-alleges Paragraphs 1 - 65 of its Answer and 1 - 41 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

43.     Mr. Kramer knew or should have known that Lockwood owed Phoenix a fiduciary duty.

44.     Mr. Kramer knew or should have known that such fiduciary duty included a duty of full disclosure with respect to the Phoenix Application and a duty not to procure SOLI policies which Lockwood knew or should have known Phoenix would decline to issue if Phoenix knew of the true nature of such policies.

45.     Mr. Kramer substantially participated in Lockwood's breach of fiduciary duty by (a) creating and/or acquiescing to the creation of the Kramer August Trust, (b) submitting and reaffirming the Phoenix Application, (c) misrepresenting the true beneficiary of the Phoenix Policies and the presence of a valid insurable interest in Mr. Kramer's life, and (d) immediately transferring the beneficial interest in the Kramer August Trust (and thus the Phoenix Policies) to Lockwood's company, Tall Tree, after the Phoenix Policies were delivered.

46.     By substantially participating in the SOLI scheme, Mr. Kramer knew or should have known that he and Lockwood induced Phoenix to issue life insurance policies that it would not have issued but for Mr. Kramer's participation in the SOLI scheme.  Thus, Mr. Kramer knew or should have known that he was aiding and abetting Lockwood's breach of fiduciary duty.

47.     If Phoenix is required to pay any death benefits pursuant to the Phoenix Policies, Mr. Kramer – by his substantial participation in the fraudulent SOLI scheme – will have caused Phoenix to suffer damages in the amount of such payments.  He will also have caused Phoenix to suffer additional damages, including but not limited to commissions paid on the Phoenix Policies.  The Estate is liable for any damages caused by Mr. Kramer.

## THIRD COUNTERCLAIM
### (Unjust Enrichment)

48.     Phoenix repeats and re-alleges Paragraphs 1 - 65 of its Answer and 1 - 47 of its

Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

49.    As set forth above and below, on information and belief, Mr. Kramer and/or other beneficiaries of his estate knowingly received substantial payments in exchange for their transfer of the beneficial interests in the Phoenix Policies that Mr. Kramer procured without a valid insurable interest.

50.    In the event that the Court rules that Plaintiff is entitled to the proceeds of the Phoenix policies, then the Estate will have been rewarded financially not only by benefiting from insurance policies that were procured without a valid insurable interest, but from the payments received by Mr. Kramer and/or other beneficiaries of his estate from the transfer of the beneficial interests in the Phoenix Policies.

51.    The circumstances as described herein are such that it would be inequitable, if the Estate receives the proceeds of the Phoenix Policies, for the Estate to also retain any payments that Mr. Kramer (or other beneficiaries) received for the transfer of the beneficial interests in the policies.

52.    In the event that the Estate receives the proceeds of the Phoenix Policies, then Phoenix is entitled to the full amount of the Estate's ill-gotten gains, including interest, resulting from Mr. Kramer's unlawful, unjust and inequitable conduct in connection with the Phoenix Policies, including but not limited to the payments received in exchange for transfer of the beneficial interests in the Phoenix Policies that he never intended to retain.  The Estate is liable for any damages caused by Mr. Kramer.

## CROSS-CLAIMS

### FIRST CROSS-CLAIM
**(Lockwood Pension Services, Inc. and Tall Tree Advisors, Inc. –
Aiding and/or Abetting Fraud)**

53.     Phoenix repeats and re-alleges Paragraphs 1 - 65 of its Answer and 1 - 52 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

54.     On information and belief, Lockwood acted not just on behalf of himself, but also on behalf of and/or in concert with his company LPS, through which he marketed his services to Mr. Kramer, and Tall Tree, in proposing the SOLI scheme to Mr. Kramer, facilitating the creation of trust and/or related documents, signing the Phoenix Application, and purchasing the beneficial interest in the Kramer August Trust.

55.     LPS and Tall Tree knew that Mr. Kramer and LPS had duties to make truthful and accurate representations on the Phoenix Application.

56.     LPS and Tall Tree knew that Lockwood had a duty of full disclosure with respect to the Phoenix Application and more generally, the procurement of the Phoenix Policies.

57.     LPS and Tall Tree knew that the SOLI arrangement was designed to circumvent New York's insurable interest rule.

58.     LPS and Tall Tree knew that Phoenix, in issuing any policies pursuant to the Phoenix Application, would rely on the representations contained in the Phoenix Application and on the presence of a valid insurable interest.

59.     LPS and Tall Tree knew that the lack of a valid insurable interest was not disclosed on the Phoenix Application.

60.     On information and belief, LPS and Tall Tree substantially participated in the above-described fraudulent SOLI arrangement as described above and below.

61.     On information and belief, Lockwood and Kramer relied on LPS's and Tall Tree's roles in the SOLI scheme.

62.     On information and belief, Tall Tree and LPS had arranged to make payment to Arthur and/or Liza Kramer immediately after the issuance of the Phoenix Policies.  On information and belief, Tall Tree and LPS understood at the time the Phoenix Application was submitted that Arthur Kramer and/or Liza Kramer intended to transfer the beneficial interest in the Kramer August Trust to Tall Tree in exchange for a payment, and, at the time the Phoenix Application was submitted, Tall Tree and LPS intended to make such payment after the issuance of the Phoenix Policies.

63.     On information and belief, Tall Tree and LPS paid Arthur Kramer and/or Liza Kramer to transfer the beneficial interest in the Kramer August Trust shortly after the Phoenix Policies were issued.

64.     Tall Tree and LPS knowingly participated in a fraudulent SOLI scheme to induce Phoenix to issue life insurance policies that it would not have issued but for LPS's and Tall Tree's substantial participation in the SOLI scheme.

65.     If Phoenix is required to pay any death benefits pursuant to the Phoenix Policies, Tall Tree and LPS – by their substantial participation in the fraudulent SOLI scheme – will have caused Phoenix to suffer damages in the amount of such payments.  They will also have caused Phoenix to suffer additional damages, including but not limited to commissions paid on the Phoenix Policies.

