Patrick J. Feeley (PF-4931)
Christopher G. Karagheuzoff (CK-1122)
Stephen M. Raab (SR-0742)
DORSEY & WHITNEY LLP
250 Park Avenue
New York, New York 10177
(212) 415-9200

*Attorneys for Defendant and Third-Party Plaintiff*
*Phoenix Life Insurance Co.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALICE KRAMER, as Personal Representative of the Estate of Arthur Kramer,<br><br>                 Plaintiff,<br><br>– against –<br><br>LOCKWOOD PENSION SERVICES, INC., TALL TREE ADVISORS, INC., LIFE PRODUCTS CLEARING, LLC, TRANSAMERICA OCCIDENTAL LIFE INSURANCE CO., PHOENIX LIFE INSURANCE CO., LINCOLN LIFE & ANNUITY CO. OF NEW YORK, LORI CALLEGARI AND TD BANKNORTH INC.,<br><br>                 Defendants.<br><br>PHOENIX LIFE INSURANCE CO.,<br><br>                 Third-Party Plaintiff,<br><br>– against –<br><br>STEVEN LOCKWOOD,<br><br>                 Third-Party Defendant. | Case No. 08 CV 2429 (DAB) (MHD)<br><br>ECF CASE<br><br>**RICO STATEMENT** |

## TABLE OF CONTENTS

**Page**

**SECTION 1:**   State whether the unlawful conduct is in violation of
18 U.S.C. §§ 1962(a), (b), (c) and/or (d). .............................................. 1

**SECTION 2:**   List each defendant and describe the misconduct and basis
of liability of each defendant. ................................................................ 1

**SECTION 3:**   List other wrongdoers, other than the named defendants,
and describe the misconduct of each wrongdoer. ................................ 4

**SECTION 4:**   List the victims and state how each victim was injured....................... 4

**SECTION 5:**   Describe in detail the pattern of racketeering activity or
collection of unlawful debts for each RICO claim. ........................... 6

The description of the pattern of racketeering shall:

**(a)**   List the predicate acts and the specific statutes which were
violated; ................................................................................... 7

**(b)**   State the dates of the participants in the predicate acts, and the
facts surrounding the predicate acts; .................................... 7

The Kramer-Phoenix SOLI Scheme ................................ 7

The Levinson-Phoenix SOLI Scheme ............................ 9

The Lobel-Lincoln Life SOLI Scheme ......................... 10

**(c)**   If the RICO claim is based on the predicate offenses of wire
fraud, mail fraud, or fraud in the sale of securities, the
"circumstances constituting fraud or mistake shall be stated
with particularity."  Fed. R. Civ. P. 9(b).  Identify the nature,
time, place and contents of misrepresentations, and the identity
of persons to whom and by whom the alleged misrepresentations
were made; it must be clear why the plaintiff claims the acts to
constitute fraud or misrepresentations;  ............................................. 11

The Kramer-Phoenix SOLI Scheme ................................ 12

The Levinson-Phoenix SOLI Scheme ............................ 16

The Lobel-Lincoln Life SOLI Scheme ......................... 19

i

**(d)**        State whether there has been a criminal conviction for violation of the predicate acts; ......................................................... 23

**(e)**        State whether civil litigation has resulted in a judgment with regard to the predicate acts; .............................................. 23

**(f)**        Describe how the predicate acts form a "pattern of racketeering activity"; ........................................................................ 23

**(g)**        State whether the alleged predicate acts relate to each other as part of a common plan.  If so, describe in detail. .............................. 25

**SECTION 6:**    Describe in detail the alleged enterprise for each RICO claim........... 26

A description of the enterprise shall:

**(a)**        State the names of the individuals, partnerships, corporations, associations, or other legal entities that constitute the enterprise;

**(b)**        Describe the structure, purpose, function and course of conduct of the enterprise;

**(c)**        State whether any defendants are employees, officers or directors of the alleged enterprise;

**(d)**        State whether any defendants are associated with the enterprise;

**(e)**        State whether you claim that the defendants are individuals or entities separate from the enterprise, or that the defendants are the enterprise itself, or members of the enterprise; and

**(f)**        If any defendants are alleged to be the enterprise itself, or members of the enterprise, explain whether such defendants are perpetrators, passive instruments, or victims of the alleged racketeering activity.

**LPS** (Lockwood as Defendant) ........................................................................... 26

**Tall Tree** (Lockwood as Defendant)................................................................. 27

**The SOLI Enterprise** ........................................................................................ 28

**SECTION 7:**    State and describe in detail whether you claim that the pattern of racketeering activity and the enterprise are separate or have merged into one entity. .................................................................... 29

**SECTION 8:**    Describe the relationship between the activities of the enterprise and the pattern of racketeering activity.  Discuss how the racketeering activity differs from the usual and daily activities of the enterprises, if at all................................................................ 30

**SECTION 9:**    Describe what benefits, if any, the enterprise receives from the alleged patterns of racketeering. ........................................................ 31

**SECTION 10:**    Describe the effect of the activities of the enterprise on interstate or foreign commerce. ........................................................ 32

**SECTION 11:**    If the complaint alleges a violation of 18 U.S.C. § 1962(a):

    **(1)**    State who received the income derived from the pattern of racketeering activity or through the collection of an unlawful debt;............................................................................................ 32

    **(2)**    Describe the use or investment of such income................................. 32

**SECTION 12:**    If the complaint alleges a violation of 18 U.S.C. § 1962(b), describe in detail the acquisition or maintenance of any interest in or control of the alleged enterprise. .................................. 32

**SECTION 13:**    If the complaint alleges a violation of 18 U.S.C. § 1962(c):

    **(1)**    State who is employed by or associated with the enterprise;.............. 33

    **(2)**    Describe whether the same entity is both the liable "person" and the "enterprise" under § 1962(c). .................................. 33

**SECTION 14:**    If the complaint alleges a violation of 18 U.S.C. §1962(d), describe in detail the alleged conspiracy. ........................................... 33

**SECTION 15:**    Describe the alleged injury to business or property.......................... 33

**SECTION 16:**    Describe the direct causal relationship between the injury and the violation of the RICO statute. ................................................ 33

**SECTION 17:**    List the damages sustained for which each defendant is liable. ......... 34

**SECTION 18:**    List all other federal causes of action, if any, and provide the relevant statute numbers.............................................................. 34

**SECTION 19:**    List all pendent state claims, if any.................................................... 35

**SECTION 20:**    Provide any additional information potentially helpful to the Court in adjudicating your RICO claim.............................................. 35

Pursuant to Sections II(H) and V of the Individual Practices of Judge Deborah A. Batts, Defendant and Third-Party Plaintiff Phoenix Life Insurance Co. ("Phoenix"), by its undersigned attorneys, hereby submits the following RICO Statement:

**SECTION 1:**   **State whether the unlawful conduct is in violation of 18 U.S.C. §§ 1962(a), (b), (c) and/or (d).**

The unlawful conduct is in violation of 18 U.S.C. § 1962(c).

**SECTION 2:**   **List each defendant and describe the misconduct and basis of liability of each defendant.**

The RICO defendants are Steven Lockwood ("Lockwood"), Lockwood Pension Services, Inc. ("LPS"), and Tall Tree Advisors, Inc. ("Tall Tree").  On information and belief, Lockwood, LPS, and Tall Tree all reside at the same address: 2 Tall Tree Lane, Pleasantville, New York.  On information and belief, the RICO defendants have developed a formulaic method of circumventing New York's insurable interest statute.  On information and belief, this method involves encouraging and assisting elderly persons in establishing trusts that were used as "strawmen" to acquire life insurance policies for the benefit of strangers who have no insurable interest in the lives of the insureds (*i.e.*, a "SOLI" scheme).

In a SOLI arrangement, the insured does not intend to obtain the life insurance for his or her family's benefit and does not intend to pay the premiums; rather, the insured is encouraged or induced (typically by an intermediary agent or broker) to procure a life insurance policy for the sole purpose of reselling it to an outside investor.  Essentially, the outside investor pays the insured in order to make a wager on the duration of the insured's life.

