## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

——————————————————————
                             :

**ALICE KRAMER, as Personal Representative**   :
**of the Estate of Arthur Kramer,**          :
                             :      **Case No.: 08 CV 2429-DAB-MHD**
                  **Plaintiff,**   :

      **—against—**              :

**LOCKWOOD PENSION SERVICES, INC.,**  :
**ET AL.,**                         :

              **Defendants.**  :
                             :
——————————————————————:

## MEMORANDUM OF LAW OF LINCOLN LIFE &
## ANNUITY COMPANY OF NEW YORK IN SUPPORT
## OF ITS MOTION TO DISMISS THE AMENDED COMPLAINT

## I.    INTRODUCTION

In response to the motion to dismiss of Defendant Lincoln Life & Annuity Company of

New York ("Lincoln"), Plaintiff has attempted to cure the pleading deficiencies by filing an

amended complaint. However, even with these changes, Plaintiff still lacks standing to assert a

claim for the proceeds of life insurance policies that she still admits were obtained as part of a

series of illegal "STOLI" transactions.[1] Briefly stated, Plaintiff has failed to allege

circumstances that entitle her to enforce the Lincoln life insurance policy (the "Lincoln Policy"),

because she has not alleged that Mr. Kramer was the owner or purchaser of such policy or that

the estate is the beneficiary of such policy.

---

[1]      STOLI is an acronym for Stranger-Originated Life Insurance. In a STOLI transaction, there is a lack of
insurable interest at the time of policy inception, and often, that lack of insurable interest is fraudulently
concealed from the insurer.

## II.    <u>FACTS</u>

Alice Kramer ("Ms. Kramer"), as Personal Representative of the Estate of Arthur Kramer, filed her complaint on March 10, 2008, asserting claims for declaratory judgment and the recovery of death benefits under policies issued by Lincoln and the other insurance company defendants.  On March 27, 2008, Lincoln filed a motion to dismiss.  Plaintiff was granted three extensions to respond to the motion to dismiss, the last of which extended the deadline to May 14, 2008.  There was no ruling on the motion to dismiss.  Instead, Plaintiff filed an amended complaint on May 7, 2008.  The "Background" section of the amended complaint alleges as follows:

- This action involves an arrangement to procure life insurance policies with the purpose of immediately transferring the beneficial interests in those policies to stranger investors, in contravention of the "insurable interest rule" as codified in the New York Insurance Law.[2]  *See* Amended Complaint ¶ 12.

- A typical STOLI arrangement is initiated by a stranger investor or an insurance agent who approaches an elderly person and encourages him to purchase life insurance, the death benefits of which will be immediately transferred to the stranger investor.  *See id.* ¶ 14.

- The investor typically agrees to pay the person an up-front payment, in addition to paying the insurance premiums, in return for the assignment of the ownership interest in the policy.  *See id.*

- The common characteristic of all STOLI arrangements is that they are structured so that the elderly person or a family member, rather than the stranger investor, is made to appear as the original beneficiary of the policy in order to try to evade the insurable interest requirement.  *See id.*

- The STOLI arrangement in this litigation was implemented by the non-insurance defendants to create the appearance that an insurable interest existed when the policies were taken out so that the subsequent transfers of the beneficial interests in those policies to the stranger investors would appear lawful.  *See id.* ¶ 15.

---

[2]    Transamerica Occidental Life Insurance Company and Phoenix Life Insurance Company also issued insurance policies on the life of Mr. Kramer, but are not the subject matter of this motion.

- The transfers to investors took place immediately upon Mr. Kramer's obtaining of the policies at issue, and that was always their plan. *See id.*

- At no time were Mr. Kramer or any of his family members the true owners of the beneficial interests in the policies. Mr. Kramer never intended for the death benefits of the insurance policies to benefit his family. *See id.*

The "Facts" section of the amended complaint alleges as follows:

- As early as 2003, Steven Lockwood ("Mr. Lockwood"), the principal of Defendant, Lockwood Pension Services, Inc. ("LPS"), approached Mr. Kramer to solicit his participation in a STOLI arrangement that is the subject matter of this litigation. *See* Amended Complaint ¶¶ 18-19.

- The insurance policies were procured on Mr. Kramer's life with the intention of immediately effectuating the assignment of the beneficial interests in the policies to an investor. *See id.* ¶ 21.

- At no time would Mr. Kramer or any of his family members have a true beneficial interest in the policies. *See id.*

- With respect to the Lincoln policy at issue, the STOLI arrangement involved Mr. Kramer, at the direction of LPS and possibly other defendants, establishing the Arthur Kramer Insurance Trust Dated August 29, 2005 (the "Trust"), in which, Hudson United Bank ("Hudson"), was named as the trustee. Mr. Lockwood and one of his associates witnessed the Trust agreement. *See id.* ¶ 32.

- Mr. Kramer's daughter, Liza, was named as the beneficiary of the Trust. *See id.*

- The Trust was prepared by LPS, who had a pre-existing relationship with Hudson and shared the same business address at 75 Rockefeller Plaza, New York, New York. *See id.* ¶¶ 33-34.

- Mr. Kramer had no prior business relationship with Hudson. *See id.* ¶ 35.

- Hudson is no longer the trustee of the Trust. Defendant, Jonathan Berck ("Mr. Berck"), is the current trustee. *See id.* ¶ 36.

- Mr. Kramer had no business relationship with Mr. Berck prior to the STOLI arrangement that is the subject matter of this litigation. *See id.* 27.

- On or about November 28, 2005, Lincoln issued a policy on the life of Mr. Kramer to the Trust having a death benefit of $10 million. *See id.* ¶ 41.

- At the direction of LPS and possibly other defendants, Mr. Kramer directed Liza to execute an assignment of her beneficial interest in the

3

Trust to stranger investor Defendant, Life Product Clearing, LLC ("Life Product").  *See id.* ¶ 42.

- Mr. Kramer and Liza never paid any premiums on the Lincoln policy, and there was no period of time when Liza was the true beneficiary of the Trust.  *See id.* ¶ 43.

- Mr. Kramer died on January 26, 2008, at the age of 81.  *See id.* ¶ 17.

- Subsequently, Ms. Kramer or her representatives received various communications from representatives of LPS and certain stranger investors demanding copies of Mr. Kramer's death certificate from Ms. Kramer so that they could submit claims to the insurance companies for death benefits.  Ms. Kramer has refused all such requests.  *See id.* ¶ 45.

- None of the insurance company Defendants have paid out the proceeds of any of the policies.  On or about April 16, 2008, Lincoln filed an action in Connecticut state court indicating its intention, *inter alia*, not to pay any death benefits in connection with the Lincoln policy.  *See id.* ¶ 46.[3]

The "Claims for Relief" section of the amended complaint alleges as follows:

- Pursuant to Insurance Law Sections 3203(a)(3) and 3205(b)(2), Plaintiff is entitled to a declaration that the insurance company defendants must pay the death benefits to her.  *See id.* ¶ 55.

- In the alternative, if some or all of the policy proceeds have already been paid to LPS, Tall Tree Advisors, Inc. ("TTA"), Life Product, Mr. Berck, or their representative or assignees, or to other persons or entities that may claim the right to receive such death benefits, then, pursuant to Insurance Law Section 3205(b)(4), Plaintiff is entitled to recover such death benefits. *See id.* ¶ 58.

## III.  ARGUMENT

### A.    Legal Standard

Although a court deciding a Rule 12(b)(6) motion to dismiss "must 'accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in plaintiff's favor,'" the claim "may still fail as a matter of law if the claim is not legally feasible."

---

[3]    With respect to the other insurance defendants, Plaintiff alleges that, on April 9, 2008, Phoenix filed a pleading in this action indicating, *inter alia*, its intention not to pay any death benefits in connection with the Phoenix policies.  *See* Amended Complaint ¶ 46.  Plaintiff states that Transamerica has not yet responded to the initial complaint in this action and was granted until June 15, 2008 to do so.  *See id.*

*See Hunt v. Enzo Biochem, Inc.*, 530 F. Supp. 2d 580, 591 (S.D.N.Y. 2008).  A complaint, subject to a Rule 12(b)(6) motion, requires the plaintiff to "provide the 'grounds' of his 'entitle[ment] to relief' [which] requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *See Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (citation omitted).  "Factual allegations must be enough to raise a right to relief above the speculative level."  *Id.* (citation omitted).  The court need not accord "'[l]egal conclusions, deductions or opinions couched as factual allegations . . . a presumption of truthfulness.'"  *See SEC  v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 483 (S.D.N.Y. 2007) (discussing legal standard under Rule 12(b)(6) generally) (footnote omitted).

### B.    Plaintiff Lacks Standing.

Plaintiff's amended complaint contains two counts.  In the first count, Plaintiff alleges that the Lincoln Policy lacks an insurable interest and that "[p]ursuant to Insurance Law Section 3203(a)(3) and 3205(b)(2), Plaintiff is entitled to a declaration that Lincoln must pay the death benefits" under the Lincoln Policy "and that such death benefits must be paid to her."  *See* Amended Complaint ¶ 55.  Plaintiff's second claim for relief (for recovery of death benefits) is not directed at Lincoln.  *See id.* at ¶¶ 57-58.

Under the first count, Plaintiff first cites to the insurance statute requiring policies to contain contestability clauses.  N.Y. Ins. Stat. § 3203(a)(3) provides:

> (a) All life insurance policies, except as otherwise stated herein, delivered or issued for delivery in this state, shall contain in substance the following provisions, or provisions which the superintendent deems to be more favorable to policyholders: …
>
> (3) that the policy shall be incontestable after being in force during the life of the insured for a period of two years from its date of issue…

Plaintiff also cites to the insurable interest statute, N.Y. Ins. Stat. § 3205(b)(2), which provides:

> No person shall procure or cause to be procured, directly or by assignment or otherwise any contract of insurance upon the person of another unless the benefits under such contract are payable to the person insured or his personal

representatives, or to a person having, at the time when such contract is made, an insurable interest in the person insured.

Neither statute, though, provides Plaintiff with the remedy she seeks. Her amended complaint has not cured the fundamental problem with her claim to the death benefits — namely, that she lacks standing to pursue a claim under the Lincoln Policy. Where, as here, it is apparent on the face of the complaint that the plaintiff lacks standing, a dismissal pursuant to Rule 12(b)(6) is warranted. *See Pappas v. Passias*, 1998 U.S. App. LEXIS 30914, at *4-5 (2d Cir. Dec. 1, 1998) (annexed as Exhibit A); *Blakely v. Cardozo*, 2007 U.S. Dist. LEXIS 68398, at *7 (S.D.N.Y. Sept. 18, 2007) (annexed as Exhibit B); *Kendall v. Employees Ret. Plan of Avon, Prods.*, 2007 U.S. Dist. LEXIS 68743, at *10-20 (S.D.N.Y. Sept. 14, 2007) (annexed as Exhibit C).

## 1.    Constitutional and Prudential Standing

It is a bedrock principle in our judicial system that a party have standing in order to bring an action. *See generally Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004) ("In every federal case, the party bringing the suit must establish standing to prosecute the action."). The doctrine of standing is embedded in Article III of the United States Constitution, as part of the "case" or "controversy" requirement. *See Warth v. Seldin*, 422 U.S. 490, 498 (1975). The issue of standing "imports justiciability: whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III," and this is a threshold question to determine the power of the federal court to entertain the suit. *See id.*

The constitutional minimum of standing contains three elements:

First, the plaintiff must have suffered an "injury in fact" -- an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of -- the injury has to be "fairly…trace[able] to the challenged action of the defendant, and not…th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*See generally Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992).  The party invoking federal jurisdiction bears the burden of establishing these elements.  *See id.* at 561.

The doctrine of standing not only involves the constitutional limitations on federal court jurisdiction under Article III, but also inquires into the prudential limitations on its exercise.  *See generally Kowalski v. Tesmer,* 543 U.S. 125, 128 (2004) ("The doctrine of standing asks whether a litigant is entitled to have a federal court resolve his grievance.  This inquiry involves 'both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.'").  The issue of prudential standing embodies "'judicially self-imposed limits on the exercise of federal jurisdiction.'"  *See Newdow*, 542 U.S. at 11  (citation omitted).  It is exemplified in the rule that a party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."  *See Kowalski*, 543 U.S. at 129  (citation omitted).  In addition to meeting the three prerequisites of standing, *supra*, "a plaintiff seeking third-party standing in federal court *must* also satisfy the prudential prerequisites of standing by demonstrating a close relation to the injured third party and a hindrance to that party's ability to protect its own interests."  *See Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 174 (2d Cir. 2005) (emphasis added).  A plaintiff will lack third-party standing where it has not demonstrated a hindrance to the injured party's ability to protect its own interests.  *See id.*

### 2.    Standing Under Declaratory Judgment Act

The Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, provides in part:

> In a case of actual controversy within its jurisdiction, [with exceptions,] any court
> of the United States, upon the filing of an appropriate pleading, may declare the
> rights and other legal relations of any interested party seeking such declaration,
> whether or not further relief is or could be sought.

28 U.S.C. § 2201(a).  The limitation in the Declaratory Judgment Act to "cases of actual controversy" harkens back to the constitutional provision limiting the exercise of judicial power

to "cases" and "controversies;" the Declaratory Judgment Act "is operative only in respect to controversies which are such in the constitutional sense." *See Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239-240 (1937); *Am. Standard, Inc. v. Oakfabco, Inc.*, 498 F. Supp. 2d 711, 715 (S.D.N.Y. 2007) ("The requirement in the Declaratory Judgment Act that the action present an 'actual controversy' between the parties is consistent with the 'cases' and 'controversies' requirement of Article III.").

### 3.    Standing Under Contracts

In a diversity action, a plaintiff must meet both Article III standing requirements and the standing requirements of applicable state law. *See Faggionato v. Lerner*, 500 F. Supp. 2d 237, 248-49 (S.D.N.Y. 2007) (discussing Article III standing requirements and then holding that, under the applicable law, the plaintiff was not a party to the contract and lacked standing). Similar to the requirements under Article III, under New York law, the plaintiff must demonstrate "injury in fact that falls within the relevant zone of interests sought to be protected by law." *Caprer v. Nussbaum*, 825 N.Y.S.2d 55, 62-63 (App. Div. 2006) (further stating that this test "requires a plaintiff first to establish that he or she will actually be harmed by the challenged action, and that the injury is more than conjectural. Second, the injury a plaintiff asserts must fall within the zone of interests or concerns sought to be promoted or protected by the statutory provision or recognized common-law relationship pursuant to which a defendant has acted.").

### 4.    Plaintiff Lacks Standing To Assert a Claim Under the Lincoln Policy

The allegations contained in Plaintiff's amended complaint — disclaiming that (i) Mr. Kramer ever held any interest as owner or purchaser of the Lincoln Policy, (ii) his family members ever had any genuine interest as beneficiaries of the Lincoln Policy, and (iii) the non-insurance company defendants that did have an interest in the Lincoln Policy had any insurable

interest in Mr. Kramer's life — can only lead to the one logical conclusion — which is that Plaintiff lacks standing to assert any claim under the Lincoln Policy.

In the amended complaint, Plaintiff alleges that Mr. Kramer's Estate is entitled to the death benefit under the Lincoln Policy because the non-insurance company defendants engaged in an "elaborate and unlawful" STOLI scheme to wager on the life of Mr. Kramer.  Plaintiff's amended complaint is based upon the New York insurable interest statute, N.Y. Ins. Stat. § 3205(b)(2), which provides that "No person shall procure or cause to be procured, directly or by assignment or otherwise any contract of insurance upon the person of another unless the benefits under such contract are payable to the person insured or his personal representatives, or to a person having, at the time when such contract is made, an insurable interest in the person insured."  Plaintiff alleges that this statute was violated, and that the non-insurance company defendants lacked an insurable interest in Mr. Kramer's life.  In this regard, Plaintiff alleges that (i) "Mr. Kramer and [his daughter] Liza never paid any premiums on the Lincoln Policies," (ii) "[a]t no time were Mr. Kramer or any of his family members the true owners of the beneficial interests in the policies," (iii) "there was no period of time when Liza was the true beneficiary" of the Kramer Trust, (iv) "Mr. Kramer never intended for the death benefits of the insurance policies to benefit his family," and (v) the Lincoln policy was "procured" by "stranger investors" (Tall Tree Advisors, Inc. and Life Products Clearing, LLC) with no insurable interest in Mr. Kramer's life.  *See* Amended Complaint ¶¶ 12, 15, 43, 52.

Under New York law, to have standing to assert a claim in connection with a life insurance policy, the plaintiff must have an interest in the policy as an owner, intended beneficiary, or purchaser of the policy.  *See Bello v. New England Fin.*, 787 N.Y.S.2d 676 (Sup. Ct. 2004); *Heslin v. Metro. Life Ins. Co*., 733 N.Y.S.2d 753, 754 n.1 (App. Div. 2001); *Silberman v. Royal Ins. Co.*, 584 N.Y.S.2d 625 (App. Div. 1992); *see also  Hylte Bruks Aktiebolag v. Babcock & Wilcox Co.,* 399 F.2d 289, 291-92 (2d Cir. 1968).  The mere fact that

9

Mr. Kramer's life was insured under the Lincoln Policy does not confer standing upon Mr.

Kramer's Estate to assert a claim for death benefits under the Lincoln Policy. *See Gaidon v. Guardian Life Ins. Co. of Am.*, 707 N.Y.S.2d 166, 167 (App. Div. 2000), *aff'd*, 750 N.E.2d 1078, 1081 (N.Y. 2001). For example, in *Gaidon*, the New York Appellate Division affirmed the dismissal of an insured's complaint and held that, where another party purchased and owned a life insurance policy insuring the insured's life, the insured lacked standing to sue under the policy. *Id.*

Neither the law relied upon by Plaintiff — New York's insurable interest statute, N.Y. Ins. Stat. § 3205(b)(2) — nor the facts alleged in the amended complaint support Plaintiff's standing to sue under the Lincoln Policy. The insurable interest statute does not vest Plaintiff with any right in the policy. Instead, the statute strips the non-insurance defendants of any interest in the policy due to their lack of insurable interest in Mr. Kramer's life. Moreover, the very nature of Plaintiff's claims and the allegations contained in Plaintiff's amended complaint belie any notion that Plaintiff has any standing to sue Lincoln under the Lincoln Policy. In the amended complaint, Plaintiff alleges and admits that the non-insurance company defendants that acquired the Lincoln Policy were stranger investors lacking an insurable interest in the life of Mr. Kramer and that neither Mr. Kramer nor any of his family members ever held any genuine interest (as owner, purchaser or beneficiary) in the Lincoln Policy during Mr. Kramer's lifetime. Notwithstanding these allegations, Plaintiff claims that, as a consequence of this illegal STOLI transaction, Lincoln and the other insurance company defendants "must pay the death benefits" under their policies to Plaintiff. However, Plaintiff's disclaimer of any genuine interest by Mr. Kramer or his family in the Lincoln Policy during Mr. Kramer's lifetime is completely inconsistent with the Estate having standing to assert any claim for death benefits under the Lincoln Policy.

The amended complaint makes clear that neither Mr. Kramer nor his family members owned the Lincoln policy, alleging that "[a]t no time were Mr. Kramer or any of his family members the true owners of the beneficial interests in the policies." Likewise, Plaintiff concedes that Mr. Kramer and his family members were not genuine beneficiaries of the Lincoln Policy or the trust that owned the policy. In this regard, Plaintiff alleges that "Mr. Kramer never intended for the death benefits of the insurance policies to benefit his family" and "there was no period of time when Liza was the true beneficiary" of the Kramer Trust. Finally, Plaintiff concedes that neither Mr. Kramer nor his family purchased the Lincoln Policy. In this regard, Plaintiff admits that "Mr. Kramer and Liza never paid any premiums on the Lincoln Policy." *See* Amended Complaint ¶¶ 12, 15, 43, 52. It is axiomatic that one becomes the purchaser of a policy by paying premium in procuring an insurance policy. *See Bello*, 787 N.Y.S.2d 676 (purchaser paying $200,000 in premium had standing to sue); *see also Bay City-Abrahams Bros. v. Estee Lauder, Inc.*, 375 F. Supp. 1206, 1218 (S.D.N.Y. 1974) (defining "purchaser" as "one who purchases, a buyer, a vendee") (citation omitted); *New York 10-13 Ass'n v. City of New York*, 1999 U.S. Dist. LEXIS 3733 (S.D.N.Y. Mar. 30, 1999) (premium is price paid to obtain insurance) (annexed as Exhibit D).[4] Under these circumstances, Plaintiff's amended complaint must be dismissed for lack of standing. *See Palladino v. Metropolitan Life Ins. Co.*, 590 N.Y.S.2d 601, 602 (App. Div. 1992) (affirming dismissal of estate's claim against insurance company for lack of standing because the estate lacked "an actual legal stake in the matter being adjudicated").

Because Plaintiff does not have the ability to enforce the contract, she similarly lacks standing to seek a declaration of rights under that contract under the Declaratory Judgment Act.

---

[4]    Moreover, even if the amended complaint alleged that any premium payments were advanced by third parties and transmitted by Mr. Kramer (which is not alleged in the amended complaint herein), the use of Mr. Kramer as a "strawman" would not render Mr. Kramer a purchaser. *See United States v. One 1937 Model Ford V-8 Coupe Auto.*, 22 F. Supp. 385 (E.D. Ky. 1938); *Zetlin v. Scher*, 217 A.2d 266 (Md. 1966).

*See Eaton Vance Mgmt. v. Forstmannleff Assoc.,* 2006 U.S. Dist. LEXIS 55741, at *17

(S.D.N.Y. Aug. 11, 2006) (annexed as Exhibit E) (where employee had signed a restrictive

covenant, and new employer, who was not a party to the covenant, sought declaration pursuant to

28 U.S.C. §§ 2201-02 that the covenant was unenforceable, new employer lacked standing to

enforce contract and thus also lacked standing to seek declaration of rights under the contract).

As the court in *Eaton* explained, because the underlying cause of action is what is actually

litigated in a declaratory judgment action, "a party bringing a declaratory judgment action must

have been a proper party had the defendant brought suit on the underlying cause of action.

Parties who lack standing to enforce an agreement also lack standing to seek a declaration of

rights under the contract." *Id.* (citations omitted).

   Finally, even though the second count of the amended complaint is no longer directed at

Lincoln, interpretations of statutes similar to the cited statute, N.Y. Ins. Stat. § 3205(b)(4),

emphasize Plaintiff's standing problem and demonstrate the limited circumstances in which an

estate has standing to sue on policies lacking insurable interest.  Many other states have enacted

statutes similar to N.Y. Ins. Stat. § 3205(b)(4), and cases from these other states have uniformly

held that the statutes (referred to herein as recovery statutes) provide estates with standing to sue

parties that are in possession of policy proceeds, but not that the statutes provide estates with

standing to sue *the insurers* that decided to pay (or decided to not pay) the policy proceeds.  *See,*

*e.g., In re Al Zuni Trading, Inc. v. Penick,* 947 F.2d 1403, 1404 (9th Cir. 1991) (state recovery

statute modifies general rule that only insurer can raise objection of want of an insurable interest;

therefore, personal representative had standing in bankruptcy adversary proceeding to raise claim

against trustee who received death benefits); *Lewis v. Wal-Mart Stores, Inc*., 2005 U.S. Dist.

LEXIS 34470, at *23 (N.D. Okla. Dec. 1, 2005) (annexed as Exhibit F) (named beneficiary of

corporate-owned life policy received death benefits, and therefore, personal representative's

claim against the named beneficiary was not dismissed for lack of standing); *Froiland v. Tritle,*

484 N.W.2d 310, 313 (S.D. 1992) (estate allowed to recover proceeds from named beneficiary).

In fact, in *Lewis*, numerous personal representatives were dismissed, under the recovery statute,

for lack of standing where the estates never received any benefits under the life insurance

policies, the insureds themselves never received any benefits, and the named beneficiary never

received any benefits. *See Lewis*, *2005* U.S. Dist. LEXIS 34470, at *21-22.[5]

## IV.   CONCLUSION

For each of the foregoing reasons, Plaintiff lacks standing to assert any claim against

Lincoln under the Lincoln Policy and Plaintiff's amended complaint must be dismissed with

prejudice pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

Respectfully submitted,

Dated: New York, New York          DRINKER BIDDLE & REATH LLP
June 3, 2008

/s/ Katherine L. Villanueva
Katherine L. Villanueva (KH 5283)
140 Broadway, 39th Floor
New York, NY  10005
(212) 248-3140

---

[5]    Moreover, as discussed more fully in Lincoln's previous motion to dismiss, N.Y. Ins. Stat. § 3205(b)(4) has not even been triggered in this case.  By its terms, N.Y. Ins. Stat. § 3205(b)(4) is triggered when the "beneficiary, assignee or other payee, [under a life insurance policy made in violation of the insurable interest requirements], *receives from the insurer* any benefits...accruing upon the death...of the person insured."  *See* N.Y. Ins. Stat. § 3205(b)(4) (emphasis added).  Other states have interpreted and applied their respective recovery statutes in a manner that simply reinforces the plain language.  Indeed, virtually all the recovery statute cases arise in a context where the insurer has paid the proceeds.  *See, e.g., Penick,* 947 F.2d at 1404 (citing to statute in the context where insurer had paid proceeds); *Froiland*, 484 N.W.2d at 313 (same); *see also Beard v. Am. Agency Life Ins. Co.*, 550 A.2d 677, 687 n.3 (Md. 1988) (explaining that the Maryland recovery statute is triggered "when a beneficiary who lacks an insurable interest receives payment of the insurance proceeds from the insurer" but "does not specify what sanctions are to be imposed when, as here, the insurer has not yet paid a beneficiary who lacks an insurable interest").  As alleged, Lincoln has not paid the policy proceeds.  *See* Amended Complaint ¶ 46.  Therefore, the statute upon which Plaintiff bases her second request for relief has not been triggered.

OF COUNSEL
Stephen C. Baker
Michael J. Miller
Drinker Biddle & Reath LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA  19103-6996

For Defendant, Lincoln Life & Annuity
Company of New York

## <u>CERTIFICATE OF SERVICE</u>

I, Katherine L. Villanueva, hereby certify that, on the date set forth below, I electronically filed copies of (1) Memorandum of Law of Lincoln Life & Annuity Company of New York in Support of its Motion to Dismiss the Amended Complaint, and (2) Affidavit of Katherine L. Villanueva, using the CM/ECF system, which will send notification of such filings to CM/ECF participants.

I also hereby certify that on the date set forth below, I submitted courtesy copies of the aforementioned, marked as courtesy copies, by overnight Federal Express to the following:

> The Honorable Deborah A. Batts, USDJ
> United States Courthouse
> 500 Pearl St., Room 2510
> New York, NY 10007
> (two copies)
>
> The Honorable Michael H. Dolinger, USMJ
> United States Courthouse
> 500 Pearl St., Room 1670
> New York, NY 10007
> (one copy)

> /s/ Katherine L. Villanueva
> Katherine L. Villanueva (KH 5283)
> Drinker Biddle & Reath LLP
> 140 Broadway, 39th Floor
> New York, NY  10005
> (212) 248-3140

Dated: June 3, 2008

# EXHIBIT A

LEXSEE 1998 US APP LEXIS 30914

**ANTHONY PAPPAS, Plaintiff-Appellant, v. GEORGE PASSIAS; DEMETRIOS COUCOUZES, aka Archbishop Iakovos; ANTHIMOS PANAGIOTOPOULOS, aka Bishop Alexios; ATHENA BELTECAS; GEORGE BIRBILIS; PAUL CAVOUNIS; TRACY DEMOS; GREGORY FEGOS; RENOS GEORGIOU; CELE IOANNOU, aka Cecelia Ioannou; DORA LAGOS; SPIRO PAPADOPOULOS; LEONIDAS PAPALAS; FRIDERIKI PAPPAS; VAN PAPPAS; ALEXANDER PRITSOS; ALICE RIGAS; GREEK ORTHODOX ARCHDIOCESE OF NORTH AND SOUTH AMERICA, INC.; ST. NICHOLAS GREEK ORTHODOX CHURCH OF FLUSHING, INC.; CLOUD TOURS, INC.; CONSTANTINE DESIGNERS & BUILDERS, LTD.; GREGORY FEGOS ELECTRIC CO.; RENO GENERAL CONSTRUCTION CORP.; CHRIS ARLIS, aka Chrysanthe Arlis; MICHAEL CAPOUS; PAUL CONDILES; ANASTASIOS DIACOVASILIS; HARRY KALOGIANNIS; MAUREEN PAPALAS; THEODORE PERDIK; KIKI SAKLABANAKIS; GLORIA SFIROUDIS; NICHOLAS TSESMELIS; JOHN TSOLIS; ANTONIA ANASTASIOU; WILLIAM SPYROPOULOS SCHOOL; ST. NICHOLAS GREEK ORTHODOX YOUTH ASSOCIATION; PARENT-TEACHERS ASSOCIATION OF THE WILLIAM SPYROPOULOS SCHOOL, Defendants-Appellees, CHRIS DEMETRIADES; DEMETRIADES DEVELOPERS, INC., Defendant.**

\# 97-9227

UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

*1998 U.S. App. LEXIS 30914*

**December 1, 1998, Decided**

**NOTICE:**    [\*1] RULES OF THE SECOND CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:**    Reported in Table Case Format at: *1998 U.S. App. LEXIS 37706.*

**PRIOR HISTORY:**    Appeal from the United States District Court for the Eastern District of New York (Joanna Seybert, Judge).

**DISPOSITION:**  AFFIRMED.

**COUNSEL:** Appearing for Appellant: ANTHONY PAPPAS, pro se, New Hyde Park, NY.

Appearing for Appellees: SPIROS A. TSIMBINOS, Kew Gardens, New York, and MICHAEL R. MANAREL, Zawacki, Everett, Gray & McLaughlin, New York, NY.

**JUDGES:** PRESENT: HON. GUIDO CALABRESI, HON. ROBERT D. SACK, HON. SONIA SOTOMAYOR, Circuit Judges.

**OPINION**

SUMMARY ORDER

UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the judgment of the District Court be and it hereby is AFFIRMED.

