UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ALICE KRAMER, as Personal Representative of the
Estate of Arthur Kramer,

                              Plaintiff,

                -against-

LOCKWOOD PENSION SERVICES, INC., TALL
TREE ADVISORS, INC., LIFE PRODUCTS
CLEARING, LLC, TRANSAMERICA OCCIDENTAL
LIFE INSURANCE CO., PHOENIX LIFE
INSURANCE CO., LINCOLN LIFE & ANNUITY CO.
OF NEW YORK and JONATHAN S. BERCK,

                         Defendants.

---

PHOENIX LIFE INSURANCE CO.,

              Third-Party Plaintiff,

                -against-

STEVEN LOCKWOOD,

              Third-Party Defendant.

---

LIFE PRODUCT CLEARING LLC,

              Third-Party Plaintiff,

                -against-

LIZA KRAMER and ANDREW B. KRAMER,

              Third-Party Defendants.

---

**ECF Case**

08 Civ. 2429 (DAB) (MHD)

**DEFENDANT-THIRD-
PARTY PLAINTIFF
LIFE PRODUCT CLEARING
LLC'S THIRD-PARTY
COMPLAINT**

**JURY TRIAL DEMANDED**

Defendant-third-party plaintiff Life Product Clearing LLC ("LPC"), by and through its attorneys, Chadbourne & Parke LLP, hereby alleges as follows for its Third-Party Complaint:

## PRIOR PLEADINGS IN THIS ACTION

1. On March 10, 2008, plaintiff Alice Kramer, as Personal Representative of the Estate of Arthur Kramer (the "Estate"), commenced this action by filing a complaint against LPC and others. A copy of this pleading is attached hereto as Exhibit A.

2. On April 9, 2008, defendant Phoenix Life Insurance Co. ("Phoenix") filed an Answer to Complaint with Counterclaims, Cross-Claims and Third Party Complaint. A copy of this pleading is attached hereto as Exhibit B.

3. On May 7, 2008, plaintiff filed an amended complaint against LPC and others. A copy of this pleading is attached hereto as Exhibit C.

4. On May 29, 2008, Phoenix filed an Answer to Amended Complaint with Counterclaims, Cross-Claims and Third Party Complaint. A copy of this pleading is attached hereto as Exhibit D.

5. On June 20, 2008, contemporaneously with the filing of this third-party complaint, LPC is filing an Answer to Amended Complaint with Counterclaims and Cross-Claims. A copy of this pleading is attached hereto as Exhibit E.

6. To date, no other pleadings have been filed in this action.

## PARTIES

7. Defendant-third-party plaintiff LPC is a limited liability company organized under the laws of the state of Delaware with its principal place of business at 75 Rockefeller Plaza, 18th Floor, New York, New York, 10019, which, inter alia, acts as agent with respect to beneficial interests under certain life insurance trusts, including the trust which is the subject of this third-party complaint.    The members of LPC are all citizens of the state of New York.

8. Upon information and belief, third-party defendant Liza Kramer ("Liza Kramer") is a citizen of the state of California with an address at 1940 Los Angeles Avenue, Berkley, California 94707, and is the daughter and heir of the plaintiff Estate's decedent, Arthur Kramer.

9. Upon information and belief, third-party defendant Andrew B. Kramer ("Andrew Kramer") is a citizen of the state of New York with a business address c/o Kramer Capital Management, Inc., 622 Third Avenue, 32nd Floor, New York, New York 10017, and is the son and heir of the plaintiff Estate's decedent, Arthur Kramer.

## JURISDICTION AND VENUE

10. This Court has subject-matter jurisdiction over the claims asserted in this third-party complaint pursuant to the doctrine of supplemental jurisdiction under 28 U.S.C. § 1367, because LPC's third-party claims share a common nucleus of operative fact with the claims set forth by the Estate in its amended complaint.

11. Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events giving rise to LPC's third-party claims occurred here.

## BACKGROUND

### The Insurance Policy Issued by Defendant Lincoln Life & Annuity Co. of New York on the Life of Arthur Kramer

12. Arthur Kramer, the plaintiff Estate's decedent, established The Arthur Kramer 2005 Insurance Trust (the "August Trust") pursuant to the Trust Agreement of Arthur Kramer 2005 Insurance Trust dated August 29, 2005 (the "August Trust Agreement"). The parties to the August Trust Agreement were Hudson United Bank, as Trustee, Arthur Kramer, as Depositor, and third-party defendant Liza Kramer, the daughter of Arthur Kramer, as the Beneficiary.

13. On or about November 23, 2005, defendant Lincoln Life & Annuity Co. of New York ("Lincoln") issued to the August Trust life insurance policy number 7214471, with a total death benefit of $10,000,000.00, on the life of Arthur Kramer (the "Lincoln Policy").

14. Liza Kramer owned the entire beneficial interest in the August Trust at the time the Lincoln Policy was procured.

15. Liza Kramer, the named beneficiary of the August Trust, had an insurable interest in the Lincoln Policy at the time the Lincoln Policy was procured.

16. The Lincoln Policy provided that: "While the insured is alive, the Owner may exercise all rights and privileges under the policy including the right[s] to . . . transfer all rights and privileges to another person . . . [and] assign the policy." The Lincoln Policy did not place any time limitations on the policy owner's exercise of these rights.

## The Transfer Agreement

17. After the Lincoln Policy was issued, and in consideration for a payment of $100,000.00 (the "Cash Consideration"), Liza Kramer sold her rights to the August Trust's interest in the Lincoln Policy to LPC, pursuant to a Beneficial Interest Transfer Agreement dated November 29, 2005 (the "Transfer Agreement").

18. In connection with that transaction, Arthur Kramer and Liza Kramer also executed a document entitled Acknowledgements and Consents Relating to Sale of Beneficial Interest dated November 29, 2005 (the "Acknowledgements and Consents Form") in which they each expressly made, inter alia, the following acknowledgements, consents and representations relating to Liza Kramer's decision to sell to LPC the rights to the August Trust's interest in the Lincoln Policy:

> a. "After reviewing several alternatives for maintaining the [Lincoln] Policy and paying the premium, Arthur and Liza have determined that the sale of the Beneficial Interest [in the August Trust] to [LPC] for the Cash Consideration is in their best interest and in the best interest of their Family."
>
> b. "Arthur and Liza acknowledge that they have had sufficient time to thoroughly analyze and discuss the

strategy of selling the Beneficial Interest in the [August] Trust to [LPC.]"

c. "Arthur and Liza have had the opportunity to discuss this strategy with their family advisors."

d. "Upon completion of the sale of [the] Beneficial Interest in the [August] Trust to [LPC] for the Cash Consideration, Arthur and Liza expressly acknowledge, understand, consent and agree to waive all rights, claims, interests, powers and privileges that they now possess, or in the future may possess, under or with respect to the [Lincoln] Policy."

### Lincoln's Failure and Refusal to Pay the
### Lincoln Policy Following Arthur Kramer's Death

19. Arthur Kramer died on January 26, 2008.

20. On February 27, 2008, the trustee of the August Trust submitted to Lincoln a Claimant's Statement requesting that Lincoln process its claim under the Lincoln Policy and pay the death benefit to the August Trust.

21. The Lincoln Policy was properly payable to the August Trust (or to LPC, or at LPC's direction) under the foregoing circumstances, and Lincoln lacked any proper or valid basis under law for failing to timely pay to the August Trust (or to LPC, or at LPC's direction) the benefit under the Lincoln Policy.

22. Nevertheless, Lincoln has failed and refused to pay the proceeds of the Lincoln Policy to the August Trust (or to LPC, or at LPC's direction).

### AS AND FOR LPC'S FIRST THIRD-PARTY CLAIM
### (Tortious Interference with Contractual Relations)

23. LPC repeats and realleges ¶¶ 1-22 hereof as though fully set forth at length herein.

24. Lincoln issued the Lincoln Policy to the August Trust. The Lincoln Policy constituted a valid, binding and enforceable contract between Lincoln and the August Trust.

25. The August Trust is the named beneficiary of the Lincoln Policy and as such, is entitled to the proceeds thereof.

26. LPC purchased from Liza Kramer the entire beneficial interest in the August Trust's rights under the Lincoln Policy.

27. On March 10, 2008, the Estate commenced this action by filing a complaint alleging, inter alia, that the Lincoln Policy was procured with the view to its immediate assignment to a party that lacked an insurable interest in the life of Arthur Kramer. This allegation was untrue.

28. The Estate's filing of this action constituted a knowing, intentional and unjustified interference with the August Trust's contractual relationship with Lincoln under the Lincoln Policy, and a knowing, intentional and unjustified inducement of Lincoln to breach the Lincoln Policy by refusing to pay the proceeds to the August Trust (or to LPC, or at LPC's direction).

29. Upon information and belief, Liza Kramer and/or Andrew Kramer proximately caused the Estate to file the main action.

30. Following the Estate's initiation of this lawsuit, Lincoln has failed and refused to make payment on the Lincoln Policy, based upon the Estate's allegations in the original complaint that the Lincoln Policy was "procured as part of a STOLI transaction and that [it] lacks an insurable interest [sic]."

31. Despite Liza Kramer's express warranty to LPC in the Acknowledgments and Consents Form that she would provide a death certificate to LPC within a reasonable time following Arthur Kramer's death, Liza Kramer and the Estate failed and refused to do so (as acknowledged in ¶ 43 of the Estate's original complaint in the main action), so as to delay and/or frustrate the efforts of the August Trust and LPC to successfully obtain payment by Lincoln of the proceeds of the Lincoln Policy.

32. Upon information and belief, Lincoln would have paid the Lincoln Policy proceeds to the August Trust (or to LPC, or at LPC's direction) promptly had the Estate and Liza Kramer timely cooperated with the August Trust and LPC regarding Arthur Kramer's death certificate and/or had Liza Kramer and Andrew Kramer not caused the Estate to file its original complaint in the main action on March 10, 2008.

33. The foregoing actions of Andrew and Liza Kramer have damaged and continue to damage LPC in that they have delayed the receipt of the Lincoln Policy proceeds from

Lincoln.  In the event this Court does not order that the proceeds of the Lincoln Policy are owing and payable to the August Trust (or to LPC, or at LPC's direction), LPC will suffer damages in an amount not less than the face value of the Lincoln Policy, i.e., $10,000,000.00, plus interest, as a direct and proximate result of the interference of Liza Kramer and Andrew Kramer with the payment of the death benefit under the Lincoln Policy, and LPC will be entitled to recover damages from Liza Kramer and Andrew Kramer, jointly and severally, for such injury.

### AS AND FOR LPC'S SECOND THIRD-PARTY CLAIM
### (Against Liza Kramer, for Breach of Express Warranty)

34. LPC repeats and realleges ¶¶ 1-33 hereof as though fully set forth at length herein.

35. In the Acknowledgments and Consents Form, Liza Kramer expressly acknowledged, consented and represented to LPC that she would provide LPC "with a death certificate to present to the insurance company to enable [LPC] to receive the insurance proceeds."

36. The Acknowledgments and Consents Form provided that Liza's failure to present LPC with Arthur Kramer's death certificate would "be damaging to [LPC] and, in such case, Liza will be responsible to return the Cash Consideration to [LPC]."

37. Liza Kramer failed and refused to provide Arthur Kramer's death certificate to LPC and/or the August Trust when duly requested to do so, so as to delay and/or frustrate the

efforts of LPC and the August Trust to successfully submit a claim to Lincoln for the proceeds of the Lincoln Policy.

38. Upon information and belief, Lincoln would have paid the Lincoln Policy proceeds promptly had Liza Kramer timely provided LPC and/or the August Trust with a copy of Arthur Kramer's death certificate.

39. The Acknowledgments and Consents Form signed by Liza Kramer also stated that upon completion of the sale of her beneficial interest in the August Trust to LPC, she expressly "waive[d] all rights, claims, interests, powers and privileges that [she] now possesses, or in the future may possess, under or with respect to the [Lincoln] Policy."

40. Because Liza Kramer is, upon information and belief, an heir to the Estate, the Estate's claim in the main action represents an indirect attempt by Liza Kramer to assert a claim for the proceeds of the Lincoln Policy, in violation of Liza Kramer's express waiver of that claim in the Acknowledgments and Consents Form.

41. LPC relied on Liza Kramer's acknowledgements, consents and representations in the Acknowledgments and Consents Form in deciding to pay the Cash Consideration to her to purchase her beneficial interest in the August Trust.

42. Accordingly, in the event this Court does not order that the proceeds of the Lincoln Policy are owing and payable to the August Trust (or to LPC, or at LPC's direction), LPC will suffer an injury in an amount of $100,000.00, plus interest, as a direct and proximate

result of Liza Kramer's breach of her express warranties, and will be entitled to recover damages from Liza Kramer for such injury.

**AS AND FOR LPC'S THIRD THIRD-PARTY CLAIM**
**(Against Liza Kramer, for Breach of Contract)**

43. LPC repeats and realleges ¶¶ 1-42 hereof as though fully set forth at length herein.

44. The Transfer Agreement constitutes a valid, binding and enforceable agreement between LPC and Liza Kramer.

45. The Transfer Agreement provided that it "constitutes a transfer of all of [Liza Kramer's] beneficial [August] Trust rights in the [August] Trust's interest in [the Lincoln Policy]" and that Liza Kramer "shall relinquish all of [her] rights with respect to the [August Trust]."

46. Because Liza Kramer is, upon information and belief, an heir to the Estate, the Estate's claim in the main action represents an indirect attempt by Liza Kramer to assert a claim for the rights under the August Trust that she sold for valuable consideration to LPC, in violation of Liza Kramer's express relinquishment of that claim in the Transfer Agreement.

47. Accordingly, Liza Kramer has breached the Transfer Agreement.

48. LPC (and any and all other necessary persons, if any) have performed (completely, or at least substantially), and have not materially breached, any and all obligations they may have had under the Transfer Agreement.

49. If the Court determines that the Estate is entitled to the proceeds of the Lincoln Policy (which it should not), LPC will suffer an injury in an amount not less than the face value of the Lincoln Policy, i.e., $10,000,000.00, plus interest, plus the amount LPC paid Liza Kramer for her rights interest in the August Trust, i.e., $100,000.00, plus interest, as a direct and proximate result of Liza Kramer's breach of contract, and will be entitled to recover damages from Liza Kramer for such injuries.

WHEREFORE, LPC respectfully demands judgment in its favor as follows:

(i)      in the event this Court does not order that the proceeds of the Lincoln Policy are owing and payable to the August Trust (or to LPC, or at LPC's direction), awarding LPC compensatory damages from Liza Kramer and Andrew Kramer, joint and severally, in an amount to be determined at trial but not less than $10,000,000.00;

(ii)     in the event this Court does not order that the proceeds of the Lincoln Policy are owing and payable to the August Trust (or to LPC, or at LPC's direction), awarding LPC compensatory damages from Liza Kramer for breach of warranty in an amount to be determined at trial but not less than $100,000.00; and

(iii)    in the event this Court does not order that the proceeds of the Lincoln Policy are owing and payable to the August Trust (or to LPC, or at LPC's direction), awarding LPC

compensatory damages from Liza Kramer for breach of contract in an amount to be determined at trial but not less than $10,000,000.00; and

(iv)    awarding LPC interest, costs, disbursements, and such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

LPC demands a trial by jury of all claims in this third-party action which are so triable.

Dated: New York, New York
        June 20, 2008

CHADBOURNE & PARKE LLP

By _____
        Oliver J. Armas
        Robert A. Schwinger
        Members of the Firm
    Attorneys for Defendant-Third-Party
        Plaintiff Life Product Clearing LLC
    30 Rockefeller Plaza
    New York, New York  10112
    (212) 408-5100
    *oarmas@chadbourne.com*
    *rschwinger@chadbourne.com*

13

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------- x

ALICE KRAMER, as Personal Representative of the
Estate of Arthur Kramer,

                Plaintiff,

– against –

LOCKWOOD PENSION SERVICES, INC., TALL
TREE ADVISORS, INC., LIFE PRODUCTS
CLEARING, LLC, TRANSAMERICA
OCCIDENTAL LIFE INSURANCE CO., PHOENIX
LIFE INSURANCE CO., LINCOLN LIFE &
ANNUITY CO. OF NEW YORK, LORI
CALLEGARI AND TD BANKNORTH INC.,

                Defendants.

--------------------------------------------- x

Civil Action No.

**08 CV 2429**

**COMPLAINT**



MAR 10 2008

U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff Alice Kramer, in her fiduciary capacity as the Personal Representative of the

Estate of Arthur Kramer ("Plaintiff"), by and through her attorneys, Friedman & Wittenstein, A

Professional Corporation, hereby alleges as follows:

**PARTIES**

1.     Plaintiff is a citizen of the state of Connecticut, and resides in Stamford,

Connecticut. She is the widow of Arthur Kramer and the Personal Representative of his Estate.

She brings this action in that capacity.

2.     Mr. Kramer died on January 26, 2008. At the time of his death, he was a citizen

of the state of Connecticut.

3.     Upon information and belief, defendant Lockwood Pension Services, Inc.

("LPS") is a New York corporation with its principal place of business located in New York,

New York.

4.     Upon information and belief, defendant Tall Tree Advisors, Inc. ("TTA") is a New York corporation with its principal place of business located in Pleasantville, New York.

5.     Upon information and belief, defendant Life Products Clearing, LLC ("Life Products") is a Delaware limited liability company with its principal place of business located in New York, New York.

6.     Upon information and belief, defendant Transamerica Occidental Life Insurance Co. ("Transamerica") is an Iowa corporation with its principal place of business located in Cedar Rapids, Iowa.

7.     Upon information and belief, defendant Phoenix Life Insurance Co. ("Phoenix") is a New York corporation with its principal place of business located in East Greenbush, New York.

8.     Upon information and belief, defendant Lincoln Life & Annuity Co. of New York ("Lincoln") is a New York corporation with its principal place of business located in Syracuse, New York.

9.     Upon information and belief, defendant Lori Callegari is a citizen of the state of New York.

10.     Upon information and belief, defendant TD Banknorth Inc. ("TD Bank") acquired Hudson United Bank ("Hudson") in early 2006 and is the successor-in-interest to Hudson.  Upon information and belief, TD Bank is a Canadian corporation with its principal place of business located in Portland, Maine.

2

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this action pursuant to the Federal

Declaratory Judgment Act, 28 U.S.C. § 2201, because an actual controversy exists among the

parties; and pursuant to 28 U.S.C. § 1332(a) and (c) in that the parties are citizens of different

states and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

12.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a)(2)

because a substantial part of the events giving rise to Plaintiff's claims occurred here.

## BACKGROUND

13.    This action involves an arrangement to procure life insurance policies with the

purpose of immediately transferring the beneficial interests in those policies to stranger

investors, in contravention of the "insurable interest rule" as codified in the New York Insurance

Law.  As described herein, in a case such as this, where the procurement of life insurance

violates the insurable interest rule, the remedy is either that the death benefits be paid to the

personal representative of the decedent's estate (in this case, the Plaintiff) or, if already paid to a

stranger investor, that they be disgorged and paid to the personal representative.

14.    The "insurable interest rule" is a well-settled principle in New York insurance

law that prevents the issuance of wager life insurance policies.  New York Insurance Law

Section 3205(b)(2) provides that one may not obtain an insurance policy on the life of another

without having an "insurable interest" in the insured's life.

15.    It is against public policy for parties to circumvent the insurable interest rule by

participating in the procurement of what is known as "stranger-owned life insurance" ("SOLI").

A typical SOLI arrangement is initiated by a stranger investor or an insurance agent who

approaches an elderly person and encourages him to purchase life insurance, the death benefits

3

of which will be immediately transferred to the stranger investor. The appeal of a SOLI arrangement is that the purchase of life insurance is represented to the elderly person as a way to receive a payment of money on a risk-free basis at little or no cost. The investor typically agrees to pay the person an up-front payment in addition to paying the insurance premiums in return for the assignment of the ownership interest in the policy. The common characteristic of all SOLI arrangements is that they are structured so that the elderly person or a family member, rather than the stranger investor, is made to appear as the original beneficiary of the policy in order to try to evade the insurable interest requirement. Such arrangements are contrary to public policy because they enable investors to speculate or wager on a person's death.

16.    As further described below, defendants participated in an elaborate and unlawful SOLI arrangement where every detail, from drafting the trust agreements to choosing the trustees and investors, was structured for the sole purpose of trying to avoid the insurable interest rule. The arrangement was implemented by defendants to create the appearance that an insurable interest existed when Mr. Kramer took out several policies, so that the subsequent transfers of the beneficial interests in those policies to the stranger investors would appear lawful. However, the transfers to investors took place immediately upon Mr. Kramer's obtaining of the policies at issue, and that was always their plan. At no time were Mr. Kramer or any of his family members the true owners of the beneficial interests in the policies. Upon information and belief, Mr. Kramer never intended for the death benefits of the insurance policies to benefit his family.

17.    The putative assignments of the beneficial interests in the death benefits of the policies are void under New York law.

## FACTS

18.    Arthur Kramer was a retired attorney at the time of his death on January 26,

2008 at the age of 81.

19.    Upon information and belief, as early as 2003, Steven Lockwood, the principal

of LPS, approached Mr. Kramer to solicit his participation in a SOLI arrangement.

20.    Upon information and belief, during 2005, Mr. Lockwood introduced Mr.

Kramer to the SOLI arrangement that is the subject matter of this litigation.

21.    Upon information and belief, the SOLI arrangement worked as follows:  Mr.

Kramer, at the direction of LPS and possibly other defendants, would establish trusts, naming

himself as the depositor and one or more of his children as the initial beneficiaries.  An LPS

affiliated person or entity would be appointed as the trustee.  The witnesses to the trust

instrument would be Mr. Lockwood and one of his associates.  Upon the issuance of the policies,

Mr. Kramer, again acting at the direction of LPS and possibly other defendants, would

immediately direct his children to execute a putative assignment of their nominal interest in the

trust to a stranger third-party investor arranged by Mr. Lockwood.  (The three children from Mr.

Kramer's marriage to Plaintiff are Andrew Kramer ("Andrew"), Rebecca Kramer ("Rebecca")

and Liza Kramer ("Liza")).

22.    Upon information and belief, the insurance policies were procured on Mr.

Kramer's life with the intention of immediately effectuating the assignment of the beneficial

interests in the policies to an investor.  At no time would Mr. Kramer or any of his family

members have a true beneficial interest in the policies.

23.    Upon information and belief, LPS and certain other defendants employed the

above-described SOLI arrangement with respect to a series of life insurance policies totaling

5

approximately $56,200,000 on the life of Mr. Kramer. These policies were issued by defendants

Transamerica, Phoenix and Lincoln.

**The Transamerica Policies**

24.    On or about June 6, 2005, Mr. Kramer, at the direction of LPS and possibly

other defendants, established the Arthur Kramer Insurance Trust (the "June Trust") and named

defendant Lori Callegari as trustee. Mr. Kramer also listed Andrew and Rebecca as the putative

beneficiaries thereunder. Mr. Lockwood and his associate witnessed the June Trust agreement.

Under the terms of the June Trust agreement, the trust is governed by New York law.

25.    Upon information and belief, the June Trust agreement was prepared by counsel

for LPS, and Mr. Kramer had no involvement in its drafting.

26.    Upon information and belief, Mr. Kramer had no prior business relationship with

Ms. Callegari, who at the time was employed by LPS or TTA.

27.    On or about June 27, 2005, Transamerica issued one or more insurance policies

to the June Trust having a total death benefit of approximately $18,200,000 (the "Transamerica

Policies") on the life of Mr. Kramer.

28.    Upon information and belief, upon issuance of the policies, and at the direction

of LPS and possibly other defendants, Mr. Kramer directed Andrew and Rebecca to execute

putative assignments of their beneficial interests in the June Trust to stranger investor TTA.

29.    Mr. Kramer, Andrew and Rebecca never paid any premiums on the

Transamerica Policies, and there was no period of time when Andrew and Rebecca were the true

beneficiaries of the June Trust after the Transamerica Policies were issued.

30.    Upon information and belief, in or about June 2005, TTA was associated with LPS, and Ms. Callegari was an employee of, or affiliated with, TTA or LPS. Today, Ms. Callegari is a Vice President of LPS, and works for Mr. Lockwood at 75 Rockefeller Plaza.

**The Phoenix Policies**

31.    On or about August 29, 2005, Mr. Kramer, at the direction of LPS and possibly other defendants, established the Arthur Kramer 2005 Insurance Trust (the "August Trust") and named Hudson, the predecessor-in-interest to defendant TD Bank, as trustee. Mr. Kramer also listed Liza as the putative beneficiary thereunder. Mr. Lockwood and one of his associates witnessed the August Trust agreement. Under the terms of the August Trust agreement, the trust is governed by New York law.

32.    Upon information and belief, the August Trust agreement was prepared by counsel for LPS, and Mr. Kramer had no involvement in its drafting.

33.    Upon information and belief, at the time the August Trust was created, Hudson and LPS had a pre-existing business relationship and shared the same business address at 75 Rockefeller Plaza, New York, New York.

34.    Upon information and belief, Mr. Kramer had no prior business relationship with Hudson.

35.    Upon information and belief, Hudson was acquired by TD Bank in early 2006, making TD Bank the current trustee of the August Trust as the successor-in-interest.

36.    Upon information and belief, on or about October 12, 2005, Phoenix issued one or more insurance policies to the August Trust having a total death benefit of $28,000,000 (the "Phoenix Policies") on the life of Mr. Kramer.

7

37.     Upon information and belief, upon issuance of the policies, and at the direction of LPS and possibly other defendants, Mr. Kramer directed Liza to execute putative assignments of her beneficial interest in the August Trust to stranger investor TTA.

38.     Upon information and belief, Mr. Kramer and Liza never paid any premiums on the Phoenix Policies, and there was no period of time when Liza was the true beneficiary of the August Trust after the Phoenix Policies were issued.

**The Lincoln Policies**

39.     Upon information and belief, on or about November 28, 2005, Lincoln issued one or more insurance policies to the August Trust having a total death benefit of $10,000,000 (the "Lincoln Policies") on the life of Mr. Kramer.

40.     Upon information and belief, upon issuance of the policies, and at the direction of LPS and possibly other defendants, Mr. Kramer directed Liza to execute putative assignments of her beneficial interest in the August Trust to stranger investor Life Products.

41.     Mr. Kramer and Liza never paid any premiums on the Lincoln Policies, and there was no period of time when Liza was the true beneficiary of the August Trust after the Lincoln Policies were issued.

**Arthur Kramer's Death**

42.     Mr. Kramer died on January 26, 2008.

43.     Subsequently, Plaintiff or her representatives have received various communications from representatives of defendant LPS and certain stranger investors demanding copies of Mr. Kramer's death certificate so that they may submit claims to the insurance companies for a total of approximately $56,200,000 in death benefits.  Plaintiff has refused all such requests.

44.    Upon information and belief, Transamerica, Phoenix and Lincoln have either already paid, or are about to pay, the death benefits of approximately $18,200,000, $28,000,000 and $10,000,000, respectively, to the June and August Trusts, or their nominees or assignees.

**FIRST CLAIM FOR RELIEF**
**(DECLARATORY JUDGMENT)**

45.    Plaintiff hereby repeats and realleges each and every allegation contained in paragraphs 1-44 above.

46.    New York Insurance Law Section 3205(b)(2) provides:

> No person shall procure or cause to be procured, directly or by assignment or otherwise any contract of insurance upon the person of another unless the benefits under such contract are payable to the person insured or his personal representatives, or a person having, at the time when such contract is made an insurable interest in the person insured.

47.    New York Insurance Law Section 3205(a)(1) defines an "insurable interest" as "(A) in the case of persons closely related by blood or by law, a substantial interest engendered by love and affection; (B) in the case of other persons, a lawful and substantial economic interest in the continued life, health or bodily safety of the person insured, as distinguished from an interest which would arise only by, or would be enhanced in value by, the death, disablement or injury of the insured."

48.    Neither TTA nor Life Products held an insurable interest in the life of Mr. Kramer.

49.    TTA and Life Products procured or caused to be procured, directly or by assignment or otherwise, contracts of insurance upon the person of Mr. Kramer.

