**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ALICE KRAMER, as Personal Representative of the Estate of Arthur Kramer,

Plaintiff,

– against –

LOCKWOOD PENSION SERVICES, INC., TALL TREE ADVISORS, INC., LIFE PRODUCTS CLEARING, LLC, TRANSAMERICA OCCIDENTAL LIFE INSURANCE CO., PHOENIX LIFE INSURANCE CO., LINCOLN LIFE & ANNUITY CO. OF NEW YORK AND JONATHAN S. BERCK,

Defendants.

---

**Civil Action No.**
**08 CV 2429 (DAB)(MHD)**

**ECF Case**

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HER MOTION TO DISMISS DEFENDANT PHOENIX LIFE INSURANCE CO.'S COUNTERCLAIMS**

FRIEDMAN & WITTENSTEIN
A Professional Corporation

600 Lexington Avenue
New York, New York 10022
(212) 750-8700

*Attorneys for Plaintiff*

# Table of Contents

**Page(s)**

Table of Authorities .......... ii

Preliminary Statement .......... 1

STATEMENT OF FACTS .......... 4

The Parties .......... 4

Background: "Stranger-Owned Life Insurance" and the Insurable Interest Rule .......... 5

The Phoenix Policies .......... 6

The Present Action .......... 7

ARGUMENT .......... 9

POINT I

PHOENIX'S COUNTERCLAIM FOR FRAUD IS BARRED AS A MATTER OF LAW BY THE EXPIRATION OF THE TWO-YEAR CONTESTABILITY PERIOD .......... 10

POINT II

PHOENIX'S COUNTERCLAIM FOR AIDING AND/OR ABETTING BREACH OF FIDUCIARY DUTY SHOULD BE DISMISSED .......... 16

A. Phoenix's Counterclaim for Aiding and/or Abetting Breach of Fiduciary Duty is Barred by the Expiration of the Two-Year Contestability Period .......... 16

B. Phoenix's Counterclaim for Aiding and/or Abetting Breach of Fiduciary Duty Should be Dismissed Because It Fails to Allege Actual Knowledge of Mr. Lockwood's Alleged Breach on the Part of Mr. Kramer .......... 19

POINT III

PHOENIX'S COUNTERCLAIM FOR UNJUST ENRICHMENT SHOULD BE DISMISSED BECAUSE THE ALLEGED PAYMENTS TO MR. KRAMER OR HIS FAMILY WERE NOT MADE BY PHOENIX .......... 21

Conclusion .......... 24

**Table of Authorities**

**Cases** **Page(s)**

ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87 (2d Cir. 2007) ..... 9

Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) ..... 9

Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield, 448 F.3d 573 (2d Cir. 2006) ..... 21

Bullmore v. Ernst & Young Cayman Islands, 45 A.D.3d 461, 846 N.Y.S.2d 145 (1st Dept. 2007) ..... 3, 19

Clarke-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 516 N.E.2d 190, 521 N.Y.S.2d 653 (1987) ..... 23

Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42 (2d Cir. 1991) ..... 7

Global Minerals and Metals Corp. v. Holme, 35 A.D.3d 93, 824 N.Y.S.2d 210 (1st Dept. 2006) ..... 19

Hartford Fire Ins. Co. v. Federated Dep't. Stores, Inc., 723 F. Supp. 976 (S.D.N.Y. 1989) ..... 22-23

Hunt v. Enzo Biochem, Inc., 530 F. Supp. 2d 580 (S.D.N.Y. 2008) ..... 4, 9

Ilyaich v. Bankers Life Ins. Co. of New York, 47 A.D.3d 614, 849 N.Y.S.2d 595 (2d Dept. 2008) ..... 2, 13

Kolbeck v. LIT America, Inc., 939 F. Supp. 240 (S.D.N.Y. 1996) ..... 19

Life Product Clearing LLC v. Angel, 530 F. Supp. 2d 646 (S.D.N.Y. 2008) ..... 5

Lucas v. Oxigene, Inc., No. 94 Civ. 1961, 1995 WL 520752 (S.D.N.Y. Aug. 31, 1995) ..... 23

Magee v. Paul Revere Life Ins. Co., 172 F.R.D. 647 (E.D.N.Y. 1997) ..... 11

New England Mutual Life Ins. Co. v. Caruso, 73 N.Y.2d 74, 535 N.E.2d 270, 538 N.Y.S.2d 217 (1989) ..... 2, 8, 10-13, 15

Reliastar Life Ins. Co. of New York v. Leopold,
192 Misc. 2d 385, 745 N.Y.S.2d 810 (Sup. Ct. Nassau Co. 2002)................................ 14, 17-18

Yak v. Bank Brussels Lambert, BBL,
252 F.3d 127 (2d Cir. 2001)........................................................................................ 7

**Statutes**

Fed. R. Civ. P. 8(d) ..................................................................................................... 8

Fed. R. Civ. P.12(b)(6)............................................................................................... 1, 9

New York Insurance Law Section 3203(a)(3) .......................................1-2, 5, 7, 10, 12-13, 15, 18

New York Insurance Law Section 3205(a)(1) ......................................................................... 5

New York Insurance Law Section 3205(b)(2)......................................................................... 5

New York Insurance Law Section 3205(b)(4)......................................................................... 8

New York Insurance Law Section 3216(d)(1)(B)(i)............................................................... 11

Plaintiff Alice Kramer, in her capacity as the Personal Representative of the Estate of Arthur Kramer ("Plaintiff" or "Estate"), respectfully submits this memorandum of law in support of her motion pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the three counterclaims asserted by defendant Phoenix Life Insurance Co. ("Phoenix") in its Answer to Amended Complaint with Counterclaims, Cross-Claims and Third-Party Complaint. As shown below, Phoenix's Counterclaims – which are for fraud, aiding and/or abetting breach of fiduciary duty and unjust enrichment – constitute a meritless attempt by Phoenix to avoid paying out the proceeds of life insurance policies that were past the period of contestability at the time of Mr. Kramer's death.[1]

**Preliminary Statement**

This case involves Phoenix's stubborn, inexcusable failure to pay out the proceeds of three life insurance policies issued upon the life of Arthur Kramer, even though Phoenix knows full well that the time period during which it could have contested the policies expired in July 2007, six months before Mr. Kramer's death in January 2008.

New York law on the issue of contestability of life insurance policies could not be any clearer. Pursuant to New York Insurance Law Section 3203(a)(3) (McKinney 2006), all life insurance policies issued for delivery in this state must contain a clause providing that the policy "shall be incontestable" two years from its date of issue. Id. (emphasis added). Once the two years have passed, the insurance company is barred from contesting its obligation to pay the

[1] Phoenix, in its pleading, numbers the paragraphs 1 through 68 in answering Plaintiff's Amended Complaint, and then re-numbers the paragraphs (starting again with 1) when asserting its counterclaims, cross-claims and third-party complaint. To avoid confusion when citing to paragraph numbers, we will refer to Phoenix's "Answer" when citing to the material on pages 1 to 10 of Phoenix's pleading, and will refer to Phoenix's "Counterclaims" when citing to the material beginning on page 10 of Phoenix's pleading.

death benefits, even if it contends that there were fraudulent misrepresentations made in the application for life insurance.  See, e.g., Ilyaich v. Bankers Life Ins. Co. of New York, 47 A.D.3d 614, 849 N.Y.S.2d 595, 596 (2d Dept. 2008) ("The defendant issued the life insurance policy based upon the representations in the application for coverage, and the burden rested upon it to investigate, within the two-year contestability period, the veracity of the representations concerning the insured's financial condition.") (emphasis added).  In the present case, there is no dispute that the two-year contestability period – during which Phoenix could have investigated the representations made in the life insurance application – has expired.  Nevertheless, Phoenix now claims that it was the victim of "fraud," and has asserted three counterclaims against the Estate.  As we show below, the courts have uniformly rejected the exact type of claims that Phoenix has asserted, and have found that the two-year contestability period acts as a statute of limitations to bar all such claims.

