**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- x

ALICE KRAMER, as Personal Representative of the
Estate of Arthur Kramer,

                                    Plaintiff,

            – against –

LOCKWOOD PENSION SERVICES, INC., TALL
TREE ADVISORS, INC., LIFE PRODUCTS
CLEARING, LLC, TRANSAMERICA
OCCIDENTAL LIFE INSURANCE CO., PHOENIX
LIFE INSURANCE CO., LINCOLN LIFE &
ANNUITY CO. OF NEW YORK AND
JONATHAN S. BERCK,

                                    Defendants.

---------------------------------------------------------------- x

Civil Action No.
**08 CV 2429 (DAB)(MHD)**

**ECF Case**

**AFFIDAVIT OF STUART I. FRIEDMAN IN SUPPORT OF PLAINTIFF'S MOTION
TO DISMISS DEFENDANT PHOENIX LIFE INSURANCE CO.'S COUNTERCLAIMS**

STATE OF NEW YORK      )
                                         )      ss.:
COUNTY OF NEW YORK  )

Stuart I. Friedman, being duly sworn, deposes and says:

1.      I am a principal in the firm of Friedman & Wittenstein, A Professional

Corporation, attorneys for plaintiff Alice Kramer, as Personal Representative of the Estate of

Arthur Kramer.  I respectfully submit this affidavit in support of Plaintiff's Motion to Dismiss

Defendant Phoenix Life Insurance Co.'s ("Phoenix") Counterclaims.

2.      The following documents are attached hereto as Exhibits:

<u>Exhibit 1</u>:      Plaintiff's Amended Complaint, dated May 7, 2008;

<u>Exhibit 2</u>:      Phoenix's Answer to Amended Complaint with Counterclaims,
                         Cross-Claims and Third-Party Complaint, dated May 29, 2008;

Exhibit 3:    Phoenix Policy No. 97303913, in the amount of $10,000,000, dated July 10, 2005;

Exhibit 4:    Phoenix Policy No. 97303935, in the amount of $9,000,000, dated July 10, 2005;

Exhibit 5:    Phoenix Policy No. 97303936, in the amount of $9,000,000, dated July 10, 2005;

Exhibit 6:    Trust Agreement of the Arthur Kramer 2005 Insurance Trust, dated August 29, 2005;

Exhibit 7:    Fax cover sheet from Phoenix to Lockwood Pension Services, and Life Insurance Policy Questionnaire regarding Phoenix Policy No. 97303935, signed by Christina Bush of Phoenix and dated October 5, 2007;

Exhibit 8:    Fax cover sheet from Phoenix to Lockwood Pension Services, and Life Insurance Policy Questionnaire regarding Phoenix Policy No. 97303936, signed by Christina Bush of Phoenix and dated October 5, 2007.


_____
Stuart I. Friedman

Sworn to before me this
26th day of June, 2008

_____
Notary Public

PATRICIA N. TAKEMOTO
Notary Public, State of New York
No. 01TA4792771
Qualified in New York County
My Commission Expires 01/31/2010

# Ex. 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ALICE KRAMER, as Personal Representative of the Estate of Arthur Kramer, <br><br> Plaintiff, <br><br> – against – <br><br> LOCKWOOD PENSION SERVICES, INC., TALL TREE ADVISORS, INC., LIFE PRODUCTS CLEARING, LLC, TRANSAMERICA OCCIDENTAL LIFE INSURANCE CO., PHOENIX LIFE INSURANCE CO., LINCOLN LIFE & ANNUITY CO. OF NEW YORK AND JONATHAN S. BERCK, <br><br> Defendants. | Civil Action No. <br><br> 08 CV 2429 (DAB)(MHD) <br><br> ECF Case <br><br><br> **AMENDED COMPLAINT** |



Plaintiff Alice Kramer, in her fiduciary capacity as the Personal Representative of the Estate of Arthur Kramer ("Plaintiff"), by and through her attorneys, Friedman & Wittenstein, A Professional Corporation, hereby alleges as follows for her Amended Complaint:

## PARTIES

1.      Plaintiff is a citizen of the state of Connecticut, and resides in Stamford, Connecticut.  She is the widow of Arthur Kramer and the Personal Representative of his Estate. She brings this action in that capacity.

2.      Mr. Kramer died on January 26, 2008.  At the time of his death, he was a citizen of the state of Connecticut.

3.      Upon information and belief, defendant Lockwood Pension Services, Inc. ("LPS") is a New York corporation with its principal place of business located in New York, New York.

4.      Upon information and belief, defendant Tall Tree Advisors, Inc. ("TTA") is a New York corporation with its principal place of business located in Pleasantville, New York.

5.      Upon information and belief, defendant Life Products Clearing, LLC ("Life Products") is a Delaware limited liability company with its principal place of business located in New York, New York.

6.      Upon information and belief, defendant Transamerica Occidental Life Insurance Co. ("Transamerica") is an Iowa corporation with its principal place of business located in Cedar Rapids, Iowa.

7.      Upon information and belief, defendant Phoenix Life Insurance Co. ("Phoenix") is a New York corporation with its principal place of business located in East Greenbush, New York.

8.      Upon information and belief, defendant Lincoln Life & Annuity Co. of New York ("Lincoln") is a New York corporation with its principal place of business located in Syracuse, New York.

9.      Upon information and belief, defendant Jonathan S. Berck is a citizen of the state of New Jersey.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, because an actual controversy exists among the parties; and pursuant to 28 U.S.C. § 1332(a) and (c) in that the parties are citizens of different states and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

11.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred here.

## BACKGROUND

12.     This action involves an arrangement to procure life insurance policies with the purpose of immediately transferring the beneficial interests in those policies to stranger investors, in contravention of the "insurable interest rule" as codified in the New York Insurance Law.  As described herein, in a case such as this, where the procurement of life insurance violates the insurable interest rule, the remedy is either that the death benefits be paid to the personal representative of the decedent's estate (in this case, the Plaintiff) or, if already paid to a stranger investor, that they be disgorged and paid to the personal representative.

13.     The "insurable interest rule" is a well-settled principle in New York insurance law that prevents the issuance of wager life insurance policies.  New York Insurance Law Section 3205(b)(2) provides that one may not obtain an insurance policy on the life of another without having an "insurable interest" in the insured's life.

14.     It is against public policy for parties to circumvent the insurable interest rule by participating in the procurement of what is known as "stranger-owned life insurance" ("SOLI").  A typical SOLI arrangement is initiated by a stranger investor or an insurance agent who approaches an elderly person and encourages him to purchase life insurance, the death benefits of which will be immediately transferred to the stranger investor.  The appeal of a SOLI arrangement is that the purchase of life insurance is represented to the elderly person as a way to receive a payment of money on a risk-free basis at little or no cost.  The investor typically agrees to pay the person an up-front payment in addition to paying the insurance premiums in return for the assignment of the ownership interest in the policy.  The common characteristic of all SOLI arrangements is that they are structured so that the elderly person or a family member, rather than the stranger investor, is made to appear as the original beneficiary of the policy in order to

3

try to evade the insurable interest requirement. Such arrangements are contrary to public policy because they enable investors to speculate or wager on a person's death.

15.    As further described below, defendants participated in an elaborate and unlawful SOLI arrangement where every detail, from drafting the trust agreements to choosing the trustees and investors, was structured for the sole purpose of trying to avoid the insurable interest rule. The arrangement was implemented by defendants to create the appearance that an insurable interest existed when Mr. Kramer took out several policies, so that the subsequent transfers of the beneficial interests in those policies to the stranger investors would appear lawful. However, the transfers to investors took place immediately upon Mr. Kramer's obtaining of the policies at issue, and that was always their plan. At no time were Mr. Kramer or any of his family members the true owners of the beneficial interests in the policies. Upon information and belief, Mr. Kramer never intended for the death benefits of the insurance policies to benefit his family.

16.    The putative assignments of the beneficial interests in the death benefits of the policies are void under New York law.

## FACTS

17.    Arthur Kramer was a retired attorney at the time of his death on January 26, 2008 at the age of 81.

18.    Upon information and belief, as early as 2003, Steven Lockwood, the principal of LPS, approached Mr. Kramer to solicit his participation in a SOLI arrangement.

19.    Upon information and belief, during 2005, Mr. Lockwood introduced Mr. Kramer to the SOLI arrangement that is the subject matter of this litigation.

20.    Upon information and belief, the SOLI arrangement worked as follows: Mr. Kramer, at the direction of LPS and possibly other defendants, would establish trusts, naming

4

himself as the depositor and one or more of his children as the initial beneficiaries. An LPS affiliated person or entity would be appointed as the trustee. The witnesses to the trust instrument would be Mr. Lockwood and one of his associates. Upon the issuance of the policies, Mr. Kramer, again acting at the direction of LPS and possibly other defendants, would immediately direct his children to execute a putative assignment of their nominal interest in the trust to a stranger third-party investor arranged by Mr. Lockwood. (The three children from Mr. Kramer's marriage to Plaintiff are Andrew Kramer ("Andrew"), Rebecca Kramer ("Rebecca") and Liza Kramer ("Liza")).

21.      Upon information and belief, the insurance policies were procured on Mr. Kramer's life with the intention of _immediately_ effectuating the assignment of the beneficial interests in the policies to an investor. At no time would Mr. Kramer or any of his family members have a true beneficial interest in the policies.

22.      Upon information and belief, LPS and certain other defendants employed the above-described SOLI arrangement with respect to a series of life insurance policies totaling approximately $56,200,000 on the life of Mr. Kramer. These policies were issued by defendants Transamerica, Phoenix and Lincoln.

**The Transamerica Policies**

23.      On or about June 6, 2005, Mr. Kramer, at the direction of LPS and possibly other defendants, established the Arthur Kramer Insurance Trust (the "June Trust") and named Lori Callegari as trustee. Mr. Kramer also listed Andrew and Rebecca as the putative beneficiaries thereunder. Mr. Lockwood and his associate witnessed the June Trust agreement. Under the terms of the June Trust agreement, the trust is governed by New York law.

5

24.    Upon information and belief, the June Trust agreement was prepared by counsel for LPS, and Mr. Kramer had no involvement in its drafting.

25.    Upon information and belief, Mr. Kramer had no prior business relationship with Ms. Callegari, who at the time was employed by LPS or TTA. Upon information and belief, Ms. Callegari is presently a Vice President of LPS, and works for Mr. Lockwood at 75 Rockefeller Plaza.

26.    Upon information and belief, Ms. Callegari is no longer the trustee of the June Trust. Upon information and belief, defendant Jonathan S. Berck is the current trustee.

27.    Upon information and belief, Mr. Kramer had no business relationship with defendant Mr. Berck prior to the SOLI arrangement that is the subject matter of this litigation.

28.    Upon information and belief, in June and July 2005, Transamerica issued one or more insurance policies to the June Trust having a total death benefit of approximately $18,200,000 (the "Transamerica Policies") on the life of Mr. Kramer.

29.    Upon information and belief, upon issuance of the policies, and at the direction of LPS and possibly other defendants, Mr. Kramer directed Andrew and Rebecca to execute putative assignments of their beneficial interests in the June Trust to stranger investor TTA.

30.    Upon information and belief, at the direction of LPS and possibly other defendants, in 2007, defendant Mr. Berck in his capacity as trustee of the June Trust, sold the ownership interests in the Transamerica Policies to a non-party individual or entity.

31.    Mr. Kramer, Andrew and Rebecca never paid any premiums on the Transamerica Policies, and there was no period of time when Andrew and Rebecca were the true beneficiaries of the June Trust after the Transamerica Policies were issued.

**The Phoenix Policies**

32.     On or about August 29, 2005, Mr. Kramer, at the direction of LPS and possibly other defendants, established the Arthur Kramer 2005 Insurance Trust (the "August Trust") and named Hudson United Bank ("Hudson") as trustee.  Mr. Kramer also listed Liza as the putative beneficiary thereunder.  Mr. Lockwood and one of his associates witnessed the August Trust agreement.  Under the terms of the August Trust agreement, the trust is governed by New York law.

33.     Upon information and belief, the August Trust agreement was prepared by counsel for LPS, and Mr. Kramer had no involvement in its drafting.

34.     Upon information and belief, at the time the August Trust was created, Hudson and LPS had a pre-existing business relationship and shared the same business address at 75 Rockefeller Plaza, New York, New York.

35.     Upon information and belief, Mr. Kramer had no prior business relationship with Hudson.

36.     Upon information and belief, Hudson is no longer the trustee of the August Trust.  Upon information and belief, defendant Mr. Berck is the current trustee.

37.     Upon information and belief, in July 2005, Phoenix issued one or more insurance policies to the August Trust having a total death benefit of approximately $28,000,000 (the "Phoenix Policies") on the life of Mr. Kramer.

38.     Upon information and belief, upon issuance of the policies, and at the direction of LPS and possibly other defendants, Mr. Kramer directed Liza to execute putative assignments of her beneficial interest in the August Trust to stranger investor TTA.

39.     Upon information and belief, at the direction of LPS and possibly other defendants, in 2007, defendant Mr. Berck in his capacity as trustee of the August Trust, sold the ownership interest in the Phoenix Policies to a non-party individual or entity.

40.     Upon information and belief, Mr. Kramer and Liza never paid any premiums on the Phoenix Policies, and there was no period of time when Liza was the true beneficiary of the August Trust after the Phoenix Policies were issued.

**The Lincoln Policies**

41.     Upon information and belief, on or about November 28, 2005, Lincoln issued one or more insurance policies to the August Trust having a total death benefit of $10,000,000 (the "Lincoln Policies") on the life of Mr. Kramer.

42.     Upon information and belief, upon issuance of the policies, and at the direction of LPS and possibly other defendants, Mr. Kramer directed Liza to execute putative assignments of her beneficial interest in the August Trust to stranger investor Life Products.

43.     Mr. Kramer and Liza never paid any premiums on the Lincoln Policies, and there was no period of time when Liza was the true beneficiary of the August Trust after the Lincoln Policies were issued.

**Arthur Kramer's Death**

44.     Mr. Kramer died on January 26, 2008.

45.     Subsequently, Plaintiff or her representatives have received various communications from representatives of defendant LPS and certain stranger investors demanding copies of Mr. Kramer's death certificate so that they may submit claims to the insurance companies for a total of approximately $56,200,000 in death benefits.  Plaintiff has refused all such requests.

8

46.     Pursuant to New York Insurance Law Section 3203(a)(3), all of the aforementioned life insurance policies are incontestable because they were in force during the life of Mr. Kramer for more than two years.  However, upon information and belief, none of the insurance company defendants have paid out the proceeds of any of the policies.  On April 9, 2008, approximately one month after the initial Complaint in this action was filed, Phoenix filed a pleading in this action indicating, inter alia, its intention not to pay any death benefits in connection with the Phoenix Policies.  On or about April 16, 2008, approximately five weeks after the initial Complaint in this action was filed, defendant Lincoln filed an action in Connecticut state court indicating its intention, inter alia, not to pay any death benefits in connection with the Lincoln Policies.  Defendant Transamerica has not yet responded to the initial Complaint in this action, and was granted until June 15, 2008 to do so.

## FIRST CLAIM FOR RELIEF

## (DECLARATORY JUDGMENT)

47.     Plaintiff hereby repeats and realleges each and every allegation contained in paragraphs 1-46 above.

48.     New York Insurance Law Section 3203(a)(3) provides:

(a)     All life insurance policies, except as otherwise stated herein, delivered or issued for delivery in this state, shall contain in substance the following provisions, or provisions which the superintendent deems to be more favorable to policyholders:

* * *

(3)     that the policy shall be incontestable after being in force during the life of the insured for a period of two years from its date of issue . . .

9

49.    New York Insurance Law Section 3205(b)(2) provides:

No person shall procure or cause to be procured, directly or by
assignment or otherwise any contract of insurance upon the person
of another unless the benefits under such contract are payable to
the person insured or his personal representatives, or a person
having, at the time when such contract is made, an insurable
interest in the person insured.

50.    New York Insurance Law Section 3205(a)(1) defines an "insurable interest" as

"(A) in the case of persons closely related by blood or by law, a substantial interest engendered

by love and affection; (B) in the case of other persons, a lawful and substantial economic interest

in the continued life, health or bodily safety of the person insured, as distinguished from an

interest which would arise only by, or would be enhanced in value by, the death, disablement or

injury of the insured."

51.    Neither TTA nor Life Products held an insurable interest in the life of Mr.

Kramer.

52.    TTA and Life Products procured or caused to be procured, directly or by

assignment or otherwise, contracts of insurance upon the person of Mr. Kramer.

53.    TTA lacked an insurable interest in Mr. Kramer at the time the Transamerica and

Phoenix Policies were issued.  Life Products lacked an insurable interest in Mr. Kramer at the

time the Lincoln Policies were issued.

54.    In the case of TTA, the Transamerica and Phoenix Policies on the life of Mr.

Kramer were procured with the view to their immediate assignment to TTA.  In the case of Life

Products, the Lincoln Policies on the life of Mr. Kramer were procured with the view to their

immediate assignment to Life Products.

55.     Pursuant to New York Insurance Law Sections 3203(a)(3) and 3205(b)(2),

Plaintiff is entitled to a declaration that the insurance company defendants must pay the death

benefits under the aforementioned policies, and that such death benefits must be paid to her.

## SECOND CLAIM FOR RELIEF

### (AGAINST DEFENDANTS LOCKWOOD PENSION SERVICES, INC., TALL TREE ADVISORS, INC., LIFE PRODUCTS CLEARING, LLC AND JONATHAN S. BERCK FOR THE RECOVERY OF DEATH BENEFITS)

56.     Plaintiff repeats and realleges each and every allegation contained in paragraphs

1-55 above.

57.     New York Insurance Law Section 3205(b)(4) provides:

> If the beneficiary, assignee or other payee under any contract made
> in violation of this subsection [(b)] receives from the insurer any
> benefits hereunder accruing upon the death, disablement or injury
> of the person insured, the person insured or his executor or
> administrator may maintain an action to recover such benefits from
> the person receiving them.

58.     In the alternative, if some or all of the death benefits of the aforementioned

policies have already been paid to LPS, TTA, Life Products, Mr. Berck or their representatives

or assignees, or to other persons or entities that may claim the right to receive such death

benefits, then pursuant to this statute, Plaintiff is entitled to recover such death benefits.


WHEREFORE, Plaintiff prays for judgment against Lockwood Pension Services, Inc.,

Tall Tree Advisors, Inc., Life Products Clearing, LLC, Transamerica Occidental Life Insurance

Co., Phoenix Life Insurance Co., Lincoln Life & Annuity Co. of New York and Jonathan S.

Berck as follows:

A.    Declaring that the insurance company defendants must pay the death benefits under the aforementioned life insurance policies, and that such death benefits must be paid to Plaintiff;

B.    Awarding Plaintiff the death benefits of all the aforementioned policies;

C.    Awarding Plaintiff reasonable attorneys' fees, and the costs and disbursements of this action; and

D.    Awarding Plaintiff such other and further relief as this Court may deem just and proper.

Dated: New York, New York
      May 7, 2008

FRIEDMAN & WITTENSTEIN
A Professional Corporation

By: _____
     Stuart I. Friedman (SF-9186)
     Andrew A. Wittenstein (AW-1943)
     Claire L. Chau (CC-4738)

600 Lexington Avenue
New York, New York 10022
(212) 750-8700

*Attorneys for Plaintiff*

12

# Ex. 2

Patrick J. Feeley (PF-4931)
Christopher G. Karagheuzoff (CK-1122)
Stephen M. Raab (SR-0742)
DORSEY & WHITNEY LLP
250 Park Avenue
New York, New York 10177
(212) 415-9200

*Attorneys for Defendant and Third-Party Plaintiff
Phoenix Life Insurance Co.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALICE KRAMER, as Personal Representative of the Estate of Arthur Kramer,<br><br>                   Plaintiff,<br><br>   – against –<br><br>LOCKWOOD PENSION SERVICES, INC., TALL TREE ADVISORS, INC., LIFE PRODUCTS CLEARING, LLC, TRANSAMERICA OCCIDENTAL LIFE INSURANCE CO., PHOENIX LIFE INSURANCE CO., LINCOLN LIFE & ANNUITY CO. OF NEW YORK AND JONATHAN S. BERCK,<br><br>                   Defendants.<br><br>PHOENIX LIFE INSURANCE CO.,<br><br>                 Third-Party Plaintiff,<br><br>   – against –<br><br>STEVEN LOCKWOOD,<br><br>                 Third-Party Defendant. | Case No. 08 CV 2429 (DAB) (MHD)<br><br>ECF CASE<br><br>**ANSWER TO AMENDED COMPLAINT WITH COUNTERCLAIMS, CROSS-CLAIMS AND THIRD-PARTY COMPLAINT** |

      Defendant Phoenix Life Insurance Co. ("Phoenix"), by its undersigned attorneys, hereby

answers the amended complaint of Alice Kramer, as Personal Representative of the Estate of

Arthur Kramer ("Plaintiff" or "Estate"), in corresponding numbered paragraphs as follows:

**RESPONSE TO "PARTIES"**

1.     Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations concerning the citizenship and residency of Plaintiff, and otherwise, on information and belief, admits the allegations contained in Paragraph 1.

2.     Phoenix denies having knowledge or information sufficient to form a belief as to whether Mr. Kramer was "a citizen of the State of Connecticut" at the time of his death, and otherwise admits the allegations contained in Paragraph 2.

3.     Phoenix, on information and belief, admits that Lockwood Pension Services, Inc. is a New York corporation, and denies having knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations contained in Paragraph 3.

4.     Phoenix, on information and belief, admits the allegations contained in Paragraph 4.

5.     Phoenix, on information and belief, admits that Life Product Clearing, LLC is a Delaware limited liability company, and denies having knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations contained in Paragraph 5.

6.     Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 6.

7.     Phoenix admits that it is incorporated in New York.  The remainder of the allegations contained in Paragraph 7 state a conclusion of law to which no response is required. To the extent that a response is required, Phoenix denies the remaining allegations contained in Paragraph 7.

8.     Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 8.

9.      Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 9.

## RESPONSE TO "JURISDICTION AND VENUE"

10.      Phoenix states that the allegations contained in Paragraph 10 state a conclusion of law to which no response is required.

11.      Phoenix states that the allegations contained in Paragraph 11 state a conclusion of law to which no response is required.

## RESPONSE TO "BACKGROUND"

12.      Phoenix, on information and belief, admits that this action involves an arrangement to procure life insurance policies with the purpose of immediately transferring the beneficial interest in those policies to stranger investors, in contravention of the "insurable interest rule" that Phoenix avers is recognized by the statutory and/or common law of most states (including the New York Insurance Law), and states that the remaining allegations contained in Paragraph 12 state conclusions of law to which no response is required. To the extent a response to the remaining allegations is deemed necessary, Phoenix denies that Plaintiff is entitled to the disgorgement of the payment of death benefits and that death benefits should in any event be paid to Plaintiff.

13.      Phoenix admits the allegations contained in Paragraph 13.

14.      Phoenix admits the allegations contained in Paragraph 14.

15.      Phoenix, on information and belief, admits the allegations contained in Paragraph 15.

16.      Phoenix states that the allegations contained in Paragraph 16 state a conclusion of law to which no response is required. To the extent a response is deemed necessary, Phoenix

-3-

admits that the entire "stranger-owned life insurance" ("SOLI") arrangements, including the putative assignments of the beneficial interests in the death benefits of the policies, are void under New York law and the laws of most states.

## RESPONSE TO "FACTS"

17.     Phoenix, on information and belief, admits that Arthur Kramer was an attorney and died on January 26, 2008, and denies having knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations contained in Paragraph 17.

18.     Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 18 to the extent that it alleges that Mr. Lockwood may have first approached Mr. Kramer in 2003, but avers, on information and belief, that Messrs. Lockwood and Kramer participated in a SOLI scheme that resulted in the procurement of three Phoenix policies numbered 97303913, 97303935, and 97303936 (the "Phoenix Policies") for a total amount of $28,000,000.

19.     Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 19 to the extent that it suggests that Mr. Lockwood first introduced Mr. Kramer to the SOLI arrangement, but avers, on information and belief, that Messrs. Lockwood and Kramer participated in a SOLI scheme that resulted in the procurement of the Phoenix Policies.

20.     Phoenix, on information and belief, admits the allegations contained in Paragraph 20, except denies having knowledge or information sufficient to form a belief as to the truth of those allegations that identify the children of Mr. Kramer and Mrs. Kramer.

21.     Phoenix, on information and belief, admits the allegations contained in Paragraph 21.

-4-

22.    Phoenix, on information and belief, admits the allegations contained in Paragraph 22, except denies having knowledge or information sufficient to form a belief as to the truth of those allegations concerning the total amount of the life insurance policies that are the subject of Plaintiff's suit.

**Response to "The Transamerica Policies"**

23.    Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 23.

24.    Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 24.

25.    Phoenix denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 25.

26.    Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 26.

27.    Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 27.

28.    Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 28.

29.    Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 29.

30.    Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 30.

31.    Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 31.

**Response to "The Phoenix Policies"**

32.     Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 32, but avers that the insurance application for the Phoenix Policies lists the "Arthur Kramer 2005 Insurance Trust" as the owner and beneficiary of the policies, and lists "Hudson United Bank" as trustee.

33.     Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 33.

34.     Phoenix, on information and belief, admits the allegations contained in Paragraph 34.

35.     Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 35.

36.     Phoenix, on information and belief, admits the allegations contained in Paragraph 36.

37.     Phoenix denies that it issued the Phoenix Policies in July 2005, admits the remaining allegations contained in Paragraph 37, and avers that when Phoenix issued the Phoenix Policies on the life of Mr. Kramer, the ostensible owner and beneficiary of them were represented to be the "Arthur Kramer 2005 Insurance Trust."

38.     Phoenix, on information and belief, admits that the assignment or transfer of the beneficial interest in the Phoenix Policies occurred on or about when they were issued, and otherwise denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 38.

39.     Phoenix, on information and belief, admits the allegations contained in Paragraph 39, and avers, on information and belief, that Mr. Kramer and/or unknown others

directed, approved, and/or participated in such sale.

  40. Phoenix, on information and belief, admits the allegations contained in Paragraph 40.

**Response to "The Lincoln Policies"**

  41. Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 41.

  42. Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 42.

  43. Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 43.

**Response to "Arthur Kramer's Death"**

  44. Phoenix, on information and belief, admits the allegations contained in Paragraph 44.

  45. Phoenix denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 45.

  46. Phoenix admits that, on April 9, 2008, it filed its Answer to Complaint with Counterclaims, Cross-Claims and Third-Party Complaint, and respectfully refers the Court to it for a complete and accurate recitation of the contents thereof, admits that it has not paid out the proceeds on any of the Phoenix Policies, denies that the policies are incontestable under New York or other states' laws, and denies having knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations contained in Paragraph 46.

## RESPONSE TO FIRST CLAIM FOR RELIEF

  47. Phoenix repeats and re-alleges its responses to Paragraphs 1 - 46 as though fully

set forth herein.

48.    Phoenix admits that Plaintiff has accurately quoted New York Insurance Law Section 3203(a)(3) in Paragraph 48.

49.    Phoenix admits that Plaintiff has accurately quoted New York Insurance Law Section 3205(b)(2) in Paragraph 49.

50.    Phoenix admits that Plaintiff has accurately quoted New York Insurance Law Section 3205(a)(1) in Paragraph 50.

51.    Phoenix admits the allegations contained in Paragraph 51.

52.    Phoenix admits the allegations contained in Paragraph 52, and avers that at this time it lacks information sufficient to form a belief as to whether additional actors were involved in procuring contracts of insurance upon the person of Mr. Kramer or causing such contracts of insurance to be procured.

53.    Phoenix admits the allegations contained in Paragraph 53.

54.    Phoenix admits the allegations contained in Paragraph 54.

55.    Phoenix denies the allegations contained in Paragraph 55.

## RESPONSE TO SECOND CLAIM FOR RELIEF

56.    Phoenix repeats and re-alleges its responses to Paragraphs 1 - 55 as though fully set forth herein.

57.    Phoenix admits that Plaintiff has accurately quoted New York Insurance Law Section 3205(b)(4) in Paragraph 57.

58.    Phoenix states that the allegations contained in Paragraph 58 state a conclusion of law to which no response is required.  To the extent that a response to the allegations is deemed necessary, Phoenix denies the allegations.

## DEFENSES

### FIRST DEFENSE
**(Failure to State a Claim for Relief)**

59.    The Complaint fails to state a claim against Phoenix upon which relief may be granted.

### SECOND DEFENSE
**(No Damage or Injury)**

60.    Plaintiff is barred from recovery against Phoenix, in whole or in part, by the lack of damage or injury to Plaintiff.

### THIRD DEFENSE
**(Unjust Enrichment)**

61.    Plaintiff is barred from recovery against Phoenix, in whole or in part, because it would be unjustly enriched if permitted to collect the sums to which it claims it is entitled.

### FOURTH DEFENSE
**(Estoppel)**

62.    Plaintiff is barred from recovery against Phoenix, in whole or in part, by the doctrine of estoppel.

### FIFTH DEFENSE
**(Unclean Hands)**

63.    Plaintiff is barred from recovery against Phoenix, in whole or in part, by the doctrine of unclean hands.

### SIXTH DEFENSE
**(No Insurable Interest)**

64.    Plaintiff is barred from recovery against Phoenix because there was no insurable interest at the time that the Phoenix Policies were procured, thereby rendering them void from their inception.

## SEVENTH DEFENSE
### (Void - Public Policy)

65.     Plaintiff is barred from recovery against Phoenix because the Phoenix Policies were procured pursuant to a fraudulent SOLI scheme in which Mr. Kramer knowingly participated, which relieves Phoenix of any obligation to pay death benefits.

## EIGHTH DEFENSE
### (No Standing)

66.     Plaintiff is barred from recovery because she lacks standing to sue Phoenix.

## NINTH DEFENSE
### (Failure to Join Required Parties)

67.     Plaintiff is barred from recovery against Phoenix, in whole or in part, because it has failed to join parties required by Federal Rule of Civil Procedure 19.

## RESERVATION OF RIGHT TO ASSERT ADDITIONAL DEFENSES

68.     Phoenix has not knowingly or voluntarily waived any applicable affirmative defenses and reserves the right to assert and rely upon such additional affirmative defenses to the Complaint as may become available or apparent as discovery commences and progresses in this action.

## COUNTERCLAIMS, CROSS-CLAIMS & THIRD-PARTY COMPLAINT

## GENERAL ALLEGATIONS

1.     Phoenix repeats and re-alleges Paragraphs 1-68 of its Answer as though fully set forth herein.

2.     On information and belief, Steven Lockwood ("Lockwood") is the owner and chief executive officer of Lockwood Pension Services, Inc. ("LPS") and Tall Tree Advisors, Inc. ("Tall Tree").

3.    On information and belief, Lockwood, LPS, and Tall Tree all reside at the same address: 2 Tall Tree Lane, Pleasantville, New York.

4.    Jonathan S. Berck ("Berck") has served, and continues to serve, as the trustee for various life insurance trusts that Lockwood helped to establish.

5.    On information and belief, Lockwood, LPS, Life Product Clearing LLC ("Life Product"), M&M Brokerage Services, Inc. ("M&M"), and Berck all have (or had during the time period relevant to this action) offices located at 75 Rockefeller Plaza, New York, New York.

6.    On information and belief, Lockwood, LPS, Tall Tree, Life Product, and Berck have developed a formulaic method of circumventing New York's insurable interest rule. On information and belief, this method involves using elderly persons, and the trusts they encourage or aid them in establishing, as strawmen to acquire life insurance policies for the benefit of strangers who have no insurable interest in the lives of the insureds (*i.e.*, a "SOLI" scheme).

7.    On information and belief, Lockwood, LPS, Tall Tree, Life Product, and Berck have used fraudulent SOLI schemes to procure multiple life insurance policies worth hundreds of millions of dollars. On information and belief, all of the insurance policies at issue in this lawsuit were procured by means of fraudulent SOLI schemes formulated and perpetuated by Lockwood, LPS, Tall, Life Product, and Berck.

8.    On information and belief, Lockwood colluded with Arthur Kramer to participate in one or more fraudulent SOLI arrangements. In particular, Lockwood colluded with Mr. Kramer (a) to establish a life insurance trust, (b) to apply for one or more life insurance policies in which the trust would be both the policyholder and beneficiary of the policies, (c) upon the issuance of the policies, to immediately transfer the beneficial interest in the trust to Tall Tree

-11-

and/or Life Product in exchange for monetary compensation, and (d) to replace the financial institution trustee of the trust with Berck.

9.      On or about July 1, 2005, Lockwood and Phoenix entered into a contract pursuant to which Lockwood would serve as an independent producer of various Phoenix products, including life insurance policies.

10.     On or about August 30, 2005, Phoenix approved the Independent Producer Contract (the "IPC").

11.     On or about August 29, 2005, Mr. Kramer established the Arthur Kramer 2005 Insurance Trust (the "Kramer August Trust").

12.     On information and belief, the only advantage and purpose of the Kramer August Trust was to effectuate a transfer of the right to the death proceeds payable under the requested life insurance policies in a fraudulent manner that would not be apparent to Phoenix.

13.     Mr. Kramer submitted (through Lockwood) a life insurance application to Phoenix in early September 2005 (the "Phoenix Application").

14.     On information and belief, Mr. Kramer did not apply for life insurance on his own initiative, but rather was induced to do so by the offer of ready cash.

15.     On information and belief, at the time he submitted the Phoenix Application, Mr. Kramer had no intention of procuring life insurance for the benefit of himself or his family; rather, Mr. Kramer was attempting to procure a policy for the benefit of a stranger investor with no insurable interest in his life.

16.     On information and belief, the stranger investor on whose behalf Mr. Kramer procured the life insurance was Tall Tree. Thus, Tall Tree was the true intended beneficiary of the requested policy.

-12-

17.    In Sections II and III of Part I of the Phoenix Application, Mr. Kramer represented that the owner and beneficiary of the policies applied for would be the Kramer August Trust.

18.    Mr. Kramer signed Part I of the Phoenix Application on or about September 2, 2005.

19.    Above Mr. Kramer's signature on Part I of the Phoenix Application, the application states, in relevant part:

> I have reviewed this application, and the statements made herein are those of the proposed insured and all such statements made by the proposed insured in Part I or and in Part II of this application are full, complete, and true to the best knowledge and belief of the undersigned and have been correctly recorded . . .

> I understand and agree that the Insurance applied for shall not take effect unless and until each of the following has occurred: the policy has been issued by the Company; the premium required for the issuance of the policy has been paid in full during the lifetime of the insured; all the representations made in the application remain true, complete and accurate as of the latest of such dates; and there has been no change in the health of any proposed insured that would change the answers to any of the questions in the application . . . .

20.    Lockwood signed Part I of the Phoenix Application as the producer of the Phoenix policies numbered 97303913, 97303935, and 97303936 (the "Phoenix Policies") for a total amount of $28,000,000.

21.    Above Lockwood's signature on Part I of the Phoenix Application, the Application states, in relevant part, that "The Producer hereby confirms he/she has truly and accurately recorded on the application the information supplied by the Proposed Insured; and that he/she is qualified and authorized to discuss the contract herein applied for."

22.    Given the applicable law and public policy prohibiting "wager" life insurance policies, Mr. Kramer, Lockwood, and the Trustee implicitly represented that (a) the Kramer August Trust would be the true owner and beneficiary of the requested Phoenix Policies (*i.e.*, not

-13-

just a strawman), and (b) the Kramer August Trust and its intended beneficiary had an insurable interest in Mr. Kramer's life.

23.    While Phoenix was processing and underwriting Mr. Kramer's Phoenix Application, Lockwood informed Phoenix that Mr. Kramer would like a total of $28 million of life insurance, issued to the Kramer August Trust in three separate policies, based on the same Phoenix Application.

24.    In reliance upon the truth of the representations made in the Phoenix Application, Phoenix issued the Phoenix Policies.

25.    Phoenix delivered the Phoenix Policies to Lockwood in or about October 2005.

26.    On information and belief, the beneficial interest in the Kramer August Trust was transferred to Tall Tree on or about October 13, 2005.

27.    On October 21, 2005, Mr. Kramer signed three Policy Acceptance Forms acknowledging receipt of the Phoenix Policies.

28.    Above Mr. Kramer's signature on each Policy Acceptance Form, the Form stated, in relevant part, that "The insured(s) declares that the statements made in the application remain full, complete, and true as of this date . . . ."

29.    On information and belief, Berck was appointed the successor trustee of the Kramer August Trust on or about July 10, 2006. On information and belief, Lockwood had a relationship with Berck that involved similar SOLI arrangements, and Berck's appointment as successor trustee allowed Lockwood to tightly control the Phoenix Policies.

30.    The application for the Phoenix Policies, the creation of the Kramer August Trust, and the transfer of the beneficial interest in the Kramer August Trust (and thus the beneficial proceeds of the Phoenix Policies), were all part of a single transaction, which had as its purpose

the procurement of a policy of insurance on Mr. Kramer's life by a person having no insurable interest in his life.

31.    Indeed, while an insured may be permitted to apply for life insurance on his own initiative and for the benefit of a person with a valid insurable interest (*i.e.*, not for the benefit of a stranger) and then **after** the policy is issued, decide to transfer the beneficial interest in the policy, there is no chance that such a legitimate transfer occurred in this case.  That is, Plaintiff cannot plausibly claim, and indeed does not claim, that Mr. Kramer just happened to decide – after the Phoenix Policies were issued – to transfer the beneficial interest in the Phoenix Policies to Tall Tree.  *First*, the beneficial interest was transferred before Mr. Kramer even acknowledged receipt of the Phoenix Policies and before the first premium was paid.  *Second*, with the assistance of Lockwood and within, at most, a six-month span, Mr. Kramer procured at least seven insurance policies from three different insurance companies, worth a total of $56 million.  On information and belief, Mr. Kramer transferred the ultimate right to the proceeds of every single one of those policies on or about the time that they were issued.

32.    The identity of the parties, the clear characteristics of a SOLI scheme, the timing of the applications and transfers, and the sheer number and value of policies involved provide clear and convincing evidence of an intent to procure the Phoenix Policies for the benefit of a stranger-investor who had no valid insurable interest.

33.    Although Phoenix lacks information regarding the specific details of the transactions involving the Transamerica and Lincoln Life policies at issue in this lawsuit, on information and belief those policies were procured by virtually identical SOLI schemes involving Lockwood, LPS, an outside investor (either Tall Tree or Life Product), and Berck (as successor trustee to the relevant trusts).

34.     Therefore, the Phoenix Policies and the other policies were fraudulently procured in violation of state law.

## FIRST COUNTERCLAIM
### (Fraud)

35.     Phoenix repeats and re-alleges Paragraphs 1 - 68 of its Answer and 1 - 34 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

36.     On the Phoenix Application and by his reaffirmation thereof on October 21, 2005, Mr. Kramer represented that the true owner and beneficiary of the Phoenix Policies was the Kramer August Trust and that the Kramer August Trust (and its true beneficiary) had a valid insurable interest in his life.

37.     These representations were incomplete and false when made, and Mr. Kramer knew they were incomplete and false when he made them.

38.     By making these misrepresentations Mr. Kramer intended to deceive Phoenix with respect to the identity of the true beneficiary of the Phoenix Policies and with respect to the true beneficiary's lack of an insurable interest in Mr. Kramer's life.

39.     Phoenix relied on Mr. Kramer's representations that the Kramer August Trust was the true owner and beneficiary of the Phoenix Policies and that the Kramer August Trust (and its true beneficiary) had a valid insurable interest in Mr. Kramer's life.

40.     As a result of Mr. Kramer's misrepresentation, Mr. Kramer knowingly induced Phoenix to issue life insurance policies that it would not have issued but for Mr. Kramer's misrepresentation.

41.     If Phoenix is required to pay any death benefits pursuant to the Phoenix Policies, Mr. Kramer – by his misrepresentation and his substantial participation in the fraudulent SOLI scheme described above – will have caused Phoenix to suffer damages in the amount of such

payments. He has also caused Phoenix to suffer additional damages, including but not limited to commissions paid on the Phoenix Policies. The Estate is liable for any damages caused by Mr. Kramer.

## SECOND COUNTERCLAIM
### (Aiding and/or Abetting Breach of Fiduciary Duty)

42.    Phoenix repeats and re-alleges Paragraphs 1 - 68 of its Answer and 1 - 41 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

43.    Mr. Kramer knew or should have known that Lockwood owed Phoenix a fiduciary duty.

44.    Mr. Kramer knew or should have known that such fiduciary duty included a duty of full disclosure with respect to the Phoenix Application and a duty not to procure SOLI policies which Lockwood knew or should have known Phoenix would decline to issue if Phoenix knew of the true nature of such policies.

45.    Mr. Kramer substantially participated in Lockwood's breach of fiduciary duty by (a) creating and/or acquiescing to the creation of the Kramer August Trust, (b) submitting and reaffirming the Phoenix Application, (c) misrepresenting the true beneficiary of the Phoenix Policies and the presence of a valid insurable interest in Mr. Kramer's life, and (d) immediately transferring the beneficial interest in the Kramer August Trust (and thus the Phoenix Policies) to Lockwood's company, Tall Tree, after the Phoenix Policies were delivered.

46.    By substantially participating in the SOLI scheme, Mr. Kramer knew or should have known that he and Lockwood induced Phoenix to issue life insurance policies that it would not have issued but for Mr. Kramer's participation in the SOLI scheme. Thus, Mr. Kramer knew or should have known that he was aiding and abetting Lockwood's breach of fiduciary duty.

-17-

47.    If Phoenix is required to pay any death benefits pursuant to the Phoenix Policies, Mr. Kramer – by his substantial participation in the fraudulent SOLI scheme – will have caused Phoenix to suffer damages in the amount of such payments.  He has also caused Phoenix to suffer additional damages, including but not limited to commissions paid on the Phoenix Policies.  The Estate is liable for any damages caused by Mr. Kramer.

### THIRD COUNTERCLAIM
### (Unjust Enrichment)

48.    Phoenix repeats and re-alleges Paragraphs 1 - 68 of its Answer and 1 - 47 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

49.    As set forth above and below, on information and belief, Mr. Kramer and/or other beneficiaries of his estate knowingly received substantial payments in exchange for their transfer of the beneficial interests in the Phoenix Policies that Mr. Kramer procured without a valid insurable interest.

50.    In the event that the Court rules that Plaintiff is entitled to the proceeds of the Phoenix policies, then the Estate will have been rewarded financially not only by benefiting from insurance policies that were procured without a valid insurable interest, but from the payments received by Mr. Kramer and/or other beneficiaries of his estate from the transfer of the beneficial interests in the Phoenix Policies.

51.    The circumstances as described herein are such that it would be inequitable, if the Estate receives the proceeds of the Phoenix Policies, for the Estate to also retain any payments that Mr. Kramer (or other beneficiaries) received for the transfer of the beneficial interests in the policies.

52.    In the event that the Estate receives the proceeds of the Phoenix Policies, then Phoenix is entitled to the full amount of the Estate's ill-gotten gains, including interest, resulting

-18-

from Mr. Kramer's unlawful, unjust and inequitable conduct in connection with the Phoenix Policies, including but not limited to the payments received in exchange for transfer of the beneficial interests in the Phoenix Policies that he never intended to retain. The Estate is liable for any damages caused by Mr. Kramer.

<div align="center">

**CROSS-CLAIMS**

**FIRST CROSS-CLAIM**
**(Lockwood Pension Services, Inc. and Tall Tree Advisors, Inc. –**
**Aiding and/or Abetting Fraud)**

</div>

53.    Phoenix repeats and re-alleges Paragraphs 1 - 68 of its Answer and 1 - 52 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

54.    On information and belief, Lockwood acted not just on behalf of himself, but also on behalf of and/or in concert with his company LPS, through which he marketed his services to Mr. Kramer, and Tall Tree, in proposing the SOLI scheme to Mr. Kramer, facilitating the creation of trust and/or related documents, signing the Phoenix Application, and purchasing the beneficial interest in the Kramer August Trust.

55.    LPS and Tall Tree knew that Mr. Kramer and LPS had duties to make truthful and accurate representations on the Phoenix Application.

56.    LPS and Tall Tree knew that Lockwood had a duty of full disclosure with respect to the Phoenix Application and more generally, the procurement of the Phoenix Policies.

57.    LPS and Tall Tree knew that the SOLI arrangement was designed to circumvent applicable law requiring the presence of an insurable interest.

58.    LPS and Tall Tree knew that Phoenix, in issuing any policies pursuant to the Phoenix Application, would rely on the representations contained in the Phoenix Application and on the presence of a valid insurable interest.

<div align="center">

-19-

</div>

59.     LPS and Tall Tree knew that the lack of a valid insurable interest was not disclosed on the Phoenix Application.

60.     On information and belief, LPS and Tall Tree substantially participated in the above-described fraudulent SOLI arrangement as described above and below.

61.     On information and belief, Lockwood and Kramer relied on LPS's and Tall Tree's roles in the SOLI scheme.

62.     On information and belief, Tall Tree and LPS had arranged to make payment to Arthur and/or Liza Kramer immediately after the issuance of the Phoenix Policies.   On information and belief, Tall Tree and LPS understood at the time the Phoenix Application was submitted that Arthur Kramer and/or Liza Kramer intended to transfer the beneficial interest in the Kramer August Trust to Tall Tree in exchange for a payment, and, at the time the Phoenix Application was submitted, Tall Tree and LPS intended to make such payment after the issuance of the Phoenix Policies.

63.     On information and belief, Tall Tree and LPS paid Arthur Kramer and/or Liza Kramer to transfer the beneficial interest in the Kramer August Trust shortly after the Phoenix Policies were issued.

64.     Tall Tree and LPS knowingly participated in a fraudulent SOLI scheme to induce Phoenix to issue life insurance policies that it would not have issued but for LPS's and Tall Tree's substantial participation in the SOLI scheme.

65.     If Phoenix is required to pay any death benefits pursuant to the Phoenix Policies, Tall Tree and LPS – by their substantial participation in the fraudulent SOLI scheme – will have caused Phoenix to suffer damages in the amount of such payments.  They have also caused

Phoenix to suffer additional damages, including but not limited to commissions paid on the Phoenix Policies.

<div align="center">

**SECOND CROSS-CLAIM**
**(Lockwood Pension Services, Inc. and Tall Tree Advisors, Inc. –**
**Aiding and/or Abetting Breach of Fiduciary Duty)**

</div>

66.     Phoenix repeats and re-alleges Paragraphs 1 - 68 of its Answer and 1 - 65 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

67.     LPS and Tall Tree knew that Lockwood owed Phoenix a fiduciary duty.

68.     LPS and Tall Tree knew that such fiduciary duty included a duty of full disclosure with respect to the Phoenix Application and a duty not to procure SOLI policies which Lockwood knew Phoenix would decline to issue if it knew of the true nature of such policies.

69.     LPS and Tall Tree substantially participated in Lockwood's breach of fiduciary duty by among other things, (a) inducing Mr. Kramer to apply for life insurance policies for the benefit of a person or persons without an insurable interest in Mr. Kramer's life, (b) facilitating the creation of trust and/or related documents, and (c) arranging for the transfer of the beneficial interest in the Kramer August Trust (and thus the Phoenix Policies) to Tall Tree immediately after the Phoenix Policies were delivered.

70.     By participating in the SOLI scheme, LPS and Tall Tree knowingly induced Phoenix to issue life insurance policies that it would not have issued but for Mr. Kramer's participation in the SOLI scheme.   Thus, Tall Tree and LPS knowingly aided and abetted Lockwood's breach of fiduciary duty.

71.     If Phoenix is required to pay any death benefits pursuant to the Phoenix Policies, LPS and Tall Tree – by their substantial participation in the fraudulent SOLI scheme – will have caused Phoenix to suffer damages in the amount of such payments.   They have also caused

Phoenix to suffer additional damages, including but not limited to commissions paid on the Phoenix Policies.

### THIRD-PARTY CLAIMS

### FIRST THIRD-PARTY CLAIM
**(Steven Lockwood – Fraud)**

72.    Phoenix repeats and re-alleges Paragraphs 1- 68 of its Answer and 1 - 71 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

73.    On information and belief, Lockwood had knowledge of and personally participated in and/or directed the fraudulent SOLI scheme by, among other things, (a) proposing the SOLI scheme to Mr. Kramer, (b) failing to disclose information that he knew Phoenix would deem relevant to its decision to issue the Phoenix Policies (and in fact would have caused it to decline to issue them), including but not limited to Kramer's intention to transfer the beneficial interests in the Phoenix Policies to strangers, (c) facilitating the creation of trust and/or related documents, (d) signing the Phoenix Application, and (e) purchasing (through Tall Tree) the beneficial interest in the Kramer August Trust.  In signing the Phoenix Application, Lockwood represented that the true owner and beneficiary of the Phoenix Policies was the Kramer August Trust and that the Kramer August Trust had a valid insurable interest – representations that Lockwood knew to be incomplete and false when made.

74.    By making these misrepresentations and perpetrating this fraudulent scheme, Lockwood intended to, and did in fact, deceive Phoenix with respect to the true beneficiary of the Phoenix Policies and with respect to the true beneficiary's lack of an insurable interest in Mr. Kramer's life.

75.    As a result of Lockwood's fraud, Lockwood knowingly induced Phoenix to issue life insurance policies that it would not have issued but for Lockwood's misrepresentation.

76.    If Phoenix is required to pay any death benefits pursuant to the Phoenix Policies, Lockwood will have caused Phoenix to suffer damages in the amount of such payments. He has also caused Phoenix to suffer additional damages, including but not limited to commissions paid on the Phoenix Policies.

### SECOND THIRD-PARTY CLAIM
#### (Steven Lockwood – Breach of Fiduciary Duty)

77.    Phoenix repeats and re-alleges its responses to Paragraphs 1 - 68 of its Answer and 1 - 76 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

78.    As producer of the Phoenix Policies, Lockwood owed a fiduciary duty to Phoenix. Such duty included a duty of full disclosure with respect to the Phoenix Application, including but not limited to: (a) the duty to make full disclosure of the nature of the risk undertaken; (b) the duty to make full disclosure of any and all information that would enable Phoenix to determine if the insurance should issue; (c) to make recommendations upon reasonable grounds that the solicited insurance is suitable and consistent with the applicant's insurable needs and financial objectives; and (d) not to procure SOLI policies which Lockwood knew Phoenix would decline to issue if Phoenix knew of the true nature of such policies.

79.    Lockwood breached that fiduciary duty by, among other things, (a) inducing Mr. Kramer to apply for life insurance policies for the benefit of a person or persons without an insurable interest in Mr. Kramer's life, (b) facilitating the creation of trust and/or related documents to hide the transfer of the beneficial interest in the Phoenix Policies from Phoenix, (c) failing to disclose to Phoenix information he knew Phoenix would deem relevant to determining whether the insurance would issue, including but not limited to the failure to disclose the lack of an insurable interest on Mr. Kramer's life, and (d) arranging for the

immediate transfer of the beneficial interest in the Kramer August Trust (and thus the Phoenix Policies) to his affiliate company, Tall Tree.

80.     Lockwood thereby caused Phoenix to issue the Phoenix Policies, which it would not have issued but for Lockwood's breach of its fiduciary duty.

81.     If Phoenix is required to pay any death benefits pursuant to the Phoenix Policies, Lockwood will have caused Phoenix to suffer damages in the amount of such payments.  He has also caused Phoenix to suffer additional damages, including but not limited to commissions paid on the Phoenix Policies that must be disgorged.

### THIRD THIRD-PARTY CLAIM
### (Steven Lockwood -- Breach of Contract)

82.     Phoenix repeats and re-alleges Paragraphs 1 - 68 of its Answer and 1 - 81 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

83.     Under Section 1(d) of the "Basic Contract Provisions" section of the IPC, Lockwood agreed that the contract and his conduct is subject to "applicable federal or state laws, statutes and regulations or directives issued by any regulatory entity having jurisdiction over the matters covered in this contract . . . ."

84.     Under Section 10 of the "Basic Contract Provisions" section of the IPC, Lockwood agreed that all "[a]ll rights, powers, and remedies provided herein may be exercised only to the extent that the exercise thereof does not violate any applicable provision of law . . . ."

85.     Section 11 of the "Basic Contract Provisions" section of the IPC, Lockwood "acknowledge[d] that [Phoenix] relies upon [him] for a careful and frank presentation of the facts necessary for the proper underwriting and acceptance of the requested insurance coverages," agreed to "give complete and accurate answers in the application and associated forms," and agreed to "promptly transmit to [Phoenix] any and all information that will enable [Phoenix] to

determine if the insurance applied for should be issued by [Phoenix] and upon what terms and rates."

86.    Under Section 1 of the "Compliance and Sales Practices Provisions" section of the IPC, Lockwood agreed that he would "make recommendations based upon reasonable grounds that the products being solicited are suitable and consistent with the applicants' insurable needs and financial objectives."

87.    On or about January 2, 2007, Lockwood executed a Broker Agreement between, among others, Phoenix and him (the "2007 Broker Agreement"). The 2007 Broker Agreement contains provisions that similarly obligate Lockwood to conduct himself in accordance with applicable laws and regulations and to make full and accurate disclosures to Phoenix with respect to prospective insureds.

88.    Lockwood breached the above-referenced provisions of the IPC by, among other things, (a) inducing Mr. Kramer to apply for life insurance policies for the benefit of a person or persons without an insurable interest in Mr. Kramer's life, (b) facilitating the creation of trust and/or related documents to hide the transfer of the beneficial interest in the Phoenix Policies from Phoenix, (c) failing to disclose to Phoenix information he knew Phoenix would deem relevant to determining whether the insurance would issue, including but not limited to the failure to disclose the lack of an insurable interest on Mr. Kramer's life, and (d) arranging for the immediate transfer of the beneficial interest in the Kramer August Trust (and thus the Phoenix Policies) to LPS's affiliate, Tall Tree.

89.    If Phoenix is required to pay any death benefits pursuant to the Phoenix Policies, Lockwood will have caused Phoenix to suffer damages in the amount of such payments. He has

also caused Phoenix to suffer additional damages, including but not limited to commissions paid on the Phoenix Policies that must be disgorged.

## FOURTH THIRD-PARTY CLAIM
### (Steven Lockwood – Negligence)

90.     Phoenix repeats and re-alleges Paragraphs 1 - 68 of its Answer and 1 - 89 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

91.     As producer of the Phoenix Policies, Lockwood owed a common law duty of care to Phoenix that required it to provide full disclosure with respect to the Phoenix Application, including all facts relevant to the risk insured.

92.     Lockwood breached that duty by, among other things, failing to disclose to Phoenix (a) the lack of an insurable interest on Mr. Kramer's life, (b) facts from which Phoenix could determine that lack of insurable interest, (c) facts from which Phoenix could ascertain the true nature of the risk that it undertook in issuing the Phoenix Policies, and (d) that the Phoenix Application was submitted as part of a SOLI arrangement.

93.     If Phoenix is required to pay any death benefits pursuant to the Phoenix Policies, then Lockwood – by the above-referenced conduct – will have caused Phoenix to suffer damages in the amount of such payments.  He has also caused Phoenix to suffer additional damages, including but not limited to commissions paid on the Phoenix Policies that must be disgorged.

## FIFTH THIRD-PARTY CLAIM
### (Steven Lockwood – Contractual Indemnification)

94.     Phoenix repeats and re-alleges Paragraphs 1 - 68 of its Answer and 1 - 93 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

95.     Under Section 5 of the "Basic Contract Provisions" section of the IPC, Lockwood agreed "to indemnify [Phoenix] for any liabilities, losses, costs or expenses incurred or moneys

paid by [Phoenix] to any person as the result of the misrepresentations, negligence or unauthorized acts by [him], [his] employees, or Sub-producers associated with [him]."

96.    Section 8.1 of the 2007 Broker Agreement that Lockwood executed provides that Lockwood "hold harmless, defend, exonerate and indemnify" Phoenix for any and all "losses, claims, judgments, fines, penalties, damages, or liabilities" that Phoenix suffers as a result of Lockwood's actions, or resulting from the breach of any representation contained in the Broker Agreement.

97.    Phoenix would not have issued the Phoenix Policies but for the above-described fraudulent, negligent, and/or unauthorized conduct by Lockwood and those under his employ/associated with him.

98.    If Phoenix is obliged to pay death benefits pursuant to the Phoenix Policies, it is entitled to indemnification from Lockwood in the amount of such payments. Lockwood has also caused Phoenix to suffer additional damages, including but not limited to (a) commissions paid on the Phoenix Policies that must be disgorged and (b) attorneys fees incurred in defending against this litigation and prosecuting these cross-claims and counterclaims (and which it would not have incurred but for Lockwood's conduct) that he must reimburse.

### SIXTH THIRD-PARTY CLAIM
**(Steven Lockwood – Unjust Enrichment)**

99.    Phoenix repeats and re-alleges Paragraphs 1 - 68 of its Answer and 1 - 98 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

100.    As alleged herein, Lockwood knowingly solicited and procured the Phoenix Policies, in violation of federal and state law and public policy, for the benefit of an investor who had no insurable interest in the life of Mr. Kramer.

101.    On information and belief, Lockwood has received benefits from his wrongful actions described herein, including but not limited to commissions that he received from Phoenix for procuring the Phoenix Policies.

102.    Lockwood has knowledge of these benefits, and has voluntarily accepted and retained these benefits.

103.    The circumstances as described herein are such that it would be inequitable for Lockwood to retain these ill-gotten benefits without disgorging the value thereof to Phoenix.

104.    As a direct and proximate result of Lockwood's wrongful actions, Phoenix has suffered damages in issuing the Phoenix Policies and paying the associated commissions, and will suffer further damages if it is obliged to pay death benefits. Thus, Phoenix is entitled to the full amount of Lockwood's ill-gotten gains, including interest, resulting from his unlawful, unjust and inequitable conduct in connection with the Phoenix Policies.

## SEVENTH THIRD-PARTY CLAIM
### (Steven Lockwood – Civil RICO Violation - 18 U.S.C. § 1962(c))

105.    Phoenix repeats and re-alleges Paragraphs 1 - 68 of its Answer and 1 - 104 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

### The Violations

106.    18 U.S.C. § 1962(c) provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

107.    Lockwood violated § 1962(c) by conducting the affairs of LPS and Tall Tree through a pattern of racketeering activity, including but not limited to numerous instances of

-28-

mail and wire fraud in furtherance of the fraudulent SOLI scheme described herein, as well as other virtually identical SOLI schemes involving other insureds and insurers.

### The Enterprises

108.    LPS is a corporation and thus qualifies as an enterprise for purposes of RICO.

109.    Tall Tree is a corporation and qualifies as an enterprise for purposes of RICO.

110.    LPS affects interstate commerce in that it procures life insurance policies for clients with residences in various states from insurers residing in various states.

111.    Tall Tree affects interstate commerce in that (a) it purchases beneficial interests in life insurance trusts (and thus life insurance policies) from insureds and/or their relatives with residences in various states, and (b) it purchases the ultimate rights to death benefits pursuant to policies that are issued by insurers residing in various states.

### Lockwood & His Role in the Enterprises

112.    On information and belief, Lockwood is the owner and chief executive officer of both LPS and Tall Tree, and Lockwood participated in the operation or management of these enterprises by, among other things, his specific activities as alleged herein.

### The Pattern

113.    On information and belief, Lockwood has used LPS and Tall Tree to engage in a pattern of racketeering that includes numerous criminal acts of mail fraud over the past three years.

114.    The pattern of racketeering activity and the virtually identical SOLI schemes alleged herein confirm Lockwood's intent to defraud the insurers involved in the SOLI schemes alleged herein and also reveal a continued threat of criminal activity by Lockwood.

115.    Indeed, upon information and belief, discovery in this action will yield evidence of additional fraudulent SOLI schemes in which Lockwood engaged.

A.    The Kramer-Phoenix SOLI Scheme

116.    On information and belief, Lockwood devised a scheme to submit a fraudulent life insurance application on behalf of Mr. Kramer and the Kramer August Trust to Phoenix, and thereby to procure a SOLI policy, as alleged herein.

117.    Phoenix relied on that fraudulent application, and the misrepresentations contained therein, in issuing the Phoenix Policies.

118.    Phoenix was injured by virtue of issuing the Kramer Policies.

119.    Lockwood used the mails and wires on numerous occasions in furtherance of his fraudulent SOLI scheme.  Such uses include but are not limited to the following:

a.    Lori Callegari, an employee of LPS, mailed the Policy Acceptance Forms and first premiums payments for the Phoenix Policies to Phoenix on or about October 21, 2005;

b.    Lori Callegari mailed the second quarterly premiums payments for the Phoenix Policies to Phoenix on or about October 24, 2005;

c.    Lucy Montemarano, the Office Manager of M&M, mailed quarterly premiums payments for the Phoenix Policies to Phoenix on or about January 4, 2006;

d.    Lockwood mailed a letter to Phoenix on or about June 22, 2007, using LPS letterhead, advising Phoenix that Berck had been appointed as Successor Trustee;

e.    LPS made several telephone calls to Phoenix to request life insurance illustrations that would allow the financers of the SOLI scheme to pay minimum premiums in the years that they would hold the rights to the Phoenix Policies, including calls from "Dave" on or about August 4, 2006 (requesting an illustration showing a minimum premium in year 2, then level premiums through age 100 with an ending cash value of $1,000), June 1, 2007 (requesting an illustration showing minimum level premiums in policy years 3-5 with level premiums until age 100 with an ending cash value of $1,000) June 13, 2007 (requesting an illustration showing level premiums to age 100), June 28, 2007

-30-

(minimum annual premiums in policy years 3-5 with level premiums thereafter), and July 6, 2007 (requesting an illustration with specified premiums in years 3-5 and level premiums thereafter with $1,000 cash value at age 100).

120.    On information and belief, Lockwood caused all of the above uses of the mails or wires, either by personal direction or authorization or by virtue of the fact that such uses were reasonably foreseeable or likely to follow in the regular course of the Kramer-Phoenix SOLI scheme.

121.    On information and belief, by his SOLI scheme and by the above uses of the mails and wires, Lockwood intended to deprive Phoenix of property by causing it to issue the Phoenix Policies without an insurable interest that it would not have issued but for the fraudulent SOLI scheme, and eventually to pay out death benefits pursuant to such policies.

122.    The intent of Lockwood to defraud Phoenix is further confirmed by his participation in virtually identical SOLI schemes targeting Transamerica and Lincoln Life.

123.    On information and belief, Lockwood and LPS submitted a fraudulent life insurance application on behalf of Mr. Kramer to Lincoln Life through the mail.  On information and belief, when they mailed that application, Lockwood and LPS had a specific intent to defraud Lincoln Life with essentially the same SOLI scheme that they employed to perpetrate their fraud against Phoenix.

124.    On information and belief, Lockwood and LPS submitted a fraudulent life insurance application on behalf of Mr. Kramer to Transamerica through the mail.   On information and belief, when they mailed that application, Lockwood, LPS, and Tall Tree had a specific intent to defraud Transamerica with essentially the same SOLI scheme that they employed to perpetrate their fraud against Phoenix.

B.    The Levinson-Phoenix SOLI Scheme

125.    In November 2005, Lockwood and LPS submitted a life insurance application to Phoenix on behalf of Irwin Levinson and the Irwin Levinson Insurance Trust II (the "Levinson Trust"). In the application, Mr. Levinson, the Levinson Trust, and Lockwood represented that the Policy applied for would be owned by the Levinson Trust, which was also to be the designated primary beneficiary of any policy issued.

126.    Lockwood signed the application as the producer of the Policy.

127.    Above Lockwood's signature, the application stated, in relevant part, that "The Producer hereby confirms he/she has truly and accurately recorded on the application the information supplied by the Proposed Insured; and that he/she is qualified and authorized to discuss the contract herein applied for."

128.    Given the applicable law and public policy prohibiting "wager" life insurance policies, as well as Lockwood's contractual, fiduciary, and common law duties to Phoenix, Lockwood implicitly represented that (a) the Levinson Trust would be the true owner and beneficiary of the requested Phoenix Policies (*i.e.*, not just a strawman), and (b) the Levinson Trust and its intended beneficiary had an insurable interest in Mr. Levinson's life

129.    On information and belief, these representations were incomplete and false when made, and Lockwood and Mr. Levinson knew they were incomplete and false when they made them.

130.    Furthermore, given his contractual, fiduciary, and common law duties of disclosure, Lockwood's failure to disclose to Phoenix (a) the lack of an insurable interest on Mr. Levinson's life, (b) facts from which Phoenix could determine that lack of insurable interest, (c) facts from which Phoenix could ascertain the true nature of the risk that it undertook in issuing

the Levinson Policy, and (d) that the Levinson Application was submitted as part of a SOLI arrangement, constituted misrepresentations with respect to those facts.

131.    By making the foregoing misrepresentations, Lockwood and Mr. Levinson intended to deceive Phoenix with respect to the identity of the true beneficiary of the Levinson Policy and with respect to the true beneficiary's lack of an insurable interest in Mr. Levinson's life.

132.    In reliance upon the truth of the representations made in the application, Phoenix issued the Policy (No. 97304016) with a Policy Date of November 27, 2008, a basic policy amount of $5,000,000, and a planned annual premium of $270,000.

133.    The application was attached to the Policy as issued.

134.    The Levinson Trust was created on or about November 4, 2005 – just before Mr. Levinson's application was submitted to Phoenix. Lockwood provided a draft trust agreement to Mr. Levinson (apparently using a form Lockwood had used previously) to establish the Levinson Trust.

135.    The initial beneficiary of the Levinson Trust was Dede Levinson, Mr. Levinson's wife.

136.    On information and belief, in procuring the Policy, Mr. Levinson did not intend to provide his wife with financial security from the death benefit of the Policy.

137.    On information and belief, there was no estate tax advantage that derived from the creation of the Levinson Trust and the purpose of the Levinson Trust was not to minimize Mr. or Mrs. Levinson's estate taxes.

138.    On information and belief, the only advantage and purpose of the Levinson Trust was to effectuate a transfer of the right to the death proceeds payable under the Policy to an

outside investor, and thus the formation of the Levinson Trust in connection with Mr. Levinson's application reveals an intent to effect such a transfer at the time the application was submitted.

139.    On information and belief, Berck was named the successor Trustee of the Levinson Trust on or about July 10, 2006.  Lockwood was a witness to the Levinson Trustee succession agreement.

140.    In the course of Phoenix's investigation of this SOLI scheme, Lockwood informed Phoenix in a February 7, 2008 letter that he was "aware" that "within a few weeks after the policy was issued" Mr. Levinson was contacted by an investment group "inquiring whether the family would be interested in selling its rights in the policy," and that the "transaction did take place between the relevant parties."

141.    Phoenix's inquiries into the details and circumstances surrounding Mr. Levinson's application and the transfer of the beneficial interest in the Policy have been stymied.  On two separate occasions – on or about September 5, 2007, and on or about February 15, 2008 – an insurance investigator met with Mrs. Levinson to obtain information relevant to the processing of the claim.  Such interviews are standard procedure with respect to claims made during the contestability period of a policy.

142.    On both occasions, Lockwood and someone identified as a "family friend" were present and interfered with the interviews, interrupting both the investigator and Mrs. Levinson when they were speaking and directing Mrs. Levinson not to answer certain questions.

143.    In response to questions concerning the Policy, the Levinson Trust and the transfer of beneficial interest, Mrs. Levinson claimed near-total ignorance and said she was unaware the Policy and the Levinson Trust even existed until after her husband's death.  Mrs. Levinson said she had not seen any documentation relating to the Policy, the Levinson Trust or

the transfer of beneficial interest and did not know where any such documentation may be located.

144.    In response to questions directed to Lockwood concerning the Levinson Trust and the alleged SOLI arrangement, Lockwood claimed he had heard Mr. Levinson was contacted by an outside investor or group of investors shortly after the Policy was issued and that Mr. Levinson had sold the beneficial interest in the Levinson Trust to the outside investor. Lockwood claimed near-total ignorance regarding the details of that transaction. He stated he does not know who the investors are, how to contact them, who put them in touch with Mr. Levinson, or how much they paid Mr. Levinson.

145.    On information and belief, the creation of the Levinson Trust, the Levinson application for the policy, and the assignment of the beneficial interest in the Levinson Trust (and thus the ultimate right to the death benefits payable under the Policy) were all part of a single transaction, which had as its purpose the procurement of an insurance policy on Mr. Levinson's life for the benefit of a person having no insurable interest on his life.    On information and belief, Lockwood and LPS devised this fraudulent SOLI scheme, advised Mr. Levinson with respect to the transaction, induced Mr. Levinson to participate in the scheme, and facilitated the transfer of the rights to the death benefits to an outside investor.

146.    Phoenix was injured by virtue of issuing the Levinson policy and paying the associated commissions.

147.    Lockwood used the mails and wires on numerous occasions in furtherance of the fraudulent SOLI scheme. Such uses include but are not limited to the following:

    a.    Lockwood faxed a letter to Dr. James N. Harris, MD, on a LPS fax cover sheet, requesting Mr. Levinson's medical history to facilitate his life insurance applications and forwarding an authorization form with respect to same, on or about March 22, 2005;

-35-

b. Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson regarding Mr. Levinson's net worth and medical records, and the status of his application for life insurance, on or about April 5, 2005;

c. Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson regarding the status of Mr. Levinson's application for life insurance, on or about August 15, 2005;

d. Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson regarding putting Mr. Levinson in contact with companies who specialize in the sale/purchase of life insurance policies, on or about September 27, 2005;

e. Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson regarding the Levinson Trust, forwarding a sample life insurance trust agreement, offering to recommend a trustee, and recommending that Mr. Levinson's application be submitted to Phoenix, on or about October 24, 2005;

f. Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson forwarding the Phoenix policy on or about December 1, 2005;

g. Lori Callegari, an employee of LPS, mailed the policy acceptance form and first premium payment to Phoenix on or about December 8, 2005;

h. Lori Callegari mailed additional premium payments to Phoenix on or about February 1, 2006;

i. Lockwood mailed a premium payment from Berck to Phoenix on or about December 4, 2006;

j. Lockwood mailed a letter to Phoenix, using LPS letterhead, advising Phoenix that Berck had been appointed as Successor Trustee, on or about August 3, 2007; and

k. Berck mailed a letter to Phoenix making a claim on behalf of the Levinson Trust for death benefits, on or about August 20, 2007.

148. On information and belief, Lockwood caused all of the above uses of the mails or wires, either by personal direction or authorization or by virtue of the fact that such uses were reasonably foreseeable or likely to follow in the regular course of the Kramer-Phoenix SOLI scheme.

149.    On information and belief, by his SOLI scheme and by the above uses of the mails and wires, Lockwood intended to deprive Phoenix of property by causing it to issue a policy that it would not have issued but for the fraudulent SOLI scheme, and eventually to pay out death benefits pursuant to the policy.

C.    The Lobel-Lincoln Life SOLI Scheme

150.    On or about January 22, 2007, Life Product filed suit in the United States District Court for the Southern District of New York, seeking a declaration that it was entitled to the proceeds of a $10 million life insurance policy (the "Lobel Policy") issued by Lincoln Life & Annuity Company of New York upon the life of Leon Lobel – a retired butcher who was seventy-seven years old when he applied for the policy.   The case is entitled *Life Product Clearing LLC v. Linda Angel*, 07-CV-0475 (DC) (the "*Angel* lawsuit").

151.    On or about March 12, 2007, Linda Angel, Lobel's daughter and the personal representative of Lobel's estate ("Angel"), filed her answer and counterclaims against Life Product.   On or about March 13, 2007, Angel filed a third-party complaint against Leon Lobel Insurance Trust (the "Lobel Trust") and Jonathan S. Berck, as Trustee, seeking a declaration that the Lobel Trust is void and that Lobel's estate is entitled to recover the death benefits paid under the Lobel Policy.

152.    On information and belief, Lockwood, Life Product, and others devised a scheme to submit a fraudulent life insurance application on behalf of Mr. Lobel and the Lobel Trust to Lincoln Life, and thereby to procure a SOLI policy.

153.    On information and belief, Lockwood, together with another insurance broker, colluded with Mr. Lobel to participate in a fraudulent SOLI arrangements.   In particular, they colluded with Mr. Lobel (a) to establish a life insurance trust, (b) to apply for one or more life

insurance policies in which the trust would be both the policyholder and beneficiary of the policies, and (c) upon the issuance of the policies, to immediately transfer the beneficial interest in the trust to Life Product – an outside investor who lacked an insurable interest in Mr. Lobel's life – in exchange for monetary compensation. On information and belief, Lockwood facilitated the SOLI transaction by helping Mr. Lobel establish the Lobel Trust and by acting as an intermediary between Mr. Lobel and the outside investor.

154.    Pursuant to the agreed-upon SOLI scheme, on or about November 15, 2005, Mr. Lobel established the Lobel Trust.

155.    On information and belief, the only advantage and purpose of the Lobel Trust was to effectuate a transfer of the right to the death proceeds payable under the requested life insurance policies in a fraudulent manner that would not be apparent to Lincoln Life.

156.    Also on or about November 15, 2005, Mr. Lobel signed a written application for a $10 million life insurance policy and authorized the submission of that application (the "Lobel Application") to Lincoln Life.

157.    Above Mr. Lobel's signature on the Lobel Application, the application states, in relevant part: "I/WE have read the questions and answers in this application and declare that they are complete and true to the best of my (our) knowledge and belief."

158.    On information and belief, Mr. Lobel did not apply for life insurance on his own initiative, but rather was induced to do so by the offer of ready cash. On information and belief, Mr. Lobel was unable to afford the $10 million policy requested in his application; in fact, on information and belief, Mr. Lobel lacked sufficient funds to afford even one year's premium. On information and belief, at the time he submitted the Lobel Application, Mr. Lobel had no intention of procuring life insurance for the benefit of himself or his family; rather, Mr. Lobel

was attempting to procure a policy for the benefit of a stranger investor with no insurable interest in his life.

159.    On information and belief, Mr. Lobel, Lockwood, and Life Product understood at the time the Lobel Application was submitted to Lincoln Life that Mr. Lobel would immediately transfer the ultimate rights to the death benefits to Life Product, and that Life Product would be responsible for paying the premiums.  Thus, on information and belief, Life Product was the true intended beneficiary of the requested policy.

160.    Mr. Lobel represented on his application to Lincoln Life that the owner and beneficiary of the policy would be the Lobel Trust.

161.    Given the applicable law and public policy prohibiting "wager" life insurance policies, Mr. Lobel implicitly represented to Lincoln Life that (a) the Lobel Trust would be the true owner and beneficiary of the requested policy (*i.e.*, not just a strawman), and (b) the Lobel Trust and its intended beneficiary had an insurable interest in Mr. Lobel's life.

162.    These representations were incomplete and false when made, and Mr. Lobel knew they were incomplete and false when he made them.

163.    Furthermore, given his contractual, fiduciary, and/or common law duties of disclosure as a producer of the policy, Lockwood's failure to disclose to Lincoln Life (a) the lack of an insurable interest on Mr. Lobel's life, (b) facts from which Lincoln Life could determine that lack of insurable interest, (c) facts from which Lincoln Life could ascertain the true nature of the risk that it undertook in issuing the Lobel policy, and (d) that the Lobel Application was submitted as part of a SOLI arrangement, constituted misrepresentations with respect to those facts.

164.    By making the foregoing misrepresentations, Mr. Lobel and Lockwood intended to deceive Lincoln Life with respect to the identity of the true beneficiary of the policy on Mr. Lobel's life and with respect to the true beneficiary's lack of an insurable interest in Mr. Lobel's life.

165.    On information and belief, Lincoln Life relied on the fraudulent Lobel Application, and the misrepresentations contained therein, in issuing the Lobel policy.

166.    On information and belief, on or about December 20, 2005, approximately (6) six days after the policy was issued, Mr. Lobel sold his interest in the Lobel Trust – and thus the right to any insurance proceeds upon his death – to Life Product.

167.    On information and belief, Mr. Lobel never paid any premiums, and received a cash payment of $300,000 for transferring the beneficial interest in the Lobel Trust to Life Product.

168.    On information and belief, after the right to the benefits payable under Mr. Lobel's policy was transferred, Berck became the successor trustee of the Lobel Trust.

169.    In a recent decision in the *Angel* lawsuit, the United States District Court for the Southern District of New York denied Life Product's motion for judgment on the pleadings and concluded as follows: "These factual allegations, taken together, surely make a plausible claim that Lobel intended to transfer the Policy to LPC prior to procuring it. Such a scheme surely could amount to an impermissible attempt to circumvent the prohibition on wager policies." 530 F. Supp. 2d 646, 655-56 (S.D.N.Y. 2008).

170.    Lincoln Life was injured by virtue of issuing the Lobel policy and by its subsequent payment of death benefits.

171.    On information and belief, Lockwood used the mails and wires on numerous occasions in furtherance of his fraudulent SOLI scheme.  Such uses include but are not limited to the following:

      a.     Lockwood mailed a letter dated December 16, 2005, to Lobel forwarding the Lincoln Life policy, advising him of an investor willing to purchase the beneficial interest in the Lobel Trust, and enclosing a Beneficial Interest Transfer Agreement; and

      b.     Lockwood mailed a letter dated January 3, 2006, to Lobel forwarding a check for $300,000 from Life Product in exchange for a 100% ownership interest in the Lobel Trust.

172.    On information and belief, Lockwood caused, by personal action, direction, or authorization, all of the above uses of the mails.

173.    On information and belief, by his SOLI scheme and by the above uses of the mails, Lockwood intended to deprive Lincoln Life of property by causing it to issue a policy that it would not have issued but for the fraudulent SOLI scheme, and ultimately to pay out death benefits pursuant to the policy.

**The Injury**

174.    If Phoenix is required to pay any death benefits pursuant to the Phoenix Policies, Lockwood – by means of his fraudulent SOLI scheme and racketeering activity– will have caused Phoenix to suffer damages in the amount of such payments. He has also caused Phoenix to suffer additional damages, including but not limited to commissions paid on the Levinson Policy and the Phoenix Policies.

## COMBINED CROSS-CLAIM AND THIRD-PARTY CLAIM
### (Steven Lockwood, LPS, and Tall Tree – Civil RICO Violation - 18 U.S.C. § 1962(c))

175.    Phoenix repeats and re-alleges Paragraphs 1 - 68 of its Answer and 1 - 174 of its Counterclaims, Cross-Claims and Third-Party Complaint as though fully set forth herein.

### The Violations

176.    On information and belief, Lockwood, LPS, and Tall Tree violated § 1962(c) by conducting the affairs of, or by participating in the conduct of the affairs of, an "association in fact" – consisting of Lockwood, LPS, Tall Tree, and Life Product, and Berck (the "SOLI Enterprise") – through a pattern of racketeering activity, including but not limited to numerous instances of mail and wire fraud in furtherance of the fraudulent SOLI scheme described herein, as well as other virtually identical SOLI schemes involving other insureds and insurers.

### The Enterprise

177.    On information and belief, Lockwood, LPS, Tall Tree, Life Product, and Berck share a common purpose of procuring SOLI policies, hiding the nature of those policies from the life insurers who issued them for the duration of the contestability period, and then profiting from those policies by either claiming and collecting the proceeds of such policies or eventually selling such policies to other outside investors.

178.    On information and belief, Lockwood, LPS, Tall Tree, Life Product, and Berck have engaged in and are engaged in a course of conduct such that they function as a continuing unit with an ongoing organization.  In the course of its regular operation, the SOLI Enterprise must identify potential insureds, market the SOLI scheme to those potential insureds, establish a trust on behalf of the potential insured, appoint a trustee, procure policies, pay the insureds to transfer the beneficial interest in the trust, finance and regularly pay the premiums, correspond with and submit forms to insurers, and either sell the policies to other outside investors or, if the

SOLI Enterprise retains the rights to the proceeds of the policies, file, administer, and facilitate claims for death benefits  That is, the regular functions of the SOLI Enterprise include, among other things, financing, marketing, administration, and sales.

179.    On information and belief, the SOLI Enterprise affects interstate commerce in that it (a) procures life insurance policies for clients with residences in various states from insurers residing in various states, (b) purchases beneficial interests in life insurance trusts (and thus life insurance policies) from insureds and/or their relatives with residences in various states, and thus purchases and holds the ultimate rights to death benefits pursuant to policies that are issued by insurers residing in various states, and (c) sells the rights to the death benefits (in the form of the beneficial interests in the trusts or the policies themselves) to investors that are located in various states and countries.

### The Participants & Their Roles in the Enterprise

180.    On information and belief, Lockwood participated in the operation or management of the SOLI Enterprise by his specific activities as alleged herein.  More generally, Lockwood identifies potential insureds, approaches and advises potential insureds on the benefits of the SOLI scheme (*i.e.*, markets the SOLI scheme), facilitates the creation of life insurance trusts, and advises insureds, trustees, beneficiaries, and claimants with respect to their communications with insurers both before and after the issuance of the policies.  On information and belief, Lockwood also sometimes purchases (through Tall Tree) the beneficial interest in the life insurance trusts and thus provides the financial incentive for insureds to participate in the SOLI scheme and the vehicle by which they do so.

181.    On information and belief, LPS participated in the operation or management of the SOLI Enterprise by its specific activities as alleged herein.  More generally, LPS approaches

and advises potential insureds on the benefits of the SOLI scheme (*i.e.*, markets the SOLI scheme), facilitates the creation of life insurance trusts, and advises insureds, trustees, beneficiaries, and claimants with respect to their communications with insurers both before and after the issuance of the policies.

182.    On information and belief, Tall Tree participated in the operation or management of the SOLI Enterprise by its specific activities as alleged herein.  More generally, Tall Tree is a financer of SOLI transactions: it purchases the beneficial interest in the life insurance trusts and thus provides the financial incentive for insureds to participate in the SOLI scheme and the vehicle by which they do so.

183.    On information and belief, Life Product participated in the operation or management of the SOLI Enterprise by its specific activities as alleged herein.  More generally, Life Product is a financer of SOLI transactions: it purchases the beneficial interest in the life insurance trusts and thus provides the financial incentive for insureds to participate in the SOLI scheme and the vehicle by which they do so.

184.    On information and belief, Berck participated in the operation or management of the SOLI Enterprise by his specific activities as alleged herein.  More generally, after the beneficial interests in the life insurance trusts have been transferred to investors such as Life Product and Tall Tree, Berck serves as the successor trustee of these trusts and thus acts in their interests and as their agent in paying premiums, filing and administering claims, collecting and distributing death benefits, and executing the sale of the policies to any other investors.

**The Pattern**

185.    Lockwood, LPS and Tall Tree have engaged in a pattern of racketeering by committing numerous criminal acts of mail/wire fraud over the past three years.    These racketeering activities are connected to and designed to further the goals of the SOLI Enterprise.

186.    The pattern of racketeering activity and the virtually identical SOLI schemes alleged herein confirm the intent of Lockwood, LPS and Tall Tree to defraud the insurers involved in the SOLI schemes alleged herein and also reveal a continued threat of criminal activity by Lockwood, LPS and Tall Tree.

187.    Indeed, upon information and belief, discovery in this action will yield evidence of additional fraudulent SOLI schemes in which Lockwood, LPS, Tall Tree and others engaged.

A.     The Kramer-Phoenix SOLI Scheme

188.    On information and belief, Lockwood, LPS, and Tall Tree devised a scheme to submit a fraudulent life insurance application on behalf of Mr. Kramer and the Kramer August Trust to Phoenix, and thereby to procure a SOLI policy, as alleged herein.

189.    Phoenix relied on that fraudulent application, and the misrepresentations contained therein, in issuing the Phoenix Policies.

190.    Phoenix was injured by virtue of issuing the Kramer Policies.

191.    Lockwood, LPS, and Tall Tree used the mails and wires on numerous occasions in furtherance of their fraudulent SOLI scheme.    Such uses include but are not limited to the following:

a.     Lori Callegari, an employee of LPS, mailed the Policy Acceptance Forms and first premiums payments for the Phoenix Policies to Phoenix on or about October 21, 2005;

b.     Lori Callegari mailed the second quarterly premiums payments for the Phoenix Policies to Phoenix on or about October 24, 2005;

c.    Lucy Montemarano, the Office Manager of M&M, mailed quarterly premiums payments for the Phoenix Policies to Phoenix on or about January 4, 2006;

d.    Lockwood mailed a letter to Phoenix on or about June 22, 2007, using LPS letterhead, advising Phoenix that Berck had been appointed as Successor Trustee; and

e.    LPS made several telephone calls to Phoenix to request life insurance illustrations that would allow the financers of the SOLI scheme to pay minimum premiums in the years that they would hold the rights to the Phoenix Policies, including calls from "Dave" on or about August 4, 2006 (requesting an illustration showing a minimum premium in year 2, then level premiums through age 100 with an ending cash value of $1,000), June 1, 2007 (requesting an illustration showing minimum level premiums in policy years 3-5 with level premiums until age 100 with an ending cash value of $1,000) June 13, 2007 (requesting an illustration showing level premiums to age 100), June 28, 2007 (minimum annual premiums in policy years 3-5 with level premiums thereafter), and July 6, 2007 (requesting an illustration with specified premiums in years 3-5 and level premiums thereafter with $1,000 cash value at age 100.

192.    On information and belief, Lockwood, LPS, and Tall Tree each individually caused all of the above uses of the mails or wires, either by personal direction or authorization or by virtue of the fact that such uses were reasonably foreseeable or likely to follow from the regular operation of the SOLI Enterprise.

193.    On information and belief, Lockwood, LPS, and Tall Tree each individually intended by their participation in the SOLI Enterprise, the pattern of racketeering, and the above instances of mail and wire frauds to deprive Phoenix of property by causing it to issue the Phoenix Policies that it would not have issued but for the fraudulent SOLI scheme, and eventually to pay out death benefits pursuant to such policies.

B.    The Levinson-Phoenix SOLI Scheme

194.    On information and belief, Lockwood and LPS devised a scheme to submit a fraudulent life insurance application to Phoenix on behalf of Mr. Levinson and the Levinson Trust, and thereby to procure a SOLI policy.

195.    Phoenix relied on that fraudulent application, and the misrepresentations contained therein, in issuing the Levinson Policy.

196.    Phoenix was injured by virtue of issuing the Levinson policy and paying the associated commissions.

197.    Lockwood and LPS used the mails and wires on numerous occasions in furtherance of their fraudulent SOLI scheme with respect to the Levinson policy.  Such uses include but are not limited to the following:

    a.    Lockwood faxed a letter to Dr. James N. Harris, MD, on a LPS fax cover sheet, requesting Mr. Levinson's medical history to facilitate his life insurance applications and forwarding an authorization form with respect to same, on or about March 22, 2005;

    b.    Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson regarding Mr. Levinson's net worth and medical records, and the status of his application for life insurance, on or about April 5, 2005;

    c.    Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson regarding the status of Mr. Levinson's application for life insurance, on or about August 15, 2005;

    d.    Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson regarding putting Mr. Levinson in contact with companies who specialize in the sale/purchase of life insurance policies, on or about September 27, 2005;

    e.    Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson regarding the Levinson Trust, forwarding a sample life insurance trust agreement, offering to recommend a trustee, and recommending that Mr. Levinson's application be submitted to Phoenix, on or about October 24, 2005;

  f.  Lockwood mailed a letter, on LPS letterhead, to Mr. Levinson forwarding the Phoenix policy on or about December 1, 2005;

  g.  Lori Callegari, an employee of LPS, mailed the policy acceptance form and first premium payment to Phoenix on or about December 8, 2005;

  h.  Lori Callegari mailed additional premium payments to Phoenix on or about February 1, 2006;

  i.  Lockwood mailed a premium payment from Berck to Phoenix on or about December 4, 2006;

  j.  Lockwood mailed a letter to Phoenix, using LPS letterhead, advising Phoenix that Berck had been appointed as Successor Trustee, on or about August 3, 2007; and

  k.  Berck mailed a letter to Phoenix making a claim on behalf of the Levinson Trust for death benefits, on or about August 20, 2007.

198. On information and belief, Lockwood and LPS each individually caused all of the above uses of the mails or wires, either by personal direction or authorization or by virtue of the fact that such uses were reasonably foreseeable or likely to follow from the regular operation of the SOLI Enterprise.

199. On information and belief, Lockwood and LPS each individually intended by their participation in the SOLI Enterprise, the pattern of racketeering, and the above instances of mail and wire frauds to deprive Phoenix of property by causing it to issue a policy that it would not have issued but for the fraudulent SOLI scheme, and eventually to pay out death benefits pursuant to such policy.

C.  <u>The Lobel-Lincoln Life SOLI Scheme</u>

200. On information and belief, Lockwood and LPS devised a scheme to submit a fraudulent life insurance application on behalf of Mr. Lobel and the Lobel Trust to Lincoln Life, and thereby to procure a SOLI policy.

201.    On information and belief, Lincoln Life relied on that fraudulent application, and the misrepresentations contained therein, in issuing the Lobel policy.

202.    Lincoln Life was injured by virtue of issuing the Lobel policy and by its subsequent payment of death benefits.

203.    Lockwood and LPS used the mails and wires on numerous occasions in furtherance of their fraudulent SOLI scheme. Such uses include but are not limited to the following:

      a.    Lockwood mailed a letter dated December 16, 2005, to Lobel forwarding the Lincoln Life policy, advising him of an investor willing to purchase the beneficial interest in the Lobel Trust, and enclosing a Beneficial Interest Transfer Agreement; and

      b.    Lockwood mailed a letter dated January 3, 2006, to Lobel forwarding a check for $300,000 from Life Product in exchange for a 100% ownership interest in the Lobel Trust.

204.    On information and belief, Lockwood and LPS each individually caused all of the above uses of the mails, either by personal direction or authorization or by virtue of the fact that such uses were reasonably foreseeable or likely to follow from the regular operation of the SOLI Enterprise.

205.    On information and belief, Lockwood and LPS each individually intended by their participation in the SOLI Enterprise, the pattern of racketeering, and the above instances of mail fraud to deprive Lincoln Life of property by causing it to issue a policy that it would not have issued but for the fraudulent SOLI scheme, and eventually to pay out death benefits pursuant to such policy.

## The Injury

206.    If Phoenix is required to pay any death benefits pursuant to the Phoenix Policies, then Lockwood, LPS and Tall Tree – by means of their fraudulent SOLI scheme and

racketeering activity – will have caused Phoenix to suffer damages in the amount of such payments. They also have caused Phoenix to suffer additional damages, including but not limited to commissions paid on the Levinson Policy and the Phoenix Policies that must be disgorged.

WHEREFORE, plaintiff Phoenix Life Insurance Company respectfully requests as follows:

(a)     an Order (i) rescinding the Phoenix Policies and declaring them null and void, either from their inception or as the result of a fraudulent scheme to issue the Phoenix Policies where there was no valid insurable interest, or, alternatively (ii) declaring that Phoenix has no obligation to pay any death benefits to Plaintiff in connection with the Phoenix Policies;

(b) an order awarding Phoenix damages against the Plaintiff in the amount of those death benefits, if any, that Phoenix is obligated to pay pursuant to the Phoenix Policies, plus any additional damages, including but not limited to commissions paid on the Levinson Policy and the Phoenix Policies;

(c) an order awarding Phoenix damages against Lockwood Pension Services, Inc. in the amount of those death benefits, if any, that Phoenix is obligated to pay pursuant to the Phoenix Policies, plus any additional damages, including but not limited to commissions paid on the Phoenix Policies;

(d) an order awarding Phoenix damages against Tall Tree Advisors, Inc. in the amount of those death benefits, if any, that Phoenix is obligated to pay pursuant to the Phoenix Policies, plus any additional damages, including but not limited to commissions paid on the Phoenix Policies;

-50-

(e) an order awarding Phoenix damages against Steven Lockwood in the amount of those death benefits, if any, that Phoenix is obligated to pay pursuant to the Phoenix Policies, plus any additional damages, including but not limited to commissions paid on the Phoenix Policies and attorneys fees in connection with defense of this lawsuit and prosecution of counterclaims, cross-claims and third-party claims;

(f) as against any parties named in Phoenix's RICO claims, an order awarding Phoenix its treble damages, as well as costs and attorneys fees in connection with defense of this lawsuit and prosecution of counterclaims, cross-claims and third-party claims, pursuant to 18 U.S.C. § 1964(c); and

(g) an order awarding Phoenix its costs and disbursements incurred herein together with any such further relief as the Court may deem just and proper.

Dated: New York, New York
       May 29, 2008

Respectfully submitted,

**DORSEY & WHITNEY LLP**

By: /s/Patrick J. Feeley
     Patrick J. Feeley (PF-4931)
     Christopher G. Karagheuzoff (CK-1122)
     Stephen M. Raab (SR-0742)

250 Park Avenue
New York, New York 10177
(212) 415-9200

Attorneys for Defendant and Third-Party
Plaintiff Phoenix Life Insurance Co.

# Ex. 3

**Phoenix Life Insurance Company**
Executive Offices:
One American Row
Hartford, CT 06102

Statutory Home Office:
10 Krey Boulevard
East Greenbush, NY 12144

**Insured**  ARTHUR B KRAMER

**Age & Sex**  78  MALE

**Policy Number**  97303913

**Face Amount**  $10,000,000.00

**Policy Date**  JULY 10, 2005

Dear Policyowner:

We agree to pay the benefits of this policy in accordance with its provisions. It is important to Us that You are satisfied with Your policy and that it meets Your insurance goals. For service or information on this policy, contact the agent who sold the policy, any of Our agency offices, Our Home Office or Our Customer Service Center.

YOU HAVE A RIGHT TO RETURN THIS POLICY. If for any reason You are not satisfied with this policy, You may return it at any time within ten days (or sixty days if this policy was issued as a replacement of another life insurance policy) after You receive it to either the agent through whom it was purchased or to Us at Our Main Administrative Office at the following address:

> Phoenix Life Insurance Company
> Underwriting and Issue Department
> P.O. Box 8027
> Boston, MA 02266-8027
>
> Telephone (860) 403-1000

Notice given by mail and returning the policy or contract by mail are effective if postmarked, properly addressed and postage is prepaid.

If returned, the policy will be considered void from the beginning and any premium paid will be refunded to You less any partial withdrawals or any loans taken under the policy. Such payment will be made within ten days after we receive notice of cancellation and the returned policy.

Signed for Phoenix Life Insurance Company at its Executive Offices in Hartford, Connecticut.

Sincerely yours,

Phoenix Life Insurance Company

*John H. Beers*

Secretary

*Dona D. Young*

Chairman, President
and Chief Executive Officer

**FLEXIBLE PREMIUM LIFE INSURANCE POLICY**
**Death Benefit Payable if Insured Dies While the Policy is In Force**

**Nonparticipating**

U607 NY

U607NYF1

# SCHEDULE PAGE

The specifications shown below are those in effect initially. They may later be changed for reasons as stated in this policy. Coverage may end if premiums paid are not enough to continue coverage.

## BASIC INFORMATION

**POLICY NUMBER:**    97303913

**POLICY DATE:**    JULY 10, 2005

**FACE AMOUNT:**    $10,000,000.00

**MATURITY DATE:**    JULY 10, 2027    **(See Death Benefit Following Insured's Age 100 provision in Part 7.)**

**DEATH BENEFIT OPTION:**    A

**OWNER:**    OWNER AS STATED ON THE APPLICATION UNLESS LATER CHANGED.

**BENEFICIARY:**    AS STATED ON THE APPLICATION UNLESS LATER CHANGED.

### INSURED

| INSURED | ISSUE AGE & SEX | RISK CLASSIFICATION |
|---|---|---|
| ARTHUR B KRAMER | 78    MALE | PREFERRED |

### PREMIUMS

**ISSUE PREMIUM:**    $446,023.00

**SUBSEQUENT PLANNED QUARTERLY PREMIUM:**    $135,000.00    *

**TOTAL PREMIUM LIMIT:**    GREATER OF $7,125,601.42 AND RESULT OF $1,212,629.74 MULTIPLIED BY THE NUMBER OF ELAPSED POLICY YEARS (OR FRACTION THEREOF) AFTER JULY 10, 2005

The limit may decrease when monthly charges for any rider or any other monthly charges cease, and may be exceeded if additional premium is needed to prevent policy lapse.

**PREMIUM DUE DATES:**    The amount and time of premium payments following the Policy Date are flexible. Subsequent planned premiums are payable on the NINTH day of each QUARTER thereafter until the Death of the Insured, but not beyond JULY 10, 2027 .

**POLICY VALUE **
**BENCHMARK AMOUNT:**    $9,000,000.00    (See Part 5)

* Payment of planned premiums does not guarantee coverage until the Maturity Date. Even if all planned premiums are paid, the policy may lapse earlier than the anniversary nearest the Insured's Age 100, due to the fact that current cost of insurance and interest rates are not guaranteed, policy loans and partial withdrawals may be taken, and there may be changes in the death benefit option. (See section entitled "Grace Period and Lapse" in Part 4.) Planned premiums are the amounts the owner anticipates paying when the policy is originally issued.

** Beginning in the third Policy Year, We will credit Additional Interest each Monthly Calculation Day on unborrowed Policy Value in excess of the Policy Value Benchmark Amount. See Part 5 of this policy for more details.

U607 NY

PAGE 1 OF 5
U607NYS1

# SCHEDULE PAGE
## CONTINUED

POLICY NUMBER:              97303913

## POLICY CHARGES

SALES CHARGE:          10% of the first $540,000.00    of premium paid in the first policy year. 5% of any premium paid in excess of $540,000.00    in the first policy year.  5% of all premiums  paid in policy years 2+.

MONTHLY DEDUCTION:*     See Part 5, "Monthly Deduction".  Includes cost of insurance, any rider charges, any flat extra mortality charges, and monthly service and expense charges.

MONTHLY SERVICE CHARGE:   $3.50 Guaranteed not to exceed $7.00.

ISSUE CHARGE:           $50.00     deductible monthly during the first Policy Year. If you surrender during the first Policy Year, any unpaid Issue Charges will be assessed to reduce the Surrender Value payable under this policy.

PARTIAL WITHDRAWAL FEE FOR EACH WITHDRAWAL:  $25.00 (in addition to a partial Surrender Charge).

SURRENDER CHARGE:         See table on next page.

## OTHER RATES

GUARANTEED MINIMUM INTEREST RATE:          4%.

CREDITED INTEREST RATE ON LOANED AMOUNTS (See Part 5):
Policy Years 1 – 15:  Loan Interest Rate less 1.5%
Policy Years 16 and thereafter:  Loan Interest Rate less 0.5%

## LIMITATIONS

MINIMUM FACE AMOUNT:      $250,000

PARTIAL WITHDRAWALS:      A Partial Withdrawal will not be permitted in an amount

- less than $500.00;
- which would reduce the Surrender Value to $0.00; or
- which would reduce the face amount below $250,000.

*Additional amounts are not guaranteed. We have the right to change the amount of interest credited to the policy and the amount of cost of insurance deducted under the policy. This may require more premium to be paid than was illustrated, or the cash values may be less than those illustrated.

# SCHEDULE PAGE
## (CONTINUED)

POLICY NUMBER:   97303913

### TABLE OF SURRENDER CHARGES

For an explanation of this table, see section entitled "Surrender Value" in Part 5. The charges shown in this table are stated as of the beginning of the Policy Year indicated. The charge will be level for the first 10 Policy Years and will be prorated on an annual basis beginning in Policy Year 11, unless limited by legal maximums.  In all Policy Years after the 20th policy year, the Surrender Charge is zero.

| POLICY YEAR | CHARGE PER $1,000 OF FACE AMOUNT |
|---|---|
| 1 | 58.5000 |
| 2 | 58.5000 |
| 3 | 58.5000 |
| 4 | 58.5000 |
| 5 | 58.5000 |
| 6 | 58.5000 |
| 7 | 58.5000 |
| 8 | 58.5000 |
| 9 | 58.5000 |
| 10 | 58.5000 |
| 11 | 57.5250 |
| 12 | 45.8250 |
| 13 | 34.1250 |
| 14 | 22.4250 |
| 15 | 10.7250 |
| 16 | 0.0000 |
| 17 | 0.0000 |
| 18 | 0.0000 |
| 19 | 0.0000 |
| 20 | 0.0000 |
| 20+ | 0.0000 |

U607 NY

## SCHEDULE PAGES (CONTINUED)

POLICY NUMBER:     97303913

### TABLE OF GUARANTEED MAXIMUM COST OF INSURANCE RATES
### PER $1000 OF NET AMOUNT AT RISK
### BASED ON 1980 CSO MORTALITY TABLE

| POLICY YEAR | MONTHLY RATE | POLICY YEAR | MONTHLY RATE | POLICY YEAR | MONTHLY RATE |
|---|---|---|---|---|---|
| 01 | 6.53920 | 09 | 13.56670 | 17 | 24.63750 |
| 02 | 7.14330 | 10 | 14.73250 | 18 | 27.49670 |
| 03 | 7.80580 | 11 | 15.90750 | 19 | 32.04580 |
| 04 | 8.54330 | 12 | 17.10750 | 20 | 40.01670 |
| 05 | 9.37670 | 13 | 18.34920 | 21 | 54.83170 |
| 06 | 10.31580 | 14 | 19.65330 | 22 | 83.33330 |
| 07 | 11.34250 | 15 | 21.06250 | | |
| 08 | 12.43330 | 16 | 22.63580 | | |

Basis of Calculations:   1980 Commissioner's Standard Ordinary Mortality Smoker/Nonsmoker Distinct Table for each insured's sex and risk class, age nearest birthday, and 4% effective annual interest rate.

Monthly Factor used in determining Cost of Insurance:   1.0032737 (SEE PART 5)

U607 NY

# SCHEDULE PAGE
## (CONTINUED)

POLICY NUMBER:     97303913

### TABLE OF FACE AMOUNTS OF INSURANCE

| ISSUE DATE | FACE AMOUNT |
|---|---|
| JULY 10, 2005 | $10,000,000.00 |

### RIDERS AND RIDER BENEFITS

| RIDER DESCRIPTION | RIDER DATE OF ISSUE | COVERAGE AMOUNT | RIDER TERMINATION DATE | MONTHLY CHARGE |
|---|---|---|---|---|
| UR78 - EXCHANGE OF INSURED OPTION | 07/10/2005 - EXCHANGE OPTION RIDER | $0.00 | 07/10/2027 | $0 |

## BRIEF SUMMARY OF MAIN PROVISIONS

This is only a summary to help You understand the basics of Your policy. The policy provisions spell out the full details of the rights and obligations of the parties to this policy. The policy provisions and not this brief summary are binding on Us. We will pay the benefits of this policy as set forth on the policy Schedule Pages.

There are two Death Benefit Options to choose from, as described in Part 7. Option A is the Face Amount. Option B is the Face Amount plus Policy Value. Under either Option, the Death Benefit must be at least the Minimum Death Benefit as described in Part 7.

The premiums You pay are added to the Policy Value after We deduct any applicable premium expense charges. We make a monthly deduction from the Policy Value to pay the cost of insurance, the cost of any additional benefit riders and certain monthly charges. We determine cost of insurance rates from time to time, with the guarantee that they will never be higher than the maximum provided on the Schedule Pages. The Policy Value is credited with interest at a current rate which We set from time to time but which will not be less per year than the Guaranteed Minimum Interest Rate shown on the Schedule Pages.

The Subsequent Planned Premium shown on the Schedule Pages is the premium You selected in Your application and is the basis for the Policy Summary delivered with this policy. However, You may generally pay premiums when and in the amount You choose provided sufficient premium is paid to maintain the policy In Force. The amount and timing of premium payments will affect the accumulation of Policy Value.

This policy gives You a number of other options. Under stated conditions, You may change the Death Benefit Option, withdraw part of the Surrender Value or surrender the policy for its full Surrender Value. The Surrender Value is based on the Policy Value, minus any applicable Surrender Charges, unpaid issue charges, loans and loan interest.

We pay the insurance proceeds, as described in Part 3, to the beneficiary when We receive due proof that the Insured's death has occurred while this policy is In Force.

We pay the Surrender Value, as described in Part 5, to You if the Insured is living on the surrender date and this policy is then In Force.

You may change the premiums and Death Benefit Option, subject to Our approval. Certain changes may require evidence of insurability.

See the policy provisions for details.


**READ YOUR POLICY CAREFULLY. IT IS A CONTRACT BETWEEN YOU AND US.**


U607 NY

# TABLE OF CONTENTS

SCHEDULE PAGES

BRIEF SUMMARY OF MAIN PROVISIONS

PART 1: DEFINITIONS................................1

PART 2: GENERAL PROVISIONS................2
   Effective Date of Insurance.................2
   Entire Contract.................................2
   Revised Schedule Pages...................3
   Age..................................................3
   Misstatement of Age or Sex.............3
   Contestability.................................3
   Insurability Requirements After Issue...3
   Suicide Exclusion...........................4
   Termination....................................4
   Minimum Policy Value.....................4

PART 3: OWNER, COLLATERAL
ASSIGNMENT, BENEFICIARY...............4
   Owner............................................4
   Rights of Owner.............................4
   Collateral Assignment.....................5
   Beneficiary....................................5
   How to Change the Beneficiary..........6

PART 4: PREMIUMS.............................6
   Payments.......................................6
   Total Premium Limit........................6
   Reduced Paid-Up Benefit.................7
   Grace Period and Lapse...................7
   Reinstatement.................................7

PART 5: POLICY VALUES........................8
   Basis of Calculations......................8
   Policy Value...................................8
   Interest Rate..................................9
   Benchmark Additional Interest Credit..9
   Monthly Deduction.........................10
   Cost of Insurance..........................10
   Cost of Insurance Rates..................11
   Surrender Value............................11
   Partial Withdrawals........................12

PART 6: POLICY LOANS..........................12
   When Available..............................12
   Amount Available...........................12
   Loan Interest.................................13
   Debt.............................................13
   Repayment....................................14

PART 7: INSURANCE COVERAGE
PROVISIONS.........................................14
   Death Proceeds.............................14
   Interest on Insurance Proceeds..........14
   Death Benefit................................14
   Minimum Death Benefit...................14
   Death Benefit Following Insured's
      Age 100.................................15
   Change in Death Benefit Option.........15
   Request for a Decrease in Face
                  16

PART 8: MISCELLANEOUS
PROVISIONS.........................................16
   Annual Report................................16
   Projection of Benefits and Values......16
   Notices by Us................................16
   Deferment of Certain Payments..........16
   Claims of Creditors........................17
   Corrections...................................17

PART 9: PAYMENT OPTIONS...................17
   Who May Elect Payments Options.....17
   How to Elect a Payment Option.........17
   What Payment Options Are Available 17
   Other Payment Options....................19
   Additional Interest.........................20

PART 10: TABLE OF PAYMENT OPTION
AMOUNTS                                        20
   Adjusted Age.................................20
   Basis of Calculation.......................20
   Tables for Options 3, 4 and 5...........21
   Table for Option 7..........................22

U607 NY

# PART 1: DEFINITIONS

| | |
|---|---|
| **Assigns** | Any persons to whom You assign an interest in this policy if We have notice of the assignment in accordance with the provisions stated in Part 3. |
| **Death Benefit Option** | The type of Death Benefit in effect as described in Part 7. |
| **Due Proof of Death** | A certified death certificate, an order of a court of competent jurisdiction, or any other proof acceptable to Us. |
| **In Force** | The policy has not terminated or otherwise lapsed in accordance with the Grace Period and Lapse Provision in Part 4. |
| **In Writing (Written Notice) (Written Request)** | Is a written form signed by You, satisfactory to Us and received at Our Home Office or Our Main Administrative Office. |
| **Monthly Calculation Day** | The first Monthly Calculation Day is the same day as the Policy Date. Subsequent Monthly Calculation Days are the same days of each month thereafter or, if such day does not fall within a given month, the last day of that month will be the Monthly Calculation Day. |
| **Nonparticipating** | This is a nonparticipating policy which does not pay any dividends. |
| **Subsequent Planned Premium** | The premium shown on the Schedule Page, which is the premium You selected in Your application and is the basis for the Policy Summary delivered with this policy. |
| **Policy Anniversary** | The anniversary of the Policy Date. |
| **Policy Date** | The Policy Date shown on the Schedule Pages from which Policy Years and Policy Anniversaries are measured. |
| **Policy Debt** | Unpaid policy loans with accrued interest. |
| **Policy Month** | The period from one Monthly Calculation Day up to but not including the next Monthly Calculation Day. |
| **Policy Value** | The Policy Value as defined in Part 5. |
| **Policy Year** | The first Policy Year is the one-year period from the Policy Date to, but not including, the first Policy Anniversary. Each succeeding Policy Year is the one-year period from the Policy Anniversary up to but not including the next Policy Anniversary. |
| **Surrender Value** | The Surrender Value as defined in Part 5. The Surrender Value is the Policy Value on the date of surrender less any applicable surrender charge, unpaid issue charge, and less any Policy Debt. |
| **We (Our, Us)** | Phoenix Life Insurance Company. |
| **You (Your)** | The owner of this policy at the time an owner's right is exercised. |

## PART 2:  GENERAL PROVISIONS

**Effective Date of Insurance**

This policy will be In Force from the Policy Date until terminated in accordance with its terms, provided the first Issue Premium shown on the Schedule Pages is paid on or before delivery of this policy while the Insured is alive.

**Entire Contract**

This policy, including the Schedule Pages (and any supplements or changes thereto), any riders or endorsements, and the written application of the owner, a copy of which is attached to and made a part of the policy, are the entire contract between You and Us.

This policy is made in consideration of the application and the payment of premiums as provided in this policy. We rely on all statements made by or for the Insured in the written application. Each statement made in an application will, be deemed a representation and not a warranty. No statement will be used to void this policy or in defense of a claim under this policy unless:

1.  it is contained in the application or in a supplemental application; and

2.  a copy of that application is attached to this policy when issued or made a part of this policy when changes become effective.

Any change in the provisions of the policy, to be in effect, must be signed by one of Our executive officers and countersigned by Our registrar or one of Our executive officers. This policy is issued by Us and any benefits payable under this policy are payable by Us.

U607 NY

**Revised Schedule Pages**

The Schedule Pages issued with the policy show the initial policy data in effect for this policy on the Policy Date. Some of this policy data may change by an action You request or take or by a change You make. Any of these changes will be reflected in Revised Schedule Pages which supplement or restate the Schedule Pages and show the effective date of the change. We will send You such Revised Schedule Pages along with a copy of any supplemental application, and they will become part of this policy as of their effective date.

**Age**

Issue Age means the Insured's age on the Policy Date as of the Insured's nearest birthday. The attained age of the Insured on any Policy Anniversary and for the entire Policy Year then starting is the Issue Age plus the number of Policy Years since the Policy Date.

**Misstatement of Age or Sex**

If the age or sex of the insured has been misstated, any benefits payable under this policy will be adjusted to reflect the correct age and sex. The death benefit payable will be adjusted to reflect the amount of coverage that would have been supported by the most recent monthly deduction based on the then current cost of insurance rates for the correct age and sex.

**Contestability**

We rely on all statements made by or for the insured in the written application and in any supplemental application. These statements are considered to be representations and not warranties. We can contest the validity of this policy and any coverage under it for any material misrepresentation of fact. To do so, however, the misrepresentation must be contained in an application and the application, must be attached to this policy when issued or made a part of this policy when a change is made.

We cannot contest the validity of the original face amount of this policy after it has been In Force during the insured's lifetime for two years from its Policy Date (or two years from any reinstatement, if applicable). If We contest the policy, it will be based on the application for this policy (or the application for reinstatement, if applicable).

If this policy was issued as the result of a conversion option from term insurance, the contestable period for the converted amount is effective as of the date the term policy was issued.

If We contest the validity of all or a portion of the face amount provided under this policy, the amount We pay with respect to such portion of the face amount will be limited to the higher of a return of any paid premium required by Us for the contested Face Amount, or the sum of any monthly deductions made under this policy for the contested face amount.

**Insurability Requirements After Issue**

To make some changes or elections under this policy after it is issued, the Insured must meet Our insurability requirements (medical and/or financial) as follows:

1.  evidence of the Insured's insurability must be given that is satisfactory to Us; and

2.  under Our underwriting standards, the Insured must be in a Risk Classification that is the same as, or better than, the Risk Classification for this policy at issue.

U607 NY                                   -3-

**Suicide Exclusion**

If the Insured dies by suicide within two years from the Policy Date, and while the policy is In Force, Our liability shall be limited to an amount equal to the premiums paid on this policy less any debt owed Us and less any partial withdrawals.

If this policy was issued as a result of a conversion option from term insurance and if the Insured died by suicide within two years of the date the original term policy was issued and while this policy is In Force, Our liability shall be limited to an amount equal to the premiums paid on this policy and the original term policy, less any debt owed Us and less any partial withdrawals.

If this policy is reinstated, the Suicide Exclusion period does not begin anew. As regards to an increase in death benefit attributable to a premium payment as described in the Payments provision of Part 4, the Suicide Exclusion period begins again from the date of the increase in death benefit and only for the amount of such increase. The amount we pay attributable to such an increase in death benefit, in the event of suicide within such period, will be limited to a return of the monthly deductions assessed for the portion of the death benefit equal to the increase in death benefit.

**Termination**

If not previously terminated, this policy will terminate automatically on the earliest of:

1.  the date the Insured dies; or

2.  the date the grace period expires without the payment of sufficient premium in accordance with the Grace Period and Lapse Provision in Part 4.

**Minimum Policy Value**

All of the values under this policy are equal to or more than the minimums required on the Policy Date by the state in which this policy was delivered. The method of computation of the values under this policy has been filed as may be required with the Insurance Department of the state in which this policy was delivered.

# PART 3: OWNER, COLLATERAL ASSIGNMENT, BENEFICIARY

**Owner**

The Insured is the owner of this policy, unless otherwise provided in the application or by later transfer of ownership.

**Rights of Owner**

While the Insured is living, You may, as the owner, exercise all rights provided by this policy or allowed by Us. Consent of any beneficiary not irrevocably named or any contingent owner is not required. By Written Notice You may:

1.  Transfer ownership to a new owner.

2.  Name or change a contingent owner to succeed to the rights of owner at the owner's death. If there is no contingent owner at the owner's death, ownership will pass to the Insured, except as You may have otherwise directed In Writing.

3. Receive any amounts payable under this policy during the Insured's lifetime.

4. Change the beneficiary of the death benefit. See Part 3.

5. Change the Subsequent Planned Premium payment amount and frequency. See Part 4.

6. Obtain a partial withdrawal. See Part 5.

7. Surrender this policy for its cash Surrender Value. See Part 5.

8. Obtain policy loans. See Part 6.

9. Request changes in the insurance amount. See Part 7.

10. Change the Death Benefit Option. See Part 7.

11. Select a payment option for any cash Surrender Value that becomes payable. See Part 10.

12. Assign, release or surrender any of Your interest in the policy.

Exercise of any of these rights will, to the extent thereof, assign, release or surrender the interest of the Insured and all other beneficiaries and owners under this policy.

Any change in the owner or beneficiary designation is effective on the date the notice was signed, subject to receipt by the insurer. A transfer of ownership (or absolute assignment) is not the same as a "collateral assignment" as described in the next paragraph, and the new owner is not an "assignee" as these terms are used in this policy.

**Collateral Assignment**

By Written Notice You may assign an interest in this policy as collateral to a collateral assignee. The collateral assignment or a certified copy of it must be filed with Us at Our Main Administrative Office. When filed, it will bind Us as of the date of the assignment, subject to any action taken by Us before such filing. We shall not be responsible for the validity of any assignment. The interest of the assignee shall be prior to the interest of any beneficiary not irrevocably named or any contingent owner. A collateral assignee cannot change the beneficiary, owner or contingent owner.

**Beneficiary**

Unless another payment option is elected as described in Part 10, any death proceeds that become payable will be paid in equal shares to such beneficiaries living at the death of the Insured as stated in the application or as later changed. Payments will be made successively in the following order:
a)   Primary beneficiaries;
b)   Contingent beneficiaries, if any, provided no primary beneficiary is living at the death of the Insured;
c)   You or Your executor or administrator, provided no primary or contingent beneficiary is living at the death of the Insured, or in the absence of a beneficiary designation.

Unless otherwise stated, the relationship of a beneficiary is the relationship to the Insured.

| | |
|---|---|
| **How to Change the Beneficiary** | You may change the beneficiary by Written Notice filed with Us at Our Main Administrative Office. When We receive it, the change will relate back and take effect as of the date it was signed by You. However, the change will be subject to any payments made or actions taken by Us before We received the notice at Our Main Administrative Office. |

Irrevocable beneficiaries are permitted and cannot be changed without the consent of the irrevocable beneficiary.

## PART 4: PREMIUMS

| | |
|---|---|
| **Payments** | The Issue Premium as shown on the Schedule Pages is payable on or before delivery of this policy. The Insured must be alive when that premium is paid. |

Subject to the limitations stated below, You may pay additional premiums at any time prior to the Policy Anniversary nearest the Insured's age 100 while this policy is In Force.

On Written Request We will send Subsequent Planned Premium notices to You. These notices can be sent annually, semi–annually or quarterly. Premiums may also be paid at other intervals, or under automatic collection methods, subject to Our consent.

The minimum premium payment amount that We will accept is $25, unless to prevent policy lapse. Any premium payment that would increase the Death Benefit by more than it would increase the Policy Value, shall be subject to evidence of insurability satisfactory to Us. As regards to any such increase, the Contestability and Suicide Exclusion provisions in Part 2 will apply from the date of the increase. The application for such increase will be attached to and is made part of the policy.

| | |
|---|---|
| **Total Premium Limit** | The total premium limit is shown on the Schedule Pages and is applied to the sum of all premiums received by Us to date, excluding premiums applied to debt repayment, reduced by the sum of all partial withdrawals paid by Us to date. If the total premium limit is exceeded, We will refund the excess with interest at an annual rate of not less than 4%, not later than 60 days after the end of the Policy Year in which the limit was exceeded. The Policy Value will be adjusted to reflect such refund. |

The total premium limit may be exceeded if additional premium is needed to prevent lapse under the Grace Period and Lapse provision, and such additional premium is permitted by federal tax laws or regulations such that this policy continues to meet the Definition of Life Insurance.

The total premium limit may change due to:

a)  a change in Death Benefit Option;

b)  a decrease of face amount;

c)  a partial withdrawal;

d) addition, change or termination of a rider; or

e) a change in federal tax law or regulations.

If the total premium limit changes, We will send You Revised Schedule Pages reflecting the change. However, We reserve the right to require that the policy be returned to Us to endorse the change.

**Reduced Paid-Up Benefit**

Upon your request, after the first policy year, you may elect to lapse this policy to a reduced paid-up Death Benefit as of the next policy anniversary. The amount of the Death Benefit will be calculated based on the Surrender Value after assessment of the full Surrender Charge, the Guaranteed Minimum Interest Rate and the Guaranteed Maximum Cost of Insurance rates as specified in the Schedule Pages. Once elected, no further premiums may be paid into the contract. The cash surrender value of this reduced paid-up Death Benefit will be equal to the present value of the future guaranteed benefits provided for by this policy at that time.

**Grace Period and Lapse**

During the first seven Policy Years, if on any Monthly Calculation Day the required monthly deduction exceeds the Policy Value less any outstanding Debt, a grace period of 61 days will be allowed for the payment of an additional premium. Such additional premium, less the Sales Charge must be sufficient to increase such value on that Monthly Calculation Day to cover three monthly deductions.

After the seventh Policy Year, if on any Monthly Calculation Day the required monthly deduction exceeds the Surrender Value, a grace period of 61 days will be allowed for the payment of an additional premium. Such additional premium, less the Sales Charge must be sufficient to increase such value on that Monthly Calculation Day to cover three monthly deductions.

In addition, if on any Monthly Calculation Day the Policy Debt exceeds the maximum loan value, a grace period of 61 days will be allowed for the repayment of the policy loan such that the Policy Debt is no greater than the maximum loan value.

The policy will continue In Force during such grace period. We will mail to You and any Assigns at the post office addresses last known to Us a Written Notice as to the amount of premium required. This Written Notice will be sent at least 15 days and not more than 45 days prior to the date that the policy would lapse. If such required premium amount is not postmarked as having been mailed to Us by the end of the grace period, the policy will lapse without value. The Death Benefit payable during the grace period will equal the Death Benefit in effect immediately prior to such period less overdue charges.

Any premiums paid will be used, after assessment of sales charges, to pay for any unpaid monthly deductions.

**Reinstatement**

If this policy terminates, in accordance with the Grace Period and Lapse Provision, You may reinstate this policy back to an "In Force" status within five years after the expiration of the Grace Period. Reinstatement must become effective prior to age 100 and while the Insured is alive. We will not approve a request for a reinstatement

until We receive at Our Main Administrative Office all of the following:

1. a Written Request for reinstatement;

2. evidence of insurability satisfactory to Us;

3. if applicable, payment or reinstatement of any Policy Debt as of the date of lapse; and

4. the payment of a reinstatement premium while the Insured is alive which equals an amount needed to provide for a positive Surrender Value as of the date of lapse, plus three monthly deductions. However, during the first seven Policy Years, the reinstatement premium will equal an amount needed to provide for a positive Policy Value (less any Policy Debt) as of the date of lapse, plus three monthly deductions.

Subject to the foregoing conditions, the effective date of a reinstatement will be the Monthly Calculation Day following the date We approve the request for reinstatement. If We approve it on a Monthly Calculation Day, the effective date will be that Monthly Calculation Day.

The Policy Value as of the effective date of a reinstatement shall equal the reinstatement premium received, plus any Policy Debt in effect as of the date of lapse, plus any surrender charge assessed on the date of lapse, minus the monthly deduction for the month then starting.

The surrender charge as of the effective date of a reinstatement shall equal the surrender charge that would be in effect as if the policy never lapsed.

# PART 5: POLICY VALUES

The premiums You pay, minus the premium expense charges shown on the Schedule Pages, are added to the policy's Policy Value. We make monthly deductions from the Policy Value to cover the cost of insurance, the cost of any additional benefit riders and the monthly charges shown on the Schedule Pages. We also deduct any partial withdrawals You make and charges for them, as well as any charges for face amount decreases. The Policy Value earns interest. Any additional amounts credited to the Policy Value are nonforfeitable, except indirectly due to surrender charges.

Details are provided below. We will keep You informed of the current Policy Value by sending You an Annual Report as described in Part 8 of this policy.

**Basis of Calculations**  Minimum Surrender Values are determined from the Basis of Calculations shown on the Schedule Pages. The Guaranteed Maximum Insurance Rates shown on the Schedule Pages are also based on this Table.

**Policy Value**  Policy Value is to be calculated as follows:

1. on each Monthly Calculation Day following the Policy Date, the Policy Value will equal $(A + B + C - D - E)$;

2. on a day of the month other than a Monthly Calculation Day, it will equal (A + C), plus interest on A from the beginning of the Policy Month to the date on which the Policy Value is being determined;

3. on the Policy Date, it will equal all premiums received, net of any premium expense charges, minus E;

where:

A = the Policy Value on the prior Monthly Calculation Day, after assessment of the monthly deduction on that day;

B = one month's interest on A, including any Additional Interest Credit;

C = all premiums received, net of any premium expense charges, since the prior Monthly Calculation Day, plus interest thereon to the end of the Policy Month, or any earlier date on which the Policy Value is being determined;

D = any partial withdrawal, and charge for it, being made as of that Monthly Calculation Day; and

E = the monthly deduction for the month then starting (no monthly deduction is made if the policy is surrendered for its full Surrender Value as of that Monthly Calculation Day).

**Interest Rate**

We will, from time to time, determine the interest rate used in the calculation of the Policy Value, based on Our anticipation of future investment earnings, mortality, persistency and expense/administrative costs. We will determine the interest rate at least once each year. We may, in Our sole discretion, change the interest rate. Changes made will be in accordance with procedures and standards on file with the Insurance Department of the state where this policy was delivered. Any interest credited in excess of the Guaranteed Minimum Interest Rate is referred to as "excess interest." The effective annual interest rate will never be less than the Guaranteed Minimum Interest Rate shown on the Schedule Pages.

We may credit different interest rates on loaned and unloaned portions of the Policy Value. The rate in effect on a given date for unloaned amounts is referred to as the "current interest rate." For loaned amounts, the credited interest rate for the first 15 policy years will be equal to the Loan Interest Rate in effect on that date less 1.5%, and after year 15 the rate will equal the Loan Interest Rate in effect on that date less 0.5%. In no event will the credited rate on loaned amounts be less than the Guaranteed Minimum Interest Rate. All interest rates are stated as effective annual rates. Interest will be compounded at least monthly to yield the effective annual rate.

**Benchmark Additional Interest Credit**

Beginning in the third Policy Year of this policy, in addition to interest being credited under the policy on each Monthly Calculation Day, We will also credit Additional Interest on each Monthly Calculation Day on amounts in excess of the Policy Value Benchmark Amount, shown on the Schedule Page. The Benchmark Additional Interest Rate will be equal to:

1. An annual effective rate of 1% if the Current Interest Rate is 5% or greater; or

2. An annual effective rate of .5% if the Current Interest Rate is at least 4.5% but less than 5%; or

3. An annual effective rate of 0% if the Current Interest Rate is less than 4.5%.

This Additional Interest Credit will be equal to (A x B), where:

A = the Benchmark Additional Interest Rate; and

B = the excess of the unloaned portion of the Policy Value over the Policy Value Benchmark Amount, shown on the Schedule Page.

The Additional Interest Credit is provided to reflect a reduction in Our holdback margin for profit and expense.

**Monthly Deduction**

The monthly deduction is the amount deducted from the Policy Value on the Policy Date and on each Monthly Calculation Day to pay the cost of insurance, the cost for any additional benefit riders and monthly charges for the Policy Month starting on that day. The monthly deduction will be equal to:

(A + B + C); where:

A = the cost of insurance (as defined in the Cost of Insurance provision below);

B = the monthly cost for any additional benefit riders as shown on the Schedule Pages;

C = the Monthly Service Charge shown on the Schedule Pages, and if applicable, one-twelfth of the Issue Charge.

**Cost of Insurance**

The cost of insurance is the amount We charge each month for providing the insurance coverage. The cost of insurance is equal to:

(A x (B − C)) + D; where

A = the applicable cost of insurance rate for the Insured's risk class, based upon the Net Amount at Risk and Insured's risk class, including any applicable substandard mortality percentage extra. The Net Amount at Risk is equal to (B−C) below;

B = the Death Benefit at the beginning of the Policy Month, divided by the Monthly Factor shown on the Schedule Pages;

C = the Policy Value at the beginning of the Policy Month, after the Monthly Service Charge and, when applicable, one-twelfth of the Issue Charge, and prior to subtracting the Cost of Insurance for that month;

D = the Substandard (Temporary or Permanent) Extra Charge, if any, shown on the Schedule Pages.

In item B "Death Benefit" means the Death Benefit as defined in Part 7 but prior to subtracting the cost of insurance for that month from any Policy Value element.

**Cost of Insurance Rates**

The cost of insurance rate for each Policy Month is based on the Insured's age at issue, risk class and sex, and on policy duration. The rate used in computing the cost of insurance is obtained from the Table of Guaranteed Maximum Cost of Insurance Rates shown on the Schedule Pages for the insured risk classification(s), or such lower rate as We may declare. At least 31 days before the start of the Policy Year, We will send You a notice of any change in rates.

No more frequently than once per year and no less frequently than once every five years, We will review the monthly Cost of Insurance Rates to determine if these rates should be changed. However, the rates will never exceed the Guaranteed Maximum Cost of Insurance Rates shown on the Schedule Pages. Our right to change rates also is subject to the following terms:

1. Any change in rates will be made on a uniform basis for all insureds in the same class. No change in rates will occur due to any change in the Insured's health or occupation.

2. Any change in rates will be determined prospectively. We will not distribute past gains or recoup prior losses, if any, by changing the rates.

3. Any change in rates will be based on a change in Our expectations of future investment earnings, mortality, persistency and expense/administrative costs.

4. Any change in rates will comply with any procedures and standards that may be on file with the insurance official of the jurisdiction where this policy is delivered.

The Monthly Service Charge, shown on the Schedule Pages, is subject to change based on Our expectations of future investment earnings, mortality, persistency and expense/administrative costs, subject to the maximum Monthly Service Charge stated on the Schedule Pages.

**Surrender Value**

You may surrender this policy for its Surrender Value at any time, by sending Us a Written Request along with this policy on or before such Monthly Calculation Day.

The Surrender Value on any date is the Policy Value on that date minus any applicable surrender charge as shown in the Table of Surrender Charges on the Schedule Pages, minus any Policy Debt, minus any unpaid issue charge. If the surrender is requested within 30 days after a Policy Anniversary, the Surrender Value shall not be less than the Surrender Value on the Policy Anniversary less any debt, partial withdrawals and charges made or incurred since the Policy Anniversary. The Surrender Value is never less than zero.

If this policy is terminated, the remaining schedule of Surrender Charges will be suspended. When this policy is reinstated, the remaining schedule of Surrender Charges also will be reinstated. The Surrender Charges are based on the period of time the policy is in

effect. When reinstated, the schedule of Surrender Charges will start from the point where the schedule was suspended.

**Partial Withdrawals**

You may withdraw part of the Surrender Value as of any Monthly Calculation Day while the Insured is living, subject to the charges and limitations shown on the Schedule Pages. We must receive your Written Request for partial withdrawal on or before the Monthly Calculation Day on which the partial withdrawal is to be effective. The Policy Value will be reduced by the amount withdrawn, a partial surrender charge and a partial withdrawal fee.

The partial surrender charge is equal to the product of (A) and (B), where (A) is the Face Amount decrease in units of $1,000 resulting from the partial withdrawal, and (B) is the charge per $1,000 of Face Amount as set forth in the Table of Surrender Charges shown on Schedule Page 3 of 5. The partial surrender charge assessed will reduce all remaining surrender charges. There is no partial surrender charge assessed under Death Benefit Option B.

The partial withdrawal fee is shown on the Schedule Pages.

Under Death Benefit Option A (the Face Amount), the Face Amount is decreased by the same amount of reduction as the Policy Value.

Under Death Benefit Option B (the Face Amount plus the Policy Value), the Face Amount does not change.

A partial withdrawal will not be permitted which would reduce the Face Amount below Our then current Minimum Face Amount, or the Surrender Value to zero.

Any benefits provided are not less than that required by law of the state where this policy was delivered. We reserve the right to defer payment of surrender values for six months from the date of request.

## PART 6: POLICY LOANS

**When Available**

You may obtain a loan from Us at any time, on assignment of the policy to Us as security, if it has a Surrender Value greater than zero.

**Amount Available**

The amount of any loan may not exceed the maximum loan value less the amount of any existing debt, where the maximum loan value is equal to the lesser of:

- the Surrender Value of this policy projected from the date of the loan to the next Policy Anniversary based upon guaranteed assumptions, minus loan interest charges through the next Policy Anniversary; and

- the current Surrender Value of this policy.

If on any Monthly Calculation Day the Policy Debt exceeds the maximum loan value, this policy will lapse according to the terms of the "Grace Period and Lapse" provision.

We reserve the right to defer the granting of a loan, other than for the payment of any premium to Us, for six months after submission of a loan application.

A loan will have a permanent effect on any death benefit and cash surrender value of this policy. We recommend consultation with a tax advisor before taking a loan.

**Loan Interest**

Loan interest will accure on a daily basis from the date of the loan, and is payable in arrears.

Loans will bear interest at such rate or rates as established by Us for any period during which loans are outstanding. On each Policy Anniversary We will set the rate that will apply during the next Policy Year. Such rate will be effective at the beginning of that year and will apply to both new and any outstanding loans under this policy.

On each Policy Anniversary, any unpaid loan interest from the previous Policy Year will be added to the existing policy loan. Failure to repay a policy loan or to pay loan interest will not terminate this policy except as otherwise provided under the Grace Period and Lapse Provision in Part 4 when the policy does not have sufficient remaining value to pay the monthly deductions, in which event, that provision will apply.

We will notify You of the initial loan interest rate at the time a policy loan is made, or as soon as practical thereafter. If there are any outstanding loans, except for purposes of reinstatement, We will give You at least 30 days advance notice of any increase in the rate.

There is a maximum limit on the interest rate We can set. The maximum limit is the Published Monthly Average for the calendar month ending two months before the Policy Year begins or the Guaranteed Minimum Interest Rate used in computing the Policy Value plus 1%, whichever is higher.

The Published Monthly Average will be:

A. The Corporate Bond Yield Average – Monthly Average Corporates as published by Moody's Investors Service, Inc. or any successor to that Service; or

B. If that Monthly Average is no longer published, a substantially similar average issued by the insurance supervisory official of the state where this policy was delivered.

If the maximum limit for a Policy Year is at least 1/2% higher than the rate in effect for the previous year, We may increase the rate to not more than that limit.

If the maximum limit for a Policy Year is at least 1/2% lower than the rate in effect for the previous Policy Year, We must decrease the rate to not more than that limit.

**Debt**

As used in this policy, "debt" or "Policy Debt" means all loans existing on this policy plus accrued interest. When this policy

terminates, We will add to any existing debt interest accrued from the prior Policy Anniversary to the termination date.

**Repayment**

The whole or any part of a loan may be repaid at any time while this policy is in effect. Any moneys received will be applied directly to reduce the debt unless specified as a premium payment. We will not accept partial payments in amounts less than $25, unless to prevent policy lapse.

## PART 7: INSURANCE COVERAGE PROVISIONS

**Death Proceeds**

Upon receipt by Us of Due Proof of Death that the Insured died while this policy is In Force, We will pay the death proceeds of this policy. The death proceeds at the death of the Insured are equal to:

a) the Death Benefit, as described below, in effect on the Insured's date of death; PLUS

b) any insurance then in effect on the life of the Insured that is provided by any additional benefit riders; PLUS

c) any premiums received by Us after the Monthly Calculation Day just prior to the Date of Death and on or before the Date of Death; MINUS

d) Any partial withdrawals made after the Date of Death and prior to receipt of Written Notice of the insured's death; MINUS

e) Any debt then existing on this policy; MINUS

f) Any monthly deductions not already made up to and including the Policy Month of death.

**Interest on Insurance Proceeds**

We will pay interest on any death proceeds from the date of death to the date of payment. The amount of interest will be the same as would be paid were the death proceeds left for that period of time to earn interest under Payment Option 2. However, in no case will the amount of interest be less than the minimum required in Your state.

**Death Benefit**

The Death Benefit under this policy will be determined under either Option A or Option B, whichever is chosen and is then in effect, but in no event while the policy In Force will it be less than the Minimum Death Benefit described below.

Option A: The Face Amount on that date.

Option B: The Face Amount plus the Policy Value on that date.

**Minimum Death Benefit**

The Minimum Death Benefit will be equal to a percentage of the Policy Value as of the insured's attained age at the beginning of the Policy Year in which the insured's death occurs, as follows:

U607 NY                                    −14−

| ATTAINED AGE | % OF POLICY VALUE | ATTAINED AGE | % OF POLICY VALUE | ATTAINED AGE | % OF POLICY VALUE |
|---|---|---|---|---|---|
| 0-40 | 250% | 54 | 157% | 68 | 117% |
| 41 | 243% | 55 | 150% | 69 | 116% |
| 42 | 236% | 56 | 146% | 70 | 115% |
| 43 | 229% | 57 | 142% | 71 | 113% |
| 44 | 222% | 58 | 138% | 72 | 111% |
| 45 | 215% | 59 | 134% | 73 | 109% |
| 46 | 209% | 60 | 130% | 74 | 107% |
| 47 | 203% | 61 | 128% | 75 | 105% |
| 48 | 197% | 62 | 126% | 76-90 | 105% |
| 49 | 191% | 63 | 124% | 91 | 104% |
| 50 | 185% | 64 | 122% | 92 | 103% |
| 51 | 178% | 65 | 120% | 93 | 102% |
| 52 | 171% | 66 | 119% | 94 | 101% |
| 53 | 164% | 67 | 118% | 95 and over | 100% |

**Death Benefit Following Insured's Age 100**

After the Policy Anniversary which follows the Insured's 100th birthday, the Death Benefit will equal the Policy Value. Monthly Service Charges and Cost of Insurance Charges will not be deducted after this anniversary, nor can any premiums be paid. Policy loans and partial withdrawals will continue to be made available after this anniversary.

**Under federal tax law, this policy may not qualify as life insurance after the Insured's attained age 100. It may be subject to adverse tax consequences and a tax advisor should be consulted before the owner chooses to continue the policy after the Insured's attained age 100.**

**Change in Death Benefit Option**

The Face Amount and Death Benefit Option You have chosen initially are shown on the initial Schedule Pages. While this policy is In Force, You may request In Writing to change the Death Benefit Option. Any change will be subject to the following:

1. A change in Death Benefit Option will require that there be no immediate change in Our insurance risk. To assure this, when We approve a change from Option A to Option B, We will decrease the Face Amount by the Policy Value. Such a change from Option A to Option B may not be made if it would reduce the Face Amount below the Minimum Face Amount shown on the Schedule Pages. Similarly, when We approve a change from Option B to Option A, We will increase the Face Amount by the Policy Value. We will not require evidence of insurability for a change in Death Benefit Option. You are limited to one change in Death Benefit Option for each Policy Year.

2. The effective date of any change will be the Monthly Calculation Day next following Our approval of Your Written Request for change. This date will be shown on the Revised Schedule Pages that We will send You.

**Request for a Decrease in Face Amount**

You may request a decrease in face amount at any time after the first Policy Year. The decrease requested must at least equal $25,000 and the face amount remaining after the decrease must at least equal $250,000. All requests to decrease the face amount must be In Writing and will be effective on the first Monthly Calculation Day following the date We approve the request. We reserve the right to require that this policy first be returned to Us before the decrease is made. Upon a decrease in face amount, a partial surrender charge will be deducted from the Policy Value based on the amount of the decrease. The charge will equal the applicable surrender charge that would then apply to a full surrender multiplied by the result of dividing the decrease in face amount by the face amount of the policy before the decrease. We will send You a Revised Schedule Page reflecting the change.

# PART 8: MISCELLANEOUS PROVISIONS

**Annual Report**

We will send You, without charge, a report for each Policy Year which includes:

1. the current Policy Value, Death Benefit, Face Amount and Surrender Value;

2. any partial withdrawals, premiums paid, interest credited and charges made during the year;

3. any outstanding policy loans and new loans and loan repayments made during the year; and

4. such additional information as required by the Superintendent of Insurance or the supervisory official of the state in which this policy was delivered .

You have the right to request an illustrative report at any other time. We reserve the right to charge a reasonable fee for the report.

**Projection of Benefits and Values**

We will provide You, on Written Request and payment of Our service fee then in effect, a projection of illustrative future benefits and values under Your Policy. We may limit the number of such projections in any Policy Year.

**Notices By Us**

Whenever We are required to give notice to You, it shall be deemed given if We mail it to You and, unless otherwise specified, to the assignee of record, if any, in a postage-paid envelope mailed by first class mail to the last known address of record at Our Main Administrative Office.

**Deferment of Certain Payments**

We may defer, for not more than six months after We receive Written Request, the payment of the Surrender Value due to surrender or partial withdrawal or the making of any loan (except to pay premiums). If payment is deferred 10 days or more on any surrender, interest will be paid on the amount deferred at the interest rate currently payable on the interest-only settlement option described in Part 9, from the date the request is received to the date of payment.

U607 NY

-16-

**Claims of Creditors**

The proceeds and any income payments under this policy shall not be subject to the claims of creditors and shall be exempt from legal process, levy or attachment to the extent allowed by law.

**Corrections**

We reserve the right to correct any clerical errors in this policy, or in Our administration of the policy.

## PART 9: PAYMENT OPTIONS

**Who May Elect Payment Options**

The surrender or death proceeds of this policy will be paid in one sum unless otherwise provided. As an alternative to payment in one sum as provided under Option 1, the proceeds may be applied under one or more of the alternative income payment options described in this Part.

However, Our consent is required for the election of an income payment option by a fiduciary or any entity other than a natural person. Our consent is also required for elections by any Assigns or an owner other than the Insured if the owner has been changed.

Except for Option 7 which is not available for death proceeds, You may elect any payment option for payment of the death proceeds. You may also designate or change one or more beneficiaries who will be the payee or payees under that Option. You may only do this during the lifetime of the Insured. If no election is in effect when the death benefit becomes payable, the beneficiary may elect any payment option other than Option 7. The payment options are also available to the payee of any Surrender Value that becomes payable under this policy.

Unless We agree otherwise, all payments under any Option chosen will be made to the designated payee or to his or her executor or administrator. We may require proof of age of any payee or payees on whose life payments depend as well as proof of the continued survival of any such payee(s).

**How To Elect a Payment Option**

The election of an income payment option must be in Writing. You can elect that the payments be made on an annual, semi-annual, quarterly, or monthly basis provided that each installment will at least equal $25. We also require that at least $1,000 be applied under any option chosen.

**What Payment Options Are Available**

This section provides a brief description of the various payment options that are available. In Part 10 You will find tables illustrating the guaranteed installment amounts provided by several of the Options described in this section. The amounts shown for Option 4, Option 5 and Option 7 are the minimum monthly payments for each $1,000 applied. The actual payments will be based on the monthly payment rates We are using when the first payment is due. They will not be less than shown in the tables.

Option 1  –  Payment in one sum

Option 2 – Left to earn interest

We pay interest on the amount left with Us under this Option as a principal sum.

We guarantee that at least one of the versions of this Option will provide interest at a rate of at least 3% per year.

Option 3 – Payments for a specified period

Equal income installments are paid for a specified period of years whether the payee lives or dies. The first payment will be on the date of settlement.

The Option 3 Table shows the guaranteed amount of each installment for monthly and annual payment frequencies. The table assumes an interest rate of 3% per year on the unpaid balance. The actual interest rate is guaranteed not to be less than this minimum rate.

Option 4 – Life annuity with specified period certain

Equal installments are paid until the later of:

a) the death of the payee;

b) the end of the period certain.

The first payment will be on the date of settlement. The period certain must be chosen at the time this Option is elected. The periods certain that may be chosen are as follows.

a) ten years;

b) twenty years;

c) until the installments paid refund the amount applied under this Option. If the payee is not living when the final payment falls due, that payment will be limited to the amount which needs to be added to the payments already made to equal the amount applied under this Option.

If , for the age of the payee, a period certain is chosen that is shorter than another period certain paying the same installment amount, We will deem the longer period certain as having been elected.

Any life annuity as may be provided under this Option is calculated using an interest assumption of 3 3/8%, except that any life annuity providing a period certain of twenty years or more is calculated using an interest rate of 3 1/4%.

U607 NY

–18–

Option 5 – Life annuity

Equal installments are paid only during the lifetime of the payee. The first payment will be on the date of settlement.

Any life annuity as may be provided under this Option is calculated using an interest rate of 3 1/2%.

Option 6 – Payments of a specified amount

Equal installments of a specified amount, out of the principal sum and interest on that sum, are paid until the principal sum remaining is less than the amount of the installment. When that happens, the principal sum remaining with accrued interest will be paid as a final payment. The first payment will be on the date of settlement. The payments will include interest on the principal sum remaining at a rate guaranteed to at least equal 3% per year. This interest will be credited at the end of each year. If the amount of interest credited at the end of a year exceeds the income payments made in the last 12 months, that excess will be paid in one sum on the date credited.

Option 7  – Joint survivorship annuity with a 10-year period certain

This payment option is not available for death proceeds. This Option is only available if the policy is surrendered within 6 months of the Policy Anniversary nearest the Insured's 55th, 60th, or 65th birthday. The first payment will be on the date of settlement. Equal income installments are paid until the latest of:

a)  the end of the 10-year period certain;

b)  the death of the Insured;

c)  the death of the other named annuitant.

The other annuitant must be named at the time this Option is elected and cannot later be changed. That annuitant must have an adjusted age as defined in Part 10 of at least 40.

Any joint survivorship annuity as may be provided under this Option is calculated using an interest rate of 3 3/8%.

**Other Payment Options**    We may offer other payment options or alternative versions of the options listed in the above section.

**Additional Interest**

In addition to:

a) the interest of 3% per year guaranteed on the principal sum remaining with Us under Option 2 or 6; and

b) the interest of 3% per year included in the installments payable under Option 3;

We will pay or credit at the end of each year such additional interest as We may declare.

## PART 10: TABLES OF PAYMENT OPTION AMOUNTS

The installment amounts shown in the tables that follow are shown for each $1,000 applied. Amounts for payment frequencies, periods or ages not shown will be furnished upon request. Under Options 4 and 5, the installment amount for younger ages than shown will be the same as for the first age shown and for older ages than shown, it will be the same amount as for the last age shown.

**Adjusted Age**

The term "age" as used in the tables refers to the adjusted age. Under Options 4 and 5, the adjusted age is defined as follows:

a) for Surrender Values, the age of the payee on the payee's nearest birthday to the Policy Anniversary nearest the date of surrender;

b) for death benefits, the age of the payee on the payee's birthday nearest the effective date of the payment option elected.

Under Option 7, the adjusted age is the age on the nearest birthday to the Policy Anniversary nearest the date of surrender. The table for Option 7 only shows the amounts for annuitants of the opposite sex. Rates for annuitants of the same sex will be furnished upon request.

**Basis of Calculation**

The rates that follow are based on the a-49 Table projected to 1985 with Projection Scale B and Projection B thereafter with 3 1/2% interest for Non-Refund, 3 3/8% for 10-Year Certain and Life and Installment Refund, and 3 1/2% for 20-Year Certain and Life.

## Option 3 - Payments for a specified period

| Number of Years....... | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|
| Annual Installment....$ | 211.99 | 179.22 | 155.83 | 138.31 | 124.69 | 113.82 | 104.93 | 97.54 | 91.29 |
| Monthly Installment...$ | 17.91 | 15.14 | 13.16 | 11.68 | 10.53 | 9.61 | 8.86 | 8.24 | 7.71 |

| Number of Years....... | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 25 | 30 |
|---|---|---|---|---|---|---|---|---|---|
| Annual Installments...$ | 85.95 | 81.33 | 77.29 | 73.74 | 70.59 | 67.78 | 65.26 | 56.76 | 49.53 |
| Monthly Installment...$ | 7.26 | 6.87 | 6.53 | 6.23 | 5.96 | 5.73 | 5.51 | 4.71 | 4.18 |

## *Option 4 - Life annuity with specified period certain

| Age of Payee | Installment Refund Certain | | 10 Years Certain | | 20 Years Certain | | Age of Payee | Installment Refund Certain | | 10 Years Certain | | 20 Years Certain | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Male | Female | Male | Female | Male | Female | | Male | Female | Male | Female | Male | Female |
| 10 | $3.08 | $3.03 | $3.08 | $2.99 | $3.00 | $2.94 | 50 | $4.36 | $4.12 | $4.50 | $4.10 | $4.28 | $3.99 |
| 15 | 3.14 | 3.09 | 3.15 | 3.04 | 3.07 | 3.00 | 55 | 4.76 | 4.47 | 4.95 | 4.47 | 4.61 | 4.31 |
| 20 | 3.22 | 3.16 | 3.24 | 3.11 | 3.15 | 3.07 | 60 | 5.28 | 4.93 | 5.54 | 4.96 | 4.97 | 4.67 |
| 25 | 3.33 | 3.24 | 3.34 | 3.20 | 3.25 | 3.15 | 65 | 5.97 | 5.54 | 6.30 | 5.63 | 5.29 | 5.06 |
| 30 | 3.45 | 3.35 | 3.47 | 3.30 | 3.38 | 3.25 | 70 | 6.91 | 6.39 | 7.24 | 6.50 | 5.43 | 5.31 |
| 35 | 3.61 | 3.48 | 3.63 | 3.43 | 3.55 | 3.38 | 75 | 8.21 | 7.57 | 8.26 | 7.56 | 5.44 | 5.40 |
| 40 | 3.80 | 3.64 | 3.86 | 3.60 | 3.74 | 3.54 | 80 | 10.04 | 9.26 | 9.12 | 8.60 | 5.46 | 5.46 |
| 45 | 4.05 | 3.85 | 4.14 | 3.82 | 3.99 | 3.74 | 85 | 12.61 | 11.68 | 9.60 | 9.31 | 5.46 | 5.46 |

## * Option 5 - Life annuity

| Age Of Payee | Male | Female | Age Of Payee | Male | Female |
|---|---|---|---|---|---|
| 10 | $3.37 | $3.12 | 50 | $4.62 | $4.28 |
| 15 | 3.24 | 3.18 | 55 | 5.12 | 4.68 |
| 20 | 3.32 | 3.25 | 60 | 5.79 | 5.24 |
| 25 | 3.42 | 3.34 | 65 | 6.75 | 6.04 |
| 30 | 3.56 | 3.44 | 70 | 8.16 | 7.22 |
| 35 | 3.73 | 3.58 | 75 | 10.26 | 9.03 |
| 40 | 3.95 | 3.75 | 80 | 13.54 | 11.88 |
| 45 | 4.24 | 3.88 | 85 | 18.72 | 16.54 |

U607 NY

### *Option 7 - Joint survivorship annuity with 10-year period certain

| Age of Other Annuitant F | Age of Insured Male | | | Age of Other Annuitant F | Age of Insured Male | | | Age of Other Annuitant M | Age of Insured Female | | | Age of Other Annuitant M | Age of Insured Female | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 55 | 60 | 65 | | 55 | 60 | 65 | | 55 | 60 | 65 | | 55 | 60 | 65 |
| 40 | $3.62 | $3.64 | $3.66 | 60 | $4.43 | $4.64 | $4.82 | 40 | $3.72 | $3.77 | $3.80 | 60 | $4.34 | $4.64 | $4.93 |
| 45 | 3.80 | 3.83 | 3.86 | 65 | 4.61 | 4.93 | 5.23 | 45 | 3.89 | 3.97 | 4.03 | 65 | 4.44 | 4.82 | 5.23 |
| 50 | 4.00 | 4.07 | 4.12 | 70 | 4.75 | 5.18 | 5.63 | 50 | 4.06 | 4.19 | 4.31 | 70 | 4.50 | 4.95 | 5.48 |
| 55 | 4.22 | 4.34 | 4.44 | 75 | 4.86 | 5.36 | 5.95 | 55 | 4.22 | 4.43 | 4.61 | 75 | 4.54 | 5.03 | 5.65 |

* Minimum monthly income for each $1,000 applied.

# EXCHANGE OF INSURED OPTION RIDER

This rider is part of the policy to which it is attached. Except as stated in this rider, it is subject to all of the provisions contained in the policy.

**The Exchange Option**
While this rider is in effect and subject to its terms, you have the option to exchange your policy ("the exchange policy") for a new policy on the life of a substitute insured.

**How to Exercise This Option**
To exercise this option, You must file an application with Us at Our Main Administrative Office. It must be signed by You. We must also receive:

1.  Evidence that You have a satisfactory insurable interest in the life of the substitute insured.

2.  Evidence that the substitute insured is insurable under our established practice in the selection of risks for the amount and plan applied for. Selection of risks includes health and non-health factors.

3.  The release of any lien against or assignment of your policy. You may instead submit written approval by the lienholder or assigns of the exchange policy in a form satisfactory to Us with such other documents as We may reasonably require.

4.  The surrender and release of the exchange policy.

5.  Payment of any amounts due to Us for the exchange as described in the Exchange Adjustments.

Unless otherwise provided in the application, the owner and the beneficiary of the new policy will be the same as under the exchange policy. Any subsequent changes will be governed by provisions of the new policy.

The Date of Exchange will be the policy anniversary following the later of:

1.  Our receipt of the application;

2.  Payment of the Exchange Adjustments, if any; and

3.  Our approval of the insurable interest.

The new policy will take effect on the Date of Exchange. When the new policy takes effect, the exchange policy will terminate.

**The New Policy**
The Policy Date of the new policy will be the Date of Exchange.

The issue age of the Insured under the new policy will be determined based upon the substitute insured's age on his or her birthday nearest the date of issue of the new policy.

The new policy on the life of the substitute insured will be written on any plan of universal life insurance issued with a level face amount issued by Us at the time of the exchange. The new policy will be subject to Our published issue rules (e.g., age and amount limits) for the plan chosen which are in effect at that time. The risk classification and any exclusions applicable to the new policy will be determined in accordance with Our rules and practices in effect on the date of exchange. The rates for the new policy will be based on Our published rates in effect on the Date of Exchange.

The face amount of the new policy will equal the basic face amount of the exchange policy without regard to any riders under the exchange policy, except as provided below. The Policy Value of the exchange policy on the Date of Exchange will be applied as premium to the new policy, but without any issue or sales charge applied under the new policy.

**Exchange Adjustments**
The owner must pay an amount equal to the excess, if any, of the surrender charge in effect on the exchange policy over the surrender charge for the new policy. All such surrender charges will be determined as of the Date of Exchange.

In some cases, the amount of Policy Value that may be applied to the new policy may exceed the premium limit for the new policy. In that event, We will return such excess Policy Value to You in cash.

**Monthly Rider Charges**
There are no Monthly Charges for coverage under this rider.

**Termination of This Rider**
This rider will terminate on the first of any of the following events to occur:

1.  Termination of the exchange policy;

2.  Lapse or Exchange of the exchange policy;

3.  Our receipt at Our Home Office of a Written Request to cancel this rider; and

4.  Death of the insured.

Phoenix Life Insurance Company

*Dona D. Young*

Chairman, President
and Chief Executive Officer

 **PHOENIX**

Phoenix Life Insurance Company
P.O. Box 8027
Boston, MA 02266-8027

**Policy Acceptance Form**

| Agency: | | Insured(s): |
|---|---|---|
| | E9206 | ARTHUR B KRAMER |
| Policy Number: | | |
| | 97303913 | |

## DECLARATION:

The insured(s) declares that the statements made in the application remain full, complete, and true as of this date; that since the date of the application, no insured has applied to any insurance company or society without receiving the exact policy applied for or had any symptoms, diseases or disorders for which advice has been sought.

All insured(s) must attest to the above declaration. If any insured cannot attest to the above statement, please so indicate by checking the box next to that insured's signature below and complete a form #519B for that insured. PLEASE NOTE: Home Office approval of form #519B is necessary before the policy is in effect.

**AMENDMENTS:** The application for Policy No. 97303913    is amended as follows:

> The subsequent planned annual premium is $460,800.
> The first year anticipated annual premium is $540,000.
> Last consult with Dr. Nash was in June of 2005.

**ENDORSEMENTS:**

> Delivery expiry is 11/15/2005 on policy 97303913.

It is agreed that the above declaration and amendments are part of the application and shall be part of the policy.

**DELIVERY RECEIPT:** To be completed when policy is delivered. If form #519B is required, please consult with your agent before completing this section.

This certifies that as the policy owner, (check ONE only):

☒ I have received delivery of the insurance policy listed above, which includes a Statement of Policy Cost and Benefit Information.

☐ I have received delivery of the insurance policy listed above, which includes a Statement of Policy Cost and Benefit Information, and authorize _____ to hold such policy on my behalf.

| Date | 10/21/05 | Insured(s) | _Arthur Kramer_ | ☐ |
|---|---|---|---|---|
| Signed at | New York, NY | | | ☐ |
| Witness | _Eric Pollard_ | | | ☐ |
| Owner | Arthur Kramer 2005 Insurance Trust | | | ☐ |
| | Aric Hadlow United Bank & Trust | | | |
| | By: _(All other than Insured)_ | | | |
| | Kevin J. Reed, VP | | | |

If owner is a firm or corporation, please give the name of the firm or corporation and the title of the officer signing for the firm or corporation.

AGENT: ORIGINAL to Underwriting and Issue, YELLOW COPY to Agent, PINK COPY to remain with policy.

HP01                                                                    HHR01771        2-96

◇ **PHOENIX**·    Phoenix Life Insurance Company
PO Box 8027
Boston MA 02266-8027
Underwriting Service Center

**Application for Life Insurance**
**Part I**

---

## Section I - Proposed Insured

| Print Name as it is to appear on policy (First, Middle, Last) | Sex | Birthdate (Month, Day, Year) |
|---|---|---|
| Arthur B Kramer | ☒ Male  ☐ Female | 1-10-27 |

| Birthplace (State or Country) | United States Citizen | Social Security Number |
|---|---|---|
| NY /USA | ☒ Yes  ☐ No | 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 |

Driver's License Number (Include State)    014836023    CT

Marital Status:  ☐ Single  ☒ Married  ☐ Widowed  ☐ Divorced  ☐ Separated

Home Address (Include Street, Apt. Number, City, State, and ZIP Code)
688 Westover Road  Stamford, CT 06902

Home Telephone Number (203) 357-7886

Give Prior Address if at address less than 2 years (Include Street, Apt. Number, City, State, and ZIP Code)

| Current Occupation and Duties | Employer | Length of Employment |
|---|---|---|
| retired | | |

| Business Address (Include Street, Apt. Number, City, State, and ZIP Code) | Bus. Phone No. (Include Ext.) ( ) |
|---|---|

Email Address

---

## Section II - Ownership

☐ A.  Insured
☐ B.  Successive Owners
☐ B1.  Owners Jointly
☐ C.  Corporation, its successors or assigns (Include state of incorporation)

☐ D.  Partnership (Include Name of all Partners - If partnership is limited, indicate which partners are general partners)
☐ E.  Sole Proprietorship (Include Name of Sole Proprietor)
☒ F.  Trust (Include Name and Date of Trust, Name of Trustee(s) and Grantor)

(Complete section below if B, C, D, E or F are checked)

If Owner is other than Proposed Insured, Premium Notice will be sent to:

Owner's Name  Arthur Kramer 2005 Insurance Trust, dated August 29, 2005
Hudson UNITED BANK truskee    Arthur Kramer, Grantor

Mailing Address 75 Rockefeller Plaza New York, NY 10019

Owner's Email Address

Social Security or Tax I.D. Number  APPLIED For    Relationship _____ Date of Birth _____

Contingent Owner

Name _____ Date of Birth _____

Relationship _____

**Ultimate Owner:** Check one. If none checked, insured will be ultimate owner.
☐ Insured  ☐ Executor or administrator of the survivor of the primary and contingent owners

---

## Section III - Beneficiary Designation

| Primary Beneficiary | Relationship to Proposed Insured | Date of Birth (If Available) | Social Security No. (If known) |
|---|---|---|---|
| Arthur Kramer 2005 Insurance Trust | | August 29, 2005 | APPLIED FoR |

☐ If this box is checked, each of the Contingent Beneficiaries listed shall receive an equal interest.

| First Contingent Beneficiary | Relationship to Proposed Insured | Date of Birth (If Available) | Social Security No. (If known) |
|---|---|---|---|
| | | | |

| Second Contingent Beneficiary | Relationship to Proposed Insured | Date of Birth (If Available) | Social Security No. (If known) |
|---|---|---|---|
| | | | |

**If Trust is primary beneficiary: (check one)**
☐ Trust under insured's will
☒ Inter vivos - Name of Trustee  Hudson United Bank    Robert J. Desch, VP
Date of Trust  August 29, 2005

To qualify for payment, beneficiary must be living: (Check A or B, otherwise A will apply)
☐ A. at the Proposed Insured's death.  ☐ B. on the 30th day after the date of the Proposed Insured's death.

---

**Section IV - Coverage Applied For**

| Plan of Insurance | Basic Policy Amount |
|---|---|
| *Phoenix Accumulator UL II* | $ 10,000,000 |

**Section V - VARIABLE/UNIVERSAL PLANS of Insurance - Riders and Features**

| First Year Anticipated, BILLED Premium (Excluding 1035 Exchange, Lump Sum Funds, etc.) | Subsequent Planned Annual Premium |
|---|---|

☐ Disability Waiver of a Specified Amount

    Amount $_____

☐ Accidental Death Benefit Rider

☐ Death Benefit Protection Rider

    ☐ Age 70　☐ Age 80　☐ Age 100

☐ Purchase Protector _____ units

☐ Child's Term Rider

☐ Family Term Rider

☐ Living Benefit Rider

☐ Guaranteed Death Benefit Rider

☐ Guaranteed Extension Rider

☐ Cash Value Accumulation Rider

☐ Age 100 + Rider

☐ Individual Term Rider $ _____

**Death Benefit Option:** (check one) If none checked, Option 1 will apply.
☒ Option 1 - Level Face Amount
☐ Option 2 - Increasing Face Amount

**Face Amount Increase Options:**
☐ _____ % percentage increase
☐ $ _____ Fixed Dollar Increase
☐ Increase Equal to Premiums Paid

**Policy Option:** (check one) If none checked, Option A will apply.
☐ Policy Option A
☐ Policy Option B
☐ Policy Option C
☐ Other _____
☐ Other _____
☐ Other _____
☐ Other _____

**Temporary Money Market Allocation**

If the state of issue does not require refund of premium during the Right To Cancel Period, but you prefer to temporarily allocate your premiums to the Money Market subaccount until the end of the Right to Cancel Period, as stated in the policy, indicate: ☐ Yes ☐ No

**Electronic Delivery Authorization**

By checking "Yes," I am authorizing the Company to provide my statements, prospectuses and other information electronically if available. I understand that I must have Internet access to use this service and there may be access fees charged by the Internet service provider. ☐ Yes ☐ No

**Section VI - Suitability**

Do you understand that if you have purchased a Variable Life Policy and the Death Benefit may be variable or fixed under certain conditions and that the Death Benefit and Cash Values under any Variable Policy may increase or decrease in amount or duration based on the investment experience of the underlying subaccounts? ☐ Yes ☐ No

If you are purchasing a Variable Life Policy, do you believe it is suitable to meet your financial objectives? ☐ Yes ☐ No

If I have purchased a Variable Life Policy, I confirm that I have received the prospectus for that policy and its underlying funds.

Illustrations of benefits including death benefits, policy values and cash surrender values are available on request.

**Section VII - Complete if Temporary Insurance is Requested**

If either of the following questions are answered "Yes" or left blank, no agent or broker is authorized to accept money and a Temporary Insurance Agreement may not be issued, and no coverage will take effect.

| Yes | No | |
|---|---|---|
| ☐ | ☐ | 1. Within the past two years have you been treated for heart disease, stroke, or cancer or had such treatment recommended? |
| ☐ | ☐ | 2. Within the past 60 days have you been scheduled or advised to have any diagnostic test (excluding HIV) tests or surgery not yet performed? |

$_____ has been paid by _____ to the Licensed Agent/Registered Representative indicated in this application, for proposed insurance applied for in this application. This sum is to be applied in accordance with and subject to the terms of the Temporary Insurance Receipt bearing the same number as this application.

**Section VIII - TERM/WHOLE LIFE PLANS of Insurance - Riders and Features**

☐ Accidental Death Benefit
☐ Disability Waiver of Premium on Insured
☐ Purchase Protector _____ units
☐ Family Protection
☐ Children's Protection _____ units
☐ Living Benefit Rider
☐ Other _____

Cost of Living is automatic (No COL for Term products) unless this box is checked ☐ I do not desire Cost of Living

Additional Death Benefit Riders:
Primary Insurance Term Rider (PITR)  $ _____
Other Rider Name _____ Amount $ _____

☐ Paid-Up Additions Purchase Options Rider (PAPOR) (check one)
  ☐ PAPOR A-Flexible   ☐ PAPOR B-Flexible with Optionterm
  Number of years payable _____
Intended premium payments for the first 7 years:

Year 1 _____     Year 5 _____
Year 2 _____     Year 6 _____
Year 3 _____     Year 7 _____
Year 4 _____     Maximum Amount $ _____

**Dividend Option:**
☐ Optionterm
  Optionterm Death Benefit $ _____
  Premium Paying Coverage ☐ Yes  ☐ No  or
  % of Increase _____
☐ Accumulate at Interest (ACCUM)
☐ Paid-up Additional Insurance (PUA)
☐ One Year Term with Balance to:
  ☐ Cash   ☐ PUA   ☐ ACCUM   ☐ RP
☐ Reduce Premium (RP)
☐ Cash
☐ Other _____
☐ Other _____

Automatic Premium Loan, if applicable
☐ Yes   ☐ No

Policy Loan Interest Rate, if applicable (if none checked, "Variable" will apply.)

☐ Variable   ☐ Fixed

**Section IX - Mode of Premium Payment - (Please note, there is a higher cost associated with the purchase of a Whole Life or Term policy, if the mode of payment is other than on an annual pay basis. Please consult with your Licensed Agent/Registered Representative.)**

☐ Annual                               ☑ Quarterly                                ☐ Semi-Annual
☐ Monthly (Variable Life insurance only)   ☐ PCS (Phoenix Check-O-Matic Service)
                                         Minimum Monthly Check for Each Service - $25.00

Multiple Billing Option - Give # or Details _____
☐ List Bill  ☐ Employee Insurance Counseling Service (EICS)  ☐ Salary Allotment  ☐ Pension  ☐ Money Purchase Pension
☐ Other _____

If electing PCS, complete the following:
Existing Policy Number or PCS File Number _____

Authorization Agreement for Preauthorized Payments
I (we) hereby authorize the Company (Note: Company is defined as indicated on page 1 of application) to initiate debit entries to my (our) checking account and the depository named below.

Information for New Account
Attach a void check to furnish encoding details.
If the depositor's name is not imprinted on the check, fill it in here exactly as it appears in the bank records.

**Attach Void Check Here**

Signature of depositor (if different from owner) _____

Send premium notices to: (in addition to owner)
☐ Insured at:  ☐ Home Address  ☐ Business Address
☐ Other (Name, Relationship to Owner and Address) _____

_____

**Section X - Existing Life Insurance**

Describe all additional coverage in force. Include individual and group. If no coverage inforce, check here ☐.

| Company | Issue Date | Plan | Amount | Personal / Business | |
|---|---|---|---|---|---|
| Transamerica | 4 policies | UL | Total $22,000,000 | ☒ | ☐ |
| | | | $ | ☐ | ☐ |
| | | | $ | ☐ | ☐ |

Total Life Insurance in force (if none, indicate) $22,000,000   Total Accidental Death Benefit in force (if none, indicate) $_____

| Yes | No | | |
|---|---|---|---|
| ☒ | ☐ | 1. | Are there any life insurance policies or annuity contracts, owned by, or on the life of, the applicants or the insureds or the owner(s) or the annuitant? |
| ☐ | ☒ | 2. | With this policy, do you plan to replace (in whole or in part) now or in the future any existing life insurance or annuity contract in force with this policy? |
| ☐ | ☒ | 3. | Do you plan to utilize values from any existing life insurance policy or annuity contract (through loans, surrenders or otherwise) to pay any initial or subsequent premium(s) for this policy? |

For all "Yes" answers above, please provide the following information

| Company | Issue Date | Plan | Amount | Personal / Business | |
|---|---|---|---|---|---|
| Transamerica | Various | Universal Life | $ 22,000,000 | ☒ | ☐ |
| | | | $ | ☐ | ☐ |
| | | | $ | ☐ | ☐ |

**Section XI - Income**

Earned Income
a. -0-

Independent Income
b. 3,000,000

Net Worth
c. 70,000,000

**Section XII - Additional Information**

| Yes | No | | |
|---|---|---|---|
| ☐ | ☒ | 1. | Have you used tobacco or nicotine products in any form in the last 10 years? If "Yes," please circle the product(s) used: cigarettes, cigars, pipes, snuff, smokeless or chewing tobacco, nicotine patch or gum. If "Yes," check one: ☐ Use currently     ☐ Date quit_____ |
| ☐ | ☒ | 2. | Have you ever applied for life, accident, or health insurance and been declined, postponed, or been offered a policy differing in plan, amount or premium rate from that applied for? (If "Yes," give date, company and reason). |
| ☐ | ☒ | 3. | Are you negotiating for other insurance? (If "Yes," name companies and total amount to be placed in force.) |
| ☐ | ☒ | 4. | Do you intend to live or travel outside the United States or Canada? (If "Yes," state where and for how long). |
| ☐ | ☒ | 5. | Have you flown during the past three years as a pilot, student pilot or crew member? (If "Yes," complete Aviation Questionnaire). |
| ☐ | ☒ | 6. | Have you participated in the past 3 years or plan to engage in any extreme sport activities such as motorized vehicle, or parachute jumping, or underwater diving, or any other extreme avocation? (If "Yes," complete Avocation Questionnaire). |
| ☐ | ☒ | 7. | Have you in the past three years been the driver of a motor vehicle involved in an accident, or convicted of a moving violation of any motor vehicle law, or had your driver's license suspended or revoked? |
| ☐ | ☒ | 8. | Have you ever been convicted of a felony or do you have charges pending? |

Give full details for all "Yes" answers above. If necessary, use an additional piece of paper and please sign it.

| Question # | Details |
|---|---|
| | |
| | |
| | |
| | |
| | |

## Section XIII - Medical History (Not necessary to complete if medical or paramedical exam has been ordered)

| Height 5' 10" | Weight 180 lbs | Has your weight changed by 10 pounds or more in the past 2 years? If "yes", how much __15__ pounds ☐ Gain ☒ Loss |

| Family History: | Age if Alive | Age at Death | If alive, indicate health problems or if deceased, indicate cause of death: | Family History: | Age if Alive | Age at Death | If alive, indicate health problems or if deceased, indicate cause of death: |
|---|---|---|---|---|---|---|---|
| Father ☐ Alive ☒ Deceased | | 72 | Unknown | Mother ☐ Alive ☒ Deceased | | 96 | Old Age |

**Personal Physician:** Please provide the name and address of your personal physician or health care provider, date of most recent visit, reason for visit, and results of treatment (if any):

Dr. Thomas Nash
New York City, N.Y.

Has anyone in your immediate family developed any hereditary condition, cancer, or heart disease before age 60? ☐ Yes (please provide details below) ☒ No

**To the best of your knowledge and belief have you ever had, or been told by a physician or other health care provider that you have:**

1. High blood pressure or hypertension? ☐ Yes ☒ No
2. Pain, pressure, or discomfort in the chest, angina pectoris, palpitations, swelling of the ankles, or undue shortness of breath? ☐ Yes ☒ No
3. Heart disease, coronary artery disease, cardiomyopathy, heart failure, atrial fibrillation, heart rhythm abnormality, heart murmur, congenital heart disease or valvular heart disease? ☐ Yes ☒ No
4. Peripheral vascular disease, claudication, narrowing or blockage of arteries or veins? ☐ Yes ☒ No
5. Asthma, pulmonary fibrosis, chronic cough, emphysema, pneumonia, or any other lung disease? ☐ Yes ☒ No
6. Neurologic disease, seizures, fainting, falls, concussion, stroke, transient ischemic attack (TIA), tremor, neuropathy, weakness, paralysis, Parkinson's disease, memory loss, dementia, or any other disease of the brain or nervous system? ☐ Yes ☒ No
7. Depression, bipolar disorder, schizophrenia, anxiety, or other psychiatric illness? ☐ Yes ☒ No
8. Arthritis, lupus, or any musculoskeletal or skin disorder? ☒ Yes ☐ No
9. Ulcers, abdominal pain, colitis, Crohn's disease, gall bladder disease, liver disease, hepatitis, jaundice, pancreatitis, or any other disease of the gastrointestinal system? ☐ Yes ☒ No
10. Diabetes, kidney disease, kidney stones, bladder disorder, prostate disorder, protein or blood in the urine? ☐ Yes ☒ No
11. Endocrine disorder, including disorder of the thyroid, parathyroid, adrenal, or pituitary glands? ☐ Yes ☒ No
12. Acquired Immune Deficiency Syndrome (AIDS) or any other immunologic disorder? ☐ Yes ☒ No
13. Anemia, bleeding or clotting disorder, or any other disorder of the blood or bone marrow? ☐ Yes ☒ No
14. Cancer of any type, tumor (benign or malignant), leukemia, lymphoma, or Hodgkin's disease? ☒ Yes ☐ No
15. Are you taking any kind of medicine, therapy, or treatment regularly or at frequent intervals? ☒ Yes ☐ No
16. Have you ever been treated for alcoholism or been advised to limit or stop your use of alcohol? ☐ Yes ☒ No
17. Have you ever used narcotics, barbiturates, amphetamines, hallucinogens, or any prescription drug except in accordance with a physician's instructions? ☐ Yes ☒ No
18. Have you ever been a patient in any hospital, treatment center, or similar facility within the last 10 years? ☒ Yes ☐ No
19. Have you had, or been advised to have, any surgery, X-rays, electrocardiograms, blood studies (excluding HIV or AIDS tests), or other tests within the last 5 years? ☒ Yes ☐ No
20. Other than above, have you had any other physical or psychological disorder or been treated by a physician or other health care provider for any reason within the past 5 years? ☐ Yes ☒ No

**Please provide details of "YES" answers (include question number, diagnosis, date of occurrence, hospital or treating physician's name and address, and current status). Use OL1590 if additional space is necessary to record all details.**

8. 2 Knee replacements 7½ yrs ago
Right hip replacement 2-3 yrs ago - Greenwich Hospital

14. Basal cell Ca removed 2-3 yrs ago Dr. Kahan

15. Flomax

18. See #8

19. Routine ekgs + lab work 4 Dr. Nash

Phoenix reserves the right to require additional medical information, medical examination or testing to complete the underwriting process.

OL2773NY                    5 of 6                    VOB081416371147                    4-02

### Authorization To Obtain Information

I authorize any physician, health care provider, hospital, clinic or other medically-related facility, insurance company or the Medical Information Bureau (MIB), having any records or knowledge of me or my health, to provide any such information to Phoenix Life Insurance Company and its affiliated insurers (Phoenix) or its reinsurers. I authorize any of the above sources to release to Phoenix or its reinsurers any of my information relating to alcohol use, drug use and mental health care.

Medical information will be used only for the purpose of risk evaluation and determining eligibility for benefits under any policies issued. Phoenix may disclose information it has obtained to others as permitted or required by law, including the MIB, our reinsurers and other persons or entities performing business or legal services in connection with this application, any contract issued pursuant to it or in connection with the determination of eligibility for benefits under an existing policy. Information that is not personally identifiable may be used for insurance statistical studies.

If insurance on any minor child is applied for, this authorization extends to records and knowledge of that child and that child's health. To facilitate rapid submission of information, I authorize all of the above sources, except MIB, to give such records or knowledge to any agency employed by Phoenix to collect and transmit such information.

I authorize consumer reporting agencies, insurance companies, motor vehicle departments, my attorneys, accountants and business associates and the MIB to provide any information to Phoenix or its reinsurers that may affect my insurability. This may include information about my occupation, participation in hazardous activities, motor vehicle record, foreign travel, finances, and other insurance coverage in place.

I acknowledge that I have received a copy of the Notice of Information Practices, including information about Investigative Consumer Reports and the Medical Information Bureau. I authorize the preparation of an investigative consumer report.

This authorization shall continue to be valid for thirty months from the date it is signed unless otherwise required by law. A photocopy of this signed authorization shall be as valid as the original. This authorization may be revoked by writing to Phoenix prior to the time the insurance coverage has been placed in force. I understand my authorized representative or I may receive a copy of this authorization on request.

☐ I do ☐ I do not (check one) require that I be interviewed in connection with any investigative consumer report that may be prepared.

I have reviewed this application, and the statements made herein are those of the proposed insured and all such statements made by the proposed insured in Part I or in Part II of this application are full, complete, and true to the best knowledge and belief of the undersigned and have been correctly recorded.

I understand that i) no statement made to, or information acquired by any Licensed Agent/Registered Representative who takes this application, shall bind the Company unless stated in Part I and/or Part II of this application, and ii) the Licensed Agent/Registered Representative has no authority to make, modify, alter or discharge any contract thereby applied for.

I understand and agree that the insurance applied for shall not take effect unless and until each of the following has occurred: the policy has been issued by the Company; the premium required for issuance of the policy has been paid in full during the lifetime of the insured; all the representations made in the application remain true, complete and accurate as of the latest of such dates, and there has been no change in the health of any proposed insured that would change the answers to any of the questions in the application, except as otherwise provided by the Temporary Insurance Agreement.

I understand that if there is any change in my health or physical condition, or if I visit a physician or am hospitalized, subsequent to the date I complete the application or provide any information to be contained in the application, I will inform the Company as soon as possible.

This application is attached to and made a part of the policy.

Under penalty of perjury, I confirm that (a) the Social Security or Tax Identification Number shown above is correct, and (b) that I am not subject to backup withholding. (Strike this out and initial if not true).

If I have applied for the Living Benefit Rider, I confirm that I have received a copy of the disclosure form, Summary of Coverage for Accelerated Benefit Rider.

| Proposed Insured's Signature | State Signed In<br>N Y | Witness (Must be signed in presence of Proposed Insured) | Date<br>9-2-05 |
|---|---|---|---|
| Owner's Signature (if other than Proposed Insured) | State Signed In<br>N Y | Witness (Must be signed in presence of Owner) | Date<br>9-2-05 |
| Parent's Signature (if Minor Insured) | State Signed In | Witness (Must be signed in presence of Parent) | Date |

The Producer hereby confirms he/she has truly and accurately recorded on the application the information supplied by the Proposed Insured; and that he/she is qualified and authorized to discuss the contract herein applied for.

Will the proposed insured replace (in whole or in part) any existing life insurance or annuity contract in force with the policy applied for? ☐ Yes ☒ No

Will the proposed insured utilize values from another insurance policy (through loans, surrenders or otherwise) or annuity to pay for the initial or subsequent premium(s) for the policy applied for? ☐ Yes ☒ No

Are there any life insurance policies or annuity contracts owned by or on the life of the applicants or the insureds or the owner(s) or the annuitant? ☒ Yes ☐ No

| Lic.Agt./Reg. Rep's Name (Print)<br>Steven Lockwood | | Lic. Agt./Reg. Rep's Email Address<br>Lockwoodjim @ hotmail.com |
|---|---|---|
| Lic.Agt./Reg. Rep's Signature<br>X | Date<br>9/2/05 | Lic. Agt./Reg. Rep's I.D. No.<br>APPLIED FO | Lic. Agt./Reg. Rep's Telephone No.<br>212 767 7334 |
| Broker / Dealer Name and Address | | Broker/Dealer Number |



**FLEXIBLE PREMIUM LIFE INSURANCE POLICY**
**Death Benefit Payable if Insured Dies While the Policy is In Force**

**Nonparticipating**

U607 NY

# Ex. 4

# Phoenix Life Insurance Company

Executive Offices:
One American Row
Hartford, CT 06102

Statutory Home Office:
10 Krey Boulevard
East Greenbush, NY 12144

| | |
|---|---|
| **Insured** | ARTHUR B KRAMER |
| **Age & Sex** | 78        MALE |
| **Policy Number** | 97303935 |
| **Face Amount** | $9,000,000.00 |
| **Policy Date** | JULY 10, 2005 |

Dear Policyowner:

We agree to pay the benefits of this policy in accordance with its provisions. It is important to Us that You are satisfied with Your policy and that it meets Your insurance goals. For service or information on this policy, contact the agent who sold the policy, any of Our agency offices, Our Home Office or Our Customer Service Center.

YOU HAVE A RIGHT TO RETURN THIS POLICY. If for any reason You are not satisfied with this policy, You may return it at any time within ten days (or sixty days if this policy was issued as a replacement of another life insurance policy) after You receive it to either the agent through whom it was purchased or to Us at Our Main Administrative Office at the following address:

> Phoenix Life Insurance Company
> Underwriting and Issue Department
> P.O. Box 8027
> Boston, MA 02266-8027
>
> Telephone (860) 403-1000

Notice given by mail and returning the policy or contract by mail are effective if postmarked, properly addressed and postage is prepaid.

If returned, the policy will be considered void from the beginning and any premium paid will be refunded to You less any partial withdrawals or any loans taken under the policy. Such payment will be made within ten days after we receive notice of cancellation and the returned policy.

Signed for Phoenix Life Insurance Company at its Executive Offices in Hartford, Connecticut.

Sincerely yours,

Phoenix Life Insurance Company

*John M. Beers*

Secretary

*Dona D. Young*

Chairman, President
and Chief Executive Officer

## FLEXIBLE PREMIUM LIFE INSURANCE POLICY
### Death Benefit Payable if Insured Dies While the Policy Is In Force

**Nonparticipating**

U607 NY

U607NYF1

# SCHEDULE PAGE

The specifications shown below are those in effect initially. They may later be changed for reasons as stated in this policy. Coverage may end if premiums paid are not enough to continue coverage.

## BASIC INFORMATION

| | |
|---|---|
| POLICY NUMBER: | 97303935 |
| POLICY DATE: | JULY 10, 2005 |
| FACE AMOUNT: | $9,000,000.00 |
| MATURITY DATE: | JULY 10, 2027 |

(See Death Benefit Following Insured's Age 100 provision in Part 7.)

| | |
|---|---|
| DEATH BENEFIT OPTION: | A |
| OWNER: | OWNER AS STATED ON THE APPLICATION UNLESS LATER CHANGED. |
| BENEFICIARY: | AS STATED ON THE APPLICATION UNLESS LATER CHANGED. |

## INSURED

| INSURED | ISSUE AGE & SEX | RISK CLASSIFICATION |
|---|---|---|
| ARTHUR B KRAMER | 78   MALE | PREFERRED |

## PREMIUMS

ISSUE PREMIUM:        $401,493.00

SUBSEQUENT PLANNED QUARTERLY PREMIUM:        $121,500.00        *

TOTAL PREMIUM LIMIT:    GREATER OF  $6,413,125.50  AND RESULT OF  $1,091,379.92 MULTIPLIED BY THE NUMBER OF ELAPSED POLICY YEARS (OR FRACTION THEREOF) AFTER JULY 10, 2005

The limit may decrease when monthly charges for any rider or any other monthly charges cease, and may be exceeded if additional premium is needed to prevent policy lapse.

PREMIUM DUE DATES:    The amount and time of premium payments following the Policy Date are flexible. Subsequent planned premiums are payable on the NINTH day of each QUARTER        thereafter until the Death of the Insured, but not beyond JULY 10, 2027        .

POLICY VALUE **
BENCHMARK AMOUNT: $8,100,000.00        (See Part 5)

* Payment of planned premiums does not guarantee coverage until the Maturity Date. Even if all planned premiums are paid, the policy may lapse earlier than the anniversary nearest the Insured's Age 100, due to the fact that current cost of insurance and interest rates are not guaranteed, policy loans and partial withdrawals may be taken, and there may be changes in the death benefit option. (See section entitled "Grace Period and Lapse" in Part 4.) Planned premiums are the amounts the owner anticipates paying when the policy is originally issued.

** Beginning in the third Policy Year, We will credit Additional Interest each Monthly Calculation Day on unborrowed Policy Value in excess of the Policy Value Benchmark Amount. See Part 5 of this policy for more details.

U607 NY

# SCHEDULE PAGE
## CONTINUED

POLICY NUMBER:          97303935

### POLICY CHARGES

SALES CHARGE:           10% of the first $486,000.00    of premium paid in the
                        first policy year. 5% of any premium paid in excess of
                        $486,000.00      in the first policy year.  5% of all
                        premiums  paid in policy years 2+.

MONTHLY DEDUCTION:*     See Part 5, "Monthly Deduction".  Includes cost of insurance, any
                        rider charges, any flat extra mortality charges, and monthly
                        service and expense charges.

MONTHLY SERVICE CHARGE: $3.50 Guaranteed not to exceed $7.00.

ISSUE CHARGE:            $50.00     deductible monthly during the first Policy Year.
                        If you surrender during the first Policy Year, any unpaid Issue
                        Charges will be assessed to reduce the Surrender Value payable
                        under this policy.

PARTIAL WITHDRAWAL FEE FOR EACH WITHDRAWAL:  $25.00 (in addition to a partial
                                             Surrender Charge).

SURRENDER CHARGE:       See table on next page.

### OTHER RATES

GUARANTEED MINIMUM INTEREST
RATE:                   4%.

CREDITED INTEREST RATE ON LOANED AMOUNTS (See Part 5):
    Policy Years 1 – 15:  Loan Interest Rate less 1.5%
    Policy Years 16 and thereafter:  Loan Interest Rate less 0.5%

### LIMITATIONS

MINIMUM FACE AMOUNT:    $250,000

PARTIAL WITHDRAWALS:    A Partial Withdrawal will not be permitted in an amount

- less than $500.00;
- which would reduce the Surrender Value to $0.00; or
- which would reduce the face amount below $250,000.

* Additional amounts are not guaranteed. We have the right to change the amount of interest
credited to the policy and the amount of cost of insurance deducted under the policy. This
may require more premium to be paid than was illustrated, or the cash values may be less
than those illustrated.

U607 NY

# SCHEDULE PAGE
## (CONTINUED)

POLICY NUMBER:    97303935

### TABLE OF SURRENDER CHARGES

For an explanation of this table, see section entitled "Surrender Value" in Part 5.  The charges shown in this table are stated as of the beginning of the Policy Year indicated. The charge will be level for the first 10 Policy Years and will be prorated on an annual basis beginning in Policy Year 11, unless limited by legal maximums.  In all Policy Years after the 20th policy year, the Surrender Charge is zero.

| POLICY YEAR | CHARGE PER $1,000 OF FACE AMOUNT |
|:-----------:|:--------------------------------:|
| 1  | 58.5000 |
| 2  | 58.5000 |
| 3  | 58.5000 |
| 4  | 58.5000 |
| 5  | 58.5000 |
| 6  | 58.5000 |
| 7  | 58.5000 |
| 8  | 58.5000 |
| 9  | 58.5000 |
| 10 | 58.5000 |
| 11 | 57.5250 |
| 12 | 45.8250 |
| 13 | 34.1250 |
| 14 | 22.4250 |
| 15 | 10.7250 |
| 16 | 0.0000 |
| 17 | 0.0000 |
| 18 | 0.0000 |
| 19 | 0.0000 |
| 20 | 0.0000 |
| 20+ | 0.0000 |

# SCHEDULE PAGES (CONTINUED)

POLICY NUMBER:    97303935

### TABLE OF GUARANTEED MAXIMUM COST OF INSURANCE RATES
### PER $1000 OF NET AMOUNT AT RISK
### BASED ON 1980 CSO MORTALITY TABLE

| POLICY YEAR | MONTHLY RATE | POLICY YEAR | MONTHLY RATE | POLICY YEAR | MONTHLY RATE |
|---|---|---|---|---|---|
| 01 | 6.53920 | 09 | 13.56670 | 17 | 24.63750 |
| 02 | 7.14330 | 10 | 14.73250 | 18 | 27.49670 |
| 03 | 7.80580 | 11 | 15.90750 | 19 | 32.04580 |
| 04 | 8.54330 | 12 | 17.10750 | 20 | 40.01670 |
| 05 | 9.37670 | 13 | 18.34920 | 21 | 54.83170 |
| 06 | 10.31580 | 14 | 19.65330 | 22 | 83.33330 |
| 07 | 11.34250 | 15 | 21.06250 | | |
| 08 | 12.43330 | 16 | 22.63580 | | |

Basis of Calculations:   1980 Commissioner's Standard Ordinary Mortality Smoker/Nonsmoker Distinct Table for each insured's sex and risk class, age nearest birthday, and 4% effective annual interest rate.

Monthly Factor used in determining Cost of Insurance:   1.0032737 (SEE PART 5)

U607 NY

# SCHEDULE PAGE
### (CONTINUED)

POLICY NUMBER:    97303935

### TABLE OF FACE AMOUNTS OF INSURANCE

ISSUE DATE | FACE AMOUNT
JULY 10, 2005 | $9,000,000.00

### RIDERS AND RIDER BENEFITS

| RIDER DESCRIPTION | RIDER DATE OF ISSUE | COVERAGE AMOUNT | RIDER TERMINATION DATE | MONTHLY CHARGE |
|---|---|---|---|---|
| UR7B - EXCHANGE OF INSURED OPTION | 07/10/2005 - EXCHANGE OPTION RIDER | $0.00 | 07/10/2027 | $0 |

## BRIEF SUMMARY OF MAIN PROVISIONS

This is only a summary to help You understand the basics of Your policy. The policy provisions spell out the full details of the rights and obligations of the parties to this policy. The policy provisions and not this brief summary are binding on Us. We will pay the benefits of this policy as set forth on the policy Schedule Pages.

There are two Death Benefit Options to choose from, as described in Part 7. Option A is the Face Amount. Option B is the Face Amount plus Policy Value. Under either Option, the Death Benefit must be at least the Minimum Death Benefit as described in Part 7.

The premiums You pay are added to the Policy Value after We deduct any applicable premium expense charges. We make a monthly deduction from the Policy Value to pay the cost of insurance, the cost of any additional benefit riders and certain monthly charges. We determine cost of insurance rates from time to time, with the guarantee that they will never be higher than the maximum provided on the Schedule Pages. The Policy Value is credited with interest at a current rate which We set from time to time but which will not be less per year than the Guaranteed Minimum Interest Rate shown on the Schedule Pages.

The Subsequent Planned Premium shown on the Schedule Pages is the premium You selected in Your application and is the basis for the Policy Summary delivered with this policy. However, You may generally pay premiums when and in the amount You choose provided sufficient premium is paid to maintain the policy In Force. The amount and timing of premium payments will affect the accumulation of Policy Value.

This policy gives You a number of other options. Under stated conditions, You may change the Death Benefit Option, withdraw part of the Surrender Value or surrender the policy for its full Surrender Value. The Surrender Value is based on the Policy Value, minus any applicable Surrender Charges, unpaid issue charges, loans and loan interest.

We pay the insurance proceeds, as described in Part 3, to the beneficiary when We receive due proof that the Insured's death has occurred while this policy is In Force.

We pay the Surrender Value, as described in Part 5, to You if the Insured is living on the surrender date and this policy is then In Force.

You may change the premiums and Death Benefit Option, subject to Our approval. Certain changes may require evidence of insurability.

See the policy provisions for details.


**READ YOUR POLICY CAREFULLY. IT IS A CONTRACT BETWEEN YOU AND US.**

U607 NY

# TABLE OF CONTENTS

SCHEDULE PAGES

BRIEF SUMMARY OF MAIN PROVISIONS

PART 1: DEFINITIONS.................................1

PART 2: GENERAL PROVISIONS.................2
    Effective Date of Insurance....................2
    Entire Contract.........................................2
    Revised Schedule Pages.........................3
    Age..............................................................3
    Misstatement of Age or Sex..................3
    Contestability...........................................3
    Insurability Requirements After Issue...3
    Suicide Exclusion....................................4
    Termination...............................................4
    Minimum Policy Value.............................4

PART 3: OWNER, COLLATERAL
ASSIGNMENT, BENEFICIARY.................4
    Owner........................................................4
    Rights of Owner......................................4
    Collateral Assignment............................5
    Beneficiary................................................5
    How to Change the Beneficiary..............6

PART 4: PREMIUMS..................................6
    Payments..................................................6
    Total Premium Limit...............................6
    Reduced Paid-Up Benefit.......................7
    Grace Period and Lapse........................7
    Reinstatement..........................................7

PART 5: POLICY VALUES..........................8
    Basis of Calculations.............................8
    Policy Value..............................................8
    Interest Rate............................................9
    Benchmark Additional Interest Credit...9
    Monthly Deduction.................................10
    Cost of Insurance..................................10
    Cost of Insurance Rates......................11
    Surrender Value.....................................11
    Partial Withdrawals...............................12

PART 6: POLICY LOANS.........................12
    When Available.......................................12
    Amount Available...................................12
    Loan Interest.........................................13
    Debt.........................................................13
    Repayment..............................................14

PART 7: INSURANCE COVERAGE
PROVISIONS.............................................14
    Death Proceeds....................................14
    Interest on Insurance Proceeds.........14
    Death Benefit........................................14
    Minimum Death Benefit.......................14
    Death Benefit Following Insured's
        Age 100...........................................15
    Change in Death Benefit Option......15
    Request for a Decrease in Face
        16

PART 8: MISCELLANEOUS
PROVISIONS.............................................16
    Annual Report........................................16
    Projection of Benefits and Values...16
    Notices by Us.........................................16
    Deferment of Certain Payments.........16
    Claims of Creditors...............................17
    Corrections.............................................17

PART 9: PAYMENT OPTIONS.................17
    Who May Elect Payments Options......17
    How to Elect a Payment Option..........17
    What Payment Options Are Available 17
    Other Payment Options.......................19
    Additional Interest................................20

PART 10: TABLE OF PAYMENT OPTION
AMOUNTS.................................................20
    Adjusted Age..........................................20
    Basis of Calculation.............................20
    Tables for Options 3, 4 and 5............21
    Table for Option 7...............................22

U607 NY

# PART 1: DEFINITIONS

**Assigns**

Any persons to whom You assign an interest in this policy if We have notice of the assignment in accordance with the provisions stated in Part 3.

**Death Benefit Option**

The type of Death Benefit in effect as described in Part 7.

**Due Proof of Death**

A certified death certificate, an order of a court of competent jurisdiction, or any other proof acceptable to Us.

**In Force**

The policy has not terminated or otherwise lapsed in accordance with the Grace Period and Lapse Provision in Part 4.

**In Writing (Written Notice) (Written Request)**

Is a written form signed by You, satisfactory to Us and received at Our Home Office or Our Main Administrative Office.

**Monthly Calculation Day**

The first Monthly Calculation Day is the same day as the Policy Date. Subsequent Monthly Calculation Days are the same days of each month thereafter or, if such day does not fall within a given month, the last day of that month will be the Monthly Calculation Day.

**Nonparticipating**

This is a nonparticipating policy which does not pay any dividends.

**Subsequent Planned Premium**

The premium shown on the Schedule Page, which is the premium You selected in Your application and is the basis for the Policy Summary delivered with this policy.

**Policy Anniversary**

The anniversary of the Policy Date.

**Policy Date**

The Policy Date shown on the Schedule Pages from which Policy Years and Policy Anniversaries are measured.

**Policy Debt**

Unpaid policy loans with accrued interest.

**Policy Month**

The period from one Monthly Calculation Day up to but not including the next Monthly Calculation Day.

**Policy Value**

The Policy Value as defined in Part 5.

**Policy Year**

The first Policy Year is the one-year period from the Policy Date to, but not including, the first Policy Anniversary. Each succeeding Policy Year is the one-year period from the Policy Anniversary up to but not including the next Policy Anniversary.

**Surrender Value**

The Surrender Value as defined in Part 5. The Surrender Value is the Policy Value on the date of surrender less any applicable surrender charge, unpaid issue charge, and less any Policy Debt.

**We (Our, Us)**

Phoenix Life Insurance Company.

**You (Your)**

The owner of this policy at the time an owner's right is exercised.

# PART 2:  GENERAL PROVISIONS

**Effective Date of Insurance**

This policy will be In Force from the Policy Date until terminated in accordance with its terms, provided the first Issue Premium shown on the Schedule Pages is paid on or before delivery of this policy while the Insured is alive.

**Entire Contract**

This policy, including the Schedule Pages (and any supplements or changes thereto), any riders or endorsements, and the written application of the owner, a copy of which is attached to and made a part of the policy, are the entire contract between You and Us.

This policy is made in consideration of the application and the payment of premiums as provided in this policy. We rely on all statements made by or for the Insured in the written application. Each statement made in an application will, be deemed a representation and not a warranty. No statement will be used to void this policy or in defense of a claim under this policy unless:

1. it is contained in the application or in a supplemental application; and

2. a copy of that application is attached to this policy when issued or made a part of this policy when changes become effective.

Any change in the provisions of the policy, to be in effect, must be signed by one of Our executive officers and countersigned by Our registrar or one of Our executive officers. This policy is issued by Us and any benefits payable under this policy are payable by Us.

U607 NY

**Revised Schedule Pages**

The Schedule Pages issued with the policy show the initial policy data in effect for this policy on the Policy Date. Some of this policy data may change by an action You request or take or by a change You make. Any of these changes will be reflected in Revised Schedule Pages which supplement or restate the Schedule Pages and show the effective date of the change. We will send You such Revised Schedule Pages along with a copy of any supplemental application, and they will become part of this policy as of their effective date.

**Age**

Issue Age means the Insured's age on the Policy Date as of the Insured's nearest birthday. The attained age of the Insured on any Policy Anniversary and for the entire Policy Year then starting is the Issue Age plus the number of Policy Years since the Policy Date.

**Misstatement of Age or Sex**

If the age or sex of the insured has been misstated, any benefits payable under this policy will be adjusted to reflect the correct age and sex. The death benefit payable will be adjusted to reflect the amount of coverage that would have been supported by the most recent monthly deduction based on the then current cost of insurance rates for the correct age and sex.

**Contestability**

We rely on all statements made by or for the insured in the written application and in any supplemental application. These statements are considered to be representations and not warranties. We can contest the validity of this policy and any coverage under it for any material misrepresentation of fact. To do so, however, the misrepresentation must be contained in an application and the application must be attached to this policy when issued or made a part of this policy when a change is made.

We cannot contest the validity of the original face amount of this policy after it has been In Force during the insured's lifetime for two years from its Policy Date (or two years from any reinstatement, if applicable). If We contest the policy, it will be based on the application for this policy (or the application for reinstatement, if applicable).

If this policy was issued as the result of a conversion option from term insurance, the contestable period for the converted amount is effective as of the date the term policy was issued.

If We contest the validity of all or a portion of the face amount provided under this policy, the amount We pay with respect to such portion of the face amount will be limited to the higher of a return of any paid premium required by Us for the contested Face Amount, or the sum of any monthly deductions made under this policy for the contested face amount.

**Insurability Requirements After Issue**

To make some changes or elections under this policy after it is issued, the Insured must meet Our insurability requirements (medical and/or financial) as follows:

1. evidence of the Insured's insurability must be given that is satisfactory to Us; and

2. under Our underwriting standards, the Insured must be in a Risk Classification that is the same as, or better than, the Risk Classification for this policy at issue.

U607 NY                                         -3-

**Suicide Exclusion**

If the Insured dies by suicide within two years from the Policy Date, and while the policy is In Force, Our liability shall be limited to an amount equal to the premiums paid on this policy less any debt owed Us and less any partial withdrawals.

If this policy was issued as a result of a conversion option from term insurance and if the Insured died by suicide within two years of the date the original term policy was issued and while this policy is In Force, Our liability shall be limited to an amount equal to the premiums paid on this policy and the original term policy, less any debt owed Us and less any partial withdrawals.

If this policy is reinstated, the Suicide Exclusion period does not begin anew. As regards to an increase in death benefit attributable to a premium payment as described in the Payments provision of Part 4, the Suicide Exclusion period begins again from the date of the increase in death benefit and only for the amount of such increase. The amount we pay attributable to such an increase in death benefit, in the event of suicide within such period, will be limited to a return of the monthly deductions assessed for the portion of the death benefit equal to the increase in death benefit.

**Termination**

If not previously terminated, this policy will terminate automatically on the earliest of:

1. the date the Insured dies; or

2. the date the grace period expires without the payment of sufficient premium in accordance with the Grace Period and Lapse Provision in Part 4.

**Minimum Policy Value**

All of the values under this policy are equal to or more than the minimums required on the Policy Date by the state in which this policy was delivered. The method of computation of the values under this policy has been filed as may be required with the Insurance Department of the state in which this policy was delivered.

# PART 3: OWNER, COLLATERAL ASSIGNMENT, BENEFICIARY

**Owner**

The Insured is the owner of this policy, unless otherwise provided in the application or by later transfer of ownership.

**Rights of Owner**

While the Insured is living, You may, as the owner, exercise all rights provided by this policy or allowed by Us. Consent of any beneficiary not irrevocably named or any contingent owner is not required. By Written Notice You may:

1. Transfer ownership to a new owner.

2. Name or change a contingent owner to succeed to the rights of owner at the owner's death. If there is no contingent owner at the owner's death, ownership will pass to the Insured, except as You may have otherwise directed In Writing.

U607 NY                                    —4—

3. Receive any amounts payable under this policy during the Insured's lifetime.

4. Change the beneficiary of the death benefit. See Part 3.

5. Change the Subsequent Planned Premium payment amount and frequency. See Part 4.

6. Obtain a partial withdrawal. See Part 5.

7. Surrender this policy for its cash Surrender Value. See Part 5.

8. Obtain policy loans. See Part 6.

9. Request changes in the insurance amount. See Part 7.

10. Change the Death Benefit Option. See Part 7.

11. Select a payment option for any cash Surrender Value that becomes payable. See Part 10.

12. Assign, release or surrender any of Your interest in the policy.

Exercise of any of these rights will, to the extent thereof, assign, release or surrender the interest of the Insured and all other beneficiaries and owners under this policy.

Any change in the owner or beneficiary designation is effective on the date the notice was signed, subject to receipt by the insurer. A transfer of ownership (or absolute assignment) is not the same as a "collateral assignment" as described in the next paragraph, and the new owner is not an "assignee" as these terms are used in this policy.

**Collateral Assignment**

By Written Notice You may assign an interest in this policy as collateral to a collateral assignee. The collateral assignment or a certified copy of it must be filed with Us at Our Main Administrative Office. When filed, it will bind Us as of the date of the assignment, subject to any action taken by Us before such filing. We shall not be responsible for the validity of any assignment. The interest of the assignee shall be prior to the interest of any beneficiary not irrevocably named or any contingent owner. A collateral assignee cannot change the beneficiary, owner or contingent owner.

**Beneficiary**

Unless another payment option is elected as described in Part 10, any death proceeds that become payable will be paid in equal shares to such beneficiaries living at the death of the Insured as stated in the application or as later changed. Payments will be made successively in the following order:
a)  Primary beneficiaries;
b)  Contingent beneficiaries, if any, provided no primary beneficiary is living at the death of the Insured;
c)  You or Your executor or administrator, provided no primary or contingent beneficiary is living at the death of the Insured, or in the absence of a beneficiary designation.

Unless otherwise stated, the relationship of a beneficiary is the relationship to the Insured.

U607 NY

**How to Change the Beneficiary**

You may change the beneficiary by Written Notice filed with Us at Our Main Administrative Office. When We receive it, the change will relate back and take effect as of the date it was signed by You. However, the change will be subject to any payments made or actions taken by Us before We received the notice at Our Main Administrative Office.

Irrevocable beneficiaries are permitted and cannot be changed without the consent of the irrevocable beneficiary.

## PART 4: PREMIUMS

**Payments**

The Issue Premium as shown on the Schedule Pages is payable on or before delivery of this policy. The Insured must be alive when that premium is paid.

Subject to the limitations stated below, You may pay additional premiums at any time prior to the Policy Anniversary nearest the Insured's age 100 while this policy is In Force.

On Written Request We will send Subsequent Planned Premium notices to You. These notices can be sent annually, semi-annually or quarterly. Premiums may also be paid at other intervals, or under automatic collection methods, subject to Our consent.

The minimum premium payment amount that We will accept is $25, unless to prevent policy lapse. Any premium payment that would increase the Death Benefit by more than it would increase the Policy Value, shall be subject to evidence of insurability satisfactory to Us. As regards to any such increase, the Contestability and Suicide Exclusion provisions in Part 2 will apply from the date of the increase. The application for such increase will be attached to and is made part of the policy.

**Total Premium Limit**

The total premium limit is shown on the Schedule Pages and is applied to the sum of all premiums received by Us to date, excluding premiums applied to debt repayment, reduced by the sum of all partial withdrawals paid by Us to date. If the total premium limit is exceeded, We will refund the excess with interest at an annual rate of not less than 4%, not later than 60 days after the end of the Policy Year in which the limit was exceeded. The Policy Value will be adjusted to reflect such refund.

The total premium limit may be exceeded if additional premium is needed to prevent lapse under the Grace Period and Lapse provision, and such additional premium is permitted by federal tax laws or regulations such that this policy continues to meet the Definition of Life Insurance.

The total premium limit may change due to:

a) a change in Death Benefit Option;

b) a decrease of face amount;

c) a partial withdrawal;

d) addition, change or termination of a rider; or

e) a change in federal tax law or regulations.

If the total premium limit changes, We will send You Revised Schedule Pages reflecting the change. However, We reserve the right to require that the policy be returned to Us to endorse the change.

**Reduced Paid-Up Benefit**

Upon your request, after the first policy year, you may elect to lapse this policy to a reduced paid-up Death Benefit as of the next policy anniversary. The amount of the Death Benefit will be calculated based on the Surrender Value after assessment of the full Surrender Charge, the Guaranteed Minimum Interest Rate and the Guaranteed Maximum Cost of Insurance rates as specified in the Schedule Pages. Once elected, no further premiums may be paid into the contract. The cash surrender value of this reduced paid-up Death Benefit will be equal to the present value of the future guaranteed benefits provided for by this policy at that time.

**Grace Period and Lapse**

During the first seven Policy Years, if on any Monthly Calculation Day the required monthly deduction exceeds the Policy Value less any outstanding Debt, a grace period of 61 days will be allowed for the payment of an additional premium. Such additional premium, less the Sales Charge must be sufficient to increase such value on that Monthly Calculation Day to cover three monthly deductions.

After the seventh Policy Year, if on any Monthly Calculation Day the required monthly deduction exceeds the Surrender Value, a grace period of 61 days will be allowed for the payment of an additional premium. Such additional premium, less the Sales Charge must be sufficient to increase such value on that Monthly Calculation Day to cover three monthly deductions.

In addition, if on any Monthly Calculation Day the Policy Debt exceeds the maximum loan value, a grace period of 61 days will be allowed for the repayment of the policy loan such that the Policy Debt is no greater than the maximum loan value.

The policy will continue In Force during such grace period. We will mail to You and any Assigns at the post office addresses last known to Us a Written Notice as to the amount of premium required. This Written Notice will be sent at least 15 days and not more than 45 days prior to the date that the policy would lapse. If such required premium amount is not postmarked as having been mailed to Us by the end of the grace period, the policy will lapse without value. The Death Benefit payable during the grace period will equal the Death Benefit in effect immediately prior to such period less overdue charges.

Any premiums paid will be used, after assessment of sales charges, to pay for any unpaid monthly deductions.

**Reinstatement**

If this policy terminates, in accordance with the Grace Period and Lapse Provision, You may reinstate this policy back to an "In Force" status within five years after the expiration of the Grace Period. Reinstatement must become effective prior to age 100 and while the Insured is alive. We will not approve a request for a reinstatement

U607 NY                                    -7-

until We receive at Our Main Administrative Office all of the following:

1. a Written Request for reinstatement;

2. evidence of insurability satisfactory to Us;

3. if applicable, payment or reinstatement of any Policy Debt as of the date of lapse; and

4. the payment of a reinstatement premium while the Insured is alive which equals an amount needed to provide for a positive Surrender Value as of the date of lapse, plus three monthly deductions. However, during the first seven Policy Years, the reinstatement premium will equal an amount needed to provide for a positive Policy Value (less any Policy Debt) as of the date of lapse, plus three monthly deductions.

Subject to the foregoing conditions, the effective date of a reinstatement will be the Monthly Calculation Day following the date We approve the request for reinstatement. If We approve it on a Monthly Calculation Day, the effective date will be that Monthly Calculation Day.

The Policy Value as of the effective date of a reinstatement shall equal the reinstatement premium received, plus any Policy Debt in effect as of the date of lapse, plus any surrender charge assessed on the date of lapse, minus the monthly deduction for the month then starting.

The surrender charge as of the effective date of a reinstatement shall equal the surrender charge that would be in effect as if the policy never lapsed.

## PART 5: POLICY VALUES

The premiums You pay, minus the premium expense charges shown on the Schedule Pages, are added to the policy's Policy Value. We make monthly deductions from the Policy Value to cover the cost of insurance, the cost of any additional benefit riders and the monthly charges shown on the Schedule Pages. We also deduct any partial withdrawals You make and charges for them, as well as any charges for face amount decreases. The Policy Value earns interest. Any additional amounts credited to the Policy Value are nonforfeitable, except indirectly due to surrender charges.

Details are provided below. We will keep You informed of the current Policy Value by sending You an Annual Report as described in Part 8 of this policy.

**Basis of Calculations**

Minimum Surrender Values are determined from the Basis of Calculations shown on the Schedule Pages. The Guaranteed Maximum Insurance Rates shown on the Schedule Pages are also based on this Table.

**Policy Value**

Policy Value is to be calculated as follows:

1. on each Monthly Calculation Day following the Policy Date, the Policy Value will equal (A + B + C − D − E);

2. on a day of the month other than a Monthly Calculation Day, it will equal (A + C), plus interest on A from the beginning of the Policy Month to the date on which the Policy Value is being determined;

3. on the Policy Date, it will equal all premiums received, net of any premium expense charges, minus E;

where:

A = the Policy Value on the prior Monthly Calculation Day, after assessment of the monthly deduction on that day;

B = one month's interest on A, including any Additional Interest Credit;

C = all premiums received, net of any premium expense charges, since the prior Monthly Calculation Day, plus interest thereon to the end of the Policy Month, or any earlier date on which the Policy Value is being determined;

D = any partial withdrawal, and charge for it, being made as of that Monthly Calculation Day; and

E = the monthly deduction for the month then starting (no monthly deduction is made if the policy is surrendered for its full Surrender Value as of that Monthly Calculation Day).

**Interest Rate**

We will, from time to time, determine the interest rate used in the calculation of the Policy Value, based on Our anticipation of future investment earnings, mortality, persistency and expense/administrative costs. We will determine the interest rate at least once each year. We may, in Our sole discretion, change the interest rate. Changes made will be in accordance with procedures and standards on file with the Insurance Department of the state where this policy was delivered. Any interest credited in excess of the Guaranteed Minimum Interest Rate is referred to as "excess interest." The effective annual interest rate will never be less than the Guaranteed Minimum Interest Rate shown on the Schedule Pages.

We may credit different interest rates on loaned and unloaned portions of the Policy Value. The rate in effect on a given date for unloaned amounts is referred to as the "current interest rate." For loaned amounts, the credited interest rate for the first 15 policy years will be equal to the Loan Interest Rate in effect on that date less 1.5%, and after year 15 the rate will equal the Loan Interest Rate in effect on that date less 0.5%. In no event will the credited rate on loaned amounts be less than the Guaranteed Minimum Interest Rate. All interest rates are stated as effective annual rates. Interest will be compounded at least monthly to yield the effective annual rate.

**Benchmark Additional Interest Credit**

Beginning in the third Policy Year of this policy, in addition to interest being credited under the policy on each Monthly Calculation Day, We will also credit Additional Interest on each Monthly Calculation Day on amounts in excess of the Policy Value Benchmark Amount, shown on the Schedule Page. The Benchmark Additional Interest Rate will be equal to:

1. An annual effective rate of 1% if the Current Interest Rate is 5% or greater; or

2. An annual effective rate of .5% if the Current Interest Rate is at least 4.5% but less than 5%; or

3. An annual effective rate of 0% if the Current Interest Rate is less than 4.5%.

This Additional Interest Credit will be equal to (A x B), where:

A = the Benchmark Additional Interest Rate; and

B = the excess of the unloaned portion of the Policy Value over the Policy Value Benchmark Amount, shown on the Schedule Page.

The Additional Interest Credit is provided to reflect a reduction in Our holdback margin for profit and expense.

**Monthly Deduction**

The monthly deduction is the amount deducted from the Policy Value on the Policy Date and on each Monthly Calculation Day to pay the cost of insurance, the cost for any additional benefit riders and monthly charges for the Policy Month starting on that day. The monthly deduction will be equal to:

(A + B + C); where:

A = the cost of insurance (as defined in the Cost of Insurance provision below);

B = the monthly cost for any additional benefit riders as shown on the Schedule Pages;

C = the Monthly Service Charge shown on the Schedule Pages, and if applicable, one-twelfth of the Issue Charge.

**Cost of Insurance**

The cost of insurance is the amount We charge each month for providing the insurance coverage. The cost of insurance is equal to:

(A x (B − C)) + D; where

A = the applicable cost of insurance rate for the Insured's risk class, based upon the Net Amount at Risk and Insured's risk class, including any applicable substandard mortality percentage extra. The Net Amount at Risk is equal to (B−C) below;

B = the Death Benefit at the beginning of the Policy Month, divided by the Monthly Factor shown on the Schedule Pages;

C = the Policy Value at the beginning of the Policy Month, after the Monthly Service Charge and, when applicable, one-twelfth of the Issue Charge, and prior to subtracting the Cost of Insurance for that month;

D = the Substandard (Temporary or Permanent) Extra Charge, if any, shown on the Schedule Pages.

U607 NY

−10−

In item B "Death Benefit" means the Death Benefit as defined in Part 7 but prior to subtracting the cost of insurance for that month from any Policy Value element.

**Cost of Insurance Rates**

The cost of insurance rate for each Policy Month is based on the Insured's age at issue, risk class and sex, and on policy duration. The rate used in computing the cost of insurance is obtained from the Table of Guaranteed Maximum Cost of Insurance Rates shown on the Schedule Pages for the insured risk classification(s), or such lower rate as We may declare. At least 31 days before the start of the Policy Year, We will send You a notice of any change in rates.

No more frequently than once per year and no less frequently than once every five years, We will review the monthly Cost of Insurance Rates to determine if these rates should be changed. However, the rates will never exceed the Guaranteed Maximum Cost of Insurance Rates shown on the Schedule Pages. Our right to change rates also is subject to the following terms:

1. Any change in rates will be made on a uniform basis for all insureds in the same class. No change in rates will occur due to any change in the Insured's health or occupation.

2. Any change in rates will be determined prospectively. We will not distribute past gains or recoup prior losses, if any, by changing the rates.

3. Any change in rates will be based on a change in Our expectations of future investment earnings, mortality, persistency and expense/administrative costs.

4. Any change in rates will comply with any procedures and standards that may be on file with the insurance official of the jurisdiction where this policy is delivered.

The Monthly Service Charge, shown on the Schedule Pages, is subject to change based on Our expectations of future investment earnings, mortality, persistency and expense/administrative costs, subject to the maximum Monthly Service Charge stated on the Schedule Pages.

**Surrender Value**

You may surrender this policy for its Surrender Value at any time, by sending Us a Written Request along with this policy on or before such Monthly Calculation Day.

The Surrender Value on any date is the Policy Value on that date minus any applicable surrender charge as shown in the Table of Surrender Charges on the Schedule Pages, minus any Policy Debt, minus any unpaid issue charge. If the surrender is requested within 30 days after a Policy Anniversary, the Surrender Value shall not be less than the Surrender Value on the Policy Anniversary less any debt, partial withdrawals and charges made or incurred since the Policy Anniversary. The Surrender Value is never less than zero.

If this policy is terminated, the remaining schedule of Surrender Charges will be suspended. When this policy is reinstated, the remaining schedule of Surrender Charges also will be reinstated. The Surrender Charges are based on the period of time the policy is in

effect. When reinstated, the schedule of Surrender Charges will start from the point where the schedule was suspended.

**Partial Withdrawals**

You may withdraw part of the Surrender Value as of any Monthly Calculation Day while the Insured is living, subject to the charges and limitations shown on the Schedule Pages. We must receive your Written Request for partial withdrawal on or before the Monthly Calculation Day on which the partial withdrawal is to be effective. The Policy Value will be reduced by the amount withdrawn, a partial surrender charge and a partial withdrawal fee.

The partial surrender charge is equal to the product of (A) and (B), where (A) is the Face Amount decrease in units of $1,000 resulting from the partial withdrawal, and (B) is the charge per $1,000 of Face Amount as set forth in the Table of Surrender Charges shown on Schedule Page 3 of 5. The partial surrender charge assessed will reduce all remaining surrender charges. There is no partial surrender charge assessed under Death Benefit Option B.

The partial withdrawal fee is shown on the Schedule Pages.

Under Death Benefit Option A (the Face Amount), the Face Amount is decreased by the same amount of reduction as the Policy Value.

Under Death Benefit Option B (the Face Amount plus the Policy Value), the Face Amount does not change.

A partial withdrawal will not be permitted which would reduce the Face Amount below Our then current Minimum Face Amount, or the Surrender Value to zero.

Any benefits provided are not less than that required by law of the state where this policy was delivered. We reserve the right to defer payment of surrender values for six months from the date of request.

# PART 6: POLICY LOANS

**When Available**

You may obtain a loan from Us at any time, on assignment of the policy to Us as security, if it has a Surrender Value greater than zero.

**Amount Available**

The amount of any loan may not exceed the maximum loan value less the amount of any existing debt, where the maximum loan value is equal to the lesser of:

- the Surrender Value of this policy projected from the date of the loan to the next Policy Anniversary based upon guaranteed assumptions, minus loan interest charges through the next Policy Anniversary; and

- the current Surrender Value of this policy.

If on any Monthly Calculation Day the Policy Debt exceeds the maximum loan value, this policy will lapse according to the terms of the "Grace Period and Lapse" provision.

U607 NY

We reserve the right to defer the granting of a loan, other than for the payment of any premium to Us, for six months after submission of a loan application.

A loan will have a permanent effect on any death benefit and cash surrender value of this policy. We recommend consultation with a tax advisor before taking a loan.

**Loan Interest**

Loan interest will accure on a daily basis from the date of the loan, and is payable in arrears.

Loans will bear interest at such rate or rates as established by Us for any period during which loans are outstanding. On each Policy Anniversary We will set the rate that will apply during the next Policy Year. Such rate will be effective at the beginning of that year and will apply to both new and any outstanding loans under this policy.

On each Policy Anniversary, any unpaid loan interest from the previous Policy Year will be added to the existing policy loan. Failure to repay a policy loan or to pay loan interest will not terminate this policy except as otherwise provided under the Grace Period and Lapse Provision in Part 4 when the policy does not have sufficient remaining value to pay the monthly deductions, in which event, that provision will apply.

We will notify You of the initial loan interest rate at the time a policy loan is made, or as soon as practical thereafter. If there are any outstanding loans, except for purposes of reinstatement, We will give You at least 30 days advance notice of any increase in the rate.

There is a maximum limit on the interest rate We can set. The maximum limit is the Published Monthly Average for the calendar month ending two months before the Policy Year begins or the Guaranteed Minimum Interest Rate used in computing the Policy Value plus 1%, whichever is higher.

The Published Monthly Average will be:

A. The Corporate Bond Yield Average – Monthly Average Corporates as published by Moody's Investors Service, Inc. or any successor to that Service; or

B. If that Monthly Average is no longer published, a substantially similar average issued by the insurance supervisory official of the state where this policy was delivered.

If the maximum limit for a Policy Year is at least 1/2% higher than the rate in effect for the previous year, We may increase the rate to not more than that limit.

If the maximum limit for a Policy Year is at least 1/2% lower than the rate in effect for the previous Policy Year, We must decrease the rate to not more than that limit.

**Debt**

As used in this policy, "debt" or "Policy Debt" means all loans existing on this policy plus accrued interest. When this policy

U607 NY

terminates, We will add to any existing debt interest accrued from the prior Policy Anniversary to the termination date.

**Repayment**

The whole or any part of a loan may be repaid at any time while this policy is in effect. Any moneys received will be applied directly to reduce the debt unless specified as a premium payment. We will not accept partial payments in amounts less than $25, unless to prevent policy lapse.

## PART 7: INSURANCE COVERAGE PROVISIONS

**Death Proceeds**

Upon receipt by Us of Due Proof of Death that the Insured died while this policy is In Force, We will pay the death proceeds of this policy. The death proceeds at the death of the Insured are equal to:

a) the Death Benefit, as described below, in effect on the Insured's date of death; PLUS

b) any insurance then in effect on the life of the Insured that is provided by any additional benefit riders; PLUS

c) any premiums received by Us after the Monthly Calculation Day just prior to the Date of Death and on or before the Date of Death; MINUS

d) Any partial withdrawals made after the Date of Death and prior to receipt of Written Notice of the insured's death; MINUS

e) Any debt then existing on this policy; MINUS

f) Any monthly deductions not already made up to and including the Policy Month of death.

**Interest on Insurance Proceeds**

We will pay interest on any death proceeds from the date of death to the date of payment. The amount of interest will be the same as would be paid were the death proceeds left for that period of time to earn interest under Payment Option 2. However, in no case will the amount of interest be less than the minimum required in Your state.

**Death Benefit**

The Death Benefit under this policy will be determined under either Option A or Option B, whichever is chosen and is then in effect, but in no event while the policy In Force will it be less than the Minimum Death Benefit described below.

Option A: The Face Amount on that date.

Option B: The Face Amount plus the Policy Value on that date.

**Minimum Death Benefit**

The Minimum Death Benefit will be equal to a percentage of the Policy Value as of the insured's attained age at the beginning of the Policy Year in which the insured's death occurs, as follows:

U607 NY

| ATTAINED AGE | % OF POLICY VALUE | ATTAINED AGE | % OF POLICY VALUE | ATTAINED AGE | % OF POLICY VALUE |
|---|---|---|---|---|---|
| 0-40 | 250% | 54 | 157% | 68 | 117% |
| 41 | 243% | 55 | 150% | 69 | 116% |
| 42 | 236% | 56 | 146% | 70 | 115% |
| 43 | 229% | 57 | 142% | 71 | 113% |
| 44 | 222% | 58 | 138% | 72 | 111% |
| 45 | 215% | 59 | 134% | 73 | 109% |
| 46 | 209% | 60 | 130% | 74 | 107% |
| 47 | 203% | 61 | 128% | 75 | 105% |
| 48 | 197% | 62 | 126% | 76-90 | 105% |
| 49 | 191% | 63 | 124% | 91 | 104% |
| 50 | 185% | 64 | 122% | 92 | 103% |
| 51 | 178% | 65 | 120% | 93 | 102% |
| 52 | 171% | 66 | 119% | 94 | 101% |
| 53 | 164% | 67 | 118% | 95 and over | 100% |

**Death Benefit Following Insured's Age 100**

After the Policy Anniversary which follows the Insured's 100th birthday, the Death Benefit will equal the Policy Value. Monthly Service Charges and Cost of Insurance Charges will not be deducted after this anniversary, nor can any premiums be paid. Policy loans and partial withdrawals will continue to be made available after this anniversary.

**Under federal tax law, this policy may not qualify as life insurance after the Insured's attained age 100. It may be subject to adverse tax consequences and a tax advisor should be consulted before the owner chooses to continue the policy after the Insured's attained age 100.**

**Change in Death Benefit Option**

The Face Amount and Death Benefit Option You have chosen initially are shown on the initial Schedule Pages. While this policy is In Force, You may request In Writing to change the Death Benefit Option. Any change will be subject to the following:

1. A change in Death Benefit Option will require that there be no immediate change in Our insurance risk. To assure this, when We approve a change from Option A to Option B, We will decrease the Face Amount by the Policy Value. Such a change from Option A to Option B may not be made if it would reduce the Face Amount below the Minimum Face Amount shown on the Schedule Pages. Similarly, when We approve a change from Option B to Option A, We will increase the Face Amount by the Policy Value. We will not require evidence of insurability for a change in Death Benefit Option. You are limited to one change in Death Benefit Option for each Policy Year.

2. The effective date of any change will be the Monthly Calculation Day next following Our approval of Your Written Request for change. This date will be shown on the Revised Schedule Pages that We will send You.

U607 NY                        -15-

**Request for a Decrease in Face Amount**

You may request a decrease in face amount at any time after the first Policy Year. The decrease requested must at least equal $25,000 and the face amount remaining after the decrease must at least equal $250,000. All requests to decrease the face amount must be In Writing and will be effective on the first Monthly Calculation Day following the date We approve the request. We reserve the right to require that this policy first be returned to Us before the decrease is made. Upon a decrease in face amount, a partial surrender charge will be deducted from the Policy Value based on the amount of the decrease. The charge will equal the applicable surrender charge that would then apply to a full surrender multiplied by the result of dividing the decrease in face amount by the face amount of the policy before the decrease. We will send You a Revised Schedule Page reflecting the change.

# PART 8: MISCELLANEOUS PROVISIONS

**Annual Report**

We will send You, without charge, a report for each Policy Year which includes:

1. the current Policy Value, Death Benefit, Face Amount and Surrender Value;

2. any partial withdrawals, premiums paid, interest credited and charges made during the year;

3. any outstanding policy loans and new loans and loan repayments made during the year; and

4. such additional information as required by the Superintendent of Insurance or the supervisory official of the state in which this policy was delivered .

You have the right to request an illustrative report at any other time. We reserve the right to charge a reasonable fee for the report.

**Projection of Benefits and Values**

We will provide You, on Written Request and payment of Our service fee then in effect, a projection of illustrative future benefits and values under Your Policy. We may limit the number of such projections in any Policy Year.

**Notices By Us**

Whenever We are required to give notice to You, it shall be deemed given if We mail it to You and, unless otherwise specified, to the assignee of record, if any, in a postage-paid envelope mailed by first class mail to the last known address of record at Our Main Administrative Office.

**Deferment of Certain Payments**

We may defer, for not more than six months after We receive Written Request, the payment of the Surrender Value due to surrender or partial withdrawal or the making of any loan (except to pay premiums). If payment is deferred 10 days or more on any surrender, interest will be paid on the amount deferred at the interest rate currently payable on the interest-only settlement option described in Part 9, from the date the request is received to the date of payment.

U607 NY

| | |
|---|---|
| **Claims of Creditors** | The proceeds and any income payments under this policy shall not be subject to the claims of creditors and shall be exempt from legal process, levy or attachment to the extent allowed by law. |
| **Corrections** | We reserve the right to correct any clerical errors in this policy, or in Our administration of the policy. |

# PART 9: PAYMENT OPTIONS

**Who May Elect Payment Options**

The surrender or death proceeds of this policy will be paid in one sum unless otherwise provided. As an alternative to payment in one sum as provided under Option 1, the proceeds may be applied under one or more of the alternative income payment options described in this Part.

However, Our consent is required for the election of an income payment option by a fiduciary or any entity other than a natural person. Our consent is also required for elections by any Assigns or an owner other than the Insured if the owner has been changed.

Except for Option 7 which is not available for death proceeds, You may elect any payment option for payment of the death proceeds. You may also designate or change one or more beneficiaries who will be the payee or payees under that Option. You may only do this during the lifetime of the Insured. If no election is in effect when the death benefit becomes payable, the beneficiary may elect any payment option other than Option 7. The payment options are also available to the payee of any Surrender Value that becomes payable under this policy.

Unless We agree otherwise, all payments under any Option chosen will be made to the designated payee or to his or her executor or administrator. We may require proof of age of any payee or payees on whose life payments depend as well as proof of the continued survival of any such payee(s).

**How To Elect a Payment Option**

The election of an income payment option must be in Writing. You can elect that the payments be made on an annual, semi-annual, quarterly, or monthly basis provided that each installment will at least equal $25. We also require that at least $1,000 be applied under any option chosen.

**What Payment Options Are Available**

This section provides a brief description of the various payment options that are available. In Part 10 You will find tables illustrating the guaranteed installment amounts provided by several of the Options described in this section. The amounts shown for Option 4, Option 5 and Option 7 are the minimum monthly payments for each $1,000 applied. The actual payments will be based on the monthly payment rates We are using when the first payment is due. They will not be less than shown in the tables.

Option 1  —  Payment in one sum

Option 2 – Left to earn interest

> We pay interest on the amount left with Us under this Option as a principal sum.

> We guarantee that at least one of the versions of this Option will provide interest at a rate of at least 3% per year.

Option 3 – Payments for a specified period

> Equal income installments are paid for a specified period of years whether the payee lives or dies. The first payment will be on the date of settlement.

> The Option 3 Table shows the guaranteed amount of each installment for monthly and annual payment frequencies. The table assumes an interest rate of 3% per year on the unpaid balance. The actual interest rate is guaranteed not to be less than this minimum rate.

Option 4 – Life annuity with specified period certain

> Equal installments are paid until the later of:

> a) the death of the payee;

> b) the end of the period certain.

> The first payment will be on the date of settlement. The period certain must be chosen at the time this Option is elected. The periods certain that may be chosen are as follows.

> a) ten years;

> b) twenty years;

> c) until the installments paid refund the amount applied under this Option. If the payee is not living when the final payment falls due, that payment will be limited to the amount which needs to be added to the payments already made to equal the amount applied under this Option.

> If , for the age of the payee, a period certain is chosen that is shorter than another period certain paying the same installment amount, We will deem the longer period certain as having been elected.

> Any life annuity as may be provided under this Option is calculated using an interest assumption of 3 3/8%, except that any life annuity providing a period certain of twenty years or more is calculated using an interest rate of 3 1/4%.

Option 5 – Life annuity

Equal installments are paid only during the lifetime of the payee. The first payment will be on the date of settlement.

Any life annuity as may be provided under this Option is calculated using an interest rate of 3 1/2%.

Option 6 – Payments of a specified amount

Equal installments of a specified amount, out of the principal sum and interest on that sum, are paid until the principal sum remaining is less than the amount of the installment. When that happens, the principal sum remaining with accrued interest will be paid as a final payment. The first payment will be on the date of settlement. The payments will include interest on the principal sum remaining at a rate guaranteed to at least equal 3% per year. This interest will be credited at the end of each year. If the amount of interest credited at the end of a year exceeds the income payments made in the last 12 months, that excess will be paid in one sum on the date credited.

Option 7 – Joint survivorship annuity with a 10-year period certain

This payment option is not available for death proceeds. This Option is only available if the policy is surrendered within 6 months of the Policy Anniversary nearest the Insured's 55th, 60th, or 65th birthday. The first payment will be on the date of settlement. Equal income installments are paid until the latest of:

a)  the end of the 10-year period certain;

b)  the death of the Insured;

c)  the death of the other named annuitant.

The other annuitant must be named at the time this Option is elected and cannot later be changed. That annuitant must have an adjusted age as defined in Part 10 of at least 40.

Any joint survivorship annuity as may be provided under this Option is calculated using an interest rate of 3 3/8%.

**Other Payment Options**   We may offer other payment options or alternative versions of the options listed in the above section.

**Additional Interest**

In addition to:

a)  the interest of 3% per year guaranteed on the principal sum remaining with Us under Option 2 or 6; and

b)  the interest of 3% per year included in the installments payable under Option 3;

We will pay or credit at the end of each year such additional interest as We may declare.

## PART 10: TABLES OF PAYMENT OPTION AMOUNTS

The installment amounts shown in the tables that follow are shown for each $1,000 applied. Amounts for payment frequencies, periods or ages not shown will be furnished upon request. Under Options 4 and 5, the installment amount for younger ages than shown will be the same as for the first age shown and for older ages than shown, it will be the same amount as for the last age shown.

**Adjusted Age**

The term "age" as used in the tables refers to the adjusted age. Under Options 4 and 5, the adjusted age is defined as follows:

a)  for Surrender Values, the age of the payee on the payee's nearest birthday to the Policy Anniversary nearest the date of surrender;

b)  for death benefits, the age of the payee on the payee's birthday nearest the effective date of the payment option elected.

Under Option 7, the adjusted age is the age on the nearest birthday to the Policy Anniversary nearest the date of surrender. The table for Option 7 only shows the amounts for annuitants of the opposite sex. Rates for annuitants of the same sex will be furnished upon request.

**Basis of Calculation**

The rates that follow are based on the a-49 Table projected to 1985 with Projection Scale B and Projection B thereafter with 3 1/2% interest for Non-Refund, 3 3/8% for 10-Year Certain and Life and Installment Refund, and 3 1/2% for 20-Year Certain and Life.

## Option 3 - Payments for a specified period

| Number of Years....... | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|
| Annual Installment....$ | 211.99 | 179.22 | 155.83 | 138.31 | 124.69 | 113.82 | 104.93 | 97.54 | 91.29 |
| Monthly Installment...$ | 17.81 | 15.14 | 13.16 | 11.68 | 10.53 | 9.61 | 8.86 | 8.24 | 7.71 |

| Number of Years....... | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 25 | 30 |
|---|---|---|---|---|---|---|---|---|---|
| Annual Installment....$ | 85.95 | 81.33 | 77.29 | 73.74 | 70.59 | 67.78 | 65.26 | 55.76 | 49.53 |
| Monthly Installment...$ | 7.26 | 6.87 | 6.53 | 6.23 | 5.96 | 5.73 | 5.51 | 4.71 | 4.18 |

## *Option 4 - Life annuity with specified period certain

| Age of Payee | Installment Refund Certain | | 10 Years Certain | | 20 Years Certain | | Age of Payee | Installment Refund Certain | | 10 Years Certain | | 20 Years Certain | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Male | Female | Male | Female | Male | Female | | Male | Female | Male | Female | Male | Female |
| 10 | $3.08 | $3.03 | $3.08 | $2.99 | $3.00 | $2.94 | 50 | $4.36 | $4.12 | $4.50 | $4.10 | $4.28 | $3.99 |
| 15 | 3.14 | 3.09 | 3.15 | 3.04 | 3.07 | 3.00 | 55 | 4.76 | 4.47 | 4.95 | 4.47 | 4.61 | 4.31 |
| 20 | 3.22 | 3.16 | 3.24 | 3.11 | 3.15 | 3.07 | 60 | 5.28 | 4.93 | 5.54 | 4.96 | 4.97 | 4.67 |
| 25 | 3.33 | 3.24 | 3.34 | 3.20 | 3.25 | 3.15 | 65 | 5.97 | 5.54 | 6.30 | 5.63 | 5.29 | 5.06 |
| 30 | 3.45 | 3.35 | 3.47 | 3.30 | 3.38 | 3.25 | 70 | 6.91 | 6.39 | 7.24 | 6.50 | 5.43 | 5.31 |
| 35 | 3.61 | 3.48 | 3.64 | 3.43 | 3.52 | 3.38 | 75 | 8.21 | 7.57 | 8.26 | 7.56 | 5.44 | 5.40 |
| 40 | 3.80 | 3.64 | 3.86 | 3.60 | 3.74 | 3.54 | 80 | 10.04 | 9.26 | 9.12 | 8.60 | 5.46 | 5.46 |
| 45 | 4.05 | 3.85 | 4.14 | 3.82 | 3.99 | 3.74 | 85 | 12.61 | 11.68 | 9.60 | 9.31 | 5.46 | 5.46 |

## * Option 5 - Life annuity

| Age Of Payee | Male | Female | Age Of Payee | Male | Female |
|---|---|---|---|---|---|
| 10 | $3.37 | $3.12 | 50 | $4.62 | $4.28 |
| 15 | 3.24 | 3.18 | 55 | 5.12 | 4.68 |
| 20 | 3.32 | 3.25 | 60 | 5.79 | 5.24 |
| 25 | 3.42 | 3.34 | 65 | 6.75 | 6.04 |
| 30 | 3.56 | 3.44 | 70 | 8.15 | 7.22 |
| 35 | 3.73 | 3.58 | 75 | 10.26 | 9.03 |
| 40 | 3.95 | 3.75 | 80 | 13.54 | 11.88 |
| 45 | 4.24 | 3.98 | 85 | 18.72 | 16.54 |

U607 NY

**\*Option 7 - Joint survivorship annuity with 10-year period certain**

| Age of Other Annuitant F | Age of Insured Male | | | Age of Other Annuitant F | Age of Insured Male | | | Age of Other Annuitant M | Age of Insured Female | | | Age of Other Annuitant M | Age of Insured Female | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 55 | 60 | 65 | | 55 | 60 | 65 | | 55 | 60 | 65 | | 55 | 60 | 65 |
| 40 | $3.62 | $3.64 | $3.65 | 60 | $4.43 | $4.64 | $4.82 | 40 | $3.72 | $3.77 | $3.80 | 60 | $4.34 | $4.64 | $4.93 |
| 45 | 3.80 | 3.83 | 3.86 | 65 | 4.61 | 4.93 | 5.23 | 45 | 3.89 | 3.97 | 4.03 | 65 | 4.44 | 4.82 | 5.23 |
| 50 | 4.00 | 4.07 | 4.12 | 70 | 4.75 | 5.18 | 5.63 | 50 | 4.06 | 4.19 | 4.31 | 70 | 4.50 | 4.95 | 5.48 |
| 55 | 4.22 | 4.34 | 4.44 | 75 | 4.86 | 5.36 | 5.96 | 55 | 4.22 | 4.43 | 4.61 | 75 | 4.54 | 5.03 | 5.65 |

\* Minimum monthly income for each $1,000 applied.

# EXCHANGE OF INSURED OPTION RIDER

This rider is part of the policy to which it is attached. Except as stated in this rider, it is subject to all of the provisions contained in the policy.

**The Exchange Option**
While this rider is in effect and subject to its terms, you have the option to exchange your policy ("the exchange policy") for a new policy on the life of a substitute insured.

**How to Exercise This Option**
To exercise this option, You must file an application with Us at Our Main Administrative Office. It must be signed by You. We must also receive:

1.  Evidence that You have a satisfactory insurable interest in the life of the substitute insured.

2.  Evidence that the substitute insured is insurable under our established practice in the selection of risks for the amount and plan applied for. Selection of risks includes health and non-health factors.

3.  The release of any lien against or assignment of your policy. You may instead submit written approval by the lienholder or assigns of the exchange policy in a form satisfactory to Us with such other documents as We may reasonably require.

4.  The surrender and release of the exchange policy.

5.  Payment of any amounts due to Us for the exchange as described in the Exchange Adjustments.

Unless otherwise provided in the application, the owner and the beneficiary of the new policy will be the same as under the exchange policy. Any subsequent changes will be governed by provisions of the new policy.

The Date of Exchange will be the policy anniversary following the later of:

1.  Our receipt of the application;

2.  Payment of the Exchange Adjustments, if any; and

3.  Our approval of the insurable interest.

The new policy will take effect on the Date of Exchange. When the new policy takes effect, the exchange policy will terminate.

**The New Policy**
The Policy Date of the new policy will be the Date of Exchange.

The issue age of the Insured under the new policy will be determined based upon the substitute insured's age on his or her birthday nearest the date of issue of the new policy.

The new policy on the life of the substitute insured will be written on any plan of universal life insurance issued with a level face amount issued by Us at the time of the exchange. The new policy will be subject to Our published issue rules (e.g., age and amount limits) for the plan chosen which are in effect at that time. The risk classification and any exclusions applicable to the new policy will be determined in accordance with Our rules and practices in effect on the date of exchange. The rates for the new policy will be based on Our published rates in effect on the Date of Exchange.

The face amount of the new policy will equal the basic face amount of the exchange policy without regard to any riders under the exchange policy, except as provided below. The Policy Value of the exchange policy on the Date of Exchange will be applied as premium to the new policy, but without any issue or sales charge applied under the new policy.

**Exchange Adjustments**
The owner must pay an amount equal to the excess, if any, of the surrender charge in effect on the exchange policy over the surrender charge for the new policy. All such surrender charges will be determined as of the Date of Exchange.

In some cases, the amount of Policy Value that may be applied to the new policy may exceed the premium limit for the new policy. In that event, We will return such excess Policy Value to You in cash.

**Monthly Rider Charges**
There are no Monthly Charges for coverage under this rider.

**Termination of This Rider**
This rider will terminate on the first of any of the following events to occur:

1. Termination of the exchange policy;

2. Lapse or Exchange of the exchange policy;

3. Our receipt at Our Home Office of a Written Request to cancel this rider; and

4. Death of the insured.

Phoenix Life Insurance Company

*Dona D. Young*

Chairman, President
and Chief Executive Officer

 **PHOENIX**

Phoenix Life Insurance Company
P.O. Box 8027
Boston, MA 02266-8027

**Policy Acceptance Form**

| Agency: | E9206 | Insured(s): ARTHUR B KRAMER |
|---|---|---|
| Policy Number: | 97303935 | |

**DECLARATION:**

The insured(s) declares that the statements made in the application remain full, complete, and true as of this date; that since the date of the application, no insured has applied to any insurance company or society without receiving the exact policy applied for or had any symptoms, diseases or disorders for which advice has been sought.

All insured(s) must attest to the above declaration. If any insured cannot attest to the above statement, please so indicate by checking the box next to that insured's signature below and complete a form #519B for that insured. PLEASE NOTE: Home Office approval of form #519B is necessary before the policy is in effect.

**AMENDMENTS:** The application for Policy No.   97303935    is amended as follows:

    **The face amount of the base policy is decreased to $9,000,000.**
    **The subsequent planned annual premium is $414,800.**
    **The first year anticipated annual premium is $468,000.**

    **ENDORSEMENTS:**

    **Delivery expiry is 11/15/2005 on policy 97303935.**

It is agreed that the above declaration and amendments are part of the application and shall be part of the policy.

**DELIVERY RECEIPT:** To be completed when policy is delivered. If form #519B is required, please consult with your agent before completing this section.

This certifies that as the policy owner, (check ONE only):

☒ I have received delivery of the insurance policy listed above, which includes a Statement of Policy Cost and Benefit Information.

☐ I have received delivery of the insurance policy listed above, which includes a Statement of Policy Cost and Benefit Information, and authorize _____ to hold such policy on my behalf.

| Date | 10/7/05 | Insured(s) | _Arth Kramer_ | ☐ |
|---|---|---|---|---|
| Signed at | New York, NY | | | ☐ |
| Witness | | | | ☐ |
| Owner | Arthur Kramer 2006 Insurance Trust | | | ☐ |
| | By: JP Morgan Trust Co as trustee | | | ☐ |
| | By: _____ (if other than insured) | | | |
| | Robert B Deresz VP | | | |

If owner is a firm or corporation, please give the name of the firm or corporation and the title of the officer signing for the firm or corporation.

AGENT: ORIGINAL to Underwriting and Issue, YELLOW COPY to Agent, PINK COPY to remain with policy.

HR01                                                                                                    HHR01ZZ1        2-96

◈ **PHOENIX**
Phoenix Life Insurance Company
PO Box 8027
Boston MA 02266-8027
Underwriting Service Center

**Application for Life Insurance**
**Part I**

## Section I - Proposed Insured

Print Name as it is to appear on policy (First, Middle, Last)
**Arthur B. Kramer**

Sex: ☒ Male  ☐ Female

Birthdate (Month, Day, Year): **1-10-27**

Birthplace (State or Country): **NY / USA**

United States Citizen: ☒ Yes  ☐ No

Social Security Number: **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**

Driver's License Number (Include State): **014836023  CT**

Marital Status: ☐ Single  ☒ Married  ☐ Widowed  ☐ Divorced  ☐ Separated

Home Address (Include Street, Apt. Number, City, State, and ZIP Code)
**688 Westover Road  Stamford, CT 06902**

Home Telephone Number: **(203) 357-7886**

Give Prior Address if address less than 2 years (Include Street, Apt. Number, City, State, and ZIP Code)

Current Occupation and Duties: **Retired**

Employer:

Length of Employment:

Business Address (Include Street, Apt. Number, City, State, and ZIP Code)

Bus. Phone No. (Include Ext.): ( )

Email Address

## Section II - Ownership

☐ A. Insured

☐ B. Successive Owners

☐ B1. Owners Jointly

☐ C. Corporation, its successors or assigns (Include state of incorporation)

☐ D. Partnership (Include Name of all Partners - if partnership is limited, indicate which partners are general partners)

☐ E. Sole Proprietorship (Include Name of Sole Proprietor)

☒ F. Trust (Include Name and Date of Trust, Name of Trustee(s) and Grantor)

(Complete section below if B, C, D, E or F are checked)

If Owner is other than Proposed Insured, Premium Notice will be sent to:

Owner's Name **Arthur Kramer 2005 Insurance Trust, dated August 29, 2005**
**Hudson United Bank Trustee     Arthur Kramer Grantor**

Mailing Address **75 Rockefeller Plaza  New York, N.Y. 10019**

Owner's Email Address

Social Security or Tax I.D. Number **APPLIED FOR**   Relationship _____   Date of Birth _____

**Contingent Owner**

Name _____   Date of Birth _____

Relationship _____

Ultimate Owner: Check one. If none checked, insured will be ultimate owner.
☐ Insured  ☐ Executor or administrator of the survivor of the primary and contingent owners

## Section III - Beneficiary Designation

| Primary Beneficiary | Relationship to Proposed Insured | Date of Birth (If Available) | Social Security No. (If known) |
|---|---|---|---|
| Arthur Kramer 2005 Insurance Trust | | August 29, 2005 | APPLIED FOR |

☐ If this box is checked, each of the Contingent Beneficiaries listed shall receive an equal interest.

| First Contingent Beneficiary | Relationship to Proposed Insured | Date of Birth (If Available) | Social Security No. (If known) |
|---|---|---|---|
| | | | |

| Second Contingent Beneficiary | Relationship to Proposed Insured | Date of Birth (If Available) | Social Security No. (If known) |
|---|---|---|---|
| | | | |

If Trust is primary beneficiary: (check one)
☐ Trust under Insured's will
☒ Inter vivos - Name of Trustee **Hudson United Bank    Robert J. Desch, VP**
Date of Trust **August 29, 2005**

To qualify for payment, beneficiary must be living: (Check A or B, otherwise A will apply)
☐ A. at the Proposed Insured's death.  ☐ B. on the 30th day after the date of the Proposed Insured's death.

**Section IV - Coverage Applied For**

Plan of Insurance: Phoenix Accumulator UL II

Basic Policy Amount: $ 10,000,000

**Section V - VARIABLE/UNIVERSAL PLANS of Insurance - Riders and Features**

First Year Anticipated, BILLED Premium (Excluding 1035 Exchange, Lump Sum Funds, etc.)

Subsequent Planned Annual Premium

☐ Disability Waiver of a Specified Amount
    Amount $_____
☐ Accidental Death Benefit Rider
☐ Death Benefit Protection Rider
    ☐ Age 70   ☐ Age 80   ☐ Age 100
☐ Purchase Protector _____ units
☐ Child's Term Rider
☐ Family Term Rider
☐ Living Benefit Rider
☐ Guaranteed Death Benefit Rider
☐ Guaranteed Extension Rider
☐ Cash Value Accumulation Rider
☐ Age 100 + Rider
☐ Individual Term Rider $ _____

**Death Benefit Option:** (check one) If none checked, Option 1 will apply.
☒ Option 1 - Level Face Amount
☐ Option 2 - Increasing Face Amount
**Face Amount Increase Options:**
☐ _____% percentage Increase
☐ $_____ Fixed Dollar Increase
☐ Increase Equal to Premiums Paid
**Policy Option:** (check one) If none checked, Option A will apply.
☐ Policy Option A
☐ Policy Option B
☐ Policy Option C
☐ Other _____
☐ Other _____
☐ Other _____
☐ Other _____

**Temporary Money Market Allocation**

If the state of issue does not require refund of premium during the Right To Cancel Period, but you prefer to temporarily allocate your premiums to the Money Market subaccount until the end of the Right to Cancel Period, as stated in the policy, indicate: ☐ Yes ☐ No

**Electronic Delivery Authorization**

By checking "Yes," I am authorizing the Company to provide my statements, prospectuses and other information electronically if available. I understand that I must have internet access to use this service and there may be access fees charged by the internet service provider. ☐ Yes ☐ No

**Section VI - Suitability**

Do you understand that if you have purchased a Variable Life Policy and the Death Benefit may be variable or fixed under certain conditions and that the Death Benefit and Cash Values under any Variable Policy may increase or decrease in amount or duration based on the investment experience of the underlying subaccounts? ☐ Yes ☐ No

If you are purchasing a Variable Life Policy, do you believe it is suitable to meet your financial objectives? ☐ Yes ☐ No

If I have purchased a Variable Life Policy, I confirm that I have received the prospectus for that policy and its underlying funds.

Illustrations of benefits including death benefits, policy values and cash surrender values are available on request.

**Section VII - Complete if Temporary Insurance is Requested**

If either of the following questions are answered "Yes" or left blank, no agent or broker is authorized to accept money and a Temporary Insurance Agreement may not be issued, and no coverage will take effect.

| Yes | No | |
|---|---|---|
| ☐ | ☐ | 1. Within the past two years have you been treated for heart disease, stroke, or cancer or had such treatment recommended? |
| ☐ | ☐ | 2. Within the past 60 days have you been scheduled or advised to have any diagnostic test (excluding HIV) tests or surgery not yet performed? |

$_____ has been paid by _____ to the Licensed Agent/Registered Representative indicated in this application, for proposed insurance applied for in this application. This sum is to be applied in accordance with and subject to the terms of the **Temporary Insurance Receipt** bearing the same number as this application.

**Section VIII - TERM/WHOLE LIFE PLANS of Insurance - Riders and Features**

☐ Accidental Death Benefit
☐ Disability Waiver of Premium on Insured
☐ Purchase Protector _____ units
☐ Family Protection
☐ Children's Protection _____ units
☐ Living Benefit Rider
☐ Other _____

Cost of Living is automatic (No COL for Term products) unless this box is checked ☐ I do not desire Cost of Living

Additional Death Benefit Riders:
Primary Insurance Term Rider (PITR)  $ _____
Other Rider Name _____  Amount $ _____

☐ Paid-Up Additions Purchase Options Rider (PAPOR) (check one)
    ☐ PAPOR A-Flexible   ☐ PAPOR B-Flexible with Optionterm
    Number of years payable _____
Intended premium payments for the first 7 years:
Year 1 _____        Year 5 _____
Year 2 _____        Year 6 _____
Year 3 _____        Year 7 _____
Year 4 _____        Maximum Amount $ _____

**Dividend Option:**
☐ Optionterm
    Optionterm Death Benefit $ _____
    Premium Paying Coverage ☐ Yes  ☐ No  or
    % of Increase _____
☐ Accumulate at Interest (ACCUM)
☐ Paid-up Additional Insurance (PUA)
☐ One Year Term with Balance to:
    ☐ Cash   ☐ PUA        ☐ ACCUM        ☐ RP
☐ Reduce Premium (RP)
☐ Cash
☐ Other _____
☐ Other _____

Automatic Premium Loan, if applicable
☐ Yes  ☐ No

Policy Loan Interest Rate, if applicable (if none checked, "Variable" will apply.)

☐ Variable   ☐ Fixed

**Section IX - Mode of Premium Payment -** (Please note, there is a higher cost associated with the purchase of a Whole Life or Term policy, if the mode of payment is other than on an annual pay basis. Please consult with your Licensed Agent/Registered Representative.)

☐ Annual                          ☒ Quarterly                              ☐ Semi-Annual
☐ Monthly (Variable Life Insurance only)    ☐ PCS (Phoenix Check-O-Matic Service)
                                   Minimum Monthly Check for Each Service - $25.00

Multiple Billing Option - Give # or Details _____
☐ List Bill   ☐ Employee Insurance Counseling Service (EICS)   ☐ Salary Allotment   ☐ Pension   ☐ Money Purchase Pension
☐ Other _____

If electing PCS, complete the following:
Existing Policy Number or PCS File Number _____
**Authorization Agreement for Preauthorized Payments**
I (we) hereby authorize the Company (Note: Company is defined as indicated on page 1 of application) to initiate debit entries to my (our) checking account and the depository named below.
**Information for New Account**
Attach a void check to furnish encoding details.
If the depositor's name is not imprinted on the check, fill it in here exactly as it appears in the bank records.

**Attach Void Check Here**

Signature of depositor (if different from owner) _____

Send premium notices to: (in addition to owner)
☐ Insured at:   ☐ Home Address   ☐ Business Address
☐ Other (Name, Relationship to Owner and Address) _____

**Section X - Existing Life Insurance**

Describe all additional coverage in force. Include individual and group. If no coverage inforce, check here ☐.

| Company | Issue Date | Plan | Amount | Personal / Business | |
|---|---|---|---|---|---|
| Transamerica | 4 policies | UL | Total $22,000,000 | ☒ | ☐ |
| | | | $ | ☐ | ☐ |
| | | | $ | ☐ | ☐ |

Total Life Insurance in force (if none, indicate) $22,000,000     Total Accidental Death Benefit in force (if none, indicate) $_____

| Yes | No | | |
|---|---|---|---|
| ☒ | ☐ | 1. | Are there any life insurance policies or annuity contracts, owned by, or on the life of, the applicants or the insureds or the owner(s) or the annuitant? |
| ☐ | ☒ | 2. | With this policy, do you plan to replace (in whole or in part) now or in the future any existing life insurance or annuity contract in force with this policy? |
| ☐ | ☒ | 3. | Do you plan to utilize values from any existing life insurance policy or annuity contract (through loans, surrenders or otherwise) to pay any initial or subsequent premium(s) for this policy? |

For all "Yes" answers above, please provide the following information

| Company | Issue Date | Plan | Amount | Personal / Business | |
|---|---|---|---|---|---|
| Transamerica | Various | Universal Life | $ 22,000,000 | ☒ | ☐ |
| | | | $ | ☐ | ☐ |
| | | | $ | ☐ | ☐ |

**Section XI - Income**

| Earned Income | Independent Income | Net Worth |
|---|---|---|
| a. -0- | b. 3,000,000 | c. 70,000,000 |

**Section XII - Additional Information**

| Yes | No | | |
|---|---|---|---|
| ☐ | ☒ | 1. | Have you used tobacco or nicotine products in any form in the last 10 years? If "Yes," please circle the product(s) used: cigarettes, cigars, pipes, snuff, smokeless or chewing tobacco, nicotine patch or gum. If "Yes," check one: ☐ Use currently  ☐ Date quit _____ |
| ☐ | ☒ | 2. | Have you ever applied for life, accident, or health insurance and been declined, postponed, or been offered a policy differing in plan, amount or premium rate from that applied for? (If "Yes," give date, company and reason). |
| ☐ | ☒ | 3. | Are you negotiating for other insurance? (If "Yes," name companies and total amount to be placed in force.) |
| ☐ | ☒ | 4. | Do you intend to live or travel outside the United States or Canada? (If "Yes," state where and for how long). |
| ☐ | ☒ | 5. | Have you flown during the past three years as a pilot, student pilot or crew member? (If "Yes," complete Aviation Questionnaire). |
| ☐ | ☒ | 6. | Have you participated in the past 3 years or plan to engage in any extreme sport activities such as motorized vehicle, or parachute jumping, or underwater diving, or any other extreme avocation? (If "Yes," complete Avocation Questionnaire). |
| ☐ | ☒ | 7. | Have you in the past three years been the driver of a motor vehicle involved in an accident, or convicted of a moving violation of any motor vehicle law, or had your driver's license suspended or revoked? |
| ☐ | ☒ | 8. | Have you ever been convicted of a felony or do you have charges pending? |

Give full details for all "Yes" answers above. If necessary, use an additional piece of paper and please sign it.

| Question # | Details |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |

## Section XIII - Medical History (Not necessary to complete if medical or paramedical exam has been ordered)

| Height 5'10" | Weight 180 lbs | Has your weight changed by 10 pounds or more in the past 2 years? If "yes", how much 15 pounds ☐ Gain ☒ Loss |
|---|---|---|

| Family History: | Age if Alive | Age at Death | If alive, indicate health problems or if deceased, indicate cause of death: | Family History: | Age if Alive | Age at Death | If alive, indicate health problems or if deceased, indicate cause of death: |
|---|---|---|---|---|---|---|---|
| Father ☐ Alive ☒ Deceased | | 72 | Unknown | Mother ☐ Alive ☒ Deceased | | 96 | Old Age |

**Personal Physician:** Please provide the name and address of your personal physician or health care provider, date of most recent visit, reason for visit, and results of treatment (if any):

Dr. Thomas Nash
New York City, N.Y.

Has anyone in your immediate family developed any hereditary condition, cancer, or heart disease before age 60? ☐ Yes (please provide details below) ☒ No

| To the best of your knowledge and belief have you ever had, or been told by a physician or other health care provider that you have: | | |
|---|---|---|
| 1. High blood pressure or hypertension? | ☐ Yes | ☒ No |
| 2. Pain, pressure, or discomfort in the chest, angina pectoris, palpitations, swelling of the ankles, or undue shortness of breath? | ☐ Yes | ☒ No |
| 3. Heart disease, coronary artery disease, cardiomyopathy, heart failure, atrial fibrillation, heart rhythm abnormality, heart murmur, congenital heart disease or valvular heart disease? | ☐ Yes | ☒ No |
| 4. Peripheral vascular disease, claudication, narrowing or blockage of arteries or veins? | ☐ Yes | ☒ No |
| 5. Asthma, pulmonary fibrosis, chronic cough, emphysema, pneumonia, or any other lung disease? | ☐ Yes | ☒ No |
| 6. Neurologic disease, seizures, fainting, falls, concussion, stroke, transient ischemic attack (TIA), tremor, neuropathy, weakness, paralysis, Parkinson's disease, memory loss, dementia, or any other disease of the brain or nervous system? | ☐ Yes | ☒ No |
| 7. Depression, bipolar disorder, schizophrenia, anxiety, or other psychiatric illness? | ☐ Yes | ☒ No |
| 8. Arthritis, lupus, or any musculoskeletal or skin disorder? | ☒ Yes | ☐ No |
| 9. Ulcers, abdominal pain, colitis, Crohn's disease, gall bladder disease, liver disease, hepatitis, jaundice, pancreatitis, or any other disease of the gastrointestinal system? | ☐ Yes | ☒ No |
| 10. Diabetes, kidney disease, kidney stones, bladder disorder, prostate disorder, protein or blood in the urine? | ☐ Yes | ☒ No |
| 11. Endocrine disorder, including disorder of the thyroid, parathyroid, adrenal, or pituitary glands? | ☐ Yes | ☒ No |
| 12. Acquired Immune Deficiency Syndrome (AIDS) or any other immunologic disorder? | ☐ Yes | ☒ No |
| 13. Anemia, bleeding or clotting disorder, or any other disorder of the blood or bone marrow? | ☐ Yes | ☒ No |
| 14. Cancer of any type, tumor (benign or malignant), leukemia, lymphoma, or Hodgkin's disease? | ☒ Yes | ☐ No |
| 15. Are you taking any kind of medicine, therapy, or treatment regularly or at frequent intervals? | ☒ Yes | ☐ No |
| 16. Have you ever been treated for alcoholism or been advised to limit or stop your use of alcohol? | ☐ Yes | ☒ No |
| 17. Have you ever used narcotics, barbiturates, amphetamines, hallucinogens, or any prescription drug except in accordance with a physician's instructions? | ☐ Yes | ☒ No |
| 18. Have you ever been a patient in any hospital, treatment center, or similar facility within the last 10 years? | ☒ Yes | ☐ No |
| 19. Have you had, or been advised to have, any surgery, X-rays, electrocardiograms, blood studies (excluding HIV or AIDS tests), or other tests within the last 5 years? | ☒ Yes | ☐ No |
| 20. Other than above, have you had any other physical or psychological disorder or been treated by a physician or other health care provider for any reason within the past 5 years? | ☐ Yes | ☒ No |

Please provide details of "YES" answers (include question number, diagnosis, date of occurrence, hospital or treating physician's name and address, and current status). Use OL1590 if additional space is necessary to record all details.

8. 2 knee replacements 7 1/2 yrs ago
Right hip replacement 2-3 yrs ago - Greenwich Hospital

14. Basal cell CA removed 2-3 yrs ago Dr. Kahan

15. Flomax

18. See #8

19. Routine ekgs + lab work 4 Dr. Nash

Phoenix reserves the right to require additional medical information, medical examination or testing to complete the underwriting process.

## Authorization To Obtain Information

I authorize any physician, health care provider, hospital, clinic or other medically-related facility, insurance company or the Medical Information Bureau (MIB), having any records or knowledge of me or my health, to provide any such information to Phoenix Life Insurance Company and its affiliated insurers (Phoenix) or its reinsurers. I authorize any of the above sources to release to Phoenix or its reinsurers any of my information relating to alcohol use, drug use and mental health care.

Medical information will be used only for the purpose of risk evaluation and determining eligibility for benefits under any policies issued. Phoenix may disclose information it has obtained to others as permitted or required by law, including the MIB, our reinsurers and other persons or entities performing business or legal services in connection with this application, any contract issued pursuant to it or in connection with the determination of eligibility for benefits under an existing policy. Information that is not personally identifiable may be used for insurance statistical studies.

If insurance on any minor child is applied for, this authorization extends to records and knowledge of that child and that child's health. To facilitate rapid submission of information, I authorize all of the above sources, except MIB, to give such records or knowledge to any agency employed by Phoenix to collect and transmit such information.

I authorize consumer reporting agencies, insurance companies, motor vehicle departments, my attorneys, accountants and business associates and the MIB to provide any information to Phoenix or its reinsurers that may affect my insurability. This may include information about my occupation, participation in hazardous activities, motor vehicle record, foreign travel, finances, and other insurance coverage in place.

I acknowledge that I have received a copy of the Notice of Information Practices, including information about Investigative Consumer Reports and the Medical Information Bureau. I authorize the preparation of an investigative consumer report.

This authorization shall continue to be valid for thirty months from the date it is signed unless otherwise required by law. A photocopy of this signed authorization shall be as valid as the original. This authorization may be revoked by writing to Phoenix prior to the time the insurance coverage has been placed in force. I understand my authorized representative or I may receive a copy of this authorization on request.

☐ I do ☐ I do not (check one) require that I be interviewed in connection with any investigative consumer report that may be prepared.

I have reviewed this application, and the statements made herein are those of the proposed insured and all such statements made by the proposed insured in Part I or and in Part II of this application are full, complete, and true to the best knowledge and belief of the undersigned and have been correctly recorded.

I understand that i) no statement made to, or information acquired by any Licensed Agent/Registered Representative who takes this application, shall bind the Company unless stated in Part I and/or Part II of this application, and ii) the Licensed Agent/Registered Representative has no authority to make, modify, alter or discharge any contract thereby applied for.

I understand and agree that the Insurance applied for shall not take effect unless and until each of the following has occurred: the policy has been issued by the Company; the premium required for issuance of the policy has been paid in full during the lifetime of the insured; all the representations made in the application remain true, complete and accurate as of the latest of such dates, and there has been no change in the health of any proposed insured that would change the answers to any of the questions in the application, except as otherwise provided by the Temporary Insurance Agreement.

I understand that if there is any change in my health or physical condition, or if I visit a physician or am hospitalized, subsequent to the date I complete the application or provide any information to be contained in the application, I will inform the Company as soon as possible.

This application is attached to and made a part of the policy.

Under penalty of perjury, I confirm that (a) the Social Security or Tax Identification Number shown above is correct, and (b) that I am not subject to back-up withholding. (Strike this out and initial if not true).

If I have applied for the Living Benefit Rider, I confirm that I have received a copy of the disclosure form, Summary of Coverage for Accelerated Benefit Rider.

| Proposed Insured's Signature | State Signed In | Witness (Must be signed in presence of Proposed Insured) | Date |
|---|---|---|---|
| | N Y | | 9-2-05 |
| Owner's Signature (if other than Proposed Insured) | State Signed In | Witness (Must be signed in presence of Owner) | Date |
| | N Y | | 9-2-05 |
| Parent's Signature (for minor insured) | State Signed In | Witness (Must be signed in presence of Parent) | Date |

The Producer hereby confirms he/she has truly and accurately recorded on the application the information supplied by the Proposed Insured; and that he/she is qualified and authorized to discuss the contract herein applied for.

Will the proposed insured replace (in whole or in part) any existing life insurance or annuity contract in force with the policy applied for? ☐ Yes ☒ No

Will the proposed insured utilize values from another insurance policy (through loans, surrenders or otherwise) or annuity to pay for the initial or subsequent premium(s) for the policy applied for? ☐ Yes ☒ No

Are there any life insurance policies or annuity contracts owned by or on the life of the applicants or the insureds or the owner(s) or the annuitant? ☒ Yes ☐ No

| Lic. Agt./Reg. Rep's Name (Print) | | Lic. Agt./Reg. Rep's Email Address |
|---|---|---|
| Steven Lockwood | | lockwoodjrm@hotmail.com |
| Lic. Agt./Reg. Rep's Signature | Date | Lic. Agt./Reg. Rep's I.D. No. | Lic. Agt./Reg. Rep's Telephone No. |
| X | 9/2/05 | APPLIED FO | 212 767 7334 |
| Broker / Dealer Name and Address | | Broker/Dealer Number |

# Ex. 5

## Phoenix Life Insurance Company

Executive Offices:
One American Row
Hartford, CT 06102

Statutory Home Office:
10 Krey Boulevard
East Greenbush, NY 12144

**Insured** ARTHUR B KRAMER

**Age & Sex** 78    MALE

**Policy Number** 97303936

**Face Amount** $9,000,000.00

**Policy Date** JULY 10, 2005

Dear Policyowner:

We agree to pay the benefits of this policy in accordance with its provisions. It is important to Us that You are satisfied with Your policy and that it meets Your insurance goals. For service or information on this policy, contact the agent who sold the policy, any of Our agency offices, Our Home Office or Our Customer Service Center.

YOU HAVE A RIGHT TO RETURN THIS POLICY. If for any reason You are not satisfied with this policy, You may return it at any time within ten days (or sixty days if this policy was issued as a replacement of another life insurance policy) after You receive it to either the agent through whom it was purchased or to Us at Our Main Administrative Office at the following address:

> Phoenix Life Insurance Company
> Underwriting and Issue Department
> P.O. Box 8027
> Boston, MA 02266-8027
>
> Telephone (860) 403-1000

Notice given by mail and returning the policy or contract by mail are effective if postmarked, properly addressed and postage is prepaid.

If returned, the policy will be considered void from the beginning and any premium paid will be refunded to You less any partial withdrawals or any loans taken under the policy. Such payment will be made within ten days after we receive notice of cancellation and the returned policy.

Signed for Phoenix Life Insurance Company at its Executive Offices in Hartford, Connecticut.

Sincerely yours,

Phoenix Life Insurance Company

*John H. Beers*

Secretary

*Dona D. Young*

Chairman, President
and Chief Executive Officer

**FLEXIBLE PREMIUM LIFE INSURANCE POLICY**
**Death Benefit Payable if Insured Dies While the Policy is In Force**

**Nonparticipating**

U607 NY

U607NYF1

# SCHEDULE PAGE

The specifications shown below are those in effect initially. They may later be changed for reasons as stated in this policy. Coverage may end if premiums paid are not enough to continue coverage.

## BASIC INFORMATION

| | |
|---|---|
| **POLICY NUMBER:** | 97303936 |
| **POLICY DATE:** | JULY 10, 2005 |
| **FACE AMOUNT:** | $9,000,000.00 |
| **MATURITY DATE:** | JULY 10, 2027    (See Death Benefit Following Insured's Age 100 provision in Part 7.) |
| **DEATH BENEFIT OPTION:** | A |
| **OWNER:** | OWNER AS STATED ON THE APPLICATION UNLESS LATER CHANGED. |
| **BENEFICIARY:** | AS STATED ON THE APPLICATION UNLESS LATER CHANGED. |

## INSURED

| INSURED | ISSUE AGE & SEX | RISK CLASSIFICATION |
|---|---|---|
| ARTHUR B KRAMER | 78    MALE | PREFERRED |

## PREMIUMS

**ISSUE PREMIUM:**     $401,493.00

**SUBSEQUENT PLANNED QUARTERLY PREMIUM:**     $121,500.00    *

**TOTAL PREMIUM LIMIT:**     GREATER OF  $6,413,125.50  AND RESULT OF  $1,091,379.92 MULTIPLIED BY THE NUMBER OF ELAPSED POLICY YEARS (OR FRACTION THEREOF) AFTER JULY 10, 2005

The limit may decrease when monthly charges for any rider or any other monthly charges cease, and may be exceeded if additional premium is needed to prevent policy lapse.

**PREMIUM DUE DATES:**     The amount and time of premium payments following the Policy Date are flexible. Subsequent planned premiums are payable on the NINTH day of each QUARTER    thereafter until the Death of the Insured, but not beyond JULY 10, 2027

**POLICY VALUE \*\***
**BENCHMARK AMOUNT:** $8,100,000.00    (See Part 5)

\* Payment of planned premiums does not guarantee coverage until the Maturity Date. Even if all planned premiums are paid, the policy may lapse earlier than the anniversary nearest the Insured's Age 100, due to the fact that current cost of insurance and interest rates are not guaranteed, policy loans and partial withdrawals may be taken, and there may be changes in the death benefit option. (See section entitled "Grace Period and Lapse" in Part 4.) Planned premiums are the amounts the owner anticipates paying when the policy is originally issued.

\*\* Beginning in the third Policy Year, We will credit Additional Interest each Monthly Calculation Day on unborrowed Policy Value in excess of the Policy Value Benchmark Amount. See Part 5 of this policy for more details.

U607 NY                                                                 PAGE 1 OF 5
                                                                        U607NYS1

# SCHEDULE PAGE
## CONTINUED

POLICY NUMBER:                97303936

### POLICY CHARGES

SALES CHARGE:        10% of the first $486,000.00     of premium paid in the
first policy year. 5% of any premium paid in excess of
$486,000.00     in the first policy year.  5% of all
premiums  paid in policy years 2+.

MONTHLY DEDUCTION:*    See Part 5, "Monthly Deduction".  Includes cost of insurance, any
rider charges, any flat extra mortality charges, and monthly
service and expense charges.

MONTHLY SERVICE CHARGE:   $3.50 Guaranteed not to exceed $7.00.

ISSUE CHARGE:          $50.00       deductible monthly during the first Policy Year.
If you surrender during the first Policy Year, any unpaid Issue
Charges will be assessed to reduce the Surrender Value payable
under this policy.

PARTIAL WITHDRAWAL FEE FOR EACH WITHDRAWAL:  $25.00 (in addition to a partial
Surrender Charge).

SURRENDER CHARGE:       See table on next page.

### OTHER RATES

GUARANTEED MINIMUM INTEREST
RATE:                  4%.

CREDITED INTEREST RATE ON LOANED AMOUNTS (See Part 5):
Policy Years 1 – 15:  Loan Interest Rate less 1.5%
Policy Years 16 and thereafter:  Loan Interest Rate less 0.5%

### LIMITATIONS

MINIMUM FACE AMOUNT:     $250,000

PARTIAL WITHDRAWALS:     A Partial Withdrawal will not be permitted in an amount

- less than $500.00;
- which would reduce the Surrender Value to $0.00; or
- which would reduce the face amount below $250,000.

* Additional amounts are not guaranteed. We have the right to change the amount of interest
credited to the policy and the amount of cost of insurance deducted under the policy. This
may require more premium to be paid than was illustrated, or the cash values may be less
than those illustrated.

U607 NY

# SCHEDULE PAGE
## (CONTINUED)

POLICY NUMBER:    97303936

### TABLE OF SURRENDER CHARGES

For an explanation of this table, see section entitled "Surrender Value" in Part 5. The charges shown in this table are stated as of the beginning of the Policy Year indicated. The charge will be level for the first 10 Policy Years and will be prorated on an annual basis beginning in Policy Year 11, unless limited by legal maximums. In all Policy Years after the 20th policy year, the Surrender Charge is zero.

| POLICY YEAR | CHARGE PER $1,000 OF FACE AMOUNT |
|---|---|
| 1 | 58.5000 |
| 2 | 58.5000 |
| 3 | 58.5000 |
| 4 | 58.5000 |
| 5 | 58.5000 |
| 6 | 58.5000 |
| 7 | 58.5000 |
| 8 | 58.5000 |
| 9 | 58.5000 |
| 10 | 58.5000 |
| 11 | 57.5250 |
| 12 | 45.8250 |
| 13 | 34.1250 |
| 14 | 22.4250 |
| 15 | 10.7250 |
| 16 | 0.0000 |
| 17 | 0.0000 |
| 18 | 0.0000 |
| 19 | 0.0000 |
| 20 | 0.0000 |
| 20+ | 0.0000 |

## SCHEDULE PAGES (CONTINUED)

POLICY NUMBER:    97303936

### TABLE OF GUARANTEED MAXIMUM COST OF INSURANCE RATES
### PER $1000 OF NET AMOUNT AT RISK
### BASED ON 1980 CSO MORTALITY TABLE

| POLICY YEAR | MONTHLY RATE | POLICY YEAR | MONTHLY RATE | POLICY YEAR | MONTHLY RATE |
|---|---|---|---|---|---|
| 01 | 6.53920 | 09 | 13.56670 | 17 | 24.63750 |
| 02 | 7.14330 | 10 | 14.73250 | 18 | 27.49670 |
| 03 | 7.80580 | 11 | 15.90750 | 19 | 32.04580 |
| 04 | 8.54330 | 12 | 17.10750 | 20 | 40.01670 |
| 05 | 9.37670 | 13 | 18.34920 | 21 | 54.83170 |
| 06 | 10.31580 | 14 | 19.65330 | 22 | 83.33330 |
| 07 | 11.34250 | 15 | 21.06250 | | |
| 08 | 12.43330 | 16 | 22.63580 | | |

Basis of Calculations:  1980 Commissioner's Standard Ordinary Mortality Smoker/Nonsmoker Distinct Table for each insured's sex and risk class, age nearest birthday, and 4% effective annual interest rate.

Monthly Factor used in determining Cost of Insurance:  1.0032737 (SEE PART 5)

U607 NY

# SCHEDULE PAGE
## (CONTINUED)

POLICY NUMBER:    97303936

### TABLE OF FACE AMOUNTS OF INSURANCE

| ISSUE DATE | FACE AMOUNT |
|---|---|
| JULY 10, 2005 | $9,000,000.00 |

### RIDERS AND RIDER BENEFITS

| RIDER DESCRIPTION | RIDER DATE OF ISSUE | COVERAGE AMOUNT | RIDER TERMINATION DATE | MONTHLY CHARGE |
|---|---|---|---|---|
| UR78 - EXCHANGE OF INSURED OPTION | 07/10/2005 - EXCHANGE OPTION RIDER | $0.00 | 07/10/2027 | $0 |

## BRIEF SUMMARY OF MAIN PROVISIONS

This is only a summary to help You understand the basics of Your policy. The policy provisions spell out the full details of the rights and obligations of the parties to this policy. The policy provisions and not this brief summary are binding on Us. We will pay the benefits of this policy as set forth on the policy Schedule Pages.

There are two Death Benefit Options to choose from, as described in Part 7. Option A is the Face Amount. Option B is the Face Amount plus Policy Value. Under either Option, the Death Benefit must be at least the Minimum Death Benefit as described in Part 7.

The premiums You pay are added to the Policy Value after We deduct any applicable premium expense charges. We make a monthly deduction from the Policy Value to pay the cost of insurance, the cost of any additional benefit riders and certain monthly charges. We determine cost of insurance rates from time to time, with the guarantee that they will never be higher than the maximum provided on the Schedule Pages. The Policy Value is credited with interest at a current rate which We set from time to time but which will not be less per year than the Guaranteed Minimum Interest Rate shown on the Schedule Pages.

The Subsequent Planned Premium shown on the Schedule Pages is the premium You selected in Your application and is the basis for the Policy Summary delivered with this policy. However, You may generally pay premiums when and in the amount You choose provided sufficient premium is paid to maintain the policy In Force. The amount and timing of premium payments will affect the accumulation of Policy Value.

This policy gives You a number of other options. Under stated conditions, You may change the Death Benefit Option, withdraw part of the Surrender Value or surrender the policy for its full Surrender Value. The Surrender Value is based on the Policy Value, minus any applicable Surrender Charges, unpaid issue charges, loans and loan interest.

We pay the insurance proceeds, as described in Part 3, to the beneficiary when We receive due proof that the Insured's death has occurred while this policy is In Force.

We pay the Surrender Value, as described in Part 5, to You if the Insured is living on the surrender date and this policy is then In Force.

You may change the premiums and Death Benefit Option, subject to Our approval. Certain changes may require evidence of insurability.

See the policy provisions for details.


**READ YOUR POLICY CAREFULLY. IT IS A CONTRACT BETWEEN YOU AND US.**

# TABLE OF CONTENTS

SCHEDULE PAGES

BRIEF SUMMARY OF MAIN PROVISIONS

PART 1: DEFINITIONS.................................1

PART 2: GENERAL PROVISIONS.................2
    Effective Date of Insurance.................2
    Entire Contract.................2
    Revised Schedule Pages.................3
    Age.................3
    Misstatement of Age or Sex.................3
    Contestability.................3
    Insurability Requirements After Issue.....3
    Suicide Exclusion.................4
    Termination.................4
    Minimum Policy Value.................4

PART 3: OWNER, COLLATERAL
ASSIGNMENT, BENEFICIARY.................4
    Owner.................4
    Rights of Owner.................4
    Collateral Assignment.................5
    Beneficiary.................5
    How to Change the Beneficiary.................6

PART 4: PREMIUMS.................6
    Payments.................6
    Total Premium Limit.................6
    Reduced Paid-Up Benefit.................7
    Grace Period and Lapse.................7
    Reinstatement.................7

PART 5: POLICY VALUES.................8
    Basis of Calculations.................8
    Policy Value.................8
    Interest Rate.................9
    Benchmark Additional Interest Credit.....9
    Monthly Deduction.................10
    Cost of Insurance.................10
    Cost of Insurance Rates.................11
    Surrender Value.................11
    Partial Withdrawals.................12

PART 6: POLICY LOANS.................12
    When Available.................12
    Amount Available.................12
    Loan Interest.................13
    Debt.................13
    Repayment.................14

PART 7: INSURANCE COVERAGE
PROVISIONS.................14
    Death Proceeds.................14
    Interest on Insurance Proceeds.................14
    Death Benefit.................14
    Minimum Death Benefit.................14
    Death Benefit Following Insured's
        Age 100.................15
    Change in Death Benefit Option.................15
    Request for a Decrease in Face
        .................16

PART 8: MISCELLANEOUS
PROVISIONS.................16
    Annual Report.................16
    Projection of Benefits and Values.................16
    Notices by Us.................16
    Deferment of Certain Payments.................16
    Claims of Creditors.................17
    Corrections.................17

PART 9: PAYMENT OPTIONS.................17
    Who May Elect Payments Options.................17
    How to Elect a Payment Option.................17
    What Payment Options Are Available.....17
    Other Payment Options.................19
    Additional Interest.................20

PART 10: TABLE OF PAYMENT OPTION
AMOUNTS.................20
    Adjusted Age.................20
    Basis of Calculation.................20
    Tables for Options 3, 4 and 5.................21
    Table for Option 7.................22

U607 NY

# PART 1: DEFINITIONS

| | |
|---|---|
| **Assigns** | Any persons to whom You assign an interest in this policy if We have notice of the assignment in accordance with the provisions stated in Part 3. |
| **Death Benefit Option** | The type of Death Benefit in effect as described in Part 7. |
| **Due Proof of Death** | A certified death certificate, an order of a court of competent jurisdiction, or any other proof acceptable to Us. |
| **In Force** | The policy has not terminated or otherwise lapsed in accordance with the Grace Period and Lapse Provision in Part 4. |
| **In Writing (Written Notice) (Written Request)** | Is a written form signed by You, satisfactory to Us and received at Our Home Office or Our Main Administrative Office. |
| **Monthly Calculation Day** | The first Monthly Calculation Day is the same day as the Policy Date. Subsequent Monthly Calculation Days are the same days of each month thereafter or, if such day does not fall within a given month, the last day of that month will be the Monthly Calculation Day. |
| **Nonparticipating** | This is a nonparticipating policy which does not pay any dividends. |
| **Subsequent Planned Premium** | The premium shown on the Schedule Page, which is the premium You selected in Your application and is the basis for the Policy Summary delivered with this policy. |
| **Policy Anniversary** | The anniversary of the Policy Date. |
| **Policy Date** | The Policy Date shown on the Schedule Pages from which Policy Years and Policy Anniversaries are measured. |
| **Policy Debt** | Unpaid policy loans with accrued interest. |
| **Policy Month** | The period from one Monthly Calculation Day up to but not including the next Monthly Calculation Day. |
| **Policy Value** | The Policy Value as defined in Part 5. |
| **Policy Year** | The first Policy Year is the one-year period from the Policy Date to, but not including, the first Policy Anniversary. Each succeeding Policy Year is the one-year period from the Policy Anniversary up to but not including the next Policy Anniversary. |
| **Surrender Value** | The Surrender Value as defined in Part 5. The Surrender Value is the Policy Value on the date of surrender less any applicable surrender charge, unpaid issue charge, and less any Policy Debt. |
| **We (Our, Us)** | Phoenix Life Insurance Company. |
| **You (Your)** | The owner of this policy at the time an owner's right is exercised. |

# PART 2:  GENERAL PROVISIONS

**Effective Date of Insurance**

This policy will be In Force from the Policy Date until terminated in accordance with its terms, provided the first Issue Premium shown on the Schedule Pages is paid on or before delivery of this policy while the Insured is alive.

**Entire Contract**

This policy, including the Schedule Pages (and any supplements or changes thereto), any riders or endorsements, and the written application of the owner, a copy of which is attached to and made a part of the policy, are the entire contract between You and Us.

This policy is made in consideration of the application and the payment of premiums as provided in this policy. We rely on all statements made by or for the Insured in the written application. Each statement made in an application will, be deemed a representation and not a warranty. No statement will be used to void this policy or in defense of a claim under this policy unless:

1.  it is contained in the application or in a supplemental application; and

2.  a copy of that application is attached to this policy when issued or made a part of this policy when changes become effective.

Any change in the provisions of the policy, to be in effect, must be signed by one of Our executive officers and countersigned by Our registrar or one of Our executive officers. This policy is issued by Us and any benefits payable under this policy are payable by Us.

U607 NY

**Revised Schedule Pages**

The Schedule Pages issued with the policy show the initial policy data in effect for this policy on the Policy Date. Some of this policy data may change by an action You request or take or by a change You make. Any of these changes will be reflected in Revised Schedule Pages which supplement or restate the Schedule Pages and show the effective date of the change. We will send You such Revised Schedule Pages along with a copy of any supplemental application, and they will become part of this policy as of their effective date.

**Age**

Issue Age means the Insured's age on the Policy Date as of the Insured's nearest birthday. The attained age of the Insured on any Policy Anniversary and for the entire Policy Year then starting is the Issue Age plus the number of Policy Years since the Policy Date.

**Misstatement of Age or Sex**

If the age or sex of the insured has been misstated, any benefits payable under this policy will be adjusted to reflect the correct age and sex. The death benefit payable will be adjusted to reflect the amount of coverage that would have been supported by the most recent monthly deduction based on the then current cost of insurance rates for the correct age and sex.

**Contestability**

We rely on all statements made by or for the insured in the written application and in any supplemental application. These statements are considered to be representations and not warranties. We can contest the validity of this policy and any coverage under it for any material misrepresentation of fact. To do so, however, the misrepresentation must be contained in an application and the application, must be attached to this policy when issued or made a part of this policy when a change is made.

We cannot contest the validity of the original face amount of this policy after it has been In Force during the insured's lifetime for two years from its Policy Date (or two years from any reinstatement, if applicable). If We contest the policy, it will be based on the application for this policy (or the application for reinstatement, if applicable).

If this policy was issued as the result of a conversion option from term insurance, the contestable period for the converted amount is effective as of the date the term policy was issued.

If We contest the validity of all or a portion of the face amount provided under this policy, the amount We pay with respect to such portion of the face amount will be limited to the higher of a return of any paid premium required by Us for the contested Face Amount, or the sum of any monthly deductions made under this policy for the contested face amount.

**Insurability Requirements After Issue**

To make some changes or elections under this policy after it is issued, the Insured must meet Our insurability requirements (medical and/or financial) as follows:

1.  evidence of the Insured's insurability must be given that is satisfactory to Us; and

2.  under Our underwriting standards, the Insured must be in a Risk Classification that is the same as, or better than, the Risk Classification for this policy at issue.

**Suicide Exclusion**

If the Insured dies by suicide within two years from the Policy Date, and while the policy is In Force, Our liability shall be limited to an amount equal to the premiums paid on this policy less any debt owed Us and less any partial withdrawals.

If this policy was issued as a result of a conversion option from term insurance and if the Insured died by suicide within two years of the date the original term policy was issued and while this policy is In Force, Our liability shall be limited to an amount equal to the premiums paid on this policy and the original term policy, less any debt owed Us and less any partial withdrawals.

If this policy is reinstated, the Suicide Exclusion period does not begin anew. As regards to an increase in death benefit attributable to a premium payment as described in the Payments provision of Part 4, the Suicide Exclusion period begins again from the date of the increase in death benefit and only for the amount of such increase. The amount we pay attributable to such an increase in death benefit, in the event of suicide within such period, will be limited to a return of the monthly deductions assessed for the portion of the death benefit equal to the increase in death benefit.

**Termination**

If not previously terminated, this policy will terminate automatically on the earliest of:

1. the date the Insured dies; or

2. the date the grace period expires without the payment of sufficient premium in accordance with the Grace Period and Lapse Provision in Part 4.

**Minimum Policy Value**

All of the values under this policy are equal to or more than the minimums required on the Policy Date by the state in which this policy was delivered. The method of computation of the values under this policy has been filed as may be required with the Insurance Department of the state in which this policy was delivered.

# PART 3: OWNER, COLLATERAL ASSIGNMENT, BENEFICIARY

**Owner**

The Insured is the owner of this policy, unless otherwise provided in the application or by later transfer of ownership.

**Rights of Owner**

While the Insured is living, You may, as the owner, exercise all rights provided by this policy or allowed by Us. Consent of any beneficiary not irrevocably named or any contingent owner is not required. By Written Notice You may:

1. Transfer ownership to a new owner.

2. Name or change a contingent owner to succeed to the rights of owner at the owner's death. If there is no contingent owner at the owner's death, ownership will pass to the Insured, except as You may have otherwise directed In Writing.

3. Receive any amounts payable under this policy during the Insured's lifetime.

4. Change the beneficiary of the death benefit. See Part 3.

5. Change the Subsequent Planned Premium payment amount and frequency. See Part 4.

6. Obtain a partial withdrawal. See Part 5.

7. Surrender this policy for its cash Surrender Value. See Part 5.

8. Obtain policy loans. See Part 6.

9. Request changes in the insurance amount. See Part 7.

10. Change the Death Benefit Option. See Part 7.

11. Select a payment option for any cash Surrender Value that becomes payable. See Part 10.

12. Assign, release or surrender any of Your interest in the policy.

Exercise of any of these rights will, to the extent thereof, assign, release or surrender the interest of the Insured and all other beneficiaries and owners under this policy.

Any change in the owner or beneficiary designation is effective on the date the notice was signed, subject to receipt by the insurer. A transfer of ownership (or absolute assignment) is not the same as a "collateral assignment" as described in the next paragraph, and the new owner is not an "assignee" as these terms are used in this policy.

**Collateral Assignment**    By Written Notice You may assign an interest in this policy as collateral to a collateral assignee. The collateral assignment or a certified copy of it must be filed with Us at Our Main Administrative Office. When filed, it will bind Us as of the date of the assignment, subject to any action taken by Us before such filing. We shall not be responsible for the validity of any assignment. The interest of the assignee shall be prior to the interest of any beneficiary not irrevocably named or any contingent owner. A collateral assignee cannot change the beneficiary, owner or contingent owner.

**Beneficiary**    Unless another payment option is elected as described in Part 10, any death proceeds that become payable will be paid in equal shares to such beneficiaries living at the death of the Insured as stated in the application or as later changed. Payments will be made successively in the following order:
a)  Primary beneficiaries;
b)  Contingent beneficiaries, if any, provided no primary beneficiary is living at the death of the Insured;
c)  You or Your executor or administrator, provided no primary or contingent beneficiary is living at the death of the Insured, or in the absence of a beneficiary designation.

Unless otherwise stated, the relationship of a beneficiary is the relationship to the Insured.

U607 NY

**How to Change the Beneficiary**

You may change the beneficiary by Written Notice filed with Us at Our Main Administrative Office. When We receive it, the change will relate back and take effect as of the date it was signed by You. However, the change will be subject to any payments made or actions taken by Us before We received the notice at Our Main Administrative Office.

Irrevocable beneficiaries are permitted and cannot be changed without the consent of the irrevocable beneficiary.

## PART 4: PREMIUMS

**Payments**

The Issue Premium as shown on the Schedule Pages is payable on or before delivery of this policy. The Insured must be alive when that premium is paid.

Subject to the limitations stated below, You may pay additional premiums at any time prior to the Policy Anniversary nearest the Insured's age 100 while this policy is In Force.

On Written Request We will send Subsequent Planned Premium notices to You. These notices can be sent annually, semi-annually or quarterly. Premiums may also be paid at other intervals, or under automatic collection methods, subject to Our consent.

The minimum premium payment amount that We will accept is $25, unless to prevent policy lapse. Any premium payment that would increase the Death Benefit by more than it would increase the Policy Value, shall be subject to evidence of insurability satisfactory to Us. As regards to any such increase, the Contestability and Suicide Exclusion provisions in Part 2 will apply from the date of the increase. The application for such increase will be attached to and is made part of the policy.

**Total Premium Limit**

The total premium limit is shown on the Schedule Pages and is applied to the sum of all premiums received by Us to date, excluding premiums applied to debt repayment, reduced by the sum of all partial withdrawals paid by Us to date. If the total premium limit is exceeded, We will refund the excess with interest at an annual rate of not less than 4%, not later than 60 days after the end of the Policy Year in which the limit was exceeded. The Policy Value will be adjusted to reflect such refund.

The total premium limit may be exceeded if additional premium is needed to prevent lapse under the Grace Period and Lapse provision, and such additional premium is permitted by federal tax laws or regulations such that this policy continues to meet the Definition of Life Insurance.

The total premium limit may change due to:

a) a change in Death Benefit Option;

b) a decrease of face amount;

c) a partial withdrawal;

d) addition, change or termination of a rider; or

e) a change in federal tax law or regulations.

If the total premium limit changes, We will send You Revised Schedule Pages reflecting the change. However, We reserve the right to require that the policy be returned to Us to endorse the change.

**Reduced Paid-Up Benefit**

Upon your request, after the first policy year, you may elect to lapse this policy to a reduced paid-up Death Benefit as of the next policy anniversary. The amount of the Death Benefit will be calculated based on the Surrender Value after assessment of the full Surrender Charge, the Guaranteed Minimum Interest Rate and the Guaranteed Maximum Cost of Insurance rates as specified in the Schedule Pages. Once elected, no further premiums may be paid into the contract. The cash surrender value of this reduced paid-up Death Benefit will be equal to the present value of the future guaranteed benefits provided for by this policy at that time.

**Grace Period and Lapse**

During the first seven Policy Years, if on any Monthly Calculation Day the required monthly deduction exceeds the Policy Value less any outstanding Debt, a grace period of 61 days will be allowed for the payment of an additional premium. Such additional premium, less the Sales Charge must be sufficient to increase such value on that Monthly Calculation Day to cover three monthly deductions.

After the seventh Policy Year, if on any Monthly Calculation Day the required monthly deduction exceeds the Surrender Value, a grace period of 61 days will be allowed for the payment of an additional premium. Such additional premium, less the Sales Charge must be sufficient to increase such value on that Monthly Calculation Day to cover three monthly deductions.

In addition, if on any Monthly Calculation Day the Policy Debt exceeds the maximum loan value, a grace period of 61 days will be allowed for the repayment of the policy loan such that the Policy Debt is no greater than the maximum loan value.

The policy will continue In Force during such grace period. We will mail to You and any Assigns at the post office addresses last known to Us a Written Notice as to the amount of premium required. This Written Notice will be sent at least 15 days and not more than 45 days prior to the date that the policy would lapse. If such required premium amount is not postmarked as having been mailed to Us by the end of the grace period, the policy will lapse without value. The Death Benefit payable during the grace period will equal the Death Benefit in effect immediately prior to such period less overdue charges.

Any premiums paid will be used, after assessment of sales charges, to pay for any unpaid monthly deductions.

**Reinstatement**

If this policy terminates, in accordance with the Grace Period and Lapse Provision, You may reinstate this policy back to an "In Force" status within five years after the expiration of the Grace Period. Reinstatement must become effective prior to age 100 and while the Insured is alive. We will not approve a request for a reinstatement

until We receive at Our Main Administrative Office all of the following:

1. a Written Request for reinstatement;

2. evidence of insurability satisfactory to Us;

3. if applicable, payment or reinstatement of any Policy Debt as of the date of lapse; and

4. the payment of a reinstatement premium while the Insured is alive which equals an amount needed to provide for a positive Surrender Value as of the date of lapse, plus three monthly deductions. However, during the first seven Policy Years, the reinstatement premium will equal an amount needed to provide for a positive Policy Value (less any Policy Debt) as of the date of lapse, plus three monthly deductions.

Subject to the foregoing conditions, the effective date of a reinstatement will be the Monthly Calculation Day following the date We approve the request for reinstatement. If We approve it on a Monthly Calculation Day, the effective date will be that Monthly Calculation Day.

The Policy Value as of the effective date of a reinstatement shall equal the reinstatement premium received, plus any Policy Debt in effect as of the date of lapse, plus any surrender charge assessed on the date of lapse, minus the monthly deduction for the month then starting.

The surrender charge as of the effective date of a reinstatement shall equal the surrender charge that would be in effect as if the policy never lapsed.

## PART 5: POLICY VALUES

The premiums You pay, minus the premium expense charges shown on the Schedule Pages, are added to the policy's Policy Value. We make monthly deductions from the Policy Value to cover the cost of insurance, the cost of any additional benefit riders and the monthly charges shown on the Schedule Pages. We also deduct any partial withdrawals You make and charges for them, as well as any charges for face amount decreases. The Policy Value earns interest. Any additional amounts credited to the Policy Value are nonforfeitable, except indirectly due to surrender charges.

Details are provided below. We will keep You informed of the current Policy Value by sending You an Annual Report as described in Part 8 of this policy.

**Basis of Calculations**

Minimum Surrender Values are determined from the Basis of Calculations shown on the Schedule Pages. The Guaranteed Maximum Insurance Rates shown on the Schedule Pages are also based on this Table.

**Policy Value**

Policy Value is to be calculated as follows:

1. on each Monthly Calculation Day following the Policy Date, the Policy Value will equal (A + B + C − D − E);

2. on a day of the month other than a Monthly Calculation Day, it will equal (A + C), plus interest on A from the beginning of the Policy Month to the date on which the Policy Value is being determined;

3. on the Policy Date, it will equal all premiums received, net of any premium expense charges, minus E;

where:

A = the Policy Value on the prior Monthly Calculation Day, after assessment of the monthly deduction on that day;

B = one month's interest on A, including any Additional Interest Credit;

C = all premiums received, net of any premium expense charges, since the prior Monthly Calculation Day, plus interest thereon to the end of the Policy Month, or any earlier date on which the Policy Value is being determined;

D = any partial withdrawal, and charge for it, being made as of that Monthly Calculation Day; and

E = the monthly deduction for the month then starting (no monthly deduction is made if the policy is surrendered for its full Surrender Value as of that Monthly Calculation Day).

**Interest Rate**

We will, from time to time, determine the interest rate used in the calculation of the Policy Value, based on Our anticipation of future investment earnings, mortality, persistency and expense/administrative costs. We will determine the interest rate at least once each year. We may, in Our sole discretion, change the interest rate. Changes made will be in accordance with procedures and standards on file with the Insurance Department of the state where this policy was delivered. Any interest credited in excess of the Guaranteed Minimum Interest Rate is referred to as "excess interest." The effective annual interest rate will never be less than the Guaranteed Minimum Interest Rate shown on the Schedule Pages.

We may credit different interest rates on loaned and unloaned portions of the Policy Value. The rate in effect on a given date for unloaned amounts is referred to as the "current interest rate." For loaned amounts, the credited interest rate for the first 15 policy years will be equal to the Loan Interest Rate in effect on that date less 1.5%, and after year 15 the rate will equal the Loan Interest Rate in effect on that date less 0.5%. In no event will the credited rate on loaned amounts be less than the Guaranteed Minimum Interest Rate. All interest rates are stated as effective annual rates. Interest will be compounded at least monthly to yield the effective annual rate.

**Benchmark Additional Interest Credit**

Beginning in the third Policy Year of this policy, in addition to interest being credited under the policy on each Monthly Calculation Day, We will also credit Additional Interest on each Monthly Calculation Day on amounts in excess of the Policy Value Benchmark Amount, shown on the Schedule Page. The Benchmark Additional Interest Rate will be equal to:

1. An annual effective rate of 1% if the Current Interest Rate is 5% or greater; or

2. An annual effective rate of .5% if the Current Interest Rate is at least 4.5% but less than 5%; or

3. An annual effective rate of 0% if the Current Interest Rate is less than 4.5%.

This Additional Interest Credit will be equal to (A x B), where:

A = the Benchmark Additional Interest Rate; and

B = the excess of the unloaned portion of the Policy Value over the Policy Value Benchmark Amount, shown on the Schedule Page.

The Additional Interest Credit is provided to reflect a reduction in Our holdback margin for profit and expense.

**Monthly Deduction**

The monthly deduction is the amount deducted from the Policy Value on the Policy Date and on each Monthly Calculation Day to pay the cost of insurance, the cost for any additional benefit riders and monthly charges for the Policy Month starting on that day. The monthly deduction will be equal to:

$$(A + B + C); \text{ where:}$$

A = the cost of insurance (as defined in the Cost of Insurance provision below);

B = the monthly cost for any additional benefit riders as shown on the Schedule Pages;

C = the Monthly Service Charge shown on the Schedule Pages, and if applicable, one-twelfth of the Issue Charge.

**Cost of Insurance**

The cost of insurance is the amount We charge each month for providing the insurance coverage. The cost of insurance is equal to:

$$(A \times (B - C)) + D; \text{ where}$$

A = the applicable cost of insurance rate for the Insured's risk class, based upon the Net Amount at Risk and Insured's risk class, including any applicable substandard mortality percentage extra. The Net Amount at Risk is equal to (B−C) below;

B = the Death Benefit at the beginning of the Policy Month, divided by the Monthly Factor shown on the Schedule Pages;

C = the Policy Value at the beginning of the Policy Month, after the Monthly Service Charge and, when applicable, one-twelfth of the Issue Charge, and prior to subtracting the Cost of Insurance for that month;

D = the Substandard (Temporary or Permanent) Extra Charge, if any, shown on the Schedule Pages.

In item B "Death Benefit" means the Death Benefit as defined in Part 7 but prior to subtracting the cost of insurance for that month from any Policy Value element.

**Cost of Insurance Rates**

The cost of insurance rate for each Policy Month is based on the Insured's age at issue, risk class and sex, and on policy duration. The rate used in computing the cost of insurance is obtained from the Table of Guaranteed Maximum Cost of Insurance Rates shown on the Schedule Pages for the insured risk classification(s), or such lower rate as We may declare. At least 31 days before the start of the Policy Year, We will send You a notice of any change in rates.

No more frequently than once per year and no less frequently than once every five years, We will review the monthly Cost of Insurance Rates to determine if these rates should be changed. However, the rates will never exceed the Guaranteed Maximum Cost of Insurance Rates shown on the Schedule Pages. Our right to change rates also is subject to the following terms:

1. Any change in rates will be made on a uniform basis for all insureds in the same class. No change in rates will occur due to any change in the Insured's health or occupation.

2. Any change in rates will be determined prospectively. We will not distribute past gains or recoup prior losses, if any, by changing the rates.

3. Any change in rates will be based on a change in Our expectations of future investment earnings, mortality, persistency and expense/administrative costs.

4. Any change in rates will comply with any procedures and standards that may be on file with the insurance official of the jurisdiction where this policy is delivered.

The Monthly Service Charge, shown on the Schedule Pages, is subject to change based on Our expectations of future investment earnings; mortality, persistency and expense/administrative costs, subject to the maximum Monthly Service Charge stated on the Schedule Pages.

**Surrender Value**

You may surrender this policy for its Surrender Value at any time, by sending Us a Written Request along with this policy on or before such Monthly Calculation Day.

The Surrender Value on any date is the Policy Value on that date minus any applicable surrender charge as shown in the Table of Surrender Charges on the Schedule Pages, minus any Policy Debt, minus any unpaid issue charge. If the surrender is requested within 30 days after a Policy Anniversary, the Surrender Value shall not be less than the Surrender Value on the Policy Anniversary less any debt, partial withdrawals and charges made or incurred since the Policy Anniversary. The Surrender Value is never less than zero.

If this policy is terminated, the remaining schedule of Surrender Charges will be suspended. When this policy is reinstated, the remaining schedule of Surrender Charges also will be reinstated. The Surrender Charges are based on the period of time the policy is in

effect. When reinstated, the schedule of Surrender Charges will start from the point where the schedule was suspended.

**Partial Withdrawals**

You may withdraw part of the Surrender Value as of any Monthly Calculation Day while the Insured is living, subject to the charges and limitations shown on the Schedule Pages. We must receive your Written Request for partial withdrawal on or before the Monthly Calculation Day on which the partial withdrawal is to be effective. The Policy Value will be reduced by the amount withdrawn, a partial surrender charge and a partial withdrawal fee.

The partial surrender charge is equal to the product of (A) and (B), where (A) is the Face Amount decrease in units of $1,000 resulting from the partial withdrawal, and (B) is the charge per $1,000 of Face Amount as set forth in the Table of Surrender Charges shown on Schedule Page 3 of 5. The partial surrender charge assessed will reduce all remaining surrender charges. There is no partial surrender charge assessed under Death Benefit Option B.

The partial withdrawal fee is shown on the Schedule Pages.

Under Death Benefit Option A (the Face Amount), the Face Amount is decreased by the same amount of reduction as the Policy Value.

Under Death Benefit Option B (the Face Amount plus the Policy Value), the Face Amount does not change.

A partial withdrawal will not be permitted which would reduce the Face Amount below Our then current Minimum Face Amount, or the Surrender Value to zero.

Any benefits provided are not less than that required by law of the state where this policy was delivered. We reserve the right to defer payment of surrender values for six months from the date of request.

# PART 6: POLICY LOANS

**When Available**

You may obtain a loan from Us at any time, on assignment of the policy to Us as security, if it has a Surrender Value greater than zero.

**Amount Available**

The amount of any loan may not exceed the maximum loan value less the amount of any existing debt, where the maximum loan value is equal to the lesser of:

- the Surrender Value of this policy projected from the date of the loan to the next Policy Anniversary based upon guaranteed assumptions, minus loan interest charges through the next Policy Anniversary; and

- the current Surrender Value of this policy.

If on any Monthly Calculation Day the Policy Debt exceeds the maximum loan value, this policy will lapse according to the terms of the "Grace Period and Lapse" provision.

U607 NY

We reserve the right to defer the granting of a loan, other than for the payment of any premium to Us, for six months after submission of a loan application.

A loan will have a permanent effect on any death benefit and cash surrender value of this policy. We recommend consultation with a tax advisor before taking a loan.

**Loan Interest**

Loan interest will accrue on a daily basis from the date of the loan, and is payable in arrears.

Loans will bear interest at such rate or rates as established by Us for any period during which loans are outstanding. On each Policy Anniversary We will set the rate that will apply during the next Policy Year. Such rate will be effective at the beginning of that year and will apply to both new and any outstanding loans under this policy.

On each Policy Anniversary, any unpaid loan interest from the previous Policy Year will be added to the existing policy loan. Failure to repay a policy loan or to pay loan interest will not terminate this policy except as otherwise provided under the Grace Period and Lapse Provision in Part 4 when the policy does not have sufficient remaining value to pay the monthly deductions, in which event, that provision will apply.

We will notify You of the initial loan interest rate at the time a policy loan is made, or as soon as practical thereafter. If there are any outstanding loans, except for purposes of reinstatement, We will give You at least 30 days advance notice of any increase in the rate.

There is a maximum limit on the interest rate We can set. The maximum limit is the Published Monthly Average for the calendar month ending two months before the Policy Year begins or the Guaranteed Minimum Interest Rate used in computing the Policy Value plus 1%, whichever is higher.

The Published Monthly Average will be:

A. The Corporate Bond Yield Average – Monthly Average Corporates as published by Moody's Investors Service, Inc. or any successor to that Service; or

B. If that Monthly Average is no longer published, a substantially similar average issued by the insurance supervisory official of the state where this policy was delivered.

If the maximum limit for a Policy Year is at least 1/2% higher than the rate in effect for the previous year, We may increase the rate to not more than that limit.

If the maximum limit for a Policy Year is at least 1/2% lower than the rate in effect for the previous Policy Year, We must decrease the rate to not more than that limit.

**Debt**

As used in this policy, "debt" or "Policy Debt" means all loans existing on this policy plus accrued interest. When this policy

terminates, We will add to any existing debt interest accrued from the prior Policy Anniversary to the termination date.

**Repayment**

The whole or any part of a loan may be repaid at any time while this policy is in effect. Any moneys received will be applied directly to reduce the debt unless specified as a premium payment. We will not accept partial payments in amounts less than $25, unless to prevent policy lapse.

# PART 7: INSURANCE COVERAGE PROVISIONS

**Death Proceeds**

Upon receipt by Us of Due Proof of Death that the Insured died while this policy is In Force, We will pay the death proceeds of this policy. The death proceeds at the death of the Insured are equal to:

a) the Death Benefit, as described below, in effect on the Insured's date of death; PLUS

b) any insurance then in effect on the life of the Insured that is provided by any additional benefit riders; PLUS

c) any premiums received by Us after the Monthly Calculation Day just prior to the Date of Death and on or before the Date of Death; MINUS

d) Any partial withdrawals made after the Date of Death and prior to receipt of Written Notice of the insured's death; MINUS

e) Any debt then existing on this policy; MINUS

f) Any monthly deductions not already made up to and including the Policy Month of death.

**Interest on Insurance Proceeds**

We will pay interest on any death proceeds from the date of death to the date of payment. The amount of interest will be the same as would be paid were the death proceeds left for that period of time to earn interest under Payment Option 2. However, in no case will the amount of interest be less than the minimum required in Your state.

**Death Benefit**

The Death Benefit under this policy will be determined under either Option A or Option B, whichever is chosen and is then in effect, but in no event while the policy In Force will it be less than the Minimum Death Benefit described below.

Option A: The Face Amount on that date.

Option B: The Face Amount plus the Policy Value on that date.

**Minimum Death Benefit**

The Minimum Death Benefit will be equal to a percentage of the Policy Value as of the insured's attained age at the beginning of the Policy Year in which the insured's death occurs, as follows:

| ATTAINED AGE | % OF POLICY VALUE | ATTAINED AGE | % OF POLICY VALUE | ATTAINED AGE | % OF POLICY VALUE |
|---|---|---|---|---|---|
| 0-40 | 250% | 54 | 157% | 68 | 117% |
| 41 | 243% | 55 | 150% | 69 | 116% |
| 42 | 236% | 56 | 146% | 70 | 115% |
| 43 | 229% | 57 | 142% | 71 | 113% |
| 44 | 222% | 58 | 138% | 72 | 111% |
| 45 | 215% | 59 | 134% | 73 | 109% |
| 46 | 209% | 60 | 130% | 74 | 107% |
| 47 | 203% | 61 | 128% | 75 | 105% |
| 48 | 197% | 62 | 126% | 76-90 | 105% |
| 49 | 191% | 63 | 124% | 91 | 104% |
| 50 | 185% | 64 | 122% | 92 | 103% |
| 51 | 178% | 65 | 120% | 93 | 102% |
| 52 | 171% | 66 | 119% | 94 | 101% |
| 53 | 164% | 67 | 118% | 95 and over | 100% |

**Death Benefit Following Insured's Age 100**

After the Policy Anniversary which follows the Insured's 100th birthday, the Death Benefit will equal the Policy Value. Monthly Service Charges and Cost of Insurance Charges will not be deducted after this anniversary, nor can any premiums be paid. Policy loans and partial withdrawals will continue to be made available after this anniversary.

**Under federal tax law, this policy may not qualify as life insurance after the Insured's attained age 100. It may be subject to adverse tax consequences and a tax advisor should be consulted before the owner chooses to continue the policy after the Insured's attained age 100.**

**Change in Death Benefit Option**

The Face Amount and Death Benefit Option You have chosen initially are shown on the initial Schedule Pages. While this policy is In Force, You may request In Writing to change the Death Benefit Option. Any change will be subject to the following:

1. A change in Death Benefit Option will require that there be no immediate change in Our insurance risk. To assure this, when We approve a change from Option A to Option B, We will decrease the Face Amount by the Policy Value. Such a change from Option A to Option B may not be made if it would reduce the Face Amount below the Minimum Face Amount shown on the Schedule Pages. Similarly, when We approve a change from Option B to Option A, We will increase the Face Amount by the Policy Value. We will not require evidence of insurability for a change in Death Benefit Option. You are limited to one change in Death Benefit Option for each Policy Year.

2. The effective date of any change will be the Monthly Calculation Day next following Our approval of Your Written Request for change. This date will be shown on the Revised Schedule Pages that We will send You.

**Request for a Decrease in Face Amount**

You may request a decrease in face amount at any time after the first Policy Year. The decrease requested must at least equal $25,000 and the face amount remaining after the decrease must at least equal $250,000. All requests to decrease the face amount must be In Writing and will be effective on the first Monthly Calculation Day following the date We approve the request. We reserve the right to require that this policy first be returned to Us before the decrease is made. Upon a decrease in face amount, a partial surrender charge will be deducted from the Policy Value based on the amount of the decrease. The charge will equal the applicable surrender charge that would then apply to a full surrender multiplied by the result of dividing the decrease in face amount by the face amount of the policy before the decrease. We will send You a Revised Schedule Page reflecting the change.

# PART 8: MISCELLANEOUS PROVISIONS

**Annual Report**

We will send You, without charge, a report for each Policy Year which includes:

1. the current Policy Value, Death Benefit, Face Amount and Surrender Value;

2. any partial withdrawals, premiums paid, interest credited and charges made during the year;

3. any outstanding policy loans and new loans and loan repayments made during the year; and

4. such additional information as required by the Superintendent of Insurance or the supervisory official of the state in which this policy was delivered .

You have the right to request an illustrative report at any other time. We reserve the right to charge a reasonable fee for the report.

**Projection of Benefits and Values**

We will provide You, on Written Request and payment of Our service fee then in effect, a projection of illustrative future benefits and values under Your Policy. We may limit the number of such projections in any Policy Year.

**Notices By Us**

Whenever We are required to give notice to You, it shall be deemed given if We mail it to You and, unless otherwise specified, to the assignee of record, if any, in a postage-paid envelope mailed by first class mail to the last known address of record at Our Main Administrative Office.

**Deferment of Certain Payments**

We may defer, for not more than six months after We receive Written Request, the payment of the Surrender Value due to surrender or partial withdrawal or the making of any loan (except to pay premiums). If payment is deferred 10 days or more on any surrender, interest will be paid on the amount deferred at the interest rate currently payable on the interest-only settlement option described in Part 9, from the date the request is received to the date of payment.

U607 NY

**Claims of Creditors**

The proceeds and any income payments under this policy shall not be subject to the claims of creditors and shall be exempt from legal process, levy or attachment to the extent allowed by law.

**Corrections**

We reserve the right to correct any clerical errors in this policy, or in Our administration of the policy.

# PART 9: PAYMENT OPTIONS

**Who May Elect Payment Options**

The surrender or death proceeds of this policy will be paid in one sum unless otherwise provided. As an alternative to payment in one sum as provided under Option 1, the proceeds may be applied under one or more of the alternative income payment options described in this Part.

However, Our consent is required for the election of an income payment option by a fiduciary or any entity other than a natural person. Our consent is also required for elections by any Assigns or an owner other than the Insured if the owner has been changed.

Except for Option 7 which is not available for death proceeds, You may elect any payment option for payment of the death proceeds. You may also designate or change one or more beneficiaries who will be the payee or payees under that Option. You may only do this during the lifetime of the Insured. If no election is in effect when the death benefit becomes payable, the beneficiary may elect any payment option other than Option 7. The payment options are also available to the payee of any Surrender Value that becomes payable under this policy.

Unless We agree otherwise, all payments under any Option chosen will be made to the designated payee or to his or her executor or administrator. We may require proof of age of any payee or payees on whose life payments depend as well as proof of the continued survival of any such payee(s).

**How To Elect a Payment Option**

The election of an income payment option must be in Writing. You can elect that the payments be made on an annual, semi-annual, quarterly, or monthly basis provided that each installment will at least equal $25. We also require that at least $1,000 be applied under any option chosen.

**What Payment Options Are Available**

This section provides a brief description of the various payment options that are available. In Part 10 You will find tables illustrating the guaranteed installment amounts provided by several of the Options described in this section. The amounts shown for Option 4, Option 5 and Option 7 are the minimum monthly payments for each $1,000 applied. The actual payments will be based on the monthly payment rates We are using when the first payment is due. They will not be less than shown in the tables.

Option 1  —  Payment in one sum

Option 2 – Left to earn interest

We pay interest on the amount left with Us under this Option as a principal sum.

We guarantee that at least one of the versions of this Option will provide interest at a rate of at least 3% per year.

Option 3 – Payments for a specified period

Equal income installments are paid for a specified period of years whether the payee lives or dies. The first payment will be on the date of settlement.

The Option 3 Table shows the guaranteed amount of each installment for monthly and annual payment frequencies. The table assumes an interest rate of 3% per year on the unpaid balance. The actual interest rate is guaranteed not to be less than this minimum rate.

Option 4 – Life annuity with specified period certain

Equal installments are paid until the later of:

a)  the death of the payee;

b)  the end of the period certain.

The first payment will be on the date of settlement. The period certain must be chosen at the time this Option is elected. The periods certain that may be chosen are as follows.

a)  ten years;

b)  twenty years;

c)  until the installments paid refund the amount applied under this Option. If the payee is not living when the final payment falls due, that payment will be limited to the amount which needs to be added to the payments already made to equal the amount applied under this Option.

If , for the age of the payee, a period certain is chosen that is shorter than another period certain paying the same installment amount, We will deem the longer period certain as having been elected.

Any life annuity as may be provided under this Option is calculated using an interest assumption of 3 3/8%, except that any life annuity providing a period certain of twenty years or more is calculated using an interest rate of 3 1/4%.

U607 NY

Option 5 – Life annuity

> Equal installments are paid only during the lifetime of the payee. The first payment will be on the date of settlement.

> Any life annuity as may be provided under this Option is calculated using an interest rate of 3 1/2%.

Option 6 – Payments of a specified amount

> Equal installments of a specified amount, out of the principal sum and interest on that sum, are paid until the principal sum remaining is less than the amount of the installment. When that happens, the principal sum remaining with accrued interest will be paid as a final payment. The first payment will be on the date of settlement. The payments will include interest on the principal sum remaining at a rate guaranteed to at least equal 3% per year. This interest will be credited at the end of each year. If the amount of interest credited at the end of a year exceeds the income payments made in the last 12 months, that excess will be paid in one sum on the date credited.

Option 7 – Joint survivorship annuity with a 10-year period certain

> This payment option is not available for death proceeds. This Option is only available if the policy is surrendered within 6 months of the Policy Anniversary nearest the Insured's 55th, 60th, or 65th birthday. The first payment will be on the date of settlement. Equal income installments are paid until the latest of:

> a)  the end of the 10-year period certain;

> b)  the death of the Insured;

> c)  the death of the other named annuitant.

> The other annuitant must be named at the time this Option is elected and cannot later be changed. That annuitant must have an adjusted age as defined in Part 10 of at least 40.

> Any joint survivorship annuity as may be provided under this Option is calculated using an interest rate of 3 3/8%.

**Other Payment Options**  We may offer other payment options or alternative versions of the options listed in the above section.

**Additional Interest**

In addition to:

a) the interest of 3% per year guaranteed on the principal sum remaining with Us under Option 2 or 6; and

b) the interest of 3% per year included in the installments payable under Option 3;

We will pay or credit at the end of each year such additional interest as We may declare.

## PART 10: TABLES OF PAYMENT OPTION AMOUNTS

The installment amounts shown in the tables that follow are shown for each $1,000 applied. Amounts for payment frequencies, periods or ages not shown will be furnished upon request. Under Options 4 and 5, the installment amount for younger ages than shown will be the same as for the first age shown and for older ages than shown, it will be the same amount as for the last age shown.

**Adjusted Age**

The term "age" as used in the tables refers to the adjusted age. Under Options 4 and 5, the adjusted age is defined as follows:

a) for Surrender Values, the age of the payee on the payee's nearest birthday to the Policy Anniversary nearest the date of surrender;

b) for death benefits, the age of the payee on the payee's birthday nearest the effective date of the payment option elected.

Under Option 7, the adjusted age is the age on the nearest birthday to the Policy Anniversary nearest the date of surrender. The table for Option 7 only shows the amounts for annuitants of the opposite sex. Rates for annuitants of the same sex will be furnished upon request.

**Basis of Calculation**

The rates that follow are based on the a−49 Table projected to 1985 with Projection Scale B and Projection B thereafter with 3 1/2% interest for Non−Refund, 3 3/8% for 10−Year Certain and Life and Installment Refund, and 3 1/2% for 20−Year Certain and Life.

## Option 3 - Payments for a specified period

| Number of Years....... | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|
| Annual Installment....$ | 211.99 | 179.22 | 155.83 | 138.31 | 124.69 | 113.82 | 104.93 | 97.54 | 91.29 |
| Monthly Installment...$ | 17.91 | 15.14 | 13.16 | 11.68 | 10.53 | 9.61 | 8.86 | 8.24 | 7.71 |

| Number of Years....... | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 25 | 30 |
|---|---|---|---|---|---|---|---|---|---|
| Annual Installments....$ | 85.95 | 81.33 | 77.29 | 73.74 | 70.59 | 67.78 | 65.26 | 55.76 | 49.53 |
| Monthly Installment...$ | 7.26 | 6.87 | 6.53 | 6.23 | 5.96 | 5.73 | 5.51 | 4.71 | 4.18 |

## *Option 4 - Life annuity with specified period certain

| Age of Payee | Installment Refund Certain | | 10 Years Certain | | 20 Years Certain | | Age of Payee | Installment Refund Certain | | 10 Years Certain | | 20 Years Certain | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Male | Female | Male | Female | Male | Female | | Male | Female | Male | Female | Male | Female |
| 10 | $3.08 | $3.03 | $3.08 | $2.99 | $3.00 | $2.94 | 50 | $4.36 | $4.12 | $4.50 | $4.10 | $4.28 | $3.99 |
| 15 | 3.14 | 3.09 | 3.15 | 3.04 | 3.07 | 3.00 | 55 | 4.76 | 4.47 | 4.95 | 4.47 | 4.61 | 4.31 |
| 20 | 3.22 | 3.16 | 3.24 | 3.11 | 3.15 | 3.07 | 60 | 5.28 | 4.93 | 5.54 | 4.96 | 4.97 | 4.67 |
| 25 | 3.33 | 3.24 | 3.34 | 3.20 | 3.25 | 3.15 | 65 | 5.97 | 5.54 | 6.30 | 5.83 | 5.29 | 5.06 |
| 30 | 3.45 | 3.35 | 3.47 | 3.30 | 3.38 | 3.25 | 70 | 6.91 | 6.39 | 7.24 | 6.50 | 5.43 | 5.31 |
| 35 | 3.61 | 3.48 | 3.64 | 3.43 | 3.55 | 3.38 | 75 | 8.21 | 7.57 | 8.26 | 7.56 | 5.44 | 5.40 |
| 40 | 3.80 | 3.64 | 3.86 | 3.60 | 3.74 | 3.64 | 80 | 10.04 | 9.26 | 9.12 | 8.60 | 5.46 | 5.46 |
| 45 | 4.05 | 3.85 | 4.14 | 3.82 | 3.99 | 3.74 | 85 | 12.61 | 11.68 | 9.60 | 9.31 | 5.46 | 5.46 |

## * Option 5 - Life annuity

| Age Of Payee | Male | Female | Age Of Payee | Male | Female |
|---|---|---|---|---|---|
| 10 | $3.37 | $3.12 | 50 | $4.62 | $4.28 |
| 15 | 3.24 | 3.18 | 55 | 5.12 | 4.68 |
| 20 | 3.32 | 3.25 | 60 | 5.79 | 5.24 |
| 25 | 3.42 | 3.34 | 65 | 6.75 | 6.04 |
| 30 | 3.56 | 3.44 | 70 | 8.15 | 7.22 |
| 35 | 3.73 | 3.58 | 75 | 10.26 | 9.03 |
| 40 | 3.95 | 3.75 | 80 | 13.54 | 11.88 |
| 45 | 4.24 | 3.98 | 85 | 18.72 | 16.54 |

**\*Option 7 - Joint survivorship annuity with 10-year period certain**

| Age of Other Annuitant F | Age of Insured Male | | | Age of Other Annuitant F | Age of Insured Male | | | Age of Other Annuitant M | Age of Insured Female | | | Age of Other Annuitant M | Age of Insured Female | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 55 | 60 | 65 | | 55 | 60 | 65 | | 55 | 60 | 65 | | 55 | 60 | 65 |
| 40 | $3.62 | $3.64 | $3.65 | 60 | $4.43 | $4.64 | $4.82 | 40 | $3.72 | $3.77 | $3.80 | 60 | $4.34 | $4.64 | $4.93 |
| 45 | 3.80 | 3.83 | 3.86 | 65 | 4.61 | 4.93 | 5.23 | 45 | 3.89 | 3.97 | 4.03 | 65 | 4.44 | 4.82 | 5.23 |
| 50 | 4.00 | 4.07 | 4.12 | 70 | 4.75 | 5.18 | 5.63 | 50 | 4.06 | 4.19 | 4.31 | 70 | 4.50 | 4.95 | 5.48 |
| 55 | 4.22 | 4.34 | 4.44 | 75 | 4.86 | 5.36 | 5.96 | 55 | 4.22 | 4.43 | 4.61 | 75 | 4.64 | 5.03 | 5.65 |

\* Minimum monthly income for each $1,000 applied.

# EXCHANGE OF INSURED OPTION RIDER

This rider is part of the policy to which it is attached. Except as stated in this rider, it is subject to all of the provisions contained in the policy.

**The Exchange Option**
While this rider is in effect and subject to its terms, you have the option to exchange your policy ("the exchange policy") for a new policy on the life of a substitute insured.

**How to Exercise This Option**
To exercise this option, You must file an application with Us at Our Main Administrative Office. It must be signed by You. We must also receive:

1.  Evidence that You have a satisfactory insurable interest in the life of the substitute insured.

2.  Evidence that the substitute insured is insurable under our established practice in the selection of risks for the amount and plan applied for. Selection of risks includes health and non-health factors.

3.  The release of any lien against or assignment of your policy. You may instead submit written approval by the lienholder or assigns of the exchange policy in a form satisfactory to Us with such other documents as We may reasonably require.

4.  The surrender and release of the exchange policy.

5.  Payment of any amounts due to Us for the exchange as described in the Exchange Adjustments.

Unless otherwise provided in the application, the owner and the beneficiary of the new policy will be the same as under the exchange policy. Any subsequent changes will be governed by provisions of the new policy.

The Date of Exchange will be the policy anniversary following the later of:

1.  Our receipt of the application;

2.  Payment of the Exchange Adjustments, if any; and

3.  Our approval of the insurable interest.

The new policy will take effect on the Date of Exchange. When the new policy takes effect, the exchange policy will terminate.

**The New Policy**
The Policy Date of the new policy will be the Date of Exchange.

The issue age of the Insured under the new policy will be determined based upon the substitute insured's age on his or her birthday nearest the date of issue of the new policy.

The new policy on the life of the substitute insured will be written on any plan of universal life insurance issued with a level face amount issued by Us at the time of the exchange. The new policy will be subject to Our published issue rules (e.g., age and amount limits) for the plan chosen which are in effect at that time. The risk classification and any exclusions applicable to the new policy will be determined in accordance with Our rules and practices in effect on the date of exchange. The rates for the new policy will be based on Our published rates in effect on the Date of Exchange.

UR78                                    - 1 -                                    RUR78ZZ1

The face amount of the new policy will equal the basic face amount of the exchange policy without regard to any riders under the exchange policy, except as provided below. The Policy Value of the exchange policy on the Date of Exchange will be applied as premium to the new policy, but without any issue or sales charge applied under the new policy.

**Exchange Adjustments**
The owner must pay an amount equal to the excess, if any, of the surrender charge in effect on the exchange policy over the surrender charge for the new policy. All such surrender charges will be determined as of the Date of Exchange.

In some cases, the amount of Policy Value that may be applied to the new policy may exceed the premium limit for the new policy. In that event, We will return such excess Policy Value to You in cash.

**Monthly Rider Charges**
There are no Monthly Charges for coverage under this rider.

**Termination of This Rider**
This rider will terminate on the first of any of the following events to occur:

1.  Termination of the exchange policy;

2.  Lapse or Exchange of the exchange policy;

3.  Our receipt at Our Home Office of a Written Request to cancel this rider; and

4.  Death of the insured.


Phoenix Life Insurance Company

*Dona D. Young*

Chairman, President
and Chief Executive Officer

 **PHOENIX**

Phoenix Life Insurance Company
P.O. Box 8027
Boston, MA 02266-8027

**Policy Acceptance Form**

| Agency: E9206 | Insured(s): ARTHUR B KRAMER |
|---|---|
| Policy Number: 97303936 | |

**DECLARATION:**

The insured(s) declares that the statements made in the application remain full, complete, and true as of this date; that since the date of the application, no insured has applied to any insurance company or society without receiving the exact policy applied for or had any symptoms, diseases or disorders for which advice has been sought.

All insured(s) must attest to the above declaration. If any insured cannot attest to the above statement, please so indicate by checking the box next to that insured's signature below and complete a form #519B for that insured. PLEASE NOTE: Home Office approval of form #519B is necessary before the policy is in effect.

**AMENDMENTS:** The application for Policy No. 97303936    is amended as follows:

**The face amount of the base policy is decreased to $9,000,000.**
**The subsequent planned annual premium is $414,800.**
**The first year anticipated annual premium is $486,000.**

**ENDORSEMENTS:**

**Delivery expiry is 11/15/2005 on policy 97303936.**

It is agreed that the above declaration and amendments are part of the application and shall be part of the policy.

**DELIVERY RECEIPT:** To be completed when policy is delivered. If form #519B is required, please consult with your agent before completing this section.

This certifies that as the policy owner, (check ONE only):

☒ I have received delivery of the insurance policy listed above, which includes a Statement of Policy Cost and Benefit Information.

☐ I have received delivery of the insurance policy listed above, which includes a Statement of Policy Cost and Benefit Information, and authorize _____ to hold such policy on my behalf.

Date _10/21/05_                    Insured(s) _Arthur Kramer_                    ☐

Signed at _New York, NY_                                            ☐

Witness _Steve Lockwood_                                            ☐

Owner _Arthur Kramer 2005 Insurance Trust_
_By: Hudson United Bank as trustee_                                ☐
_BY [Robert J. Desch] (other than insured)_
_Robert J. Desch, VP_

If owner is a firm or corporation, please give the name of the firm or corporation and the title of the officer signing for the firm or corporation.

AGENT: ORIGINAL to Underwriting and Issue, YELLOW COPY to Agent, PINK COPY to remain with policy.

HR01                                            HHR01ZZ1                    2-96

◈ **PHOENIX**®   Phoenix Life Insurance Company
PO Box 8027
Boston MA 02266-8027
Underwriting Service Center

**Application for Life Insurance**
**Part I**

## Section I - Proposed Insured

Print Name as it is to appear on policy (First, Middle, Last)
Arthur B Kramer

Sex   ☒ Male   ☐ Female

Birthdate (Month, Day, Year)
1-10-27

Birthplace (State or Country)
NY /USA

United States Citizen   ☒ Yes   ☐ No

Social Security Number
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

Driver's License Number (Include State)
014836023    CT

Marital Status
☐ Single  ☒ Married  ☐ Widowed  ☐ Divorced  ☐ Separated

Home Address (Include Street, Apt. Number, City, State, and ZIP Code)
688 Westover Road  Stamford, CT 06902

Home Telephone Number
(203) 357-7886

Give Prior Address if at address less than 2 years (Include Street, Apt. Number, City, State, and ZIP Code)

Current Occupation and Duties
retired

Employer

Length of Employment

Business Address (Include Street, Apt. Number, City, State, and ZIP Code)

Bus. Phone No. (Include Ext.)
( )

Email Address

## Section II - Ownership

☐ A. Insured

☐ B. Successive Owners

☐ B1. Owners Jointly

☐ C. Corporation, its successors or assigns (Include state of incorporation)

☐ D. Partnership (Include Name of all Partners - if partnership is limited, indicate which partners are general partners)

☐ E. Sole Proprietorship (Include Name of Sole Proprietor)

☒ F. Trust (Include Name and Date of Trust, Name of Trustee(s) and Grantor)

(Complete section below if B, C, D, E or F are checked)
If Owner is other than Proposed Insured, Premium Notice will be sent to:

Owner's Name  Arthur Kramer 2005 Insurance Trust, dated August 29, 2005
Hudson United Bank, Trustee    Arthur Kramer, Grantor

Mailing Address 75 Rockefeller Plaza  New York, N.Y. 10019

Owner's Email Address

Social Security or Tax I.D. Number  APPLIED FOR    Relationship ____ Date of Birth ____

Contingent Owner

Name ____ Date of Birth ____

Relationship ____

Ultimate Owner: Check one. If none checked, insured will be ultimate owner.
☐ Insured   ☐ Executor or administrator of the survivor of the primary and contingent owners

## Section III - Beneficiary Designation

Primary Beneficiary
Arthur Kramer 2005 Insurance Trust

Relationship to Proposed Insured

Date of Birth (If Available)
August 29, 2005

Social Security No. (If known)
APPLIED FOR

☐ If this box is checked, each of the Contingent Beneficiaries listed shall receive an equal interest.

First Contingent Beneficiary

Relationship to Proposed Insured

Date of Birth (If Available)

Social Security No. (If known)

Second Contingent Beneficiary

Relationship to Proposed Insured

Date of Birth (If Available)

Social Security No. (If known)

**If Trust is primary beneficiary: (check one)**
☐ Trust under insured's will
☒ Inter vivos - Name of Trustee  Hudson United Bank    Robert J. Desch, VP
Date of Trust  August 29, 2005

To qualify for payment, beneficiary must be living: (Check A or B, otherwise A will apply)
☐ A. at the Proposed Insured's death.   ☐ B. on the 30th day after the date of the Proposed Insured's death.

OL2773NY                    1 of 6              v08081416371147                4-02

**Section IV - Coverage Applied For**

Plan of Insurance

*Phoenix Accumulator UL II*

Basic Policy Amount
$ 10,000,000

**Section V - VARIABLE/UNIVERSAL PLANS of Insurance - Riders and Features**

First Year Anticipated, BILLED Premium (Excluding 1035 Exchange, Lump Sum Funds, etc.)

☐ Disability Waiver of a Specified Amount

Amount $_____

☐ Accidental Death Benefit Rider

☐ Death Benefit Protection Rider

☐ Age 70    ☐ Age 80    ☐ Age 100

☐ Purchase Protector _____ units

☐ Child's Term Rider

☐ Family Term Rider

☐ Living Benefit Rider

☐ Guaranteed Death Benefit Rider

☐ Guaranteed Extension Rider

☐ Cash Value Accumulation Rider

☐ Age 100 + Rider

☐ Individual Term Rider $_____

Subsequent Planned Annual Premium

**Death Benefit Option:** (check one) If none checked, Option 1 will apply.
☒ Option 1 - Level Face Amount
☐ Option 2 - Increasing Face Amount
**Face Amount Increase Options:**
☐ _____% percentage Increase
☐ $_____ Fixed Dollar Increase
☐ Increase Equal to Premiums Paid
**Policy Option:** (check one) If none checked, Option A will apply.
☐ Policy Option A
☐ Policy Option B
☐ Policy Option C
☐ Other _____
☐ Other _____
☐ Other _____
☐ Other _____

**Temporary Money Market Allocation**

If the state of issue does not require refund of premium during the Right To Cancel Period, but you prefer to temporarily allocate your premiums to the Money Market subaccount until the end of the Right to Cancel Period, as stated in the policy, indicate: ☐ Yes  ☐ No

**Electronic Delivery Authorization**

By checking "Yes," I am authorizing the Company to provide my statements, prospectuses and other information electronically if available. I understand that I must have internet access to use this service and there may be access fees charged by the Internet service provider. ☐ Yes  ☐ No

**Section VI - Suitability**

Do you understand that if you have purchased a Variable Life Policy and the Death Benefit may be variable or fixed under certain conditions and that the Death Benefit and Cash Values under any Variable Policy may increase or decrease in amount or duration based on the investment experience of the underlying subaccounts? ☐ Yes  ☐ No

If you are purchasing a Variable Life Policy, do you believe it is suitable to meet your financial objectives? ☐ Yes  ☐ No

If I have purchased a Variable Life Policy, I confirm that I have received the prospectus for that policy and its underlying funds.

Illustrations of benefits including death benefits, policy values and cash surrender values are available on request.

**Section VII - Complete If Temporary Insurance Is Requested**

If either of the following questions are answered "Yes" or left blank, no agent or broker is authorized to accept money and a Temporary Insurance Agreement may not be issued, and no coverage will take effect.

| Yes | No | |
|-----|-----|---|
| ☐ | ☐ | 1. Within the past two years have you been treated for heart disease, stroke, or cancer or had such treatment recommended? |
| ☐ | ☐ | 2. Within the past 60 days have you been scheduled or advised to have any diagnostic test (excluding HIV) tests or surgery not yet performed? |

$_____ has been paid by _____ to the Licensed Agent/Registered Representative indicated in this application, for proposed insurance applied for in this application. This sum is to be applied in accordance with and subject to the terms of the **Temporary Insurance Receipt** bearing the same number as this application.

**Section VIII - TERM/WHOLE LIFE PLANS of Insurance - Riders and Features**

☐ Accidental Death Benefit
☐ Disability Waiver of Premium on Insured
☐ Purchase Protector _____ units
☐ Family Protection
☐ Children's Protection _____ units
☐ Living Benefit Rider
☐ Other _____

Cost of Living is automatic (No COL for Term products) unless this box is checked ☐ I do not desire Cost of Living

**Additional Death Benefit Riders:**
Primary Insurance Term Rider (PITR) $ _____
Other Rider Name _____ Amount $ _____

☐ Paid-Up Additions Purchase Options Rider (PAPOR) (check one)
   ☐ PAPOR A-Flexible  ☐ PAPOR B-Flexible with Optionterm
   Number of years payable _____
Intended premium payments for the first 7 years:
Year 1 _____    Year 5 _____
Year 2 _____    Year 6 _____
Year 3 _____    Year 7 _____
Year 4 _____    Maximum Amount $ _____

**Dividend Option:**
☐ Optionterm
   Optionterm Death Benefit $ _____
   Premium Paying Coverage ☐ Yes  ☐ No or
     % of increase _____
☐ Accumulate at Interest (ACCUM)
☐ Paid-up Additional Insurance (PUA)
☐ One Year Term with Balance to:
   ☐ Cash   ☐ PUA     ☐ ACCUM    ☐ RP
☐ Reduce Premium (RP)
☐ Cash
☐ Other _____
☐ Other _____

**Automatic Premium Loan, if applicable**
☐ Yes  ☐ No

Policy Loan Interest Rate, if applicable (if none checked, "Variable" will apply.)

☐ Variable  ☐ Fixed

**Section IX - Mode of Premium Payment - (Please note, there is a higher cost associated with the purchase of a Whole Life or Term policy, if the mode of payment is other than on an annual pay basis. Please consult with your Licensed Agent/Registered Representative.)**

☐ Annual
☐ Monthly (Variable Life Insurance only)
☑ Quarterly
☐ PCS (Phoenix Check-O-Matic Service)
   Minimum Monthly Check for Each Service - $25.00
☐ Semi-Annual

Multiple Billing Option - Give # or Details _____
☐ List Bill  ☐ Employee Insurance Counseling Service (EICS)  ☐ Salary Allotment  ☐ Pension  ☐ Money Purchase Pension
☐ Other _____

**If electing PCS, complete the following:**
Existing Policy Number or PCS File Number _____

**Authorization Agreement for Preauthorized Payments**
I (we) hereby authorize the Company (Note: Company is defined as indicated on page 1 of application) to initiate debit entries to my (our) checking account and the depository named below.

**Information for New Account**
Attach a void check to furnish encoding details.
If the depositor's name is not imprinted on the check, fill it in here exactly as it appears in the bank records.

**Attach Void Check Here**

Signature of depositor (if different from owner) _____

Send premium notices to: (in addition to owner)
☐ Insured at:  ☐ Home Address  ☐ Business Address
☐ Other (Name, Relationship to Owner and Address) _____

## Section X - Existing Life Insurance

Describe all additional coverage in force. Include individual and group. If no coverage in force, check here ☐.

| Company | Issue Date | Plan | Amount | Personal / Business | |
|---|---|---|---|---|---|
| Transamerica | 4 policies | UL | $ 22,000,000 15 life | ☒ | ☐ |
| | | | $ | ☐ | ☐ |
| | | | $ | ☐ | ☐ |

Total Life Insurance in force (if none, indicate) $ 22,000,000    Total Accidental Death Benefit in force (if none, indicate) $ _____

| Yes | No | | |
|---|---|---|---|
| ☒ | ☐ | 1. | Are there any life insurance policies or annuity contracts, owned by, or on the life of, the applicants or the insureds or the owner(s) or the annuitant? |
| ☐ | ☒ | 2. | With this policy, do you plan to replace (in whole or in part) now or in the future any existing life insurance or annuity contract in force with this policy? |
| ☐ | ☒ | 3. | Do you plan to utilize values from any existing life insurance policy or annuity contract (through loans, surrenders or otherwise) to pay any initial or subsequent premium(s) for this policy? |

For all "Yes" answers above, please provide the following information

| Company | Issue Date | Plan | Amount | Personal / Business | |
|---|---|---|---|---|---|
| Transamerica | Various | Universal Life | $ 22,000,000 | ☒ | ☐ |
| | | | $ | ☐ | ☐ |
| | | | $ | ☐ | ☐ |

## Section XI - Income

| Earned Income | Independent Income | Net Worth |
|---|---|---|
| a. -0- | b. 3,000,000 | c. 70,000,000 |

## Section XII - Additional Information

| Yes | No | | |
|---|---|---|---|
| ☐ | ☒ | 1. | Have you used tobacco or nicotine products in any form in the last 10 years? If "Yes," please circle the product(s) used: cigarettes, cigars, pipes, snuff, smokeless or chewing tobacco, nicotine patch or gum. if "Yes," check one: ☐ Use currently  ☐ Date quit _____ |
| ☐ | ☒ | 2. | Have you ever applied for life, accident, or health insurance and been declined, postponed, or been offered a policy differing in plan, amount or premium rate from that applied for? (If "Yes," give date, company and reason). |
| ☐ | ☒ | 3. | Are you negotiating for other insurance? (If "Yes," name companies and total amount to be placed in force.) |
| ☐ | ☒ | 4. | Do you intend to live or travel outside the United States or Canada? (If "Yes," state where and for how long). |
| ☐ | ☒ | 5. | Have you flown during the past three years as a pilot, student pilot or crew member? (If "Yes," complete Aviation Questionnaire). |
| ☐ | ☒ | 6. | Have you participated in the past 3 years or plan to engage in any extreme sport activities such as motorized vehicle, or parachute jumping, or underwater diving, or any other extreme avocation? (If "Yes," complete Avocation Questionnaire). |
| ☐ | ☒ | 7. | Have you in the past three years been the driver of a motor vehicle involved in an accident, or convicted of a moving violation of any motor vehicle law, or had your driver's license suspended or revoked? |
| ☐ | ☒ | 8. | Have you ever been convicted of a felony or do you have charges pending? |

Give full details for all "Yes" answers above. If necessary, use an additional piece of paper and please sign it.

| Question # | Details |
|---|---|
| | |
| | |
| | |
| | |
| | |

**Section XIII - Medical History** (Not necessary to complete if medical or paramedical exam has been ordered)

| Height | Weight | Has your weight changed by 10 pounds or more in the past 2 years? |
|---|---|---|
| 5'10" | 180 lbs | If "yes", how much __15__ pounds ☐ Gain ☒ Loss |

| Family History: | Age if Alive | Age at Death | If alive, indicate health problems or if deceased, indicate cause of death: | Family History: | Age if Alive | Age at Death | If alive, indicate health problems or if deceased, indicate cause of death: |
|---|---|---|---|---|---|---|---|
| Father ☐ Alive ☒ Deceased | | 72 | Unknown | Mother ☐ Alive ☒ Deceased | | 96 | Old Age |

**Personal Physician:** Please provide the name and address of your personal physician or health care provider, date of most recent visit, reason for visit, and results of treatment (if any):

Dr. Thomas Nash
New York City, N.Y.

**Has anyone in your immediate family developed any hereditary condition, cancer, or heart disease before age 60?** ☐ Yes (please provide details below) ☒ No

To the best of your knowledge and belief have you ever had, or been told by a physician or other health care provider that you have:

| | | |
|---|---|---|
| 1. High blood pressure or hypertension? | ☐ Yes | ☒ No |
| 2. Pain, pressure, or discomfort in the chest, angina pectoris, palpitations, swelling of the ankles, or undue shortness of breath? | ☐ Yes | ☒ No |
| 3. Heart disease, coronary artery disease, cardiomyopathy, heart failure, atrial fibrillation, heart rhythm abnormality, heart murmur, congenital heart disease or valvular heart disease? | ☐ Yes | ☒ No |
| 4. Peripheral vascular disease, claudication, narrowing or blockage of arteries or veins? | ☐ Yes | ☒ No |
| 5. Asthma, pulmonary fibrosis, chronic cough, emphysema, pneumonia, or any other lung disease? | ☐ Yes | ☒ No |
| 6. Neurologic disease, seizures, fainting, falls, concussion, stroke, transient ischemic attack (TIA), tremor, neuropathy, weakness, paralysis, Parkinson's disease, memory loss, dementia, or any other disease of the brain or nervous system? | ☐ Yes | ☒ No |
| 7. Depression, bipolar disorder, schizophrenia, anxiety, or other psychiatric illness? | ☐ Yes | ☒ No |
| 8. Arthritis, lupus, or any musculoskeletal or skin disorder? | ☒ Yes | ☐ No |
| 9. Ulcers, abdominal pain, colitis, Crohn's disease, gall bladder disease, liver disease, hepatitis, jaundice, pancreatitis, or any other disease of the gastrointestinal system? | ☐ Yes | ☒ No |
| 10. Diabetes, kidney disease, kidney stones, bladder disorder, prostate disorder, protein or blood in the urine? | ☐ Yes | ☒ No |
| 11. Endocrine disorder, including disorder of the thyroid, parathyroid, adrenal, or pituitary glands? | ☐ Yes | ☒ No |
| 12. Acquired Immune Deficiency Syndrome (AIDS) or any other immunologic disorder? | ☐ Yes | ☒ No |
| 13. Anemia, bleeding or clotting disorder, or any other disorder of the blood or bone marrow? | ☐ Yes | ☒ No |
| 14. Cancer of any type, tumor (benign or malignant), leukemia, lymphoma, or Hodgkin's disease? | ☒ Yes | ☐ No |
| 15. Are you taking any kind of medicine, therapy, or treatment regularly or at frequent intervals? | ☒ Yes | ☐ No |
| 16. Have you ever been treated for alcoholism or been advised to limit or stop your use of alcohol? | ☐ Yes | ☒ No |
| 17. Have you ever used narcotics, barbiturates, amphetamines, hallucinogens, or any prescription drug except in accordance with a physician's instructions? | ☐ Yes | ☒ No |
| 18. Have you ever been a patient in any hospital, treatment center, or similar facility within the last 10 years? | ☒ Yes | ☐ No |
| 19. Have you had, or been advised to have, any surgery, X-rays, electrocardiograms, blood studies (excluding HIV or AIDS tests), or other tests within the last 5 years? | ☒ Yes | ☐ No |
| 20. Other than above, have you had any other physical or psychological disorder or been treated by a physician or other health care provider for any reason within the past 5 years? | ☐ Yes | ☒ No |

Please provide details of "YES" answers (include question number, diagnosis, date of occurrence, hospital or treating physician's name and address, and current status). Use OL1590 if additional space is necessary to record all details.

8. 2 Knee replacements 7½ yrs ago
Right hip replacement 2-3 yrs ago - Greenwich Hospital

14. Basal cell CA removed 2-3 yrs ago Dr. Kahan

15. Flomax

18. See #8

19. Routine ekgs + lab work by Dr. Nash

Phoenix reserves the right to require additional medical information, medical examination or testing to complete the underwriting process.

OL2773NY                    5 of 6                    v08081416371147                    4-02

### Authorization To Obtain Information

I authorize any physician, health care provider, hospital, clinic or other medically-related facility, insurance company or the Medical Information Bureau (MIB), having any records or knowledge of me or my health, to provide any such information to Phoenix Life Insurance Company and its affiliated insurers (Phoenix) or its reinsurers. I authorize any of the above sources to release to Phoenix or its reinsurers any of my information relating to alcohol use, drug use and mental health care.

Medical information will be used only for the purpose of risk evaluation and determining eligibility for benefits under any policies issued. Phoenix may disclose information it has obtained to others as permitted or required by law, including the MIB, our reinsurers and other persons or entities performing business or legal services in connection with this application, any contract issued pursuant to it or in connection with the determination of eligibility for benefits under an existing policy. Information that is not personally identifiable may be used for insurance statistical studies.

If insurance on any minor child is applied for, this authorization extends to records and knowledge of that child and that child's health. To facilitate rapid submission of information, I authorize all of the above sources, except MIB, to give such records or knowledge to any agency employed by Phoenix to collect and transmit such information.

I authorize consumer reporting agencies, insurance companies, motor vehicle departments, my attorneys, accountants and business associates and the MIB to provide any information to Phoenix or its reinsurers that may affect my insurability. This may include information about my occupation, participation in hazardous activities, motor vehicle record, foreign travel, finances, and other insurance coverage in place.

I acknowledge that I have received a copy of the Notice of Information Practices, including information about Investigative Consumer Reports and the Medical Information Bureau. I authorize the preparation of an investigative consumer report.

This authorization shall continue to be valid for thirty months from the date it is signed unless otherwise required by law. A photocopy of this signed authorization shall be as valid as the original. This authorization may be revoked by writing to Phoenix prior to the time the insurance coverage has been placed in force. I understand my authorized representative or I may receive a copy of this authorization on request.

☐ I do ☐ I do not (check one) require that I be interviewed in connection with any investigative consumer report that may be prepared.

I have reviewed this application, and the statements made herein are those of the proposed insured and all such statements made by the proposed insured in Part I or and in Part II of this application are full, complete, and true to the best knowledge and belief of the undersigned and have been correctly recorded.

I understand that i) no statement made to, or information acquired by any Licensed Agent/Registered Representative who takes this application, shall bind the Company unless stated in Part I and/or Part II of this application, and ii) the Licensed Agent/Registered Representative has no authority to make, modify, alter or discharge any contract thereby applied for.

I understand and agree that the insurance applied for shall not take effect unless and until each of the following has occurred: the policy has been issued by the Company; the premium required for issuance of the policy has been paid in full during the lifetime of the insured; all the representations made in the application remain true, complete and accurate as of the latest of such dates, and there has been no change in the health of any proposed insured that would change the answers to any of the questions in the application, except as otherwise provided by the Temporary Insurance Agreement.

I understand that if there is any change in my health or physical condition, or if I visit a physician or am hospitalized, subsequent to the date I complete the application or provide any information to be contained in the application, I will inform the Company as soon as possible.

This application is attached to and made a part of the policy.

Under penalty of perjury, I confirm that (a) the Social Security or Tax Identification Number shown above is correct, and (b) that I am not subject to back-up withholding. (Strike this out and initial if not true).

If I have applied for the Living Benefit Rider, I confirm that I have received a copy of the disclosure form, Summary of Coverage for Accelerated Benefit Rider.

| Proposed Insured's Signature | State Signed In NY | Witness (Must be signed in presence of Proposed Insured) | Date 9-2-05 |
| Owner's Signature (if other than Proposed Insured) | State Signed In NY | Witness (Must be signed in presence of Owner) | Date 9-2-05 |
| Parent's Signature (for minor insured) | State Signed In | Witness (Must be signed in presence of Parent) | Date |

The Producer hereby confirms he/she has truly and accurately recorded on the application the information supplied by the Proposed Insured; and that he/she is qualified and authorized to discuss the contract herein applied for.

Will the proposed insured replace (in whole or in part) any existing life insurance or annuity contract in force with the policy applied for? ☐ Yes ☒ No

Will the proposed insured utilize values from another insurance policy (through loans, surrenders or otherwise) or annuity to pay for the initial or subsequent premium(s) for the policy applied for? ☐ Yes ☒ No

Are there any life insurance policies or annuity contracts owned by or on the life of the applicants or the insureds or the owner(s) or the annuitant? ☒ Yes ☐ No

| Lic. Agt./Reg. Rep's Name (Print) Steven Lockwood | Lic. Agt./Reg. Rep's Email Address lockwoodjim@hotmail.com |
| Lic. Agt./Reg. Rep's Signature X | Date 9/2/05 | Lic. Agt./Reg. Rep's I.D. No. APPLIED FOR | Lic. Agt./Reg. Rep's Telephone No. 212 767 7334 |
| Broker / Dealer Name and Address | | Broker/Dealer Number |

V08091416971147    4-92



**FLEXIBLE PREMIUM LIFE INSURANCE POLICY**
Death Benefit Payable if Insured Dies While the Policy is In Force

**Nonparticipating**

U607 NY

# Ex. 6

TRUST AGREEMENT

OF

ARTHUR KRAMER 2005 INSURANCE TRUST

By and Among

Hudson United Bank, the Trustee, Arthur Kramer, the Depositor

and Liza Kramer, the Beneficiary

Dated as of August 29, 2005

TRUST AGREEMENT

ARTHUR KRAMER 2005 INSURANCE TRUST

THIS TRUST AGREEMENT (as modified, supplemented or amended, from time to time, this "Agreement") is dated and effective as of August ᵜᵻ, 2005 by and among the Trustee (as defined herein), the Depositor (as defined herein), and the holder, from time to time, of the sole undivided beneficial interest in the Trust (the "Beneficiary").

WHEREAS, the Trustee and the Depositor desire to establish the Arthur Kramer 2005 Insurance Trust (the "Trust") pursuant to the laws of the State of New York;

NOW, THEREFORE, it being the intention of the parties hereto that the Trust constitute a common law trust created under the laws of the State of New York and that this Agreement constitute the governing instrument of such common law trust, the parties hereby agree as follows:

ARTICLE I
DEFINITIONS

SECTION 1.1 Definitions.

Unless the context otherwise requires:

(a)    capitalized terms used in this Agreement shall have the meaning as ascribed herein;

(b)    all references in this Agreement to Articles and Sections are to Articles and Sections of this Agreement unless otherwise specified; and

(c)    a reference to the singular includes the plural and vice versa.

"Agreement" has the meaning set forth in the introductory paragraph hereof.

"Beneficial Interest" means the sole undivided beneficial interest in the assets of the Trust created by this Agreement.

"Beneficial Interest Transfer Agreement" has the meaning set forth in Section 2.4(c) hereof.

"Beneficiary" has the meaning set forth in the introductory paragraph hereof.

"Certificate of Beneficial Interest" shall mean the certificate representing the Beneficial Interest issued to the Beneficiary from time to time in substantially the form attached hereto as Exhibit A.

"Collateral Document" means any (i) security agreement or similar arrangement to be entered into at the direction of the Beneficiary in order to pledge or secure the Trust assets for the benefit of the Beneficiary or its designee or to collateralize any obligations of the

Beneficiary or its designee or (ii) any amendment to any document referred to in clause (i) entered into at the written instruction of the Beneficiary and the applicable Secured Party.

"Depositor" means the Person who makes the initial contribution to the Trust pursuant to Section 2.4(a) hereof and who has signed this Agreement as depositor.

"Indemnified Person" means (i) the Trustee and (ii) any officer, director, shareholder, employee, member, partner, representative or agent of the Trustee.

"Person" means a legal person, including any individual, corporation, estate, partnership, limited partnership, joint venture, association, joint stock company, limited liability company, trust (including a business or statutory trust), unincorporated association, or government or any agency or political subdivision thereof, or any other entity of whatever nature.

"Secured Party" means a secured party under any Collateral Document.

"Transaction Documents" means this Agreement, the Certificate of Beneficial Interest, any Beneficial Interest Transfer Agreement, the Collateral Documents and all agreements, instruments and other documents to be delivered in connection herewith or therewith, including, without limitation, all applications therefor, all notifications, requests for consents, requests for acknowledgments and other documentation in connection with the administration of the Trust assets, and all exhibits, supplements, schedules and other documentation, in each case as modified, supplemented or amended from time to time.

"Trust" has the meaning set forth in the recitals hereof.

"Trustee" means the Person who has signed this Agreement as a trustee, so long as such Person shall continue in office in accordance with the terms hereof, and any other Person who may from time to time be duly appointed, qualified and serving as a Trustee in accordance with the provisions hereof, and references herein to a Trustee shall refer to such Person solely in its capacity as a trustee hereunder.

ARTICLE II
ORGANIZATION

SECTION 2.1 Name.

The Trust created by this Agreement is named "Arthur Kramer 2005 Insurance Trust". The Trust's activities shall be conducted under the name of the Trust.

SECTION 2.2 Office.

The address of the principal office of the Trust is 75 Rockefeller Plaza, NY 10019 or as otherwise directed by the Beneficiary from time to time.

2

SECTION 2.3 <u>Purpose</u>.

The exclusive purposes and functions of the Trust are (a) to reflect in the Trust's books and records the ownership of the Beneficial Interest by, and to issue the Certificate of Beneficial Interest to, the Beneficiary, (b) to hold the assets contributed to the Trust for the benefit of the Beneficiary as provided in Section 2.4(a) hereof, (c) to distribute the Trust's income and assets as provided in this Agreement, (d) to pledge the Trust assets to secure or collateralize any obligations of the Beneficiary or its designee, (e) to enter into the Transaction Documents and to administer the Trust assets in accordance therewith, and (f) except as otherwise limited herein, to engage in only such other activities as directed by the Beneficiary from time to time.

SECTION 2.4 <u>Declaration and Authority</u>.

(a)    The Trustee declares that all assets contributed to the Trust will be held in trust for the benefit of the Beneficiary subject to, and in accordance with, the provisions of this Agreement.

(b)    Subject to Section 2.4(e), the Trustee shall manage the affairs of the Trust and otherwise act hereunder only in accordance with written instructions from the Beneficiary. Without limiting the foregoing, the Beneficiary may direct the Trustee to (i) distribute any and all Trust assets to the Beneficiary or its designee, (ii) sell or otherwise dispose of Trust assets and distribute any and all proceeds thereof to the Beneficiary or its designee, and (iii) pledge the Trust assets to secure or collateralize any obligations of the Beneficiary or its designee. An action taken by the Trustee in accordance with such an instruction shall constitute the act of, and serve to bind, the Trust. In dealing with the Trustee acting on behalf of the Trust, no person shall be required to inquire into the authority of the Trustee to bind the Trust. Persons dealing with the Trust are entitled to rely conclusively on the power and authority of the Trustee as set forth in this Agreement.

(c)    The Trustee is hereby authorized and directed to reflect the ownership by the Beneficiary of the Beneficial Interest in the Trust's records and to issue the Certificate of Beneficial Interest to the Beneficiary. The Trustee is further authorized and directed to reflect transfers of the Beneficial Interest in the Trust's records and to issue new Certificates of Beneficial Interest in accordance with instructions from the Beneficiary; <u>provided, however,</u> that any such transferee shall execute a transfer agreement with respect to the Beneficial Interest (a "<u>Beneficial Interest Transfer Agreement</u>") in substantially the form attached hereto as Exhibit B agreeing to be bound by the terms hereof; and <u>provided further</u> there shall be no more than one Beneficial Interest, Certificate of Beneficial Interest and Beneficiary at any time.

(d)    The Trustee is hereby authorized and directed to execute, on behalf of the Trust, each of the Transaction Documents from time to time including instructions to apply for and purchase an insurance policy; <u>provided, however,</u> that the Trustee shall have no duty or obligation to cause the Trust to perform its obligations under the Transaction Documents except in accordance with written instructions from the Beneficiary.

3

(e)    Notwithstanding anything herein to the contrary, (i) the Beneficiary may not direct or otherwise cause the Trustee to dissolve and liquidate the Trust and (ii) the Trustee shall not take, nor shall the Beneficiary have the power to cause the Trustee to take, any action on behalf of the Trust that would contravene Section 2.3 hereof or any Transaction Document; provided that actions may be taken in contravention of a Collateral Document with the written consent of the secured party thereunder.

SECTION 2.5 Title to Property of the Trust.

Legal title to all assets of the Trust shall be vested in the Trust.

SECTION 2.6 Duration of Trust.

The Trust, absent termination pursuant to the provisions of Section 5.2, shall have existence for fifty (50) years from the date hereof.

SECTION 2.7 Certain Responsibilities of the Beneficiary.

The Beneficiary agrees:

(a)    from time to time to determine the States in which to take appropriate action to qualify or register the Trust to do business and to do any and all such acts, other than actions which must be taken by the Trust, and advise the Trust of actions it must take, and prepare for execution and filing any documents to be executed and filed by the Trust, as the Beneficiary deems necessary or advisable in order to comply with the applicable laws of any such States; and

(b)    to direct the Trustee in the management of the Trust as set forth in Section 2.4 hereof.

SECTION 2.8 Income, Profits and Distributions.

The Beneficiary shall be entitled to the income on and profits of, any of the Trust's assets as and when they are earned or arise, as the case may be. The Beneficiary may direct the Trustee to distribute such income and profits to the Beneficiary at any time and from time to time.

SECTION 2.9 Access to Books and Records.

The books and records of the Trust shall be available for inspection and copying by any Secured Party and/or its authorized representative, at the expense of such Secured Party, during ordinary business hours and upon 24 hour written notice given to the Trustee and the Beneficiary.

4

ARTICLE III
THE TRUSTEE

SECTION 3.1 Trustee.

The initial Trustee of the Trust shall be Hudson United Bank.

SECTION 3.2 Certain Provisions Relating to the Trustee.

(a)    The Trustee shall not be liable with respect to any action taken or omitted to be taken by it in accordance with the instructions provided by the Beneficiary in accordance with and subject to this Agreement.

(b)    No provision of this Agreement or any other document or instrument shall require the Trustee to expend or risk funds or otherwise incur any financial liability in the performance of any of its rights or powers hereunder, if the Trustee shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured or provided to it.

(c)    The Trustee shall not be responsible for or in respect of and makes no representation as to the validity or sufficiency of any provision of this Agreement or for the due execution hereof by the Depositor or for the form, character, genuineness, sufficiency, value or validity of any of the trust estate.

(d)    The Trustee shall not be liable for the default or misconduct of the Depositor or the Beneficiary.

(e)    The Trustee shall not have any duty or obligation to manage, control, prepare, file or maintain any report, license or registration, use, sell, dispose of or otherwise deal with the trust estate, or otherwise to take or refrain from taking any action under or in connection with this Agreement or any other document or instrument, except as expressly required hereby; and no implied duties or obligations shall be read into this Agreement against the Trustee.

(f)    The Trustee shall be under no obligation to appear in, prosecute or defend any action, or to take any other action other than the giving of notices, which in its opinion may require it to incur any out-of-pocket expense or any liability unless it shall be furnished with such security and indemnity against such expense or liability as it may reasonably require.

(g)    The Trustee shall incur no liability if, by reason of any provision of any present or future law or regulation thereunder, or by any force majeure event, including but not limited to natural disaster, war or other circumstances beyond its reasonable control, the Trustee shall be prevented or forbidden from doing or performing any act or thing which the terms of this Agreement provide shall or may be done or performed, or by reason of any exercise of, or failure to exercise, any discretion provided for in this Agreement.

5

(h)    The Trustee shall not be required to take any action hereunder or in relation to any asset of the Trust even if directed by the Beneficiary if the Trustee shall have reasonably determined, or shall have been advised by counsel, that such action is likely to result in liability on the part of the Trustee or is contrary to the terms hereof or is otherwise contrary to law.

SECTION 3.3 Compensation of Trustee.

The Beneficiary agrees:

(a)    to pay the Trustee from time to time reasonable compensation for all services rendered by it hereunder, which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust and which shall be as set forth in a fee letter from the Trustee to the Beneficiary; provided, however, that notwithstanding anything to the contrary set forth in this Agreement or in any Transaction Document, the Beneficiary shall not be required to pay compensation or fees to the Trustee at or with respect to any time that the Trust has no (or de minimis) assets; and

(b)    except as otherwise expressly provided herein, to reimburse the Trustee upon request for all reasonable documented expenses, disbursements and advances incurred or made by the Trustee in accordance with any provision of this Agreement (including the reasonable compensation and the expenses and disbursements of its agents and counsel), except any such expense, disbursement or advance as may be attributable to the gross negligence or bad faith of such Trustee.

SECTION 3.4 Exception to Payment of Fees and Expenses.

For the avoidance of doubt, no Beneficiary shall have any obligation under this Section 3.4 to the Trustee in respect of fees and expenses of the Trustee rendered, incurred or made by the Trustee during a time when such Beneficiary was not the holder of the Beneficial Interest.

ARTICLE IV
LIMITATION OF LIABILITY OF
BENEFICIARY, TRUSTEE AND OTHERS

SECTION 4.1 Exculpation.

(a)    No Indemnified Person shall be liable, responsible or accountable in damages or otherwise to the Trust for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Indemnified Person in good faith on behalf of the Trust and in a manner such Indemnified Person reasonably believed to be within the scope of the authority conferred on such Indemnified Person by this Agreement or by law, except that the foregoing limitation shall not limit the liability, if any, of an Indemnified Person to the extent that any such loss, damage or claim is incurred by reason of such Indemnified Person's gross negligence or willful misconduct with respect to such acts or omissions; and

6

(b)    an Indemnified Person shall be fully protected in relying in good faith upon the records of the Trust and upon such information, opinions, reports or statements presented to the Trust by any Person as to matters the Indemnified Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Trust, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits, losses, or any other facts pertinent to the existence and amount of assets from which distributions to the Beneficiary might properly be paid.

SECTION 4.2 Fiduciary Duty.

(a)    To the extent that, at law or in equity, an Indemnified Person has duties (including fiduciary duties) and liabilities relating thereto to the Trust, an Indemnified Person acting under this Agreement shall not be liable to the Trust for its good faith reliance on the provisions of this Agreement. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of an Indemnified Person otherwise existing at law or in equity, are agreed by the parties hereto to replace such other duties and liabilities of such Indemnified Person;

(b)    To the fullest extent permitted by applicable law, whenever in this Agreement an Indemnified Person is permitted or required to make a decision in its "good faith" or another express standard, the Indemnified Person shall act under such express standard and shall not be subject to any other or different standard imposed by this Agreement or by applicable law.

SECTION 4.3 Indemnification.

The Beneficiary agrees, to the fullest extent permitted by applicable law, to indemnify and hold harmless any Indemnified Person from and against any loss, damage, liability, tax, penalty, expense or claim of any kind or nature whatsoever incurred by such Indemnified Person during the time that such Beneficiary is the holder of the Beneficial Interest by reason of the creation, operation or termination of the Trust or any act or omission performed or omitted by such Indemnified Person in good faith on behalf of the Trust and in a manner such Indemnified Person reasonably believed to be within the scope of authority conferred on such Indemnified Person by this Agreement, except that no Indemnified Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Indemnified Person by reason of gross negligence or willful misconduct with respect to such acts or omissions. For the avoidance of doubt, no Beneficiary shall have any obligation under this Section 4.3 to any Indemnified Person in respect of any such loss, damage, liability, tax, penalty, expense or claim of any kind or nature whatsoever incurred by such Indemnified Person, or arising out of or related to events or circumstances occurring, during a time when such Beneficiary was not the holder of the Beneficial Interest.

SECTION 4.4 Resignation and Removal of Trustee; Appointment of Successor.

(a)    The Trustee may resign at any time without cause by giving at least 10 days' prior written notice to the Beneficiary and each Secured Party, if any, such

7

resignation to be effective only upon the acceptance of appointment by a successor Trustee under Section 4.5(d) below.

(b)    In addition, the Beneficiary may at any time remove the Trustee without cause by an instrument in writing delivered to the Trustee, with the written consent of each Secured Party, if any, such removal to be effective upon the acceptance of appointment by a successor Trustee under Section 4.5(d) below.

(c)    In case of the resignation or removal of the Trustee, the Beneficiary shall appoint a successor Trustee by a written instrument signed by the Beneficiary and with the written consent of each Secured Party. If a successor Trustee shall not have been appointed within 40 days after the giving of written notice of such resignation or the delivery of the written instrument with respect to such removal, the Trustee or the Beneficiary or any Secured Party may apply to any court of competent jurisdiction to appoint a successor Trustee to act until such time, if any, as a successor Trustee shall have been appointed as provided above. Any successor Trustee so appointed by such court shall immediately and without further act be superseded by any successor Trustee appointed as above provided within one year from the date of the appointment by such court.

(d)    Any successor Trustee, however appointed, shall execute and deliver to the predecessor Trustee and to the Beneficiary and each Secured Party an instrument accepting such appointment, and thereupon such successor Trustee, without further act, shall become vested with all the properties, rights, powers, duties and trust of the predecessor Trustee in the Trust hereunder with like effect as if originally named the Trustee herein; but nevertheless, upon the written request of such successor Trustee, such predecessor Trustee shall execute and deliver an instrument transferring to such successor Trustee, upon the trusts herein expressed, all the estates, properties, rights, powers, duties and trusts of such predecessor Trustee, and such predecessor Trustee shall duly assign, transfer, deliver and pay over to such successor Trustee all monies or other property then held or subsequently received by such predecessor Trustee upon the trusts herein expressed.

(e)    If a successor Trustee shall be the sole Trustee, such Trustee shall meet the requirements set forth in the first sentence of Section 3.1.

ARTICLE V
AMENDMENTS, DISSOLUTION, MISCELLANEOUS

SECTION 5.1 Amendments.

This Agreement may be amended or restated by, and only by, a written instrument executed by the Trustee and the Beneficiary.

SECTION 5.2 Termination and Dissolution of Trust.

(a)    The Trust shall dissolve and terminate and be of no further force or effect:

(i)    upon the bankruptcy of the Beneficiary;

8

(ii)    upon the entry of a decree of judicial dissolution of the Beneficiary or the Trust;

(iii)    upon the expiration of the term set forth in Section 2.7;

(iv)    if, pursuant to Section 2.4(b), the Beneficiary directs the Trustee to distribute all of the Trust's assets to the Beneficiary or its designee and within six (6) months of the date on which such distribution occurs no additional assets are contributed to the Trust by the Depositor or the Beneficiary;

(v)    at the sole discretion of the Trustee if, for a period of six (6) months or more, the Beneficiary does not pay the fees of the Trustee when due and payable in accordance with Section 3.3 hereof; and

(vi)    upon the receipt by the Trust of payment in full at maturity of all of the Trust assets listed in Schedule 1.0 hereto.

(b)    As soon as practicable after the occurrence of an event referred to in Section 5.2(a), the Trustee shall distribute all of the Trust's assets to the Beneficiary or its designee, if such distribution has not already been made.

SECTION 5.3 Governing Law.

THIS AGREEMENT AND THE RIGHTS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK AND ALL RIGHTS AND REMEDIES SHALL BE GOVERNED BY SUCH LAWS WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS.

SECTION 5.4 Headings.

Headings contained in this Agreement are inserted for convenience of reference and do not affect the interpretation of this Agreement or any provision hereof.

SECTION 5.5 Successors and Assigns.

Whenever in this Agreement any of the parties hereto is named or referred to, the successors and assigns of such party shall be deemed to be included, and all covenants and agreements in this Agreement by the Depositor, the Trustee, and the Beneficiary shall bind and inure to the benefit of their respective successors and assigns, whether or not so expressed.

SECTION 5.6 Partial Enforceability.

If any provision of this Agreement, or the application of such provision to any Person or circumstance, shall be held invalid, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those to which it is held invalid, shall not be affected thereby.

9

SECTION 5.7 <u>Counterparts; Delivery by Facsimile.</u>

This Agreement may contain more than one counterpart of the signature page and this Agreement may be executed by the affixing of the signature of each of the parties hereto to one of such counterpart signature pages. All such counterpart signature pages shall be read as though one, and they shall have the same force and effect as though all of the signers had signed a single signature page. Delivery of an executed counterpart of the signature page by facsimile or by other electronic means shall be effective as delivery of an original counterpart thereof.

SECTION 5.8 <u>Consent to Jurisdiction and Service of Process.</u>

Each of the parties hereto hereby consents and agrees that the State or Federal courts located in the Borough of Manhattan, in New York City, New York, shall have exclusive jurisdiction to hear and determine any claims or disputes between the parties pertaining to this Agreement or to any matter arising out of or relating to this Agreement. Each of the parties hereto expressly submits and consents in advance to such jurisdiction in any action or suit commenced in any such court, and hereby waives any objection it may have based upon lack of personal jurisdiction, improper venue or forum non conveniens. Each of the parties hereto hereby waives personal service of the summons, complaint and other process issued in any such action or suit and agrees that service of such summons, complaint and other process may be made by registered or certified mail addressed to it at its notice address as provided in Section 5.9 and that service so made shall be deemed completed upon the earlier of such party's actual receipt thereof or three (3) days after deposit in the United States mails, proper postage prepaid.

SECTION 5.9 <u>Notices.</u>

(a)  Any notice required or permitted to be given to the Depositor shall be deemed to have been duly given if sent to the Depositor at 7772 St. Andrew Road, Rancho Santa Fe, CA 92067 Attention: Arthur Kramer. The Depositor may change this information by written notice to the Trustee.

(b)  Any notice or instruction required or permitted to be given to the Trustee shall be deemed to have been duly given if sent to Hudson United Bank, 75 Rockefeller Plaza, New York, NY 10019. The Trustee may change this information by notice to the Depositor and the Beneficiary.

(c)  Any notice required or permitted to be given to the Beneficiary shall be deemed to have been duly given if such notice is mailed by first class mail, postage prepaid, to the address of the Beneficiary as shown in the Trust's books and records or to such other address or facsimile number as the Beneficiary shall request by notice to the Trustee and the Depositor.

10

IN WITNESS WHEREOF, the undersigned have caused these presents to be executed as of the day and year above written.

Arthur Kramer,
as Depositor

By: _____

    Name:  Arthur Kramer


Arthur Kramer 2005 Insurance Trust
Hudson United Bank, Trustee

By: _____


Liza Kramer,
as initial Beneficiary

By: _____

    Liza Kramer


Witnesses:

_____
Steven Lockwood

_____
David Capitelli

11

# Ex. 7

OCT. 5. 2007  9:26AM    PHOENIX LIFE INS CO 518 479 8488              NO. 054    P. 1



PHOENIX

# Fax Cover Sheet

Phoenix Life Insurance Company
PHL Variable Insurance Company
Members of The Phoenix Companies

**Date:**                     10/05/2007

**Number of pages**
**including cover sheet** 4

---

**TO:  Susan**

Company:  Lockwood Pension Services

Fax Number:  302-575-2006

Re: 97303935

**FROM:  Christina Bush**
          Customer Care Center

Phone Number:  800-541-0171

Fax Number:  816-221-7036

**COMMENTS:**

**Confidentiality Note:**
The documents accompanying this fax cover sheet contain information that is confidential or privileged from Phoenix
Life Insurance Company.  The information is intended to be for the sole use of the individual or entity named on this
cover sheet.  If you are not the intended recipient, please note that any disclosure, copying, distribution or use of the
contents of this telecopied information is strictly prohibited.  If you have received this fax cover sheet in error, please
contact us immediately.  Thank you.

OCT. 5. 2007 9:26AM PHOENIX LIFE INS CO 518 479 8488    NO.NO. 054 P. P. 2

CREDITSUISSE

## LIFE INSURANCE POLICY QUESTIONNAIRE

**GENERAL INFORMATION:**

Primary Insured's Name: _Arthur Kramer_   DOB: _1/18/27_   SSN: _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_

Secondary Insured's Name: ___   DOB: ___   SSN: ___

Policy Owner's Name: _Arthur Kramer 2005 Insurance Trust_   Tax IDR: _20-6662790_

Insurance Company: _Phoenix Life_   Issue Class: _Standard_

Policy: _97303938_   Issue Date: _7/10/05_   Original Issue Date: __/__/__

Policy Type:   Whole Life ☐   Universal ☑   Term ☐   Variable ☐   Survivorship ☐

Has the policy owner ever been different to the current policy owner? Yes ☐   No ☑

If yes, please provide a complete list of previous owners _____

**TYPE OF COVERAGE:**

1. Which option was selected?    Option A or 1 (Level) ☑    Option B or 2 (Increasing) ☐
2. Is this a variable product?    Yes ☐    No ☑
3. Face amount $ _9,000,000_    Total Net Death Benefits $ _9,000,000_
4. Account Value $ _384,608.75_   As of what date? _9/19/07_
5. Cash surrender value $ _0_    As of what date? _9/19/07_
6. Is a partial withdrawal of the cash value allowed?    Yes ☐ No ☐
7. If yes, what is the fee? $_____
8. If yes, what is the maximum amount available as a partial withdrawal? $_____
9. If yes, and the maximum were withdrawn, what would the new Net Death Benefit be? $_____
10. Is the policy currently in a Grace Period?    Yes ☐    No ☑
11. If Survivorship, is the Primary Insured deceased?    Yes ☐ No ☐
12. If Survivorship, is the Secondary Insured deceased?    Yes ☐ No ☐

**LOANS AND LIENS:**

1. Are there any existing Policy Loans?    Yes ☐ No ☑   Interest Rate ____% Fixed ☐ Variable ☐
2. Loan amounts excluding interest $_____   Interest amount $_____
3. What is the maximum amount available for a new loan? $_____
4. Are there any liens against the policy?    Yes ☐ No ☑   If yes, explain_____

**CONTESTABILITY:**

1. Was this policy issued as a result of a conversion? Yes ☐   ☑ No
2. Is the policy past the contestability period? Yes ☑    No ☐

3. Is the policy past the suicide period? Yes ☑  No ☐
4. Has the policy ever lapsed? Yes ☐  No ☑
5. If yes, what was the reinstatement date? _____/_____/_____

## WAIVER OF PREMIUM:

1. Does the policy have a Disability Waiver of Premium Rider? Yes ☐  No ☐
2. Has the insured applied for the Disability Waiver of Premium Rider? Yes ☐  No ☐
3. If yes, what is the current status?    Pending ☐ Approved ☐    Approval Date: _____/_____/_____
4. If approved, what is the effective date? _____/_____/_____  Next proof date? _____/_____/_____
5. If assigned, will the request of re-approval for Disability be sent to assignee?    Yes ☐  No ☐

## PREMIUMS:

1. Current Premium $ _121,500_    Annual Premium $ ~~476,000~~ 414,800 CB
2. Premium Mode:    Annual ☐    Semi-Annual ☐ Quarterly ☑    Monthly ☐
3. What was the last premium payment date? _8/24/07_ Amount of Payment? _100,000_
4. What is the next scheduled premium date? _10/10/07_ Amount of Payment? _121,500.00_
5. What is the current minimum Monthly Cost of Insurance? $ _29,900.02_
6. What is the current Administrative Charges? $_____ Monthly / Annual / Other
7. What was the Monthly Cost of Insurance before the last policy anniversary? _____
8. What is the Premium Load Charge? _____ %
9. Have any of the premiums on the policy ever been financed or paid under a premium finance program? Yes ☐ No ☑
10. If yes, please specify dates when premiums were financed? _____/_____/_____ to _____/_____/_____

## ADDITIONAL BENEFITS:

1. Does this policy offer Accelerated Death Benefit? Yes    No
2. If yes, what percentage of the face amount is available? _____ %
3. If yes, has the insured applied for the benefit? Yes ☐  No ☐
4. If yes, what is the current status? Pending ☐    Approval Date _____/_____/_____
5. The accelerated amount? $_____    The remaining amount? $_____

## BENEFICIARIES AND ASSIGNMENT:

1. Designated Beneficiaries: _Andrew Kramer 2005 Irrevocable Trust_
2. What is the relationship of the beneficiary to the insured? _Trust_
3. Is the current beneficiary irrevocable? Yes ☐  No ☑
4. Is the policy currently assigned?    Yes ☐  No ☑
If yes, who is the assignee? _____

Life Settlements – 20                                    Page 2 of 3

OCT. 5. 2007; 9:27AM #1266 PHOENIX LIFE INS CO 518 479 8488          NCNO. 054  P. P. _4 04

*If a change of beneficiary, assignment, or change of ownership is to be made on this policy, to whom should these requests be sent?

Name: _____

Title: _____

Street Address: _____

City _____ State _____ Zip _____

CONFIRMATION:

Date: 10/5/07  Name of Person completing this confirmation: Christina Bush

Title: CSR _____ Department: _____

Company: _____

Phone Number: _____

Signature: Christina Bush

Please send or fax forms listed below to (302) 675-2006

Absolute Assignment ☐   Transfer of Ownership ☐          Beneficiary Change ☐

We thank you for your cooperation!

Life Settlements – 20                                    Page 3 of 3

# Ex. 8



## PHOENIX

Phoenix Life Insurance Company
PHL Variable Insurance Company
Members of The Phoenix Companies

# Fax Cover Sheet

Date: 10/05/2007

Number of pages
including cover sheet 4

---

**TO: Susan**

Company: Lockwood Pension Services

Fax Number: 302-575-2006

Re: 9730393$

**FROM: Christina Bush**
Customer Care Center

Phone Number: 800-541-0171

Fax Number: 816-221-7036

**COMMENTS:**

**Confidentiality Note:**
The documents accompanying this fax cover sheet contain information that is confidential or privileged from Phoenix Life Insurance Company. The information is intended to be for the sole use of the individual or entity named on this cover sheet. If you are not the intended recipient, please note that any disclosure, copying, distribution or use of the contents of this telecopied information is strictly prohibited. If you have received this fax cover sheet in error, please contact us immediately. Thank you.



CREDIT SUISSE

## LIFE INSURANCE POLICY QUESTIONNAIRE

**GENERAL INFORMATION:**

Primary Insured's Name: _Arthur Kramer_ DOB: _1/10/37_ SSN: _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_

Secondary Insured's Name: _____ DOB: _____ SSN: _____

Policy Owner's Name: _Arthur Kramer 2005 Insurance Trust_ Tax ID#: _20-6611290_

Insurance Company: _Phoenix Life_ Issue Class: _Standard_

Policy#: _97363936_ Issue Date: _7/10/05_ Original Issue Date: ___/___/___

Policy Type: Whole Life ☐ Universal ☑ Term ☐ Variable ☐ Survivorship ☐

Has the policy owner ever been different to the current policy owner? Yes ☐ No ☑

If yes, please provide a complete list of previous owners _____

_____

**TYPE OF COVERAGE:**

1. Which option was selected? Option A or 1 (Level) ☑ Option B or 2 (Increasing) ☐

2. Is this a variable product? Yes ☐ No ☑

3. Face amount: $ _9,000,000_ Total Net Death Benefits: $ _9,000,000_

4. Account Value: $ _284,608.75_ As of what date? _9/19/07_

5. Cash surrender value: $ _0_ As of what date? _9/19/07_

6. Is a partial withdrawal of the cash value allowed? Yes ☐ No ☑

7. If yes, what is the fee? $ _____

8. If yes, what is the maximum amount available as a partial withdrawal? $ _____

9. If yes, and the maximum were withdrawn, what would the new Net Death Benefit be? $ _____

10. Is the policy currently in a Grace Period? Yes ☐ No ☑

11. If Survivorship, is the Primary insured deceased? Yes ☐ No ☐

12. If Survivorship, is the Secondary insured deceased? Yes ☐ No ☐

**LOANS AND LIENS:**

1. Are there any existing Policy Loans? Yes ☐ No ☑ Interest Rate ____ % Fixed ☐ Variable ☐

2. Loan amounts excluding interest? $ _____ Interest amount? $ _____

3. What is the maximum amount available for a new loan? $ _____

4. Are there any liens against the policy? Yes ☐ No ☑ If yes, explain _____

_____

**CONTESTIBILITY:**

1. Was this policy issues as a result of a conversion? Yes ☐ No ☑

2. Is the policy past the contestability period? Yes ☑ No ☐

3. Is the policy past the suicide period? Yes ☑ No ☐

4. Has the policy ever lapsed? Yes ☐ No ☑

5. If yes, what was the reinstatement date? _____/_____/_____

**WAIVER OF PREMIUM:**

1. Does the policy have a Disability Waiver of Premium Rider? Yes ☐ No ☐

2. Has this insured applied for the Disability Waiver of Premium Rider? Yes ☐ No ☐

3. If yes, what is the current status? Pending ☐ Approved ☐ Approval Date: _____/_____/_____

4. If approved, what is the effective date? _____/_____/_____ Next proof date? _____/_____/_____

5. If assigned, will the request of re-approval for Disability be sent to assignee? Yes ☐ No ☐

**PREMIUMS:**

1. Current Premium: $ _121,500_ Annual Premium $ ~~484,000~~ $414,800.00

2. Premium Mode: Annual ☐ Semi-Annual ☐ Quarterly ☐ Monthly ☐

3. What was the last premium payment date? _8/29/07_ Amount of Payment? _100,000_

4. What is the next scheduled premium date? _10/10/07_ Amount of Payment? _121,500.00_

5. What is the current minimum Monthly Cost of Insurance? $ _29,900.02_

6. What is the current Administrative Charges? $_____ Monthly / Annual / Other

7. What was the Monthly Cost of Insurance before the last policy anniversary?_____

8. What is the Premium Load Charge? _____%

9. Have any of the premiums on the policy ever been financed or paid under a premium finance program? Yes ☐ No ☑

10. If yes, please specify dates when premiums were financed? _____/_____/_____ to _____/_____/_____

**ADDITIONAL BENEFITS:**

1. Does this policy offer Accelerated Death Benefit? Yes No

2. If yes, what percentage of the face amount is available? _____%

3. If yes, has the insured applied for the benefit? Yes ☐ No ☐

4. If yes, what is the current status? Pending ☐ Approval Date _____/_____/_____

5. The accelerated amount? $_____ The remaining amount? $_____

**BENEFICIARIES AND ASSIGNMENT:**

1. Designated Beneficiaries: _Arizona Kramer JWF Insurance Trust_

2. What is the relationship of the beneficiary to the insured? _Trust_

3. Is the current beneficiary irrevocable? Yes ☐ No ☑

4. Is the policy currently assigned? Yes ☐ No ☑

If yes, who is the assignee? _____

Life Settlements – 20

Page 2 of 3

*If a change of beneficiary, assignment, or change of ownership is to be made on this policy, to whom should these requests be sent?

Name: _____

Title: _____

Street Address: _____

City _____ State _____ Zip _____

**CONFIRMATION:**

Date: 10/5/07  Name of Person completing this confirmation: Christina Bush

Title: C.S.R.  Department: _____

Company: _____

Phone Number: _____

Signature: Christina Bush

Please send or fax forms listed below to (302) 675-2006

Absolute Assignment ☐   Transfer of Ownership ☐      Beneficiary Change ☐

We thank you for your cooperation!