**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————— x
                                                              :
ALICE KRAMER, as Personal Representative of the    :    **Civil Action No.**
Estate of Arthur Kramer,                                    :    **08 CV 2429 (DAB)(MHD)**
                                                              :
                                    Plaintiff,                 :    **ECF Case**
                                                              :
            – against –                                      :
                                                              :
LOCKWOOD PENSION SERVICES, INC., TALL     :
TREE ADVISORS, INC., LIFE PRODUCTS           :
CLEARING, LLC, TRANSAMERICA                     :
OCCIDENTAL LIFE INSURANCE CO., LINCOLN    :
LIFE & ANNUITY CO. OF NEW YORK AND          :
JONATHAN S. BERCK,                                      :
                                                              :
                                    Defendants.            :
                                                              :
———————————————————— x


**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT LINCOLN LIFE & ANNUITY CO. OF**
**NEW YORK'S MOTION TO DISMISS THE AMENDED COMPLAINT**


FRIEDMAN & WITTENSTEIN
A Professional Corporation

600 Lexington Avenue
New York, New York 10022
(212) 750-8700

*Attorneys for Plaintiff*

## **Table of Contents**

**Page(s)**

Table of Authorities ............................................................................................ ii

Preliminary Statement......................................................................................... 1

STATEMENT OF FACTS ................................................................................... 3

     The Parties ..................................................................................................... 3

     Background: "Stranger-Owned Life Insurance" and the Insurable Interest Rule.............. 4

     The Lincoln Policy......................................................................................... 5

     The Present Action......................................................................................... 6

     Lincoln's Later-Filed Action in Connecticut State Court.................................... 7

ARGUMENT......................................................................................................... 9

     LINCOLN'S MOTION TO DISMISS THE
     AMENDED COMPLAINT SHOULD BE DENIED ........................................ 9

          A.    The Applicable Standard When
                   Deciding a Motion to Dismiss ................................................. 9

          B.    The Lincoln Policy Is Incontestable, and
                   Lincoln Must Therefore Pay the Death Benefits ....................... 10

          C.    Plaintiff Has Standing to Assert Her Rights
                   to the Death Benefits Under the Lincoln Policy ....................... 14

               1.    Basic Principles of Standing ................................. 14

               2.    Plaintiff Is Clearly Within the "Zone of Interests"
                   of New York Insurance Law Section 3205(b)(4) ................. 16

               3.    A Declaratory Judgment Action Is the Ideal
                   Mechanism For Adjudicating the Present Controversy......... 19

          D.    The Cases That Lincoln Cites Are Not Even
                   Tangentially Relevant to the Present Controversy...................... 22

Conclusion ........................................................................................................... 25

## Table of Authorities

**Cases**                                                                    **Page(s)**

Allen v. Wright,
    468 U.S. 737, 104 S. Ct. 3315 (1984) .................................................................. 15

Am. Standard, Inc. v. Oakfabco, Inc.,
    498 F. Supp. 2d 711 (S.D.N.Y. 2007) ............................................................... 21

Bello v. New England Financial,
    No. 15802-03, 2004 WL 1305515 (Sup. Ct. Nassau Co. 2004) .............................. 24

Blakely v. Cardozo,
    No. 07 Civ. 3951, 2007 WL 2702241 (S.D.N.Y. Sept. 17, 2007) ........................ 22-23

Caprer v. Nussbaum,
    36 A.D.3d 176, 825 N.Y.S.2d 55 (2d Dept. 2006) ....................................... 15-17, 23

Cortec Indus., Inc. v. Sum Holding L.P.,
    949 F.2d 42 (2d Cir. 1991) .............................................................................. 5

Eaton Vance Management v. ForstmannLeff Associates, LLC,
    No. 06 Civ. 1510, 2006 WL 2331009 (S.D.N.Y. Aug. 11, 2006) ........................ 23-24

Elk Grove Unified Sch. Dist. v. Newdow,
    542 U.S. 1, 124 S. Ct. 2301 (2004) ............................................................... 14-15, 17

Even St. Prods., Ltd., v. Shkat Arrow Hafer & Weber, LLP,
    No. 05 Civ. 3834, 2008 WL 2224297 (S.D.N.Y. May 29, 2008) ........................... 10

Faggionato v. Lerner,
    500 F. Supp. 2d 237 (S.D.N.Y. 2007) ............................................................... 23

Froiland v. Tritle,
    484 N.W.2d 310 (S.D. 1992) ........................................................................... 25

Gaidon v. Guardian Life Insurance Co. of America,
    272 A.D.2d 60, 707 N.Y.S.2d 166 (1st Dept. 2000),
    aff'd, 750 N.E.2d 1078 (2001) ........................................................................ 24

Heslin v. Metropolitan Life Insurance Co.,
    287 A.D.2d 113, 733 N.Y.S.2d 753 (3d Dept. 2001) ......................................... 24

Hylte Bruks Aktiebolag v. Babcock & Wilcox Co.,
    399 F.2d 289 (2d Cir. 1968) ........................................................................... 24

Ilyaich v. Bankers Life Ins. Co. of New York,
 47 A.D.3d 614, 849 N.Y.S.2d 595 (2d Dept. 2008) ......................................1-2, 12-13

In re Al Zuni Trading, Inc.,
 947 F.2d 1403 (9th Cir. 1991) ................................................................24-25

Kendall v. Employees' Ret. Plan of Avon Prods.,
 No. 03 Civ. 2518, 2007 WL 2728430 (S.D.N.Y. Sept. 14, 2007) ......................22-23

Kidder, Peabody & Company, Inc. v. Maxus Energy Corp.,
 925 F.2d 556 (2d Cir. 1991)..................................................................21-22

Kowalski v. Tesmer,
 543 U.S. 125, 125 S. Ct. 564 (2004).............................................................. 23

Lewis v. Wal-Mart Stores, Inc.,
 No. 02CV0944 CVE-FHM, 2005 WL 3263377 (N.D. Okla. Dec. 1, 2005) ............ 25

Life Product Clearing LLC v. Angel,
 530 F. Supp. 2d 646 (S.D.N.Y. 2008)......................................................... 4, 19

Lujan v. Defenders of Wildlife,
 504 U.S. 555, 112 S. Ct. 2130 (1992)............................................................ 23

Magee v. Paul Revere Life Ins. Co.,
 172 F.R.D. 647 (E.D.N.Y. 1997) ................................................................ 11

Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.,
 418 F.3d 168 (2d Cir. 2005)................................................................... 14, 23

New England Mutual Life Insurance Co. v. Caruso,
 73 N.Y.2d 74, 535 N.E.2d 270, 538 N.Y.S.2d 217 (1989)................2, 6-8, 11-12, 16

Palladino v. Metropolitan Life Insurance Co.,
 188 A.D.2d 708, 590 N.Y.S.2d 601 (3d Dept. 1992) ................................... 24

Pappas v. Passias,
 No. 97-9227, 1998 WL 852886 (2d Cir. Dec. 1, 1998)......................................22-23

Reliastar Life Insurance Co. of New York v. Leopold,
 192 Misc. 2d 385, 745 N.Y.S.2d 810 (Sup. Ct. Nassau Co. 2002)........................... 13

Silberman v. Royal Insurance Co.,
 184 A.D.2d 562, 584 N.Y.S.2d 625 (2d Dept. 1992) ................................24-25

Warth v. Seldin,
 422 U.S. 490, 95 S. Ct. 2197 (1975)............................................................. 15

Yak v. Bank Brussels Lambert, BBL,
    252 F.3d 127 (2d Cir. 2001)...................................................................................... 5


**Statutes**

Declaratory Judgment Act, 28 U.S.C. § 2201.................................................... 3, 21-22

Fed. R. Civ. P. 8(d) ..................................................................................................... 7

Fed. R. Civ. P. 12(b)(6)............................................................................................. 1, 9

New York Insurance Law Section 3203(a)(3) ..............................................1, 5-6, 10-13

New York Insurance Law Section 3205(a)(1) ............................................................ 4

New York Insurance Law Section 3205(b)(2)........................................................ 4, 16

New York Insurance Law Section 3205(b)(4)......................................2, 6-7, 16-21, 24

New York Insurance Law Section 3216(d)(1)(B)(i)................................................. 11

Plaintiff Alice Kramer, in her capacity as the Personal Representative of the Estate of Arthur Kramer ("Plaintiff" or "Estate"), respectfully submits this memorandum of law in opposition to the motion of Defendant Lincoln Life & Annuity Co. of New York ("Lincoln") to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for lack of standing. As shown below, Lincoln's motion constitutes a meritless procedural maneuver to avoid paying out the proceeds of a life insurance policy that was past the period of contestability at the time of Mr. Kramer's death.

## Preliminary Statement

The present motion is a transparent delay tactic on the part of Lincoln that is designed to forestall the inevitable – i.e., payment by Lincoln of the proceeds of a $10 million life insurance policy issued upon the life of Arthur Kramer. As shown below, Lincoln knows full well that the time period during which it could have contested the policy expired in November 2007, several months before Mr. Kramer's death in January 2008. Lincoln's refusal to pay out the proceeds under these circumstances is an inexcusable violation of its statutory obligations, and its argument that Plaintiff lacks standing is frivolous.

New York law on the issue of contestability of life insurance policies could not be any clearer. Pursuant to New York Insurance Law Section 3203(a)(3) (McKinney 2006), all life insurance policies issued for delivery in this state must contain a clause providing that the policy "shall be incontestable" two years from its date of issue. Id. (emphasis added). Once the two years have passed, the insurance company is barred from contesting its obligation to pay the death benefits, even if it contends that there were fraudulent misrepresentations made in the application for the policy. See, e.g., Ilyaich v. Bankers Life Ins. Co. of New York, 47 A.D.3d 614, 849 N.Y.S.2d 595, 596 (2d Dept. 2008) ("The defendant issued the life insurance policy

1

based upon the representations in the application for coverage, and <u>the burden rested upon it to investigate, within the two-year contestability period, the veracity of the representations concerning the insured's financial condition</u>.") (emphasis added).  In the present case, there is no dispute that the two-year contestability period – during which Lincoln could have investigated the representations made in the life insurance application – has expired.  Lincoln, however, has refused to pay the death benefits.

Equally important, Lincoln's repeated reference to the fact that there was no "insurable interest" in Mr. Kramer's life is of no help to it whatsoever.  Pursuant to New York's "insurable interest" rule, life insurance must be obtained with the genuine intent to provide protection for a family member, loved one or business partner, as opposed to a stranger who would have an interest in the early death of the insured.  Plaintiff agrees that the insurable interest rule was violated with respect to the policy issued on the life of Mr. Kramer.  However, as the New York Court of Appeals held in <u>New England Mutual Life Insurance Co. v. Caruso</u>, 73 N.Y.2d 74, 535 N.E.2d 270, 538 N.Y.S.2d 217 (1989), the absence of an insurable interest in the life of the insured does not mean that the policy is void.  Rather, that unanimous decision established the rule – which has been followed ever since – that once the two-year contestability period has passed, an insurance company may not avoid its statutory obligation to pay out life insurance proceeds – and thereby reap a windfall – by claiming that no "insurable interest" existed in the first place.

Moreover, Lincoln's argument that the Estate lacks "standing" to pursue its claim for the death benefits under the policy is directly refuted by the New York Insurance Law.  Critical to the instant motion, New York Insurance Law Section 3205(b)(4) <u>bestows upon the Estate the right to the death benefits of a life insurance policy if that policy was procured in</u>

violation of the insurable interest rule. This statutory right unquestionably gives standing to the Estate pursuant to the "zone of interests" test that is used in the law of standing. Indeed, the New York State Legislature has, in effect, provided by statute that where a life insurance policy is procured in violation of the insurable interest rule, the Estate of the decedent is the only entity that is within the zone of interests.

Although these factors – standing alone – demonstrate the lack of merit to Lincoln's motion, the weakness of Lincoln's position is underscored by an action that it filed in Connecticut state court on April 16, 2008, about five weeks after Plaintiff filed the present action in the Southern District of New York. In Lincoln's Connecticut state court action, Lincoln seeks, inter alia, a declaratory judgment that the life insurance policy at issue in the present case is void and that Lincoln does not have to pay any death benefits under that policy. In short, Lincoln is seeking to void the exact policy under which Plaintiff is seeking $10 million in death benefits. The "case of actual controversy" requirement under the Declaratory Judgment Act, 28 U.S.C. § 2201, is thus clearly satisfied here.

### STATEMENT OF FACTS

**The Parties**

Plaintiff Alice Kramer is the widow of Arthur Kramer and the Personal Representative of his Estate. She brings this action in that capacity. Mr. Kramer was a retired attorney at the time of his death on January 26, 2008 at the age of 81. (Amended Complaint, ¶¶ 1, 17).[1]

---

[1] A copy of Plaintiff's Amended Complaint is attached as Exhibit 1 to the accompanying Affidavit of Stuart I. Friedman in Opposition to Defendant Lincoln Life & Annuity Co. of New York's Motion to Dismiss the Amended Complaint ("Friedman Aff.").

Defendant Lincoln, an insurance company, is a New York corporation with its principal place of business located in Syracuse, New York.  Lincoln issued a $10 million life insurance policy on the life of Mr. Kramer in 2005.  (Id. at ¶¶ 8, 41).

Defendant Lockwood Pension Services, Inc. ("LPS") is a New York corporation with its principal place of business located in New York, New York.  Defendant Tall Tree Advisors, Inc. ("TTA") is a New York corporation with its principal place of business located in Pleasantville, New York.  Defendant Life Products Clearing, LLC ("Life Products") is a Delaware limited liability company with its principal place of business located in New York, New York.  (Id. at ¶¶ 3-5).

**Background:  "Stranger-Owned Life Insurance" and the Insurable Interest Rule**

To put this matter into context, this case involves the procurement of what is known as "stranger-owned life insurance" ("SOLI").

New York Insurance Law Section 3205(b)(2) provides that one may not obtain an insurance policy on the life of another without having an "insurable interest" in the insured's life.  New York Insurance Law Section 3205(a)(1) defines an "insurable interest" as the type of interest that a relative, loved one or business partner would have in the continued life of the insured.  This so-called "insurable interest rule" is a well-settled principle in New York insurance law, and it prevents the issuance of "wager" life insurance policies – i.e., life insurance contracts that give the policy owner an interest in having the insured's life come to an end as soon as possible.  (Amended Complaint, at ¶¶ 13, 50).  See generally Life Product Clearing LLC v. Angel, 530 F. Supp. 2d 646, 652-54 (S.D.N.Y. 2008).

A typical SOLI arrangement – which is designed to circumvent the insurable interest rule – is initiated by a stranger investor or an insurance agent who approaches an elderly

person and encourages him to purchase life insurance, the death benefits of which will be immediately transferred to the stranger investor. The common characteristic of all SOLI arrangements is that they are structured so that the elderly person or a family member, rather than the stranger investor, is made to appear as the original beneficiary of the policy in order to try to evade the insurable interest requirement. (Amended Complaint, ¶ 14).

Plaintiff alleges that LPS, TTA and Life Products participated in an unlawful SOLI arrangement that was structured for the sole purpose of trying to avoid the insurable interest rule. (Id. at ¶ 15).

**The Lincoln Policy**

On or about November 23, 2005, Lincoln issued a life insurance policy (the "Lincoln Policy") on the life of Arthur Kramer in the amount of $10 million. (See Amended Complaint, ¶ 41; a copy of the policy (Policy No. 7214471) is attached to the Friedman Aff. as Ex. 2).[2] Pursuant to New York Insurance Law Section 3203(a)(3), the Lincoln Policy contained a two-year incontestability clause:

> **Incontestability.** Except for nonpayment of Monthly Deductions, this policy will be incontestable after it has been in force during the insured's lifetime for 2 years from its Date of Issue. This means that Lincoln Life will not use any misstatement in the application to challenge a claim or avoid liability after that time.

(Friedman Aff., Ex. 2, p. 20) (emphasis added).

---

[2] Although the Lincoln Policy, as well as the documents attached as Exhibits 3 and 4 to the Friedman Aff., are not attached to the Amended Complaint, the Court may consider these documents in ruling on Lincoln's motion to dismiss. All of these documents are specifically referenced in the Amended Complaint (¶¶ 32, 41-42, 46) and are therefore "incorporated by reference" into that pleading. See Yak v. Bank Brussels Lambert, BBL, 252 F.3d 127, 130 (2d Cir. 2001) ("On a motion to dismiss, the court may consider 'any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference.'") (quoting Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991)).

Pursuant to New York Insurance Law Section 3203(a)(3) and the above-quoted provision, the Lincoln Policy became incontestable on November 23, 2007. Arthur Kramer died on January 26, 2008.

**The Present Action**

On March 10, 2008, the Estate commenced this action against various defendants, including Lincoln. On March 27, 2008, Lincoln moved to dismiss the Complaint. On May 7, 2008, the Estate filed an Amended Complaint, and on June 3, 2008, Lincoln moved to dismiss the Amended Complaint.

It is important to note that under New York law – pursuant to the rule of <u>Caruso</u> – a life insurance policy that is procured by someone without an insurable interest in the life of the insured is not void. (<u>See</u> pp. 10-13, <u>infra</u>). Rather, if the two-year period of contestability has passed, the insurance company must pay out the proceeds of the policy.

However, New York effectuates its policy against wager life insurance contracts by including an important provision in its statutory scheme that is designed to prevent the "wagerer" from keeping the benefits of his wager. That provision – New York Insurance Law Section 3205(b)(4) – states, in essence, that if someone receives from an insurer benefits under a policy that was made in violation of the insurable interest rule, then the <u>insured's estate</u> may maintain an action to recover those benefits.

Plaintiff's Amended Complaint, therefore, contains two claims. First, Plaintiff seeks a declaration that Lincoln and the other insurance company defendants must pay the death benefits under the policies, and that such death benefits must be paid to her. This claim assumes, of course, that the insurance companies have not yet paid the death benefits to anyone, and that a claim by Plaintiff under Section 3205(b)(4) would therefore not yet be triggered. Plaintiff's

second claim – which is pled in the alternative and which is not asserted against the insurance

company defendants – is based on Section 3205(b)(4), and asserts that if the insurance

companies have already paid out the death benefits, then Plaintiff is entitled to recover those

benefits from the entity that received them.[3]

**Lincoln's Later-Filed Action in Connecticut State Court**

On April 16, 2008 – approximately five weeks _after_ Plaintiff filed the present

action in the Southern District of New York – Lincoln filed an action in the Superior Court of the

State of Connecticut (the "Connecticut Action") against, _inter alia_, some of the defendants in the

present action.  (A copy of Lincoln's Complaint in the Connecticut Action is attached as Exhibit

3 to Friedman Aff.).  In that action, Lincoln seeks, _inter alia_, a declaratory judgment that the very

policy at issue in the present case is void because there was no insurable interest in Mr. Kramer's

life.  (Such a judgment, of course, would be directly contrary to the New York Court of Appeals'

ruling in the _Caruso_ case).  Lincoln's Complaint in the Connecticut Action states, in relevant

part, as follows:

COUNT XIII

DECLARATORY JUDGMENT

154.    Lincoln hereby incorporates by reference each and
every averment of fact contained in the preceding paragraphs as if
set forth herein at length.

155.    The Kramer Policy lacks an insurable interest and is
the product of a STOLI [stranger-originated life insurance]
arrangement.

---

[3] Such pleading in the alternative is specifically authorized by Fed. R. Civ. P. 8(d).

(Friedman Aff., Ex. 3, p. 47).[4]

        In the section of Lincoln's Complaint in the Connecticut Action in which Lincoln

spells out the relief it is seeking on this count, Lincoln states:

As to Count XIII:

        1.      A declaratory judgment that:

           (i)     the Kramer Policy lacked an
                       insurable interest at the time of
                       policy issuance;
           (ii)    the Kramer Policy is void *ab initio*:
           (iii)   no death benefit is payable under the
                       Kramer Policy.

(Friedman Aff., Ex. 3, at p. 49) (emphasis added) (italics in original).

        Lincoln's filing of the Connecticut Action was a case of blatant forum-shopping,

and its current motion is Lincoln's latest attempt to escape the New York forum. As noted

above, under the Caruso decision issued by the New York Court of Appeals, an insurance

company – once the two-year contestability period has passed – may not avoid its statutory

obligation to pay out life insurance proceeds by claiming that no insurable interest existed in the

first place. Although the present action would have been the logical place for Lincoln to assert

its claims, Lincoln fled to Connecticut in an attempt to avoid the holding in Caruso.[5]

---

[4] Lincoln uses the acronym "STOLI" for "stranger-originated life insurance," whereas Plaintiff uses the acronym "SOLI" for "stranger-owned life insurance." This is a difference in nomenclature only, as the two concepts are the same.

[5] As the Amended Complaint alleges, Lincoln is a New York corporation with its principal place of business in Syracuse, New York. (Amended Complaint, ¶ 8). Lincoln does not contend otherwise in its Complaint in the Connecticut Action; rather, in a carefully drafted paragraph that omits any reference to its principal place of business, Lincoln states in its Connecticut Complaint that it is a New York corporation "with offices located" in Hartford, Connecticut. (Friedman Aff., Ex. 3, ¶ 1). However, with respect to all other corporate entities that it identifies in its Connecticut Complaint, Lincoln specifically refers to each company's "principal place of

*(continued)*

Regardless of Lincoln's motivation however, the import of the Connecticut Action for the purposes of the present motion cannot be overstated. In the present action, Plaintiff seeks a declaratory judgment that Lincoln must pay the death benefits under the Lincoln Policy, and that those death benefits must be paid to Plaintiff. Five weeks after the present action was filed, <u>Lincoln</u> sued for a declaratory judgment in Connecticut, seeking a declaration that the Lincoln Policy is void and that Lincoln need not pay the death benefits to anyone. If there is one thing that is obvious, it is that Plaintiff and Lincoln have a clear and direct conflict over the Lincoln Policy. Under these circumstances, Lincoln cannot legitimately argue – and should be estopped from asserting – that there is no "case of actual controversy" under the Declaratory Judgment Act.

## ARGUMENT

## LINCOLN'S MOTION TO DISMISS THE AMENDED COMPLAINT SHOULD BE DENIED

### A.    The Applicable Standard When Deciding a Motion to Dismiss

This Court recently summarized the applicable standards when deciding a motion to dismiss under Rule 12(b)(6):

> The purpose of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is to "test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief *without* resolving a contest regarding its substantive merits." *Global Network Communications, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006). On such a motion, the court "assesses the legal feasibility of the complaint, but does not weigh the evidence that might be offered to support it." *Id.* (citing *AmBase Corp. v. City Investing Co. Liquidating Trust*, 326 F.3d 63, 72 (2d Cir. 2003)). The court therefore "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from

business."  (Friedman Aff., Ex. 3, ¶¶ 2, 5-7; <u>see also</u> Friedman Aff., Ex. 2 (front page of Lincoln Policy gives Lincoln's "Home Office Location" as Syracuse, New York)).

those allegations in the light most favorable to plaintiff, and construe the complaint liberally." *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)). However, the plaintiff must provide enough facts to state a claim for relief that is plausible on its face. *Bell Atlantic Corp. v. Twombly*, ___ U.S. ___, ___, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007).

Even St. Prods., Ltd., v. Shkat Arrow Hafer & Weber, LLP, No. 05 Civ. 3834, 2008 WL 2224297, at *2 (S.D.N.Y. May 29, 2008) (Batts, J.) (italics in original).[6]

Under these standards, Lincoln's motion to dismiss the Amended Complaint should be denied.

## B.    The Lincoln Policy Is Incontestable, and Lincoln Must Therefore Pay the Death Benefits

New York Insurance Law Section 3203(a)(3) requires that all life insurance policies contain a two-year incontestability clause providing that the insurer is barred from contesting the validity of the policy after it has been continuously in effect for at least two years. As the statute provides:

> (a)    All life insurance policies, except as otherwise stated herein, delivered or issued for delivery in this state, shall contain in substance the following provisions, or provisions which the superintendent deems to be more favorable to policyholders:
>
> * * *
>
> (3)    that the policy shall be incontestable after being in force during the life of the insured for a period of two years from its date of issue . . .

New York Insurance Law Section 3203(a)(3) (McKinney 2006) (emphasis added). The only exceptions allowed by the statute, neither of which is relevant here, are for non-payment of premiums or violation of policy conditions relating to service in the armed forces. Id. Under

---

[6] Copies of unreported decisions cited in this memorandum are annexed hereto in alphabetical order.

New York law, the two-year incontestability clause applies even where there may have been no

insurable interest in the life of the insured at the time the policy was procured.  See New England

Mutual Life Ins. Co. v. Caruso, 73 N.Y.2d 74, 535 N.E.2d 270, 538 N.Y.S.2d 217 (1989).  Thus,

where – as here – the insurance company claims that there was no insurable interest in the life of

the insured, the insurance company must still pay the death benefits if the policy at issue was in

force for at least two years during the life of the insured.[7]

      In Caruso – a unanimous 7-0 decision by the New York Court of Appeals – the

plaintiff insurance company argued that:

> [L]ife insurance policies issued to persons lacking an insurable
> interest in the life of the insured are void from inception because of
> statutory prohibitions and because they violate public policy
> concerns against wagering contracts. . . . Plaintiff [insurance
> company] contends that the majority of jurisdictions accept this
> reasoning and, notwithstanding the expiration of the
> incontestability period, refuse to enforce life insurance contracts in
> which the policyholder has no insurable interest in the insured.

Caruso, 535 N.E.2d at 271 (citation omitted).

      The New York Court of Appeals, however, forcefully rejected the insurance

company's argument, and held that once the contestability period has passed, the insurance

company is barred from claiming that the policyholder lacked an insurable interest:

---

[7] When examining the New York case law regarding periods of contestability, it is important to make a distinction between cases involving life insurance policies and cases involving accident and health insurance policies.  As noted above, New York Insurance Law Section 3203(a)(3) – which governs life insurance policies – does not allow life insurance companies to avoid an incontestability clause by claiming that the insured committed fraud in his application for life insurance.  However, Section 3216(d)(1)(B)(i) of the New York Insurance Law, which covers accident and health insurance policies, expressly permits insurance companies to include language in such policies allowing the insurance companies to contest them, even after the two-year contestability period has expired, if "fraudulent misstatements" were made in the application for insurance.  See generally Magee v. Paul Revere Life Ins. Co., 172 F.R.D. 647, 650-53 (E.D.N.Y. 1997).  Therefore, cases that involve incontestability clauses in accident or health insurance policies are not relevant here.

New York's rule is otherwise, however.  As generally interpreted, earlier decisions of this court hold that <u>passage of the incontestability period bars the insurer from thereafter asserting the policyholder's lack of an insurable interest.  For the reasons that follow, we adhere to that rule.</u>

<u>Id.</u> (citation omitted) (emphasis added).

The New York Court of Appeals elaborated as follows:

Our statute requires, however, that all life insurance policies contain incontestability clauses providing that after a specified period of time the insurer's conditional promise to pay benefits <u>shall become absolute</u> (Insurance Law § 3203[a][3]). . . . <u>The incontestability clause fixes the insurer's promise to pay benefits upon maturity if the policy is in force for a period of two years during the life of the insured and the premiums have been paid.</u>

* * *

The provisions of the Insurance Law <u>do not make life insurance contracts void if the policyholder lacks an insurable interest in the insured's life.</u>

* * *

Moreover, a comparison of the incontestability provision with other Insurance Law sections indicates that <u>the language of section 3203(a)(3) was not intended to make such policies void for want of an insurable interest in the policyholder.</u>

<u>Id.</u> at 272-73 (emphasis added).

The rule of <u>Caruso</u> is therefore clear:  once the two-year contestability period has expired, the insurance company <u>must</u> pay the death benefits even if it contends that the policyholder lacked an insurable interest.  That – plain and simple – is the law of New York.  <u>See also</u> <u>Ilyaich v. Bankers Life Ins. Co. of New York</u>, 47 A.D.3d 614, 849 N.Y.S.2d 595, 596-97 (2d Dept. 2008) ("<u>[T]he burden rested upon [the insurance company] to investigate, within the two-year contestability period, the veracity of the representations concerning the insured's financial condition</u>. . . . The insured's finances were a condition of insurance, which were ascertainable by the defendant at the time that the policy was issued, and <u>which it is precluded</u>

from contesting more than two years thereafter.") (emphasis added); <u>Reliastar Life Ins. Co. of</u> <u>New York v. Leopold</u>, 192 Misc. 2d 385, 745 N.Y.S.2d 810, 812 (Sup. Ct. Nassau Co. 2002) ("Reliastar's present action to rescind and/or void the policy was instituted well after the elapse of the two year incontestability period. . . . <u>It is well settled that once the incontestable period has</u> <u>elapsed, allegations that an insured procured the policy through fraud will not support a claim to</u> <u>void or rescind the policy.</u>") (emphasis added) (internal quotation and citations omitted).

There is no question that Section 3203(a)(3) applies here. By its plain language, it governs all life insurance policies "delivered or issued for delivery in this state." The owner of the policy is the "Hudson United Bank, Trustee of the Arthur Kramer 2005 Insurance Trust, dated August 29, 2005, or the Successor(s) in said Trust" (the "Trust"). (Friedman Aff., Ex. 2, p. 3B). The address of the Trust as provided on the life insurance application is 75 Rockefeller Plaza, New York, New York 10019. (A copy of the life insurance application is included in Friedman Aff., Ex. 2, attached at the end of the life insurance policy). The Trust Agreement for the Trust also shows that its principal office is at 75 Rockefeller Plaza, New York, New York 10019, that it was created under the laws of New York, and that the Trust is governed by New York law. (A copy of the Trust Agreement is attached to the Friedman Aff. as Exhibit 4; <u>see</u> p. 1 and §§ 2.2 and 5.3 thereof).

Second, there is no doubt that the two-year period during which Lincoln could have contested the policy expired before Mr. Kramer's death. As noted above, the policy was issued on November 23, 2005 and became incontestable on November 23, 2007. Mr. Kramer died on January 26, 2008. Under these circumstances – and as Lincoln is no doubt aware – there is no possible basis for Lincoln to refuse to pay the death benefits under the policy.

**C.    Plaintiff Has Standing to Assert Her Rights
to the Death Benefits Under the Lincoln Policy**

We submit that Lincoln's argument based on Plaintiff's alleged lack of standing is

a sham, and that its sole purpose is to delay payment of the life insurance proceeds.[8]

In its brief, Lincoln sets forth a thoroughly disjointed recitation of various

standing concepts, such as prudential standing, third-party standing and standing under contracts.

(See Memorandum of Law of Lincoln Life & Annuity Company of New York in Support of its

Motion to Dismiss the Amended Complaint ("Lincoln's Brief"), pp. 5-13).  Lincoln makes no

attempt to apply the law to the facts of the present action, and, as explained below, most of the

standing concepts that Lincoln mentions have absolutely nothing to do with this case.  Similarly,

the cases upon which Lincoln relies are so far afield from the issues involved here that we are

mystified as to why Lincoln cited them in the first place.

**1.    Basic Principles of Standing**

At the outset, a few basic principles should be stated.  First, where (as here)

jurisdiction is based on diversity of citizenship, "a plaintiff must have standing under both

Article III of the Constitution and applicable state law in order to maintain a cause of action."

Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 173 (2d Cir.

2005).

With respect to standing under federal law, the Supreme Court has explained as

follows:

---

[8] In Lincoln's Connecticut Action, several defendants have moved to dismiss Lincoln's
Complaint on the ground that the present action in the Southern District of New York is the
appropriate forum for the litigation of Lincoln's claims.  Upon information and belief, Lincoln is
doing anything possible to avoid answering the Amended Complaint in the present action
because it does not want to appear to be actively involved in litigation in this New York forum.

> [O]ur standing jurisprudence contains two strands:  <u>Article III</u>
> <u>standing, which enforces the Constitution's case-or-controversy</u>
> <u>requirement</u>; and prudential standing, which embodies "judicially
> self-imposed limits on the exercise of federal jurisdiction."  The
> Article III limitations are familiar:  The plaintiff must show that
> the conduct of which he complains has caused him to suffer an
> "injury in fact" that a favorable judgment will redress.  Although
> we have not exhaustively defined the prudential dimensions of the
> standing doctrine, we have explained that prudential standing
> encompasses "the general prohibition on a litigant's raising another
> person's legal rights, the rule barring adjudication of generalized
> grievances more appropriately addressed in the representative
> branches, <u>and the requirement that a plaintiff's complaint fall</u>
> <u>within the zone of interests protected by the law invoked</u>."

