**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ALICE KRAMER, as Personal Representative of the Estate of Arthur Kramer,<br><br>                        Plaintiff,<br><br>   – against –<br><br>LOCKWOOD PENSION SERVICES, INC., TALL TREE ADVISORS, INC., LIFE PRODUCTS CLEARING, LLC, TRANSAMERICA OCCIDENTAL LIFE INSURANCE CO., PHOENIX LIFE INSURANCE CO., LINCOLN LIFE & ANNUITY CO. OF NEW YORK AND JONATHAN S. BERCK,<br><br>                       Defendants. | **Civil Action No.**<br>**08 CV 2429 (DAB)(MHD)**<br><br>**ECF Case** |

**AFFIDAVIT OF STUART I. FRIEDMAN IN**
**OPPOSITION TO DEFENDANT LINCOLN LIFE & ANNUITY CO.**
**OF NEW YORK'S MOTION TO DISMISS THE AMENDED COMPLAINT**

| | |
|---|---|
| STATE OF NEW YORK  ) | |
|                      )   ss.: | |
| COUNTY OF NEW YORK  ) | |

Stuart I. Friedman, being duly sworn, deposes and says:

1.    I am a principal in the firm of Friedman & Wittenstein, A Professional Corporation, attorneys for Plaintiff Alice Kramer, as Personal Representative of the Estate of Arthur Kramer.  I respectfully submit this affidavit in opposition to Defendant Lincoln Life & Annuity Co. of New York's ("Lincoln") Motion to Dismiss the Amended Complaint.

2.    The following documents are attached hereto as Exhibits:

      Exhibit 1:    Plaintiff's Amended Complaint, dated May 7, 2008;

Exhibit 2:    Lincoln Policy No. 7214471, in the amount of $10,000,000, dated
November 23, 2005;

Exhibit 3:    Lincoln's Verified Complaint filed in the State of Connecticut
Superior Court, Judicial District of Hartford, dated April 16, 2008;

Exhibit 4:    Trust Agreement of the Arthur Kramer 2005 Insurance Trust, dated
August 29, 2005.

Exhibit 5:    Defendant Life Product Clearing LLC's Answer to Amended
Complaint with Counterclaims and Cross-Claims, dated June 20,
2008.


_____

Stuart I. Friedman

Sworn to before me this
10th day of July, 2008

_____
Notary Public

PATRICIA N. TAKEMOTO
Notary Public, State of New York
No. 01TA4792771
Qualified in New York County
My Commission Expires 01/31/20 10

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

ALICE KRAMER, as Personal Representative of the
Estate of Arthur Kramer,

                         Plaintiff,

      – against –

LOCKWOOD PENSION SERVICES, INC., TALL
TREE ADVISORS, INC., LIFE PRODUCTS
CLEARING, LLC, TRANSAMERICA
OCCIDENTAL LIFE INSURANCE CO., PHOENIX
LIFE INSURANCE CO., LINCOLN LIFE &
ANNUITY CO. OF NEW YORK AND
JONATHAN S. BERCK,

                    Defendants.

---------------------------------------------------------------x

Civil Action No.

08 CV 2429 (DAB)(MHD)

ECF Case

**AMENDED COMPLAINT**



    Plaintiff Alice Kramer, in her fiduciary capacity as the Personal Representative of the

Estate of Arthur Kramer ("Plaintiff"), by and through her attorneys, Friedman & Wittenstein, A

Professional Corporation, hereby alleges as follows for her Amended Complaint:

### PARTIES

    1.    Plaintiff is a citizen of the state of Connecticut, and resides in Stamford,

Connecticut. She is the widow of Arthur Kramer and the Personal Representative of his Estate.

She brings this action in that capacity.

    2.    Mr. Kramer died on January 26, 2008. At the time of his death, he was a citizen

of the state of Connecticut.

    3.    Upon information and belief, defendant Lockwood Pension Services, Inc. ("LPS")

is a New York corporation with its principal place of business located in New York, New York.

4.      Upon information and belief, defendant Tall Tree Advisors, Inc. ("TTA") is a New York corporation with its principal place of business located in Pleasantville, New York.

5.      Upon information and belief, defendant Life Products Clearing, LLC ("Life Products") is a Delaware limited liability company with its principal place of business located in New York, New York.

6.      Upon information and belief, defendant Transamerica Occidental Life Insurance Co. ("Transamerica") is an Iowa corporation with its principal place of business located in Cedar Rapids, Iowa.

7.      Upon information and belief, defendant Phoenix Life Insurance Co. ("Phoenix") is a New York corporation with its principal place of business located in East Greenbush, New York.

8.      Upon information and belief, defendant Lincoln Life & Annuity Co. of New York ("Lincoln") is a New York corporation with its principal place of business located in Syracuse, New York.

9.      Upon information and belief, defendant Jonathan S. Berck is a citizen of the state of New Jersey.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, because an actual controversy exists among the parties; and pursuant to 28 U.S.C. § 1332(a) and (c) in that the parties are citizens of different states and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

11.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred here.

**BACKGROUND**

12.     This action involves an arrangement to procure life insurance policies with the purpose of immediately transferring the beneficial interests in those policies to stranger investors, in contravention of the "insurable interest rule" as codified in the New York Insurance Law. As described herein, in a case such as this, where the procurement of life insurance violates the insurable interest rule, the remedy is either that the death benefits be paid to the personal representative of the decedent's estate (in this case, the Plaintiff) or, if already paid to a stranger investor, that they be disgorged and paid to the personal representative.

13.     The "insurable interest rule" is a well-settled principle in New York insurance law that prevents the issuance of wager life insurance policies. New York Insurance Law Section 3205(b)(2) provides that one may not obtain an insurance policy on the life of another without having an "insurable interest" in the insured's life.

14.     It is against public policy for parties to circumvent the insurable interest rule by participating in the procurement of what is known as "stranger-owned life insurance" ("SOLI"). A typical SOLI arrangement is initiated by a stranger investor or an insurance agent who approaches an elderly person and encourages him to purchase life insurance, the death benefits of which will be immediately transferred to the stranger investor. The appeal of a SOLI arrangement is that the purchase of life insurance is represented to the elderly person as a way to receive a payment of money on a risk-free basis at little or no cost. The investor typically agrees to pay the person an up-front payment in addition to paying the insurance premiums in return for the assignment of the ownership interest in the policy. The common characteristic of all SOLI arrangements is that they are structured so that the elderly person or a family member, rather than the stranger investor, is made to appear as the original beneficiary of the policy in order to

3

try to evade the insurable interest requirement. Such arrangements are contrary to public policy because they enable investors to speculate or wager on a person's death.

15.    As further described below, defendants participated in an elaborate and unlawful SOLI arrangement where every detail, from drafting the trust agreements to choosing the trustees and investors, was structured for the sole purpose of trying to avoid the insurable interest rule. The arrangement was implemented by defendants to create the appearance that an insurable interest existed when Mr. Kramer took out several policies, so that the subsequent transfers of the beneficial interests in those policies to the stranger investors would appear lawful. However, the transfers to investors took place <u>immediately</u> upon Mr. Kramer's obtaining of the policies at issue, and that was always their plan. At no time were Mr. Kramer or any of his family members the true owners of the beneficial interests in the policies. Upon information and belief, Mr. Kramer never intended for the death benefits of the insurance policies to benefit his family.

16.    The putative assignments of the beneficial interests in the death benefits of the policies are void under New York law.

## FACTS

17.    Arthur Kramer was a retired attorney at the time of his death on January 26, 2008 at the age of 81.

18.    Upon information and belief, as early as 2003, Steven Lockwood, the principal of LPS, approached Mr. Kramer to solicit his participation in a SOLI arrangement.

19.    Upon information and belief, during 2005, Mr. Lockwood introduced Mr. Kramer to the SOLI arrangement that is the subject matter of this litigation.

20.    Upon information and belief, the SOLI arrangement worked as follows:  Mr. Kramer, at the direction of LPS and possibly other defendants, would establish trusts, naming

himself as the depositor and one or more of his children as the initial beneficiaries. An LPS affiliated person or entity would be appointed as the trustee. The witnesses to the trust instrument would be Mr. Lockwood and one of his associates. Upon the issuance of the policies, Mr. Kramer, again acting at the direction of LPS and possibly other defendants, would immediately direct his children to execute a putative assignment of their nominal interest in the trust to a stranger third-party investor arranged by Mr. Lockwood. (The three children from Mr. Kramer's marriage to Plaintiff are Andrew Kramer ("Andrew"), Rebecca Kramer ("Rebecca") and Liza Kramer ("Liza")).

21.     Upon information and belief, the insurance policies were procured on Mr. Kramer's life with the intention of immediately effectuating the assignment of the beneficial interests in the policies to an investor. At no time would Mr. Kramer or any of his family members have a true beneficial interest in the policies.

22.     Upon information and belief, LPS and certain other defendants employed the above-described SOLI arrangement with respect to a series of life insurance policies totaling approximately $56,200,000 on the life of Mr. Kramer. These policies were issued by defendants Transamerica, Phoenix and Lincoln.

**The Transamerica Policies**

23.     On or about June 6, 2005, Mr. Kramer, at the direction of LPS and possibly other defendants, established the Arthur Kramer Insurance Trust (the "June Trust") and named Lori Callegari as trustee. Mr. Kramer also listed Andrew and Rebecca as the putative beneficiaries thereunder. Mr. Lockwood and his associate witnessed the June Trust agreement. Under the terms of the June Trust agreement, the trust is governed by New York law.

24.     Upon information and belief, the June Trust agreement was prepared by counsel for LPS, and Mr. Kramer had no involvement in its drafting.

25.     Upon information and belief, Mr. Kramer had no prior business relationship with Ms. Callegari, who at the time was employed by LPS or TTA.  Upon information and belief, Ms. Callegari is presently a Vice President of LPS, and works for Mr. Lockwood at 75 Rockefeller Plaza.

26.     Upon information and belief, Ms. Callegari is no longer the trustee of the June Trust.  Upon information and belief, defendant Jonathan S. Berck is the current trustee.

27.     Upon information and belief, Mr. Kramer had no business relationship with defendant Mr. Berck prior to the SOLI arrangement that is the subject matter of this litigation.

28.     Upon information and belief, in June and July 2005, Transamerica issued one or more insurance policies to the June Trust having a total death benefit of approximately $18,200,000 (the "Transamerica Policies") on the life of Mr. Kramer.

29.     Upon information and belief, upon issuance of the policies, and at the direction of LPS and possibly other defendants, Mr. Kramer directed Andrew and Rebecca to execute putative assignments of their beneficial interests in the June Trust to stranger investor TTA.

30.     Upon information and belief, at the direction of LPS and possibly other defendants, in 2007, defendant Mr. Berck in his capacity as trustee of the June Trust, sold the ownership interests in the Transamerica Policies to a non-party individual or entity.

31.     Mr. Kramer, Andrew and Rebecca never paid any premiums on the Transamerica Policies, and there was no period of time when Andrew and Rebecca were the true beneficiaries of the June Trust after the Transamerica Policies were issued.

6

**The Phoenix Policies**

32.     On or about August 29, 2005, Mr. Kramer, at the direction of LPS and possibly other defendants, established the Arthur Kramer 2005 Insurance Trust (the "August Trust") and named Hudson United Bank ("Hudson") as trustee. Mr. Kramer also listed Liza as the putative beneficiary thereunder. Mr. Lockwood and one of his associates witnessed the August Trust agreement. Under the terms of the August Trust agreement, the trust is governed by New York law.

33.     Upon information and belief, the August Trust agreement was prepared by counsel for LPS, and Mr. Kramer had no involvement in its drafting.

34.     Upon information and belief, at the time the August Trust was created, Hudson and LPS had a pre-existing business relationship and shared the same business address at 75 Rockefeller Plaza, New York, New York.

35.     Upon information and belief, Mr. Kramer had no prior business relationship with Hudson.

36.     Upon information and belief, Hudson is no longer the trustee of the August Trust. Upon information and belief, defendant Mr. Berck is the current trustee.

37.     Upon information and belief, in July 2005, Phoenix issued one or more insurance policies to the August Trust having a total death benefit of approximately $28,000,000 (the "Phoenix Policies") on the life of Mr. Kramer.

38.     Upon information and belief, upon issuance of the policies, and at the direction of LPS and possibly other defendants, Mr. Kramer directed Liza to execute putative assignments of her beneficial interest in the August Trust to stranger investor TTA.

7

39.     Upon information and belief, at the direction of LPS and possibly other defendants, in 2007, defendant Mr. Berck in his capacity as trustee of the August Trust, sold the ownership interest in the Phoenix Policies to a non-party individual or entity.

40.     Upon information and belief, Mr. Kramer and Liza never paid any premiums on the Phoenix Policies, and there was no period of time when Liza was the true beneficiary of the August Trust after the Phoenix Policies were issued.

**The Lincoln Policies**

41.     Upon information and belief, on or about November 28, 2005, Lincoln issued one or more insurance policies to the August Trust having a total death benefit of $10,000,000 (the "Lincoln Policies") on the life of Mr. Kramer.

42.     Upon information and belief, upon issuance of the policies, and at the direction of LPS and possibly other defendants, Mr. Kramer directed Liza to execute putative assignments of her beneficial interest in the August Trust to stranger investor Life Products.

43.     Mr. Kramer and Liza never paid any premiums on the Lincoln Policies, and there was no period of time when Liza was the true beneficiary of the August Trust after the Lincoln Policies were issued.

**Arthur Kramer's Death**

44.     Mr. Kramer died on January 26, 2008.

45.     Subsequently, Plaintiff or her representatives have received various communications from representatives of defendant LPS and certain stranger investors demanding copies of Mr. Kramer's death certificate so that they may submit claims to the insurance companies for a total of approximately $56,200,000 in death benefits.  Plaintiff has refused all such requests.

8

46.     Pursuant to New York Insurance Law Section 3203(a)(3), all of the aforementioned life insurance policies are incontestable because they were in force during the life of Mr. Kramer for more than two years.  However, upon information and belief, none of the insurance company defendants have paid out the proceeds of any of the policies.  On April 9, 2008, approximately one month after the initial Complaint in this action was filed, Phoenix filed a pleading in this action indicating, inter alia, its intention not to pay any death benefits in connection with the Phoenix Policies.  On or about April 16, 2008, approximately five weeks after the initial Complaint in this action was filed, defendant Lincoln filed an action in Connecticut state court indicating its intention, inter alia, not to pay any death benefits in connection with the Lincoln Policies.  Defendant Transamerica has not yet responded to the initial Complaint in this action, and was granted until June 15, 2008 to do so.

## FIRST CLAIM FOR RELIEF

## (DECLARATORY JUDGMENT)

47.     Plaintiff hereby repeats and realleges each and every allegation contained in paragraphs 1-46 above.

48.     New York Insurance Law Section 3203(a)(3) provides:

> (a)     All life insurance policies, except as otherwise stated herein, delivered or issued for delivery in this state, shall contain in substance the following provisions, or provisions which the superintendent deems to be more favorable to policyholders:
>
> \* \* \*
>
> (3)     that the policy shall be incontestable after being in force during the life of the insured for a period of two years from its date of issue . . .

49.     New York Insurance Law Section 3205(b)(2) provides:

> No person shall procure or cause to be procured, directly or by
> assignment or otherwise any contract of insurance upon the person
> of another unless the benefits under such contract are payable to
> the person insured or his personal representatives, or a person
> having, at the time when such contract is made, an insurable
> interest in the person insured.

50.     New York Insurance Law Section 3205(a)(1) defines an "insurable interest" as "(A) in the case of persons closely related by blood or by law, a substantial interest engendered by love and affection; (B) in the case of other persons, a lawful and substantial economic interest in the continued life, health or bodily safety of the person insured, as distinguished from an interest which would arise only by, or would be enhanced in value by, the death, disablement or injury of the insured."

51.     Neither TTA nor Life Products held an insurable interest in the life of Mr. Kramer.

52.     TTA and Life Products procured or caused to be procured, directly or by assignment or otherwise, contracts of insurance upon the person of Mr. Kramer.

53.     TTA lacked an insurable interest in Mr. Kramer at the time the Transamerica and Phoenix Policies were issued.  Life Products lacked an insurable interest in Mr. Kramer at the time the Lincoln Policies were issued.

54.     In the case of TTA, the Transamerica and Phoenix Policies on the life of Mr. Kramer were procured with the view to their immediate assignment to TTA.  In the case of Life Products, the Lincoln Policies on the life of Mr. Kramer were procured with the view to their immediate assignment to Life Products.

55.     Pursuant to New York Insurance Law Sections 3203(a)(3) and 3205(b)(2),

Plaintiff is entitled to a declaration that the insurance company defendants must pay the death

benefits under the aforementioned policies, and that such death benefits must be paid to her.

## SECOND CLAIM FOR RELIEF

### (AGAINST DEFENDANTS LOCKWOOD PENSION SERVICES, INC., TALL TREE ADVISORS, INC., LIFE PRODUCTS CLEARING, LLC AND JONATHAN S. BERCK FOR THE RECOVERY OF DEATH BENEFITS)

56.     Plaintiff repeats and realleges each and every allegation contained in paragraphs

1-55 above.

57.     New York Insurance Law Section 3205(b)(4) provides:

> If the beneficiary, assignee or other payee under any contract made
> in violation of this subsection [(b)] receives from the insurer any
> benefits hereunder accruing upon the death, disablement or injury
> of the person insured, the person insured or his executor or
> administrator may maintain an action to recover such benefits from
> the person receiving them.

58.     In the alternative, if some or all of the death benefits of the aforementioned

policies have already been paid to LPS, TTA, Life Products, Mr. Berck or their representatives

or assignees, or to other persons or entities that may claim the right to receive such death

benefits, then pursuant to this statute, Plaintiff is entitled to recover such death benefits.


WHEREFORE, Plaintiff prays for judgment against Lockwood Pension Services, Inc.,

Tall Tree Advisors, Inc., Life Products Clearing, LLC, Transamerica Occidental Life Insurance

Co., Phoenix Life Insurance Co., Lincoln Life & Annuity Co. of New York and Jonathan S.

Berck as follows:

11

A.    Declaring that the insurance company defendants must pay the death benefits under the aforementioned life insurance policies, and that such death benefits must be paid to Plaintiff;

B.    Awarding Plaintiff the death benefits of all the aforementioned policies;

C.    Awarding Plaintiff reasonable attorneys' fees, and the costs and disbursements of this action; and

D.    Awarding Plaintiff such other and further relief as this Court may deem just and proper.

Dated: New York, New York
       May 7, 2008

FRIEDMAN & WITTENSTEIN
A Professional Corporation

By: _____
       Stuart I. Friedman (SF-9186)
       Andrew A. Wittenstein (AW-1943)
       Claire L. Chau (CC-4738)

600 Lexington Avenue
New York, New York 10022
(212) 750-8700

*Attorneys for Plaintiff*

Policy Number  7214471

Insured   ARTHUR B KRAMER

Initial Specified Amount   $10,000,000          Date of Issue   NOVEMBER 23, 2005

# Lincoln Life & Annuity Company of New York

A Stock Company           Home Office Location:   100 Madison Street, Suite 1860
                                                  Syracuse, NY

                    Administrator Mailing Address:   Lincoln Life & Annuity Company of New York
                                                     350 Church Street
                                                     Hartford, CT 06103-1106

Lincoln Life & Annuity Company of New York ("Lincoln Life") agrees to pay the Death Benefit to the Beneficiary upon receipt of due proof of the Insured's death during the continuance of the policy. Such payment shall be made as provided under the *GENERAL PROVISIONS*, **Payment of Proceeds** provision. Lincoln Life further agrees to pay the Surrender Value to the Owner upon surrender of the policy.

**Right to Examine the Policy.** The policy may be returned to the insurance agent through whom it was purchased or to Lincoln Life within 10 days after its receipt (60 days after its receipt where required by law for policies issued in replacement of other insurance). If the policy is so returned, it will be deemed void from the Date of Issue, and Lincoln Life will refund the premium paid.

The policy is issued and accepted subject to the terms set forth on the following pages, which are made a part of the policy. In consideration of the application and the payment of premiums as provided, this policy is executed by Lincoln Life as of the Date of Issue.

*John N. Gatta*
President

Registrar

**Flexible Premium Adjustable Life Insurance Policy – Non-Participating**
Death Benefit payable in the event of death of the Insured. Adjustable Death Benefit.
Surrender Value payable upon surrender of the policy.
Flexible Premiums payable to the Insured's age 100 or death of the Insured, whichever is earlier.
Premium Payment Periods and Supplementary Coverages as shown in the Policy Specifications.

# Table of Contents

Page

Policy Specifications ...................................................................................................... 3

Table of Surrender Charges ........................................................................................... 5

Corridor Percentages Table ........................................................................................... 6

Table of Expense Charges ............................................................................................. 7

Table of Guaranteed Maximum Cost of Insurance Rates ............................................... 8

Definitions ...................................................................................................................... 9

Premium and Reinstatement Provisions ...................................................................... 10

Ownership, Assignment and Beneficiary Provisions ..................................................... 11

Insurance Coverage Provisions .................................................................................... 12

Nonforfeiture Provisions .............................................................................................. 16

Loan Provisions ........................................................................................................... 19

General Provisions ....................................................................................................... 19

Followed by Optional Methods of Settlement and any Riders

Page 4 is intentionally "blank".

LN589                                   NY                                        2

# Policy Specifications

Policy Number 7214471

| | | | |
|---|---|---|---|
| Insured | ARTHUR B KRAMER | Date of Issue | NOVEMBER 23, 2005 |
| Initial Specified Amount | $10,000,000 | Age at Issue | 79 |
| Minimum Specified Amount | $25,000 | Premium Class | PREFERRED |
| Monthly Anniversary Day | 23 | | |

**LN589 FLEXIBLE PREMIUM ADJUSTABLE LIFE INSURANCE**

**Specified Amount:**       See Initial Specified Amount

**Effective Date:**       Date of Issue

**Monthly Insurance Cost:**       *See NONFORFEITURE PROVISIONS*, Cost of Insurance

**Years Deductible:**       21

**Death Benefit Option:**       Death Benefit Option 1 (Level)

**Minimum Initial Premium:**       $31,891.10 is the minimum amount due on or before the Date of Issue to commence coverage under this policy and to prevent the policy from lapsing prior to the first Monthly Anniversary Day.

**Payment Mode:**       QUARTERLY

Note:   This policy may terminate prior to age 100 if actual premiums paid are insufficient to continue coverage to that date. However, coverage will be continued as long as the requirements under the Lapse Protection Rider are met and the No-Lapse Value, less Indebtedness, remains positive.

AN ADDITIONAL LUMP SUM PAYMENT MAY BE REQUIRED TO KEEP THE POLICY IN FORCE SHOULD BOTH THE CASH VALUE, MINUS INDEBTEDNESS, AND THE NO-LAPSE VALUE, MINUS INDEBTEDNESS, BE INSUFFICIENT TO COVER THE RESPECTIVE MONTHLY DEDUCTIONS. THE OWNER SHOULD CONTACT THE COMPANY TO OBTAIN ADDITIONAL INFORMATION ABOUT THIS.

UNDER FEDERAL LAW, THE POLICY MAY NOT QUALIFY AS LIFE INSURANCE AFTER THE INSURED REACHES OR WOULD HAVE REACHED AGE 100 AND MAY BE SUBJECT TO ADVERSE TAX CONSEQUENCES. A TAX ADVISOR SHOULD BE CONSULTED PRIOR TO THE CONTINUATION OF THE POLICY AFTER THE INSURED REACHES OR WOULD HAVE REACHED AGE 100.

Upon request, the Company will in any one policy year provide one projection of illustrative benefits and values at no cost to the Owner. However, each additional projection requested in the same policy year will be subject to a maximum service fee of $5.00.

# Policy Specifications

Policy Number 7214471

| | | | |
|---|---|---|---|
| Insured | ARTHUR B KRAMER | | |
| Initial Specified Amount | $10,000,000 | Date of Issue | NOVEMBER 23, 2005 |
| Minimum Specified Amount | $25,000 | Age at Issue | 79 |
| Monthly Anniversary Day | 23 | Premium Class | PREFERRED |

(Continued from page 3)

The guaranteed interest rate to be credited to the Cash Values is 4% on unborrowed funds. The interest rate to be credited on borrowed funds may vary, but will never be less than the loan interest rate minus 2.0% per year.

Lincoln Life will grant an additional interest at the end of Policy Years 6 and thereafter. This amount will equal 0.25% of the Cash Value in Policy Years 6-10, and will equal 0.50% of the Cash Value in Policy Years 11 and thereafter.

The following expenses are charged under this policy: (1) a policy fee of $150 as of the Date of Issue, (2) a fee of $25.00 for each partial surrender (i.e. withdrawal), (3) a monthly administrative expense charge of $10.00 beginning on the Date of Issue, (4) premium expense charges as described on page 7, **Table of Expense Charges**, (5) a charge per $1,000 from the table on page 7 of Initial Specified Amount is due on the Date of Issue and an additional charge per $1,000 from the table on page 7 will be applied to any increase in Specified Amount will be deducted on the effective date of the increase.

The surrender charges applied to the Policy include: (1) the applicable surrender charge (if any) from the Table of Surrender Charges on page 5 for full surrender or decreases in Specified Amount, and (2) a maximum of 4 partial surrenders (i.e. withdrawals) per Policy Year with a $25 fee for each.

Cost of Insurance rates are determined by Lincoln Life based on its expectations of future mortality experience, persistency, investment income, and expenses (including taxes), but such rates will never exceed the guaranteed maximum rates shown on page 8.

Subject to the maximums and guarantees stated in the policy, Lincoln Life has the right to change the amount of interest credited, the Cost of Insurance rates, and other expense charges deducted under the policy. This may require that more premium be paid or may result in lower policy values than were illustrated.

This policy may lapse before the Insured reaches Age 100 even if planned premiums are paid when due. This is due to the fact that current Cost of Insurance and interest rates are not guaranteed, policy loans and partial surrenders (i.e. partial withdrawals) may be taken, there may be a change in Death Benefit Option, or there may be a requested change to the Specified Amount. Any of these actions may require that more premium be paid.

This policy is intended to qualify as life insurance under the Internal Revenue Code of 1986, as amended (IRC). Changes in premium or death benefit will be allowed subject to the policy provisions, provided that the policy continues to qualify as life insurance under the IRC.

# Policy Specifications

Policy Number  7214471

|  |  |  |  |
|---|---|---|---|
| Insured | ARTHUR B KRAMER | Date of Issue | NOVEMBER 23, 2005 |
| Initial Specified Amount | $10,000,000 | Age at Issue | 79 |
| Minimum Specified Amount | $25,000 | Premium Class | PREFERRED |
| Monthly Anniversary Day | 23 |  |  |

**Lapse Protection Rider**
Effective Date: Date of Issue
Date of Expiry: November 23, 2026

LN589 NY

3A

# Policy Specifications

Policy Number  7214471

| | | | |
|---|---|---|---|
| Insured | ARTHUR B KRAMER | Date of Issue | NOVEMBER 23, 2005 |
| Initial Specified Amount | $10,000,000 | Age at Issue | 79 |
| Minimum Specified Amount | $25,000 | Premium Class | PREFERRED |
| Monthly Anniversary Day | 23 | | |

**Owner**
HUDSON UNITED BANK, TRUSTEE OF THE ARTHUR KRAMER 2005 INSURANCE TRUST,
DATED AUGUST 29, 2005, OR THE SUCCESSOR(S) IN SAID TRUST.

**Beneficiary**
HUDSON UNITED BANK, TRUSTEE OF THE ARTHUR KRAMER 2005 INSURANCE TRUST,
DATED AUGUST 29, 2005, OR THE SUCCESSOR(S) IN SAID TRUST.

LN589                                                                3B − 1 of 1

This Page Intentionally Blank

# Table Of Surrender Charges

Upon either a full surrender of the policy or a decrease in Specified Amount made at the request of the Owner, a charge will be assessed based on the *TABLE OF SURRENDER CHARGES*, subject to the following conditions.

For decreases in Specified Amount, excluding full surrender of the policy, no such charge will be applied under the following circumstances:

1. where the decrease occurs after the tenth Policy Anniversary following the issuance of the Initial Specified Amount, or
2. where the decrease is directly caused by a Death Benefit Option change, or
3. where the decrease is caused by a partial surrender of Cash Value (i.e. withdrawal), or
4. where the decrease plus the sum of all prior decreases does not exceed 25% of the Initial Specified Amount.

For all other decreases in Specified Amount, the charge will be calculated as (1) minus (2), then divided by (3) and then multiplied by (4), where:

1. is the amount of this decrease plus any prior decreases,
2. is the greater of an amount equal to 25% of the Initial Specified Amount or the sum of all prior decreases,
3. is the Initial Specified Amount, and
4. is the then applicable surrender charge from the *TABLE OF SURRENDER CHARGES*.

Requests for decreases in Specified Amount may be limited by Lincoln Life to the extent there is insufficient Net Cash Value to cover the necessary charges.

Upon full surrender of the policy, the charge will be calculated as the entire amount shown in the *TABLE OF SURRENDER CHARGES* multiplied by one minus the percentage of Initial Specified Amount for which a surrender charge was previously assessed, if any. In no event will the charge assessed upon a full surrender exceed the then current Net Cash Value.

Separate surrender charge tables apply with respect to each increase in Specified Amount. For purposes of calculating charges for full surrenders of, or decreases in, such increased Specified Amounts, the amount of the increase will be considered a new "Initial Specified Amount".

| Policy Year | Surrender Charge as of Beginning of Policy Year | Policy Year | Surrender Charge as of Beginning of Policy Year |
|---|---|---|---|
| 1 | 244,100 | 11 | 146,000 |
| 2 | 232,600 | 12 | 138,000 |
| 3 | 221,300 | 13 | 129,800 |
| 4 | 210,400 | 14 | 121,400 |
| 5 | 199,800 | 15 | 112,200 |
| 6 | 189,600 | 16 | 102,000 |
| 7 | 180,000 | 17 | 90,400 |
| 8 | 171,000 | 18 | 77,000 |
| 9 | 162,300 | 19 | 61,200 |
| 10 | 154,000 | 20 | 40,800 |
| | | 21 and thereafter | 0 |

The procedures for full and partial surrenders and the imposition of surrender charges for full surrenders are described in greater detail in *NONFORFEITURE PROVISIONS*.