### SECOND CROSS-CLAIM
**(Lockwood Pension Services, Inc. and Tall Tree Advisors, Inc. –
Aiding and/or Abetting Breach of Fiduciary Duty)**

66.     Phoenix repeats and re-alleges Paragraphs 1 - 65 of its Answer and 1 - 65 of its

Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

67.    LPS and Tall Tree knew that Lockwood owed Phoenix a fiduciary duty.

68.    LPS and Tall Tree knew that such fiduciary duty included a duty of full disclosure with respect to the Phoenix Application and a duty not to procure SOLI policies which Lockwood knew Phoenix would decline to issue if it knew of the true nature of such policies.

69.    LPS and Tall Tree substantially participated in Lockwood's breach of fiduciary duty by among other things, (a) inducing Mr. Kramer to apply for life insurance policies for the benefit of a person or persons without an insurable interest in Mr. Kramer's life, (b) facilitating the creation of trust and/or related documents, and (c) arranging for the transfer of the beneficial interest in the Kramer August Trust (and thus the Phoenix Policies) to Tall Tree immediately after the Phoenix Policies were delivered.

70.    By participating in the SOLI scheme, LPS and Tall Tree knowingly induced Phoenix to issue life insurance policies that it would not have issued but for Mr. Kramer's participation in the SOLI scheme.  Thus, Tall Tree and LPS knowingly aided and abetted Lockwood's breach of fiduciary duty.

71.    If Phoenix is required to pay any death benefits pursuant to the Phoenix Policies, LPS and Tall Tree – by their substantial participation in the fraudulent SOLI scheme – will have caused Phoenix to suffer damages in the amount of such payments.  They will also have caused Phoenix to suffer additional damages, including but not limited to commissions paid on the Phoenix Policies.

### FIRST THIRD-PARTY CLAIM
**(Steven Lockwood – Fraud)**

72.    Phoenix repeats and re-alleges Paragraphs 1- 65 of its Answer and 1 - 71 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

73.    On information and belief, Lockwood had knowledge of and personally participated in and/or directed the fraudulent SOLI scheme by, among other things, (a) proposing the SOLI scheme to Mr. Kramer, (b) failing to disclose information that he knew Phoenix would deem relevant to its decision to issue the Phoenix Policies (and in fact would have caused it to decline to issue them), including but not limited to Kramer's intention to transfer the beneficial interests in the Phoenix Policies to strangers, (c) facilitating the creation of trust and/or related documents, (d) signing the Phoenix Application, and (e) purchasing (through Tall Tree) the beneficial interest in the Kramer August Trust. In signing the Phoenix Application, Lockwood represented that the true owner and beneficiary of the Phoenix Policies was the Kramer August Trust and that the Kramer August Trust had a valid insurable interest – representations that Lockwood knew to be incomplete and false when made.

74.    By making these misrepresentations and perpetrating this fraudulent scheme, Lockwood intended to, and did in fact, deceive Phoenix with respect to the true beneficiary of the Phoenix Policies and with respect to the true beneficiary's lack of an insurable interest in Mr. Kramer's life.

75.    As a result of Lockwood's fraud, Lockwood knowingly induced Phoenix to issue life insurance policies that it would not have issued but for Lockwood's misrepresentation.

76.    If Phoenix is required to pay any death benefits pursuant to the Phoenix Policies, Lockwood will have caused Phoenix to suffer damages in the amount of such payments. He will also have caused Phoenix to suffer additional damages, including but not limited to commissions paid on the Phoenix Policies.

## SECOND THIRD-PARTY CLAIM
### (Steven Lockwood – Breach of Fiduciary Duty)

77.    Phoenix repeats and re-alleges its responses to Paragraphs 1 - 65 of its Answer

-22-

and 1 - 76 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

78.     As producer of the Phoenix Policies, Lockwood owed a fiduciary duty to Phoenix. Such duty included a duty of full disclosure with respect to the Phoenix Application, including but not limited to: (a) the duty to make full disclosure of the nature of the risk undertaken; (b) the duty to make full disclosure of any and all information that would enable Phoenix to determine if the insurance should issue; (c) to make recommendations upon reasonable grounds that the solicited insurance is suitable and consistent with the applicant's insurable needs and financial objectives; and (d) not to procure SOLI policies which Lockwood knew Phoenix would decline to issue if Phoenix knew of the true nature of such policies.

79.     Lockwood breached that fiduciary duty by, among other things, (a) inducing Mr. Kramer to apply for life insurance policies for the benefit of a person or persons without an insurable interest in Mr. Kramer's life, (b) facilitating the creation of trust and/or related documents to hide the transfer of the beneficial interest in the Phoenix Policies from Phoenix, (c) failing to disclose to Phoenix information he knew Phoenix would deem relevant to determining whether the insurance would issue, including but not limited to the failure to disclose the lack of an insurable interest on Mr. Kramer's life, and (d) arranging for the immediate transfer of the beneficial interest in the Kramer August Trust (and thus the Phoenix Policies) to his affiliate company, Tall Tree.

80.     Lockwood thereby caused Phoenix to issue the Phoenix Policies, which it would not have issued but for Lockwood's breach of its fiduciary duty.

81.     If Phoenix is required to pay any death benefits pursuant to the Phoenix Policies, Lockwood will have caused Phoenix to suffer damages in the amount of such payments.  He will

also have caused Phoenix to suffer additional damages, including but not limited to commissions paid on the Phoenix Policies that must be disgorged.

## THIRD THIRD-PARTY CLAIM
### (Steven Lockwood -- Breach of Contract)

82.    Phoenix repeats and re-alleges Paragraphs 1 - 65 of its Answer and 1 - 81 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

83.    Under Section 1(d) of the "Basic Contract Provisions" section of the IPC, Lockwood agreed that the contract and his conduct is subject to "applicable federal or state laws, statutes and regulations or directives issued by any regulatory entity having jurisdiction over the matters covered in this contract . . . ."

84.    Under Section 10 of the "Basic Contract Provisions" section of the IPC, Lockwood agreed that all "[a]ll rights, powers, and remedies provided herein may be exercised only to the extent that the exercise thereof does not violate any applicable provision of law . . . ."

85.    Section 11 of the "Basic Contract Provisions" section of the IPC, Lockwood "acknowledge[d] that [Phoenix] relies upon [him] for a careful and frank presentation of the facts necessary for the proper underwriting and acceptance of the requested insurance coverages," agreed to "give complete and accurate answers in the application and associated forms," and agreed to "promptly transmit to [Phoenix] any and all information that will enable [Phoenix] to determine if the insurance applied for should be issued by [Phoenix] and upon what terms and rates."