At all relevant times, the RICO defendants were aware that (a) SOLI arrangements are illegal and contrary to strong public policy interests and (b) Phoenix and other life insurance

companies would not issue policies if they knew the policies were intended for the benefit of outside investors who have no insurable interest in the lives of the insureds.

On information and belief, the RICO defendants and the other wrongdoers identified in Section 3 herein have used fraudulent SOLI schemes to procure, administer, sell, and/or collect on multiple life insurance policies worth hundreds of millions of dollars. Such policies include, but are not limited to, the policies issued on the lives of Arthur Kramer, Irwin Levinson, and Leon Lobel, as alleged in Sections 5(b) and 5(c) herein, as well as the other policies at issue in this lawsuit, as alleged in Section 5(f) herein. On information and belief, all of the insurance policies at issue in this lawsuit were procured by means of fraudulent SOLI schemes formulated and perpetuated by the RICO defendants.

On information and belief, there are three RICO enterprises involved in these fraudulent SOLI schemes: LPS, Tall Tree, and an "association in fact" consisting of Lockwood, LPS, Tall Tree, Life Product Clearing LLC ("Life Product"), and Jonathan S. Berck ("Berck") (collectively, the "SOLI Enterprise"). Accordingly, Phoenix has alleged (1) a separate RICO claim against Lockwood individually arising from his management of and participation in LPS and Tall Tree, and (2) a combined RICO claim against all three RICO defendants arising from their management of and participation in the SOLI Enterprise. Thus, LPS and Tall Tree are both enterprises and individual defendants: enterprises with respect to the separate claim against Lockwood, and individual defendants with respect to their participation in the SOLI Enterprise.

Lockwood violated § 1962(c) by conducting the affairs of LPS, Tall Tree, and the SOLI Enterprise through a pattern of racketeering activity, including but not limited to numerous instances of mail and wire fraud in furtherance of the fraudulent SOLI schemes described herein. On information and belief, Lockwood participated in the operation or management of LPS, Tall

Tree, and the SOLI Enterprise by his specific activities as alleged in Sections 5(b) and 5(c) herein.   More generally, Lockwood identifies potential insureds, approaches and advises potential insureds on the benefits of the SOLI scheme (*i.e.*, markets the SOLI scheme), facilitates the creation of life insurance trusts, and advises insureds, trustees, beneficiaries, and claimants with respect to their communications with insurers both before and after the issuance of the policies.   On information and belief, Lockwood also sometimes purchases (through Tall Tree) the beneficial interest in the life insurance trusts and thus provides the financial incentive for insureds to participate in the SOLI scheme and the vehicle by which they do so.

LPS violated § 1962(c) by conducting the affairs of the SOLI Enterprise through a pattern of racketeering activity, including but not limited to numerous instances of mail and wire fraud in furtherance of the fraudulent SOLI schemes described herein.   On information and belief, LPS participated in the operation or management of the SOLI Enterprise by its specific activities as alleged in Sections 5(b) and 5(c) herein.   More generally, LPS approaches and advises potential insureds on the benefits of the SOLI scheme (*i.e.*, markets the SOLI scheme), facilitates the creation of life insurance trusts, and advises insureds, trustees, beneficiaries, and claimants with respect to their communications with insurers both before and after the issuance of the policies.

Tall Tree violated § 1962(c) by conducting the affairs of the SOLI Enterprise through a pattern of racketeering activity, including but not limited to numerous instances of mail and wire fraud in furtherance of the fraudulent SOLI schemes described herein.   On information and belief, Tall Tree participated in the operation or management of the SOLI Enterprise by its specific activities as alleged in Sections 5(b) and 5(c) herein.   More generally, Tall Tree finances SOLI transactions: it purchases the beneficial interest in the life insurance trusts and thus

3

provides the financial incentive for insureds to participate in the SOLI scheme and the vehicle by which they do so.

**SECTION 3:      List other wrongdoers, other than the named defendants, and describe the misconduct of each wrongdoer.**

Other wrongdoers include Life Product and Berck, who, along with Lockwood and LPS, have (or had during the time period relevant to this action) offices located at 75 Rockefeller Plaza, New York, New York.

On information and belief, Life Product participated in the operation or management of the SOLI Enterprise by its specific activities as alleged in Sections 5(b) and 5(c) herein.  More generally, as set forth above, Life Product finances SOLI transactions: it purchases the beneficial interest in the life insurance trusts and thus provides the financial incentive for insureds to participate in the SOLI scheme and the vehicle by which they do so.

On information and belief, Berck participated in the operation or management of the SOLI Enterprise by his specific activities as alleged in Sections 5(b) and 5(c) herein.  More generally, after the beneficial interests in the life insurance trusts have been transferred to investors such as Life Product and Tall Tree, Berck serves as the successor trustee of these trusts and thus acts in the investors' interests and as their agent in paying premiums, filing and administering claims, collecting and distributing death benefits, and executing the sale of the policies to any other investors.

**SECTION 4:      List the victims and state how each victim was injured.**

The currently known victims of the RICO defendants' unlawful conduct are Phoenix, Lincoln Life & Annuity Co. of New York ("Lincoln Life"), and Transamerica Occidental Life Insurance Co. ("Transamerica").  However, on information and belief, the RICO defendants have

procured, through similar fraudulent SOLI arrangements involving similar racketeering activities, life insurance policies from several other insurance companies as well.

Phoenix is a New York life insurance company. Phoenix has been injured in that the RICO defendants have caused it to issue life insurance policies, including those policies issued on the lives of Mr. Kramer and Mr. Levinson, as alleged in Sections 5(b) and 5(c) herein, that it would not have issued but for the RICO defendants' unlawful conduct. If Phoenix is required to pay any death benefits pursuant to the wrongfully procured policies, the RICO defendants will have caused Phoenix to suffer damages in the amount of such payments. They will also have caused Phoenix to suffer additional damages, including but not limited to commissions paid on the wrongfully procured policies.

Lincoln Life is a New York life insurance company. Lincoln Life has been injured in that the RICO defendants have caused it to issue life insurance policies, including those policies issued on the lives of Mr. Kramer and Mr. Lobel, as alleged in Sections 5(b), (c), and (f) herein, that it would not have issued but for the RICO defendants' unlawful conduct. On information and belief, Lincoln Life has already paid $10,712,328.77 in death benefits and interest on a wrongfully procured policy, as alleged in Sections 5(b) and 5(c) herein. If Lincoln Life is required to pay $10 million in death benefits pursuant to the policy or policies it has issued on the life of Mr. Kramer, as demanded by Plaintiff, the RICO defendants will have caused Lincoln Life to suffer damages in the amount of such payments. On information and belief, they will also have caused Lincoln Life to suffer additional damages, including but not limited to commissions paid on the wrongfully procured policies.

Transamerica is a life insurance company incorporated in Iowa. Transamerica has been injured in that the RICO defendants have caused it to issue one or more life insurance policies on

the life of Mr. Kramer having a total death benefit of approximately $18,200,000 (the "Transamerica Policies"), as alleged in Section 5(f) herein, that it would not have issued but for the RICO defendants' unlawful conduct.  If Transamerica is required to pay any death benefits pursuant to the Transamerica Policies, as demanded by Plaintiff, the RICO defendants will have caused Transamerica to suffer damages in the amount of such payments.  On information and belief, they will also have caused Transamerica to suffer additional damages, including but not limited to commissions paid on the Transamerica Policies.

**SECTION 5:**     **Describe in detail the pattern of racketeering activity or collection of unlawful debts for each RICO claim.  The description of the pattern of racketeering shall:**

    **(a)**     **List the predicate acts and the specific statutes which were violated;**

    **(b)**     **State the dates of the participants in the predicate acts, and the facts surrounding the predicate acts;**

    **(c)**     **If the RICO claim is based on the predicate offenses of wire fraud, mail fraud, or fraud in the sale of securities, the "circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).  Identify the nature, time, place and contents of misrepresentations, and the identity of persons to whom and by whom the alleged misrepresentations were made; it must be clear why the plaintiff claims the acts to constitute fraud or misrepresentations;**

    **(d)**     **State whether there has been a criminal conviction for violation of the predicate acts;**

    **(e)**     **State whether civil litigation has resulted in a judgment with regard to the predicate acts;**

    **(f)**     **Describe how the predicate acts form a "pattern of racketeering activity"; and**

    **(g)**     **State whether the alleged predicate acts relate to each other as part of a common plan.  If so, describe in detail.**

**SECTION 5(a):**        The predicate acts include: at least four (4) instances of mail fraud and five (5) instances of wire fraud in furtherance of the Kramer-Phoenix SOLI Scheme; ten (10) instances of mail fraud and one (1) instance of wire fraud in furtherance of the Levinson-Phoenix SOLI Scheme; and two (2) instances of mail fraud in furtherance of the Lobel-Lincoln Life SOLI Scheme.  The acts of mail fraud violate 18 U.S.C. § 1341.  The acts of wire fraud violate 18 U.S.C. § 1343.