Anthony Pappas, *pro se*, appeals from a judgment

1998 U.S. App. LEXIS 30914, *1

entered on October 7, 1997 in the United States District Court for the Eastern District of New York (Seybert, *J.*) dismissing his RICO and state law claims and denying him leave to amend his complaint for a third time.

I

Pappas is a member of the St. [*2] Nicholas Greek Orthodox Church. He contends that the church, the archdiocese, and numerous officials of both organizations make up two racketeering enterprises that fraudulently solicited contributions from church parishioners and then misappropriated the funds. As a predicate act for this RICO scheme, Pappas alleges that, over a period of several years, the church committed mail fraud by sending misleading financial statements and solicitations to individual members of the congregation. In particular, he claims that the annual statements of the parish's finances failed to describe the budget in sufficient detail.

Pappas asserts that he relied on these allegedly misleading financial statements and other solicitations when he made several contributions to the church. These contributions included: (1) a $ 1,250 contribution to the Godparent program; (2) a $ 250 contribution to the Parish Directory Fund Drive; (3) a series of small donations made between 1988 and 1991 to commemorate living and deceased relatives; (4) payment of membership dues between 1987 and 1993, along with $ 25 as partial payment towards his 1994 membership dues; and (5) a series of small payments to the School [*3] Food Program.

Pappas brought suit in 1993 pursuant to *18 U.S.C. § 1962* and state law, alleging that the St. Nicholas church and its alleged co-conspirators had, *inter alia*, violated civil RICO. *See Pappas v. Passias, 887 F. Supp. 465, 469 (S.D.N.Y. 1995)*. The district court dismissed for lack of standing, since Pappas failed to show that "he had sustained some separate injury to his business or property that arose apart from his status in relation to the subject association or organization." *See id at 472*. Pappas then filed an amended complaint in which he attempted to articulate an individual harm sufficient to establish standing under RICO. The district court granted defendants' *Rule 12(b)(6)* motion to dismiss this second RICO complaint--again for lack of standing. In addition, the district court exercised its discretion to dismiss

Pappas' state law claims and deny him leave to amend his complaint a third time. The court ruled, however, that Rule 11 sanctions against Pappas were not appropriate.

II

"We review the district court's dismissal of a complaint pursuant to *Rule 12(b)(6) de novo*." *Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir. 1996)*. [*4] And "we take all [of the plaintiff's] allegations as true, and all reasonable inferences are drawn and viewed in a light most favorable to the plaintiff[]." *Id.*

The civil RICO statute confers standing on "any person injured in his business or property by reason of a violation of [civil RICO]." *See 18 U.S.C. § 1964(c) (1994)*. We have held, therefore, that "in order to have standing, a plaintiff must show: (1) a violation of [civil RICO]; (2) injury to business and property; and (3) causation of the injury by the violation." *See Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 23 (2d Cir. 1990)*.

To show causation, the Supreme Court has held that a plaintiff must establish "some direct relation between the injury asserted and the injurious conduct alleged." *See Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 268, 117 L. Ed. 2d 532, 112 S. Ct. 1311 (1992)*. Since Pappas has not alleged anything in his pleadings that shows any relation, let alone a direct relation, between the alleged RICO violations and his specific contributions. Accordingly, we conclude that he has not met the third prong of the [*5] *Hecht* standing analysis.

As to Pappas' state law claims, it was well within the district court's discretion to dismiss them once the federal cause of action was dismissed pursuant to *Rule 12(b)(6)*. *See 28 U.S.C. § 1367(c)(3)*. We also affirm the district court's decision to deny Pappas leave to amend his complaint a third time since it appears that any such amendment would be futile. *See Mackensworth v. S.S. American Merchant, 28 F.3d 246, 251 (2d Cir. 1994)*. Finally, we agree with the district court that Rule 11 sanctions against Pappas are not warranted.

We have considered all of Pappas' arguments and find them to be without merit. The judgment of the district court is therefore affirmed.

# EXHIBIT B

LEXSEE 2007 US DIST LEXIS 68398

**DR. DELOIS BLAKELY, Plaintiff, -v- MICHAEL A. CARDOZO, LESLIE SPITALNICK, MARTHA E. STARK, SHAUN DONOVAN, MYRIAM ELLIS, MARK MATTHEWS, Defendants.**

**07 Civ. 3951 (DLC)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2007 U.S. Dist. LEXIS 68398*

**September 17, 2007, Decided
September 18, 2007, Filed**

**COUNSEL:** [*1] Appearances:

Pro se Plaintiff: Dr. Delois Blakely, New York, New York.

For Defendants: Christina L. Hoggan, Assistant Corporation Counsel of the City of New York, New York, New York.

**JUDGES:** DENISE COTE, United States District Judge.

**OPINION BY:** DENISE COTE

**OPINION**

*ORDER AND OPINION*

DENISE COTE, District Judge:

Plaintiff Dr. Delois Blakely brings the instant action against various officials of the City of New York (the "City"), alleging that the City has violated her federal statutory and constitutional rights by initiating an in rem tax foreclosure action against 477 West 142nd Street, New York, New York (the "property"), a property owned by the 477 West 142nd Street Housing Development Fund Corporation (the "HDFC"), of which Blakely claims to be a shareholder. The defendant City officials (the "defendants") have moved to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, claiming that Blakely lacks standing to prosecute this action or, in the alternative, that she has failed to state a claim upon which

relief can be granted. Because Blakely lacks standing to sue, the defendants' motion to dismiss is granted.

BACKGROUND

The following facts are undisputed. The HFDC, duly organized as a corporation under the [*2] New York Private Housing Finance Law, purchased the property at 477 West 142nd Street from the City in 1982 and covenanted with the City to operate the premises solely as a housing project for persons or families of low income. Blakely lives on the property and claims to be a shareholder in the HDFC. On January 9, 2004, the City commenced an in rem tax foreclosure action against certain delinquent tax parcels, including 477 West 142nd Street. *See In Rem Tax Foreclosure Action No. 46, Borough of Manhattan*, Index No. 580001/04 ("*Manhattan 46*"). As of that date, the outstanding taxes and other charges against the property amounted to $ 302,370.03; as of September 21, 2006, this figure had increased to $ 475,172.96. HDFC answered in *Manhattan 46* on April 29, 2004, resulting in the severance of the property from the foreclosure action. *See N.Y. City Admin. Code § 11-409*.

The City moved for summary judgment in the Supreme Court, New York County, on December 22, 2006. On April 16, 2007, Shirley Pitts, suing as Vice President and a shareholder of HDFC and represented by counsel, filed an opposition. HDFC did not file its own submission, and the court treated Pitts' opposition as HDFC's own. [*3] The City served Pitts with its reply papers on April 19, 2007, and on April 23, the court

Case 1:08-cv-02429-DAB    Document 53-3    Filed 06/03/2008    Page 3 of 4

Page 2
2007 U.S. Dist. LEXIS 68398, *3

granted the City's motion for summary judgment. The City filed a proposed judgment of foreclosure on May 21, 2007. Three days later, on May 24, the HDFC, represented by counsel, moved for reargument and sought vacatur of the Supreme Court's April 23, 2007 decision. The HDFC claimed that it failed to submit its own opposition to the City's motion for summary judgment because of miscommunication among the interested parties. On June 6, the City served opposition papers on the HDFC in response to its May 24 motion for reargument and vacatur, and the HDFC replied on June 8. By decision dated June 11, 2007, the Supreme Court vacated its April 23, 2007 decision and reconsidered the City's motion for summary judgment. After reviewing the parties' submissions, the court again found that the HDFC had defaulted and, on reargument, had not "proffered evidence of inaccuracy of calculation and what correct amount is due." Accordingly, the Supreme Court again granted summary judgment to the City.

On May 21, 2007, Blakely, along with Bishop Shirley Pitts and Margaret Calender, filed the instant suit seeking [*4] injunctive and declaratory relief under *18 U.S.C. §§ 241, 242,* and *245,* and *42 U.S.C. §§ 1983* and *3631*. On July 9, Pitts and Calender withdrew their claims pursuant to a Stipulation to Discontinue Action. Blakely, pro se and proceeding as the sole plaintiff, requests appointment of an independent attorney to recalculate the debt owed by the HDFC to the City; an injunction to prevent the City from foreclosing on the property for six months so that the HDFC can "obtain grants and pay outstanding taxes"; a transfer of the property to the New Future Foundation, a nonprofit organization of which Blakely is president, and a declaration that transfer to any other third party would be "void on its face"; and ten million dollars in monetary damages. The City moves to dismiss, claiming principally that Blakely lacks standing to prosecute this action, and that she has failed to state a claim under the various statutes listed in the complaint.

## DISCUSSION

When considering a motion to dismiss under *Rule 12(b)(6),* a trial court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007)* [*5] (citation omitted). It may "dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent

with the allegations" set forth therein. *Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)* (citation omitted); *see also McCarthy, 482 F.3d at 191.* Standing is assessed on the basis of the pleadings, and thus a court accepts as true "all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Bldg. & Constr. Trades Council v. Downtown Dev., Inc., 448 F.3d 138, 144 (2d Cir. 2006)* (citation omitted).

The defendants claim that Blakely lacks standing to prosecute this suit because she does not own the premises subject to the in rem foreclosure action. To the extent Blakely seeks to bring the action on behalf of the HDFC, they contend that she is not authorized to do so because a corporation cannot proceed pro se. Blakely counters that she has standing because she brings this suit as a "private shareholder[]" of the HDFC. She further argues that she was deceived by the City into believing that she was the owner of the property by its sanctioning of the HDFC as a corporate body comprised [*6] of the owners of apartments at 477 West 142nd Street, and that she would suffer a constitutionally cognizable injury if the City were now to preclude her from bringing suit on behalf of the HDFC.

To have standing under Article III of the United States Constitution, "a plaintiff must have suffered an 'injury in fact' that is 'distinct and palpable'; the injury must be fairly traceable to the challenged action; and the injury must be likely redressable by a favorable decision." *Denney v. Deutsche Bank AG, 443 F.3d 253, 263 (2d Cir. 2006)* (citing *Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)).* "[T]he harm must be 'actual or imminent,' not 'conjectural or hypothetical.'" *Id. at 264* (citing *Whitmore v. Arkansas, 495 U.S. 149, 155-56, 110 S. Ct. 1717, 109 L. Ed. 2d 135 (1990)).*

Because the property at 477 West 142nd Street is the object of the City's in rem foreclosure action, only the property's legal owner, the HDFC, can be alleged to have suffered the requisite injury to confer standing. Blakely, a shareholder of the HDFC, is "injured only as a result of the injury to another, *i.e.,* the corporation, and therefore generally lacks standing." *Bingham v. Zolt, 66 F.3d 553, 562 (2d Cir. 1995).* Because she has not [*7] alleged that the City "has violated an independent duty" to her as a shareholder in the HDFC, *Ceribelli v. Elghanayan, 990 F.2d 62, 63 (2d Cir. 1993),* she lacks standing to pursue

this action. To the extent she seeks to represent the interests of the HDFC in suing the City, it is clear that she may not do so pro se, as the Second Circuit has stated that "a natural person must represent the corporation in court," and consequently "insisted that that person be an attorney licensed to practice law before our courts." *Jones v. Niagara Frontier Transp. Authority, 722 F.2d 20, 22 (2d Cir. 1983)*.

CONCLUSION

The defendants' motion to dismiss is granted for plaintiff's lack of standing. The Clerk of Court shall close the case.

SO ORDERED.

Dated: New York, New York

September 17, 2007

DENISE COTE

United States District Judge

# EXHIBIT C

LEXSEE 2007 US DIST LEXIS 68743

**IRENE M. KENDALL, Personally and on Behalf of all similarly situated, Plaintiff, -against- EMPLOYEES' RETIREMENT PLAN OF AVON PRODUCTS and THE RETIREMENT BOARD, As plan administrator, Defendants.**

**03 Civ. 2518 (DAB)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2007 U.S. Dist. LEXIS 68743*

**September 14, 2007, Decided**
**September 14, 2007, Filed**

**COUNSEL:** [*1] For Irene M. Kendall, personally and onbehalf of all similarly situated, Plaintiff: Edgar Pauk, LEAD ATTORNEY, Law Offices of Edgar Pauk, Esq., New York, NY.

For Employees Retirement Plan of Avon Products, Retirement Board, as Plan Administrator, Defendants: Jeffrey S. Klein, LEAD ATTORNEY, Nicholas James Pappas, LEAD ATTORNEY, Weil, Gotshal & Manges LLP (NYC), New York, NY.

**JUDGES:** DEBORAH A. BATTS, United States District Judge.

**OPINION BY:** DEBORAH A. BATTS

**OPINION**

**MEMORANDUM & ORDER**

**DEBORAH A. BATTS, United States District Judge.**

Plaintiff Irene M. Kendall, personally and on behalf of all similarly situated, brings suit against Defendants Employees' Retirement Plan of Avon Products, and The Retirement Board, as plan administrator. Plaintiff's Amended Class Action Complaint ("Amended Complaint") alleges that Defendants' employee pension plan, in which Plaintiff is a participant, violates several provisions of the Employee Retirement Income Security Act ("ERISA") and other applicable regulations.

Defendants move to dismiss the Amended Complaint pursuant to *Fed. R. Civ. P. 12(b)(6)* and on the ground that Plaintiff lacks standing to assert several of the claims contained therein. For the reasons set forth, Defendants' [*2] Motion to Dismiss the Amended Complaint is GRANTED.

I. BACKGROUND

Plaintiff is a participant in Defendants' "Retirement Plan of Avon Products" pension plan ("the Plan"). (Amended Complaint P 6.) Under ERISA, the Plan is a defined benefit plan whose "purpose is to provide retirement income to retired participants in the Plan." (Id.) The Plan has been amended a number of times, including in 1977 and in 1994.

Plaintiff was born on September 20, 1937 and began employment with Avon ("employer") on October 9, 1967. (Id. P 11.) On May 25, 1980, Plaintiff "became totally and permanently disabled . . . and began receiving a Social Security Disability Award effective November 1, 1980." (Id.) As a result of her disability, "until her retirement on a pension," Plaintiff received long term disability benefits from her employer. (Id. P 12.) Thus, although unable to work any longer, Plaintiff "continued to accrue years of service under the terms of" Defendants' Plan. (Id.)

In 1995, Plaintiff qualified for a so-called "Rule of 85" early retirement benefit under the Plan ("Rule of 85 benefit"). (Id. P 13.) Under the Plan, the Rule of 85 benefit "provides that, when a participant's age and years

of service [*3] add to 85, the participant is entitled to unreduced early retirement benefits." (Id.) Four years after qualifying for the Rule of 85 benefit, "effective August 1, 1999," Plaintiff retired. (Id. P 14.) She was credited with 31.833 years of service. (Id.) Plaintiff's employer "calculated her pension to be $ 529.78 as a single-life annuity with no survivor's benefits, equivalent to a lump sum of $ 78,093.48." (Id.) Plaintiff chose to receive her pension "partially as a lump sum and partially as an annuity, which she continues to receive to date." (Id.)

Plaintiff alleges that, but for "several ERISA violations in the terms of the Plan," the early retirement benefit pension that she accepted under the Plan should have been higher. (Id. P 15.) Exactly how much higher her pension should have been, she alleges, "will be known only after reformation of the Plan to bring it into compliance with ERISA." (Id.)

II. DISCUSSION

A. Legal Standard

On a motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)* the Court "must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff." *Bolt Elec. v. City of New York, 53 F.3d 465, 469 (2d Cir. 1995)* [*4] (citations omitted). "The district court should grant such a motion only if, after viewing the plaintiff's allegations in this favorable light, it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Harris v. City of New York, 186 F.3d 243, 247 (2d Cir. 1999).* A court does not, however, have to accept as true "conclusions of law or unwarranted deductions of fact." *First National Bank v. Gelt Funding Corp., 27 F.3d 763, 771 (2d Cir.1994),* cert. denied, *513 U.S. 1079, 115 S. Ct. 728, 130 L. Ed. 2d 632 (1995).*

B. The First Claim: Defendant's Rule of 85 Early Retirement Benefit Is Disregarded for Purposes of Measuring the Plan's Compliance with ERISA's 133 1/3 Percent Anti-Backloading Test

Plaintiff's First Claim alleges that the structure of Defendants' Plan, specifically the Plan's Rule of 85 early retirement benefit, violates ERISA's applicable "anti-backloading" provision, *ERISA § 204(b)(1)(B), 29 U.S.C. § 1054(b)(1)(B).* (Amended Complaint PP 27-30.)

"Backloading" is "a term of art describing a [pension] plan's use of a benefit accrual formula that postpones the bulk of an employee's accrual to her later years of service." *In re Citigroup Pension Plan ERISA Litigation, 470 F. Supp.2d 323, 333 (S.D.N.Y. 2006);* [*5] see also *Campanella v. Mason Tenders' District Council Pension Plan, 299 F. Supp.2d 274, 283-84 (S.D.N.Y. 2004)* ("A plan 'backloads' pension benefits when it 'provide[s] inordinately low rates of accrual in the employee's early years of service when he is most likely to leave the firm and concentrat[es] the accrual of benefits in the employee's later years of service when he is most likely to remain with the firm until retirement'") (quoting H.R. Rep. No. 93807 (1974), reprinted in 1974 U.S.C.C.A.N. 4639, 4688). "To combat backloading, ERISA requires plans to accrue benefits relatively evenly over the course of an employee's career." *In re Citigroup Pension Plan ERISA Litigation, 470 F. Supp.2d at 333.* ERISA provides that pension plans must comply with at least one of three statutory tests that are designed to ensure that the rate at which an employee's benefits accrue under a pension plan is within a range that does not constitute unlawful backloading. Id.

The Parties agree that of the three statutory tests, the only one applicable to Defendants' Plan is the 133 1/3 percent test set forth in *29 U.S.C. § 1054(b)(1)(B)* (the "statute"):

> A defined benefit plan satisfies the requirements [*6] of this paragraph of a particular plan year if under the plan the accrued benefit payable at the normal retirement age is equal to the normal retirement benefit and the annual rate at which any individual who is or could be a participant can accrue the retirement benefits payable at normal retirement age under the plan for any later plan year is not more than 133 1/3 percent of the annual rate at which he can accrue benefits for any plan year beginning on or after such particular plan year and before such later plan year. For purposes of this subparagraph --
>
> (i) any amendment to the plan which is in effect for the current year shall be treated as in effect for all other plan years;

(ii) any change in an accrual rate which does not apply to any individual who is or could be a participant in the current year shall be disregarded;

(iii) the fact that benefits under the plan may be payable to certain employees before normal retirement age shall be disregarded; and

(iv) social security benefits and all other relevant factors used to compute benefits shall be treated as remaining constant as of the current year for all years after the current year.

*ERISA § 204(b)(1)(B); 29 U.S.C. § 1054(b)(1)(B).* [*7] Regulations enacted pursuant to this statutory provision explain how compliance with the 133 1/3 percent rule is determined:

(i) General rule. A defined benefit plan satisfies the requirements of this subparagraph for a particular plan year if--

(A) Under the plan the accrued benefit payable at the normal retirement age (determined under the plan) is equal to the normal retirement benefit (determined under the plan), and

(B) The annual rate at which any individual who is or could be a participant can accrue the retirement benefits payable at normal retirement age under the plan for any later plan year cannot be more than 133 1/3 percent of the annual rate at which he can accrue benefits for any plan year beginning on or after such particular plan year and before such later plan year.

*26 C.F.R. § 1.411(b)-1(b)(2).*

Plaintiff provides calculations demonstrating that if an employee elects to take the Rule of 85 early retirement benefit under the Plan, she may find that, under certain circumstances, the rate of accrual for her pension increases from one year to the next by more than the maximum rate of 133 1/3 percent allowed by the statute. (Amended Complaint PP 20-27.) Plaintiff therefore [*8] claims that the Plan is unlawfully backloaded. As Plaintiff acknowledges, however, there is no question that the Rule of 85 benefit under the Plan is an early retirement benefit that an employee may elect to receive prior to reaching the normal retirement age of 65. (See Corrected Pappas Aff. Ex. A §§ 1.31, 1.39, 1.40, 5.2 & 6.1(d); Amended Complaint P 13.)

The clear language of the statute provides that when measuring a pension plan's compliance with the 133 1/3 percent test, "the fact that benefits under the plan may be payable to certain employees before normal retirement age shall be disregarded." *29 U.S.C. § 1054(b)(1)(B)(iii).* The applicable regulation governing compliance with the 133 1/3 test provides the same:

Early retirement benefits. The fact that certain benefits under the plan may be payable to certain participants before normal retirement age is disregarded. Thus, the requirements of *subdivision (i)* of this subparagraph must be satisfied without regard to any benefit payable prior to the normal retirement benefit (such as an early retirement benefit which is not the normal retirement benefit (see *§ 1.411(a)-7(c)).*

*26 C.F.R. § 1.411(b)1-(b)(2)(ii)(C).* Plaintiff's convoluted [*9] arguments notwithstanding, it is plain that early retirement benefits are disregarded for purposes of measuring the Plan's compliance with the statute's applicable anti-backloading provision. Since the statute and the applicable regulation both clearly provide that early retirement benefits such as the Plan's Rule of 85 benefit are not subject to the 133 1/3 percent test, it follows that Plaintiff's First Claim, alleging that the Rule of 85 benefit violates the 133 1/3 percent test, fails to state an actionable claim. See *Engers v. AT & T, No. 98-3660 (SRC), 2007 U.S. Dist. LEXIS 47, 2007 WL 14585, at * 4 (D.N.J. Jan. 3, 2007)* (noting that the plain

meaning of *29 U.S.C. § 1054(b)(1)(B)(iii)* "instructs the reader to disregard the payment of early retirement benefits" and also that "*26 C.F.R. 1.411(b)1-(b)(2)(ii)(C)* clearly states that the 133 1/3% rule does not apply to early retirement benefits"). Accordingly, Defendants' Motion to Dismiss the Amended Complaint's First Claim pursuant to *Fed. R. Civ. 12(b)(6)* is GRANTED.

C. Plaintiff Lacks Standing to Raise the Second, Third, Seventh, Eighth and Ninth Claims

A plaintiff seeking to invoke federal jurisdiction must establish that she has standing to sue under Article III of the Constitution [*10] by demonstrating: (1) that she suffered an injury-in-fact; (2) a causal connection between the injury and the objectionable conduct she seeks to remedy; and (3) that the injury will be remedied by the requested relief. *Luian v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992).* "Without a plaintiff's satisfaction and demonstration of the requirements of Article III standing, a federal court has no subject matter jurisdiction to hear the merits of a plaintiff's -- or, in this case, the class plaintiffs' -- claim . . . ." *Central States Southeast and Southwest Areas Health and Welfare Fund v. Merck-Medco Managed Care, LLC, 433 F.3d 181, 198 (2d Cir. 2005).*

1. The Second Claim

Plaintiff's Second Claim alleges that Defendants' Plan violates the 133 1/3 percent test provided for in the statute in yet another way. Plaintiff's Second Claim alleges that Defendants' Plan violates *26 C.F.R. § 1.411(b)-1(b)(2)(ii)(F)*, a regulation governing compliance with the statute. (Amended Complaint P 33.) The regulation provides that the 133 1/3 percent test is not satisfied if "the [*11] base for the computation of retirement benefits changes solely by reason of an increase in the number of years of participation." *26 C.F.R. § 1.411(b)-1(b)(2)(ii)(F).*

Plaintiff points to the Plan's formula for calculating an employee's pension benefits and notes that it features an offset for Social Security benefits paid for by the employer on behalf of the employee. (Amended Complaint P 32; Corrected Pappas Aff. Ex. A § 5.1.) Defendants explain that under the Plan, the employer pays not only the full cost of employees' pension benefits but that it also pays for half the cost of employees' Social Security benefits. (Defs.' Mem. at 5.) The Summary Plan

Description, dated 1980, provided to employees covered under the Plan gives the following explanation of the Social Security offset:

> The reason Social Security is used in figuring your pension is to reflect the cost which Avon pays for these benefits. The maximum offset for 40 years of Creditable Service is never more than that part of your Social Security paid for by Avon, since you and Avon share the cost of Social Security on a 50/50 basis all during your career. And Avon -- as noted -- pays the full cost of your Retirement Plan benefits [*12] as well.

> Please note that the Social Security offset has no effect on the benefits you receive from Social Security. You get this added income entirely on top of your pension. And if Social Security payments increase after you retire, these higher government payments will simply add to the total income you receive.

(Corrected Pappas Aff. Ex. B.) Defendants assert that because of the Social Security contribution the employer makes, the Plan includes "a lawful reduction for Social Security in the value of the pension benefits, called the 'Social Security offset,' based on or made 'to reflect Avon's contribution for these benefits.'" (Defs.' Mem. at 6.)

Plaintiff does not allege that the use of a Social Security offset in Defendants' Plan is unlawful. Plaintiff takes issue, however, with the fact that the Plan discontinues the Social Security offset in calculating benefits once an employee has rendered "50 (previously 40) years of credited service." (Amended Complaint P 32.) According to Plaintiff, the Plan's discontinuation of the Social Security offset after fifty years of service means that an employee's pension benefit will increase by more than 133 1/3 percent between her fiftieth and [*13] fifty-first years of service. Therefore, Plaintiff alleges, "[b]y discontinuing the Social security offset based solely upon an increase in years of service, the Plan changes the base of the computation" in violation of *26 C.F.R. § 1.411(b)-1(b)(2)(ii)(F).* (Id. P 34.)

Defendants move to dismiss Plaintiff's Second Claim

on the grounds that (1) Plaintiff has not alleged that she was injured by the fact that the Plan discontinues the Social Security offset after the fiftieth year of service and (2) that, in any event, the operation of this particular provision of the Plan never violates the statutory 133 1/3 percent test. Defendant argues that "Plaintiff is not harmed by the discontinuation of the Social Security offset after 50 years of service, because she retired after only 32 years of service . . . ." (Defs.' Reply at 4, n.3.) Plaintiff indeed acknowledges that she retired with "31.833 years of credited service." (Amended Complaint P 14.) The obvious implication is that regardless of whether the Plan's discontinuation of the Social Security offset "changes the base of the computation," in violation of *26 C.F.R. § 1.411(b)-1(b)(2)(ii)(F)*, for some employees, at some point, the Social [*14] Security offset was never discontinued in the calculation of Plaintiff's pension. [1]

> 1 As noted by Defendants, the change in the rate of an employee's benefit accrual occasioned by the discontinuance of the Social Security offset has no bearing on the "base" used to compute an employee's pension under the Plan. For purposes of *26 C.F.R. § 1.411(b)-1(b)(2)(ii)(F)*, "the average monthly pay constitutes the 'base.'" *Carollo v. Cement And Concrete Workers Dist. Council Pension Plan, 964 F. Supp. 677, 682 (E.D.N.Y. 1997).* Thus "[a]lthough an employer may, of course, raise salaries after 25 years of service and thereby change the base, it may not change the base because of length of service." Id.

Plaintiff seeks injunctive relief, specifically, the reformation of Defendants' Plan, pursuant to *ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).* (Amended Complaint P 3.) That provision provides statutory standing to "a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the [*15] terms of the plan." *29 U.S.C. § 1132(a)(3).* However, "even where statutory standing pursuant to ERISA is satisfied, the elements of Article III standing must still be met, and '[i]t is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing.'" *Banyai v. Mazur, No. 00 Civ. 980 (SHS), 2007 U.S. Dist. LEXIS 25275, 2007 WL*

959066, at *2 (S.D.N.Y. 2007)* (quoting *Raines v. Byrd, 521 U.S. 811, 820 n.3, 117 S. Ct. 2312, 138 L. Ed. 2d 849 (1997)*). In order to support Article III standing, a "plaintiff's injury must be actual or imminent to ensure that the court avoids deciding a purely hypothetical case in which the projected harm may ultimately fail to occur." *Baur v. Veneman, 352 F.3d 625, 633 (2d Cir. 2003).* "Moreover, the named class plaintiffs 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" Id. (quoting *Warth v. Seldin, 422 U.S. 490, 502, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975)*).

Since Plaintiff worked for fewer than fifty years before retiring, the Social Security offset was never discontinued for the purposes of calculating [*16] her pension under the Plan. [2] Plaintiff therefore cannot allege any injury-in-fact as a result of the Plan's discontinuance of the Social Security offset after fifty years of service. Accordingly, since Plaintiff has failed to allege injury-in-fact, the Second Claim is DISMISSED for Plaintiff's lack of standing.

> 2 Additionally, Defendants demonstrate that it is mathematically impossible for the discontinuance of the Social Security offset to violate the statute's 133 1/3 percent test. The statutory test applies only to "the accrued benefit payable at the normal retirement age" or to the equivalent "normal retirement benefit." *29 U.S.C. § 1054(b)(1)(B)* (emphasis added). Under the Plan, the normal retirement age is 65. (Amended Complaint P 17.) Given that the earliest that an employee could legally begin working is at age sixteen and "[b]ecause of the mathematical fact that the 50 years of service always expire after a participant is over age 65, Plaintiff has not and cannot state a claim that the discontinuation of the Social Security offset can ever unlawfully increase the rate of accrual of the benefit *payable at normal retirement age,*" i.e. at age 65. (Defs.' Reply at 12.) Thus even [*17] if Plaintiff could allege an injury-in-fact, her Second Claim would still fail to state an actionable claim.

2. The Third Claim

Plaintiff's Third Claim challenges section 5.1 of the Plan, alleging that it runs afoul of ERISA by providing that "upon the attainment of age 25, a participant's rate of

accrual is reduced by 1.25 % of his Social Security Benefit, while providing for no Social Security offset before that age." (Amended Complaint PP 36-37.) The relevant provision of ERISA provides that:

> [A] defined benefit shall be treated as not satisfying the requirements of [the 133 1/3 percent test] if, under the plan, an employee's benefit accrual is ceased, or the rate of an employee's benefit accrual is reduced, because of the attainment of any age.