50.    TTA lacked an insurable interest in Mr. Kramer at the time the Transamerica and Phoenix Policies were issued.  Life Products lacked an insurable interest in Mr. Kramer at the time the Lincoln Policies were issued.

51.    In the case of TTA, the Transamerica and Phoenix Policies on the life of Mr. Kramer were procured with the view to their immediate assignment to TTA.  In the case of Life Products, the Lincoln Policies on the life of Mr. Kramer were procured with the view to their immediate assignment to Life Products.

52.    Pursuant to Insurance Law Section 3205(b)(4), Plaintiff is entitled to a declaration that the death benefits of all the aforementioned policies should be paid to her.

### SECOND CLAIM FOR RELIEF
### (RECOVERY OF DEATH BENEFITS)

53.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-52 above.

54.    Insurance Law Section 3205(b)(4) provides:

> If the beneficiary, assignee or other payee under any contract
> made in violation of this subsection [(b)] receives from the
> insurer any benefits hereunder accruing upon the death,
> disablement or injury of the person insured, the person insured or
> his executor or administrator may maintain an action to recover
> such benefits from the person receiving them.

55.    In the alternative, if some or all of the death benefits of the aforementioned policies have already been paid to any of the defendants or their representatives, then pursuant to this statute, Plaintiff is entitled to recover such death benefits.

WHEREFORE, Plaintiff prays for judgment against Lockwood Pension Services, Inc., Tall Tree Advisors, Inc., Life Products Clearing, LLC, Transamerica Occidental Life Insurance

10

Co., Phoenix Life Insurance Co., Lincoln Life & Annuity Co. of New York, Lori Callegari and

TD Banknorth Inc. as follows:

A.    Declaring that the death benefits of all the aforementioned policies should be

paid to Plaintiff;

B.    Awarding Plaintiff the death benefits of all the aforementioned policies;

C.    Awarding Plaintiff reasonable attorneys' fees, and the costs and disbursements

of this action; and

D.    Awarding Plaintiff such other and further relief as this Court may deem just and

proper.

Dated:  New York, New York                    FRIEDMAN & WITTENSTEIN
        March 10, 2008                        A Professional Corporation


                                             By: _____
                                                 Stuart I. Friedman (SF-9186)
                                                 Andrew A. Wittenstein (AW-1943)
                                                 Claire L. Chau (CC-4738)

                                             600 Lexington Avenue
                                             New York, New York 10022
                                             (212) 750-8700

                                             *Attorneys for Plaintiff*

11

Patrick J. Feeley (PF-4931)
Christopher G. Karagheuzoff (CK-1122)
Stephen M. Raab (SR-0742)
DORSEY & WHITNEY LLP
250 Park Avenue
New York, New York 10177
(212) 415-9200

*Attorneys for Defendant and Third-Party Plaintiff*
*Phoenix Life Insurance Co.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALICE KRAMER, as Personal Representative of the Estate of Arthur Kramer,<br><br>        Plaintiff,<br><br>– against –<br><br>LOCKWOOD PENSION SERVICES, INC., TALL TREE ADVISORS, INC., LIFE PRODUCTS CLEARING, LLC, TRANSAMERICA OCCIDENTAL LIFE INSURANCE CO., PHOENIX LIFE INSURANCE CO., LINCOLN LIFE & ANNUITY CO. OF NEW YORK, LORI CALLEGARI AND TD BANKNORTH INC.,<br><br>        Defendants. | Case No. 08 CV 2429 (DAB) (MHD)<br><br>ECF CASE<br><br>**ANSWER TO COMPLAINT WITH COUNTERCLAIMS, CROSS-CLAIMS AND THIRD-PARTY COMPLAINT** |
| PHOENIX LIFE INSURANCE CO.,<br><br>        Third-Party Plaintiff,<br><br>– against –<br><br>STEVEN LOCKWOOD,<br><br>        Third-Party Defendant. | |

Defendant Phoenix Life Insurance Co. ("Phoenix"), by its undersigned attorneys, hereby answers the complaint of Alice Kramer, as Personal Representative of the Estate of Arthur Kramer ("Plaintiff" or "Estate"), in corresponding numbered paragraphs as follows:

**RESPONSE TO "PARTIES"**

1.    Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations concerning the citizenship and residency of Plaintiff, and otherwise, on information and belief, admits the allegations contained in Paragraph 1.

2.    Phoenix denies having knowledge or information sufficient to form a belief as to whether Mr. Kramer was "a citizen of the State of Connecticut" at the time of his death, and otherwise admits the allegations contained in Paragraph 2.

3.    Phoenix, on information and belief, admits that Lockwood Pension Services, Inc. is a New York corporation, and denies having knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations contained in Paragraph 3.

4.    Phoenix, on information and belief, admits the allegations contained in Paragraph 4.

5.    Phoenix, on information and belief, admits that Life Product Clearing, LLC is a Delaware limited liability company, and denies having knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations contained in Paragraph 5.

6.    Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 6.

7.    Phoenix admits that it is incorporated in New York.   The remainder of the allegations contained in Paragraph 7 state a conclusion of law to which no response is required.. To the extent that a response is required, Phoenix denies the remaining allegations contained in Paragraph 7.

8.    Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 8.

9.      Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 9.

10.     Phoenix, on information and belief, admits that TD Banknorth Inc. ("TD Bank") acquired Hudson United Bank ("Hudson") in 2006, offers no response to the legal conclusion that TD Bank is the "successor-in-interest" to Hudson because no such response is required, and denies having knowledge or information sufficient to form a belief as to the remainder of the allegations contained in Paragraph 10.

## RESPONSE TO "JURISDICTION AND VENUE"

11.     Phoenix states that the allegations contained in Paragraph 11 state a conclusion of law to which no response is required.

12.     Phoenix states that the allegations contained in Paragraph 12 state a conclusion of law to which no response is required.

## RESPONSE TO "BACKGROUND"

13.     Phoenix, on information and belief, admits that this action involves an arrangement to procure life insurance policies with the purpose of immediately transferring the beneficial interest in those policies to stranger investors, in contravention of the "insurable interest rule" as codified in the New York Insurance Law, and states that the remaining allegations contained in Paragraph 13 state conclusions of law to which no response is required. To the extent a response to the remaining allegations is deemed necessary, Phoenix denies that Plaintiff is entitled to the disgorgement of the payment of death benefits and that death benefits should in any event be paid to Plaintiff.

14.     Phoenix admits the allegations contained in Paragraph 14.

15.     Phoenix admits the allegations contained in Paragraph 15.

16.   Phoenix, on information and belief, admits the allegations contained in Paragraph 16.

17.   Phoenix states that the allegations contained in Paragraph 17 state a conclusion of law to which no response is required.  To the extent a response is deemed necessary, Phoenix admits that the entire "stranger-owned life insurance" ("SOLI") arrangements, including the putative assignments of the beneficial interests in the death benefits of the policies, are void under New York law.

## RESPONSE TO "FACTS"

18.   Phoenix, on information and belief, admits that Arthur Kramer was an attorney and died on January 26, 2008, and denies having knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations contained in Paragraph 18.

19.   Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 19 to the extent that it alleges that Mr. Lockwood may have first approached Mr. Kramer in 2003, but avers, on information and belief, that Messrs. Lockwood and Kramer participated in a SOLI scheme that resulted in the procurement of three Phoenix policies numbered 97303913, 97303935, and 97303936 (the "Phoenix Policies") for a total amount of $28,000,000.

20.   Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 20 to the extent that it suggests that Mr. Lockwood first introduced Mr. Kramer to the SOLI arrangement, but avers, on information and belief, that Messrs. Lockwood and Kramer participated in a SOLI scheme that resulted in the procurement of the Phoenix Policies.

21.   Phoenix, on information and belief, admits the allegations contained in

Paragraph 21, except denies having knowledge or information sufficient to form a belief as to the truth of those allegations that identify the children of Mr. Kramer and Mrs. Kramer.

22.     Phoenix, on information and belief, admits the allegations contained in Paragraph 22.

23.     Phoenix, on information and belief, admits the allegations contained in Paragraph 23, except denies having knowledge or information sufficient to form a belief as to the truth of those allegations concerning the total amount of the life insurance policies that are the subject of Plaintiff's suit.

**Response to "The Transamerica Policies"**

24.     Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 24.

25.     Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 25.

26.     Phoenix denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 26.

27.     Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 27.

28.     Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 28.

29.     Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 29.

30.     Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 30.

**Response to "The Phoenix Policies"**

31.     Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 31, but avers that the insurance application for the Phoenix Policies lists the "Arthur Kramer 2005 Insurance Trust" as the owner and beneficiary of the policies, and lists "Hudson United Bank" as trustee.

32.     Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 32.

33.     Phoenix, on information and belief, admits the allegations contained in Paragraph 33.

34.     Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 34.

35.     Phoenix, on information and belief, admits that Hudson was acquired by TD Bank in early 2006, and denies having knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 35.

36.     Phoenix admits the allegations contained in Paragraph 36, and avers that when Phoenix issued the Phoenix Policies on the life of Mr. Kramer, the ostensible owner and beneficiary of them were represented to be the "Arthur Kramer 2005 Insurance Trust."

37.     Phoenix, on information and belief, admits that the assignment or transfer of the beneficial interest in the Phoenix Policies occurred on or about when they were issued, and otherwise denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 37.

38.     Phoenix, on information and belief, admits the allegations contained in Paragraph 38.

**Response to "The Lincoln Policies"**

39.     Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 39.

40.     Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 40.

41.     Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 41.

**Response to "Arthur Kramer's Death"**

42.     Phoenix, on information and belief, admits the allegations contained in Paragraph 42.

43.     Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 43.

44.     Phoenix denies having paid death benefits under the Phoenix Policies, denies having knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations contained in Paragraph 44, and avers that it is in the process of investigating the claims made on the Phoenix Policies.

### RESPONSE TO FIRST CLAIM FOR RELIEF

45.     Phoenix repeats and re-alleges its responses to Paragraphs 1 - 44 as though fully set forth herein.

46.     Phoenix admits that Plaintiff has accurately quoted New York Insurance Law Section 3205(b)(2) in Paragraph 46.

47.     Phoenix admits that Plaintiff has accurately quoted New York Insurance Law Section 3205(a)(1) in Paragraph 47.

48.     Phoenix admits the allegations contained in Paragraph 48.

49.     Phoenix admits the allegations contained in Paragraph 49, and avers that at this time it lacks information sufficient to form a belief as to whether additional actors were involved in procuring contracts of insurance upon the person of Mr. Kramer or causing such contracts of insurance to be procured.

50.     Phoenix admits the allegations contained in Paragraph 50.

51.     Phoenix admits the allegations contained in Paragraph 51.

52.     Phoenix denies the allegations contained in Paragraph 52.

### RESPONSE TO SECOND CLAIM FOR RELIEF

53.     Phoenix repeats and re-alleges its responses to Paragraphs 1 - 52 as though fully set forth herein.

54.     Phoenix admits that Plaintiff has accurately quoted New York Insurance Law Section 3205(b)(4) in Paragraph 54.

55.     Phoenix denies the allegations contained in Paragraph 55.

### DEFENSES

### FIRST DEFENSE
**(Failure to State a Claim for Relief)**

56.     The Complaint fails to state a claim against Phoenix upon which relief may be granted.

### SECOND DEFENSE
**(No Damage or Injury)**

57.     Plaintiff is barred from recovery against Phoenix, in whole or in part, by the lack of damage or injury to Plaintiff.

**THIRD DEFENSE**
**(Unjust Enrichment)**

58.     Plaintiff is barred from recovery against Phoenix, in whole or in part, because it would be unjustly enriched if permitted to collect the sums to which it claims it is entitled.

**FOURTH DEFENSE**
**(Estoppel)**

59.     Plaintiff is barred from recovery against Phoenix, in whole or in part, by the doctrine of estoppel.

**FIFTH DEFENSE**
**(Unclean Hands)**

60.     Plaintiff is barred from recovery against Phoenix, in whole or in part, by the doctrine of unclean hands.

**SIXTH DEFENSE**
**(No Insurable Interest)**

61.     Plaintiff is barred from recovery against Phoenix because there was no insurable interest at the time that the Phoenix Policies were procured, thereby rendering them void from their inception.

**SEVENTH DEFENSE**
**(Void - Public Policy)**

62.     Plaintiff is barred from recovery against Phoenix because the Phoenix Policies were procured pursuant to a fraudulent SOLI scheme in which Mr. Kramer knowingly participated, which relieves Phoenix of any obligation to pay death benefits.

**EIGHTH DEFENSE**
**(No Standing)**

63.     Plaintiff is barred from recovery because she lacks standing to sue Phoenix, inasmuch as N.Y. Ins. Stat. § 3205(b)(4) provides standing for a suit only against the party that

has received insurance policy proceeds, and not against the insurer, and even then only in circumstances where policy proceeds have been paid.

**NINTH DEFENSE**
**(Failure to Join Required Parties)**

64.    Plaintiff is barred from recovery against Phoenix, in whole or in part, because it has failed to join parties required by Federal Rule of Civil Procedure 19.

**RESERVATION OF RIGHT TO ASSERT ADDITIONAL DEFENSES**

65.    Phoenix has not knowingly or voluntarily waived any applicable affirmative defenses and reserves the right to assert and rely upon such additional affirmative defenses to the Complaint as may become available or apparent as discovery commences and progresses in this action.

**COUNTERCLAIMS, CROSS-CLAIMS & THIRD-PARTY COMPLAINT**

**GENERAL ALLEGATIONS**

1.    Phoenix repeats and re-alleges Paragraphs 1-65 of its Answer as though fully set forth herein.

2.    On information and belief, Steven Lockwood ("Lockwood") is the owner and chief executive officer of Lockwood Pension Services, Inc. ("LPS") and Tall Tree Advisors, Inc. ("Tall Tree").

3.    On information and belief, Lockwood, LPS, and Tall Tree all reside at the same address: 2 Tall Tree Lane, Pleasantville, New York.

4.    Jonathan S. Berck ("Berck") has served, and continues to serve, as the trustee for various life insurance trusts that Lockwood helped to establish.

5.    On information and belief, Lockwood, LPS, Life Product Clearing LLC ("Life Product"), M&M Brokerage Services, Inc. ("M&M"), and Berck all have (or had during the time

-10-

period relevant to this action) offices located at 75 Rockefeller Plaza, New York, New York.

6.    On information and belief, Lockwood, LPS, Tall Tree, Life Product, and Berck have developed a formulaic method of circumventing New York's insurable interest rule.  On information and belief, this method involves using elderly persons, and the trusts they encourage or aid them in establishing, as strawmen to acquire life insurance policies for the benefit of strangers who have no insurable interest in the lives of the insureds (*i.e.*, a "SOLI" scheme).

7.    On information and belief, Lockwood, LPS, Tall Tree, Life Product, and Berck have used fraudulent SOLI schemes to procure multiple life insurance policies worth hundreds of millions of dollars.  On information and belief, all of the insurance policies at issue in this lawsuit were procured by means of fraudulent SOLI schemes formulated and perpetuated by Lockwood, LPS, Tall, Life Product, and Berck.

8.    On information and belief, Lockwood colluded with Arthur Kramer to participate in one or more fraudulent SOLI arrangements.  In particular, Lockwood colluded with Mr. Kramer (a) to establish a life insurance trust, (b) to apply for one or more life insurance policies in which the trust would be both the policyholder and beneficiary of the policies, (c) upon the issuance of the policies, to immediately transfer the beneficial interest in the trust to Tall Tree and/or Life Product in exchange for monetary compensation, and (d) to replace the financial institution trustee of the trust with Berck.

9.    On or about July 1 2005, Lockwood and Phoenix entered into a contract pursuant to which Lockwood would serve as an independent producer of various Phoenix products, including life insurance policies.

10.    On or about August 30, 2005, Phoenix approved the Independent Producer Contract (the "IPC").

11.    On or about August 29, 2005, Mr. Kramer established the Arthur Kramer 2005 Insurance Trust (the "Kramer August Trust").

12.    On information and belief, the only advantage and purpose of the Kramer August Trust was to effectuate a transfer of the right to the death proceeds payable under the requested life insurance policies in a fraudulent manner that would not be apparent to Phoenix.

13.    Mr. Kramer submitted (through Lockwood) a life insurance application to Phoenix in early September 2005 (the "Phoenix Application").

14.    On information and belief, Mr. Kramer did not apply for life insurance on his own initiative, but rather was induced to do so by the offer of ready cash.

15.    On information and belief, at the time he submitted the Phoenix Application, Mr. Kramer had no intention of procuring life insurance for the benefit of himself or his family; rather, Mr. Kramer was attempting to procure a policy for the benefit of a stranger investor with no insurable interest in his life.

16.    On information and belief, the stranger investor on whose behalf Mr. Kramer procured the life insurance was Tall Tree.  Thus, Tall Tree was the true intended beneficiary of the requested policy.

17.    In Sections II and III of Part I of the Phoenix Application, Mr. Kramer represented that the owner and beneficiary of the policies applied for would be the Kramer August Trust.

18.    Mr. Kramer signed Part I of the Phoenix Application on or about September 2, 2005.

19.    Above Mr. Kramer's signature on Part I of the Phoenix Application, the application states, in relevant part:

I have reviewed this application, and the statements made herein are those of the proposed insured and all such statements made by the proposed insured in Part I or in Part II of this application are full, complete, and true to the best knowledge and belief of the undersigned and have been correctly recorded . . .

I understand and agree that the Insurance applied for shall not take effect unless and until each of the following has occurred: the policy has been issued by the Company; the premium required for the issuance of the policy has been paid in full during the lifetime of the insured; all the representations made in the application remain true, complete and accurate as of the latest of such dates; and there has been no change in the health of any proposed insured that would change the answers to any of the questions in the application . . . .

20.    Lockwood signed Part I of the Phoenix Application as the producer of the Phoenix policies numbered 97303913, 97303935, and 97303936 (the "Phoenix Policies") for a total amount of $28,000,000.

21.    Above Lockwood's signature on Part I of the Phoenix Application, the Application states, in relevant part, that "The Producer hereby confirms he/she has truly and accurately recorded on the application the information supplied by the Proposed Insured; and that he/she is qualified and authorized to discuss the contract herein applied for."

22.    Given Section 3205 of the New York Insurance Law and New York's long-standing public policy against "wager" life insurance policies, Mr. Kramer, Lockwood, and the Trustee implicitly represented that (a) the Kramer August Trust would be the true owner and beneficiary of the requested Phoenix Policies (i.e., not just a strawman), and (b) the Kramer August Trust and its intended beneficiary had an insurable interest in Mr. Kramer's life.

23.    While Phoenix was processing and underwriting Mr. Kramer's Phoenix Application, Lockwood informed Phoenix that Mr. Kramer would like a total of $28 million of life insurance, issued to the Kramer August Trust in three separate policies, based on the same Phoenix Application.

24.     In reliance upon the truth of the representations made in the Phoenix Application, Phoenix issued the Phoenix Policies.

25.     Phoenix delivered the Phoenix Policies to Lockwood in or about October 2005.

26.     On information and belief, the beneficial interest in the Kramer August Trust was transferred to Tall Tree on or about October 13, 2005.

27.     On October 21, 2005, Mr. Kramer signed three Policy Acceptance Forms acknowledging receipt of the Phoenix Policies.

28.     Above Mr. Kramer's signature on each Policy Acceptance Form, the Form stated, in relevant part, that "The insured(s) declares that the statements made in the application remain full, complete, and true as of this date . . . ."

29.     On information and belief, Berck was appointed the successor trustee of the Kramer August Trust on or about July 10, 2006.  On information and belief, Lockwood had a relationship with Berck that involved similar SOLI arrangements, and Berck's appointment as successor trustee allowed Lockwood to tightly control the Phoenix Policies.

30.     The application for the Phoenix Policies, the creation of the Kramer August Trust, and the transfer of the beneficial interest in the Kramer August Trust (and thus the beneficial proceeds of the Phoenix Policies), were all part of a single transaction, which had as its purpose the procurement of a policy of insurance on Mr. Kramer's life by a person having no insurable interest in his life.

31.     Indeed, while an insured may be permitted to apply for life insurance on his own initiative and for the benefit of a person with a valid insurable interest (*i.e.*, not for the benefit of a stranger) and then **after** the policy is issued**,** decide to transfer the beneficial interest in the policy, there is no chance that such a legitimate transfer occurred in this case.  That is, Plaintiff

cannot plausibly claim, and indeed does not claim, that Mr. Kramer just happened to decide –

after the Phoenix Policies were issued – to transfer the beneficial interest in the Phoenix Policies

to Tall Tree. *First*, the beneficial interest was transferred before Mr. Kramer even acknowledged

receipt of the Phoenix Policies and before the first premium was paid. *Second*, with the

assistance of Lockwood and within, at most, a six-month span, Mr. Kramer procured at least

seven insurance policies from three different insurance companies, worth a total of $56 million.

On information and belief, Mr. Kramer transferred the ultimate right to the proceeds of every

single one of those policies on or about the time that they were issued.

32.     The identity of the parties, the clear characteristics of a SOLI scheme, the timing

of the applications and transfers, and the sheer number and value of policies involved provide

clear and convincing evidence of an intent to procure the Phoenix Policies for the benefit of a

stranger-investor who had no valid insurable interest.

33.     Although Phoenix lacks information regarding the specific details of the

transactions involving the Transamerica and Lincoln Life policies at issue in this lawsuit, on

information and belief those policies were procured by virtually identical SOLI schemes

involving Lockwood, LPS, an outside investor (either Tall Tree or Life Product), and Berck (as

successor trustee to the relevant trusts).

34.     Therefore, the Phoenix Policies and the other policies were fraudulently procured

in violation of Section 3205 of the New York Insurance Law.

### FIRST COUNTERCLAIM
**(Fraud)**

35.     Phoenix repeats and re-alleges Paragraphs 1 - 65 of its Answer and 1 - 34 of its

Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

36.     On the Phoenix Application and by his reaffirmation thereof on October 21, 2005,

Mr. Kramer represented that the true owner and beneficiary of the Phoenix Policies was the Kramer August Trust and that the Kramer August Trust (and its true beneficiary) had a valid insurable interest in his life.

37.    These representations were incomplete and false when made, and Mr. Kramer knew they were incomplete and false when he made them.

38.    By making these misrepresentations Mr. Kramer intended to deceive Phoenix with respect to the identity of the true beneficiary of the Phoenix Policies and with respect to the true beneficiary's lack of an insurable interest in Mr. Kramer's life.

39.    Phoenix relied on Mr. Kramer's representations that the Kramer August Trust was the true owner and beneficiary of the Phoenix Policies and that the Kramer August Trust (and its true beneficiary) had a valid insurable interest in Mr. Kramer's life.

40.    As a result of Mr. Kramer's misrepresentation, Mr. Kramer knowingly induced Phoenix to issue life insurance policies that it would not have issued but for Mr. Kramer's misrepresentation.

41.    If Phoenix is required to pay any death benefits pursuant to the Phoenix Policies, Mr. Kramer – by his misrepresentation and his substantial participation in the fraudulent SOLI scheme described above – will have caused Phoenix to suffer damages in the amount of such payments.  He will also have caused Phoenix to suffer additional damages, including but not limited to commissions paid on the Phoenix Policies.  The Estate is liable for any damages caused by Mr. Kramer.

## SECOND COUNTERCLAIM
### (Aiding and/or Abetting Breach of Fiduciary Duty)

42.    Phoenix repeats and re-alleges Paragraphs 1 - 65 of its Answer and 1 - 41 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

43.     Mr. Kramer knew or should have known that Lockwood owed Phoenix a fiduciary duty.

44.     Mr. Kramer knew or should have known that such fiduciary duty included a duty of full disclosure with respect to the Phoenix Application and a duty not to procure SOLI policies which Lockwood knew or should have known Phoenix would decline to issue if Phoenix knew of the true nature of such policies.

45.     Mr. Kramer substantially participated in Lockwood's breach of fiduciary duty by (a) creating and/or acquiescing to the creation of the Kramer August Trust, (b) submitting and reaffirming the Phoenix Application, (c) misrepresenting the true beneficiary of the Phoenix Policies and the presence of a valid insurable interest in Mr. Kramer's life, and (d) immediately transferring the beneficial interest in the Kramer August Trust (and thus the Phoenix Policies) to Lockwood's company, Tall Tree, after the Phoenix Policies were delivered.

46.     By substantially participating in the SOLI scheme, Mr. Kramer knew or should have known that he and Lockwood induced Phoenix to issue life insurance policies that it would not have issued but for Mr. Kramer's participation in the SOLI scheme. Thus, Mr. Kramer knew or should have known that he was aiding and abetting Lockwood's breach of fiduciary duty.

47.     If Phoenix is required to pay any death benefits pursuant to the Phoenix Policies, Mr. Kramer – by his substantial participation in the fraudulent SOLI scheme – will have caused Phoenix to suffer damages in the amount of such payments. He will also have caused Phoenix to suffer additional damages, including but not limited to commissions paid on the Phoenix Policies. The Estate is liable for any damages caused by Mr. Kramer.

### THIRD COUNTERCLAIM
#### (Unjust Enrichment)

48.     Phoenix repeats and re-alleges Paragraphs 1 - 65 of its Answer and 1 - 47 of its

Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

49.    As set forth above and below, on information and belief, Mr. Kramer and/or other beneficiaries of his estate knowingly received substantial payments in exchange for their transfer of the beneficial interests in the Phoenix Policies that Mr. Kramer procured without a valid insurable interest.

50.    In the event that the Court rules that Plaintiff is entitled to the proceeds of the Phoenix policies, then the Estate will have been rewarded financially not only by benefiting from insurance policies that were procured without a valid insurable interest, but from the payments received by Mr. Kramer and/or other beneficiaries of his estate from the transfer of the beneficial interests in the Phoenix Policies.

51.    The circumstances as described herein are such that it would be inequitable, if the Estate receives the proceeds of the Phoenix Policies, for the Estate to also retain any payments that Mr. Kramer (or other beneficiaries) received for the transfer of the beneficial interests in the policies.

52.    In the event that the Estate receives the proceeds of the Phoenix Policies, then Phoenix is entitled to the full amount of the Estate's ill-gotten gains, including interest, resulting from Mr. Kramer's unlawful, unjust and inequitable conduct in connection with the Phoenix Policies, including but not limited to the payments received in exchange for transfer of the beneficial interests in the Phoenix Policies that he never intended to retain. The Estate is liable for any damages caused by Mr. Kramer.

## CROSS-CLAIMS

### FIRST CROSS-CLAIM
**(Lockwood Pension Services, Inc. and Tall Tree Advisors, Inc. –
Aiding and/or Abetting Fraud)**

53.    Phoenix repeats and re-alleges Paragraphs 1 - 65 of its Answer and 1 - 52 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

54.    On information and belief, Lockwood acted not just on behalf of himself, but also on behalf of and/or in concert with his company LPS, through which he marketed his services to Mr. Kramer, and Tall Tree, in proposing the SOLI scheme to Mr. Kramer, facilitating the creation of trust and/or related documents, signing the Phoenix Application, and purchasing the beneficial interest in the Kramer August Trust.

55.    LPS and Tall Tree knew that Mr. Kramer and LPS had duties to make truthful and accurate representations on the Phoenix Application.

56.    LPS and Tall Tree knew that Lockwood had a duty of full disclosure with respect to the Phoenix Application and more generally, the procurement of the Phoenix Policies.

57.    LPS and Tall Tree knew that the SOLI arrangement was designed to circumvent New York's insurable interest rule.

58.    LPS and Tall Tree knew that Phoenix, in issuing any policies pursuant to the Phoenix Application, would rely on the representations contained in the Phoenix Application and on the presence of a valid insurable interest.

59.    LPS and Tall Tree knew that the lack of a valid insurable interest was not disclosed on the Phoenix Application.

60.    On information and belief, LPS and Tall Tree substantially participated in the above-described fraudulent SOLI arrangement as described above and below.