Equally important, Phoenix's attempt to avoid the impact of New York Insurance Law Section 3203(a)(3) by arguing that there was no "insurable interest" here was soundly rejected by the New York Court of Appeals in New England Mutual Life Insurance Company v. Caruso, 73 N.Y.2d 74, 535 N.E.2d 270, 538 N.Y.S.2d 217 (1989), discussed below.  That unanimous decision established the rule – which has been followed ever since – that once the two-year contestability period has passed, an insurance company may not avoid its statutory obligation to pay out life insurance proceeds by claiming that no "insurable interest" existed in the first place.

With respect to the specific counterclaims alleged by Phoenix, Phoenix's fraud counterclaim is barred by the two-year incontestability clauses required by New York law and contained in the Phoenix policies.  (See Point I, infra).  Phoenix's second counterclaim, which is

for aiding and/or abetting an alleged breach of fiduciary duty, should also be dismissed because it is premised upon the exact same alleged misrepresentations upon which the fraud counterclaim is based, and is also time-barred. (See Point II, infra). As the discussion below demonstrates, the courts not only bar fraud claims under these circumstances, but also attempts by insurance companies to assert what is essentially a fraud claim by simply affixing another label to it. In addition, Phoenix has failed to plead (and could not plead) "actual knowledge" on the part of Mr. Kramer, which is a required element of the aiding and/or abetting cause of action. Phoenix's repeated allegation that Mr. Kramer "knew or should have known" about the underlying breach of fiduciary duty is deficient as a matter of law. See, e.g., Bullmore v. Ernst & Young Cayman Islands, 45 A.D.3d 461, 846 N.Y.S.2d 145, 148 (1st Dept. 2007) ("Actual knowledge, as opposed to merely constructive knowledge, is required and a plaintiff may not merely rely on conclusory and sparse allegations that the aider or abettor knew or should have known about the primary breach of fiduciary duty.") (emphasis added).

Finally, Phoenix's counterclaim for unjust enrichment should be dismissed because it does not allege – and could not allege – that the Estate was enriched at Phoenix's expense. (See Point III, infra). Rather, Phoenix alleges that the Estate was unjustly enriched by payments that Mr. Kramer or other beneficiaries of his Estate received from a third party for the transfer of the beneficial interests in the Phoenix policies. Such an allegation fails to satisfy a fundamental required element of a claim for unjust enrichment.

## STATEMENT OF FACTS[2]

**The Parties**

Plaintiff Alice Kramer is the widow of Arthur Kramer and the Personal Representative of his Estate. She brings this action in that capacity. Mr. Kramer was a retired attorney at the time of his death on January 26, 2008 at the age of 81. (Amended Complaint, ¶¶ 1, 17; Answer, ¶¶ 1, 17).[3]

Defendant Phoenix, an insurance company, is a New York corporation that issued three life insurance policies on the life of Mr. Kramer in 2005. (Amended Complaint, ¶ 7; Answer, ¶¶ 7, 18).

Defendant Lockwood Pension Services, Inc. ("LPS") is a New York corporation with its principal place of business located in New York, New York. Defendant Tall Tree Advisors, Inc. ("TTA") is a New York corporation with its principal place of business located in Pleasantville, New York. Defendant Life Products Clearing, LLC ("Life Products") is a Delaware limited liability company with its principal place of business located in New York, New York. (Amended Complaint, ¶¶ 3-5; Answer, ¶¶ 3-5).

---

[2] The background information contained in this Statement of Facts is based, in part, on allegations contained in Plaintiff's Amended Complaint that Phoenix either admitted outright or did not materially dispute in its Answer. In those instances where we are relying on undisputed allegations, we have provided a citation to both Plaintiff's Amended Complaint and Phoenix's Answer. With respect to Phoenix's Counterclaims, the allegations contained therein must be accepted as true for the purposes of Plaintiff's motion to dismiss. See, e.g., Hunt v. Enzo Biochem, Inc., 530 F. Supp. 2d 580, 591 (S.D.N.Y. 2008).

[3] Copies of Plaintiff's Amended Complaint and Phoenix's Answer are attached as Exhibits 1 and 2 to the accompanying Affidavit of Stuart I. Friedman in Support of Plaintiff's Motion to Dismiss Defendant Phoenix Life Insurance Co.'s Counterclaims ("Friedman Aff.").

**Background:  "Stranger-Owned Life Insurance" and the Insurable Interest Rule**

To put this matter into context, this case involves the procurement of what is known as "stranger-owned life insurance" ("SOLI").  As the Court can see from an examination of the pleadings, both Plaintiff and Phoenix contend that the three Phoenix life insurance policies at issue here were procured as part of a SOLI arrangement.  (See Amended Complaint, ¶¶ 12-21; Phoenix's Answer, ¶¶ 12-21).

New York Insurance Law Section 3205(b)(2) provides that one may not obtain an insurance policy on the life of another without having an "insurable interest" in the insured's life. New York Insurance Law Section 3205(a)(1) defines an "insurable interest" as "(A) in the case of persons closely related by blood or by law, a substantial interest engendered by love and affection; (B) in the case of other persons, a lawful and substantial economic interest in the continued life, health or bodily safety of the person insured, as distinguished from an interest which would arise only by, or would be enhanced in value by, the death, disablement or injury of the insured."  This so-called "insurable interest rule" is a well-settled principle in New York insurance law, and it prevents the issuance of "wager" life insurance policies – i.e., life insurance contracts that give the policy owner an interest in having the insured's life come to an end as soon as possible.  (Amended Complaint, ¶¶ 13, 50; Answer, ¶¶ 13, 50).  See generally Life Product Clearing LLC v. Angel, 530 F. Supp. 2d 646, 652 (S.D.N.Y. 2008).

A typical SOLI arrangement – which is designed to circumvent the insurable interest rule – is initiated by a stranger investor or an insurance agent who approaches an elderly person and encourages him to purchase life insurance, the death benefits of which will be immediately transferred to the stranger investor.  The common characteristic of all SOLI arrangements is that they are structured so that the elderly person or a family member, rather

than the stranger investor, is made to appear as the original beneficiary of the policy in order to try to evade the insurable interest requirement.  Such arrangements are contrary to public policy because they enable investors to speculate or wager on a person's death.  (Amended Complaint, ¶ 14; Answer, ¶ 14).

Plaintiff alleges, and Phoenix admits upon information and belief, that LPS, TTA and Life Products participated in an unlawful SOLI arrangement that was structured for the sole purpose of trying to avoid the insurable interest rule.  (Amended Complaint, ¶ 15; Answer, ¶ 15).

**The Phoenix Policies**

Phoenix alleges in its Counterclaims that on or about July 1, 2005, Steven Lockwood (the principal of LPS) and Phoenix entered into an agreement pursuant to which Mr. Lockwood would act as an independent producer of insurance policies for Phoenix. (Counterclaims, ¶ 9).  In August 2005, Mr. Kramer, at the direction of Mr. Lockwood, established the Arthur Kramer 2005 Insurance Trust (the "August Trust").  (Amended Complaint, ¶ 32; Counterclaims, ¶ 11).  In September 2005, Mr. Kramer (through Mr. Lockwood) submitted an application for life insurance to Phoenix.  (Counterclaims, ¶ 13). According to the Counterclaims, at the time Mr. Kramer submitted his application to Phoenix, he had no intention of procuring life insurance for the benefit of himself or his family; rather, Mr. Kramer was attempting to procure a policy for the benefit of a stranger investor.  (Id. at ¶ 15). The stranger investor was TTA (referred to by Phoenix as "Tall Tree"), which was the true intended beneficiary of the requested policy.  (Id. at ¶ 16).

Mr. Lockwood informed Phoenix that Mr. Kramer would like a total of $28 million of life insurance issued to the August Trust in three separate policies, based on the same application.  (Id. at ¶ 23).

Phoenix ultimately issued three insurance policies numbered 97303913, 97303935 and 97303936 to the August Trust. One of the policies was in the amount of $10 million and two of the policies were in the amount of $9 million each, for a total amount of $28 million in death benefits. (Id. at ¶ 20). Copies of the three policies and the application (which is a part of each policy), as well as the Trust Agreement for the August Trust, are attached as Exhibits 3, 4, 5 and 6 to the accompanying Friedman Aff.[4]

All three policies were dated July 10, 2005 and became effective on that date. (See Friedman Aff., Exs. 3, 4 and 5, "Part 2: General Provisions"). Each of the policies contains an incontestability clause stating that the insurance policies would become incontestable two years from the date of the policy. (Id.).