<u>Elk Grove Unified Sch. Dist. v. Newdow</u>, 542 U.S. 1, 11-12, 124 S. Ct. 2301 (2004) (quoting

<u>Allen v. Wright</u>, 468 U.S. 737, 751, 104 S. Ct. 3315 (1984)) (emphasis added) (citations

omitted).[9]

      In <u>Warth v. Seldin</u>, 422 U.S. 490, 95 S. Ct. 2197 (1975), the Supreme Court

elaborated on what a plaintiff must show to establish standing:

> The actual or threatened injury required by Art. III may exist solely
> by virtue of "<u>statutes creating legal rights, the invasion of which</u>
> <u>creates standing</u> . . . ."  Essentially, the standing question in such
> cases is whether <u>the constitutional or statutory provision on which</u>
> <u>the claim rests properly can be understood as granting persons in</u>
> <u>the plaintiff's position a right to judicial relief</u>.

<u>Warth</u>, 422 U.S. at 500 (citations omitted) (emphasis added).

      With respect to New York law on standing, the court in <u>Caprer v. Nussbaum</u>, 36

A.D.3d 176, 825 N.Y.S.2d 55 (2d Dept. 2006), explained as follows:

> The Court of Appeals has defined the standard by which standing
> is measured, explaining that a plaintiff, in order to have standing in
> a particular dispute, must demonstrate an injury in fact <u>that falls</u>
> <u>within the relevant zone of interests sought to be protected by law</u>.

---

[9] The issue of prudential standing typically arises in cases where a party is attempting to assert
the rights of others.  (<u>See</u> p. 23 n.13, <u>infra</u>).

Specifically, this familiar two-part test requires a plaintiff first to establish that he or she will actually be harmed by the challenged action, and that the injury is more than conjectural. Second, the injury a plaintiff asserts must fall within <u>the zone of interests or concerns sought to be promoted or protected by the statutory provision</u> or recognized common-law relationship pursuant to which a defendant has acted.

<u>Caprer</u>, 825 N.Y.S.2d at 62-63 (emphasis added) (citation omitted).

## 2. Plaintiff Is Clearly Within the "Zone of Interests" of New York Insurance Law Section 3205(b)(4)

As set forth above, New York Insurance Law Section 3205(b)(2) provides that one may not obtain an insurance policy on the life of another without having an "insurable interest" in the insured's life. However, as discussed above (<u>see</u> pp. 10-13, <u>supra</u>), a life insurance policy that is procured in violation of the insurable interest rule <u>is not void</u>. As the <u>Caruso</u> case held, once the two-year contestability period has expired, the insurance company <u>must</u> pay the death benefits even if it contends that the policyholder lacked an insurable interest.

Since – even where there is no insurable interest – the insurance company must still pay out the death benefits, the question that presents itself is who has the rights to those death benefits. On this point, the New York State Legislature has spoken loud and clear, and has specifically provided by statute that <u>the insured's estate</u> – and <u>not</u> the policyholder who lacked an insurable interest – is entitled to the proceeds. In short, this statute effectuates New York's policy against wager life insurance contracts by preventing the "wagerer" from keeping the benefits of his wager. As New York Insurance Law Section 3205(b)(4) states:

If the beneficiary, assignee or other payee under any contract made in violation of this subsection [(b)] receives from the insurer any benefits hereunder accruing upon the death, disablement or injury of the person insured, <u>the person insured or his executor or administrator may maintain an action to recover such benefits from the person receiving them.</u>

Id. (emphasis added).

The Plaintiff in the present case, therefore, easily satisfies the "zone of interests" test referred to in the cases discussed above. New York Insurance Law Section 3205(b)(4) – with laser-like precision – confers upon the insured's estate – and no one else – the right to life insurance proceeds when there was no insurable interest in the life of the insured party. Thus, it is indisputable that the insured's estate is within the "zone of interests" protected by the statute; indeed – because of the specificity of the statute – it can fairly be said that there is no one within the statute's "zone of interests" except the insured's estate. Lincoln's argument that "[t]he insurable interest statute does not vest Plaintiff with any right in the policy" is thus completely wrong. (Lincoln's Brief, p. 10).[10]

In view of New York Insurance Law Section 3205(b)(4), the arguments in Lincoln's brief simply make no sense. For example, Lincoln states that Plaintiff lacks standing because "she has not alleged that Mr. Kramer was the owner or purchaser of such policy or that the estate is the beneficiary of such policy." (Lincoln's Brief, p. 1). Similarly, Lincoln argues that Plaintiff "must have an interest in the policy as an owner, intended beneficiary, or purchaser of the policy." (Id. at 9). As Section 3205(b)(4) makes clear, however, Plaintiff – to be entitled to the insurance proceeds – does not have to be an owner or purchaser of the policy, or a beneficiary under the policy. Rather, Plaintiff's status as the personal representative of the estate of the insured is what entitles her to recover the proceeds of the policy. Indeed, it is fair to say that Section 3205(b)(4) assumes that the party ultimately entitled to the proceeds (i.e., the

---

[10] Nor is there any doubt that Plaintiff has suffered an "injury in fact" that is "more than conjectural." See, e.g., Elk Grove, 542 U.S. at 11-12; Caprer, 825 N.Y.S.2d at 62-63. Obviously, Lincoln's refusal to pay the $10 million in death benefits in violation of its statutory obligations has caused significant monetary harm to Plaintiff.

insured's personal representative) is probably <u>not</u> the owner, purchaser or beneficiary.  After all,

the statute envisions that someone other than the insured's estate – mostly likely, the stranger

investor – will <u>initially</u> receive the insurance proceeds, but will later have to disgorge them.  In

all likelihood, it is the person who initially receives the proceeds that will be the owner,

purchaser or beneficiary of the policy – otherwise, the insurance company would not have paid

the proceeds to that person in the first place.  The statute provides, however, that the insured's

estate may recover those proceeds from the stranger investor who initially received them; thus,

implicit in the statute is the notion that the entity that is ultimately entitled to the proceeds – <u>i.e.</u>,

the insured's estate – will <u>not</u> be the owner, purchaser or beneficiary of the policy.

       Lincoln also thoroughly confuses the concept of standing with the factors that

determine whether or not a life insurance policy was procured as part of a SOLI scheme.  For

example, Lincoln states in its brief that:

> In the amended complaint, Plaintiff alleges and admits that the
> non-insurance company defendants that acquired the Lincoln
> Policy were stranger investors lacking an insurable interest in the
> life of Mr. Kramer and that neither Mr. Kramer nor any of his
> family members ever held any genuine interest (as owner,
> purchaser or beneficiary) in the Lincoln Policy during Mr.
> Kramer's lifetime.  Notwithstanding these allegations, Plaintiff
> claims that, as a consequence of this illegal STOLI transaction,
> Lincoln and the other insurance company defendants "must pay the
> death benefits" under their policies to Plaintiff.  However,
> Plaintiff's disclaimer of any genuine interest by Mr. Kramer or his
> family in the Lincoln Policy during Mr. Kramer's lifetime is
> completely inconsistent with the Estate having standing to assert
> any claim for death benefits under the Lincoln Policy.

(<u>Id.</u> at 10).

       Once again, Lincoln's argument makes no sense.  It is important to remember that

under New York law, a person may obtain life insurance on his own initiative – "with a genuine

intent to obtain insurance protection for a family member, loved one, or business partner" – and

thereafter decide to assign the policy to a person who does not have an insurable interest in his life. <u>Life Product Clearing LLC v. Angel</u>, 530 F. Supp. 2d 646, 653 (S.D.N.Y. 2008). There is nothing unlawful about such a transaction. However, if the policy was taken out with a view to its <u>immediate assignment</u> to a stranger investor – and the insured never had even an initial intent to benefit a family member or business partner – then a SOLI scheme is involved and the insurable interest rule is violated. <u>Id.</u> at 653-54. In order to demonstrate the existence of such a SOLI scheme, the insured's estate must show that the insured and his family members never had any true interest in the policy, and that – to the extent that the transaction facially exhibited such an interest – it was a mere sham designed to evade the insurable interest rule. <u>Id.</u> Therefore, Plaintiff's allegations in her Amended Complaint regarding the lack of a true interest in the Lincoln Policy on the part of Mr. Kramer and his family <u>go only to the issue of whether or not a SOLI scheme was involved, not to the issue of Plaintiff's standing</u>. If Plaintiff proves that, in fact, a SOLI scheme was involved and that the insurable interest rule was violated, then Section 3205(b)(4) bestows standing upon her to assert a claim for the proceeds. Put another way, the facts showing that Mr. Kramer or his family never had a true interest in the policy are the very same facts that show that a SOLI scheme was involved, and that Plaintiff is therefore entitled to the insurance proceeds under Section 3205(b)(4).

   **3.    A Declaratory Judgment Action Is the Ideal**
          **Mechanism For Adjudicating the Present Controversy**

        Given the wording of Section 3205(b)(4), it is clear that – if Lincoln had already dispensed the $10 million in death benefits to defendant Life Products (the stranger investor in the policy at issue) – then Plaintiff would have the right under the statute to sue Life Products in order to recover those proceeds. Indeed, the second claim for relief in Plaintiff's Amended Complaint covers precisely that potential scenario.

Lincoln, however, employing a technical, loophole-like reading of Section 3205(b)(4), argues that the statute does not address the situation we have here, where (i) the insurance policy has become incontestable because the two-year period has passed; (ii) there was no insurable interest in the life of the insured party; and (iii) the insurance company has not yet paid out the proceeds to anyone, including the stranger investor who would have to disgorge the proceeds to the insured's estate in any event. Thus, Lincoln states that New York Insurance Law Section 3205(b)(4) "has not even been triggered in this case" because no one has yet received any death benefits from the insurer. (Lincoln Brief, p. 13 n.5). However, it is Lincoln itself – by refusing to pay the death benefits to anyone – that has prevented a potential claim by Plaintiff under Section 3205(b)(4) from coming into play.

Although Plaintiff's claim for a declaratory judgment – the first claim in her Amended Complaint – is thus not brought directly under Section 3205(b)(4), Plaintiff, as set forth above, is within the "zone of interests" for bringing a declaratory judgment because Section 3205(b)(4) vests in her the right to recover the insurance proceeds. Under these circumstances, the only course of action that makes sense is for the insurance company to pay the death benefits directly to the insured's estate, and that is exactly what Plaintiff seeks in the declaratory judgment claim in her Amended Complaint.

To the extent that Lincoln views the matter otherwise, its position is directly contrary to the clear intent of the New York State Legislature – as expressed in Section 3205(b)(4) – that the insured's estate recover the death benefits. Moreover – given that clear intent – it would be completely illogical for Lincoln to think that, if ordered to pay the death benefits, it should pay them to the wrong party (i.e., Life Products), and then have Plaintiff (i.e., the right party) try to recover them. Such a result would also be indefensible in terms of judicial

economy, because it would result in utterly needless litigation that could be obviated by a direct

payment from Lincoln to the Estate.

Under these circumstances, a declaratory judgment is the logical and ideal vehicle

for adjudicating the present action.  As the Second Circuit held in Kidder, Peabody & Company,

Inc. v. Maxus Energy Corp., 925 F.2d 556 (2d Cir. 1991):

> The question in each case [in which a declaratory judgment is
> sought] is whether the facts alleged, under all the circumstances,
> show that there is a substantial controversy, between parties having
> adverse legal interests, of sufficient immediacy and reality to
> warrant the issuance of a declaratory judgment.
>
> * * *
>
> [A] declaratory judgment action should be entertained when the
> judgment will serve a useful purpose in clarifying and settling the
> legal relations in issue, and . . . when it will terminate and afford
> relief from the uncertainty, insecurity, and controversy giving rise
> to the proceeding.  It follows as a general corollary to this rule that
> if either of these objectives can be achieved the action should be
> entertained.

Id. at 562 (citations and quotations omitted).[11]

The present case fits squarely within these parameters.  Lincoln, as noted above,

has not yet dispensed the death benefits of the policy, and, in fact, is refusing to dispense them.

Obviously, there is a real and substantial controversy between Plaintiff and Lincoln, since

Lincoln (in its later-filed Connecticut Action) is trying to void the very $10 million policy on

which Plaintiff is seeking the proceeds.  Furthermore, the declaratory judgment remedy allows

the court to "declare the rights and other legal relations" of the parties.  See 28 U.S.C. § 2201.  If

---

[11] Even though a plaintiff in a diversity case must have standing under both Article III of the
Constitution and state law, the Federal Declaratory Judgment Act is the mechanism for granting
declaratory relief.  See Am. Standard, Inc. v. Oakfabco, Inc., 498 F. Supp. 2d 711, 715 (S.D.N.Y.
2007) ("The Declaratory Judgment Act – not state declaratory judgment law – provides the
procedural mechanism for granting declaratory relief in federal diversity cases.").

the Court finds (i) that Lincoln must pay out the death benefits because the policy is

incontestable, and (ii) that Plaintiff (as opposed to Life Products) is entitled to receive those

death benefits, the Court can so declare. This, of course, would obviate the absurd scenario

under which Lincoln would pay the proceeds to Life Products – which is not entitled to them –

only to have Plaintiff then engage in more litigation to recover those proceeds. In the words of

the Second Circuit in Kidder, Peabody, a declaratory judgment would "serve a useful purpose in

clarifying and settling the legal relations in issue." Id. at 562.[12]

**D.     The Cases That Lincoln Cites Are Not Even
        Tangentially Relevant to the Present Controversy**

Aside from a few United States Supreme Court cases that set forth the general

requirements for standing, the cases upon which Lincoln relies have no relevance to the present

controversy. For example, Lincoln cites Pappas v. Passias, No. 97-9227, 1998 WL 852886 (2d

Cir. Dec. 1, 1998); Blakely v. Cardozo, No. 07 Civ. 3951, 2007 WL 2702241 (S.D.N.Y.

Sept. 17, 2007); and Kendall v. Employees' Ret. Plan of Avon Prods., No. 03 Civ. 2518, 2007

WL 2728430 (S.D.N.Y. Sept. 14, 2007), apparently to show that Plaintiff lacks standing.

(Lincoln's Brief, p. 6). The facts of these cases are so facially inapposite that no detailed

discussion of them is necessary here. See Pappas, 1998 WL 852886 (pro se plaintiff claimed that

Greek Orthodox Church and its officials comprised a RICO enterprise); Blakeley, 2007 WL

2702241 (pro se plaintiff challenged an in rem tax foreclosure action on a building that she did

---

[12] Significantly, Defendant Life Products – the stranger investor in the Lincoln Policy – has counterclaimed for a declaratory judgment seeking a declaration that it – rather than Plaintiff – is entitled to the proceeds of the policy. (See Friedman Aff., Ex. 5, ¶¶ 85-89). In effect, therefore, Lincoln is a stakeholder in a situation in which two different entities – i.e., Plaintiff and Life Products – are both claiming entitlement to the same funds, which Lincoln is refusing to release to anyone. This is a classic situation in which a court can utilize a declaratory judgment to "declare the rights and other legal relations" of the parties. See 28 U.S.C. § 2201.

not own); <u>Kendall</u>, 2007 WL 2728430 (plaintiff complained about sections of a retirement plan that did not apply to her).[13]

Lincoln, on page 8 of its brief, also raises the concept of "standing under contracts," without explaining why that concept might be relevant here. In fact, it is not relevant at all, because Plaintiff is asserting her claims based on the New York Insurance Law, not on the contention that she was an actual party to the life insurance contract. Therefore, the cases cited by Lincoln are inapposite. <u>See</u> <u>Faggionato v. Lerner</u>, 500 F. Supp. 2d 237, 248 (S.D.N.Y. 2007) ("Where the claim asserted is contractual and the plaintiff is not a party to the contract or a third party beneficiary of the contract the claim must be dismissed."); <u>Caprer</u>, 825 N.Y.S.2d at 62-68 (holding that the owner of a condominium unit does not have standing to sue individually to recover damages for a wrong to the condominium as a whole, but does have standing to bring a derivative action on behalf of the condominium). For this same reason, <u>Eaton Vance Management v. ForstmannLeff Associates, LLC</u>, No. 06 Civ. 1510, 2006 WL 2331009 (S.D.N.Y. Aug. 1, 2006), cited on page 12 of Lincoln's Brief, is also irrelevant. In that case, an employee had signed a restrictive covenant with his employer, and then left to work for a new

---

[13] On page 7 of its brief, Lincoln brings up the concept of "third-party standing," pursuant to which a party is attempting to assert the rights of others. This concept is irrelevant here because the Estate is asserting claims in its own right, and not on behalf of anyone else. Accordingly, the cases that Lincoln cites have nothing to do with the present situation. <u>See</u>, <u>e.g.</u>, <u>Kowalski v. Tesmer</u>, 543 U.S. 125, 130-34, 125 S. Ct. 564 (2004) (applying the doctrine of prudential standing, Court held that attorneys did not have "third-party standing" to assert the rights of hypothetical indigents with whom they had no present attorney-client relationship); <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 562, 112 S. Ct. 2130 (1992) (wildlife conservation groups lacked standing to challenge rule promulgated by the Secretary of the Interior that allegedly had adverse effects on endangered species in foreign nations; "[w]hen, however, as in this case, a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of <i>someone else</i>, much more is needed") (italics in original); <u>Mid-Hudson Catskill Ministry</u>, 418 F.3d at 173-74 (multi-faith ministry providing religious services to migrant farm workers had standing to sue on its own behalf, but not on behalf of its volunteers, where there was no showing that the volunteers could not protect their own interests).

page

employer. The new employer – which, of course, was not a party to the restrictive covenant – then sought a declaration in court that the covenant was unenforceable. Understandably, the court held that the new employer lacked standing to challenge the restrictive covenant, since it was not a party to it. Id. at *16-17.

We have already dealt with the fallacy of Lincoln's argument that Plaintiff must be an owner, purchaser or beneficiary of the Lincoln Policy in order to have standing. (See pp. 17-18, supra). However, the cases Lincoln cites on this point are also way off the mark. In Bello v. New England Financial, No. 15802-03, 2004 WL 1305515 (Sup. Ct. Nassau Co. 2004), the court simply noted that the plaintiff, as a purchaser of the life insurance policy at issue, had standing to prosecute the action. In Heslin v. Metropolitan Life Insurance Co., 287 A.D.2d 113, 733 N.Y.S.2d 753 (3d Dept. 2001), and Gaidon v. Guardian Life Insurance Co. of America, 272 A.D.2d 60, 707 N.Y.S.2d 166 (1st Dept. 2000), aff'd, 750 N.E.2d 1078, 1081 (2001), the courts found that someone who was not a purchaser of the subject policies did not have standing to sue. Needless to say, none of these cases concerned a SOLI situation such as we have here, where a specific statute confers upon the estate of the insured standing to assert a claim for the death benefits of the policy.[14]

Finally, the cases cited by Lincoln from other jurisdictions that have statutes similar to New York Insurance Law Section 3205(b)(4) are of no help to Lincoln here. See In re

---

[14] Hylte Bruks Aktiebolag v. Babcock & Wilcox Co., 399 F.2d 289 (2d Cir. 1968), concerned the question of whether the plaintiff was a third-party beneficiary of a contract, an issue not germane to the present action. In Silberman v. Royal Insurance Co., 184 A.D.2d 562, 584 N.Y.S.2d 625 (2d Dept. 1992), the court held that the plaintiff could not bring an action to recover the value of a stolen vehicle because the vehicle was solely owned by his wife, not him. And in Palladino v. Metropolitan Life Insurance Co., 188 A.D.2d 708, 590 N.Y.S.2d 601 (3d Dept. 1992), the court held that the plaintiff – the decedent's father – could not seek a declaration that a life insurance policy had been cancelled because only a duly appointed personal representative can bring suit on behalf of a decedent, and plaintiff had never been so appointed.

Al Zuni Trading, Inc., 947 F.2d 1403, 1404 (9th Cir. 1991); Lewis v. Wal-Mart Stores, Inc., No. 02CV0944 CVE-FHM, 2005 WL 3263377 (N.D. Okla. Dec. 1, 2005); Froiland v. Tritle, 484 N.W.2d 310 (S.D. 1992). Those cases do not hold, as Lincoln suggests in a grossly misleading sentence on page 12 of its brief, that estates do not have standing to sue insurers who have refused to pay the policy proceeds. Rather, those cases simply confirm that where death benefits have been paid to someone with no insurable interest, the estate may seek to recover them. None of those cases deals with the situation we have here, where the insurance company is flat-out refusing to pay the death benefits to anyone, including even the wrong party.

In sum, not one single case cited by Lincoln in its brief gives any support to its position on this motion.

## Conclusion

For all the foregoing reasons, Defendant Lincoln Life & Annuity Co. of New York's Motion to Dismiss the Amended Complaint should be denied.

Dated:     New York, New York
           July 11, 2008

                         FRIEDMAN & WITTENSTEIN
                         A Professional Corporation

                         By:  _Andrew A. Wittenstein_
                              Stuart I. Friedman (SF-9186)
                              Andrew A. Wittenstein (AW-1943)
                              Claire L. Chau (CC-0125)

                         600 Lexington Avenue
                         New York, New York 10022
                         (212) 750-8700

                         *Attorneys for Plaintiff*

Westlaw.

3 Misc.3d 1109(A)                                                                                            Page 1
3 Misc.3d 1109(A), 787 N.Y.S.2d 676, 2004 WL 1305515 (N.Y.Sup.), 2004 N.Y. Slip Op. 50520(U)
**(Cite as: 3 Misc.3d 1109(A), 2004 WL 1305515 (N.Y.Sup.))**

Bello v. New England Financial
N.Y.Sup.,2004.
(The decision of the Court is referenced in a table in
the New York Supplement.)
Supreme Court, Nassau County, New York.
Saverio BELLO, Plaintiff,
v.
NEW ENGLAND FINANCIAL, New England Life
Insurance Company, Metlife, Inc., Stein & Knox,
Creative Financial Partners, LLC, and Gregory
Meyer, Defendants.
**No. 15802-03.**

May 20, 2004.

Kushnick & Associates, P.C., Melville, for plaintiff.
McCarter & English, LLP, New York, for defendant
New England Financial, New England Life Ins. Co.
& Metlife, Inc.
D'Amato & Lynch, Esqs. New York, for defendant
Gregory Meyer.
LEONARD B. AUSTIN, J.
*1 In December 1999, Saverio Bello ("Bello"), who
was then 68 years old, purchased a single premium
Variable Life Policy from New England Life
Insurance Company.

Bello asserts that he purchased this policy based upon
representations made to him by his son-in-law
Defendant Gregory Meyer ("Meyer"), that he would
never have to pay another premium on the policy,
that the policy's cash value would never decrease and
that the policy's death benefit would increase to
approximately $500,000.00.

Bello alleges that based upon these representations,
he withdrew the sum of $200,000.00 from an
individual retirement account and paid the one time
premium due on this policy.

The policy was issued on January 27, 2000. The
primary beneficiary and owner of the policy was the
Saverio Bello Family Trust ("Bello Trust").

When Bello purchased the policy, Meyer was
employed by the Defendant, Stein & Knox. Stein &
Knox was in the business of providing financial

planning and life insurance. Bello alleges that, when
Meyer made the allegedly false, misleading or
fraudulent representations regarding the policy, he
was acting as an employee of Stein & Knox and as an
agent for the Defendants New England Life
Insurance Company, New England Financial and
MetLife, Inc. Creative Financial Partners, LLC is
alleged to be the successor in interest to Stein &
Knox.[FN1]

> FN1. The Defendants Stein & Knox and
> Creative Financial Partners LLC have been
> served but have not appeared.

New England Life Insurance Company issued the
insurance policy to Bello.

New England Financial's relationship to the
transaction involved in this litigation is unclear. New
England Life Insurance Company and New England
Financial are alleged to be subsidiaries of MetLife,
Inc.

The premium paid to purchase the policy were
invested in mutual funds in accordance with the
terms of the policy. The cash value and the death
benefits payable pursuant to the terms of the policy
vary and were dependent upon the performance of
the mutual funds in which the premium was invested
and the return on these investments. The policy had a
fixed minimum death benefit.

By October 2002, the cash value of the policy had
declined to approximately $120,000.00. On October
2, 2002, Bello cancelled the policy and was paid the
sum of $116,342.28, which was the cash surrender
value of the policy less the surrender charge set forth
in the policy.

Bello commenced this action on October 20, 2003 by
filing the summons and complaint with the Nassau
County Clerk. The complaint, after making general
allegations regarding the parties, their status and
relationship alleged five causes of action, to wit:
violation of Insurance Law § 3209 (first cause of
action); negligence (second cause of action); breach
of fiduciary duty (third cause of action); breach of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3 Misc.3d 1109(A)                                                                                                 Page 2
3 Misc.3d 1109(A), 787 N.Y.S.2d 676, 2004 WL 1305515 (N.Y.Sup.), 2004 N.Y. Slip Op. 50520(U)
**(Cite as: 3 Misc.3d 1109(A), 2004 WL 1305515 (N.Y.Sup.))**

contract (fourth cause of action); and unjust enrichment (fifth cause of action). All of the causes of action are based upon the underlying premise that this was not a proper investment for a person of Bello's age and investment needs and that Meyer misrepresented the nature, risks and benefits of a variable life policy. Bello seeks to recover the sum of $83,657.72 which represents the difference between the amount invested $200,000.00 and the amount he received when he surrendered the policy $116,342.28.

**\*2** Defendants move to dismiss this action asserting initially that Bello lacks standing to bring this action or, alternatively, that the claim is barred by documentary evidence; is barred by the applicable statutes of limitations; or fails to set forth a cause of action. Plaintiff cross-moves to serve a supplemental summons and amended complaint adding the Bello Trust as a party Plaintiff and adding additional causes of action alleging violation of General Business Law § 349, fraud in the inducement and fraud and misrepresentation.

*DISCUSSION*

A. *Plaintiff's Motion to Add the Saverio Bello Family Trust as a Plaintiff and Defendant's Motion to Dismiss for Lack of Standing*

The purchasers, owners and/or holders of a life insurance policy have standing to maintain actions on those policies. *Gaidon v. Guardian Life Insurance Company of America,* 272 A.D.2d 60, 707 N.Y.S.2d 166 (1st Dept., 2000), *aff'd.,*96 N.Y.2d 201, 727 N.Y.S.2d 30, 750 N.E.2d 1078 (2001); and *Heslin v. Metropolitan LifeIns. Co.,* 287 A.D.2d 113, 733 N.Y.S.2d 753 (3rd Dept., 2001). As a purchaser of the policy, Bello has standing to bring and prosecute this action.

CPLR 305 and 1003 permit the court to add those who should properly be parties to an action on such terms as may be just. In this case, the Bello Trust, as the owner of the policy, is also a proper party to this action and should be added. See, *Schleidt v. Stamler,* 106 A.D.2d 264, 482 N.Y.S.2d 481 (1st Dept., 1984); and *McDaniel v. Clarkstown Central District No. 1,* 83 A.D.2d 624, 441 N.Y.S.2d 532, (2nd Dept., 1981).

Plaintiff's motion to amend the caption should be

granted. The Bello Trust will be added as a party Plaintiff. Defendants' motion pursuant to CPLR 3211(a)(3), seeking dismissal of this action on the ground that Plaintiff lacks standing to sue must, therefore, be denied.

B. *First Cause of Action-Insurance Law § 3209*

Insurance Law § 3209 prohibits an insurance company from issuing a variable life insurance policy unless the insurance company provides to the prospective purchaser a copy of the most recent buyer's guide and the preliminary information as required by Insurance Law § 3209(d). Bello asserts that he was not provided with either buyer's guide or the preliminary information as required by statute.

CPLR 214(2) imposes a three year statute of limitations on "... an action to recover upon a liability ... created or imposed by statute except as provided in sections 213 and 215."Neither CPLR 213 nor CPLR 215 are relevant to this action. CPLR 214(2) applies to all causes of action in which liability is premised upon an obligation, duty or right created by statute and not recognized by the common or decisional law. *Hartnett v. New York City Transit Authority,* 86 N.Y.2d 438, 633 N.Y.S.2d 758, 657 N.E.2d 773 (1995).

The statute of limitations begins to run when the cause of action accrues.CPLR 203(a). The cause of action accrues "... when all of the facts necessary to the cause of action have occurred so that the party would be entitled to obtain relief in court (citations omitted)."*Aetna Life & Casualty Co. v. Nelson,* 67 N.Y.2d 169, 175, 501 N.Y.S.2d 313, 492 N.E.2d 386 (1986). In this case, the obligation to provide Bello with the material required by Insurance Law § 3209 arose before the policy was issued on January 27, 2000. Therefore, the cause of action accrued not later than January 27, 2000.

**\*3** An action is commenced when the summons with notice or the summons and complaint is filed with the County Clerk. CPLR 304. The summons and complaint herein were filed on October 20, 2003.

Since more than three years have elapsed between the time that this cause of action accrued and the action was commenced, the first cause of action which asserts a claim pursuant to Insurance Law § 3209 is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3 Misc.3d 1109(A)                                                                                    Page 3
3 Misc.3d 1109(A), 787 N.Y.S.2d 676, 2004 WL 1305515 (N.Y.Sup.), 2004 N.Y. Slip Op. 50520(U)
**(Cite as: 3 Misc.3d 1109(A), 2004 WL 1305515 (N.Y.Sup.))**

time barred by the applicable statute of limitations and must be dismissed.

This action is also subject to dismissal pursuant to CPLR 3211(a)(1) which provides for dismissal of an action where the defense is based upon documentary evidence. A cause of action will be dismissed when the documentary evidence submitted in support of the motion conclusively establishes a defense as a matter of law. *730 J & J LLC v. Fillmore Agency, Inc.*, 303 A.D.2d 486, 755 N.Y.S.2d 887 (2nd Dept., 2003); and *Berger v. Temple Beth-el of Great Neck*, 303 A.D.2d 346, 756 N.Y.S.2d 94 (2nd Dept., 2003).

Policy Paragraph 19 is captioned "Suitability/Disclosure Section." In this section, Bello was asked if he received a prospectus relating to the policy on April 30, 1999. He was also asked whether he was advised and understood that death benefit may increase or decrease but never be less than the guaranteed minimum and that the cash value of the policy may increase or decrease depending upon the return on the policy's investments. Finally, Bello was asked if he believed that this policy will meet his insurance needs and financial objectives. Bello answered "Yes" to all of these questions. The questions posed and the answers given by Bello conclusively establish that he was provided with the information required by Insurance Law § 3209.

Based upon the applicable statute of limitations and the documentary evidence presented, the first cause of action must be dismissed.

C.    *Second Cause of Action-Negligent Misrepresentation*

This cause of action essentially alleges that the Defendants negligently misrepresented the risks involved in purchasing a variable life insurance policy. Bello asserts that given his age and his objective to purchase a risk-free life insurance policy that the Defendants should have advised him of the risks and should have advised him to purchase another type of policy.

Causes of action against to recover damages for the negligence of insurance brokers or agents are governed by a three (3) year statute of limitation established in CPLR 214(4).*Chase Scientific Research, Inc. v. NIA Group, Inc.*, 96 N.Y.2d 20, 725

N.Y.S.2d 592, 749 N.E.2d 161 (2001).

Since the basis of the allegations of negligence relate to the description of the policy given by Meyer, the cause of action accrued no later than the date of issuance of the policy; January 27, 2000. The alleged false representations had to be made prior to the issuance of the policy.

The policy contains a provision that it could be cancelled and a full refund of the premium obtained if the policy was returned to New England Life or its agent within ten (10) days of the date that the policy was received by Bello, as the insured. The policy was issued on January 27, 2000. Bello does not claim that he did not receive the policy or that is was received significantly after January 27, 2000.

**\*4** Since this cause of action accrued more than three years prior to the date on which the action was commenced, it is also barred by the statute of limitations and must be dismissed.

D. *Third Cause of Action-Breach of Fiduciary Duty*

Defendant also moves to dismiss this cause of action on the grounds that it is time barred and that the complaint fails to state a cause of action.

The relationship between a life insurance company and a policyholder is one in contract. Thus, no fiduciary relationship exists between a life insurance company and its policyholder. *Uhlman v. New York Life Ins. Co.*, 109 N.Y. 421, 17 N.E. 363 (1888). See also, *Rabouin v. Metropolitan Life Ins. Co.*, 182 Misc.2d 632, 699 N.Y.S.2d 655 (Sup.Ct., N.Y. Co.1999), aff'd.*282 A.D.2d 381, 723 N.Y.S.2d 651 (1st Dept.2001). Since no fiduciary relationship exists between Bello and New England Financial, New England Life Insurance Company and/or MetLife, Inc., the third cause of action fails to state a cause of action upon which relief can be granted and must be dismissed.