# Corridor Percentages Table

As of the Date of Issue of this policy the formula in effect to determine the amount under item (b) of both Death Benefit Option 1, Death Benefit Option 2 and Death Benefit Option 3 is based on a percent of the Cash Value as determined from the following table:

(i)    If on or before the Insured's age 40, 250% of the Cash Value.
(ii)   If after the Insured's age 40, a percent of the Cash Value as determined from the following table:

| Insured's Attained Age | Corridor Percentage | Insured's Attained Age | Corridor Percentage |
|---|---|---|---|
| 0-40 | 250% | 70 | 115% |
| 41 | 243 | 71 | 113 |
| 42 | 236 | 72 | 111 |
| 43 | 229 | 73 | 109 |
| 44 | 222 | 74 | 107 |
| 45 | 215 | 75 | 105 |
| 46 | 209 | 76 | 105 |
| 47 | 203 | 77 | 105 |
| 48 | 197 | 78 | 105 |
| 49 | 191 | 79 | 105 |
| 50 | 185 | 80 | 105 |
| 51 | 178 | 81 | 105 |
| 52 | 171 | 82 | 105 |
| 53 | 164 | 83 | 105 |
| 54 | 157 | 84 | 105 |
| 55 | 150 | 85 | 105 |
| 56 | 146 | 86 | 105 |
| 57 | 142 | 87 | 105 |
| 58 | 138 | 88 | 105 |
| 59 | 134 | 89 | 105 |
| 60 | 130 | 90 | 105 |
| 61 | 128 | 91 | 104 |
| 62 | 126 | 92 | 103 |
| 63 | 124 | 93 | 102 |
| 64 | 122 | 94 | 101 |
| 65 | 120 | 95 | 100 |
| 66 | 119 | 96 | 100 |
| 67 | 118 | 97 | 100 |
| 68 | 117 | 98 | 100 |
| 69 | 116 | 99 | 100 |

LN589

# Table of Expense Charges

The following expenses are charged under this policy:

(1) A policy fee of $150 as of the Date of Issue.
(2) A fee of $25.00 for each partial surrender (i.e. withdrawal).
(3) An administrative expense charge of $10 per month beginning on the Date of Issue.
(4) Premium expense charges as follows:

  (i) If the premium payment received during a Policy Year, when combined with all previous premium payments for that Policy Year, results in total premium for the Policy Year that is less than or equal to an amount equal to $56.18 multiplied by the greater of: (a) the Specified Amount on the date of payment or (b) the Specified Amount on the Date of Issue, divided by 1000, the premium expense charge will be:

| | |
|---|---|
| In Policy Year  1 | 12.0% of each premium received |
| In Policy Years 2-10 | 6.0% of each premium received |
| In Policy Years 11 and beyond | 2.0% of each premium received |

  (ii) If the premium payment (or any portion thereof) received during a Policy Year, when combined with all previous premium payments for that Policy Year, results in total premium for the Policy Year that is greater than an amount equal to $56.18 multiplied by the greater of: (a) the Specified Amount on the date of payment or (b) the Specified Amount on the Date of Issue, divided by 1,000, the premium expense charge for the portion of the payment in excess of such amount will be:

| | |
|---|---|
| In Policy Year  1 | 9.0% of each premium received |
| In Policy Years 2-10 | 4.0% of each premium received |
| In Policy Years 11 and beyond | 2.0% of each premium received |

  The premium expense charge for the portion of the payment not in excess of such amount will be as described in (i) above.

(5) A charge per $1,000 from the table below of Initial Specified Amount is due on the Date of Issue. An additional charge per $1,000 from the table below will be applied to any increase in Specified Amount and will be due on the effective date of the increase.

| Attained Age (nearest birthday) | Male expense charge Per 1,000 | Female expense charge Per 1,000 | Attained Age (nearest birthday) | Male expense charge Per 1,000 | Female expense charge Per 1,000 | Attained Age (nearest birthday) | Male expense charge Per 1,000 | Female expense charge Per 1,000 |
|---|---|---|---|---|---|---|---|---|
| 0-3 | 0.35 | 0.32 | 42 | 1.35 | 1.22 | 62 | 7.60 | 6.84 |
| 4-8 | 0.40 | 0.36 | 43 | 1.40 | 1.26 | 63 | 8.40 | 7.56 |
| 9-13 | 0.45 | 0.41 | 44 | 1.45 | 1.31 | 64 | 9.20 | 8.28 |
| 14-25 | 0.50 | 0.45 | 45 | 1.50 | 1.35 | 65 | 10.00 | 9.00 |
| 26 | 0.55 | 0.50 | 46 | 1.55 | 1.40 | 66 | 10.50 | 9.45 |
| 27 | 0.60 | 0.54 | 47 | 1.60 | 1.44 | 67 | 11.00 | 9.90 |
| 28 | 0.65 | 0.59 | 48 | 1.65 | 1.49 | 68 | *11.50 | 10.35 |
| 29 | 0.70 | 0.63 | 49 | 1.70 | 1.53 | 69 | 12.00 | 10.80 |
| 30 | 0.75 | 0.68 | 50 | 1.75 | 1.58 | 70 | 12.50 | 11.25 |
| 31 | 0.80 | 0.72 | 51 | 1.80 | 1.62 | 71 | 13.00 | 11.70 |
| 32 | 0.85 | 0.77 | 52 | 1.85 | 1.67 | 72 | 13.50 | 12.15 |
| 33 | 0.90 | 0.81 | 53 | 1.90 | 1.71 | 73 | 14.00 | 12.60 |
| 34 | 0.95 | 0.86 | 54 | 1.95 | 1.76 | 74 | 14.50 | 13.05 |
| 35 | 1.00 | 0.90 | 55 | 2.00 | 1.80 | 75-99 | 15.00 | 13.50 |
| 36 | 1.05 | 0.95 | 56 | 2.80 | 2.52 | | | |
| 37 | 1.10 | 0.99 | 57 | 3.60 | 3.24 | | | |
| 38 | 1.15 | 1.04 | 58 | 4.40 | 3.96 | | | |
| 39 | 1.20 | 1.08 | 59 | 5.20 | 4.68 | | | |
| 40 | 1.25 | 1.13 | 60 | 6.00 | 5.40 | | | |
| 41 | 1.30 | 1.17 | 61 | 6.80 | 6.12 | | | |

LN589

# Table of Guaranteed Maximum Cost of Insurance Rates Per $1,000

**SPECIAL NOTE:** The monthly Cost of Insurance rates are based on the sex and attained age (nearest birthday), but will not exceed the rates shown in the table below. If the Insured is in a rated premium class, the Guaranteed Maximum Cost of Insurance Rates will be those in the table multiplied by the Risk Factor, if any, shown in the *POLICY SPECIFICATIONS*. In determining the Guaranteed Maximum Cost of Insurance Rates, Lincoln Life will add the amount of the Flat Extra Monthly Insurance Cost, if any, shown in the *POLICY SPECIFICATIONS*. The rates below are based on the 1980 CSO Tables (Male or Female as appropriate).

| Attained Age (nearest birthday) | Male Monthly Rate | Female Monthly Rate | Attained Age (nearest birthday) | Male Monthly Rate | Female Monthly Rate | Attained Age (nearest birthday) | Male Monthly Rate | Female Monthly Rate |
|---|---|---|---|---|---|---|---|---|
| 0 | 0.34845 | 0.24089 | 35 | 0.17586 | 0.13752 | 70 | 3.30338 | 1.84590 |
| 1 | 0.08917 | 0.07251 | 36 | 0.18670 | 0.14669 | 71 | 3.62140 | 2.02325 |
| 2 | 0.08251 | 0.06750 | 37 | 0.20004 | 0.15752 | 72 | 3.98666 | 2.24419 |
| 3 | 0.08167 | 0.06584 | 38 | 0.21505 | 0.17003 | 73 | 4.40599 | 2.51548 |
| 4 | 0.07917 | 0.06417 | 39 | 0.23255 | 0.18503 | 74 | 4.87280 | 2.83552 |
| 5 | 0.07501 | 0.06334 | 40 | 0.25173 | 0.20171 | 75 | 5.37793 | 3.19685 |
| 6 | 0.07167 | 0.06084 | 41 | 0.27424 | 0.22005 | 76 | 5.91225 | 3.59370 |
| 7 | 0.06667 | 0.06000 | 42 | 0.29675 | 0.23922 | 77 | 6.46824 | 4.01942 |
| 8 | 0.06334 | 0.05834 | 43 | 0.32260 | 0.25757 | 78 | 7.04089 | 4.47410 |
| 9 | 0.06167 | 0.05750 | 44 | 0.34929 | 0.27674 | 79 | 7.64551 | 4.97042 |
| 10 | 0.06084 | 0.05667 | 45 | 0.37931 | 0.29675 | 80 | 8.30507 | 5.52957 |
| 11 | 0.06417 | 0.05750 | 46 | 0.41017 | 0.31677 | 81 | 9.03761 | 6.17118 |
| 12 | 0.07084 | 0.06000 | 47 | 0.44353 | 0.33761 | 82 | 9.86724 | 6.91414 |
| 13 | 0.08251 | 0.06250 | 48 | 0.47856 | 0.36096 | 83 | 10.80381 | 7.77075 |
| 14 | 0.09584 | 0.06667 | 49 | 0.51777 | 0.38598 | 84 | 11.82571 | 8.72632 |
| 15 | 0.11085 | 0.07084 | 50 | 0.55948 | 0.41350 | 85 | 12.91039 | 9.76952 |
| 16 | 0.12585 | 0.07501 | 51 | 0.60870 | 0.44270 | 86 | 14.03509 | 10.89151 |
| 17 | 0.13919 | 0.07917 | 52 | 0.66377 | 0.47523 | 87 | 15.18978 | 12.08770 |
| 18 | 0.14836 | 0.08167 | 53 | 0.72636 | 0.51276 | 88 | 16.36948 | 13.35774 |
| 19 | 0.15502 | 0.08501 | 54 | 0.79730 | 0.55114 | 89 | 17.57781 | 14.70820 |
| 20 | 0.15836 | 0.08751 | 55 | 0.87326 | 0.59118 | 90 | 18.82881 | 16.15259 |
| 21 | 0.15919 | 0.08917 | 56 | 0.95591 | 0.63123 | 91 | 20.14619 | 17.71416 |
| 22 | 0.15752 | 0.09084 | 57 | 1.04192 | 0.66961 | 92 | 21.57655 | 19.43814 |
| 23 | 0.15502 | 0.09251 | 58 | 1.13378 | 0.70633 | 93 | 23.20196 | 21.40786 |
| 24 | 0.15169 | 0.09501 | 59 | 1.23235 | 0.74556 | 94 | 25.28174 | 23.83051 |
| 25 | 0.14752 | 0.09668 | 60 | 1.34180 | 0.78979 | 95 | 28.27411 | 27.16158 |
| 26 | 0.14419 | 0.09918 | 61 | 1.46381 | 0.84488 | 96 | 33.10677 | 32.32378 |
| 27 | 0.14252 | 0.10168 | 62 | 1.60173 | 0.91417 | 97 | 41.68475 | 41.21204 |
| 28 | 0.14169 | 0.10501 | 63 | 1.75809 | 1.00267 | 98 | 58.01259 | 57.81394 |
| 29 | 0.14252 | 0.10835 | 64 | 1.93206 | 1.10539 | 99 | 83.33333 | 83.33333 |
| 30 | 0.14419 | 0.11251 | 65 | 2.12283 | 1.21731 | | | |
| 31 | 0.14836 | 0.11668 | 66 | 2.32623 | 1.33511 | | | |
| 32 | 0.15252 | 0.12085 | 67 | 2.54312 | 1.45461 | | | |
| 33 | 0.15919 | 0.12502 | 68 | 2.77350 | 1.57247 | | | |
| 34 | 0.16669 | 0.13168 | 69 | 3.02328 | 1.69955 | | | |

This Page Intentionally Blank

# Definitions

**Administrator Mailing Address.** The Administrator Mailing Address for the policy is shown on the front cover.

**Cash Value.** The sum of premiums received and interest credited under the policy, less partial surrenders, fees, charges and Monthly Deductions. (See *NONFORFEITURE PROVISIONS*, **Cash Value**.)

**Cost of Insurance.** See *NONFORFEITURE PROVISIONS*, **Cost of Insurance**.

**Date of Issue.** The Date of Issue is shown in the *POLICY SPECIFICATIONS*.

**Death Benefit.** The amount payable upon death of the Insured is based upon the Death Benefit Option selected under the policy and in effect at the time of death. Each option is described under *INSURANCE COVERAGE PROVISIONS*, **Death Benefit** and is payable as described under *GENERAL PROVISIONS*, **Payment of Proceeds**.

**Due Proof of Death.** A certified copy of an official death certificate, a certified copy of a decree of a court of competent jurisdiction as to the finding of death, or any other proof of death satisfactory to Lincoln Life.

**In Writing.** With respect to any notice to Lincoln Life, this term means a written form satisfactory to Lincoln Life and received at the Administrator Mailing Address. With respect to any notice by Lincoln Life to the Owner, any assignee or other person, this term means written notice by ordinary mail to such person at the most recent address in Lincoln Life's records.

**Indebtedness.** See *LOAN PROVISIONS*, **Indebtedness**.

**Monthly Deduction.** The amount deducted from the policy Cash Value on each Monthly Anniversary Day for certain expenses and the Cost of Insurance. (See *NONFORFEITURE PROVISIONS*, **Monthly Deduction**.)

**Monthly Anniversary Day.** The day of the month, as shown in the *POLICY SPECIFICATIONS*, when Lincoln Life deducts the Monthly Deduction. If that day is not a business day, then such charges will be deducted on the immediately preceding business day.

**Net Cash Value.** An amount equal to the Cash Value less the amount of any Indebtedness.

**Policy Anniversaries and Policy Years.** Twelve-month periods measured from the Date of Issue.

**Specified Amount.** The Specified Amount is shown in the *POLICY SPECIFICATIONS* or supplemental *POLICY SPECIFICATIONS*, if later changed. The Specified Amount is chosen by the Owner and used in determining the amount of the Death Benefit. It may be increased or decreased as described in *INSURANCE COVERAGE PROVISIONS*, **Changes in Insurance Coverage**.

**Surrender Value.** See *NONFORFEITURE PROVISIONS*, **Surrender and Surrender Value**.

# Premium and Reinstatement Provisions

**Payment of Premiums.** All premiums are payable at the Administrator Mailing Address or to an authorized agent of Lincoln Life. The first premium is due on the Date of Issue and is payable in advance. All subsequent premium payments may be made at any time before the Insured's age 100. Receipts signed by the President or Secretary and duly countersigned will be furnished upon request.

Monthly Anniversary Days, policy months, Policy Years and Policy Anniversaries are computed from the Date of Issue.

**Minimum Premiums.** The Minimum Initial Premium as shown in the *POLICY SPECIFICATIONS* for the Initial Specified Amount as of the Date of Issue is the amount required to commence coverage under this policy and to prevent the policy from lapsing prior to the first Monthly Anniversary Day. Thereafter, the minimum premium amount is the amount required to prevent the policy from lapsing as set forth under **Policy Lapse and Grace Period.**

**Planned Premiums.** The Owner may, from time to time, establish the amount and frequency of premium payments, subject to the maximum premium requirements permitted under the Internal Revenue Code to qualify the policy as life insurance. Lincoln Life will send premium reminder notices for the amounts and frequency of payments established by the Owner. Lincoln Life reserves the right to stop sending such notices if no premium payment is made within 2 Policy Years.

Any premium payment received by Lincoln Life shall be applied as premium and not to repay any outstanding loans, unless Lincoln Life is specifically instructed otherwise In Writing by the Owner.

The Planned Premium amount as determined by the Owner, payable in accordance with the mode specified, may not continue the policy in force until the Policy Anniversary after the Insured reaches or would have reached age 100 even if the amount is paid as scheduled. The duration for which the policy will continue will depend upon:

1.  The amount, timing, and frequency of premium payment;
2.  Changes in Specified Amount and Death Benefit options;
3.  Changes in current interest credits and insurance costs;
4.  Changes in deductions for riders, if any; and
5.  Partial withdrawals and loans.

**Additional Premium.** In addition to any planned premium, it is possible to make additional premium payments of no less than $100.00 at any time before the Insured's age 100. Lincoln Life reserves the right to limit the amount or frequency of any such additional premium payment. If a payment of any additional premium would increase the difference between the Cash Value and the Death Benefit, Lincoln Life may reject the additional premium payment unless evidence of insurability is furnished to Lincoln Life and it agrees to accept the risk. If a payment of additional premium would cause the policy to cease to qualify as life insurance for federal income tax purposes, Lincoln Life may reject all or such excess portion of the additional premium.

**Policy Lapse and Grace Period.** This policy will lapse if the Net Cash Value on any Monthly Anniversary Day is less than the required Monthly Deduction. In such event, a grace period of 61 days will be granted to pay a premium sufficient to cover the required Monthly Deduction.

At least 31 days before the end of the grace period Lincoln Life will send a notice In Writing to the Owner and any assignee of record that there is insufficient Net Cash Value under the policy. The notice will show the amount of premium required to prevent the policy from lapsing, which will be equal to the Monthly Deductions due and unpaid plus three additional Monthly Deductions. If such premium, as billed by Lincoln Life, is not paid within the grace period, all coverage under the policy will terminate without value at the end of the grace period. If the Insured dies during the grace period, Lincoln Life will deduct any overdue Monthly Deductions from the Death Benefit Proceeds.

## Premium and Reinstatement Provisions (continued)

**Reinstatement.** After the policy has lapsed due to the failure to make a necessary payment before the end of a 60 day grace period, the policy may be reinstated within 5 years provided: (a) there is an application for reinstatement In Writing, (b) satisfactory evidence of insurability is furnished to Lincoln Life, (c) enough premium is paid, in an amount equal to the Monthly Deductions due and unpaid during the grace period plus three additional Monthly Deductions, and (d) any Indebtedness against the policy, increased by any loan interest, is paid or reinstated. The reinstated policy will be effective as of the Monthly Anniversary Day after the date on which Lincoln Life approves the application for reinstatement. The surrender charges set forth in the *TABLE OF SURRENDER CHARGES* will be reinstated as of the Policy Year in which the policy lapsed. Policies which have been surrendered cannot be reinstated.

# Ownership, Assignment and Beneficiary Provisions

**Owner.**  The Owner on the Date of Issue will be the person designated in the *POLICY SPECIFICATIONS*. If no Owner is designated, the Insured will be the Owner.

**Rights of Owner.** While the Insured is alive, the Owner may exercise all rights and privileges under the policy including the right to: (a) release or surrender the policy to Lincoln Life, (b) agree with Lincoln Life to any change in or amendment to the policy, (c) transfer all rights and privileges to another person, (d) change the Beneficiary, and (e) assign the policy.

All rights and privileges of the Owner may be exercised without the consent of any designated transferee, or any Beneficiary if the Owner has reserved the right to change the Beneficiary. All such rights and privileges, however, may be exercised only with the consent of any assignee recorded with Lincoln Life.

Unless provided otherwise, if the Owner is a person other than the Insured and dies before the Insured, all of the rights and privileges of the Owner will vest in the Owner's executors, administrators or assigns.

**Transfer of Owner.** The Owner may transfer all rights and privileges of the Owner. On the effective date of transfer, the transferee will become the Owner and will have all the rights and privileges of the Owner. The Owner may revoke any transfer prior to its effective date.

Unless provided otherwise, a transfer will not affect the interest of any Beneficiary designated prior to the effective date of transfer.

A transfer of Owner, or a revocation of transfer, will be In Writing on a form satisfactory to Lincoln Life and filed at the Administrator Mailing Address. A transfer, or a revocation, will not take effect until the notice of change is received In Writing by Lincoln Life. When a transfer or revocation has been so received, it will take effect as of the effective date specified by the Owner. Any payment made or any action taken or allowed by Lincoln Life before the transfer, or revocation, is received will be without prejudice to Lincoln Life.

**Assignment.**  Lincoln Life will not be affected by any assignment of the policy until the original assignment or a certified copy of the assignment is filed at the Administrator Mailing Address.

Lincoln Life does not assume responsibility for the validity or sufficiency of any assignment.  An assignment of the policy will operate so long as the assignment remains in force.

To the extent provided under the terms of the assignment, an assignment will transfer the interest of any designated transferee or of any Beneficiary if the Owner has reserved the right to change the Beneficiary.

## Ownership, Assignment and Beneficiary Provisions (continued)

**Beneficiary.** The Beneficiary on the Date of Issue will be the person designated in the *POLICY SPECIFICATIONS*.

Unless provided otherwise, the interest of any Beneficiary who dies before the Insured will vest in the Owner or the Owner's executors, administrators or assigns.

**Change of Beneficiary.** A new Beneficiary may be designated from time to time. A request for change of Beneficiary must be In Writing and filed at the Administrator Mailing Address. The request must be signed by the Owner. The request must also be signed by any irrevocable Beneficiary.

A change of Beneficiary will not take effect until the notice of change is received by Lincoln Life. When a change of Beneficiary has been so received it will take effect as of the date the request was signed. Any payment made or any action taken or allowed by Lincoln Life before the change of Beneficiary is received will be without prejudice to Lincoln Life.

Unless provided otherwise, the right to change any Beneficiary is reserved to the Owner.

## Insurance Coverage Provisions

**Date of Coverage.** The date of coverage will be the Date of Issue provided the initial premium has been paid and the policy has been accepted by the Owner: (a) while the Insured is alive, and (b) prior to any change in health and insurability as represented in the original application. This provision will not, however, affect the terms of any Temporary Insurance Agreement.

For any increase or addition to coverage, the effective date will be the Monthly Anniversary Day that coincides with or next follows the date the supplemental application is approved by Lincoln Life provided: (a) sufficient Net Cash Value exists under the policy to cover the cost for the increase, (b) sufficient premium for the increase or addition has been paid, and (c) the Insured is alive on such day. The effective date for any change in insurance coverage will be shown under the effective date on the supplement to the *POLICY SPECIFICATIONS* page that will be sent to the Owner.

**Termination of Coverage.** All coverage under this policy terminates on the first of the following to occur:

1. A full surrender of the policy.

2. Death of the Insured.

3. Failure to pay the amount of premium necessary to avoid termination before the end of any applicable grace period.

No action by Lincoln Life after such a termination of the policy, including any Monthly Deduction made after termination of coverage, will constitute a reinstatement of the policy or waiver of the termination. Any such deduction will be refunded.

**Death Benefit.** The amount payable upon death is based upon the Death Benefit Option in effect on the date of death. (See *GENERAL PROVISIONS*, **Payment of Proceeds.**). The Death Benefit Options available under this policy are as follows:

## Insurance Coverage Provisions (continued)

DEATH
BENEFIT
OPTION 1

The Specified Amount includes the Cash Value. The Death Benefit (before deduction of any Indebtedness against the policy) will equal the greater of:

(a)  the Specified Amount on the date of death, or

(b)  the amount determined by Lincoln Life equal to that required by the Internal Revenue Code to maintain this contract as a life insurance policy as shown in the *CORRIDOR PERCENTAGES TABLE*. Any amount so determined will be set forth in the annual report which Lincoln Life will send to the Owner.

For Option 1, a partial surrender will reduce the Cash Value, Death Benefit, and Specified Amount.

DEATH
BENEFIT
OPTION 2

The Specified Amount is in addition to the Cash Value. The Death Benefit (before deduction of any Indebtedness against the policy) will equal the greater of:

(a)  the Specified Amount on the date of death plus the Cash Value on the date of death, or

(b)  the amount determined by Lincoln Life equal to that required by the Internal Revenue Code to maintain this contract as a life insurance policy as shown in the *CORRIDOR PERCENTAGES TABLE*. Any amount so determined will be set forth in the annual report which Lincoln Life will send to the Owner.

For Option 2, a partial surrender will reduce the Cash Value and the Death Benefit. The Specified Amount will not be reduced.

DEATH
BENEFIT
OPTION 3

The Specified Amount in addition to the Accumulated Premium(s). The Death Benefit (before deduction of any Indebtedness against the policy) will equal the greater of:

(a)  the sum of the Specified Amount plus the Accumulated Premium(s) on the date of death, up to the Death Benefit Option 3 Limit shown in the *POLICY SPECIFICATIONS*, or

(b)  the amount determined by Lincoln Life equal to that required by the Internal Revenue Code to maintain this contract as a life insurance policy as shown in the *CORRIDOR PERCENTAGES TABLE*. Any amount so determined will be set forth in the annual report which Lincoln Life will send to the Owner.

For Option 3, a partial surrender will reduce the Accumulated Premium(s), the Death Benefit, Cash Value, and the Death Benefit Option 3 Limit by the amount of the partial surrender. If the amount of the partial surrender exceeds the Accumulated Premium(s), the Specified Amount will be reduced by the excess amount.

**Accumulated Premium(s) for Death Benefit Option 3.** The Accumulated Premium(s) is determined on each Monthly Anniversary Day and is based on the sum of all premiums paid, less the Cumulative Policy Factor (if elected) from the later of the Date of Issue or the effective date of change to Option 3. Any premium paid that will cause the Death Benefit amount to exceed the Death Benefit Option 3 Limit will be applied to the policy, but will only increase the Death Benefit up to the Death Benefit Option 3 Limit.

# Insurance Coverage Provisions (continued)

**Increases in the Death Benefit Option 3 Limit.** The Owner may request an increase to the Death Benefit Option 3 Limit. If an increase is requested, a supplemental application must be submitted and evidence of insurability satisfactory to Lincoln Life must be furnished. If Lincoln Life approves the request, the increase will become effective upon the Monthly Anniversary Day that coincides with or next follows the date the request is approved.

**Cumulative Policy Factor for Death Benefit Option 3.** The Cumulative Policy Factor, if elected by the Owner, is an amount calculated as (1) multiplied by (2) accumulated monthly from the later of the Date of Issue of the policy or the effective date of change to Death Benefit Option, where:

(1)    is the applicable monthly rate from the table then used by the Internal Revenue Service (IRS) to determine the economic benefit attributable to life insurance coverage, or an alternative table permitted by the IRS, as selected by the Owner at issue; and

(2)    is the Specified Amount divided by 1,000.

If the Owner elects to have a Cumulative Policy Factor and later changes this election, any accumulation of the Cumulative Policy Factor to that date will be carried forward, but will not continue to accumulate. If the Owner does not elect to have a Cumulative Policy Factor and later changes this election, the accumulation of a Cumulative Policy Factor will begin as of the date of the change.

Unless Death Benefit Option 2 or 3 is elected on the application, the Owner will be deemed to have elected Death Benefit Option 1.

**Changes in Insurance Coverage.** The Owner may effect a change in coverage under this policy, subject to the following conditions:

1.    **General**
      Lincoln Life will require the Owner to submit a supplemental application for any change in coverage. A supplement to the *POLICY SPECIFICATIONS* will be endorsed to the policy and sent to the Owner once the change is completed.

2.    **Decrease in Specified Amount**
      The Owner may decrease the Specified Amount of this policy at any time up to 12 times per Policy Year, subject to IRS guidelines. The Owner cannot reduce the Specified Amount below $25,000.

      The decrease in the Specified Amount will take effect on the Monthly Anniversary day on or next following the date on which the Owner's request In Writing is received at the Administrator's Mailing Address. If Death Benefit Option 3 is in effect, a decrease in Specified Amount will also reduce the Death Benefit Option 3 Limit. A decrease in Specified Amount may be subject to a surrender charge, if any, as set forth in the *TABLE OF SURRENDER CHARGES*, which will be deducted from the Cash Value.

      The decrease will reduce any past increases in the reverse order in which they occurred.

3.    **Increase in Specified Amount**
      The Owner may make a minimum increase of $1,000 to the Specified Amount of this policy at any time up to 12 times in the first Policy Year subject to satisfactory evidence of insurability. After the first Policy Year the Owner may make one increase per Policy Year. The Date of Issue of any increase will be shown on the supplemental *POLICY SPECIFICATIONS* sent to the Owner. Increases in Specified Amount that are not initiated by the Owner, but are initiated by Lincoln Life, will not require evidence of insurability.

## Insurance Coverage Provisions (continued)

If Lincoln Life approves the request, the increase will become effective upon (i) the Monthly Anniversary Day that coincides with or next follows the date Lincoln Life approves the request, and, (ii) the deduction from the Cash Value of the first month's cost for the increase, using the Insured's then attained age (nearest birthday) as the issue age for such coverage provided the Insured is alive on such day. If Death Benefit Option 3 is in effect, an increase in Specified Amount will increase the Death Benefit Option 3 Limit, unless requested otherwise by the Owner.

4.  **Change in Death Benefit Option**
    The Owner may change the Death Benefit Option after the first Policy Year. If such change results in an increase in the net amount at risk, it will be subject to satisfactory evidence of insurability. The change will take effect on the Monthly Anniversary Day on or next following the date on which the Owner's request In Writing is received at the Administrator Mailing Address and approved by Lincoln Life.

    (a)  Change from Option 1 to Option 2

         The Specified Amount will be reduced to equal the Specified Amount immediately prior to the change less the Cash Value at the time of the change.

    (b)  Change from Option 2 to Option 1

         The Specified Amount will be increased to equal the Specified Amount immediately prior to the change plus the Cash Value at the time of the change.

    (c)  Change from Option 3 to Option 1

         The Specified Amount will be increased by Accumulated Premium(s) at the time of change.

    (d)  Change from Option 3 to Option 2 and the Cash Value is greater than the Accumulated Premium(s)

         The Specified Amount will be reduced by the Cash Value less Accumulated Premium(s) at the time of change.

    (e)  Change from Option 3 to Option 2 and the Cash Value is less than Accumulated Premium(s)

         The Specified Amount will be increased by the Accumulated Premium(s) less the Cash Value at the time of change.