86.    Under Section 1 of the "Compliance and Sales Practices Provisions" section of the IPC, Lockwood agreed that he would "make recommendations based upon reasonable grounds that the products being solicited are suitable and consistent with the applicants' insurable needs and financial objectives."

87.     On or about January 2, 2007, Lockwood executed a Broker Agreement between, among others, Phoenix and him (the "2007 Broker Agreement").  The 2007 Broker Agreement contains provisions that similarly obligate Lockwood to conduct himself in accordance with applicable laws and regulations and to make full and accurate disclosures to Phoenix with respect to prospective insureds.

88.     Lockwood breached the above-referenced provisions of the IPC by, among other things, (a) inducing Mr. Kramer to apply for life insurance policies for the benefit of a person or persons without an insurable interest in Mr. Kramer's life, (b) facilitating the creation of trust and/or related documents to hide the transfer of the beneficial interest in the Phoenix Policies from Phoenix, (c) failing to disclose to Phoenix information he knew Phoenix would deem relevant to determining whether the insurance would issue, including but not limited to the failure to disclose the lack of an insurable interest on Mr. Kramer's life, and (d) arranging for the immediate transfer of the beneficial interest in the Kramer August Trust (and thus the Phoenix Policies) to LPS's affiliate, Tall Tree.

89.     If Phoenix is required to pay any death benefits pursuant to the Phoenix Policies, Lockwood will have caused Phoenix to suffer damages in the amount of such payments.  He will also have caused Phoenix to suffer additional damages, including but not limited to commissions paid on the Phoenix Policies that must be disgorged.

### FOURTH THIRD-PARTY CLAIM
#### (Steven Lockwood – Negligence)

90.     Phoenix repeats and re-alleges Paragraphs 1 - 65 of its Answer and 1 - 89 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

91.     As producer of the Phoenix Policies, Lockwood owed a common law duty of care to Phoenix that required it to provide full disclosure with respect to the Phoenix Application,

including all facts relevant to the risk insured.

92.    Lockwood breached that duty by, among other things, failing to disclose to Phoenix (a) the lack of an insurable interest on Mr. Kramer's life, (b) facts from which Phoenix could determine that lack of insurable interest, (c) facts from which Phoenix could ascertain the true nature of the risk that it undertook in issuing the Phoenix Policies, and (d) that the Phoenix Application was submitted as part of a SOLI arrangement.

93.    If Phoenix is required to pay any death benefits pursuant to the Phoenix Policies, then Lockwood – by the above-referenced conduct – will have caused Phoenix to suffer damages in the amount of such payments.  He will also have caused Phoenix to suffer additional damages, including but not limited to commissions paid on the Phoenix Policies that must be disgorged.

## FIFTH THIRD-PARTY CLAIM
### (Steven Lockwood – Contractual Indemnification)

94.    Phoenix repeats and re-alleges Paragraphs 1 - 65 of its Answer and 1 - 93 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

95.    Under Section 5 of the "Basic Contract Provisions" section of the IPC, Lockwood agreed "to indemnify [Phoenix] for any liabilities, losses, costs or expenses incurred or moneys paid by [Phoenix] to any person as the result of the misrepresentations, negligence or unauthorized acts by [him], [his] employees, or Sub-producers associated with [him]."

96.    Section 8.1 of the 2007 Broker Agreement that Lockwood executed provides that Lockwood "hold harmless, defend, exonerate and indemnify" Phoenix for any and all "losses, claims, judgments, fines, penalties, damages, or liabilities" that Phoenix suffers as a result of Lockwood's actions, or resulting from the breach of any representation contained in the Broker Agreement.

97.    Phoenix would not have issued the Phoenix Policies but for the above-described

fraudulent, negligent, and/or unauthorized conduct by Lockwood and those under his employ/associated with him.

98.     If Phoenix is obliged to pay death benefits pursuant to the Phoenix Policies, it is entitled to indemnification from Lockwood in the amount of such payments.  Lockwood will also have caused Phoenix to suffer additional damages, including but not limited to (a) commissions paid on the Phoenix Policies that must be disgorged and (b) attorneys fees incurred in defending against this litigation and prosecuting these cross-claims and counterclaims (and which would not have incurred but for Lockwood's conduct) that he must reimburse.

### SIXTH THIRD-PARTY CLAIM
**(Steven Lockwood – Unjust Enrichment)**

99.     Phoenix repeats and re-alleges Paragraphs 1 - 65 of its Answer and 1 - 98 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

100.     As alleged herein, Lockwood knowingly solicited and procured the Phoenix Policies, in violation of federal and state law and public policy, for the benefit of an investor who had no insurable interest in the life of Mr. Kramer.

101.     On information and belief, Lockwood has received benefits from his wrongful actions described herein, including but not limited to commissions that he received from Phoenix for procuring the Phoenix Policies.

102.     Lockwood has knowledge of these benefits, and has voluntarily accepted and retained these benefits.

103.     The circumstances as described herein are such that it would be inequitable for Lockwood to retain these ill-gotten benefits without disgorging the value thereof to Phoenix.

104.     As a direct and proximate result of Lockwood's wrongful actions, Phoenix has suffered damages in issuing the Phoenix Policies and paying the associated commissions, and

will suffer further damages if it is obliged to pay death benefits.  Thus, Phoenix is entitled to the full amount of Lockwood's ill-gotten gains, including interest, resulting from his unlawful, unjust and inequitable conduct in connection with the Phoenix Policies.

### SEVENTH THIRD-PARTY CLAIM
**(Steven Lockwood – Civil RICO Violation - 18 U.S.C. § 1962(c))**

105.    Phoenix repeats and re-alleges Paragraphs 1 - 65 of its Answer and 1 - 104 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

### The Violations

106.    18 U.S.C. § 1962(c) provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

107.    Lockwood violated § 1962(c) by conducting the affairs of LPS and Tall Tree through a pattern of racketeering activity, including but not limited to numerous instances of mail and wire fraud in furtherance of the fraudulent SOLI scheme described herein, as well as other virtually identical SOLI schemes involving other insureds and insurers.