**SECTION 5(b):**        The predicate acts are described as follows:

**The Kramer-Phoenix SOLI Scheme**

On information and belief, Lockwood, LPS, and Tall Tree devised a scheme to submit a fraudulent life insurance application on behalf of Mr. Kramer and the Arthur Kramer 2005 Insurance Trust to Phoenix, and thereby to procure a SOLI policy, as alleged herein.  Phoenix relied on that fraudulent application, and the misrepresentations contained therein, in issuing three Phoenix policies numbered 97303913, 97303935, and 97303936 (the "Phoenix Policies") for a total amount of $28,000,000.  Phoenix further relied on the payment of premiums in maintaining the Phoenix Policies (at least ostensibly) in force.  Phoenix was injured by virtue of issuing the Phoenix Policies and paying the associated commissions, and will be further injured to the extent it is required to pay death benefits pursuant to the Phoenix Policies.

Lockwood, LPS, and Tall Tree used the mails and wires on numerous occasions in furtherance of their fraudulent SOLI scheme.  Such uses include but are not limited to the following:

    i.   Lori Callegari, an employee of LPS, mailed the Policy Acceptance Forms and first premiums payments for the Phoenix Policies to Phoenix on or about October 21, 2005;

   ii.   Lori Callegari mailed the second quarterly premiums payments for the Phoenix Policies to Phoenix on or about October 24, 2005;

    iii.   Lucy Montemarano, the Office Manager of M&M Brokerage Services, Inc. ("M&M") (M&M is the "Senior Associate" that endorsed Lockwood's application to be appointed as a broker for Phoenix, and has an office in a neighboring suite to LPS's suite at 75 Rockefeller Plaza), mailed quarterly premiums payments for the Phoenix Policies to Phoenix on or about January 4, 2006;

    iv.   Lockwood mailed a letter to Phoenix on or about June 22, 2007, using LPS letterhead, advising Phoenix that Berck had been appointed as Successor Trustee; and

    v.   LPS made several telephone calls to Phoenix to request life insurance illustrations that would allow the financers of the SOLI scheme to pay minimum premiums in the years that they would hold the rights to the Phoenix Policies, including calls from "Dave" on or about August 4, 2006 (requesting an illustration showing a minimum premium in year 2, then level premiums through age 100 with an ending cash value of $1,000), June 1, 2007 (requesting an illustration showing minimum level premiums in policy years 3-5 with level premiums until age 100 with an ending cash value of $1,000) June 13, 2007 (requesting an illustration showing level premiums to age 100), June 28, 2007 (minimum annual premiums in policy years 3-5 with level premiums thereafter), and July 6, 2007 (requesting an illustration with specified premiums in years 3-5 and level premiums thereafter with $1,000 cash value at age 100).

On information and belief, Lockwood, LPS, and Tall Tree each individually caused all of the above uses of the mails or wires, either by personal direction or authorization or by virtue of the fact that such uses were reasonably foreseeable or likely to follow from the regular operation of the Kramer-Phoenix SOLI Scheme and/or the SOLI Enterprise.  On information and belief, Lockwood, LPS, and Tall Tree each individually intended by their participation in the Kramer-Phoenix SOLI Scheme, the SOLI Enterprise, the pattern of racketeering, and the above instances of mail and wire frauds, to deprive Phoenix of property by causing it to issue the Phoenix Policies that it would not have issued but for the fraudulent SOLI scheme, and eventually to pay out death benefits pursuant to such policies.

**The Levinson-Phoenix SOLI Scheme**

On information and belief, Lockwood and LPS devised a scheme to submit a fraudulent life insurance application to Phoenix on behalf of Mr. Levinson and the Irwin Levinson Insurance Trust II (the "Levinson Trust"), and thereby to procure a SOLI policy, as alleged herein. Phoenix relied on that fraudulent application, and the misrepresentations contained therein, in issuing Phoenix policy No. 97304016 with a Policy Date of November 27, 2008, and a basic policy amount of $5,000,000 (the "Levinson Policy"). Phoenix further relied on the payment of premiums in maintaining the Levinson Policy (at least ostensibly) in force. Phoenix was injured by virtue of issuing the Levinson Policy and paying the associated commissions.

Lockwood and LPS used the mails and wires on numerous occasions in furtherance of their fraudulent SOLI scheme with respect to the Levinson policy. Such uses include, but are not limited to, the following:

 i. Lockwood faxed a letter to Dr. James N. Harris, MD, on a LPS fax cover sheet, requesting Mr. Levinson's medical history to aid in completing his life insurance applications, and forwarded an authorization form with respect to same, on or about March 22, 2005;

 ii. Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson regarding Mr. Levinson's net worth and medical records, and the status of his application for life insurance, on or about April 5, 2005;

 iii. Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson regarding the status of Mr. Levinson's application for life insurance, on or about August 15, 2005;

 iv. Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson regarding putting Mr. Levinson in contact with companies who specialize in the sale/purchase of life insurance policies, on or about September 27, 2005;

 v. Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson regarding the Levinson Trust, forwarding a sample life insurance trust agreement, offering to recommend a trustee, and recommending that Mr. Levinson's application be submitted to Phoenix, on or about October 24, 2005;

vi.   Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson forwarding the Phoenix policy on or about December 1, 2005;

vii.  Lori Callegari, an employee of LPS, mailed the policy acceptance form and first premium payment to Phoenix on or about December 8, 2005;

viii. Lori Callegari mailed additional premium payments to Phoenix on or about February 1, 2006;

ix.   Lockwood mailed a premium payment from Berck to Phoenix on or about December 4, 2006;

x.    Lockwood mailed a letter to Phoenix, using LPS letterhead, advising Phoenix that Berck had been appointed as Successor Trustee, on or about August 3, 2007; and

xi.   Berck mailed a letter to Phoenix making a claim on behalf of the Levinson Trust for death benefits, on or about August 20, 2007.

On information and belief, Lockwood and LPS each individually caused all of the above uses of the mails or wires, either by personal direction or authorization or by virtue of the fact that such uses were reasonably foreseeable or likely to follow from the regular operation of the Levinson-Phoenix SOLI Scheme and/or the SOLI Enterprise.   On information and belief, Lockwood and LPS each individually intended by their participation in the Levinson-Phoenix SOLI Scheme, the SOLI Enterprise, the pattern of racketeering, and the above instances of mail and wire frauds to deprive Phoenix of property by causing it to issue a policy that it would not have issued but for the fraudulent SOLI scheme, and eventually to pay out death benefits pursuant to such policy.

**The Lobel-Lincoln Life SOLI Scheme**

On information and belief, Lockwood and LPS devised a scheme to submit a fraudulent life insurance application on behalf of Mr. Lobel and Leon Lobel Insurance Trust (the "Lobel Trust") to Lincoln Life, and thereby to procure a SOLI policy.   On information and belief, Lincoln Life relied on that fraudulent application, and the misrepresentations contained therein,

in issuing a policy numbered 7221595 with a date of issue of December 14, 2005 in the amount of $10,000,000 (the "Lobel Policy").  Lincoln Life was injured by virtue of issuing the Lobel Policy and by its subsequent payment on or about January 17, 2007 to Berck, as Trustee of the Lobel Trust, of $10,712,328.77, reflecting the insured amount and interest thereon.