*ERISA § 204(b)(1)(H)(i), 29 U.S.C. § 1054(b)(1)(H)(i).*

Defendant observes, however, that "Plaintiff has not been injured by this alleged violation because she was more than 25 years old when *ERISA § 204(b)(1)(H)* was enacted in 1986, and thus she never suffered a decrease in her rate of accrual when she turned 25." (Defs.' Reply at 13.) Moreover, Plaintiff began working for her employer under the Plan when she was thirty years old, in 1967. (Amended [*18] Complaint P 11.) Since Plaintiff cannot allege any injury-in-fact as a result of section 5.1 of the Plan, she lacks standing to assert the Third Claim, alleging that the Plan violates *29 U.S.C. § 1054(b)(1)(H)(i)*. Accordingly, the Third Claim is DISMISSED.

### 3. The Seventh, Eighth and Ninth Claims

The Seventh, Eighth and Ninth Claims are all premised on the allegation that the Plan's "method of annualizing a partial year of compensation" when calculating an employee's pension benefit violates *26 C.F.R. § 1.411(a)-7(c)(5)*. That regulation provides, in pertinent part:

> If a defined benefit plan bases its normal retirement benefits on employee compensation, the compensation must reflect the compensation which would have been paid for a full year of participation . . . .

*26 C.F.R. § 1.411(a)-7(c)(5).* Plaintiff alleges that section 1.5 of the Plan violates the regulation by providing that where an employee has worked for only part of a year in "any of the last ten years of service," the compensation earned during that partial year is annualized according to

a "composite" method that "will always yield a lower compensation" than would a method that annualizes "the partial year of compensation based [*19] on the salary rate in effect in the partial year." (Amended Complaint PP 62-63.)

Defendants contend that Plaintiff herself was not actually affected by section 1.5 of the Plan because her partial year of employment was calculated under a different section of the Plan that credited her with a full year's compensation for the partial year she worked in 1980. (Defs.' Reply at 16.) Plaintiff "became totally and permanently disabled on May 25, 1980" and thereafter received "long term disability benefits from Avon's Long Term Disability Plan" until her retirement in 1999. (Amended Complaint PP 11-12.) Plaintiff acknowledges that as a disabled participant in the Plan, "the amount of her benefits is not governed by Section 1.5, but by Section 5(7)." (Pl.'s Opp. at 32.) Defendant notes that, actually, as a result of an amendment to the Plan in 1994, the provision of the Plan that applies to the annualization of Plaintiff's partial year of service is section 1.10(d). (Defs.' Mem. at 26.) Defendants assert, without contradiction by Plaintiff, that pursuant to sections 1.10(d) and 1.41(b), the Plan "deemed her actual compensation in the year her absence began (i.e. her compensation in 1980, which [*20] was $ 22,241.24) to be her compensation for each year while she was on disability." (Id. at 27.) In calculating her pension benefit, Defendants' Plan thus credited Plaintiff with a full year's compensation for the last partial year that she worked. Defendants have therefore demonstrated that Plaintiff does not, and cannot, allege injury-in-fact based on the operation of section 1.5 of the Plan. Accordingly, because Plaintiff lacks standing to assert that section 1.5 of the Plan violates *26 C.F.R. § 1.411(a)-7(c)(5)*, the Seventh Claim is DISMISSED. The Eighth and Ninth Claims, which are derivative of the Seventh Claim, are also DISMISSED.

### D. Defendants Have Demonstrated that the Fourth Claim is not Actionable

Plaintiff's Fourth Claim alleges that the Plan violates ERISA and the applicable regulations because the Rule of 85 early retirement benefit that she elected to receive provided her with a greater pension than she would have received had she elected to take the normal retirement benefit at age sixty-five. (Amended Complaint PP 44-45.) Using the same sample figures advanced by Plaintiff,

Defendants demonstrate that, in fact, employees' pension benefits under the Plan are greater at [*21] the normal retirement age of sixty-five than they are at the earliest Rule of 85 early retirement age. (Defs.' Mem. at 19-23.) The reason that the calculations contained in the Amended Complaint are flawed, Defendants show, is that Plaintiff incorrectly "assumes that because the Social Security offset is lowest at the point when a participant first becomes eligible for the Rule of 85, the benefit at the earliest date of eligibility for the Rule of 85 must be greater than the benefit payable at normal retirement age." (Defs.' Reply at 15.) This assumption:

> completely ignores the fact that although a participant's Rule of 85 subsidy continues to decrease as the employee approaches age 65, the retirement benefit would continue to increase, because each additional year of creditable service and compensation that the employee earns as she approaches the normal retirement age more than outweighs the diminishing subsidy to the Social Security offset."

(Id.) Although Defendants raised this point in their moving papers, neither Plaintiff's opposition nor her sur-reply provide an adequate response. The Court thus finds that Defendants have conclusively demonstrated that an employee's pension benefits [*22] received under the Plan at the normal retirement age of sixty five are greater than at any Rule of 85 early retirement age and that Plaintiff's Fourth Claim is based on an unfounded assumption. Accordingly, Defendants' Motion to Dismiss the Fourth Claim pursuant to *Fed. R. Civ. P. 12(b)(6)* is GRANTED.

E. Plaintiff Concedes that the Fifth and Sixth Claims are Without Merit

Plaintiff's Fifth and Sixth Claims are based upon a change in the definition of the "Average Final Compensation" (the "AFC") used to calculate pensions under the Plan. (Amended Complaint PP 48-49.) The definition of the AFC in effect in the 1977 version of the Plan was changed in 1994. (Id.) Plaintiff alleges that the 1994 definition of the AFC, provided in section 1.10(d) of the Plan, "does not provide for annualizing a partial year of compensation" and therefore causes "the amount of pension to be smaller than under the prior definition" for employees who receive Long Term Disability under

the Plan. (Id. P 51.) Plaintiff therefore requests that her pension be calculated based on the AFC formula provided in the 1977 version of the Plan. (Id. P 55.)

Defendants point out that under the challenged section 1.10(d) of the [*23] 1994 version of the Plan, Plaintiff actually receives a greater pension benefit than she would under the 1977 version. (Defs.' Mem. at 26.) In her opposition, Plaintiff concedes that "[i]n pleading the Fifth and Sixth Claims, Plaintiff overlooked Section 5(7) of the 1977 Plan, as correctly pointed out by Defendants in their Memorandum." (Pl.'s Opp. at 32, n.22.) Plaintiff thus states that she "is not contesting the dismissal of those two Claims." (Id.) In light of Defendants' showing that Plaintiff is better off as a result of the 1994 change in the AFC's definition and because Plaintiff concedes the point, Defendants' Motion to Dismiss the Fifth and Sixth Claims pursuant to *Fed. R. Civ. P. 12(b)(6)* is GRANTED. [3]

> 3  In her sur-reply, Plaintiff seeks leave to retract the concession she made with respect to the Fifth and Sixth Claims. (Pl.'s Sur-Reply at 2, n.3.) She appears to base the request on the contention that section 1.5 of the 1994 version of the Plan is "fully applicable to disabled Avon employees who, like Plaintiff, received long term disability benefits from Avon prior to retirement." (Id. at 2.) It is unclear to the Court what relevance that contention has to the Fifth and [*24] Sixth Claims, which challenge section 1.10(d) of the Plan. In any event, Plaintiff does not contest the point that the application of section 1.10(d) of the 1994 version of the Plan works to her benefit. The request to retract the concession is accordingly denied.

III. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss Plaintiff's First, Fourth, Fifth and Sixth Claims pursuant to *Fed. R. Civ. P. 12(b)(6)* is GRANTED. Plaintiff's Second, Third, Seventh, Eighth and Ninth Claims are DISMISSED for Plaintiff's lack of standing. The Amended Complaint is DISMISSED. The Clerk of Court is directed to close the docket for this case. SO ORDERED.

Dated: New York, New York

September 14, 2007

2007 U.S. Dist. LEXIS 68743, *24

DEBORAH A. BATTS                              United States District Judge

# EXHIBIT D

LEXSEE 1999 U.S. DIST. LEXIS 3733

**NEW YORK 10-13 ASSOCIATION, ET AL., Plaintiffs, -against- CITY OF NEW YORK, ET AL., Defendants.**

**98 Civ. 1425 (JGK)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1999 U.S. Dist. LEXIS 3733*

**March 29, 1999, Decided
March 30, 1999, Filed**

**COUNSEL:** [*1] For Plaintiffs: John Kirklin, New City, NY.

For City, defendants: Michael Hess, Corporation Counsel of the City of New York, New York, NY.

For SBA, defendants: George Cerrone, Cerrone & Geoghan, New York, NY.

For PBA, defendants: Elliot Susser, Worth Longworth & Bamundo, New York, NY.

For DEA, CEA, and LBA, defendants: Leslie Ben-Zvi, Dienst & Serrins, New York, NY.

**JUDGES:** John G. Koeltl, United States District Judge.

**OPINION BY:** John G. Koeltl

**OPINION**

***OPINION AND ORDER***

**JOHN G. KOELTL, District Judge:**

This is an action for injunctive and declaratory relief and for money damages filed by retired police officers of the New York City Police Department (the "NYPD") and an organization of retired police officers. The plaintiffs allege age discrimination and other violations of federal, state, and local law in the administration of retirement benefits. Pending now before the Court are two motions. The City defendants have moved for judgment on the

pleadings, which the Police Union defendants and Board of Trustee defendants have joined to the extent applicable. [1] The plaintiffs have filed a motion for class certification, which the defendants oppose. The Court [*2] heard argument on these motions on January 29, 1999.

> 1    The Police Union and Board of Trustee defendants have not submitted separate briefs in support of their motion for judgment on the pleadings. In addition, although the plaintiffs have submitted a Rule 56.1 Statement and some of the defendants have submitted responses to the plaintiffs' Rule 56.1 Statement, the plaintiffs' motion for summary judgment was withdrawn at oral argument. (*See* Transcript of Oral Argument ("Tr.") at 28).

**I.**

The following allegations are assumed to be true for the purposes of the defendants' motion for judgment on the pleadings. The individual named plaintiffs are retired New York City police officers of various ranks who are 40 years of age or older. (Compl. P 10). All are members of the various police unions which are defendants in this case. (Compl. P 11). The organizational plaintiff New York 10-13 Association, Inc. ("New York 10-13") is a not-for-profit corporation formed in 1986 which represents the interests of NYPD [*3] police retirees. (*See* Compl. P 14).

The plaintiffs have filed this action against three groups of defendants. The first group consists of the City

Case 1:08-cv-02429-DAB    Document 53-5    Filed 06/03/2008    Page 3 of 18

Page 2
1999 U.S. Dist. LEXIS 3733, *3

of New York (the "City"), the New York City Office of Labor Relations (Compl. P 18), the NYPD (Compl. P 19), and various New York City officials, who are sued in their official capacities. (Compl. PP 15-19). (This group is referred to collectively as the "City defendants"). The City defendants receive federal revenue sharing payments pursuant to the Revenue Sharing Act, *31 U.S.C. §§ 6701 et seq.*, which are used in the City's crime prevention and related programs. (Compl. PP 15, 19).

The second group of defendants consists of several labor organizations which represent active and retired members of the NYPD and their officers. These organizations include the following: the Patrolmen's Benevolent Association, headed by Lou Matarazzo (the "PBA defendants") (Compl. P 20); the Detectives' Endowment Association, headed by Thomas Scotto (the "DEA defendants") (Compl. P 21); the Sergeants Benevolent Association, headed by Joseph Toal (the "SBA defendants") (Compl P 22); the Lieutenants Benevolent Association, headed by Anthony Garvey (the [*4] "LBA defendants") (Compl. P 23); and the Captains' Endowment Association, headed by John Driscoll (the "CEA defendants") (Compl. P 24). Collectively, these defendants are referred to as the "Police Union defendants."

The third group of defendants includes the Boards of Trustees of various funds which provide retirement benefits, and the officers of the funds (collectively, the "Board of Trustees defendants"). This third group consists of three subgroups. One is the Board of Trustees of the Police Pension Fund (Compl. P 25). Another is the Boards of Trustees of the Police Officers' Variable Supplements Fund ("POVSF") (Compl. P 26), and the Police Superior Officers' Variable Supplements Fund ("PSOVSF") (Compl. P 27) (collectively, the "VSFs"). The third subgroup includes the Boards of Trustee of the: PBA Retiree Health and Welfare Fund (Compl. P 28), the New York City Superior Officers' Retiree Health and Welfare Fund (Compl. P 29), the SBA Retiree Health and Welfare Fund (Compl. P 30), and the DEA Retiree Health and Welfare Fund (Compl. P 31) (collectively, the "health and welfare funds").

The Complaint asserts seventy causes of action relating to the plaintiffs' alleged entitlements [*5] to three categories of retirement benefits: (1) pension benefits provided by the Police Pension Fund; (2) variable supplement benefits provided through the VSFs;

and (3) health insurance benefits covered by the health and welfare funds. Eligibility for these retirement benefits is based on years of service, not on age. N.Y.C. Admin. Code §§ 13-247, 281 (1995 and 1997 Pocket Part); 1998 Summary [Health Benefits] Program Description at 40.

Police retirees draw pension benefits from the Police Pension Fund. N.Y.C. Admin. Code §§ 13-201 et seq. The amount of individual pension benefits depends on their years of service and final salary, as determined by formulas specified by statute. *Id.* §§ 13-255-258; *N.Y. Retirement & Soc. Sec. Law §§ 440*, 443-444 (McKinney 1997 Pocket Part). Pursuant to statute, the amount of pension benefits received by individual retirees is not determined by the Board of Trustees of the Police Pension Fund. *Id.*; N.Y.C. Admin. Code § 13-216. Moreover, the pension benefits are constitutionally guaranteed by the New York State Constitution. *N.Y.S. Const., art. V, § 7.*

The Police Pension Fund is funded by the City of New York through an annual contribution. [*6] N.Y.C. Admin. Code § 13-228. The amount of that contribution is determined by an independent city official known as the chief actuary. N.Y.C. Admin. Code § 13-632.2; Tr. at 5. The actuary determines the City's contribution by making a number of actuarial assumptions, based on his professional judgment, regarding mortality, inflation, and the working life of individual police officers. N.Y.C. Admin. Code § 13-632.2; Tr. at 5. However, the "interest rate assumption," or the assumption as to the stream of future earnings of the current assets of the Police Pension Fund, is set by the New York State legislature. N.Y.C. Admin. Code § 13-638.2.b(2) (1997 Pocket Part). Neither the chief actuary nor the Board of Trustees of the Police Pension Fund has any discretion as to the interest rate assumption. *Id.*

The interest rate assumption set by the State legislature affects only the amount of the City's contribution to the Police Pension Fund. *Id.* §§ 13-228, 13-638.2.b(2) (1997 Pocket Part). In the event an error in the interest rate assumption resulted in the depletion of pension fund assets, the City in subsequent years must increase its contribution to compensate for the error. [*7] *Id.* § 13-228. Thus, the interest rate assumption does not affect the pension benefits of individual police officers.

In addition to pension benefits, police retirees also receive non-pension benefits from the POVSF, *id.* §§ 13-268-277, and the PSOVSF, *id.* §§ 13-278-284. The

Case 1:08-cv-02429-DAB    Document 53-5    Filed 06/03/2008    Page 4 of 18

Page 3
1999 U.S. Dist. LEXIS 3733, *7

history of the POVSF has been described by the New York Court of Appeals:

> The POVSF was created . . . in 1970 as a result of collective bargaining negotiations between New York City and the Patrolmen's Benevolent Association (PBA). As originally implemented, the POVSF was funded by a formula based on the extent to which the earnings of the Police Pension Fund from investments in equities exceeded the hypothetical earnings from fixed income securities. Additionally, the board of trustees created to administer the POVSF was given broad discretion concerning the manner and amount of disbursements of POVSF funds to eligible beneficiaries.
>
> In 1988, however, legislation was passed changing both the funding method and payment structure of the POVSF: the board of trustees' discretion over disbursements was eliminated and replaced with a schedule for defined annual payments and the method for funding [*8] the POVSF was changed from a formula based on the Police Pension Fund's investment equity earnings to a requirement that amounts be transferred from the Police Pension Fund only as needed to finance the defined POVSF payments [see, L. 1988, ch. 247, §§ 9, 15, 17, 18 [amending [N.Y.C. Admin. Code] §§ 13-271, 13-232 and creating § 13-232.1]).

*Ballentine v. Koch, 89 N.Y.2d 51, 54-55, 651 N.Y.S.2d 362, 674 N.E.2d 292 (1996)* (citations and footnotes omitted). The background of the PSOVSF is identical, with the exception that the payment structure and funding method for the PSOVSF was changed by legislation in 1993. 1993 N.Y. Laws, ch. 479, §§ 9, 18, amending N.Y.C. Admin. Code § 13-281 and creating § 13-232.2; *see also Castellano v. City of New York, 142 F.3d 58, 63* (2d Cir.) (explaining history of the VSFs), cert. denied, *142 L. Ed. 2d 47, 119 S. Ct. 60 (1998).*

Finally, the health and welfare funds cover, among other things, insurance coverage for health, hospital, and prescription drug expenses for police retirees. (Compl. P 61). Health insurance coverage is funded by the City. N.Y.C. Admin. Code § 12-126(b)(1).

The Complaint alleges that the defendants, acting [*9] in concert, have "systematically reduced, diminished, and otherwise compromised" the plaintiffs' pension, VSF, and health insurance benefits. (Compl. PP 38-42). In particular, the defendants adopted four policies or practices which adversely affected retirement benefits (the "challenged policies"). First, the City and Police Union defendants jointly caused the passage of the 1988 and 1993 legislation which altered the VSFs' funding method and payment structures, as described above. (Compl. PP 50-56). As a result of these laws, retirees entitled to VSF benefits receive fixed annual payments instead of variable payments, as originally planned. The amount of these payments increase by $ 500 each year, up to a maximum of $ 12,000 per beneficiary by the year 2007. N.Y.C. Admin. Code §§ 13-271, 13-281.

Second, the City and Police Union defendants reached an agreement in or around 1997 to require the Board of Trustees of the Police Pension Fund to accept an increase in the interest rate assumption for the Police Pension Fund, which automatically triggered a corresponding reduction in the City's contribution to the Police Pension Fund. (Compl. PP 58-60, 67).

Third, in 1995, as the collective [*10] bargaining agreement in effect at that time was expiring, the Police Union and City defendants reached an unwritten agreement whereby the Police Union defendants turned down the City's offers to increase the City's contributions to the health and welfare funds. (Compl. PP 63, 71). Under that unwritten agreement, the City and Police Union defendants also decided, among other things, to raise police retirees' out-of-pocket expenses under their health insurance plans through the imposition of copayments and deductibles. (Compl. P 65).

Fourth, the City and Police Union defendants acted in concert to exclude retirees from representation on the Boards of Trustees of the Police Pension Fund, the VSFs, and the health and welfare funds. (Compl. PP 72-73).

Each of these four challenged policies was purportedly adopted in order to achieve cost savings for the City which are then used to make collective bargaining concessions to younger, active police officers.

In addition, the plaintiffs allege that the Police Union defendants have retaliated against them by threatening to use the health and welfare funds to finance the legal defense costs for this action and a related complaint with the Equal [*11] Employment Opportunity Commission. (*See* Compl. PP 82-84).

The plaintiffs allege that the impairment of their pension, VSF, and health insurance benefits and the exclusion of retirees from the Boards of Trustees of the funds violate federal law, including: the Age Discrimination in Employment Act, *29 U.S.C. §§ 621 et seq.* (the "ADEA") (Claims 1-6, 8-9); the Revenue Sharing Act, *31 U.S.C. §§ 6701 et seq.* (Claims 10-13); the *Contracts Clause, U.S. Const., art. I, § 10, cl. 1* (Claims 15-18); the *Equal Protection Clause, U.S. Const., amend. V & XIV* (Claims 19-24); the *First* and *Fourteenth Amendments, U.S. Const., amend. 1 & XIV* (Claims 25-30); the *Due Process Clause, U.S. Const., amend. XIV* (Claims 31-36); the *Just Compensation Clause, U.S. Const., amend. V & XIV* (Claims 37-41); and federal common law fiduciary duty and duty of fair representation (Claims 42-49).

The plaintiffs also assert violations of state and local law: the New York State Human Rights Law, *N.Y. Exec. Law §§ 296(1) et seq.* (Claims 50, 52); the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 (Claims 51, 53); N.Y.C. Admin. Code § 12-126 (Claim 66); the New York City Charter (Claim 58); and various other [*12] state statutory and common law claims (Claims 56-57, 59-65, 67, 70).

In addition, the plaintiffs have asserted causes of action based on the alleged retaliation by the Police Union defendants (Claims 7, 14, 43, 48, 54-55, 68-69).

## II.

When reviewing a *Rule 12(c)* motion for judgment on the pleadings, the Court applies the same standards as on a *Rule 12(b)(6)* motion to dismiss. *See Narvarte v. Chase Manhattan Bank, N.A., 969 F. Supp. 10, 11 (S.D.N.Y. 1997).* The Court "must view the pleadings in the light most favorable to, and draw all reasonable inferences in favor of, the nonmoving party." *Davidson v. Flynn, 32 F.3d 27, 29 (2d Cir. 1994); see also Madonna v. United States, 878 F.2d 62, 65 (2d Cir. 1989); National Ass'n of Pharmaceutical Mfrs., Inc. v. Ayerst Labs., 850 F.2d 904, 909 [2] (2d Cir. 1988)* (indicating that the Court treats a motion for judgment on the pleadings as if it were

a motion to dismiss); *Slavsky v. New York City Police Dep't, 967 F. Supp. 117, 118 (S.D.N.Y. 1997),* aff'd, *159 F.3d 1348 (1998).* In deciding the motion, the Court can consider documents referenced in the complaint and documents that are in the plaintiff's possession or that [*13] the plaintiff knew of and relied on in bringing suit. *See Brass v. American Film Technologies, Inc., 987 F.2d 142, 150 (2d Cir. 1993); Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d Cir. 1991),* cert. denied, *503 U.S. 960 (1992); I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co., Inc., 936 F.2d 759, 762 (2d Cir. 1991); Skeete v. IVF America, Inc., 972 F. Supp. 206, 208 (S.D.N.Y. 1997).*

A court should not dismiss a complaint unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *See Valmonte v. Bane, 18 F.3d 992, 998 (2d Cir. 1994)* (citing *Conley v. Gibson, 355 U.S. 41, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)); see also First Wall Street Capital Corp. v. Int'l Prop. Corp., Ltd., 1998 U.S. Dist. LEXIS 18475,* No. 97 Civ. 0702, 1998 WL 823619 at *1 (S.D.N.Y. Nov. 25, 1998).

In this case, the plaintiffs argue that the defendants' motion for judgment on the pleadings should be converted into a motion for summary judgment because both sides have submitted evidentiary material outside of the pleadings. However, in deciding this motion the Court has considered only the pleadings and has also taken [*14] judicial notice of the relevant statutes and legislative history. *See Castellano v. Board of Trustees of the Police Officers' Variable Supplements Fund, 937 F.2d 752, 754 (2d Cir.)* (taking judicial notice of statutory material on a motion to dismiss), cert. denied, *502 U.S. 941, 116 L. Ed. 2d 329, 112 S. Ct. 378 (1991).* Therefore, the defendants' motion will be treated as a motion for judgment on the pleadings.

## III.

The defendants move to dismiss the claims arising under the ADEA. Apparently interpreting these claims to be based on the disparate treatment theory of liability, the defendants argue that the Complaint fails to state a claim under the ADEA because the plaintiffs have not alleged that the challenged policies were impermissibly motivated by age. The City defendants point out that the challenged policies relate to retirement benefits, and therefore distinguish between retired and active police officers, not between older and younger workers.

At oral argument, however, the plaintiffs made it clear that, contrary to the assertions in their Complaint, their ADEA claims are based solely on disparate impact, 2 and that age correlates with retirement status. On the [*15] basis of the plaintiffs' representations at oral argument, the plaintiffs' claims will be analyzed under the disparate impact theory of age discrimination. Any disparate treatment theory has been withdrawn.

> 2  At oral argument, counsel for the plaintiffs was asked to clarify the theory of the ADEA claim:
>
> The Court: Let me stop you. The claim under [the ADEA] is solely a disparate impact claim?
>
> Mr. Kirklin: Yes, your Honor, it is. The Second Circuit has recognized the disparate impact theory as one that is viable in this circuit.
>
> The Court: Your theory is a disparate impact claim?
>
> Mr. Kirklin: It is primarily a disparate impact claim.
>
> The Court: You keep on -
>
> Mr. Kirklin: It is a disparate impact claim. We are not really claiming they are singling out these individuals. The City and Police Unions don't single out police retirees because they are age 40 and over. They single them out because they are vulnerable.
>
> The Court: It is a disparate impact theory rather than a disparate treatment theory?
>
> Mr. Kirklin: Yes, it is, your Honor.
>
> (Tr. at 23).

[*16] **(A)**

As the Supreme Court has explained, Congress promulgated the ADEA to protect older workers from adverse employment actions "on the basis of inaccurate and stigmatizing stereotypes." *See Hazen Paper Co. v. Biggins, 507 U.S. 604, 610, 123 L. Ed. 2d 338, 113 S. Ct. 1701 (1993)*. The Supreme Court has not decided whether a disparate impact theory of liability is viable under the ADEA. *See id. at 610*. However, the Court of Appeals for the Second Circuit has recognized an ADEA

cause of action based on disparate impact. *See Criley v. Delta Air Lines, Inc., 119 F.3d 102, 105* (2d Cir.), cert. denied, *522 U.S. 1028, 139 L. Ed. 2d 607, 118 S. Ct. 626 (1997)*; *Dist. Council 37 v. New York City Dep't of Parks and Recreation, 113 F.3d 347, 351 (2d Cir. 1997)*; *Maresco v. Evans Chemetics, 964 F.2d 106, 115 (2d Cir. 1991)*.

To establish a prima facie case of disparate impact, the plaintiffs must identify a specific employment practice having an adverse impact upon members of a protected class, show that they are members of the protected class, and establish causation. *See Dist. Council 37, 113 F.3d at 351-52* (citations omitted); *Criley, 119 F.3d at 105*; *Diehl v. Xerox Corp., [*17] 933 F. Supp. 1157, 1166 (W.D.N.Y. 1996)* (citing *Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 650, 104 L. Ed. 2d 733, 109 S. Ct. 2115 (1989))*; *Maresco, 964 F.2d at 115*.

In this case, the plaintiffs argue that the challenged policies, while facially age neutral, in fact have a harsher impact on those age 40 and over as compared to those under age 40 because retirement status correlates with age. Although the present record contains no statistical evidence of disparate impact, on a motion to dismiss the plaintiffs have sufficiently alleged that age and retirement status in this case are correlated. Therefore, the plaintiffs have stated a claim under the disparate impact theory.

The defendants' response, advanced at argument, is that the correlation between age and retirement status or age and years of service is not perfect in the case of police officers. They contend that one-third of the City's police retirees are disability retirees, including many retirees who are below the age of 40. (Tr. at 8). Moreover, police officers are permitted to remain in service until their mandatory retirement age 63. N.Y.C. Admin. Code § 14-124. Therefore, the City defendants argue that [*18] the challenged policies affect many who are under age 40 and also do not affect many who are over age 40. However, these arguments are insufficient to rebut the plaintiffs' prima facie case at this point in the case. Under the disparate impact theory, the plaintiffs are not required to show that the adversely affected class comprises only individuals age 40 or over. It is sufficient to show that the challenged employment practice or policy had a "significant" disparate impact on older workers. *See Dist. Council 37, 113 F.3d at 352*; *Diehl, 933 F. Supp. at 1165* ("statistically valid disparity" required). Whether the plaintiffs will be able to prove that

1999 U.S. Dist. LEXIS 3733, *18

the challenged practices actually had a disparate impact on persons 40 years of age or older [3] cannot be decided on this motion. Therefore, the plaintiffs' ADEA claims cannot be dismissed on the basis that they fail to state a claim under the ADEA.

3  The SBA defendants asserted at oral argument that in 1998 more money was spent by the SBA Health and Welfare Fund on retirees than on active officers. (Tr. at 46). According to the SBA defendants, their fund spent approximately $ 800 per active officer and approximately $ 1,000 on each retiree. (Tr. at 46). Therefore, the SBA defendants contend that the practices of the SBA Health and Welfare Fund do not have an adverse impact on SBA members who are age 40 or older. However, this information is not included in the pleadings and thus is not properly before the Court on this motion for judgment on the pleadings.

[*19] **(B)**

The City defendants argue that even if the plaintiffs have sufficiently pleaded their ADEA claims, those claims must be dismissed because the challenged policies relate to bona fide employee benefits plans which are exempt from ADEA coverage under § 4(f)(2) of the Act, 29 U.S.C. § 623(f)(2). Section 623(f)(2) provides, in relevant part, that it shall not be unlawful for an employer, employment agency, or labor organization--

to take any action otherwise prohibited under subsection (a) [employer practices that discriminate on the basis of age] . . . , [or] (c) [labor organization practices that discriminate on the basis of age] . . . of this section-

. . .

(B) to observe the terms of a bona fide employee benefit plan-

(i) where, for each benefit or benefit package, the actual amount of payment made or cost incurred on behalf of an older worker is no less than that made or incurred on behalf of a younger worker . . .

29 U.S.C. § 623(f)(2)(B)(i). Thus, a benefit plan that

provides either the same benefits to employees regardless of cost, or different levels of benefits at the same cost, satisfies the equal cost/equal benefits principle. See [*20] 29 C.F.R. § 1625.10 (interpreting ADEA § 4(f)(2)); Auerbach v. Bd. of Educ. of the Harborfields Central High Sch. Dist. of Greenlawn, 136 F.3d 104, 110-12 (2d Cir. 1998) (reviewing legislative history of § 4(f)(2) of the ADEA and explaining that the only justification for an age-based reduction in employee benefits is the increased cost in providing those benefits to older workers); Equal Employment Opportunity Comm'n v. Commonwealth of Massachusetts, 77 F.3d 572, 573 (1st Cir. 1996) (explaining the equal cost/equal benefit principle).