-19-

61.    On information and belief, Lockwood and Kramer relied on LPS's and Tall Tree's roles in the SOLI scheme.

62.    On information and belief, Tall Tree and LPS had arranged to make payment to Arthur and/or Liza Kramer immediately after the issuance of the Phoenix Policies.    On information and belief, Tall Tree and LPS understood at the time the Phoenix Application was submitted that Arthur Kramer and/or Liza Kramer intended to transfer the beneficial interest in the Kramer August Trust to Tall Tree in exchange for a payment, and, at the time the Phoenix Application was submitted, Tall Tree and LPS intended to make such payment after the issuance of the Phoenix Policies.

63.    On information and belief, Tall Tree and LPS paid Arthur Kramer and/or Liza Kramer to transfer the beneficial interest in the Kramer August Trust shortly after the Phoenix Policies were issued.

64.    Tall Tree and LPS knowingly participated in a fraudulent SOLI scheme to induce Phoenix to issue life insurance policies that it would not have issued but for LPS's and Tall Tree's substantial participation in the SOLI scheme.

65.    If Phoenix is required to pay any death benefits pursuant to the Phoenix Policies, Tall Tree and LPS – by their substantial participation in the fraudulent SOLI scheme – will have caused Phoenix to suffer damages in the amount of such payments.  They will also have caused Phoenix to suffer additional damages, including but not limited to commissions paid on the Phoenix Policies.

## SECOND CROSS-CLAIM
### (Lockwood Pension Services, Inc. and Tall Tree Advisors, Inc. – Aiding and/or Abetting Breach of Fiduciary Duty)

66.    Phoenix repeats and re-alleges Paragraphs 1 - 65 of its Answer and 1 - 65 of its

Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

67.     LPS and Tall Tree knew that Lockwood owed Phoenix a fiduciary duty.

68.     LPS and Tall Tree knew that such fiduciary duty included a duty of full disclosure with respect to the Phoenix Application and a duty not to procure SOLI policies which Lockwood knew Phoenix would decline to issue if it knew of the true nature of such policies.

69.     LPS and Tall Tree substantially participated in Lockwood's breach of fiduciary duty by among other things, (a) inducing Mr. Kramer to apply for life insurance policies for the benefit of a person or persons without an insurable interest in Mr. Kramer's life, (b) facilitating the creation of trust and/or related documents, and (c) arranging for the transfer of the beneficial interest in the Kramer August Trust (and thus the Phoenix Policies) to Tall Tree immediately after the Phoenix Policies were delivered.

70.     By participating in the SOLI scheme, LPS and Tall Tree knowingly induced Phoenix to issue life insurance policies that it would not have issued but for Mr. Kramer's participation in the SOLI scheme.  Thus, Tall Tree and LPS knowingly aided and abetted Lockwood's breach of fiduciary duty.

71.     If Phoenix is required to pay any death benefits pursuant to the Phoenix Policies, LPS and Tall Tree – by their substantial participation in the fraudulent SOLI scheme – will have caused Phoenix to suffer damages in the amount of such payments.  They will also have caused Phoenix to suffer additional damages, including but not limited to commissions paid on the Phoenix Policies.

## FIRST THIRD-PARTY CLAIM
### (Steven Lockwood – Fraud)

72.     Phoenix repeats and re-alleges Paragraphs 1- 65 of its Answer and 1 - 71 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

-21-

73.    On information and belief, Lockwood had knowledge of and personally participated in and/or directed the fraudulent SOLI scheme by, among other things, (a) proposing the SOLI scheme to Mr. Kramer, (b) failing to disclose information that he knew Phoenix would deem relevant to its decision to issue the Phoenix Policies (and in fact would have caused it to decline to issue them), including but not limited to Kramer's intention to transfer the beneficial interests in the Phoenix Policies to strangers, (c) facilitating the creation of trust and/or related documents, (d) signing the Phoenix Application, and (e) purchasing (through Tall Tree) the beneficial interest in the Kramer August Trust.  In signing the Phoenix Application, Lockwood represented that the true owner and beneficiary of the Phoenix Policies was the Kramer August Trust and that the Kramer August Trust had a valid insurable interest – representations that Lockwood knew to be incomplete and false when made.

74.    By making these misrepresentations and perpetrating this fraudulent scheme, Lockwood intended to, and did in fact, deceive Phoenix with respect to the true beneficiary of the Phoenix Policies and with respect to the true beneficiary's lack of an insurable interest in Mr. Kramer's life.

75.    As a result of Lockwood's fraud, Lockwood knowingly induced Phoenix to issue life insurance policies that it would not have issued but for Lockwood's misrepresentation.

76.    If Phoenix is required to pay any death benefits pursuant to the Phoenix Policies, Lockwood will have caused Phoenix to suffer damages in the amount of such payments. He will also have caused Phoenix to suffer additional damages, including but not limited to commissions paid on the Phoenix Policies.

## SECOND THIRD-PARTY CLAIM
### (Steven Lockwood – Breach of Fiduciary Duty)

77.    Phoenix repeats and re-alleges its responses to Paragraphs 1 - 65 of its Answer

-22-

and 1 - 76 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

78.      As producer of the Phoenix Policies, Lockwood owed a fiduciary duty to Phoenix. Such duty included a duty of full disclosure with respect to the Phoenix Application, including but not limited to: (a) the duty to make full disclosure of the nature of the risk undertaken; (b) the duty to make full disclosure of any and all information that would enable Phoenix to determine if the insurance should issue; (c) to make recommendations upon reasonable grounds that the solicited insurance is suitable and consistent with the applicant's insurable needs and financial objectives; and (d) not to procure SOLI policies which Lockwood knew Phoenix would decline to issue if Phoenix knew of the true nature of such policies.

79.      Lockwood breached that fiduciary duty by, among other things, (a) inducing Mr. Kramer to apply for life insurance policies for the benefit of a person or persons without an insurable interest in Mr. Kramer's life, (b) facilitating the creation of trust and/or related documents to hide the transfer of the beneficial interest in the Phoenix Policies from Phoenix, (c) failing to disclose to Phoenix information he knew Phoenix would deem relevant to determining whether the insurance would issue, including but not limited to the failure to disclose the lack of an insurable interest on Mr. Kramer's life, and (d) arranging for the immediate transfer of the beneficial interest in the Kramer August Trust (and thus the Phoenix Policies) to his affiliate company, Tall Tree.

80.      Lockwood thereby caused Phoenix to issue the Phoenix Policies, which it would not have issued but for Lockwood's breach of its fiduciary duty.

81.      If Phoenix is required to pay any death benefits pursuant to the Phoenix Policies, Lockwood will have caused Phoenix to suffer damages in the amount of such payments.  He will

also have caused Phoenix to suffer additional damages, including but not limited to commissions paid on the Phoenix Policies that must be disgorged.

## THIRD THIRD-PARTY CLAIM
### (Steven Lockwood -- Breach of Contract)

82.    Phoenix repeats and re-alleges Paragraphs 1 - 65 of its Answer and 1 - 81 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

83.    Under Section 1(d) of the "Basic Contract Provisions" section of the IPC, Lockwood agreed that the contract and his conduct is subject to "applicable federal or state laws, statutes and regulations or directives issued by any regulatory entity having jurisdiction over the matters covered in this contract . . . ."

84.    Under Section 10 of the "Basic Contract Provisions" section of the IPC, Lockwood agreed that all "[a]ll rights, powers, and remedies provided herein may be exercised only to the extent that the exercise thereof does not violate any applicable provision of law . . . ."

85.    Section 11 of the "Basic Contract Provisions" section of the IPC, Lockwood "acknowledge[d] that [Phoenix] relies upon [him] for a careful and frank presentation of the facts necessary for the proper underwriting and acceptance of the requested insurance coverages," agreed to "give complete and accurate answers in the application and associated forms," and agreed to "promptly transmit to [Phoenix] any and all information that will enable [Phoenix] to determine if the insurance applied for should be issued by [Phoenix] and upon what terms and rates."

86.    Under Section 1 of the "Compliance and Sales Practices Provisions" section of the IPC, Lockwood agreed that he would "make recommendations based upon reasonable grounds that the products being solicited are suitable and consistent with the applicants' insurable needs and financial objectives."

87.     On or about January 2, 2007, Lockwood executed a Broker Agreement between, among others, Phoenix and him (the "2007 Broker Agreement"). The 2007 Broker Agreement contains provisions that similarly obligate Lockwood to conduct himself in accordance with applicable laws and regulations and to make full and accurate disclosures to Phoenix with respect to prospective insureds.

88.     Lockwood breached the above-referenced provisions of the IPC by, among other things, (a) inducing Mr. Kramer to apply for life insurance policies for the benefit of a person or persons without an insurable interest in Mr. Kramer's life, (b) facilitating the creation of trust and/or related documents to hide the transfer of the beneficial interest in the Phoenix Policies from Phoenix, (c) failing to disclose to Phoenix information he knew Phoenix would deem relevant to determining whether the insurance would issue, including but not limited to the failure to disclose the lack of an insurable interest on Mr. Kramer's life, and (d) arranging for the immediate transfer of the beneficial interest in the Kramer August Trust (and thus the Phoenix Policies) to LPS's affiliate, Tall Tree.

89.     If Phoenix is required to pay any death benefits pursuant to the Phoenix Policies, Lockwood will have caused Phoenix to suffer damages in the amount of such payments. He will also have caused Phoenix to suffer additional damages, including but not limited to commissions paid on the Phoenix Policies that must be disgorged.

## FOURTH THIRD-PARTY CLAIM
### (Steven Lockwood – Negligence)

90.     Phoenix repeats and re-alleges Paragraphs 1 - 65 of its Answer and 1 - 89 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

91.     As producer of the Phoenix Policies, Lockwood owed a common law duty of care to Phoenix that required it to provide full disclosure with respect to the Phoenix Application,

including all facts relevant to the risk insured.

92.     Lockwood breached that duty by, among other things, failing to disclose to Phoenix (a) the lack of an insurable interest on Mr. Kramer's life, (b) facts from which Phoenix could determine that lack of insurable interest, (c) facts from which Phoenix could ascertain the true nature of the risk that it undertook in issuing the Phoenix Policies, and (d) that the Phoenix Application was submitted as part of a SOLI arrangement.

93.     If Phoenix is required to pay any death benefits pursuant to the Phoenix Policies, then Lockwood – by the above-referenced conduct – will have caused Phoenix to suffer damages in the amount of such payments.  He will also have caused Phoenix to suffer additional damages, including but not limited to commissions paid on the Phoenix Policies that must be disgorged.

### FIFTH THIRD-PARTY CLAIM
#### (Steven Lockwood – Contractual Indemnification)

94.     Phoenix repeats and re-alleges Paragraphs 1 - 65 of its Answer and 1 - 93 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

95.     Under Section 5 of the "Basic Contract Provisions" section of the IPC, Lockwood agreed "to indemnify [Phoenix] for any liabilities, losses, costs or expenses incurred or moneys paid by [Phoenix] to any person as the result of the misrepresentations, negligence or unauthorized acts by [him], [his] employees, or Sub-producers associated with [him]."

96.     Section 8.1 of the 2007 Broker Agreement that Lockwood executed provides that Lockwood "hold harmless, defend, exonerate and indemnify" Phoenix for any and all "losses, claims, judgments, fines, penalties, damages, or liabilities" that Phoenix suffers as a result of Lockwood's actions, or resulting from the breach of any representation contained in the Broker Agreement.

97.     Phoenix would not have issued the Phoenix Policies but for the above-described

-26-

fraudulent, negligent, and/or unauthorized conduct by Lockwood and those under his employ/associated with him.

98.    If Phoenix is obliged to pay death benefits pursuant to the Phoenix Policies, it is entitled to indemnification from Lockwood in the amount of such payments.  Lockwood will also have caused Phoenix to suffer additional damages, including but not limited to (a) commissions paid on the Phoenix Policies that must be disgorged and (b) attorneys fees incurred in defending against this litigation and prosecuting these cross-claims and counterclaims (and which would not have incurred but for Lockwood's conduct) that he must reimburse.

### SIXTH THIRD-PARTY CLAIM
**(Steven Lockwood – Unjust Enrichment)**

99.    Phoenix repeats and re-alleges Paragraphs 1 - 65 of its Answer and 1 - 98 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

100.    As alleged herein, Lockwood knowingly solicited and procured the Phoenix Policies, in violation of federal and state law and public policy, for the benefit of an investor who had no insurable interest in the life of Mr. Kramer.

101.    On information and belief, Lockwood has received benefits from his wrongful actions described herein, including but not limited to commissions that he received from Phoenix for procuring the Phoenix Policies.

102.    Lockwood has knowledge of these benefits, and has voluntarily accepted and retained these benefits.

103.    The circumstances as described herein are such that it would be inequitable for Lockwood to retain these ill-gotten benefits without disgorging the value thereof to Phoenix.

104.    As a direct and proximate result of Lockwood's wrongful actions, Phoenix has suffered damages in issuing the Phoenix Policies and paying the associated commissions, and

will suffer further damages if it is obliged to pay death benefits. Thus, Phoenix is entitled to the full amount of Lockwood's ill-gotten gains, including interest, resulting from his unlawful, unjust and inequitable conduct in connection with the Phoenix Policies.

## SEVENTH THIRD-PARTY CLAIM
### (Steven Lockwood – Civil RICO Violation - 18 U.S.C. § 1962(c))

105.    Phoenix repeats and re-alleges Paragraphs 1 - 65 of its Answer and 1 - 104 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

### The Violations

106.    18 U.S.C. § 1962(c) provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

107.    Lockwood violated § 1962(c) by conducting the affairs of LPS and Tall Tree through a pattern of racketeering activity, including but not limited to numerous instances of mail and wire fraud in furtherance of the fraudulent SOLI scheme described herein, as well as other virtually identical SOLI schemes involving other insureds and insurers.

### The Enterprises

108.    LPS is a corporation and thus qualifies as an enterprise for purposes of RICO.

109.    Tall Tree is a corporation and qualifies as an enterprise for purposes of RICO.

110.    LPS affects interstate commerce in that it procures life insurance policies for clients with residences in various states from insurers residing in various states.

111.    Tall Tree affects interstate commerce in that (a) it purchases beneficial interests in life insurance trusts (and thus life insurance policies) from insureds and/or their relatives with residences in various states, and (b) it purchases the ultimate rights to death benefits pursuant to

policies that are issued by insurers residing in various states.

### Lockwood & His Role in the Enterprises

112.    On information and belief, Lockwood is the owner and chief executive officer of both LPS and Tall Tree, and Lockwood participated in the operation or management of these enterprises by, among other things, his specific activities as alleged herein.

### The Pattern

113.    On information and belief, Lockwood has used LPS and Tall Tree to engage in a pattern of racketeering that includes numerous criminal acts of mail fraud over the past three years.

A.    The Kramer-Phoenix SOLI Scheme

114.    On information and belief, Lockwood devised a scheme to submit a fraudulent life insurance application on behalf of Mr. Kramer and the Kramer August Trust to Phoenix, and thereby to procure a SOLI policy, as alleged herein.

115.    Phoenix relied on that fraudulent application, and the misrepresentations contained therein, in issuing the Phoenix Policies.

116.    Phoenix was injured by virtue of issuing the Kramer Policies.

117.    Lockwood used the mails and wires on numerous occasions in furtherance of his fraudulent SOLI scheme. Such uses include but are not limited to the following:

a.    Lori Callegari, an employee of LPS, mailed the Policy Acceptance Forms and first premiums payments for the Phoenix Policies to Phoenix on or about October 21, 2005;

b.    Lori Callegari mailed the second quarterly premiums payments for the Phoenix Policies to Phoenix on or about October 24, 2005;

c.    Lucy Montemarano, the Office Manager of M&M, mailed quarterly premiums payments for the Phoenix Policies to Phoenix on or about January 4, 2006;

    d.     Lockwood mailed a letter to Phoenix on or about June 22, 2007, using LPS letterhead, advising Phoenix that Berck had been appointed as Successor Trustee;

    e.     LPS made several telephone calls to Phoenix to request life insurance illustrations that would allow the financers of the SOLI scheme to pay minimum premiums in the years that they would hold the rights to the Phoenix Policies, including calls from "Dave" on or about August 4, 2006 (requesting an illustration showing a minimum premium in year 2, then level premiums through age 100 with an ending cash value of $1,000), June 1, 2007 (requesting an illustration showing minimum level premiums in policy years 3-5 with level premiums until age 100 with an ending cash value of $1,000) June 13, 2007 (requesting an illustration showing level premiums to age 100), June 28, 2007 (minimum annual premiums in policy years 3-5 with level premiums thereafter), and July 6, 2007 (requesting an illustration with specified premiums in years 3-5 and level premiums thereafter with $1,000 cash value at age 100).

118.    On information and belief, Lockwood caused all of the above uses of the mails or wires, either by personal direction or authorization or by virtue of the fact that such uses were reasonably foreseeable or likely to follow in the regular course of the Kramer-Phoenix SOLI scheme.

119.    On information and belief, by his SOLI scheme and by the above uses of the mails and wires, Lockwood intended to deprive Phoenix of property by causing it to issue the Phoenix Policies without an insurable interest that it would not have issued but for the fraudulent SOLI scheme, and eventually to pay out death benefits pursuant to such policies.

120.    The intent of Lockwood to defraud Phoenix is further confirmed by his participation in virtually identical SOLI schemes targeting Transamerica and Lincoln Life.

121.    On information and belief, Lockwood and LPS submitted a fraudulent life insurance application on behalf of Mr. Kramer to Lincoln Life through the mail. On information and belief, when they mailed that application, Lockwood and LPS had a specific intent to defraud Lincoln Life with essentially the same SOLI scheme that they employed to perpetrate

their fraud against Phoenix.

122.    On information and belief, Lockwood and LPS submitted a fraudulent life insurance application on behalf of Mr. Kramer to Transamerica through the mail.    On information and belief, when they mailed that application, Lockwood, LPS, and Tall Tree had a specific intent to defraud Transamerica with essentially the same SOLI scheme that they employed to perpetrate their fraud against Phoenix.

123.    These related SOLI schemes reveal a continued threat of criminal activity by Lockwood.

B.    The Levinson-Phoenix SOLI Scheme

124.    In November 2005, Lockwood and LPS submitted a life insurance application to Phoenix on behalf of Irwin Levinson and the Irwin Levinson Insurance Trust II (the "Levinson Trust").    In the application, Mr. Levinson, the Levinson Trust, and Lockwood represented that the Policy applied for would be owned by the Levinson Trust, which was also to be the designated primary beneficiary of any policy issued.

125.    Lockwood signed the application as the producer of the Policy.

126.    Above Lockwood's signature, the application stated, in relevant part, that "The Producer hereby confirms he/she has truly and accurately recorded on the application the information supplied by the Proposed Insured; and that he/she is qualified and authorized to discuss the contract herein applied for."

127.    Given Section 3205 of the New York Insurance Law and New York's long-standing public policy against "wager" life insurance policies, as well as Lockwood's contractual, fiduciary, and common law duties to Phoenix, Lockwood implicitly represented that (a) the Levinson Trust would be the true owner and beneficiary of the requested Phoenix Policies

(*i.e.*, not just a strawman), and (b) the Levinson Trust and its intended beneficiary had an insurable interest in Mr. Levinson's life

128.    In reliance upon the truth of the representations made in the application, Phoenix issued the Policy (No. 97304016) with a Policy Date of November 27, 2008, a basic policy amount of $5,000,000, and a planned annual premium of $270,000.

129.    The application was attached to the Policy as issued.

130.    The Levinson Trust was created on or about November 4, 2005 – just before Mr. Levinson's application was submitted to Phoenix. Lockwood provided a draft trust agreement to Mr. Levinson (apparently using a form Lockwood had used previously) to establish the Levinson Trust.

131.    The initial beneficiary of the Levinson Trust was Dede Levinson, Mr. Levinson's wife.

132.    On information and belief, in procuring the Policy, Mr. Levinson did not intend to provide his wife with financial security from the death benefit of the Policy.

133.    On information and belief, there was no estate tax advantage that derived from the creation of the Levinson Trust and the purpose of the Levinson Trust was not to minimize Mr. or Mrs. Levinson's estate taxes.

134.    On information and belief, the only advantage and purpose of the Levinson Trust was to effectuate a transfer of the right to the death proceeds payable under the Policy to an outside investor, and thus the formation of the Levinson Trust in connection with Mr. Levinson's application reveals an intent to effect such a transfer at the time the application was submitted.

135.    On information and belief, Berck was named the successor Trustee of the Levinson Trust on or about July 10, 2006. Lockwood was a witness to the Levinson Trustee succession agreement.

136.    In the course of Phoenix's investigation of this SOLI scheme, Lockwood informed Phoenix in a February 7, 2008 letter that he was "aware" that "within a few weeks after the policy was issued" Mr. Levinson was contacted by an investment group "inquiring whether the family would be interested in selling its rights in the policy," and that the "transaction did take place between the relevant parties."

137.    Phoenix's inquiries into the details and circumstances surrounding Mr. Levinson's application and the transfer of the beneficial interest in the Policy have been stymied. On two separate occasions – on or about September 5, 2007, and on or about February 15, 2008 – an insurance investigator met with Mrs. Levinson to obtain information relevant to the processing of the claim. Such interviews are standard procedure with respect to claims made during the contestability period of a policy.

138.    On both occasions, Lockwood and someone identified as a "family friend" were present and interfered with the interviews, interrupting both the investigator and Mrs. Levinson when they were speaking and directing Mrs. Levinson not to answer certain questions.

139.    In response to questions concerning the Policy, the Levinson Trust and the transfer of beneficial interest, Mrs. Levinson claimed near-total ignorance and said she was unaware the Policy and the Levinson Trust even existed until after her husband's death. Mrs. Levinson said she had not seen any documentation relating to the Policy, the Levinson Trust or the transfer of beneficial interest and did not know where any such documentation may be located.

-33-

140.    In response to questions directed to Lockwood concerning the Levinson Trust and the alleged SOLI arrangement, Lockwood claimed he had heard Mr. Levinson was contacted by an outside investor or group of investors shortly after the Policy was issued and that Mr. Levinson had sold the beneficial interest in the Levinson Trust to the outside investor. Lockwood claimed near-total ignorance regarding the details of that transaction. He stated he does not know who the investors are, how to contact them, who put them in touch with Mr. Levinson, or how much they paid Mr. Levinson.

141.    On information and belief, the creation of the Levinson Trust, the Levinson application for the policy, and the assignment of the beneficial interest in the Levinson Trust (and thus the ultimate right to the death benefits payable under the Policy) were all part of a single transaction, which had as its purpose the procurement of an insurance policy on Mr. Levinson's life for the benefit of a person having no insurable interest on his life.   On information and belief, Lockwood and LPS devised this fraudulent SOLI scheme, advised Mr. Levinson with respect to the transaction, induced Mr. Levinson to participate in the scheme, and facilitated the transfer of the rights to the death benefits to an outside investor.

142.    Phoenix was injured by virtue of issuing the Levinson policy.

143.    Lockwood used the mails and wires on numerous occasions in furtherance of the fraudulent SOLI scheme.  Such uses include but are not limited to the following:

   a.    Lockwood faxed a letter to Dr. James N. Harris, MD, on a LPS fax cover sheet, requesting Mr. Levinson's medical history to facilitate his life insurance applications and forwarding an authorization form with respect to same, on or about March 22, 2005;

   b.    Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson regarding Mr. Levinson's net worth and medical records, and the status of his application for life insurance, on or about April 5, 2005;

   c.    Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson regarding the status of Mr. Levinson's application for life insurance,

on or about August 15, 2005;

d.    Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson regarding putting Mr. Levinson in contact with companies who specialize in the sale/purchase of life insurance policies, on or about September 27, 2005;

e.    Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson regarding the Levinson Trust, forwarding a sample life insurance trust agreement, offering to recommend a trustee, and recommending that Mr. Levinson's application be submitted to Phoenix, on or about October 24, 2005;

f.    Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson forwarding the Phoenix policy on or about December 1, 2005;

g.    Lori Callegari, an employee of LPS, mailed the policy acceptance form and first premium payment to Phoenix on or about December 8, 2005;

h.    Lori Callegari mailed additional premium payments to Phoenix on or about February 1, 2006;

i.    Lockwood mailed a premium payment from Berck to Phoenix on or about December 4, 2006;

j.    Lockwood mailed a letter to Phoenix, using LPS letterhead, advising Phoenix that Berck had been appointed as Successor Trustee, on or about August 3, 2007; and

k.    Berck mailed a letter to Phoenix making a claim on behalf of the Levinson Trust for death benefits, on or about August 20, 2007.

144.    On information and belief, Lockwood caused all of the above uses of the mails or wires, either by personal direction or authorization or by virtue of the fact that such uses were reasonably foreseeable or likely to follow in the regular course of the Kramer-Phoenix SOLI scheme.

145.    On information and belief, by his SOLI scheme and by the above uses of the mails and wires, Lockwood intended to deprive Phoenix of property by causing it to issue a policy that it would not have issued but for the fraudulent SOLI scheme, and eventually to pay out death benefits pursuant to the policy.

146.    The intent of Lockwood to defraud Phoenix is further confirmed by his participation in virtually identical SOLI schemes as alleged herein.

147.    These virtually identical SOLI schemes also reveal a continued threat of criminal activity by Lockwood.

C.    The Lobel-Lincoln Life SOLI Scheme

148.    On or about January 22, 2007, Life Product filed suit in the United States District Court for the Southern District of New York, seeking a declaration that it was entitled to the proceeds of a $10 million life insurance policy (the "Lobel Policy") issued by Lincoln Life & Annuity Company of New York upon the life of Leon Lobel – a retired butcher who was seventy-seven years old when he applied for the policy. The case is entitled *Life Product Clearing LLC v. Linda Angel*, 07-CV-0475 (DC) (the "Angel lawsuit").

149.    On or about March 12, 2007, Linda Angel, Lobel's daughter and the personal representative of Lobel's estate, filed her answer and counterclaims against Life Product. On or about March 13, 2007, Angel filed a third-party complaint against Leon Lobel Insurance Trust (the "Lobel Trust") and Jonathan S. Berck, as Trustee, seeking a declaration that the Lobel Trust is void and that Lobel's estate is entitled to recover the death benefits paid under the Lobel Policy.

150.    Angel alleges that the Lobel Trust was established as part of a SOLI scheme to procure an insurance policy on the life of her father for the benefit of Life Product – an outside investor who lacked an insurable interest in Mr. Lobel's life.

151.    Angel alleges that Mr. Lobel established the Lobel Trust at about the same time he submitted his application to Lincoln Life, and that the Lobel Trust was formed to own the policy and was designated as the sole beneficiary of Mr. Lobel's policy.

152.    Angel alleges that Lockwood facilitated the SOLI transaction by helping Mr. Lobel establish the Lobel Trust and that Lockwood acted as an intermediary between Mr. Lobel and the outside investor.

153.    Angel alleges that, six days after the policy was issued, Mr. Lobel sold his interest in the Lobel Trust – and thus the right to any insurance proceeds upon his death – to Life Product.

154.    Angel alleges that Mr. Lobel never paid any premiums and received a cash payment of $300,000 for transferring the beneficial interest in the Lobel Trust to Life Product.

155.    Angel alleges that, after the right to the benefits payable under Mr. Lobel's policy was transferred, Berck became the successor trustee of the Lobel Trust.

156.    In a recent decision in the *Angel* lawsuit, the United States District Court for the Southern District of New York denied Life Product's motion for judgment on the pleadings and concluded as follows: "These factual allegations, taken together, surely make a plausible claim that Lobel intended to transfer the Policy to LPC prior to procuring it.  Such a scheme surely could amount to an impermissible attempt to circumvent the prohibition on wager policies."  530 F. Supp. 2d 646, 655-56 (S.D.N.Y. 2008).

157.    On information and belief, Lockwood devised a scheme to submit a fraudulent life insurance application on behalf of Mr. Lobel and the Lobel Trust to Lincoln Life, and thereby to procure a SOLI policy.

158.    On information and belief, Lincoln Life relied on that fraudulent application, and the misrepresentations contained therein, in issuing the Lobel policy.