The beneficial interest in the Phoenix Policies was transferred to TTA on or about October 13, 2005. (Counterclaims, ¶ 26).

Pursuant to Section 3203(a)(3) of the New York Insurance Law, the three Phoenix policies became incontestable on July 10, 2007. Mr. Kramer died on January 26, 2008.

**The Present Action**

On March 10, 2008, the Estate commenced this action against various defendants, including Phoenix. On April 9, 2008, Phoenix filed its Answer with Counterclaims, Cross-Claims and Third-Party Complaint. On May 7, 2008, the Estate filed an Amended Complaint,

---

[4] Although the Phoenix policies, application and Trust Agreement are not attached to the Counterclaims, the Court may consider these documents in ruling on this motion to dismiss. These documents are repeatedly referenced throughout the Counterclaims and are therefore "incorporated by reference" into the Counterclaims. See Yak v. Bank Brussels Lambert, BBL, 252 F.3d 127, 130 (2d Cir. 2001) ("On a motion to dismiss, the court may consider 'any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference.'") (quoting Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991)).

and on May 29, 2008, Phoenix filed its Answer to Amended Complaint with Counterclaims, Cross-Claims and Third-Party Complaint.

It is important to note that under New York law – pursuant to the rule of Caruso – a life insurance policy that is procured by someone without an insurable interest in the life of the insured is not void. (See pp. 10-13, infra). Rather, if the two-year period of contestability has passed, the insurance company must pay out the proceeds of the policy.

However, New York effectuates its policy against wager life insurance contracts by including an important provision in its statutory scheme that is designed to prevent the "wagerer" from keeping the benefits of his wager. That provision – New York Insurance Law Section 3205(b)(4) – states, in essence, that if someone receives from an insurer benefits under a policy that was made in violation of the insurable interest rule, then the insured's estate may maintain an action to recover those benefits.

Plaintiff's Amended Complaint, therefore, contains two claims. First, Plaintiff seeks a declaration that Phoenix and the other insurance company defendants must pay the death benefits under the policies, and that such death benefits must be paid to her. This claim assumes, of course, that the insurance companies have not yet paid the death benefits to anyone, and that a claim by Plaintiff under Section 3205(b)(4) would therefore not yet be triggered. Plaintiff's second claim – which is pled in the alternative and which is not asserted against the insurance company defendants – is based on Section 3205(b)(4), and asserts that if the insurance companies have already paid out the death benefits, then Plaintiff is entitled to recover those benefits from the entity that received them.[5]

[5] Such pleading in the alternative is specifically authorized by Fed. R. Civ. P. 8(d).

The essence of Phoenix's Counterclaims is that Mr. Kramer committed fraud in connection with his application for life insurance by not disclosing that the true beneficiary of the policies would not be Mr. Kramer's family, but rather a stranger investor that lacked an insurable interest in Mr. Kramer's life.

## ARGUMENT

This Court recently summarized the applicable standards when deciding a motion to dismiss under Rule 12(b)(6):

> [T]he court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in plaintiff's favor. Even though plaintiff's allegations are taken as true, the claim may still fail as a matter of law if the claim is not legally feasible.

Hunt v. Enzo Biochem, Inc., 530 F. Supp. 2d 580, 591 (S.D.N.Y. 2008) (internal quotations and footnotes omitted) (emphasis added).

In order to survive a Rule 12(b)(6) motion to dismiss, "the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007)). A complaint may be dismissed where it fails to plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic, 127 S. Ct. at 1974. As a result, "more than labels and conclusions" are required to satisfy "a plaintiff's obligation to provide the grounds of his entitlement to relief," and a "formulaic recitation of the elements of a cause of action will not do." Id. at 1964-65. Where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." Id. at 1974. Under these standards, Phoenix's Counterclaims should be dismissed.

## POINT I

## PHOENIX'S COUNTERCLAIM FOR FRAUD IS BARRED AS A MATTER OF LAW BY THE EXPIRATION OF THE TWO-YEAR CONTESTABILITY PERIOD

New York Insurance Law Section 3203(a)(3) requires that all life insurance policies contain a two-year incontestability clause providing that the insurer is barred from contesting the validity of the policy after it has been continuously in effect for at least two years. As the statute provides:

> (a)    All life insurance policies, except as otherwise stated herein, delivered or issued for delivery in this state, shall contain in substance the following provisions, or provisions which the superintendent deems to be more favorable to policyholders:
>
> * * *
>
> (3)    that the policy shall be incontestable after being in force during the life of the insured for a period of two years from its date of issue . . .

New York Insurance Law Section 3203(a)(3) (McKinney 2006).  The only exceptions allowed by the statute, neither of which are relevant here, are for non-payment of premiums or violation of policy conditions relating to service in the armed forces.  Id.  Under New York law, the two-year incontestability clause applies even where there may have been no insurable interest in the life of the insured at the time the policy was procured.  See New England Mutual Life Ins. Co. v. Caruso, 73 N.Y.2d 74, 535 N.E.2d 270, 538 N.Y.S.2d 217 (1989).  Thus, where – as here – the insurance company claims that there was no insurable interest in the life of the insured, the

insurance company must still pay the death benefits if the policy at issue was in force for at least two years during the life of the insured.[6]

In Caruso – a unanimous 7-0 decision by the New York Court of Appeals – the plaintiff insurance company argued that:

> [L]ife insurance policies issued to persons lacking an insurable interest in the life of the insured are void from inception because of statutory prohibitions and because they violate public policy concerns against wagering contracts. . . . Plaintiff [insurance company] contends that the majority of jurisdictions accept this reasoning and, notwithstanding the expiration of the incontestability period, refuse to enforce life insurance contracts in which the policyholder has no insurable interest in the insured.

Caruso, 535 N.E.2d at 271 (citation omitted).

The New York Court of Appeals, however, forcefully rejected the insurance company's argument, and held that once the contestability period has passed, the insurance company is barred from claiming that the policyholder lacked an insurable interest:

> New York's rule is otherwise, however. As generally interpreted, earlier decisions of this court hold that passage of the incontestability period bars the insurer from thereafter asserting the policyholder's lack of an insurable interest. For the reasons that follow, we adhere to that rule.

Id. (citation omitted) (emphasis added).

---

[6] When examining the New York case law regarding periods of contestability, it is important to make a distinction between cases involving life insurance policies and cases involving accident and health insurance policies. As noted above, New York Insurance Law Section 3203(a)(3) – which governs life insurance policies – does not allow life insurance companies to avoid an incontestability clause by claiming that the insured committed fraud in its application for life insurance. However, Section 3216(d)(1)(B)(i) of the New York Insurance Law, which covers accident and health insurance policies, allows insurance companies to contest a policy, even after the two-year contestability period has expired, if "fraudulent misstatements" were made in the application for insurance. See generally Magee v. Paul Revere Life Ins. Co., 172 F.R.D. 647, 650-53 (E.D.N.Y. 1997). Therefore, cases that involve incontestability clauses in accident or health insurance policies are inapposite here.

The New York Court of Appeals elaborated as follows:

> Our statute requires, however, that all life insurance policies contain incontestability clauses providing that after a specified period of time the insurer's conditional promise to pay benefits shall become absolute (Insurance Law § 3203[a][3]). . . . The incontestability clause fixes the insurer's promise to pay benefits upon maturity if the policy is in force for a period of two years during the life of the insured and the premiums have been paid.
>
> * * *
>
> The provisions of the Insurance Law do not make life insurance contracts void if the policyholder lacks an insurable interest in the insured's life.
>
> * * *
>
> Moreover, a comparison of the incontestability provision with other Insurance Law sections indicates that the language of section 3203(a)(3) was not intended to make such policies void for want of an insurable interest in the policyholder.

Id. at 272-73 (emphasis added).