Nor does the purchase of an insurance policy from an agent or broker give rise to a fiduciary relationship. *Paull v. First UNUM Life Ins. Co.*, 295 A.D.2d 982, 744 N.Y.S.2d 95 (4th Dept., 2002). See also, *Goshen v. The Mutual Life Ins. Co. of New York*, 1997 WL 710669 (Sup.Ct., N.Y. Co., 1997), aff'd.*259 A.D.2d

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

360, 684 N.Y.S.2d 791 (1st Dept.), *mod. on other grds,* 94 N.Y.2d 330, 704 N.Y.S.2d 177, 725 N.E.2d 598 (1999). An insurance agent has the obligation to obtain the coverage requested by the customer within a reasonable period of time or to inform the customer of the agent's inability to obtain such coverage. *Barco Auto Leasing Corp. v. Montano,* 215 A.D.2d 617, 627 N.Y.S.2d 705 (2nd Dept., 1995). Since the relationship between Meyer and Bello in this circumstance is one of agent-customer, a fiduciary relationship does not exist.

Therefore, the third cause of action fails to state a cause of action and must be dismissed.

Even if one were to assume that a fiduciary relationship existed between Bello and the Defendants, a cause of action for breach of that fiduciary duty would be barred by the applicable statute of limitations.

The statute of limitations for a cause of action for breach of fiduciary duty is dependent upon the relief requested. If Plaintiff, in the complaint, alleges an equitable claim, then the applicable statute of limitation is six (6) years. CPLR 213(1). See, *Loengard v. Santa Fe Indus., Inc.,* 70 N.Y.2d 262, 519 N.Y.S.2d 801, 514 N.E.2d 113 (1987); and *Langford v. Roman Catholic Diocese of Brooklyn,* 271 A.D.2d 494, 705 N.Y.S.2d 661 (2nd Dept., 2000). If Plaintiff seeks legal relief or money damages, in the complaint, the applicable statute of limitations is three (3) years. *Dignelli v. Berman,* 293 A.D.2d 565, 741 N.Y.S.2d 66 (2nd Dept., 2002); and *Yatter v. William Morris Agency, Inc.,* 256 A.D.2d 260, 682 N.Y.S.2d 198; and CPLR 214(4).

This cause of action accrued, at the latest, when the insurance policy was issued on January 27, 2000. This action was not commenced until October 2003. The only relief sought for the breach of the fiduciary duty is money damages. The applicable statute of limitations is three (3) years. This action was not commenced within three years of its accrual. Therefore, it is barred by the statute of limitations and must be dismissed.

E. *CPLR 3211(a)(7)-Failure To State A Cause of Action*

**\*5** When deciding such a motion to dismiss for

failure to state a cause of action, the court must accept as true all of the facts alleged in the complaint and any evidentiary submissions made in opposition to the motion. *511 West 232rd Street Owners Crop. V. Jennifer Realty Co.,* 98 N.Y.2d 144, 746 N.Y.S.2d 131, 773 N.E.2d 496 (2002); and *Sokoloff v. Harriman Estates Development Corp.,* 96 N.Y.2d 409, 729 N.Y.S.2d 425, 754 N.E.2d 184 (2001). The court must also give the pleader the benefit of every inference which may be drawn from the pleadings. *Leon v. Martinez,* 84 N.Y. 12 (1994); See also, *Dye v. Catholic Medical Center of Brooklyn & Queens, Inc.,* 273 A.D.2d 193, 710 N.Y.S.2d 83 (2nd Dept., 2000).

On a motion made pursuant to CPLR 3211(a)(7), the court must read the pleading to determine if the pleader has a cause of action and not whether the cause of action has been properly plead. *Guggenheimer v. Ginzburg,* 43 N.Y.2d 268, 401 N.Y.S.2d 182, 372 N.E.2d 17 (1977); and *Rovello v. Orofino Realty Co.,* 40 N.Y.2d 633, 389 N.Y.S.2d 314, 357 N.E.2d 970 (1976). See also, *Kenneth R. v. Roman Catholic Diocese of Brooklyn,* 229 A.D.2d 159, 654 N.Y.S.2d 791 (2nd Dept., 1997); and *Goldman v. Goldman,* 118

A.D.2d 498 (1st Dept., 1986). The court must determine from the facts as plead and the inferences which can be drawn from those facts whether the pleader has any legally cognizable cause of action. *Frank v. DaimlerChrysler Corp.,* 292 A.D.2d 118, 741 N.Y.S.2d 9 (1st Dept., 2002).

The factual allegations contained in the complaint are deemed true and afforded every favorable inference, legal conclusions or facts contradicted on the record, however, are not entitled to such a presumption. *In re Loukoumi,* 285 A.D.2d 595, 728 N.Y.S.2d 383 (2nd Dept., 2001); and *Doria v. Masucci,* 230 A.D.2d 764, 646 N.Y.S.2d 363 (2nd Dept., 1996). When the movant offers evidentiary material, the court must determine whether the pleader has a valid, sustainable cause of action. *Morris v. Morris,* 306 A.D.2d 449, 763 N.Y.S.2d 622 (2nd Dept., 2003); and *Meyer v. Guinta,* 262 A.D.2d 463, 692 N.Y.S.2d 159 (2nd Dept., 1999).

1. *Fourth Cause of Action-Breach of Contract*

In order to plead a cause of action for breach of contract, the complaint must plead the provisions of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the contract upon which the cause of action is based.*Rattenni v. Cerreta, 285 A.D.2d 636, 728 N.Y.S.2d 401 (2nd Dept., 2001);* and *Atkinson v. Mobil Oil Corp., 205 A.D.2d 719, 614 N.Y.S.2d 36 (2nd Dept., 1994).* The complaint and the papers submitted in opposition to the Defendants' motion are devoid of any factual allegations regarding what contract was breached or which contractual provisions were violated.

Bello did not have a contractual relationship with either New England Financial or MetLife. Since Bello was not in privity with either of these Defendants, the fourth cause of action fails to state cause of action against these Defendants and must be dismissed.

Bello did have a contractual relationship with New England Life. However, Bello does not allege that New England Life violated any provision of the insurance policy. In fact, Bello's action is premised on the fact that New England Life fully complied with the terms of the policy thus causing both the death benefit and cash value of policy to decrease.

**\*6** Bello also had a contractual relationship with Meyer. However, an insurance agent's obligation to the client is to obtain the requested coverage within a reasonable period of time or to advise the customer of the inability to obtain such coverage. *Barco Auto Leasing Corp. v. Montano, supra.* In this case, Meyer obtained the precise policy that Bello requested. Bello does not contest this. This action is not premised upon a breach of contract but rather upon the fact the policy performed in accordance with its terms.

Therefore, the fourth cause of action fails to state a cause of action upon which must be dismissed as to all Defendants.

### 2. Fifth Cause of Action-Unjust Enrichment

Unjust enrichment is based upon quasi-contract. A party may not obtain recovery for unjust enrichment unless the written agreement between the parties "... has been rescinded, is unenforceable or abrogated."*Waldman v. Englishtown Sportswear, Ltd., 92 A.D.2d 833, 836, 460 N.Y.S.2d 552 (1st Dept., 1983).*

In this case, the contractual relationship between Bello and the Defendants has not been rescinded. Nor has it been held to be unenforceable or abrogated. Bello seeks to recover the difference between the amount he received under the terms of the contract when he cancelled the contract (the cash surrender value) and the initial premium he paid. Bello cannot enforce the contract and then seek recovery in quasi-contract.

To establish a claim for unjust enrichment, Plaintiff must establish that the Plaintiff performed services for the Defendant which resulted in the Defendant being unjustly enriched. *Clark v. Daby, 300 A.D.2d 732, 751 N.Y.S.2d 622 (3rd Dept., 2002);* and *Kagan v. K-Tel Entertainment, Inc., 172 A.D.2d 375, 568 N.Y.S.2d 756 (1st Dept., 1991).* Plaintiff must establish that the services were performed at the request or behest of the Defendant. *Clark v. Daby, supra; Prestige Caterers v. Kaufman, 290 A.D.2d 295, 736 N.Y.S.2d 335 (1st Dept., 2002);* and *Lakeville Pace Mechanical, Inc. v. Elmar Realty Corp., 276 A.D.2d 673, 714 N.Y.S.2d 338 (2nd Dept., 2000).*

In this case, Bello has not performed any services for the Defendants. He paid a premium to purchase an insurance policy issued by New England Life. New England Life fully complied with the terms of the policy. While the purchase of a variable life policy may have been an imprudent or unwise investment, none of the Defendants were unjustly enriched by Bello's purchase of this policy. Until it was cancelled, Bello enjoyed the benefits conferred by the policy for which he paid.In deciding a motion made pursuant to CPLR 3211(a)(7), the court must determine if the pleader has a cause of action, not whether it has been properly plead.

*Guggneheimer v. Ginzburg, supra.*While the fifth cause of action is denominated a cause of action for "Unjust Enrichment", it appears, from a reading of the complaint and the papers submitted in regard to this motion, that Plaintiff is actually seeking restitution-the difference between what Bello paid as the premium on the policy and the amount he received when he surrendered the policy.

**\*7** To establish a claim for restitution, the Plaintiff must establish that the Defendant received money,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3 Misc.3d 1109(A)                                                                                               Page 6
3 Misc.3d 1109(A), 787 N.Y.S.2d 676, 2004 WL 1305515 (N.Y.Sup.), 2004 N.Y. Slip Op. 50520(U)
**(Cite as: 3 Misc.3d 1109(A), 2004 WL 1305515 (N.Y.Sup.))**

property or services from the plaintiff, that the Defendant benefitted from the receipt of the money, property or services and that in equity and good conscience the Defendant should not be permitted to retain the money or property or should be required to pay for the services. *Matter of Estate of Witbeck*, 245 A.D.2d 848, 666 N.Y.S.2d 315 (3rd Dept., 1997); and *Wiener v. Lazard Freres & Co.*, 241 A.D.2d 114, 672 N.Y.S.2d 8 (2nd Dept., 1998); and *Tarrytown House Condominiums, Inc. V. Hainje*, 161 A.D.2d 310, 555 N.Y.S.2d 83 (1st Dept., 1990), See also, 2 N.Y. PJI 4:2, p. 615 (2004).

The complaint fails to state a cause of action for restitution against Meyer since he did not receive an money, property or services from Bello. The money to purchase the policy was paid to New England Life.

The complaint also fails to state a cause of action for restitution against New England Financial, New England Life or MetLife. Neither New England Financial nor MetLife received any money or property from Bello. The premium was paid the New England Life which issued the policy.

The money paid by Bello to New England Life was used to purchase a variable life policy. When Bello chose to surrender the policy, he received the full cash surrender value of the policy calculated in accordance with the terms of the policy. New England Life did not receive a benefit and retain anything that was due, or properly belonged, to Bello pursuant to the terms of the policy. Bello is seeking to recover the losses he sustained as a result of the policy performing in accordance with its terms. Restitution does not provide a remedy to one who made an unwise or improvident investment.

The fifth cause of action fails to state a cause of action and must be dismissed.

F. *Plaintiff's Cross-motions for Leave to Serve an Amended Complaint*

1. *Standard-Motion to Amend the Complaint*

A party should be granted leave to serve an amended pleading in the absence of prejudice or surprise resulting from delay. CPLR 3025(b). See also, *Fahey v. County of Ontario*, 44 N.Y.2d 934, 408 N.Y.S.2d

314, 380 N.E.2d 146 (1978); and *Northbay Construction Co., Inc. v. Bauco Construction Corp.*, 275 A.D.2d 310, 711 N.Y.S.2d 510 (2nd Dept., 2000). The party opposing the amendment must demonstrate that there will be actual prejudice in permitting the service of an amended pleading. *Edenwald Contracting Co., Inc. v. City of New York*, 60 N.Y.2d 957, 471 N.Y.S.2d 55, 459 N.E.2d 164 (1983); *Holchendler v. We Transport, Inc.*, 292 A.D.2d 568, 739 N.Y.S.2d 621 (2nd Dept., 2002); and *O'Neal v. Cohen*, 186 A.D.2d 639, 588 N.Y.S.2d 621 (2nd Dept., 1992).

The determination of whether to deny or permit an amendment to the pleadings is one addressed to the sound discretion of the court. *Liendo v. Long Island Jewish Med. Ctr.*, 273 A.D.2d 445, 711 N.Y.S.2d 741 (2nd Dept., 2000); and *Henderson v. Gulati*, 270 A.D.2d 308, 705 N.Y.S.2d 54 (2nd Dept., 2000)

The party seeking leave to serve an amended pleading must make an evidentiary showing establishing merit to the proposed amendment. *Joyce v. McKenna Assocs., Inc.*, 2 A.D.3d 592, 768 N.Y.S.2d 358 (2nd Dept., 2003); and *Morgan v. Prospect Park Assocs. Holdings, L.P.*, 251 A.D.2d 306, 674 N.Y.S.2d 62 (2nd Dept., 1998). The evidentiary showing establishing merit must be made by one with actual knowledge of the facts surrounding the proposed amendment. *Id.;* and *Frost v. Monter*, 202 A.D.2d 632, 609 N.Y.S.2d 308 (2nd Dept., 1994). The court will not consider the merits of the proposed amendment unless it is insufficient as a matter of law or totally devoid of merit. *Sunrise Plaza Assocs., L.P. v. International Summit Equities Corp.*, 288 A.D.2d 300, 733 N.Y.S.2d 443 (2nd Dept., 2001); and *Norman v. Ferrara*, 107 A.D.2d 739, 484 N.Y.S.2d 600 (2nd Dept., 1985). See also, Siegel, *New York Practice 3rd* § 237.

**\*8** In this case, Plaintiff's cross-motions for leave to serve an amended complaint are supported solely by an attorney's affirmation. While a verified complaint may be used in lieu of an affidavit to establish merit. (CPLR 105 [u] ), the verification must be by someone with personal knowledge of the facts and the complaint must set forth facts sufficient to withstand a motion for summary judgment. See, *Pollnow v. Poughkeepsie Newspaper, Inc.*, 67 N.Y.2d 778, 501 N.Y.S.2d 17, 492 N.E.2d 125 (1986); and *Riverhead Building Supply Corp. v. Regine Starr*,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3 Misc.3d 1109(A)                                                                                   Page 7
3 Misc.3d 1109(A), 787 N.Y.S.2d 676, 2004 WL 1305515 (N.Y.Sup.), 2004 N.Y. Slip Op. 50520(U)
**(Cite as: 3 Misc.3d 1109(A), 2004 WL 1305515 (N.Y.Sup.))**

---

*Inc.,* 249 A.D.2d 532, 672 N.Y.S.2d 117 (2nd Dept., 1998). The complaint is verified by Plaintiff's attorney. The proposed amended complaint is not verified by a party with knowledge.

Since Plaintiff has failed to make an evidentiary showing that the proposed amendment is meritorious, the motion for leave to serve an amended complaint must be denied. Nevertheless, denial of Bello's cross-motions on this basis would not be a determination of the merits of causes of action asserted in the proposed amended complaint. Plaintiff could simply commence another action asserting these causes of action. The Court would then address the sufficiency of those claims.

2. *General Business Law § 349*

General Business Law § 349 prohibits deceptive business practices. The statute makes actionable conduct which does not rise to the level of common law fraud. *Gaidon v. Guardian Life Ins. Co. Of America,* 94 N.Y.2d 330, 704 N.Y.S.2d 177, 725 N.E.2d 598 (1999) ("*Gaidon I* ").

The statute provides a remedy to those who have been subjected to deceptive or misleading acts or business practices that are consumer oriented. *Oswego Laborers Local 214 Pension Fund v. Marine Midland Bank, N.A.,* 85 N.Y.2d 20, 623 N.Y.S.2d 529, 647 N.E.2d 741 (1995). A deceptive act or practice for the purpose of the statute is one which is likely to mislead a reasonably prudent consumer. *Karlin v. IVF, America, Inc.,* 93 N.Y.2d 282, 690 N.Y.S.2d 495, 712 N.E.2d 662 (1999).General Business Law § 349(h) provides for a private right of action to enjoin such practices or to recover damages sustained resulting from such practices.

The three (3) years statute of limitations set forth in CPLR 214(2) is applicable to private actions brought pursuant to General Business Law § 349. *Gaidon v. Guardian Life Ins. Co. of America,* 272 A.D.2d 60, 707 N.Y.S.2d 166 (1st Dept.2000), *aff'd.,*96 N.Y.2d 201, 727 N.Y.S.2d 30, 750 N.E.2d 1078 (2001). ("*Gaidon II* "). The cause of action accrues when Plaintiff first suffers compensable injury. *Id.*

In this case, the cause of action accrued when the policy was issued. The face sheet of the policy contains a statement that the death benefit can vary

from day to day in accordance with the terms of the policy. The statement relating to the variable death benefits specifically makes reference to Section 7 of the policy which contains a detailed explanation of how the death benefit will be calculated. The face sheet also contains a statement that the cash value of the policy can vary from day to day depending upon the performance of the investment accounts. The statement regarding the variable nature of the cash value of the policy makes reference to Section 11 of the policy which gives a detailed explanation of how the cash value of the policy will be calculated and how, when and why the cash value of the policy will vary.

**\*9** The face sheet of the policy clearly states that the policy is a legal contract between the policyholder and the company; that the policy should be read carefully; and that the policy can be cancelled and the full premium paid refunded if the policy is returned to either the company or the agent within ten days of the issuance of the policy.

Considering the statements contained in the policy, any claims relating to any false or misleading statements made by Meyer to Bello regarding the nature of the policy could and should have been discovered when the policy was issued or shortly thereafter. The policy was issued in January 2000. Bello does not claim that he did not receive a copy of the policy nor does he assert that the policy provided to him was different from the policy attached to the motion.

A party may not amend a complaint to assert a claim that is barred by the statute of limitations. See, *Goldberg v. Camp Mikan-Recro,* 42 N.Y.2d 1029, 398 N.Y.S.2d 1008, 369 N.E.2d 8 (1977). See also, *Truty v. Federal Bakers Supply Corp.,* 217 A.D.2d 951, 629 N.Y.S.2d 898 (4th Dept., 1995).

General Business Law § 349 applies only to deceptive business practices that occur in New York. *Goshen v. Mutual Life Ins. Co. Of New York,* 98 N.Y.2d 314, 746 N.Y.S.2d 858, 774 N.E.2d 1190 (2002).

Bello resided in Fort Lee, New Jersey at the time that he purchased the policy. The named owner and beneficiary, the "Bello Trust" is also listed as having an address in Fort Lee, New Jersey. In view of this,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3 Misc.3d 1109(A)                                                                                          Page 8
3 Misc.3d 1109(A), 787 N.Y.S.2d 676, 2004 WL 1305515 (N.Y.Sup.), 2004 N.Y. Slip Op. 50520(U)
**(Cite as: 3 Misc.3d 1109(A), 2004 WL 1305515 (N.Y.Sup.))**

General Business Law § 349 is not applicable to this circumstance.

Finally, the claim would also be barred by the documentary evidence. In order to sustain a claim pursuant to General Business Law § 349, the deceptive representation or practice must be such that it mislead a reasonably prudent consumer. *Stutman v. Chemical Bank, 95 N.Y.2d 24, 709 N.Y.S.2d 892, 731 N.E.2d 608 (2000).* Fully disclosed risks are not deceptive practices for the purposes of General Business Law § 349. *Citipostal, Inc. v. Unistar Leasing, 283 A.D.2d 916, 724 N.Y.S.2d 555 (4th Dept., 2001).* In this case, the policy fully explains the risks. Furthermore, Bello admits to having received the prospectus regarding his policy, that the risks of the policy were fully disclosed and explained to him prior to his purchase of the policy and that he understood those risks.

For the foregoing reasons, leave to amend the complaint to allege a cause of action pursuant to General Business Law § 349 cannot be granted.

### 3. Fraud

Plaintiff also seeks leave to serve an amended complaint which alleges a cause of action for fraud in the inducement and fraudulent concealment.

The elements of common law fraud are "representation of a material existing fact, falsity, scienter, deception and injury." *Channel Master Corp. v. Aluminum Limited Sales Inc., 4 N.Y.2d 403, 407, 176 N.Y.S.2d 259, 151 N.E.2d 833 (1958).* See also, *Dalessio v. Kressler, --- A.D.2d ----, 773 N.Y.S.2d 434 (2nd Dept., 2004).* In the context of the purchase of an insurance policy, Plaintiff must establish that the misrepresentations induced Plaintiff to purchase the policy as well as scienter, reliance and injury. *Gaidon I, supra;* and *New York University v. Continental Ins. Co., 87 N.Y.2d 308, 639 N.Y.S.2d 283, 662 N.E.2d 763 (1995).*

*10 A contract is not fraudulently induced if the misrepresentation could have been discovered through the exercise of due diligence. See, *Danann Realty Corp. v. Harris, 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959);* and *Cohen v. Cerier, 243 A.D.2d 670, 663 N.Y.S.2d 643 (2nd Dept., 1997).*

Assuming that Meyer did, at some point, misrepresent the risks of the policy, Bello cannot claim to have reasonable relied upon those representations in view of his acknowledgment of receipt of the prospectus and his acknowledgment that the risks of the policy were explained to him. Furthermore, the terms of the policy clearly and unambiguously explain the risks involved in such a policy. Therefore, the proposed amendment to assert a claim for fraud in the inducement is meritless and the motion must be denied.

A party cannot void an agreement by claiming that the terms of an agreement were fraudulently misrepresented when the fraudulent misrepresentation could have easily discovered by reading the document. *Morby v. Di Siena Assoc., LPA, 291 A.D.2d 604, 737 N.Y.S.2d 678 (3rd Dept., 2002);* and; *Collins v. E-Magine, LLC, 291 A.D.2d 350, 739 N.Y.S.2d 15 (1st Dept., 2002).* See, *Shklovskiy v. Khan, 273 A.D.2d 371, 709 N.Y.S.2d 208 (2nd Dept., 2000).*

Plaintiffs also seek to assert a cause of action for fraudulent concealment. In order to establish a claim for fraudulent concealment, Plaintiff must prove the elements of fraud and must further establish that the Defendant had an affirmative duty to disclose information. *Swersky v. Dreyer and Traub, 219 A.D.2d 321, 643 N.Y.S.2d 33 (2nd Dept., 1996);* and *George Cohen Agency, Inc. v. Donald S. Perlman Agency, Inc., 114 A.D.2d 930, 495 N.Y.S.2d 408 (2nd Dept., 1985).* Such an obligation arises in the absence of a fiduciary relationship only where one's superior knowledge of the essential facts renders a transaction inherently unfair if those facts are not disclosed. *Swersky v. Dreyer and Traub, supra.* A claim for fraud in the inducement will not lie where the information is readily available to the Plaintiff. *Reale v. Sotheby's, Inc., 278 A.D.2d 119, 718 N.Y.S.2d 37 (1st Dept., 2000).*

In this case, the information regarding the risks of the policy were not only readily available to Bello, they were actually disclosed to him. Therefore, the claim for fraudulent concealment is meritless and leave to amend to permit such a claim to be alleged must be denied.

### G. Defendants' Motion for Sanctions

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3 Misc.3d 1109(A)                                                                                             Page 9
3 Misc.3d 1109(A), 787 N.Y.S.2d 676, 2004 WL 1305515 (N.Y.Sup.), 2004 N.Y. Slip Op. 50520(U)
**(Cite as: 3 Misc.3d 1109(A), 2004 WL 1305515 (N.Y.Sup.))**

Defendants New England Financial, New England Life and MetLife seek sanctions as provided for by 22 NYCRR § 130-1.1 and attorney's fees. Sanctions may be imposed for frivolous conduct. 22 NYCRR § 130-1.1(c). For the purposes of this action, the only relevant section is 22 NYCRR § 130-1.1(c)(1) which permits the Court to impose sanctions on a party who commences an action which "... is completely without merit or which cannot be supported by a reasonable argument for an extension, modification or reversal of existing law."The decision as to whether to award sanctions is within the sound discretion of the court. _Wagner v. Goldberg,_ 293 A.D.2d 527, 739 N.Y.S.2d 850 (2nd Dept., 2002).

*11 The moving Defendants base their claim for sanctions upon a letter on New England Financial letterhead dated August 20, 2003 responding to letters sent by Plaintiff's attorney to New England Financial regarding this claim which was in response to letters sent by Plaintiff's attorney to New England Financial on three occasions, the first being on June 24, 2003.

New England Financial took nearly two months to respond to these letters. New England Financial's letter sets forth its position in regard to this claim. It is not a final determination of the claim nor does it address any of the bases upon which this motion was made.

Additionally, Bello has filed a complaint with the New York State Insurance Department regarding the issues involved in this action. It is unclear what, if any, action has been taken by the Insurance Department in regard to this complaint. It would be improvident for this Court to impose sanctions upon the Plaintiff for commencing a frivolous action while this matter is pending for the Insurance Department.

Therefore, Defendants request for sanctions and legal fees is denied.

Accordingly, it is,

ORDERED, that Plaintiff's cross-motions to amend the caption to add "The Saverio Bello Family Trust" as a Plaintiff is granted; and it is further,

ORDERED, that the motions of the Defendants, New England Financial, New England Life Insurance Company, MetLife, Inc., and Gregory Meyer for an order dismissing the complain in this action pursuant to CPLR 3211(a)(1),(5) and (7) is granted; and it is further,

ORDERED, that Plaintiff's cross-motions for leave to serve an amended complaint is denied; and it is further,

ORDERED, that the motion of Defendants New England Financial, New England Life Insurance Company and MetLife, Inc. for sanctions and attorney's fees is denied.

This constitutes the decision and Order of the Court.

N.Y.Sup.,2004.
Bello v. New England Financial
3 Misc.3d 1109(A), 787 N.Y.S.2d 676, 2004 WL 1305515 (N.Y.Sup.), 2004 N.Y. Slip Op. 50520(U)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy
Slip Copy, 2007 WL 2702241 (S.D.N.Y.)
**(Cite as: 2007 WL 2702241 (S.D.N.Y.))**

Page 1

Blakely v. Cardozo
S.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Dr. Delois BLAKELY, Plaintiff,
v.
Michael A. CARDOZO, Leslie Spitalnick, Martha E.
Stark, Shaun Donovan, Myriam Ellis, Mark
Matthews, Defendants.
**No. 07 Civ. 3951 DLC.**

Sept. 17, 2007.

Dr. Delois Blakely, New York, New York, Plaintiff,
pro se.
Christina L. Hoggan, Assistant Corporation Counsel
of the City of New York, New York, New York, for
Defendants.

*ORDER AND OPINION*

COTE, J.
**\*1** Plaintiff Dr. Delois Blakely brings the instant
action against various officials of the City of New
York (the "City"), alleging that the City has violated
her federal statutory and constitutional rights by
initiating an in rem tax foreclosure action against 477
West 142nd Street, New York, New York (the
"property"), a property owned by the 477 West
142nd Street Housing Development Fund
Corporation (the "HDFC"), of which Blakely claims
to be a shareholder. The defendant City officials (the
"defendants") have moved to dismiss pursuant to
Federal Rule of Civil Procedure 12(b)(6), claiming
that Blakely lacks standing to prosecute this action
or, in the alternative, that she has failed to state a
claim upon which relief can be granted. Because
Blakely lacks standing to sue, the defendants' motion
to dismiss is granted.

BACKGROUND

The following facts are undisputed. The HFDC, duly
organized as a corporation under the New York
Private Housing Finance Law, purchased the property
at 477 West 142nd Street from the City in 1982 and
covenanted with the City to operate the premises

solely as a housing project for persons or families of
low income. Blakely lives on the property and claims
to be a shareholder in the HDFC. On January 9, 2004,
the City commenced an in rem tax foreclosure action
against certain delinquent tax parcels, including 477
West 142nd Street. *See In Rem Tax Foreclosure
Action No. 46, Borough of Manhattan,* Index No.
580001/04 (*"Manhattan 46"* ). As of that date, the
outstanding taxes and other charges against the
property amounted to $302,370.03; as of September
21, 2006, this figure had increased to $475,172.96.
HDFC answered in *Manhattan 46* on April 29, 2004,
resulting in the severance of the property from the
foreclosure action. *See N.Y. City Admin. Code § 11-
409.*

The City moved for summary judgment in the
Supreme Court, New York County, on December 22,
2006. On April 16, 2007, Shirley Pitts, suing as Vice
President and a shareholder of HDFC and represented
by counsel, filed an opposition. HDFC did not file its
own submission, and the court treated Pitts'
opposition as HDFC's own. The City served Pitts
with its reply papers on April 19, 2007, and on April
23, the court granted the City's motion for summary
judgment. The City filed a proposed judgment of
foreclosure on May 21, 2007. Three days later, on
May 24, the HDFC, represented by counsel, moved
for reargument and sought vacatur of the Supreme
Court's April 23, 2007 decision. The HDFC claimed
that it failed to submit its own opposition to the City's
motion for summary judgment because of
miscommunication among the interested parties. On
June 6, the City served opposition papers on the
HDFC in response to its May 24 motion for
reargument and vacatur, and the HDFC replied on
June 8. By decision dated June 11, 2007, the
Supreme Court vacated its April 23, 2007 decision
and reconsidered the City's motion for summary
judgment. After reviewing the parties' submissions,
the court again found that the HDFC had defaulted
and, on reargument, had not "proffered evidence of
inaccuracy of calculation and what correct amount is
due."Accordingly, the Supreme Court again granted
summary judgment to the City.

**\*2** On May 21, 2007, Blakely, along with Bishop
Shirley Pitts and Margaret Calender, filed the instant

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 2
Slip Copy, 2007 WL 2702241 (S.D.N.Y.)
**(Cite as: 2007 WL 2702241 (S.D.N.Y.))**

suit seeking injunctive and declaratory relief under 18 U.S.C. §§ 241, 242, and 245, and 42 U.S.C. §§ 1983 and 3631. On July 9, Pitts and Calender withdrew their claims pursuant to a Stipulation to Discontinue Action. Blakely, pro se and proceeding as the sole plaintiff, requests appointment of an independent attorney to recalculate the debt owed by the HDFC to the City; an injunction to prevent the City from foreclosing on the property for six months so that the HDFC can "obtain grants and pay outstanding taxes"; a transfer of the property to the New Future Foundation, a nonprofit organization of which Blakely is president, and a declaration that transfer to any other third party would be "void on its face"; and ten million dollars in monetary damages. The City moves to dismiss, claiming principally that Blakely lacks standing to prosecute this action, and that she has failed to state a claim under the various statutes listed in the complaint.

DISCUSSION

When considering a motion to dismiss under Rule 12(b)(6), a trial court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party."*McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir.2007)* (citation omitted). It may "dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations" set forth therein. *Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514 (2002)* (citation omitted); see also*McCarthy, 482 F.3d at 191.* Standing is assessed on the basis of the pleadings, and thus a court accepts as true "all material allegations of the complaint, and must construe the complaint in favor of the complaining party."*Bldg. & Constr. Trades Council v. Downtown Dev., Inc., 448 F.3d 138, 144 (2d Cir.2006)* (citation omitted).

The defendants claim that Blakely lacks standing to prosecute this suit because she does not own the premises subject to the in rem foreclosure action. To the extent Blakely seeks to bring the action on behalf of the HDFC, they contend that she is not authorized to do so because a corporation cannot proceed pro se. Blakely counters that she has standing because she brings this suit as a "private shareholder[ ]" of the HDFC. She further argues that she was deceived by the City into believing that she was the owner of the

property by its sanctioning of the HDFC as a corporate body comprised of the owners of apartments at 477 West 142nd Street, and that she would suffer a constitutionally cognizable injury if the City were now to preclude her from bringing suit on behalf of the HDFC.

To have standing under Article III of the United States Constitution, "a plaintiff must have suffered an 'injury in fact' that is 'distinct and palpable'; the injury must be fairly traceable to the challenged action; and the injury must be likely redressable by a favorable decision."*Denney v. Deutsche Bank AG, 443 F.3d 253, 263 (2d Cir.2006)* (citing *Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).*"[T]he harm must be 'actual or imminent,' not 'conjectural or hypothetical.' " *Id.* at 264 (citing *Whitmore v. Arkansas, 495 U.S. 149, 155-56 (1990)).*

*3 Because the property at 477 West 142nd Street is the object of the City's in rem foreclosure action, only the property's legal owner, the HDFC, can be alleged to have suffered the requisite injury to confer standing. Blakely, a shareholder of the HDFC, is "injured only as a result of the injury to another, *i.e.,* the corporation, and therefore generally lacks standing."*Bingham v. Zolt, 66 F.3d 553, 562 (2d Cir.1995).* Because she has not alleged that the City "has violated an independent duty" to her as a shareholder in the HDFC, *Ceribelli v. Elghanayan, 990 F.2d 62, 63 (2d Cir.1993),* she lacks standing to pursue this action. To the extent she seeks to represent the interests of the HDFC in suing the City, it is clear that she may not do so pro se, as the Second Circuit has stated that "a natural person must represent the corporation in court," and consequently "insisted that that person be an attorney licensed to practice law before our courts."*Jones v. Niagara Frontier Transp. Authority, 722 F.2d 20, 22 (2d Cir.1983).*

CONCLUSION

The defendants' motion to dismiss is granted for plaintiff's lack of standing. The Clerk of Court shall close the case.