    (f)  Change from Option 2 to Option 3

         The Specified Amount will be increased to equal the Specified Amount immediately prior to the change plus the Cash Value at the time of the change.

**Projection of Benefits and Values.** Lincoln Life will provide a projection of illustrative future Death Benefits and Cash Values at any time upon written request and payment of a reasonable service fee. The fee payable will be the one then in effect for this service. The illustration will be based on (a) assumptions as to Specified Amount(s), type of coverage option(s) and future planned annual premium payments, and (b) such other assumptions (e.g., mortality and interest) as are necessary and specified.

# Nonforfeiture Provisions

**The following provisions describe how values are calculated under the policy and the amounts that would be payable if the policy is terminated before a death benefit becomes payable.**

**Cash Value.** On each Monthly Anniversary Day, the Cash Value will be calculated as (1), plus (2), plus (3), minus (4), minus (5), minus (6), minus (7) where:

(1)    is the Cash Value on the preceding Monthly Anniversary Day.

(2)    is all premiums received since the preceding Monthly Anniversary Day less the percentage of premium expense charge from the *TABLE OF EXPENSE CHARGES.*

(3)    is interest on items (1) and (2).

(4)    is the Monthly Deduction for the month following the Monthly Anniversary Day.

(5)    is the applicable charge per $1,000 from the *TABLE OF EXPENSE CHARGES,* if any.

(6)    is the amount of any partial surrenders (i.e. withdrawals) and associated fees on the Monthly Anniversary Day.

(7)    is the surrender charge for any decrease in Specified Amount from the *TABLE OF SURRENDER CHARGES,* if any.

If premium is received at any time other than the beginning of a policy month, the rate of interest used in the calculation of item (3) above will be determined pro rata from the date of receipt.

On any day other than a Monthly Anniversary Day, the Cash Value will be the Cash Value as of the preceding Monthly Anniversary Day, plus all premiums received since the preceding Monthly Anniversary Day less the premium expense charge from the *TABLE OF EXPENSE CHARGES* plus accumulated interest and less partial surrenders and associated fees. The Cash Value on the Date of Issue will be the initial premium received less: (i) the initial policy fee from the *TABLE OF EXPENSE CHARGES,* (ii) the Monthly Deduction for the first policy month, (iii) the premium expense charge from the *TABLE OF EXPENSE CHARGES,* and (iv) the charge per $1,000 of Initial Specified Amount from the *TABLE OF EXPENSE CHARGES.*

**Net Cash Value.** The Net Cash Value as of any date will equal the Cash Value on that date as determined above less any Indebtedness against the policy.

**Monthly Deduction.** The Monthly Deduction for a policy month will be calculated as Charge (1) plus Charge (2) where:

CHARGE (1)    is the Cost of Insurance (as described in the **Cost of Insurance** provision) and the cost of any additional benefits provided by rider for the policy month; and

CHARGE (2)    is the monthly administrative expense charge from the *TABLE OF EXPENSE CHARGES.*

**Interest Rates.** Lincoln Life will credit interest to the Cash Value of the policy daily. The interest rate applied to the Net Cash Value of the policy will be the greater of:

(a)    0.01074598% per day, compounded daily (4.0% annually), or

(b)    a rate determined by Lincoln Life from time to time. Such rate will be established on a prospective basis.

The interest rate applied to that borrowed portion of the Cash Value which secures any outstanding policy loan when expressed as an equivalent annual rate will be equal to the policy loan rate less a percentage no greater than 2.0%, but not less than the guaranteed interest rate of 4%. (See *LOAN PROVISIONS,* **Loan Interest.**)

# Nonforfeiture Provisions (continued)

**Additional Interest.** In addition to the interest being credited under the policy, Lincoln Life will grant an additional interest at the end of Policy Years 6 and thereafter. This amount will equal 0.25% of the Cash Value in Policy Years 6-10, and will equal 0.50% of Cash Value in Policy Years 11 and thereafter and will be applied automatically to increase the then current Cash Value of the policy. Any additional interest credited does not change the guaranteed rate of 4%.

The additional excess interest is the result of a reduction in the interest margin for profit and expenses. The guaranteed interest rate will not be increased by the additional excess interest rate.

**Cost of Insurance.** The Cost of Insurance under this policy is determined on a monthly basis. Such cost will be the result of (1) minus (2), multiplied by (3), and divided by 1,000, where:

(1)     is the Death Benefit at the beginning of the policy month, divided by 1.0032737,

(2)     is the Cash Value at the beginning of the policy month prior to the deduction for the monthly Cost of Insurance, or zero if greater, and

(3)     is the Cost of Insurance rate as described in the **Cost of Insurance Rates** provision.

**Cost of Insurance Rates.** Monthly Cost of Insurance rates will be determined by Lincoln Life, based on its expectations as to future mortality, investment earnings, persistency, and expenses (including taxes). Any change in Cost of Insurance rates will apply to all individuals of the same class as the Insured. If the Insured is in a rated premium class, the monthly Cost of Insurance rates for that premium class will reflect the Risk Factor, if any, shown in the *POLICY SPECIFICATIONS*. In determining the monthly Cost of Insurance, Lincoln Life will add the amount of the Flat Extra Monthly Insurance Cost, if any, shown in the *POLICY SPECIFICATIONS*. Under no circumstances will the Cost of Insurance rates ever be greater than those specified in the *TABLE OF GUARANTEED MAXIMUM COST OF INSURANCE RATES PER $1,000*.

**Insufficient Value.** If the Net Cash Value, on the day preceding a Monthly Anniversary Day is insufficient to cover the Monthly Deduction for the month following such Monthly Anniversary Day, the policy will terminate. (See *PREMIUM AND REINSTATEMENT PROVISIONS*, **Policy Lapse and Grace Period**.)

**Basis of Computations.** The minimum Cash Values under this policy are guaranteed to be no less than those calculated based on the applicable Commissioners 1980 Standard Ordinary Mortality Table (age nearest birthday) with interest at 4% per year, compounded yearly.

The Cash Values are at least equal to those required on the Date of Issue by the jurisdiction in which this policy is delivered. A detailed statement of the method of computing values has been filed with the insurance supervisory official of that jurisdiction.

**Continuation of Insurance.** Insurance coverage under this policy and any benefits provided by rider will be continued until the Net Cash Value is insufficient to cover the Monthly Deduction. (See *PREMIUM AND REINSTATEMENT PROVISIONS*, **Policy Lapse and Grace Period**). If the Insured is still living at age 100 and the policy has not lapsed or been surrendered, Lincoln Life will: a) continue to credit interest to the Cash Value as defined in the **Interest Rate** provision; b) no longer charge Monthly Deductions under the policy; c) no longer accept premium payments (except as needed to keep the policy from lapsing); d) continue to charge loan interest; and e) continue the policy in force and pay the Death Benefit upon receipt of Due Proof of Death of the Insured. This provision will not continue any rider attached to the policy beyond the date for its termination, as provided in the rider.

## Nonforfeiture Provisions (continued)

**Surrender and Surrender Value.** This policy may be surrendered on any Monthly Anniversary Day during the lifetime of the Insured and during the continuance of the policy. The amount payable on surrender of this policy (i.e., the Surrender Value) will be the Net Cash Value on the date of surrender less a charge determined from the *TABLE OF SURRENDER CHARGES*. (The charges shown in the table are the charges imposed at the beginning of the Policy Year; charges imposed upon surrender during the Policy Year will be determined on a consistent basis allowing for the lapse of time within such year).

The Surrender Value will be paid in cash or under an elected Optional Method of Settlement. Lincoln Life may defer the payment of the Surrender Value for the period permitted by law, but not for more than 6 months from the date of request for surrender.

If surrender is requested under this section within 30 days after a Policy Anniversary, the Surrender Value will not be less than the Surrender Value on that anniversary, less any policy loans or partial surrenders made on or after such anniversary.

**Partial Surrender.** A partial surrender (i.e. withdrawal) of this policy may be elected on any Monthly Anniversary Day during the lifetime of the Insured and while the policy is in force by submitting a request In Writing to Lincoln Life. The amount of the partial surrender (a) must be at least $500.00 but (b) may not exceed 90% of the then current Surrender Value. The amount of the partial surrender shall be withdrawn against the most recent increases first, then against the recent increases successively. Partial Surrender may continue to be made even after the Insured's age 100.

When a partial surrender is made, the amount of the partial surrender and the applicable fee will be deducted from the Cash Value. Also, the Death Benefit payable will be reduced by the amount of the partial surrender and the applicable fee. (See *INSURANCE COVERAGE PROVISIONS*, **Death Benefit**). The Specified Amount remaining in force after any partial surrender will be subject to the limits imposed by IRS guidelines and minimum Specified Amount. (See *INSURANCE COVERAGE PROVISIONS*, **Changes in Insurance Coverage**). A partial surrender impacting the Specified Amount will reduce any past increases to the Specified Amount in the reverse order in which they occurred.

A fee as set forth in the *TABLE OF EXPENSE CHARGES* will be deducted from the Cash Value for each partial surrender. Lincoln Life reserves the right to limit the number of partial surrenders in a Policy Year to four. Lincoln Life also reserves the right to defer payment for the period permitted by law, but not for more than 6 months from the date of request for the partial surrender, unless such partial surrender amount is is to be applied to the payment of premiums on policies with Lincoln Life.

**Paid-up Insurance.**   The Owner may at any time request that Lincoln Life grant guaranteed nonparticipating paid-up insurance, which shall be payable at a like time and in like manner with the original policy. The amount of paid-up insurance will be that which the Net Cash Value will purchase when applied as a net single premium at the Insured's then attained age using the guaranteed interest of 4% per annum and mortality basis set forth under the **Basis of Computations** provision. The amount of such paid-up insurance, however, shall be limited to the current Death Benefit under the policy, and the amount of any Net Cash Value in excess of that required to purchase such paid-up insurance will be paid to the Owner in cash. After election of this option, no further premiums will be accepted or excess interest credits applied. The paid-up insurance will not include any supplementary or additional benefits provided by rider under the original policy.

The Owner, at any time after election of the paid-up option, may surrender the policy for the Net Cash Value and is not subject to any expense charge on any monthly anniversary after the election.

# Loan Provisions

**Policy Loans.** If the policy has a Surrender Value available, Lincoln Life will grant a loan against the policy provided: (a) a proper loan agreement is executed, and (b) a satisfactory assignment of the policy to Lincoln Life is made. The policy will be the sole security for the loan. The total amount of all loans with interest may not exceed the Surrender Value of the policy. Loans may continue to be made even after the Insured's age 100. The Owner should consult his/her tax advisor before making any loan under the policy.

Lincoln Life may defer a loan for 6 months from the date of the request for the loan. Lincoln Life will not, however, defer a loan to be used to pay premiums on policies with Lincoln Life. If the loan is deferred for more than 10 days, Lincoln Life will pay interest on the loan amount at a rate equal to 3% per year.

**Loan Interest.** Interest on any policy loan will be at a rate equivalent to 6% per year payable in arrears. Loan interest is payable annually on each Policy Anniversary or as otherwise agreed in Writing by the Owner and Lincoln Life. Interest not paid when due will then be added to the loan and bear interest at the same rate. Interest, as it accrues from day to day, will constitute an Indebtedness.

**Indebtedness.** The term Indebtedness means money which is owed on this policy due to an outstanding loan and interest accrued thereon but not yet charged. Any Indebtedness at time of settlement will reduce the proceeds. Indebtedness may be repaid in whole or in part at any time even after the Insured's age 100. If, however, a premium is not paid within the grace period, any outstanding Indebtedness can be repaid only if the policy is reinstated.

If at any time the total Indebtedness against the policy, including interest accrued but not due, equals or exceeds the then current Cash Value, less any applicable surrender charge(s), the policy will thereupon terminate without value. (See *PREMIUM AND REINSTATEMENT PROVISIONS*, **Policy Lapse and Grace Period.**)

# General Provisions

**Entire Contract.** The policy and the application for the policy (including any supplemental applications for additional Specified Amounts) constitute the entire contract between the parties. All statements made in the application will be deemed representations and not warranties. No statement will be used in defense of a claim under the policy unless it is contained in the application, and a copy of the application is attached to the policy when issued.

Only the President, a Vice President, an Assistant Vice President, a Secretary, a Director or an Assistant Director of Lincoln Life may make or modify this policy.

The policy is executed at the Administrator Mailing Address shown on the front cover of the policy.

**Non-Participation.** The policy is not entitled to share in surplus distribution.

**Notice of Claim.** Due Proof of Death must be furnished to Lincoln Life within 30 days or as soon as reasonably possible after the death of the Insured. Such notice shall be given by or on behalf of the Owner to Lincoln Life at its Administrator Mailing Address located on the front cover of the policy.

**Payment of Proceeds.** Proceeds, as used in this policy, means the amount payable (a) upon the surrender of this policy, or (b) upon the death of the Insured.

## General Provisions (continued)

Upon the death of the Insured, while the policy is still inforce, the proceeds payable will be the Death Benefit less any Indebtedness against the policy. Such Death Benefit Proceeds are payable subject to the receipt of Due Proof of Death. Payment shall include interest on proceeds from the date of death of the Insured to the date of payment. The interest shall be computed daily at the rate currently paid by Lincoln Life on proceeds left under settlement options. If the policy is surrendered before the death of the Insured, the proceeds payable upon surrender will be the Surrender Value as described in *NONFORFEITURE PROVISIONS*. The proceeds payable under the policy are subject to the adjustments described in the following provisions:

1.   Misstatement of Age or Sex;

2.   Suicide;

3.   Incontestability;

4.   Partial Surrender;

5.   Policy Lapse and Grace Period; and

6.   Indebtedness.

When settlement is made, Lincoln Life may require return of the policy. Proceeds will be paid in a lump sum unless an Optional Method of Settlement is elected.

Policy proceeds are exempt from the claims of creditors and the rights of beneficiaries and assignees thereof shall be protected.

**Misstatement of Age or Sex.** If the age or sex of the Insured is misstated, Lincoln Life will adjust all benefits to the amounts that would have been purchased for the correct age and sex according to the basis specified in the *TABLE OF GUARANTEED MAXIMUM COST OF INSURANCE RATES PER $1,000;* that is, all benefits will be adjusted for the difference between the Monthly Deductions made and the Monthly Deductions that would have been made on the correct age and sex.

**Suicide.** If the Insured commits suicide within 2 years from the Date of Issue, the Death Benefit Proceeds will be limited to a refund of premiums paid, less (a) any Indebtedness against the policy and (b) the amount of any partial surrenders.

If the Insured commits suicide within 2 years from the date of any applied increase in the Specified Amount (other than an applied for increase solely attributable to a change in Specified Amount Option), the Death Benefit Proceeds with respect to such increase will be limited to a refund of the monthly charges for the cost of such additional insurance and the amount of insurance will be based on the Specified Amount before such increase was made, provided that the increase became effective at least 2 years from the Date of Issue of the policy.

If the policy lapses and is reinstated (See *PREMIUM AND REINSTATEMENT*, **Reinstatement**), the 2 year period for suicide does not begin anew.

**Incontestability.** Except for nonpayment of Monthly Deductions, this policy will be incontestable after it has been in force during the Insured's lifetime for 2 years from its Date of Issue. This means that Lincoln Life will not use any misstatement in the application to challenge a claim or avoid liability after that time.

Any applied for increase in the Specified Amount (other than an applied for increase solely attributable to a change in Specified Amount Option) effective after the Date of Issue will be incontestable only after such increase has been in force for 2 years during the Insured's lifetime. The basis for contesting an increase in Specified Amount will be limited to material misrepresentations made in the supplemental application for the increase. The basis for contesting after reinstatement will be (a) limited for a period of 2 years from the date of reinstatement, and (b) limited to material misrepresentations made in the reinstatement application.

LN589                                        NY                                        20

# General Provisions (continued)

**Effect of Waiver of Provisions.** If at some time Lincoln Life chooses not to enforce a policy provision, it still retains the right to enforce that provision at any other time. To be effective, a waiver of any terms of the policy must be In Writing and signed by a person authorized by Lincoln Life to waive such terms.

**Policy Changes – Applicable Law.** This policy must qualify initially and continue to qualify as life insurance under the Internal Revenue Code in order for the Owner to receive the tax treatment accorded to life insurance under Federal Law. Therefore, to maintain this qualification to the maximum extent permitted by law, Lincoln Life reserves the right to return any premium payments that would cause this policy to fail to qualify as life insurance under applicable tax law as interpreted by Lincoln Life. Further, Lincoln Life reserves the right to make changes in this policy or to make distributions from the policy to the extent it deems necessary, in its sole discretion, to continue to qualify this policy as life insurance. Any such changes will apply uniformly to all policies that are affected.

**Annual Report.** Lincoln Life will send a report to the Owner at least once a year without charge. The report will show (a) the current Death Benefit, (b) the current Net Cash Value, (c) premiums paid and all deductions made since the last report, (d) outstanding policy loans, and (e) any other information required by the Superintendent of Insurance. In addition, the report will indicate when the policy is projected to lapse based on current and guaranteed factors.

**Change of Plan.** This policy may be exchanged for another policy only if Lincoln Life consents to the exchange and all requirements for the exchange as determined by Lincoln Life, are met.

# Optional Methods of Settlement

This rider is made part of the policy to which it is attached as of the Date of Issue. Upon written request, the Company will agree to pay in accordance with any one of the options shown below all or part of the net proceeds that may be payable under the policy.

If any optional income settlement provides for instalment payments for a given age of payee for an amount which would be the same for different periods certain, the Company will deem that an election has been made for the longest period certain for such age and amount.

While the Insured is alive, the request, including the designation of the payee, may be made by the Owner. Unless the Owner has previously elected a settlement option, at the time a Death Benefit becomes payable under the policy, the request, including the designation of the payee, may then be made by the Beneficiary. Once Income Payments have begun, the policy cannot be surrendered and the payee cannot be changed, nor can the settlement option be changed.

**Payment Dates.** The first Income Payment under the settlement option selected will become payable on the date proceeds are settled under the option. Subsequent payments will be made on the first day of each month in accordance with the manner of payment selected.

**Minimum Payment Amount.** The settlement option elected must result in an Income Payment at least equal to the minimum payment amount in accordance with the Company's rules then in effect. If at any time payments are less than the minimum payment amount, the Company has the right to change the frequency to an interval that will provide the minimum payment amount. If any amount due is less than the minimum per year, the Company may make other arrangements that are equitable.

**Income Payments.** Income Payments will remain constant pursuant to the terms of the settlement option(s) selected. The amount of each Income Payment shall be determined in accordance with the terms of the settlement option and the table(s) set forth in this rider, as applicable. The mortality table used is the Annuity 2000 Table and 3% interest. In determining the settlement amount, the settlement age of the payee will be reduced by one year when the first installment is payable during 2010-2019, reduced by two years when the first installment is payable during the decade 2020-2029, and so on.

**First Option: Life Annuity.** An annuity payable monthly to the payee during the lifetime of the payee, ceasing with the last payment due prior to the death of the payee.

**Second Option: Life Annuity with Certain Period.** An annuity providing monthly income to the payee for a fixed period of 60, 120, 180, or 240 months (as selected), and for as long thereafter as the payee shall live.

**Third Option: Annuity Certain.** An amount payable monthly for the number of years selected which may be from 5 to 30 years.

**Fourth Option: As a Deposit at Interest.** The Company will retain the proceeds while the payee is alive and will pay interest annually thereon at a rate of not less than 3% per year. Upon the payee's death, the amount on deposit will be paid.

**Excess Interest.** At the sole discretion of the Company, excess interest may be paid or credited from time to time in addition to the payments guaranteed under any Optional Method of Settlement.

**Additional Options.** Any proceeds payable under the policy may also be settled under any other method of settlement offered by the Company at the time of the request.

Lincoln Life & Annuity Company of New York

*John N. Gatta*

President

# Optional Methods of Settlement (Continued)

Life Annuity and Life Annuity with Certain Period Table for Each $1,000 Applied – Male

| Settlement age of payee nearest birthday | Life Annuity | Number of instalments certain | | | |
|---|---|---|---|---|---|
| Age | | 60 | 120 | 180 | 240 |
| 10 | 2.84 | 2.84 | 2.84 | 2.84 | 2.84 |
| 11 | 2.85 | 2.85 | 2.85 | 2.85 | 2.85 |
| 12 | 2.87 | 2.87 | 2.86 | 2.86 | 2.86 |
| 13 | 2.88 | 2.88 | 2.88 | 2.88 | 2.87 |
| 14 | 2.89 | 2.89 | 2.89 | 2.89 | 2.89 |
| 15 | 2.91 | 2.91 | 2.91 | 2.90 | 2.90 |
| 16 | 2.92 | 2.92 | 2.92 | 2.92 | 2.91 |
| 17 | 2.94 | 2.94 | 2.93 | 2.93 | 2.93 |
| 18 | 2.95 | 2.95 | 2.95 | 2.95 | 2.94 |
| 19 | 2.97 | 2.97 | 2.97 | 2.96 | 2.96 |
| 20 | 2.99 | 2.99 | 2.98 | 2.98 | 2.98 |
| 21 | 3.00 | 3.00 | 3.00 | 3.00 | 2.99 |
| 22 | 3.02 | 3.02 | 3.02 | 3.02 | 3.01 |
| 23 | 3.04 | 3.04 | 3.04 | 3.04 | 3.03 |
| 24 | 3.06 | 3.06 | 3.06 | 3.06 | 3.05 |
| 25 | 3.08 | 3.08 | 3.08 | 3.08 | 3.07 |
| 26 | 3.10 | 3.10 | 3.10 | 3.10 | 3.09 |
| 27 | 3.13 | 3.13 | 3.12 | 3.12 | 3.11 |
| 28 | 3.15 | 3.15 | 3.15 | 3.14 | 3.14 |
| 29 | 3.17 | 3.17 | 3.17 | 3.17 | 3.16 |
| 30 | 3.20 | 3.20 | 3.20 | 3.19 | 3.19 |
| 31 | 3.23 | 3.23 | 3.22 | 3.22 | 3.21 |
| 32 | 3.26 | 3.25 | 3.25 | 3.25 | 3.24 |
| 33 | 3.28 | 3.28 | 3.28 | 3.28 | 3.27 |
| 34 | 3.32 | 3.31 | 3.31 | 3.31 | 3.30 |
| 35 | 3.35 | 3.35 | 3.34 | 3.34 | 3.33 |
| 36 | 3.38 | 3.38 | 3.38 | 3.37 | 3.36 |
| 37 | 3.42 | 3.42 | 3.41 | 3.40 | 3.39 |
| 38 | 3.46 | 3.46 | 3.45 | 3.44 | 3.42 |
| 39 | 3.50 | 3.49 | 3.49 | 3.48 | 3.46 |
| 40 | 3.54 | 3.54 | 3.53 | 3.52 | 3.50 |
| 41 | 3.58 | 3.58 | 3.57 | 3.56 | 3.53 |
| 42 | 3.63 | 3.62 | 3.62 | 3.60 | 3.57 |
| 43 | 3.68 | 3.67 | 3.66 | 3.64 | 3.62 |
| 44 | 3.73 | 3.72 | 3.71 | 3.69 | 3.66 |
| 45 | 3.78 | 3.77 | 3.76 | 3.74 | 3.70 |
| 46 | 3.83 | 3.83 | 3.81 | 3.79 | 3.75 |
| 47 | 3.89 | 3.88 | 3.87 | 3.84 | 3.80 |
| 48 | 3.95 | 3.94 | 3.93 | 3.89 | 3.85 |
| 49 | 4.01 | 4.01 | 3.99 | 3.95 | 3.90 |
| 50 | 4.08 | 4.07 | 4.05 | 4.01 | 3.95 |
| 51 | 4.15 | 4.14 | 4.11 | 4.07 | 4.00 |
| 52 | 4.22 | 4.21 | 4.18 | 4.13 | 4.06 |
| 53 | 4.30 | 4.29 | 4.26 | 4.20 | 4.12 |
| 54 | 4.38 | 4.37 | 4.33 | 4.27 | 4.18 |
| 55 | 4.46 | 4.45 | 4.41 | 4.34 | 4.24 |
| 56 | 4.55 | 4.54 | 4.50 | 4.42 | 4.30 |
| 57 | 4.65 | 4.63 | 4.58 | 4.50 | 4.36 |
| 58 | 4.75 | 4.73 | 4.68 | 4.58 | 4.43 |
| 59 | 4.86 | 4.84 | 4.78 | 4.66 | 4.49 |
| 60 | 4.98 | 4.95 | 4.88 | 4.75 | 4.56 |
| 61 | 5.10 | 5.07 | 4.99 | 4.84 | 4.62 |
| 62 | 5.23 | 5.20 | 5.11 | 4.93 | 4.69 |
| 63 | 5.37 | 5.34 | 5.23 | 5.03 | 4.75 |
| 64 | 5.53 | 5.48 | 5.35 | 5.13 | 4.82 |
| 65 | 5.69 | 5.64 | 5.49 | 5.23 | 4.88 |
| 66 | 5.86 | 5.80 | 5.62 | 5.33 | 4.94 |
| 67 | 6.04 | 5.98 | 5.77 | 5.43 | 5.00 |
| 68 | 6.24 | 6.16 | 5.92 | 5.53 | 5.06 |
| 69 | 6.45 | 6.35 | 6.07 | 5.63 | 5.11 |
| 70 | 6.67 | 6.56 | 6.23 | 5.73 | 5.16 |
| 71 | 6.91 | 6.78 | 6.39 | 5.83 | 5.21 |
| 72 | 7.16 | 7.00 | 6.56 | 5.93 | 5.25 |
| 73 | 7.43 | 7.25 | 6.73 | 6.02 | 5.29 |
| 74 | 7.72 | 7.50 | 6.90 | 6.11 | 5.33 |
| 75 | 8.02 | 7.77 | 7.08 | 6.20 | 5.36 |
| 76 | 8.35 | 8.05 | 7.26 | 6.28 | 5.39 |
| 77 | 8.70 | 8.34 | 7.43 | 6.36 | 5.41 |
| 78 | 9.08 | 8.65 | 7.61 | 6.43 | 5.43 |
| 79 | 9.48 | 8.98 | 7.78 | 6.49 | 5.45 |
| 80 | 9.91 | 9.31 | 7.95 | 6.55 | 5.46 |
| 81 | 10.38 | 9.66 | 8.11 | 6.60 | 5.47 |
| 82 | 10.87 | 10.02 | 8.27 | 6.65 | 5.48 |
| 83 | 11.39 | 10.40 | 8.42 | 6.69 | 5.49 |
| 84 | 11.95 | 10.78 | 8.56 | 6.72 | 5.50 |
| 85 | 12.55 | 11.16 | 8.69 | 6.75 | 5.50 |