### The Enterprises

108.    LPS is a corporation and thus qualifies as an enterprise for purposes of RICO.

109.    Tall Tree is a corporation and qualifies as an enterprise for purposes of RICO.

110.    LPS affects interstate commerce in that it procures life insurance policies for clients with residences in various states from insurers residing in various states.

111.    Tall Tree affects interstate commerce in that (a) it purchases beneficial interests in life insurance trusts (and thus life insurance policies) from insureds and/or their relatives with residences in various states, and (b) it purchases the ultimate rights to death benefits pursuant to

policies that are issued by insurers residing in various states.

### Lockwood & His Role in the Enterprises

112.    On information and belief, Lockwood is the owner and chief executive officer of both LPS and Tall Tree, and Lockwood participated in the operation or management of these enterprises by, among other things, his specific activities as alleged herein.

### The Pattern

113.    On information and belief, Lockwood has used LPS and Tall Tree to engage in a pattern of racketeering that includes numerous criminal acts of mail fraud over the past three years.

A.    <u>The Kramer-Phoenix SOLI Scheme</u>

114.    On information and belief, Lockwood devised a scheme to submit a fraudulent life insurance application on behalf of Mr. Kramer and the Kramer August Trust to Phoenix, and thereby to procure a SOLI policy, as alleged herein.

115.    Phoenix relied on that fraudulent application, and the misrepresentations contained therein, in issuing the Phoenix Policies.

116.    Phoenix was injured by virtue of issuing the Kramer Policies.

117.    Lockwood used the mails and wires on numerous occasions in furtherance of his fraudulent SOLI scheme.  Such uses include but are not limited to the following:

    a.    Lori Callegari, an employee of LPS, mailed the Policy Acceptance Forms and first premiums payments for the Phoenix Policies to Phoenix on or about October 21, 2005;

    b.    Lori Callegari mailed the second quarterly premiums payments for the Phoenix Policies to Phoenix on or about October 24, 2005;

    c.    Lucy Montemarano, the Office Manager of M&M, mailed quarterly premiums payments for the Phoenix Policies to Phoenix on or about January 4, 2006;

d.    Lockwood mailed a letter to Phoenix on or about June 22, 2007, using LPS letterhead, advising Phoenix that Berck had been appointed as Successor Trustee;

e.    LPS made several telephone calls to Phoenix to request life insurance illustrations that would allow the financers of the SOLI scheme to pay minimum premiums in the years that they would hold the rights to the Phoenix Policies, including calls from "Dave" on or about August 4, 2006 (requesting an illustration showing a minimum premium in year 2, then level premiums through age 100 with an ending cash value of $1,000), June 1, 2007 (requesting an illustration showing minimum level premiums in policy years 3-5 with level premiums until age 100 with an ending cash value of $1,000) June 13, 2007 (requesting an illustration showing level premiums to age 100), June 28, 2007 (minimum annual premiums in policy years 3-5 with level premiums thereafter), and July 6, 2007 (requesting an illustration with specified premiums in years 3-5 and level premiums thereafter with $1,000 cash value at age 100).

118.    On information and belief, Lockwood caused all of the above uses of the mails or wires, either by personal direction or authorization or by virtue of the fact that such uses were reasonably foreseeable or likely to follow in the regular course of the Kramer-Phoenix SOLI scheme.

119.    On information and belief, by his SOLI scheme and by the above uses of the mails and wires, Lockwood intended to deprive Phoenix of property by causing it to issue the Phoenix Policies without an insurable interest that it would not have issued but for the fraudulent SOLI scheme, and eventually to pay out death benefits pursuant to such policies.

120.    The intent of Lockwood to defraud Phoenix is further confirmed by his participation in virtually identical SOLI schemes targeting Transamerica and Lincoln Life.

121.    On information and belief, Lockwood and LPS submitted a fraudulent life insurance application on behalf of Mr. Kramer to Lincoln Life through the mail. On information and belief, when they mailed that application, Lockwood and LPS had a specific intent to defraud Lincoln Life with essentially the same SOLI scheme that they employed to perpetrate

-30-

their fraud against Phoenix.

122.    On information and belief, Lockwood and LPS submitted a fraudulent life insurance application on behalf of Mr. Kramer to Transamerica through the mail.    On information and belief, when they mailed that application, Lockwood, LPS, and Tall Tree had a specific intent to defraud Transamerica with essentially the same SOLI scheme that they employed to perpetrate their fraud against Phoenix.

123.    These related SOLI schemes reveal a continued threat of criminal activity by Lockwood.

    B.    The Levinson-Phoenix SOLI Scheme

124.    In November 2005, Lockwood and LPS submitted a life insurance application to Phoenix on behalf of Irwin Levinson and the Irwin Levinson Insurance Trust II (the "Levinson Trust").    In the application, Mr. Levinson, the Levinson Trust, and Lockwood represented that the Policy applied for would be owned by the Levinson Trust, which was also to be the designated primary beneficiary of any policy issued.

125.    Lockwood signed the application as the producer of the Policy.

126.    Above Lockwood's signature, the application stated, in relevant part, that "The Producer hereby confirms he/she has truly and accurately recorded on the application the information supplied by the Proposed Insured; and that he/she is qualified and authorized to discuss the contract herein applied for."

127.    Given Section 3205 of the New York Insurance Law and New York's long-standing public policy against "wager" life insurance policies, as well as Lockwood's contractual, fiduciary, and common law duties to Phoenix, Lockwood implicitly represented that (a) the Levinson Trust would be the true owner and beneficiary of the requested Phoenix Policies

(*i.e.*, not just a strawman), and (b) the Levinson Trust and its intended beneficiary had an insurable interest in Mr. Levinson's life

128.    In reliance upon the truth of the representations made in the application, Phoenix issued the Policy (No. 97304016) with a Policy Date of November 27, 2008, a basic policy amount of $5,000,000, and a planned annual premium of $270,000.

129.    The application was attached to the Policy as issued.

130.    The Levinson Trust was created on or about November 4, 2005 – just before Mr. Levinson's application was submitted to Phoenix. Lockwood provided a draft trust agreement to Mr. Levinson (apparently using a form Lockwood had used previously) to establish the Levinson Trust.

131.    The initial beneficiary of the Levinson Trust was Dede Levinson, Mr. Levinson's wife.

132.    On information and belief, in procuring the Policy, Mr. Levinson did not intend to provide his wife with financial security from the death benefit of the Policy.