Lockwood and LPS used the mails and wires on numerous occasions in furtherance of their fraudulent SOLI scheme.  Such uses include, but are not limited to, the following:

    i.  Lockwood mailed a letter dated December 16, 2005, to Lobel forwarding the Lincoln Life policy, advising him of an investor willing to purchase the beneficial interest in the Lobel Trust, and enclosing a Beneficial Interest Transfer Agreement; and

    ii.  Lockwood mailed a letter dated January 3, 2006, to Lobel forwarding a check for $300,000 from Life Product in exchange for a 100% ownership interest in the Lobel Trust.

On information and belief, Lockwood and LPS each individually caused all of the above uses of the mails, either by personal direction or authorization or by virtue of the fact that such uses were reasonably foreseeable or likely to follow from the regular operation of the Lobel-Lincoln Life SOLI Scheme and/or the SOLI Enterprise.  On information and belief, Lockwood and LPS each individually intended by their participation in the Lobel-Lincoln Life SOLI Scheme, the SOLI Enterprise, the pattern of racketeering, and the above instances of mail frauds to deprive Lincoln Life of property by causing it to issue a policy that it would not have issued but for the fraudulent SOLI scheme, and eventually to pay out death benefits pursuant to such policy.

**SECTION 5(c):**     The circumstances constituting the misrepresentations that occurred in the course of the fraudulent SOLI schemes are described with particularity as follows:

**The Kramer-Phoenix SOLI Scheme**

On or about July 1, 2005, Lockwood and Phoenix entered into a contract pursuant to which Lockwood would serve as an independent producer of various Phoenix products, including life insurance policies.  On or about August 30, 2005, Phoenix approved the Independent Producer Contract (the "IPC").  Pursuant to the IPC and his status as a producer, Lockwood owed Phoenix contractual, fiduciary, and common law duties that included, among other duties, a duty to conduct himself in accordance with applicable laws and regulations and a duty of full disclosure with respect to any life insurance application Lockwood submitted to Phoenix.

On information and belief, Lockwood colluded with Arthur Kramer to participate in one or more fraudulent SOLI arrangements.  In particular, Lockwood colluded with Mr. Kramer (a) to establish a life insurance trust, (b) to apply for one or more life insurance policies in which the trust would be both the policyholder and beneficiary of the policies, (c) upon the issuance of the policies, to immediately transfer the beneficial interest in the trust to Tall Tree in exchange for monetary compensation, and (d) to replace the financial institution trustee of the trust with Berck.

On or about August 29, 2005, Mr. Kramer established the Arthur Kramer 2005 Insurance Trust (the "Kramer August Trust").  On information and belief, the only advantage and purpose of the Kramer August Trust was to effectuate a transfer of the right to the death proceeds payable under the requested life insurance policies in a fraudulent manner that would not be apparent to Phoenix.  Mr. Kramer then submitted (through Lockwood) a life insurance application to Phoenix in early September 2005 (the "Phoenix Application").

12

As producer of the Phoenix Policies, Lockwood owed a duty of full disclosure to Phoenix with respect to the Phoenix Application, including but not limited to: (a) the duty to make truthful and accurate representations on the Phoenix Application; (b) the duty to make full disclosure of the nature of the risk undertaken; (c) the duty to make full disclosure of any and all information that would enable Phoenix to determine if the insurance should issue; and (d) the duty not to procure SOLI policies that Lockwood knew Phoenix would decline to issue if Phoenix knew of the true nature of such policies.

On information and belief, Mr. Kramer did not apply for life insurance on his own initiative, but rather was induced to do so by the offer of ready cash.  On information and belief, at the time he submitted the Phoenix Application, Mr. Kramer had no intention of procuring life insurance for the benefit of himself or his family; rather, Mr. Kramer was attempting to procure a policy for the benefit of a stranger investor with no insurable interest in his life.

On information and belief, at the time the Phoenix Application was submitted, Tall Tree and LPS had arranged to make payment to Arthur and/or Liza Kramer immediately after the issuance of the Phoenix Policies.  On information and belief, Tall Tree and LPS understood at the time that the Phoenix Application was submitted that Arthur Kramer and/or Liza Kramer intended to transfer the beneficial interest in the Kramer August Trust to Tall Tree in exchange for a payment, and, at the time the Phoenix Application was submitted, Tall Tree and LPS intended to make such payment after the issuance of the Phoenix Policies.  On information and belief, the stranger investor on whose behalf Mr. Kramer procured the life insurance was Tall Tree.  Thus, on information and belief, Tall Tree was the true intended beneficiary of the requested policy.

13

In Sections II and III of Part I of the Phoenix Application, Mr. Kramer represented that the owner and beneficiary of the policies applied for would be the Kramer August Trust.  Mr. Kramer signed Part I of the Phoenix Application on or about September 2, 2005.  Above Mr. Kramer's signature on Part I of the Phoenix Application, the application states, in relevant part:

> I have reviewed this application, and the statements made herein are those of the proposed insured and all such statements made by the proposed insured in Part I or and in Part II of this application are full, complete, and true to the best knowledge and belief of the undersigned and have been correctly recorded . . .

> I understand and agree that the Insurance applied for shall not take effect unless and until each of the following has occurred: the policy has been issued by the Company; the premium required for the issuance of the policy has been paid in full during the lifetime of the insured; all the representations made in the application remain true, complete and accurate as of the latest of such dates; and there has been no change in the health of any proposed insured that would change the answers to any of the questions in the application . . . .

Lockwood signed Part I of the Phoenix Application as the producer of the Phoenix Policies.  Above Lockwood's signature on Part I of the Phoenix Application, the Application states, in relevant part, that "The Producer hereby confirms he/she has truly and accurately recorded on the application the information supplied by the Proposed Insured; and that he/she is qualified and authorized to discuss the contract herein applied for."

Given Section 3205 of the New York Insurance Law and New York's long-standing public policy against "wager" life insurance policies, Mr. Kramer, Lockwood, and the Trustee implicitly represented that (a) the Kramer August Trust would be the true owner and beneficiary of the requested Phoenix Policies (*i.e.*, not just a "strawman"), and (b) the Kramer August Trust and its intended beneficiary had an insurable interest in Mr. Kramer's life.  These representations were incomplete and false when made, and Lockwood and Mr. Kramer knew they were incomplete and false when they made them.  Furthermore, given his contractual, fiduciary, and common law duties of disclosure, Lockwood's failure to disclose to Phoenix (a) the lack of an

14

insurable interest on Mr. Kramer's life, (b) facts from which Phoenix could determine that lack of insurable interest, (c) facts from which Phoenix could ascertain the true nature of the risk that it undertook in issuing the Phoenix Policies, and (d) that the Phoenix Application was submitted as part of a SOLI arrangement, constituted misrepresentations with respect to those facts. By making the foregoing misrepresentations, Lockwood and Mr. Kramer intended to deceive Phoenix with respect to the identity of the true beneficiary of the Phoenix Policies and with respect to the true beneficiary's lack of an insurable interest in Mr. Kramer's life. In sum, the submission of the Phoenix Application was a fraud that was designed and facilitated by Lockwood, LPS, Tall Tree, and others as part of a fraudulent SOLI scheme.

While Phoenix was processing and underwriting Mr. Kramer's Phoenix Application, Lockwood informed Phoenix that Mr. Kramer would like a total of $28 million of life insurance, issued to the Kramer August Trust in three separate policies, based on the same Phoenix Application. In reliance upon the truth of the representations made in the Phoenix Application, Phoenix issued the Phoenix Policies.

Phoenix delivered the Phoenix Policies to Lockwood in or about October 2005. On information and belief, the beneficial interest in the Kramer August Trust was transferred to Tall Tree on or about October 13, 2005. On October 21, 2005, Mr. Kramer signed three Policy Acceptance Forms acknowledging receipt of the Phoenix Policies. Above Mr. Kramer's signature on each Policy Acceptance Form, the Form stated, in relevant part, that "The insured(s) declares that the statements made in the application remain full, complete, and true as of this date . . . ."