Moreover, "[a] plan is considered 'bona fide' if its terms . . . have been accurately described in writing to all employees and if it actually provides the benefits in accordance with the terms of the plan. . . . An 'employee benefit plan' is a plan, such as a retirement, pension, or insurance plan, which provides employees with what are frequently referred to as 'fringe benefits.'" 29 C.F.R. § 1625.10(b).

The City defendants affirmatively represent that the benefit plans at issue are age neutral because the formulas for calculating a retiree's pension and VSF benefits do not vary with the retiree's age. See N.Y.C. Admin. Code §§ [*21] 13-255-261.2 (pension benefits), 13-271 (supplemental benefits). Similarly, the retiree's entitlement to medical benefits is determined independently of age. (See 1998 Summary [Health Benefits] Program Description at 40). Moreover, the plaintiffs have not alleged that the pension, VSF, and health insurance plans embody any age-based benefit reduction, that they have not provided substantial benefits to retirees, or that descriptions of the plans have not been provided to the retirees. See N.Y.C. Admin. Code §§ 13-214 et seq. (pension and variable supplement benefits); 12-126 (health insurance benefits); 1998 Summary [Health Benefits] Plan Description. Therefore, these plans fall within the "bona fide employee benefits plan" exemption, and the challenged policies which are in accordance with these plans may not be challenged under the ADEA.

The plaintiffs argue, however, that the exemption only applies to an analysis of the provision of similar benefits to older and younger workers, whereas their grievance focuses on different benefits offered to older

and younger officers. For example, the plaintiffs do not claim that the Police Union or City defendants are "raiding retiree [*22] health and welfare benefits to give better health and welfare benefits to active members." (Tr. at 27). Instead, the plaintiffs allege that the defendants have raided the pension, VSF, and health and welfare funds in order to generate savings for the City which are used to provide different kinds of benefits to the active union members, such as wage and salary increases. (Tr. at 27). This argument fails for two reasons.

First, to the extent that the plaintiffs allege that the defendants intended to reduce pension, VSF, or health insurance benefits to retired officers in order to confer greater economic privileges on younger police officers, that is a disparate treatment claim and has been withdrawn.

Second, the ADEA disparate impact analysis compares the effect of a single employment practice on workers age 40 and over with its effect on younger workers. *See Criley, 119 F.3d at 103* (challenging hiring criteria); *Dist. Council 37, 113 F.3d at 349* (layoff policy). A plaintiff cannot maintain an ADEA cause of action by comparing entirely different employment practices. In arguing that the bona fide employee benefits plan exemption does not apply to this case, the plaintiffs [*23] here seek to compare policies relating to retirement benefits with entirely different policies governing collective bargaining for active police officers. That is not a valid comparison for purposes of the ADEA.

Therefore, the defendants' motion to dismiss Claims 1-6 and 8-9 is **granted** on the basis of *29 U.S.C. § 623(f)(2)(B)(i)*.

## IV.

The City defendants argue that dismissal of the ADEA claims requires dismissal of the claims under the New York State Human Rights Law, N.Y. Exec. Law §§ 290-301, and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107.

In *Tyler v. Bethlehem Steel Corp., 958 F.2d 1176* (2d Cir.), cert. denied, *506 U.S. 826, 121 L. Ed. 2d 46, 113 S. Ct. 82 (1992)*, the Second Circuit Court of Appeals considered an age discrimination claim arising under the New York State Human Rights Law. The Court of Appeals noted that "New York courts have consistently looked to federal caselaw in expounding the Human

Rights Law" and that "this makes senses, because the ultimate goals of the fact-finders in both federal and New York age discrimination actions are the same--to determine whether an adverse employment decision was made 'because of' age." [*24] *Id. at 1180* (collecting cases); *compare 29 U.S.C. § 623(a)(1) & (c)(1), N.Y. Exec. Law § 296(1)(a) & (1)(c)*, and N.Y.C. Admin Code § 8-107.1(a) & (c). Moreover, the New York City Human Rights Law contains a provision expressly recognizing the disparate impact theory. N.Y.C. Admin. Code § 8-107.17. Therefore, because the plaintiffs have sufficiently pleaded disparate impact claims under the ADEA, the claims under the New York State and City Human Rights laws cannot be dismissed on the grounds that those statutes do not encompass disparate impact claims.

The defendants have not, however, pointed to any provision of the New York State or New York City Human Rights Laws which contains an exemption for employee benefit plans that satisfy the equal cost/equal benefits principle, and the defendants relied solely on *§ 623(f)(2)(B)* in their argument that the challenged policies are exempt from the ADEA. The defendants have not attempted to argue, much less explain, how any of the other specific exemptions in the New York State and New York City statutes that cover employee retirement and benefit plans should apply to this case. *See, e.g.,* N.Y.C. Admin. Code § 8-107.1(e). Therefore, [*25] the motion for judgment on the pleadings with respect to the state and city human rights law claims cannot be granted on the same basis as the motion for judgment on the ADEA claims which relied on *§ 623(f)(2)(B)*, although it is not possible on the papers presented to foreclose the availability of another exemption under the state and city statutes. Accordingly, the defendants' motion to dismiss the claims arising under the New York State and New York City Human Rights Laws (Claims 50-53) is **denied without prejudice to renewal.**

## V.

The defendants move to dismiss all claims based on the exclusion of retirees from the Boards of Trustees of the Police Pension Fund and the VSFs. They argue that the plaintiffs lack standing to bring these claims because they cannot demonstrate that they have been injured by such exclusion. The plaintiffs have not responded to this argument on the merits in their responsive brief.

It is well-established that "'the party invoking federal

jurisdiction bears the burden of establishing [the elements of standing].' . . . To meet this burden, a plaintiff must show (1) that [he or] she suffered an 'injury in fact--an invasion of a legally protected [*26] interest' that is 'concrete and particular,' and not merely hypothetical; (2) that there is 'a causal connection between the injury and the conduct complained of;' and (3) that it is 'likely that the injury will be redressed by a favorable decision.'" *United States v. Vazquez, 145 F.3d 74, 80 (2d Cir. 1998)* (citing *Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 119 L. Ed. 2d 351, 112 S. Ct. 2130 (1992)); Bastek v. Fed. Crop Ins. Corp., 145 F.3d 90, 92* (2d Cir.), cert. denied, *142 L. Ed. 2d 448, 119 S. Ct. 539 (1998)*.

In this case, the plaintiffs have not sufficiently alleged that any of their legally protected interests have been injured by the exclusion of retirees from the Boards of Trustees of the Police Pension Fund and the VSFs. The Complaint identifies only one concrete consequence of exclusion from the Boards of Trustees. (Compl. PP 58-60, 72). It asserts that the City Defendants required the Police Pension Fund Trustees to agree to an increase in the interest rate assumption of the Police Pension Fund. (Compl. P 58 (quoting a March 1997 DEA publication)). Presumably, if retirees had been represented on the Board of Trustees, they would have opposed the increase [*27] in the interest rate assumption.

The interest rate assumption is established by legislation. N.Y.C. Admin. Code §§ 13-228 (determination of City's annual contribution), 13-638.2(b)(2) (interest rate assumption). None of the defendants has any power to alter the interest rate assumption. Thus, the exclusion of police retirees from the Boards of Trustees of the Police Pension Fund in no way affects the interest rate assumption. Moreover, changing the interest rate assumption does not harm any of the plaintiffs because it does not affect the level of pension benefits.

The plaintiffs have also failed to allege that the exclusion of retirees from the Boards of Trustees of the Police Pension Fund causes any other actual or potential injury. Pension benefits are constitutionally protected under the New York State Constitution, which provides that "membership in any pension or retirement system of the state or of a civil division thereof shall be a contractual relationship, the benefits of which shall not be diminished or impaired." *N.Y.S. Const., art. V, § 7*; see

*also Ballentine, 89 N.Y.2d at 56*. This constitutional guarantee is codified in the New York City Administrative Code. N.Y.C. [*28] Admin. Code §§ 13-255-258 (service and disability pension benefits). Under the Code, the Trustees of the Police Pension Fund have no discretion to alter the level of individual pension benefits.

Similarly, the exclusion of retirees from the Boards of Trustees of the VSFs does not cause any injury to the retirees. The defined VSF benefits are established by law, *see* N.Y.C. Admin. Code §§ 13-271(7)(i) and 13-281(2)(i), leaving no discretion to the Boards of Trustees.

The plaintiffs also allege in Claims 27 and 30 that the exclusion of police officer retirees from representation as trustees of the VSFs and the Police Pension Fund violates their rights to freedom of association secured by the *First* and *Fourteenth Amendments of the United States Constitution* and therefore violates *42 U.S.C. § 1983*. While the nature of these claims is not detailed, the defendants have only argued that the plaintiffs lack standing because there was no economic injury and have not directed their standing argument to the alleged denial of a constitutional right to association. Thus, to the extent that the defendants' motion includes a motion to dismiss Claims 27 and 30, it is denied without prejudice.

[*29] Therefore, the defendants' motion to dismiss those claims alleging causes of action based on the exclusion of retirees from the Boards of Trustees of the VSFs and the Police Pension Fund on the grounds that the plaintiffs lack standing to assert those claims is **granted**, except the defendants' motion to dismiss Claims 27 and 30 is **denied**. [4]

> 4    The defendants have not identified the particular claims they are moving to dismiss. The claims which protest the exclusion of retirees from the various Boards of Trustees are also based in part on the exclusion of retirees from the Boards of Trustees of the health and welfare funds. However, the City defendants have argued only that the plaintiffs lack standing to challenge their exclusion from the Police Pension Fund and the VSFs. Thus, those claims challenging the exclusion of retirees from the Boards of Trustees of the health and welfare funds would not be dismissed in any event.

1999 U.S. Dist. LEXIS 3733, *29

## VI.

### (A)

The defendants argue that the Court should decline to [*30] exercise supplemental jurisdiction over the pendent state law claims, whether or not the federal claims are dismissed, because a ruling on those claims would be an unwarranted federal intrusion into state sovereignty. [5] The plaintiffs make no response to this argument.

> 5    In their Amended Memorandum of Law in Support of Their Cross-Motion for Judgment on the Pleadings, the City defendants have nevertheless argued that the claim for a violation of N.Y.C. Admin. Code § 12-126 should be dismissed because the plaintiffs have failed to state a claim, which would appear to be inconsistent with their argument that the Court should decline jurisdiction to consider that claim. (*See* City defs.' Mem. Supp. at 18-21). At oral argument, the City defendants argued that the "state claims should be dismissed regardless of the disposition of the federal claims. . . . We, of course, believe abstention is particularly appropriate being that it is a New York City local law that is being construed as a matter of first impression." (Tr. at 42). The City defendants confirmed their request made at oral argument that the Court should decline, pursuant to *28 U.S.C. § 1367(c)*, to exercise supplemental jurisdiction over the claim for a violation of N.Y.C. Admin. Code § 12-126. (*See* Letter from Anshel David dated Feb. 2, 1999).

[*31] The Court of Appeals for the Second Circuit has held that a district court's exercise of supplemental jurisdiction is mandatory over any claim that satisfies the requirements of *28 U.S.C. § 1367(a)* unless the claim also falls within one of the exceptions enumerated in *§ 1367(c)*. See *Itar-Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d 442, 447 (2d Cir. 1998)*; *see also Nevares v. Morrissey, 1998 U.S. Dist. LEXIS 7680*, No. 95 Civ. 1135, 1998 WL 265119 at *8 (S.D.N.Y. May 22, 1998). Subsection (a) states:

> Except as provided in subsection . . . (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original

> jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution . . . .

*28 U.S.C. § 1367(a).*

In this case, both the federal and pendent state and local law claims relate to the same challenged policies and alleged threats of retaliation, and therefore are part of the same case or controversy. Moreover, an independent [*32] basis for federal jurisdiction exists because the defendants have not moved to dismiss all of the federal causes of actions, including, for example, the *First Amendment*, Revenue Sharing Act, and federal common law claims. Therefore, the exercise of supplemental jurisdiction is mandatory unless one of the *§ 1367(c)* exceptions apply.

> *Section 1367(c)* provides that:

> > District courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—

> > (1) the claim raises a novel or complex issue of State law,

> > (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

> > (3) the district court has dismissed all claims over which it has original jurisdiction, or

> > (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

*28 U.S.C. § 1367(c).* Moreover, "once a court identifies one of the factual predicates which corresponds to one of the subsection 1367(c) categories, the exercise of discretion 'is informed by whether remanding the pendent state claims comports with the underlying objective of 'most sensibly accommodating' the values of 'economy, convenience, [*33] fairness, and comity.'" *Itar-Tass,*

*140 F.3d at 446* (quoting *Executive Software N. Am., Inc. v. United States Dist. Court, 24 F.3d 1545, 1557 (9th Cir. 1994))*.

Subsections (2) and (3) of *§ 1367(c)* do not apply because the state law claims do not predominate over the federal law claims and federal claims remain in the lawsuit. Because the factual basis for the federal and state claims is intertwined, there do not appear to be exceptional circumstances under subsection (c)(4) to warrant declining supplemental jurisdiction.

There is only one claim as to which the defendants have argued that the issues of state law are so novel and complex that subsection (c)(1) is satisfied, namely Claim 66 which argues that requiring the payment of deductibles and copayments for health insurance violates N.Y.C. Admin. Code § 12-126. Section 12-126 provides that the "city will pay the entire cost of health insurance coverage for city employees, city retirees, and their dependents, not to exceed one hundred percent of the full cost of H.I.P.-H.M.O. on a category basis." [6]

> 6  The parties agree that New York state courts have not interpreted the term "entire cost" within the meaning of § 12-126. While both sides have cited cases that construe the term "cost," those cases arise in contexts other than § 12-126. Thus, this is a novel question under New York law.

[*34] The Court is not required to decline supplemental jurisdiction over this claim. *See Itar-Tass, 140 F.3d at 447.* Moreover, considerations of "economy, convenience, fairness, and comity" in this case favor the exercise of supplemental jurisdiction over the § 12-126 claim. A number of constitutional and federal law claims are based in part on allegations that the defendants have compromised the health and welfare funds in violation of § 12-126. Those claims cannot be resolved without deciding whether the defendants have violated § 12-126. Under these circumstances, to decline jurisdiction would require the parties to segregate and litigate a single issue in state court that is inextricably intertwined with this case. The result would be duplicitous and wasteful litigation and would not serve the interests of judicial economy and fairness for all litigants.

Therefore, the defendants' motion pursuant to *28 U.S.C. § 1367(c)* to dismiss the pendent state and local law claims is **denied.**

**(B)**

The City defendants move to dismiss Claim 66 which alleges a violation of N.Y.C. Admin. Code § 12-126. The plaintiffs argue that the term "entire cost" of health insurance should [*35] be interpreted expansively to cover all charges associated with obtaining basic hospital-surgical-medical services, including premium payments as well as deductibles and copayments. The plaintiffs contend that the City defendants violated § 12-126 by requiring retirees to pay deductibles and copayments under certain health insurance plans, beginning in or around 1995. (*See* Compl. PP 65-66).

The City defendants contend that the term "entire cost" should be construed to cover health insurance premiums only. Their argument is persuasive in light of the statutory language and relevant legislative history, of which the Court takes judicial notice. *See, e.g., Oneida Indian Nation of New York v. State of New York, 691 F.2d 1070, 1086 (2d Cir. 1982)* (stating that where there is no dispute as to the authenticity of materials relating to legislative history and judicial notice is limited to law, legislative facts, or factual matters that are incontrovertible, judicial notice is admissible), cert. denied, *474 U.S. 823 (1985).*

The "cost" of insurance is normally understood to mean the "premium" or price that must be paid for the insurance. *See, e.g., Lippman v. Bd. of Educ. of the* [*36] *Sewanhaka Central High Sch., 483 N.Y.S.2d 446, 447, 104 A.D.2d 123, 125 (3d Dep't 1984), aff'd, 66 N.Y.2d 313, 496 N.Y.S.2d 987, 487 N.E.2d 897 (1985)* (treating contributions for retired teachers' health insurance premiums as the cost of health insurance coverage to be paid under the Civil Service Law). Moreover, to construe "cost" as including items such as deductibles and copayments would prevent the ready application of the statutory yardstick which only requires the City to pay the cost of insurance of the H.I.P.-H.M.O. plan on a category basis. There would be no reasonable way to compare deductibles and copayments to the straight premium cost of the H.I.P.-H.M.O. plan. [7]

> 7  The 1998 Summary [Health Benefits] Program Description provided by the City indicates that the H.I.P.-H.M.O. plan includes no deductibles or copayments. *See* Summary Plan Description at 7, 53. Even if the H.I.P.-H.M.O. plan included such copayments or deductibles there would be no reasonable way to translate them into the cost of

insurance to allow a comparison among plans.

[*37] The legislative history also indicates that the drafters of the New York City Administrative Code considered "cost" to be the equivalent of "premium." Section 12-126 was originally enacted by the New York City Council through Local Law No. 120 of the Laws of 1967. Section 1.b of Local Law No. 120, entitled "Payment of health insurance costs," provided that "the city of New York will pay the entire cost of health insurance coverage for . . . city retirees, and their dependents, not to exceed one hundred per cent of the full cost of H.I.P.-Blue Cross (21-day plan) . . . ." (*See* 1967 N.Y. Law No. 120 attached as Appendix 2 to City defs.' Reply Mem.). The proceedings of the 1967 session recited that the statute was enacted pursuant to Resolution Cal. No. 292 of the Board of Estimate in 1965. (See Appendix 3 attached to City defs.' Reply Mem.). That resolution provided that the City would assume the full payment for health and hospital insurance (within one year of the effective date) not to exceed 100 percent of the full cost of the H.I.P.-Blue Cross (21-day Plan) on a category basis. The resolution also stated: "Each choice-of-plans carrier having a contract with the City providing [*38] for premiums based on experience rating, shall be entitled to charge, in addition to regular *premiums . . . ,* supplemental *premiums . . . ." Id.* (emphasis added). Moreover, in introducing the resolution, the then-City Personnel Director stated that it was being presented to effectuate "the assumption by the City of a greater share of *premium* costs." *Id.* (emphasis added). This legislative history makes plain that the Board of Estimate and the City Council contemplated only premiums when they enacted Local Law No. 120, codified as N.Y.C. Admin. Code § 12-126. Therefore, the City's obligation to pay the "entire cost of health insurance coverage" does not require the City to offer only health insurance plans that impose no copayments and deductibles on the insureds. Accordingly, the defendants' motion to dismiss Claim 66 is **granted.**

## VII.

The defendants also move to dismiss the plaintiffs' claims arising under *42 U.S.C. § 1983* based on alleged violations of the United States Constitution. At the outset, the Court dismisses those constitutional claims to the extent they are based on any deprivation of pension benefits. Under the New York State Constitution [*39] the plaintiffs' pensions shall not be diminished or

impaired and there are no factual allegations that they have been.

### (A)

The defendants argue that the *§ 1983* claim alleging a violation of the *Equal Protection Clause of the Fourteenth Amendment to the United States Constitution* must be dismissed. The equal protection claims are based solely on the alleged reduction or compromise of the pension, VSF, and health insurance benefits. As an initial matter, the plaintiffs have not argued what level of scrutiny the Court should apply to their equal protection claims. The defendants accurately contend that rational review is appropriate.

Unless a statute "employs a classification that is inherently invidious or that impinges on fundamental rights, areas in which the judiciary then has a duty to intervene in the democratic process," the Court exercises only a limited review power over the representative body through which the public makes democratic choices among alternative solutions to social and economic problems. *See Schweiker v. Wilson, 450 U.S. 221, 230, 67 L. Ed. 2d 186, 101 S. Ct. 1074 (1981).* Economic legislation, such as the provisions regulating the retirement benefits [*40] at issue in this case, is entitled to a strong presumption of constitutionality, and will be upheld so long as it bears any rational relation to a legitimate state objective. *See id. at 238; Mathews v. De Castro, 429 U.S. 181, 184, 50 L. Ed. 2d 389, 97 S. Ct. 431 (1976); Poggi v. City of New York, 491 N.Y.S.2d 331, 337, 109 A.D.2d 265, 273* (1st Dep't 1985).

The burden rests on the plaintiffs to show that the challenged distinctions drawn by the legislation are irrelevant to the achievement of the City's legitimate objectives. *See Schweiker, 450 U.S. at 234; Dandridge v. Williams, 397 U.S. 471, 485, 25 L. Ed. 2d 491, 90 S. Ct. 1153 (1970); Western & S. Life Ins. Co. v. State Bd. of Equalization, 451 U.S. 648, 668, 68 L. Ed. 2d 514, 101 S. Ct. 2070 (1981); McGowan v. Maryland, 366 U.S. 420, 425, 6 L. Ed. 2d 393, 81 S. Ct. 1101 (1961).* Economic legislation "does not violate the *Equal Protection Clause* merely because classifications made by its laws are imperfect." *Dandridge, 397 U.S. at 485.* The Supreme Court has "consistently refused to invalidate on equal protection grounds legislation which it simply deemed unwise or unartfully drawn." *United States* [*41] *R.R. Retirement Bd. v. Fritz, 449 U.S. 166, 175, 66 L. Ed. 2d 368, 101 S. Ct. 453 (1980).* The deference to the

1999 U.S. Dist. LEXIS 3733, *41

legislature embodied by the rational basis standard is "true to the principle that the *Fourteenth Amendment* gives federal courts no power to impose upon the states their views of what constitutes wise economic or social policy." *Dandridge, 397 U.S. at 486, 90 S. Ct. at 1162*; *see also Slavsky, 967 F. Supp. at 119*.

This case does not implicate a suspect class. *See Gregory v. Ashcroft, 501 U.S. 452, 470, 115 L. Ed. 2d 410, 111 S. Ct. 2395 (1991)* (age is not a suspect classification under the *Equal Protection Clause*); *Massachusetts Bd. of Retirement v. Murgia, 427 U.S. 307, 313-14, 49 L. Ed. 2d 520, 96 S. Ct. 2562 (1976)* (holding that the class of uniformed police officers over 50 did not constitute a suspect class), or fundamental rights. Therefore, rational review rather than strict scrutiny is appropriate. *See Castellano v. Board, 937 F.2d at 755-56* (applying rational review to an equal protection challenge to the VSFs). The defendants contend that, assuming as true the plaintiffs' allegations that retirement benefits have been reduced in order to adjust [*42] the balance of compensation between retirees and active police officers, the legislation and contractual undertakings which implemented those adjustments have a rational basis and therefore do not violate the *Equal Protection Clause*. The Court agrees. The change from variable to fixed VSF benefits enhance the financial security of retirees, who previously were not able to depend on any payments at all from those sources. Similarly, the decisions to require health insurance copayments and deductibles serve the legitimate fiscal purpose of containing the cost of health care. [8]

> 8 The interest rate assumption does not have any impact on the level of benefits received by the plaintiffs, and therefore there is no viable equal protection challenge to the interest rate assumption.

Therefore, the defendants' motion to dismiss Claims 19-24 is **granted**.

**(B)**

The defendants move to dismiss the *§ 1983* claims based on alleged violations of the Due Process Clause and the *Contracts Clause*. These claims must be [*43] dismissed because the plaintiffs have failed to allege a sufficiently protected property interest in VSF payments or health insurance coverage with no out-of-pocket deductibles or copayments.

The Due Process Clause provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const., art. XIV, § 1, cl. 2. Where "there is no protectable property interest, . . . the *fourteenth amendment's* due process guarantee does not attach." *Castellano v. Board, 937 F.2d at 758*. "To have a property interest in a benefit, a person clearly must . . . have a legitimate claim of entitlement to it. . . . A constitutional entitlement cannot be created . . . merely because a wholly and expressly discretionary state privilege has been granted generously in the past." *Allen v. Cuomo, 100 F.3d 253, 261 (2d Cir. 1996)*.

The *Contracts Clause* prohibits States from passing any "Law impairing the Obligation of Contracts." *U.S. Const., art. I, § 10, cl. 1*. Similar to due process claims, analysis of a *Contracts Clause* claim begins with a determination of "whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." [*44] *See Energy Reserves Group v. Kansas Power & Light, 459 U.S. 400, 411, 74 L. Ed. 2d 569, 103 S. Ct. 697 (1983)* (citation omitted). However, where no contractual agreement regarding the terms changed by the legislation exists, there is no need to consider whether there was in fact an impairment and if so, whether such impairment was substantial. *See General Motors Corp. v. Romein, 503 U.S. 181, 186, 117 L. Ed. 2d 328, 112 S. Ct. 1105 (1992)*.

The plaintiffs argue that certain legislation--namely, 1988 N.Y. Law, ch. 247, 1993 N.Y. Law, ch. 479, and N.Y.C. Admin. Code, tit. 13, ch. 2--as well as collective bargaining agreements ("CBAs") and unwritten agreements between the defendants have infringed on their rights to pension, VSF, and health insurance benefits. These claims are without merit.

The plaintiffs have no contractual right to VSF payments. In *Ballentine*, the New York Court of Appeals confronted the precise issue raised in this case. The *Ballentine* plaintiffs were police officers who alleged that the 1988 statutory scheme that changed the payment structure of the POVSF from a discretionary variable scheme to defined payment plan violated the federal *Contracts* [*45] *Clause*, among other provisions. *Ballentine, 89 N.Y.2d at 54*. In rejecting this challenge, the Court of Appeals held that the original 1968 CBA and the 1970 implementing legislation created no contractual right to disbursements from the POVSF. *Id. at 61*. In particular, the *Ballentine* Court noted that the 1970

legislation expressly stipulated that it did not create any contractual rights as to the POVSF payments. *Id. See also Castellano v. City,* 142 F.3d at 73-74 (rejecting the argument that either the 1968 CBA or the 1970 legislation created contractual rights in VSF payments); *Castellano v. Board,* 937 F.2d at 758 (finding no protected property interest in VSF payments). Although *Ballentine* considered only the POVSF, an identical disclaimer in the PSOVSF-implementing legislation compels the same conclusion as to PSOVSF benefits. [9]

> [9]    The implementing legislation for both the POVSF and the PSOVSF provides that the "variable supplements fund shall not be, and shall not be construed to constitute, a pension or retirement system or fund," and that "the legislature hereby reserves to the state of New York and itself the right and power to amend, modify or repeal any or all of the provisions of this subchapter." *See* N.Y.C. Admin. Code §§ 13-269(b), 13-279(b).

[*46]    The plaintiffs also base their *Contracts Clause* and due process claims on the alleged impairment of the POVSF corpus, as distinct from VSF payments to qualified retirees, resulting from two purported transfers of funds from the POVSF into the City's general fund. (Compl. PP 51, 57). However, because the plaintiffs have no contractual right to receive any payments at all from the VSFs, they do not have any protected interest in the management of the underlying funds.

The plaintiffs also have no contractual right to health insurance coverage free of copayments and deductibles. A similar issue was considered in *Lippman*: whether the contributions by the respondent school district to its retired teachers' health insurance premiums constituted contractual pension benefits which may not be impaired under *§ 7 of article V of the New York State Constitution. Lippman,* 483 N.Y.S.2d at 447, 104 A.D.2d at 124. The *Lippman* court held that the State Constitution did not prevent the respondent school district from reducing its contributions to the statutory minimum. *Id. at 448, 104 A.D.2d at 126.*

The relevant statutory provision in this case, N.Y.C. Admin. Code § 12-126, requires [*47] the City to cover health insurance premiums, but does not create a contractual right to health insurance without deductibles and copayments. Therefore, the defendants' motion to dismiss Claims 15-18 and 31-36 is **granted.**

(C)

The defendants next move to dismiss the *§ 1983* claims based on alleged violations of the *Just Compensation Clause of the Fifth Amendment,* as applied by the *Fourteenth Amendment. See Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 160, 66 L. Ed. 2d 358, 101 S. Ct. 446 (1980). This Clause provides: "Nor shall private property be taken for public use, without just compensation." U.S. Const., amend. V. The Supreme Court has rejected any set formula for identifying a "taking" forbidden by the *Fifth Amendment. See Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 224, 89 L. Ed. 2d 166, 106 S. Ct. 1018 (1986). Instead, courts are to engage in ad hoc, factual inquiries into the circumstances of each particular case. *See id.* In doing so, three factors have "particular significance: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed [*48] expectations; and (3) the character of the governmental action." *See id.* at 224-225 (quoting *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 124, 57 L. Ed. 2d 631, 98 S. Ct. 2646 (1978)) (internal quotation marks omitted). All three factors favor dismissal of the just compensation claims in this case.

First, the economic impact of switching over to fixed VSF payments on the plaintiffs is entirely speculative because there is no baseline for comparison. As the New York Court of Appeals pointed out in *Ballentine,* under the variable payments system, the level of benefits was highly conditional and in some years the retirees received no payment at all. *Ballentine,* 89 N.Y.2d at 61.

Second, the plaintiffs have no protected property interest in variable VSF benefits or in health insurance coverage free of deductibles and copayments. *See Allen,* 100 F.3d at 262 (no "reasonable investment-backed expectation" in bi-weekly payment of wages since prompt payment was not statutorily or contractually required). Therefore, to the extent the plaintiffs held expectations of such benefits, those expectations were unreasonable.