159.    Lincoln Life was injured by virtue of issuing the Lobel policy and by its subsequent payment of death benefits.

160.  On information and belief, Lockwood used the mails and wires on numerous occasions in furtherance of his fraudulent SOLI scheme.  Such uses include but are not limited to the following:

a.  Lockwood mailed a letter dated December 16, 2005, to Lobel forwarding the Lincoln Life policy, advising him of an investor willing to purchase the beneficial interest in the Lobel Trust, and enclosing a Beneficial Interest Transfer Agreement; and

b.  Lockwood mailed a letter dated January 3, 2006, to Lobel forwarding a check for $300,000 from Life Product in exchange for a 100% ownership interest in the Lobel Trust.

161.  On information and belief, Lockwood caused, by personal action, direction, or authorization, all of the above uses of the mails.

162.  On information and belief, by his SOLI scheme and by the above uses of the mails, Lockwood intended to deprive Lincoln Life of property by causing it to issue a policy that it would not have issued but for the fraudulent SOLI scheme, and ultimately to pay out death benefits pursuant to the policy.

163.  The intent of Lockwood to defraud Lincoln Life is further confirmed by his participation in virtually identical SOLI schemes as alleged herein.

164.  These virtually identical SOLI schemes also reveal a continued threat of criminal activity by Lockwood.

### The Injury

165.  If Phoenix is required to pay any death benefits pursuant to the Phoenix Policies, Lockwood – by means of his fraudulent SOLI scheme and as a direct result of his fraudulent mailing of the Phoenix Application– will have caused Phoenix to suffer damages in the amount of such payments.

## COMBINED CROSS-CLAIM AND THIRD-PARTY CLAIM
### (Steven Lockwood, LPS, and Tall Tree – Civil RICO Violation - 18 U.S.C. § 1962(c))

166.    Phoenix repeats and re-alleges Paragraphs 1 - 65 of its Answer and 1 - 165 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

### The Violations

167.    On information and belief, Lockwood, LPS, and Tall Tree violated § 1962(c) by conducting the affairs of, or by participating in the conduct of the affairs of, an "association in fact" – consisting of Lockwood, LPS, Tall Tree, and Life Product, and Berck (the "SOLI Enterprise") – through a pattern of racketeering activity, including but not limited to numerous instances of mail and wire fraud in furtherance of the fraudulent SOLI scheme described herein, as well as other virtually identical SOLI schemes involving other insureds and insurers.

### The Enterprise

168.    On information and belief, Lockwood, LPS, Tall Tree, Life Product, and Berck share a common purpose of procuring SOLI policies, hiding the nature of those policies from the life insurers who issued them for the duration of the contestability period, and then profiting from those policies by either claiming and collecting the proceeds of such policies or eventually selling such policies to other outside investors.

169.    On information and belief, Lockwood, LPS, Tall Tree, Life Product, and Berck have engaged in and are engaged in a course of conduct such that they function as a continuing unit with an ongoing organization. In the course of its regular operation, the SOLI Enterprise must identify potential insureds, market the SOLI scheme to those potential insureds, establish a trust on behalf of the potential insured, appoint a trustee, procure policies, pay the insureds to transfer the beneficial interest in the trust, finance and regularly pay the premiums, correspond with and submit forms to insurers, and either sell the policies to other outside investors or, if the

SOLI Enterprise retains the rights to the proceeds of the policies, file, administer, and facilitate claims for death benefits  That is, the regular functions of the SOLI Enterprise include, among other things, financing, marketing, administration, and sales.

### The Participants & Their Roles in the Enterprise

170.    On information and belief, Lockwood participated in the operation or management of the SOLI Enterprise by his specific activities as alleged herein.  More generally, Lockwood identifies potential insureds, approaches and advises potential insureds on the benefits of the SOLI scheme (*i.e.*, markets the SOLI scheme), facilitates the creation of life insurance trusts, and advises insureds, trustees, beneficiaries, and claimants with respect to their communications with insurers both before and after the issuance of the policies.  On information and belief, Lockwood also sometimes purchases (through Tall Tree) the beneficial interest in the life insurance trusts and thus provides the financial incentive for insureds to participate in the SOLI scheme and the vehicle by which they do so.

171.    On information and belief, LPS participated in the operation or management of the SOLI Enterprise by its specific activities as alleged herein.  More generally, LPS approaches and advises potential insureds on the benefits of the SOLI scheme (*i.e.*, markets the SOLI scheme), facilitates the creation of life insurance trusts, and advises insureds, trustees, beneficiaries, and claimants with respect to their communications with insurers both before and after the issuance of the policies.

172.    On information and belief, Tall Tree participated in the operation or management of the SOLI Enterprise by its specific activities as alleged herein.  More generally, Tall Tree is a financer of SOLI transactions: it purchases the beneficial interest in the life insurance trusts and thus provides the financial incentive for insureds to participate in the SOLI scheme and the

vehicle by which they do so.

173.   On information and belief, Life Product participated in the operation or management of the SOLI Enterprise by its specific activities as alleged herein.   More generally, Life Product is a financer of SOLI transactions: it purchases the beneficial interest in the life insurance trusts and thus provides the financial incentive for insureds to participate in the SOLI scheme and the vehicle by which they do so.

174.   On information and belief, Berck participated in the operation or management of the SOLI Enterprise by his specific activities as alleged herein.   More generally, after the beneficial interests in the life insurance trusts have been transferred to investors such as Life Product and Tall Tree, Berck serves as the successor trustee of these trusts and thus acts in their interests and as their agent in paying premiums, filing and administering claims, collecting and distributing death benefits, and executing the sale of the policies to any other investors.

## The Pattern

175.   Lockwood, LPS and Tall Tree have engaged in a pattern of racketeering by committing numerous criminal acts of mail/wire fraud over the past three years.   These racketeering activities are connected to and designed to further the goals of the SOLI Enterprise.

A.   The Kramer-Phoenix SOLI Scheme

176.   On information and belief, Lockwood, LPS, and Tall Tree devised a scheme to submit a fraudulent life insurance application on behalf of Mr. Kramer and the Kramer August Trust to Phoenix, and thereby to procure a SOLI policy, as alleged herein.

177.   Phoenix relied on that fraudulent application, and the misrepresentations contained therein, in issuing the Phoenix Policies.

178.   Phoenix was injured by virtue of issuing the Kramer Policies.

179.    Lockwood, LPS, and Tall Tree used the mails and wires on numerous occasions in furtherance of their fraudulent SOLI scheme.  Such uses include but are not limited to the following:

a.    Lori Callegari, an employee of LPS, mailed the Policy Acceptance Forms and first premiums payments for the Phoenix Policies to Phoenix on or about October 21, 2005;

b.    Lori Callegari mailed the second quarterly premiums payments for the Phoenix Policies to Phoenix on or about October 24, 2005;

c.    Lucy Montemarano, the Office Manager of M&M, mailed quarterly premiums payments for the Phoenix Policies to Phoenix on or about January 4, 2006;

d.    Lockwood mailed a letter to Phoenix on or about June 22, 2007, using LPS letterhead, advising Phoenix that Berck had been appointed as Successor Trustee; and

e.    LPS made several telephone calls to Phoenix to request life insurance illustrations that would allow the financers of the SOLI scheme to pay minimum premiums in the years that they would hold the rights to the Phoenix Policies, including calls from "Dave" on or about August 4, 2006 (requesting an illustration showing a minimum premium in year 2, then level premiums through age 100 with an ending cash value of $1,000), June 1, 2007 (requesting an illustration showing minimum level premiums in policy years 3-5 with level premiums until age 100 with an ending cash value of $1,000) June 13, 2007 (requesting an illustration showing level premiums to age 100), June 28, 2007 (minimum annual premiums in policy years 3-5 with level premiums thereafter), and July 6, 2007 (requesting an illustration with specified premiums in years 3-5 and level premiums thereafter with $1,000 cash value at age 100.

180.    On information and belief, Lockwood, LPS, and Tall Tree each individually caused all of the above uses of the mails or wires, either by personal direction or authorization or by virtue of the fact that such uses were reasonably foreseeable or likely to follow from the regular operation of the SOLI Enterprise.

181.    On information and belief, Lockwood, LPS, and Tall Tree each individually intended by their participation in the SOLI Enterprise, the pattern of racketeering, and the above

-42-

instances of mail and wire frauds to deprive Phoenix of property by causing it to issue the

Phoenix Policies that it would not have issued but for the fraudulent SOLI scheme, and

eventually to pay out death benefits pursuant to such policies.

182.    The intent of Lockwood, LPS, and Tall Tree to defraud Phoenix is further

confirmed by their participation in virtually identical SOLI schemes as alleged herein.

183.    These virtually identical SOLI schemes also reveal a continued threat of criminal

activity by Lockwood, LPS, and Tall Tree in conducting the affairs of the SOLI Enterprise.

B.    The Levinson-Phoenix SOLI Scheme

184.    On information and belief, Lockwood and LPS devised a scheme to submit a

fraudulent life insurance application to Phoenix on behalf of Mr. Levinson and the Levinson

Trust, and thereby to procure a SOLI policy.

185.    Lockwood and LPS used the mails and wires on numerous occasions in

furtherance of their fraudulent SOLI scheme with respect to the Levinson policy.  Such uses

include but are not limited to the following:

a.    Lockwood faxed a letter to Dr. James N. Harris, MD, on a LPS fax
cover sheet, requesting Mr. Levinson's medical history to facilitate his
life insurance applications and forwarding an authorization form with
respect to same, on or about March 22, 2005;

b.    Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson
regarding Mr. Levinson's net worth and medical records, and the
status of his application for life insurance, on or about April 5, 2005;

c.    Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson
regarding the status of Mr. Levinson's application for life insurance,
on or about August 15, 2005;

d.    Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson
regarding putting Mr. Levinson in contact with companies who
specialize in the sale/purchase of life insurance policies, on or about
September 27, 2005;

e.    Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson

regarding the Levinson Trust, forwarding a sample life insurance trust agreement, offering to recommend a trustee, and recommending that Mr. Levinson's application be submitted to Phoenix, on or about October 24, 2005;

f.    Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson forwarding the Phoenix policy on or about December 1, 2005;

g.    Lori Callegari, an employee of LPS, mailed the policy acceptance form and first premium payment to Phoenix on or about December 8, 2005;

h.    Lori Callegari mailed additional premium payments to Phoenix on or about February 1, 2006;

i.    Lockwood mailed a premium payment from Berck to Phoenix on or about December 4, 2006;

j.    Lockwood mailed a letter to Phoenix, using LPS letterhead, advising Phoenix that Berck had been appointed as Successor Trustee, on or about August 3, 2007; and

k.    Berck mailed a letter to Phoenix making a claim on behalf of the Levinson Trust for death benefits, on or about August 20, 2007.

186.    On information and belief, Lockwood and LPS each individually caused all of the above uses of the mails or wires, either by personal direction or authorization or by virtue of the fact that such uses were reasonably foreseeable or likely to follow from the regular operation of the SOLI Enterprise.

187.    On information and belief, Lockwood and LPS each individually intended by their participation in the SOLI Enterprise, the pattern of racketeering, and the above instances of mail and wire frauds to deprive Phoenix of property by causing it to issue a policy that it would not have issued but for the fraudulent SOLI scheme, and eventually to pay out death benefits pursuant to such policy.

188.    The intent of Lockwood and LPS to defraud Phoenix is further confirmed by their participation in virtually identical SOLI schemes as alleged herein.

-44-

189.    These virtually identical SOLI schemes also reveal a continued threat of criminal activity by Lockwood, LPS, and Tall Tree in conducting the affairs of the SOLI Enterprise.

C.    The Lobel-Lincoln Life SOLI Scheme

190.    On information and belief, Lockwood and LPS devised a scheme to submit a fraudulent life insurance application on behalf of Mr. Lobel and the Lobel Trust to Lincoln Life, and thereby to procure a SOLI policy.

191.    On information and belief, Lincoln Life relied on that fraudulent application, and the misrepresentations contained therein, in issuing the Lobel policy.

192.    Lincoln Life was injured by virtue of issuing the Lobel policy and by its subsequent payment of death benefits.

193.    Lockwood and LPS used the mails and wires on numerous occasions in furtherance of their fraudulent SOLI scheme.   Such uses include but are not limited to the following:

    a.    Lockwood mailed a letter dated December 16, 2005, to Lobel forwarding the Lincoln Life policy, advising him of an investor willing to purchase the beneficial interest in the Lobel Trust, and enclosing a Beneficial Interest Transfer Agreement; and

    b.    Lockwood mailed a letter dated January 3, 2006, to Lobel forwarding a check for $300,000 from Life Product in exchange for a 100% ownership interest in the Lobel Trust.

194.    On information and belief, Lockwood and LPS each individually caused all of the above uses of the mails, either by personal direction or authorization or by virtue of the fact that such uses were reasonably foreseeable or likely to follow from the regular operation of the SOLI Enterprise.

195.    On information and belief, Lockwood and LPS each individually intended by their participation in the SOLI Enterprise, the pattern of racketeering, and the above instances of

-45-

mail frauds to deprive Lincoln Life of property by causing it to issue a policy that it would not have issued but for the fraudulent SOLI scheme, and eventually to pay out death benefits pursuant to such policy.

196.    The intent of Lockwood and LPS to defraud Lincoln Life is further confirmed by their participation in virtually identical SOLI schemes as alleged herein.

197.    These virtually identical SOLI schemes also reveal a continued threat of criminal activity by Lockwood, LPS, and Tall Tree in conducting the affairs of the SOLI Enterprise.

198.    Indeed, upon information and belief, discovery in this action will yield evidence of additional fraudulent SOLI schemes in which Lockwood, LPS, Tall Tree and others engaged.

### The Injury

199.    If Phoenix is required to pay any death benefits pursuant to the Phoenix Policies, then Lockwood, LPS and Tall Tree – by means of their fraudulent SOLI scheme and as a direct result of their fraudulent mailing of the Phoenix Application– will have caused Phoenix to suffer damages in the amount of such payments.  They also have caused Phoenix to suffer additional damages, including but not limited to commissions paid on the Phoenix Policies that must be disgorged.

WHEREFORE, plaintiff Phoenix Life Insurance Company respectfully requests as follows:

(a)    an Order (i) rescinding the Phoenix Policies and declaring them null and void, either from their inception or as the result of a fraudulent scheme to issue the Phoenix Policies where there was no valid insurable interest, or, alternatively (ii) declaring that Phoenix has no obligation to pay any death benefits to Plaintiff in connection with the Phoenix Policies;

(b) an order awarding Phoenix damages against the Plaintiff in the amount of those death benefits, if any, that Phoenix is obligated to pay pursuant to the Phoenix Policies, plus any additional damages, including but not limited to commissions paid on the Phoenix Policies;

(c) an order awarding Phoenix damages against Lockwood Pension Services, Inc. in the amount of those death benefits, if any, that Phoenix is obligated to pay pursuant to the Phoenix Policies, plus any additional damages, including but not limited to commissions paid on the Phoenix Policies;

(d) an order awarding Phoenix damages against Tall Tree Advisors, Inc. in the amount of those death benefits, if any, that Phoenix is obligated to pay pursuant to the Phoenix Policies, plus any additional damages, including but not limited to commissions paid on the Phoenix Policies;

(e) an order awarding Phoenix damages against Steven Lockwood in the amount of those death benefits, if any, that Phoenix is obligated to pay pursuant to the Phoenix Policies, plus any additional damages, including but not limited to commissions paid on the Phoenix Policies and attorneys fees in connection with defense of this lawsuit and prosecution of counterclaims, cross-claims and third-party claims;

(f) as against any parties named in Phoenix's RICO claims, an order awarding Phoenix its treble damages, as well as costs and attorneys fees in connection with defense of this lawsuit and prosecution of counterclaims, cross-claims and third-party claims, pursuant to 18 U.S.C. § 1964(c); and

(g) an order awarding Phoenix its costs and disbursements incurred herein together with any such further relief as the Court may deem just and proper.

Dated: New York, New York
       April 9, 2008

Respectfully submitted,

**DORSEY & WHITNEY LLP**

By:  /s/Patrick J. Feeley
    Patrick J. Feeley (PF-4931)
    Christopher G. Karagheuzoff (CK-1122)
    Stephen M. Raab (SR-0742)

250 Park Avenue
New York, New York  10177
(212) 415-9200

Attorneys for Defendant and Third-Party
Plaintiff Phoenix Life Insurance Co.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- x

ALICE KRAMER, as Personal Representative of the
Estate of Arthur Kramer,

                    Plaintiff,

  – against –

LOCKWOOD PENSION SERVICES, INC., TALL
TREE ADVISORS, INC., LIFE PRODUCTS
CLEARING, LLC, TRANSAMERICA
OCCIDENTAL LIFE INSURANCE CO., PHOENIX
LIFE INSURANCE CO., LINCOLN LIFE &
ANNUITY CO. OF NEW YORK AND
JONATHAN S. BERCK,

                 Defendants.

---------------------------------------------------------------- x

**Civil Action No.**

**08 CV 2429 (DAB)(MHD)**

**ECF Case**

**AMENDED COMPLAINT**



RECEIVED
MAY 0 7 2008
U.S.D.C. S.D. N.Y.
CASHIERS

      Plaintiff Alice Kramer, in her fiduciary capacity as the Personal Representative of the

Estate of Arthur Kramer ("Plaintiff"), by and through her attorneys, Friedman & Wittenstein, A

Professional Corporation, hereby alleges as follows for her Amended Complaint:

**PARTIES**

      1.     Plaintiff is a citizen of the state of Connecticut, and resides in Stamford,

Connecticut.  She is the widow of Arthur Kramer and the Personal Representative of his Estate.

She brings this action in that capacity.

      2.     Mr. Kramer died on January 26, 2008.  At the time of his death, he was a citizen

of the state of Connecticut.

      3.     Upon information and belief, defendant Lockwood Pension Services, Inc. ("LPS")

is a New York corporation with its principal place of business located in New York, New York.

4.      Upon information and belief, defendant Tall Tree Advisors, Inc. ("TTA") is a New York corporation with its principal place of business located in Pleasantville, New York.

5.      Upon information and belief, defendant Life Products Clearing, LLC ("Life Products") is a Delaware limited liability company with its principal place of business located in New York, New York.

6.      Upon information and belief, defendant Transamerica Occidental Life Insurance Co. ("Transamerica") is an Iowa corporation with its principal place of business located in Cedar Rapids, Iowa.

7.      Upon information and belief, defendant Phoenix Life Insurance Co. ("Phoenix") is a New York corporation with its principal place of business located in East Greenbush, New York.

8.      Upon information and belief, defendant Lincoln Life & Annuity Co. of New York ("Lincoln") is a New York corporation with its principal place of business located in Syracuse, New York.

9.      Upon information and belief, defendant Jonathan S. Berck is a citizen of the state of New Jersey.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, because an actual controversy exists among the parties; and pursuant to 28 U.S.C. § 1332(a) and (c) in that the parties are citizens of different states and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

11.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred here.

## BACKGROUND

12.     This action involves an arrangement to procure life insurance policies with the purpose of immediately transferring the beneficial interests in those policies to stranger investors, in contravention of the "insurable interest rule" as codified in the New York Insurance Law. As described herein, in a case such as this, where the procurement of life insurance violates the insurable interest rule, the remedy is either that the death benefits be paid to the personal representative of the decedent's estate (in this case, the Plaintiff) or, if already paid to a stranger investor, that they be disgorged and paid to the personal representative.

13.     The "insurable interest rule" is a well-settled principle in New York insurance law that prevents the issuance of wager life insurance policies. New York Insurance Law Section 3205(b)(2) provides that one may not obtain an insurance policy on the life of another without having an "insurable interest" in the insured's life.

14.     It is against public policy for parties to circumvent the insurable interest rule by participating in the procurement of what is known as "stranger-owned life insurance" ("SOLI"). A typical SOLI arrangement is initiated by a stranger investor or an insurance agent who approaches an elderly person and encourages him to purchase life insurance, the death benefits of which will be immediately transferred to the stranger investor. The appeal of a SOLI arrangement is that the purchase of life insurance is represented to the elderly person as a way to receive a payment of money on a risk-free basis at little or no cost. The investor typically agrees to pay the person an up-front payment in addition to paying the insurance premiums in return for the assignment of the ownership interest in the policy. The common characteristic of all SOLI arrangements is that they are structured so that the elderly person or a family member, rather than the stranger investor, is made to appear as the original beneficiary of the policy in order to

3

try to evade the insurable interest requirement. Such arrangements are contrary to public policy because they enable investors to speculate or wager on a person's death.

15.    As further described below, defendants participated in an elaborate and unlawful SOLI arrangement where every detail, from drafting the trust agreements to choosing the trustees and investors, was structured for the sole purpose of trying to avoid the insurable interest rule. The arrangement was implemented by defendants to create the appearance that an insurable interest existed when Mr. Kramer took out several policies, so that the subsequent transfers of the beneficial interests in those policies to the stranger investors would appear lawful. However, the transfers to investors took place immediately upon Mr. Kramer's obtaining of the policies at issue, and that was always their plan. At no time were Mr. Kramer or any of his family members the true owners of the beneficial interests in the policies. Upon information and belief, Mr. Kramer never intended for the death benefits of the insurance policies to benefit his family.

16.    The putative assignments of the beneficial interests in the death benefits of the policies are void under New York law.

## FACTS

17.    Arthur Kramer was a retired attorney at the time of his death on January 26, 2008 at the age of 81.

18.    Upon information and belief, as early as 2003, Steven Lockwood, the principal of LPS, approached Mr. Kramer to solicit his participation in a SOLI arrangement.

19.    Upon information and belief, during 2005, Mr. Lockwood introduced Mr. Kramer to the SOLI arrangement that is the subject matter of this litigation.

20.    Upon information and belief, the SOLI arrangement worked as follows: Mr. Kramer, at the direction of LPS and possibly other defendants, would establish trusts, naming

himself as the depositor and one or more of his children as the initial beneficiaries. An LPS affiliated person or entity would be appointed as the trustee. The witnesses to the trust instrument would be Mr. Lockwood and one of his associates. Upon the issuance of the policies, Mr. Kramer, again acting at the direction of LPS and possibly other defendants, would immediately direct his children to execute a putative assignment of their nominal interest in the trust to a stranger third-party investor arranged by Mr. Lockwood. (The three children from Mr. Kramer's marriage to Plaintiff are Andrew Kramer ("Andrew"), Rebecca Kramer ("Rebecca") and Liza Kramer ("Liza")).

21.    Upon information and belief, the insurance policies were procured on Mr. Kramer's life with the intention of _immediately_ effectuating the assignment of the beneficial interests in the policies to an investor. At no time would Mr. Kramer or any of his family members have a true beneficial interest in the policies.

22.    Upon information and belief, LPS and certain other defendants employed the above-described SOLI arrangement with respect to a series of life insurance policies totaling approximately $56,200,000 on the life of Mr. Kramer. These policies were issued by defendants Transamerica, Phoenix and Lincoln.

**The Transamerica Policies**

23.    On or about June 6, 2005, Mr. Kramer, at the direction of LPS and possibly other defendants, established the Arthur Kramer Insurance Trust (the "June Trust") and named Lori Callegari as trustee. Mr. Kramer also listed Andrew and Rebecca as the putative beneficiaries thereunder. Mr. Lockwood and his associate witnessed the June Trust agreement. Under the terms of the June Trust agreement, the trust is governed by New York law.

5

24.    Upon information and belief, the June Trust agreement was prepared by counsel for LPS, and Mr. Kramer had no involvement in its drafting.

25.    Upon information and belief, Mr. Kramer had no prior business relationship with Ms. Callegari, who at the time was employed by LPS or TTA.  Upon information and belief, Ms. Callegari is presently a Vice President of LPS, and works for Mr. Lockwood at 75 Rockefeller Plaza.

26.    Upon information and belief, Ms. Callegari is no longer the trustee of the June Trust.  Upon information and belief, defendant Jonathan S. Berck is the current trustee.

27.    Upon information and belief, Mr. Kramer had no business relationship with defendant Mr. Berck prior to the SOLI arrangement that is the subject matter of this litigation.

28.    Upon information and belief, in June and July 2005, Transamerica issued one or more insurance policies to the June Trust having a total death benefit of approximately $18,200,000 (the "Transamerica Policies") on the life of Mr. Kramer.

29.    Upon information and belief, upon issuance of the policies, and at the direction of LPS and possibly other defendants, Mr. Kramer directed Andrew and Rebecca to execute putative assignments of their beneficial interests in the June Trust to stranger investor TTA.

30.    Upon information and belief, at the direction of LPS and possibly other defendants, in 2007, defendant Mr. Berck in his capacity as trustee of the June Trust, sold the ownership interests in the Transamerica Policies to a non-party individual or entity.

31.    Mr. Kramer, Andrew and Rebecca never paid any premiums on the Transamerica Policies, and there was no period of time when Andrew and Rebecca were the true beneficiaries of the June Trust after the Transamerica Policies were issued.

6

**The Phoenix Policies**

32.     On or about August 29, 2005, Mr. Kramer, at the direction of LPS and possibly other defendants, established the Arthur Kramer 2005 Insurance Trust (the "August Trust") and named Hudson United Bank ("Hudson") as trustee. Mr. Kramer also listed Liza as the putative beneficiary thereunder. Mr. Lockwood and one of his associates witnessed the August Trust agreement. Under the terms of the August Trust agreement, the trust is governed by New York law.

33.     Upon information and belief, the August Trust agreement was prepared by counsel for LPS, and Mr. Kramer had no involvement in its drafting.

34.     Upon information and belief, at the time the August Trust was created, Hudson and LPS had a pre-existing business relationship and shared the same business address at 75 Rockefeller Plaza, New York, New York.

35.     Upon information and belief, Mr. Kramer had no prior business relationship with Hudson.

36.     Upon information and belief, Hudson is no longer the trustee of the August Trust. Upon information and belief, defendant Mr. Berck is the current trustee.

37.     Upon information and belief, in July 2005, Phoenix issued one or more insurance policies to the August Trust having a total death benefit of approximately $28,000,000 (the "Phoenix Policies") on the life of Mr. Kramer.

38.     Upon information and belief, upon issuance of the policies, and at the direction of LPS and possibly other defendants, Mr. Kramer directed Liza to execute putative assignments of her beneficial interest in the August Trust to stranger investor TTA.

39.     Upon information and belief, at the direction of LPS and possibly other defendants, in 2007, defendant Mr. Berck in his capacity as trustee of the August Trust, sold the ownership interest in the Phoenix Policies to a non-party individual or entity.

40.     Upon information and belief, Mr. Kramer and Liza never paid any premiums on the Phoenix Policies, and there was no period of time when Liza was the true beneficiary of the August Trust after the Phoenix Policies were issued.

**The Lincoln Policies**

41.     Upon information and belief, on or about November 28, 2005, Lincoln issued one or more insurance policies to the August Trust having a total death benefit of $10,000,000 (the "Lincoln Policies") on the life of Mr. Kramer.

42.     Upon information and belief, upon issuance of the policies, and at the direction of LPS and possibly other defendants, Mr. Kramer directed Liza to execute putative assignments of her beneficial interest in the August Trust to stranger investor Life Products.

43.     Mr. Kramer and Liza never paid any premiums on the Lincoln Policies, and there was no period of time when Liza was the true beneficiary of the August Trust after the Lincoln Policies were issued.

**Arthur Kramer's Death**

44.     Mr. Kramer died on January 26, 2008.

45.     Subsequently, Plaintiff or her representatives have received various communications from representatives of defendant LPS and certain stranger investors demanding copies of Mr. Kramer's death certificate so that they may submit claims to the insurance companies for a total of approximately $56,200,000 in death benefits.  Plaintiff has refused all such requests.