The Court of Appeals concluded its opinion as follows:

> Decedent consented to the policy's issuance and plaintiff [insurance company] accepted the application on the strength of the representations contained in it. If it doubted defendant's interest, the burden rested on it to investigate in a timely manner or ignore the matter at its peril. A failure to enforce the incontestability rule now would result in a forfeiture to defendant (or to the deceased's estate if the policyholder had no insurable interest [*see*, Insurance Law § 3205(b)(3)]) after decedent's death and an unnecessary advantage to plaintiff by enabling it to avoid a claim it previously accepted. This inequity may be avoided, and the public purpose underlying the insurable interest requirement implemented, by a rule which encourages the insurer to investigate the insurable interest of its policyholders promptly within the two-year period. Such investigations would not only eliminate "wagering" contracts but would do so promptly, thereby furthering the policy behind the provisions to the statute.

Id. at 274-75 (emphasis added) (italics in original).

The rule of Caruso is therefore clear: once the two-year contestability period has expired, the insurance company must pay the death benefits under the policy even if it contends that the policyholder lacked an insurable interest. That – plain and simple – is the law of New York.

Many other cases have followed Caruso. For example, in Ilyaich v. Bankers Life Insurance Company of New York, 47 A.D.3d 614, 849 N.Y.S.2d 595 (2d Dept. 2008), the defendant insurance company issued a life insurance policy on the life of plaintiff's grandmother, naming the plaintiff as the beneficiary. After the death of the insured – which was after the contestability period had expired – the insurance company purported to rescind the policy based on alleged misrepresentations in the application for insurance. The Appellate Division, Second Department, in a decision issued earlier this year, rejected the insurance company's argument:

> As required by Insurance Law § 3203(a)(3), the policy contained a two-year incontestability clause, that is, a provision barring the defendant from contesting the validity of the policy after it had been continuously in effect for at least two years. The insured died on April 12, 2004, after the contestability period had expired. In response to the plaintiff's demand for the proceeds, the defendant purported to rescind the policy, based on alleged misrepresentations in the initial application for coverage with respect to the insured's assets and the purpose of the insurance.
>
> * * *
>
> The defendant issued the life insurance policy based upon the representations in the application for coverage, and the burden rested upon it to investigate, within the two-year contestability period, the veracity of the representations concerning the insured's financial condition (*see* New England Mut. Life Ins. Co. v. Caruso, 73 N.Y.2d 74, 538 N.Y.S.2d 217, 535 N.E.2d 270). The insured's finances were a condition of insurance, which were ascertainable by the defendant at the time that the policy was issued, and which it is precluded from contesting more than two years thereafter.

Ilyaich, 849 N.Y.S.2d at 596-97 (emphasis added) (italics in original).

Reliastar Life Insurance Company of New York v. Leopold, 192 Misc. 2d 385, 745 N.Y.S.2d 810 (Sup. Ct. Nassau Co. 2002), is also directly on point. In that case, Reliastar, an insurance company, commenced an action claiming that the defendant had made fraudulent statements regarding his medical condition when applying for a life insurance policy. As the court held:

> It is undisputed that the policy contained the statutorily required, incontestability clause. Insurance Law § 3203(a)(3). Reliastar's present action to rescind and/or void the policy was instituted well after the elapse of the two year incontestability period. Significantly, incontestability clauses limit the period of time that the carrier has to investigate the veracity of the policyholder's statements, after which it may not contest the policy except of stated grounds, usually nonpayment of premiums. . . . It is well settled that once the incontestable period has elapsed, allegations that an insured procured the policy through fraud will not support a claim to void or rescind the policy.

Reliastar, 745 N.Y.S.2d at 812 (emphasis added) (internal quotation and citations omitted).

In an attempt to avoid the conclusive impact of these decisions, Phoenix, in the section of its pleading where it delineates its counterclaim for fraud, does not specifically state that it is seeking to void or rescind the policies. (See Counterclaims, ¶¶ 35-41). However, Phoenix is clearly seeking that relief. As Phoenix states at the end of its pleading, it is seeking, inter alia:

> (a) an Order (i) rescinding the Phoenix Policies and declaring them null and void, either from their inception or as the result of a fraudulent scheme to issue the Phoenix Policies where there was no valid insurable interest, or, alternatively (ii) declaring that Phoenix has no obligation to pay any death benefits to Plaintiff in connection with the Phoenix Policies.

(Id. at p. 50) (emphasis added). Moreover, to the extent that Phoenix is claiming damages in its fraud counterclaim in the amount of the death benefits, it is, in actuality, seeking rescission of the

policy. (Counterclaims, ¶ 41). Obviously, if Phoenix could pay out the death benefits on a life insurance policy and then immediately recover those exact same death benefits as "damages," the effect is the same as if the policy were rescinded or declared void. Under such a scenario, Phoenix would receive a windfall of $28 million in death benefits that it became obligated to pay once the two-year incontestability clauses expired. Such a result would violate Section 3203(a)(3), the case law discussed above and the legislative intent behind the incontestability clause requirement that the Court of Appeals elucidated in Caruso.

In sum, Section 3203(a)(3) – and the case law construing it – clearly doom Phoenix's counterclaim for fraud against the Estate. First, there is no question that the statute applies here. By its plain language, it governs all life insurance policies "delivered or issued for delivery in this state." All three Phoenix policies provide that the owner of the policy is "as stated on the application," and the owner stated on the application is the Arthur Kramer 2005 Insurance Trust, 75 Rockefeller Plaza, New York, New York 10019. (See Friedman Aff., Exs. 3, 4 and 5, "Schedule Page" (second page of each Exhibit), and Application for Life Insurance, Part I, included at the end of each of those Exhibits.). The Trust Agreement for the Trust also shows that its principal office is at 75 Rockefeller Plaza, New York, New York 10019, and that the Trust is governed by New York law. (Friedman Aff., Ex. 6, §§ 2.2 and 5.3). Phoenix itself alleges that it delivered the policies to Mr. Lockwood at the 75 Rockefeller Plaza, New York, New York address. (Counterclaims, ¶¶ 5, 25).

Second, there is no doubt that the two-year period during which Phoenix could have contested the policies expired before Phoenix first claimed that it had been the victim of fraud. The effective date of all three policies was July 10, 2005, and all three policies therefore became incontestable on July 10, 2007. Mr. Kramer died on January 26, 2008, and Phoenix first

asserted its claim for fraud on April 9, 2008 when it filed its initial Answer and Counterclaims. Phoenix's fraud counterclaim is therefore time-barred and should be dismissed.[7]

## POINT II

## PHOENIX'S COUNTERCLAIM FOR AIDING AND/OR ABETTING BREACH OF FIDUCIARY DUTY SHOULD BE DISMISSED

### A. Phoenix's Counterclaim for Aiding and/or Abetting Breach of Fiduciary Duty is Barred by the Expiration of the Two-Year Contestability Period

In its second Counterclaim, Phoenix does not allege that Mr. Kramer breached any fiduciary duty to Phoenix, or that Mr. Kramer owed any such fiduciary duty to Phoenix. Rather, in a strained effort to come up with some viable cause of action, Phoenix claims that Mr. Kramer aided and/or abetted Mr. Lockwood in Mr. Lockwood's alleged breach of his fiduciary duty to Phoenix. (Counterclaims, ¶¶ 42-47). As shown below, this counterclaim is nothing more than a rehash of Phoenix's counterclaim for fraud. Indeed, a comparison of the two counterclaims leaves no doubt on this point.

For example, in the fraud counterclaim, Phoenix alleges that it relied on Mr. Kramer's representations that the August Trust was the true owner and beneficiary of the policies; that the August Trust had a valid and insurable interest in Mr. Kramer's life; and that

[7] In or about October 2007, the August Trust sold two of the three Phoenix policies (Policy Nos. 97303935 and 97303936, each in the amount of $9 million) to the CSSEL Bare Trust, a unit of Credit Suisse Securities (Europe) Limited ("Credit Suisse"). As part of that transaction, Credit Suisse requested Phoenix to fill out forms that asked, inter alia: "Is the policy past the contestability period?" In both cases, Phoenix answered "Yes." Copies of these forms filled out and signed by Phoenix are attached to the Friedman Aff. as Exhibits 7 and 8. (On each Exhibit, see "Contestibility" section at bottom of first page of the "Life Insurance Policy Questionnaire"). Although these documents are not necessary to a determination of Plaintiff's motion to dismiss (because the expiration of the two-year contestability period cannot be disputed), and although they may be technically beyond the scope of the pleadings, these documents demonstrate the disingenuousness of Phoenix's statement in its Answer that it "denies that the policies are incontestable under New York or other states' laws." (Answer, ¶ 46).