SO ORDERED:

S.D.N.Y.,2007.
Blakely v. Cardozo

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2702241 (S.D.N.Y.)
**(Cite as: 2007 WL 2702241 (S.D.N.Y.))**

Page 3

Slip Copy, 2007 WL 2702241 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                      Page 1
Not Reported in F.Supp.2d, 2006 WL 2331009 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2331009 (S.D.N.Y.))**

Eaton Vance Management v. ForstmannLeff
Associates, LLC
S.D.N.Y.,2006.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
EATON VANCE MANAGEMENT, et al., Plaintiffs,
v.
FORSTMANNLEFF ASSOCIATES, LLC,
Defendant.
**No. 06 Civ. 1510(WHP).**

Aug. 11, 2006.

Lawrence Coe Lanpher, Michele Levy Berlove,
Kirkpatrick & Lockhart, Washington, DC, for
Plaintiffs.
Christine Josine. Wichers, Thomas Edward Shirley,
Choate, Hall & Stewart, LLP, Boston, MA, Lyle
Stewart Zuckerman, Hughes Hubbard & Reed LLP,
New York, NY, for Defendant.

*MEMORANDUM AND ORDER*

WILLIAM H. PAULEY III, District Judge.
**\*1** Plaintiffs Eaton Vance Management, Eaton Vance
Investment Counsel (collectively, "Eaton Vance")
and Nancy Tooke ("Tooke") bring this action
pursuant to the Declaratory Judgment Act, 28 U.S.C.
§§ 2201-02, against ForstmannLeff Associates LLC
("Defendant" or "ForstmannLeff"). Plaintiffs seek a
declaration that a restrictive covenant entered into
between Tooke and ForstmannLeff is unenforceable,
and request an injunction prohibiting ForstmannLeff
from enforcing the covenant. Defendant moves to
dismiss or, in the alternative, to stay this action
pending arbitration. Plaintiffs move for summary
judgment on all of their claims. For the reasons set
forth below, Defendant's motion to dismiss is
granted, and Plaintiffs' motion for summary judgment
is denied.

*BACKGROUND*

Eaton Vance, ForstmannLeff and Schroders
Investment Management North America, Inc.
("Schroders") are investment management firms.
(Amended Complaint, dated Apr. 28, 2006

("Compl.") ¶¶ 13, 17-18.) Tooke is an investment
portfolio manager who was employed by Schroders
from 1994 to 2004. (Compl.¶¶ 14, 17-19.) In May
2004, Tooke left Schroders to work for
ForstmannLeff following ForstmannLeff' s
acquisition of her asset management contracts from
Schroders. (Compl.¶¶ 18-19.)

ForstmannLeff and Tooke entered into a written
employment agreement with a term of two years (the
"Employment Agreement"). (Compl.Ex. 1, § 5(a).)
Section 7 of the Employment Agreement prohibits
Tooke from "solicit[ing], attempt[ing] to solicit or
accept[ing] customers which were customers of
[ForstmannLeff]" for one year following Tooke's
departure from ForstmannLeff (the "Restrictive
Covenant"). (Compl.Ex. 1, § 7.) Further, Section 8 of
the Employment Agreement provides that:

if [Tooke] breaches, or threatens to commit a breach
of, any of the covenants contained in Sections 6 or 7,
[ForstmannLeff] shall have, in addition to, and not in
lieu of, any other rights and remedies available to
[ForstmannLeff] under law or in equity, the right to
have such covenant specifically enforced by any
court of competent jurisdiction ...

(Compl.Ex. 1, § 8.) Finally, Section 14 of the
Employment Agreement states that "[a]ny
controversy or claim arising out of or relating to this
Agreement, or the breach hereof, other than claims
for specific performance or injunctive relief pursuant
to Section 8 hereof, shall be settled by arbitration ..."
(the "Arbitration Clause"). (Compl.Ex. 1, § 14.)

Nearly all of Tooke's clients followed her from
Schroders to ForstmannLeff. (Compl.¶ 19.) On
January 13, 2006, Tooke resigned from
ForstmannLeff to work for Eaton Vance. (Compl.¶¶
32-34.) A number of Tooke's clients have since
withdrawn their assets from ForstmannLeff
(Plaintiffs' Statement of Undisputed Material Facts,
dated Apr. 14, 2006 ¶ 22), and ForstmannLeff has
informed at least some of these clients that the
Restrictive Covenant prohibits Tooke from soliciting
or accepting their business (Compl.¶ 4). In a letter to
ForstmannLeff dated February 1, 2006, Eaton Vance
asserted that the Restrictive Covenant is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2331009 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 2331009 (S.D.N.Y.))

Page 2

unenforceable with respect to certain of Tooke's former clients. (Compl.¶ 54.) The letter informed ForstmannLeff that Eaton Vance had accepted an account from one of these clients and that it intended to accept other, similar accounts. (Compl.¶ 54.)

\*2 On February 7, 2006, ForstmannLeff filed an arbitration demand with the American Arbitration Association, alleging that Tooke is in violation of the Restrictive Covenant. (Compl.¶ 55.) ForstmannLeff seeks damages, specific performance of the Restrictive Covenant and injunctive relief requiring that Tooke "sever her relationship with any client whose business she has improperly solicited or accepted" since joining Eaton Vance. (Plaintiffs' Memorandum of Law in Support of Its Motion for Summary Judgment, dated Apr. 14, 2006, Ex. 11.) Certain of Tooke's former clients have declined to move their assets to Eaton Vance as a result of the arbitration demand. (Compl.¶¶ 56-58.)

Eaton Vance filed this action on February 24, 2006. On April 14, 2006, the Complaint was amended to name Tooke as a plaintiff. Defendant moves to dismiss the Amended Complaint on the grounds that: (1) Eaton Vance lacks standing; (2) the action should be dismissed or, in the alternative, stayed pursuant to Federal Arbitration Act ("FAA") § 3; and (3) the action should be dismissed or, in the alternative, stayed pursuant to this Court's inherent power to control its docket.

### DISCUSSION

#### I. Legal Standard

On a motion to dismiss pursuant to rule 12(b)(6), a court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in Plaintiffs' favor. *Hartford Court Co. v. Pellegrino,* 380 F.3d 83, 89-90 (2d Cir.2004). A court should not dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *accord Jacobs v. Ramirez,* 400 F.3d 105, 106 (2d Cir.2005). Dismissal is proper when the plaintiffs fail to plead the basic elements of a cause of action. See *In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 69 (2d Cir.2001). The issue on a motion to dismiss is not

"whether plaintiff[s] will prevail, but simply whether [they are] entitled to offer evidence to support [their] claims." *Taylor v. Vt. Dep't of Educ.,* 313 F.3d 768, 788 (2d Cir.2002).

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction," a district court "may declare the rights and other legal relations of any interested party seeking such declaration."28 U.S.C. § 2201(a). In passing the Act, "Congress sought to place a remedial arrow in the district court's quiver; it created an opportunity, rather than a duty, to grant a new form of relief to qualifying litigants."*Wilton v. Seven Falls Co.,* 515 U.S. 277, 288 (1995). While district courts typically have a "virtually unflagging obligation" to exercise their jurisdiction, *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817 (1976), they "possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites."*Wilton,* 515 U.S. at 282.

\*3 In order to decide whether to entertain an action for a declaratory judgment, this Court must consider whether the judgment will (1) serve a useful purpose in clarifying or settling the legal issues involved; and (2) finalize the controversy and offer relief from uncertainty. *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.,* 411 F.3d 384, 389 (2d Cir.2005); *Texport Oil Co. v. M/V. Amolyntos,* 11 F.3d 361, 366 (2d Cir.1993). The Court may also consider: "(1) whether the proposed remedy is being used merely for 'procedural fencing' or a 'race to res judicata'; (2) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and (3) whether there is a better or more effective remedy."*Dow Jones & Co. v. Harrods Ltd.,* 346 F.3d 357, 359-60 (2d Cir.2003).

#### II. Tooke

ForstmannLeff seeks to dismiss or, in the alternative, stay this action with respect to Tooke pursuant to Section 3 of the FAA, 9 U.S.C. § 3, and this Court's inherent power to control its docket, see *WorldCrisa Corp. v. Armstrong,* 129 F.3d 71, 76 (2d Cir.1997). For the reasons stated below, this Court grants ForstmannLeff' s motion to dismiss the claims

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2331009 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 2331009 (S.D.N.Y.))

asserted by Tooke.

A. *Jurisdiction to Decide Arbitrability*

As an initial matter, ForstmannLeff argues that this Court should not reach the question of whether Tooke's claims are within the scope of the Arbitration Clause. ForstmannLeff contends that this issue of arbitrability is a question for the arbitrator in the first instance.

"Although the [Supreme] Court has also long recognized and enforced a 'liberal federal policy favoring arbitration agreements,' it has made clear that there is an exception to this policy: The question whether the parties have submitted a particular dispute to arbitration, i.e., the 'question of arbitrability,' is 'an issue for judicial determination unless the parties clearly and unmistakably provide otherwise.' " *Howsam*, 537 U.S. at 83 (quoting *AT & T Techs.*, 475 U.S. at 649;*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983); and citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)) (emphasis in original). Such "clear and unmistakable evidence" may be found in the arbitration clause "even absent an express contractual commitment" of questions of arbitrability to an arbitral forum. *Shaw Group Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121 (2d Cir.2003). A broadly drafted arbitration clause may evidence the parties' intention to arbitrate issues of arbitrability. *See Shaw Group*, 322 F.3d at 121;*Paine Webber, Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir.1996) ("The words 'any and all [disputes]' are elastic enough to encompass disputes over whether a claim ... is within the scope of arbitration."); *Smith Barney Shearson Inc. v. Sacharow*, 91 N.Y.2d 39, 46 (1997). Courts have also found clear and unmistakable evidence when the parties agree to be bound by the rules of an arbitral tribunal that require arbitrability to be decided by the arbitrator. *See, e.g., Contec Corp. v. Remote Solution Co.*, 398 F.3d 205, 211 (2d Cir.2005). Thus, "parties may overcome the *First Options* presumption [against arbitrability] by entering into a separate agreement that (1) employs ... 'any and all' language ..., or (2) expressly incorporates the provisions of [a tribunal that requires questions of arbitrability to be decided in arbitration]." *John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48, 55 (2d Cir.2001).

**\*4** It is undisputed that the American Arbitration Association's National Rules for the Resolution of Employment Disputes govern the arbitration at issue in this action, and that these rules are silent as to whether the arbitrator or the court determines questions of arbitrability. (Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion to Dismiss, dated Apr. 28, 2006 ("Pl.Opp.Mem.") Exs. 2-3.) Thus, Defendant relies on the language of the Arbitration Clause, which provides that "[a]ny controversy or claim arising out of or relating to this Agreement, or the breach hereof, other than claims for specific performance or injunctive relief pursuant to Section 8 hereof, shall be settled by arbitration ..." (Compl.Ex. 1, § 14.) As discussed in greater detail below, Section 8 of the Employment Agreement gives ForstmannLeff the right to initiate proceedings for specific performance or injunctive relief in court, rather than arbitration. Where, as here, "a single agreement contains both a broadly worded arbitration clause and a specific clause assigning a certain decision to [another authority] ... the presence of both ... clauses creates an ambiguity" as to whether the parties assigned questions of arbitrability to the arbitrator. *Katz v. Feinberg*, 290 F.3d 95, 97 (2d Cir.2002). Because the Arbitration Clause contains no "clear and unmistakable" delegation of the arbitrability question, this Court must determine whether Tooke's claims are arbitrable. *Katz*, 290 F.3d at 97.

B. *Scope of the Arbitration Clause*

"There is a strong federal policy favoring arbitration as an alternative means of dispute resolution."*Oldroyd v. Elmira Sav. Bank, FSB*, 134 F.3d 72, 76 (2d Cir.1998). As a result, arbitration clauses must be read as broadly as possible, and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."*Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24-25.

Section 3 of the FAA provides:

If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2331009 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 2331009 (S.D.N.Y.))

Page 4

parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement ...

9 U.S.C. § 3; accord *Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 218 (1985). In reviewing the arbitrability of Tooke's claims, the court must determine (1) whether the parties agreed to arbitrate; and (2) whether the scope of the agreement encompasses the claims asserted.[FN1] *ACE Capital Re Overseas Ltd. v. Cent. United Life Ins. Co.,* 307 F.3d 24, 28 (2d Cir.2002); *Campaniello Imports, Ltd. v. Saporiti Italia S.P.A.,* 117 F.3d 665 (2d Cir.1997). If all of her claims are subject to arbitration, and no useful purpose will be served by granting a stay, the case may be dismissed. *In re Am. Express Merchants Litig.,* No. 03 Civ. 9592(GBD), 2006 WL 662341, at *10 (S.D.N.Y. Mar. 16, 2006); *Cicchetti v. Davis Selected Advisors,* No. 02 Civ. 10150(RMB), 2003 WL 22723015, at *3 (S.D.N.Y. Nov. 17, 2003); *Lewis Tree Serv., Inc. v. Lucent Techs. Inc.,* 239 F.Supp.2d 332, 340 (S.D.N.Y.2002). Here, the parties do not dispute the validity of their agreement to arbitrate, but instead spar over whether the scope of the clause encompasses the claims asserted in the Amended Complaint.

> FN1. Tooke does not identify any federal statute that would render her claims non-arbitrable.

*5 The Arbitration Clause provides that "[a]ny controversy or claim arising out of or relating to this Agreement, or the breach hereof, other than claims for specific performance or injunctive relief pursuant to Section 8 hereof, shall be settled by arbitration ..." (Compl.Ex. 1, § 14.) Because Tooke seeks a declaratory judgment and injunctive relief pertaining to the enforceability of the Restrictive Covenant, her claims clearly "arise out of" and "relate to" the Employment Agreement. Therefore, her claims are non-arbitrable only if they qualify as "claims for specific performance or injunctive relief pursuant to Section 8 ..."

Section 8 provides that if Tooke breaches or threatens to breach the Restrictive Covenant in Section 7, "[ForstmannLeff] shall have, *in addition to, and not in lieu of, any other rights and remedies available to [ForstmannLeff]* under law or in equity, the right to have such covenant specifically enforced by any

court of competent jurisdiction." (Compl. Ex. 1, § 8 (emphasis added).) This language does not remove actions for specific performance or injunctive relief from the Arbitration Clause. Instead, it provides ForstmannLeff the right to initiate such a proceeding in a court "in addition to, and not in lieu of" its right to arbitrate issues of specific performance and injunctive relief pursuant to the Arbitration Clause. In other words, ForstmannLeff may assert these claims in *either* an arbitration or a court of competent jurisdiction. When ForstmannLeff chose to initiate proceedings in arbitration, it did so within its rights under the Arbitration Clause.

Moreover, only ForstmannLeff is granted rights under Section 8. That section provides: "[ForstmannLeff] shall have ... the right to have such covenant specifically enforced by any court of competent jurisdiction." (Emphasis added.) Section 8 grants Tooke no rights of any kind. Thus, Tooke's options are limited to those set forth in the Arbitration Clause, which requires arbitration for "[a]ny controversy or claim arising out of or relating to this Agreement, or the breach hereof." The claims asserted by Tooke in the Amended Complaint are therefore subject to binding arbitration. Indeed, the issue of the Restrictive Covenant's enforceability is presently before the arbitrator in the proceedings brought by ForstmannLeff.

This Court retains the jurisdiction to order dismissal rather than a stay in the context of FAA § 3. *Lewis Tree Serv., Inc.,* 239 F.Supp.2d at 340. Particularly in the context of a declaratory judgment request, district courts "possess discretion in determining whether and when to entertain an action ... even when the suit otherwise satisfies subject matter jurisdictional prerequisites." *Wilton,* 515 U.S. at 282. "Since this Court finds that all of [Tooke's] claims against [ForstmannLeff] are subject to arbitration, it ... orders that [her claims] be dismissed." *In re Am. Express Merchants Litig.,* 2006 WL 662341, at *10.[FN2]

> FN2. This holding does not apply to Eaton Vance because Eaton Vance is not a party to the Employment Agreement and, therefore, is not bound by the Arbitration Clause. *See WorldCrisa,* 129 F.3d at 75-76.

III. *Eaton Vance*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                  Page 5
Not Reported in F.Supp.2d, 2006 WL 2331009 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2331009 (S.D.N.Y.))**

**\*6** ForstmannLeff contends that as a non-party to the Employment Agreement, Eaton Vance lacks standing to prosecute this action. This Court agrees.

A. *Standing*

Under New York law,[FN3] unless a party has contractual privity or is a third-party beneficiary of a contract, it lacks standing to enforce the terms of the agreement. *Highlands Ins. Co. v. PRG Brokerage, Inc.,* No. 01 Civ. 2272(GBD), 2004 WL 35439, at \*14 (S.D .N.Y. Jan. 6, 2004); *Wells Fargo Bank Northwest, N.A. v. Energy Ammonia Transp. Corp.,* No. 01 Civ. 5861(JSR), 2002 WL 1343757, at \*1 (S.D.N.Y. June 18, 2002); *Eaves Brooks Costume Co. v. Y.B.H. Realty Corp.,* 76 N.Y.2d 220, 226 (1990). Eaton Vance was neither a party to nor a third-party beneficiary of the Employment Agreement. Therefore, it lacks standing to sue under the Agreement.

> FN3. It is undisputed that New York law governs Plaintiff's claims."[W]here the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry."*Texaco A/S v. Commercial Ins. Co.,* 160 F.3d 124, 128 (2d Cir.1998) (quoting *Am. Fuel Corp. v. Utah Energy Dev. Co.,* 122 F.3d 130, 134 (2d Cir.1997)).

"Since it is the underlying cause of action ... that is actually litigated in a declaratory judgment action, a party bringing a declaratory judgment action must have been a proper party had the defendant brought suit on the underlying cause of action."*Collin County v. Homeowners Assoc. for Values Essential to Neighborhoods,* 915 F.2d 167, 171 (5th Cir.1990); *see also Mylan Pharms., Inc. v. Thompson,* 268 F.3d 1323, 1330 (Fed.Cir.2001). Parties who lack standing to enforce an agreement also lack standing to seek a declaration of rights under the contract. *See Travelers Prop. Cas. Corp. v. Winterthur Int'l,* No. 02 Civ. 2406(SAS), 2002 WL 1391920, at \*5 (S.D.N.Y. Jun. 25, 2002) (a party that is not privy to an insurance contract but would benefit from the insurance policy may not bring a declaratory judgment action to determine whether the insurer owes coverage under the policy); *Hartford Fire Ins. Co. v. Mitlof,* 123 F.Supp.2d 762, 769-71 (S .D.N.Y.2000) (same); *Verosol B.V. v. Hunter Douglas, Inc.,* 806 F.Supp.

582, 588 (E.D.Va.1992) (holding that party not in contractual privity has an "interest in this controversy [which is] far too remote to make it a proper party to this declaratory judgment action"). Indeed, "[c]ourts routinely hold that a plaintiff that has hired (or wishes to hire) the employees of a competitor does not have standing to sue that company to seek nullification of a non-compete agreement between the competitor and its employees."*Bowhead Info. Tech. Servs., LLC v. Catapult Tech., Ltd.,* 377 F.Supp.2d 166, 172 (D.D.C.2005) (granting ex-employer's motion to dismiss new employer's declaratory judgment action); *see also Defiance Hosp., Inc. v. Fauster-Cameron, Inc.,* 344 F.Supp.2d 1097, 1118 (N.D.Ohio 2004) (same); *Premier Pyrotechnics, Inc. v. Zambelli Fireworks Mfg. Co.,* No. 05-3112-CVSFJG, 2005 WL 1307682, at \*2 (W.D.Mo. May 31, 2005) (same).

Eaton Vance contends that its standing arises not from the Employment Agreement itself, but from ForstmannLeff' s initiation of the arbitration against Tooke. The arbitration is purportedly the source of the harm to Eaton Vance because some of Tooke's former clients will not transfer their assets to Eaton Vance while the arbitration is pending. (Pl. Opp. Mem. at 7-8.) This argument is unavailing. The Amended Complaint seeks an interpretation of the Employment Agreement and injunctive relief based on that interpretation. Plaintiffs do not seek relief based on the existence of an arbitration. Where, as here, "the relief requested is the interpretation of a contract to which plaintiff is not a party ... Plaintiff does not having standing to pursue [a] declaratory judgment action."*Premier Pyrotechnics,* 2005 WL 1307682, at \*2 (rejecting plaintiff's contention that "the gravamen of [the] complaint is that the defendant has threatened legal action against the plaintiff for impermissibly interfering with defendant's allegedly protected interests"); *see also Bowhead Info.,* 377 F.Supp.2d at 172-73;*Defiance Hosp.,* 344 F.Supp.2d at 1118.

**\*7** The law does not permit Eaton Vance to use the Declaratory Judgment Act to avoid the well-settled requirements of contractual privity. Eaton Vance therefore lacks standing to pursue this action.

*CONCLUSION*

For the foregoing reasons, Defendant's motion to dismiss is granted, and Plaintiffs' motion for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 6
Not Reported in F.Supp.2d, 2006 WL 2331009 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2331009 (S.D.N.Y.))**

summary judgment is denied.

SO ORDERED:

S.D.N.Y.,2006.
Eaton Vance Management v. ForstmannLeff
Associates, LLC
Not Reported in F.Supp.2d, 2006 WL 2331009
(S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                           Page 1
Slip Copy, 2008 WL 2224297 (S.D.N.Y.)
**(Cite as: 2008 WL 2224297 (S.D.N.Y.))**

Even Street Productions, Ltd. v. Shkat Arrow Hafer & Weber, LLP
S.D.N.Y.,2008.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
EVEN STREET PRODUCTIONS, LTD., Plaintiff,
v.
SHKAT ARROW HAFER & WEBER, LLP,
Defendant.
No. 05 CV 3834(DAB).

May 29, 2008.

*OPINION*

<u>DEBORAH A. BATTS</u>, District Judge.
*1 Plaintiff Even Street Productions filed the above-captioned case against Defendant Shukat Arrow Hafer & Webber, LLP., for legal malpractice. Now before the Court is the Defendant's Motion to Dismiss. Plaintiff opposes the Motion to Dismiss.

For the reasons that follow, Defendant's Motion to Dismiss is DENIED.

I. *Background*[FN1]

> <u>FN1.</u> Unless otherwise indicated, the facts herein are taken from the First Amended Complaint and are accepted as true by the Court for the purposes of this Motion to Dismiss.

Plaintiff Even Street Productions is a corporation incorporated in the State of New York. (Am.Compl.¶ 1.) Its principal place of business is likewise located in New York County, New York. (*Id*.) Plaintiff is the assignee of all the rights and interests of the musical career of Sylvester Stewart, professionally known as Sly Stone. (*Id.*) These rights and interests include, but are not limited to, his rights and interests as a composer, publisher, recording artist and entertainer. (*Id.*) Plaintiff is likewise the assignee of the rights and interests of Frederick Stewart, Rose Stewart, Cynthia Robinson, Larry Graham, Greg Errico and Gerald Martini with respect to their past activities as members of the musical group Sly and the Family

Stone.(*Id.*) Plaintiff benefits from royalties and income generated by the exploitation of compositions written by Sylvester Stewart, and from royalties on the sale and exploitation of master recordings made by Sly and the Family Stone. (Am.Compl.¶¶ 2, 3.)

Defendant Shukat Arrow Hafer & Webber, LLP., is a limited liability partnership practicing law; its principal office is in New York County, New York. (Compl.¶ 5.)

In 2000, Diamond Time Ltd. and New York Times Television produced a documentary titled *Jimi and Sly: The Skin I'm In.*(Compl.¶ 11.) This documentary was broadcast on the cable television network Showtime on September 17, 2000 and on at least two other occasions, in September and October of 2000. (Compl.¶ 13.) The documentary incorporated, without the authorization or permission of any of the rights holders, 39 musical compositions (the "Compositions") and 10 master recordings (the "Master Recordings") made by Sly and the Family Stone, as well as several film clips containing the image and likeness of Sly and the Family Stone. (Compl.¶ 12.) All the Master Recordings were and are the exclusive property of Sony Music Entertainment, Inc. ("Sony"). (Compl.¶ 6.) Copyrights in all the Compositions were and are owned by Mijac Music and administered by Warner/Chappell Music, Inc. ("Warner/Chappell") (Compl.¶ 4.)

Prior to September 2003, Sony and Warner/Chappell retained Shukat Arrow Hafer & Webber to prosecute a copyright infringement action against New York Times Television, Showtime Networks, Inc. and Diamond Time Ltd. (Compl.¶ 16.) On September 17, 2003, Shukat Arrow Hafer & Webber entered a written agreement with attorneys representing New York Times Television. (Compl.¶ 18.) This agreement tolled the statute of limitations from September 17, 2003 to December 15, 2003. (*Id.*) The Parties were unable to reach agreement during that time. (Compl.¶ 19.) They also did not commence any litigation relating to the copyright infringement during this period. (Compl.¶ 20.) Instead, the Parties discussed reaching agreement to extend further the statute of limitations. (Compl.¶ 21.) However, no

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                              Page 2
Slip Copy, 2008 WL 2224297 (S.D.N.Y.)
(Cite as: 2008 WL 2224297 (S.D.N.Y.))

such agreement was formalized. (*Id* .) On December 16, 2003, when the statute of limitations expired for the Sony and Warner/Chappell *The Skin I'm In* copyright claims, attorneys for the New York Times and Showtime Networks declined to enter another tolling agreement. (Compl.¶¶ 21, 22.)

**\*2** Plaintiff expected to benefit from resolution of the copyright infringement claims against New York Times Television and Showtime Networks because allegedly any amounts awarded to Sony and Warner/Chappell would directly result in an increase in the royalties and other monies paid to Plaintiff. (Compl.¶ 17.) In 2004, Plaintiff entered into separate agreements with Sony and Warner/Chappell, in each case assigning, conveying and transferring any and all claims, rights, suits, or causes of action which the assignor had against any third party, including but not limited to New York Times Television and Showtime Networks, arising from their unauthorized use of the Master Recordings and Compositions. (Compl. ¶¶ 23, 24; Pl's Mem. in Opp'n to Mot. to Dis. Ex. B & C FN2.) The terms of the Warner/Chappell assignment agreement include a release which reads:

> FN2. These exhibits are misnumbered in Plaintiff's Memorandum: there are two different Exhibit As and two different Exhibit Bs.

> Grantee will not bring, institute or assert, or authorize or permit others to bring, institute or assert, any claim or action against Grantor or Mijac Music, its or their predecessors, successors, licensees, agents, or assigns in any way relating to the use of the Compositions in the Program. (Herbsman Decl., Exh. G. ¶ 3(d).)

## II. *Discussion*

### A. *Legal Standard for Motion to Dismiss*

The purpose of a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) is to "test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief *without* resolving a contest regarding its substantive merits."*Global Network Communications, Inc. v. City of New York,* 458 F.3d 150, 155 (2d Cir.2006). On such a motion, the court "assesses the legal feasibility of the complaint, but does not weigh the evidence that

might be offered to support it."*Id.* (citing *AmBase Corp. v. City Investing Co. Liquidating Trust,* 326 F.3d 63, 72 (2d Cir.2003)). The court therefore "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally."*Gregory v. Daly,* 243 F.3d 687, 691 (2d Cir.2001) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). However, the plaintiff must provide enough facts to state a claim for relief that is plausible on its face. *Bell Atlantic Corp. v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). Pleading legal conclusions is not sufficient to prevent dismissal. *Smith v. Local 819, IBT Pension Plan,* 291 F.3d 236, 240 (2d Cir.2002). Finally, " '[d]ocuments that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered."*Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007) (citing *Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 71 (2d Cir.1998), *cert. denied,*525 U.S. 1103, 119 S.Ct. 868, 142 L.Ed.2d 770 (1999)).

Federal Rule of Civil Procedure 8(a)(2) provides that civil complaints "shall contain ... a short and plain statement of the claim showing that the pleader is entitled to relief."The Supreme Court has explained that Rule 8(a)(2) requires that a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true ...."*Bell Atlantic v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929, (2007) (internal citations omitted). However, under Rule 8(a)(2), "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'"*Erickson v. Pardus,* --- U.S. ----, ----, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (per curiam) (citations omitted). Thus, on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "the bottom-line principle is that 'once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint.'"*Roth,* 489 F.3d at 510 (quoting *Bell Atlantic,* 127 S.Ct. at 1969)."In order to withstand a motion to dismiss, a complaint must plead, 'enough facts to state a claim for relief that is plausible on its face.'"*Patane v. Clark,* No. 06-3446-CV, 2007 WL 4179838, at \*3 (2d Cir. Nov.28, 2007).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 3
Slip Copy, 2008 WL 2224297 (S.D.N.Y.)
**(Cite as: 2008 WL 2224297 (S.D.N.Y.))**

B. *The Legal Malpractice Claim*

**\*3** Plaintiff argues that Defendant committed malpractice by allowing the statute of limitations to expire on Sony and Warner/Chappell's copyright infringement claims against Showtime and New York Times Television. (Pl. Mem. Law at 2.) At this stage of the litigation, Defendant does not dispute that its oversight led to the loss of these claims.

In New York, "[i]n deciding a motion to dismiss a legal malpractice action, the facts alleged by plaintiff are assumed to be true, and plaintiff is afforded the benefit of every possible favorable inference."*Mercantile Capital Partners Fund, LP. v. Morrison Cohen, LLP.* 2008 WL 1777431, *3 (N.Y.Sup.2008)* (citations omitted). In order to state a claim for legal malpractice under New York law, a Plaintiff must allege "(1) the negligence of an attorney; (2) the negligence was the proximate cause of the loss sustained; and (3) proof of actual damages."*Rondout Landing at the Strand, Inc. v. Hudson Land Dev. Corp.*, 361 F.Supp.2d 218, 223 (S.D.N.Y.2005).

To establish causation adequately in a legal malpractice claim, the plaintiff must show that, but for the attorney's negligence, "what would have been a favorable outcome was an unfavorable outcome. The test is whether a proper defense would have altered the result of the prior action."*D'Jamoos v. Griffith*, 2001 U.S. Dist. LEXIS 17595, 2001 WL 1328592 No. 00 Civ. 1361, at *5 (E.D.N.Y. Aug. 1, 2001); *see also, Pellegrino v. File*, 291 A.D.2d 60, 738 N.Y.S.2d 320, 323 (1st Dep't) (citations omitted), *lv. denied,*98 N.Y.2d 606, 774 N.E.2d 221, 746 N.Y.S.2d 456 (2002). This causation requirement, "seeks to insure a tight causal relationship exists between the claimed injuries and the alleged malpractice, and demands a nexus between loss and injury ...."*Sloane v. Reich*, 1994 U.S. Dist. LEXIS 2851, No. 90 Civ. 8187, 1994 WL 88008, at *3 (S.D.N.Y. Mar.11, 1994). The ' "but for' prong requires the trier of fact in effect [to] decide a lawsuit within a lawsuit, because it demands a hypothetical re-examination of the events at issue absent the alleged malpractice."*Littman Krooks Roth Ball, P.C. v. N.J. Sports Prod., Inc.*, 2001 U.S. Dist. LEXIS 12677, No. 00 Civ. 9419, 2001 WL 963949, at *3 (S.D.N.Y. Aug.22, 2001) (citing *N.A. Kerson Co. v.*

*Shayne, Dachs, Weiss, Kolbrenner, Levy, et al.*, 59 A.D.2d 551, 397 N.Y.S.2d 142, 143 (2d Dep't 1977) (internal quotations marks omitted)).

At this early stage of the litigation, however, Plaintiff need only allege, not prove, the proximate cause element of the legal malpractice claim.*Mercantile*, 2008 WL 1777431 at *4 (citing *Gamiel v. Curtis & Reiss-Curtis, P.C.*, 16 A.D.3d 140, 791 N.Y.S.2d 78, 79 (First Dep't 2005); *see also, Abuhouran v. Lans*, N. 06-2857-PR, 2008 WL 739903, *1 (2d Cir.2008) (observing that to state properly a claim for legal malpractice based on an underlying criminal proceeding, plaintiff must only allege his innocence, or a colorable claim of his innocence).