Page 2

LR521

# Optional Methods of Settlement (Continued)

## Life Annuity and Life Annuity with Certain Period Table for Each $1,000 Applied – Female

| Settlement age of payee nearest birthday (Age) | Life Annuity | Number of instalments certain | | | |
|---|---|---|---|---|---|
| | | 60 | 120 | 180 | 240 |
| 10 | 2.78 | 2.78 | 2.78 | 2.78 | 2.78 |
| 11 | 2.79 | 2.79 | 2.79 | 2.79 | 2.79 |
| 12 | 2.81 | 2.81 | 2.81 | 2.80 | 2.80 |
| 13 | 2.82 | 2.82 | 2.82 | 2.82 | 2.81 |
| 14 | 2.83 | 2.83 | 2.83 | 2.83 | 2.83 |
| 15 | 2.84 | 2.84 | 2.84 | 2.84 | 2.84 |
| 16 | 2.85 | 2.85 | 2.85 | 2.85 | 2.85 |
| 17 | 2.87 | 2.87 | 2.87 | 2.87 | 2.86 |
| 18 | 2.88 | 2.88 | 2.88 | 2.88 | 2.88 |
| 19 | 2.90 | 2.90 | 2.89 | 2.89 | 2.89 |
| 20 | 2.91 | 2.91 | 2.91 | 2.91 | 2.91 |
| 21 | 2.93 | 2.93 | 2.92 | 2.92 | 2.92 |
| 22 | 2.94 | 2.94 | 2.94 | 2.94 | 2.94 |
| 23 | 2.96 | 2.96 | 2.96 | 2.96 | 2.95 |
| 24 | 2.98 | 2.97 | 2.97 | 2.97 | 2.97 |
| 25 | 2.99 | 2.99 | 2.99 | 2.99 | 2.99 |
| 26 | 3.01 | 3.01 | 3.01 | 3.01 | 3.01 |
| 27 | 3.03 | 3.03 | 3.03 | 3.03 | 3.02 |
| 28 | 3.05 | 3.05 | 3.05 | 3.05 | 3.04 |
| 29 | 3.07 | 3.07 | 3.07 | 3.07 | 3.06 |
| 30 | 3.09 | 3.09 | 3.09 | 3.09 | 3.09 |
| 31 | 3.12 | 3.11 | 3.11 | 3.11 | 3.11 |
| 32 | 3.14 | 3.14 | 3.14 | 3.14 | 3.13 |
| 33 | 3.17 | 3.16 | 3.16 | 3.16 | 3.16 |
| 34 | 3.19 | 3.19 | 3.19 | 3.19 | 3.18 |
| 35 | 3.22 | 3.22 | 3.22 | 3.21 | 3.21 |
| 36 | 3.25 | 3.25 | 3.24 | 3.24 | 3.23 |
| 37 | 3.28 | 3.28 | 3.27 | 3.27 | 3.26 |
| 38 | 3.31 | 3.31 | 3.30 | 3.30 | 3.29 |
| 39 | 3.34 | 3.34 | 3.34 | 3.33 | 3.32 |
| 40 | 3.38 | 3.37 | 3.37 | 3.36 | 3.35 |
| 41 | 3.41 | 3.41 | 3.41 | 3.40 | 3.39 |
| 42 | 3.45 | 3.45 | 3.44 | 3.44 | 3.42 |
| 43 | 3.49 | 3.49 | 3.48 | 3.47 | 3.46 |
| 44 | 3.53 | 3.53 | 3.52 | 3.51 | 3.50 |
| 45 | 3.57 | 3.57 | 3.57 | 3.55 | 3.54 |
| 46 | 3.62 | 3.62 | 3.61 | 3.60 | 3.58 |
| 47 | 3.67 | 3.67 | 3.66 | 3.64 | 3.62 |
| 48 | 3.72 | 3.72 | 3.71 | 3.69 | 3.67 |
| 49 | 3.77 | 3.77 | 3.76 | 3.74 | 3.71 |
| 50 | 3.83 | 3.82 | 3.81 | 3.79 | 3.76 |
| 51 | 3.89 | 3.88 | 3.87 | 3.85 | 3.81 |
| 52 | 3.95 | 3.94 | 3.93 | 3.90 | 3.86 |
| 53 | 4.01 | 4.01 | 3.99 | 3.96 | 3.92 |
| 54 | 4.08 | 4.08 | 4.06 | 4.02 | 3.97 |
| 55 | 4.15 | 4.15 | 4.13 | 4.09 | 4.03 |
| 56 | 4.23 | 4.22 | 4.20 | 4.16 | 4.09 |
| 57 | 4.31 | 4.30 | 4.28 | 4.23 | 4.15 |
| 58 | 4.40 | 4.39 | 4.36 | 4.30 | 4.22 |
| 59 | 4.49 | 4.48 | 4.45 | 4.38 | 4.29 |
| 60 | 4.59 | 4.58 | 4.54 | 4.46 | 4.35 |
| 61 | 4.69 | 4.68 | 4.63 | 4.56 | 4.42 |
| 62 | 4.80 | 4.79 | 4.73 | 4.64 | 4.49 |
| 63 | 4.92 | 4.90 | 4.84 | 4.73 | 4.57 |
| 64 | 5.04 | 5.02 | 4.95 | 4.83 | 4.84 |
| 65 | 5.18 | 5.15 | 5.07 | 4.93 | 4.71 |
| 66 | 5.32 | 5.29 | 5.20 | 5.03 | 4.78 |
| 67 | 5.48 | 5.44 | 5.33 | 5.14 | 4.85 |
| 68 | 5.64 | 5.60 | 5.47 | 5.25 | 4.92 |
| 69 | 5.82 | 5.77 | 5.62 | 5.36 | 4.99 |
| 70 | 6.01 | 5.95 | 5.78 | 5.47 | 5.05 |
| 71 | 6.21 | 6.15 | 5.94 | 5.58 | 5.11 |
| 72 | 6.44 | 6.36 | 6.11 | 5.70 | 5.17 |
| 73 | 6.68 | 6.59 | 6.29 | 5.81 | 5.22 |
| 74 | 6.94 | 6.83 | 6.48 | 5.92 | 5.27 |
| 75 | 7.22 | 7.09 | 6.67 | 6.03 | 5.31 |
| 76 | 7.53 | 7.36 | 6.86 | 6.13 | 5.35 |
| 77 | 7.86 | 7.65 | 7.06 | 6.22 | 5.38 |
| 78 | 8.21 | 7.97 | 7.26 | 6.31 | 5.40 |
| 79 | 8.60 | 8.30 | 7.46 | 6.40 | 5.43 |
| 80 | 9.02 | 8.65 | 7.66 | 6.47 | 5.45 |
| 81 | 9.48 | 9.02 | 7.86 | 6.54 | 5.46 |
| 82 | 9.97 | 9.41 | 8.05 | 6.58 | 5.48 |
| 83 | 10.50 | 9.82 | 8.23 | 6.64 | 5.49 |
| 84 | 11.08 | 10.24 | 8.40 | 6.69 | 5.49 |
| 85 | 11.70 | 10.67 | 8.55 | 6.73 | 5.50 |

## Annuity Certain Table for Each $1,000 Applied

| Number of years during which instalments will be paid | Amount of each instalment | |
|---|---|---|
| | Annual | Monthly |
| 5 | $211.99 | $17.91 |
| 6 | 179.22 | 15.14 |
| 7 | 155.83 | 13.16 |
| 8 | 138.31 | 11.68 |
| 9 | 124.69 | 10.53 |
| 10 | 113.82 | 9.61 |
| 11 | 104.93 | 8.86 |
| 12 | $97.54 | $8.24 |
| 13 | 91.29 | 7.71 |
| 14 | 85.95 | 7.26 |
| 15 | 81.33 | 6.87 |
| 16 | 77.29 | 6.53 |
| 17 | 73.74 | 6.23 |
| 18 | 70.59 | 5.96 |
| 19 | $67.78 | $5.73 |
| 20 | 65.26 | 5.51 |
| 25 | 55.76 | 4.71 |
| 30 | 49.53 | 4.18 |

LR521

# Lapse Protection Rider

This rider is made part of the policy to which it is attached if "Lapse Protection Rider" is shown on the *POLICY SPECIFICATIONS*.

**Lapse Protection.** The policy will not lapse as long as the No-Lapse Value, less Indebtedness, is greater than zero even if the Cash Value, less Indebtedness, under the policy is insufficient to cover the Monthly Deduction.

On any Monthly Anniversary Day on which the Cash Value, less Indebtedness, under the policy is insufficient to cover the required Monthly Deductions, the policy will not lapse as long as the No-Lapse Value, less Indebtedness, is positive.  Under these circumstances, if the Cash Value becomes negative, the Cash Value will continue to be calculated, but with the following modifications:

(a)     Interest credited will be set at zero.

(b)     The negative Cash Value will be considered zero for the purpose of calculating the cost of insurance charges.

Under these circumstances, in the absence of additional premium payments, the Cash Value will become a larger negative value.

On any Monthly Anniversary Day on which both the No-Lapse Value, less Indebtedness, and the Cash Value, less Indebtedness, under the policy are less than or equal to zero, the Owner will be notified of the pending lapse as provided under the **Policy Lapse and Grace Period** provision of the policy.  Negative Cash Value would need to be repaid if the Owner wished to maintain the policy in force based upon a positive Cash Value, less Indebtedness.

The duration of the Lapse Protection provided by this rider may be reduced if: (a) scheduled premiums are not received on or before their due date; or (b) the Owner initiates any policy change that decreases the Cash Value, less Indebtedness, under the policy.  Policy changes that could decrease the Cash Value, less Indebtedness, include partial surrenders, loans, increases in Specified Amount, and a change from Death Benefit Option 1 to Death Benefit Option 2 or 3.

**No-Lapse Value.** The No-Lapse Value, No-Lapse Death Benefit, No-Lapse Monthly Deduction, and No-Lapse Cost of Insurance are reference values and are not used in determining the actual Cash Value or Death Benefit provided by the policy.  On each Monthly Anniversary Day, the No-Lapse Value will be calculated as (1), plus (2), plus (3), minus (4), minus (5), minus (6) where:

(1)     is the No-Lapse Value on the preceding Monthly Anniversary Day.

(2)     is all premiums received since the preceding Monthly Anniversary Day, less a premium expense charge as follows:

(i)     If the premium payment received during a Policy Year, when combined with all previous premium payments for that Policy Year, results in total premium for the Policy Year that is less than or equal to an amount equal to $56.18 multiplied by the greater of: (a) the Specified Amount on the date of payment or (b) the Specified Amount on the Date of Issue, divided by 1000, the premium expense charge will be:

In Policy Year  1                                  60.0% of each premium received
In Policy Years 2 and beyond              55.0% of each premium received

(ii)   If the premium payment (or any portion thereof) received during a Policy Year, when combined with all previous premium payments for that Policy Year, results in total premium for the Policy Year that is greater than an amount equal to $56.18 multiplied by the greater of: (a) the Specified Amount on the date of payment or (b) the Specified Amount on the Date of Issue, divided by 1,000, the premium expense charge for the portion of the payment in excess of such amount will be:

In Policy Year   1                           55.0% of each premium received
In Policy Years 2 and beyond                 50.0% of each premium received

The premium expense charge for the portion of the payment not in excess of such amount will be as described in (i) above.

(3)   is interest on items (1) and (2) above paid at the rates listed in the **Interest Credited on No-Lapse Value** provision.

(4)   is the **No-Lapse Monthly Deduction** for the month following the Monthly Anniversary Day.

(5)   is the amount of any partial surrenders (i.e. withdrawals) and associated fees under the policy on the Monthly Anniversary Day.

(6)   is the surrender charge for any decrease in Specified Amount, from the *TABLE OF SURRENDER CHARGES* shown in the policy, if any.

If premium is received at any time other than the beginning of a policy month, the rate of interest used in the calculation of item (3) above will be determined pro rata from the date of receipt.

On any day other than a Monthly Anniversary Day, the No-Lapse Value will be the No-Lapse Value as of the preceding Monthly Anniversary Day, plus all premiums received since the preceding Monthly Anniversary Day, less the premium expense charge noted in item (2) above, plus accumulated interest and less partial surrenders and associated fees.

The No-Lapse Value on the Date of Issue will be the initial premium received less: (i) the initial policy fee of $150.00, (ii) the No-Lapse Monthly Deduction for the first policy month and (iii) the premium expense charge.

The No-Lapse Value may become less than zero. If the No-Lapse Value, less Indebtedness, is less than or equal to zero, the policy may lapse as provided by the *POLICY LAPSE AND GRACE PERIOD* provision of the policy.

**No-Lapse Monthly Deduction.** The No-Lapse Monthly Deduction for a policy month will be calculated as Charge (1) plus Charge (2) where:

CHARGE 1   is the No-Lapse Cost of Insurance (as described in the **No-Lapse Cost of Insurance** provision) and the cost of any additional benefits provided by rider for the policy month; and

CHARGE 2   is an administrative expense charge of $10 per month beginning on the Date of Issue.

**Interest Credited on No-Lapse Value.** Lincoln Life will credit interest to the No-Lapse Value daily. The interest rate applied to that portion equal to the No-Lapse Value less Indebtedness  will be based on the table below:

| Attained Age | Daily Rate Compounded Daily | Annual Rate |
|---|---|---|
| 0-86 | 0.01596536% | 6.0% |
| 87-89 | 0.01853833% | 7.0% |
| 90-94 | 0.02361312% | 9.0% |
| 95-99 | 0.02611579% | 10.0% |

The interest rate credited on that portion of the No-Lapse Value equal to Indebtedness will be no less than 0.01206015% per day, compounded daily (4.5% annually).

On any Monthly Anniversary Day on which the No-Lapse Value is or becomes negative, the **Interest Credited on No-Lapse Value** will be set at zero.

**No-Lapse Cost of Insurance.** The No-Lapse Cost of Insurance under this rider is determined on a monthly basis. Such cost will be the result of (1) minus (2), multiplied by (3), and divided by 1,000, where:

(1)     is the **No-Lapse Death Benefit** at the beginning of the policy month, divided by 1.0032737,

(2)     is the No-Lapse Value at the beginning of the policy month prior to the **No-Lapse Monthly Deduction**, or zero, if greater, and

(3)     is the No-Lapse Factor as described in the **No-Lapse Cost of Insurance Rates** provision.

On any Monthly Anniversary Day on which the No-Lapse Value is or becomes negative, the negative No-Lapse Value will be considered zero for the purpose of calculating the **No-Lapse Cost of Insurance.**

**No-Lapse Death Benefit.** The No-Lapse Death Benefit is calculated as described in the **Death Benefit** provision of the policy using the No-Lapse Value in lieu of the Cash Value.

For purposes of calculating the No-Lapse Death Benefit, if the No-Lapse Value is negative, it will be considered equal to zero.

**No-Lapse Cost of Insurance Rates.** The No-Lapse Cost of Insurance Rates are described in the *TABLE OF NO-LAPSE FACTORS* attached to this rider.

A new *TABLE OF NO-LAPSE FACTORS* will be provided with respect to any increase in Specified Amount under the policy and will apply to the increase for the purpose of determining the No-Lapse Value.

**Termination.** This rider and all rights provided under it will terminate automatically upon whichever of the following occurs first: (a) the Insured reaches insurance age 100, or (b) surrender or other termination of the policy. If the rider terminates due to (a) above, coverage will continue as provided under the **Continuation of Insurance** provision of the policy. If the policy terminates and is reinstated, this rider will likewise be reinstated as set forth in the Reinstatement provision of the policy.

The duration of the Lapse Protection provided by this rider may be reduced if: (a) premiums or other deposits are not received on or before their due date; or (b) the Owner initiates any policy change that decreases the No-Lapse Value under the policy. Policy changes that could decrease the No-Lapse Value include, but are not limited to, partial surrenders, loans, increases in Specified Amount, or changes to Death Benefit Options 2 or 3.

**Policy Provisions.** Except as provided above, this rider is subject to all the terms of the policy.

**Effective Date.** This rider becomes effective as of its Date of Issue which is the Date of Issue of the policy.

**Lincoln Life & Annuity Company of New York**

*John N. Galta*
President

LR589                              NY                              Page 3

This Page is Intentionally Blank

## Table of No-Lapse Factors

**SPECIAL NOTE:**  These monthly reference factors are based on the sex, issue age (nearest birthday) and premium class of the Insured. If the Insured is in a rated premium class, the No-Lapse rates will be those in the table multiplied by the Risk Factor, if any, shown in the *POLICY SPECIFICATIONS*. In determining the No-Lapse Cost of Insurance used in the calculation of the No-Lapse Value, Lincoln Life will add the amount of the Flat Extra Monthly Insurance Cost, if any, shown in the *POLICY SPECIFICATIONS*. These factors are not used in calculating the actual Cash Value or Death Benefit provided under the policy.

| Duration | Monthly Rate | Duration | Monthly Rate | Duration | Monthly Rate |
|---|---|---|---|---|---|
| 1 | 1.133320 | 2 | 1.133320 | 3 | 1.133320 |
| 4 | 1.133320 | 5 | 1.133320 | 6 | 1.133320 |
| 7 | 1.901320 | 8 | 2.065000 | 9 | 2.232720 |
| 10 | 2.403740 | 11 | 2.578560 | 12 | 2.759180 |
| 13 | 2.948980 | 14 | 3.154580 | 15 | 3.387620 |
| 16 | 3.684880 | 17 | 3.684880 | 18 | 3.684880 |
| 19 | 3.684880 | 20 | 3.684880 | 21 | 3.684880 |

LR589A

# Lincoln Life & Annuity Company of New York

Hartford, CT 06103-1106

1891

Insured(s):    ARTHUR B KRAMER

Policy or Annuity Number:    7214471

I hereby amend my application for the above numbered policy or annuity so that:

BENEFICIARY IS AS SPECIFIED ON THE POLICY/CERTIFICATE SPECIFICATIONS PAGE
OF THE POLICY/CERTIFICATE, AS DELIVERED TO ME.

Dated at _____    on _____
City and State

Witness _____    1st Insured or Annuitant _____

Witness _____    2nd Insured or Annuitant _____

Witness _____    Applicant/Owner _____
(If other than Insured or Annuitant)

RETURN ONE SIGNED COPY TO:    Lincoln Life & Annuity Company of New York
New Business MBR2
350 Church Street
Hartford, CT 06103-1106

B2758e LNY

*Life Insurance Application Part I*     ⋅⋅⋅  **Lincoln Life & Annuity Company of New York**

| PROPOSED INSURED A | *(Please Print in Blue or Black Ink)* | B35 NY – Page 1a |
|---|---|---|

**1a.** Name *(First, Middle Initial & Last)*  **Arthur B Kramer**     **1b.** ☐ Female  ☒ Male

**1c.** Residence Address *(No, Street, P.O. Box)*  **688 Westover Road**

City **Stamford, CT**     State     Zip Code **06902**

**1d.** US Citizen ☒ Yes ☐ No     If No, what country?

**1e.** DOB *(MM/DD/YY)* **1-10-27**     **1f.** Birth State **New York**     **1g.** SSN **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**

**1h.** Occupation **retired**     **1i.** Driver's License No. & State **014836023 CT**

**1j.** Business Name & Address

**1k.** Insured phone number & most convenient time to contact
Home **(203) 357-7886**  ☐ AM ☐ PM
Work **(___)**  ☐ AM ☐ PM

**2a.** List all Life Insurance or Annuities presently in force or currently applied for.  *(Provide details.)*     ☐ None

| COMPANY | AMOUNT | IN FORCE | APPLIED FOR |
|---|---|---|---|
| Transamerica | 22,000,000 | ☒ | ☐ |
| Phoenix | 28,000,000 | ☒ | ☐ |
|  |  | ☐ | ☐ |
|  |  | ☐ | ☐ |

**2b.** What is the total amount of new life insurance coverage that will be placed in force with all companies, including this application? **10 million**

**3.** Have you or will you replace, discontinue coverage, stop paying premiums, initiate a reduction in face amount, or borrow or surrender cash value on any Life Insurance or Annuity if this insurance is issued? *(If "Yes", provide details.)*     ☐ Yes ☒ No

| COMPANY | POLICY NO. | AMOUNT | ISSUE DATE | 1035 EXCHANGE |
|---|---|---|---|---|
|  |  |  |  | ☐ Yes |
|  |  |  |  | ☐ Yes |
|  |  |  |  | ☐ Yes |
|  |  |  |  | ☐ Yes |

**4a.** Do you contemplate flying, or have you flown during the past 2 years as a pilot, student pilot or crew member? *(If "Yes", an Aviation supplement is required.)*     ☐ Yes ☒ No

**4b.** Do you plan to participate or, have you participated within the past 2 years, in motor vehicle or boat racing, hang gliding, sky, or scuba diving or similar sports? *(If "Yes", an Avocation Questionnaire is required.)*     ☐ Yes ☒ No

**4c.** Do you contemplate residence or any travel outside of the United States or Canada within the next year? *(If "Yes", a Foreign Travel or Residence Questionnaire is required.)*     ☐ Yes ☒ No

**4d.** Have you ever used tobacco or products containing nicotine? *(If "Yes", check all that apply.)*     ☒ Yes ☐ No

| Type | Cigarettes ☒ | Cigar ☐ | Pipe ☐ | Chewing Tobacco ☐ | Snuff ☐ | Nicotine Patches/Gum ☐ |
|---|---|---|---|---|---|---|
| Date First Used |  |  |  |  |  |  |
| Date Last Used | Over 30 yrs ago |  |  |  |  |  |
| Quantity |  |  |  |  |  |  |

*If you answer "Yes" to any of the following questions, please give details in space provided below.*

**4e.** Have you had any convictions within the past 3 years for motor vehicle moving violations, or had your license suspended, revoked or restricted?     ☐ Yes ☒ No

**4f.** Have you ever applied for any Life or Health Insurance which was denied, required an extra premium or was issued for a reduced amount?     ☐ Yes ☒ No

**4g.** Have you ever been convicted of a felony?     ☐ Yes ☒ No

**5.** Details *(List details from questions above; please include question number details pertain to. An additional sheet of paper may be attached if necessary.)*

B35 NY

## POLICY INFORMATION

**B35 NY – Page 2**

6a. Plan of Insurance  *ULLPRS*          6b. Amount $ *10,000,000*

6c. Death Benefit Option *(Complete for Universal Life and Variable Universal Life Products)*
☒ 1-Level      ☐ 2-Increase/Cash Value      ☐ 3-Increase by: *(Check one)* ☐ Premium  ☐ Premium Less Policy Factor

6d. Supplemental Benefits or Riders/If Available *(Provide full details if applicable; e.g. face amounts, start year, end year, etc.)*

6e. Save Age  ☒ Yes ☐ No  (If not saving age, policy will be current dated.)

### BILLING INFORMATION

7a. Premium Frequency      ☒ Annually      ☐ Semi-Annually    ☒ Quarterly      ☐ Monthly (PAC/EFT)
7b. Special Billing *(Check one, if applicable.)*      ☐ New List Bill      ☐ Existing List Bill *(provide #)* _____
7c. Automatic Premium Loan *(Complete for Term & Whole Life only.)*  ☐ Yes  ☒ No
7d. Premium Notices To      *(Check all that apply.)*
☐ Insured at Residence      ☐ Insured at Business    ☒ Owner *(Provide address below.)*  ☐ Other _____
7e. Initial Premium Amount $ *131,175 per Quarter*  7f. Planned Premium Amount $ *131,175 qtr*
*(7f. & 7g. Complete for Universal Life Products)*

### OWNER

- If a **Trust**, provide Trustee Name(s), Trust Name and Date of Trust.
- If **Split Dollar Endorsement**, provide Owner's Name & Interest, Sub-Owner name and Relationship.
- If **Split Dollar Assignment**, submit appropriate assignment form **AFTER** policy is in force.

8a. Primary *(Provide full name, Social Security Numbers and relationship.)*
*Arthur Kramer 2005 Insurance Trust dated August 29, 2005*
*Hudson United Bank, Trustee*

8b. If Multiple owners *(Check one.)* ☐ Joint with Right of Survivorship  ☐ Tenants in Common *(Specify shares in fractions or percentages.)*
8c. Contingent *(Provide full name, Social Security Numbers and relationship.)*
*C/o Hudson United Bank*

8d. Owner Address *( No, Street, P.O. Box)* *75 Rockefeller Plaza*
City *New York*                     State *NY*      Zip Code *10019*
8e. Owner Social Security/Tax Identification Number *20-6662290*
8f. Will this policy be funded through a split dollar arrangement? ☐ Yes  ☒ No

### TRUST VERIFICATION

I/WE hereby certify that the Trustee(s) named in this application are the Trustee(s) for the named Trust, which is in full force and effect. Lincoln Life & Annuity Company of New York (hereinafter "Company") shall not be obliged to inquire into the terms of any trust agreement affecting this policy and shall not be chargeable with knowledge of the terms thereof. The Company may rely solely upon the signature(s) of the Trustee(s) named in this application to any receipt, release or waiver, or to any transfer or other instrument affecting this policy or any options privileges or benefits thereunder. Unless otherwise indicated, the signature(s) of all Trustee(s) named, or their successors, will be required to exercise any contractual right under the policy. The Company shall have no obligation to see to the use or application of any funds paid to the Trustee(s) in accordance with the terms of the policy. Any such payment made by the Company to the Trustee(s) shall fully discharge the Company with respect to any amounts so paid.

### BENEFICIARY *Beneficiaries share equally unless otherwise indicated.*

- If a **Trust**, provide Trustee Name(s), Trust Name and Date of Trust.

9a. Primary *(Provide full name, Social Security Numbers and relationship.)*
*Arthur Kramer 2005 Insurance Trust*
*Hudson United Bank, Trustee*

9b. Contingent *(Provide full name, Social Security Numbers and relationship.)*

NON-MEDICAL PROPOSED INSUR___A *(Answer this section only when required.) (I___ answer "Yes"* **B3s5 NY – Page 3a**
*to any of the following questions, please give details in space provided below. An additional sheet of paper*
*may be attached if necessary.)*

10. Provide full name/address/phone number of personal physician(s) and any other physicians seen. Include date of last visit, reason, tests performed except HIV & treatment received:

_Dr. Thomas Nash_
_New York, NY    6/05_

|  | Yes | No |
|---|---|---|
| 11. Have you had or been advised to have a check-up, EKG, x-ray, blood or urine test or any other diagnostic test (other than HIV tests)? | ☒ | ☐ |
| 12. Have you been a patient in a hospital, clinic, sanatorium or other medical facility, or been advised to have any hospitalization or surgery which has not been completed? | ☒ | ☐ |

13. **Have you ever had any indication of, or been treated for:**

|  | Yes | No |
|---|---|---|
| a. Chest pain, high blood pressure, heart disease, heart murmur or other disorders of the heart or blood vessels? | ☐ | ☒ |
| b. Ulcers, colitis, jaundice, or other diseases of the stomach, liver, intestines, gallbladder, kidney or urinary bladder? | ☐ | ☒ |
| c. Seizures, fainting, dizziness, epilepsy, stroke or paralysis? | ☐ | ☒ |
| d. Any nervous, mental, or emotional disorder, or received counseling for anxiety, depression, stress or any other emotional condition? | ☐ | ☒ |
| e. Any tumor, cancer, cysts, skin disorder or any disorder of the lymph nodes? | ☒ | ☐ |
| f. Arthritis, gout, or any disorder of the back, spine, muscles, nerves, bones or joints? | ☒ | ☐ |
| g. Diabetes, thyroid, or other endocrine or glandular disorder? | ☐ | ☒ |
| h. Anemia or any other blood disorder? | ☐ | ☒ |
| i. Asthma, emphysema, shortness of breath, allergies, sleep apnea or any other disorder of the respiratory system? | ☐ | ☒ |
| j. Any disorder of the eyes, ears, nose or throat? | ☐ | ☒ |
| k. Any complication of pregnancy or disorder of the testicles, prostate, breasts, ovaries, uterus or cervix? | ☐ | ☒ |
| l. Any mental or physical disorder not listed above? | ☐ | ☒ |
| 14. Have you ever been diagnosed as having or been treated by a physician for Acquired Immune Deficiency Syndrome or an AIDS related condition? | ☐ | ☒ |
| 15. Have you used alcoholic beverages? *(If Yes, Provide Type, Frequency & Amount.)* Type _____ Frequency _Social occ_ Amount ___ | ☒ | ☐ |
| 16. Have you ever been treated for drug or alcohol abuse or been advised by your doctor to limit your use of alcohol or any medication, prescribed or not? Have you ever used hallucinogenic or narcotic drugs not prescribed by a doctor? | ☐ | ☒ |

17. List all medication and dosages you are currently taking to include prescriptions, over the counter drugs, aspirin and herbal supplements.

_Flomax_

18. Details *(List details from questions above; please include question number and insured details pertain to. An additional sheet of paper may be attached if necessary.)*

_11. routine exams ekgs + lab work w/ Dr. Nash._
_12. 2 knee replacements 7½ yrs ago. Right hip replacement 2-3 yrs ago  Greenwich Hosp._
_13 e basal cell carcinoma removed 3 yrs ago  Dr. Kahan   13 k see #12_

19. Height _5' 10"_  Weight _180_  Indicate any weight change in past year _____  Birth Weight _____ *(If age 5 or younger.)*

20.

|  | Age if Living & Health Status | Diabetes, Cancer, Heart Disease? | Age at Death & Cause | Diabetes, Cancer, Heart Disease? |
|---|---|---|---|---|
| a. Father |  |  | 72 unknown |  |
| b. Mother |  |  | 96 old age | no |
| c. Sibling(s) |  |  |  |  |

## ILLUSTRATION OF BENEFITS                                                    B35 NY – Page 4

Illustration of benefits, including death benefits, policy values and cash surrender values are available upon request.

## TAXPAYER IDENTIFICATION NUMBER CERTIFICATION

Under penalties of perjury, it is certified that (a) the social security or Employer ID numbers shown in this application are correct taxpayer identification numbers, and (b) the holders of said numbers are not subject to any backup withholding of U.S. Federal income tax for failure to report interest or dividends.

## CERTIFICATIONS

I/WE have read the questions and answers in this application and declare that they are complete and true to the best of my (our) knowledge and belief. I/WE understand, a) that this Application shall form a part of any Policy issued, and b) that no Agent/Representative of the Company shall have the authority to waive a complete answer to any question in this Application, make or alter any contract, or waive any of the Company's other rights or requirements. I/We further understand that (except as provided in the Temporary Life Insurance Agreement if advance payment has been made or acknowledged below and such Agreement issued) insurance will take effect under the Policy only when: 1) the Policy has been delivered to me/us; 2) the initial premium has been paid in full during the lifetime of the Proposed Insured(s); and 3) the Proposed Insured(s) remain in the same state of health and insurability as described in each part of the application at the time conditions 1) and 2) are met.

I/WE have paid $ _____ to the Agent/Representative in exchange for the Temporary Life Insurance Agreement, and I/we acknowledge that I /we fully understand its terms.

## AUTHORIZATION

The purpose of this authorization is to allow Lincoln Life & Annuity Company of New York, hereinafter Company, to determine eligibility for life coverage or a claim for benefits under a life policy.

I/WE authorize any medical professional, hospital or other medical institution, insurer, MIB, Inc., or any other person or organization that has any records or knowledge of me/us or my/our physical or mental health or insurability to disclose that information to the Company, its reinsurers, or any other party acting on the Company's behalf.

I/WE authorize the Company to disclose medical information to MIB, Inc., and to other insurers to whom I/we may apply for coverage.

This authorization shall be valid for two years after it is signed. A photographic copy of this authorization shall be as valid as the original. I/We will be given a copy of this authorization at my/our request.

I/WE understand that I/we may revoke this authorization at any time by written notification to the Company; however, any action taken prior to notification will not be affected. I/We acknowledge that if I/we revoke this authorization, the Company will be unable to consider my application for insurance.

If an investigative consumer report is obtained, I/we ☐ DO ☐ DO NOT request to be interviewed.

I/WE ACKNOWLEDGE receipt of the Important Notice containing the Privacy Notice, Investigative Consumer Report, and MIB, Inc. Information.

Dated at (City and State)  *New York NY*

| | | |
|---|---|---|
| Signature of Proposed Insured A | Witness | Date  10/24/05 |

| | | |
|---|---|---|
| Signature of Proposed Insured B | Witness | Date |
| Signature of Applicant/Owner/Trustee | Witness | Date  10/24/05 |

(Provide Officer's Title if policy is owned by a Corporation.)

# Lincoln Life & Annuity Company of New York

**Flexible Premium Adjustable Life Insurance Policy – Non-Participating**
Death Benefit payable in the event of death of the Insured.  Adjustable Death Benefit.
Surrender Value payable upon surrender of the policy.
Flexible Premiums payable to the Insured's age 100 or death of the Insured, whichever is earlier.
Premium Payment Periods and Supplementary Coverages as shown in the Policy Specifications.

LN589

RETURN DATE:    MAY 6, 2008               :        SUPERIOR COURT

THE LINCOLN LIFE & ANNUITY               :        JUDICIAL DISTRICT OF HARTFORD
COMPANY OF NEW YORK,                     :
                                          :        AT HARTFORD
V.                                        :
                                          :
LOCKWOOD PENSION SERVICES, INC.,         :
STEVEN LOCKWOOD, JOEL B. MILLER,         :
JONATHAN S. BERCK (individually and as   :
Trustee of the Arthur Kramer 2005        :
Insurance Trust dated August 29, 2005)   :
LIFE PRODUCT CLEARING, LLC,              :
and TD BANKNORTH, N.A.                   :        APRIL 16, 2008

## VERIFIED COMPLAINT

Plaintiff, The Lincoln Life & Annuity Company of New York, as successor by merger to

Jefferson Pilot LifeAmerica Insurance Company ("Lincoln"), by and through its attorneys, hereby files

this Complaint, and in support thereof, avers as follows:

## PARTIES

1.      Plaintiff Lincoln is a life insurance company organized and existing under the laws of

the State of New York with offices located at 350 Church Street, Hartford, CT 06103-1106.