133.    On information and belief, there was no estate tax advantage that derived from the creation of the Levinson Trust and the purpose of the Levinson Trust was not to minimize Mr. or Mrs. Levinson's estate taxes.

134.    On information and belief, the only advantage and purpose of the Levinson Trust was to effectuate a transfer of the right to the death proceeds payable under the Policy to an outside investor, and thus the formation of the Levinson Trust in connection with Mr. Levinson's application reveals an intent to effect such a transfer at the time the application was submitted.

135.    On information and belief, Berck was named the successor Trustee of the Levinson Trust on or about July 10, 2006.  Lockwood was a witness to the Levinson Trustee succession agreement.

136.    In the course of Phoenix's investigation of this SOLI scheme, Lockwood informed Phoenix in a February 7, 2008 letter that he was "aware" that "within a few weeks after the policy was issued" Mr. Levinson was contacted by an investment group "inquiring whether the family would be interested in selling its rights in the policy," and that the "transaction did take place between the relevant parties."

137.    Phoenix's inquiries into the details and circumstances surrounding Mr. Levinson's application and the transfer of the beneficial interest in the Policy have been stymied.  On two separate occasions – on or about September 5, 2007, and on or about February 15, 2008 – an insurance investigator met with Mrs. Levinson to obtain information relevant to the processing of the claim.  Such interviews are standard procedure with respect to claims made during the contestability period of a policy.

138.    On both occasions, Lockwood and someone identified as a "family friend" were present and interfered with the interviews, interrupting both the investigator and Mrs. Levinson when they were speaking and directing Mrs. Levinson not to answer certain questions.

139.    In response to questions concerning the Policy, the Levinson Trust and the transfer of beneficial interest, Mrs. Levinson claimed near-total ignorance and said she was unaware the Policy and the Levinson Trust even existed until after her husband's death.  Mrs. Levinson said she had not seen any documentation relating to the Policy, the Levinson Trust or the transfer of beneficial interest and did not know where any such documentation may be located.

140.    In response to questions directed to Lockwood concerning the Levinson Trust and the alleged SOLI arrangement, Lockwood claimed he had heard Mr. Levinson was contacted by an outside investor or group of investors shortly after the Policy was issued and that Mr. Levinson had sold the beneficial interest in the Levinson Trust to the outside investor. Lockwood claimed near-total ignorance regarding the details of that transaction. He stated he does not know who the investors are, how to contact them, who put them in touch with Mr. Levinson, or how much they paid Mr. Levinson.

141.    On information and belief, the creation of the Levinson Trust, the Levinson application for the policy, and the assignment of the beneficial interest in the Levinson Trust (and thus the ultimate right to the death benefits payable under the Policy) were all part of a single transaction, which had as its purpose the procurement of an insurance policy on Mr. Levinson's life for the benefit of a person having no insurable interest on his life. On information and belief, Lockwood and LPS devised this fraudulent SOLI scheme, advised Mr. Levinson with respect to the transaction, induced Mr. Levinson to participate in the scheme, and facilitated the transfer of the rights to the death benefits to an outside investor.

142.    Phoenix was injured by virtue of issuing the Levinson policy.

143.    Lockwood used the mails and wires on numerous occasions in furtherance of the fraudulent SOLI scheme. Such uses include but are not limited to the following:

   a.    Lockwood faxed a letter to Dr. James N. Harris, MD, on a LPS fax cover sheet, requesting Mr. Levinson's medical history to facilitate his life insurance applications and forwarding an authorization form with respect to same, on or about March 22, 2005;

   b.    Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson regarding Mr. Levinson's net worth and medical records, and the status of his application for life insurance, on or about April 5, 2005;

   c.    Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson regarding the status of Mr. Levinson's application for life insurance,

on or about August 15, 2005;

d.    Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson regarding putting Mr. Levinson in contact with companies who specialize in the sale/purchase of life insurance policies, on or about September 27, 2005;

e.    Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson regarding the Levinson Trust, forwarding a sample life insurance trust agreement, offering to recommend a trustee, and recommending that Mr. Levinson's application be submitted to Phoenix, on or about October 24, 2005;

f.    Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson forwarding the Phoenix policy on or about December 1, 2005;

g.    Lori Callegari, an employee of LPS, mailed the policy acceptance form and first premium payment to Phoenix on or about December 8, 2005;

h.    Lori Callegari mailed additional premium payments to Phoenix on or about February 1, 2006;

i.    Lockwood mailed a premium payment from Berck to Phoenix on or about December 4, 2006;

j.    Lockwood mailed a letter to Phoenix, using LPS letterhead, advising Phoenix that Berck had been appointed as Successor Trustee, on or about August 3, 2007; and

k.    Berck mailed a letter to Phoenix making a claim on behalf of the Levinson Trust for death benefits, on or about August 20, 2007.

144.    On information and belief, Lockwood caused all of the above uses of the mails or wires, either by personal direction or authorization or by virtue of the fact that such uses were reasonably foreseeable or likely to follow in the regular course of the Kramer-Phoenix SOLI scheme.

145.    On information and belief, by his SOLI scheme and by the above uses of the mails and wires, Lockwood intended to deprive Phoenix of property by causing it to issue a policy that it would not have issued but for the fraudulent SOLI scheme, and eventually to pay out death benefits pursuant to the policy.

146.    The intent of Lockwood to defraud Phoenix is further confirmed by his participation in virtually identical SOLI schemes as alleged herein.

147.    These virtually identical SOLI schemes also reveal a continued threat of criminal activity by Lockwood.

C.    The Lobel-Lincoln Life SOLI Scheme

148.    On or about January 22, 2007, Life Product filed suit in the United States District Court for the Southern District of New York, seeking a declaration that it was entitled to the proceeds of a $10 million life insurance policy (the "Lobel Policy") issued by Lincoln Life & Annuity Company of New York upon the life of Leon Lobel – a retired butcher who was seventy-seven years old when he applied for the policy.  The case is entitled *Life Product Clearing LLC v. Linda Angel*, 07-CV-0475 (DC) (the "Angel lawsuit").

149.    On or about March 12, 2007, Linda Angel, Lobel's daughter and the personal representative of Lobel's estate, filed her answer and counterclaims against Life Product.  On or about March 13, 2007, Angel filed a third-party complaint against Leon Lobel Insurance Trust (the "Lobel Trust") and Jonathan S. Berck, as Trustee, seeking a declaration that the Lobel Trust is void and that Lobel's estate is entitled to recover the death benefits paid under the Lobel Policy.