On information and belief, Tall Tree and LPS paid Arthur Kramer and/or Liza Kramer to transfer the beneficial interest in the Kramer August Trust shortly after the Phoenix Policies were

issued.  On information and belief, the application for the Phoenix Policies, the creation of the Kramer August Trust, and the transfer of the beneficial interest in the Kramer August Trust (and thus the beneficial proceeds of the Phoenix Policies), were all part of a single transaction, which had as its purpose the procurement of a policy of insurance on Mr. Kramer's life by a person having no insurable interest in his life.  On information and belief, Berck was appointed the successor trustee of the Kramer August Trust on or about July 10, 2006.  On information and belief, Lockwood had a relationship with Berck that involved similar SOLI arrangements, and Berck's appointment as successor trustee allowed Lockwood to tightly control the Phoenix Policies.

**The Levinson-Phoenix SOLI Scheme**

In November 2005, Lockwood and LPS submitted a life insurance application to Phoenix on behalf of Irwin Levinson and the Levinson Trust.  In the application, Mr. Levinson, the Levinson Trust, and Lockwood represented that the Policy applied for would be owned by the Levinson Trust, which was also to be the designated primary beneficiary of any policy issued. Lockwood signed the application as the producer of the Levinson Policy.  Above Lockwood's signature, the application stated, in relevant part, that "The Producer hereby confirms he/she has truly and accurately recorded on the application the information supplied by the Proposed Insured; and that he/she is qualified and authorized to discuss the contract herein applied for."

Given Section 3205 of the New York Insurance Law and New York's long-standing public policy against "wager" life insurance policies, as well as Lockwood's contractual, fiduciary, and common law duties to Phoenix, Mr. Levinson and Lockwood implicitly represented that (a) the Levinson Trust would be the true owner and beneficiary of the requested Phoenix Policies (*i.e.*, not just a strawman), and (b) the Levinson Trust and its intended

16

beneficiary had an insurable interest in Mr. Levinson's life.  These representations were incomplete and false when made, and Lockwood and Mr. Levinson knew they were incomplete and false when they made them.  Furthermore, given his contractual, fiduciary, and common law duties of disclosure, Lockwood's failure to disclose to Phoenix (a) the lack of an insurable interest on Mr. Levinson's life, (b) facts from which Phoenix could determine that lack of insurable interest, (c) facts from which Phoenix could ascertain the true nature of the risk that it undertook in issuing the Levinson Policy, and (d) that the Levinson Application was submitted as part of a SOLI arrangement, constituted misrepresentations with respect to those facts.  By making the foregoing misrepresentations, Lockwood and Mr. Levinson intended to deceive Phoenix with respect to the identity of the true beneficiary of the Levinson Policy and with respect to the true beneficiary's lack of an insurable interest in Mr. Levinson's life.

In sum, the submission of the Levinson Application was a fraud designed and facilitated by Lockwood, LPS, and others as part of a fraudulent SOLI scheme.  In reliance upon the truth of the representations made in the application, Phoenix issued the Levinson Policy.  The application was attached to the Levinson Policy as issued.

The Levinson Trust was created on or about November 4, 2005 – just before Mr. Levinson's application was submitted to Phoenix.  Lockwood provided a draft trust agreement to Mr. Levinson (apparently using a form Lockwood had used previously) to establish the Levinson Trust.  The initial beneficiary of the Levinson Trust was Dede Levinson, Mr. Levinson's wife. On information and belief, in procuring the Policy, Mr. Levinson did not intend to provide his wife with financial security from the death benefit of the Policy.  On information and belief, there was no estate tax advantage that derived from the creation of the Levinson Trust and the purpose of the Levinson Trust was not to minimize Mr. or Mrs. Levinson's estate taxes.  On

information and belief, the only advantage and purpose of the Levinson Trust was to effectuate a transfer of the right to the death proceeds payable under the Policy to an outside investor, and thus the formation of the Levinson Trust in connection with Mr. Levinson's application reveals an intent to effect such a transfer at the time the application was submitted.  On information and belief, Berck was named the successor Trustee of the Levinson Trust on or about July 10, 2006. Lockwood was a witness to the Levinson Trustee succession agreement.

In the course of Phoenix's investigation of this SOLI scheme, Lockwood informed Phoenix in a February 7, 2008 letter that he was "aware" that "within a few weeks after the policy was issued" Mr. Levinson was contacted by an investment group "inquiring whether the family would be interested in selling its rights in the policy," and that the "transaction did take place between the relevant parties."   However, Phoenix's inquiries into the details and circumstances surrounding Mr. Levinson's application and the transfer of the beneficial interest in the Policy have been stymied.  On two separate occasions – on or about September 5, 2007, and on or about February 15, 2008 – an insurance investigator met with Mrs. Levinson to obtain information relevant to the processing of the claim.  Such interviews are standard procedure with respect to claims made during the contestability period of a policy.   On both occasions, Lockwood and someone identified as a "family friend" were present and interfered with the interviews, interrupting both the investigator and Mrs. Levinson when they were speaking and directing Mrs. Levinson not to answer certain questions.  In response to questions concerning the Policy, the Levinson Trust and the transfer of beneficial interest, Mrs. Levinson claimed near-total ignorance and said she was unaware the Policy and the Levinson Trust even existed until after her husband's death.  Mrs. Levinson said she had not seen any documentation relating to

the Policy, the Levinson Trust or the transfer of beneficial interest and did not know where any such documentation may be located.

In response to questions directed to Lockwood concerning the Levinson Trust and the alleged SOLI arrangement, Lockwood claimed he had heard Mr. Levinson was contacted by an outside investor or group of investors shortly after the Policy was issued and that Mr. Levinson had sold the beneficial interest in the Levinson Trust to the outside investor.  Lockwood claimed near-total ignorance regarding the details of that transaction.  He stated he does not know who the investors are, how to contact them, who put them in touch with Mr. Levinson, or how much they paid Mr. Levinson.

On information and belief, the creation of the Levinson Trust, the Levinson application for the policy, and the assignment of the beneficial interest in the Levinson Trust (and thus the ultimate right to the death benefits payable under the Policy) were all part of a single transaction, which had as its purpose the procurement of an insurance policy on Mr. Levinson's life for the benefit of a person having no insurable interest on his life.  On information and belief, Lockwood and LPS devised this fraudulent SOLI scheme, advised Mr. Levinson with respect to the transaction, induced Mr. Levinson to participate in the scheme, and facilitated the transfer of the rights to the death benefits to an outside investor.

**The Lobel-Lincoln Life SOLI Scheme**

On or about January 22, 2007, Life Product filed suit in the United States District Court for the Southern District of New York, seeking a declaration that it was entitled to the proceeds of a $10 million life insurance policy (the "Lobel Policy") issued by Lincoln Life & Annuity Company of New York upon the life of Leon Lobel – a retired butcher who was seventy-seven years old when he applied for the policy.  The case is entitled *Life Product Clearing LLC v.*

*Linda Angel*, 07-CV-0475 (DC) (the "Angel lawsuit").   On or about March 12, 2007, Linda Angel, Lobel's daughter and the personal representative of Lobel's estate, filed her answer and counterclaims against Life Product.   On or about March 13, 2007, Angel filed a third-party complaint against the Lobel Trust and Jonathan S. Berck, as Trustee, seeking a declaration that the Lobel Trust is void and that Lobel's estate is entitled to recover the death benefits paid under the Lobel Policy.

On information and belief, Lockwood, together with another insurance broker, colluded with Mr. Lobel to participate in a fraudulent SOLI arrangements.   In particular, they colluded with Mr. Lobel (a) to establish a life insurance trust, (b) to apply for one or more life insurance policies in which the trust would be both the policyholder and beneficiary of the policies, and (c) upon the issuance of the policies, to immediately transfer the beneficial interest in the trust to Life Product in exchange for monetary compensation.   Pursuant to the agreed-upon SOLI scheme, on or about November 15, 2005, Mr. Lobel established the Lobel Trust.   On information and belief, the only advantage and purpose of the Lobel Trust was to effectuate a transfer of the right to the death proceeds payable under the requested life insurance policies in a fraudulent manner that would not be apparent to Lincoln Life.   That same day, Mr. Lobel signed a written application for a $10 million life insurance policy and authorized the submission of that application (the "Lobel Application") to Lincoln Life.   Above Mr. Lobel's signature on the Lobel Application, the application states, in relevant part: "I/WE have read the questions and answers in this application and declare that they are complete and true to the best of my (our) knowledge and belief."