Third, the defendants have not interfered with [*49] any of the plaintiffs' rights in a way that amounts to a compensable taking. In *Connolly,* the Supreme Court rejected an argument that imposing withdrawal liability on pension funds constituted a *Fifth Amendment* taking of the contributing employers' property interests. Noting that

the purpose of imposing withdrawal liability was to ensure that employees would receive the benefits promised them, the Supreme Court held that "this interference with the property rights of an employer arises from a public program that adjusts the benefits and burdens of economic life to promote the common good and, under our cases, does not constitute a taking requiring Government compensation." *Connolly, 475 U.S. at 225.* In this case, all that the plaintiffs have alleged, even if true, is that the defendants decided to fund various benefits for the active police force. In doing so, as explained above, it did not take away any rights that the plaintiffs had. But, in any event, the economic tradeoffs between two legitimate public obligations--to current employees and to retirees--do not amount to a violation of the *Just Compensation Clause.*

Therefore, the defendants' motion to dismiss Claims 37-41 [*50] is **granted.**

**VIII.**

**(A)**

The plaintiffs move pursuant to *Rule 23 of the Federal Rules of Civil Procedure* to certify "a class of retired police officers of the New York City police department of all ranks who variously receive as retirees certain pension, variable supplements fund, retirement and/or health and welfare (including health and hospital insurance) benefits" with respect to all claims other than those arising under the ADEA and the parallel state and city human rights law. (*See* Pls.' Mem. at 6). With respect to claims arising under the ADEA and the parallel state and city human rights laws, the plaintiffs agree to limit the class to those retirees who opt into the class rather than, as with the remainder of the class claims, to include all those members unless they opt out. *See 29 U.S.C. § 626(b).*

*Rule 23(a)* sets out the requirements for class certification:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative [*51] parties are typical of the claims or

> defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

*Fed. R. Civ. P. 23(a).*

The party seeking to certify a class, here the plaintiffs, bears the burden of demonstrating each of the four elements, *see Bishop v. New York City Dep't of Hous. Preservation and Dev., 141 F.R.D. 229, 234 (S.D.N.Y. 1992),* and the Court must be "satisfied, after a rigorous analysis, that the prerequisites of *Rule 23(a)* have been satisfied." *General Telephone Co. of Southwest v. Falcon, 457 U.S. 147, 161, 72 L. Ed. 2d 740, 102 S. Ct. 2364 (1982).* If the Court is satisfied that each of the four elements have been met, and that the class is maintainable pursuant to one of the subdivisions of *Fed. R. Civ. P. 23(b),* the Court may, in its discretion, certify the class. *See In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 290 (2nd Cir. 1992).* Class certification, however, is not an occasion for examination of the merits of the case. The Court should not resolve any material factual disputes in the process of determining whether plaintiffs have provided a reasonable basis for their assertions. [*52] *See Sirota v. Solitron Devices, Inc., 673 F.2d 566, 570-72* (2d Cir.), cert. denied, *459 U.S. 838, 74 L. Ed. 2d 80, 103 S. Ct. 86 (1982); Meyer v. Macmillan Publishing Co., 95 F.R.D. 411, 414 (S.D.N.Y. 1982).* Permitting a class certification proceeding to become a mini-trial on the merits is both unauthorized and unwise. *See Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177-78, 40 L. Ed. 2d 732, 94 S. Ct. 2140 (1974); see also Krueger v. New York Telephone Co., 163 F.R.D. 433, 438 (S.D.N.Y. 1995).*

However, although a district court must determine if an action is to be maintained as a class action "as soon as practicable after the commencement of the action, *Fed. R. Civ. P. 23(c)(1),* this does not mandate precipitous action. The court should defer decision on certification pending discovery if the existing record is inadequate for resolving the relevant issues." *Chateau de Ville Prod., Inc. v. Tams-Witmark Music Library, Inc., 586 F.2d 962, 966 (2d Cir. 1978)* (internal quotation marks and citation omitted); *see also In re American Med. Sys., Inc., 75 F.3d 1069, 1086 (6th Cir. 1996); In re Ford Motor Credit Co. Motor Vehicle Lease Litig., 1998 U.S. Dist. LEXIS 4174,* No. 95 Civ. 1876, [*53] 1998 WL 159051 at *5 (S.D.N.Y. Apr. 1, 1998) (denying plaintiff's motion for

partial summary judgment and deferring ruling on the class certification question in view of the fact that defendants may be entitled to summary judgment). The issue here is whether, based upon the pleadings and affidavits, the plaintiffs have carried their burden of showing that each of the requirements of *Rule 23(a)* have been met and that the action is maintainable under one of the subdivisions of *Rule 23(b)*.

**(B)**

In this case, it is not possible to decide on the basis of the parties' briefs whether the surviving claims meet the commonality and typicality requirements for class certification. The commonality component of *Rule 23(a)* requires that plaintiffs show there are questions of law or fact common to the aggrieved class. *See Marisol A. v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997); Bishop, 141 F.R.D. at 237.* "Commonality does not mandate that all class members make identical claims and arguments," *Trief v. Dun & Bradstreet Corp., 144 F.R.D. 193, 198 (S.D.N.Y. 1992)*, only that "the gravamen of the Complaint is that defendants discriminated against class members in the same general [*54] fashion." *Open Hous. Ctr., Inc. v. Samson Management Corp., 152 F.R.D. 472, 476 (S.D.N.Y. 1993)*. The mere presence of some asserted factual differences between class members is not a bar to commonality. *See Marisol A., 126 F.3d at 377* (affirming district court's finding that unique circumstances of plaintiffs did not defeat commonality); *Open Hous. Ctr., 152 F.R.D. at 476; Trief, 144 F.R.D. at 198; see also Krueger, 163 F.R.D. at 439.*

The *Rule 23(a)(3)* typicality requirement tends to merge with the commonality requirement since both serve as "guideposts for determining whether . . . the class claims are so interrelated that the interests of the class members will be firmly and adequately protected." *Falcon, 457 U.S. at 157 n.13; see also Marisol A., 126 F.3d at 376.*

The plaintiffs' contention that they have met the commonality and typicality requirements depends in large part on claims that the Court has dismissed. *See Christensen v. Kiewit-Murdock Investment Corp., 815 F.2d 206, 214 (2d Cir. 1987)*, cert. denied, *484 U.S. 908, 108 S. Ct. 250, 98 L. Ed. 2d 209 (1987)* (it is within district court's discretion to reserve decision on a class certification [*55] motion pending disposition of a motion to dismiss). For example, the plaintiffs allege that one common question is whether the City, Police Union,

and Board of Trustee defendants have maintained and continue to maintain a concerted and systemic policy and practice of illegally discriminating against and violating the legal rights of retired police officers regarding their various retirement benefits, including pensions, variable supplement benefits, and health benefits. (Compl. P 34). Another allegedly common issue is whether the defendants have illegally excluded retirees as trustees on the various Boards of Trustees which control the retirement benefits at issue. (*Id.*). With regard to typicality, the plaintiffs argue that the named plaintiffs' claims are typical of the claims of the proposed class because all were subjected to the same concerted policy and practice of reducing retirement benefits and of excluding retirees from the Boards of Trustees. (*Id. P 35*).

The defendants have resisted the argument of typicality primarily by presenting affidavits from retirees who explain that they prefer to receive defined benefits rather than variable benefits. The City defendants [*56] also argue that the relief sought in connection with medical insurance benefits is inimical to the interests of many members of the proposed class because invalidation of deductibles and copayments could lead to increased medical insurance premiums for many class members. (*See* Affidavit of Caroline Sullivan dated June 26, 1998, attached as Ex. 4 to Affirmation of Anshel David dated July 3, 1998).

However, as explained above, the plaintiffs have no constitutional or statutory right to variable VSF payments or to health insurance without copayments and deductibles, and their claims based on changes to the interest rate assumption for the Police Pension Fund are similarly not viable. Nor do the plaintiffs have standing to protest, on the basis of alleged economic injury, the exclusion of police retirees from representation on the Boards of Trustees of the Police Pension Fund and the VSFs. Moreover, the provision of the specified retirement benefits falls within the bona fide employee benefit plan exemption of the ADEA.

While the remaining claims may satisfy the *Rule 23* requirements, those questions are not focused in the parties' papers. The plaintiffs should be given an opportunity [*57] to file an Amended Complaint asserting those claims that have not been dismissed and identifying the new common questions of law and fact. The class action motions should be directed to the Amended Complaint and the issues of commonality,

typicality, the adequacy of representation, and the absence of relevant conflicts should be addressed in the context of the Amended Complaint. Therefore, the motion for class certification is **denied without prejudice to renewal** after the filing of the Amended Complaint. *See In re Ford Motor Credit Co.*, 1998 WL 159051 at *5.

## IX.

For substantially the same reasons, the Court will deny the plaintiffs' motion pursuant to *29 U.S.C. § 626(b)* for preliminary class certification **without prejudice to renewal** after the plaintiffs file their Amended Complaint. *Section 626(b)* furnishes an "opt in" mechanism by borrowing the notice provisions of the Fair Labor Standards Act of 1938, *29 U.S.C. §§ 201 et seq. (1988)*. Pursuant to *29 U.S.C. § 216(b)*:

> An action to recover the liability prescribed . . . may be maintained against any employer . . . by any one or more employees for and in behalf of himself or themselves and other employees [*58] similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

There are two conditions for maintaining a collective action. First, the named plaintiffs and the proposed members must be "similarly situated." Second, the proposed class members must consent in writing to be bound by the result of the suit, or "opt-in." *See Sperling v. Hoffman-LaRoche, Inc.*, *118 F.R.D. 392, 399* (D.N.J.), aff'd, *862 F.2d 439 (3d Cir. 1988)*, aff'd, *493 U.S. 165 (1989)*.

In this case, the plaintiffs' ADEA claims remain in the case to the extent they are based on allegations of retaliation. However, it was unclear from the oral argument whether the plaintiffs would seek to pursue an ADEA opt-in class if the ADEA claims were limited to retaliation. (Tr. at 37). The plaintiffs can address this issue in their Amended Complaint, as well as the appropriate definition of an opt-in class and whether that class definition differs from the definition of the opt-out class. Therefore, the plaintiffs' motion for access to the names and addresses of potential class [*59] members

and for authorization of notice to such persons is **denied without prejudice to renewal** after the filing of the Amended Complaint.

CONCLUSION

For the reasons explained above, the Court hereby orders as follows:

1. The defendants' motion to dismiss Claims 1-6 and 8-9 based on the ADEA is **granted.**

2. The defendants' motion to dismiss Claims 15-18 based on *42 U.S.C. § 1983* and the *Contracts Clause* is **granted.**

3. The defendants' motion to dismiss Claims 19-24 based on *42 U.S.C. § 1983* and the *Equal Protection Clause* is **granted.**

4. The defendants' motion to dismiss Claims 31-36 based on *42 U.S.C. § 1983* and the Due Process Clause is **granted.**

5. The defendants' motion to dismiss Claims 37-41 based on *42 U.S.C. § 1983* and the *Just Compensation Clause* is **granted.**

6. The defendants' motion to dismiss those causes of action based on the exclusion of retirees from the Boards of Trustees of the VSFs and the Police Pension Fund because the plaintiffs lack standing to assert those claims is **granted**, except the defendants' motion to dismiss Claims 27 and 30 is **denied.**

7. The defendants' motion to dismiss [*60] the pendent state and city claims (Claims 50-70) because the Court should not exercise supplemental jurisdiction is **denied**, except to the extent these claims are otherwise dismissed for lack of standing.

8. The defendants' motion to dismiss Claims 50-53 based on the New York State and City Human Rights Laws is **denied without prejudice to renewal**, except to the extent these claims are otherwise dismissed for lack of standing.

9. The defendants' motion to dismiss Claim 66 is **granted.**

10. The plaintiffs' motion for class certification pursuant to *Fed. R. Civ. P. 23* is **denied without**

**prejudice to renewal** after the filing of an Amended Complaint.

11. The plaintiffs' motion for preliminary class certification pursuant to *28 U.S.C. § 626(b)*, for access to the names and addresses of potential class members, and for authorization of notice to such persons, is **denied without prejudice to renewal** after the filing of the Amended Complaint.

12. The plaintiffs should file and serve an Amended Complaint consistent with this opinion within **twenty-one (21)** days of the receipt of this Opinion and

Order. The defendants should move or answer [*61] within **twenty-one (21)** days of the receipt of the Amended Complaint.

**SO ORDERED.**

**DATED: New York, New York**

**March 29, 1999**

**John G. Koeltl**

**United States District Judge**

# EXHIBIT E

LEXSEE 2006 U.S. DIST. LEXIS 55741

**EATON VANCE MANAGEMENT, et al., Plaintiffs, -against- FORSTMANNLEFF ASSOCIATES, LLC, Defendant.**

**06 Civ. 1510 (WHP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2006 U.S. Dist. LEXIS 55741*

**August 11, 2006, Decided**

**COUNSEL:** [*1] Lawrence Coe Lanpher, Esq., Michele Levy Berlove, Esq., Kirkpatrick & Lockhart, Washington, DC, Counsel for Plaintiffs.

Thomas E. Shirley, Esq., Choate, Hall & Stewart LLP, Boston, MA, Counsel for Defendants.

**JUDGES:** WILLIAM H. PAULEY III, U.S.D.J.

**OPINION BY:** WILLIAM H. PAULEY III

**OPINION**

*MEMORANDUM AND ORDER*

WILLIAM H. PAULEY III, District Judge:

Plaintiffs Eaton Vance Management, Eaton Vance Investment Counsel (collectively, "Eaton Vance") and Nancy Tooke ("Tooke") bring this action pursuant to the Declaratory Judgment Act, *28 U.S.C. §§ 2201-02*, against ForstmannLeff Associates LLC ("Defendant" or "ForstmannLeff"). Plaintiffs seek a declaration that a restrictive covenant entered into between Tooke and ForstmannLeff is unenforceable, and request an injunction prohibiting ForstmannLeff from enforcing the covenant. Defendant moves to dismiss or, in the alternative, to stay this action pending arbitration. Plaintiffs move for summary judgment on all of their claims. For the reasons set forth below, Defendant's motion to dismiss is granted, and Plaintiffs' motion for summary judgment is denied.

*BACKGROUND*

Eaton Vance, ForstmannLeff and Schroders Investment [*2] Management North America, Inc. ("Schroders") are investment management firms. (Amended Complaint, dated Apr. 28, 2006 ("Compl.") PP13, 17-18.) Tooke is an investment portfolio manager who was employed by Schroders from 1994 to 2004. (Compl. PP14, 17-19.) In May 2004, Tooke left Schroders to work for ForstmannLeff following ForstmannLeff's acquisition of her asset management contracts from Schroders. (Compl. PP18-19.)

ForstmannLeff and Tooke entered into a written employment agreement with a term of two years (the "Employment Agreement"). (Compl. Ex. 1, § 5(a).) Section 7 of the Employment Agreement prohibits Tooke from "solicit[ing], attempt[ing] to solicit or accept[ing] customers which were customers of [ForstmannLeff]" for one year following Tooke's departure from ForstmannLeff (the "Restrictive Covenant"). (Compl. Ex. 1, § 7.) Further, Section 8 of the Employment Agreement provides that:

> if [Tooke] breaches, or threatens to commit a breach of, any of the covenants contained in Sections 6 or 7, [ForstmannLeff] shall have, in addition to, and not in lieu of, any other rights and remedies available to [ForstmannLeff] under law or in equity, the right to have [*3] such covenant specifically enforced by any court of competent jurisdiction ...

(Compl. Ex. 1, § 8.) Finally, Section 14 of the Employment Agreement states that "[a]ny controversy or

2006 U.S. Dist. LEXIS 55741, *3

claim arising out of or relating to this Agreement, or the breach hereof, other than claims for specific performance or injunctive relief pursuant to Section 8 hereof, shall be settled by arbitration ..." (the "Arbitration Clause"). (Compl. Ex. 1, § 14.)

Nearly all of Tooke's clients followed her from Schroders to ForstmannLeff. (Compl. P19.) On January 13, 2006, Tooke resigned from ForstmannLeff to work for Eaton Vance. (Compl. PP32-34.) A number of Tooke's clients have since withdrawn their assets from ForstmannLeff (Plaintiffs' Statement of Undisputed Material Facts, dated Apr. 14, 2006 P22), and ForstmannLeff has informed at least some of these clients that the Restrictive Covenant prohibits Tooke from soliciting or accepting their business (Compl. P4). In a letter to ForstmannLeff dated February 1, 2006, Eaton Vance asserted that the Restrictive Covenant is unenforceable with respect to certain of Tooke's former clients. (Compl. P54.) The letter informed ForstmannLeff that Eaton Vance [*4] had accepted an account from one of these clients and that it intended to accept other, similar accounts. (Compl. P54.)

On February 7, 2006, ForstmannLeff filed an arbitration demand with the American Arbitration Association, alleging that Tooke is in violation of the Restrictive Covenant. (Compl. P55.) ForstmannLeff seeks damages, specific performance of the Restrictive Covenant and injunctive relief requiring that Tooke "sever her relationship with any client whose business she has improperly solicited or accepted" since joining Eaton Vance. (Plaintiffs' Memorandum of Law in Support of Its Motion for Summary Judgment, dated Apr. 14, 2006, Ex. 11.) Certain of Tooke's former clients have declined to move their assets to Eaton Vance as a result of the arbitration demand. (Compl. PP56-58.)

Eaton Vance filed this action on February 24, 2006. On April 14, 2006, the Complaint was amended to name Tooke as a plaintiff. Defendant moves to dismiss the Amended Complaint on the grounds that: (1) Eaton Vance lacks standing; (2) the action should be dismissed or, in the alternative, stayed pursuant to Federal Arbitration Act ("FAA") § 3; and (3) the action should be dismissed or, in the alternative, [*5] stayed pursuant to this Court's inherent power to control its docket.

## DISCUSSION

### I. Legal Standard

On a motion to dismiss pursuant to *rule 12(b)(6)*, a court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in Plaintiffs' favor. *Hartford Court Co. v. Pellegrino, 380 F.3d 83, 89-90 (2d Cir. 2004)*. A court should not dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*; *accord Jacobs v. Ramirez, 400 F.3d 105, 106 (2d Cir. 2005)*. Dismissal is proper when the plaintiffs fail to plead the basic elements of a cause of action. *See In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 69 (2d Cir. 2001)*. The issue on a motion to dismiss is not "whether plaintiff[s] will prevail, but simply whether [they are] entitled to offer evidence to support [their] claims." *Taylor v. Vt. Dep't of Educ., 313 F.3d 768, 788 (2d Cir. 2002)*.

The [*6] Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction," a district court "may declare the rights and other legal relations of any interested party seeking such declaration." *28 U.S.C. § 2201(a)*. In passing the Act, "Congress sought to place a remedial arrow in the district court's quiver; it created an opportunity, rather than a duty, to grant a new form of relief to qualifying litigants." *Wilton v. Seven Falls Co., 515 U.S. 277, 288, 115 S. Ct. 2137, 132 L. Ed. 2d 214 (1995)*. While district courts typically have a "virtually unflagging obligation" to exercise their jurisdiction, *Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817, 96 S. Ct. 1236, 47 L. Ed. 2d 483 (1976)*, they "possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites." *Wilton, 515 U.S. at 282*.

In order to decide whether to entertain an action for a declaratory judgment, this Court must consider whether the judgment will (1) serve a useful purpose in clarifying or settling [*7] the legal issues involved; and (2) finalize the controversy and offer relief from uncertainty. *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co., 411 F.3d 384, 389 (2d Cir. 2005)*; *Texport Oil Co. v. M/V Amolyntos, 11 F.3d 361, 366 (2d Cir. 1993)*. The Court may also consider: "(1) whether the proposed remedy is being used merely for 'procedural fencing' or a 'race to res judicata'; (2) whether the use of a declaratory judgment would increase friction between sovereign legal systems

Case 1:08-cv-02429-DAB    Document 53-6    Filed 06/03/2008    Page 4 of 7

Page 3
2006 U.S. Dist. LEXIS 55741, *7

or improperly encroach on the domain of a state or foreign court; and (3) whether there is a better or more effective remedy." *Dow Jones & Co. v. Harrods Ltd., 346 F. 3d 357, 359-60 (2d Cir. 2003).*

II. *Tooke*

ForstmannLeff seeks to dismiss or, in the alternative, stay this action with respect to Tooke pursuant to Section 3 of the FAA, *9 U.S.C. § 3,* and this Court's inherent power to control its docket, *see WorldCrisa Corp. v. Armstrong, 129 F.3d 71, 76 (2d Cir. 1997).* For the reasons stated below, this Court grants FormstmannLeff's. motion to dismiss the claims asserted by Tooke.

A. *Jurisdiction to Decide* [*8] *Arbitrability*

As an initial matter, ForstmannLeff argues that this Court should not reach the question of whether Tooke's claims are within the scope of the Arbitration Clause. ForstmannLeff contends that this issue of arbitrability is a question for the arbitrator in the first instance.

"Although the [Supreme] Court has also long recognized and enforced a 'liberal federal policy favoring arbitration agreements, 'it has made clear that there is an exception to this policy: The question whether the parties have submitted a particular dispute to arbitration, i.e., the 'question of arbitrability, 'is 'an issue for judicial determination unless the parties clearly and unmistakably provide otherwise. '" *Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83, 123 S. Ct. 588, 154 L. Ed. 2d 491* (quoting *AT&T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 649, 106 S. Ct. 1415, 89 L. Ed. 2d 648; Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983);* and citing *First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944, 115 S. Ct. 1920, 131 L. Ed. 2d 985 (1995))* (emphasis in original). Such "clear and unmistakable evidence" may be found in the arbitration clause "even absent an express contractual commitment" of questions [*9] of arbitrability to an arbitral forum. *Shaw Group Inc. v. Triplefine Int'l Corp., 322 F.3d 115, 121 (2d Cir. 2003).* A broadly drafted arbitration clause may evidence the parties' intention to arbitrate issues of arbitrability. *See Shaw Group, 322 F.3d at 121; Paine Webber, Inc. v. Bybyk, 81 F.3d 1193, 1199 (2d Cir. 1996)* ("The words 'any and all [disputes] 'are elastic enough to encompass disputes over whether a claim ... is within the scope of arbitration."); *Smith Barney Shearson Inc. v. Sacharow, 91 N.Y. 2d 39, 46,* *689 N.E.2d 884, 666 N.Y.S.2d 990 (1997).* Courts have also found clear and unmistakable evidence when the parties agree to be bound by the rules of an arbitral tribunal that require arbitrability to be decided by the arbitrator. *See, e.g., Contec Corp. v. Remote Solution Co., 398 F.3d 205, 211 (2d Cir. 2005).* Thus, "parties may overcome the *First Options* presumption [against arbitrability] by entering into a separate agreement that (1) employs ... 'any and all' language ..., or (2) expressly incorporates the provisions of [a tribunal that requires questions of arbitrability to be decided in arbitration]. [*10] " *John Hancock Life Ins. Co. v. Wilson, 254 F.3d 48, 55 (2d Cir. 2001).*

It is undisputed that the American Arbitration Association's National Rules for the Resolution of Employment Disputes govern the arbitration at issue in this action, and that these rules are silent as to whether the arbitrator or the court determines questions of arbitrability. (Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion to Dismiss, dated Apr. 28, 2006 ("Pl. Opp. Mem.") Exs. 2-3.) Thus, Defendant relies on the language of the Arbitration Clause, which provides that "[a] ny controversy or claim arising out of or relating to this Agreement, or the breach hereof, other than claims for specific performance or injunctive relief pursuant to Section 8 hereof, shall be settled by arbitration ..." (Compl. Ex. 1, § 14.) As discussed in greater detail below, Section 8 of the Employment Agreement gives ForstmannLeff the right to initiate proceedings for specific performance or injunctive relief in court, rather than arbitration. Where, as here, "a single agreement contains both a broadly worded arbitration clause and a specific clause assigning a certain decision to [another authority] [*11] ... the presence of both ... clauses creates an ambiguity" as to whether the parties assigned questions of arbitrability to the arbitrator. *Katz v. Feinberg, 290 F.3d 95, 97 (2d Cir. 2002).* Because the Arbitration Clause contains no "clear and unmistakable" delegation of the arbitrability question, this Court must determine whether Tooke's claims are arbitrable. *Katz, 290 F.3d at 97.*

B. *Scope of the Arbitration Clause*

"There is a strong federal policy favoring arbitration as an alternative means of dispute resolution." *Oldroyd v. Elmira Sav. Bank, FSB, 134 F.3d 72, 76 (2d Cir. 1998).* As a result, arbitration clauses must be read as broadly as possible, and "any doubts concerning the scope of

arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp., 460 U.S. at 24-25.*

*Section 3 of the FAA* provides:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding [*12] is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement ...

*9 U.S.C. § 3; accord Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 218, 105 S. Ct. 1238, 84 L. Ed. 2d 158 (1985).* In reviewing the arbitrability of Tooke's claims, the court must determine (1) whether the parties agreed to arbitrate; and (2) whether the scope of the agreement encompasses the claims asserted. [1] *ACE Capital Re Overseas Ltd. v. Cent. United Life Ins. Co., 307 F.3d 24, 28 (2d Cir. 2002); Campaniello Imports, Ltd. v. Saporiti Italia S.P.A., 117 F.3d 655 (2d Cir. 1997).* If all of her claims are subject to arbitration, and no useful purpose will be served by granting a stay, the case may be dismissed. *In re Am. Express Merchants Litig., 2006 U.S. Dist. LEXIS 11742, No. 03 Civ. 9592 (GBD), 2006 WL 662341, at *10 (S.D.N.Y. Mar. 16, 2006); Cicchetti v. Davis Selected Advisors, 2003 U.S. Dist. LEXIS 20747, No. 02 Civ. 10150 (RMB), 2003 WL 22723015, at *3 (S.D.N.Y. Nov. 17, 2003); Lewis Tree Serv., Inc. v. Lucent Techs. Inc., 239 F. Supp. 2d 332, 340 (S.D.N.Y. 2002).* [*13] Here, the parties do not dispute the validity of their agreement to arbitrate, but instead spar over whether the scope of the clause encompasses the claims asserted in the Amended Complaint.

> 1  Tooke does not identify any federal statute that would render her claims non-arbitrable.

The Arbitration Clause provides that "[a]ny controversy or claim arising out of or relating to this Agreement, or the breach hereof, other than claims for specific performance or injunctive relief pursuant to

Section 8 hereof, shall be settled by arbitration ..." (Compl. Ex. 1, § 14.) Because Tooke seeks a declaratory judgment and injunctive relief pertaining to the enforceability of the Restrictive Covenant, her claims clearly "arise out of" and "relate to" the Employment Agreement. Therefore, her claims are non-arbitrable only if they qualify as "claims for specific performance or injunctive relief pursuant to Section 8 ..."

Section 8 provides that if Tooke breaches or threatens to breach the Restrictive Covenant in Section [*14] 7, "[ForstmannLeff] shall have, *in addition to, and not in lieu of, any other rights and remedies available to [ForstmannLeff]* under law or in equity, the right to have such covenant specifically enforced by any court of competent jurisdiction." (Compl. Ex. 1, § 8 (emphasis added).) This language does not remove actions for specific performance or injunctive relief from the Arbitration Clause. Instead, it provides ForstmannLeff the right to initiate such a proceeding in a court "in addition to, and not in lieu of" its right to arbitrate issues of specific performance and injunctive relief pursuant to the Arbitration Clause. In other words, ForstmannLeff may assert these claims in *either* an arbitration or a court of competent jurisdiction. When ForstmannLeff chose to initiate proceedings in arbitration, it did so within its rights under the Arbitration Clause.

Moreover, only ForstmannLeff is granted rights under Section 8. That section provides: "[ForstmannLeff] shall have ... the right to have such covenant specifically enforced by any court of competent jurisdiction." (Emphasis added.) Section 8 grants Tooke no rights of any kind. Thus, Tooke's options are limited [*15] to those set forth in the Arbitration Clause, which requires arbitration for "[a]ny controversy or claim arising out of or relating to this Agreement, or the breach hereof." The claims asserted by Tooke in the Amended Complaint are therefore subject to binding arbitration. Indeed, the issue of the Restrictive Covenant's enforceability is presently before the arbitrator in the proceedings brought by ForstmannLeff.

This Court retains the jurisdiction to order dismissal rather than a stay in the context of *FAA § 3. Lewis Tree Serv., Inc., 239 F. Supp. 2d at 340.* Particularly in the context of a declaratory judgment request, district courts "possess discretion in determining whether and when to entertain an action ... even when the suit otherwise satisfies subject matter jurisdictional prerequisites."

2006 U.S. Dist. LEXIS 55741, *15

*Wilton, 515 U.S. at 282.* "Since this Court finds that all of [Tooke's] claims against [ForstmannLeff] are subject to arbitration, it ... orders that [her claims] be dismissed." *In re Am. Express Merchants Litig., 2006 U.S. Dist. LEXIS 11742, 2006 WL 662341, at \*10.* [2]

> 2   This holding does not apply to Eaton Vance because Eaton Vance is not a party to the Employment Agreement and, therefore, is not bound by the Arbitration Clause. *See WorldCrisa, 129 F.3d at 75-76.*

[*16] III. *Eaton Vance*

ForstmannLeff contends that as a non-party to the Employment Agreement, Eaton Vance lacks standing to prosecute this action. This Court agrees.

A. *Standing*

Under New York law, [3] unless a party has contractual privity or is a third-party beneficiary of a contract, it lacks standing to enforce the terms of the agreement. *Highlands Ins. Co. v. PRG Brokerage, Inc., 2004 U.S. Dist. LEXIS 83, No. 01 Civ. 2272 (GBD), 2004 WL 35439, at \*14 (S.D.N.Y. Jan. 6, 2004); Wells Fargo Bank Northwest, N.A. v. Energy Ammonia Transp. Corp., 2002 U.S. Dist. LEXIS 10912, No. 01 Civ. 5861 (JSR), 2002 WL 1343757, at \*1 (S.D.N.Y. June 18, 2002); Eaves Brooks Costume Co. v. Y.B.H. Realty Corp., 76 N.Y. 2d 220, 226, 556 N.E.2d 1093, 557 N.Y.S.2d 286 (1990).* Eaton Vance was neither a party to nor a third-party beneficiary of the Employment Agreement. Therefore, it lacks standing to sue under the Agreement.