46.    Pursuant to New York Insurance Law Section 3203(a)(3), all of the

aforementioned life insurance policies are incontestable because they were in force during the

life of Mr. Kramer for more than two years.  However, upon information and belief, none of the

insurance company defendants have paid out the proceeds of any of the policies.  On April 9,

2008, approximately one month after the initial Complaint in this action was filed, Phoenix filed

a pleading in this action indicating, inter alia, its intention not to pay any death benefits in

connection with the Phoenix Policies.  On or about April 16, 2008, approximately five weeks

after the initial Complaint in this action was filed, defendant Lincoln filed an action in

Connecticut state court indicating its intention, inter alia, not to pay any death benefits in

connection with the Lincoln Policies.  Defendant Transamerica has not yet responded to the

initial Complaint in this action, and was granted until June 15, 2008 to do so.

## FIRST CLAIM FOR RELIEF

## (DECLARATORY JUDGMENT)

47.    Plaintiff hereby repeats and realleges each and every allegation contained in

paragraphs 1-46 above.

48.    New York Insurance Law Section 3203(a)(3) provides:

(a)    All life insurance policies, except as otherwise stated
herein, delivered or issued for delivery in this state, shall
contain in substance the following provisions, or provisions
which the superintendent deems to be more favorable to
policyholders:

* * *

(3)    that the policy shall be incontestable after being in
force during the life of the insured for a period of
two years from its date of issue . . .

9

49.    New York Insurance Law Section 3205(b)(2) provides:

No person shall procure or cause to be procured, directly or by
assignment or otherwise any contract of insurance upon the person
of another unless the benefits under such contract are payable to
the person insured or his personal representatives, or a person
having, at the time when such contract is made, an insurable
interest in the person insured.

50.    New York Insurance Law Section 3205(a)(1) defines an "insurable interest" as

"(A) in the case of persons closely related by blood or by law, a substantial interest engendered

by love and affection; (B) in the case of other persons, a lawful and substantial economic interest

in the continued life, health or bodily safety of the person insured, as distinguished from an

interest which would arise only by, or would be enhanced in value by, the death, disablement or

injury of the insured."

51.    Neither TTA nor Life Products held an insurable interest in the life of Mr.

Kramer.

52.    TTA and Life Products procured or caused to be procured, directly or by

assignment or otherwise, contracts of insurance upon the person of Mr. Kramer.

53.    TTA lacked an insurable interest in Mr. Kramer at the time the Transamerica and

Phoenix Policies were issued.  Life Products lacked an insurable interest in Mr. Kramer at the

time the Lincoln Policies were issued.

54.    In the case of TTA, the Transamerica and Phoenix Policies on the life of Mr.

Kramer were procured with the view to their immediate assignment to TTA.  In the case of Life

Products, the Lincoln Policies on the life of Mr. Kramer were procured with the view to their

immediate assignment to Life Products.

55.     Pursuant to New York Insurance Law Sections 3203(a)(3) and 3205(b)(2),

Plaintiff is entitled to a declaration that the insurance company defendants must pay the death

benefits under the aforementioned policies, and that such death benefits must be paid to her.

## SECOND CLAIM FOR RELIEF

### (AGAINST DEFENDANTS LOCKWOOD PENSION SERVICES, INC., TALL TREE ADVISORS, INC., LIFE PRODUCTS CLEARING, LLC AND JONATHAN S. BERCK FOR THE RECOVERY OF DEATH BENEFITS)

56.     Plaintiff repeats and realleges each and every allegation contained in paragraphs

1-55 above.

57.     New York Insurance Law Section 3205(b)(4) provides:

> If the beneficiary, assignee or other payee under any contract made
> in violation of this subsection [(b)] receives from the insurer any
> benefits hereunder accruing upon the death, disablement or injury
> of the person insured, the person insured or his executor or
> administrator may maintain an action to recover such benefits from
> the person receiving them.

58.     In the alternative, if some or all of the death benefits of the aforementioned

policies have already been paid to LPS, TTA, Life Products, Mr. Berck or their representatives

or assignees, or to other persons or entities that may claim the right to receive such death

benefits, then pursuant to this statute, Plaintiff is entitled to recover such death benefits.


WHEREFORE, Plaintiff prays for judgment against Lockwood Pension Services, Inc.,

Tall Tree Advisors, Inc., Life Products Clearing, LLC, Transamerica Occidental Life Insurance

Co., Phoenix Life Insurance Co., Lincoln Life & Annuity Co. of New York and Jonathan S.

Berck as follows:

11

A.      Declaring that the insurance company defendants must pay the death benefits under the aforementioned life insurance policies, and that such death benefits must be paid to Plaintiff;

B.      Awarding Plaintiff the death benefits of all the aforementioned policies;

C.      Awarding Plaintiff reasonable attorneys' fees, and the costs and disbursements of this action; and

D.      Awarding Plaintiff such other and further relief as this Court may deem just and proper.

Dated: New York, New York
      May 7, 2008

FRIEDMAN & WITTENSTEIN
A Professional Corporation

By: _____
    Stuart I. Friedman (SF-9186)
    Andrew A. Wittenstein (AW-1943)
    Claire L. Chau (CC-4738)

600 Lexington Avenue
New York, New York 10022
(212) 750-8700

*Attorneys for Plaintiff*

Patrick J. Feeley (PF-4931)
Christopher G. Karagheuzoff (CK-1122)
Stephen M. Raab (SR-0742)
DORSEY & WHITNEY LLP
250 Park Avenue
New York, New York 10177
(212) 415-9200

*Attorneys for Defendant and Third-Party Plaintiff*
*Phoenix Life Insurance Co.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALICE KRAMER, as Personal Representative of the Estate of Arthur Kramer,<br><br>                Plaintiff,<br><br>  – against –<br><br>LOCKWOOD PENSION SERVICES, INC., TALL TREE ADVISORS, INC., LIFE PRODUCTS CLEARING, LLC, TRANSAMERICA OCCIDENTAL LIFE INSURANCE CO., PHOENIX LIFE INSURANCE CO., LINCOLN LIFE & ANNUITY CO. OF NEW YORK AND JONATHAN S. BERCK,<br><br>                Defendants. | Case No. 08 CV 2429 (DAB) (MHD)<br><br>ECF CASE<br><br>**ANSWER TO AMENDED COMPLAINT WITH COUNTERCLAIMS, CROSS-CLAIMS AND THIRD-PARTY COMPLAINT** |
| PHOENIX LIFE INSURANCE CO.,<br><br>                Third-Party Plaintiff,<br><br>  – against –<br><br>STEVEN LOCKWOOD,<br><br>                Third-Party Defendant. | |

Defendant Phoenix Life Insurance Co. ("Phoenix"), by its undersigned attorneys, hereby answers the amended complaint of Alice Kramer, as Personal Representative of the Estate of Arthur Kramer ("Plaintiff" or "Estate"), in corresponding numbered paragraphs as follows:

**RESPONSE TO "PARTIES"**

1.      Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations concerning the citizenship and residency of Plaintiff, and otherwise, on information and belief, admits the allegations contained in Paragraph 1.

2.      Phoenix denies having knowledge or information sufficient to form a belief as to whether Mr. Kramer was "a citizen of the State of Connecticut" at the time of his death, and otherwise admits the allegations contained in Paragraph 2.

3.      Phoenix, on information and belief, admits that Lockwood Pension Services, Inc. is a New York corporation, and denies having knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations contained in Paragraph 3.

4.      Phoenix, on information and belief, admits the allegations contained in Paragraph 4.

5.      Phoenix, on information and belief, admits that Life Product Clearing, LLC is a Delaware limited liability company, and denies having knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations contained in Paragraph 5.

6.      Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 6.

7.      Phoenix admits that it is incorporated in New York.   The remainder of the allegations contained in Paragraph 7 state a conclusion of law to which no response is required. To the extent that a response is required, Phoenix denies the remaining allegations contained in Paragraph 7.

8.      Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 8.

9.     Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 9.

## RESPONSE TO "JURISDICTION AND VENUE"

10.     Phoenix states that the allegations contained in Paragraph 10 state a conclusion of law to which no response is required.

11.     Phoenix states that the allegations contained in Paragraph 11 state a conclusion of law to which no response is required.

## RESPONSE TO "BACKGROUND"

12.     Phoenix, on information and belief, admits that this action involves an arrangement to procure life insurance policies with the purpose of immediately transferring the beneficial interest in those policies to stranger investors, in contravention of the "insurable interest rule" that Phoenix avers is recognized by the statutory and/or common law of most states (including the New York Insurance Law), and states that the remaining allegations contained in Paragraph 12 state conclusions of law to which no response is required.  To the extent a response to the remaining allegations is deemed necessary, Phoenix denies that Plaintiff is entitled to the disgorgement of the payment of death benefits and that death benefits should in any event be paid to Plaintiff.

13.     Phoenix admits the allegations contained in Paragraph 13.

14.     Phoenix admits the allegations contained in Paragraph 14.

15.     Phoenix, on information and belief, admits the allegations contained in Paragraph 15.

16.     Phoenix states that the allegations contained in Paragraph 16 state a conclusion of law to which no response is required.  To the extent a response is deemed necessary, Phoenix

admits that the entire "stranger-owned life insurance" ("SOLI") arrangements, including the putative assignments of the beneficial interests in the death benefits of the policies, are void under New York law and the laws of most states.

## RESPONSE TO "FACTS"

17.     Phoenix, on information and belief, admits that Arthur Kramer was an attorney and died on January 26, 2008, and denies having knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations contained in Paragraph 17.

18.     Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 18 to the extent that it alleges that Mr. Lockwood may have first approached Mr. Kramer in 2003, but avers, on information and belief, that Messrs. Lockwood and Kramer participated in a SOLI scheme that resulted in the procurement of three Phoenix policies numbered 97303913, 97303935, and 97303936 (the "Phoenix Policies") for a total amount of $28,000,000.

19.     Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 19 to the extent that it suggests that Mr. Lockwood first introduced Mr. Kramer to the SOLI arrangement, but avers, on information and belief, that Messrs. Lockwood and Kramer participated in a SOLI scheme that resulted in the procurement of the Phoenix Policies.

20.     Phoenix, on information and belief, admits the allegations contained in Paragraph 20, except denies having knowledge or information sufficient to form a belief as to the truth of those allegations that identify the children of Mr. Kramer and Mrs. Kramer.

21.     Phoenix, on information and belief, admits the allegations contained in Paragraph 21.

22.    Phoenix, on information and belief, admits the allegations contained in Paragraph 22, except denies having knowledge or information sufficient to form a belief as to the truth of those allegations concerning the total amount of the life insurance policies that are the subject of Plaintiff's suit.

**Response to "The Transamerica Policies"**

23.    Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 23.

24.    Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 24.

25.    Phoenix denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 25.

26.    Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 26.

27.    Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 27.

28.    Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 28.

29.    Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 29.

30.    Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 30.

31.    Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 31.

**Response to "The Phoenix Policies"**

32.     Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 32, but avers that the insurance application for the Phoenix Policies lists the "Arthur Kramer 2005 Insurance Trust" as the owner and beneficiary of the policies, and lists "Hudson United Bank" as trustee.

33.     Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 33.

34.     Phoenix, on information and belief, admits the allegations contained in Paragraph 34.

35.     Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 35.

36.     Phoenix, on information and belief, admits the allegations contained in Paragraph 36.

37.     Phoenix denies that it issued the Phoenix Policies in July 2005, admits the remaining allegations contained in Paragraph 37, and avers that when Phoenix issued the Phoenix Policies on the life of Mr. Kramer, the ostensible owner and beneficiary of them were represented to be the "Arthur Kramer 2005 Insurance Trust."

38.     Phoenix, on information and belief, admits that the assignment or transfer of the beneficial interest in the Phoenix Policies occurred on or about when they were issued, and otherwise denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 38.

39.     Phoenix, on information and belief, admits the allegations contained in Paragraph 39, and avers, on information and belief, that Mr. Kramer and/or unknown others

directed, approved, and/or participated in such sale.

      40.     Phoenix, on information and belief, admits the allegations contained in Paragraph 40.

**Response to "The Lincoln Policies"**

      41.     Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 41.

      42.     Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 42.

      43.     Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 43.

**Response to "Arthur Kramer's Death"**

      44.     Phoenix, on information and belief, admits the allegations contained in Paragraph 44.

      45.     Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 45.

      46.     Phoenix admits that, on April 9, 2008, it filed its Answer to Complaint with Counterclaims, Cross-Claims and Third-Party Complaint, and respectfully refers the Court to it for a complete and accurate recitation of the contents thereof, admits that it has not paid out the proceeds on any of the Phoenix Policies, denies that the policies are incontestable under New York or other states' laws, and denies having knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations contained in Paragraph 46.

### RESPONSE TO FIRST CLAIM FOR RELIEF

      47.     Phoenix repeats and re-alleges its responses to Paragraphs 1 - 46 as though fully

set forth herein.

48.    Phoenix admits that Plaintiff has accurately quoted New York Insurance Law Section 3203(a)(3) in Paragraph 48.

49.    Phoenix admits that Plaintiff has accurately quoted New York Insurance Law Section 3205(b)(2) in Paragraph 49.

50.    Phoenix admits that Plaintiff has accurately quoted New York Insurance Law Section 3205(a)(1) in Paragraph 50.

51.    Phoenix admits the allegations contained in Paragraph 51.

52.    Phoenix admits the allegations contained in Paragraph 52, and avers that at this time it lacks information sufficient to form a belief as to whether additional actors were involved in procuring contracts of insurance upon the person of Mr. Kramer or causing such contracts of insurance to be procured.

53.    Phoenix admits the allegations contained in Paragraph 53.

54.    Phoenix admits the allegations contained in Paragraph 54.

55.    Phoenix denies the allegations contained in Paragraph 55.

**RESPONSE TO SECOND CLAIM FOR RELIEF**

56.    Phoenix repeats and re-alleges its responses to Paragraphs 1 - 55 as though fully set forth herein.

57.    Phoenix admits that Plaintiff has accurately quoted New York Insurance Law Section 3205(b)(4) in Paragraph 57.

58.    Phoenix states that the allegations contained in Paragraph 58 state a conclusion of law to which no response is required.  To the extent that a response to the allegations is deemed necessary, Phoenix denies the allegations.

## DEFENSES

### FIRST DEFENSE
**(Failure to State a Claim for Relief)**

59.     The Complaint fails to state a claim against Phoenix upon which relief may be granted.

### SECOND DEFENSE
**(No Damage or Injury)**

60.     Plaintiff is barred from recovery against Phoenix, in whole or in part, by the lack of damage or injury to Plaintiff.

### THIRD DEFENSE
**(Unjust Enrichment)**

61.     Plaintiff is barred from recovery against Phoenix, in whole or in part, because it would be unjustly enriched if permitted to collect the sums to which it claims it is entitled.

### FOURTH DEFENSE
**(Estoppel)**

62.     Plaintiff is barred from recovery against Phoenix, in whole or in part, by the doctrine of estoppel.

### FIFTH DEFENSE
**(Unclean Hands)**

63.     Plaintiff is barred from recovery against Phoenix, in whole or in part, by the doctrine of unclean hands.

### SIXTH DEFENSE
**(No Insurable Interest)**

64.     Plaintiff is barred from recovery against Phoenix because there was no insurable interest at the time that the Phoenix Policies were procured, thereby rendering them void from their inception.

**SEVENTH DEFENSE**
**(Void - Public Policy)**

65.    Plaintiff is barred from recovery against Phoenix because the Phoenix Policies were procured pursuant to a fraudulent SOLI scheme in which Mr. Kramer knowingly participated, which relieves Phoenix of any obligation to pay death benefits.

**EIGHTH DEFENSE**
**(No Standing)**

66.    Plaintiff is barred from recovery because she lacks standing to sue Phoenix.

**NINTH DEFENSE**
**(Failure to Join Required Parties)**

67.    Plaintiff is barred from recovery against Phoenix, in whole or in part, because it has failed to join parties required by Federal Rule of Civil Procedure 19.

**RESERVATION OF RIGHT TO ASSERT ADDITIONAL DEFENSES**

68.    Phoenix has not knowingly or voluntarily waived any applicable affirmative defenses and reserves the right to assert and rely upon such additional affirmative defenses to the Complaint as may become available or apparent as discovery commences and progresses in this action.

**COUNTERCLAIMS, CROSS-CLAIMS & THIRD-PARTY COMPLAINT**

**GENERAL ALLEGATIONS**

1.    Phoenix repeats and re-alleges Paragraphs 1-68 of its Answer as though fully set forth herein.

2.    On information and belief, Steven Lockwood ("Lockwood") is the owner and chief executive officer of Lockwood Pension Services, Inc. ("LPS") and Tall Tree Advisors, Inc. ("Tall Tree").

3.    On information and belief, Lockwood, LPS, and Tall Tree all reside at the same address: 2 Tall Tree Lane, Pleasantville, New York.

4.    Jonathan S. Berck ("Berck") has served, and continues to serve, as the trustee for various life insurance trusts that Lockwood helped to establish.

5.    On information and belief, Lockwood, LPS, Life Product Clearing LLC ("Life Product"), M&M Brokerage Services, Inc. ("M&M"), and Berck all have (or had during the time period relevant to this action) offices located at 75 Rockefeller Plaza, New York, New York.

6.    On information and belief, Lockwood, LPS, Tall Tree, Life Product, and Berck have developed a formulaic method of circumventing New York's insurable interest rule. On information and belief, this method involves using elderly persons, and the trusts they encourage or aid them in establishing, as strawmen to acquire life insurance policies for the benefit of strangers who have no insurable interest in the lives of the insureds (*i.e.*, a "SOLI" scheme).

7.    On information and belief, Lockwood, LPS, Tall Tree, Life Product, and Berck have used fraudulent SOLI schemes to procure multiple life insurance policies worth hundreds of millions of dollars. On information and belief, all of the insurance policies at issue in this lawsuit were procured by means of fraudulent SOLI schemes formulated and perpetuated by Lockwood, LPS, Tall, Life Product, and Berck.

8.    On information and belief, Lockwood colluded with Arthur Kramer to participate in one or more fraudulent SOLI arrangements. In particular, Lockwood colluded with Mr. Kramer (a) to establish a life insurance trust, (b) to apply for one or more life insurance policies in which the trust would be both the policyholder and beneficiary of the policies, (c) upon the issuance of the policies, to immediately transfer the beneficial interest in the trust to Tall Tree

and/or Life Product in exchange for monetary compensation, and (d) to replace the financial institution trustee of the trust with Berck.

9.    On or about July 1, 2005, Lockwood and Phoenix entered into a contract pursuant to which Lockwood would serve as an independent producer of various Phoenix products, including life insurance policies.

10.    On or about August 30, 2005, Phoenix approved the Independent Producer Contract (the "IPC").

11.    On or about August 29, 2005, Mr. Kramer established the Arthur Kramer 2005 Insurance Trust (the "Kramer August Trust").

12.    On information and belief, the only advantage and purpose of the Kramer August Trust was to effectuate a transfer of the right to the death proceeds payable under the requested life insurance policies in a fraudulent manner that would not be apparent to Phoenix.

13.    Mr. Kramer submitted (through Lockwood) a life insurance application to Phoenix in early September 2005 (the "Phoenix Application").

14.    On information and belief, Mr. Kramer did not apply for life insurance on his own initiative, but rather was induced to do so by the offer of ready cash.

15.    On information and belief, at the time he submitted the Phoenix Application, Mr. Kramer had no intention of procuring life insurance for the benefit of himself or his family; rather, Mr. Kramer was attempting to procure a policy for the benefit of a stranger investor with no insurable interest in his life.

16.    On information and belief, the stranger investor on whose behalf Mr. Kramer procured the life insurance was Tall Tree. Thus, Tall Tree was the true intended beneficiary of the requested policy.

17.    In Sections II and III of Part I of the Phoenix Application, Mr. Kramer represented that the owner and beneficiary of the policies applied for would be the Kramer August Trust.

18.    Mr. Kramer signed Part I of the Phoenix Application on or about September 2, 2005.

19.    Above Mr. Kramer's signature on Part I of the Phoenix Application, the application states, in relevant part:

> I have reviewed this application, and the statements made herein are those of the proposed insured and all such statements made by the proposed insured in Part I or and in Part II of this application are full, complete, and true to the best knowledge and belief of the undersigned and have been correctly recorded . . .
>
> I understand and agree that the Insurance applied for shall not take effect unless and until each of the following has occurred: the policy has been issued by the Company; the premium required for the issuance of the policy has been paid in full during the lifetime of the insured; all the representations made in the application remain true, complete and accurate as of the latest of such dates; and there has been no change in the health of any proposed insured that would change the answers to any of the questions in the application . . . .

20.    Lockwood signed Part I of the Phoenix Application as the producer of the Phoenix policies numbered 97303913, 97303935, and 97303936 (the "Phoenix Policies") for a total amount of $28,000,000.

21.    Above Lockwood's signature on Part I of the Phoenix Application, the Application states, in relevant part, that "The Producer hereby confirms he/she has truly and accurately recorded on the application the information supplied by the Proposed Insured; and that he/she is qualified and authorized to discuss the contract herein applied for."

22.    Given the applicable law and public policy prohibiting "wager" life insurance policies, Mr. Kramer, Lockwood, and the Trustee implicitly represented that (a) the Kramer August Trust would be the true owner and beneficiary of the requested Phoenix Policies (*i.e.*, not

-13-

just a strawman), and (b) the Kramer August Trust and its intended beneficiary had an insurable interest in Mr. Kramer's life.

23.    While Phoenix was processing and underwriting Mr. Kramer's Phoenix Application, Lockwood informed Phoenix that Mr. Kramer would like a total of $28 million of life insurance, issued to the Kramer August Trust in three separate policies, based on the same Phoenix Application.

24.    In reliance upon the truth of the representations made in the Phoenix Application, Phoenix issued the Phoenix Policies.

25.    Phoenix delivered the Phoenix Policies to Lockwood in or about October 2005.

26.    On information and belief, the beneficial interest in the Kramer August Trust was transferred to Tall Tree on or about October 13, 2005.

27.    On October 21, 2005, Mr. Kramer signed three Policy Acceptance Forms acknowledging receipt of the Phoenix Policies.

28.    Above Mr. Kramer's signature on each Policy Acceptance Form, the Form stated, in relevant part, that "The insured(s) declares that the statements made in the application remain full, complete, and true as of this date . . . ."

29.    On information and belief, Berck was appointed the successor trustee of the Kramer August Trust on or about July 10, 2006.  On information and belief, Lockwood had a relationship with Berck that involved similar SOLI arrangements, and Berck's appointment as successor trustee allowed Lockwood to tightly control the Phoenix Policies.

30.    The application for the Phoenix Policies, the creation of the Kramer August Trust, and the transfer of the beneficial interest in the Kramer August Trust (and thus the beneficial proceeds of the Phoenix Policies), were all part of a single transaction, which had as its purpose

the procurement of a policy of insurance on Mr. Kramer's life by a person having no insurable interest in his life.

31.    Indeed, while an insured may be permitted to apply for life insurance on his own initiative and for the benefit of a person with a valid insurable interest (*i.e.*, not for the benefit of a stranger) and then **after** the policy is issued, decide to transfer the beneficial interest in the policy, there is no chance that such a legitimate transfer occurred in this case. That is, Plaintiff cannot plausibly claim, and indeed does not claim, that Mr. Kramer just happened to decide – after the Phoenix Policies were issued – to transfer the beneficial interest in the Phoenix Policies to Tall Tree. *First*, the beneficial interest was transferred before Mr. Kramer even acknowledged receipt of the Phoenix Policies and before the first premium was paid. *Second*, with the assistance of Lockwood and within, at most, a six-month span, Mr. Kramer procured at least seven insurance policies from three different insurance companies, worth a total of $56 million. On information and belief, Mr. Kramer transferred the ultimate right to the proceeds of every single one of those policies on or about the time that they were issued.

32.    The identity of the parties, the clear characteristics of a SOLI scheme, the timing of the applications and transfers, and the sheer number and value of policies involved provide clear and convincing evidence of an intent to procure the Phoenix Policies for the benefit of a stranger-investor who had no valid insurable interest.

33.    Although Phoenix lacks information regarding the specific details of the transactions involving the Transamerica and Lincoln Life policies at issue in this lawsuit, on information and belief those policies were procured by virtually identical SOLI schemes involving Lockwood, LPS, an outside investor (either Tall Tree or Life Product), and Berck (as successor trustee to the relevant trusts).

34.     Therefore, the Phoenix Policies and the other policies were fraudulently procured in violation of state law.

## FIRST COUNTERCLAIM
### (Fraud)

35.     Phoenix repeats and re-alleges Paragraphs 1 - 68 of its Answer and 1 - 34 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

36.     On the Phoenix Application and by his reaffirmation thereof on October 21, 2005, Mr. Kramer represented that the true owner and beneficiary of the Phoenix Policies was the Kramer August Trust and that the Kramer August Trust (and its true beneficiary) had a valid insurable interest in his life.

37.     These representations were incomplete and false when made, and Mr. Kramer knew they were incomplete and false when he made them.

38.     By making these misrepresentations Mr. Kramer intended to deceive Phoenix with respect to the identity of the true beneficiary of the Phoenix Policies and with respect to the true beneficiary's lack of an insurable interest in Mr. Kramer's life.

39.     Phoenix relied on Mr. Kramer's representations that the Kramer August Trust was the true owner and beneficiary of the Phoenix Policies and that the Kramer August Trust (and its true beneficiary) had a valid insurable interest in Mr. Kramer's life.

40.     As a result of Mr. Kramer's misrepresentation, Mr. Kramer knowingly induced Phoenix to issue life insurance policies that it would not have issued but for Mr. Kramer's misrepresentation.

41.     If Phoenix is required to pay any death benefits pursuant to the Phoenix Policies, Mr. Kramer – by his misrepresentation and his substantial participation in the fraudulent SOLI scheme described above – will have caused Phoenix to suffer damages in the amount of such

Case 1:08-cv-02429-DAB    Document 43    Filed 05/29/2008    Page 17 of 51

payments. He has also caused Phoenix to suffer additional damages, including but not limited to commissions paid on the Phoenix Policies. The Estate is liable for any damages caused by Mr. Kramer.

## SECOND COUNTERCLAIM
### (Aiding and/or Abetting Breach of Fiduciary Duty)

42.    Phoenix repeats and re-alleges Paragraphs 1 - 68 of its Answer and 1 - 41 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

43.    Mr. Kramer knew or should have known that Lockwood owed Phoenix a fiduciary duty.

44.    Mr. Kramer knew or should have known that such fiduciary duty included a duty of full disclosure with respect to the Phoenix Application and a duty not to procure SOLI policies which Lockwood knew or should have known Phoenix would decline to issue if Phoenix knew of the true nature of such policies.

45.    Mr. Kramer substantially participated in Lockwood's breach of fiduciary duty by (a) creating and/or acquiescing to the creation of the Kramer August Trust, (b) submitting and reaffirming the Phoenix Application, (c) misrepresenting the true beneficiary of the Phoenix Policies and the presence of a valid insurable interest in Mr. Kramer's life, and (d) immediately transferring the beneficial interest in the Kramer August Trust (and thus the Phoenix Policies) to Lockwood's company, Tall Tree, after the Phoenix Policies were delivered.

46.    By substantially participating in the SOLI scheme, Mr. Kramer knew or should have known that he and Lockwood induced Phoenix to issue life insurance policies that it would not have issued but for Mr. Kramer's participation in the SOLI scheme. Thus, Mr. Kramer knew or should have known that he was aiding and abetting Lockwood's breach of fiduciary duty.

47.    If Phoenix is required to pay any death benefits pursuant to the Phoenix Policies,

Mr. Kramer – by his substantial participation in the fraudulent SOLI scheme – will have caused

Phoenix to suffer damages in the amount of such payments.  He has also caused Phoenix to

suffer additional damages, including but not limited to commissions paid on the Phoenix

Policies.  The Estate is liable for any damages caused by Mr. Kramer.

### THIRD COUNTERCLAIM
### (Unjust Enrichment)

48.    Phoenix repeats and re-alleges Paragraphs 1 - 68 of its Answer and 1 - 47 of its

Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

49.    As set forth above and below, on information and belief, Mr. Kramer and/or other

beneficiaries of his estate knowingly received substantial payments in exchange for their transfer

of the beneficial interests in the Phoenix Policies that Mr. Kramer procured without a valid

insurable interest.