Mr. Kramer made these alleged misrepresentations on his application for insurance and by his reaffirmation thereof in October 2005. (Counterclaims, ¶¶ 36-40). In its counterclaim for aiding and/or abetting breach of fiduciary duty, Phoenix repeats and realleges its fraud counterclaim and alleges that:

> Mr. Kramer substantially participated in Lockwood's breach of fiduciary duty by (a) creating and/or acquiescing to the creation of the Kramer August Trust, (b) submitting and reaffirming the Phoenix Application, (c) misrepresenting the true beneficiary of the Phoenix Policies and the presence of a valid insurable interest in Mr. Kramer's life, and (d) immediately transferring the beneficial interest in the Kramer August Trust (and thus the Phoenix Policies) to Lockwood's company, Tall Tree, after the Phoenix Policies were delivered.

(Id. at ¶ 45). Thus, the alleged acts committed by Mr. Kramer to supposedly aid Mr. Lockwood in breaching his fiduciary duty are the exact same acts that allegedly constituted Mr. Kramer's acts of fraud. There is no escaping the fact that the gist of both counterclaims is that Mr. Kramer, in his application for life insurance, allegedly did not disclose that the true beneficiary of the policies would be a stranger investor that lacked an insurable interest in Mr. Kramer's life. Under these circumstances, Phoenix's aiding and/or abetting counterclaim is simply a restatement of its fraud counterclaim – albeit with another label affixed to it – and it should meet the same fate as the fraud counterclaim.

Reliastar, supra, is directly on point. In that case, the plaintiff insurance company commenced an action seeking rescission of a life insurance policy and an order estopping the insured from relying on the incontestability clause. Reliastar, 745 N.Y.S.2d at 811. The insurance company argued that the insured had falsely represented in his application that he "had not [sic] medical or health ailments and was not undergoing treatment for any ailments including AIDS or AIDS related Complex, when, in fact he was suffering from and being treated for a fatal

disease." Id. (citation and internal quotation omitted). The complaint alleged several claims, including common law fraud, and the defendant moved to dismiss. As the court explained:

> Upon the instant motion, Defendants move to dismiss the complaint, arguing, that Reliastar's causes of action merely restate and reallege the same underlying theories of fraud – which, they assert – are barred as a matter of law by the expiration of the two year incontestable period.

Id. (emphasis added).

The court agreed, and dismissed the insurance company's complaint:

> While Reliastar has recast and repleaded its claim in various permutations, the first through fourth causes of action and the sixth cause of action alleging common law fraud are still grounded upon the theory [that the insured's] fraudulent statements justify rescission, "tolling" and/or the voiding of the policy, such claims are now foreclosed by the elapse of the policy's two year incontestability period.

Id. at 812 (emphasis added).

The exact same result should obtain here. In enacting New York Insurance Law Section 3203(a)(3), the legislature intended to bar any claim by an insurer to void or rescind a life insurance policy for reasons of fraud after the mandatory two-year contestability period has expired. As Reliastar makes clear, Phoenix cannot circumvent the legislature's intent by recasting its fraud claim as one for aiding and/or abetting breach of fiduciary duty. Phoenix's counterclaim for aiding and/or abetting breach of fiduciary duty should therefore be dismissed as barred by the expiration of the two-year incontestability clause contained in the Phoenix policies.

**B. Phoenix's Counterclaim for Aiding and/or Abetting Breach of Fiduciary Duty Should be Dismissed Because It Fails to Allege Actual Knowledge of Mr. Lockwood's Alleged Breach on the Part of Mr. Kramer**

The Appellate Division, First Department has recently articulated the elements of a claim for aiding and abetting a breach of fiduciary duty. As that court stated in Bullmore v. Ernst & Young Cayman Islands, 45 A.D.3d 461, 846 N.Y.S.2d 145 (1st Dept. 2007):

> To state such a claim, a plaintiff must plead a breach of fiduciary duty, that the defendant knowingly induced or participated in the breach, and damages resulting therefrom.

Bullmore, 846 N.Y.S.2d at 148 (emphasis added).

The Appellate Division then explained that constructive knowledge on the part of the alleged wrongdoer is not sufficient; rather, actual knowledge is a required element of the claim:

> Actual knowledge, as opposed to merely constructive knowledge is required and a plaintiff may not merely rely on conclusory and sparse allegations that the aider or abettor knew or should have known about the primary breach of fiduciary duty.

Id. (emphasis added). See also Kolbeck v. LIT America, Inc., 939 F. Supp. 240, 246 (S.D.N.Y. 1996) ("New York common law, which controls the analysis here, has not adopted a constructive knowledge standard for imposing aiding and abetting liability. Rather, New York courts and federal courts in this district, have required actual knowledge.") (emphasis added); Global Minerals and Metals Corp. v. Holme, 35 A.D.3d 93, 824 N.Y.S.2d 210, 217 (1st Dept. 2006) ("Actual knowledge, as opposed to merely constructive knowledge, is required and a plaintiff may not merely rely on conclusory and sparse allegations that the aider or abettor knew or should have known about the primary breach of fiduciary duty.") (emphasis added).

Phoenix's counterclaim for aiding and/or abetting breach of fiduciary duty flies in the face of these authorities and should be dismissed. Rather than alleging actual knowledge on

the part of Mr. Kramer – which the case law requires as a substantive element of the cause of action – Phoenix's counterclaim repeatedly invokes the "knew or should have known" language – i.e., the exact language that the case law deems impermissible. Thus, the counterclaim alleges that:

- "Mr. Kramer knew or should have known that Lockwood owed Phoenix a fiduciary duty."

(Counterclaims, ¶ 43) (emphasis added).

- "Mr. Kramer knew or should have known that such fiduciary duty included a duty of full disclosure with respect to the Phoenix Application and duty not to procure SOLI policies . . ."

(Id. at ¶ 44) (emphasis added).

- "Mr. Kramer knew or should have known that [Mr. Kramer] and Lockwood induced Phoenix to issue life insurance policies it would not have issued but for Mr. Kramer's participation in the SOLI scheme."

(Id. at ¶ 46) (emphasis added).

- "Thus, Mr. Kramer knew or should have known that he was aiding and abetting Lockwood's breach of fiduciary duty."

(Id.) (emphasis added).

Under the case law discussed above, these allegations are patently insufficient to state a claim for aiding and/or abetting breach of fiduciary duty.

Moreover, this is not a situation where a mere pleading deficiency could theoretically be cured by an amendment. Indeed, given the fact that Mr. Kramer is deceased, it is impossible to imagine how Phoenix's attorneys could allege actual knowledge on the part of Mr.

Kramer, consistent with their obligations under Rule 11.[8] For these reasons, Phoenix's second counterclaim should be dismissed.

## POINT III

## PHOENIX'S COUNTERCLAIM FOR UNJUST ENRICHMENT SHOULD BE DISMISSED BECAUSE THE ALLEGED PAYMENTS TO MR. KRAMER OR HIS FAMILY WERE NOT MADE BY PHOENIX

Phoenix's counterclaim for unjust enrichment demands that money allegedly paid to Mr. Kramer or his family by certain other defendants – but not by Phoenix – should be recovered by Phoenix. However – since Phoenix admits that it never made any such payments – it lacks standing to maintain an action for unjust enrichment.

The Second Circuit, in Beth Israel Medical Center v. Horizon Blue Cross and Blue Shield, 448 F.3d 573 (2d Cir. 2006), recently set forth the elements of a claim for unjust enrichment under New York law:

> Cases dealing with unjust enrichment in New York are uniform in their recognition of three elements of the claim: To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution.