For the purposes of this Motion to Dismiss, Defendant does not dispute that the factual allegations set forth in Plaintiff s Amended Complaint, if proven, and if Plaintiff had standing, would be sufficient to state a claim for a judgment of malpractice against Defendant. The Court agrees and finds that Plaintiff has pleaded adequately the causation prong of this legal malpractice claim.[FN3]Instead of challenging whether Plaintiff has pleaded adequately the elements of the malpractice claim, Defendant argues for dismissal on the grounds that Plaintiff lacks standing to pursue this claim.[FN4]

> FN3. Should this case proceed through the completion of discovery and evidence calls into question Plaintiff's allegation that, but for Defendant's negligence, the outcome of the underlying copyright litigation would have terminated favorably, Defendant could use this evidence to challenge the merits of Plaintiff's claim.

> FN4. Defendant moves to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (Def. Mem. Law at 1). However, standing can be raised on either a Rule 12(b)(1) or a Rule 12(b)(6) motion. *RBCI Holdings, Inc. v. Drinks Americas Holdings, Ltd.*, 2008 WL 759339 at *3 (S.D.N.Y.2008) (citations omitted). Where standing goes to the existence of a case or controversy, a prerequisite to jurisdiction, it is proper for the district court to first consider standing on a Rule 12(b)(1) motion before considering issues that maybe be inextricably

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 4
Slip Copy, 2008 WL 2224297 (S.D.N.Y.)
**(Cite as: 2008 WL 2224297 (S.D.N.Y.))**

intertwined with the merits. *Id.* Because the Court needed to review documents outside the pleadings in this case, namely the assignment agreements, in order to make factual findings about whether Plaintiff had standing, in this case, the Court considered Defendant's motion under both a 12(b)(1) and 12(b) (6) standards. *See e.g., Winn v. Schafer,* 499 F.Supp.2d 390, 395 (S.D.N.Y.2007). The distinction is largely immaterial here, and the Court does not detail the Rule 12(b)(1) legal standard since, even under a Rule 12(b)(6) standard, the assignment agreements would be reviewed by the Court because the contracts were incorporated in the Amended Complaint by reference.

*C. Plaintiff's Standing*

**\*4** Defendant raises three challenges to Plaintiff's standing. First, Defendant argues that no attorney-client relationship existed between Plaintiff and Defendant, and therefore Plaintiff has no legally cognizable malpractice claim. (Def. Mem. Law at 6-7.) Second, Defendant avers that Plaintiff was not an intended third-party beneficiary of the retainer agreements. (Def. Mem. Law at 8-10.) Finally, Defendant argues that the assignment of Sony and Warner/Chappell's copyright claims to Plaintiff does not create a basis for Plaintiff's malpractice claims against Defendant. (Def. Mem. Law at 11.)

*1. Defendant's Attorney-Client Relationship and Third party Beneficiary Arguments*

Plaintiff asserts that it can legally pursue these claims because they were assigned to Plaintiff by Defendant's clients, Sony and Warner/Chappell. It is undisputed that the Plaintiff in this case did not retain Defendant as their counsel. Thus, Defendant's first argument is irrelevant.[FN5]Nor does Plaintiff rely on its disputed status as a third-party beneficiary to the contract in bringing this claim. Thus, Defendant's second argument also does not warrant consideration. The only issue that remains is whether the assignment agreements between Plaintiff, Sony and Warner/Chappell give Plaintiff standing to proceed in this action.

FN5. In support of its argument, Defendant

cites to *Uehigashi v. Kanamori,* 161 F.Supp.2d 221, 225 (S.D.N.Y.2001) for the proposition that, "only the party retaining the services of an attorney can bring a legal malpractice action against the attorney."However, this authority is miscited and inapposite; Defendant both ignores the prefatory phrase *Uehigashi* uses to qualify this rule, "in general," and overlooks the fact that *Uehigashi* does not consider the *assignment* of a legal malpractice claim. It is well-settled that in New York, pursuant to General Obligations Law § 13-101, all claims are assignable except those expressly prohibited, or contrary to public policy. The claims that are expressly prohibited do not include a claim for legal malpractice.*Greevy by Greevy v. Becker, Isserlis, Sullivan & Kurtz,* 240 A.D.2d 539, 541, 658 N.Y.S.2d 693 (N.Y.App.Div.1997). In fact, legal malpractice claims are often assigned in New York State. *See e.g., Chang v. Chang,* 226 A.D.2d 316, 642 N.Y.S.2d 628 (N.Y.App.Div.1996); *Tawil v. Finkelstein Bruckman Wohl Most & Rothman,* 223 A.D.2d 52, 56, 646 N.Y.S.2d 691 (N.Y.App.Div.1996); *Am. Hemisphere Marine Agencies, Inc. v. Kreis,* 40 Misc.2d 1090, 244 N.Y.S.2d 602 (N.Y.Misc.1963); *Oppel v. Empire Mut. Ins. Co.,* 517 F.Supp. 1305 (S.D.N.Y.1981).

*1. Defendant's Arguments that the Assignment Agreements Do Not Contemplate a Suit Against Shukat Arrow & Weber, LLP.*

Defendant argues that even if legal malpractice claims can be assigned, in this particular case, Plaintiff has no standing because the right to bring this claim was *not* among the rights assigned in the agreements between Plaintiff, Sony and Warner/Chappell. Defendant contends that the terms of the assignment agreements between Plaintiff and, respectively, Sony and Warner/Chappell do not include claims against Shukat Arrow & Weber, LLP. (Def. Mem. Law at 11-13.) With respect to the Warner/Chappell agreement specifically, Defendant further claims that, as an agent, it is released by the terms of that contract. (*Id.* at 14.)Defendant's arguments put into consideration the issue of contract interpretation.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 5
Slip Copy, 2008 WL 2224297 (S.D.N.Y.)
**(Cite as: 2008 WL 2224297 (S.D.N.Y.))**

The primary objective in contract interpretation is to give effect to the intent of the contracting parties "as revealed by the language they chose to use." *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan,* 7 F.3d 1091, 1094 (2d Cir.1993) (quoting *Seiden Assocs. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992)); *accord, Care Travel Co. v. Pan Am. World Airways, Inc.,* 944 F.2d 983, 987 (2d Cir.1991); *W.W.W. Assocs. v. Giancontieri,* 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990); *Hartford Accident & Idem. Co. v. Wesolowski,* 33 N.Y.2d 169, 171, 350 N.Y.S.2d 895, 305 N.E.2d 907 (1973). Issues of contract interpretation are "generally matters of law and therefore [are] suitable for disposition on a motion to dismiss." *Citadel Equity Fund, Ltd. v. Aquila, Inc.,* 371 F.Supp.2d 510, 516 (S.D.N.Y.2005) (quoting *Thayer v. Dial Indus. Sales, Inc.,* 85 F.Supp.2d 263, 269 (S.D.N.Y.2000)) (internal quotation marks omitted); *see also, Lind v. Vanguard Offset Printers, Inc.,* 857 F.Supp. 1060, 1065 (S.D.N.Y.1994). Further, in deciding a motion to dismiss, the Court may consider exhibits to the complaint and documents incorporated in the complaint by reference; in this case such exhibits include the contracts themselves. *See, Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002).

**\*5** It is long established that "the fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." *Computer Assocs. Int'l, Inc. v. U.S. Balloon Mfg. Co.,* 10 A.D.3d 699, 782 N.Y.S.2d 117 (N.Y.App.Div.2004), citing *Greenfield v. Philles Records,* 98 N.Y.2d 562, 569, 780 N.E.2d 166, 750 N.Y.S.2d 565 (2002); *Slatt v. Slatt,* 64 N.Y.2d 966, 967, 477 N.E.2d 1099, 488 N.Y.S.2d 645 (1985). Therefore, a written agreement that is "complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield,* 98 N.Y.2d at 569, 750 N.Y.S.2d 565, 780 N.E.2d 166; *R/S Assoc. v. New York Job Dev. Auth.,* 98 N.Y.2d 29, 771 N.E.2d 240, 744 N.Y.S.2d 358 (2002); *W.W.W. Assoc. v. Giancontieri,* 77 N.Y.2d 157, 162, 566 N.E.2d 639, 565 N.Y.S.2d 440 (1990). A contract is unambiguous if the language it uses has "a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion." *Breed v. Insurance Co. of N. Am.,* 46 N.Y.2d 351, 355, 385 N.E.2d 1280, 413 N.Y.S.2d 352 (1978).

In this action, neither of the assignment agreements explicitly refer to the Defendant by name as someone included or excluded in the assignment of a malpractice claim. The question, then, is whether the agreements are, respectively, reasonably susceptible of more than one interpretation.

a. *The Sony Assignment Agreement*

The Sony Assignment Agreement was signed March 3, 2004. The legal malpractice claim arose December 16, 2003, yet there is no explicit mention of that claim in the assignment agreement. The agreement does say that it assigns: *"any and all claims* Sony has against a *third party (including but not limited to* New York Times Television and Showtime Networks) ... arising from the unauthorized use of the [Master Recordings] on the Infringing Program."(Def.'s Mot. to Dis., Ex. F) (emphasis added). The Plaintiffs argue that this includes the legal malpractice claims; the Defendant argues it does not. Looking at the Agreement in the light most favorable to Plaintiff, it is ambiguous:

"WHEREAS, the parties wish to structure a procedure pursuant to which any and all claims relating to the use of the Original Masters on the Infringing program may be pursued;

THEREFORE ... the parties agree as follows:

1. Sony hereby forever assigns conveys and transfers any and all claims, rights, suits, or causes of action Sony has against any third party ('including but not limited to New York Times Television and Showtime Networks) (the "Claims"), arising from the unauthorized use of the original Masters on the Infringing Program, to Even St. Productions Ltd."

Or

"WHEREAS, the parties wish to structure a procedure pursuant to which any and all claims relating to the use of the Original Masters on the Infringing program may be pursued;

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 2224297 (S.D.N.Y.)
(Cite as: 2008 WL 2224297 (S.D.N.Y.))

Page 6

*6 THEREFORE ... the parties agree as follows:

1. Sony hereby forever assigns conveys and transfers any and all claims, rights, suits, or causes of action Sony has against any third party (including but not limited to New York Times Television and Showtime Networks) (the "Claims"), arising from the unauthorized use of the original Masters On the Infringing Program, to Even St. Productions Ltd."

b. *The Warner/Chappell Assignment Agreement*

The Warner/Chappell Assignment Agreement states that it assigns "all right, title and interest in and to any claims, rights, suits, and causes of action of any nature whatsoever ... against *any third party, including hut not limited to* Producers/Distributors *and/or other parties* for failure to enforce, protect or prosecute the aforesaid claims ... with respect to the use of the Compositions in Broadcasts of the Program."(Def.'s Mot. to Dis ., Ex. G.) (emphasis added).

In this case, the Warner/Chappell Assignment Agreement is clear. Notwithstanding that one stated purpose of the assignment agreement was to allow Plaintiff to sue Showtime and New York Times Television, the legal malpractice claim against Defendant here is based on Defendant's "failure to enforce, protect or prosecute the aforesaid claims ... with respect to the use of the Compositions in Broadcasts of the Program."(Def.'s Mot. to Dis., Ex. G.)

Finally, the Court addresses the merits of Defendant's argument that it is released by the terms of the Warner/Chappell assignment agreement. Defendant argues that the provisions of that agreement which bar Plaintiff from pursuing actions against Warner/Chappell's agents act as a release of Shukat Arrow Hafer & Weber, LLP. The merits of this argument turn on whether Defendant was an agent of Warner/Chappell at the time the assignment agreement was entered. [FN6]

> FN6. Under general contract principles there can be no agreement unless the parties to the contract have mutual assent, or a meeting of the minds. Such understanding requires that all parties agree the stated terms of the contract as they exist at the time the contract

is entered into. *See generally,* Calamari and Perillo, *Contracts,* Third Ed. Thus, if the Warner/Chappell agreement provides a release for its "agents," and, at the time the contract was entered into, Defendant was in fact a "former agent" of Warner/Chappell, that release cannot be said to have contemplated Defendant.

Although Defendant argues that, "There is not a single allegation in the Amended Complaint that justifies plaintiff's conclusion that the attorney-client relationship between [Shukat Arrow Hafer & Weber, LLP] and Warner/Chapell had ended at the time the assignment was executed," the Court disagrees. Plaintiff alleges that Defendant was retained for representation in the underlying copyright litigation in September of 2003 and that Defendant negligently allowed the statute of limitations on that action to expire in December of 2003; the assignment agreements at issue were entered into in March of 2004 and July of 2004. (Am.Compl.¶¶ 16-24.) Since, an "attorney is considered [to be an] agent when acting, or failing to act, in furtherance of the litigation,"*Gilfus v. Vargason,* Nos. 9:04-CV-188, 9:04-CV-189, 9:04-CV-190, 2008 WL 65579, *7 (N.D.N.Y.2008),* P laintiff has pleaded plausibly that Defendant's role as Warner/Chappell's agent was terminated well before Plaintiff and Warner/Chappell entered into an assignment agreement. *See also,*2A N.Y.Jur2d, Agency § 35 (an agency that is limited to a particular accomplishment of some particular transaction terminates upon completion of the transaction for the accomplishment of which it was created).

*7 If so, Plaintiff has pleaded sufficiently.

III. *CONCLUSION*

Accordingly, Defendant's Motion to Dismiss is DENIED. Defendant shall answer within forty five (45) days of the date of this Memorandum and Order.

SO ORDERED.

S.D.N.Y.,2008.
Even Street Productions, Ltd. v. Shkat Arrow Hafer &amp; Weber, LLP
Slip Copy, 2008 WL 2224297 (S.D.N.Y.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 2224297 (S.D.N.Y.)
**(Cite as: 2008 WL 2224297 (S.D.N.Y.))**

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                              Page 1
Slip Copy, 2007 WL 2728430 (S.D.N.Y.)
(Cite as: 2007 WL 2728430 (S.D.N.Y.))

Kendall v. Employees' Retirement Plan of Avon
Products
S.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Irene M. KENDALL, Personally and on Behalf of all
similarly situated, Plaintiff,
v.
EMPLOYEES' RETIREMENT PLAN OF AVON
PRODUCTS and the Retirement Board, As plan
administrator, Defendants.
No. 03 Civ. 2518(DAB).

Sept. 14, 2007.

*MEMORANDUM & ORDER*

DEBORAH A. BATTS, United States District Judge.

*1 Plaintiff Irene M. Kendall, personally and on
behalf of all similarly situated, brings suit against
Defendants Employees' Retirement Plan of Avon
Products, and The Retirement Board, as plan
administrator. Plaintiff's Amended Class Action
Complaint ("Amended Complaint") alleges that
Defendants' employee pension plan, in which
Plaintiff is a participant, violates several provisions
of the Employee Retirement Income Security Act
("ERISA") and other applicable regulations.
Defendants move to dismiss the Amended Complaint
pursuant to Fed.R.Civ.P. 12(b)(6) and on the ground
that Plaintiff lacks standing to assert several of the
claims contained therein. For the reasons set forth,
Defendants' Motion to Dismiss the Amended
Complaint is GRANTED.

## I. BACKGROUND

Plaintiff is a participant in Defendants' "Retirement
Plan of Avon Products" pension plan ("the Plan").
(Amended Complaint ¶ 6.) Under ERISA, the Plan is
a defined benefit plan whose "purpose is to provide
retirement income to retired participants in the
Plan."(*Id.*) The Plan has been amended a number of
times, including in 1977 and in 1994.

Plaintiff was born on September 20, 1937 and began
employment with Avon ("employer") on October 9,

1967. (*Id.* ¶ 11.)On May 25, 1980, Plaintiff "became
totally and permanently disabled ... and began
receiving a Social Security Disability Award
effective November 1, 1980."(*Id.*) As a result of her
disability, "until her retirement on a pension,"
Plaintiff received long term disability benefits from
her employer. (*Id.* ¶ 12.)Thus, although unable to
work any longer, Plaintiff "continued to accrue years
of service under the terms of" Defendants' Plan. (*Id.*)

In 1995, Plaintiff qualified for a so-called "Rule of
85" early retirement benefit under the Plan ("Rule of
85 benefit").(*Id.* ¶ 13.)Under the Plan, the Rule of 85
benefit "provides that, when a participant's age and
years of service add to 85, the participant is entitled
to unreduced early retirement benefits."(*Id.*) Four
years after qualifying for the Rule of 85 benefit,
"effective August 1, 1999," Plaintiff retired. (*Id.* ¶
14.)She was credited with 31.833 years of service.
(*Id.*) Plaintiff's employer "calculated her pension to
be $529 .78 as a single-life annuity with no survivor's
benefits, equivalent to a lump sum of
$78,093.48."(*Id.*) Plaintiff chose to receive her
pension "partially as a lump sum and partially as an
annuity, which she continues to receive to date."(*Id.*)

Plaintiff alleges that, but for "several ERISA
violations in the terms of the Plan," the early
retirement benefit pension that she accepted under the
Plan should have been higher. (*Id.* ¶ 15.)Exactly how
much higher her pension should have been, she
alleges, "will be known only after reformation of the
Plan to bring it into compliance with ERISA."(*Id.*)

## II. DISCUSSION

### A. Legal Standard

On a motion to dismiss pursuant to Fed.R.Civ.P.
12(b)(6) the Court "must accept as true the factual
allegations in the complaint, and draw all reasonable
inferences in favor of the plaintiff."*Bolt Elec. v. City
of New York*, 53 F.3d 465, 469 (2d Cir.1995)
(citations omitted)."The district court should grant
such a motion only if, after viewing the plaintiff's
allegations in this favorable light, it appears beyond
doubt that the plaintiff can prove no set of facts in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 2
Slip Copy, 2007 WL 2728430 (S.D.N.Y.)
(Cite as: 2007 WL 2728430 (S.D.N.Y.))

support of his claim which would entitle him to relief."*Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). A court does not, however, have to accept as true "conclusions of law or unwarranted deductions of fact."*First National Bank v. Gelt Funding Corp.,* 27 F.3d 763, 771 (2d Cir.1994), *cert. denied,*513 U.S. 1079 (1995).

B. The First Claim: Defendant's Rule of 85 Early Retirement Benefit Is Disregarded for Purposes of Measuring the Plan's Compliance with ERISA's 133 1/3 Percent Anti-Backloading Test

**\*2** Plaintiff's First Claim alleges that the structure of Defendants' Plan, specifically the Plan's Rule of 85 early retirement benefit, violates ERISA's applicable "anti-backloading" provision, ERISA § 204(b)(1)(B), 29 U.S.C. § 1054(b)(1)(B). (Amended Complaint ¶¶ 27-30.) "Backloading" is "a term of art describing a [pension] plan's use of a benefit accrual formula that postpones the bulk of an employee's accrual to her later years of service."*In re Citigroup Pension Plan ERISA Litigation,* 470 F.Supp.2d 323, 333 (S.D.N.Y.2006); *see also Campanella v. Mason Tenders' District Council Pension Plan,* 299 F.Supp.2d 274, 283-84 (S.D.N.Y.2004) ("A plan 'backloads' pension benefits when it 'provide[s] inordinately low rates of accrual in the employee's early years of service when he is most likely to leave the firm and concentrat[es] the accrual of benefits in the employee's later years of service when he is most likely to remain with the firm until retirement") (quoting H.R.Rep. No. 93807 (1974), reprinted in 1974 U.S.C.C.A.N. 4639, 4688)."To combat backloading, ERISA requires plans to accrue benefits relatively evenly over the course of an employee's career."*In re Citigroup Pension Plan ERISA Litigation,* 470 F.Supp.2d at 333. ERISA provides that pension plans must comply with at least one of three statutory tests that are designed to ensure that the rate at which an employee's benefits accrue under a pension plan is within a range that does not constitute unlawful backloading. *Id.*

The Parties agree that of the three statutory tests, the only one applicable to Defendants' Plan is the 133 1/3 percent test set forth in 29 U.S.C. § 1054(b)(1)(B) (the "statute"):

A defined benefit plan satisfies the requirements of this paragraph of a particular plan year if under the

plan the accrued benefit payable at the normal retirement age is equal to the normal retirement benefit and the annual rate at which any individual who is or could be a participant can accrue the retirement benefits payable at normal retirement age under the plan for any later plan year is not more than 133 1/3 percent of the annual rate at which he can accrue benefits for any plan year beginning on or after such particular plan year and before such later plan year. For purposes of this subparagraph-

(i) any amendment to the plan which is in effect for the current year shall be treated as in effect for all other plan years;

(ii) any change in an accrual rate which does not apply to any individual who is or could be a participant in the current year shall be disregarded;

(iii) the fact that benefits under the plan may be payable to certain employees before normal retirement age shall be disregarded; and

(iv) social security benefits and all other relevant factors used to compute benefits shall be treated as remaining constant as of the current year for all years after the current year.

ERISA § 204(b)(1)(B); 29 U.S.C. § 1054(b)(1)(B). Regulations enacted pursuant to this statutory provision explain how compliance with the 133 1/3 percent rule is determined:
**\*3** (i) General rule. A defined benefit plan satisfies the requirements of this subparagraph for a particular plan year if-

(A) Under the plan the accrued benefit payable at the normal retirement age (determined under the plan) is equal to the normal retirement benefit (determined under the plan), and

(B) The annual rate at which any individual who is or could be a participant can accrue the retirement benefits payable at normal retirement age under the plan for any later plan year cannot be more than 133 1/3 percent of the annual rate at which he can accrue benefits for any plan year beginning on or after such particular plan year and before such later plan year.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2728430 (S.D.N.Y.)
**(Cite as: 2007 WL 2728430 (S.D.N.Y.))**

26 C.F.R. § 1.411(b)-1(b)(2).

Plaintiff provides calculations demonstrating that if an employee elects to take the Rule of 85 early retirement benefit under the Plan, she may find that, under certain circumstances, the rate of accrual for her pension increases from one year to the next by more than the maximum rate of 133 1/3 percent allowed by the statute. (Amended Complaint ¶¶ 20-27.) Plaintiff therefore claims that the Plan is unlawfully backloaded. As Plaintiff acknowledges, however, there is no question that the Rule of 85 benefit under the Plan is an early retirement benefit that an employee may elect to receive prior to reaching the normal retirement age of 65. (See Corrected Pappas Aff. Ex. A §§ 1.31, 1.39, 1.40, 5.2 & 6.1(d); Amended Complaint ¶ 13.)

The clear language of the statute provides that when measuring a pension plan's compliance with the 133 1/3 percent test, "the fact that benefits under the plan may be payable to certain employees before normal retirement age shall be disregarded." 29 U.S.C. § 1054(b)(1)(B)(iii). The applicable regulation governing compliance with the 133 1/3 test provides the same:

> Early retirement benefits. The fact that certain benefits under the plan may be payable to certain participants before normal retirement age is disregarded. Thus, the requirements of subdivision (i) of this subparagraph must be satisfied without regard to any benefit payable prior to the normal retirement benefit (such as an early retirement benefit which is not the normal retirement benefit (see § 1.411(a)-7(c)).

26 C.F.R. § 1.411(b)1-(b)(2)(ii)(C). Plaintiff's convoluted arguments notwithstanding, it is plain that early retirement benefits are disregarded for purposes of measuring the Plan's compliance with the statute's applicable anti-backloading provision. Since the statute and the applicable regulation both clearly provide that early retirement benefits such as the Plan's Rule of 85 benefit are not subject to the 133 1/3 percent test, it follows that Plaintiff's First Claim, alleging that the Rule of 85 benefit violates the 133 1/3 percent test, fails to state an actionable claim. *See Engers v. AT & T*, No. 98-3660(SRC), 2007 WL 14585, at * 4 (D.N.J. Jan. 3, 2007) (noting that the

plain meaning of 29 U.S.C. § 1054(b)(1)(B)(iii) "instructs the reader to disregard the payment of early retirement benefits" and also that "26 C.F.R. 1.411(b)1-(b)(2)(ii)(C) clearly states that the 133 1/3% rule does not apply to early retirement benefits"). Accordingly, Defendants' Motion to Dismiss the Amended Complaint's First Claim pursuant to Fed. R. Civ. 12(b)(6) is GRANTED.

**C. Plaintiff Lacks Standing to Raise the Second, Third, Seventh, Eighth and Ninth Claims**

*4 A plaintiff seeking to invoke federal jurisdiction must establish that she has standing to sue under Article III of the Constitution by demonstrating: (1) that she suffered an injury-in-fact; (2) a causal connection between the injury and the objectionable conduct she seeks to remedy; and (3) that the injury will be remedied by the requested relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). "Without a plaintiff's satisfaction and demonstration of the requirements of Article III standing, a federal court has no subject matter jurisdiction to hear the merits of a plaintiff's-or, in this case, the class plaintiffs'-claim ...." *Central States Southeast and Southwest Areas Health and Welfare Fund v. Merck-Medco Managed Care, LLC*, 433 F.3d 181, 198 (2d Cir.2005).

**1. The Second Claim**

Plaintiff's Second Claim alleges that Defendants' Plan violates the 133 1/3 percent test provided for in the statute in yet another way. Plaintiff's Second Claim alleges that Defendants' Plan violates 26 C.F.R. § 1.411(b)-1(b)(2)(ii)(F), a regulation governing compliance with the statute. (Amended Complaint ¶ 33.) The regulation provides that the 133 1/3 percent test is not satisfied if "the base for the computation of retirement benefits changes solely by reason of an increase in the number of years of participation." 26 C.F.R. § 1.411(b)-1(b)(2)(ii)(F).

Plaintiff points to the Plan's formula for calculating an employee's pension benefits and notes that it features an offset for Social Security benefits paid for by the employer on behalf of the employee. (Amended Complaint ¶ 32; Corrected Pappas Aff. Ex. A § 5.1.) Defendants explain that under the Plan, the employer pays not only the full cost of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

employees' pension benefits but that it also pays for half the cost of employees' Social Security benefits. (Defs.' Mem. at 5.) The Summary Plan Description, dated 1980, provided to employees covered under the Plan gives the following explanation of the Social Security offset:

> The reason Social Security is used in figuring your pension is to reflect the cost which Avon pays for these benefits. The maximum offset for 40 years of Creditable Service is never more than that part of your Social Security paid for by Avon, since you and Avon share the cost of Social Security on a 50/50 basis all during your career. And Avon-as noted-pays the full cost of your Retirement Plan benefits as well.

> Please note that the Social Security offset has no effect on the benefits you receive from Social Security. You get this added income entirely on top of your pension. And if Social Security payments increase after you retire, these higher government payments will simply add to the total income you receive.

(Corrected Pappas Aff. Ex. B.) Defendants assert that because of the Social Security contribution the employer makes, the Plan includes "a lawful reduction for Social Security in the value of the pension benefits, called the 'Social Security offset,' based on or made 'to reflect Avon's contribution for these benefits.'" (Defs.' Mem. at 6.)

**\*5** Plaintiff does not allege that the use of a Social Security offset in Defendants' Plan is unlawful. Plaintiff takes issue, however, with the fact that the Plan discontinues the Social Security offset in calculating benefits once an employee has rendered "50 (previously 40) years of credited service."(Amended Complaint ¶ 32.) According to Plaintiff, the Plan's discontinuation of the Social Security offset after fifty years of service means that an employee's pension benefit will increase by more than 133 1/3 percent between her fiftieth and fifty-first years of service. Therefore, Plaintiff alleges, "[b]y discontinuing the Social security offset based solely upon an increase in years of service, the Plan changes the base of the computation" in violation of 26 C.F.R. § 1.411(b)-1(b)(2)(ii)(F).(*Id.* ¶ 34.)

Defendants move to dismiss Plaintiff's Second Claim

on the grounds that (1) Plaintiff has not alleged that she was injured by the fact that the Plan discontinues the Social Security offset after the fiftieth year of service and (2) that, in any event, the operation of this particular provision of the Plan never violates the statutory 133 1/3 percent test. Defendant argues that "Plaintiff is not harmed by the discontinuation of the Social Security offset after 50 years of service, because she retired after only 32 years of service ...." (Defs.' Reply at 4, n. 3.) Plaintiff indeed acknowledges that she retired with "31.833 years of credited service." (Amended Complaint ¶ 14.) The obvious implication is that regardless of whether the Plan's discontinuation of the Social Security offset "changes the base of the computation," in violation of 26 C.F.R. § 1.411(b)-1(b)(2)(ii) (F), for some employees, at some point, the Social Security offset was never discontinued in the calculation of Plaintiff's pension.[FN1]

> FN1. As noted by Defendants, the change in the rate of an employee's benefit accrual occasioned by the discontinuance of the Social Security offset has no bearing on the "base" used to compute an employee's pension under the Plan. For purposes of 26 C.F.R. § 1.411(b)-1(b)(2)(ii)(F), "the average monthly pay constitutes the 'base.' " *Carollo v. Cement And Concrete Workers Dist. Council Pension Plan,* 964 F.Supp. 677, 682 (E.D.N.Y.1997). Thus "[a]lthough an employer may, of course, raise salaries after 25 years of service and thereby change the base, it may not change the base because of length of service." *Id.*

Plaintiff seeks injunctive relief, specifically, the reformation of Defendants' Plan, pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3). (Amended Complaint ¶ 3.) That provision provides statutory standing to "a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."29 U.S.C. § 1132(a)(3). However, "even where statutory standing pursuant to ERISA is satisfied, the elements of Article III standing must still be met, and '[i]t is settled that Congress cannot erase Article III's standing requirements by statutorily granting the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

right to sue to a plaintiff who would not otherwise have standing.'" *Banyai v. Mazur,* No. 00 Civ. 980(SHS), 2007 WL 959066, at * 2 (S.D.N.Y.2007) (quoting *Raines v. Byrd,* 521 U .S. 811, 820 n. 3 (1997)). In order to support Article III standing, a "plaintiff's injury must be actual or imminent to ensure that the court avoids deciding a purely hypothetical case in which the projected harm may ultimately fail to occur." *Baur v. Veneman,* 352 F.3d 625, 633 (2d Cir.2003). "Moreover, the named class plaintiffs 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.' " *Id.* (quoting *Warth v. Seldin,* 422 U.S. 490, 502 (1975)).

*6 Since Plaintiff worked for fewer than fifty years before retiring, the Social Security offset was never discontinued for the purposes of calculating her pension under the Plan.[FN2] Plaintiff therefore cannot allege any injury-in-fact as a result of the Plan's discontinuance of the Social Security offset after fifty years of service. Accordingly, since Plaintiff has failed to allege injury-in-fact, the Second Claim is DISMISSED for Plaintiff's lack of standing.

> FN2. Additionally, Defendants demonstrate that it is mathematically impossible for the discontinuance of the Social Security offset to violate the statute's 133 1/3 percent test. The statutory test applies only to "the accrued benefit payable *at* the normal retirement age" or to the equivalent "normal retirement benefit." 29 U.S.C. § 1054(b)(1)(B) (emphasis added). Under the Plan, the normal retirement age is 65. (Amended Complaint ¶ 17.) Given that the earliest that an employee could legally begin working is at age sixteen and "[b]ecause of the mathematical fact that the 50 years of service always expire after a participant is over age 65, Plaintiff has not and cannot state a claim that the discontinuance of the Social Security offset can ever unlawfully increase the rate of accrual of the benefit *payable at normal retirement age,"* i.e. *at* age 65. (Defs.' Reply at 12.) Thus even if Plaintiff could allege an injury-in-fact, her Second Claim would still fail to state an actionable claim.

**2. The Third Claim**

Plaintiff's Third Claim challenges section 5.1 of the Plan, alleging that it runs afoul of ERISA by providing that "upon the attainment of age 25, a participant's rate of accrual is reduced by 1.25 % of his Social Security Benefit, while providing for no Social Security offset before that age."(Amended Complaint ¶¶ 36-37.) The relevant provision of ERISA provides that:

> [A] defined benefit shall be treated as not satisfying the requirements of [the 133 1/3 percent test] if, under the plan, an employee's benefit accrual is ceased, or the rate of an employee's benefit accrual is reduced, because of the attainment of any age.

ERISA § 204(b)(1)(H)(i), 29 U.S.C. § 1054(b)(1)(H)(i).

Defendant observes, however, that "Plaintiff has not been injured by this alleged violation because she was more than 25 years old when ERISA § 204(b)(1)(H) was enacted in 1986, and thus she never suffered a decrease in her rate of accrual when she turned 25."(Defs.' Reply at 13.) Moreover, Plaintiff began working for her employer under the Plan when she was thirty years old, in 1967. (Amended Complaint ¶ 11.) Since Plaintiff cannot allege any injury-in-fact as a result of section 5.1 of the Plan, she lacks standing to assert the Third Claim, alleging that the Plan violates 29 U.S.C. § 1054(b)(1)(H)(i). Accordingly, the Third Claim is DISMISSED.