2.      Upon information and belief, Defendant Lockwood Pension Services, Inc. ("LPS") is a

corporation organized under the laws of the State of New York with its principal place of business

located at 75 Rockefeller Plaza, New York, New York 10019.

Rome McGuigan, P.C. • Attorneys at Law
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

Rome McGuigan, P.C. • Attorneys at Law

One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27728

3.     Upon information and belief, Defendant Steven Lockwood ("Lockwood") is an individual residing at 2 Tall Tree Lane, Pleasantville, New York 10570.   At all times relevant hereto, Lockwood was the Chairman of the Board and/or Chief Executive Officer of LPS.

4.     Upon information and belief, Defendant Joel B. Miller ("Miller") is an individual residing at 721 NW 108 Ave., Plantation, Florida 33324.

5.     Upon information and belief, Defendant Jonathan S. Berck ("Berck") is an individual residing at 604 Ramapo Road, Teaneck, New Jersey 07666.  At all times relevant hereto, Berck was the sole member of Jonathan S. Berck, LLC, a limited liability company organized under the laws of the State of New York with its principal place of business located at 75 Rockefeller Plaza, New York, New York 10019.  Upon information and belief, Berck is the Trustee of the Arthur Kramer 2005 Insurance Trust dated August 29, 2005 and the Trustee of the Leon Lobel Insurance Trust dated November 15, 2005.

6.     Upon information and belief, Defendant Life Product Clearing, LLC ("Life Product") is a limited liability company organized under the laws of the State of Delaware with its principal place of business located at 75 Rockefeller Plaza, New York, New York 10019. Upon information and belief, Life Product was formed on November 7, 2005.  Life Product consists of a group of investors who purchase, acquire, or otherwise participate in the sale of beneficial interests in life insurance policies and shares office space with Lockwood.

2

7.     Upon information and belief, Defendant TD Banknorth, N.A. ("TD Banknorth") is a national association with its principal place of business located at One Portland Square, Portland, Maine 04112.   Upon information and belief, TD Banknorth acquired Hudson United Bank ("Hudson") in January 2006 and is the successor-in-interest to Hudson.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction pursuant to *Conn. Gen. Stat.* § 52-59b and *Conn. Gen. Stat.* § 33-929(f) because (i) the defendants transact business in Connecticut; (ii) the defendants committed tortious acts in Connecticut; (iii) the defendants committed tortious acts outside the State of Connecticut which caused damage to Lincoln in Connecticut and the defendants expected or reasonably should have expected their actions to have consequences in Connecticut and the defendants derive substantial revenue from interstate commerce; and (iv) the claims set forth in this Complaint against arise out of contracts made and/or performed in Connecticut.

9.     Venue properly lies before this Court and in this Judicial District pursuant to *Conn. Gen. Stat.* § 51-345 because Lincoln is located, the injury and damage to Lincoln occurred, and the contracts at issue were performed in this Judicial District.

*Rome McGuigan, P.C. • Attorneys at Law*
One State Street • Hartford, Connecticut 08103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

Rome McGuigan, P.C. • Attorneys at Law
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

## BACKGROUND

### Stranger-Originated Life Insurance

10.    Over the last decade, an insurance market has emerged in which investors have begun

to use traditional life insurance as a morbid and speculative investment vehicle, rather than for the

income protection and estate planning purposes for which such insurance was created.

11.    In its simplest form, such an investment vehicle is created when a life insurance policy

is applied for and issued at the behest of individuals or entities – with no insurable interest in the life of

the insured – who later acquire or participate in the sale of some, if not all, of the interest in the death

benefit payable upon the death of the insured.  Such arrangements are commonly referred to as IOLI,

which stands for "investor-originated life insurance," or STOLI, which stands for "stranger-originated

life insurance."  For ease of reference, these transactions are referred to as "STOLI" herein.

12.    Though the STOLI market is relatively new, the underlying concept is not; indeed, in

the late nineteenth and early twentieth centuries, the United States Supreme Court opined against

unlawful "wagering policies," and the "sinister counter interest" in the death of the insured that results

from the issuance of such policies.

13.    State insurable interest laws, which protect the integrity of life insurance by requiring

that a policy owner have a cognizable interest in the longevity of the insured at the time the policy is

issued, provide another safeguard against STOLI arrangements.  However, STOLI speculators attempt

4

to circumvent these laws by carefully constructing their transactions to hide the fact that the policies are not being procured to satisfy legitimate insurance needs, but instead are being procured as impermissible investments.

14.    Logically, STOLI speculators seek out the highest anticipated rates of return when choosing the individuals to apply for life insurance in which they will invest. This often means the typical life insurance policy that such speculators endeavor to initiate insures the life of an individual aged seventy or older, with a net worth of over one million dollars. Such an individual can obtain large value policies, and, actuarially speaking, is expected to have a relatively limited lifespan.

15.    The perverse result is that the shorter the expected lifetime of the insured, the more valuable the policy becomes to those who would gamble on his or her life; in short, a "sinister counter interest" in the death of the insured, of the sort condemned by the Supreme Court, arises.

16.    Once the speculators locate an individual who meets their investment profile and, more importantly, will agree to collaborate in the STOLI arrangement, an application is made for one or more insurance policies. The speculators typically pay most or all of the prospective insured's costs, including premium payments. Some speculators even agree to pay the prospective insured a fee or other compensation upon the issuance of the policy.

17.    In many cases, the policy application indicates that a third-party entity, such as a trust, a shell corporation, or a limited partnership, will be the policy owner and/or beneficiary of the policy

Rome McGuigan, P.C.  •  Attorneys at Law
One State Street  •  Hartford, Connecticut 06103-3101  •  (860) 549-1000  •  Fax (860) 724-3921  •  Juris No. 27726

One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27728

*Rome McGuigan, P.C.* • Attorneys at Law

proceeds. Alternatively, the applicant may designate a legitimate beneficiary, such as a close family member or the insured's estate, at the outset, but after the policy is issued, the applicant will submit a request to change the beneficiary to a STOLI entity. It is anticipated at the inception of these transactions that there will be some form of change of beneficiary, such that the STOLI entity ultimately becomes the beneficiary of the life insurance policy proceeds. In any event, the manipulation of the beneficiary designation often permits the speculators to acquire an interest in either the policy itself or the holding entity – and, most importantly, in the death benefit that will later be disbursed by the insurer – without disclosing their interest to the insurer. References to policy proceeds, beneficial interests, and death benefits herein include payment of policy proceeds by insurers to *trusts and other shell entities that then pay or otherwise share or transfer such proceeds to or with the* trust/shell entity beneficiaries.

18.    While there are many variations, all STOLI schemes have one thing in common: their objective is to give investors with no insurable interest in the life of the insured a stake in a life insurance policy on the life of a complete stranger.

19.    The arrangements in connection with the life insurance policies issued by Lincoln and insuring the lives of Arthur Kramer ("Kramer") and Leon Lobel ("Lobel") were similarly structured. A trust was created in which either the insured or his children were initially named as the beneficiary. The insured applied for life insurance in which the trust/trustee was named as the beneficiary. As part

of the plan, the beneficial interest was immediately assigned to a stranger investor following the issuance of the life insurance policy. At no time did the insured or his family have a true beneficial interest in the insurance policy.

20.     Kramer, at the direction of Lockwood, LPS, and/or other entities engaged in secondary life insurance market transactions, established a trust, naming himself as the depositor and his daughter, Liza Kramer ("Liza"), as the initial beneficiary. Upon issuance of the insurance policy, Kramer, acting on the direction of Lockwood, LPS, and/or other entities engaged in secondary life insurance market transactions, immediately directed his daughter to execute a putative assignment of her interest in the trust to a stranger investor. The policy was procured on Kramer's life with the intention of immediately effectuating the assignment of the beneficial interest in the policy to an investor. At no time did Kramer or any of his family members have a true beneficial interest in the policy.

21.     Lobel, at the direction of Miller, Lockwood, LPS, Life Product, and/or other entities engaged in secondary life insurance market transactions, established a trust, naming himself as the depositor and as the initial beneficiary. Upon issuance of the insurance policy, Lobel, acting on the direction of Miller, Lockwood, LPS, Life Product, and/or other entities engaged in secondary life insurance market transactions, executed a putative assignment of his interest in the trust to a stranger investor. The policy was procured on Lobel's life with the intention of immediately effectuating the

Rome McGuigan, P.C. • Attorneys at Law
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

assignment of the beneficial interest in the policy to an investor. At no time did Lobel or any of his family members have a true beneficial interest in the policy.

**The Kramer Policy**

22.    On or around April 6, 1999, Lockwood entered into a Broker Agreement with Lincoln (the "Lockwood Broker Agreement"). Pursuant to the Lockwood Broker Agreement, Lockwood agreed, *inter alia*, "to comply with all applicable state and federal laws and with all rules and regulations of the regulatory agencies having jurisdiction with respect to the sales of the Policies"; to offer "Policies for sale in accordance with all [Lincoln's] rules and procedures then in effect"; to review insurance applications "for completeness and suitability"; that "all policyholder files, records and premium accounts are the property of" Lincoln; and that "all such property shall be returned to" Lincoln "upon termination of" the Lockwood Broker Agreement. Pursuant to the Lockwood Broker Agreement, Lockwood also agreed to indemnify and hold Lincoln harmless "for all costs, expenses, losses, claims, damages or liabilities (or actions in respect thereof), including reasonable attorneys' fees, resulting from any negligent, fraudulent or unauthorized acts or omissions by" Lockwood or "any unlawful sales practices" by Lockwood in connection with the sale of Lincoln policies.

23.    Upon information and belief, in early 2003, Lockwood, LPS, and/or other entities engaged in secondary life insurance market transactions, solicited Kramer's participation in a STOLI arrangement. Subsequently, Kramer began applying for life insurance with several insurance

*Rome McGuigan, P.C.* • *Attorneys at Law*
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27728

8

Rome McGuigan, P.C. • Attorneys at Law
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

companies including Lincoln. The insurance was placed through M&M Brokerage Services, Inc. ("M&M") with Lockwood as the producer.

24.    In October 2003, Lockwood sent correspondence to Kramer's doctor, Thomas Nash, M.D., indicating that Kramer was applying for life insurance coverage and enclosing a signed authorization form to forward Kramer's medical history.

25.    On or about July 11, 2005, an informal inquiry as to insurance on the life of Kramer was submitted to Lincoln at its offices in Hartford, Connecticut by M&M. The informal inquiry is primarily used to conduct limited underwriting concerning the health condition of an applicant, so as to provide the applicant and the insurance producer a preliminary indication of the type and amount of coverage available, along with an estimate of premium costs. For coverage to be issued, however, a formal application must be submitted by the prospective insured and/or on the prospective insured's behalf.

26.    In July 2005, Lincoln initially, from its offices in Hartford, Connecticut, declined to make an offer on a policy for Kramer based on the medical information provided.

27.    On August 29, 2005, Kramer, at the direction of Lockwood, LPS, and/or other entities engaged in secondary life insurance market transactions, established the Arthur Kramer 2005 Insurance Trust dated August 29, 2005 (the "Kramer Trust"), in which Hudson was named as the trustee. The original beneficiary of the Kramer Trust was Kramer's daughter, Liza.

28.    Lockwood and one of his associates (David Capitelli) were witnesses to the execution of the Kramer Trust documents by Kramer. Upon information and belief, the Kramer Trust documents were prepared by legal counsel for LPS at the direction of Lockwood, LPS, and/or other entities engaged in secondary life insurance market transactions.

29.    Upon information and belief, at the time the Kramer Trust was created, Hudson and LPS had a pre-existing business relationship and shared the same business address at 75 Rockefeller Plaza, New York, New York 10019. Berck also had a business address at 75 Rockefeller Plaza, New York, New York 10019, and Life Product (once it was formed) had its address there as well.

30.    On September 30, 2005, Lincoln, from its offices in Hartford, Connecticut, again declined to make an offer on a policy for Kramer based on the medical information provided.

31.    On October 5, 2005, Lincoln, from its offices in Hartford, Connecticut, made a tentative offer to insure Kramer's life based upon updated medical information provided.

32.    On October 24, 2005, Kramer submitted an application (the "Kramer Application") for the Lincoln policy with the Kramer Trust (Hudson United Bank as trustee) as the policy owner and beneficiary and an owner's address of 75 Rockefeller Plaza, New York, New York 10019. The Application was submitted to Lincoln at its offices in Hartford, Connecticut.

33.    The Kramer Application was witnessed by Lockwood. In the agent's certification to the Kramer Application, Lockwood (i) "recommend[ed] this risk to the Company without reservation";

*Rome McGuigan, P.C.* • *Attorneys at Law*
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

and (ii) represented that the purpose of the insurance policy was for estate planning; that the client did not intend to use the policy for any type of viatical settlement, senior settlement, life settlement or for any other secondary market; and that Kramer's total net worth (exclusive of life insurance) was $70 million plus $3 million in other income.

34.    On or about November 7, 2005, Life Product was formed; Martin Fleisher ("Fleisher") is one of the principals of Life Product.

35.    On or around November 11, 2005, Fleisher, a principal of Life Product, sent a letter regarding the net worth estimates for Kramer.  In the letter, Fleisher states that he is an attorney and financial advisor to Kramer, has known him for over 20 years, and is familiar with his net worth, which he estimates to be in excess of $70 million, with an annual unearned income in excess of $2 million a year.  The letter was received by Lincoln at its Hartford, Connecticut offices.

36.    On or about November 23, 2005, in reliance upon the actions and conduct of the defendants and Kramer, Lincoln issued, from its offices in Hartford, Connecticut, a universal life insurance policy number 7214471 in the face amount of $10 million insuring Kramer's life (hereinafter the "Kramer Policy").  The Kramer Policy identifies "HUDSON UNITED BANK, TRUSTEE OF *THE ARTHUR KRAMER 2005 INSURANCE TRUST, DATED AUGUST 29, 2005, OR THE SUCCESSOR(S) IN SAID TRUST*" as the owner and beneficiary.

*Rome McGuigan, P.C.* • *Attorneys at Law*
One State Street • Hartford, Connecticut  06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

11

37.    The underwriting and administration for the Kramer Policy, and for that matter all Lincoln universal life policies issued before April of 2007, was conducted at Lincoln's offices in Hartford, Connecticut.

38.    Upon information and belief, at no time did Kramer intend to purchase insurance for the benefit of any person or entity having an insurable interest in Kramer's life. Rather, at all relevant times, Kramer expected and understood that the right to receive the death benefit payable under any policy acquired from Lincoln would be sold to a third party having no insurable interest in Kramer's life.

39.    Upon information and belief, at no time did Liza intend to retain her beneficial interest in the Kramer Trust and, consequently, of the right to receive the death benefit payable under the Kramer Policy.

40.    Upon information and belief, at no time did Kramer believe that the premiums due would be paid by Kramer or the Kramer Trust. Kramer expected and understood that the premiums due under the Kramer Policy would be advanced and/or financed by a third party.

41.    The submission of the Kramer Application and the Kramer Policy that resulted were part of a collaborative effort by Lockwood, LPS, Life Product, and/or other entities engaged in secondary life insurance market transactions, to profit at Lincoln's expense from a gamble upon the life of Kramer. Though this gamble would also produce, in the short term, a significant amount of

Rome McGuigan, P.C. • Attorneys at Law
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

cash for Kramer, the party which stood to gain by far the most from the payment by Lincoln of the death benefit was Life Product.

42.    Upon information and belief, upon issuance of the Kramer Policy, from its offices in Hartford, Connecticut, at the direction of Lockwood, LPS, Life Product and/or other entities engaged in secondary life insurance market transactions, *Kramer instructed his daughter, Liza, to execute putative assignments of her beneficial interest in the Kramer Trust to a stranger investor, Life Product.*

43.    At no time did Kramer or Liza make any premium payments on the Kramer Policy.

44.    On December 1, 2005, Hudson submitted a premium payment to Lincoln in the amount of $140,450.00 on the Kramer Policy.  The premium payment was received by Lincoln at its Hartford, Connecticut offices.  *Upon information and belief, Life Product funded this premium payment.*

45.    The above payment was also accompanied by an amendment form signed by Kramer, Lockwood, and Hudson, which stated, "I hereby amend my application for the above numbered policy or annuity so that: BENEFICIARY IS AS SPECIFIED ON THE POLICY/CERTIFICATE SPECIFICATIONS PAGE OF THE POLICY/CERTIFICATE, AS DELIVERED TO ME." The amendment form was received by Lincoln at its Hartford, Connecticut offices.

46.    On January 31, 2006, Hudson was acquired by and merged with TD Banknorth, and *TD Banknorth* became the successor trustee to the Kramer Trust.  Hudson sent a Certificate of Merger to Lincoln at its Hartford, Connecticut offices.

13

*Rome McGuigan, P.C.* • Attorneys at Law
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

47.    On or about February 1, 2006, LPS forwarded to M&M a premium payment check from Hudson payable to Lincoln in the amount of $399,550.00. *The premium payment was received by Lincoln at its Hartford, Connecticut offices. Upon information and belief, Life Product funded this premium payment.*

48.    TD Banknorth subsequently resigned as trustee of the Kramer Trust.

49.    On or about July 10, 2006, Berck succeeded TD Banknorth as trustee to the Kramer Trust.

50.    On September 5, 2006, Berck submitted a premium payment to Lincoln in the amount of $400,000 on the Kramer Policy. *The premium payment was received by Lincoln at its Hartford, Connecticut offices. Upon information and belief, Life Product funded this premium payment.*

51.    On December 17, 2007, TD Banknorth sent a letter to Lincoln informing Lincoln that trustee for the *Kramer Trust had been changed to Berck. The letter was received by Lincoln at its Hartford, Connecticut offices.*

52.    Lincoln has learned since receiving the December 17, 2007 letter that Berck serves, upon information and belief, as trustee for numerous *insurance trusts created for the purpose of cloaking STOLI transactions, and indeed acts as a funding source for some of those transactions. Indeed, several of these STOLI transactions where Berck is the trustee involve Lincoln policies that* were underwritten and administrated at Lincoln's office in Hartford, Connecticut. Lincoln has

Rome McGuigan, P.C. • Attorneys at Law
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

moreover learned that Berck's place of business is located, upon information and belief, in the same office building as the respective offices of Lockwood, LPS, and Life Product.

53.    On January 26, 2008, Kramer died.

54.    Upon information and belief, subsequent to Kramer's death, the Estate of Arthur Kramer received various communications from representatives of LPS and certain stranger investors demanding copies of Kramer's death certificate so they could submit claims to Lincoln and other insurance companies for the payment of death benefits on policies insuring the life of Kramer.

55.    Upon information and belief, the Estate of Arthur Kramer refused such requests.

56.    On February 27, 2008, Berck submitted a Claimant's Statement for the payment of death benefits under the Kramer Policy.

57.    On or around March 10, 2008, Alice Kramer, as Personal Representative of the Estate of Arthur Kramer (the "Kramer Estate"), commenced a legal action entitled *Alice Kramer, as Personal Representative of the Estate of Arthur Kramer v. Lockwood Pension Services, Inc. et al.*, in the United States District Court for the Southern District of New York, Civil Action No. 08 CV 2429. In this action, the Kramer Estate alleges that the Kramer Policy was procured as part of a STOLI transaction and that the policy lacks an insurable interest and seeks a declaratory judgment that the Kramer Estate is entitled to recover the $10 million death benefit on the Kramer Policy issued by Lincoln and on

other life insurance policies issued by Transamerica Occidental Life Insurance Company and Phoenix Life Insurance Company with death benefits totaling $56,200,000.

### The Lobel Policy

58.    On or around April 27, 2005, Miller entered into a Broker Agreement with Lincoln (the "Miller Broker Agreement"). Pursuant to the Miller Broker Agreement, Miller agreed, *inter alia*, "to comply with all applicable state and federal laws and with all rules and regulations of the regulatory agencies having jurisdiction with respect to the sales of the Policies"; to offer "Policies for sale in accordance with all [Lincoln's] rules and procedures then in effect"; to review insurance applications "for completeness and suitability"; that "all policyholder files, records and premium accounts are the property of" Lincoln; and that "all such property shall be returned to [Lincoln] upon demand or upon termination of" the Miller Broker Agreement. Pursuant to the Miller Broker Agreement, Miller also agreed to indemnify and hold Lincoln harmless "for all costs, expenses, losses, claims, damages or liabilities (or actions in respect thereof), including reasonable attorneys' fees, resulting from any negligent, fraudulent or unauthorized acts or omissions by" Miller or "any unlawful sales practices" by Miller in connection with the sale of Lincoln policies.

59.    Upon information and belief, in the first half of 2005, Miller, Lockwood, LPS, and/or other entities engaged in secondary life insurance market transactions, solicited Lobel's participation in a STOLI arrangement. Subsequently, Lobel began applying for life insurance with several insurance

16

*Rome McGuigan, P.C.* • Attorneys at Law

One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

companies including Lincoln. The insurance was placed through Freundt & Associates Insurance

Services, Inc. d/b/a The Producers Group (hereinafter "Producers Group") with Miller and Lockwood

as producers.

60.    In September and October of 2005, an informal inquiry as to insurance on the life of

Lobel was submitted to Lincoln by L. Michelle Kepler, Director of New Business at Producers Group.

61.    In October of 2005, Lincoln provided a quote for a life insurance policy insuring

Lobel's life.

62.    On November 15, 2005, Lobel, at the direction of Miller, Lockwood, LPS, Life Product,

and/or other entities engaged in secondary life insurance market transactions, established the Leon

Lobel Insurance Trust dated November 15, 2005 (the "Lobel Trust"), in which Hudson was listed as

trustee.

63.    Upon information and belief, the Lobel Trust documents were prepared by legal counsel

for Life Product at the direction of Miller, Lockwood, LPS, Life Product, and/or other entities engaged

in secondary life insurance market transactions.

64.    Although the original beneficiary of the Lobel Trust was Lobel, the intent in setting up

the Lobel Trust was to immediately assign Lobel's beneficial interest in the Lobel Trust to a stranger

investor, Life Product, as evidenced by the reference to Life Product in the Lobel Trust documents that

Lobel executed.

17

65.     On November 15, 2005, Lobel submitted an application (the "Lobel Application") for the Lincoln policy with the Lobel Trust (with Hudson as trustee) as the policy owner and beneficiary and an owner's address of 75 Rockefeller Plaza, New York, New York 10019. The Application was submitted to Lincoln at its offices in Hartford, Connecticut.

66.     The Lobel Application was witnessed by Miller. In the agent's certification to the application, Miller represented that the purpose of the insurance policy was for estate planning and that Lobel's total net worth (exclusive of life insurance) was approximately $8 million to $10 million.

67.     On or about December 14, 2005, in reliance upon the actions and conduct of the defendants and Lobel, Lincoln issued a universal life policy number 7221595 in the face amount of $10 million insuring Lobel's life (hereinafter the "Lobel Policy"). The Lobel Policy identifies "HUDSON UNITED BANK, TRUSTEE OF THE LEON LOBEL INSURANCE TRUST, DATED NOVEMBER 15, 2005, OR THE SUCCESSOR(S) IN SAID TRUST" as the owner and beneficiary.

68.     The underwriting and administration for the Lobel Policy, and for that matter all Lincoln universal life policies issued prior to April of 2007, was conducted at Lincoln's offices in Hartford, Connecticut.

69.     Upon information and belief, at no time did Lobel intend to purchase insurance for the benefit of any person or entity having an insurable interest in Lobel's life. Rather, at all relevant times,

Rome McGuigan, P.C. • Attorneys at Law
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

Rome McGuigan, P.C. • Attorneys at Law
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

Lobel expected and understood that the right to receive the death benefit payable under any policy acquired from Lincoln would be sold to a third party having no insurable interest in Lobel's life.

70.    Upon information and belief, at no time did Lobel intend to retain his beneficial interest in the Lobel Trust and, consequently, of the right to receive the death benefit payable under the Lobel Policy.

71.    Upon information and belief, at no time did Lobel believe that the premiums due would be paid by Lobel or the Lobel Trust. Lobel expected and understood that the premiums due under the policy would be advanced and/or financed by a third party.

72.    The submission of the Lobel Application and the Lobel Policy that resulted were part of a collaborative effort by Miller, Lockwood, LPS, Life Product, and/or other entities engaged in secondary life insurance market transactions, to profit at Lincoln's expense from a gamble upon the life of Lobel. Though this gamble would also produce in the short term a significant amount of cash for Lobel, the party which stood to gain by far the most from the payment by Lincoln of the death benefit was Life Product.

73.    At the direction of Miller, Lockwood, LPS, Life Product, and/or other entities engaged in secondary life insurance market transactions, on or around December 19, 2005, Lobel signed a transfer agreement, pursuant to which Lobel received $300,000 from Life Product in exchange for the transfer of his beneficial interest in the Lobel Trust to Life Product. Upon information and belief, the

transfer agreement documents were prepared by legal counsel for Life Product at the direction of Miller, Lockwood, LPS, Life Product, and/or other entities engaged in secondary life insurance market transactions.

74.    On December 22 2005, Hudson submitted a premium payment to Lincoln in the amount of $143,000 on the Lobel Policy.  The premium payment was received by Lincoln at its Hartford, Connecticut offices.  Upon information and belief, Life Product funded this premium payment.

75.    On January 10, 2006, Lobel died.

76.    On February 7, 2006, Hudson submitted a Claimant's Statement for the payment of death benefits under the Lobel Policy.    The Claimant's Statement was received by Lincoln at its Hartford, Connecticut offices.

77.    On or about August 15, 2006, Berck succeeded Hudson as trustee to the Lobel Trust.

78.    On August 18, 2006, Berck sent a letter to Lincoln informing Lincoln that he was the successor trustee to the Lobel Trust and inquiring as to the status of payment of the death benefit under the Lobel Policy.    The letter was received by Lincoln at its Hartford, Connecticut offices.

79.    From August through October of 2006, Lincoln's Hartford, Connecticut offices sent letters to Hudson regarding the status of Lincoln's review of the claim for death benefits under the Lobel Policy.

80.    In December 2006, Lincoln terminated its agreements with Miller and Lockwood.

Roma McGuigan, P.C. • Attorneys at Law
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

Rome McGuigan, P.C. • Attorneys at Law
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

81.    On or about January 11, 2007, Lincoln paid a death benefit in the amount of $10,712,328.77 to the Lobel Trust.  Upon information and belief, those funds have been transferred by Berck to Life Product.

82.    On or around March 13, 2007, Linda Angel, as Personal Representative of the Estate of Leon Lobel (the "Lobel Estate") filed a third-party complaint against the Lobel Trust and Berck, *Life Product Clearing LLC v. Linda Angel, Personal Representative of the Estate of Leon Lobel v. Leon Lobel Insurance Trust and Jonathan S. Berck, as Trustee of the Leon Lobel Insurance Trust*, in the United States District Court for the Sourthern District of New York, Civil Action No. 07 CV 0475.  In the third-party complaint, the Lobel Estate seeks entry of a judgment in its favor in the sum of $10,712,328.77, and it seeks a declaratory judgment that the Lobel Trust is void, the transfer of the beneficial interest in the Lobel Trust to Life Product is void, the Lobel Estate is entitled to receive the proceeds of the Lobel Policy, and that Linda Angel, *as personal representative, has the exclusive right* to such funds.

## COUNT I

### BREACH OF CONTRACT
### (Against Lockwood)

83.    Lincoln hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

84.    Lockwood breached the Lockwood Broker Agreement, *inter alia*, by:

21

(i)      soliciting Kramer's participation in a STOLI arrangement;

(ii)     submitting to Lincoln an application for the Kramer Policy that Lockwood knew lacked an insurable interest;

(iii)    falsely certifying in the agent's certification that, *inter alia*, the purpose of the Kramer Policy was for estate planning;

(iv)     falsely certifying in the agent's certification that, *inter alia*, Kramer did not intend to use the Kramer Policy for any type of viatical settlement, senior settlement, life settlement, or for any other secondary market;

(v)      recommending the risk of the Kramer Policy "without reservation" when Lockwood knew that the Kramer Policy lacked an insurable interest and was unsuitable;

(vi)     participating in, facilitating, and directing the establishment of the Kramer Trust to conceal the absence of an insurable interest in connection with the Kramer Policy;

(vii)    directing LPS's counsel to prepare the trust documents for the Kramer Trust to conceal the absence of an insurable interest in connection with the Kramer Policy;

(viii)   soliciting and/or facilitating Life Product's acquisition of the Kramer Policy;

(ix)     concealing from Lincoln that there was a lack of an insurable interest at the inception of the Kramer Policy;

Rome McGuigan, P.C. • Attorneys at Law
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

Roma McGuigan, P.C. • Attorneys at Law
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

(x)    immediately upon issuance of the Kramer Policy, directing Kramer to have his daughter, Liza, execute putative assignments of her beneficial interest in the Kramer Trust to a stranger investor, Life Product;

(xi)    soliciting Lobel's participation in a STOLI arrangement;

(xii)    participating in, facilitating, and directing the establishment of the Lobel Trust to conceal the absence of an insurable interest in connection with the Lobel Policy;

(xiii)    directing Life Product's counsel to prepare the trust documents for the Lobel Trust to conceal the absence of an insurable interest in connection with the Lobel Policy;

(xiv)    soliciting and/or facilitating Life Product's acquisition of the Lobel Policy;

(xv)    concealing from Lincoln that there was a lack of an insurable interest at the inception of the Lobel Policy;

(xvi)    upon issuance of the Lobel Policy, directing Lobel to execute a transfer agreement transferring his beneficial interest in the Lobel Trust to a stranger investor, Life Product; and

(xvii)    failing to return Lincoln's property upon termination of the Lockwood Broker Agreement.