150.    Angel alleges that the Lobel Trust was established as part of a SOLI scheme to procure an insurance policy on the life of her father for the benefit of Life Product – an outside investor who lacked an insurable interest in Mr. Lobel's life.

151.    Angel alleges that Mr. Lobel established the Lobel Trust at about the same time he submitted his application to Lincoln Life, and that the Lobel Trust was formed to own the policy and was designated as the sole beneficiary of Mr. Lobel's policy.

152.    Angel alleges that Lockwood facilitated the SOLI transaction by helping Mr. Lobel establish the Lobel Trust and that Lockwood acted as an intermediary between Mr. Lobel and the outside investor.

153.    Angel alleges that, six days after the policy was issued, Mr. Lobel sold his interest in the Lobel Trust – and thus the right to any insurance proceeds upon his death – to Life Product.

154.    Angel alleges that Mr. Lobel never paid any premiums and received a cash payment of $300,000 for transferring the beneficial interest in the Lobel Trust to Life Product.

155.    Angel alleges that, after the right to the benefits payable under Mr. Lobel's policy was transferred, Berck became the successor trustee of the Lobel Trust.

156.    In a recent decision in the *Angel* lawsuit, the United States District Court for the Southern District of New York denied Life Product's motion for judgment on the pleadings and concluded as follows:  "These factual allegations, taken together, surely make a plausible claim that Lobel intended to transfer the Policy to LPC prior to procuring it.  Such a scheme surely could amount to an impermissible attempt to circumvent the prohibition on wager policies."  530 F. Supp. 2d 646, 655-56 (S.D.N.Y. 2008).

157.    On information and belief, Lockwood devised a scheme to submit a fraudulent life insurance application on behalf of Mr. Lobel and the Lobel Trust to Lincoln Life, and thereby to procure a SOLI policy.

158.    On information and belief, Lincoln Life relied on that fraudulent application, and the misrepresentations contained therein, in issuing the Lobel policy.

159.    Lincoln Life was injured by virtue of issuing the Lobel policy and by its subsequent payment of death benefits.

160.    On information and belief, Lockwood used the mails and wires on numerous occasions in furtherance of his fraudulent SOLI scheme. Such uses include but are not limited to the following:

    a.    Lockwood mailed a letter dated December 16, 2005, to Lobel forwarding the Lincoln Life policy, advising him of an investor willing to purchase the beneficial interest in the Lobel Trust, and enclosing a Beneficial Interest Transfer Agreement; and

    b.    Lockwood mailed a letter dated January 3, 2006, to Lobel forwarding a check for $300,000 from Life Product in exchange for a 100% ownership interest in the Lobel Trust.

161.    On information and belief, Lockwood caused, by personal action, direction, or authorization, all of the above uses of the mails.

162.    On information and belief, by his SOLI scheme and by the above uses of the mails, Lockwood intended to deprive Lincoln Life of property by causing it to issue a policy that it would not have issued but for the fraudulent SOLI scheme, and ultimately to pay out death benefits pursuant to the policy.

163.    The intent of Lockwood to defraud Lincoln Life is further confirmed by his participation in virtually identical SOLI schemes as alleged herein.

164.    These virtually identical SOLI schemes also reveal a continued threat of criminal activity by Lockwood.

**The Injury**

165.    If Phoenix is required to pay any death benefits pursuant to the Phoenix Policies, Lockwood – by means of his fraudulent SOLI scheme and as a direct result of his fraudulent mailing of the Phoenix Application– will have caused Phoenix to suffer damages in the amount of such payments.

## COMBINED CROSS-CLAIM AND THIRD-PARTY CLAIM
**(Steven Lockwood, LPS, and Tall Tree – Civil RICO Violation - 18 U.S.C. § 1962(c))**

166.    Phoenix repeats and re-alleges Paragraphs 1 - 65 of its Answer and 1 - 165 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

### The Violations

167.    On information and belief, Lockwood, LPS, and Tall Tree violated § 1962(c) by conducting the affairs of, or by participating in the conduct of the affairs of, an "association in fact" – consisting of Lockwood, LPS, Tall Tree, and Life Product, and Berck (the "SOLI Enterprise") – through a pattern of racketeering activity, including but not limited to numerous instances of mail and wire fraud in furtherance of the fraudulent SOLI scheme described herein, as well as other virtually identical SOLI schemes involving other insureds and insurers.

### The Enterprise

168.    On information and belief, Lockwood, LPS, Tall Tree, Life Product, and Berck share a common purpose of procuring SOLI policies, hiding the nature of those policies from the life insurers who issued them for the duration of the contestability period, and then profiting from those policies by either claiming and collecting the proceeds of such policies or eventually selling such policies to other outside investors.

169.    On information and belief, Lockwood, LPS, Tall Tree, Life Product, and Berck have engaged in and are engaged in a course of conduct such that they function as a continuing unit with an ongoing organization.  In the course of its regular operation, the SOLI Enterprise must identify potential insureds, market the SOLI scheme to those potential insureds, establish a trust on behalf of the potential insured, appoint a trustee, procure policies, pay the insureds to transfer the beneficial interest in the trust, finance and regularly pay the premiums, correspond with and submit forms to insurers, and either sell the policies to other outside investors or, if the

SOLI Enterprise retains the rights to the proceeds of the policies, file, administer, and facilitate claims for death benefits  That is, the regular functions of the SOLI Enterprise include, among other things, financing, marketing, administration, and sales.

### The Participants & Their Roles in the Enterprise

170.    On information and belief, Lockwood participated in the operation or management of the SOLI Enterprise by his specific activities as alleged herein.  More generally, Lockwood identifies potential insureds, approaches and advises potential insureds on the benefits of the SOLI scheme (*i.e.*, markets the SOLI scheme), facilitates the creation of life insurance trusts, and advises insureds, trustees, beneficiaries, and claimants with respect to their communications with insurers both before and after the issuance of the policies.  On information and belief, Lockwood also sometimes purchases (through Tall Tree) the beneficial interest in the life insurance trusts and thus provides the financial incentive for insureds to participate in the SOLI scheme and the vehicle by which they do so.