On information and belief, Mr. Lobel did not apply for life insurance on his own initiative, but rather was induced to do so by the offer of ready cash.   On information and belief,

Mr. Lobel was unable to afford the $10 million policy requested in his application; in fact, on information and belief, Mr. Lobel lacked sufficient funds to afford even one year's premium. On information and belief, at the time he submitted the Lobel Application, Mr. Lobel had no intention of procuring life insurance for the benefit of himself or his family; rather, Mr. Lobel was attempting to procure a policy for the benefit of a stranger investor with no insurable interest in his life. On information and belief, the stranger investor on whose behalf Mr. Lobel procured the life insurance was Life Product. On information and belief, Mr. Lobel, Lockwood, and Life Product understood at the time the Lobel Application was submitted to Lincoln Life that Mr. Lobel would immediately transfer the ultimate rights to the death benefits to Life Product, and that Life Product would be responsible for paying the premiums. Thus, on information and belief, Life Product was the true intended beneficiary of the requested policy.

Mr. Lobel represented on his application to Lincoln Life that the owner and beneficiary of the policy would be the Lobel Trust. Given Section 3205 of the New York Insurance Law and New York's long-standing public policy against "wager" life insurance policies, Mr. Lobel implicitly represented to Lincoln Life that (a) the Lobel Trust would be the true owner and beneficiary of the requested policy (*i.e.*, not just a strawman), and (b) the Lobel Trust and its intended beneficiary had an insurable interest in Mr. Lobel's life. These representations were incomplete and false when made, and Mr. Lobel knew they were incomplete and false when he made them. Furthermore, given his contractual, fiduciary, and/or common law duties of disclosure as producers of the policy, Lockwood's failure to disclose to Lincoln Life (a) the lack of an insurable interest on Mr. Lobel's life, (b) facts from which Lincoln Life could determine that lack of insurable interest, (c) facts from which Lincoln Life could ascertain the true nature of the risk that it undertook in issuing the Lobel policy, and (d) that the Lobel Application was

submitted as part of a SOLI arrangement, constituted misrepresentations with respect to those facts.  By making the foregoing misrepresentations, Mr. Lobel and Lockwood intended to deceive Lincoln Life with respect to the identity of the true beneficiary of the policy on Mr. Lobel's life and with respect to the true beneficiary's lack of an insurable interest in Mr. Lobel's life.

In sum, on information and belief, the creation of the Lobel Trust and the submission of the Lobel Application was a fraud designed and facilitated by Lockwood, LPS, Life Product, and others as part of a fraudulent SOLI scheme to procure an insurance policy on the life of Mr. Lobel for the benefit of Life Product – an outside investor who lacked an insurable interest in Mr. Lobel's life.  On information and belief, Lockwood facilitated the SOLI transaction by helping Mr. Lobel establish the Lobel Trust and Lockwood acted as an intermediary between Mr. Lobel and Life Product.  On information and belief, the Lobel Trust agreement specifically contemplated a transfer of the beneficial interest therein to Life Product, in that Section 2.4(c) of the Lobel Trust Agreement provides "The Trustee has delegated its responsibility under this subsection (c) to issue new Certificates of Beneficial Interest following the transfer of such Beneficial Interest to Life Products Clearing LLC."

On December 16, 2005, Lockwood notified Mr. Lobel that Lincoln Life had agreed to issue the requested $10 million policy.  In that same letter, Lockwood enclosed a Beneficial Interest Transfer Agreement and requested certain documents and a payment to establish an account for the Lobel Trust.  Thus, on information and belief, the sale of the beneficial interest in the Lobel Trust was planned before Mr. Lobel had even established an account for the Lobel Trust.  (Indeed, the sale was planned before Lincoln Life had issued the policy.)  On information and belief, on or about December 20, 2005, approximately (6) six days after the policy was

issued, Mr. Lobel sold his interest in the Lobel Trust – and thus the right to any insurance proceeds upon his death – to Life Product.  On information and belief, Mr. Lobel never paid any premiums, and received a cash payment of $300,000 for transferring the beneficial interest in the Lobel Trust to Life Product.  On information and belief, after the right to the benefits payable under Mr. Lobel's policy was transferred, Berck became the successor trustee of the Lobel Trust.

**SECTION 5(d):**      On information and belief, there have been no criminal convictions for the predicate acts alleged herein.

**SECTION 5(e):**      On information and belief, there have been no civil judgments entered with respect to the predicate acts alleged herein.

**SECTION 5(f):**      The predicate acts form a pattern of racketeering in that they involve 16 acts of mail fraud and six (6) acts of wire fraud occurring over more than two (2) years.  As alleged in Sections 5(b) and 5(c) herein, the RICO defendants procured five (5) life insurance policies worth approximately $43 million in total from two different life insurance companies pursuant to three distinct (but virtually identical) SOLI schemes.  The SOLI schemes alleged herein share a common purpose, similar methods of perpetration of the frauds, similar victims, and involve many of the same participants.

In addition, discovery will reveal additional SOLI schemes and predicate acts in furtherance of those schemes.  For example, on information and belief, the RICO defendants have also procured policies from Lincoln Life and Transamerica on the life of Mr. Kramer, as alleged in the Complaint in this action, using virtually identical SOLI schemes.  On information and belief, the following occurred:

- The RICO defendants encouraged and facilitated the creation of the Arthur Kramer Insurance Trust on or about June 6, 2005 (the "Kramer June Trust");

- Lockwood, LPS, and Life Product and/or Tall Tree devised a scheme to submit a fraudulent life insurance application on behalf of Mr. Kramer and the Kramer June Trust to Transamerica, and thereby to procure the Transamerica Policies, which provide $18 million in death benefits;

- Transamerica relied on that fraudulent application, and the misrepresentations contained therein, in issuing the Transamerica Policies;

- The beneficial interest in the Kramer June Trust (and thus the ultimate right to those death benefits) was transferred to Life Product or Tall Tree immediately after the Transamerica Policies were issued;

- Transamerica further relied on the payment of premiums in maintaining the Transamerica Policies (at least ostensibly) in force;

- Lockwood, LPS, and Life Product and/or Tall Tree devised a scheme to submit a fraudulent life insurance application on behalf of Mr. Kramer and the Kramer August Trust to Lincoln Life, and thereby to procure a SOLI policy;

- Lincoln Life relied on that fraudulent application, and the misrepresentations contained therein, in issuing one or more policies on the life of Mr. Kramer having a total death benefit of approximately $10,000,000 (the "Lincoln Life Policies");

- The ultimate right to those death benefits was transferred to Life Product or Tall Tree before or immediately after the Lincoln Life Policies were issued; and

- Lincoln Life further relied on the payment of premiums in maintaining the Lincoln Life Policies (at least ostensibly) in force.

The nature and number of the SOLI schemes alleged in this case, as well as the size of the life settlement market and the substantial profits that the RICO defendants can earn by procuring life insurance policies for outside investors, implies a continued threat of criminal activity by Lockwood, LPS, and Tall Tree in conducting the affairs of the alleged enterprises. Indeed, upon information and belief, discovery in this action will yield evidence of additional fraudulent SOLI schemes in which Lockwood, LPS, Tall Tree and others engaged.

**SECTION 5(g):**     The predicate acts relate to each other as part of a common plan in that (a) all of the RICO defendants shared a common purpose in executing the fraudulent SOLI schemes described herein (namely, to procure life insurance policies for the benefit of outside investors with no insurable interest in the lives of the insureds and to administer those policies until the RICO defendants could profit from them - either by reselling them in the secondary market or by collecting the death benefits); (b) the RICO defendants developed a formulaic method of achieving their common purpose and understood their respective roles in that scheme; (c) each RICO defendant played its usual part in executing that plan with respect to the particular SOLI arrangements alleged herein; and (d) the instances of mail and wire fraud alleged herein were all in furtherance of the particular SOLI arrangements alleged herein and reflect the respective roles of the RICO defendants in the common plan.