> 3   It is undisputed that New York law governs Plaintiff's claims. "[W]here the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry." *Texaco A/S v. Commercial Ins. Co., 160 F.3d 124, 128 (2d Cir. 1998)* (quoting *Am. Fuel Corp. v. Utah Energy Dev. Co., 122 F.3d 130, 134 (2d Cir. 1997)).*

[*17] "Since it is the underlying cause of action ... that is actually litigated in a declaratory judgment action, a party bringing a declaratory judgment action must have been a proper party had the defendant brought suit on the underlying cause of action." *Collin County v. Homeowners Assoc. for Values Essential to Neighborhoods, 915 F.2d 167, 171 (5th Cir. 1990); see*

*also Mylan Pharms., Inc. v. Thompson, 268 F.3d 1323, 1330 (Fed. Cir. 2001).* Parties who lack standing to enforce an agreement also lack standing to seek a declaration of rights under the contract. *See Travelers Prop. Cas. Corp. v. Winterthur Int'l, 2002 U.S. Dist. LEXIS 11342, No. 02 Civ. 2406 (SAS), 2002 WL 1391920, at \*5 (S.D.N.Y. Jun. 25, 2002)* (a party that is not privy to an insurance contract but would benefit from the insurance policy may not bring a declaratory judgment action to determine whether the insurer owes coverage under the policy); *Hartford Fire Ins. Co. v. Mitlof, 123 F. Supp. 2d 762, 769-71 (S.D.N.Y. 2000)* (same); *Verosol B.V. v. Hunter Douglas, Inc., 806 F. Supp. 582, 588 (E. D. Va. 1992)* (holding that party not in contractual privity has an [*18] "interest in this controversy [which is] far too remote to make it a proper party to this declaratory judgment action"). Indeed, "[c]ourts routinely hold that a plaintiff that has hired (or wishes to hire) the employees of a competitor does not have standing to sue that company to seek nullification of a non-compete agreement between the competitor and its employees." *Bowhead Info. Tech. Servs., LLC v. Catapult Tech., Ltd., 377 F. Supp. 2d 166, 172 (D.D.C. 2005)* (granting ex-employer's motion to dismiss new employer's declaratory judgment action); *see also Defiance Hosp., Inc. v. Fauster-Cameron, Inc., 344 F. Supp. 2d 1097, 1118 (N.D. Ohio 2004)* (same); *Premier Pyrotechnics, Inc. v. Zambelli Fireworks Mfg. Co., 2005 U.S. Dist. LEXIS 30250, No. 05-3112-CV-SFJG, 2005 WL 1307682, at \*2 (W.D. Mo. May 31, 2005)* (same).

Eaton Vance contends that its standing arises not from the Employment Agreement itself, but from ForstmannLeff's initiation of the arbitration against Tooke. The arbitration is purportedly the source of the harm to Eaton Vance because some of Tooke's former clients will not transfer their assets to Eaton Vance while the arbitration is pending. (Pl. [*19] Opp. Mem. at 7-8.) This argument is unavailing. The Amended Complaint seeks an interpretation of the Employment Agreement and injunctive relief based on that interpretation. Plaintiffs do not seek relief based on the existence of an arbitration. Where, as here, "the relief requested is the interpretation of a contract to which plaintiff is not a party ... Plaintiff lacks standing to pursue [a] declaratory judgment action." *Premier Pyrotechnics, 2005 U.S. Dist. LEXIS 30250, 2005 WL 1307682, at \*2* (rejecting plaintiff's contention that "the gravamen of [the] complaint is that the defendant has threatened legal action against the plaintiff for impermissibly interfering

2006 U.S. Dist. LEXIS 55741, *19

with defendant's allegedly protected interests"); *see also Bowhead Info., 377 F. Supp. 2d at 172-73; Defiance Hosp., 344 F. Supp. 2d at 1118.*

The law does not permit Eaton Vance to use the Declaratory Judgment Act to avoid the well-settled requirements of contractual privity. Eaton Vance therefore lacks standing to pursue this action.

*CONCLUSION*

For the foregoing reasons, Defendant's motion to dismiss is granted, and Plaintiffs' motion for summary judgment is denied.

Dated: [*20]  August 11, 2006

New York, New York

SO ORDERED:

WILLIAM H. PAULEY III

U.S.D.J.

# EXHIBIT F

LEXSEE 2005 U.S. DIST. LEXIS 34470

**FRANK O. LEWIS, et al., Plaintiffs v. WAL-MART STORES, INC., et al, Defendants**

**Case No. 02-CV-0944-CVE-FHM**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OKLAHOMA**

*2005 U.S. Dist. LEXIS 34470*

**December 1, 2005, Decided**

**SUBSEQUENT HISTORY:** Motion granted by, Motion denied by *Lewis v. Wal-Mart Stores, 2005 U.S. Dist. LEXIS 34461 (N.D. Okla., Dec. 2, 2005)*

**COUNSEL:** [*1] For Frank O Lewis, Plaintiff: James Collins Hodges, Eller & Detrich, Tulsa, OK; Michael D Myers, McClanahan & Clearman LLP, Houston, TX; Robert Henry Espey, II, McClanahan & Clearman LLP, Houston, TX; Scott M Clearman, McClanahan & Clearman LLP, Houston, TX; Shanann Pinkham Passley, Eller & Detrich, Tulsa, OK

For Herbert Sarty, Plaintiff: James Collins Hodges, Eller & Detrich, Tulsa, OK; Michael D Myers, McClanahan & Clearman LLP, Houston, TX; Robert Henry Espey, II, McClanahan & Clearman LLP, Houston, TX; Scott M Clearman, McClanahan & Clearman LLP, Houston, TX; Shanann Pinkham Passley, Eller & Detrich, Tulsa, OK

For Rodney Bizal, Plaintiff: James Collins Hodges, Eller & Detrich, Tulsa, OK; Michael D Myers, McClanahan & Clearman LLP, Houston, TX; Robert Henry Espey, II, McClanahan & Clearman LLP, Houston, TX; Scott M Clearman, McClanahan & Clearman LLP, Houston, TX; Shanann Pinkham Passley, Eller & Detrich, Tulsa, OK

For Jeff Todd Brown, Plaintiff: James Collins Hodges, Eller & Detrich, Tulsa, OK; Michael D Myers, McClanahan & Clearman LLP, Houston, TX; Robert Henry Espey, II, McClanahan & Clearman LLP, Houston, TX; Scott M Clearman, McClanahan & Clearman LLP, Houston, [*2] TX; Shanann Pinkham Passley, Eller & Detrich, Tulsa, OK

For Tab Art Brown, Plaintiff: James Collins Hodges, Eller & Detrich, Tulsa, OK; Michael D Myers, McClanahan & Clearman LLP, Houston, TX; Robert Henry Espey, II, McClanahan & Clearman LLP, Houston, TX; Scott M Clearman, McClanahan & Clearman LLP, Houston, TX; Shanann Pinkham Passley, Eller & Detrich, Tulsa, OK

For Wal-Mart Stores, Inc., Defendant: Craig Alan Fitzgerald, Bryant Law Firm, TULSA, OK; David Len Bryant, Bryant Law Firm, TULSA, OK

For Wal-Mart Stores, Inc. Corporation Grantor Trust, Defendant: Craig Alan Fitzgerald, Bryant Law Firm, TULSA, OK; David Len Bryant, Bryant Law Firm, TULSA, OK

For AIG Life Insurance Company, Defendant: James F Jorden, Washington, DC; Paul A Fischer, Washington, DC; Todd Alan Nelson, Fellers Snider Blankenship Bailey & Tippens (Tulsa), TULSA, OK

For Kenneth Frank Jacobson, Plaintiff: James Collins Hodges, Eller & Detrich, Tulsa, OK; Michael D Myers, McClanahan & Clearman LLP, Houston, TX; Robert Henry Espey, II, McClanahan & Clearman LLP, Houston, TX; Scott M Clearman, McClanahan & Clearman LLP, Houston, TX; Shanann Pinkham Passley, Eller & Detrich, Tulsa, OK

For [*3] Janet Switzer, Plaintiff: James Collins Hodges, Eller & Detrich, Tulsa, OK; Michael D Myers, McClanahan & Clearman LLP, Houston, TX; Robert Henry Espey, II, McClanahan & Clearman LLP, Houston, TX; Scott M Clearman, McClanahan &

Clearman LLP, Houston, TX; Shanann Pinkham Passley, Eller & Detrich, Tulsa, OK

For Terry Scott Shelnut, Plaintiff: James Collins Hodges, Eller & Detrich, Tulsa, OK; Michael D Myers, McClanahan & Clearman LLP, Houston, TX; Robert Henry Espey, II, McClanahan & Clearman LLP, Houston, TX; Scott M Clearman, McClanahan & Clearman LLP, Houston, TX; Shanann Pinkham Passley, Eller & Detrich, Tulsa, OK

**JUDGES:** CLAIRE V. EAGAN, CHIEF JUDGE, UNITED STATES DISTRICT COURT

**OPINION BY:** CLAIRE V. EAGAN

**OPINION**

**OPINION AND ORDER**

Now before the Court are the Wal-Mart Defendants' Motion for Summary Judgment (Dkt. # 88) and the Plaintiffs' Cross-Motion for Summary Judgment (Dkt. # 133). Plaintiffs brought this action on December 18, 2002, by filing a "Class Action Complaint," but the Court has not certified the action as a class action. Plaintiffs have amended their complaint three times. [1] As the personal representatives of the estates of eight individuals who were employed [*4] by Wal-Mart Stores, Inc. in Oklahoma, plaintiffs seek to recover life insurance benefits they claim the Wal-Mart defendants [2] wrongfully received upon the deaths of the Wal-Mart employees whom they represent. In both the Second and Third Amended Class Action Complaints, all of the plaintiffs specifically allege a violation of *Okla. Stat. tit. 36, § 3604*, unjust enrichment, and misappropriation. Plaintiff Rodney Bizal, on behalf of the estate of Shelly Bizal-Webb, also alleges an individual claim against AIG Life Insurance Company ("AIG") for the policy benefits due to Shelly Bizal-Webb's estate. Wal-Mart Stores, Inc. has been substituted for AIG as the real party in interest with respect to that claim and AIG has been dismissed. [3]

> 1  At a hearing on October 15, 2003, the Court granted plaintiffs' motion for leave to amend to file a third amended complaint (Dkt. # 38) in part: plaintiffs were permitted to assert a claim against AIG Life Insurance Company, but that portion of the motion for leave to amend which served as a request to revise or assert new claims against

Wal-Mart was taken under advisement pending the Court's consideration of Wal-Mart's motion for summary judgment as to the Second Amended Complaint. On June 22, 2005, plaintiffs filed a Motion for Leave to File Fourth Amended Complaint (Dkt. # 132) which, like their motion for leave to file a third amended complaint, modifies their request to plead a multi-state class. Both motions for leave to amend (Dkt. # 38, 132) are pending.

[*5]

> 2  Plaintiffs named both Wal-Mart Stores, Inc. and Wal-Mart Stores Inc. Corporation Grantor Trust as defendants, referenced herein collectively as "Wal-Mart."

> 3  When plaintiffs filed a Third Amended Class Action Complaint (Dkt. # 36) on July 31, 2003, they added Hartford Life Insurance Company and Wachovia Bank of Georgia, N.A. as party defendants. However, that pleading was stricken on October 15, 2003, when the Court permitted the plaintiffs to file a revised Third Amended Complaint to assert a claim against AIG only. Plaintiffs filed the revised pleading on October 20, 2003 without naming Hartford or Wachovia and, consequently, these party defendants have been terminated as party defendants in the case.

**I.**

Before Wal-Mart filed its motion for summary judgment, the Court ruled upon similar claims in *Tillman v. Camelot Music, Inc., 2003 U.S. Dist. LEXIS 21662, 02-CV-761 EA(J), slip op. (N.D. Okla. Sept. 29, 2003)*. That opinion explains the context in which this case arises as well:

> As recounted in several news articles submitted by Camelot, COLI [corporate-owned life insurance] policies were purchased [*6] by numerous companies, including Fortune 500 companies, in the 1990s to take advantage of a tax loophole. Companies borrowed money from the insurer to cover the cost of the policies, took a tax deduction on the interest, and repaid the loans with proceeds from the benefits they collected when employees covered by the policies

died. Most companies, like Camelot, claimed that they purchased the policies as part of a strategy to increase resources they could devote to other employee benefit programs. Some companies informed their employees of the policies and gave them the option to be excluded from coverage. Many would provide incentives to the employees by offering life insurance benefits in amounts smaller than the company would receive if the employees would agree to coverage. The companies paid the premiums for COLI policies; covered employees paid nothing.

The Internal Revenue Service ("IRS") began contesting the interest deductions on COLI policies, see *American Elec. Power. Co., Inc. v. United States, 326 F.3d 737 (6th Cir. 2003); Dow Chemical Co. and Subsidiaries v. United States, 250 F. Supp. 2d 748 (E.D. Mich. 2003); Winn-Dixie Stores, Inc. v. Commissioner, 113 T.C. 254, 1999 WL 907566 (U.S. Tax. Ct. 1999),* [*7] *aff'd, 254 F.3d 1313 (11th Cir. 2001),* . . . Employees, or their estates, also began challenging the COLI policies similar to the way in which plaintiff challenges Camelot's policies in this matter, and at least one court has ruled in favor of covered employees. See *Mayo v. Hartford Life Ins. Co., 220 F. Supp. 2d 714, 780-84 (S.D. Tex. 2002).* Plaintiff brings this suit in the wake of the Mayo decision.

*Tillman,     2003     U.S.     Dist.     LEXIS     21662, 02-CV-761-EA(J), slip op. at 4-5.*

The Mayo court ruled against Wal-Mart at the same time as it ruled against Camelot. See *Mayo v. Hartford Life Ins. Co., 220 F. Supp. 2d 714, 791-93 (S.D. Tex. 2002):* see also *Mayo v. Hartford Life Ins. Co., 220 F. Supp. 2d 794, 808 (S.D. Tex. 2002).* In Tillman, this Court disagreed with some aspects of the Mayo opinion and agreed with others by holding (1) a three-year statute of limitations did not bar Tillman's claim, (2) Oklahoma law applied to Tillman's claim, (3) the insurance policy at issue was constructively delivered in Oklahoma, (4) Camelot had an insurable interest in Tillman's life, and

(5) Camelot was not unjustly enriched when it received [*8] life insurance proceeds as a result of Tillman's death. While Tillman was on appeal, the Fifth Circuit affirmed and remanded the lower court Mayo decision. *Mayo v. Hartford Life Ins. Co., 354 F.3d 400 (5th Cir. 2004).* Subsequently, the Tenth Circuit Court of Appeals affirmed this Court's rulings in Tillman on constructive delivery and unjust enrichment, but reversed the ruling on insurable interest. *Tillman v. Camelot Music. Inc., 408 F.3d 1300 (10th Cir. 2005).* The Tenth Circuit did not address the statute of limitations issue, as Camelot did not appeal that ruling. Here, Wal-Mart was permitted to supplement its motion for summary judgment in light of the Tenth Circuit's decision in Tillman.

Wal-Mart instituted its COLI program in December 1993 and ended it in January 2000. [4] In December 1993, Wal-Mart established the Wal-Mart Stores Inc. Corporation Grantor Trust ("Trust") in Georgia to act, allegedly, as the legal holder of, and recipient of performance under, any COLI policies to be issued insuring the lives of Wal-Mart employees residing in the United States. The instrument establishing the Trust provided that Georgia law would [*9] govern issues relating to the Trust's "construction, validity and administration," and it appointed as trustee Atlanta's Wachovia Bank of Georgia, N.A., an entity which already served as trustee for Wal-Mart's profit-sharing plan. See Motion for Summary Judgment, Dkt. # 88, Ex. 1 (Ex. 3 attached thereto). Wal-Mart claims that its COLI programs were sited in Georgia on the basis of the certainty and clarity afforded by Georgia laws on insurable interest and based on the understanding that Georgia's premium tax rates were comparatively low. The AIG and Hartford policies were applied for in person in Atlanta, Georgia, and were issued and delivered in person to, and accepted in person by, the trustee of the Trust in Atlanta, Georgia. In addition, the Trust paid the policy premiums by wire payment from Georgia.

[4] Many of the facts set forth herein are as stated by Wal-Mart in its original motion since plaintiffs did not respond, as the local rules require, with "a concise statement of material facts to which the party asserts genuine issues of fact exist." LCvR 56.1(c). The rule provides: "All material facts set forth in the statement of the material facts of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of material facts of

the opposing party." Id.

[*10] Until July 1995, the Trust periodically purchased COLI policies covering more than 350,000 of Wal-Mart's "associates" or employees. COLI policies purchased from AIG insured hourly-rate employees; COLI policies purchased from Hartford Life Insurance Company ("Hartford") insured salaried employees. The first block of AIG COLI policies were purchased on December 23, 1993. Although AIG policies insuring individual Wal-Mart employees varied in amount of benefits payable upon the death of the insured, all of the 1993 AIG COLI policies provided coverage in accordance with the terms of the same AIG master form policy.

In purchasing the policies, Wal-Mart provided AIG and Hartford with the name, social security number, gender, date of birth, state and zip code of residence, and annual compensation of its employees. The Wal-Mart COLI plans were "experience rated," meaning that the actual "cost of insurance" was adjusted periodically to account for actual mortality experience within the pool of insured associates. The policies were permanent whole life insurance policies and were not renewable from year to year, but were designed to accumulate cash value through payment of premiums and remain [*11] in effect throughout the life of the insured employee.

Wal-Mart asserts that it spends millions of dollars annually to recruit, screen, train, and retain its employees because its success depends on a trained and experienced work force in stores, distribution centers, its home office, and at other locations. It does not consider its employees to be fungible. Wal-Mart also claims to incur substantial costs resulting from employee deaths, such as the costs associated with employee replacement, retraining, sickness and death-related benefits and expenses, and lost productivity. Wal-Mart purports to have analyzed its economic interest in the continued lives of its employees insured under its COLI programs to determine appropriate benefit amounts under the policies.

Since prior to 1992, Wal-Mart has administered and funded the Wal-Mart Health & Welfare Plan (the "Benefits Plan"). Subject to eligibility requirements specified in the COLI policies, Wal-Mart's COLI programs were structured to cover all Wal-Mart employees who were enrolled in the Benefits Plan when the blocks of policies were purchased and who chose not to opt out of the COLI programs, regardless of the

employee's rank or [*12] status in the company. Where Wal-Mart later determined that employees initially listed as COLI participants did not meet the eligibility requirements, it cancelled the policies insuring such employees and any premiums paid were returned.

The Benefits Plan provided various benefits to Wal-Mart employees, including company-paid life insurance in an amount equal to the employee's annual pay rounded to the nearest $ 1,000 up to $ 50,000, payable to the beneficiary designated by the employee. In addition, Wal-Mart provided to employees who did not opt out of the COLI plans a special death benefit payable to the same beneficiary as named for the company-paid life insurance. The special death benefit for active employees was $ 5,000 and an additional $ 5,000 for accidental death. When purchases of COLI policies were discontinued, Wal-Mart also discontinued the special death benefit.

Wal-Mart argues that, unlike Camelot, it informed its employees of the COLI program and gave them the option to be excluded from coverage. Wal-Mart's Vice-President of Benefits, Thomas G. Emerick, testified that he prepared and distributed a memorandum, dated December 14, 1993, to all Wal-Mart location managers [*13] advising them of the new COLI plans and attaching a brochure (the "1993 brochure"). [5] The brochure describes participation in the COLI program and special death benefits flowing from such participation. It also informs eligible employees that they may opt-out of participation. Emerick affies that he instructed all location managers to distribute the brochure to all eligible employees. Plaintiffs dispute that the brochure was distributed, and they dispute that it served to inform eligible employees of Wal-Mart's COLI policies.

5   On the eve of the October 5, 2005 hearing in this matter, plaintiffs filed an objection to Wal-Mart's summary judgment evidence (Dkt. # 164) which includes an objection to Emerick's December 11, 2003 affidavit and the documents attached thereto, and an objection to Emerick's July 27, 2005 supplemental affidavit. Plaintiff's objection is not only exceedingly untimely, but also an improper attempt to exceed page limitations imposed by local rule and the Court for summary judgment briefs. Further, it appears that many of the objections, including the

objection to the 1993 brochure, are based on hearsay, to which the exception for business records (*Fed. R. Evid. 803(6)*) would apply. Finally, the Court was advised at the October 5, 2005 hearing that Wal-Mart made available a *Rule 30(b)(6)* witness to testify as a records custodian, but plaintiffs' counsel decided not to take that individual's deposition. Hence, plaintiffs' objections as to authenticity of the documents attached to Emerick's affidavit are not well-taken. The objection (Dkt. # 164) is hereby stricken as untimely, improper, and without merit.

[*14] In addition to the 1993 brochure, Wal-Mart claims that it sent a notice in February 1994 informing employees of a $ 1,000 special death benefit for COLI participants who either cancelled their medical coverage but continued to work for Wal-Mart, or terminated employment with Wal-Mart. As employees became eligible for enrollment in the COLI program after December 1993, they were provided with an individual "Personal Choice" form containing disclosures consistent with the 1993 brochure. Wal-Mart claims that more than 450 employees from locations across the country returned opt-out forms. As further evidence of notice, Wal-Mart points out that an article appearing in the October 23, 1995 issue of Newsweek discussed COLI programs in general and Wal-Mart's program in particular. Similar articles specifically discussing Wal-Mart's COLI programs also appeared around the same time in The Washington Post and The New York Times.

The Health Insurance Portability and Accountability Act of 1996 (HIPAA) effectively eliminated interest deductions on policy holder loans to fund a COLI plan. Wal-Mart claims that passage of HIPAA led Wal-Mart to unwind its COLI programs because the interest [*15] deductions were integral to their financial viability. Wal-Mart ultimately surrendered all of its remaining COLI policies by January 2000 and contemporaneously waived any death benefits with respect to the surrendered policies. The insurers returned certain premium and investment funds they had held for Wal-Mart in connection with the COLI program. The IRS challenged the tax benefits that Wal-Mart expected from its COLI plans, and Wal-Mart claims that it entered into a settlement which preserved only a small portion of the originally expected tax benefits.

The Tillman case involved only one plaintiff, and

Camelot received life insurance proceeds upon that employee's death. This case involves eight plaintiffs. Wal-Mart received benefits upon the death of only one of the individuals whose estate is represented by a named plaintiff herein, Alene Jacobson. Before any policy claim was made, Wal-Mart cancelled the policies as to three other individuals whose estates are represented herein: Shelly Bizal-Webb, Eavy Marie Brown and Nellie May Lewis. Three additional individuals represented herein, Alice Fay Haskins, Irene Brasher and Troy Allen Brasher, were never insured under Wal-Mart's [*16] COLI policies. The policy of the remaining individual represented herein, Hazel Lee Sarty, was rescinded after she was determined to be ineligible for the insurance.

Wal-Mart contends in its supplemental brief in support of its summary judgment motion that the Tenth Circuit's decision in Tillman has no impact on (1) Wal-Mart's statute of limitations defense, (2) the Bizal-Webb claim, and (3) Wal-Mart's defense to plaintiffs' claims for the tort of misappropriation. Wal-Mart also argues that, under the Tenth Circuit's decision in Tillman. plaintiff's claims for unjust enrichment fail as a matter of law. Finally, Wal-Mart argues that the Tenth Circuit Tillman decision supports Wal-Mart's position that Oklahoma's insurable interest statute does not apply and, under the version of the insurable interest statute in effect in 1993, the presence of an employer's lawful and substantial economic interest in the life of any employee may be shown by evidence that Wal-Mart, unlike Camelot, can produce.

In their cross-motion for summary judgment, plaintiffs move for summary judgment on Wal-Mart's affirmative defenses of limitations, consent, waiver, estoppel, laches, and ERISA preemption. [*17] They also seek a ruling that Wal-Mart did not have an insurable interest in the lives of its rank-and-file employees, including Nellie Mae Lewis, Shelly Bizal-Webb, Alene Jacobson, and Eavy Marie Brown. Plaintiffs specifically argue that summary judgment is proper as to Wal-Mart's limitations defense because the doctrines of collateral estoppel and issue preclusion bar Wal-Mart from arguing that it made effective disclosures to its employees, and the summary judgment record shows that Wal-Mart's limitations defense is contrary to the facts. They argue that summary judgment is proper as to Wal-Mart's equitable defenses of waiver, estoppel, consent, and laches because plaintiffs did not have full knowledge of the operative facts, and because Wal-Mart knew its COLI

policies were unlawful when it bought them. Plaintiffs rely on rulings from other courts to assert that Wal-Mart's ERISA preemption defense is barred, and to assert that Wal-Mart lacked an insurable interest in the lives of its rank-and-file employees.

## II.

Summary judgment pursuant to *Fed. R. Civ. P. 56* is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter [*18] of law. *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*; *Anderson v. Liberty Lobby. Inc., 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*; *Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993)*. The plain language of *Rule 56(c)* mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex, 477 U.S. at 317*. "Summary judgment procedure is properly regarded not as a disfavored procedural device, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id. at 327*.

"When the moving party has carried its burden under *Rule 56(c)*, its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)* [*19] (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." *Anderson, 477 U.S. at 252*. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id. at 250*. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. *Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998)*.

## III.

## A. Statutory Violation

### 1. Standing

As to persons entitled to maintain a cause of action for violation of Oklahoma's insurable interest statute (with respect to personal insurance), the statute provides:

> If the beneficiary, assignee or other payee under any contract made in violation of this section receives from the insurer any benefits thereunder accruing upon the death, disablement, or injury of the individual insured, the individual insured or the executor or [*20] administrator, as the case may be, may maintain an action to recover such benefits from the person so receiving them.

*Okla. Stat. tit. 36, § 3604(B)*. The undisputed facts are that former Wal-Mart employees Alice Fay Haskins, Irene Brasher and Troy Allen Brasher were never insured under Wal-Mart's COLI policies. Former Wal-Mart employee Hazel Lee Sarty was insured in 1993 but determined to be ineligible on June 2, 1994. Wal-Mart received no benefits accruing upon the deaths of these individuals, and none of these individuals, or their personal representatives, ever received any benefits under the Wal-Mart COLI policies. Accordingly, none of them has standing to assert any claim under *Okla. Stat. tit. 36, § 3604*.

The "irreducible constitutional minimum" for establishing standing in Article III courts requires "that the plaintiff must have suffered an 'injury in fact' -- an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not conjectural or hypothetical.'" *Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)*(citations omitted). In addition, "there must be a causal connection between the injury [*21] and the conduct complained of," and "it must be 'likely' . . . that the injury will be 'redressed by a favorable decision.'" *Id. at 560-61*. Plaintiff Janet Switzer represents the estates of Troy Allen Brasher and Irene Brasher, Terry Scott Shelnut represents Alice Fay Haskins' estate, and Herbert Sarty represents the estate of Hazel Lee Sarty. Because these decedents were never insured, the statutory claims of personal representative plaintiffs Switzer, Shelnut and Sarty must be dismissed for lack of standing.

Similarly, the personal representatives of the estates of former Wal-Mart employees Nellie Mae Lewis, [6] Shelly Bizal-Webb, and Eavy Marie Brown lack standing to assert a violation of *Okla. Stat. tit. 36, § 3604* because: (1) they never received any benefits under the Wal-Mart COLI policies, even though these decedents had been insured; (2) the employees themselves never received any benefits under the Wal-Mart COLI policies; and, (3) contrary to plaintiffs' argument, Wal-Mart received no death benefits or policy "proceeds" upon the deaths of these employees. Wal-Mart surrendered the COLI policies before any claims were made, and Wal-Mart waived any death benefits [*22] when it surrendered all of its remaining COLI policies. The "payment" Wal-Mart received in January 2000 was a refund of certain premium and investment funds the insurers had held for Wal-Mart in connection with the COLI program. Presumably, the insurers would have paid death benefits and policy proceeds from those funds if the policies had not been surrendered, but it would be contrary to the plain meaning of the statute to find that the return of those funds to Wal-Mart in exchange for release of contractual obligations constitutes "benefits [] accruing upon the death, disablement, or injury of the individual insured[s]." Accordingly, the statutory claims of personal representative plaintiffs Frank O. Lewis, Rodney Bizal, [7] Jeff Todd Brown and Tab Art Brown must be dismissed because these plaintiffs have no standing to assert that Wal-Mart violated *Okla. Stat. tit. 36, § 3604* by its purchase of COLI policies.

> 6    Nellie Mae Lewis was insured on March 1, 1995 -- after the Oklahoma legislature amended the statute to permit COLI policies, but "only with the written consent of the insured." *Okla. Stat., tit. 36, § 3604(C)(4)(a)*. It is undisputed that Wal-Mart did not obtain the written consent of Nellie Mae Lewis.

[*23]

> 7    Plaintiff Rodney Bizal's claim for policy benefits is an offshoot of his claim for violation of the statute and fails for similar reasons. Neither he nor Shelly Bizal-Webb, whose estate he represents, was a signatory to the contract between Wal-Mart and AIG, and neither paid any premium for the life insurance. Although Shelly Bizal-Webb died in 1999 before Wal-Mart cancelled its COLI policy insuring her life, Wal-Mart never made a claim for or received any policy benefits accruing upon her death. Thus, he

has no standing as to this claim, and Wal-Mart, substituted for AIG, is entitled to summary judgment.

The remaining statutory claim is that of Kenneth Frank Jacobson, the plaintiff representing Alene Jacobson. Alene Jacobson died on September 12, 1996, and on November 14, 1996 Wal-Mart actually received COLI benefits which accrued upon her death. Thus, the Court must address the following additional issues as to this claim: Wal-Mart's statute of limitations defense; other affirmative defenses raised by Wal-Mart; and whether Wal-Mart had an insurable interest in Alene Jacobson's life.

**[*24] 2. Statute of Limitations**

Wal-Mart initially argued that all of the plaintiffs' claims are barred because they accrued more than three years before the action was commenced and the limitations period is not tolled by alleged fraudulent concealment. Plaintiffs argued, with respect to the Jacobson claim in particular, that Wal-Mart's position contradicts the Mayo decisions, and that the statute of limitations on Jacobson's claim is tolled by the discovery rule and Wal-Mart's fraudulent concealment of its COLI policies. In response to Wal-Mart's supplemental briefing on the statute of limitations issue, plaintiffs filed their cross-motion for summary judgment, arguing that the doctrines of collateral estoppel and issue preclusion bar Wal-Mart from arguing that it made effective disclosures to its employees. Plaintiffs also assert that the summary judgment record before the Court proves that Wal-Mart's limitations defense is contrary to the facts.