50.    In the event that the Court rules that Plaintiff is entitled to the proceeds of the

Phoenix policies, then the Estate will have been rewarded financially not only by benefiting from

insurance policies that were procured without a valid insurable interest, but from the payments

received by Mr. Kramer and/or other beneficiaries of his estate from the transfer of the beneficial

interests in the Phoenix Policies.

51.    The circumstances as described herein are such that it would be inequitable, if the

Estate receives the proceeds of the Phoenix Policies, for the Estate to also retain any payments

that Mr. Kramer (or other beneficiaries) received for the transfer of the beneficial interests in the

policies.

52.    In the event that the Estate receives the proceeds of the Phoenix Policies, then

Phoenix is entitled to the full amount of the Estate's ill-gotten gains, including interest, resulting

from Mr. Kramer's unlawful, unjust and inequitable conduct in connection with the Phoenix Policies, including but not limited to the payments received in exchange for transfer of the beneficial interests in the Phoenix Policies that he never intended to retain. The Estate is liable for any damages caused by Mr. Kramer.

## CROSS-CLAIMS

### FIRST CROSS-CLAIM
**(Lockwood Pension Services, Inc. and Tall Tree Advisors, Inc. – Aiding and/or Abetting Fraud)**

53.    Phoenix repeats and re-alleges Paragraphs 1 - 68 of its Answer and 1 - 52 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

54.    On information and belief, Lockwood acted not just on behalf of himself, but also on behalf of and/or in concert with his company LPS, through which he marketed his services to Mr. Kramer, and Tall Tree, in proposing the SOLI scheme to Mr. Kramer, facilitating the creation of trust and/or related documents, signing the Phoenix Application, and purchasing the beneficial interest in the Kramer August Trust.

55.    LPS and Tall Tree knew that Mr. Kramer and LPS had duties to make truthful and accurate representations on the Phoenix Application.

56.    LPS and Tall Tree knew that Lockwood had a duty of full disclosure with respect to the Phoenix Application and more generally, the procurement of the Phoenix Policies.

57.    LPS and Tall Tree knew that the SOLI arrangement was designed to circumvent applicable law requiring the presence of an insurable interest.

58.    LPS and Tall Tree knew that Phoenix, in issuing any policies pursuant to the Phoenix Application, would rely on the representations contained in the Phoenix Application and on the presence of a valid insurable interest.

59.     LPS and Tall Tree knew that the lack of a valid insurable interest was not disclosed on the Phoenix Application.

60.     On information and belief, LPS and Tall Tree substantially participated in the above-described fraudulent SOLI arrangement as described above and below.

61.     On information and belief, Lockwood and Kramer relied on LPS's and Tall Tree's roles in the SOLI scheme.

62.     On information and belief, Tall Tree and LPS had arranged to make payment to Arthur and/or Liza Kramer immediately after the issuance of the Phoenix Policies.   On information and belief, Tall Tree and LPS understood at the time the Phoenix Application was submitted that Arthur Kramer and/or Liza Kramer intended to transfer the beneficial interest in the Kramer August Trust to Tall Tree in exchange for a payment, and, at the time the Phoenix Application was submitted, Tall Tree and LPS intended to make such payment after the issuance of the Phoenix Policies.

63.     On information and belief, Tall Tree and LPS paid Arthur Kramer and/or Liza Kramer to transfer the beneficial interest in the Kramer August Trust shortly after the Phoenix Policies were issued.

64.     Tall Tree and LPS knowingly participated in a fraudulent SOLI scheme to induce Phoenix to issue life insurance policies that it would not have issued but for LPS's and Tall Tree's substantial participation in the SOLI scheme.

65.     If Phoenix is required to pay any death benefits pursuant to the Phoenix Policies, Tall Tree and LPS – by their substantial participation in the fraudulent SOLI scheme – will have caused Phoenix to suffer damages in the amount of such payments.   They have also caused

Phoenix to suffer additional damages, including but not limited to commissions paid on the Phoenix Policies.

## SECOND CROSS-CLAIM
### (Lockwood Pension Services, Inc. and Tall Tree Advisors, Inc. – Aiding and/or Abetting Breach of Fiduciary Duty)

66.    Phoenix repeats and re-alleges Paragraphs 1 - 68 of its Answer and 1 - 65 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

67.    LPS and Tall Tree knew that Lockwood owed Phoenix a fiduciary duty.

68.    LPS and Tall Tree knew that such fiduciary duty included a duty of full disclosure with respect to the Phoenix Application and a duty not to procure SOLI policies which Lockwood knew Phoenix would decline to issue if it knew of the true nature of such policies.

69.    LPS and Tall Tree substantially participated in Lockwood's breach of fiduciary duty by among other things, (a) inducing Mr. Kramer to apply for life insurance policies for the benefit of a person or persons without an insurable interest in Mr. Kramer's life, (b) facilitating the creation of trust and/or related documents, and (c) arranging for the transfer of the beneficial interest in the Kramer August Trust (and thus the Phoenix Policies) to Tall Tree immediately after the Phoenix Policies were delivered.

70.    By participating in the SOLI scheme, LPS and Tall Tree knowingly induced Phoenix to issue life insurance policies that it would not have issued but for Mr. Kramer's participation in the SOLI scheme.  Thus, Tall Tree and LPS knowingly aided and abetted Lockwood's breach of fiduciary duty.

71.    If Phoenix is required to pay any death benefits pursuant to the Phoenix Policies, LPS and Tall Tree – by their substantial participation in the fraudulent SOLI scheme – will have caused Phoenix to suffer damages in the amount of such payments.  They have also caused

Phoenix to suffer additional damages, including but not limited to commissions paid on the Phoenix Policies.

## THIRD-PARTY CLAIMS

### FIRST THIRD-PARTY CLAIM
### (Steven Lockwood – Fraud)

72.    Phoenix repeats and re-alleges Paragraphs 1- 68 of its Answer and 1 - 71 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

73.    On information and belief, Lockwood had knowledge of and personally participated in and/or directed the fraudulent SOLI scheme by, among other things, (a) proposing the SOLI scheme to Mr. Kramer, (b) failing to disclose information that he knew Phoenix would deem relevant to its decision to issue the Phoenix Policies (and in fact would have caused it to decline to issue them), including but not limited to Kramer's intention to transfer the beneficial interests in the Phoenix Policies to strangers, (c) facilitating the creation of trust and/or related documents, (d) signing the Phoenix Application, and (e) purchasing (through Tall Tree) the beneficial interest in the Kramer August Trust.  In signing the Phoenix Application, Lockwood represented that the true owner and beneficiary of the Phoenix Policies was the Kramer August Trust and that the Kramer August Trust had a valid insurable interest – representations that Lockwood knew to be incomplete and false when made.

74.    By making these misrepresentations and perpetrating this fraudulent scheme, Lockwood intended to, and did in fact, deceive Phoenix with respect to the true beneficiary of the Phoenix Policies and with respect to the true beneficiary's lack of an insurable interest in Mr. Kramer's life.

75.    As a result of Lockwood's fraud, Lockwood knowingly induced Phoenix to issue life insurance policies that it would not have issued but for Lockwood's misrepresentation.

76.     If Phoenix is required to pay any death benefits pursuant to the Phoenix Policies,

Lockwood will have caused Phoenix to suffer damages in the amount of such payments. He has

also caused Phoenix to suffer additional damages, including but not limited to commissions paid

on the Phoenix Policies.

## SECOND THIRD-PARTY CLAIM
### (Steven Lockwood – Breach of Fiduciary Duty)

77.     Phoenix repeats and re-alleges its responses to Paragraphs 1 - 68 of its Answer

and 1 - 76 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set

forth herein.

78.     As producer of the Phoenix Policies, Lockwood owed a fiduciary duty to Phoenix.

Such duty included a duty of full disclosure with respect to the Phoenix Application, including

but not limited to: (a) the duty to make full disclosure of the nature of the risk undertaken; (b) the

duty to make full disclosure of any and all information that would enable Phoenix to determine if

the insurance should issue; (c) to make recommendations upon reasonable grounds that the

solicited insurance is suitable and consistent with the applicant's insurable needs and financial

objectives; and (d) not to procure SOLI policies which Lockwood knew Phoenix would decline

to issue if Phoenix knew of the true nature of such policies.

79.     Lockwood breached that fiduciary duty by, among other things, (a) inducing Mr.

Kramer to apply for life insurance policies for the benefit of a person or persons without an

insurable interest in Mr. Kramer's life, (b) facilitating the creation of trust and/or related

documents to hide the transfer of the beneficial interest in the Phoenix Policies from Phoenix,

(c) failing to disclose to Phoenix information he knew Phoenix would deem relevant to

determining whether the insurance would issue, including but not limited to the failure to

disclose the lack of an insurable interest on Mr. Kramer's life, and (d) arranging for the

immediate transfer of the beneficial interest in the Kramer August Trust (and thus the Phoenix Policies) to his affiliate company, Tall Tree.

80.     Lockwood thereby caused Phoenix to issue the Phoenix Policies, which it would not have issued but for Lockwood's breach of its fiduciary duty.

81.     If Phoenix is required to pay any death benefits pursuant to the Phoenix Policies, Lockwood will have caused Phoenix to suffer damages in the amount of such payments.  He has also caused Phoenix to suffer additional damages, including but not limited to commissions paid on the Phoenix Policies that must be disgorged.

### THIRD THIRD-PARTY CLAIM
### (Steven Lockwood -- Breach of Contract)

82.     Phoenix repeats and re-alleges Paragraphs 1 - 68 of its Answer and 1 - 81 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

83.     Under Section 1(d) of the "Basic Contract Provisions" section of the IPC, Lockwood agreed that the contract and his conduct is subject to "applicable federal or state laws, statutes and regulations or directives issued by any regulatory entity having jurisdiction over the matters covered in this contract . . . ."

84.     Under Section 10 of the "Basic Contract Provisions" section of the IPC, Lockwood agreed that all "[a]ll rights, powers, and remedies provided herein may be exercised only to the extent that the exercise thereof does not violate any applicable provision of law . . . ."

85.     Section 11 of the "Basic Contract Provisions" section of the IPC, Lockwood "acknowledge[d] that [Phoenix] relies upon [him] for a careful and frank presentation of the facts necessary for the proper underwriting and acceptance of the requested insurance coverages," agreed to "give complete and accurate answers in the application and associated forms," and agreed to "promptly transmit to [Phoenix] any and all information that will enable [Phoenix] to

determine if the insurance applied for should be issued by [Phoenix] and upon what terms and rates."

86.    Under Section 1 of the "Compliance and Sales Practices Provisions" section of the IPC, Lockwood agreed that he would "make recommendations based upon reasonable grounds that the products being solicited are suitable and consistent with the applicants' insurable needs and financial objectives."

87.    On or about January 2, 2007, Lockwood executed a Broker Agreement between, among others, Phoenix and him (the "2007 Broker Agreement"). The 2007 Broker Agreement contains provisions that similarly obligate Lockwood to conduct himself in accordance with applicable laws and regulations and to make full and accurate disclosures to Phoenix with respect to prospective insureds.

88.    Lockwood breached the above-referenced provisions of the IPC by, among other things, (a) inducing Mr. Kramer to apply for life insurance policies for the benefit of a person or persons without an insurable interest in Mr. Kramer's life, (b) facilitating the creation of trust and/or related documents to hide the transfer of the beneficial interest in the Phoenix Policies from Phoenix, (c) failing to disclose to Phoenix information he knew Phoenix would deem relevant to determining whether the insurance would issue, including but not limited to the failure to disclose the lack of an insurable interest on Mr. Kramer's life, and (d) arranging for the immediate transfer of the beneficial interest in the Kramer August Trust (and thus the Phoenix Policies) to LPS's affiliate, Tall Tree.

89.    If Phoenix is required to pay any death benefits pursuant to the Phoenix Policies, Lockwood will have caused Phoenix to suffer damages in the amount of such payments. He has

also caused Phoenix to suffer additional damages, including but not limited to commissions paid on the Phoenix Policies that must be disgorged.

## FOURTH THIRD-PARTY CLAIM
### (Steven Lockwood – Negligence)

90.     Phoenix repeats and re-alleges Paragraphs 1 - 68 of its Answer and 1 - 89 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

91.     As producer of the Phoenix Policies, Lockwood owed a common law duty of care to Phoenix that required it to provide full disclosure with respect to the Phoenix Application, including all facts relevant to the risk insured.

92.     Lockwood breached that duty by, among other things, failing to disclose to Phoenix (a) the lack of an insurable interest on Mr. Kramer's life, (b) facts from which Phoenix could determine that lack of insurable interest, (c) facts from which Phoenix could ascertain the true nature of the risk that it undertook in issuing the Phoenix Policies, and (d) that the Phoenix Application was submitted as part of a SOLI arrangement.

93.     If Phoenix is required to pay any death benefits pursuant to the Phoenix Policies, then Lockwood – by the above-referenced conduct – will have caused Phoenix to suffer damages in the amount of such payments.  He has also caused Phoenix to suffer additional damages, including but not limited to commissions paid on the Phoenix Policies that must be disgorged.

## FIFTH THIRD-PARTY CLAIM
### (Steven Lockwood – Contractual Indemnification)

94.     Phoenix repeats and re-alleges Paragraphs 1 - 68 of its Answer and 1 - 93 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

95.     Under Section 5 of the "Basic Contract Provisions" section of the IPC, Lockwood agreed "to indemnify [Phoenix] for any liabilities, losses, costs or expenses incurred or moneys

paid by [Phoenix] to any person as the result of the misrepresentations, negligence or unauthorized acts by [him], [his] employees, or Sub-producers associated with [him]."

96.     Section 8.1 of the 2007 Broker Agreement that Lockwood executed provides that Lockwood "hold harmless, defend, exonerate and indemnify" Phoenix for any and all "losses, claims, judgments, fines, penalties, damages, or liabilities" that Phoenix suffers as a result of Lockwood's actions, or resulting from the breach of any representation contained in the Broker Agreement.

97.     Phoenix would not have issued the Phoenix Policies but for the above-described fraudulent, negligent, and/or unauthorized conduct by Lockwood and those under his employ/associated with him.

98.     If Phoenix is obliged to pay death benefits pursuant to the Phoenix Policies, it is entitled to indemnification from Lockwood in the amount of such payments.  Lockwood has also caused Phoenix to suffer additional damages, including but not limited to (a) commissions paid on the Phoenix Policies that must be disgorged and (b) attorneys fees incurred in defending against this litigation and prosecuting these cross-claims and counterclaims (and which it would not have incurred but for Lockwood's conduct) that he must reimburse.

### SIXTH THIRD-PARTY CLAIM
#### (Steven Lockwood – Unjust Enrichment)

99.     Phoenix repeats and re-alleges Paragraphs 1 - 68 of its Answer and 1 - 98 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

100.     As alleged herein, Lockwood knowingly solicited and procured the Phoenix Policies, in violation of federal and state law and public policy, for the benefit of an investor who had no insurable interest in the life of Mr. Kramer.

101.    On information and belief, Lockwood has received benefits from his wrongful actions described herein, including but not limited to commissions that he received from Phoenix for procuring the Phoenix Policies.

102.    Lockwood has knowledge of these benefits, and has voluntarily accepted and retained these benefits.

103.    The circumstances as described herein are such that it would be inequitable for Lockwood to retain these ill-gotten benefits without disgorging the value thereof to Phoenix.

104.    As a direct and proximate result of Lockwood's wrongful actions, Phoenix has suffered damages in issuing the Phoenix Policies and paying the associated commissions, and will suffer further damages if it is obliged to pay death benefits.  Thus, Phoenix is entitled to the full amount of Lockwood's ill-gotten gains, including interest, resulting from his unlawful, unjust and inequitable conduct in connection with the Phoenix Policies.

### SEVENTH THIRD-PARTY CLAIM
**(Steven Lockwood – Civil RICO Violation - 18 U.S.C. § 1962(c))**

105.    Phoenix repeats and re-alleges Paragraphs 1 - 68 of its Answer and 1 - 104 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

### The Violations

106.    18 U.S.C. § 1962(c) provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

107.    Lockwood violated § 1962(c) by conducting the affairs of LPS and Tall Tree through a pattern of racketeering activity, including but not limited to numerous instances of

mail and wire fraud in furtherance of the fraudulent SOLI scheme described herein, as well as other virtually identical SOLI schemes involving other insureds and insurers.

### The Enterprises

108.    LPS is a corporation and thus qualifies as an enterprise for purposes of RICO.

109.    Tall Tree is a corporation and qualifies as an enterprise for purposes of RICO.

110.    LPS affects interstate commerce in that it procures life insurance policies for clients with residences in various states from insurers residing in various states.

111.    Tall Tree affects interstate commerce in that (a) it purchases beneficial interests in life insurance trusts (and thus life insurance policies) from insureds and/or their relatives with residences in various states, and (b) it purchases the ultimate rights to death benefits pursuant to policies that are issued by insurers residing in various states.

### Lockwood & His Role in the Enterprises

112.    On information and belief, Lockwood is the owner and chief executive officer of both LPS and Tall Tree, and Lockwood participated in the operation or management of these enterprises by, among other things, his specific activities as alleged herein.

### The Pattern

113.    On information and belief, Lockwood has used LPS and Tall Tree to engage in a pattern of racketeering that includes numerous criminal acts of mail fraud over the past three years.

114.    The pattern of racketeering activity and the virtually identical SOLI schemes alleged herein confirm Lockwood's intent to defraud the insurers involved in the SOLI schemes alleged herein and also reveal a continued threat of criminal activity by Lockwood.

115.   Indeed, upon information and belief, discovery in this action will yield evidence of additional fraudulent SOLI schemes in which Lockwood engaged.

A.    The Kramer-Phoenix SOLI Scheme

116.   On information and belief, Lockwood devised a scheme to submit a fraudulent life insurance application on behalf of Mr. Kramer and the Kramer August Trust to Phoenix, and thereby to procure a SOLI policy, as alleged herein.

117.   Phoenix relied on that fraudulent application, and the misrepresentations contained therein, in issuing the Phoenix Policies.

118.   Phoenix was injured by virtue of issuing the Kramer Policies.

119.   Lockwood used the mails and wires on numerous occasions in furtherance of his fraudulent SOLI scheme.  Such uses include but are not limited to the following:

a.    Lori Callegari, an employee of LPS, mailed the Policy Acceptance Forms and first premiums payments for the Phoenix Policies to Phoenix on or about October 21, 2005;

b.    Lori Callegari mailed the second quarterly premiums payments for the Phoenix Policies to Phoenix on or about October 24, 2005;

c.    Lucy Montemarano, the Office Manager of M&M, mailed quarterly premiums payments for the Phoenix Policies to Phoenix on or about January 4, 2006;

d.    Lockwood mailed a letter to Phoenix on or about June 22, 2007, using LPS letterhead, advising Phoenix that Berck had been appointed as Successor Trustee;

e.    LPS made several telephone calls to Phoenix to request life insurance illustrations that would allow the financers of the SOLI scheme to pay minimum premiums in the years that they would hold the rights to the Phoenix Policies, including calls from "Dave" on or about August 4, 2006 (requesting an illustration showing a minimum premium in year 2, then level premiums through age 100 with an ending cash value of $1,000), June 1, 2007 (requesting an illustration showing minimum level premiums in policy years 3-5 with level premiums until age 100 with an ending cash value of $1,000) June 13, 2007 (requesting an illustration showing level premiums to age 100), June 28, 2007

Case 1:08-cv-02429-DAB    Document 43    Filed 05/29/2008    Page 31 of 51

(minimum annual premiums in policy years 3-5 with level premiums thereafter), and July 6, 2007 (requesting an illustration with specified premiums in years 3-5 and level premiums thereafter with $1,000 cash value at age 100).

120.    On information and belief, Lockwood caused all of the above uses of the mails or wires, either by personal direction or authorization or by virtue of the fact that such uses were reasonably foreseeable or likely to follow in the regular course of the Kramer-Phoenix SOLI scheme.

121.    On information and belief, by his SOLI scheme and by the above uses of the mails and wires, Lockwood intended to deprive Phoenix of property by causing it to issue the Phoenix Policies without an insurable interest that it would not have issued but for the fraudulent SOLI scheme, and eventually to pay out death benefits pursuant to such policies.

122.    The intent of Lockwood to defraud Phoenix is further confirmed by his participation in virtually identical SOLI schemes targeting Transamerica and Lincoln Life.

123.    On information and belief, Lockwood and LPS submitted a fraudulent life insurance application on behalf of Mr. Kramer to Lincoln Life through the mail. On information and belief, when they mailed that application, Lockwood and LPS had a specific intent to defraud Lincoln Life with essentially the same SOLI scheme that they employed to perpetrate their fraud against Phoenix.

124.    On information and belief, Lockwood and LPS submitted a fraudulent life insurance application on behalf of Mr. Kramer to Transamerica through the mail.    On information and belief, when they mailed that application, Lockwood, LPS, and Tall Tree had a specific intent to defraud Transamerica with essentially the same SOLI scheme that they employed to perpetrate their fraud against Phoenix.

B.      The Levinson-Phoenix SOLI Scheme

125.    In November 2005, Lockwood and LPS submitted a life insurance application to Phoenix on behalf of Irwin Levinson and the Irwin Levinson Insurance Trust II (the "Levinson Trust"). In the application, Mr. Levinson, the Levinson Trust, and Lockwood represented that the Policy applied for would be owned by the Levinson Trust, which was also to be the designated primary beneficiary of any policy issued.

126.    Lockwood signed the application as the producer of the Policy.

127.    Above Lockwood's signature, the application stated, in relevant part, that "The Producer hereby confirms he/she has truly and accurately recorded on the application the information supplied by the Proposed Insured; and that he/she is qualified and authorized to discuss the contract herein applied for."

128.    Given the applicable law and public policy prohibiting "wager" life insurance policies, as well as Lockwood's contractual, fiduciary, and common law duties to Phoenix, Lockwood implicitly represented that (a) the Levinson Trust would be the true owner and beneficiary of the requested Phoenix Policies (*i.e.*, not just a strawman), and (b) the Levinson Trust and its intended beneficiary had an insurable interest in Mr. Levinson's life

129.    On information and belief, these representations were incomplete and false when made, and Lockwood and Mr. Levinson knew they were incomplete and false when they made them.

130.    Furthermore, given his contractual, fiduciary, and common law duties of disclosure, Lockwood's failure to disclose to Phoenix (a) the lack of an insurable interest on Mr. Levinson's life, (b) facts from which Phoenix could determine that lack of insurable interest, (c) facts from which Phoenix could ascertain the true nature of the risk that it undertook in issuing

the Levinson Policy, and (d) that the Levinson Application was submitted as part of a SOLI arrangement, constituted misrepresentations with respect to those facts.

131.    By making the foregoing misrepresentations, Lockwood and Mr. Levinson intended to deceive Phoenix with respect to the identity of the true beneficiary of the Levinson Policy and with respect to the true beneficiary's lack of an insurable interest in Mr. Levinson's life.

132.    In reliance upon the truth of the representations made in the application, Phoenix issued the Policy (No. 97304016) with a Policy Date of November 27, 2008, a basic policy amount of $5,000,000, and a planned annual premium of $270,000.

133.    The application was attached to the Policy as issued.

134.    The Levinson Trust was created on or about November 4, 2005 – just before Mr. Levinson's application was submitted to Phoenix.  Lockwood provided a draft trust agreement to Mr. Levinson (apparently using a form Lockwood had used previously) to establish the Levinson Trust.

135.    The initial beneficiary of the Levinson Trust was Dede Levinson, Mr. Levinson's wife.

136.    On information and belief, in procuring the Policy, Mr. Levinson did not intend to provide his wife with financial security from the death benefit of the Policy.

137.    On information and belief, there was no estate tax advantage that derived from the creation of the Levinson Trust and the purpose of the Levinson Trust was not to minimize Mr. or Mrs. Levinson's estate taxes.

138.    On information and belief, the only advantage and purpose of the Levinson Trust was to effectuate a transfer of the right to the death proceeds payable under the Policy to an

-33-

outside investor, and thus the formation of the Levinson Trust in connection with Mr. Levinson's application reveals an intent to effect such a transfer at the time the application was submitted.

139.    On information and belief, Berck was named the successor Trustee of the Levinson Trust on or about July 10, 2006.  Lockwood was a witness to the Levinson Trustee succession agreement.

140.    In the course of Phoenix's investigation of this SOLI scheme, Lockwood informed Phoenix in a February 7, 2008 letter that he was "aware" that "within a few weeks after the policy was issued" Mr. Levinson was contacted by an investment group "inquiring whether the family would be interested in selling its rights in the policy," and that the "transaction did take place between the relevant parties."

141.    Phoenix's inquiries into the details and circumstances surrounding Mr. Levinson's application and the transfer of the beneficial interest in the Policy have been stymied.  On two separate occasions – on or about September 5, 2007, and on or about February 15, 2008 – an insurance investigator met with Mrs. Levinson to obtain information relevant to the processing of the claim.  Such interviews are standard procedure with respect to claims made during the contestability period of a policy.

142.    On both occasions, Lockwood and someone identified as a "family friend" were present and interfered with the interviews, interrupting both the investigator and Mrs. Levinson when they were speaking and directing Mrs. Levinson not to answer certain questions.

143.    In response to questions concerning the Policy, the Levinson Trust and the transfer of beneficial interest, Mrs. Levinson claimed near-total ignorance and said she was unaware the Policy and the Levinson Trust even existed until after her husband's death.  Mrs. Levinson said she had not seen any documentation relating to the Policy, the Levinson Trust or

the transfer of beneficial interest and did not know where any such documentation may be located.

144.    In response to questions directed to Lockwood concerning the Levinson Trust and the alleged SOLI arrangement, Lockwood claimed he had heard Mr. Levinson was contacted by an outside investor or group of investors shortly after the Policy was issued and that Mr. Levinson had sold the beneficial interest in the Levinson Trust to the outside investor. Lockwood claimed near-total ignorance regarding the details of that transaction. He stated he does not know who the investors are, how to contact them, who put them in touch with Mr. Levinson, or how much they paid Mr. Levinson.

145.    On information and belief, the creation of the Levinson Trust, the Levinson application for the policy, and the assignment of the beneficial interest in the Levinson Trust (and thus the ultimate right to the death benefits payable under the Policy) were all part of a single transaction, which had as its purpose the procurement of an insurance policy on Mr. Levinson's life for the benefit of a person having no insurable interest on his life. On information and belief, Lockwood and LPS devised this fraudulent SOLI scheme, advised Mr. Levinson with respect to the transaction, induced Mr. Levinson to participate in the scheme, and facilitated the transfer of the rights to the death benefits to an outside investor.

146.    Phoenix was injured by virtue of issuing the Levinson policy and paying the associated commissions.

147.    Lockwood used the mails and wires on numerous occasions in furtherance of the fraudulent SOLI scheme. Such uses include but are not limited to the following:

     a.    Lockwood faxed a letter to Dr. James N. Harris, MD, on a LPS fax cover sheet, requesting Mr. Levinson's medical history to facilitate his life insurance applications and forwarding an authorization form with respect to same, on or about March 22, 2005;

b.    Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson regarding Mr. Levinson's net worth and medical records, and the status of his application for life insurance, on or about April 5, 2005;

c.    Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson regarding the status of Mr. Levinson's application for life insurance, on or about August 15, 2005;

d.    Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson regarding putting Mr. Levinson in contact with companies who specialize in the sale/purchase of life insurance policies, on or about September 27, 2005;

e.    Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson regarding the Levinson Trust, forwarding a sample life insurance trust agreement, offering to recommend a trustee, and recommending that Mr. Levinson's application be submitted to Phoenix, on or about October 24, 2005;

f.    Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson forwarding the Phoenix policy on or about December 1, 2005;

g.    Lori Callegari, an employee of LPS, mailed the policy acceptance form and first premium payment to Phoenix on or about December 8, 2005;

h.    Lori Callegari mailed additional premium payments to Phoenix on or about February 1, 2006;

i.    Lockwood mailed a premium payment from Berck to Phoenix on or about December 4, 2006;

j.    Lockwood mailed a letter to Phoenix, using LPS letterhead, advising Phoenix that Berck had been appointed as Successor Trustee, on or about August 3, 2007; and

k.    Berck mailed a letter to Phoenix making a claim on behalf of the Levinson Trust for death benefits, on or about August 20, 2007.