Id. at 586 (emphasis added) (internal quotations omitted).

[8] Even if this pleading problem could somehow be overcome, it is equally hard to imagine – given the fact that Mr. Kramer is deceased – how Phoenix could ever carry its burden of proof on this claim.

Similarly, in Hartford Fire Insurance Company v. Federated Department Stores, Inc., 723 F. Supp. 976 (S.D.N.Y. 1989), this Court stated:

> To state a claim for unjust enrichment, Hartford must allege that the defendant was enriched, that such enrichment was at plaintiff's expense, and that the circumstances were such that in equity and good conscience the defendant should return the money or property to the plaintiff.

Id. at 994 (emphasis added) (internal quotations omitted).

As these cases make clear, Phoenix – in order to state a claim for unjust enrichment – must allege that it (i.e., Phoenix itself) provided something of value to the Estate and that the Estate must return it to Phoenix.

Phoenix's counterclaim for unjust enrichment fails to satisfy this fundamental element of the claim. Phoenix does not allege – nor could it allege – that it provided something of value to the Estate. Rather, Phoenix alleges that "Mr. Kramer and/or other beneficiaries of his estate knowingly received substantial payments in exchange for their transfer of the beneficial interests in the Phoenix Policies that Mr. Kramer procured without a valid insurable interest." (Counterclaims, ¶ 49). As noted above, however, those payments were not made by Phoenix, and under no circumstances could it be said that the Estate was enriched by these payments at Phoenix's expense. Nor would there be any basis for "returning" those payments to Phoenix under an unjust enrichment theory, because Phoenix never made the payments in the first place. In fact, Phoenix specifically alleges that "Tall Tree and/or Life Product" made the monetary compensation to Mr. Kramer. (Id. at ¶ 8(c)) (emphasis added). Since Phoenix cannot allege that it (as opposed to a third party) made those payments to Mr. Kramer or his family, it has failed to state a claim for unjust enrichment.

Finally, Phoenix does not appear to be alleging that the Estate would be unjustly enriched by the death benefits payable under the policies. (Id. at ¶¶ 48-52). However, for the sake of completeness, we wish to point out that if Phoenix attempted to assert that position, its claim would still be deficient as a matter of law because the theory of unjust enrichment cannot be invoked where there is a valid contract between the parties. See, e.g., Lucas v. Oxigene, Inc., No. 94 Civ. 1961, 1995 WL 520752, at *6 (S.D.N.Y. Aug. 31, 1995) ("unjust enrichment is a quasi-contract claim that can ordinarily be invoked only in the absence of a valid, enforceable contract.");[9] Clarke-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 516 N.E.2d 190, 521 N.Y.S.2d 653, 656 (1987) ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."); Hartford Fire, 723 F. Supp. at 994 (dismissing unjust enrichment claim after finding that a valid contract governed the subject matter). Here, there are valid contracts – i.e., the insurance policies – that govern the subject matter of the dispute between the parties. Thus, a theory of unjust enrichment would not be available to Phoenix in any event.

For the reasons set forth above, Phoenix's counterclaim for unjust enrichment should be dismissed.

[9] A copy of this unreported decision is attached hereto.

**Conclusion**

For all the foregoing reasons, Plaintiff's Motion to Dismiss Defendant Phoenix Life Insurance Co.'s Counterclaims should be granted in all respects.

Dated: New York, New York
June 27, 2008

FRIEDMAN & WITTENSTEIN
A Professional Corporation

By: [signature]
Stuart I. Friedman (SF-9186)
Andrew A. Wittenstein (AW-1943)
Claire L. Chau (CC-0125)

600 Lexington Avenue
New York, New York 10022
(212) 750-8700

*Attorneys for Plaintiff*

Westlaw.

Not Reported in F.Supp. Page 1
Not Reported in F.Supp., 1995 WL 520752 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1995 WL 520752 (S.D.N.Y.))**

Lucas v. Oxigene, Inc.
S.D.N.Y.,1995.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
John E. LUCAS, Plaintiff,
v.
OXIGENE, INC., Defendant.
**No. 94 Civ. 1691 (MBM).**

Aug. 31, 1995.

David Otis Fuller, Jr., Baker, Nelson & Williams, New York City, for plaintiff.
W. Bruce Johnson, Battle Fowler, New York City, for defendant.

AMENDED OPINION AND ORDER

MUKASEY, District Judge.
***1** In this diversity action, John E. Lucas sues his former employer, Oxigene, to regain stock option rights which were altered by an agreement allegedly procured by misrepresentation, fraud, and undue influence. Plaintiff seeks a declaration pursuant to 28 U.S.C. § 2201 that the agreement is invalid, an injunction to prevent defendant from extinguishing his option rights, and an order directing defendant to restore the stock options to prevent unjust enrichment. Defendant moves for summary judgment pursuant to either Fed. R. Civ. P. 12(b)(6) or 56 on the grounds that the misrepresentation, undue influence, and unjust enrichment claims are deficient. For the reasons stated below, defendant's motion is granted.

I.

Plaintiff joined Oxigene as Chairman of the Board of Directors, President, and Chief Executive Officer, on April 28, 1992. (Compl. ¶ 8) The terms of his employment were set forth in an agreement ("First Employment Agreement") which characterized plaintiff as an at-will employee, and granted him an annual salary of $180,000 and a stock option plan. (Compl. Ex. 1 at ¶¶ 1-2) Under the plan, plaintiff had the right to purchase up to 240,000 shares, exercisable in three equal installments of 80,000 shares at the end of each of his first three years of employment, or immediately upon a public offering of common stock.[FN1](*Id.;* Compl. Ex. 2) All unexercised options were to be automatically extinguished upon termination of employment. (Compl. Ex. 6 ¶ 6(g))

In March 1993, Oxigene signed a letter of intent to conduct an initial public offering ("IPO") of its common stock. (Brown Aff. ¶ 8) That same month, plaintiff checked himself into a hospital to receive treatment for alcoholism. (Lucas Aff. ¶ 4(d)) Defendant's Board of Directors subsequently suspended plaintiff, and Richard A. Brown, the Acting Chief Executive Officer, informed plaintiff that his future status with Oxigene would be discussed after his recovery. (Compl. Ex. 3)

On April 20, 1993, plaintiff resumed his position as Chief Executive Officer and a meeting was held among plaintiff, Brown, and Yuval Binur, Oxigene's Chief Operating Officer, to discuss new terms of employment. (Compl. ¶ 12; Lucas Aff. ¶ 4(e)) A memorandum dated May 6, 1993, written by Brown, allegedly documented the changes that were discussed and agreed to in the April 20 meeting, including a 50% reduction in plaintiff's salary and a modification in the vesting schedule for plaintiff's option rights. (Compl. Ex. 4) Instead of vesting immediately upon completion of an IPO, plaintiff's options would become exercisable six months after the IPO, subject to approval by the Board of Directors. (Compl. Ex. 4 ¶ 4) Plaintiff claims his option rights were never discussed at the meeting, and that the memorandum was the first indication to him that these rights were being altered. (Lucas Aff. ¶ 4(e), (f)) Nevertheless, the changes noted in the memorandum were incorporated in a new employment agreement ("Second Employment Agreement") which provided that Oxigene's Board of Directors would review the option vesting dates six months after an IPO, "with the intent of possibly accelerating the Vesting Schedule so that all options granted to [Lucas] become immediately exercisable."(Compl. Ex. 5 ¶ 4) At this point, plaintiff's right to purchase the first installment of 80,000 shares had already vested because he completed his first year of employment on April 27,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1993.

***2** The Second Employment Agreement was left on plaintiff's desk on May 20, 1993 for him to sign. (Compl. ¶ 15) Binur arrived to discuss the agreement, and allegedly to persuade him to sign it. (*Id.*) Plaintiff claims he objected to the agreement because it transformed the certainty of acceleration following an IPO into a matter for the Board of Directors' discretion. (*Id.* at ¶ 16) Plaintiff feared that because he was an at-will employee who could be terminated upon 90 days written notice, defendant would use his expertise at half-salary, consummate the IPO, and deprive him of the remaining 180,000 shares in his option plan by voting not to accelerate and firing him before they vested. (*Id.*) To allay plaintiff's concerns, Binur allegedly stated:

"That doesn't mean anything. You and I have both heard Brown say that you're going to get all those options. Don't worry about it. I'm your friend."