**3. The Seventh, Eighth and Ninth Claims**

The Seventh, Eighth and Ninth Claims are all premised on the allegation that the Plan's "method of annualizing a partial year of compensation" when calculating an employee's pension benefit violates 26 C.F.R. § 1.411(a)-7(c)(5). That regulation provides, in pertinent part:

> If a defined benefit plan bases its normal retirement benefits on employee compensation, the compensation must reflect the compensation which would have been paid for a full year of participation ....

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 6
Slip Copy, 2007 WL 2728430 (S.D.N.Y.)
**(Cite as: 2007 WL 2728430 (S.D.N.Y.))**

26 C.F.R. § 1.411(a)-7(c)(5). Plaintiff alleges that section 1.5 of the Plan violates the regulation by providing that where an employee has worked for only part of a year in "any of the last ten years of service," the compensation earned during that partial year is annualized according to a "composite" method that "will always yield a lower compensation" than would a method that annualizes "the partial year of compensation based on the salary rate in effect in the partial year."(Amended Complaint ¶¶ 62-63.)

Defendants contend that Plaintiff herself was not actually affected by section 1.5 of the Plan because her partial year of employment was calculated under a different section of the Plan that credited her with a full year's compensation for the partial year she worked in 1980. (Defs.' Reply at 16.) Plaintiff "became totally and permanently disabled on May 25, 1980" and thereafter received "long term disability benefits from Avon's Long Term Disability Plan" until her retirement in 1999. (Amended Complaint ¶¶ 11-12.) Plaintiff acknowledges that as a disabled participant in the Plan, "the amount of her benefits is not governed by Section 1.5, but by Section 5(7)." (Pl.'s Opp. at 32.) Defendant notes that, actually, as a result of an amendment to the Plan in 1994, the provision of the Plan that applies to the annualization of Plaintiff's partial year of service is section 1.10(d). (Defs.' Mem. at 26.) Defendants assert, without contradiction by Plaintiff, that pursuant to sections 1.10(d) and 1.41(b), the Plan "deemed her actual compensation in the year her absence began (i.e. her compensation in 1980, which was $22,241.24) to be her compensation for each year while she was on disability."(Id. at 27.)In calculating her pension benefit, Defendants' Plan thus credited Plaintiff with a full year's compensation for the last partial year that she worked. Defendants have therefore demonstrated that Plaintiff does not, and cannot, allege injury-in-fact based on the operation of section 1.5 of the Plan. Accordingly, because Plaintiff lacks standing to assert that section 1.5 of the Plan violates 26 C.F.R. § 1.411(a)-7(c)(5), the Seventh Claim is DISMISSED. The Eighth and Ninth Claims, which are derivative of the Seventh Claim, are also DISMISSED.

**D. Defendants Have Demonstrated that the Fourth Claim is not Actionable**

*7 Plaintiff's Fourth Claim alleges that the Plan violates ERISA and the applicable regulations because the Rule of 85 early retirement benefit that she elected to receive provided her with a greater pension than she would have received had she elected to take the normal retirement benefit at age sixty-five. (Amended Complaint ¶¶ 44-45.) Using the same sample figures advanced by Plaintiff, Defendants demonstrate that, in fact, employees' pension benefits under the Plan are greater at the normal retirement age of sixty-five than they are at the earliest Rule of 85 early retirement age. (Defs.' Mem. at 19-23.) The reason that the calculations contained in the Amended Complaint are flawed, Defendants show, is that Plaintiff incorrectly "assumes that because the Social Security offset is lowest at the point when a participant first becomes eligible for the Rule of 85, the benefit at the earliest date of eligibility for the Rule of 85 must be greater than the benefit payable at normal retirement age."(Defs.' Reply at 15.) This assumption:

> completely ignores the fact that although a participant's Rule of 85 subsidy continues to decrease as the employee approaches age 65, the retirement benefit would continue to increase, because each additional year of creditable service and compensation that the employee earns as she approaches the normal retirement age more than outweighs the diminishing subsidy to the Social Security offset."

(Id.) Although Defendants raised this point in their moving papers, neither Plaintiff's opposition nor her sur-reply provide an adequate response. The Court thus finds that Defendants have conclusively demonstrated that an employee's pension benefits received under the Plan at the normal retirement age of sixty five are greater than at any Rule of 85 early retirement age and that Plaintiff's Fourth Claim is based on an unfounded assumption. Accordingly, Defendants' Motion to Dismiss the Fourth Claim pursuant to Fed.R.Civ.P. 12(b)(6) is GRANTED.

**E. Plaintiff Concedes that the Fifth and Sixth Claims are Without Merit**

Plaintiff's Fifth and Sixth Claims are based upon a change in the definition of the "Average Final Compensation" (the "AFC") used to calculate

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 7
Slip Copy, 2007 WL 2728430 (S.D.N.Y.)
(Cite as: 2007 WL 2728430 (S.D.N.Y.))

pensions under the Plan. (Amended Complaint ¶¶ 48-49.) The definition of the AFC in effect in the 1977 version of the Plan was changed in 1994. (*Id.*) Plaintiff alleges that the 1994 definition of the AFC, provided in section 1.10(d) of the Plan, "does not provide for annualizing a partial year of compensation" and therefore causes "the amount of pension to be smaller than under the prior definition" for employees who receive Long Term Disability under the Plan.(*Id.* ¶ 51.)Plaintiff therefore requests that her pension be calculated based on the AFC formula provided in the 1977 version of the Plan. (*Id.* ¶ 55.)

Defendants point out that under the challenged section 1.10(d) of the 1994 version of the Plan, Plaintiff actually receives a greater pension benefit than she would under the 1977 version. (Defs.' Mem. at 26.) In her opposition, Plaintiff concedes that "[i]n pleading the Fifth and Sixth Claims, Plaintiff overlooked Section 5(7) of the 1977 Plan, as correctly pointed out by Defendants in their Memorandum."(Pl.'s Opp. at 32, n. 22.) Plaintiff thus states that she "is not contesting the dismissal of those two Claims."(*Id.*) In light of Defendants' showing that Plaintiff is better off as a result of the 1994 change in the AFC's definition and because Plaintiff concedes the point, Defendants' Motion to Dismiss the Fifth and Sixth Claims pursuant to <u>Fed.R.Civ.P. 12(b)(6)</u> is GRANTED.<u>FN3</u>

> <u>FN3.</u> In her sur-reply, Plaintiff seeks leave to retract the concession she made with respect to the Fifth and Sixth Claims. (Pl .'s Sur-Reply at 2, n. 3.) She appears to base the request on the contention that section 1.5 of the 1994 version of the Plan is "fully applicable to disabled Avon employees who, like Plaintiff, received long term disability benefits from Avon prior to retirement ."(*Id.* at 2.) It is unclear to the Court what relevance that contention has to the Fifth and Sixth Claims, which challenge section 1.10(d) of the Plan. In any event, Plaintiff does not contest the point that the application of section 1.10(d) of the 1994 version of the Plan works to her benefit. The request to retract the concession is accordingly denied.

### III. CONCLUSION

**\*8** For the foregoing reasons, Defendants' Motion to Dismiss Plaintiff's First, Fourth, Fifth and Sixth Claims pursuant to <u>Fed.R.Civ.P. 12(b)(6)</u> is GRANTED. Plaintiff's Second, Third, Seventh, Eighth and Ninth Claims are DISMISSED for Plaintiff's lack of standing. The Amended Complaint is DISMISSED. The Clerk of Court is directed to close the docket for this case.

SO ORDERED.

S.D.N.Y.,2007.
Kendall v. Employees' Retirement Plan of Avon Products
Slip Copy, 2007 WL 2728430 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2005 WL 3263377 (N.D.Okla.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3263377 (N.D.Okla.))**

Lewis v. Wal-Mart Stores, Inc.
N.D.Okla.,2005.
Only the Westlaw citation is currently available.
United States District Court,N.D. Oklahoma.
Frank O. LEWIS, et al., Plaintiffs,
v.
WAL-MART STORES, INC., et al, Defendants.
No. 02CV0944CVE-FHM.

Dec. 1, 2005.

James Collins Hodges, Shanann Pinkham Passley,
Eller & Detrich, Tulsa, OK, Michael D. Myers,
Robert Henry Espey, II, Scott M. Clearman,
McClanahan & Clearman LLP, Houston, TX, for
Plaintiffs.
Craig Alan Fitzgerald, David Len Bryant, Bryant
Law Firm, Tulsa, OK, for Defendants.

*OPINION AND ORDER*

EAGAN, Chief J.
*\*1* Now before the Court are the Wal-Mart
Defendants' Motion for Summary Judgment (Dkt.#
88) and the Plaintiffs' Cross-Motion for Summary
Judgment (Dkt. # 133). Plaintiffs brought this action
on December 18, 2002, by filing a "Class Action
Complaint," but the Court has not certified the action
as a class action. Plaintiffs have amended their
complaint three times.[FN1] As the personal
representatives of the estates of eight individuals who
were employed by Wal-Mart Stores, Inc. in
Oklahoma, plaintiffs seek to recover life insurance
benefits they claim the Wal-Mart defendants [FN2]
wrongfully received upon the deaths of the Wal-Mart
employees whom they represent. In both the Second
and Third Amended Class Action Complaints, all of
the plaintiffs specifically allege a violation of Okla.
Stat. tit. 36, § 3604, unjust enrichment, and
misappropriation. Plaintiff Rodney Bizal, on behalf
of the estate of Shelly Bizal-Webb, also alleges an
individual claim against AIG Life Insurance
Company ("AIG") for the policy benefits due to
Shelly Bizal-Webb's estate. Wal-Mart Stores, Inc. has
been substituted for AIG as the real party in interest
with respect to that claim and AIG has been
dismissed.[FN3]

FN1. At a hearing on October 15, 2003, the
Court granted plaintiffs' motion for leave to
amend to file a third amended complaint
(Dkt.# 38) in part: plaintiffs were permitted
to assert a claim against AIG Life Insurance
Company, but that portion of the motion for
leave to amend which served as a request to
revise or assert new claims against Wal-
Mart was taken under advisement pending
the Court's consideration of Wal-Mart's
motion for summary judgment as to the
Second Amended Complaint. On June 22,
2005, plaintiffs filed a Motion for Leave to
File Fourth Amended Complaint (Dkt.# 132)
which, like their motion for leave to file a
third amended complaint, modifies their
request to plead a multi-state class. Both
motions for leave to amend (Dkt.# 38, 132)
are pending.

FN2. Plaintiffs named both Wal-Mart
Stores, Inc. and Wal-Mart Stores Inc.
Corporation Grantor Trust as defendants,
referenced herein collectively as "Wal-
Mart."

FN3. When plaintiffs filed a Third Amended
Class Action Complaint (Dkt.# 36) on July
31, 2003, they added Hartford Life
Insurance Company and Wachovia Bank of
Georgia, N.A. as party defendants.
However, that pleading was stricken on
October 15, 2003, when the Court permitted
the plaintiffs to file a revised Third
Amended Complaint to assert a claim
against AIG only. Plaintiffs filed the revised
pleading on October 20, 2003 without
naming Hartford or Wachovia and,
consequently, these party defendants have
been terminated as party defendants in the
case.

I.

Before Wal-Mart filed its motion for summary
judgment, the Court ruled upon similar claims in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                  Page 2
Not Reported in F.Supp.2d, 2005 WL 3263377 (N.D.Okla.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 3263377 (N.D.Okla.))

*Tillman v. Camelot Music, Inc.,* 02-CV-761 EA(J), slip op. (N.D.Okla. Sept. 29, 2003). That opinion explains the context in which this case arises as well:

As recounted in several news articles submitted by Camelot, COLI [corporate-owned life insurance] policies were purchased by numerous companies, including Fortune 500 companies, in the 1990s to take advantage of a tax loophole. Companies borrowed money from the insurer to cover the cost of the policies, took a tax deduction on the interest, and repaid the loans with proceeds from the benefits they collected when employees covered by the policies died. Most companies, like Camelot, claimed that they purchased the policies as part of a strategy to increase resources they could devote to other employee benefit programs. Some companies informed their employees of the policies and gave them the option to be excluded from coverage. Many would provide incentives to the employees by offering life insurance benefits in amounts smaller than the company would receive if the employees would agree to coverage. The companies paid the premiums for COLI policies; covered employees paid nothing.

The Internal Revenue Service ("IRS") began contesting the interest deductions on COLI policies, see*American Elec. Power. Co., Inc. v. United States,* 326 F.3d 737 (6th Cir.2003); *Dow Chemical Co. and Subsidiaries v. United States,* 250 F.Supp.2d 748 (E.D.Mich.2003); *Winn-Dixie, Inc. v. Comm'r,* 113 T.C. 254, 1999 WL 907566 (U.S.Tax Ct.1999), *aff'd,*254 F.3d 1313 (11th Cir.2001),....

Employees, or their estates, also began challenging the COLI policies similar to the way in which plaintiff challenges Camelot's policies in this matter, and at least one court has ruled in favor of covered employees. See*Mayo v. Hartford Life Ins. Co.,* 220 F.Supp.2d 714, 780-84 (S.D.Tex.2002). Plaintiff brings this suit in the wake of the *Mayo* decision.

*2*Tillman,* 02-CV-761-EA(J), slip op. at 4-5.

The *Mayo* court ruled against Wal-Mart at the same time as it ruled against Camelot. See*Mayo v. Hartford Life Ins. Co.,* 220 F.Supp.2d 714, 791-93 (S.D.Tex.2002); seealso*Mayo v. Hartford Life Ins. Co.,* 220 F.Supp.2d 794, 808 (S.D.Tex.2002). In *Tillman,* this Court disagreed with some aspects of

the *Mayo* opinion and agreed with others by holding (1) a three-year statute of limitations did not bar Tillman's claim, (2) Oklahoma law applied to Tillman's claim, (3) the insurance policy at issue was constructively delivered in Oklahoma, (4) Camelot had an insurable interest in Tillman's life, and (5) Camelot was not unjustly enriched when it received life insurance proceeds as a result of Tillman's death. While *Tillman* was on appeal, the Fifth Circuit affirmed and remanded the lower court *Mayo* decision. *Mayo v. Hartford Life Ins. Co.,* 354 F.3d 400 (5th Cir.2004). Subsequently, the Tenth Circuit Court of Appeals affirmed this Court's rulings in *Tillman* on constructive delivery and unjust enrichment, but reversed the ruling on insurable interest.*Tillman v. Camelot Music, Inc.,* 408 F.3d 1300 (10th Cir.2005). The Tenth Circuit did not address the statute of limitations issue, as Camelot did not appeal that ruling. Here, Wal-Mart was permitted to supplement its motion for summary judgment in light of the Tenth Circuit's decision in *Tillman.*

Wal-Mart instituted its COLI program in December 1993 and ended it in January 2000.[FN4]In December 1993, Wal-Mart established the Wal-Mart Stores Inc. Corporation Grantor Trust ("Trust") in Georgia to act, allegedly, as the legal holder of, and recipient of performance under, any COLI policies to be issued insuring the lives of Wal-Mart employees residing in the United States. The instrument establishing the Trust provided that Georgia law would govern issues relating to the Trust's "construction, validity and administration," and it appointed as trustee Atlanta's Wachovia Bank of Georgia, N.A., an entity which already served as trustee for Wal-Mart's profit-sharing plan. *See* Motion for Summary Judgment, Dkt. # 88, Ex. 1 (Ex. 3 attached thereto). Wal-Mart claims that its COLI programs were sited in Georgia on the basis of the certainty and clarity afforded by Georgia laws on insurable interest and based on the understanding that Georgia's premium tax rates were comparatively low. The AIG and Hartford policies were applied for in person in Atlanta, Georgia, and were issued and delivered in person to, and accepted in person by, the trustee of the Trust in Atlanta, Georgia. In addition, the Trust paid the policy premiums by wire payment from Georgia.

FN4. Many of the facts set forth herein are as stated by Wal-Mart in its original motion

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3
Not Reported in F.Supp.2d, 2005 WL 3263377 (N.D.Okla.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3263377 (N.D.Okla.))**

since plaintiffs did not respond, as the local rules require, with "a concise statement of material facts to which the party asserts genuine issues of fact exist."LCvR 56.1(c). The rule provides: "All material facts set forth in the statement of the material facts of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of material facts of the opposing party."*Id.*

Until July 1995, the Trust periodically purchased COLI policies covering more than 350,000 of Wal-Mart's "associates" or employees. COLI policies purchased from AIG insured hourly-rate employees; COLI policies purchased from Hartford Life Insurance Company ("Hartford") insured salaried employees. The first block of AIG COLI policies were purchased on December 23, 1993. Although AIG policies insuring individual Wal-Mart employees varied in amount of benefits payable upon the death of the insured, all of the 1993 AIG COLI policies provided coverage in accordance with the terms of the same AIG master form policy.

**\*3** In purchasing the policies, Wal-Mart provided AIG and Hartford with the name, social security number, gender, date of birth, state and zip code of residence, and annual compensation of its employees. The Wal-Mart COLI plans were "experience rated," meaning that the actual "cost of insurance" was adjusted periodically to account for actual mortality experience within the pool of insured associates. The policies were permanent whole life insurance policies and were not renewable from year to year, but were designed to accumulate cash value through payment of premiums and remain in effect throughout the life of the insured employee.

Wal-Mart asserts that it spends millions of dollars annually to recruit, screen, train, and retain its employees because its success depends on a trained and experienced work force in stores, distribution centers, its home office, and at other locations. It does not consider its employees to be fungible. Wal-Mart also claims to incur substantial costs resulting from employee deaths, such as the costs associated with employee replacement, retraining, sickness and death-related benefits and expenses, and lost productivity. Wal-Mart purports to have analyzed its economic interest in the continued lives of its

employees insured under its COLI programs to determine appropriate benefit amounts under the policies.

Since prior to 1992, Wal-Mart has administered and funded the Wal-Mart Health & Welfare Plan (the "Benefits Plan"). Subject to eligibility requirements specified in the COLI policies, Wal-Mart's COLI programs were structured to cover all Wal-Mart employees who were enrolled in the Benefits Plan when the blocks of policies were purchased and who chose not to opt out of the COLI programs, regardless of the employee's rank or status in the company. Where Wal-Mart later determined that employees initially listed as COLI participants did not meet the eligibility requirements, it cancelled the policies insuring such employees and any premiums paid were returned.

The Benefits Plan provided various benefits to Wal-Mart employees, including company-paid life insurance in an amount equal to the employee's annual pay rounded to the nearest $1,000 up to $50,000, payable to the beneficiary designated by the employee. In addition, Wal-Mart provided to employees who did not opt out of the COLI plans a special death benefit payable to the same beneficiary as named for the company-paid life insurance. The special death benefit for active employees was $5,000 and an additional $5,000 for accidental death. When purchases of COLI policies were discontinued, Wal-Mart also discontinued the special death benefit.

Wal-Mart argues that, unlike Camelot, it informed its employees of the COLI program and gave them the option to be excluded from coverage. Wal-Mart's Vice-President of Benefits, Thomas G. Emerick, testified that he prepared and distributed a memorandum, dated December 14, 1993, to all Wal-Mart location managers advising them of the new COLI plans and attaching a brochure (the "1993 brochure").[FN5] The brochure describes participation in the COLI program and special death benefits flowing from such participation. It also informs eligible employees that they may opt-out of participation. Emerick affies that he instructed all location managers to distribute the brochure to all eligible employees. Plaintiffs dispute that the brochure was distributed, and they dispute that it served to inform eligible employees of Wal-Mart's COLI policies.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                          Page 4
Not Reported in F.Supp.2d, 2005 WL 3263377 (N.D.Okla.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 3263377 (N.D.Okla.))

FN5. On the eve of the October 5, 2005 hearing in this matter, plaintiffs filed an objection to Wal-Mart's summary judgment evidence (Dkt. # 164) which includes an objection to Emerick's December 11, 2003 affidavit and the documents attached thereto, and an objection to Emerick's July 27, 2005 supplemental affidavit. Plaintiff's objection is not only exceedingly untimely, but also an improper attempt to exceed page limitations imposed by local rule and the Court for summary judgment briefs. Further, it appears that many of the objections, including the objection to the 1993 brochure, are based on hearsay, to which the exception for business records (Fed.R.Evid.803(6)) would apply. Finally, the Court was advised at the October 5, 2005 hearing that Wal-Mart made available a Rule 30(b)(6) witness to testify as a records custodian, but plaintiffs' counsel decided not to take that individual's deposition. Hence, plaintiffs' objections as to authenticity of the documents attached to Emerick's affidavit are not well-taken. The objection (Dkt.# 164) is hereby stricken as untimely, improper, and without merit.

*4 In addition to the 1993 brochure, Wal-Mart claims that it sent a notice in February 1994 informing employees of a $1,000 special death benefit for COLI participants who either cancelled their medical coverage but continued to work for Wal-Mart, or terminated employment with Wal-Mart. As employees became eligible for enrollment in the COLI program after December 1993, they were provided with an individual "Personal Choice" form containing disclosures consistent with the 1993 brochure. Wal-Mart claims that more than 450 employees from locations across the country returned opt-out forms. As further evidence of notice, Wal-Mart points out that an article appearing in the October 23, 1995 issue of *Newsweek* discussed COLI programs in general and Wal-Mart's program in particular. Similar articles specifically discussing Wal-Mart's COLI programs also appeared around the same time in *The Washington Post* and *The New York Times*.

The Health Insurance Portability and Accountability Act of 1996 (HIPAA) effectively eliminated interest deductions on policy holder loans to fund a COLI plan. Wal-Mart claims that passage of HIPAA led Wal-Mart to unwind its COLI programs because the interest deductions were integral to their financial viability. Wal-Mart ultimately surrendered all of its remaining COLI policies by January 2000 and contemporaneously waived any death benefits with respect to the surrendered policies. The insurers returned certain premium and investment funds they had held for Wal-Mart in connection with the COLI program. The IRS challenged the tax benefits that Wal-Mart expected from its COLI plans, and Wal-Mart claims that it entered into a settlement which preserved only a small portion of the originally expected tax benefits.

The *Tillman* case involved only one plaintiff, and Camelot received life insurance proceeds upon that employee's death. This case involves eight plaintiffs. Wal-Mart received benefits upon the death of only one of the individuals whose estate is represented by a named plaintiff herein, Alene Jacobson. Before any policy claim was made, Wal-Mart cancelled the policies as to three other individuals whose estates are represented herein: Shelly Bizal-Webb, Eavy Marie Brown and Nellie May Lewis. Three additional individuals represented herein, Alice Fay Haskins, Irene Brasher and Troy Allen Brasher, were never insured under Wal-Mart's COLI policies. The policy of the remaining individual represented herein, Hazel Lee Sarty, was rescinded after she was determined to be ineligible for the insurance.

Wal-Mart contends in its supplemental brief in support of its summary judgment motion that the Tenth Circuit's decision in *Tillman* has no impact on (1) Wal-Mart's statute of limitations defense, (2) the Bizal-Webb claim, and (3) Wal-Mart's defense to plaintiffs' claims for the tort of misappropriation. Wal-Mart also argues that, under the Tenth Circuit's decision in *Tillman*, plaintiff's claims for unjust enrichment fail as a matter of law. Finally, Wal-Mart argues that the Tenth Circuit *Tillman* decision supports Wal-Mart's position that Oklahoma's insurable interest statute does not apply and, under the version of the insurable interest statute in effect in 1993, the presence of an employer's lawful and substantial economic interest in the life of any employee may be shown by evidence that Wal-Mart, unlike Camelot, can produce.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 5
Not Reported in F.Supp.2d, 2005 WL 3263377 (N.D.Okla.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3263377 (N.D.Okla.))**

**\*5** In their cross-motion for summary judgment, plaintiffs move for summary judgment on Wal-Mart's affirmative defenses of limitations, consent, waiver, estoppel, laches, and ERISA preemption. They also seek a ruling that Wal-Mart did not have an insurable interest in the lives of its rank-and-file employees, including Nellie Mae Lewis, Shelly Bizal-Webb, Alene Jacobson, and Eavy Marie Brown. Plaintiffs specifically argue that summary judgment is proper on Wal-Mart's limitations defense because the doctrines of collateral estoppel and issue preclusion bar Wal-Mart from arguing that it made effective disclosures to its employees, and the summary judgment record shows that Wal-Mart's limitations defense is contrary to the facts. They argue that summary judgment is proper as to Wal-Mart's equitable defenses of waiver, estoppel, consent, and laches because plaintiffs did not have full knowledge of the operative facts, and because Wal-Mart knew its COLI policies were unlawful when it bought them. Plaintiffs rely on rulings from other courts to assert that Wal-Mart's ERISA preemption defense is barred, and to assert that Wal-Mart lacked an insurable interest in the lives of its rank-and-file employees.

II.

Summary judgment pursuant to Fed.R.Civ.P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. _Celotex Corp. v. Catrett,_ 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); _Anderson v. Liberty Lobby, Inc.,_ 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); _Kendall v. Watkins,_ 998 F.2d 848, 850 (10th Cir.1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. _Celotex,_ 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" _Id._ at 327.

"When the moving party has carried its burden under

Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" _Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,_ 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." _Anderson,_ 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." _Id._ at 250. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. _Garratt v. Walker,_ 164 F.3d 1249, 1251 (10th Cir.1998).

III.

A. Statutory Violation

1. Standing

**\*6** As to persons entitled to maintain a cause of action for violation of Oklahoma's insurable interest statute (with respect to personal insurance), the statute provides:

If the beneficiary, assignee or other payee under any contract made in violation of this section receives from the insurer any benefits thereunder accruing upon the death, disablement, or injury of the individual insured, the individual insured or the executor or administrator, as the case may be, may maintain an action to recover such benefits from the person so receiving them.

Okla. Stat. tit. 36, § 3604(B). The undisputed facts are that former Wal-Mart employees Alice Fay Haskins, Irene Brasher and Troy Allen Brasher were never insured under Wal-Mart's COLI policies. Former Wal-Mart employee Hazel Lee Sarty was insured in 1993 but determined to be ineligible on June 2, 1994. Wal-Mart received no benefits accruing upon the deaths of these individuals, and none of these individuals, or their personal representatives, ever received any benefits under the Wal-Mart COLI

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 6
Not Reported in F.Supp.2d, 2005 WL 3263377 (N.D.Okla.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3263377 (N.D.Okla.))**

policies. Accordingly, none of them has standing to assert any claim under <u>Okla. Stat. tit. 36, § 3604.</u>

The "irreducible constitutional minimum" for establishing standing in Article III courts requires "that the plaintiff must have suffered an 'injury in fact'-an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not conjectural or hypothetical.'"*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citations omitted). In addition, "there must be a causal connection between the injury and the conduct complained of," and "it must be 'likely' ... that the injury will be 'redressed by a favorable decision.' "*Id.* at 560-61.Plaintiff Janet Switzer represents the estates of Troy Allen Brasher and Irene Brasher, Terry Scott Shelnut represents Alice Fay Haskins' estate, and Herbert Sarty represents the estate of Hazel Lee Sarty. Because these decedents were never insured, the statutory claims of personal representative plaintiffs Switzer, Shelnut and Sarty must be dismissed for lack of standing.

Similarly, the personal representatives of the estates of former Wal-Mart employees Nellie Mae Lewis,[FN6] Shelly Bizal-Webb, and Eavy Marie Brown lack standing to assert a violation of <u>Okla. Stat. tit. 36, § 3604</u> because: (1) they never received any benefits under the Wal-Mart COLI policies, even though these decedents had been insured; (2) the employees themselves never received any benefits under the Wal-Mart COLI policies; and, (3) contrary to plaintiffs' argument, Wal-Mart received no death benefits or policy "proceeds" upon the deaths of these employees. Wal-Mart surrendered the COLI policies before any claims were made, and Wal-Mart waived any death benefits when it surrendered all of its remaining COLI policies. The "payment" Wal-Mart received in January 2000 was a refund of certain premium and investment funds the insurers had held for Wal-Mart in connection with the COLI program. Presumably, the insurers would have paid death benefits and policy proceeds from those funds if the policies had not been surrendered, but it would be contrary to the plain meaning of the statute to find that the return of those funds to Wal-Mart in exchange for release of contractual obligations constitutes "benefits [ ] accruing upon the death, disablement, or injury of the individual insured [s]." Accordingly, the statutory claims of personal

representative plaintiffs Frank O. Lewis, Rodney Bizal,[FN7] Jeff Todd Brown and Tab Art Brown must be dismissed because these plaintiffs have no standing to assert that Wal-Mart violated <u>Okla. Stat. tit. 36, § 3604</u> by its purchase of COLI policies.

> <u>FN6.</u> Nellie Mae Lewis was insured on March 1, 1995-after the Oklahoma legislature amended the statute to permit COLI policies, but "only with the written consent of the insured."<u>Okla. Stat., tit. 36, § 3604(C)(4)(a).</u> It is undisputed that Wal-Mart did not obtain the *written* consent of Nellie Mae Lewis.

> <u>FN7.</u> Plaintiff Rodney Bizal's claim for policy benefits is an offshoot of his claim for violation of the statute and fails for similar reasons. Neither he nor Shelly Bizal-Webb, whose estate he represents, was a signatory to the contract between Wal-Mart and AIG, and neither paid any premium for the life insurance. Although Shelly Bizal-Webb died in 1999 before Wal-Mart cancelled its COLI policy insuring her life, Wal-Mart never made a claim for or received any policy benefits accruing upon her death. Thus, he has no standing as to this claim, and Wal-Mart, substituted for AIG, is entitled to summary judgment.

*7 The remaining statutory claim is that of Kenneth Frank Jacobson, the plaintiff representing Alene Jacobson. Alene Jacobson died on September 12, 1996, and on November 14, 1996 Wal-Mart actually received COLI benefits which accrued upon her death. Thus, the Court must address the following additional issues as to this claim: Wal-Mart's statute of limitations defense; other affirmative defenses raised by Wal-Mart; and whether Wal-Mart had an insurable interest in Alene Jacobson's life.

2. Statute of Limitations

Wal-Mart initially argued that all of the plaintiffs' claims are barred because they accrued more than three years before the action was commenced and the limitations period is not tolled by alleged fraudulent concealment. Plaintiffs argued, with respect to the Jacobson claim in particular, that Wal-Mart's position contradicts the *Mayo* decisions, and that the statute of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 7
Not Reported in F.Supp.2d, 2005 WL 3263377 (N.D.Okla.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3263377 (N.D.Okla.))**

limitations on Jacobson's claim is tolled by the discovery rule and Wal-Mart's fraudulent concealment of its COLI policies. In response to Wal-Mart's supplemental briefing on the statute of limitations issue, plaintiffs filed their cross-motion for summary judgment, arguing that the doctrines of collateral estoppel and issue preclusion bar Wal-Mart from arguing that it made effective disclosures to its employees. Plaintiffs also assert that the summary judgment record before the Court proves that Wal-Mart's limitations defense is contrary to the facts.

As discussed in the Court's *Tillman* decision, Oklahoma's insurable interest statute does not contain its own statute of limitations or tolling provisions. *Tillman,* 02-CV-761-EA(J), slip op. at 13. The Court found applicable the three-year statute of limitations for an "action upon a liability created by statute other than a forfeiture or penalty; ..." Okla. Stat. tit. 12, § 95(2), given that a "liability created by statute is defined as a liability which would *not* exist but for the statute." *Lincoln Bank and Trust Co. v. Neustadt,* 917 P.2d 1005, 1008 (Okla.Ct.App.1996) (citations omitted). The Court also found, in *Tillman,* that the limitations period for Tillman's claim for violation of Oklahoma's insurable interest statute commenced the day Camelot bought the policy because, theoretically, Tillman could have sought a declaratory judgment that Camelot had no insurable interest. *Id.* at 15.[FN8] Tillman failed to bring suit within three years of that date. Thus, the Court addressed three key issues: whether the limitations period was tolled by Camelot's alleged fraudulent concealment, whether Tillman's representative had constructive notice of her claims, and if so, when. *Tillman,* 02-CV-761-EA(J), slip op. at 15.

> FN8. One court has found likewise, at least as to the accrual of claims for commercial misappropriation, unjust enrichment, civil conspiracy and declaratory judgment. *SeeRice v. Wal-Mart Stores, Inc.,* No. Civ. 02-390-B, 2004 WL 1638241, *2 (D.N.H. July 23, 2004); *Keenan v. AIG Life Ins. Co.,* No. Civ. 03-31-B, 2003 WL 21696185, *3 (D.N.H. July 11, 2003).