85.    As a proximate result of Lockwood's breach of the Lockwood Broker Agreement, Lincoln has sustained damages and may sustain damages in the future.

*Rome McGuigan, P.C.* • Attorneys at Law

One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

86.    Pursuant to the Lockwood Broker Agreement, Lincoln is entitled to indemnification of such damages by Lockwood.

## COUNT II

## BREACH OF CONTRACT
## (Against Miller)

87.    Lincoln hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

88.    Miller breached the Miller Broker Agreement, *inter alia*, by:

(i)    soliciting Lobel's participation in a STOLI arrangement;

(ii)    submitting to Lincoln an application for the Lobel Policy that Miller knew lacked an insurable interest;

(iii)    falsely certifying in the agent's certification, that the purpose of the Lobel Policy was for estate planning;

(iv)    recommending the risk of the Lobel Policy "without reservation" when Miller knew that the Lobel Policy lacked an insurable interest and was unsuitable;

(v)    participating in, facilitating, and directing the establishment of the Lobel Trust to conceal the absence of an insurable interest in connection with the Lobel Policy;

(vi)    directing Life Product's counsel to prepare the trust documents for the Lobel Trust to conceal the absence of an insurable interest in connection with the Lobel Policy;

24

Rome McGuigan, P.C. • Attorneys at Law
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

(vii)    soliciting and/or facilitating Life Product's acquisition of the Lobel Policy;

(viii)   concealing from Lincoln that there was a lack of an insurable interest at the inception of the Lobel Policy;

(ix)    upon issuance of the Lobel Policy, directing Lobel to execute a transfer agreement transferring his beneficial interest in the Lobel Trust to a stranger investor, Life Product; and

(x)    failing to return Lincoln's property upon termination of the Miller Broker Agreement.

89.    As a proximate result of Miller's breach of the Miller Broker Agreement, Lincoln has sustained damages and may sustain damages in the future.

90.    Pursuant to the Miller Broker Agreement, Lincoln is entitled to indemnification of such damages by Miller.

### COUNT III

### FRAUD: KRAMER POLICY
### (Against Lockwood And LPS)

91.    Lincoln hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

92.    In the agent's certification to the Kramer Policy, Lockwood (i) represented to Lincoln that the purpose of the Kramer Policy was for estate planning and Kramer did not intend to use the Kramer Policy for any type of viatical settlement, senior settlement, life settlement, or for any other

25

secondary market; and (ii) recommended to Lincoln the risk of the Kramer Policy "without reservation."

93.    At the time that Lockwood made these representations to Lincoln, Lockwood knew that his representations in the agent's certification were false, that the Kramer Policy was unsuitable and lacked an insurable interest, that the purpose of the Kramer Policy was not for estate planning, and that Kramer intended to sell the Kramer Policy on the secondary market.  At the time that Lockwood made these representations, Lockwood knew that the Kramer Application was being submitted to Lincoln as part of a fraudulent STOLI scheme inasmuch as he had already solicited Kramer's participation in the STOLI arrangement; participated in, facilitated and directed the establishment of the Kramer Trust to conceal the absence of an insurable interest in connection with the Kramer Policy; directed LPS's counsel to prepare the trust documents for the Kramer Trust to conceal the absence of an insurable interest in connection with the Kramer Policy; and solicited and/or facilitated Life Product's acquisition of the Kramer Policy.

94.    Lockwood made these misrepresentations to Lincoln with the intent to deceive Lincoln and to induce Lincoln to issue the Kramer Policy, which Lockwood knew lacked an insurable interest.

95.    Lincoln reasonably relied upon the truth of Lockwood's representations by issuing the Kramer Policy.

Rome McGuigan, P.C. • Attorneys at Law
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

96.    Acting with the intent to perpetrate a fraud and in furtherance of the fraud perpetrated on Lincoln in connection with the Kramer Policy, Lockwood, LPS, and/or other entities engaged in secondary life insurance market transactions solicited Kramer's participation in the STOLI arrangement; participated in, facilitated and directed the establishment of the Kramer Trust to conceal the absence of an insurable interest in connection with the Kramer Policy; directed LPS's counsel to prepare the trust documents for the Kramer Trust to conceal the absence of an insurable interest in connection with the Kramer Policy; solicited and/or facilitated Life Product's acquisition of the Kramer Policy; and immediately upon issuance of the Kramer Policy, directed Kramer to have his daughter, Liza, execute putative assignments of her beneficial interest in the Kramer Trust to a stranger investor, Life Product.

97.    As a proximate result of the fraudulent misrepresentations made by Lockwood and the fraudulent acts of Lockwood and LPS, Lincoln has sustained damages and may sustain damages in the future.

## COUNT IV

### FRAUD: LOBEL POLICY
### (Against Miller, Lockwood, And LPS)

98.    Lincoln hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

*Rome McGuigan, P.C.* • *Attorneys at Law*
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

*Rome McGuigan, P.C.* • *Attorneys at Law*
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27728

99.    In the agent's certification to the Lobel Policy, Miller (i) represented to Lincoln that the purpose of the Lobel Policy was for estate planning; and (ii) recommended to Lincoln the risk of the Lobel Policy "without reservation."

100.    At the time that Miller made these representations to Lincoln, Miller knew that his representations in the agent's certification were false, that the Lobel Policy was unsuitable and lacked an insurable interest, and that the purpose of the Lobel Policy was not for estate planning. At the time that Miller made these representations, Miller knew that the Lobel Application was being submitted to Lincoln as part of a fraudulent STOLI scheme inasmuch as he had already solicited Lobel's participation in the STOLI arrangement; participated in, facilitated and directed the establishment of the Lobel Trust to conceal the absence of an insurable interest in connection with the Lobel Policy; directed Life Product's counsel to prepare the trust documents for the Lobel Trust to conceal the absence of an insurable interest in connection with the Lobel Policy; and solicited and/or facilitated Life Product's acquisition of the Lobel Policy as evidenced by the reference to Life Product in the Lobel Trust documents that were prepared by Life Product's counsel at Miller's direction.

101.    Miller made these misrepresentations to Lincoln with the intent to deceive Lincoln and to induce Lincoln to issue the Lobel Policy which Miller knew lacked an insurable interest.

102.    Lincoln reasonably relied upon the truth of Miller's representations by issuing the Lobel Policy.

28

103.    Acting with the intent to perpetrate a fraud and in furtherance of the fraud perpetrated on Lincoln in connection with the Lobel Policy, Miller, Lockwood, LPS, and/or other entities engaged in secondary life insurance market transactions, solicited Lobel's participation in the STOLI arrangement; participated in, facilitated and directed the establishment of the Lobel Trust to conceal the absence of an insurable interest in connection with the Lobel Policy; directed Life Product's counsel to prepare the trust documents for the Lobel Trust to conceal the absence of an insurable interest in connection with the Lobel Policy; solicited and/or facilitated Life Product's acquisition of the Lobel Policy; and, upon issuance of the Lobel Policy, directed Lobel to execute a transfer agreement transferring his beneficial interest in the Lobel Trust to a stranger investor, Life Product.

104.    As a proximate result of the fraudulent misrepresentations made by Miller and the fraudulent acts of Miller, Lockwood, and LPS, Lincoln has sustained damages and may sustain damages in the future.

## COUNT V

### FRAUDULENT CONCEALMENT: KRAMER POLICY
### (Against Lockwood And LPS)

105.    Lincoln hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

106.    Lockwood and LPS intentionally and fraudulently concealed from Lincoln material information in connection with the Kramer Policy including, *inter alia*, the facts that:

*Rome McGuigan, P.C.* • *Attorneys at Law*
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

(i)      Lockwood and LPS had solicited Kramer's participation in a STOLI arrangement;

(ii)     Kramer intended for his daughter's beneficial interest to be immediately assigned to a stranger investor following the issuance of the life insurance policy;

(iii)    the Kramer Trust had been established to conceal the absence of an insurable interest in connection with the Kramer Policy;

(iv)     Lockwood and LPS had directed LPS's counsel to prepare the trust documents for the Kramer Trust to conceal the absence of an insurable interest in connection with the Kramer Policy;

(v)      Lockwood and LPS had solicited and/or facilitated Life Products' acquisition of the Kramer Policy; and

(vi)     the owner of the Kramer Policy lacked an insurable interest in the life of Kramer.

107.    Lockwood and LPS intentionally and fraudulently concealed this information from Lincoln with the intent to deceive Lincoln and to induce Lincoln to issue the Kramer Policy which they knew lacked an insurable interest.

108.    As a proximate result of the fraudulent concealment of material facts in connection with the Kramer Policy by Lockwood and LPS, Lincoln has sustained damages and may sustain damages in the future.

**COUNT VI**

**FRAUDULENT CONCEALMENT: LOBEL POLICY**
**(Against Miller, Lockwood, And LPS)**

109.    Lincoln hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

110.    Miller, Lockwood, and LPS intentionally and fraudulently concealed from Lincoln material information in connection with the Lobel Policy including, *inter alia*, the facts that:

(i)    Miller, Lockwood, and LPS had solicited Lobel's participation in a STOLI arrangement;

(ii)    Lobel intended to assign his beneficial interest to a stranger investor following the issuance of the life insurance policy;

(iii)    the Lobel Trust had been established to conceal the absence of an insurable interest in connection with the Lobel Policy;

(iv)    Miller, Lockwood, and LPS had directed Life Product's counsel to prepare the trust documents for the Lobel Trust to conceal the absence of an insurable interest in connection with the Lobel Policy;

(v)    Miller, Lockwood, and LPS had solicited and/or facilitated Life Products' acquisition of the Lobel Policy; and

(vi)    the owner of the Lobel Policy lacked an insurable interest in the life of Lobel.

31

111.    Miller, Lockwood, and LPS intentionally and fraudulently concealed this information from Lincoln with the intent to deceive Lincoln and to induce Lincoln to issue the Lobel Policy which they knew lacked an insurable interest.

112.    As a proximate result of the fraudulent concealment of material facts in connection with the Lobel Policy by Miller, Lockwood, and LPS, Lincoln has sustained damages and may sustain damages in the future.

## COUNT VII

### AIDING AND ABETTING FRAUD: KRAMER POLICY
### (Against TD Banknorth, Berck, And Life Product)

113.    Lincoln hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

114.    The Kramer Policy lacks an insurable interest and is the product of a STOLI arrangement.

115.    As alleged herein, Lockwood made fraudulent misrepresentations to Lincoln ,and Lockwood and LPS engaged in fraudulent acts and/or fraudulently concealed from Lincoln facts material to the risk on the Kramer Policy.

116.    Acting with the intent to perpetrate a fraud and in furtherance of the fraud perpetrated on Lincoln, Hudson (TD Banknorth's predecessor-in-interest) substantially aided and assisted Lockwood and LPS in carrying out this fraudulent STOLI arrangement by serving as a trustee for the

32

*Rome McGuigan, P.C. • Attorneys at Law*
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27728

Kramer Trust which was established to conceal the absence of an insurable interest in connection with the Kramer Policy; and submitting to Lincoln premium payments on the Kramer Policy in the amounts of $140,450.00 and $399,550.00, which were funded by Life Product. At all times relevant hereto, Hudson knew that the aforementioned actions were in furtherance of the fraudulent STOLI arrangement carried out by Lockwood and LPS.

117.    Acting with the intent to perpetrate a fraud and in furtherance of the fraud perpetrated on Lincoln, Berck substantially aided and assisted Lockwood and LPS in carrying out this fraudulent STOLI arrangement by serving as a trustee for the Kramer Trust which was established to conceal the absence of an insurable interest in connection with the Kramer Policy; and submitting to Lincoln a premium payment on the Kramer Policy in the amount of $400,000.00, which was funded by Life Product. At all times relevant hereto, Berck knew that the aforementioned actions were in furtherance of the fraudulent STOLI arrangement carried out by Lockwood and LPS.

118.    Acting with the intent to perpetrate a fraud and in furtherance of the fraud perpetrated on Lincoln in connection with the Kramer Policy, Life Product substantially aided and assisted Lockwood and LPS in carrying out this fraudulent STOLI arrangement by acquiring and/or participating in the sale of the death benefits of the Kramer Policy; accepting, upon immediate issuance of the Kramer Policy, the assignment of the beneficial interest of Kramer's daughter in the Kramer Trust; and funding the premium payments for the Kramer Policy. At all times relevant hereto, Life

Rome McGuigan, P.C. • Attorneys at Law
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

Rome McGuigan, P.C. • Attorneys at Law
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

Product knew that the aforementioned actions were in furtherance of the fraudulent STOLI arrangement carried out by Lockwood and LPS.

119.    As a proximate result of the actions of Hudson, Berck, and Life Product in substantially aiding and assisting Lockwood and LPS in carrying out this fraudulent STOLI arrangement in connection with the Kramer Policy, Lincoln has sustained damages and may sustain damages in the future. In the event that any death benefit is found to be payable under the Kramer Policy, Lincoln is entitled to offset the damages that it has incurred in connection with the Kramer Policy against any benefits payable under Kramer Policy.

## COUNT VIII

### AIDING AND ABETTING FRAUD: LOBEL POLICY
### (Against TD Banknorth, Berck, And Life Product)

120.    Lincoln hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

121.    The Lobel Policy lacks an insurable interest and is the product of a STOLI arrangement.

122.    As alleged herein, Miller made fraudulent misrepresentations to Lincoln, and Miller, Lockwood, and LPS engaged in fraudulent acts and/or fraudulently concealed from Lincoln facts material to the risk on the Lobel Policy.

123.    Acting with the intent to perpetrate a fraud and in furtherance of the fraud perpetrated on Lincoln, Hudson (TD Banknorth's predecessor-in-interest) substantially aided and assisted Miller,

34

Rome McGuigan, P.C. • Attorneys at Law
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

Lockwood, and LPS in carrying out this fraudulent STOLI arrangement by serving as a trustee for the Lobel Trust which was established to conceal the absence of an insurable interest in connection with the Lobel Policy; and submitting to Lincoln a premium payment on the Lobel Policy in the amounts of $143,000.00, which was funded by Life Product. *At all times relevant hereto, Hudson knew that the aforementioned actions were in furtherance of the fraudulent STOLI arrangement carried out by* Miller, Lockwood, and LPS.

124.    Acting with the intent to perpetrate a fraud and in furtherance of the fraud perpetrated on Lincoln, Berck substantially aided and assisted Miller, Lockwood, and LPS in carrying out *this fraudulent STOLI arrangement by serving as a trustee for the Lobel Trust which was established to conceal the absence of an insurable interest in connection with the Lobel Policy. At all times relevant* hereto, Berck knew that the aforementioned actions were in furtherance of the fraudulent STOLI arrangement carried out by Miller, Lockwood, and LPS.

125.    Acting with the intent to perpetrate a fraud and in furtherance of the fraud perpetrated on Lincoln in connection with the Lobel Policy, Life Product substantially aided and assisted Miller, Lockwood, and LPS in carrying out this fraudulent STOLI arrangement by participating in, facilitating, and directing the establishment of the Lobel Trust to conceal the absence of an insurable interest in connection with the Lobel Policy; directing Life Product's counsel to prepare the trust documents for the Lobel Trust to conceal the absence of an insurable interest in connection with the Lobel Policy;

Rome McGuigan, P.C. • Attorneys at Law
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

acquiring and/or participating in the sale of the death benefits of the Lobel Policy; accepting, upon immediate issuance of the Lobel Policy, the assignment of the beneficial interest of Lobel in the Lobel Trust; and funding the premium payments for the Lobel Policy. At all times relevant hereto, Life Product knew that the aforementioned actions were in furtherance of the fraudulent STOLI arrangement carried out by Miller, Lockwood, and LPS.

126.    As a proximate result of the actions of Hudson, Berck, and Life Product in substantially aiding and assisting Miller, Lockwood, and LPS in carrying out this fraudulent STOLI arrangement in connection with the Lobel Policy, Lincoln has sustained damages and may sustain damages in the future. In the event that any death benefit is found to be payable under the Kramer Policy, Lincoln is entitled to offset the damages it has incurred in connection with the Lobel Policy against any benefits payable under the Kramer Policy.

## COUNT IX

### COMMON LAW CONSPIRACY: KRAMER POLICY
### (Against Lockwood, LPS, TD Banknorth, Berck, And Life Product)

127.    Lincoln hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

128.    Lockwood, LPS, Hudson (TD Banknorth's predecessor-in-interest), Berck, and Life Product conspired among themselves to fraudulently induce Lincoln to issue the Kramer Policy and to conceal the absence of an insurable interest in the Kramer Policy.

Rome McGuigan, P.C. • Attorneys at Law
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27728

129.    Acting with the intent to perpetrate a fraud on Lincoln in connection with the Kramer Policy and in furtherance of this conspiracy, Lockwood:

(i)    solicited Kramer's participation in the STOLI arrangement;

(ii)    misrepresented to Lincoln that the purpose of the Kramer Policy was for estate planning and that Kramer did not intend to use the Kramer Policy for any type of viatical settlement, senior settlement, life settlement or for any other secondary market;

(iii)    recommended to Lincoln the risk of the Kramer Policy "without reservation";

(iv)    participated in, facilitated, and directed the establishment of the Kramer Trust to conceal the absence of an insurable interest in connection with the Kramer Policy;

(v)    directed LPS's counsel to prepare the trust documents for the Kramer Trust to conceal the absence of an insurable interest in connection with the Kramer Policy;

(vi)    solicited and/or facilitated Life Product's acquisition of the Kramer Policy;

(vii)    immediately upon issuance of the Kramer Policy, directed Kramer to have his daughter, Liza, execute putative assignments of her beneficial interest in the Kramer Trust to a stranger investor, Life Product; and

(viii)    concealed from Lincoln that Lockwood and LPS had solicited Kramer's participation in a STOLI arrangement; Kramer intended for his daughter's beneficial interest to be immediately assigned to a stranger investor following the issuance of the life insurance policy; the Kramer Trust

had been established to conceal the absence of an insurable interest in connection with the Kramer Policy; Lockwood and LPS had directed LPS's counsel to prepare the trust documents for the Kramer Trust to conceal the absence of an insurable interest in connection with the Kramer Policy; Lockwood and LPS had solicited and/or facilitated Life Product's acquisition of the Kramer Policy; and the owner of the Kramer Policy lacked an insurable interest in the life of Kramer.

130.    Acting with the intent to perpetrate a fraud on Lincoln in connection with the Kramer Policy and in furtherance of this conspiracy, LPS:

(i)     solicited Kramer's participation in the STOLI arrangement;

(ii)    participated in, facilitated and directed the establishment of the Kramer Trust to conceal the absence of an insurable interest in connection with the Kramer Policy;

(iii)   directed LPS's counsel to prepare the trust documents for the Kramer Trust to conceal the absence of an insurable interest in connection with the Kramer Policy;

(iv)    solicited and/or facilitated Life Product's acquisition of the Kramer Policy;

(v)     immediately upon issuance of the Kramer Policy, directed Kramer to have his daughter, Liza, execute putative assignments of her beneficial interest in the Kramer Trust to a stranger investor, Life Product; and

(vi)    concealed from Lincoln that Lockwood and LPS had solicited Kramer's participation in a STOLI arrangement; Kramer intended for his daughter's beneficial interest to be immediately

Rome McGuigan, P.C. • Attorneys at Law
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • (860) 724-3921 • Fax (860) 724-3921 • Juris No. 27726

*Rome McGuigan, P.C.* • *Attorneys at Law*
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

assigned to a stranger investor following the issuance of the life insurance policy; the Kramer Trust had been established to conceal the absence of an insurable interest in connection with the Kramer Policy; Lockwood and LPS had directed LPS's counsel to prepare the trust documents for the Kramer Trust to conceal the absence of an insurable interest in connection with the Kramer Policy; Lockwood and LPS had solicited and/or facilitated Life Product's acquisition of the Kramer Policy; and the owner of the Kramer Policy lacked an insurable interest in the life of Kramer.

131.    Acting with the intent to perpetrate a fraud on Lincoln in connection with the Kramer Policy and in furtherance of this conspiracy, Hudson (TD Banknorth's predecessor-in-interest) served as a trustee for the Kramer Trust which was established to conceal the absence of an insurable interest in connection with the Kramer Policy; and submitted to Lincoln premium payments on the Kramer Policy in the amounts of $140,450.00 and $399,550.00, which were funded by Life Product.

132.    Acting with the intent to perpetrate a fraud on Lincoln in connection with the Kramer Policy and in furtherance of this conspiracy, Berck served as a trustee for the Kramer Trust which was established to conceal the absence of an insurable interest in connection with the Kramer Policy; and submitted to Lincoln a premium payment on the Kramer Policy in the amount of $400,000.00, which was funded by Life Product.

133.    Acting with the intent to perpetrate a fraud on Lincoln in connection with the Kramer Policy and in furtherance of this conspiracy, Life Product acquired and/or participated in the sale of the

death benefits of the Kramer Policy; accepted, upon immediate issuance of the Kramer Policy, the assignment of the beneficial interest of Kramer's daughter in the Kramer Trust; and funded the premium payments for the Kramer Policy.

134.    As a proximate result of the conspiracy among Lockwood, LPS, Hudson, Berck, and Life Product to fraudulently induce Lincoln to issue the Kramer Policy and to conceal the absence of an insurable interest in the Kramer Policy, Lincoln has sustained damages and may sustain damages in the future.  In the event that any death benefit is found to be payable under the Kramer Policy, Lincoln is entitled to offset the damages it has incurred in connection with the Kramer Policy against any benefits payable under the Kramer Policy.

## COUNT X

### COMMON LAW CONSPIRACY: LOBEL POLICY
### (Against Miller, Lockwood, LPS, TD Banknorth, Berck, And Life Product)

135.    Lincoln hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

136.    Miller, Lockwood, LPS, Hudson (TD Banknorth's predecessor-in-interest), Berck, and Life Product conspired among themselves to fraudulently induce Lincoln to issue the Lobel Policy and to conceal the absence of an insurable interest in the Lobel Policy.

137.    Acting with the intent to perpetrate a fraud on Lincoln in connection with the Lobel Policy and in furtherance of this conspiracy, Miller:

Rome McGuigan, P.C. • Attorneys at Law
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27728

(i)      solicited Lobel's participation in the STOLI arrangement;

(ii)     misrepresented to Lincoln that the purpose of the Lobel Policy was for estate planning;

(iii)    recommended to Lincoln the risk of the Lobel Policy "without reservation";

(iv)     participated in, facilitated, and directed the establishment of the Lobel Trust to conceal

the absence of an insurable interest in connection with the Lobel Policy;

(v)      directed Life Product's counsel to prepare the trust documents for the Lobel Trust to

conceal the absence of an insurable interest in connection with the Lobel Policy;

(vi)     solicited and/or facilitated Life Product's acquisition of the Lobel Policy;

(vii)    upon issuance of the Lobel Policy, directed Lobel to execute a transfer agreement

transferring his beneficial interest in the Lobel Trust to a stranger investor, Life Product;

(viii)   concealed from Lincoln that Miller, Lockwood, LPS, and Life Product had solicited

Lobel's participation in a STOLI arrangement; Lobel intended to assign his beneficial interest to a

stranger investor following the issuance of the life insurance policy; the Lobel Trust had been

established to conceal the absence of an insurable interest in connection with the Lobel Policy; Miller,

Lockwood, LPS, and Life Product had directed Life Product's counsel to prepare the trust documents

for the Lobel Trust to conceal the absence of an insurable interest in connection with the Lobel Policy;

Miller, Lockwood, and LPS had solicited and/or facilitated Life Product's acquisition of the Lobel

Policy; and the owner of the Lobel Policy lacked an insurable interest in the life of Lobel.

Rome McGuigan, P.C. ● Attorneys at Law

One State Street ● Hartford, Connecticut 06103-3101 ● (860) 549-1000 ● Fax (860) 724-3921 ● Juris No. 27726

138.    Acting with the intent to perpetrate a fraud on Lincoln in connection with the Lobel Policy and in furtherance of this conspiracy, Lockwood:

(i)    solicited Lobel's participation in the STOLI arrangement;

(ii)    participated in, facilitated, and directed the establishment of the Lobel Trust to conceal the absence of an insurable interest in connection with the Lobel Policy;

(iii)    directed Life Product's counsel to prepare the trust documents for the Lobel Trust to conceal the absence of an insurable interest in connection with the Lobel Policy;

(iv)    solicited and/or facilitated Life Product's acquisition of the Lobel Policy;

(v)    upon issuance of the Lobel Policy, directed Lobel to execute a transfer agreement transferring his beneficial interest in the Lobel Trust to a stranger investor, Life Product;

(vi)    concealed from Lincoln that Miller, Lockwood, LPS, and Life Product had solicited Lobel's participation in a STOLI arrangement; Lobel intended to assign his beneficial interest to a stranger investor following the issuance of the life insurance policy; the Lobel Trust had been established to conceal the absence of an insurable interest in connection with the Lobel Policy; Miller, Lockwood, LPS, and Life Product had directed Life Product's counsel to prepare the trust documents for the Lobel Trust to conceal the absence of an insurable interest in connection with the Lobel Policy; Miller, Lockwood, and LPS had solicited and/or facilitated Life Product's acquisition of the Lobel Policy; and the owner of the Lobel Policy lacked an insurable interest in the life of Lobel.

139.    Acting with the intent to perpetrate a fraud on Lincoln in connection with the Lobel Policy and in furtherance of this conspiracy, LPS:

(i)    solicited Lobel's participation in the STOLI arrangement;

(ii)    participated in, facilitated, and directed the establishment of the Lobel Trust to conceal the absence of an insurable interest in connection with the Lobel Policy;

(iii)    directed Life Product's counsel to prepare the trust documents for the Lobel Trust to conceal the absence of an insurable interest in connection with the Lobel Policy;

(iv)    solicited and/or facilitated Life Product's acquisition of the Lobel Policy;

(v)    upon issuance of the Lobel Policy, directed Lobel to execute a transfer agreement transferring his beneficial interest in the Lobel Trust to a stranger investor, Life Product; and

(vi)    concealed from Lincoln that Miller, Lockwood, LPS, and Life Product had solicited Lobel's participation in a STOLI arrangement; Lobel intended to assign his beneficial interest to a stranger investor following the issuance of the life insurance policy; the Lobel Trust had been established to conceal the absence of an insurable interest in connection with the Lobel Policy; Miller, Lockwood, LPS, and Life Product had directed Life Product's counsel to prepare the trust documents for the Lobel Trust to conceal the absence of an insurable interest in connection with the Lobel Policy; Miller, Lockwood, and LPS had solicited and/or facilitated Life Product's acquisition of the Lobel Policy; and the owner of the Lobel Policy lacked an insurable interest in the life of Lobel.

Rome McGuigan, P.C. • Attorneys at Law
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

140.    Acting with the intent to perpetrate a fraud on Lincoln in connection with the Lobel Policy and in furtherance of this conspiracy, Hudson (TD Banknorth's predecessor-in-interest) served as a trustee for the Lobel Trust which was established to conceal the absence of an insurable interest in connection with the Lobel Policy; and submitted to Lincoln a premium payment on the Lobel Policy in the amount of $143,000.00, which was funded by Life Product.

141.    Acting with the intent to perpetrate a fraud on Lincoln in connection with the Lobel Policy and in furtherance of this conspiracy, Berck served as a trustee for the Lobel Trust which was established to conceal the absence of an insurable interest in connection with the Lobel Policy.

142.    Acting with the intent to perpetrate a fraud on Lincoln in connection with the Lobel Policy and in furtherance of this conspiracy, Life Product participated in, facilitated, and directed the establishment of the Lobel Trust to conceal the absence of an insurable interest in connection with the Lobel Policy; directed Life Product's counsel to prepare the trust documents for the Lobel Trust to conceal the absence of an insurable interest in connection with the Lobel Policy; acquired and/or participated in the sale of the death benefits of the Lobel Policy; accepted, upon immediate issuance of the Lobel Policy, the assignment of Lobel's beneficial interest in the Lobel Trust; and funded the premium payments for the Lobel Policy.

143.    As a proximate result of the conspiracy among Miller, Lockwood, LPS, Hudson, Berck, and Life Product to fraudulently induce Lincoln to issue the Lobel Policy and to conceal the

44

absence of an insurable interest in the Lobel Policy, Lincoln has sustained damages and may sustain

damages in the future. In the event that any death benefit is found to be payable under the Kramer

Policy, Lincoln is entitled to offset the damages it has incurred in connection with the Lobel Policy

against any benefits payable under the Kramer Policy.

## COUNT XI

### NEGLIGENT MISREPRESENTATION: KRAMER POLICY
### (Against Lockwood)

144.    Lincoln hereby incorporates by reference each and every averment of fact contained in

the preceding paragraphs as if set forth herein at length.

145.    In the agent's certification to the Kramer Policy, Lockwood (i) represented to Lincoln

that the purpose of the Kramer Policy was for estate planning and Kramer did not intend to use the

Kramer Policy for any type of viatical settlement, senior settlement, life settlement or for any other

secondary market; and (ii) recommended to Lincoln the risk of the Kramer Policy "without

reservation."

146.    At the time that Lockwood made these representations to Lincoln, Lockwood knew or

should have known that these representations were false and that the proposed policy lacked an

insurable interest.

147.    Lincoln reasonably relied upon the truth of Lockwood's representations by issuing the

Kramer Policy.

Rome McGuigan, P.C. • Attorneys at Law
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

148.    As a proximate result of the negligent misrepresentations made by Lockwood, Lincoln has sustained damages and may sustain damages in the future.

## COUNT XII

### NEGLIGENT MISREPRESENTATION: LOBEL POLICY
### (Against Miller)

149.    Lincoln hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

150.    In the agent's certification to the Lobel Policy, Miller (i) represented to Lincoln that the purpose of the Kramer Policy was for estate planning; and (ii) recommended to Lincoln the risk of the Kramer Policy "without reservation."

151.    At the time that Miller made these representations to Lincoln, Miller knew or should have known that these representations were false and that the proposed policy lacked an insurable interest.