171.    On information and belief, LPS participated in the operation or management of the SOLI Enterprise by its specific activities as alleged herein.  More generally, LPS approaches and advises potential insureds on the benefits of the SOLI scheme (*i.e.*, markets the SOLI scheme), facilitates the creation of life insurance trusts, and advises insureds, trustees, beneficiaries, and claimants with respect to their communications with insurers both before and after the issuance of the policies.

172.    On information and belief, Tall Tree participated in the operation or management of the SOLI Enterprise by its specific activities as alleged herein.  More generally, Tall Tree is a financer of SOLI transactions: it purchases the beneficial interest in the life insurance trusts and thus provides the financial incentive for insureds to participate in the SOLI scheme and the

vehicle by which they do so.

173.    On information and belief, Life Product participated in the operation or management of the SOLI Enterprise by its specific activities as alleged herein. More generally, Life Product is a financer of SOLI transactions: it purchases the beneficial interest in the life insurance trusts and thus provides the financial incentive for insureds to participate in the SOLI scheme and the vehicle by which they do so.

174.    On information and belief, Berck participated in the operation or management of the SOLI Enterprise by his specific activities as alleged herein. More generally, after the beneficial interests in the life insurance trusts have been transferred to investors such as Life Product and Tall Tree, Berck serves as the successor trustee of these trusts and thus acts in their interests and as their agent in paying premiums, filing and administering claims, collecting and distributing death benefits, and executing the sale of the policies to any other investors.

**The Pattern**

175.    Lockwood, LPS and Tall Tree have engaged in a pattern of racketeering by committing numerous criminal acts of mail/wire fraud over the past three years. These racketeering activities are connected to and designed to further the goals of the SOLI Enterprise.

A.    The Kramer-Phoenix SOLI Scheme

176.    On information and belief, Lockwood, LPS, and Tall Tree devised a scheme to submit a fraudulent life insurance application on behalf of Mr. Kramer and the Kramer August Trust to Phoenix, and thereby to procure a SOLI policy, as alleged herein.

177.    Phoenix relied on that fraudulent application, and the misrepresentations contained therein, in issuing the Phoenix Policies.

178.    Phoenix was injured by virtue of issuing the Kramer Policies.

179.    Lockwood, LPS, and Tall Tree used the mails and wires on numerous occasions in furtherance of their fraudulent SOLI scheme.  Such uses include but are not limited to the following:

a.    Lori Callegari, an employee of LPS, mailed the Policy Acceptance Forms and first premiums payments for the Phoenix Policies to Phoenix on or about October 21, 2005;

b.    Lori Callegari mailed the second quarterly premiums payments for the Phoenix Policies to Phoenix on or about October 24, 2005;

c.    Lucy Montemarano, the Office Manager of M&M, mailed quarterly premiums payments for the Phoenix Policies to Phoenix on or about January 4, 2006;

d.    Lockwood mailed a letter to Phoenix on or about June 22, 2007, using LPS letterhead, advising Phoenix that Berck had been appointed as Successor Trustee; and

e.    LPS made several telephone calls to Phoenix to request life insurance illustrations that would allow the financers of the SOLI scheme to pay minimum premiums in the years that they would hold the rights to the Phoenix Policies, including calls from "Dave" on or about August 4, 2006 (requesting an illustration showing a minimum premium in year 2, then level premiums through age 100 with an ending cash value of $1,000), June 1, 2007 (requesting an illustration showing minimum level premiums in policy years 3-5 with level premiums until age 100 with an ending cash value of $1,000) June 13, 2007 (requesting an illustration showing level premiums to age 100), June 28, 2007 (minimum annual premiums in policy years 3-5 with level premiums thereafter), and July 6, 2007 (requesting an illustration with specified premiums in years 3-5 and level premiums thereafter with $1,000 cash value at age 100.

180.    On information and belief, Lockwood, LPS, and Tall Tree each individually caused all of the above uses of the mails or wires, either by personal direction or authorization or by virtue of the fact that such uses were reasonably foreseeable or likely to follow from the regular operation of the SOLI Enterprise.

181.    On information and belief, Lockwood, LPS, and Tall Tree each individually intended by their participation in the SOLI Enterprise, the pattern of racketeering, and the above

instances of mail and wire frauds to deprive Phoenix of property by causing it to issue the Phoenix Policies that it would not have issued but for the fraudulent SOLI scheme, and eventually to pay out death benefits pursuant to such policies.

182.   The intent of Lockwood, LPS, and Tall Tree to defraud Phoenix is further confirmed by their participation in virtually identical SOLI schemes as alleged herein.

183.   These virtually identical SOLI schemes also reveal a continued threat of criminal activity by Lockwood, LPS, and Tall Tree in conducting the affairs of the SOLI Enterprise.

B.    The Levinson-Phoenix SOLI Scheme

184.   On information and belief, Lockwood and LPS devised a scheme to submit a fraudulent life insurance application to Phoenix on behalf of Mr. Levinson and the Levinson Trust, and thereby to procure a SOLI policy.

185.   Lockwood and LPS used the mails and wires on numerous occasions in furtherance of their fraudulent SOLI scheme with respect to the Levinson policy.  Such uses include but are not limited to the following:

   a.    Lockwood faxed a letter to Dr. James N. Harris, MD, on a LPS fax cover sheet, requesting Mr. Levinson's medical history to facilitate his life insurance applications and forwarding an authorization form with respect to same, on or about March 22, 2005;

   b.    Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson regarding Mr. Levinson's net worth and medical records, and the status of his application for life insurance, on or about April 5, 2005;

   c.    Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson regarding the status of Mr. Levinson's application for life insurance, on or about August 15, 2005;

   d.    Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson regarding putting Mr. Levinson in contact with companies who specialize in the sale/purchase of life insurance policies, on or about September 27, 2005;

   e.    Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson

regarding the Levinson Trust, forwarding a sample life insurance trust agreement, offering to recommend a trustee, and recommending that Mr. Levinson's application be submitted to Phoenix, on or about October 24, 2005;

    f.    Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson forwarding the Phoenix policy on or about December 1, 2005;

    g.    Lori Callegari, an employee of LPS, mailed the policy acceptance form and first premium payment to Phoenix on or about December 8, 2005;

    h.    Lori Callegari mailed additional premium payments to Phoenix on or about February 1, 2006;

    i.    Lockwood mailed a premium payment from Berck to Phoenix on or about December 4, 2006;

    j.    Lockwood mailed a letter to Phoenix, using LPS letterhead, advising Phoenix that Berck had been appointed as Successor Trustee, on or about August 3, 2007; and

    k.    Berck mailed a letter to Phoenix making a claim on behalf of the Levinson Trust for death benefits, on or about August 20, 2007.