**SECTION 6:**   **Describe in detail the alleged enterprise for each RICO claim. A description of the enterprise shall:**

    **(a)**   **State the names of the individuals, partnerships, corporations, associations, or other legal entities that constitute the enterprise;**

    **(b)**   **Describe the structure, purpose, function and course of conduct of the enterprise;**

    **(c)**   **State whether any defendants are employees, officers or directors of the alleged enterprise;**

    **(d)**   **State whether any defendants are associated with the enterprise;**

    **(e)**   **State whether you claim that the defendants are individuals or entities separate from the enterprise, or that the defendants are the enterprise itself, or members of the enterprise; and**

    **(f)**   **If any defendants are alleged to be the enterprise itself, or members of the enterprise, explain whether such defendants are perpetrators, passive instruments, or victims of the alleged racketeering activity**

There are three alleged RICO enterprises.

    **LPS** (Lockwood as Defendant)

    a.   The name of the enterprise is Lockwood Pension Services, Inc.

    b.   On information and belief, LPS provides tax, pension, and estate planning for individuals with high net worth and, in connection with that planning, provides a variety of advisory and financial services to its clients. On information and belief, the official residence of LPS is 2 Tall Tree Lane, Pleasantville, New York, but it conducts most of its business out of 75 Rockefeller Plaza, New York, New York. On information and belief, Lockwood is the CEO and Lori Callegari is the Vice President. On information and belief, LPS has employed salespersons and contracted with accountants to attract and serve its clients. On information and belief, LPS advises its clients with respect to whether to obtain additional life insurance, whether to sell (or otherwise

26

modify) any currently owned policies, and whether to establish trusts, among other things. On information and belief, LPS conducts, administers, and/or facilitates the necessary transactions to effectuate those plans its clients agree to pursue. Such transactions can have a variety of legitimate purposes, including the strategic transfer of wealth to minimize the taxes that might otherwise apply to such transfers, as well as illegitimate uses - to the extent the transactions are designed to circumvent applicable laws.

        c.      Lockwood is the owner and chief executive officer of LPS.

        d.      Lockwood is the only individual RICO defendant at issue with respect to this enterprise. Other than the association between LPS and Tall Tree alleged with respect to the SOLI Enterprise below, Phoenix is not aware of any associations implicating the other RICO defendants with respect to Phoenix's RICO claim against Lockwood.

        e.      Lockwood is an individual separate from the enterprise.

        f.      Lockwood is a perpetrator of the racketeering activity alleged herein.

**Tall Tree** (Lockwood as Defendant)

        a.      The name of the enterprise is Tall Tree Advisors, Inc.

        b.      Beyond what is alleged herein with respect to Tall Tree's residence, CEO, and role in the SOLI schemes (as set forth in Section 2 above and in subsection (c) below) further facts regarding Tall Tree's structure, purpose, and course of conduct are unknown to Phoenix at this time.

        c.      Lockwood is the owner and chief executive officer of Tall Tree.

d.      Lockwood is the only individual RICO defendant at issue with respect to this enterprise.   Other than the association between LPS and Tall Tree alleged with respect to the SOLI Enterprise below, Phoenix is not aware of any associations implicating the other RICO defendants with respect to Phoenix's RICO claim against Lockwood.

e.      Lockwood is an individual separate from the enterprise.

f.      Lockwood is a perpetrator of the racketeering activity alleged herein.

**The SOLI Enterprise**

a.      The names of the individuals and entities that constitute the enterprise are Lockwood, LPS, Tall Tree, Life Product, and Berck.

b.      The SOLI Enterprise functions as a continuing unit with an ongoing organization and was formed for the purpose of procuring life insurance policies for the benefit of outside investors that lack an insurable interest in the lives of the insureds.   In the course of its regular operation, the SOLI Enterprise must identify potential insureds, market the SOLI scheme to those potential insureds, establish a trust on behalf of the potential insured, appoint a trustee, procure policies, pay the insureds to transfer the beneficial interest in the trust, finance and regularly pay the premiums, correspond with and submit forms to insurers, and either sell the policies to other outside investors or, if the SOLI Enterprise retains the rights to the proceeds of the policies, file, administer, and facilitate claims for death benefits.   That is, the regular functions of the SOLI Enterprise include, among other things, financing, marketing, administration, and sales.   Those functions are fulfilled by the members of the SOLI Enterprise as alleged in Sections 2 and 3 herein.

28

     c.     The SOLI Enterprise is not a formal legal entity; thus, none of the RICO defendants are employees, officers, or directors of the enterprise.

     d.     Lockwood, LPS, and Tall Tree are all associated with the SOLI Enterprise, as alleged in Sections 2 and 5 herein.

     e.     Lockwood is an individual who exists separate from the SOLI Enterprise. LPS is a corporation that exists separate and apart from the SOLI Enterprise. Tall Tree is a corporation that exists separate and apart from the SOLI Enterprise.

     f.     Lockwood, LPS, and Tall Tree are all perpetrators of the racketeering activity alleged herein.

**SECTION 7:**     **State and describe in detail whether you claim that the pattern of racketeering activity and the enterprise are separate or have merged into one entity.**

LPS is a legal corporation that exists separate and apart from the racketeering activity alleged herein. As set forth above, in Section 6, subheading "LPS," subsection (b), on information and belief, LPS provides a variety of advisory and financial services to its clients that go beyond the racketeering activity alleged herein.

Tall Tree is a legal corporation that exists separate and apart from the racketeering activity alleged herein.

The SOLI Enterprise functions as a continuing unit with an ongoing organization that is distinct from the racketeering activity alleged herein. In the course of its regular operation, the SOLI Enterprise must identify potential insureds, market the SOLI scheme to those potential insureds, establish a trust on behalf of the potential insured, appoint a trustee, procure policies, pay the insureds to transfer the beneficial interest in the trust, finance and regularly pay the premiums, correspond with and submit forms to insurers, and either sell the policies to other

outside investors or, if the SOLI Enterprise retains the rights to the proceeds of the policies, file, administer, and facilitate claims for death benefits.  That is, the regular functions of the SOLI Enterprise include, among other things, financing, marketing, administration, and sales.  Of course, not every communication involving the SOLI Enterprise will involve a use of the mails or wires, and not every one of its uses of the mails and wires will be in furtherance of fraudulent SOLI schemes.

**SECTION 8:**     **Describe the relationship between the activities of the enterprise and the pattern of racketeering activity.  Discuss how the racketeering activity differs from the usual and daily activities of the enterprises, if at all.**

As set forth above, in Section 6, subheading "LPS," subsection (b), on information and belief, LPS provides a variety of advisory and financial services to its clients that go beyond the racketeering activity alleged herein.  While not every one of LPS's customers may participate in a SOLI scheme, the pattern of racketeering activity alleged herein fits within the general business activities of LPS.  That is, in its role as a consultant/advisor to its customers, it is unexceptional that LPS would (a) discuss life insurance policies with its customers (whether for estate tax planning or other purposes) and (b) correspond with its customers' physicians and with life insurance companies to facilitate the procurement and administration of life insurance policies and the payments related thereto.

As set forth above, in Section 6, subheading "Tall Tree," subsection (b), Phoenix is unable to describe with specificity how the racketeering activity alleged herein differs from Tall Tree's usual and daily activities.

The SOLI Enterprise functions as a continuing unit with an ongoing organization that is distinct from the racketeering activity alleged herein.  In the course of its regular operation, the SOLI Enterprise must identify potential insureds, market the SOLI scheme to those potential

insureds, establish a trust on behalf of the potential insured, appoint a trustee, procure policies, pay the insureds to transfer the beneficial interest in the trust, finance and regularly pay the premiums, correspond with and submit forms to insurers, and either sell the policies to other outside investors or, if the SOLI Enterprise retains the rights to the proceeds of the policies, file, administer, and facilitate claims for death benefits  That is, the regular functions of the SOLI Enterprise include, among other things, financing, marketing, administration, and sales.   Of course, not every communication involving the SOLI Enterprise will involve a use of the mails or wires and not every use of the mails and wires will be in furtherance of their fraudulent SOLI schemes.

**SECTION 9:**       **Describe what benefits, if any, the enterprise receives from the alleged patterns of racketeering.**

Currently, Phoenix is unable to state with certainty the exact benefits that LPS receives from Lockwood's racketeering activities, but believes that discovery will show that LPS receives fees from its customers, some portion of the commission paid by life insurance companies in exchange for its procurement of policies, some portion of the payments made in exchange for the beneficial interest in the trusts or policies that are transferred pursuant to SOLI schemes (or commission related thereto), and/or additional business from those customers who participate in SOLI schemes following their quick and easy gains from the SOLI schemes.