As discussed in the Court's Tillman decision, Oklahoma's insurable interest statute does not contain its own statute of limitations or tolling provisions. *Tillman, 2003 U.S. Dist. LEXIS 21662, 02-CV-761-EA(J), slip op. at 13*. The Court found applicable [*25] the three-year statute of limitations for an "action upon a liability created by statute other than a forfeiture or penalty; . . ." *Okla. Stat. tit. 12, § 95(2)*, given that "a liability created by statute is defined as a liability which would not exist but for the statute." *Lincoln Bank and Trust Co. v. Neustadt, 1996 OK CIV APP 10, 917 P.2d 1005, 1008 (Okla. Ct. App. 1996)*(citations omitted). The Court also found, in Tillman, that the limitations period for Tillman's claim for violation of Oklahoma's insurable interest statute commenced the day Camelot bought the policy because, theoretically, Tillman could have sought

a declaratory judgment that Camelot had no insurable interest. *Id.* *2003 U.S. Dist. LEXIS 21662 at 15.* [8] Tillman failed to bring suit within three years of that date. Thus, the Court addressed three key issues: whether the limitations period was tolled by Camelot's alleged fraudulent concealment, whether Tillman's representative had constructive notice of her claims, and if so, when. *Tillman, 2003 U.S. Dist. LEXIS 21662, 02-CV-761-EA(J), slip op. at 15.*

> 8  One court has found likewise, at least as to the accrual of claims for commercial misappropriation, unjust enrichment, civil conspiracy and declaratory judgment. See *Rice v. Wal-Mart Stores, Inc., 2004 U.S. Dist. LEXIS 14109, No. Civ. 02-390-B, 2004 WL 1638241, *2 (D.N.H. July 23, 2004);* Keenan v. AIG Life Ins. Co., No. Civ. 03-31- 2003 WL 21696185, *3 (D.N.H. July 11, 2003).*

[*26]  Plaintiffs' counsel in this case challenge the Court's finding in Tillman as to when the cause of action accrues on claims for unjust enrichment and violation of *Okla. Stat. tit. 36, § 3604* arising out of a corporation's COLI program. [9] Relying on the Fifth Circuit's decision in Mayo, they assert that these causes of action accrued when Wal-Mart received the proceeds of the policy from the insurer after the employee's death. See *354 F.3d at 410.* The Mayo court explained that those proceeds should go to the deceased employee's estate, Id. Assuming the Fifth Circuit is correct, plaintiff still must show that the limitations period was tolled by Wal-Mart's alleged fraudulent concealment, and/or that Jacobson's personal representative had no notice of the statutory claim more than three years before he filed suit.

> 9  Under Oklahoma law, "an action accrues when a litigant can first maintain an action to a successful conclusion." *Digital Design Group, Inc. v. Information Builders, Inc., 2001 OK 21, 24 P.3d 834, 839 (Okla. 2001).*

[*27]  **a. Fraudulent Concealment**

In diversity actions, federal courts apply the state statutes of limitations and any related state tolling provisions. E.g., *Futura Music, Inc. v. Gates Radio Co., 399 F.2d 308, 310 (10th Cir. 1968).* Plaintiffs bear the burden to provide evidence of fraudulent concealment sufficient to withstand a motion for summary judgment. *Williams v. Borden, Inc., 637 F.2d 731, 739 (10th Cir.*

*1980);* see *King & King Enter., v. Champlin Petroleum Co., 446 F. Supp. 906, 911 (E.D. Okla. 1978);* cf. *Tice v. Pennington, 2001 OK CIV APP 95, 30 P.3d 1164, 1173 (Okla. Ct. App. 2001).* Further, plaintiff "must not only show that he did not know facts constituting a cause of action, but that he exercised reasonable diligence to ascertain such facts." *Funnell v. Jones, 737 P.2d 105, 107 (Okla. 1985)*(quoting *Kansas City Life Ins. Co. v. Nipper, 1935 OK 1127, 174 Okla. 634, 51 P.2d 741 (Okla. 1935)).* This is known as the "discovery rule" or the "diligence-discovery rule." E.g., *Weathers v. Fulgenzi, 1994 OK 119, 884 P.2d 538, 540-41 (Okla. 1994); Tice, 30 P.3d at 1171.* Regardless of whether a plaintiff has [*28] "exact knowledge," tolling resulting from fraudulent concealment ends "when the plaintiff knows, or reasonably should know, of enough critical facts about the injury and its cause to protect himself or herself by seeking legal assistance." *Tice, 30 P.3d at 1171.* [10]

> 10  Wal-Mart initially cited this authority in its motion for summary judgment, Dkt. # 88, at 26. In its reply brief, however, Wal-Mart argues that the discovery rule applies only in limited tort cases. Reply Br. Dkt. # 105, at 11 (citing *Smith v. Baptist Foundation of Oklahoma, 2002 OK 57, 50 P.3d 1132, 1137-38 (Okla. 2002)); see Lovelace v. Keohane, 1992 OK 24, 1992 OK 624, 831 P.2d 624, 629 (Okla. 1992).* This Court recognizes that no Oklahoma case has applied the discovery rule to a claim for violation of *Okla. Stat. tit. 36, § 3604,* and does not hold that Oklahoma courts necessarily would extend the rule to this claim. However, it is assumed, for purposes of this motion, that the rule applies.

In Tillman, this Court explained [*29] that "fraudulent concealment by a wrongdoer of the injured party's cause of action will toll the period of limitations until the injured party is placed on reasonable notice of the wrong." *2003 U.S. Dist. LEXIS 21662, No. 02-CV-761-EA(J), slip op. at 15* (citing *Telex Corp. v. Int'l Bus. Machines Corp., 367 F. Supp. 258, 360 (N.D. Okla.),* rev'd on other grounds, *510 F.2d 894 (10th Cir. 1973): Funnell, 737 P.2d at 107; Liberty Nat'l Bank of Weatherford v. Lewis, 1935 OK 492, 172 Okla. 103, 44 P.2d 127. 129 (Okla. 1935); Tice, 30 P.3d at 1171).* Based on statements made during related litigation, the Court found that Camelot had fraudulently concealed the existence of its COLI policies. Id. The Court noted that, under Oklahoma law, "the mere failure to disclose that a

cause of action exists is not sufficient to prevent the running of the statute. There must be something more; some actual artifice to prevent knowledge of the facts; some affirmative act of concealment or some misrepresentation to exclude suspicion and prevent inquiry." *Tillman, 2003 U.S. Dist. LEXIS 21662, No. 02-CV-761-EA(J), slip op. at 16* (quoting *McClenahan v. Oklahoma R. Co., 1928 OK 197, 131 Okla. 73, 267 P. 657, 658 (Okla. 1928)*: [*30] accord *Wills v. Black & West, 1959 OK 162, 344 P.2d 581, 584 (Okla. 1959))*. The "something more" was Camelot's effort to hide the insurance benefits in an account for executive compensation. Id.

There is no evidence of a similar "artifice," "affirmative act of concealment," or "misrepresentation" in this case that would have prevented the individuals represented by plaintiffs from ascertaining that Wal-Mart carried corporate-owned life insurance on their lives and would have received policy proceeds when they died. To the contrary, the 1993 brochure disclosed Wal-Mart's COLI policies to Wal-Mart employees. It included a "Personal Benefits News" bulletin with an accompanying notice captioned "For Your Information." It informed employees that, beginning January 1, 1994, Wal-Mart would provide all active associates (employees) participating in the company's group health plan an additional "death benefit" of at least $ 5,000 per employee. Importantly, the notice explained the source of the new benefits to employees, as well as the right of any eligible employee to prevent the company from owning insurance on the employee's life:

> Wal-Mart is providing these new death benefits [*31] as a result of financial gains from life insurance policies Wal-Mart will purchase which will cover the lives of associates who participate in the group health plan. That Wal-Mart owned life insurance will result in financial benefits for the corporation. Any net life insurance proceeds payable to Wal-Mart from this life insurance as a result of the death of an active associate will be contributed to the profit sharing plan. [11]
>
> Participation in the new death benefits and the Wal-Mart owned life insurance will be automatic for associates enrolled in

the group health plan. However, if you do not wish to be covered by these programs, please fill in the information below and return it to Wal-Mart's Benefits Department by January 31, 1994.

*Motion for Summary Judgment Appendix ("MSJ App."), Dkt. # 89, Ex. 1.17* (underscore in original). As employees became eligible for participation in the COLI program after December 1993, Wal-Mart provided them with an individual "Personal Choice" form disclosing the same material. *Id., Ex. 1.22.*

> 11  Plaintiffs maintain that no proceeds were ever contributed to the profit sharing plan. The Court finds this undisputed fact irrelevant to the determination of whether Wal-Mart fraudulently concealed its COLI policies or whether the 1993 brochure notified Wal-Mart employees of the COLI plan.

[*32] In addition, the national news media reported on COLI programs, and Wal-Mart's in particular, in 1995. A September 24, 1995 article in The New York Times explained how COLI policies worked and named Wal-Mart as one of the well-known companies that utilized COLI policies. MSJ App., Dkt. # 89, Ex. 1.26. A subsequent article in The Washington Post was published on October 17, 1995. It focused on Wal-Mart's COLI program and quoted Emerick at length. *Id. Ex. 1.25.* The author explained in detail "how American's biggest corporations are cashing in on your mortality" and stated, among other things: "A company takes out whole life insurance policies on thousands of its employees. This isn't like regular corporate-provided insurance. Here, when an employee dies, the money goes to the company, not to his family." *Id.* The same article was published in Newsweek on October 23, 1995. *Id., Ex. 1.24.* The Court finds the summary judgment record devoid of evidence that Wal-Mart fraudulently concealed its COLI policies.

### b. Notice

Even if Wal-Mart had fraudulently concealed its COLI policies, thus tolling the limitations period, the tolling would have ceased when the [*33] personal representative for Alene Jacobson knew, or reasonably should have known, about the COLI policies. See *Tice, 30 P.3d at 1171.* Wal-Mart contends that the 1993 brochure and subsequent "Personal Choice" form, as well as the 1995 news articles, not only demonstrate a lack of

fraudulent concealment but also demonstrate that all of the plaintiffs had notice. In Oklahoma, "whatever is notice enough to excite attention and put the party on guard and call for inquiry, is notice of everything to which such inquiry might have led." *State ex rel. Oklahoma Bar Ass'n v. Scroggs, 2003 OK 21, 70 P.3d 821, 827 (Okla. 2003)*. The common law rule has been codified, as explained by *In re Estate of Pope, 1990 OK 125, 808 P.2d 640 (Okla. 1990)*:

> "Notice is either actual or constructive." *25 O.S. 1981 § 10*. "Actual notice consists in express information of a fact." *25 O.S. 1981 § 11*. "Constructive notice is notice imputed by the law to a person not having actual notice." *25 O.S. 1981 § 12*. "Every person who has actual notice of circumstances sufficient to put a prudent man upon inquiry as to a particular fact, and who omits to make such inquiry with reasonable diligence, [*34] is deemed to have constructive notice of the fact itself." *25 O.S. 1981 § 13*.

*Id. at 646 n.32.*

Plaintiffs attack Wal-Mart's arguments on two fronts: first, they argue that the notice was vague, misleading, and superficial; second, they assert that the 1993 brochure and subsequent notices were never received by the Wal-Mart employees whom they represent. In particular, plaintiffs contend that Wal-Mart knew about and could have used a disclosure similar to one made by the Woolworth Corporation which stated that "no associate or his or her heirs or beneficiaries will have any entitlement to any policy or its proceeds" and required the employee to sign a consent form acknowledging that the company would be sole owner and beneficiary of the COLI policy on his or her life. See Resp. Br. Dkt. # 102, Ex. 29; A-6.

Further, plaintiffs argue that the primary subject of the 1993 brochure is the new "special death benefit" and makes no explicit reference to COLI policies in the first two paragraphs. The third paragraph is vague, plaintiffs argue, because there are several life insurance programs offered to Wal-Mart associates, two of which were group insurance programs, [*35] and the Wal-Mart employee handbooks for 1994 and 1995 addressed the new special death benefit in the section describing one of these group

programs -- Wal-Mart's company paid life insurance program -- in which the employee designated the beneficiary. Finally, plaintiffs challenge the 1993 brochure statement that the insurance would result in "financial benefits" for the company. Emerick testified that Wal-Mart intended to convey that it would receive tax benefits from the policies. He did not mention the death benefits paid to Wal-Mart upon the death of employees covered by the COLI policies.

In support of these arguments, plaintiffs rely on the Mayo decisions and assert that the doctrines of collateral estoppel and issue preclusion prevent Wal-Mart from relying on the 1993 brochure and subsequent similar information. In the context of a discussion of Texas statutes permitting written consent by employees for insurance on their lives and the particular beneficiary and owner designations, the district court in Mayo remarked that, "there is no proof that Sims actually received the December 1993 flyer [the 1993 brochure] or any other notice about the insurance and the beneficiary [*36] designation prior to Wal-Mart's purchase of the COLI policy on his life." *220 F. Supp. 2d at 807*. The district judge also described Wal-Mart's explanation of its insurance program as "vague," "superficial, bare of any data or concrete information," and a "mere suggestion" that insurance on employees' lives was involved, *Id. at 806-07*. The judge stated that "Wal-Mart did not explain the financial arrangements in writing or in plain English." *Id. at 807*. On appeal, the Fifth Circuit assumed the Wal-Mart had purchased the COLI policies without the employee's knowledge or consent. *Mayo, 354 F.3d at 410*.

Wal-Mart points out that the Mayo district court, in a decision issued the day prior to the one in which the statements quoted above were made, specifically stated that the court was not deciding whether the disclosures were sufficient to constitute notice or claim discovery for statute of limitations purposes:

> The Court need not resolve AIG's argument that Sims was placed on notice of the existence of the COLI policies through the flyer distributed by Wal-Mart in December 1993. First, Plaintiff Sims Estate [*37] does not rely on the discovery rule. Second, the evidence on which these Defendants [rely] to establish 'notice' to Sims raises a question of fact as

to whether Sims actually received the flyer and whether the information in it gave meaningful notice of the benefits Wal-Mart would receive from the insurance.

*229 F. Supp. 2d 759 at 770-71 n.202 (2002).* Similarly, the Fifth Circuit's assumption as to the employee's knowledge of Wal-Mart's COLI policies occurs in the context of its discussion of the Mayo plaintiff's unjust enrichment claim. See *Mayo, 354 F.3d at 410.* It was not a determination that the plaintiff had no notice for discovery rule purposes. This Court is more interested in the Mayo lower court's determination that the evidence on which the defendants relied to establish notice raised a question of fact. The evidence here raises a similar question of fact not only as to whether Alene Jacobson received the 1993 brochure, but also as to whether her personal representative knew or should have known about it when the claim accrued after her death.

Significantly, the federal district court in New Hampshire has held, on two separate occasions, [*38] that the 1993 brochure was delivered and that Wal-Mart employees had notice of Wal-Mart's COLI plan as a result of the 1993 brochure. In Keenan v. AIG Life Ins. Co., No. Civ. 03-31-B, 2003 WL 21696185, *3 (D.N.H. July 11, 2003), the district judge remarked that the plaintiff had not argued that the 1993 brochure was confusing or ambiguous. A year later the same district judge made the same ruling without a similar observation as to another Wal-Mart employee and that employee's personal representative. *Rice v. Wal-Mart Stores, Inc., 2004 U.S. Dist. LEXIS 14109, No. Civ. 02-390-B, 2004 WL 1638241 (D.N.H. July 23, 2004),* but, at the October 5, 2005 hearing, Wal-Mart's counsel quoted from a brief in which the Rice plaintiff made that argument. In Rice, the district judge explicitly found: "The notice [i.e., the 1993 brochure] clearly provided information that Wal-Mart was going to purchase life insurance policies on its employees' lives, and that it -- not the employees' survivors -would receive the financial gains." *2004 U.S. Dist. LEXIS 14109, 2004 WL 1638241, at *3.*

The court deciding the Rice and Keenan cases did not, however, differentiate between the Wal-Mart employees and [*39] their personal representatives, as he did not decide the accrual date in the context of a New Hampshire statutory claim similar to those asserted here. The plaintiffs in those cases did not allege a violation of

an insurable interest statute; instead, they claimed that they were entitled to a declaratory judgment that Wal-Mart lacked an insurable interest in the lives of the Wal-Mart employees in New Hampshire who were insured by COLI policies purchased by Wal-Mart. See *Rice v. Wal-Mart Stores. Inc., 2004 U.S. Dist. LEXIS 14109, No. Civ. 02-390-B, 2003 WL 22240349 (D.N.H. Sept. 30, 2003).* They also alleged claims for breach of contract, commercial appropriation, intrusion upon seclusion, breach of fiduciary duty, intentional infliction of emotional distress, unjust enrichment, and civil conspiracy. Id. The court dismissed all claims against one of the insurance companies that issued the COLI policies except for plaintiffs' claims for civil conspiracy and unjust enrichment. Id. The court dismissed the declaratory judgment claim, in particular, because, in New Hampshire, only the insurer can challenge the "want of insurable interest." *Id. 2004 U.S. Dist. LEXIS 14109, at *1.* [12]

> 12    The common law in Oklahoma permitted only the insurer to contest validity of a policy for lack of an insurable interest. *Ryan v. Andrewski, 1952 OK 119, 206 Okla. 199, 242 P.2d 448, 452 (Okla. 1952).* The statute, however, permits the personal representative to recover death benefits from a person receiving them under a contract made in violation of the statute. *Okla. Stat. tit. 36, § 3604(B).*

[*40] In this case, as in the *Rice* and Keenan cases, plaintiffs have submitted numerous affidavits by former Wal-Mart employees, managers, supervisors, and representatives of deceased Wal-Mart employees. These individuals assert, among other things, that they had no knowledge of Wal-Mart's coverage, that they were never told about the coverage, and that they cannot recall receiving the written information about COLI policies from Wal-Mart. See Resp. Br., Dkt. # 102, at 34-35. One individual testified that, after receiving an advertisement letter from plaintiffs' counsel, she went to the Wal-Mart store where her deceased husband had worked. She met with the store's personnel manager who searched through files and found no documents as to the COLI coverage. The personnel manager also contacted Wal-Mart's benefits department and its legal department and was told that Wal-Mart did not insure the lives of its employees. Id. at 35. [13]

> 13    Plaintiffs submitted a similar affidavit by

another individual in support of their cross-motion for summary judgment. See Cross-Motion, Dkt. # 133, Ex. D.

[*41] In opposition, Wal-Mart has submitted evidence that approximately 450 employees, and at least one in Oklahoma, completed and returned a form permitting them to "opt-out" of the COLI program. The Mayo decision indicates that "approximately 1000 employees out of 350,000 in fact opted out." *220 F. Supp. 2d at 807 n.36*. Wal-Mart also submits that the information provided to the personnel manager and, consequently, to the wife of a deceased Wal-Mart employee was correct because the inquiry was made after Wal-Mart had cancelled its COLI policies.

The Rice court, considering similar affidavits offered by the plaintiffs here, found that "none of the affiants directly challenge[s] Emerick's claim that all Wal-Mart employees received the memorandum informing them of the COLI policies in December 1993." *2004 U.S. Dist. LEXIS 14109, 2004 WL 1638241, at *3*. The Rice court concluded that "Rice has failed to produce sufficient responsive evidence to permit a reasonable jury to conclude that the discovery rule[] tolled the running of the statute of limitations." Id. This Court finds the Rice court's rationale persuasive but distinguishable because plaintiffs in *Rice* and [*42] Keenan did not assert a violation of the insurable interest statute, and the district judge there found that the asserted claims (for unjust enrichment, civil conspiracy, commercial appropriation, declaratory relief) accrued when Wal-Mart purchased the COLI policies. If one assumes a claim for violation of the statute accrues when the employer receives benefits on account of the death of the insured employee, the claim belongs to the personal representative, and the relevant issue is whether the personal representative had notice, not whether the insured employee did. [14]

> 14    Of course, evidence that an insured had notice may be circumstantial evidence from which a jury could conclude that the personal representative had notice, viz., that a reasonable insured would inform her spouse.

The competing evidence offered by the parties leads the Court to conclude that, although Wal-Mart did not fraudulently conceal the existence of its COLI policies from its employees or their personal representatives, a genuine [*43] issue of material fact remains as to whether Alene Jacobson or her personal representative

had notice. The evidence appears to indicate that many of the Wal-Mart employees whose lives were covered by Wal-Mart's COLI policies may have had actual notice of the program and the remainder may have had constructive notice of it by virtue of the 1993 brochure and subsequent "Personal Choice" forms. Yet, there is no specific evidence in the summary judgment record as to whether the brochure was actually distributed by the manager in the Wal-Mart store where Alene Jacobson worked. There is disputed evidence as to whether her husband and personal representative, Kenneth Frank Jacobson, had or should have had actual or constructive notice. He affies that his wife never told him about the policies, that she would have told him about such policies, and that he found nothing in her papers after her death to indicate that Wal-Mart had a COLI policy on her life. Resp. Br., Ex. # 102, Ex. G.

The Court does not rely for notice on the news articles in which Wal-Mart's COLI policies were discussed. The Court ruled in Tillman that the same 1995 Newsweek article upon which Wal-Mart relies did not [*44] support Camelot's argument that the Tillman plaintiff had constructive notice in 1995 because the article did not specifically inform the reader that *Camelot* had purchased COLI policies covering its employees as well as officers and, even if the article had mentioned Camelot, there was no indication that the Tillman plaintiff saw the article, and no reason that it would have led her to believe that the deceased employee whom she represented was covered under the policy or that she might otherwise have a cause of action. That employee died in January 1992, and the article did not appear until October 1995. Here, Alene Jacobson died after the article appeared, and the author did focus on Wal-Mart, but there is no evidence that Alene Jacobson or her husband and personal representative saw that or any similar article. Accordingly, the Court finds that summary judgment is not appropriate as to Wal-Mart's statute of limitations defense to the statutory claim of personal representative plaintiff Kenneth Frank Jacobson.

### c. Collateral Estoppel and/or Issue Preclusion

Plaintiffs' collateral estoppel and issue preclusion arguments do not compel different findings. In their [*45] cross motion for summary judgment, [15] plaintiffs point out that the United States Supreme Court has sanctioned the offensive use of collateral estoppel, permitting a plaintiff to "foreclose the defendant from litigating an

issue the defendant has previously litigated unsuccessfully in an action with another party." *Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 n.4, 99 S. Ct. 645, 58 L. Ed. 2d 552 (1979).* They contend that, in Mayo, Wal-Mart was unsuccessful in litigating the issue of whether it put employees on written notice of its COLI policies and therefore, Wal-Mart cannot litigate the issue again in this subsequent case brought by plaintiffs. They specifically contend that Wal-Mart argued, in Mayo, that the plaintiffs' state law claim for benefits of a COLI policy were barred by the statute of limitations because Wal-Mart gave written notice of its COLI policies to all 350,000 employees whose lives were covered by the policies.

> 15   Wal-Mart points out that plaintiffs' motion is defective because it does not comply with the local rule requirement that a motion for summary judgment contain a concise statement of material facts as to which the movant contends no genuine issue exists. LCvR 56.1 (A). The Court notes that the motion also fails to comply with local rule requiring footnotes to be in 12 pitch font and requiring an indexed table of contents and authorities for briefs exceeding fifteen pages in length. LCvR 7.1 (c). Although the Court takes these infractions seriously, it will not disregard to the merits of plaintiffs' motion, as they are inextricably intertwined with Wal-Mart's motion for summary judgment and supplemental motion.

[*46]   Wal-Mart notes that the doctrine of nonmutual offensive collateral estoppel is sometimes described by the more modern term "issue preclusion." See *State ex rel. Dept. of Transp. v. Little, 2004 OK 74, 100 P.3d 707, 719 n.47 (Okla. 2004).* Because Mayo was a diversity case, its preclusive effect, if any, is determined by Texas law except insofar as that law is incompatible with federal interests. See *Semtek Intern., Inc. v. Lockheed Martin Corp., 531 U.S. 497, 508, 121 S. Ct. 1021, 149 L. Ed. 2d 32 (2001); Hartsel Springs Ranch of Colorado, Inc. v. Bluegreen Corp., 296 F.3d 982, 986 (10th Cir. 2002).* In Texas, "[a] party seeking to assert the bar of collateral estoppel must establish that (1) the facts sought to be litigated in the second action were fully and fairly litigated in the first action; (2) those facts were essential to the judgment in the first action; and (3) the parties were cast as adversaries in the first action." *Sysco Food Servs., Inc. v. Trapnell, 890 S.W.2d 796, 801, 37 Tex. Sup. Ct. J. 1130 (Tex. 1994).* However, mutuality is

required only as to the party against whom collateral estoppel is asserted. Id. Texas courts have emphasized that the issue of fact or [*47] law decided in the first action must be identical to an issue in a pending action. See *Getty Oil Co. v. Ins. Co. of North America, 845 S.W.2d 794, 801, 36 Tex. Sup. Ct. J. 169 (Tex. 1992); Avila v. St. Luke's Lutheran Hosp., 948 S.W.2d 841, 847 (Tex. App. 1997); Tex. Dep't of Pub. Safety v. Petta, 44 S.W.3d 575, 579, 44 Tex. Sup. Ct. J. 597 (Tex. 2001).*

As set forth above, the Mayo court did not decide the identical issue presented in this case: whether, assuming the discovery rule applies, the 1993 brochure or other information was sufficient, under Oklahoma law, to constitute actual or constructive notice of claims to plaintiffs or their decedents. The Mayo court refrained from deciding that issue under Texas law because the estate of the plaintiff in that case did not rely on the discovery rule and the evidence raised a question of fact. *220 F. Supp. 2d at 770-71 n.202.* The Mayo district court later described the 1993 brochure as vague and superficial, among other things, but it did so in the context of an analysis of whether the COLI policies could be said to comport with Texas public policy as reflected in a state statute permitting Texans to designate [*48] their own life insurance beneficiaries. *Id. at 806-07.* The Fifth Circuit decision in Mayo, in describing the Mayo plaintiff's unjust enrichment claim, assumed that Wal-Mart took out an insurance policy on the Mayo plaintiff without his knowledge or consent. *354 F.3d at 410.* It did not determine that the plaintiff had no notice for discovery rule purposes. Hence, this case does not involve the identical issue as Mayo, plaintiffs have not shown that the facts to be litigated in this action were fully and fairly litigated in Mayo, and those facts were not essential to the judgment in Mayo.

Even if plaintiffs had met the technical requirements of issue preclusion, courts do not permit offensive use of nonmutual issue preclusion where it would be unfair to the party sought to be precluded. The Parklane Hosiery Court gave trial courts broad discretion to determine when the doctrine should be applied and the Court outlined various circumstances in which it should be denied. *439 U.S. at 331.* Among other things, the Supreme Court stated: "Allowing offensive collateral estoppel may . . . be unfair to a defendant if the judgment [*49] relied upon as a basis of the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant." *Id. at 330.* Subsequent federal

decisions have applied this Parklane Hosiery "fairness factor." E.g., *Setter v. A.H. Robins Co. Inc., 748 F.2d 1328, 1330-31 (8th Cir. 1984)*(Dalkon-Shield litigation); *Hardy v. Johns-Manville Sales Corp., 681 F.2d 334, 345-46 (5th Cir. 1982)*(asbestos litigation). [16] Again, as discussed above, the Rice and Keenan decisions held that the 1993 brochure gave clear notice to the Wal-Mart employees represented in those cases, and that notice triggered the statute of limitations on the claims of their personal representatives. Although these decisions were not prior to the Mayo decisions, they are inconsistent. Mayo is not entitled to issue preclusive effect with respect to Wal-Mart's statute of limitations defense in this case.

> 16 Wal-Mart does not argue that any of the other "fairness factors" apply. These are "whether the use of collateral estoppel will reward a plaintiff who could have been joined in the earlier suit but chose to "wait and see." . . . whether the defendant in the first suit had the incentive to litigate that suit fully and vigorously. . . . [and] whether the second suit will afford the defendant procedural opportunities available in the first suit that could cause a different result." *State Farm Fire and Cas. Co. v. Fullerton, 118 F.3d 374, 386 (5th Cir. 1997)*(quoting *Finger v. Southern Refrigeration Servs., 881 S.W.2d 890, 896 (Tex. App. 1994))*.

[*50] Further, Mayo does not preclude Wal-Mart from arguing that plaintiffs' decedents consented to Wal-Mart's obtaining life insurance on their lives because they did not opt out when they received the 1993 brochure. The district court in Mayo accepted Wal-Mart's contention that it actually distributed its alleged disclosures, *220 F. Supp. 2d at 759*, but later stated that "there is no concrete evidence that in fact the [1993 brochure] was received by all these managers, that they distributed the attached flyer, or that they discussed its contents with employees," *id. at 807 n.34*. This dicta is insufficient to preclude or estop Wal-Mart from asserting the affirmative defense of consent.

Neither are plaintiffs entitled to summary judgment on Wal-Mart's affirmative defenses of waiver, estoppel, or laches. Plaintiffs point out that wavier is the voluntary and intentional relinquishment of a known right. E.g., *Phillips v. New Hampshire Ins. Co., 263 F.3d 1215, 1220 (10th Cir. 2001)*. They also recite that a party to be estopped "must know the facts" and the party asserting

estoppel "must be ignorant of the true facts" if the affirmative [*51] defense of estoppel applies. *North Tex. Prod. Credit Ass'n v. McCurtain County Nat'l Bank, 222 F.3d 800, 802 (10th Cir. 2000)*. Finally, they assert that the affirmative defense of laches requires an "inexcusable delay in instituting suit." *Brunswick Corp. v. Spinit Reel Co., 832 F.2d 513, 523 (10th Cir. 1987)*. All of these affirmative defenses are foreclosed, plaintiffs argue, because Wal-Mart did not notify its employees about the COLI policies on their lives. Since the Court has found that notice involves a genuine issue of material fact, summary judgment is not appropriate as to these affirmative defenses.