148.    On information and belief, Lockwood caused all of the above uses of the mails or wires, either by personal direction or authorization or by virtue of the fact that such uses were reasonably foreseeable or likely to follow in the regular course of the Kramer-Phoenix SOLI scheme.

Case 1:08-cv-02429-DAB   Document 43   Filed 05/29/2008   Page 37 of 51

149.    On information and belief, by his SOLI scheme and by the above uses of the mails and wires, Lockwood intended to deprive Phoenix of property by causing it to issue a policy that it would not have issued but for the fraudulent SOLI scheme, and eventually to pay out death benefits pursuant to the policy.

C.    The Lobel-Lincoln Life SOLI Scheme

150.    On or about January 22, 2007, Life Product filed suit in the United States District Court for the Southern District of New York, seeking a declaration that it was entitled to the proceeds of a $10 million life insurance policy (the "Lobel Policy") issued by Lincoln Life & Annuity Company of New York upon the life of Leon Lobel – a retired butcher who was seventy-seven years old when he applied for the policy.   The case is entitled *Life Product Clearing LLC v. Linda Angel*, 07-CV-0475 (DC) (the "*Angel* lawsuit").

151.    On or about March 12, 2007, Linda Angel, Lobel's daughter and the personal representative of Lobel's estate ("Angel"), filed her answer and counterclaims against Life Product.   On or about March 13, 2007, Angel filed a third-party complaint against Leon Lobel Insurance Trust (the "Lobel Trust") and Jonathan S. Berck, as Trustee, seeking a declaration that the Lobel Trust is void and that Lobel's estate is entitled to recover the death benefits paid under the Lobel Policy.

152.    On information and belief, Lockwood, Life Product, and others devised a scheme to submit a fraudulent life insurance application on behalf of Mr. Lobel and the Lobel Trust to Lincoln Life, and thereby to procure a SOLI policy.

153.    On information and belief, Lockwood, together with another insurance broker, colluded with Mr. Lobel to participate in a fraudulent SOLI arrangements.   In particular, they colluded with Mr. Lobel (a) to establish a life insurance trust, (b) to apply for one or more life

Case 1:08-cv-02429-DAB    Document 43    Filed 05/29/2008    Page 38 of 51

insurance policies in which the trust would be both the policyholder and beneficiary of the policies, and (c) upon the issuance of the policies, to immediately transfer the beneficial interest in the trust to Life Product – an outside investor who lacked an insurable interest in Mr. Lobel's life – in exchange for monetary compensation. On information and belief, Lockwood facilitated the SOLI transaction by helping Mr. Lobel establish the Lobel Trust and by acting as an intermediary between Mr. Lobel and the outside investor.

154.    Pursuant to the agreed-upon SOLI scheme, on or about November 15, 2005, Mr. Lobel established the Lobel Trust.

155.    On information and belief, the only advantage and purpose of the Lobel Trust was to effectuate a transfer of the right to the death proceeds payable under the requested life insurance policies in a fraudulent manner that would not be apparent to Lincoln Life.

156.    Also on or about November 15, 2005, Mr. Lobel signed a written application for a $10 million life insurance policy and authorized the submission of that application (the "Lobel Application") to Lincoln Life.

157.    Above Mr. Lobel's signature on the Lobel Application, the application states, in relevant part: "I/WE have read the questions and answers in this application and declare that they are complete and true to the best of my (our) knowledge and belief."

158.    On information and belief, Mr. Lobel did not apply for life insurance on his own initiative, but rather was induced to do so by the offer of ready cash. On information and belief, Mr. Lobel was unable to afford the $10 million policy requested in his application; in fact, on information and belief, Mr. Lobel lacked sufficient funds to afford even one year's premium. On information and belief, at the time he submitted the Lobel Application, Mr. Lobel had no intention of procuring life insurance for the benefit of himself or his family; rather, Mr. Lobel

was attempting to procure a policy for the benefit of a stranger investor with no insurable interest in his life.

159.    On information and belief, Mr. Lobel, Lockwood, and Life Product understood at the time the Lobel Application was submitted to Lincoln Life that Mr. Lobel would immediately transfer the ultimate rights to the death benefits to Life Product, and that Life Product would be responsible for paying the premiums.  Thus, on information and belief, Life Product was the true intended beneficiary of the requested policy.

160.    Mr. Lobel represented on his application to Lincoln Life that the owner and beneficiary of the policy would be the Lobel Trust.

161.    Given the applicable law and public policy prohibiting "wager" life insurance policies, Mr. Lobel implicitly represented to Lincoln Life that (a) the Lobel Trust would be the true owner and beneficiary of the requested policy (*i.e.*, not just a strawman), and (b) the Lobel Trust and its intended beneficiary had an insurable interest in Mr. Lobel's life.

162.    These representations were incomplete and false when made, and Mr. Lobel knew they were incomplete and false when he made them.

163.    Furthermore, given his contractual, fiduciary, and/or common law duties of disclosure as a producer of the policy, Lockwood's failure to disclose to Lincoln Life (a) the lack of an insurable interest on Mr. Lobel's life, (b) facts from which Lincoln Life could determine that lack of insurable interest, (c) facts from which Lincoln Life could ascertain the true nature of the risk that it undertook in issuing the Lobel policy, and (d) that the Lobel Application was submitted as part of a SOLI arrangement, constituted misrepresentations with respect to those facts.

164.    By making the foregoing misrepresentations, Mr. Lobel and Lockwood intended to deceive Lincoln Life with respect to the identity of the true beneficiary of the policy on Mr. Lobel's life and with respect to the true beneficiary's lack of an insurable interest in Mr. Lobel's life.

165.    On information and belief, Lincoln Life relied on the fraudulent Lobel Application, and the misrepresentations contained therein, in issuing the Lobel policy.

166.    On information and belief, on or about December 20, 2005, approximately (6) six days after the policy was issued, Mr. Lobel sold his interest in the Lobel Trust – and thus the right to any insurance proceeds upon his death – to Life Product.

167.    On information and belief, Mr. Lobel never paid any premiums, and received a cash payment of $300,000 for transferring the beneficial interest in the Lobel Trust to Life Product.

168.    On information and belief, after the right to the benefits payable under Mr. Lobel's policy was transferred, Berck became the successor trustee of the Lobel Trust.

169.    In a recent decision in the *Angel* lawsuit, the United States District Court for the Southern District of New York denied Life Product's motion for judgment on the pleadings and concluded as follows: "These factual allegations, taken together, surely make a plausible claim that Lobel intended to transfer the Policy to LPC prior to procuring it.  Such a scheme surely could amount to an impermissible attempt to circumvent the prohibition on wager policies." 530 F. Supp. 2d 646, 655-56 (S.D.N.Y. 2008).

170.    Lincoln Life was injured by virtue of issuing the Lobel policy and by its subsequent payment of death benefits.

171.    On information and belief, Lockwood used the mails and wires on numerous occasions in furtherance of his fraudulent SOLI scheme.  Such uses include but are not limited to the following:

    a.    Lockwood mailed a letter dated December 16, 2005, to Lobel forwarding the Lincoln Life policy, advising him of an investor willing to purchase the beneficial interest in the Lobel Trust, and enclosing a Beneficial Interest Transfer Agreement; and

    b.    Lockwood mailed a letter dated January 3, 2006, to Lobel forwarding a check for $300,000 from Life Product in exchange for a 100% ownership interest in the Lobel Trust.

172.    On information and belief, Lockwood caused, by personal action, direction, or authorization, all of the above uses of the mails.

173.    On information and belief, by his SOLI scheme and by the above uses of the mails, Lockwood intended to deprive Lincoln Life of property by causing it to issue a policy that it would not have issued but for the fraudulent SOLI scheme, and ultimately to pay out death benefits pursuant to the policy.

### The Injury

174.    If Phoenix is required to pay any death benefits pursuant to the Phoenix Policies, Lockwood – by means of his fraudulent SOLI scheme and racketeering activity– will have caused Phoenix to suffer damages in the amount of such payments.  He has also caused Phoenix to suffer additional damages, including but not limited to commissions paid on the Levinson Policy and the Phoenix Policies.

## COMBINED CROSS-CLAIM AND THIRD-PARTY CLAIM
### (Steven Lockwood, LPS, and Tall Tree – Civil RICO Violation - 18 U.S.C. § 1962(c))

175.    Phoenix repeats and re-alleges Paragraphs 1 - 68 of its Answer and 1 - 174 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

### The Violations

176.    On information and belief, Lockwood, LPS, and Tall Tree violated § 1962(c) by conducting the affairs of, or by participating in the conduct of the affairs of, an "association in fact" – consisting of Lockwood, LPS, Tall Tree, and Life Product, and Berck (the "SOLI Enterprise") – through a pattern of racketeering activity, including but not limited to numerous instances of mail and wire fraud in furtherance of the fraudulent SOLI scheme described herein, as well as other virtually identical SOLI schemes involving other insureds and insurers.

### The Enterprise

177.    On information and belief, Lockwood, LPS, Tall Tree, Life Product, and Berck share a common purpose of procuring SOLI policies, hiding the nature of those policies from the life insurers who issued them for the duration of the contestability period, and then profiting from those policies by either claiming and collecting the proceeds of such policies or eventually selling such policies to other outside investors.

178.    On information and belief, Lockwood, LPS, Tall Tree, Life Product, and Berck have engaged in and are engaged in a course of conduct such that they function as a continuing unit with an ongoing organization.  In the course of its regular operation, the SOLI Enterprise must identify potential insureds, market the SOLI scheme to those potential insureds, establish a trust on behalf of the potential insured, appoint a trustee, procure policies, pay the insureds to transfer the beneficial interest in the trust, finance and regularly pay the premiums, correspond with and submit forms to insurers, and either sell the policies to other outside investors or, if the

Case 1:08-cv-02429-DAB    Document 43    Filed 05/29/2008    Page 43 of 51

SOLI Enterprise retains the rights to the proceeds of the policies, file, administer, and facilitate claims for death benefits  That is, the regular functions of the SOLI Enterprise include, among other things, financing, marketing, administration, and sales.

179.    On information and belief, the SOLI Enterprise affects interstate commerce in that it (a) procures life insurance policies for clients with residences in various states from insurers residing in various states, (b) purchases beneficial interests in life insurance trusts (and thus life insurance policies) from insureds and/or their relatives with residences in various states, and thus purchases and holds the ultimate rights to death benefits pursuant to policies that are issued by insurers residing in various states, and (c) sells the rights to the death benefits (in the form of the beneficial interests in the trusts or the policies themselves) to investors that are located in various states and countries.

### The Participants & Their Roles in the Enterprise

180.    On information and belief, Lockwood participated in the operation or management of the SOLI Enterprise by his specific activities as alleged herein.  More generally, Lockwood identifies potential insureds, approaches and advises potential insureds on the benefits of the SOLI scheme (*i.e.*, markets the SOLI scheme), facilitates the creation of life insurance trusts, and advises insureds, trustees, beneficiaries, and claimants with respect to their communications with insurers both before and after the issuance of the policies.  On information and belief, Lockwood also sometimes purchases (through Tall Tree) the beneficial interest in the life insurance trusts and thus provides the financial incentive for insureds to participate in the SOLI scheme and the vehicle by which they do so.

181.    On information and belief, LPS participated in the operation or management of the SOLI Enterprise by its specific activities as alleged herein.  More generally, LPS approaches

and advises potential insureds on the benefits of the SOLI scheme (*i.e.*, markets the SOLI scheme), facilitates the creation of life insurance trusts, and advises insureds, trustees, beneficiaries, and claimants with respect to their communications with insurers both before and after the issuance of the policies.

182.    On information and belief, Tall Tree participated in the operation or management of the SOLI Enterprise by its specific activities as alleged herein.  More generally, Tall Tree is a financer of SOLI transactions: it purchases the beneficial interest in the life insurance trusts and thus provides the financial incentive for insureds to participate in the SOLI scheme and the vehicle by which they do so.

183.    On information and belief, Life Product participated in the operation or management of the SOLI Enterprise by its specific activities as alleged herein.  More generally, Life Product is a financer of SOLI transactions: it purchases the beneficial interest in the life insurance trusts and thus provides the financial incentive for insureds to participate in the SOLI scheme and the vehicle by which they do so.

184.    On information and belief, Berck participated in the operation or management of the SOLI Enterprise by his specific activities as alleged herein.  More generally, after the beneficial interests in the life insurance trusts have been transferred to investors such as Life Product and Tall Tree, Berck serves as the successor trustee of these trusts and thus acts in their interests and as their agent in paying premiums, filing and administering claims, collecting and distributing death benefits, and executing the sale of the policies to any other investors.

Case 1:08-cv-02429-DAB    Document 43    Filed 05/29/2008    Page 45 of 51

**The Pattern**

185.    Lockwood, LPS and Tall Tree have engaged in a pattern of racketeering by committing numerous criminal acts of mail/wire fraud over the past three years.    These racketeering activities are connected to and designed to further the goals of the SOLI Enterprise.

186.    The pattern of racketeering activity and the virtually identical SOLI schemes alleged herein confirm the intent of Lockwood, LPS and Tall Tree to defraud the insurers involved in the SOLI schemes alleged herein and also reveal a continued threat of criminal activity by Lockwood, LPS and Tall Tree.

187.    Indeed, upon information and belief, discovery in this action will yield evidence of additional fraudulent SOLI schemes in which Lockwood, LPS, Tall Tree and others engaged.

A.    The Kramer-Phoenix SOLI Scheme

188.    On information and belief, Lockwood, LPS, and Tall Tree devised a scheme to submit a fraudulent life insurance application on behalf of Mr. Kramer and the Kramer August Trust to Phoenix, and thereby to procure a SOLI policy, as alleged herein.

189.    Phoenix relied on that fraudulent application, and the misrepresentations contained therein, in issuing the Phoenix Policies.

190.    Phoenix was injured by virtue of issuing the Kramer Policies.

191.    Lockwood, LPS, and Tall Tree used the mails and wires on numerous occasions in furtherance of their fraudulent SOLI scheme.    Such uses include but are not limited to the following:

      a.    Lori Callegari, an employee of LPS, mailed the Policy Acceptance Forms and first premiums payments for the Phoenix Policies to Phoenix on or about October 21, 2005;

      b.    Lori Callegari mailed the second quarterly premiums payments for the Phoenix Policies to Phoenix on or about October 24, 2005;

c.    Lucy Montemarano, the Office Manager of M&M, mailed quarterly premiums payments for the Phoenix Policies to Phoenix on or about January 4, 2006;

d.    Lockwood mailed a letter to Phoenix on or about June 22, 2007, using LPS letterhead, advising Phoenix that Berck had been appointed as Successor Trustee; and

e.    LPS made several telephone calls to Phoenix to request life insurance illustrations that would allow the financers of the SOLI scheme to pay minimum premiums in the years that they would hold the rights to the Phoenix Policies, including calls from "Dave" on or about August 4, 2006 (requesting an illustration showing a minimum premium in year 2, then level premiums through age 100 with an ending cash value of $1,000), June 1, 2007 (requesting an illustration showing minimum level premiums in policy years 3-5 with level premiums until age 100 with an ending cash value of $1,000) June 13, 2007 (requesting an illustration showing level premiums to age 100), June 28, 2007 (minimum annual premiums in policy years 3-5 with level premiums thereafter), and July 6, 2007 (requesting an illustration with specified premiums in years 3-5 and level premiums thereafter with $1,000 cash value at age 100.

192.    On information and belief, Lockwood, LPS, and Tall Tree each individually caused all of the above uses of the mails or wires, either by personal direction or authorization or by virtue of the fact that such uses were reasonably foreseeable or likely to follow from the regular operation of the SOLI Enterprise.

193.    On information and belief, Lockwood, LPS, and Tall Tree each individually intended by their participation in the SOLI Enterprise, the pattern of racketeering, and the above instances of mail and wire frauds to deprive Phoenix of property by causing it to issue the Phoenix Policies that it would not have issued but for the fraudulent SOLI scheme, and eventually to pay out death benefits pursuant to such policies.

B.    The Levinson-Phoenix SOLI Scheme

194.    On information and belief, Lockwood and LPS devised a scheme to submit a fraudulent life insurance application to Phoenix on behalf of Mr. Levinson and the Levinson Trust, and thereby to procure a SOLI policy.

195.    Phoenix relied on that fraudulent application, and the misrepresentations contained therein, in issuing the Levinson Policy.

196.    Phoenix was injured by virtue of issuing the Levinson policy and paying the associated commissions.

197.    Lockwood and LPS used the mails and wires on numerous occasions in furtherance of their fraudulent SOLI scheme with respect to the Levinson policy.  Such uses include but are not limited to the following:

    a.    Lockwood faxed a letter to Dr. James N. Harris, MD, on a LPS fax cover sheet, requesting Mr. Levinson's medical history to facilitate his life insurance applications and forwarding an authorization form with respect to same, on or about March 22, 2005;

    b.    Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson regarding Mr. Levinson's net worth and medical records, and the status of his application for life insurance, on or about April 5, 2005;

    c.    Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson regarding the status of Mr. Levinson's application for life insurance, on or about August 15, 2005;

    d.    Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson regarding putting Mr. Levinson in contact with companies who specialize in the sale/purchase of life insurance policies, on or about September 27, 2005;

    e.    Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson regarding the Levinson Trust, forwarding a sample life insurance trust agreement, offering to recommend a trustee, and recommending that Mr. Levinson's application be submitted to Phoenix, on or about October 24, 2005;

  f.  Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson forwarding the Phoenix policy on or about December 1, 2005;

  g.  Lori Callegari, an employee of LPS, mailed the policy acceptance form and first premium payment to Phoenix on or about December 8, 2005;

  h.  Lori Callegari mailed additional premium payments to Phoenix on or about February 1, 2006;

  i.  Lockwood mailed a premium payment from Berck to Phoenix on or about December 4, 2006;

  j.  Lockwood mailed a letter to Phoenix, using LPS letterhead, advising Phoenix that Berck had been appointed as Successor Trustee, on or about August 3, 2007; and

  k.  Berck mailed a letter to Phoenix making a claim on behalf of the Levinson Trust for death benefits, on or about August 20, 2007.

198. On information and belief, Lockwood and LPS each individually caused all of the above uses of the mails or wires, either by personal direction or authorization or by virtue of the fact that such uses were reasonably foreseeable or likely to follow from the regular operation of the SOLI Enterprise.

199. On information and belief, Lockwood and LPS each individually intended by their participation in the SOLI Enterprise, the pattern of racketeering, and the above instances of mail and wire frauds to deprive Phoenix of property by causing it to issue a policy that it would not have issued but for the fraudulent SOLI scheme, and eventually to pay out death benefits pursuant to such policy.

C.  <u>The Lobel-Lincoln Life SOLI Scheme</u>

200. On information and belief, Lockwood and LPS devised a scheme to submit a fraudulent life insurance application on behalf of Mr. Lobel and the Lobel Trust to Lincoln Life, and thereby to procure a SOLI policy.

201.   On information and belief, Lincoln Life relied on that fraudulent application, and the misrepresentations contained therein, in issuing the Lobel policy.

202.   Lincoln Life was injured by virtue of issuing the Lobel policy and by its subsequent payment of death benefits.

203.   Lockwood and LPS used the mails and wires on numerous occasions in furtherance of their fraudulent SOLI scheme.   Such uses include but are not limited to the following:

   a.   Lockwood mailed a letter dated December 16, 2005, to Lobel forwarding the Lincoln Life policy, advising him of an investor willing to purchase the beneficial interest in the Lobel Trust, and enclosing a Beneficial Interest Transfer Agreement; and

   b.   Lockwood mailed a letter dated January 3, 2006, to Lobel forwarding a check for $300,000 from Life Product in exchange for a 100% ownership interest in the Lobel Trust.

204.   On information and belief, Lockwood and LPS each individually caused all of the above uses of the mails, either by personal direction or authorization or by virtue of the fact that such uses were reasonably foreseeable or likely to follow from the regular operation of the SOLI Enterprise.

205.   On information and belief, Lockwood and LPS each individually intended by their participation in the SOLI Enterprise, the pattern of racketeering, and the above instances of mail fraud to deprive Lincoln Life of property by causing it to issue a policy that it would not have issued but for the fraudulent SOLI scheme, and eventually to pay out death benefits pursuant to such policy.

## The Injury

206.   If Phoenix is required to pay any death benefits pursuant to the Phoenix Policies, then Lockwood, LPS and Tall Tree – by means of their fraudulent SOLI scheme and

racketeering activity – will have caused Phoenix to suffer damages in the amount of such payments. They also have caused Phoenix to suffer additional damages, including but not limited to commissions paid on the Levinson Policy and the Phoenix Policies that must be disgorged.

WHEREFORE, plaintiff Phoenix Life Insurance Company respectfully requests as follows:

(a)    an Order (i) rescinding the Phoenix Policies and declaring them null and void, either from their inception or as the result of a fraudulent scheme to issue the Phoenix Policies where there was no valid insurable interest, or, alternatively (ii) declaring that Phoenix has no obligation to pay any death benefits to Plaintiff in connection with the Phoenix Policies;

(b) an order awarding Phoenix damages against the Plaintiff in the amount of those death benefits, if any, that Phoenix is obligated to pay pursuant to the Phoenix Policies, plus any additional damages, including but not limited to commissions paid on the Levinson Policy and the Phoenix Policies;

(c) an order awarding Phoenix damages against Lockwood Pension Services, Inc. in the amount of those death benefits, if any, that Phoenix is obligated to pay pursuant to the Phoenix Policies, plus any additional damages, including but not limited to commissions paid on the Phoenix Policies;

(d) an order awarding Phoenix damages against Tall Tree Advisors, Inc. in the amount of those death benefits, if any, that Phoenix is obligated to pay pursuant to the Phoenix Policies, plus any additional damages, including but not limited to commissions paid on the Phoenix Policies;

(e) an order awarding Phoenix damages against Steven Lockwood in the amount of those death benefits, if any, that Phoenix is obligated to pay pursuant to the Phoenix Policies, plus any additional damages, including but not limited to commissions paid on the Phoenix Policies and attorneys fees in connection with defense of this lawsuit and prosecution of counterclaims, cross-claims and third-party claims;

(f) as against any parties named in Phoenix's RICO claims, an order awarding Phoenix its treble damages, as well as costs and attorneys fees in connection with defense of this lawsuit and prosecution of counterclaims, cross-claims and third-party claims, pursuant to 18 U.S.C. § 1964(c); and

(g) an order awarding Phoenix its costs and disbursements incurred herein together with any such further relief as the Court may deem just and proper.

Dated: New York, New York
      May 29, 2008

Respectfully submitted,

**DORSEY & WHITNEY LLP**

By: /s/Patrick J. Feeley
    Patrick J. Feeley (PF-4931)
    Christopher G. Karagheuzoff (CK-1122)
    Stephen M. Raab (SR-0742)

250 Park Avenue
New York, New York  10177
(212) 415-9200

Attorneys for Defendant and Third-Party
Plaintiff Phoenix Life Insurance Co.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ALICE KRAMER, as Personal Representative of the
Estate of Arthur Kramer,

                      Plaintiff,

          -against-

LOCKWOOD PENSION SERVICES, INC., TALL
TREE ADVISORS, INC., LIFE PRODUCTS
CLEARING, LLC, TRANSAMERICA OCCIDENTAL
LIFE INSURANCE CO., PHOENIX LIFE
INSURANCE CO., LINCOLN LIFE & ANNUITY CO.
OF NEW YORK and JONATHAN S. BERCK,

                    Defendants.

---

PHOENIX LIFE INSURANCE CO.,

          Third-Party Plaintiff,

          -against-

STEVEN LOCKWOOD,

          Third-Party Defendant.

---

**ECF Case**

08 Civ. 2429 (DAB) (MHD)

**DEFENDANT LIFE
PRODUCT CLEARING
LLC'S ANSWER TO
AMENDED COMPLAINT
WITH COUNTERCLAIMS
AND CROSS-CLAIMS**

**JURY TRIAL DEMANDED**

---

Defendant Life Product Clearing LLC ("LPC"), by and through its attorneys,

Chadbourne & Parke LLP, hereby answers the Amended Complaint of plaintiff Alice Kramer,

as Personal Representative of the Estate of Arthur Kramer (the "Estate" or "Plaintiff"), filed

May 7, 2008 (the "Complaint"), as follows:

## AS TO PARTIES

1. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 1 of the Complaint, except admits that Plaintiff purports to bring this action as the personal representative of the Estate of Arthur Kramer.

2. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 2 of the Complaint, except admits that Arthur Kramer died on January 26, 2008.

3. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 3 of the Complaint.

4. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 4 of the Complaint.

5. Admits the allegations contained in ¶ 5 of the Complaint, except states that LPC's correct name is "Life Product Clearing LLC".

6. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 6 of the Complaint.

7. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 7 of the Complaint.

8. Admits on information and belief the allegations contained in ¶ 8 of the Complaint.

9. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 9 of the Complaint.

## AS TO JURISDICTION AND VENUE

10. Admits the allegations contained in ¶ 10 of the Complaint.

11. Admits the allegations contained in ¶ 11 of the Complaint.

## AS TO BACKGROUND

12. Denies each and every allegation contained in ¶ 12 of the Complaint except denies knowledge or information sufficient to form a belief as to the truth of those allegations pertaining to persons other than LPC and states that it need not respond to those allegations which purport to set forth a conclusion of law (but if any response is required, denies such allegations).

13. Denies each and every allegation contained in ¶ 13 of the Complaint and states that it need not respond to those allegations which purport to set forth a conclusion of law or paraphrase the text of statutes (but if any response is required, denies such allegations).

14. Denies each and every allegation contained in ¶ 14 of the Complaint except denies knowledge or information sufficient to form a belief as to the truth of those allegations pertaining to persons other than LPC and states that it need not respond to those allegations

which purport to set forth a conclusion of law (but if any response is required, denies such allegations).

15.  Denies each and every allegation contained in ¶ 15 of the Complaint except denies knowledge or information sufficient to form a belief as to the truth of those allegations pertaining to persons other than LPC and states that it need not respond to those allegations which purport to set forth a conclusion of law (but if any response is required, denies such allegations).

16.  Denies each and every allegation contained in ¶ 16 of the Complaint.

## AS TO ALLEGED FACTS

17.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 17 of the Complaint, except admits that Arthur Kramer was or had been an attorney, and died on January 26, 2008.

18.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 18 of the Complaint.

19.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 19 of the Complaint.

20. Denies each and every allegation contained in ¶ 20 of the Complaint except denies knowledge or information sufficient to form a belief as to the truth of those allegations pertaining to persons other than LPC.

21. Denies each and every allegation contained in ¶ 21 of the Complaint except denies knowledge or information sufficient to form a belief as to the truth of those allegations pertaining to persons other than LPC and states that it need not respond to those allegations which purport to set forth a conclusion of law (but if any response is required, denies such allegations).

22. Denies each and every allegation contained in ¶ 22 of the Complaint except admits that Lincoln issued a $10,000,000.00 life insurance policy on the life of Arthur Kramer and admits on information and belief that Phoenix issued life insurance policies totaling $28,000,000.00 on the life of Arthur Kramer, but otherwise denies knowledge or information sufficient to form a belief as to the truth of those allegations pertaining to persons other than LPC.

**As to the Transamerica Policies**

23. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 23 of the Complaint.

24. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 24 of the Complaint.

25.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 25 of the Complaint, except denies on information and belief that Ms. Callegari presently works for Mr. Lockwood at 75 Rockefeller Plaza, New York, New York.

26.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 26 of the Complaint.

27.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 27 of the Complaint.

28.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 28 of the Complaint.

29.  Denies each and every allegation contained in ¶ 29 of the Complaint except denies knowledge or information sufficient to form a belief as to the truth of those allegations pertaining to persons other than LPC.

30.  Denies each and every allegation contained in ¶ 30 of the Complaint except denies knowledge or information sufficient to form a belief as to the truth of those allegations pertaining to persons other than LPC.