"If you don't sign, the company would have to recapitalize. It would cause problems and delay with the public offering."

"I heard Brown say in front of [Gerald A.] Eppner [Oxigene's Counsel] that you would receive all your shares."(Compl. ¶ 18)

Plaintiff signed the Second Employment Agreement, allegedly in reliance on these assurances (Compl. ¶ 21), despite the fact that the clear language of the contract unequivocally changed his option rights. (Compl. Ex. 5 ¶ 4) Moreover, the agreement contained three provisions dedicated to apprising the signatory that any other agreements between the parties were not binding:

5. This agreement contains the entire agreement between you and the Company with respect to all matters relating to your employment with the Company and will supersede and replace all prior agreements, written or oral, between the parties relating to the terms or conditions of your employment.

6. Neither you nor the Company will be deemed to have made any representation, warranty, covenant or agreement except those expressly set forth herein ...

8. Neither this agreement nor any provisions hereof may be waived, amended, modified or supplemented except pursuant to an agreement in writing executed by the party against whom enforcement of such waiver, amendment, modification or supplement is being sought. (Compl. Ex. 5)

Defendant successfully completed the IPO, and the Board of Directors voted on January 7, 1994 not to accelerate the vesting schedule for plaintiff's option rights. (Compl. ¶ 25; Def. Mem. Supp. at 6) Brown notified plaintiff that he would be dismissed, effective April 7, 1994, and that all benefits then would cease. (Compl. Ex. 8) Consequently, plaintiff was deprived of the option to purchase 160,000 shares because the Board opted not to accelerate, and he was fired 20 days before the second installment of 80,000 shares would have vested at the end of his second year of employment.

In a prior hearing, this court denied plaintiff's application for a preliminary injunction to prevent defendant from dismissing him, and thereby extinguishing his option to purchase 160,000 shares. Plaintiff now seeks a declaratory judgment that the Second Employment Agreement is invalid, and an injunction preventing its enforcement on the ground that he was induced to sign it by fraud, misrepresentation, and undue influence applied at a time when he was a recovering alcoholic. (Compl. ¶¶ 30-36) He alleges further that defendant will be unjustly enriched if it is permitted to deprive him of two-thirds of the stock options offered in the First Employment Agreement, by enforcing a later agreement allegedly procured unlawfully. (*Id.* at ¶¶ 37-40)

***3** Defendant moves to dismiss the complaint under either Fed. R. Civ. P. 12(b)(6) or 56 on the basis that (1) the misrepresentation claim is premised on alleged oral statements which are barred by the parole evidence rule; (2) the elements of undue influence have not been established; and (3) the unjust enrichment claim, generally sought under a theory of quantum meruit or quasi-contract, is precluded by the existence of a written employment agreement. (Def. Mem. Supp. at 8, 15, 18-19) In addition to the complaint and the documents appended thereto, both parties have submitted affidavits and documentary evidence and had ample opportunity to respond to their adversary's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 520752 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1995 WL 520752 (S.D.N.Y.))**
Page 3

submissions. Defendant's motion will therefore be treated as one for summary judgment and disposed of pursuant to Rule 56. *See*Fed. R. Civ. P. 12(b). The motion for summary judgment is granted on the misrepresentation claim because the parol evidence rule applies to the Second Employment Agreement and operates to exclude the alleged misstatements upon which plaintiff bases his claims of wrongdoing. Defendant's motion is granted also with respect to the undue influence claim because plaintiff failed to show excessive pressure. Finally, summary judgment is granted on the unjust enrichment claim because of the existence of a valid, enforceable employment contract.

II.

In Claim I of the complaint, plaintiff argues the Second Employment Agreement is invalid because he was induced to sign it by Binur's alleged misrepresentations. (Compl. ¶¶ 30-36) On this motion for summary judgment, the court must accept as true that the statements were made, including Binur's assurance that the options would vest. The provisions in the written agreement, however, directly contradict these oral representations, particularly the clause which clearly explains that Oxigene's Board of Directors had power to prevent the options from vesting. (Compl. Ex. 5 ¶ 4) Regardless of this conflict between what was said and what was written, I must be guided by the parol evidence rule.

That rule bars proof of prior oral statements offered to refute the unambiguous terms of a written, integrated contract. *Azuma N.V. v. Sinks,* 646 F. Supp. 122, 127 (S.D.N.Y. 1986); *Marine Midland Bank-Southern v. Thurlow,* 53 N.Y.2d 381, 387, 442 N.Y.S.2d 417, 419-20 (1981). Generally, this contract law principle does not exclude a claim of fraud, which can rarely be substantiated without invoking extrinsic evidence. *Chace v. Bankers Trust Co.,* 89 Civ. 4497, 1990 WL 250181, at *3 (S.D.N.Y. Dec. 26, 1990). Parol evidence is admissible to prove fraud even if the disputed contract contains a standard merger clause stating that the signatories acknowledge the written document supersedes all prior agreements and constitutes the sole embodiment of their obligations. *Jones v. Ballon, Stoll & Itzler,* 88 Civ. 8459, 1990 WL 113120, at * 8 (S.D.N.Y. July 27, 1990) (citing *Danann Realty Corp. v. Harris,* 5 N.Y.2d 317, 321, 184 N.Y.S.2d 599, 601 (1959)). However, a specific disclaimer denying reliance on oral representations can render parol evidence inadmissible even to substantiate a claim of fraud. *Danann Realty,* 5 N.Y.2d at 320-321, 184 N.Y.S.2d at 599, the leading New York case, explained that a specific disclaimer "destroys the allegations in plaintiff's complaint that the agreement was executed in reliance upon these contrary oral representations."

*4 A specific disclaimer typically consists of a clause stipulating that the parties are not "relying" upon extra-contractual representations. *Danann Realty Corp.,* 5 N.Y.2d at 320, 184 N.Y.S.2d at 601 (contract provided "neither party [is] relying upon any statement or representation not embodied in this contract"); *Mahn Real Estate Corp. v. Shapolsky,* 178 A.D.2d 383, 385, 577 N.Y.S.2d 824, 826 (1st Dep't 1991) (plaintiff specifically acknowledged no reliance on any representation regarding subject matter of the claimed fraud); *Galvatron Industries Corp. v. Greenberg,* 96 A.D.2d 881, 466 N.Y.S.2d 35, 35 (2nd Dep't 1983) (plaintiff disclaimed "reliance on any representations, covenants or warranties made by any other party hereto"). Although the Second Employment Agreement does not contain the language of reliance, it does include a merger clause, a provision requiring all modifications to be in writing, and an acknowledgment that neither party made any representations other than those expressly set forth in the contract. Thus, plaintiff stipulated that no representations were made, and although he did not specifically disclaim reliance on oral representations, he cannot now claim to have relied on representations which he previously acknowledged were never made.

New York courts have recognized that no particular words are needed to transform a general disclaimer into a specific one, and have excluded parol evidence even when the contract did not contain an express disavowal of reliance on oral representations. Both *Clanton v. Vagianellis,* 187 A.D.2d 45, 47-48, 592 N.Y.S.2d 139, 140 (3rd Dep't 1993), and *Bango v. Naughton,* 184 A.D.2d 961, 963, 584 N.Y.S.2d 942, 944 (3rd Dep't 1992), found that the rule of *Danann Realty* applies whenever an express contractual provision contradicts a claimed oral statement "in a meaningful fashion." The contradiction in the instant case could not be more evident: plaintiff claims he relied on an oral promise that his option rights would

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 520752 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1995 WL 520752 (S.D.N.Y.))**
Page 4

not be diminished, yet signed an agreement which clearly abrogated those rights. Under these circumstances, courts should further the rationale underlying the *Danann Realty* rule rather than focusing on the language of the disclaimer.