Plaintiffs' counsel in this case challenge the Court's finding in *Tillman* as to when the cause of action accrues on claims for unjust enrichment and violation of Okla. Stat. tit. 36, § 3604 arising out of a corporation's COLI program.[FN9]Relying on the Fifth Circuit's decision in *Mayo,* they assert that these causes of action accrued when Wal-Mart received the proceeds of the policy from the insurer after the employee's death. *See*354 F.3d at 410. The *Mayo* court explained that those proceeds should go to the deceased employee's estate. *Id.* Assuming the Fifth Circuit is correct, plaintiff still must show that the limitations period was tolled by Wal-Mart's alleged fraudulent concealment, and/or that Jacobson's personal representative had no notice of the statutory claim more than three years before he filed suit.

> FN9. Under Oklahoma law, "an action accrues when a litigant can first maintain an action to a successful conclusion." *Digital Design Group. Inc. v. Information Builders, Inc.,* 24 P.3d 834, 839 (Okla.2001).

a. Fraudulent Concealment

*8 In diversity actions, federal courts apply the state statutes of limitations and any related state tolling provisions. *E.g.,Futura Music, Inc. v. Gates Radio Co.,* 399 F.2d 308, 310 (10th Cir.1968). Plaintiffs bear the burden to provide evidence of fraudulent concealment sufficient to withstand a motion for summary judgment. *Williams v. Borden, Inc.,* 637 F.2d 731, 739 (10th Cir.1980); *see*King & King Enter. v. Champlin Petroleum Co.,* 446 F.Supp. 906, 911 (E.D.Okla.1978); *cf.*Tice v. Pennington,* 30 P.3d 1164, 1173 (Okla.Ct.App.2001)). Further, plaintiff "must not only show that he did not know facts constituting a cause of action, but that he exercised reasonable diligence to ascertain such facts." *Funnel v. Jones,* 737 P.2d 105, 107 (Okla.1985) (quoting *Kansas City Life Ins. Co. v. Nipper,* 174 Okla. 634, 51 P.2d 741 (Okla.1935)). This is known as the "discovery rule" or the "diligence-discovery rule." *E.g.,Weathers v. Fulgenzi,* 884 P.2d 538, 540-41 (Okla.1994); *Tice,* 30 P.3d at 1171. Regardless of whether a plaintiff has "exact knowledge," tolling resulting from fraudulent concealment ends "when the plaintiff knows, or reasonably should know, of enough critical facts about the injury and its cause to protect himself or herself by seeking legal assistance." *Tice,* 30 P.3d at 1171.[FN10]

> FN10. Wal-Mart initially cited this authority in its motion for summary judgment, Dkt. # 88, at 26. In its reply brief, however, Wal-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 8
Not Reported in F.Supp.2d, 2005 WL 3263377 (N.D.Okla.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 3263377 (N.D.Okla.))

Mart argues that the discovery rule applies only in limited tort cases. Reply Br. Dkt. # 105, at 11 (citing *Smith v. Baptist Foundation of Oklahoma,* 50 P.3d 1132, 1137-38 (Okla.2002)); *seeLovelace v. Keohane,* 831 P.2d 624, 629 (Okla.1992). This Court recognizes that no Oklahoma case has applied the discovery rule to a claim for violation of Okla. Stat. tit. 36, § 3604, and does not hold that Oklahoma courts necessarily would extend the rule to this claim. However, it is assumed, for purposes of this motion, that the rule applies.

In *Tillman,* this Court explained that "fraudulent concealment by a wrongdoer of the injured party's cause of action will toll the period of limitations until the injured party is placed on reasonable notice of the wrong."No. 02-CV-761-EA(J), slip op. at 15 (citing *Telex Corp. v. Int'l Bus. Machines Corp.,* 367 F.Supp. 258, 360 (N.D.Okla.), *rev'd on other grounds,* 510 F.2d 894 (10th Cir.1973); *Funnel,* 737 P.2d at 107;*Liberty Nat'l Bank of Weatherford v. Lewis,* 172 Okla. 103, 44 P.2d 127, 129 (Okla.1935); *Tice,* 30 P.3d at 1171). Based on statements made during related litigation, the Court found that Camelot had fraudulently concealed the existence of its COLI policies. *Id.* The Court noted that, under Oklahoma law, "[t]he mere failure to disclose that a cause of action exists is not sufficient to prevent the running of the statute. There must be something more; some actual artifice to prevent knowledge of the facts; some affirmative act of concealment or some misrepresentation to exclude suspicion and prevent inquiry."*Tillman,* No. 02-CV-761-EA(J), slip op. at 16 (quoting *McClenahan v. Okla. Ry. Co.,* 131 Okla. 73, 267 P. 657, 658 (Okla.1928); *accordWills v. Black & West,* 344 P.2d 581, 584 (Okla.1959)). The "something more" was Camelot's effort to hide the insurance benefits in an account for executive compensation. *Id.*

There is no evidence of a similar "artifice," "affirmative act of concealment," or "misrepresentation" in this case that would have prevented the individuals represented by plaintiffs from ascertaining that Wal-Mart carried corporate-owned life insurance on their lives and would have received policy proceeds when they died. To the contrary, the 1993 brochure disclosed Wal-Mart's

COLI policies to Wal-Mart employees. It included a "Personal Benefits News" bulletin with an accompanying notice captioned "For Your Information." It informed employees that, beginning January 1, 1994, Wal-Mart would provide all active associates (employees) participating in the company's group health plan an additional "death benefit" of at least $5,000 per employee. Importantly, the notice explained the source of the new benefits to employees, as well as the right of any eligible employee to prevent the company from owning insurance on the employee's life:

*9 Wal-Mart is providing these new death benefits as a result of financial gains from life insurance policies Wal-Mart will purchase which will cover the lives of associates who participate in the group health plan. That Wal-Mart owned life insurance will result in financial benefits for the corporation. Any net life insurance proceeds payable to Wal-Mart from this life insurance as a result of the death of an active associate will be contributed to the profit sharing plan.[FN11]

> FN11. Plaintiffs maintain that no proceeds were ever contributed to the profit sharing plan. The Court finds this undisputed fact irrelevant to the determination of whether Wal-Mart fraudulently concealed its COLI policies or whether the 1993 brochure notified Wal-Mart employees of the COLI plan.

Participation in the new death benefits and the Wal-Mart owned life insurance will be automatic for associates enrolled in the group health plan. However, if *you do not wish to be covered by these programs,* please fill in the information below and return it to Wal-Mart's Benefits Department by January 31, 1994.
Motion for Summary Judgment Appendix ("MSJ App."), Dkt. # 89, Ex. 1.17 (underscore in original). As employees became eligible for participation in the COLI program after December 1993, Wal-Mart provided them with an individual "Personal Choice" form disclosing the same material. *Id.,* Ex. 1.22.

In addition, the national news media reported on COLI programs, and Wal-Mart's in particular, in 1995. A September 24, 1995 article in *The New York Times* explained how COLI policies worked and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3263377 (N.D.Okla.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3263377 (N.D.Okla.))**

Page 9

named Wal-Mart as one of the well-known companies that utilized COLI policies. MSJ App., Dkt. # 89, Ex. 1.26. A subsequent article in *The Washington Post* was published on October 17, 1995. It focused on Wal-Mart's COLI program and quoted Emerick at length. *Id.* Ex. 1.25. The author explained in detail "[h]ow American's biggest corporations are cashing in on your mortality" and stated, among other things: "A company takes out whole life insurance policies on thousands of its employees. This isn't like regular corporate-provided insurance. Here, when an employee dies, the money goes to the company, not to his family."*Id.* The same article was published in *Newsweek* on October 23, 1995. *Id.,* Ex. 1.24. The Court finds the summary judgment record devoid of evidence that Wal-Mart fraudulently concealed its COLI policies.

b. Notice

Even if Wal-Mart had fraudulently concealed its COLI policies, thus tolling the limitations period, the tolling would have ceased when the personal representative for Alene Jacobson knew, or reasonably should have known, about the COLI policies. *SeeTice,* 30 P.3d at 1171. Wal-Mart contends that the 1993 brochure and subsequent "Personal Choice" form, as well as the 1995 news articles, not only demonstrate a lack of fraudulent concealment but also demonstrate that all of the plaintiffs had notice. In Oklahoma, "[w]hatever is notice enough to excite attention and put the party on guard and call for inquiry, is notice of everything to which such inquiry might have led."*State ex rel. Oklahoma Bar Ass'n v. Scroggs,* 70 P.3d 821, 827 (Okla.2003). The common law rule has been codified, as explained by *In re Estate of Pope,* 808 P.2d 640 (Okla.1990):

*10 "Notice is either actual or constructive."25 O.S.1981 § 10."Actual notice consists in express information of a fact."25 O.S.1981 § 11. "Constructive notice is notice imputed by the law to a person not having actual notice."25 O.S.1981 § 12. "Every person who has actual notice of circumstances sufficient to put a prudent man upon inquiry as to a particular fact, and who omits to make such inquiry with reasonable diligence, is deemed to have constructive notice of the fact itself."25 O.S. 1981 § 13.

*Id.* at 646 n. 32.

Plaintiffs attack Wal-Mart's arguments on two fronts: first, they argue that the notice was vague, misleading, and superficial; second, they assert that the 1993 brochure and subsequent notices were never received by the Wal-Mart employees whom they represent. In particular, plaintiffs contend that Wal-Mart knew about and could have used a disclosure similar to one made by the Woolworth Corporation which stated that "no associate or his or her heirs or beneficiaries will have any entitlement to any policy or its proceeds" and required the employee to sign a consent form acknowledging that the company would be sole owner and beneficiary of the COLI policy on his or her life. *See* Resp. Br. Dkt. # 102, Ex. 29; A-6.

Further, plaintiffs argue that the primary subject of the 1993 brochure is the new "special death benefit" and makes no explicit reference to COLI policies in the first two paragraphs. The third paragraph is vague, plaintiffs argue, because there are several life insurance programs offered to Wal-Mart associates, two of which were group insurance programs, and the Wal-Mart employee handbooks for 1994 and 1995 addressed the new special death benefit in the section describing one of these group programs-Wal-Mart's company paid life insurance program-in which the employee designated the beneficiary. Finally, plaintiffs challenge the 1993 brochure statement that the insurance would result in "financial benefits" for the company. Emerick testified that Wal-Mart intended to convey that it would receive tax benefits from the policies. He did not mention the death benefits paid to Wal-Mart upon the death of employees covered by the COLI policies.

In support of these arguments, plaintiffs rely on the *Mayo* decisions and assert that the doctrines of collateral estoppel and issue preclusion prevent Wal-Mart from relying on the 1993 brochure and subsequent similar information. In the context of a discussion of Texas statutes permitting written consent by employees for insurance on their lives and the particular beneficiary and owner designations, the district court in *Mayo* remarked that, "there is no proof that Sims actually received the December 1993 flyer [the 1993 brochure] or any other notice about the insurance and the beneficiary designation prior to Wal-Mart's purchase of the COLI policy on his life." 220 F.Supp.2d at 807. The district judge also

Not Reported in F.Supp.2d                                                                                          Page 10
Not Reported in F.Supp.2d, 2005 WL 3263377 (N.D.Okla.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3263377 (N.D.Okla.))**

described Wal-Mart's explanation of its insurance program as "vague," "superficial, bare of any data or concrete information," and a "mere suggestion" that insurance on employees' lives was involved. *Id.* at 806-07.The judge stated that "Wal-Mart did not explain the financial arrangements in writing or in plain English."*Id.* at 807.On appeal, the Fifth Circuit assumed the Wal-Mart had purchased the COLI policies without the employee's knowledge or consent. *Mayo,* 354 F.3d at 410.

*11 Wal-Mart points out that the *Mayo* district court, in a decision issued the day prior to the one in which the statements quoted above were made, specifically stated that the court was *not* deciding whether the disclosures were sufficient to constitute notice or claim discovery for statute of limitations purposes:

The Court need not resolve AIG's argument that Sims was placed on notice of the existence of the COLI policies through the flyer distributed by Wal-Mart in December 1993. First, Plaintiff Sims Estate does not rely on the discovery rule. Second, the evidence on which these Defendants [rely] to establish 'notice' to Sims raises a question of fact as to whether Sims actually received the flyer and whether the information in it gave meaningful notice of the benefits Wal-Mart would receive from the insurance.

229 F.Supp.2d at 770-71 n. 202. Similarly, the Fifth Circuit's assumption as to the employee's knowledge of Wal-Mart's COLI policies occurs in the context of its discussion of the *Mayo* plaintiff's unjust enrichment claim. *SeeMayo,* 354 F.3d at 410. It was not a determination that the plaintiff had no notice for discovery rule purposes. This Court is more interested in the *Mayo* lower court's determination that the evidence on which the defendants relied to establish notice raised a question of fact. The evidence here raises a similar question of fact not only as to whether Alene Jacobson received the 1993 brochure, but also as to whether her personal representative knew or should have known about it when the claim accrued after her death.

Significantly, the federal district court in New Hampshire has held, on two separate occasions, that the 1993 brochure was delivered and that Wal-Mart employees had notice of Wal-Mart's COLI plan as a result of the 1993 brochure. In *Keenan v. AIG Life Ins. Co.,* No. Civ. 03-31-B, 2003 WL 21696185, *3

(D.N.H. July 11, 2003), the district judge remarked that the plaintiff had not argued that the 1993 brochure was confusing or ambiguous. A year later the same district judge made the same ruling without a similar observation as to another Wal-Mart employee and that employee's personal representative. *Rice v. Wal-Mart Stores, Inc.,* No. Civ. 02-390-B, 2004 WL 1638241 (D.N.H. July 23, 2004), but, at the October 5, 2005 hearing, Wal-Mart's counsel quoted from a brief in which the *Rice* plaintiff made that argument. In *Rice,* the district judge explicitly found: "The notice [i.e., the 1993 brochure] clearly provided information that Wal-Mart was going to purchase life insurance policies on its employees' lives, and that it-not the employees' survivors-would receive the financial gains."2004 WL 1638241, at *3.

The court deciding the *Rice* and *Keenan* cases did not, however, differentiate between the Wal-Mart employees and their personal representatives, as he did not decide the accrual date in the context of a New Hampshire statutory claim similar to those asserted here. The plaintiffs in those cases did not allege a violation of an insurable interest statute; instead, they claimed that they were entitled to a declaratory judgment that Wal-Mart lacked an insurable interest in the lives of the Wal-Mart employees in New Hampshire who were insured by COLI policies purchased by Wal-Mart. *SeeRice v. Wal-Mart Stores, Inc.,* No. Civ. 02-390-B, 2003 WL 22240349 (D.N.H. Sept.30, 2003). They also alleged claims for breach of contract, commercial appropriation, intrusion upon seclusion, breach of fiduciary duty, intentional infliction of emotional distress, unjust enrichment, and civil conspiracy.*Id.* The court dismissed all claims against one of the insurance companies that issued the COLI policies except for plaintiffs' claims for civil conspiracy and unjust enrichment. *Id.* The court dismissed the declaratory judgment claim, in particular, because, in New Hampshire, only the insurer can challenge the "want of insurable interest." *Id.* at *1.[FN12]

---

FN12. The common law in Oklahoma permitted only the insurer to contest validity of a policy for lack of an insurable interest. *Ryan v. Andrewski,* 206 Okla. 199, 242 P.2d 448, 452 (Okla.1952). The statute, however, permits the personal representative to recover death benefits from a person

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 11
Not Reported in F.Supp.2d, 2005 WL 3263377 (N.D.Okla.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 3263377 (N.D.Okla.))

receiving them under a contract made in violation of the statute.Okla. Stat. tit. 36, § 3604(B).

**\*12** In this case, as in the *Rice* and *Keenan* cases, plaintiffs have submitted numerous affidavits by former Wal-Mart employees, managers, supervisors, and representatives of deceased Wal-Mart employees. These individuals assert, among other things, that they had no knowledge of Wal-Mart's coverage, that they were never told about the coverage, and that they cannot recall receiving the written information about COLI policies from Wal-Mart. *See* Resp. Br., Dkt. # 102, at 34-35. One individual testified that, after receiving an advertisement letter from plaintiffs' counsel, she went to the Wal-Mart store where her deceased husband had worked. She met with the store's personnel manager who searched through files and found no documents as to the COLI coverage. The personnel manager also contacted Wal-Mart's benefits department and its legal department and was told that Wal-Mart did not insure the lives of its employees. *Id.* at 35.[FN13]

> FN13. Plaintiffs submitted a similar affidavit by another individual in support of their cross-motion for summary judgment. *See* Cross-Motion, Dkt. # 133, Ex. D.

In opposition, Wal-Mart has submitted evidence that approximately 450 employees, and at least one in Oklahoma, completed and returned a form permitting them to "opt-out" of the COLI program. The *Mayo* decision indicates that "[a]pproximately 1000 employees out of 350,000 in fact opted out."220 F.Supp.2d at 807 n. 36. Wal-Mart also submits that the information provided to the personnel manager and, consequently, to the wife of a deceased Wal-Mart employee was correct because the inquiry was made after Wal-Mart had cancelled its COLI policies.

The *Rice* court, considering similar affidavits offered by the plaintiffs here, found that "none of the affiants directly challenge[s] Emerick's claim that all Wal-Mart employees received the memorandum informing them of the COLI policies in December 1993."2004 WL 1638241, at \*3. The *Rice* court concluded that "Rice has failed to produce sufficient responsive evidence to permit a reasonable jury to conclude that the discovery rule[ ] tolled the running

of the statute of limitations."*Id.* This Court finds the *Rice* court's rationale persuasive but distinguishable because plaintiffs in *Rice* and *Keenan* did not assert a violation of the insurable interest statute, and the district judge there found that the asserted claims (for unjust enrichment, civil conspiracy, commercial appropriation, declaratory relief) accrued when Wal-Mart purchased the COLI policies. If one assumes a claim for violation of the statute accrues when the employer receives benefits on account of the death of the insured employee, the claim belongs to the personal representative, and the relevant issue is whether the personal representative had notice, not whether the insured employee did.[FN14]

> FN14. Of course, evidence that an insured had notice may be circumstantial evidence from which a jury could conclude that the personal representative had notice, *viz.,* that a reasonable insured would inform her spouse.

The competing evidence offered by the parties leads the Court to conclude that, although Wal-Mart did not fraudulently conceal the existence of its COLI policies from its employees or their personal representatives, a genuine issue of material fact remains as to whether Alene Jacobson or her personal representative had notice. The evidence appears to indicate that many of the Wal-Mart employees whose lives were covered by Wal-Mart's COLI policies may have had actual notice of the program and the remainder may have had constructive notice of it by virtue of the 1993 brochure and subsequent "Personal Choice" forms. Yet, there is no specific evidence in the summary judgment record as to whether the brochure was actually distributed by the manager in the Wal-Mart store where Alene Jacobson worked. There is disputed evidence as to whether her husband and personal representative, Kenneth Frank Jacobson, had or should have had actual or constructive notice. He affies that his wife never told him about the policies, that she would have told him about such policies, and that he found nothing in her papers after her death to indicate that Wal-Mart had a COLI policy on her life. Resp. Br., Ex. # 102, Ex. G.

**\*13** The Court does not rely for notice on the news articles in which Wal-Mart's COLI policies were discussed. The Court ruled in *Tillman* that the same 1995 *Newsweek* article upon which Wal-Mart relies

Not Reported in F.Supp.2d                                                                                                   Page 12
Not Reported in F.Supp.2d, 2005 WL 3263377 (N.D.Okla.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 3263377 (N.D.Okla.))

did not support Camelot's argument that the *Tillman* plaintiff had constructive notice in 1995 because the article did not specifically inform the reader that *Camelot* had purchased COLI policies covering its employees as well as officers and, even if the article had mentioned Camelot, there was no indication that the *Tillman* plaintiff saw the article, and no reason that it would have led her to believe that the deceased employee whom she represented was covered under the policy or that she might otherwise have a cause of action. That employee died in January 1992, and the article did not appear until October 1995. Here, Alene Jacobson died after the article appeared, and the author did focus on Wal-Mart, but there is no evidence that Alene Jacobson or her husband and personal representative saw that or any similar article. Accordingly, the Court finds that summary judgment is not appropriate as to Wal-Mart's statute of limitations defense to the statutory claim of personal representative plaintiff Kenneth Frank Jacobson.

c. Collateral Estoppel and/or Issue Preclusion

Plaintiffs' collateral estoppel and issue preclusion arguments do not compel different findings. In their cross motion for summary judgment,[FN15] plaintiffs point out that the United States Supreme Court has sanctioned the offensive use of collateral estoppel, permitting a plaintiff to "foreclose the defendant from litigating an issue the defendant has previously litigated unsuccessfully in an action with another party." *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326 n. 4, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). They contend that, in *Mayo,* Wal-Mart was unsuccessful in litigating the issue of whether it put employees on written notice of its COLI policies and therefore, Wal-Mart cannot litigate the issue again in this subsequent case brought by plaintiffs. They specifically contend that Wal-Mart argued, in *Mayo,* that the plaintiffs' state law claim for benefits of a COLI policy were barred by the statute of limitations because Wal-Mart gave written notice of its COLI policies to all 350,000 employees whose lives were covered by the policies.

> FN15. Wal-Mart points out that plaintiffs' motion is defective because it does not comply with the local rule requirement that a motion for summary judgment contain a concise statement of material facts as to

which the movant contends no genuine issue exists. LCvR 56.1(A). The Court notes that the motion also fails to comply with local rule requiring footnotes to be in 12 pitch font and requiring an indexed table of contents and authorities for briefs exceeding fifteen pages in length. LCvR 7.1(c). Although the Court takes these infractions seriously, it will not disregard to the merits of plaintiffs' motion, as they are inextricably intertwined with Wal-Mart's motion for summary judgment and supplemental motion.

Wal-Mart notes that the doctrine of nonmutual offensive collateral estoppel is sometimes described by the more modern term "issue preclusion." *SeeState ex rel. Dept. of Transp. v. Little,* 100 P.3d 707, 719 n. 47 (Okla.2004). Because *Mayo* was a diversity case, its preclusive effect, if any, is determined by Texas law except insofar as that law is incompatible with federal interests. *SeeSemtek Intern., Inc. v. Lockheed Martin Corp.,* 531 U.S. 497, 508, 121 S.Ct. 1021, 149 L.Ed.2d 32 (2001); *Hartsel Springs Ranch of Colorado, Inc. v. Bluegreen Corp.,* 296 F.3d 982, 986 (10th Cir.2002). In Texas, "[a] party seeking to assert the bar of collateral estoppel must establish that (1) the facts sought to be litigated in the second action were fully and fairly litigated in the first action; (2) those facts were essential to the judgment in the first action; and (3) the parties were cast as adversaries in the first action." *Sysco Food Servs., Inc. v. Trapnell,* 890 S.W.2d 796, 801 (Tex.1994). However, mutuality is required only as to the party against whom collateral estoppel is asserted. *Id.* Texas courts have emphasized that the issue of fact or law decided in the first action must be identical to an issue in a pending action. See *Getty Oil Co. v. Ins. Co. of North America,* 845 S.W.2d 794, 801 (Tex.1992); *Avila v. St. Luke's Lutheran Hosp.,* 948 S.W.2d 841, 847 (Tex.App.1997); *Tex. Dep't of Pub. Safety v. Petta,* 44 S.W.3d 575, 579 (Tex.2001).

*14 As set forth above, the *Mayo* court did not decide the identical issue presented in this case: whether, assuming the discovery rule applies, the 1993 brochure or other information was sufficient, under Oklahoma law, to constitute actual or constructive notice of claims to plaintiffs or their decedents. The *Mayo* court refrained from deciding that issue under

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 13
Not Reported in F.Supp.2d, 2005 WL 3263377 (N.D.Okla.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 3263377 (N.D.Okla.))

Texas law because the estate of the plaintiff in that case did not rely on the discovery rule and the evidence raised a question of fact. 220 F.Supp.2d at 770-71 n. 202. The *Mayo* district court later described the 1993 brochure as vague and superficial, among other things, but it did so in the context of an analysis of whether the COLI policies could be said to comport with Texas public policy as reflected in a state statute permitting Texans to designate their own life insurance beneficiaries. *Id.* at 806-07.The Fifth Circuit decision in *Mayo*, in describing the *Mayo* plaintiff's unjust enrichment claim, assumed that Wal-Mart took out an insurance policy on the *Mayo* plaintiff without his knowledge or consent. 354 F.3d at 410. It did not determine that the plaintiff had no notice for discovery rule purposes. Hence, this case does not involve the identical issue as *Mayo*, plaintiffs have not shown that the facts to be litigated in this action were fully and fairly litigated in *Mayo*, and those facts were not essential to the judgment in *Mayo*.

Even if plaintiffs had met the technical requirements of issue preclusion, courts do not permit offensive use of nonmutual issue preclusion where it would be unfair to the party sought to be precluded. The *Parklane Hosiery* Court gave trial courts broad discretion to determine when the doctrine should be applied and the Court outlined various circumstances in which it should be denied. 439 U.S. at 331. Among other things, the Supreme Court stated: "Allowing offensive collateral estoppel may ... be unfair to a defendant if the judgment relied upon as a basis of the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant."*Id.* at 330.Subsequent federal decisions have applied this *Parklane Hosiery* "fairness factor." *E.g.,Setter v. A.H. Robins Co. Inc.,* 748 F.2d 1328, 1330-31 (8th Cir.1984) (Dalkon-Shield litigation); *Hardy v. Johns-Manville Sales Corp.,* 681 F.2d 334, 345-46 (5th Cir.1982) (asbestos litigation).[FN16] Again, as discussed above, the *Rice* and *Keenan* decisions held that the 1993 brochure gave clear notice to the Wal-Mart employees represented in those cases, and that notice triggered the statute of limitations on the claims of their personal representatives. Although these decisions were not prior to the *Mayo* decisions, they are inconsistent. *Mayo* is not entitled to issue preclusive effect with respect to Wal-Mart's statute of limitations defense in this case.

FN16. Wal-Mart does not argue that any of the other "fairness factors" apply. These are "[w]hether the use of collateral estoppel will reward a plaintiff who could have been joined in the earlier suit but chose to "wait and see."...[w]hether the defendant in the first suit had the incentive to litigate that suit fully and vigorously .... [and][w]hether the second suit will afford the defendant procedural opportunities available in the first suit that could cause a different result."*State Farm Fire and Cas. Co. v. Fullerton,* 118 F.3d 374, 386 (5th Cir.1997) (quoting *Finger v. Southern Refrig. Serv.,* 881 S.W.2d 890, 896 (Tex.App.1994)).

Further, *Mayo* does not preclude Wal-Mart from arguing that plaintiffs' decedents consented to Wal-Mart's obtaining life insurance on their lives because they did not opt out when they received the 1993 brochure. The district court in *Mayo* accepted Wal-Mart's contention that it actually distributed its alleged disclosures, 220 F.Supp.2d at 759, but later stated that "there is no concrete evidence that in fact the [1993 brochure] was received by all these managers, that they distributed the attached flyer, or that they discussed its contents with employees,"*id.* at 807 n. 34.This dicta is insufficient to preclude or estop Wal-Mart from asserting the affirmative defense of consent.

*15 Neither are plaintiffs entitled to summary judgment on Wal-Mart's affirmative defenses of waiver, estoppel, or laches. Plaintiffs point out that wavier is the voluntary and intentional relinquishment of a known right. *E.g.,Phillips v. New Hampshire Ins. Co.,* 263 F.3d 1215, 1220 (10th Cir.2001). They also recite that a party to be estopped "must know the facts" and the party asserting estoppel "must be ignorant of the true facts" if the affirmative defense of estoppel applies. *North Texas Prod. Credit Ass'n v. McCurtain County Nat. Bank,* 222 F.3d 800, 882 (10th Cir.2000). Finally, they assert that the affirmative defense of laches requires an "inexcusable delay in instituting suit." *Brunswick Corp. v. Spirit Reel Co.,* 832 F.2d 513, 523 (10th Cir.1987). All of these affirmative defenses are foreclosed, plaintiffs argue, because Wal-Mart did not notify its employees about the COLI policies on their lives. Since the Court has found that notice involves a genuine issue of material fact, summary

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3263377 (N.D.Okla.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 3263377 (N.D.Okla.))

judgment is not appropriate as to these affirmative defenses.

Plaintiffs also argue that summary judgment is proper because Wal-Mart's conduct was not equitable, and "he who comes into equity must come with clean hands,"*Estate of Bruner v. Bruner,* 338 F.3d 1172, 1177 (10th Cir.2003). Relying on the Fifth Circuit decision in *Mayo* and *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.,* 872 A.2d 611, 622-23 (Del.Ch.2005), plaintiffs assert that Wal-Mart's purchase of the COLI policies and designation of itself as policy beneficiary was unlawful and in bad faith, Wal-Mart knew it, and thus, it lacks the "clean hands" necessary to seek equitable relief. Whether Wal-Mart's conduct was unlawful is the issue at the heart of this case and others, and resolution of it depends on a difficult, state-by-state, case-by-case, insured-by-insured analysis of laws, without the assistance of clear precedent at the state level. The Delaware Court of Chancery did not find that Wal-Mart acted in bad faith; it merely found that Wal-Mart took a known risk that it would be found to lack an insurable interest in the lives of its rank-and-file employees and Wal-Mart attempted to minimize that risk by focusing certain activities in Georgia, a state that allowed employers to have an insurable interest in employees. *Id.* at 622.The Delaware court made that finding as part of several bases for rejecting the commercial frustration theory advocated by Wal-Mart. *Id.* at 621-23.The Delaware opinion does not collaterally estop Wal-Mart from asserting the affirmative defenses of consent, waiver, estoppel or laches.

Finally, plaintiffs' assertion of issue preclusion, at least as to the preclusiveness of the *Mayo* decisions, is untimely. Issue preclusion or collateral estoppel, like the related doctrine of res judicata, must be affirmatively alleged by the party seeking to enforce it, Fed.R.Civ.P. 8(c); see*Blonder-Tongue Laboratories, Inc. v. Univ. of Illinois Found.,* 402 U.S. 313, 350, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), and it was not here. Plaintiffs have filed a motion for leave to amend, but untimeliness alone is an adequate reason to refuse the requested leave. *See,e.g.,Duncan v. Manager, Dep't of Safety, City and County of Denver,* 397 F.3d 1300, 1315 (10th Cir.2005). Plaintiffs have not offered any explanation for their failure to allege issue preclusion when they filed the motion for leave to file a fourth amended complaint

on June 22, 2005, the same day they filed their cross motion for partial summary judgment. The *Mayo* decision on which they rely for this argument was issued in August 2002, and the Fifth Circuit affirmed on January 5, 2004.

**\*16** Under Texas law, "[w]hile the judgment requirement for collateral estoppel does not always require a final, appealable judgment, the test for finality is 'whether the conclusion in question is procedurally definite.'*Restatement (Second) of Judgments* § 13, comment (g) (1982)."*Van Dyke v. Boswell, O'Toole, Davis & Pickering,* 697 S.W.2d 381, 385 (Tex.1985). In determining finality, a court is to consider whether "the parties were fully heard, [whether] the court supported its decision with a reasoned opinion [and whether] the decision was subject to appeal or was in fact reviewed on appeal."*Id.* (quoting *Restatement (Second) of Judgments* § 13, comment (g) (1982)). Wal-Mart contends that each of these factors is met with respect to those portions upon which plaintiffs rely except the ERISA determination, which was not certified for interlocutory appeal.[FN17]

> FN17. Wal-Mart also asserts that a settlement was reached the day before the Fifth Circuit issued its decision in *Mayo* and plaintiffs' counsel knew that it would end the *Mayo* litigation as to Wal-Mart. Yet, they did not raise the possibility that they would assert issue preclusion in this case, and thus they deprived Wal-Mart of any meaningful opportunity to include that issue in the *Mayo* settlement negotiations.

Final judgment was entered in the *Mayo* district court case on October 29, 2004. However, if one assumes that the *Mayo* court decided the issue of whether Wal-Mart put its employees on written notice of its COLI policies by distributing the 1993 brochure, the *Van Dyke* factors were met when the *Mayo* decision was issued in August 2002, or, at the latest, when the Fifth Circuit affirmed on January 5, 2004. Plaintiffs' assertion of collateral estoppel or issue preclusion is untimely.