152.    Lincoln reasonably relied upon the truth of Miller's representations by issuing the Lobel Policy.

153.    As a proximate result of the negligent misrepresentations made by Miller, Lincoln has sustained damages and may sustain damages in the future.

*Rome McGuigan, P.C.* • *Attorneys at Law*
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27728

## COUNT XIII

## DECLARATORY JUDGMENT

154.    Lincoln hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

155.    The Kramer Policy lacks an insurable interest and is the product of a STOLI arrangement.

## COUNT XIV

## EQUITABLE ACCOUNTING
### (Against Miller And Lockwood)

156.    Lincoln hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

157.    Pursuant to the terms of their contracts with Lincoln, Miller and Lockwood were obligated to return Lincoln's property (including but not limited to policyholder files, records and premium accounts) upon termination of the agreements.

158.    At the time of the events at issue, Miller and Lockwood acted in a manner that concealed the true nature of the transactions at issue and that was intended to deceive, and did deceive, Lincoln.

Rome McGuigan, P.C. • Attorneys at Law
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27728

159.    The foregoing portions of this Complaint involve two policies issued by Lincoln and properly plead claims for relief against the defendants regarding those two policies.  Lincoln has reason to believe that it may have been damaged by additional instances of unlawful activity by the defendants similar to the Kramer and Lobel situations.  At this time, Lincoln does not have a complete and adequate remedy at law for the consequences of those similar situations.

160.    Under such circumstances, an equitable accounting is appropriate.

161.    Absent an accounting, there is a risk that evidence may be spoliated and that Lincoln will suffer immediate and irreparable harm

Rome McGuigan, P.C. • Attorneys at Law

One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

WHEREFORE, the Plaintiff claims:

<u>As to Counts I through XII:</u>

1.    Compensatory damages;

2.    Punitive damages;

3.    Interest;

4.    Costs;

5.    Such other and further relief as deemed appropriate.

<u>As to Count XIII:</u>

1.    A declaratory judgment that:

(i)    the Kramer Policy lacked an insurable interest at the time of policy issuance;

(ii)    the Kramer Policy is void *ab initio*;

(iii)    no death benefit is payable under the Kramer Policy; and

(iv)    if any death benefit is found to be payable under the Kramer Policy, Lincoln is

entitled to offset any damages it has incurred in connection with the Kramer Policy and/or the

Lobel Policy against any benefits payable under the Kramer Policy.

<u>As to Count XIV:</u>

1.    An order declaring that Lincoln is entitled to an equitable accounting, consisting of the

disclosure by Miller and Lockwood of (i) all Lincoln policyholder records including but not limited to

records relating to the underwriting, acquisition and maintenance of life insurance policies issued by Lincoln; and (ii) the amount of commissions and other funds that they received directly or indirectly in connection with the placement of each such policy with Lincoln.

## VERIFICATION

I verify that I am the Assistant Vice President-Market Conduct Compliance for Lincoln Financial Group; that I am authorized to make this verification on behalf of Plaintiff The Lincoln Life & Annuity Company of New York; that I have read the foregoing Complaint; and that the allegations in the Complaint are true and correct to the best of my knowledge, information and belief.

I declare, under penalty of perjury, that the foregoing is true and correct.



Kenneth Elder
Assistant Vice President-
Market Conduct Compliance
Lincoln Financial Group

Sworn to before me this
15th day of April, 2008



NOTARY PUBLIC
My Commission Expires June 13, 2008

*Rome McGuigan, P.C. • Attorneys at Law*
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

RETURN DATE:    MAY 6, 2008                :       SUPERIOR COURT
                                           :
THE LINCOLN LIFE & ANNUITY                 :       JUDICIAL DISTRICT OF HARTFORD
COMPANY OF NEW YORK,                       :
                                           :       AT HARTFORD
V.                                         :
                                           :
LOCKWOOD PENSION SERVICES, INC.,           :
STEVEN LOCKWOOD, JOEL B. MILLER,           :
JONATHAN S. BERCK (individually and as     :
Trustee of the Arthur Kramer 2005          :
Insurance Trust dated August 29, 2005)     :
LIFE PRODUCT CLEARING, LLC,                :
and TD BANKNORTH, N.A.                     :       APRIL 16, 2008

## STATEMENT OF AMOUNT IN DEMAND

The Plaintiff, The Lincoln Life & Annuity Company of New York, claims damages in excess of Fifteen Thousand and 00/100 Dollars ($15,000), exclusive of costs and interests.

PLAINTIFF,
THE LINCOLN LIFE & ANNUITY
COMPANY OF NEW YORK

BY _____
Jeffrey L. Mehl
Rome McGuigan, P.C.
One State Street, 17th Floor
Hartford, CT 06103
(860) 549-1000

51

*Of Counsel*

Stephen C. Baker
Michael J. Miller
Charles J. Vinicombe
Drinker Biddle & Reath LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6996
(215) 988-2700

*Attorneys for Plaintiff*
*The Lincoln Life & Annuity*
*Company of New York*

*Rome McGuigan, P.C.* • *Attorneys at Law*
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

TRUST AGREEMENT

OF

ARTHUR KRAMER 2005 INSURANCE TRUST

By and Among

Hudson United Bank, the Trustee, Arthur Kramer, the Depositor

and Liza Kramer, the Beneficiary

Dated as of August 29, 2005

TRUST AGREEMENT

ARTHUR KRAMER 2005 INSURANCE TRUST

THIS TRUST AGREEMENT (as modified, supplemented or amended, from time to time, this "Agreement") is dated and effective as of August ᴗᶦ, 2005 by and among the Trustee (as defined herein), the Depositor (as defined herein), and the holder, from time to time, of the sole undivided beneficial interest in the Trust (the "Beneficiary").

WHEREAS, the Trustee and the Depositor desire to establish the Arthur Kramer 2005 Insurance Trust (the "Trust") pursuant to the laws of the State of New York;

NOW, THEREFORE, it being the intention of the parties hereto that the Trust constitute a common law trust created under the laws of the State of New York and that this Agreement constitute the governing instrument of such common law trust, the parties hereby agree as follows:

ARTICLE I
DEFINITIONS

SECTION 1.1 Definitions.

Unless the context otherwise requires:

(a)     capitalized terms used in this Agreement shall have the meaning as ascribed herein;

(b)     all references in this Agreement to Articles and Sections are to Articles and Sections of this Agreement unless otherwise specified; and

(c)     a reference to the singular includes the plural and vice versa.

"Agreement" has the meaning set forth in the introductory paragraph hereof.

"Beneficial Interest" means the sole undivided beneficial interest in the assets of the Trust created by this Agreement.

"Beneficial Interest Transfer Agreement" has the meaning set forth in Section 2.4(c) hereof.

"Beneficiary" has the meaning set forth in the introductory paragraph hereof.

"Certificate of Beneficial Interest" shall mean the certificate representing the Beneficial Interest issued to the Beneficiary from time to time in substantially the form attached hereto as Exhibit A.

"Collateral Document" means any (i) security agreement or similar arrangement to be entered into at the direction of the Beneficiary in order to pledge or secure the Trust assets for the benefit of the Beneficiary or its designee or to collateralize any obligations of the

Beneficiary or its designee or (ii) any amendment to any document referred to in clause (i) entered into at the written instruction of the Beneficiary and the applicable Secured Party.

"Depositor" means the Person who makes the initial contribution to the Trust pursuant to Section 2.4(a) hereof and who has signed this Agreement as depositor.

"Indemnified Person" means (i) the Trustee and (ii) any officer, director, shareholder, employee, member, partner, representative or agent of the Trustee.

"Person" means a legal person, including any individual, corporation, estate, partnership, limited partnership, joint venture, association, joint stock company, limited liability company, trust (including a business or statutory trust), unincorporated association, or government or any agency or political subdivision thereof, or any other entity of whatever nature.

"Secured Party" means a secured party under any Collateral Document.

"Transaction Documents" means this Agreement, the Certificate of Beneficial Interest, any Beneficial Interest Transfer Agreement, the Collateral Documents and all agreements, instruments and other documents to be delivered in connection herewith or therewith, including, without limitation, all applications therefor, all notifications, requests for consents, requests for acknowledgments and other documentation in connection with the administration of the Trust assets, and all exhibits, supplements, schedules and other documentation, in each case as modified, supplemented or amended from time to time.

"Trust" has the meaning set forth in the recitals hereof.

"Trustee" means the Person who has signed this Agreement as a trustee, so long as such Person shall continue in office in accordance with the terms hereof, and any other Person who may from time to time be duly appointed, qualified and serving as a Trustee in accordance with the provisions hereof, and references herein to a Trustee shall refer to such Person solely in its capacity as a trustee hereunder.

ARTICLE II
ORGANIZATION

SECTION 2.1 Name.

The Trust created by this Agreement is named "Arthur Kramer 2005 Insurance Trust". The Trust's activities shall be conducted under the name of the Trust.

SECTION 2.2 Office.

The address of the principal office of the Trust is 75 Rockefeller Plaza, NY 10019 or as otherwise directed by the Beneficiary from time to time.

SECTION 2.3 <u>Purpose</u>.

   The exclusive purposes and functions of the Trust are (a) to reflect in the Trust's books and records the ownership of the Beneficial Interest by, and to issue the Certificate of Beneficial Interest to, the Beneficiary, (b) to hold the assets contributed to the Trust for the benefit of the Beneficiary as provided in Section 2.4(a) hereof, (c) to distribute the Trust's income and assets as provided in this Agreement, (d) to pledge the Trust assets to secure or collateralize any obligations of the Beneficiary or its designee, (e) to enter into the Transaction Documents and to administer the Trust assets in accordance therewith, and (f) except as otherwise limited herein, to engage in only such other activities as directed by the Beneficiary from time to time.

SECTION 2.4 <u>Declaration and Authority</u>.

   (a) The Trustee declares that all assets contributed to the Trust will be held in trust for the benefit of the Beneficiary subject to, and in accordance with, the provisions of this Agreement.

   (b) Subject to Section 2.4(e), the Trustee shall manage the affairs of the Trust and otherwise act hereunder only in accordance with written instructions from the Beneficiary. Without limiting the foregoing, the Beneficiary may direct the Trustee to (i) distribute any and all Trust assets to the Beneficiary or its designee, (ii) sell or otherwise dispose of Trust assets and distribute any and all proceeds thereof to the Beneficiary or its designee, and (iii) pledge the Trust assets to secure or collateralize any obligations of the Beneficiary or its designee. An action taken by the Trustee in accordance with such an instruction shall constitute the act of, and serve to bind, the Trust. In dealing with the Trustee acting on behalf of the Trust, no person shall be required to inquire into the authority of the Trustee to bind the Trust. Persons dealing with the Trust are entitled to rely conclusively on the power and authority of the Trustee as set forth in this Agreement.

   (c) The Trustee is hereby authorized and directed to reflect the ownership by the Beneficiary of the Beneficial Interest in the Trust's records and to issue the Certificate of Beneficial Interest to the Beneficiary. The Trustee is further authorized and directed to reflect transfers of the Beneficial Interest in the Trust's records and to issue new Certificates of Beneficial Interest in accordance with instructions from the Beneficiary; <u>provided</u>, <u>however</u>, that any such transferee shall execute a transfer agreement with respect to the Beneficial Interest (a "<u>Beneficial Interest Transfer Agreement</u>") in substantially the form attached hereto as Exhibit B agreeing to be bound by the terms hereof; and <u>provided</u> <u>further</u> there shall be no more than one Beneficial Interest, Certificate of Beneficial Interest and Beneficiary at any time.

   (d) The Trustee is hereby authorized and directed to execute, on behalf of the Trust, each of the Transaction Documents from time to time including instructions to apply for and purchase an insurance policy; <u>provided</u>, <u>however</u>, that the Trustee shall have no duty or obligation to cause the Trust to perform its obligations under the Transaction Documents except in accordance with written instructions from the Beneficiary.

3

(e)    Notwithstanding anything herein to the contrary, (i) the Beneficiary may not direct or otherwise cause the Trustee to dissolve and liquidate the Trust and (ii) the Trustee shall not take, nor shall the Beneficiary have the power to cause the Trustee to take, any action on behalf of the Trust that would contravene Section 2.3 hereof or any Transaction Document; provided that actions may be taken in contravention of a Collateral Document with the written consent of the secured party thereunder.

SECTION 2.5 Title to Property of the Trust.

Legal title to all assets of the Trust shall be vested in the Trust.

SECTION 2.6 Duration of Trust.

The Trust, absent termination pursuant to the provisions of Section 5.2, shall have existence for fifty (50) years from the date hereof.

SECTION 2.7 Certain Responsibilities of the Beneficiary.

The Beneficiary agrees:

(a)    from time to time to determine the States in which to take appropriate action to qualify or register the Trust to do business and to do any and all such acts, other than actions which must be taken by the Trust, and advise the Trust of actions it must take, and prepare for execution and filing any documents to be executed and filed by the Trust, as the Beneficiary deems necessary or advisable in order to comply with the applicable laws of any such States; and

(b)    to direct the Trustee in the management of the Trust as set forth in Section 2.4 hereof.

SECTION 2.8 Income, Profits and Distributions.

The Beneficiary shall be entitled to the income on and profits of, any of the Trust's assets as and when they are earned or arise, as the case may be. The Beneficiary may direct the Trustee to distribute such income and profits to the Beneficiary at any time and from time to time.

SECTION 2.9 Access to Books and Records.

The books and records of the Trust shall be available for inspection and copying by any Secured Party and/or its authorized representative, at the expense of such Secured Party, during ordinary business hours and upon 24 hour written notice given to the Trustee and the Beneficiary.

ARTICLE III
THE TRUSTEE

SECTION 3.1 <u>Trustee</u>.

The initial Trustee of the Trust shall be Hudson United Bank.

SECTION 3.2 <u>Certain Provisions Relating to the Trustee</u>.

(a)    The Trustee shall not be liable with respect to any action taken or omitted to be taken by it in accordance with the instructions provided by the Beneficiary in accordance with and subject to this Agreement.

(b)    No provision of this Agreement or any other document or instrument shall require the Trustee to expend or risk funds or otherwise incur any financial liability in the performance of any of its rights or powers hereunder, if the Trustee shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured or provided to it.

(c)    The Trustee shall not be responsible for or in respect of and makes no representation as to the validity or sufficiency of any provision of this Agreement or for the due execution hereof by the Depositor or for the form, character, genuineness, sufficiency, value or validity of any of the trust estate.

(d)    The Trustee shall not be liable for the default or misconduct of the Depositor or the Beneficiary.

(e)    The Trustee shall not have any duty or obligation to manage, control, prepare, file or maintain any report, license or registration, use, sell, dispose of or otherwise deal with the trust estate, or otherwise to take or refrain from taking any action under or in connection with this Agreement or any other document or instrument, except as expressly required hereby; and no implied duties or obligations shall be read into this Agreement against the Trustee.

(f)    The Trustee shall be under no obligation to appear in, prosecute or defend any action, or to take any other action other than the giving of notices, which in its opinion may require it to incur any out-of-pocket expense or any liability unless it shall be furnished with such security and indemnity against such expense or liability as it may reasonably require.

(g)    The Trustee shall incur no liability if, by reason of any provision of any present or future law or regulation thereunder, or by any force majeure event, including but not limited to natural disaster, war or other circumstances beyond its reasonable control, the Trustee shall be prevented or forbidden from doing or performing any act or thing which the terms of this Agreement provide shall or may be done or performed, or by reason of any exercise of, or failure to exercise, any discretion provided for in this Agreement.

5

(h)    The Trustee shall not be required to take any action hereunder or in relation to any asset of the Trust even if directed by the Beneficiary if the Trustee shall have reasonably determined, or shall have been advised by counsel, that such action is likely to result in liability on the part of the Trustee or is contrary to the terms hereof or is otherwise contrary to law.

SECTION 3.3 Compensation of Trustee.

The Beneficiary agrees:

(a)    to pay the Trustee from time to time reasonable compensation for all services rendered by it hereunder, which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust and which shall be as set forth in a fee letter from the Trustee to the Beneficiary; provided, however, that notwithstanding anything to the contrary set forth in this Agreement or in any Transaction Document, the Beneficiary shall not be required to pay compensation or fees to the Trustee at or with respect to any time that the Trust has no (or de minimis) assets; and

(b)    except as otherwise expressly provided herein, to reimburse the Trustee upon request for all reasonable documented expenses, disbursements and advances incurred or made by the Trustee in accordance with any provision of this Agreement (including the reasonable compensation and the expenses and disbursements of its agents and counsel), except any such expense, disbursement or advance as may be attributable to the gross negligence or bad faith of such Trustee.

SECTION 3.4 Exception to Payment of Fees and Expenses.

For the avoidance of doubt, no Beneficiary shall have any obligation under this Section 3.4 to the Trustee in respect of fees and expenses of the Trustee rendered, incurred or made by the Trustee during a time when such Beneficiary was not the holder of the Beneficial Interest.

ARTICLE IV
LIMITATION OF LIABILITY OF
BENEFICIARY, TRUSTEE AND OTHERS

SECTION 4.1 Exculpation.

(a)    No Indemnified Person shall be liable, responsible or accountable in damages or otherwise to the Trust for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Indemnified Person in good faith on behalf of the Trust and in a manner such Indemnified Person reasonably believed to be within the scope of the authority conferred on such Indemnified Person by this Agreement or by law, except that the foregoing limitation shall not limit the liability, if any, of an Indemnified Person to the extent that any such loss, damage or claim is incurred by reason of such Indemnified Person's gross negligence or willful misconduct with respect to such acts or omissions; and

6

(b)    an Indemnified Person shall be fully protected in relying in good faith upon the records of the Trust and upon such information, opinions, reports or statements presented to the Trust by any Person as to matters the Indemnified Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Trust, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits, losses, or any other facts pertinent to the existence and amount of assets from which distributions to the Beneficiary might properly be paid.

SECTION 4.2 Fiduciary Duty.

(a)    To the extent that, at law or in equity, an Indemnified Person has duties (including fiduciary duties) and liabilities relating thereto to the Trust, an Indemnified Person acting under this Agreement shall not be liable to the Trust for its good faith reliance on the provisions of this Agreement.  The provisions of this Agreement, to the extent that they restrict the duties and liabilities of an Indemnified Person otherwise existing at law or in equity, are agreed by the parties hereto to replace such other duties and liabilities of such Indemnified Person;

(b)    To the fullest extent permitted by applicable law, whenever in this Agreement an Indemnified Person is permitted or required to make a decision in its "good faith" or another express standard, the Indemnified Person shall act under such express standard and shall not be subject to any other or different standard imposed by this Agreement or by applicable law.

SECTION 4.3 Indemnification.

The Beneficiary agrees, to the fullest extent permitted by applicable law, to indemnify and hold harmless any Indemnified Person from and against any loss, damage, liability, tax, penalty, expense or claim of any kind or nature whatsoever incurred by such Indemnified Person during the time that such Beneficiary is the holder of the Beneficial Interest by reason of the creation, operation or termination of the Trust or any act or omission performed or omitted by such Indemnified Person in good faith on behalf of the Trust and in a manner such Indemnified Person reasonably believed to be within the scope of authority conferred on such Indemnified Person by this Agreement, except that no Indemnified Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Indemnified Person by reason of gross negligence or willful misconduct with respect to such acts or omissions.  For the avoidance of doubt, no Beneficiary shall have any obligation under this Section 4.3 to any Indemnified Person in respect of any such loss, damage, liability, tax, penalty, expense or claim of any kind or nature whatsoever incurred by such Indemnified Person, or arising out of or related to events or circumstances occurring, during a time when such Beneficiary was not the holder of the Beneficial Interest.

SECTION 4.4 Resignation and Removal of Trustee; Appointment of Successor.

(a)    The Trustee may resign at any time without cause by giving at least 10 days' prior written notice to the Beneficiary and each Secured Party, if any, such

7

resignation to be effective only upon the acceptance of appointment by a successor Trustee under Section 4.5(d) below.

(b)    In addition, the Beneficiary may at any time remove the Trustee without cause by an instrument in writing delivered to the Trustee, with the written consent of each Secured Party, if any, such removal to be effective upon the acceptance of appointment by a successor Trustee under Section 4.5(d) below.

(c)    In case of the resignation or removal of the Trustee, the Beneficiary shall appoint a successor Trustee by a written instrument signed by the Beneficiary and with the written consent of each Secured Party.  If a successor Trustee shall not have been appointed within 40 days after the giving of written notice of such resignation or the delivery of the written instrument with respect to such removal, the Trustee or the Beneficiary or any Secured Party may apply to any court of competent jurisdiction to appoint a successor Trustee to act until such time, if any, as a successor Trustee shall have been appointed as provided above. Any successor Trustee so appointed by such court shall immediately and without further act be superseded by any successor Trustee appointed as above provided within one year from the date of the appointment by such court.

(d)    Any successor Trustee, however appointed, shall execute and deliver to the predecessor Trustee and to the Beneficiary and each Secured Party an instrument accepting such appointment, and thereupon such successor Trustee, without further act, shall become vested with all the properties, rights, powers, duties and trust of the predecessor Trustee in the Trust hereunder with like effect as if originally named the Trustee herein; but nevertheless, upon the written request of such successor Trustee, such predecessor Trustee shall execute and deliver an instrument transferring to such successor Trustee, upon the trusts herein expressed, all the estates, properties, rights, powers, duties and trusts of such predecessor Trustee, and such predecessor Trustee shall duly assign, transfer, deliver and pay over to such successor Trustee all monies or other property then held or subsequently received by such predecessor Trustee upon the trusts herein expressed.

(e)    If a successor Trustee shall be the sole Trustee, such Trustee shall meet the requirements set forth in the first sentence of Section 3.1.

ARTICLE V
AMENDMENTS, DISSOLUTION, MISCELLANEOUS

SECTION 5.1 Amendments.

This Agreement may be amended or restated by, and only by, a written instrument executed by the Trustee and the Beneficiary.

SECTION 5.2 Termination and Dissolution of Trust.

(a)    The Trust shall dissolve and terminate and be of no further force or effect:

(i)    upon the bankruptcy of the Beneficiary;

8

      (ii)     upon the entry of a decree of judicial dissolution of the Beneficiary or the Trust;

      (iii)     upon the expiration of the term set forth in Section 2.7;

      (iv)     if, pursuant to Section 2.4(b), the Beneficiary directs the Trustee to distribute all of the Trust's assets to the Beneficiary or its designee and within six (6) months of the date on which such distribution occurs no additional assets are contributed to the Trust by the Depositor or the Beneficiary;

      (v)     at the sole discretion of the Trustee if, for a period of six (6) months or more, the Beneficiary does not pay the fees of the Trustee when due and payable in accordance with Section 3.3 hereof; and

      (vi)     upon the receipt by the Trust of payment in full at maturity of all of the Trust assets listed in Schedule 1.0 hereto.

      (b)     As soon as practicable after the occurrence of an event referred to in Section 5.2(a), the Trustee shall distribute all of the Trust's assets to the Beneficiary or its designee, if such distribution has not already been made.

SECTION 5.3 Governing Law.

      THIS AGREEMENT AND THE RIGHTS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK AND ALL RIGHTS AND REMEDIES SHALL BE GOVERNED BY SUCH LAWS WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS.

SECTION 5.4 Headings.

      Headings contained in this Agreement are inserted for convenience of reference and do not affect the interpretation of this Agreement or any provision hereof.

SECTION 5.5 Successors and Assigns.

      Whenever in this Agreement any of the parties hereto is named or referred to, the successors and assigns of such party shall be deemed to be included, and all covenants and agreements in this Agreement by the Depositor, the Trustee, and the Beneficiary shall bind and inure to the benefit of their respective successors and assigns, whether or not so expressed.

SECTION 5.6 Partial Enforceability.

      If any provision of this Agreement, or the application of such provision to any Person or circumstance, shall be held invalid, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those to which it is held invalid, shall not be affected thereby.

SECTION 5.7 Counterparts; Delivery by Facsimile.

This Agreement may contain more than one counterpart of the signature page and this Agreement may be executed by the affixing of the signature of each of the parties hereto to one of such counterpart signature pages. All such counterpart signature pages shall be read as though one, and they shall have the same force and effect as though all of the signers had signed a single signature page. Delivery of an executed counterpart of the signature page by facsimile or by other electronic means shall be effective as delivery of an original counterpart thereof.

SECTION 5.8 Consent to Jurisdiction and Service of Process.

Each of the parties hereto hereby consents and agrees that the State or Federal courts located in the Borough of Manhattan, in New York City, New York, shall have exclusive jurisdiction to hear and determine any claims or disputes between the parties pertaining to this Agreement or to any matter arising out of or relating to this Agreement. Each of the parties hereto expressly submits and consents in advance to such jurisdiction in any action or suit commenced in any such court, and hereby waives any objection it may have based upon lack of personal jurisdiction, improper venue or forum non conveniens. Each of the parties hereto hereby waives personal service of the summons, complaint and other process issued in any such action or suit and agrees that service of such summons, complaint and other process may be made by registered or certified mail addressed to it at its notice address as provided in Section 5.9 and that service so made shall be deemed completed upon the earlier of such party's actual receipt thereof or three (3) days after deposit in the United States mails, proper postage prepaid.

SECTION 5.9 Notices.

(a)     Any notice required or permitted to be given to the Depositor shall be deemed to have been duly given if sent to the Depositor at 7772 St. Andrew Road, Rancho Santa Fe, CA 92067 Attention: Arthur Kramer. The Depositor may change this information by written notice to the Trustee.

(b)     Any notice or instruction required or permitted to be given to the Trustee shall be deemed to have been duly given if sent to Hudson United Bank, 75 Rockefeller Plaza, New York, NY 10019. The Trustee may change this information by notice to the Depositor and the Beneficiary.

(c)     Any notice required or permitted to be given to the Beneficiary shall be deemed to have been duly given if such notice is mailed by first class mail, postage prepaid, to the address of the Beneficiary as shown in the Trust's books and records or to such other address or facsimile number as the Beneficiary shall request by notice to the Trustee and the Depositor.

IN WITNESS WHEREOF, the undersigned have caused these presents to be executed as of the day and year above written.

Arthur Kramer,
as Depositor

By: _____

Name: Arthur Kramer


Arthur Kramer 2005 Insurance Trust
Hudson United Bank, Trustee

By: _____


Liza Kramer,
as initial Beneficiary

By: _____

Liza Kramer


Witnesses:


_____
Steven Lockwood


_____
David Capitelli


11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ALICE KRAMER, as Personal Representative of the
Estate of Arthur Kramer,

                              Plaintiff,

          -against-

LOCKWOOD PENSION SERVICES, INC., TALL
TREE ADVISORS, INC., LIFE PRODUCTS
CLEARING, LLC, TRANSAMERICA OCCIDENTAL
LIFE INSURANCE CO., PHOENIX LIFE
INSURANCE CO., LINCOLN LIFE & ANNUITY CO.
OF NEW YORK and JONATHAN S. BERCK,

                            Defendants.

---

PHOENIX LIFE INSURANCE CO.,

                Third-Party Plaintiff,

          -against-

STEVEN LOCKWOOD,

                Third-Party Defendant.

---

**ECF Case**

08 Civ. 2429 (DAB) (MHD)

**DEFENDANT LIFE
PRODUCT CLEARING
LLC'S ANSWER TO
AMENDED COMPLAINT
WITH COUNTERCLAIMS
AND CROSS-CLAIMS**

**JURY TRIAL DEMANDED**

---

       Defendant Life Product Clearing LLC ("LPC"), by and through its attorneys,

Chadbourne & Parke LLP, hereby answers the Amended Complaint of plaintiff Alice Kramer,

as Personal Representative of the Estate of Arthur Kramer (the "Estate" or "Plaintiff"), filed

May 7, 2008 (the "Complaint"), as follows:

## AS TO PARTIES

1.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 1 of the Complaint, except admits that Plaintiff purports to bring this action as the personal representative of the Estate of Arthur Kramer.

2.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 2 of the Complaint, except admits that Arthur Kramer died on January 26, 2008.

3.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 3 of the Complaint.

4.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 4 of the Complaint.

5.  Admits the allegations contained in ¶ 5 of the Complaint, except states that LPC's correct name is "Life Product Clearing LLC".

6.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 6 of the Complaint.

7.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 7 of the Complaint.

8. Admits on information and belief the allegations contained in ¶ 8 of the Complaint.

9. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 9 of the Complaint.

### AS TO JURISDICTION AND VENUE

10. Admits the allegations contained in ¶ 10 of the Complaint.

11. Admits the allegations contained in ¶ 11 of the Complaint.

### AS TO BACKGROUND

12. Denies each and every allegation contained in ¶12 of the Complaint except denies knowledge or information sufficient to form a belief as to the truth of those allegations pertaining to persons other than LPC and states that it need not respond to those allegations which purport to set forth a conclusion of law (but if any response is required, denies such allegations).

13. Denies each and every allegation contained in ¶ 13 of the Complaint and states that it need not respond to those allegations which purport to set forth a conclusion of law or paraphrase the text of statutes (but if any response is required, denies such allegations).

14. Denies each and every allegation contained in ¶14 of the Complaint except denies knowledge or information sufficient to form a belief as to the truth of those allegations pertaining to persons other than LPC and states that it need not respond to those allegations

3

which purport to set forth a conclusion of law (but if any response is required, denies such allegations).

15.  Denies each and every  allegation contained in ¶15 of the Complaint except denies knowledge or information sufficient to form a belief as to the truth of those allegations pertaining to persons other than LPC and states that it need not respond to those allegations which purport to set forth a conclusion of law (but if any response is required, denies such allegations).

16.  Denies each and every allegation contained in ¶ 16 of the Complaint.

## AS TO ALLEGED FACTS

17.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶17 of the Complaint, except admits that Arthur Kramer was or had been an attorney, and died on January 26, 2008.

18.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 18 of the Complaint.

19.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 19 of the Complaint.

4

20. Denies each and every allegation contained in ¶20 of the Complaint except denies knowledge or information sufficient to form a belief as to the truth of those allegations pertaining to persons other than LPC.