186.    On information and belief, Lockwood and LPS each individually caused all of the above uses of the mails or wires, either by personal direction or authorization or by virtue of the fact that such uses were reasonably foreseeable or likely to follow from the regular operation of the SOLI Enterprise.

187.    On information and belief, Lockwood and LPS each individually intended by their participation in the SOLI Enterprise, the pattern of racketeering, and the above instances of mail and wire frauds to deprive Phoenix of property by causing it to issue a policy that it would not have issued but for the fraudulent SOLI scheme, and eventually to pay out death benefits pursuant to such policy.

188.    The intent of Lockwood and LPS to defraud Phoenix is further confirmed by their participation in virtually identical SOLI schemes as alleged herein.

189.    These virtually identical SOLI schemes also reveal a continued threat of criminal activity by Lockwood, LPS, and Tall Tree in conducting the affairs of the SOLI Enterprise.

C.    The Lobel-Lincoln Life SOLI Scheme

190.    On information and belief, Lockwood and LPS devised a scheme to submit a fraudulent life insurance application on behalf of Mr. Lobel and the Lobel Trust to Lincoln Life, and thereby to procure a SOLI policy.

191.    On information and belief, Lincoln Life relied on that fraudulent application, and the misrepresentations contained therein, in issuing the Lobel policy.

192.    Lincoln Life was injured by virtue of issuing the Lobel policy and by its subsequent payment of death benefits.

193.    Lockwood and LPS used the mails and wires on numerous occasions in furtherance of their fraudulent SOLI scheme.  Such uses include but are not limited to the following:

a.    Lockwood mailed a letter dated December 16, 2005, to Lobel forwarding the Lincoln Life policy, advising him of an investor willing to purchase the beneficial interest in the Lobel Trust, and enclosing a Beneficial Interest Transfer Agreement; and

b.    Lockwood mailed a letter dated January 3, 2006, to Lobel forwarding a check for $300,000 from Life Product in exchange for a 100% ownership interest in the Lobel Trust.

194.    On information and belief, Lockwood and LPS each individually caused all of the above uses of the mails, either by personal direction or authorization or by virtue of the fact that such uses were reasonably foreseeable or likely to follow from the regular operation of the SOLI Enterprise.

195.    On information and belief, Lockwood and LPS each individually intended by their participation in the SOLI Enterprise, the pattern of racketeering, and the above instances of

mail frauds to deprive Lincoln Life of property by causing it to issue a policy that it would not have issued but for the fraudulent SOLI scheme, and eventually to pay out death benefits pursuant to such policy.

196.    The intent of Lockwood and LPS to defraud Lincoln Life is further confirmed by their participation in virtually identical SOLI schemes as alleged herein.

197.    These virtually identical SOLI schemes also reveal a continued threat of criminal activity by Lockwood, LPS, and Tall Tree in conducting the affairs of the SOLI Enterprise.

198.    Indeed, upon information and belief, discovery in this action will yield evidence of additional fraudulent SOLI schemes in which Lockwood, LPS, Tall Tree and others engaged.

### The Injury

199.    If Phoenix is required to pay any death benefits pursuant to the Phoenix Policies, then Lockwood, LPS and Tall Tree – by means of their fraudulent SOLI scheme and as a direct result of their fraudulent mailing of the Phoenix Application– will have caused Phoenix to suffer damages in the amount of such payments.  They also have caused Phoenix to suffer additional damages, including but not limited to commissions paid on the Phoenix Policies that must be disgorged.

WHEREFORE, plaintiff Phoenix Life Insurance Company respectfully requests as follows:

(a)    an Order (i) rescinding the Phoenix Policies and declaring them null and void, either from their inception or as the result of a fraudulent scheme to issue the Phoenix Policies where there was no valid insurable interest, or, alternatively (ii) declaring that Phoenix has no obligation to pay any death benefits to Plaintiff in connection with the Phoenix Policies;

(b) an order awarding Phoenix damages against the Plaintiff in the amount of those death benefits, if any, that Phoenix is obligated to pay pursuant to the Phoenix Policies, plus any additional damages, including but not limited to commissions paid on the Phoenix Policies;

(c) an order awarding Phoenix damages against Lockwood Pension Services, Inc. in the amount of those death benefits, if any, that Phoenix is obligated to pay pursuant to the Phoenix Policies, plus any additional damages, including but not limited to commissions paid on the Phoenix Policies;

(d) an order awarding Phoenix damages against Tall Tree Advisors, Inc. in the amount of those death benefits, if any, that Phoenix is obligated to pay pursuant to the Phoenix Policies, plus any additional damages, including but not limited to commissions paid on the Phoenix Policies;

(e) an order awarding Phoenix damages against Steven Lockwood in the amount of those death benefits, if any, that Phoenix is obligated to pay pursuant to the Phoenix Policies, plus any additional damages, including but not limited to commissions paid on the Phoenix Policies and attorneys fees in connection with defense of this lawsuit and prosecution of counterclaims, cross-claims and third-party claims;

(f) as against any parties named in Phoenix's RICO claims, an order awarding Phoenix its treble damages, as well as costs and attorneys fees in connection with defense of this lawsuit and prosecution of counterclaims, cross-claims and third-party claims, pursuant to 18 U.S.C. § 1964(c); and

(g) an order awarding Phoenix its costs and disbursements incurred herein together with any such further relief as the Court may deem just and proper.

Dated: New York, New York
      April 9, 2008

Respectfully submitted,


**DORSEY & WHITNEY LLP**


By: /s/Patrick J. Feeley
    Patrick J. Feeley (PF-4931)
    Christopher G. Karagheuzoff (CK-1122)
    Stephen M. Raab (SR-0742)

250 Park Avenue
New York, New York  10177
(212) 415-9200

Attorneys for Defendant and Third-Party
Plaintiff Phoenix Life Insurance Co.