On information and belief, Tall Tree profits from (a) the resale of the beneficial interests in the trusts or policies to other outside investors, and/or (b) its right to some or all of the death benefits that may be paid pursuant to the policies procured by the SOLI schemes and with respect to which Tall Tree has obtained a beneficial interest.

Because the SOLI Enterprise is not a formal legal entity, Phoenix is not aware of any benefits the SOLI Enterprise has received from the pattern of racketeering separate and apart from the benefits enjoyed by its members or associates.

**SECTION 10:**   **Describe the effect of the activities of the enterprise on interstate or foreign commerce.**

All three of the alleged enterprises affect interstate commerce in that they facilitate the procurement of life insurance policies for clients who reside in various states, from insurers that reside in various other states.  In addition, Tall Tree affects interstate commerce in that (a) it purchases beneficial interests in life insurance trusts (and thus life insurance policies) from insureds and/or their relatives who reside in various states, and (b) it purchases the ultimate rights to death benefits pursuant to policies that are issued by insurers that reside in various other states.  The SOLI Enterprise further affects interstate and foreign commerce in that it sells the rights to (a) the beneficial interests in the trusts, and/or (b) the policies themselves to investors that are located in various states and countries.

**SECTION 11:**   **If the complaint alleges a violation of 18 U.S.C. § 1962(a):**

        **(1)**   **State who received the income derived from the pattern of racketeering activity or through the collection of an unlawful debt; and**

        **(2)**   **Describe the use or investment of such income.**

N/A

**SECTION 12:**   **If the complaint alleges a violation of 18 U.S.C. § 1962(b), describe in detail the acquisition or maintenance of any interest in or control of the alleged enterprise**

N/A

**SECTION 13:**     If the complaint alleges a violation of 18 U.S.C. § 1962(c):

> **(1)     State who is employed by or associated with the enterprise; and**
>
> **(2)     Describe whether the same entity is both the liable "person" and the "enterprise" under § 1962(c).**

(1)     Lockwood is the owner and CEO of LPS and Tall Tree.  Lockwood, LPS, and Tall Tree are associated with the SOLI Enterprise.

(2)     The liable persons, or RICO defendants, are distinct from the alleged enterprises, as alleged in Section 6(e) (with respect to each enterprise) herein.

**SECTION 14:**     **If the complaint alleges a violation of 18 U.S.C. §1962(d), describe in detail the alleged conspiracy.**

N/A

**SECTION 15:**     **Describe the alleged injury to business or property.**

Phoenix has been injured in that the RICO defendants have caused it to issue life insurance policies, including those policies issued on the lives of Mr. Kramer and Mr. Levinson, as alleged in Sections 2, 4(a), 5(b), and 5(c) herein, that it would not have issued but for the RICO defendants' unlawful conduct.  If Phoenix is required to pay any death benefits pursuant to the Phoenix Policies, as demanded by Plaintiff, Lockwood, LPS, and Tall Tree will have caused Phoenix to suffer damages in the amount of such payments.  They will also have caused Phoenix to suffer additional damages, including but not limited to commissions paid on the Levinson Policy and the Phoenix Policies.

**SECTION 16:**     **Describe the direct causal relationship between the injury and the violation of the RICO statute.**

Phoenix's injuries were proximately caused by the RICO violations alleged herein.  On information and belief, Mr. Kramer and Mr. Levinson did not apply for life insurance on their

own initiatives, but rather were induced to do so by the offer of ready cash.  In other words, neither Mr. Kramer nor Mr. Levinson would have submitted their applications but for the pattern of racketeering alleged herein.  The racketeering activity alleged herein also kept the Phoenix Policies and the Levinson Policy (at least ostensibly) in force by the payment of premiums during the relevant contestability periods.  Phoenix relied on the representations in the submitted applications, the presence of a valid insurable interest, and the payment of the first premium in issuing the Phoenix Policies and the Levinson Policy and in paying the associated commissions, and Phoenix relied on the continued payment of premiums in keeping those policies (at least ostensibly) in force.   Phoenix would not have issued the Phoenix Policies or the Levinson Policy or kept them (at least ostensibly) in force but for the fraudulent SOLI transactions and the pattern of racketeering alleged herein.

**SECTION 17:**     **List the damages sustained for which each defendant is liable.**

The RICO defendants are liable for the following damages:

- the amount of any death benefits that Phoenix is required to pay pursuant to the Phoenix Policies, as demanded by Plaintiff;

- additional damages, including but not limited to commissions paid on the Levinson Policy and the Phoenix Policies; and

- treble damages, as well as costs and attorneys' fees in connection with defense of this lawsuit and prosecution of counterclaims, cross-claims and third-party claims, pursuant to 18 U.S.C. § 1964(c).

**SECTION 18:**     **List all other federal causes of action, if any, and provide the relevant statute numbers**

N/A

**SECTION 19:**   **List all pendent state claims, if any.**

This action was brought by the Estate of Arthur Kramer in this Court on the basis of diversity jurisdiction.   Phoenix has asserted the following state law cross-claims against defendants LPS and Tall Tree: (a) aiding and/or abetting fraud, and (b) aiding and/or abetting breach of fiduciary duty.   Phoenix has asserted the following state claims against third-party defendant Lockwood: (a) fraud, (b) breach of fiduciary duty, (c) breach of contract, (d) negligence, (e) contractual indemnification, and (f) unjust enrichment.

**SECTION 20:**   **Provide any additional information potentially helpful to the Court in adjudicating your RICO claim.**

A large secondary market has developed around the sale of life insurance policies (commonly known as the life settlements market).   Investors are drawn to this market because the "returns" from life insurance policies are not correlated with other more standard investments.   Unfortunately, certain sophisticated investors, and their agents, are not content merely to purchase available policies that were originally procured for legitimate purposes, but instead have found ways to circumvent New York's insurable interest rule (with increasing frequency) in order to facilitate the procurement of policies intended from their inception to be sold on the secondary market.   Such persons, including the RICO defendants named herein, are able to generate many policies worth millions of dollars by engineering SOLI schemes that hide the intended and real policyholder's lack of insurable interest – as well as the financial inducement to the insured to apply for and sell the policy  – from the insurer.   As the number and amount of the policies referenced in this case reveal, these SOLI schemes are a recently emerging and significant threat to the stability of traditional life insurance.

SOLI arrangements are illegal and objectionable on public policy grounds.   Indeed, there is a long-standing public policy in New York (and in the United States generally) against such

"wager" policies, which otherwise would present a widespread moral hazard arising from policyholders whose only interest is in the insured's imminent demise.  That policy is codified in Section 3205 of the New York Insurance Law, which prohibits the procuring of a life insurance policy for the benefit of someone without an insurable interest in the life of the insured.  Without such a policy, societal resources would flow into the morbid and unproductive business of identifying potential insureds with shorter-than-average life expectancies and inducing them to begin, and even coaching them through, the life insurance application process.  Given these considerations, and because life insurance companies would not issue policies if they knew the policies were part of a SOLI arrangement, such schemes are a destabilizing threat to the life insurance field.

Furthermore, SOLI arrangements present risks to the insureds, who may be deprived of the ability to obtain additional insurance – for their families or businesses – if later it would be beneficial to do so.  The insureds may also find themselves confronted with unexpected liabilities arising from their participation in these SOLI arrangements.  Such insureds are not likely to receive comprehensive and disinterested advice from those intermediaries who profit from these SOLI arrangements.  Indeed, they would in essence become the vehicles through which those with no interest in their continued well-being (and, in fact, a vested interest in their demise) would profit.

Dated:  New York, New York
       April 29, 2008

Respectfully submitted,


**DORSEY & WHITNEY LLP**


By:  /s/Patrick J. Feeley
     Patrick J. Feeley (PF-4931)
     Christopher G. Karagheuzoff (CK-1122)
     Stephen M. Raab (SR-0742)

250 Park Avenue
New York, New York  10177
(212) 415-9200

Attorneys for Defendant and Third-Party
Plaintiff Phoenix Life Insurance Co.