Plaintiffs also argue that summary judgment is proper because Wal-Mart's conduct was not equitable, and "he who comes into equity must come with clean hands," *Estate of Bruner v. Bruner, 338 F.3d 1172, 1177 (10th Cir. 2003)*. Relying on the Fifth Circuit decision in Mayo and *Wal-Mart Stores v. AIG Life Ins. Co., 872 A.2d 611, 622-23 (Del. Ch. 2005)*, plaintiffs assert that Wal-Mart's purchase of the COLI policies and designation of itself as policy beneficiary was unlawful and in bad faith, Wal-Mart knew [*52] it, and thus, it lacks the "clean hands" necessary to seek equitable relief. Whether Wal-Mart's conduct was unlawful is the issue at the heart of this case and others, and resolution of it depends on a difficult, state-by-state, case-by-case, insured-by-insured analysis of laws, without the assistance of clear precedent at the state level. The Delaware Court of Chancery did not find that Wal-Mart acted in bad faith; it merely found that Wal-Mart took a known risk that it would be found to lack an insurable interest in the lives of its rank-and-file employees and Wal-Mart attempted to minimize that risk by focusing certain activities in Georgia, a state that allowed employers to have an insurable interest in employees. *Id. at 622*. The Delaware court made that finding as part of several bases for rejecting the commercial frustration theory advocated by Wal-Mart. *Id. at 621-23*. The Delaware opinion does not collaterally estop Wal-Mart from asserting the affirmative defenses of consent, waiver, estoppel or laches.

Finally, plaintiffs' assertion of issue preclusion, at least as to the preclusiveness of the Mayo decisions, is untimely. Issue preclusion [*53] or collateral estoppel, like the related doctrine of res judicata, must be affirmatively alleged by the party seeking to enforce it, *Fed. R. Civ. P. 8(c)*; see *Blonder-Tongue Laboratories,*

*Inc. v. Univ. of Illinois Found., 402 U.S. 313, 350, 91 S. Ct. 1434, 28 L. Ed. 2d 788(1971)*, and it was not here. Plaintiffs have filed a motion for leave to amend, but untimeliness alone is an adequate reason to refuse the requested leave. See, e.g., *Duncan v. Manager. Dep't of Safety, City and County of Denver, 397 F.3d 1300, 1315 (10th Cir. 2005)*. Plaintiffs have not offered any explanation for their failure to allege issue preclusion when they filed the motion for leave to file a fourth amended complaint on June 22, 2005, the same day they filed their cross motion for partial summary judgment. The Mayo decision on which they rely for this argument was issued in August 2002, and the Fifth Circuit affirmed on January 5, 2004.

Under Texas law, "while the judgment requirement for collateral estoppel does not always require a final, appealable judgment, the test for finality is 'whether the conclusion in question is procedurally definite.' *Restatement (Second) of Judgments § 13, comment(g)*(1982). [*54] " *Van Dyke v. Boswell, O'Toole, Davis & Pickering, 697 S. W.2d 381, 385, 28 Tex. Sup. Ct. J. 457 (Tex. 1985)*. In determining finality, a court is to consider whether "the parties were fully heard, [whether] the court supported its decision with a reasoned opinion [and whether] the decision was subject to appeal or was in fact reviewed on appeal." Id. (quoting *Restatement (Second) of Judgments § 13, comment(g)*(1982)). Wal-Mart contends that each of these factors is met with respect to those portions upon which plaintiffs rely except the ERISA determination, which was not certified for interlocutory appeal. [17]

> 17   Wal-Mart also asserts that a settlement was reached the day before the Fifth Circuit issued its decision in Mayo and plaintiffs' counsel knew that it would end the Mayo litigation as to Wal-Mart. Yet, they did not raise the possibility that they would assert issue preclusion in this case, and thus they deprived Wal-Mart of any meaningful opportunity to include that issue in the Mayo settlement negotiations.

[*55] Final judgment was entered in the Mayo district court case on October 29, 2004. However, if one assumes that the Mayo court decided the issue of whether Wal-Mart put its employees on written notice of its COLI policies by distributing the 1993 brochure, the Van Dyke factors were met when the Mayo decision was issued in August 2002, or, at the latest, when the Fifth Circuit

affirmed on January 5, 2004. Plaintiffs' assertion of collateral estoppel or issue preclusion is untimely.

As discussed above, issue preclusion is also unavailable because the issue here is not identical to that decided in *Mayo* or the AIG case in Delaware, and it would be unfair to Wal-Mart to apply the doctrine given the decisions in *Rice* and *Keenan*. The doctrine of collateral estoppel or issue preclusion does not bar Wal-Mart from arguing that it made effective disclosures to its employees or that those employees' personal representatives had notice. Nor does it bar Wal-Mart from asserting its affirmative defenses. Of course, that does not mean that Wal-Mart will ultimately be successful; it merely means that plaintiffs are not entitled to summary judgment with regard to Wal-Mart's [*56] affirmative defenses as to the statutory claim relating to Alene Jacobson.

### 3. Insurable Interest

#### a. "Special Importance"

Alene Jacobson was insured on December 28, 1993; she died on November 4, 1996; death benefits were paid by the insurer to Wal-Mart on November 14, 1996. Wal-Mart agrees that, if Oklahoma law applies, the statute in effect in 1993 is applicable to the statutory violation claim of Alene Jacobson's personal representative, Kenneth Frank Jacobson. [18] In relevant part, the statute provides:

> Except as provided in subsection D of this section, no person shall procure or cause to be procured any ' insurance contract upon the life or body of another individual unless the benefits under such contract are payable to the individual insured or his personal representatives, or to person having, at the time when such contract was made, an insurable interest in the individual insured.
>
> * * *
>
> "Insurable interest" with reference to personal insurance includes only interests as follows:
>
> 1. In the case of individuals related closely by blood or by law, a substantial

interests engendered by love and affection;

2. In the case of other persons, a lawful [*57] and substantial economic interest in having the life, health, or bodily safety of the individual insured continue, as distinguished from an interest which would arise only by, or would be enhanced in value by, the death, disablement or injury of the individual insured; . . . .

*Okla. Stat. tit. 36, § 3604(A), (C).*

18    As Wal-Mart points out, Oklahoma's insurable interest statute was amended, effective July 1, 1994, to permit employers to insure the life of any employee who gives written consent. As Alene Jacobson did not provide written consent, Wal-Mart references the 1994 amendment merely to imply that public policy in Oklahoma does not view COLI policies as "abhorrent." Supp. Br., Dkt. # 137, at 13.

In *Tillman*, the Tenth Circuit held that, under the 1993 version of the statute, the employer had no insurable interest in the life of the plaintiff, a "rank-and-file" employee as distinguished from a "key" employee. *408 F.3d at 1306-07*. The Tenth Circuit stated:

Absent evidence [*58] of considerable expenditures in relation to the company's overall budget or other relevant evidence establishing the substantial nature of the expenditure, human resources' monies spent to attract and keep employees is a general cost of doing business and is not sufficient alone to support a finding of a *substantial* interest in a specific employee's continued life.

*Id. at 1306* (emphasis in original). Wal-Mart seizes upon this statement in an effort to show that it has the evidence *Tillman* lacked. However, Wal-Mart presents its "economic interest" evidence in terms of what it spends on all of its employees, not on Alene Jacobson or any of the other plaintiffs in particular. Alene Jacobson was a telephone switch-board operator insured under the AIG policy in the face amount of $ 62,056. Wal-Mart's argument ignores the Tenth Circuit's requirement that the employer establish each insured employee's "special

importance" to the company. Id. The Tenth Circuit characterized the evidence submitted by the employer as "costs associated with Camelot's general employees, not just with those who add significant pecuniary benefit to the company." Id. This Court [*59] agrees that Wal-Mart's COLI plans did not implicate the public policy served by Oklahoma's insurable interest statute, i.e., to prevent "speculating upon the hazards of a life." *Mutual Aid Union v. Stephens, 1924 OK 215, 97 Okla. 283, 223 P. 648, 649 (Okla. 1924)*. The Court is also mindful of the amendment to the statute in 1994 which permits an employer or trust to have an insurable interest "in nonmanagement and retired employees to an amount agreed to by the employee or in the absence of such agreement an amount of aggregate projected death benefits commensurate with the aggregate projected liabilities to such employees under all employee welfare benefit plans, . . ." Id. *§ 3604(C)(4)(d)*. [19] Nonetheless, *Tillman* dictates that the Court's ruling be specific to the individual insured. Wal-Mart has not established that it had a substantial interest in Alene Jacobson's life or that she was of "special importance" to the company. Hence, Wal-Mart had no insurable interest in her life.

19    In this respect, the 1994 amendment is consistent with a recent ruling by a federal court in Minnesota holding that, under Colorado common law, a corporate employer may have an insurable interest in the lives of "non-key" employees who consented to be insured under the employer's corporate-owned life insurance policies. *Xcel Energy, Inc. v. United States of America, 2005 U.S. Dist. LEXIS 25461, No. Civ. 04-1449DWFFLN, 2005 WL 2577112 (D. Minn. Oct. 12, 2005)*. The Xcel court also reasoned that the employer had a "reasonable right to expect some pecuniary advantage from a continuance of the life of [its employees] or to fear the loss from [their] death." *Id. 2005 U.S. Dist. LEXIS 25461 at *5* (quoting *Lampkin v. Travelers' Ins. Co., 11 Colo. App. 249, 52 P. 1040, 1045 (Colo. Ct. App. 1898))*.

[*60]  **b. Constructive Delivery**

Wal-Mart argues that Oklahoma law is inapplicable because its COLI policies were issued and delivered in Georgia, a state which permits employers to have an insurable interest in the lives of rank-and-file employees. Again, *Tillman* is dispositive as to this issue. In *Tillman*,

the Tenth Circuit held the COLI policy at issue had been "constructively delivered" within Oklahoma for purposes of applying Oklahoma's insurable interest statute. *408 F.3d at 1303-04*. The Oklahoma Insurance Code does not apply to "policies or contracts not issued for delivery in Oklahoma nor delivered in Oklahoma, except upon subjects of insurance other than life and disability insurance located or to be performed in Oklahoma, . . ." *Okla. Stat. tit. 36, § 3601*. The Tenth Circuit noted that the insurer had never produced, and the employer had never received, a physical copy of the policy; further, the insurer had provided a form insurance contract to the employer in another state and generated the rest of the contracts electronically. However, the Tenth Circuit found that the policy was constructively delivered in Oklahoma where the insurance contract stated [*61] that "information regarding the method of calculating policy value and cost of insurance 'has been filed with the insurance official in the jurisdiction in which this policy is delivered,'" and the employer conceded that it filed the policy with the Oklahoma Department of Insurance for approval. *408 F.3d at 1304*.

Wal-Mart does not concede that it filed its COLI policy with the Oklahoma Department of Insurance for approval. Wal-Mart relies on the actual physical delivery, in Georgia, of the AIG master policy, and the language of the policy indicating that the policy was issued in Georgia, on forms approved by the Georgia Department of Insurance. Wal-Mart acknowledges that AIG filed a form policy with the Oklahoma Department of Insurance, but that policy, Wal-Mart contends, was on a form that differed from the policies later issued and delivered to the Trust in Georgia and had nothing to do with AIG's sale of Georgia-form policies to the Wal-Mart Trust. Wal-Mart also concedes that AIG paid premium taxes to states, including Oklahoma, in which the insured employees resided. *Okla. Stat. tit. 36, § 624* requires a foreign insurer to pay such taxes. Wal-Mart argues, however, [*62] that such payment does not reflect any intention of the parties for Wal-Mart's policies to be delivered in Oklahoma for purposes of *section 3601*.

The Court finds these arguments unavailing. It is clear that Wal-Mart intended for Georgia law to govern any disputes as to insurable interest, given the favorable treatment Georgia law gave COLI policies at the time. Nonetheless, AIG filed a form of the Wal-Mart COLI policy with the Oklahoma Department of Insurance and paid premium taxes to the state. In this respect, the Court

is particularly cognizant of the Tenth Circuit's comment in Tillman: "Interpreting the statute to require physical delivery of the contract within state borders would allow all insurance companies to skirt Oklahoma insurance regulations merely by electronically storing the insurance contracts in another jurisdiction." *408 F.3d at 1304*. Wal-Mart, via AIG, "delivered" its COLI policy in Oklahoma. Holding otherwise would permit Wal-Mart to unjustifiably "skirt Oklahoma insurance regulations."

### c. Choice of Law

Wal-Mart also argues that Georgia law applies because Oklahoma follows the *lex loci contractus* rule whereby "the nature, validity [*63] and interpretation of a contract is governed by the law where the contract is made." *Bohannan v. Allstate Ins. Co., 1991 OK 64, 820 P.2d 787, 797 (Okla. 1991)*. Further, Wal-Mart argues that, if there were a conflict between Oklahoma and Georgia law concerning the existence of Wal-Mart's insurable interest, Georgia law governs. As plaintiffs point out, this Court already rejected those arguments. In Tillman, this Court concluded that Oklahoma law applied primarily because the relationship between the employer and employee was centered in Oklahoma, the employee's death triggered the employer's right to claim benefits under the policy, the employee lived, worked for the employer, and died, in Oklahoma, and the employer was domesticated in Oklahoma and did business here. *Tillman, 2003 U.S. Dist. LEXIS 21662, 02-CV-761-EA(J), slip op. at 12*.

In Oklahoma, conflict of laws relating to contracts is governed under the *lex loci contractus* rule unless the law of the state where the contract was made is "contrary to the public policy of Oklahoma, or unless the facts demonstrate that another jurisdiction has the most significant relationship with the subject matter and the parties." *Bohannan v. Allstate Ins. Co., 1991 OK 64, 820 P. 2d 787, 797 (Okla. 1991)*. [*64] Like Wal-Mart, Camelot argued in part that Georgia law should apply because the parties to the COLI policy intended for Georgia law to apply and performed certain acts to reflect that intention. *Tillman, 2003 U.S. Dist. LEXIS 21662, 02-CV-761-EA(J), slip op. at 7*. This Court rejected Camelot's argument because the plaintiff was not suing for breach of contract. *Id. 2003 U.S. Dist. LEXIS 21662, at 8*. The Tillman plaintiff sued for violation of an Oklahoma statute, and for unjust enrichment as a result of conduct allegedly in violation of that statute. This Court

Case 1:08-cv-02429-DAB    Document 53-7    Filed 06/03/2008    Page 19 of 22

Page 18
2005 U.S. Dist. LEXIS 34470, *64

reasoned that neither the employee nor the plaintiff representing him signed the contract, and that Camelot was doing business in Oklahoma and was subject to the same obligations as an Oklahoma corporation. *Okla. Stat. tit. 18, § 1130(D)*. In particular, Camelot was subject to Oklahoma's laws concerning its relationship with its employees. See *id.§§ tit. 40, 165.1-187*. The Tillman case, like this one, did not involve a dispute between an employer and its life insurance company. *Tillman, 2003 U.S. Dist. LEXIS 21662, 02-CV-761-EA(J), slip op. at 8.*

This Court found persuasive the analysis by the district court in Mayo, which applied the "most significant relationship test" described in [*65] the Restatement (Second) of Conflict of Laws (hereinafter "Restatement") *§ 6* (1971), as well as the contacts listed in Restatement *§ 188* applicable to contract actions. See *Mayo, 220 F. Supp. 2d at 728-63*. However, as it was not clear whether Oklahoma courts would apply this test, this Court also found instructive Restatement *§ 192*, which specifically addresses life insurance contracts, and Restatement *§ 221*, which applies to claims for unjust enrichment not sounding in contract or tort. *Tillman, 2003 U.S. Dist. LEXIS 21662, 02-CV-761-EA(J), slip op. at 8-10.* Relying on Bohannan as well as the Restatement, this Court found that Oklahoma had the most significant relationship with the subject matter and the parties. *Tillman, 2003 U.S. Dist. LEXIS 21662, 02-CV-761-EA(J), slip op. at 11-12.*

The Tenth Circuit did not address this analysis on appeal; instead, the Tenth Circuit held that Oklahoma law applied because Camelot's COLI policy was constructively delivered in Oklahoma. See *Tillman, 408 F.3d at 1303-04*. The Fifth Circuit did address this issue in its review of the district court decision in Mayo, and like this Court, found that a contract choice of law analysis [*66] was not appropriate because the employee was not a party to the insurance contract on his life. *354 F.3d at 403-04*. The Fifth Circuit analyzed the argument by reference to Restatement *§§ 145* (relevant to tort actions), *188*, *192*, and *221*, and affirmed the lower court's ruling that Texas law applied. *Mayo, 354 F.3d at 404-06.*

Alene Jacobson was not party to the COLI insurance policy contract between Wal-Mart and AIG. Her personal representative has sued for violation of an Oklahoma statute. Wal-Mart does business in Oklahoma and is subject to the same obligations as an Oklahoma

corporation. *Okla. Stat. tit. 18, § 1130(D)*. In particular, Wal-Mart is subject to Oklahoma's laws concerning its relationship with its employees. See *id. §§ tit. 40, 165.1-187*. This case does not involve a dispute between Wal-Mart and AIG. Oklahoma law applies not only because the policy was constructively delivered here, but also because (1) the relationship between Wal-Mart and Jacobson was centered in Oklahoma, (2) her death triggered Wal-Mart's right to claim benefits under the policy, (3) she lived, worked for Wal-Mart, and died, in Oklahoma, and (4) Wal-Mart is domesticated [*67] in Oklahoma and does business here. Since Oklahoma law forbade Wal-Mart from procuring an insurance contract upon her life, Jacobson is entitled to judgment as a matter of law on the merits of this claim if the finder of fact determines that the statute of limitations has not run.

**B. Unjust Enrichment**

Plaintiffs' unjust enrichment claim is based on plaintiffs' assertion that Wal-Mart was enriched by the receipt of benefit payments upon the deaths of Jacobson, Lewis, Bizal-Webb, and Brown. As shown above, Wal-Mart received a death benefit under its COLI policy for only one of the Wal-Mart employees represented by a plaintiff in this action, Alene Jacobson. Thus, none of the other plaintiffs has standing to assert an unjust enrichment claim. As to Jacobson's unjust enrichment claim, plaintiffs initially intermingled it with their other claims by arguing that Wal-Mart was unjust enriched by misappropriating confidential information on Wal-Mart employees to obtain the COLI policies and it did so in violation of the Oklahoma statute mandating that no life insurance policy may be taken out on an individual without that individual's consent.

The Tenth Circuit's decision in [*68] Tillman is dispositive as to the claim for unjust enrichment. The Tenth Circuit affirmed summary judgment on this claim because Camelot, the employer, did not retain a benefit "at the expense of another,"and because the alleged enrichment was not "coupled with a resulting injustice." *Tillman, 408 F.3d at 1309* (quoting *Lapkin v. Garland Bloodworth, Inc., 2001 OK CIV APP 29, 23 P.3d 958, 961 (Okla. Ct. App. 2000)*, and *Teel v. Public Serv. Co. of Okla., 1985 OK 112, 767 P.2d 391, 398 (Okla. 1985)*(superceded by statute on other grounds)). The Tenth Circuit explained: "In this case, there is no evidence of an advantage enuring to Camelot's benefit at Mr. Tillman's expense. Camelot paid all of the premiums

2005 U.S. Dist. LEXIS 34470, *68

for the COLI policy on Mr. Tillman's life, In so doing, Mr. Tillman was not prevented from obtaining life insurance himself." Id.

The Tenth Circuit also found that the alleged enrichment, i.e., the death benefit paid to the employer, did not result in the injustice for which the plaintiff complained: that the employer violated the law in obtaining insurance on the employee's life. Citing to Oklahoma law preventing courts from invoking their equitable jurisdiction [*69] "when an adequate legal remedy is available. *Hydro Turf. Inc. v. International Fidelity Ins. Co., 2004 OK CIV APP 45, 91 P.3d 667, 673 (Okla. Ct. App. 2004)*, the Tenth Circuit held that the Tillman plaintiff had an adequate remedy at law under *section 3604* of Oklahoma insurance code. Id. Similarly, no advantage enured to Wal-Mart's benefit at Jacobson's expense, and Jacobson's personal representative has an adequate remedy at law under *Okla. Stat. tit. 36, § 3604* if he proves to the finder of fact that the statute of limitations has not run.

Plaintiffs argue that the Tenth Circuit erred because it did not consider *Okla. Stat. tit. 36, § 3607*, which grants all persons the right to choose who may benefit from their death by requiring an application or consent from the insured person before any insurance contract may be made. They assert that Wal-Mart was enriched by taking the statutory right from its employees when it used their personal information, obtained through the employer/employee relationship, to insure its employees' lives without their consent. The Court views this argument as another version of plaintiffs' misappropriation claim, which would lend credence to the [*70] Tenth Circuit's point: where an adequate remedy at law is available to plaintiffs through another claim, the court should not invoke its equitable jurisdiction to address the unjust enrichment issue. Wal-Mart is entitled to summary judgment on plaintiffs' unjust enrichment claim.

## C. Misappropriation

Plaintiffs seize upon a footnote in the Tillman decision of the Tenth Circuit discussing the unjust enrichment claim. There, the Tenth Circuit stated:

> Plaintiff not only claims violation of statute as a basis for the unjust enrichment claim, but also claims Camelot improperly used confidential information to obtain the

> COLI policy. . . . Had Plaintiff properly pled invasion of privacy as one of the bases for the unjust enrichment claim, Plaintiff may have had another adequate remedy at law. *McCormack v. Oklahoma Pub. Co., 1980 OK 98, 613 P.2d 737, 740 (Okla. 1980)*.

*408 F.3d at 1309 n.9.* [20] Plaintiffs claim that Wal-Mart committed the tort of misappropriation, one of the four invasion of privacy torts, when it used its employees' names, Social Security numbers, dates of birth and other information for the commercial purpose of buying COLI [*71] policies on their lives and receiving death benefits when they died.

> 20    This dictum does not necessarily imply that the Tillman plaintiff would have succeeded on the merits of a misappropriation claim or that the statute of limitations for such claim had not run.

In its original motion for summary judgment, Wal-Mart essentially claimed that its limited use of basic employee information in the purchase of COLI policies does not constitute misappropriation because, as the Rice court found, "Wal-Mart did not exploit [its insured employees'] reputations or prestige when it purchased COLI policies in their names." *Rice, 2003 U.S. Dist. LEXIS 17288, 2003 WL 22240349, at *2*. Plaintiffs counter that Wal-Mart's reliance on Rice is misplaced because the Rice court relied on New Hampshire law for which there is no similar precedent under Oklahoma law. Relying upon the Restatement (Second) of Torts, plaintiffs contend that misappropriation claims are not limited to instances where the plaintiff's name is used [*72] for good will or publicity in advertisements.

In *McCormack v. Oklahoma Pub. Co., 1980 OK 98, 613 P.2d 737 (Okla. 1980)*, the Oklahoma Supreme Court recognized the tort of invasion of privacy in all four categories as set out in the Restatement, *Id. at 740*. Those categories are:

> (a) unreasonable intrusion upon the seclusion of another, as stated in *§ 652B*; or

> (b) appropriation of the other's name or likeness, as stated in *§ 652C*; or

(c) unreasonable publicity given to the other's private life, as stated in § 652D; or

(d) publicity that unreasonably places the other in a false light before the public, as stated in § 652E.

Restatement, § 652A(1977). Plaintiffs rely on the second category. Section 652C provides: "One who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy." Id. Comment b to the section is significant:

> The common form of invasion of privacy under the rule here stated is the appropriation and use of the plaintiff's name or likeness to advertise the defendant's business or product, or for some similar commercial purpose. [*73] Apart from statute, however, the rule stated is not limited to commercial appropriation. It applies also when the defendant makes use of the plaintiff's name or likeness for his own purposes and benefit, even though the use is not a commercial one, and even though the benefit sought to be obtained is not a pecuniary one. Statutes in some states have, however, limited the liability to commercial uses of the name or likeness.

Id. The Reporter's Note states: "Under the statutes in New York, Oklahoma, Utah, and Virginia, the appropriation must be for advertising, or for purposes of trade." Id. There is no specific reference as to the applicable statute in Oklahoma, but presumably the Reporter was referring to Okla. Stat. tit. 21, § 839.1-.3 and Okla. Stat. tit. 12, § 1449, which Wal-Mart argues are not applicable under the facts of this case because the information about the individuals represented by plaintiffs was not used "for purposes of advertising or selling, or soliciting purchases of products, merchandise, goods or services, . . ." Okla. Stat. tit. 12, § 1449. Indeed, section 1449 is commonly referenced as Oklahoma's "right of publicity" statute. See, e.g. [*74] , Cardtoons, L.C. v. Major League Baseball Players Ass'n, 868 F.Supp. 1266, 1268(N.D.Okla. 1994). "The purpose of the Oklahoma statute is to protect individuals, celebrities or otherwise, from having distinguishing characteristics of their person exploited, to the commercial benefit of another." Id. at 1269.

Here, the information about the Wal-Mart employees represented by plaintiffs was used to obtain a life insurance policy, which is arguably a commercial contract. The issue is not whether the employees were "celebrities," but whether the information was used to Wal-Mart's commercial benefit. Plaintiffs rely on the common law -- they have not alleged a violation of Oklahoma's right of publicity statute. The Court finds the Tenth Circuit dictum in Tillman persuasive. Wal-Mart obtained, or sought to obtain, tax benefits, and it received death benefits upon the death of Alene Jacobson. Whether these could be considered "commercial" benefits is for the finder of fact to decide.

In addition, the finder of fact will have to decide whether the factual issues inherent in the analysis of the statute of limitations or other affirmative defenses bar plaintiffs' [*75] misappropriation claim, and, if not, whether those plaintiffs are entitled to any damages. Plaintiffs representing former Wal-Mart employees Alice Fay Haskins, Irene Brasher and Troy Allen Brasher were never insured under Wal-Mart's COLI policies and, as there is no evidence indicating that Wal-Mart used personal information about them to obtain life insurance, they have no standing to assert a misappropriation claim. All of the remaining five named plaintiffs have standing because Wal-Mart used personal information about them to obtain life insurance. The issue for the plaintiffs representing employees for whom Wal-Mart received no death benefits is whether they can prove damages. Those employees were Hazel Lee Sarty, Nellie Mae Lewis, Shelly Bizal-Webb, and Eavy Marie Brown. Proving damages does not present the same problem for the plaintiff representing Alene Jacobson, but the issues relating to the statute of limitations and other defenses remain for that plaintiff as well as the plaintiffs representing Sarty, Lewis, Bizal-Webb and Brown.

Plaintiffs' misappropriation claim against Wal-Mart is governed by a one-year statute of limitations if it is characterized as an action for [*76] defamation; a two-year limitations period applies if it is characterized as an action for invasion of privacy. See Okla. Stat. tit. 12, P 95(3), (4). The same considerations discussed above in reference to Wal-Mart's statute of limitations defense to plaintiff Jacobson' statutory violation claim and in reference to Wal-Mart's affirmative defenses of consent, waiver, estoppel, and laches are relevant here. A genuine issue of material fact exists as to if and when Wal-Mart employees Sarty, Lewis, Bizal-Webb, Brown, and

2005 U.S. Dist. LEXIS 34470, *76

Jacobson received notice of Wal-Mart's COLI policies, which would have triggered their right to assert a misappropriation claim.

Accordingly, Wal-Mart is entitled to summary judgment on the misappropriation claims of plaintiff Janet Switzer (representing the estates of Troy Allen Brasher and Irene Brasher) and Terry Scott Shelnut (representing the estate of Alice Fay Haskins). Wal-Mart is not entitled to summary judgment on the misappropriation claim of Herbert Sarty (representing the estate of Hazel Lee Sarty),

Frank O. Lewis (representing the estate of Nellie Mae Lewis), Rodney Bizal (representing the estate of Shelly Bizal-Webb), Jeff Todd Brown and Tab Art [*77] Brown (representing the estate of Eavy Marie Brown), and Kenneth Frank Jacobson (representing the estate of Alene Jacobson).

**IV.**

Construing all of the evidence in the light most favorable to plaintiffs, the Court finds that (1) there is a genuine issue of material fact as to whether Wal-Mart employee Alene Jacobson and her personal representative had notice of the Wal-Mart COLI policy insuring Alene Jacobson's life and, thus, whether the statute of limitations precludes the statutory violation claim of Kenneth Frank Jacobson, Alene Jacobson's personal representative; (2) there are genuine issues of material fact as to Wal-Mart's affirmative defenses; (3) all other plaintiffs lack standing as to the claim for violation of the insurable interest statute; (4) there is no genuine issue of material fact as to all plaintiffs' claims for unjust enrichment; and (5) genuine issues of material fact exist as to the claims of plaintiffs Kenneth Frank Jacobson (personal representative of the estate of Alene Jacobson), Herbert Sarty (personal representative of the estate of

Hazel Lee Sarty), Frank O. Lewis (personal representative of the estate of Nellie May Lewis), Rodney Bizal (personal [*78] representative of the estate of Shelly Bizal-Webb), Jeff Todd Brown and Tab Art Brown (personal representatives of the estate of Eavy Marie Brown) for misappropriation.

Wal-Mart is entitled to dismissal for lack of standing of the statutory violation claims of all plaintiffs except Kenneth Frank Jacobson. Wal-Mart is entitled to summary judgment as to the unjust enrichment claims of all plaintiffs, and the misappropriation claims of Janet Switzer (personal representative of the estates of Troy Allen Brasher and Irene Brasher) and Terry Scott Shelnut (personal representative of Alice Fay Haskins' estate), as the Wal-Mart employees represented by these plaintiffs were never insured. Plaintiffs are entitled to partial summary judgment that Wal-Mart had no insurable interest in the lives of its rank-and-file employees in Oklahoma, but not as to Wal-Mart's affirmative defenses.

Accordingly, the Wal-Mart Defendants' Motion for Summary Judgment (Dkt. # 88) is **granted in part and denied in part;** the Plaintiffs' Cross-Motion for Summary Judgment (Dkt. # 133) is **granted in part and denied in part.** The only remaining claims in this lawsuit are the statutory violation claim of Kenneth [*79] Frank Jacobson and the claims for misappropriation asserted by Kenneth Frank Jacobson, Herbert Sarty, Frank O. Lewis, Rodney Bizal, Jeff Todd Brown and Tab Art Brown. All of Wal-Mart's affirmative defenses remain.

**IT IS SO ORDERED** this 1st day of December, 2005.

CLAIRE V. EAGAN, CHIEF JUDGE

UNITED STATES DISTRICT COURT