31.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 31 of the Complaint except states that it need not respond to those

allegations which purport to set forth a conclusion of law (but if any response is required, denies such allegations).

### As to the Phoenix Policies

32. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 32 of the Complaint, except admits that the Arthur Kramer 2005 Insurance Trust (the "August Trust") is governed by New York law and refers to the terms of the trust agreement establishing the August Trust for the true and complete contents thereof.

33. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 33 of the Complaint.

34. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 34 of the Complaint, except admits that in August 2005 Lockwood Pension Services, Inc. had an office at the twenty-first floor of 75 Rockefeller Plaza, New York, New York, and that Hudson United Bank had a branch office at the ground floor of 75 Rockefeller Plaza, New York, New York.

35. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 35 of the Complaint.

36. Admits the allegations contained in ¶ 36 of the Complaint.

37. Admits on information and belief the allegations contained in ¶ 37 of the Complaint.

38. Denies each and every allegation contained in ¶ 38 of the Complaint except denies knowledge or information sufficient to form a belief as to the truth of those allegations pertaining to persons other than LPC.

39. Denies each and every allegation contained in ¶ 39 of the Complaint except denies knowledge or information sufficient to form a belief as to the truth of those allegations pertaining to persons other than LPC.

40. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 40 of the Complaint except states that it need not respond to those allegations which purport to set forth a conclusion of law (but if any response is required, denies such allegations).

**As to the Lincoln Policies**

41. Admits the allegations contained in ¶ 41 of the Complaint except clarifies that Lincoln issued a single $10,000,000.00 life insurance policy on the life of Arthur Kramer on or about November 23, 2005.

42. Denies each and every allegation contained in ¶ 42 of the Complaint except denies knowledge or information sufficient to form a belief as to the truth of those allegations pertaining to persons other than LPC.

43.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 43 of the Complaint except states that it need not respond to those allegations which purport to set forth a conclusion of law (but if any response is required, denies such allegations).

**As to Arthur Kramer's Death**

44.  Admits the allegations contained in ¶ 44 of the Complaint.

45.  Denies each and every allegation contained in ¶ 45 of the Complaint except states that LPC has requested a copy of Arthur Kramer's death certificate from the Estate and/or its representatives and denies knowledge or information sufficient to form a belief as to the truth of those allegations pertaining to persons other than LPC.

46.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 46 of the Complaint, except admits the allegations contained in the first sentence of ¶ 46, admits that Lincoln has not paid out the proceeds of the policy it issued on the life of Arthur Kramer, and refers to the terms of the pleadings and orders in this action and in the action captioned The Lincoln Life and Annuity Company of New York v. Lockwood Pensions Services, et al., CV-08-5019142-S (Conn. Super. Ct., Hartford J.D., filed April 16, 2008), for the true and complete contents thereof.

## AS TO THE FIRST CLAIM FOR RELIEF

## (DECLARATORY JUDGMENT)

47.  Repeats and realleges each and every allegation, admission and denial made in response to those paragraphs of the Complaint which are referred to in ¶ 47 of the Complaint, as if fully set forth at length herein.

48.  States that it need not respond to those allegations that purport only to quote the text of statutes.

49.  States that it need not respond to those allegations that purport only to quote the text of statutes.

50.  States that it need not respond to those allegations that purport only to quote the text of statutes.

51.  Denies each and every allegation contained in ¶ 51 of the Complaint except denies knowledge or information sufficient to form a belief as to the truth of those allegations pertaining to persons other than LPC.

52.  Denies each and every allegation contained in ¶ 52 of the Complaint except denies knowledge or information sufficient to form a belief as to the truth of those allegations pertaining to persons other than LPC.

53.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 53 of the Complaint, except states that at the time Lincoln issued an

insurance policy on the life of Arthur Kramer LPC did not need an insurable interest in the life of Arthur Kramer, as that policy was purchased not for the benefit of LPC, but for Liza Kramer, and that LPC need not respond to those allegations which purport to set forth a conclusion of law (but if any response is required, denies such allegations).

54. Denies each and every allegation contained in ¶ 54 of the Complaint except denies knowledge or information sufficient to form a belief as to the truth of those allegations pertaining to persons other than LPC.

55. Denies each and every allegation contained in ¶ 55 of the Complaint except admits that Lincoln must pay the death benefits under the policy it issued on the life of Arthur Kramer, denies knowledge or information sufficient to form a belief as to the truth of those allegations pertaining to other policies issued on the life of Arthur Kramer, and states that it need not respond to those allegations which purport to set forth a conclusion of law (but if any response is required, denies such allegations).

## AS TO THE SECOND CLAIM FOR RELIEF

### (AGAINST DEFENDANTS LOCKWOOD PENSION SERVICES, INC., TALL TREE ADVISORS, INC. LIFE PRODUCTS CLEARING, LLC AND JONATHAN S. BERCK FOR THE RECOVERY OF DEATH BENEFITS)

56. Repeats and realleges each and every allegation, admission and denial made in response to those paragraphs of the Complaint which are referred to in ¶ 56 of the Complaint, as if fully set forth at length herein.

57. States that it need not respond to those allegations that purport only to quote the text of statutes.

58. Denies each and every allegation contained in ¶ 58 of the Complaint.

## FIRST AFFIRMATIVE DEFENSE

59. The Complaint fails, in whole or in part, to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

60. The Estate's claims are barred, in whole or in part, by the equitable doctrines of unclean hands and *in pari delicto*.

## THIRD AFFIRMATIVE DEFENSE

61. The Estate's claims are barred, in whole or in part, by the doctrines of waiver, estoppel, equitable estoppel, and/or quasi estoppel.

## FOURTH AFFIRMATIVE DEFENSE

62. The Estate's claims are barred, in whole or in part, by the acknowledgements, consents and representations of the Estate's decedent and/or his heirs as more particularly set forth in LPC's counterclaims and third-party claims herein.

## FIFTH AFFIRMATIVE DEFENSE

63. The Estate's claims are barred by the doctrine of ratification.

## SIXTH AFFIRMATIVE DEFENSE

64. The Estate's claims are barred, in whole or in part, by the doctrine of election of remedies.

## SEVENTH AFFIRMATIVE DEFENSE

65. The Estate's claims are barred by the doctrine of laches.

## EIGHTH AFFIRMATIVE DEFENSE

66. Any award to the Estate of death benefits on the life insurance policy issued by Lincoln on the life of Arthur Kramer, or declaration that the Estate is entitled to some or all of such benefits (both of which should be denied), should in any event be accompanied by an award against the Estate refunding to LPC all payments made by LPC to Arthur Kramer (or any of his heirs) for the purchase of the rights to such death benefits, and/or a declaration that LPC is entitled to such a refund.

## RESERVATION OF RIGHT TO ASSERT ADDITIONAL DEFENSES

67. LPC adopts and incorporates by reference, as if set forth fully herein, any affirmative defense asserted by any other defendant in this action to the extent that such affirmative defense would be applicable to LPC, and LPC hereby gives notice that it intends to rely upon any additional defense that may become available or appear during discovery proceedings or otherwise in this case, and LPC hereby reserves its right to amend its Answer to assert any such defense(s).

## COUNTERCLAIMS AND CROSS-CLAIMS

## GENERAL ALLEGATIONS

### Parties

68. LPC repeats and realleges Paragraphs 1-67 of its Answer as though fully set forth herein.

69. LPC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business at 75 Rockefeller Plaza, 18th Floor, New York, New York 10019, which, inter alia, acts as agent with respect to beneficial interests under certain life insurance trusts, including the trust which is the subject of these counterclaims and cross-claims.

70. Counterclaim defendant Alice Kramer alleges herself to be the personal representative of the estate of Arthur Kramer.

71. Upon information and belief, cross-claim defendant Lincoln Life & Annuity Company of New York ("Lincoln") is an insurance company organized and existing under the laws of the State of New York, with its principal place of business at 100 Madison Street, Suite 1860, Syracuse, New York 13202.

### The Insurance Policy Issued by Lincoln on Arthur Kramer's Life

72. Arthur Kramer, the plaintiff Estate's decedent, established The Arthur Kramer 2005 Insurance Trust (the "August Trust") pursuant to the Trust Agreement of Arthur Kramer 2005 Insurance Trust dated August 29, 2005 (the "August Trust Agreement"). The parties to

14

the August Trust Agreement were Hudson United Bank, as Trustee, Arthur Kramer, as Depositor, and Liza Kramer, the daughter of Arthur Kramer, as the Beneficiary.

73. On or about November 23, 2005, Lincoln issued to the August Trust as owner life insurance policy number 7214471, with a total death benefit of $10,000,000.00, on the life of Arthur Kramer (the "Lincoln Policy").

74. Liza Kramer owned the entire beneficial interest in the August Trust at the time the Lincoln Policy was procured.

75. Liza Kramer, the named beneficiary of the August Trust, had an insurable interest in the Lincoln Policy at the time the Lincoln Policy was procured.

76. The Lincoln Policy provided that: "While the insured is alive, the Owner may exercise all rights and privileges under the policy including the right[s] to . . . transfer all rights and privileges to another person . . . [and] assign the policy." The Lincoln Policy did not place any time limitations on the policy owner's exercise of these rights.

77. The Lincoln Policy also provided that it "will be incontestable after it has been in force during the Insured's lifetime for 2 years from its Date of Issue."

78. The Lincoln Policy was in force during Arthur Kramer's lifetime for well over two years, from on or about November 23, 2005 to January 26, 2008.

## The Transfer Agreement

79. After the Lincoln Policy was issued, and in consideration for a payment of $100,000.00 (the "Cash Consideration"), Liza Kramer sold her rights to the August Trust's interest in the Lincoln Policy to LPC, pursuant to a Beneficial Interest Transfer Agreement dated November 29, 2005 (the "Transfer Agreement").

80. In connection with that transaction, Arthur Kramer and Liza Kramer also executed a document entitled Acknowledgements and Consents Relating to Sale of Beneficial Interest dated November 29, 2005 (the "Acknowledgements and Consents Form") in which they each expressly made, inter alia, the following acknowledgements, consents and representations relating to Liza Kramer's decision to sell to LPC the rights to the August Trust's interest in the Lincoln Policy:

a. "After reviewing several alternatives for maintaining the [Lincoln] Policy and paying the premium, Arthur and Liza have determined that the sale of the Beneficial Interest [in the August Trust] to [LPC] for the Cash Consideration is in their best interest and in the best interest of their Family."

b. "Arthur and Liza acknowledge that they have had sufficient time to thoroughly analyze and discuss the strategy of selling the Beneficial Interest in the [August] Trust to [LPC.]"

c. "Arthur and Liza have had the opportunity to discuss this strategy with their family advisors."

d. "Upon completion of the sale of [the] Beneficial Interest in the [August] Trust to [LPC] for the Cash Consideration, Arthur and Liza expressly acknowledge, understand,

consent and agree to waive all rights, claims, interests, powers and privileges that they now possess, or in the future may possess, under or with respect to the [Lincoln] Policy."

### Lincoln's Failure and Refusal to Pay the
### Lincoln Policy Following Arthur Kramer's Death

81. Arthur Kramer died on January 26, 2008.

82. On February 27, 2008, the trustee of the August Trust submitted to Lincoln a Claimant's Statement requesting that Lincoln process the August Trust's claim under the Lincoln Policy and pay the death benefit to the August Trust.

83. The Lincoln Policy was properly payable to the August Trust (or to LPC, or at LPC's direction) under the foregoing circumstances, and Lincoln lacked any proper or valid basis under law for failing to timely pay to the August Trust (or to LPC, or at LPC's direction) the death benefit under the Lincoln Policy.

84. Nevertheless, Lincoln has failed and refused to pay the proceeds of the Lincoln Policy to the August Trust (or to LPC, or at LPC's direction).

## COUNTERCLAIMS

### AS AND FOR LPC'S FIRST COUNTERCLAIM
### (Declaratory Judgment)

85. LPC repeats and realleges ¶¶ 1-84 hereof as though fully set forth at length herein.

17

86. Lincoln is obligated to pay the death benefit under the Lincoln Policy to the August Trust, the entire beneficial interest in which LPC purchased from Liza Kramer.

87. In light of the Estate's allegations in the Complaint which seek to collect the death benefit under the Lincoln Policy for the benefit of the Estate (which allegations LPC denies, as more specifically set forth above), there is now an actual controversy of a justiciable nature regarding whether the proceeds of the Lincoln Policy are owing and payable to the August Trust (or to LPC, or at LPC's direction), rather than the Estate.

88. LPC has no adequate remedy at law.

89. Accordingly, LPC is entitled to a declaration that the proceeds of the Lincoln Policy are owing and payable to the August Trust (or to LPC, or at LPC's direction), rather than the Estate.

### AS AND FOR LPC'S SECOND COUNTERCLAIM
### (Tortious Interference with Contractual Relations)

90. LPC repeats and realleges ¶¶ 1-89 hereof as though fully set forth at length herein.

91. Lincoln issued the Lincoln Policy to the August Trust.  The Lincoln Policy constituted a valid, binding and enforceable contract between Lincoln and the August Trust.

92. The August Trust is the named beneficiary of the Lincoln Policy and as such, is entitled to the proceeds thereof.

93. LPC purchased from Liza Kramer the entire beneficial interest in the August Trust's rights under the Lincoln Policy.

94. On March 10, 2008, the Estate commenced this action by filing a complaint alleging, inter alia, that the Lincoln Policy was procured with the view to its immediate assignment to a party that lacked an insurable interest in the life of Arthur Kramer. This allegation was untrue.

95. The Estate's filing of this action constituted a knowing, intentional and unjustified interference with the August Trust's contractual relationship with Lincoln under the Lincoln Policy. and a knowing, intentional and unjustified inducement of Lincoln to breach the Lincoln Policy by refusing to pay the proceeds to the August Trust (or to LPC, or at LPC's direction).

96. Following the Estate's initiation of this lawsuit, Lincoln has failed and refused to make payment on the Lincoln Policy, based upon the Estate's allegations in the original complaint that the Lincoln Policy was "procured as part of a STOLI transaction and that [it] lacks an insurable interest [sic]."

97. Despite Liza Kramer's express warranty to LPC in the Acknowledgments and Consents Form that she would provide a death certificate to LPC within a reasonable time following Arthur Kramer's death, Liza Kramer and the Estate failed and refused to do so (as

acknowledged in ¶ 45 of the Complaint), so as to delay and/or frustrate the efforts of the August Trust and LPC to successfully obtain payment by Lincoln of the proceeds of the Lincoln Policy.

98. Upon information and belief, Lincoln would have paid the Lincoln Policy proceeds to the August Trust (or to LPC, or at LPC's direction) promptly had the Estate timely cooperated with the August Trust and LPC regarding Arthur Kramer's death certificate and/or had the Estate not filed its original complaint in this action on March 10, 2008.

99. The above-referenced actions of the Estate have damaged and continue to damage LPC in that they have delayed the receipt of the Lincoln Policy proceeds from Lincoln. In the event this Court does not order that the proceeds of the Lincoln Policy are owing and payable to the August Trust (or to LPC, or at LPC's direction), LPC will suffer damages in an amount not less than the face value of the Lincoln Policy, i.e., $10,000,000.00, plus interest, as a direct and proximate result of the Estate's interference with the payment of the death benefit under the Lincoln Policy, and LPC will be entitled to recover damages from the Estate for such injury.

### AS AND FOR LPC'S THIRD COUNTERCLAIM
### (In the Hypothetical, for Misrepresentation/Breach of Warranty)

100. LPC repeats and realleges ¶¶ 1-99 hereof as though fully set forth at length herein.

101. In connection with the issuance of the Lincoln Policy, Arthur Kramer completed an application for life insurance that was submitted to Lincoln. This application was

entitled Insurance Application Part I ("Part I") and contained various representations.  Part I became a part of the Lincoln Policy.

102. Arthur Kramer and Liza Kramer warranted in the Acknowledgements and Consents Form that they had "no knowledge that any representation made regarding [Arthur Kramer's] health or capacity in the procurement of the policy is false or misleading."

103. In the hypothetical event that payment of the Lincoln Policy by Lincoln is impeded in any way by any purported representation or misrepresentation, whether made fraudulently, intentionally, knowingly, recklessly, negligently, inadvertently, innocently and/or in good or bad faith, LPC shall be entitled to damages from the Estate for any resulting non-payment or delay of payment of the proceeds that would otherwise have been due to the August Trust under the Lincoln Policy.

## CROSS-CLAIMS

### Background:  The Secondary Market for Life Insurance Policies

104. Prior to the recent emergence of a competitive secondary market for life insurance policies, the only buyer for a policy in the secondary market was the life insurance carrier that had issued the policy.  These carriers had little incentive to offer substantial compensation for these policies.  Today, however, a competitive secondary market for life insurance policies has developed.  This secondary market for life insurance has given consumers a viable and valuable alternative to sell their policies when they determine that they are no

longer needed or desired.  Indeed, life settlement firms who are active in this market improve policyholder welfare by at least several hundred million dollars annually.

105.  Upon information and belief, certain insurance carriers have been or have become hostile to the secondary market for insurance based on their fears that, in the statistical aggregate, investors who participate in this market will not let insurance policies lapse in the same way that policyholders previously did, and that therefore insurance companies will be forced to pay a larger percentage of the policies they issued, rather than simply pocketing large volumes of premiums on policies they will never pay.  Indeed, the insurance carriers' historic business model has been based on the fact that the vast majority (perhaps approaching 90%) of universal life insurance policies do not ever pay death benefits.  Life settlement firms such as LPC pose a threat to insurance carriers' ability to continue operating on this windfall profits model based on a high lapse rate.

106.  Certain insurers have taken the approach of responding to the current secondary market environment by raising legally and/or factually unfounded issues concerning insurable interest requirements under governing law, and issuing policies for which they know they will ultimately challenge payment.  Lincoln is one such carrier, and in some cases it has sought to rescind policies while seeking to keep the premiums paid thereon, in the hopes of potentially reaping all of the benefits of its contract without bearing any of its burdens.  Under this cynical and unlawful approach, the most profitable insurance contracts are those which an

insurance carrier believes it can ultimately rescind on the basis that the policy lacked an insurable interest at its procurement.

## AS AND FOR LPC'S FIRST CROSS-CLAIM
### (Against Lincoln, for Breach of Contract)

107. LPC repeats and realleges ¶¶ 1-106 hereof as though fully set forth at length herein.

108. Lincoln issued the Lincoln Policy to the August Trust on or about November 23, 2005. The Lincoln Policy constituted a valid, binding and enforceable contract between Lincoln and the August Trust.

109. The Lincoln Policy provides that Lincoln would pay the proceeds of the Lincoln Policy to the beneficiary upon receipt of due proof that the death of Arthur Kramer occurred while the Lincoln Policy was in force.

110. The Lincoln Policy has remained in force at all times since its issuance.

111. Arthur Kramer died on January 26, 2008 while the Lincoln Policy was in force.

112. The trustee of the August Trust provided due proof of Arthur Kramer's death to Lincoln.

113. Despite demand duly made, and submission of all necessary documentation, Lincoln has failed and refused to pay to the August Trust (or to LPC, or at LPC's direction) the death benefit under the Lincoln Policy.

114. The August Trust (and any and all other necessary persons, if any) have performed (completely, or at least substantially), and have not materially breached, any and all obligations they may have had under the Lincoln Policy.

115. Lincoln has breached the Lincoln Policy by failing to pay the benefits due under the Lincoln Policy to the August Trust (or to LPC, or at LPC's direction).

116. LPC has been injured by Lincoln's breach of the Lincoln Policy.

117. Accordingly, LPC is entitled to a declaration that Lincoln breached the Lincoln Policy and an award of damages against Lincoln in an amount not less than the face value of the Lincoln Policy, i.e., $10,000,000.00, plus interest.

### AS AND FOR LPC'S SECOND CROSS-CLAIM
### (Against Lincoln, for Declaratory Judgment)

118. LPC repeats and realleges ¶¶ 1-117 hereof as though fully set forth at length herein.

119. The Lincoln Policy contains an incontestability provision which states that the Lincoln Policy "will be incontestable after it has been in force during the Insured's lifetime for two years from its Date of Issue."

120. New York law bars insurers from seeking to rescind a life insurance policy by claiming lack of "insurable interest" once two years have passed since the policy was issued.

121.  Lincoln, on April 16, 2008 — more than two years after the Lincoln Policy was issued, and after Arthur Kramer had died and a claim for death benefits under the Lincoln Policy already had been submitted — asserted for the first time that the Lincoln Policy was, or should now be deemed to be, void *ab initio*, on account of a supposed lack of a proper "insurable interest" at the time when the Lincoln Policy was issued, and that Lincoln should therefore be excused from making payment of the death benefit under the Lincoln Policy.

122.  In light of the foregoing, there is now an actual controversy of a justiciable nature regarding whether the Lincoln Policy is valid and enforceable (as opposed to void *ab initio*) and whether Lincoln must pay to the August Trust (or to LPC, or at LPC's direction) the benefits due under the Lincoln Policy.

123.  LPC has no adequate remedy at law.

124.  Accordingly, LPC is entitled to a declaration that the Lincoln Policy is valid and enforceable notwithstanding any issue Lincoln might now seek to raise regarding a supposed lack of proper "insurable interest" at the time the Lincoln Policy was issued, and that Lincoln must pay to the August Trust or LPC the benefits owed under the Lincoln Policy.

### AS AND FOR LPC'S THIRD CROSS-CLAIM
### (Against Lincoln, for Declaratory Judgment)

125.  LPC repeats and realleges ¶¶ 1-124 hereof as though fully set forth at length herein.

25

126. Lincoln, on April 16, 2008 — more than two years after the Lincoln Policy was issued, and after Arthur Kramer had died and a claim for death benefits under the Lincoln Policy already had been submitted — asserted for the first time that it was entitled to make setoffs from the death benefit payable under the Lincoln Policy on the theory that it has sustained damages as a result of one or more alleged civil conspiracies among LPC and third-party defendant Steven Lockwood, defendant Lockwood Pension Services, Inc., original defendant TD Banknorth, Inc., defendant Jonathan S. Berck, and/or non-party Joel Miller to fraudulently induce Lincoln to issue the Lincoln Policy and/or a life insurance policy Lincoln issued on the life of one Leon Lobel (the "Lobel Policy"), and to conceal the purported absence of an "insurable interest" in these policies. Lincoln asserted that LPC furthered these supposed civil conspiracies by, inter alia, acquiring and/or participating in the sale of the death benefits under these policies and funding premium payments for these policies.

127. Because the two-year incontestability period under both New York law and the express terms of the Lincoln Policy already had lapsed by the time Lincoln first made this assertion, there is no lawful basis for Lincoln to make any setoffs from the death benefit payable under the Lincoln Policy.

128. In light of the foregoing, there is now an actual controversy of a justiciable nature regarding whether Lincoln has any lawful basis to set off any amounts from the death benefit payable under the Lincoln Policy based on these belatedly-raised allegations of supposed civil conspiracy.

129. LPC has no adequate remedy at law.

130. Accordingly, LPC is entitled to a declaration that Lincoln has no lawful basis to set off any amounts from the death benefit payable under the Lincoln Policy based on its belatedly-raised allegations of supposed civil conspiracy.

### AS AND FOR LPC'S FOURTH CROSS-CLAIM
### (Against Lincoln, for Declaratory Judgment)

131. LPC repeats and realleges ¶¶ 1-130 hereof as though fully set forth at length herein.

132. Lincoln, on April 16, 2008 — more than two years after the Lincoln Policy was issued, and after Arthur Kramer had died and a claim for death benefits under the Lincoln Policy already had been submitted — asserted for the first time that it was entitled to make setoffs from the death benefit payable under the Lincoln Policy on the theory that it has sustained damages as a result of LPC's supposedly having aided and abetted third-party defendant Steven Lockwood and defendant Lockwood Pension Services, Inc. in carrying out one or more supposed fraudulent arrangements on their part to deceive and induce Lincoln to issue the Lincoln Policy and/or the Lobel Policy, and to conceal the purported absence of an "insurable interest" in these policies. Lincoln asserted that LPC allegedly aided and abetted these supposed frauds by, inter alia, acquiring and/or participating in the sale of the death benefits under these policies and funding premium payments for these policies.

133.  Because the two-year incontestability period under both New York law and the express terms of the Lincoln Policy already had lapsed by the time Lincoln first made this assertion, there is no lawful basis for Lincoln to make any setoffs from the death benefit payable under the Lincoln Policy.

134.  In light of the foregoing, there is now an actual controversy of a justiciable nature regarding whether Lincoln has any lawful basis to set off any amounts from the death benefit payable under the Lincoln Policy based on these belatedly-raised allegations of supposed aiding and abetting fraud.

135.  LPC has no adequate remedy at law.

136.  Accordingly, LPC is entitled to a declaration that Lincoln has no lawful basis to set off any amounts from the death benefit payable under the Lincoln Policy based on its belatedly-raised allegations of supposed aiding and abetting fraud.

**AS AND FOR LPC'S FIFTH CROSS-CLAIM**
**(Against Lincoln, under N.Y. Gen. Bus. Law § 349)**

137.  LPC repeats and realleges ¶¶ 1-136 hereof as though fully set forth at length herein.

138.  On information and belief, the Lincoln Policy issued to the August Trust was a standard form policy sold by Lincoln to other consumers.

139. Lincoln's representations and omissions, including representations in the Lincoln Policy, were misleading in a material respect, in that policy applicants, holders, purchasers and beneficiaries were led to believe that claims for payment under such policies would be investigated and processed in good faith and in a timely matter, and that benefits would be paid in accordance with the terms of such policies. In fact, however, Lincoln has failed to do so with respect to the policy at issue here. Lincoln has done likewise with respect to other similar policies.

140. Accordingly, Lincoln's conduct, as alleged herein, constitutes deceptive acts or practices within the meaning of New York General Business Law § 349.

141. As a direct and proximate result of Lincoln's deceptive acts or practices, LPC has been injured in an amount not less than the face value of the Lincoln Policy, i.e., $10,000,000.00, plus interest and attorneys' fees, and LPC will be entitled to recover damages from Lincoln for such injury.

WHEREFORE, LPC respectfully demands judgment in its favor as follows:

(i)      dismissing with prejudice the Estate's claims for relief in the Complaint;

(ii)      declaring that the Lincoln Policy is valid and enforceable, that Lincoln must pay the to August Trust (or to LPC, or at LPC's direction), and not to the Estate, the benefits owed under the Lincoln Policy;

(iii)      in the event that the Court awards to the Estate some or all of the death benefits payable under the Lincoln Policy, or issues a declaration that the Estate is entitled to

some or all of such benefits, awarding to LPC a refund from the Estate of all payments made by LPC to Arthur Kramer (or to any of his heirs) for the purchase of the rights to such death benefits, and/or a declaration that LPC is entitled to such a refund;

(iv)    in the event this Court does not order that the proceeds of the Lincoln Policy are owing and payable to the August Trust (or to LPC, or at LPC's direction), awarding LPC compensatory damages from the Estate in an amount to be determined at trial but not less than $10,000,000.00;

(v)    awarding LPC compensatory damages from Lincoln in an amount to be determined at trial but not less than $10 million;

(vi)    declaring that Lincoln has no lawful basis to set off any amounts from the death benefit payable under the Lincoln Policy based on its allegations of supposed civil conspiracy;

(vii)    declaring that Lincoln has no lawful basis to set off any amounts from the death benefit payable under the Lincoln Policy based on its allegations of supposed aiding and abetting fraud; and

(viii)    awarding LPC its attorneys' fees, interest, costs, disbursements, and such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

LPC demands a trial by jury of all claims in this action which are so triable.

Dated: New York, New York
      June 20, 2008

CHADBOURNE & PARKE LLP

By_____*/s/ Robert A. Schwinger*_____
           Oliver J. Armas
        Robert A. Schwinger
        Members of the Firm
Attorneys for Defendant
  Life Product Clearing LLC
30 Rockefeller Plaza
New York, New York  10112
(212) 408-5100
*oarmas@chadbourne.com*
*rschwinger@chadbourne.com*

31