One such rationale is preventing plaintiff from perpetrating a fraud by signing a contract with a clause repudiating reliance on extra-contractual representations, and then claiming he was induced to sign it by contrary oral representations. If plaintiff were relying on oral statements which contradicted the written terms of the contract, he is guilty of "deliberately misrepresenting" his true intentions at the time of signing the agreement. *CitiBank, N.A. v. Plapinger*, 66 N.Y.2d 90, 94, 495 N.Y.S.2d 309, 311 (1985); *Danann Realty Corp.*, 5 N.Y.2d at 323, 184 N.Y.S.2d at 604. Condoning these tactics undermines the purpose of the parol evidence rule -- to avoid the fraud that could be committed when parties are allowed to substitute alleged oral understandings for the plain meaning of contracts. *Transnor (Bermuda) Ltd. v. BP North America Petroleum*, 736 F. Supp. 511, 520 (S.D.N.Y. 1990).

***5** Another, equally important goal of the *Danann Realty* rule is to bar evidence of oral statements when a disclaimer put plaintiff on notice that he could not rely on such statements. Notice, therefore, is the operative factor in determining whether or not a disclaimer is sufficient to foreclose parol evidence. The *Danann Realty* Court chose specificity as the measure of notice. 5 N.Y.2d at 320, 184 N.Y.S.2d at 602. Other courts simply analyze whether the language of the disclaimer alerted the signatories to the clause's intended effect. *Hi Tor Indus. Park, Inc. v. Chemical Bank*, 114 A.D.2d 838, 839, 494 N.Y.S.2d 751, 752 (2nd Dep't 1985). There is no question that in this case, plaintiff was aware of the effect the many disclaimers in the Second Employment Agreement would have. First, the sheer number of disclaimers in that agreement necessarily conveyed the requisite notice. Three of the eight provisions in an otherwise terse, two-page document were devoted to warning the signatories that the only binding representations were those found on the printed page. The contract is thus remarkable for its focus on excluding oral representations and its attempt to foreclose later claims that other agreements existed. Further, the record shows that plaintiff, a sophisticated businessman, read and understood the terms of the contract he was about to sign. He noticed and objected to the modification in his option rights (Compl. ¶ 16; Pl. Mem. Opp'n at 5), and does not allege that he failed to comprehend the disclaimers. Where, as here, "a person has read and understood the disclaimer of representation clause, he is bound by it." *Danann Realty Corp.*, 5 N.Y.2d at 322, 184 N.Y.S.2d at 603.

In sum, parol evidence is excluded in this case because plaintiff signed an agreement laden with disclaimers, containing a clause which directly contradicted the alleged oral representations, at a time when he had notice and understanding of the terms of that contract. The operation of the parol evidence rule renders Binur's allegedly fraudulent statements inadmissible, and consequently the misrepresentation claim based on these statements fails.

III.

Plaintiff next argues that the agreement should be voided because he was induced to sign it under undue influence. To constitute either undue influence or duress, concepts which are equivalent in the Second Circuit, a defendant's conduct must betray improper and excessive pressure, surpassing what is reasonable under the circumstances. *Hellenic Lines, Ltd. v. Louis Dreyfus Corp.*, 372 F.2d 753, 757 (2d Cir. 1967); *Rust v. Drexel Firestone Inc.*, 352 F. Supp. 715, 717 (S.D.N.Y. 1972). The Restatement of Contracts characterizes duress as a wrongful threat "that induces another to enter into a transaction under the influence of such fear as precludes him from exercising free will and judgment." Restatement of Contracts § 492(b) (1932). *See also Printers II, Inc. v. Professionals Publishing, Inc.*, 615 F. Supp. 767, 772 (S.D.N.Y. 1985), *aff'd*, 784 F.2d 141 (2d Cir. 1986). Although it is difficult to discern the "line of absolute demarcation between fear that deprives a person of free will and judgment, and lesser degrees of fear," the wrongful threats alleged in the complaint lie too far from this threshold to be actionable. *Hellenic Lines, Ltd.*, 372 F.2d at 757.

***6** Plaintiff contends he was the victim of improper and excessive pressure because defendant "put [the Second Employment Agreement] on his desk and sent [[[the] chief financial officer in to see that he signed it."(Pl. Mem. Opp'n at 17) As additional

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Page 5
Not Reported in F.Supp., 1995 WL 520752 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1995 WL 520752 (S.D.N.Y.))**

evidence of duress, plaintiff alleges Binur employed "alarm tactics" by warning that any reluctance in executing the Second Employment Agreement could delay the IPO. (Compl. ¶ 18(b); Pl. Mem. Opp'n at 17) Endangering the IPO was allegedly threatening to plaintiff because he had funneled almost $200,000 of his own money into Oxigene and did not want to jeopardize his investment. (Compl. ¶ 19)

Plaintiff's claim that he was somehow overwhelmed with fear because defendant gave him time to read the Second Employment Agreement and then sent a company officer to discuss it, is confounding. His claim that alarm tactics were employed fails also to establish duress. Binur's comments were at most hard bargaining, not conduct so severe that it deprived plaintiff of his free will and judgment. *DuFort v. Aetna Life Ins. Co.*, 818 F. Supp. 578, 582 (S.D.N.Y. 1993) (using opponent's financial condition to obtain leverage in contract negotiations not duress); *Weinraub v. Int'l Banknote Co., Inc.*, 422 F. Supp. 856, 859 (S.D.N.Y. 1976) ("Mere hard bargaining positions ... and the press of financial circumstances" not deemed to be duress); *Orix Credit Alliance, Inc. v. Hanover*, 182 A.D.2d 419, 419, 582 N.Y.S.2d 153, 154 (1st Dep't 1992) ("financial or business pressure of all kinds, even if exerted in the context of unequal bargaining power, does not constitute economic duress") (citations omitted). In response to Binur's bargaining tactics, plaintiff exercised his business judgment and decided to sign the Second Employment Agreement in order to optimize his investment in the company. Duress is not proved where plaintiff "merely exercised [his] business judgment in a difficult situation."*Hellenic Lines, Ltd.*, 372 F.2d at 758;*Transmarine Seaways Corp. of Monrovia v. Marc Rich & Co. A.G.*, 480 F. Supp. 352, 359 (S.D.N.Y. 1979). Because the record contains no evidence that improper or excessive pressure was applied, defendant's motion for summary judgment to dismiss the claim of undue influence is granted.

IV.

Plaintiff demands from defendant options to buy 160,000 shares so as to prevent the unjust enrichment that would result if defendant were able to retain the benefits of an agreement allegedly procured by fraud and undue influence. (Compl. ¶¶ 37-40; Pl. Mem. Opp'n at 18) Under New York law, unjust enrichment is a quasi-contract claim that can ordinarily be invoked only in the absence of a valid, enforceable contract. *Clark-Fitzpatrick, Inc. v. Long Island R.R.*, 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 656 (1987); *Feigen v. Advance Capital Management Corp.*, 150 A.D.2d 281, 283, 541 N.Y.S.2d 797, 799 (1st Dep't 1989). Plaintiff is precluded from recovering under a theory of unjust enrichment in this case because the allegations of fraud and unjust enrichment have failed, and the Second Employment Agreement therefore is an enforceable contract. *Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1272 (S.D.N.Y. 1991) ("if the fraud allegations are dismissed or determined to be without merit, then unjust enrichment is not a valid theory of recovery"); *Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.*, 723 F. Supp. 976, 994 (S.D.N.Y. 1989) (unjust enrichment claim dismissed where Court found valid contract not induced by fraud). To put it another way, it is not unjust to permit defendant to be enriched by a valid contract.

3

*7 For the foregoing reasons, plaintiff has failed to present a genuine issue of material fact to be tried with respect to his claims of fraud, undue influence, and unjust enrichment. Accordingly, defendant's motion for summary judgment is granted, and the complaint is dismissed.

SO ORDERED.

FN1. The Stock Option Agreement, found in Compl. Ex. 2, offers an option for 24 shares, which, following a stock split, has grown to 240,000 shares.

S.D.N.Y.,1995.
Lucas v. Oxigene, Inc.
Not Reported in F.Supp., 1995 WL 520752 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.