As discussed above, issue preclusion is also unavailable because the issue here is not identical to that decided in *Mayo* or the *AIG* case in Delaware, and it would be unfair to Wal-Mart to apply the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3263377 (N.D.Okla.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 3263377 (N.D.Okla.))

doctrine given the decisions in *Rice* and *Keenan.*The doctrine of collateral estoppel or issue preclusion does not bar Wal-Mart from arguing that it made effective disclosures to its employees or that those employees' personal representatives had notice. Nor does it bar Wal-Mart from asserting its affirmative defenses. Of course, that does not mean that Wal-Mart will ultimately be successful; it merely means that plaintiffs are not entitled to summary judgment with regard to Wal-Mart's affirmative defenses as to the statutory claim relating to Alene Jacobson.

3. Insurable Interest

a. "Special Importance"

Alene Jacobson was insured on December 28, 1993; she died on November 4, 1996; death benefits were paid by the insurer to Wal-Mart on November 14, 1996. Wal-Mart agrees that, if Oklahoma law applies, the statute in effect in 1993 is applicable to the statutory violation claim of Alene Jacobson's personal representative, Kenneth Frank Jacobson.[FN18]In relevant part, the statute provides:

> FN18. As Wal-Mart points out, Oklahoma's insurable interest statute was amended, effective July 1, 1994, to permit employers to insure the life of any employee who gives written consent. As Alene Jacobson did not provide written consent, Wal-Mart references the 1994 amendment merely to imply that public policy in Oklahoma does not view COLI policies as "abhorrent." Supp. Br., Dkt. # 137, at 13.

Except as provided in subsection D of this section, no person shall procure or cause to be procured any insurance contract upon the life or body of another individual unless the benefits under such contract are payable to the individual insured or his personal representatives, or to person having, at the time when such contract was made, an insurable interest in the individual insured.

*17 "Insurable interest" with reference to personal insurance includes only interests as follows:

1. In the case of individuals related closely by blood or by law, a substantial interests engendered by love and affection;

2. In the case of other persons, a lawful and substantial economic interest in having the life, health, or bodily safety of the individual insured continue, as distinguished from an interest which would arise only by, or would be enhanced in value by, the death, disablement or injury of the individual insured;....

Okla. Stat. tit. 36, § 3604(A), (C).

In *Tillman,* the Tenth Circuit held that, under the 1993 version of the statute, the employer had no insurable interest in the life of the plaintiff, a "rank-and-file" employee as distinguished from a "key" employee. 408 F.3d at 1306-07. The Tenth Circuit stated:

[A]bsent evidence of considerable expenditures in relation to the company's overall budget or other relevant evidence establishing the substantial nature of the expenditure, human resources' monies spent to attract and keep employees is a general cost of doing business and is not sufficient alone to support a finding of a *substantial* interest in a specific employee's continued life.

*Id.* at 1306 (emphasis in original). Wal-Mart seizes upon this statement in an effort to show that it has the evidence Tillman lacked. However, Wal-Mart presents its "economic interest" evidence in terms of what it spends on all of its employees, not on Alene Jacobson or any of the other plaintiffs in particular. Alene Jacobson was a telephone switch-board operator insured under the AIG policy in the face amount of $62,056. Wal-Mart's argument ignores the Tenth Circuit's requirement that the employer establish each insured employee's "special importance" to the company. *Id.* The Tenth Circuit characterized the evidence submitted by the employer as "costs associated with Camelot's general employees, not just with those who add significant pecuniary benefit to the company."*Id.* This Court agrees that Wal-Mart's COLI plans did not implicate the public policy served by Oklahoma's insurable interest statute, *i.e.,* to prevent "speculating upon the hazards of a life."*Mutual Aid Union v. Stephens,* 97 Okla. 283, 223 P. 648, 649 (Okla.1924). The Court is also mindful of the amendment to the statute in 1994 which permits an employer or trust to have an

Not Reported in F.Supp.2d                                                                                      Page 16
Not Reported in F.Supp.2d, 2005 WL 3263377 (N.D.Okla.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3263377 (N.D.Okla.))**

insurable interest "in nonmanagement and retired employees to an amount agreed to by the employee or in the absence of such agreement an amount of aggregate projected death benefits commensurate with the aggregate projected liabilities to such employees under all employee welfare benefit plans, ..."*Id.* § 3604(C)(4)(d).[FN19] Nonetheless, *Tillman* dictates that the Court's ruling be specific to the individual insured. Wal-Mart has not established that it had a substantial interest in Alene Jacobson's life or that she was of "special importance" to the company. Hence, Wal-Mart had no insurable interest in her life.

> FN19. In this respect, the 1994 amendment is consistent with a recent ruling by a federal court in Minnesota holding that, under Colorado common law, a corporate employer may have an insurable interest in the lives of "non-key" employees who consented to be insured under the employer's corporate-owned life insurance policies. *Xcel Energy, Inc. v. United States of America,* No. Civ. 04-1449DWFFLN, 2005 WL 2577112 (D.Minn. Oct.12, 2005). The *Xcel* court also reasoned that the employer had a "reasonable right to expect some pecuniary advantage from a continuance of the life of [its employees] or to fear the loss from [their] death."*Id.* at *5 (quoting *Lampkin v. Travelers' Ins. Co.,* 11 Colo.App. 249, 52 P. 1040, 1045 (Colo.Ct.App.1898)).

b. Constructive Delivery

*18 Wal-Mart argues that Oklahoma law is inapplicable because its COLI policies were issued and delivered in Georgia, a state which permits employers to have an insurable interest in the lives of rank-and-file employees. Again, *Tillman* is dispositive as to this issue. In *Tillman,* the Tenth Circuit held the COLI policy at issue had been "constructively delivered" within Oklahoma for purposes of applying Oklahoma's insurable interest statute. 408 F.3d at 1303-04. The Oklahoma Insurance Code does not apply to "[p]olicies or contracts not issued for delivery in Oklahoma nor delivered in Oklahoma, except upon subjects of insurance other than life and disability insurance located or to be performed in Oklahoma,...."Okla. Stat. tit. 36, § 3601. The Tenth Circuit noted that the

insurer had never produced, and the employer had never received, a physical copy of the policy; further, the insurer had provided a form insurance contract to the employer in another state and generated the rest of the contracts electronically. However, the Tenth Circuit found that the policy was constructively delivered in Oklahoma where the insurance contract stated that "information regarding the method of calculating policy value and cost of insurance 'has been filed with the insurance official in the jurisdiction in which this policy is delivered,' " and the employer conceded that it filed the policy with the Oklahoma Department of Insurance for approval. 408 F.3d at 1304.

Wal-Mart does not concede that it filed its COLI policy with the Oklahoma Department of Insurance for approval. Wal-Mart relies on the actual physical delivery, in Georgia, of the AIG master policy, and the language of the policy indicating that the policy was issued in Georgia, on forms approved by the Georgia Department of Insurance. Wal-Mart acknowledges that AIG filed a form policy with the Oklahoma Department of Insurance, but that policy, Wal-Mart contends, was on a form that differed from the policies later issued and delivered to the Trust in Georgia and had nothing to do with AIG's sale of Georgia-form policies to the Wal-Mart Trust. Wal-Mart also concedes that AIG paid premium taxes to states, including Oklahoma, in which the insured employees resided. Okla. Stat. tit. 36, § 624 requires a foreign insurer to pay such taxes. Wal-Mart argues, however, that such payment does not reflect any intention of the parties for Wal-Mart's policies to be delivered in Oklahoma for purposes of section 3601.

The Court finds these arguments unavailing. It is clear that Wal-Mart intended for Georgia law to govern any disputes as to insurable interest, given the favorable treatment Georgia law gave COLI policies at the time. Nonetheless, AIG filed a form of the Wal-Mart COLI policy with the Oklahoma Department of Insurance and paid premium taxes to the state. In this respect, the Court is particularly cognizant of the Tenth Circuit's comment in *Tillman.*"[I]nterpreting the statute to require physical delivery of the contract within state borders would allow all insurance companies to skirt Oklahoma insurance regulations merely by electronically storing the insurance contracts in another jurisdiction."408 F.3d at 1304. Wal-Mart, via AIG, "delivered" its

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 17
Not Reported in F.Supp.2d, 2005 WL 3263377 (N.D.Okla.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3263377 (N.D.Okla.))**

COLI policy in Oklahoma. Holding otherwise would permit Wal-Mart to unjustifiably "skirt Oklahoma insurance regulations."

c. Choice of Law

**\*19** Wal-Mart also argues that Georgia law applies because Oklahoma follows the *lex loci contractus* rule whereby "the nature, validity and interpretation of a contract is governed by the law where the contract is made."*Bohannan v. Allstate Ins. Co., 820 P.2d 787, 797 (Okla.1991).* Further, Wal-Mart argues that, if there were a conflict between Oklahoma and Georgia law concerning the existence of Wal-Mart's insurable interest, Georgia law governs. As plaintiffs point out, this Court already rejected those arguments. In *Tillman,* this Court concluded that Oklahoma law applied primarily because the relationship between the employer and employee was centered in Oklahoma, the employee's death triggered the employer's right to claim benefits under the policy, the employee lived, worked for the employer, and died, in Oklahoma, and the employer was domesticated in Oklahoma and did business here. *Tillman,* 02-CV-761-EA(J), slip op. at 12.

In Oklahoma, conflict of laws relating to contracts is governed under the *lex loci contractus* rule unless the law of the state where the contract was made is "contrary to the public policy of Oklahoma, or unless the facts demonstrate that another jurisdiction has the most significant relationship with the subject matter and the parties."*Bohannan v. Allstate Ins. Co., 820 P.2d 787, 797 (Okla.1991).* Like Wal-Mart, Camelot argued in part that Georgia law should apply because the parties to the COLI policy intended for Georgia law to apply and performed certain acts to reflect that intention. *Tillman,* 02-CV-761-EA(J), slip op. at 7. This Court rejected Camelot's argument because the plaintiff was not suing for breach of contract. *Id.* at 8. The *Tillman* plaintiff sued for violation of an Oklahoma statute, and for unjust enrichment as a result of conduct allegedly in violation of that statute. This Court reasoned that neither the employee nor the plaintiff representing him signed the contract, and that Camelot was doing business in Oklahoma and was subject to the same obligations as an Oklahoma corporation. Okla. Stat. tit. 18, § 1130D. In particular, Camelot was subject to Oklahoma's laws concerning its relationship with its employees. *See id.* tit. 40, §§ 165.1-187. The *Tillman* case, like this one, did not

involve a dispute between an employer and its life insurance company. *Tillman,* 02-CV-761-EA(J), slip op. at 8.

This Court found persuasive the analysis by the district court in *Mayo,* which applied the "most significant relationship test" described in the *Restatement (Second) of Conflict of Laws* (hereinafter "*Restatement*" ) § 6 (1971), as well as the contacts listed in *Restatement* § 188 applicable to contract actions. *See Mayo, 220 F.Supp.2d at 728-63.* However, as it was not clear whether Oklahoma courts would apply this test, this Court also found instructive *Restatement* § 192, which specifically addresses life insurance contracts, and *Restatement* § 221, which applies to claims for unjust enrichment not sounding in contract or tort. *Tillman,* 02-CV-761-EA(J), slip op. at 8-10. Relying on *Bohannan* as well as the *Restatement,* this Court found that Oklahoma had the most significant relationship with the subject matter and the parties. *Tillman,* 02-CV-761-EA(J), slip op. at 11-12.

**\*20** The Tenth Circuit did not address this analysis on appeal; instead, the Tenth Circuit held that Oklahoma law applied because Camelot's COLI policy was constructively delivered in Oklahoma. *See Tillman, 408 F.3d at 1303-04.* The Fifth Circuit did address this issue in its review of the district court decision in *Mayo,* and like this Court, found that a contract choice of law analysis was not appropriate because the employee was not a party to the insurance contract on his life. *354 F.3d at 403-04.* The Fifth Circuit analyzed the argument by reference to *Restatement* §§ 145 (relevant to tort actions), 188, 192, and 221, and affirmed the lower court's ruling that Texas law applied. *Mayo, 354 F.3d at 404-06.*

Alene Jacobson was not party to the COLI insurance policy contract between Wal-Mart and AIG. Her personal representative has sued for violation of an Oklahoma statute. Wal-Mart does business in Oklahoma and is subject to the same obligations as an Oklahoma corporation. Okla. Stat. tit. 18, § 1130D. In particular, Wal-Mart is subject to Oklahoma's laws concerning its relationship with its employees. *See id.* tit. 40, §§ 165.1-187. This case does not involve a dispute between Wal-Mart and AIG. Oklahoma law applies not only because the policy was constructively delivered here, but also because (1) the relationship between Wal-Mart and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3263377 (N.D.Okla.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 3263377 (N.D.Okla.))

Jacobson was centered in Oklahoma, (2) her death triggered Wal-Mart's right to claim benefits under the policy, (3) she lived, worked for Wal-Mart, and died, in Oklahoma, and (4) Wal-Mart is domesticated in Oklahoma and does business here. Since Oklahoma law forbade Wal-Mart from procuring an insurance contract upon her life, Jacobson is entitled to judgment as a matter of law on the merits of this claim if the finder of fact determines that the statute of limitations has not run.

B. Unjust Enrichment

Plaintiffs' unjust enrichment claim is based on plaintiffs' assertion that Wal-Mart was enriched by the receipt of benefit payments upon the deaths of Jacobson, Lewis, Bizal-Webb, and Brown. As shown above, Wal-Mart received a death benefit under its COLI policy for only one of the Wal-Mart employees represented by a plaintiff in this action, Alene Jacobson. Thus, none of the other plaintiffs has standing to assert an unjust enrichment claim. As to Jacobson's unjust enrichment claim, plaintiffs initially intermingled it with their other claims by arguing that Wal-Mart was unjust enriched by misappropriating confidential information on Wal-Mart employees to obtain the COLI policies and it did so in violation of the Oklahoma statute mandating that no life insurance policy may be taken out on an individual without that individual's consent.

The Tenth Circuit's decision in *Tillman* is dispositive as to the claim for unjust enrichment. The Tenth Circuit affirmed summary judgment on this claim because Camelot, the employer, did not retain a benefit "at the expense of another," and because the alleged enrichment was not "coupled with a resulting injustice." *Tillman*, 408 F.3d at 1309 (quoting *Lapkin v. Garland Bloodworth, Inc.*, 23 P.3d 958, 961 (Okla.Ct.App.2000), and *Teel v. Public Serv. Co. of Okla.*, 767 P.2d 391, 398 (Okla.1985) (superceded by statute on other grounds)). The Tenth Circuit explained: "In this case, there is no evidence of an advantage enuring to Camelot's benefit at Mr. Tillman's expense. Camelot paid all of the premiums for the COLI policy on Mr. Tillman's life, In so doing, Mr. Tillman was not prevented from obtaining life insurance himself." *Id.*

**\*21** The Tenth Circuit also found that the alleged enrichment, *i.e.,* the death benefit paid to the

employer, did not result in the injustice for which the plaintiff complained: that the employer violated the law in obtaining insurance on the employee's life. Citing to Oklahoma law preventing courts from invoking their equitable jurisdiction "when an adequate legal remedy is available," *Hydro Turf, Inc. v. International Fidelity Ins. Co.*, 91 P.3d 667, 673 (Okla.Ct.App.2004), the Tenth Circuit held that the *Tillman* plaintiff had an adequate remedy at law under section 3604 of Oklahoma insurance code. *Id.* Similarly, no advantage enured to Wal-Mart's benefit at Jacobson's expense, and Jacobson's personal representative has an adequate remedy at law under Okla. Stat. tit. 36, § 3604 if he proves to the finder of fact that the statute of limitations has not run.

Plaintiffs argue that the Tenth Circuit erred because it did not consider Okla. Stat. tit. 36, § 3607, which grants all persons the right to choose who may benefit from their death by requiring an application or consent from the insured person before any insurance contract may be made. They assert that Wal-Mart was enriched by taking the statutory right from its employees when it used their personal information, obtained through the employer/employee relationship, to insure its employees' lives without their consent. The Court views this argument as another version of plaintiffs' misappropriation claim, which would lend credence to the Tenth Circuit's point: where an adequate remedy at law is available to plaintiffs through another claim, the court should not invoke its equitable jurisdiction to address the unjust enrichment issue. Wal-Mart is entitled to summary judgment on plaintiffs' unjust enrichment claim.

C. Misappropriation

Plaintiffs seize upon a footnote in the *Tillman* decision of the Tenth Circuit discussing the unjust enrichment claim. There, the Tenth Circuit stated:

Plaintiff not only claims violation of statute as a basis for the unjust enrichment claim, but also claims Camelot improperly used confidential information to obtain the COLI policies.... Had Plaintiff properly pled invasion of privacy as one of the bases for the unjust enrichment claim, Plaintiff may have had another adequate remedy at law. *McCormack v. Oklahoma Pub. Co.*, 613 P.2d 737, 740 (Okla.1980).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 19
Not Reported in F.Supp.2d, 2005 WL 3263377 (N.D.Okla.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 3263377 (N.D.Okla.))

408 F.3d at 1309 n. 9.[FN20] Plaintiffs claim that Wal-Mart committed the tort of misappropriation, one of the four invasion of privacy torts, when it used its employees' names, Social Security numbers, dates of birth and other information for the commercial purpose of buying COLI policies on their lives and receiving death benefits when they died.

> FN20. This dictum does not necessarily imply that the *Tillman* plaintiff would have succeeded on the merits of a misappropriation claim or that the statute of limitations for such claim had not run.

In its original motion for summary judgment, Wal-Mart essentially claimed that its limited use of basic employee information in the purchase of COLI policies does not constitute misappropriation because, as the *Rice* court found, "Wal-Mart did not exploit [its insured employees'] reputations or prestige when it purchased COLI policies in their names." *Rice,* 2003 WL 22240349, at *2. Plaintiffs counter that Wal-Mart's reliance on *Rice* is misplaced because the *Rice* court relied on New Hampshire law for which there is no similar precedent under Oklahoma law. Relying upon the *Restatement (Second) of Torts,* plaintiffs contend that misappropriation claims are not limited to instances where the plaintiff's name is used for good will or publicity in advertisements.

**\*22** In *McCormack v. Oklahoma Pub. Co.,* 613 P.2d 737 (Okla.1980), the Oklahoma Supreme Court recognized the tort of invasion of privacy in all four categories as set out in the *Restatement. Id.* at 740.Those categories are:

(a) unreasonable intrusion upon the seclusion of another, as stated in § 652B; or

(b) appropriation of the other's name or likeness, as stated in § 652C; or

(c) unreasonable publicity given to the other's private life, as stated in § 652D; or

(d) publicity that unreasonably places the other in a false light before the public, as stated in § 652E.

Restatement, § 652A (1977). Plaintiffs rely on the second category. Section 652C provides: "One who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy."*Id.* Comment b to the section is significant:

The common form of invasion of privacy under the rule here stated is the appropriation and use of the plaintiff's name or likeness to advertise the defendant's business or product, or for some similar commercial purpose. Apart from statute, however, the rule stated is not limited to commercial appropriation. It applies also when the defendant makes use of the plaintiff's name or likeness for his own purposes and benefit, even though the use is not a commercial one, and even though the benefit sought to be obtained is not a pecuniary one. Statutes in some states have, however, limited the liability to commercial uses of the name or likeness.

*Id.* The Reporter's Note states: "Under the statutes in New York, Oklahoma, Utah, and Virginia, the appropriation must be for advertising, or for purposes of trade."*Id.* There is no specific reference as to the applicable statute in Oklahoma, but presumably the Reporter was referring to Okla. Stat. tit. 21, § 839.1-.3 and Okla. Stat. tit. 12, § 1449, which Wal-Mart argues are not applicable under the facts of this case because the information about the individuals represented by plaintiffs was not used "for purposes of advertising or selling, or soliciting purchases of products, merchandise, goods or services,...."Okla. Stat. tit. 12, § 1449. Indeed, section 1449 is commonly referenced as Oklahoma's "right of publicity" statute. *See,e.g.,Cardtoons, L.C. v. Major League Baseball Players Ass'n,* 868 F.Supp. 1266, 1268 (N.D.Okla.1994)."The purpose of the Oklahoma statute is to protect individuals, celebrities or otherwise, from having distinguishing characteristics of their person exploited, to the commercial benefit of another."*Id.* at 1269.

Here, the information about the Wal-Mart employees represented by plaintiffs was used to obtain a life insurance policy, which is arguably a commercial contract. The issue is not whether the employees were "celebrities," but whether the information was used to Wal-Mart's commercial benefit. Plaintiffs rely on the common law-they have not alleged a violation of Oklahoma's right of publicity statute. The Court finds the Tenth Circuit dictum in *Tillman* persuasive. Wal-Mart obtained, or sought to obtain, tax benefits,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 20
Not Reported in F.Supp.2d, 2005 WL 3263377 (N.D.Okla.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 3263377 (N.D.Okla.))

and it received death benefits upon the death of Alene Jacobson. Whether these could be considered "commercial" benefits is for the finder of fact to decide.

*23 In addition, the finder of fact will have to decide whether the factual issues inherent in the analysis of the statute of limitations or other affirmative defenses bar plaintiffs' misappropriation claim, and, if not, whether those plaintiffs are entitled to any damages. Plaintiffs representing former Wal-Mart employees Alice Fay Haskins, Irene Brasher and Troy Allen Brasher were never insured under Wal-Mart's COLI policies and, as there is no evidence indicating that Wal-Mart used personal information about them to obtain life insurance, they have no standing to assert a misappropriation claim. All of the remaining five named plaintiffs have standing because Wal-Mart used personal information about them to obtain life insurance. The issue for the plaintiffs representing employees for whom Wal-Mart received no death benefits is whether they can prove damages. Those employees were Hazel Lee Sarty, Nellie Mae Lewis, Shelly Bizal-Webb, and Eavy Marie Brown. Proving damages does not present the same problem for the plaintiff representing Alene Jacobson, but the issues relating to the statute of limitations and other defenses remain for that plaintiff as well as the plaintiffs representing Sarty, Lewis, Bizal-Webb and Brown.

Plaintiffs' misappropriation claim against Wal-Mart is governed by a one-year statute of limitations if it is characterized as an action for defamation; a two-year limitations period applies if it is characterized as an action for invasion of privacy. See Okla. Stat. tit. 12, ¶ 95(3), (4). The same considerations discussed above in reference to Wal-Mart's statute of limitations defense to plaintiff Jacobson' statutory violation claim and in reference to Wal-Mart's affirmative defenses of consent, waiver, estoppel, and laches are relevant here. A genuine issue of material fact exists as to if and when Wal-Mart employees Sarty, Lewis, Bizal-Webb, Brown, and Jacobson received notice of Wal-Mart's COLI policies, which would have triggered their right to assert a misappropriation claim.

Accordingly, Wal-Mart is entitled to summary judgment on the misappropriation claims of plaintiff Janet Switzer (representing the estates of Troy Allen

Brasher and Irene Brasher) and Terry Scott Shelnut (representing the estate of Alice Fay Haskins). Wal-Mart is not entitled to summary judgment on the misappropriation claim of Herbert Sarty (representing the estate of Hazel Lee Lewis), Frank O. Lewis (representing the estate of Nellie Mae Lewis), Rodney Bizal (representing the estate of Shelly Bizal-Webb), Jeff Todd Brown and Tab Art Brown (representing the estate of Eavy Marie Brown), and Kenneth Frank Jacobson (representing the estate of Alene Jacobson).

IV.

Construing all of the evidence in the light most favorable to plaintiffs, the Court finds that (1) there is a genuine issue of material fact as to whether Wal-Mart employee Alene Jacobson and her personal representative had notice of the Wal-Mart COLI policy insuring Alene Jacobson's life and, thus, whether the statute of limitations precludes the statutory violation claim of Kenneth Frank Jacobson, Alene Jacobson's personal representative; (2) there are genuine issues of material fact as to Wal-Mart's affirmative defenses; (3) all other plaintiffs lack standing as to the claim for violation of the insurable interest statute; (4) there is no genuine issue of material fact as to all plaintiffs' claims for unjust enrichment; and (5) genuine issues of material fact exist as to the claims of plaintiffs Kenneth Frank Jacobson (personal representative of the estate of Alene Jacobson), Herbert Sarty (personal representative of the estate of Hazel Lee Sarty), Frank O. Lewis (personal representative of the estate of Nellie May Lewis), Rodney Bizal (personal representative of the estate of Shelly Bizal-Webb), Jeff Todd Brown and Tab Art Brown (personal representatives of the estate of Eavy Marie Brown) for misappropriation.

*24 Wal-Mart is entitled to dismissal for lack of standing of the statutory violation claims of all plaintiffs except Kenneth Frank Jacobson. Wal-Mart is entitled to summary judgment as to the unjust enrichment claims of all plaintiffs, and the misappropriation claims of Janet Switzer (personal representative of the estates of Troy Allen Brasher and Irene Brasher) and Terry Scott Shelnut (personal representative of Alice Fay Haskins' estate), as the Wal-Mart employees represented by these plaintiffs were never insured. Plaintiffs are entitled to partial

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 21
Not Reported in F.Supp.2d, 2005 WL 3263377 (N.D.Okla.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3263377 (N.D.Okla.))**

summary judgment that Wal-Mart had no insurable interest in the lives of its rank-and-file employees in Oklahoma, but not as to Wal-Mart's affirmative defenses.

Accordingly, the Wal-Mart Defendants' Motion for Summary Judgment (Dkt.# 88) is granted in part and denied in part; the Plaintiffs' Cross-Motion for Summary Judgment (Dkt.# 133) is granted in part and denied in part. The only remaining claims in this lawsuit are the statutory violation claim of Kenneth Frank Jacobson and the claims for misappropriation asserted by Kenneth Frank Jacobson, Herbert Sarty, Frank O. Lewis, Rodney Bizal, Jeff Todd Brown and Tab Art Brown. All of Wal-Mart's affirmative defenses remain.

IT IS SO ORDERED.

N.D.Okla.,2005.
Lewis v. Wal-Mart Stores, Inc.
Not Reported in F.Supp.2d, 2005 WL 3263377 (N.D.Okla.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

166 F.3d 1201                                                                    Page 1
166 F.3d 1201, 1998 WL 852886 (C.A.2 (N.Y.)), RICO Bus.Disp.Guide 9669
**(Cite as: 166 F.3d 1201, 1998 WL 852886 (C.A.2 (N.Y.)))**

Pappas v. Passias
C.A.2 (N.Y.),1998.
NOTICE: THIS IS AN UNPUBLISHED
OPINION.(The Court's decision is referenced in a
"Table of Decisions Without Reported Opinions"
appearing in the Federal Reporter. Use FI CTA2 s
0.23 for rules regarding the citation of unpublished
opinions.)
    United States Court of Appeals, Second Circuit.
    ANTHONY PAPPAS, Plaintiff-Appellant,
                        v.
    George PASSIAS; Demetrios Coucouzes, aka
Archbishop Iakovos; Anthimos Panagiotopoulos, aka
Bishop Alexios; Athena Beltecas; George Birbilis;
Paul Cavounis; Tracy Demos; Gregory Fegos; Renos
Georgiou; Cele Ioannou, aka Cecelia Ioannou; Dora
Lagos; Spiro Papadopoulos; Leonidas Papalas;
Frideriki Pappas; Van Pappas; Alexander Pritsos;
Alice Rigas; Greek Orthodox Archdiocese Of North
And South America, Inc.; St. Nicholas Greek
Orthodox Church of Flushing, Inc.; Cloud Tours,
Inc.; Constantine Designers & Builders, Ltd.;
Gregory Fegos Electric Co.; Reno General
Construction Corp.; Chris Arlis, aka Chrysanthe
Arlis; Michael Capous; Paul Condiles; Anastasios
Diacovasilis; Harry Kalogiannis; Maureen Papalas;
Theodore Perdik; Kiki Saklabanakis; Gloria
Sfiroudis; Nicholas Tsesmelis; John Tsolis; Antonia
Anastasiou; WilliamSpyropoulos School; St.
Nicholas Greek Orthodox Youth Association; Parent-
teachers Association Of The William Spyropoulos
School,Defendants-Appellees,
Chris DEMETRIADES; Demetriades Developers,
Inc., Defendant.
                   No. 97-9227.

                   Dec. 1, 1998.

Appeal from the United States District Court for the
Eastern District of New York (Joanna Seybert,
Judge).

Anthony Pappas, New Hyde Park, N.Y, *pro se.*
Spiros A. Tsimbinos, Kew Gardens, New York, and
Michael R. Manarel, Zawacki, Everett, Gray &
McLaughlin, New York City, for Appellees.

Present CALABRESI, SACK and SOTOMAYOR,

JJ.

*1 Anthony Pappas, *pro se,* appeals from a judgment
entered on October 7, 1997 in the United States
District Court for the Eastern District of New York
(Seybert, *J.*) dismissing his RICO and state law
claims and denying him leave to amend his complaint
for a third time.

                           I

Pappas is a member of the St. Nicholas Greek
Orthodox Church. He contends that the church, the
archdiocese, and numerous officials of both
organizations make up two racketeering enterprises
that fraudulently solicited contributions from church
parishioners and then misappropriated the funds. As a
predicate act for this RICO scheme, Pappas alleges
that, over a period of several years, the church
committed mail fraud by sending misleading
financial statements and solicitations to individual
members of the congregation. In particular, he claims
that the annual statements of the parish's finances
failed to describe the budget in sufficient detail.

Pappas asserts that he relied on these allegedly
misleading financial statements and other
solicitations when he made several contributions to
the church. These contributions included: (1) a
$1,250 contribution to the Godparent program; (2) a
$250 contribution to the Parish Directory Fund Drive;
(3) a series of small donations made between 1988
and 1991 to commemorate living and deceased
relatives; (4) payment of membership dues between
1987 and 1993, along with $25 as partial payment
towards his 1994 membership dues; and (5) a series
of small payments to the School Food Program.

Pappas brought suit in 1993 pursuant to 18 U.S.C. §
1962 and state law, alleging that the St. Nicholas
church and its alleged co-conspirators had, *inter alia,*
violated civil RICO. *See Pappas v. Passias,* 887
F.Supp. 465, 469 (S.D.N.Y.1995). The district court
dismissed for lack of standing, since Pappas failed to
show that "he ha[d] sustained some separate injury to
his business or property that ar[ose] apart from his
status in relation to the subject association or

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

166 F.3d 1201                                                                 Page 2
166 F.3d 1201, 1998 WL 852886 (C.A.2 (N.Y.)), RICO Bus.Disp.Guide 9669
**(Cite as: 166 F.3d 1201, 1998 WL 852886 (C.A.2 (N.Y.)))**

organization."*See* *id at 472.*Pappas then filed an amended complaint in which he attempted to articulate an individual harm sufficient to establish standing under RICO. The district court granted defendants' Rule 12(b)(6) motion to dismiss this second RICO complaint-again for lack of standing. In addition, the district court exercised its discretion to dismiss Pappas' state law claims and deny him leave to amend his complaint a third time. The court ruled, however, that Rule 11 sanctions against Pappas were not appropriate.

II

"We review the district court's dismissal of a complaint pursuant to Rule 12(b)(6) *de novo.*" *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). And "we take all [of the plaintiff's] allegations as true, and all reasonable inferences are drawn and viewed in a light most favorable to the plaintiff [ ]."*Id.*

**\*2** The civil RICO statute confers standing on "[a]ny person injured in his business or property by reason of a violation of [civil RICO]."*See* 18 U.S.C. § 1964(c) (1994). We have held, therefore, that "in order to have standing, a plaintiff must show: (1) a violation of [civil RICO]; (2) injury to business and property; and (3) causation of the injury by the violation."*See* *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 23 (2d Cir.1990).

To show causation, the Supreme Court has held that a plaintiff must establish "some direct relation between the injury asserted and the injurious conduct alleged."*See* *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). Since Pappas has not alleged anything in his pleadings that shows any relation, let alone a direct relation, between the alleged RICO violations and his specific contributions. Accordingly, we conclude that he has not met the third prong of the *Hecht* standing analysis.

As to Pappas' state law claims, it was well within the district court's discretion to dismiss them once the federal cause of action was dismissed pursuant to Rule 12(b)(6).*See* 28 U.S.C. § 1367(c)(3). We also affirm the district court's decision to deny Pappas leave to amend his complaint a third time since it appears that any such amendment would be futile. *See* *Mackensworth v. S.S. American Merchant,* 28

F.3d 246, 251 (2d Cir.1994). Finally, we agree with the district court that Rule 11 sanctions against Pappas are not warranted.

We have considered all of Pappas' arguments and find them to be without merit. The judgment of the district court is therefore affirmed.

C.A.2 (N.Y.),1998.
Pappas v. Passias
166 F.3d 1201, 1998 WL 852886 (C.A.2 (N.Y.)), RICO Bus.Disp.Guide 9669

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.