21. Denies each and every allegation contained in ¶21 of the Complaint except denies knowledge or information sufficient to form a belief as to the truth of those allegations pertaining to persons other than LPC and states that it need not respond to those allegations which purport to set forth a conclusion of law (but if any response is required, denies such allegations).

22. Denies each and every allegation contained in ¶22 of the Complaint except admits that Lincoln issued a $10,000,000.00 life insurance policy on the life of Arthur Kramer and admits on information and belief that Phoenix issued life insurance policies totaling $28,000,000.00 on the life of Arthur Kramer, but otherwise denies knowledge or information sufficient to form a belief as to the truth of those allegations pertaining to persons other than LPC.

**As to the Transamerica Policies**

23. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 23 of the Complaint.

24. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 24 of the Complaint.

25.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 25 of the Complaint, except denies on information and belief that Ms. Callegari presently works for Mr. Lockwood at 75 Rockefeller Plaza, New York, New York.

26.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 26 of the Complaint.

27.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 27 of the Complaint.

28.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 28 of the Complaint.

29.  Denies each and every  allegation contained in ¶29 of the Complaint  except denies knowledge or information sufficient  to form a belief as to the truth of those allegations pertaining to persons other than LPC.

30.  Denies each and every  allegation contained in ¶30 of the Complaint  except denies knowledge or information sufficient  to form a belief as to the truth of those allegations pertaining to persons other than LPC.

31.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶31 of the Complaint except states that it need not respond to those

allegations which purport to set forth a conclusion of law (but if any response is required, denies such allegations).

**As to the Phoenix Policies**

32.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶32 of the Complaint, except admits that the Arthur Kramer 2005 Insurance Trust (the "August Trust") is governed by New York law and refers to the terms of the trust agreement establishing the August Trust for the true and complete contents thereof.

33.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 33 of the Complaint.

34.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 34 of the Complaint, except admits that in August 2005 Lockwood Pension Services, Inc. had an office at the twenty-first floor of 75 Rockefeller Plaza, New York, New York, and that Hudson United Bank had a branch office at the ground floor of 75 Rockefeller Plaza, New York, New York.

35.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 35 of the Complaint.

36.  Admits the allegations contained in ¶ 36 of the Complaint.

37. Admits on information and belief the allegations contained in ¶ 37 of the Complaint.

38. Denies each and every allegation contained in ¶38 of the Complaint except denies knowledge or information sufficient to form a belief as to the truth of those allegations pertaining to persons other than LPC.

39. Denies each and every allegation contained in ¶39 of the Complaint except denies knowledge or information sufficient to form a belief as to the truth of those allegations pertaining to persons other than LPC.

40. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶40 of the Complaint except states that it need not respond to those allegations which purport to set forth a conclusion of law (but if any response is required, denies such allegations).

**As to the Lincoln Policies**

41. Admits the allegations contained in ¶41 of the Complaint except clarifies that Lincoln issued a single $10,000,000.00 life insurance policy on the life of Arthur Kramer on or about November 23, 2005.

42. Denies each and every allegation contained in ¶42 of the Complaint except denies knowledge or information sufficient to form a belief as to the truth of those allegations pertaining to persons other than LPC.

43.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 43 of the Complaint except states that it need not respond to those allegations which purport to set forth a conclusion of law (but if any response is required, denies such allegations).

**As to Arthur Kramer's Death**

44.  Admits the allegations contained in ¶ 44 of the Complaint.

45.  Denies each and every  allegation contained in ¶ 45 of the Complaint  except states that LPC has requested a copy of Arthur Kramer's death certificate from the Estate and/or its representatives and denies knowledge or information sufficient to form a belief as to the truth of those allegations pertaining to persons other than LPC.

46.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 46 of the Complaint, except admits the allegations contained in the first sentence of ¶ 46, admits that Lincoln has not paid out the proceeds of the policy it issued on the life of Arthur Kramer, and refers to the terms of the pleadings and orders in this action and in the action captioned The Lincoln Life and Annuity Company of New York v. Lockwood Pensions Services, et al., CV-08-5019142-S (Conn. Super. Ct., Hartford J.D., filed April 16, 2008), for the true and complete contents thereof.

Case 1:08-cv-02429-DAB    Document 59    Filed 06/20/2008    Page 10 of 31

## AS TO THE FIRST CLAIM FOR RELIEF

## (DECLARATORY JUDGMENT)

47.  Repeats and realleges each and every allegation, admission and denial made in response to those paragraphs of the Complaint which are referred to in ¶ 47 of the Complaint, as if fully set forth at length herein.

48.  States that it need not respond to those allegations that purport only to quote the text of statutes.

49.  States that it need not respond to those allegations that purport only to quote the text of statutes.

50.  States that it need not respond to those allegations that purport only to quote the text of statutes.

51.  Denies each and every  allegation contained in ¶51 of the Complaint except denies knowledge or information sufficient to form a belief as to the truth of those allegations pertaining to persons other than LPC.

52.  Denies each and every  allegation contained in ¶52 of the Complaint except denies knowledge or information sufficient to form a belief as to the truth of those allegations pertaining to persons other than LPC.

53.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 53 of the Complaint, except states that at the time Lincoln issued an

insurance policy on the life of Arthur Kramer LPC did not need an insurable interest in the life

of Arthur Kramer, as that policy was purchased not for the benefit of LPC, but for Liza Kramer,

and that LPC need not respond to those allegations which purport to set forth a conclusion of

law (but if any response is required, denies such allegations).

54. Denies each and every allegation contained in ¶54 of the Complaint except

denies knowledge or information sufficient to form a belief as to the truth of those allegations

pertaining to persons other than LPC.

55. Denies each and every allegation contained in ¶55 of the Complaint except

admits that Lincoln must pay the death benefits under the policy it issued on the life of Arthur

Kramer, denies knowledge or information sufficient to form a belief as to the truth of those

allegations pertaining to other policies issued on the life of Arthur Kramer, and states that it

need not respond to those allegations which purport to set forth a conclusion of law (but if any

response is required, denies such allegations).

### AS TO THE SECOND CLAIM FOR RELIEF

**(AGAINST DEFENDANTS LOCKWOOD PENSION SERVICES, INC.,
TALL TREE ADVISORS, INC. LIFE PRODUCTS CLEARING, LLC AND
JONATHAN S. BERCK FOR THE RECOVERY OF DEATH BENEFITS)**

56. Repeats and realleges each and every allegation, admission and denial made in

response to those paragraphs of the Complaint which are referred to in ¶ 56 of the Complaint, as

if fully set forth at length herein.

Case 1:08-cv-02429-DAB     Document 59     Filed 06/20/2008     Page 12 of 31

57. States that it need not respond to those allegations that purport only to quote the text of statutes.

58. Denies each and every allegation contained in ¶ 58 of the Complaint.

## FIRST AFFIRMATIVE DEFENSE

59. The Complaint fails, in whole or in part, to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

60. The Estate's claims are barred, in whole or in part, by the equitable doctrines of unclean hands and *in pari delicto*.

## THIRD AFFIRMATIVE DEFENSE

61. The Estate's claims are barred, in whole or in part, by the doctrines of waiver, estoppel, equitable estoppel, and/or quasi estoppel.

## FOURTH AFFIRMATIVE DEFENSE

62. The Estate's claims are barred, in whole or in part, by the acknowledgements, consents and representations of the Estate's decedent and/or his heirs as more particularly set forth in LPC's counterclaims and third-party claims herein.

## FIFTH AFFIRMATIVE DEFENSE

63. The Estate's claims are barred by the doctrine of ratification.

### SIXTH AFFIRMATIVE DEFENSE

64. The Estate's claims are barred, in whole or in part, by the doctrine of election of remedies.

### SEVENTH AFFIRMATIVE DEFENSE

65. The Estate's claims are barred by the doctrine of laches.

### EIGHTH AFFIRMATIVE DEFENSE

66. Any award to the Estate of death benefits on the life insurance policy issued by Lincoln on the life of Arthur Kramer, or declaration that the Estate is entitled to some or all of such benefits (both of which should be denied), should in any event be accompanied by an award against the Estate refunding to LPC all payments made by LPC to Arthur Kramer (or any of his heirs) for the purchase of the rights to such death benefits, and/or a declaration that LPC is entitled to such a refund.

### RESERVATION OF RIGHT TO ASSERT ADDITIONAL DEFENSES

67. LPC adopts and incorporates by reference, as if set forth fully herein, any affirmative defense asserted by any other defendant in this action to the extent that such affirmative defense would be applicable to LPC, and LPC hereby gives notice that it intends to rely upon any additional defense that may become available or appear during discovery proceedings or otherwise in this case, and LPC hereby reserves its right to amend its Answer to assert any such defense(s).

## COUNTERCLAIMS AND CROSS-CLAIMS

### GENERAL ALLEGATIONS

#### Parties

68. LPC repeats and realleges Paragraphs 1-67 of its Answer as though fully set forth herein.

69. LPC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business at 75 Rockefeller Plaza, 18th Floor, New York, New York 10019, which, inter alia, acts as agent with respect to beneficial interests under certain life insurance trusts, including the trust which is the subject of these counterclaims and cross-claims.

70. Counterclaim defendant Alice Kramer alleges herself to be the personal representative of the estate of Arthur Kramer.

71. Upon information and belief, cross-claim defendant Lincoln Life & Annuity Company of New York ("Lincoln") is an insurance company organized and existing under the laws of the State of New York, with its principal place of business at 100 Madison Street, Suite 1860, Syracuse, New York 13202.

#### The Insurance Policy Issued by Lincoln on Arthur Kramer's Life

72. Arthur Kramer, the plaintiff Estate's decedent, established The Arthur Kramer 2005 Insurance Trust (the "August Trust") pursuant to the Trust Agreement of Arthur Kramer 2005 Insurance Trust dated August 29, 2005 (the "August Trust Agreement"). The parties to

the August Trust Agreement were Hudson United Bank, as Trustee, Arthur Kramer, as Depositor, and Liza Kramer, the daughter of Arthur Kramer, as the Beneficiary.

73. On or about November 23, 2005, Lincoln issued to the August Trust as owner life insurance policy number 7214471, with a total death benefit of $10,000,000.00, on the life of Arthur Kramer (the "Lincoln Policy").

74. Liza Kramer owned the entire beneficial interest in the August Trust at the time the Lincoln Policy was procured.

75. Liza Kramer, the named beneficiary of the August Trust, had an insurable interest in the Lincoln Policy at the time the Lincoln Policy was procured.

76. The Lincoln Policy provided that: "While the insured is alive, the Owner may exercise all rights and privileges under the policy including the right[s] to . . . transfer all rights and privileges to another person . . . [and] assign the policy." The Lincoln Policy did not place any time limitations on the policy owner's exercise of these rights.

77. The Lincoln Policy also provided that it "will be incontestable after it has been in force during the Insured's lifetime for 2 years from its Date of Issue."

78. The Lincoln Policy was in force during Arthur Kramer's lifetime for well over two years, from on or about November 23, 2005 to January 26, 2008.

Case 1:08-cv-02429-DAB     Document 59     Filed 06/20/2008     Page 16 of 31

**The Transfer Agreement**

79. After the Lincoln Policy was issued, and in consideration for a payment of $100,000.00 (the "Cash Consideration"), Liza Kramer sold her rights to the August Trust's interest in the Lincoln Policy to LPC, pursuant to a Beneficial Interest Transfer Agreement dated November 29, 2005 (the "Transfer Agreement").

80. In connection with that transaction, Arthur Kramer and Liza Kramer also executed a document entitled Acknowledgements and Consents Relating to Sale of Beneficial Interest dated November 29, 2005 (the "Acknowledgements and Consents Form") in which they each expressly made, inter alia, the following acknowledgements, consents and representations relating to Liza Kramer's decision to sell to LPC the rights to the August Trust's interest in the Lincoln Policy:

    a.  "After reviewing several alternatives for maintaining the [Lincoln] Policy and paying the premium, Arthur and Liza have determined that the sale of the Beneficial Interest [in the August Trust] to [LPC] for the Cash Consideration is in their best interest and in the best interest of their Family."

    b.  "Arthur and Liza acknowledge that they have had sufficient time to thoroughly analyze and discuss the strategy of selling the Beneficial Interest in the [August] Trust to [LPC.]"

    c.  "Arthur and Liza have had the opportunity to discuss this strategy with their family advisors."

    d.  "Upon completion of the sale of [the] Beneficial Interest in the [August] Trust to [LPC] for the Cash Consideration, Arthur and Liza expressly acknowledge, understand,

Case 1:08-cv-02429-DAB    Document 59    Filed 06/20/2008    Page 17 of 31

consent and agree to waive all rights, claims, interests, powers and privileges that they now possess, or in the future may possess, under or with respect to the [Lincoln] Policy."

### Lincoln's Failure and Refusal to Pay the
### Lincoln Policy Following Arthur Kramer's Death

81. Arthur Kramer died on January 26, 2008.

82. On February 27, 2008, the trustee of the August Trust submitted to Lincoln a Claimant's Statement requesting that Lincoln process the August Trust's claim under the Lincoln Policy and pay the death benefit to the August Trust.

83. The Lincoln Policy was properly payable to the August Trust (or to LPC, or at LPC's direction) under the foregoing circumstances, and Lincoln lacked any proper or valid basis under law for failing to timely pay to the August Trust (or to LPC, or at LPC's direction) the death benefit under the Lincoln Policy.

84. Nevertheless, Lincoln has failed and refused to pay the proceeds of the Lincoln Policy to the August Trust (or to LPC, or at LPC's direction).

### COUNTERCLAIMS

### AS AND FOR LPC'S FIRST COUNTERCLAIM
### (Declaratory Judgment)

85. LPC repeats and realleges ¶¶ 1-84 hereof as though fully set forth at length herein.

17

86. Lincoln is obligated to pay the death benefit under the Lincoln Policy to the August Trust, the entire beneficial interest in which LPC purchased from Liza Kramer.

87. In light of the Estate's allegations in the Complaint which seek to collect the death benefit under the Lincoln Policy for the benefit of the Estate (which allegations LPC denies, as more specifically set forth above), there is now an actual controversy of a justiciable nature regarding whether the proceeds of the Lincoln Policy are owing and payable to the August Trust (or to LPC, or at LPC's direction), rather than the Estate.

88. LPC has no adequate remedy at law.

89. Accordingly, LPC is entitled to a declaration that the proceeds of the Lincoln Policy are owing and payable to the August Trust (or to LPC, or at LPC's direction), rather than the Estate.

### AS AND FOR LPC'S SECOND COUNTERCLAIM
### (Tortious Interference with Contractual Relations)

90. LPC repeats and realleges ¶¶ 1-89 hereof as though fully set forth at length herein.

91. Lincoln issued the Lincoln Policy to the August Trust. The Lincoln Policy constituted a valid, binding and enforceable contract between Lincoln and the August Trust.

92. The August Trust is the named beneficiary of the Lincoln Policy and as such, is entitled to the proceeds thereof.

18

Case 1:08-cv-02429-DAB    Document 59    Filed 06/20/2008    Page 19 of 31

93. LPC purchased from Liza Kramer the entire beneficial interest in the August Trust's rights under the Lincoln Policy.

94. On March 10, 2008, the Estate commenced this action by filing a complaint alleging, *inter alia*, that the Lincoln Policy was procured with the view to its immediate assignment to a party that lacked an insurable interest in the life of Arthur Kramer.  This allegation was untrue.

95. The Estate's filing of this action constituted a knowing, intentional and unjustified interference with the August Trust's contractual relationship with Lincoln under the Lincoln Policy. and a knowing, intentional and unjustified inducement of Lincoln to breach the Lincoln Policy by refusing to pay the proceeds to the August Trust (or to LPC, or at LPC's direction).

96. Following the Estate's initiation of this lawsuit, Lincoln has failed and refused to make payment on the Lincoln Policy, based upon the Estate's allegations in the original complaint that the Lincoln Policy was "procured as part of a STOLI transaction and that [it] lacks an insurable interest [sic]."

97. Despite Liza Kramer's express warranty to LPC in the Acknowledgments and Consents Form that she would provide a death certificate to LPC within a reasonable time following Arthur Kramer's death, Liza Kramer and the Estate failed and refused to do so (as

acknowledged in ¶ 45 of the Complaint), so as to delay and/or frustrate the efforts of the August

Trust and LPC to successfully obtain payment by Lincoln of the proceeds of the Lincoln Policy.

98. Upon information and belief, Lincoln would have paid the Lincoln Policy

proceeds to the August Trust (or to LPC, or at LPC's direction) promptly had the Estate timely

cooperated with the August Trust and LPC regarding Arthur Kramer's death certificate and/or

had the Estate not filed its original complaint in this action on March 10, 2008.

99. The above-referenced actions of the Estate have damaged and continue to

damage LPC in that they have delayed the receipt of the Lincoln Policy proceeds from Lincoln.

In the event this Court does not order that the proceeds of the Lincoln Policy are owing and

payable to the August Trust (or to LPC, or at LPC's direction), LPC will suffer damages in an

amount not less than the face value of the Lincoln Policy, i.e., $10,000,000.00, plus interest, as a

direct and proximate result of the Estate's interference with the payment of the death benefit

under the Lincoln Policy, and LPC will be entitled to recover damages from the Estate for such

injury.

### AS AND FOR LPC'S THIRD COUNTERCLAIM
### (In the Hypothetical, for Misrepresentation/Breach of Warranty)

100. LPC repeats and realleges ¶¶ 1-99 hereof as though fully set forth at length

herein.

101. In connection with the issuance of the Lincoln Policy, Arthur Kramer

completed an application for life insurance that was submitted to Lincoln. This application was

entitled Insurance Application Part I ("Part I") and contained various representations. Part I became a part of the Lincoln Policy.

102. Arthur Kramer and Liza Kramer warranted in the Acknowledgements and Consents Form that they had "no knowledge that any representation made regarding [Arthur Kramer's] health or capacity in the procurement of the policy is false or misleading."

103. In the hypothetical event that payment of the Lincoln Policy by Lincoln is impeded in any way by any purported representation or misrepresentation, whether made fraudulently, intentionally, knowingly, recklessly, negligently, inadvertently, innocently and/or in good or bad faith, LPC shall be entitled to damages from the Estate for any resulting non-payment or delay of payment of the proceeds that would otherwise have been due to the August Trust under the Lincoln Policy.

## CROSS-CLAIMS

### Background:  The Secondary Market for Life Insurance Policies

104. Prior to the recent emergence of a competitive secondary market for life insurance policies, the only buyer for a policy in the secondary market was the life insurance carrier that had issued the policy.  These carriers had little incentive to offer substantial compensation for these policies.  Today, however, a competitive secondary market for life insurance policies has developed.  This secondary market for life insurance has given consumers a viable and valuable alternative to sell their policies when they determine that they are no

Case 1:08-cv-02429-DAB     Document 59     Filed 06/20/2008     Page 22 of 31

longer needed or desired.  Indeed, life settlement firms who are active in this market improve policyholder welfare by at least several hundred million dollars annually.

105.  Upon information and belief, certain insurance carriers have been or have become hostile to the secondary market for insurance based on their fears that, in the statistical aggregate, investors who participate in this market will not let insurance policies lapse in the same way that policyholders previously did, and that therefore insurance companies will be forced to pay a larger percentage of the policies they issued, rather than simply pocketing large volumes of premiums on policies they will never pay.  Indeed, the insurance carriers' historic business model has been based on the fact that the vast majority (perhaps approaching 90%) of universal life insurance policies do not ever pay death benefits.  Life settlement firms such as LPC pose a threat to insurance carriers' ability to continue operating on this windfall profits model based on a high lapse rate.

106.  Certain insurers have taken the approach of responding to the current secondary market environment by raising legally and/or factually unfounded issues concerning insurable interest requirements under governing law, and issuing policies for which they know they will ultimately challenge payment.  Lincoln is one such carrier, and in some cases it has sought to rescind policies while seeking to keep the premiums paid thereon, in the hopes of potentially reaping all of the benefits of its contract without bearing any of its burdens.  Under this cynical and unlawful approach, the most profitable insurance contracts are those which an

insurance carrier believes it can ultimately rescind on the basis that the policy lacked an insurable interest at its procurement.

### AS AND FOR LPC'S FIRST CROSS-CLAIM
### (Against Lincoln, for Breach of Contract)

107.  LPC repeats and realleges ¶¶ 1-106 hereof as though fully set forth at length herein.

108.  Lincoln issued the Lincoln Policy to the August Trust on or about November 23, 2005.  The Lincoln Policy constituted a valid, binding and enforceable contract between Lincoln and the August Trust.

109.  The Lincoln Policy provides that Lincoln would pay the proceeds of the Lincoln Policy to the beneficiary upon receipt of due proof that the death of Arthur Kramer occurred while the Lincoln Policy was in force.

110.  The Lincoln Policy has remained in force at all times since its issuance.

111.  Arthur Kramer died on January 26, 2008 while the Lincoln Policy was in force.

112.  The trustee of the August Trust provided due proof of Arthur Kramer's death to Lincoln.

113.  Despite demand duly made, and submission of all necessary documentation, Lincoln has failed and refused to pay to the August Trust (or to LPC, or at LPC's direction) the death benefit under the Lincoln Policy.

Case 1:08-cv-02429-DAB    Document 59    Filed 06/20/2008    Page 24 of 31

114.  The August Trust (and any and all other necessary persons, if any) have performed (completely, or at least substantially), and have not materially breached, any and all obligations they may have had under the Lincoln Policy.

115.  Lincoln has breached the Lincoln Policy by failing to pay the benefits due under the Lincoln Policy to the August Trust (or to LPC, or at LPC's direction).

116.  LPC has been injured by Lincoln's breach of the Lincoln Policy.

117.  Accordingly, LPC is entitled to a declaration that Lincoln breached the Lincoln Policy and an award of damages against Lincoln in an amount not less than the face value of the Lincoln Policy, i.e., $10,000,000.00, plus interest.

### AS AND FOR LPC'S SECOND CROSS-CLAIM
#### (Against Lincoln, for Declaratory Judgment)

118.  LPC repeats and realleges ¶¶ 1-117 hereof as though fully set forth at length herein.

119.  The Lincoln Policy contains an incontestability provision which states that the Lincoln Policy "will be incontestable after it has been in force during the Insured's lifetime for two years from its Date of Issue."

120.  New York law bars insurers from seeking to rescind a life insurance policy by claiming lack of "insurable interest" once two years have passed since the policy was issued.

121. Lincoln, on April 16, 2008 — more than two years after the Lincoln Policy was issued, and after Arthur Kramer had died and a claim for death benefits under the Lincoln Policy already had been submitted — asserted for the first time that the Lincoln Policy was, or should now be deemed to be, void *ab initio*, on account of a supposed lack of a proper "insurable interest" at the time when the Lincoln Policy was issued, and that Lincoln should therefore be excused from making payment of the death benefit under the Lincoln Policy.

122. In light of the foregoing, there is now an actual controversy of a justiciable nature regarding whether the Lincoln Policy is valid and enforceable (as opposed to void *ab initio*) and whether Lincoln must pay to the August Trust (or to LPC, or at LPC's direction) the benefits due under the Lincoln Policy.

123. LPC has no adequate remedy at law.

124. Accordingly, LPC is entitled to a declaration that the Lincoln Policy is valid and enforceable notwithstanding any issue Lincoln might now seek to raise regarding a supposed lack of proper "insurable interest" at the time the Lincoln Policy was issued, and that Lincoln must pay to the August Trust or LPC the benefits owed under the Lincoln Policy.

### AS AND FOR LPC'S THIRD CROSS-CLAIM
### (Against Lincoln, for Declaratory Judgment)

125. LPC repeats and realleges ¶¶ 1-124 hereof as though fully set forth at length herein.

126. Lincoln, on April 16, 2008 — more than two years after the Lincoln Policy was issued, and after Arthur Kramer had died and a claim for death benefits under the Lincoln Policy already had been submitted — asserted for the first time that it was entitled to make setoffs from the death benefit payable under the Lincoln Policy on the theory that it has sustained damages as a result of one or more alleged civil conspiracies among LPC and third-party defendant Steven Lockwood, defendant Lockwood Pension Services, Inc., original defendant TD Banknorth, Inc., defendant Jonathan S. Berck, and/or non-party Joel Miller to fraudulently induce Lincoln to issue the Lincoln Policy and/or a life insurance policy Lincoln issued on the life of one Leon Lobel (the "Lobel Policy"), and to conceal the purported absence of an "insurable interest" in these policies. Lincoln asserted that LPC furthered these supposed civil conspiracies by, inter alia, acquiring and/or participating in the sale of the death benefits under these policies and funding premium payments for these policies.

127. Because the two-year incontestability period under both New York law and the express terms of the Lincoln Policy already had lapsed by the time Lincoln first made this assertion, there is no lawful basis for Lincoln to make any setoffs from the death benefit payable under the Lincoln Policy.

128. In light of the foregoing, there is now an actual controversy of a justiciable nature regarding whether Lincoln has any lawful basis to set off any amounts from the death benefit payable under the Lincoln Policy based on these belatedly-raised allegations of supposed civil conspiracy.

129.  LPC has no adequate remedy at law.

130.  Accordingly, LPC is entitled to a declaration that Lincoln has no lawful basis to set off any amounts from the death benefit payable under the Lincoln Policy based on its belatedly-raised allegations of supposed civil conspiracy.

### AS AND FOR LPC'S FOURTH CROSS-CLAIM
### (Against Lincoln, for Declaratory Judgment)

131.  LPC repeats and realleges ¶¶ 1-130 hereof as though fully set forth at length herein.

132.  Lincoln, on April 16, 2008 — more than two years after the Lincoln Policy was issued, and after Arthur Kramer had died and a claim for death benefits under the Lincoln Policy already had been submitted — asserted for the first time that it was entitled to make setoffs from the death benefit payable under the Lincoln Policy on the theory that it has sustained damages as a result of LPC's supposedly having aided and abetted third-party defendant Steven Lockwood and defendant Lockwood Pension Services, Inc. in carrying out one or more supposed fraudulent arrangements on their part to deceive and induce Lincoln to issue the Lincoln Policy and/or the Lobel Policy, and to conceal the purported absence of an "insurable interest" in these policies.  Lincoln asserted that LPC allegedly aided and abetted these supposed frauds by, inter alia, acquiring and/or participating in the sale of the death benefits under these policies and funding premium payments for these policies.

27

133.  Because the two-year incontestability period under both New York law and the express terms of the Lincoln Policy already had lapsed by the time Lincoln first made this assertion, there is no lawful basis for Lincoln to make any setoffs from the death benefit payable under the Lincoln Policy.

134.  In light of the foregoing, there is now an actual controversy of a justiciable nature regarding whether Lincoln has any lawful basis to set off any amounts from the death benefit payable under the Lincoln Policy based on these belatedly-raised allegations of supposed aiding and abetting fraud.

135.  LPC has no adequate remedy at law.

136.  Accordingly, LPC is entitled to a declaration that Lincoln has no lawful basis to set off any amounts from the death benefit payable under the Lincoln Policy based on its belatedly-raised allegations of supposed aiding and abetting fraud.

### AS AND FOR LPC'S FIFTH CROSS-CLAIM
### (Against Lincoln, under N.Y. Gen. Bus. Law § 349)

137.  LPC repeats and realleges ¶¶ 1-136 hereof as though fully set forth at length herein.

138.  On information and belief, the Lincoln Policy issued to the August Trust was a standard form policy sold by Lincoln to other consumers.

28

139. Lincoln's representations and omissions, including representations in the Lincoln Policy, were misleading in a material respect, in that policy applicants, holders, purchasers and beneficiaries were led to believe that claims for payment under such policies would be investigated and processed in good faith and in a timely matter, and that benefits would be paid in accordance with the terms of such policies. In fact, however, Lincoln has failed to do so with respect to the policy at issue here. Lincoln has done likewise with respect to other similar policies.

140. Accordingly, Lincoln's conduct, as alleged herein, constitutes deceptive acts or practices within the meaning of New York General Business Law § 349.

141. As a direct and proximate result of Lincoln's deceptive acts or practices, LPC has been injured in an amount not less than the face value of the Lincoln Policy, i.e., $10,000,000.00, plus interest and attorneys' fees, and LPC will be entitled to recover damages from Lincoln for such injury.

WHEREFORE, LPC respectfully demands judgment in its favor as follows:

(i)      dismissing with prejudice the Estate's claims for relief in the Complaint;

(ii)      declaring that the Lincoln Policy is valid and enforceable, that Lincoln must pay the to August Trust (or to LPC, or at LPC's direction), and not to the Estate, the benefits owed under the Lincoln Policy;

(iii)      in the event that the Court awards to the Estate some or all of the death benefits payable under the Lincoln Policy, or issues a declaration that the Estate is entitled to

29

some or all of such benefits, awarding to LPC a refund from the Estate of all payments made by

LPC to Arthur Kramer (or to any of his heirs) for the purchase of the rights to such death

benefits, and/or a declaration that LPC is entitled to such a refund;

(iv)    in the event this Court does not order that the proceeds of the Lincoln Policy

are owing and payable to the August Trust (or to LPC, or at LPC's direction), awarding LPC

compensatory damages from the Estate in an amount to be determined at trial but not less than

$10,000,000.00;

(v)    awarding LPC compensatory damages from Lincoln in an amount to be

determined at trial but not less than $10 million;

(vi)    declaring that Lincoln has no lawful basis to set off any amounts from the

death benefit payable under the Lincoln Policy based on its allegations of supposed civil

conspiracy;

(vii)    declaring that Lincoln has no lawful basis to set off any amounts from the

death benefit payable under the Lincoln Policy based on its allegations of supposed aiding and

abetting fraud; and

(viii)    awarding LPC its attorneys' fees, interest, costs, disbursements, and such

other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

LPC demands a trial by jury of all claims in this action which are so triable.

Dated: New York, New York
      June 20, 2008

CHADBOURNE & PARKE LLP

By_____*/s/ Robert A. Schwinger*_____
                Oliver J. Armas
            Robert A. Schwinger
            Members of the Firm
Attorneys for Defendant
    Life Product Clearing LLC
30 Rockefeller Plaza
New York, New York  10112
(212) 408-5100
*oarmas@chadbourne.com*
*rschwinger@chadbourne.com*