**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____
ALICE KRAMER, as Personal Representative :
of the Estate of Arthur Kramer, :
 :  **Case No.: 08 CV 2429-DAB-MHD**
     **Plaintiff,** :
 —against— :
 :
LOCKWOOD PENSION SERVICES, INC., :
ET AL., :
     **Defendants.** :
_____:
PHOENIX LIFE INSURANCE CO., :
 :
    **Third-Party** :
    **Plaintiff,** :
 —against— :
 :
STEVEN LOCKWOOD, :
    **Third-Party** :
    **Defendant.** :
_____:
LIFE PRODUCT CLEARING LLC, :
 :
    **Third-Party** :
    **Plaintiff,** :
 —against— :
 :
LIZA KRAMER and ANDREW B. KRAMER, :
 :
    **Third-Party** :
    **Defendants.** :
_____:

**REPLY MEMORANDUM OF LAW OF LINCOLN LIFE &**
**ANNUITY COMPANY OF NEW YORK IN SUPPORT**
**<u>OF ITS MOTION TO DISMISS THE AMENDED COMPLAINT</u>**

       **DRINKER BIDDLE & REATH LLP**
       140 Broadway, 39th Floor
       New York, New York  10005
       (212) 248-3140
       Attorneys for Defendant Lincoln Life &
       Annuity Company of New York

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................................... 1

II.   THE STATUTORY LANGUAGE OF N.Y. INS. STAT. § 3205(B)(4) IS
      CLEAR, CANNOT BE IGNORED, AND HAS NOT BEEN TRIGGERED, AND
      THEREFORE, PLAINTIFF DOES NOT HAVE STANDING UNDER THE
      STATUTE .................................................................................................................... 1

III.  EVEN IF IT WAS POSSIBLE TO TREAT THE PROCEEDS AS IF THEY HAD
      BEEN PAID, THAT WOULD NOT BE APPROPRIATE IN THIS CASE
      BECAUSE IT IS NOT CLEAR THAT THE PROCEEDS ARE EVEN OWED ............. 3

IV.   EVEN IF N.Y. INS. STAT. § 3205(B)(4) WAS TRIGGERED, IT ONLY
      CONFERS STANDING ON PLAINTIFF TO SUE THE RECIPIENT OF THE
      PROCEEDS, NOT THE INSURER, AND PLAINTIFF'S LACK OF
      STANDING IS FATAL TO HER DECLARATORY JUDGMENT CLAIM .................. 9

## TABLE OF AUTHORITIES

### CASES

*In re Al Zuni Trading, Inc. v. Penick*, 947 F.2d 1403 (9th Cir. 1991) ................................9

*Beard v. Am. Agency Life Ins. Co.*, 550 A.2d 677 (Md. 1988) ........................................3, 6

*Bowhead Info. Tech. Servs., LLC v. Catapult Tech. Ltd.*, 377 F. Supp. 2d 166
    (D.D.C. 2005) ................................................................................................................10

*Caprer v. Nussbaum*, 825 N.Y.S.2d 55 (N.Y. App. Div. 2006) .......................................10

*Chem v. New York Life Ins. Co.*, 1999 U.S. App. LEXIS 3101
    (9th Cir. February 25, 1999) ..........................................................................................5

*Cosmas v. Hassett*, 886 F.2d 8 (2d Cir. 1989) ................................................................10

*Eaton Vance Mgmt. v. Forstmannleff Assoc.*, 2006 U.S. Dist. LEXIS 55741
    (S.D.N.Y. Aug. 11, 2006) ..........................................................................................9, 10

*First Colony Life Ins. Co. v. Sanford*, 480 F. Supp. 2d 870 (S.D. Miss. 2007) ..................5

*Froiland v. Tritle*, 484 N.W.2d 310 (S.D. 1992) ................................................................9

*Guarantee Trust Life Ins. Co. v. Wood*, 631 F. Supp. 15 (N.D. Ga. 1984)........................6

*Highlands Ins. Co. v. PRG Brokerage, Inc.*, 2004 U.S. Dist. LEXIS 83
    (S.D.N.Y. Jan. 6, 2004)................................................................................................10

*Kentucky Central Life Insurance Company v. McNabb*, 825 F. Supp. 269
    (D. Kan. 1993) ............................................................................................................5-6

*Lewis v. Wal-Mart Stores, Inc.*, 2005 U.S. Dist. LEXIS 34470
    (N.D. Okla. Dec. 1, 2005) ..........................................................................................3, 9

*Life Product Clearing LLC v. Angel*, 530 F. Supp. 2d 646 (S.D.N.Y. 2008) .................4, 5

*New England Mutual Life Ins. Co. v. Caruso*, 535 N.E.2d 270 (N.Y. 1989) ..........3, 4, 5, 6

*New England Mutual Life Ins. Co. v. Doe*, 710 N.E.2d 1060
    (N.Y. 1999) .....................................................................................................................6

*Premier Pyrotechnics, Inc. v. Zambelli Fireworks Mfg., Inc.*,
    2005 U.S. Dist. LEXIS 30250 (W.D. Mo. May 31, 2005) ...........................................10

*Spear v. Guardian Life Ins. Co. of Am.*, 112 A.D.2d 904 (N.Y. App. Div. 1985)...............6

*Thomas v. Westchester Cty. Health Care Corp.*, 232 F. Supp. 2d 273
    (S.D.N.Y. 2002) ........................................................................................................10

*Warnock v. Davis*, 104 U.S. 775 (1881) ...........................................................................5

*Willingham v. United Ins. Co.*, 628 So. 2d 328 (Ala. 1993) ...............................................6

*Wuliger v. Mfrs. Life Ins. Co.*, 2008 U.S. Dist. LEXIS 9809
    (N.D. Ohio February 11, 2008)....................................................................................5

## STATUTES AND CODES

28 U.S.C. § 2201.............................................................................................................10

28 U.S.C. § 2202.............................................................................................................10

Kan. Stat. Ann. § 40-450(c) .............................................................................................6

Md. Code Ann., Ins. § 12-201(d) ......................................................................................6

Miss. Code Ann. § 83-5-251(2) ........................................................................................6

N.Y. Ins. Stat. 3202(a)(3).................................................................................................2

N.Y. Ins. Stat. 3205(b)(4) ...............................................................................1, 2, 3, 8, 9, 10

N.Y. Ins. Stat. 3216(d)(1)(B) ...........................................................................................6

I.     **Introduction**

Lincoln has moved to dismiss the amended complaint due to a lack of standing, because plaintiff is neither the owner, nor intended beneficiary, nor purchaser of the policy issued by Lincoln on Arthur Kramer's life.  In response, plaintiff argues that standing nevertheless exists pursuant to N.Y. Ins. Stat. § 3205(b)(4), which provides that, if the beneficiary or other payee receives the proceeds of a life insurance policy when there is a lack of insurable interest, then the estate of the decedent can recover those proceeds from the entity that received them.  *See* N.Y. Ins. Stat. § 3205(b)(4).

The obvious problem with plaintiff's argument is that the proceeds have not, in fact, been paid, and thus, the statute has not been triggered.  In an effort to solve this otherwise fatal defect, plaintiff now argues that, because it is so clear that Lincoln owes the policy proceeds, the Court should act as if the proceeds have been paid - even though they have not.

As explained herein, the statutory language is clear and cannot be ignored as urged by plaintiff.  Moreover, plaintiff's fundamental assumption - that Lincoln clearly owes the proceeds - is profoundly flawed.  Indeed, once the facts and circumstances of this transaction are brought to the full light of day, the opposite result will be required - Lincoln will *not* owe the proceeds.

Finally, even if the Court were to act as if the proceeds have been paid, the statute upon which plaintiff relies provides plaintiff with standing only to sue the policy beneficiary - *not the insurer*.  Indeed, the cases interpreting this statute, or the version of it that exists in various other states, have clearly not interpreted the statute, in the way urged by plaintiff, to confer standing on an estate to sue *an insurer*.

II.     **The Statutory Language of N.Y. Ins. Stat. § 3205(b)(4) Is Clear, Cannot be Ignored, and Has Not Been Triggered, and Therefore, Plaintiff Does Not Have Standing Under the Statute.**

The plain language of the statute upon which plaintiff relies to establish standing is, most significantly, conditional.  The condition must be met before the statute actually confers

standing, and in this case, it is undeniable - and, in fact, conceded by plaintiff - that the condition

has not been met.  Therefore, plaintiff's reliance on this statute as providing standing is clearly

misplaced and fatal to her action against Lincoln.

> The statute provides as follows:

> If the beneficiary, assignee or other payee under any contract made in violation of
> this subsection [on procuring insurance, and including insurable interest] receives
> from the insurer any benefits thereunder accruing upon the death, disablement or
> injury of the person insured, the person insured or his executor or administrator
> may maintain an action to recover such benefits from the person receiving them.

N.Y. Ins. Stat. § 3205(b)(4).  What is plain to see, but what plaintiff seems to fail to truly grasp,

is that the statute begins with "[i]f…" and is, thus, conditional in nature.[1]  Therefore, first, the

condition must be met, *i.e.*, there must be receipt of proceeds from the insurer, and only then

does the main clause come into play, *i.e.*, allowing the personal representative to maintain an

action against the recipient of the proceeds.

In this case, plaintiff concedes that the proceeds have not, in fact, been paid.  This,

obviously, establishes that the condition has not been met.  As such, it follows that the statute has

not been triggered, and plaintiff's standing to maintain an action never arises.  Thus, plaintiff is

just plain wrong when she asserts that, if she proves a SOLI scheme was involved and that the

insurable interest rule was violated, then § 3205(b)(4) confers standing upon her to assert a claim

---

[1] Plaintiff continues to vacillate on her reliance on N.Y. Ins. Stat. § 3205(b)(4) both here and in previous pleadings.
In the original complaint, she had expressly relied on that statute as the basis for her declaratory judgment and
recovery of death benefits claims.  *See* Complaint ¶¶ 52, 55.  Lincoln filed a motion to dismiss, raising plaintiff's
lack of standing problem.  Plaintiff then responded by filing an amended complaint, apparently attempting to cure
her pleading deficiencies by no longer relying on said statute in her declaratory judgment claim (the only claim
directed at Lincoln), but instead citing to N.Y. Ins. Stat. § 3202(a)(3) and 3205(b)(2).  N.Y. Ins. Stat. § 3205(b)(4) was
relegated to the second claim, seeking recovery "[i]n the alternative, if some or all of the death benefits of the
aforementioned policies have already been paid."  *See* Amended Complaint ¶ 57-58.  Now, in response to the
present motion to dismiss, plaintiff is back to relying on N.Y. Ins. Stat. § 3205(b)(4), even though the
aforementioned paragraphs in the amended complaint evidence plaintiff's concession that this statute only applies
where the proceeds have been paid, and plaintiff appears to concede at parts in her memorandum that her right to
maintain an action against the entity who received the benefits is dependent upon Lincoln's paying the proceeds.
*See* Plaintiff's memorandum p. 19 (given the wording of § 3205(b)(4), "if Lincoln had already dispensed the $10
million in death benefits to defendant Life Products (the stranger investor in the policy at issue)—then Plaintiff
would have the right under the statute to sue Life Products in order to recover those proceeds").

for the proceeds.  *See* Plaintiff's memorandum p. 19.  Moreover, plaintiff's interpretation is not

supported by New York cases or the cases from the approximately 24 other states that have

enacted statutes similar to N.Y. Ins. Stat. § 3205(b)(4).[2]

**III.    Even if it was Possible to Treat the Proceeds as if They Had Been Paid, that Would Not be Appropriate in This Case Because it is Not Clear that the Proceeds are Even Owed.**

In the amended complaint and response to the motion to dismiss, plaintiff admits the

following:

- This case involves the procurement of what is known as stranger-originated life insurance ("SOLI").  *See* Plaintiff's memorandum p.4.[3]

- A typical SOLI arrangement - which is designed to circumvent the insurable interest rule - is initiated by a stranger investor or an insurance agent who approaches an elderly person and encourages him to purchase life insurance, the death benefits of which will be immediately transferred to the stranger investor. The common characteristic of *all SOLI arrangements* is that they are structured so that the elderly person or a family member, rather than the stranger investor, is *made to appear* as the original beneficiary of the policy *in order to try to evade* the insurable interest requirement.  *See* Amended Complaint ¶ 14 (emphasis added).

- The defendants participated in an unlawful SOLI arrangement that was *structured for the sole purpose of trying to avoid* the insurable interest rule.  The arrangement was implemented by defendants to *create the appearance* that an insurable interest existed when Arthur Kramer took out several policies, so that the subsequent transfers of the beneficial interests in those policies to the stranger investors *would appear lawful*.  However, the transfers to investors took place immediately upon Mr. Kramer's obtaining of the policies at issue, and that was always their plan.  At no time were Mr. Kramer or any of his family members the

---

[2] Indeed, the case law cuts against plaintiff's argument.  Not only did *New England Mutual Life Ins. Co. v. Caruso*, 535 N.E.2d 270 (N.Y. 1989), upon which plaintiff relies so heavily, note that § 3205(b)(4) would allow the personal representative to recover proceeds *paid to a policyholder* without insurable interest, *see id.* at 274, but *Lewis v. Wal-Mart Stores, Inc.*, 2005 U.S. Dist. LEXIS 34470 (N.D. Okla. Dec. 1, 2005) is especially instructive here.  In *Lewis*, the court, citing Oklahoma's similar statute, dismissed the claims of a number of personal representative plaintiffs, where the policyholder never received any benefits under the life insurance policies at issue because proceeds were not paid out, thus resulting in the court's conclusion that *such plaintiffs lacked standing*.  *See Lewis*, 2005 U.S. Dist. LEXIS 34470, at *21; *see also Beard v. Am. Agency Life Ins. Co.*, 550 A.2d 677, 687 n.3 (Md. 1988) (explaining that Maryland's similar statute is triggered "when a beneficiary who lacks an insurable interest receives the payment of the insurance proceeds from the insurer" but "does not specify what sanctions are to be imposed when, as here, the insurer has not yet paid a beneficiary who lacks an insurable interest").

[3] Plaintiff technically refers to it as "stranger-*owned*" life insurance, but the real issue tends to be the origin and the intent for sale on the secondary market, as opposed to the ownership, of the life insurance.

true owners of the beneficial interests in the policies.  Mr. Kramer never intended for the death benefits of the insurance policies to benefit his family.  *See id.* ¶ 15 (emphasis added).

- It is against public policy for parties to circumvent the insurable interest rule by participating in the procurement of SOLI policies.  *See id.* ¶ 14.

These are stunning admissions.  For one thing, admitting that the parties were concocting schemes "to create the appearance" of an insurable interest constitutes fraud.[4]  Second, admitting that there are such things as "typical SOLI arrangements" and that there are characteristics common to "all SOLI arrangements" is an admission that this SOLI transaction is not an isolated incident.[5]

Plaintiff's view is that these admissions do her no harm, and that she is therefore entitled to a $10,000,000 windfall.  The basis for this amazing assertion is very simple - plaintiff claims that *New England Mutual Life Ins. Co. v. Caruso*, 535 N.E.2d 270 (N.Y. 1989) creates a legal loophole that can *never* be closed - not by fraud, not by criminal conduct, not by anything.  And not even if the parties - including plaintiff's decedent - went to elaborate lengths to conceal an illegal transaction that is part of a multi-billion dollar wave of similar illegal transactions.

Plaintiff's overly simplistic view would not likely be supported by any court.  Moreover, plaintiff's overly simplistic view is not even supported by *Caruso*, which, as explained in more detail below, did not involve fraud and did not set forth any absolute rule.

In *Caruso*, the defendant took out a policy on the insured's life to protect the defendant in case of a default on a loan the defendant and insured were anticipating in connection with the

---

[4] The reaction of Phoenix Life Insurance Company ("Phoenix") was to not just to identify the admissions as fraud but to label them criminal conduct.  *See* Phoenix's Answer to Amended Complaint with Counterclaims, Cross-Claims and Third-Party Complaint.

[5] In its counterclaims and crossclaims, Phoenix describes a pattern of SOLI criminal conduct.  *See* Phoenix's Answer to Amended Complaint with Counterclaims, Cross-Claims and Third-Party Complaint.  Moreover, in a related case involving many of the same parties, this Court acknowledged that the Office of General Counsel has issued opinions on behalf of the New York Insurance Department regarding SOLI policies and practices.  *See Life Product Clearing LLC v. Angel*, 530 F. Supp. 2d 646, 654 (S.D.N.Y. 2008).

pair's restaurant operations. *See Caruso*, 535 N.E.2d at 271. The insured died before the loan was obtained, and the insurer refused to pay the policy proceeds on the grounds of a lack of insurable interest. *Id*. at 272. The case essentially involved innocent parties, as there was no indication that the defendant had acted improperly or was attempting to circumvent insurable interest laws with respect to obtaining the life insurance.[6] Thus, the lack of an insurable interest was not the result of fraud, but instead appears to have been the result of a simple mistake.

Significantly, the court undertook a public policy examination, balancing the public policy in favor of the freedom to contract (*i.e*., the enforcement of an incontestable clause in an insurance policy) against the public policy against wagering contracts (*i.e*., the rationale for requiring an insurable interest). The court recognized that, while there is generally a freedom to contract, this is certainly not limitless, as contractual promises become unenforceable "when statute or public policy dictates that the interest in freedom to contract is outweighed by an overriding interest of society." *See id*. at 273-74. The court further explained that the public policy against wagering contracts prevents "gambling and, in the case of life insurance contracts, of compromising public safety by furnishing a temptation to bring about the event upon which payment is conditioned to those who insure the lives of others." *Id.* at 274.[7] While the court ultimately determined that the proceeds were owed, based, in part, on its interpretation of the insurable interest statute,[8] the court did not foreclose a public policy exception to the payment of

---

[6] *Caruso*, notably, did not involve an estate seeking the proceeds.

[7] This harkens back to the long established history and public policy against wager insurance policies. *See Life Product Clearing LLC v. Angel*, 530 F. Supp. 2d 646, 654 (S.D.N.Y. 2008) (citing to *Warnock v. Davis*, 104 U.S. 775 (1881)).

[8] It should be noted that other states have similar insurable interest statutes to that of New York, prohibiting a person from *procuring or causing to procure* a life insurance policy on the life of another unless the benefits are payable to a person having an insurable interest in the person insured. Various courts interpreting those statutes have held that life insurance policies obtained in violation of those insurable interest statutes are void *ab initio*. *See Chem v. New York Life Ins. Co.,* 1999 U.S. App. LEXIS 3101 (9th Cir. February 25, 1999) (interpreting California's insurable interest statute); *Wuliger v. Mfrs. Life Ins. Co*., 2008 U.S. Dist. LEXIS 9809 (N.D. Ohio February 11, 2008) (interpreting Ohio's insurable interest statute); *First Colony Life Ins. Co. v. Sanford*, 480 F. Supp. 2d 870 (S.D. Miss. 2007) (interpreting Mississippi's insurable interest statute); *Kentucky Central Life Insurance Company v.*

proceeds. Rather, the court ruled only that, "*in these circumstance*s," public policy did not militate against enforcement of the incontestability clause. *See id.* at 273-74 (emphasis added).

Moreover, it cannot be ignored that part of the reasoning bolstering the court's decision was the protection, had there been wrongdoing, offered by penal statutes and other case law and statutes that work to prevent an individual from profiting from his or her own wrong. *See Caruso*, 535 N.E.2d at 274. N.Y. Ins. Stat. § 3205(b)(4) was specifically mentioned, by reason that it can prevent an individual from profiting from his circumvention of the insurable interest laws by allowing an insured or personal representative to recover the proceeds paid to a policyholder lacking insurable interest. *See id*.[9]

---

*McNabb*, 825 F. Supp. 269 (D. Kan. 1993) (interpreting Kansas' insurable interest statute); *Guarantee Trust Life Ins. Co. v. Wood*, 631 F. Supp. 15, 19 (N.D. Ga. 1984); *Willingham v. United Ins. Co*., 628 So. 2d 328 (Ala. 1993); *Beard v. Am. Agency Life Insurance Co*., 550 A.2d 677, 688 (Md. 1988).

    Notably, several of these states also have statutory provisions similar to N.Y. Ins. Stat. § 3205(b)(4), permitting the estate of the insured to collect from the named beneficiary or other payee the benefits paid by the insurer under a life insurance policy made in violation of that state's insurable interest statute. *See* Kan. Stat. Ann. § 40-450(c); Md. Code Ann., Ins. § 12-201(d); Miss. Code Ann. § 83-5-251(2).

    (Unpublished cases cited herein, not previously attached as exhibits to Lincoln's memorandum of law in support of its motion to dismiss the amended complaint, are attached hereto in alphabetical order.)

[9] In at least one prior case, the New York Court of Appeals recognized that fraud could support a public policy exception to the holding in *Caruso*. *See New England Mutual Life Ins. Co. v. Doe*, 710 N.E.2d 1060 (N.Y. 1999). In *Doe*, the insurer filed a complaint, *inter alia*, to rescind the insured's disability policy based on the insured's alleged fraud in procuring the policy. *Id.* at 1061. The insurer argued that the insured fraudulently failed to disclose his HIV diagnosis when he completed the policy application, advancing a policy argument that a strict interpretation of the incontestability clause would encourage fraud. *Id.* at 1061, 1063. While the New York Court of Appeals concluded that an insurer issuing a disability policy in New York could provide itself with greater protection than afforded by a standard incontestability clause by including a fraud exception in the incontestability clause, and because the insurer there chose not to include the fraud exception, the insurer had to accept the consequences, *see id.*, 710 N.E.2d at 1063-64 (citing to N.Y. Ins. Stat. § 3216(d)(1)(B)), that was not the end of it. Notably, the court wrote that "[w]ere we faced with a choice between fraud and statutory design, a far more difficult case would be presented. *It would be difficult for us to conclude that the Legislature knowingly enacted a statute that would encourage fraud*." *Id.* at 1063 (emphasis added).

    Another case the Court should consider is *Spear v. Guardian Life Ins. Co. of Am.,* 112 A.D.2d 904 (N.Y. App. Div. 1985). In *Spear*, the insured filed a declaratory judgment against the insurer, followed by the insurer subsequently asserting several counterclaims, including three involving allegations that the insured was ineligible for the policy when it was issued. *Id.* at 905-06. In affirming the trial court's denial of the insured's motion to dismiss the three counterclaims, the court noted that "[o]rdinarily, the [insurer] would be precluded from asserting those counterclaims in the instant case by the incontestability clause." *Id.* at 908. Yet, the court wrote, "herein a different situation is presented, since [the insurer] alleges that during its investigation false information was provided to it by Mrs. Spear and/or those acting on her behalf to prevent [the insurer] from commencing an action to rescind coverage within the applicable time period under the incontestable clause." *Id.* As such, the court concluded that the trial court correctly ruled that "a question of fact is presented as to whether plaintiffs should be estopped from reliance upon the incontestable clause." *Id.* In other words, *Spear* evidences that the incontestable clause is not as absolute as plaintiff would suggest.

Turning to the case and hand, and applying the law as set forth in *Caruso* and the cases that have followed, the result is clear. Indeed, if ever there was a case for a public policy exception, this is it.

As quoted above, plaintiff has freely admitted that the policy here is a SOLI policy. Plaintiff also admits that the entities involved in placing this policy deliberately concealed what they were doing, and effectively perpetrated a fraud on Lincoln. In this regard, plaintiff admits the following:

- Defendants participated in an unlawful SOLI arrangement that was structured for the sole purpose of trying to avoid the insurable interest rule. *See* Amended Complaint ¶ 15.

- The arrangement was implemented by defendants to create the appearance that an insurable interest existed when Mr. Kramer took out several policies, so that the subsequent transfers of the beneficial interests in those policies to the stranger investors would appear lawful. *See id.*

- However, the transfers to investors took place <u>immediately</u> upon Mr. Kramer's obtaining of the policies at issue, and that was always their plan. *See id.* (emphasis in original).

- At no time were Mr. Kramer or any of his family members the true owners of the beneficial interests in the policies, and Mr. Kramer never intended for the death benefits of the insurance policies to benefit his family. *See id.*

Further, plaintiff is clear that not only were the other non-insurers defendants active participants, but so was Mr. Kramer himself. Specifically, plaintiff admits the following:

- Mr. Kramer was approached by defendant Lockwood to solicit his participation in a SOLI arrangement. *See* Amended Complaint ¶ 18.

- The SOLI arrangement worked as follows: Mr. Kramer, working with defendants, would establish trusts, naming one or more of his children as the initial beneficiaries. Upon issuance of the policies, Mr. Kramer, again working with defendants, would immediately direct his children to execute putative assignments of their interests in the trusts to stranger investors. *See id.* ¶ 20.

- The insurance policies insuring Mr. Kramer's life were procured with the intention of immediately effectuating the assignment of the beneficial interest in the polices to an investor. *See id.* ¶ 21.

7

- Mr. Kramer never intended for the death benefits of the insurance policies to benefit his family. *See id.* ¶ 15.

Defendants procured the insured's complicity in the SOLI scheme, involving not only the policy issued by Lincoln, but other policies issued by other insurer defendants as well. Whereas there was no indication of fraud by any party in *Caruso*, the same cannot be said here.[10] Here, the insured and other procurers were certainly *not* innocent parties but were, in fact, by plaintiff's own admissions, involved in a whole scheme designed, in conjunction with Mr. Kramer's participation, to evade the insurable interest laws.

Importantly, unlike in *Caruso*, where the insured and his estate were innocent of any intentional wrongdoing, the effect of N.Y. Ins. Stat. § 3205(b)(4) does not assist in avoiding a situation where a party or his successor benefits from his wrongdoing. In fact, if plaintiff is permitted to recover here, the effect of the statute would actually be to *assist* a party in benefiting from admitted wrongdoing. Similarly, although the result in *Caruso* was consistent with penal statutes and decisions that prevent wrongdoers from benefiting from their improper conduct, paying funds to plaintiff here would - again - have the opposite result of rewarding wrongdoers for their ability to circumvent the law.[11]

Clearly, if the law of New York is such that wrongdoers and their successors should not benefit from their own wrongdoing, then this is a public policy consideration that must be considered in this case. Once this is included in the analysis, there is really only one appropriate conclusion, which is that plaintiff cannot recover these proceeds.

---

[10] Phoenix clearly does not think that Mr. Kramer was innocent, having now raised counterclaims against plaintiff alleging, among other things, that Defendant "Lockwood colluded with Arthur Kramer to participate in one or more fraudulent SOLI arrangements"; "Mr. Kramer did not apply for life insurance on his own initiative, but rather was induced to do so by the offer of ready cash"; and "Mr. Kramer was attempting to procure a policy for the benefit of a stranger investor with no insurable interest in his life." *See* Phoenix's Counterclaims, Cross-Claims & Third Party Complaint ¶¶ 8, 14, 15.

[11] Plaintiff even admits that SOLI transactions are against public policy. *See* Amended Complaint ¶ 14.

**IV.     Even If N.Y. Ins. Stat. § 3205(b)(4) Was Triggered, It Only Confers Standing on Plaintiff to Sue the Recipient of the Proceeds, Not the Insurer, and Plaintiff's Lack of Standing Is Fatal to Her Declaratory Judgment Claim.**

Separate and apart from the fact that the proceeds have not been paid and cannot be deemed to have been paid, the statute in question (and the similar statutes in other states) provide standing to a plaintiff estate only to sue the beneficiaries of the proceeds - not the insurers.[12] Again, the statutory language on this is clear and provides that the personal representative may maintain an action to recover the benefits paid by the insurer "*from the person receiving them*." *See* N.Y. Ins. Stat. § 3205(b)(4) (emphasis added).  Indeed, plaintiff herself admits that the cases cited by Lincoln have arisen in the context where death benefits *had been paid*, *see* Plaintiff's memorandum p.25, and has provided no case in which the statute conferred standing where the death benefits have not been paid - and conferred standing to sue the insurer.[13]

Finally, plaintiff's standing argument about being in the "zone of interests" of N.Y. Ins. Stat. § 3205(b)(4) is also to no avail in her declaratory judgment claim against Lincoln.  Plaintiff has sued for the proceeds allegedly due under a contract.  Because the underlying cause of action is what is actually litigated in a declaratory judgment action, "a party bringing a declaratory judgment action must have been a proper party had the defendant brought suit on the underlying cause of action.  Parties who lack standing to enforce an agreement also lack standing to seek a declaration of rights under the contract."  *See Eaton Vance Mgmt. v. Forstmannleff Assoc.,* 2006 U.S. Dist. LEXIS 55741, at *17 (S.D.N.Y. Aug. 11, 2006) (citations omitted).  Therefore, as

---

[12] *See also* footnote 1, *supra* (discussing plaintiff's amendments to the complaint, which resulted in N.Y. Ins. Stat. § 3205(b)(4) only being mentioned in the second claim against non-insurer defendants).

[13] Furthermore, as Lincoln explained in its motion to dismiss, the cases from other states have uniformly held that the similar statutes provide estates with standing to sue parties that are in possession of policy proceeds, but not that the statutes provide estates with standing to sue the insurers that decided to pay (or decided to not pay) the policy proceeds.  *See, e.g., In re Al Zuni Trading, Inc. v. Penick,* 947 F.2d 1403, 1404 (9th Cir. 1991) (state statute modifies general rule that only insurer can raise objection of want of an insurable interest; therefore, personal representative had standing in bankruptcy adversary proceeding to raise claim against trustee who received death benefits); *Lewis*, 2005 U.S. Dist. LEXIS 34470 at *23 (named beneficiary of corporate-owned life policy received death benefits, and therefore, personal representative's claim against the named beneficiary was not dismissed for lack of standing); *Froiland v. Tritle*, 484 N.W.2d 310, 313 (S.D. 1992) (estate allowed to recover proceeds from named beneficiary).

plaintiff has not controverted that she is not the owner, intended beneficiary, or purchaser of the contract, and she has conceded that she is not an actual party to the contract, *see* Plaintiff's memorandum p. 23, she lacks standing to bring a declaratory judgment action relating to the contract.  *See Eaton,* 2006 U.S. Dist. LEXIS 55741 at *17 (person not a party to the contract lacked standing to enforce the contract and thus also lacked standing to seek declaration, under 28 U.S.C. §§ 2201-02, of rights under the contract); *Bowhead Info. Tech. Servs., LLC v. Catapult Tech. Ltd*., 377 F. Supp. 2d 166, 171 (D.D.C. 2005) (dismissing declaratory judgment claim related to a contract where plaintiff lacked standing to sue under the contract); *Premier Pyrotechnics, Inc. v. Zambelli Fireworks Mfg., Inc*., 2005 U.S. Dist. LEXIS 30250, *6-7 (W.D. Mo. May 31, 2005) (granting motion to dismiss declaratory judgment action relating to a contract, because plaintiff was not a party to the contract at issue and therefore lack standing to pursue declaratory judgment action); *Highlands Ins. Co. v. PRG Brokerage, Inc*., 2004 U.S. Dist. LEXIS 83, *44 (S.D.N.Y. Jan. 6, 2004) (motion to dismiss granted because a person not a party to the insurance contracts or other agreements lacked standing to raise a claim or seek declaratory relief based on the parties' obligations thereunder).[14]/[15]

---

[14] It must also be recognized that N.Y. Ins. Stat. § 3205(b)(4) is itself a statute that that specifically confers standing to certain individuals in certain circumstances.  *See* N.Y. Ins. Stat. § 3205(b)(4).  This is opposed to statutes like the ones in *Caprer v. Nussbaum*, 825 N.Y.S.2d 55 (N.Y. App. Div. 2006), cited by plaintiff, which, for example, conferred interests in property and, thus, for which there may actually have been a "zone of interest."  *See Caprer*, 825 N.Y.S.2d at 63 (holding that the individual condominium owners did not have standing to seek redress for damage to common interests).  But with respect to a statute actually conferring standing, individuals either fall under the statute and have standing, or they do not.  In this case, plaintiff does not.

[15] Plaintiff's contention that certain exhibits not attached to the amended complaint were specifically referenced in the amended complaint and are therefore incorporated by reference is simply incorrect.  In order to be incorporated by reference, the complaint must make a clear, definite and substantial reference to the documents.  *See Thomas v. Westchester Cty. Health Care Corp*., 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002).  Even limited quotation of a document in the complaint does not constitute incorporation by reference.  *See Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989) (where amended complaint discussed documents and presented short quotations of them, held that "[l]imited quotation does not constitute incorporation by reference," and since they were not attached as exhibits, they should not have been considered on the motion to dismiss*); see also Thomas*, 232 F. Supp. 2d at 275-76 (complaint's reference in one paragraph to document does not qualify as clear, definite or substantial).  But here, for example, not only did the amended complaint lack any "limited quotation" to the action commenced by Lincoln in Connecticut, all plaintiff devotes to its reference is one sentence in a five-sentence procedural history paragraph.  But, even should the Court consider it or other documents, plaintiff still lacks standing to bring her declaratory judgment claim, as described above.

Respectfully submitted,

Dated: New York, New York       DRINKER BIDDLE & REATH LLP
July 21, 2008

/s/ Katherine L. Villanueva
Katherine L. Villanueva (KH 5283)
140 Broadway, 39th Floor
New York, New York  10005
(212) 248-3140

OF COUNSEL
Stephen C. Baker
Michael J. Miller
Drinker Biddle & Reath LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA  19103-6996

For Defendant Lincoln Life & Annuity
Company of New York

## CERTIFICATE OF SERVICE

I, Katherine L. Villanueva, hereby certify that, on the date set forth below, I electronically filed copies of (1) Reply Memorandum of Law of Lincoln Life & Annuity Company of New York in Support of its Motion to Dismiss the Amended Complaint, and (2) Affidavit of Katherine L. Villanueva, using the CM/ECF system, which will send notification of such filings to CM/ECF participants.

I also hereby certify that on the date set forth below, I submitted courtesy copies of the aforementioned, marked as courtesy copies, by overnight Federal Express to the following:

> The Honorable Deborah A. Batts, USDJ
> United States Courthouse
> 500 Pearl St., Room 2510
> New York, NY 10007
> (two copies)

                                        /s/ Katherine L. Villanueva
                                        Katherine L. Villanueva (KH 5283)
                                        Drinker Biddle & Reath LLP
                                        140 Broadway, 39th Floor
                                        New York, NY  10005
                                        (212) 248-3140

Dated: July 21, 2008

# EXHIBIT A

LEXSEE 1999 U.S. APP. LEXIS 3101

**SUULAN CHEM, Plaintiff-Appellant, v. NEW YORK LIFE INSURANCE COMPANY, UNITED OLYMPIC LIFE INSURANCE COMPANY, PACIFIC CORINTHIAN LIFE INSURANCE COMPANY, FIRST CAPITAL LIFE INSURANCE COMPANY, NORTHERN LIFE INSURANCE COMPANY, SURETY LIFE INSURANCE COMPANY and DOES 1 to 50, inclusive, Defendants-Appellees.**

**CA No. 97-17206**

**UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

*1999 U.S. App. LEXIS 3101*

**December 10, 1998, Argued and Submitted, San Francisco, California
February 25, 1999, Filed**

**NOTICE:** [*1] RULES OF THE NINTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: *1999 U.S. App. LEXIS 6717.*

**PRIOR HISTORY:** Appeal from the United States District Court for the Northern District of California. DC No. CV-97-01780-SBA. Saundra Brown Armstrong, District Judge, Presiding.

**DISPOSITION:** AFFIRMED.

**COUNSEL:** For SUULAN CHEM, Plaintiff - Appellant: Laurence F. Padway, PADWAY & PADWAY, Oakland, CA.

For NEW YORK LIFE INSURANCE COMPANY, Defendant - Appellee: Richard J. Kilmartin, Esq., KNIGHT, BOLAND & RIORDAN, San Francisco, CA.

For UNITED OLYMPIC LIFE INSURANCE COMPANY, NORTHERN LIFE INSURANCE, Defendants - Appellees: Thomas M. Herlihy, Esq., KELLY, HERLIHY & BANE, Margie R. Lariviere, Esq., KELLY & HERLIHY, San Francisco, CA.

For UNITED OLYMPIC LIFE INSURANCE

COMPANY, NORTHERN LIFE INSURANCE, Defendants - Appellees: No Appearance.

For PACIFIC CORINTHIAN LIFE INSURANCE COMPANY, Defendant - Appellee: C. Mark Humbert, Esq., JAMES H. FLEMING AND ASSOCIATES, San Francisco, CA.

For SURETY LIFE INSURANCE COMPANY, Defendant - Appellee: Cynthia Becker, Esq., BOWLES AND VERNA, Walnut Creek, CA.

**JUDGES:** Before: PREGERSON and BRUNETTI, [*2] Circuit Judges, and AIKEN, District Judge. [2]

[2] The Honorable Ann L. Aiken, United States District Judge for the District of Oregon, sitting by designation.

**OPINION**

**MEMORANDUM**

[1]

[1] This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as may be provided by *9th Cir. R. 36-3.*

Suulan Chem appeals the dismissal of her action to recover the proceeds of several life insurance policies

issued by defendant insurance companies on the life of her murdered minor son, Michael. The policies were purchased by Thuan Wu, Michael's murderer. Chem contends the district court erred by: (1) concluding that the policies were void and could not be ratified or used to assert estoppel; (2) refusing to issue an injunction she requested; and (3) dismissing her complaint without leave to amend. We reject these contentions and affirm.

### 1. Void Policies

Chem contends that the district court erred by ruling that the policies were void and could not [*3] be ratified or used for estoppel purposes. We disagree. Under California law, see *Standard Fire Ins. Co. v. Peoples Church of Fresno*, 985 F.2d 446, 448 (9th Cir. 1993) (state law applies in diversity action), a life insurance contract "procured . . . upon another individual is void unless the person applying for the insurance has an insurable interest in the individual insured at the time of the application." *CAL. INS. CODE § 10110.1(e)* (West 1997); *Paul Revere Life Ins. Co. v. Fima*, 105 F.3d 490, 492 (9th Cir. 1997) (stating that under California law "an insurance policy is void ab initio where the insured lacks an insurable interest."). The insurable interest must exist at the time the life insurance policy becomes effective. *CAL. INS. CODE § 10110.1(d)* (West 1997). A policy procured by someone without an insurable interest in the life of the insured is a "mere wager on the life of the person insured" and "void as against public policy." *Jimenez v. Protective Life Ins. Co.*, 8 Cal. App. 4th 528, 10 Cal. Rptr. 2d 326, 330 (Ct. App. 1992). As Chem concedes, Wu did not have an insurable interest in her son's life when he procured the policies without her consent or knowledge [*4] and the policies are therefore void ab initio.

Moreover, Wu procured the policies with the intention of murdering Chem and her son. An insurance policy procured with the intention of murdering the insured is void. *See People v. Hardy*, 2 Cal. 4th 86, 5 Cal. Rptr. 2d 796, 825, 825 P.2d 781 (Cal. 1992) ("If it is established that the beneficiary conceived the idea of murdering the insured prior to the time the insurance was procured and with that thought in mind the beneficiary himself procured the policy . . . the insurance company may defeat liability on the ground of fraud." (quoting 4 COUCH ON INSURANCE § 27:160, at 858 (2d ed. 1984))). Under this well-established rule, recovery is barred even by the estate of the insured. *Id.*

Under California law, a void contract is incapable of being ratified and a party cannot be estopped from asserting its illegality. *See Miller v. Elite Ins. Co., 100 Cal. App. 3d 739, 161 Cal. Rptr. 322, 330 (Cal. App. 1980)* ("Estoppel cannot be used to create coverage under an insurance policy where such coverage did not originally exist."); *Russell v. Soldinger, 59 Cal. App. 3d 633, 131 Cal. Rptr. 145, 152 (Ct. App. 1976)* ("An illegal contract [*5] cannot be ratified and generally speaking no person is estopped to assert its illegality."). The district court properly found that the policies were void ab initio and could not be ratified or used for estoppel purposes.

### 2. Injunction

Chem asserts that the district court erred by not granting a permanent injunction "requiring defendants to verify all future policies with the insured prior to issuance, in order to prevent a recurrence of this tragedy." To obtain injunctive relief, Chem must show that the legal remedy available is inadequate and that she is likely to sustain substantial and immediate irreparable injury. *See Easyriders Freedom F.I.G.H.T. v. Hannigan, 92 F.3d 1486, 1495 (9th Cir. 1996)*. Chem has failed to make a "reasonable showing" of a "sufficient likelihood" that she will be injured again. *See Kruse v. State of Hawaii, 68 F.3d 331, 335 (9th Cir. 1995)* (quoting *Sample v. Johnson, 771 F.2d 1335, 1340 (9th Cir. 1985)*). It is not enough to allege that others may be injured in the same way in the future. *Id.* Chem has already suffered her tragic loss; she is in no danger of sustaining a substantial and immediate harm from the continuation of defendants' [*6] alleged conduct. Accordingly, the district court did not err by denying Chem's request for injunctive relief.

### 3. Leave to Amend

Chem contends that the district court erred by denying her leave to amend her complaint. This contention lacks merit. When a complaint is dismissed for failure to state a claim, "leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir. 1986)*. Here, the district court specifically found that "amendment to the complaint would be futile," and dismissed without leave to amend. We agree that no possible amendment to the pleadings would cure the deficiencies of Chem's complaint. Accordingly, we

affirm the court's dismissal. *See Cook, Perkiss & Liehe, Inc. v. Northern Cal. Collection Serv., Inc., 911 F.2d 242, 247 (9th Cir. 1990)* (affirming district court's decision to dismiss complaint without leave to amend where court

properly [*7] found that amendment would be futile).

**AFFIRMED.**

LEXSEE 2004 U.S. DIST. LEXIS 83

**HIGHLANDS INSURANCE CO., Plaintiff and Counterclaim Defendant, -against-
PRG BROKERAGE, INC., PROMPT CLAIMS SERVICE, INC. and LAWRENCE
W. BLESSINGER, Defendants, Counterclaim Plaintiffs and Third Party Plaintiffs,
-against- HIGHLANDS INSURANCE COMPANY, Counterclaim Defendant, -and-
WILLIS T. KING, Third Party Defendant**

**01 Civ. 2272 (GBD)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

*2004 U.S. Dist. LEXIS 83*

**January 5, 2004, Decided
January 6, 2004, Filed**

**PRIOR HISTORY:** *Highlands Ins. Co. v. Silver Car
Purchasing Group, Inc., 2002 U.S. Dist. LEXIS 3104
(S.D.N.Y., Feb. 25, 2002)*

**DISPOSITION:** [*1] Defendants' motion to dismiss
plaintiff's complaint granted in its entirety. Plaintiff's
motion to transfer venue denied. Plaintiff's motion to
dismiss counterclaims granted in part.

**COUNSEL:** For Highlands Insurance Company,
PLAINTIFF: Andrew J Frackman, Paul Robert Koepff,
O'Melveny & Myers, LLP, New York, NY USA.

For PRG Brokerage, Inc, Lawrence W Blessinger,
DEFENDANTS: Jay S Bielat, Nicoletti, Gonson &
Bielat, LLP, New York, NY USA.

For PRG Brokerage, Inc, Prompt Claims Service, Inc,
Lawrence W Blessinger, DEFENDANTS: O Peter
Sherwood, Manatt, Phelps & Phillips, LLP, New York,
NY USA.

For Prompt Claims Service, Inc, DEFENDANT: Stephen
C Cunningham, Lustig & Brown, LLP, New York, NY
USA.

For PRG Brokerage, Inc, Lawrence W Blessinger,
Thirdparty PLAINTIFFS: Jay S Bielat, Nicoletti, Gonson
& Bielat, LLP, New York, NY USA.

For Prompt Claims Service, Inc, Thirdparty PLAINTIFF:
Stephen C Cunningham, Lustig & Brown, LLP, New
York, NY USA.

For PRG Brokerage, Inc, Lawrence W Blessinger,
Counter [*2] CLAIMANTS: Jay S Bielat, Nicoletti,
Gonson & Bielat, LLP, New York, NY USA.

For Prompt Claims Service, Inc, Counter CLAIMANT:
Stephen C Cunningham, Lustig & Brown, LLP, New
York, NY USA.

For Highlands Insurance Company, Counter
DEFENDANT: Andrew J Frackman, Paul Robert Koepff,
O'Melveny & Myers, LLP, New York, NY USA.

**JUDGES:** GEORGE B. DANIELS, United States
District Judge.

**OPINION BY:** GEORGE B. DANIELS

**OPINION**

MEMORANDUM OPINION AND ORDER

GEORGE B. DANIELS, DISTRICT JUDGE:

Plaintiff, an insurance company, brought this twelve
count action against defendants alleging violations of
RICO, fraud, and pendent state law claims in connection
with plaintiff's agreement to provide commercial
automobile insurance to certain livery drivers in New

2004 U.S. Dist. LEXIS 83, *2

York City. [1] Defendants joined Willis T. King as a third party defendant, and counterclaimed against both plaintiff and King, alleging RICO violations, as well as breach of contract, and other pendent state law claims. The parties then filed cross-motions to dismiss. [2] For the following reasons, defendants' motion to dismiss the complaint is granted and the complaint is hereby dismissed in its entirety. Highlands' motion to transfer venue [*3] as to the claims against King is denied. Highlands' partial motion to dismiss the counterclaims is granted. [3]

> 1   Subject matter jurisdiction is proper pursuant to *28 U.S.C. §§ 1331and 1332*, because the action not only arises under the laws of the United States but also involves diversity of citizenship.
>
> 2   Defendants PRG Brokerage, Inc and Lawrence Blessinger moved to dismiss Counts I-IV, and VI-XII of the complaint ("PRG's motion"). Defendant Prompt Claims Services moved to dismiss Counts I-IV, and XI-XII of the complaint ("PCS's motion") (collectively, "defendants' motion"). Plaintiff Highlands Insurance Co. and third party defendant Willis T. King filed a motion to dismiss counterclaims I-V, and VIII. ("Highlands' motion").
>
> 3   Highlands has not moved to dismiss the state law counterclaims VI (Breach of Contract relating to the policies), VII (*Violation of New York State Insurance Law § 3426(k)*), IX (Defamation) and X (Breach of Contract relating to the supplemental services agreement).

[*4] Background

Plaintiff Highlands Insurance Co. ("Highlands") is in the business of providing commercial property and casualty insurance to regional small business markets. Third party defendant Willis T. King is the CEO of Highlands. Defendant PRG Brokerage Inc. ("PRG") is an insurance broker in New York, and defendant Lawrence Blessinger is the CEO of PRG. Aramarine Brokerage, Inc. ("Aramarine") is also an insurance broker in New York. Silver Car Purchasing Group, Inc. ("Silver Car") is a risk purchasing group for livery car drivers in New York City. Silver Car is organized by Aramarine. Defendant Prompt Claims Services ("PCS") is a claims handler that, *inter alia,* conducts investigations relating to auto accident claims.

In or about 1999, Highlands agreed to provide insurance to livery car drivers in New York City through

Silver Car. Around January 26, 2000, Highlands executed 13 different binders of insurance for 13 group policies to Silver Car. PRG and Aramarine, as brokers, underwrote the policies, and received certain commissions for their work. The policies were effective as of March 1, 2000. The terms of the policies provided, *inter alia,* that: 1) the policy [*5] period was three years, from March 1, 2000 through March 1, 2003; and 2) the policies were "non-cancellable" by Highlands, except for either non-payment of premiums or other specific reasons set out in the New York Insurance Law.

Around December 19, 2000, Highlands sent PRG and each of Silver Car's insured members, copies of a "Notice of Nonrenewal," stating that Highlands was not going to renew the policies, effective March 1, 2001, two years short of the termination date. Further, around December 21, 2000, Highlands sent PRG and Aramarine a letter purporting to revoke their authority to bind coverage or issue certificates of insurance to Silver Car members on behalf of Highlands. Highlands then filed the instant action against Silver Car, Aramarine, PCS, PRG, and Blessinger on March 16, 2001 alleging RICO violations, as well as fraud, breach of contract, and other pendent state law claims. One month later, Highlands settled with Silver Car and Aramarine, who were then dismissed from the suit. PRG, Blessinger, and PCS, however, remained as defendants. The remaining defendants then joined King as a third party defendant, and filed counterclaims against Highlands and King asserting [*6] their own RICO claims, as well as breach of contract, and other pendent state law claims. [4]

> 4   On February 15, 2001, one month before Highlands filed the instant action, Silver Car and Aramarine filed a complaint against Highlands in New York Supreme Court, seeking a Temporary Restraining Order ("TRO") preventing Highlands from, *inter alia,* terminating the Silver Car policies. On February 22, 2001, Highlands joined PRG as a third party defendant. The next day, the Supreme Court granted Silver Car and Aramarine's application for a TRO. Highlands then removed the case to federal court. However, this Court granted PRG's motion to remand on the grounds that Highlands had voluntarily submitted to the jurisdiction of the state court by joining PRG. Thereafter, on March 16, 2001, Highlands commenced the instant separate action against defendants in this Court. The TRO issued by the

state court was eventually dissolved and that action was dismissed with prejudice as to the claims between Silver Car, Aramarine, and Highlands, and without prejudice as to the claims by and against PRG.

[*7] Discussion

*Federal Rule of Civil Procedure 12(b)(6)* allows a party to move to dismiss a complaint where the complaint "fails ... to state a claim upon which relief can be granted[.]" *FED. R. CIV. P. 12(b)(6)*. In reviewing a motion to dismiss, this Court accepts the allegations in the complaint as true and draws all reasonable inferences in favor of the non-moving party. See *Patel v. Searles, 305 F.3d 130, 134-35 (2d Cir. 2002)*. However, bald contentions, unsupported characterizations, and legal conclusions are not well-pleaded allegations, and will not suffice to defeat a motion to dismiss. See *Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir. 1996)*. Here, a motion to dismiss will only be granted if the claimant can prove no set of facts in support of its claim that would entitle it to relief. See *Citibank, N.A. v. K-H Corp., 968 F.2d 1489, 1494 (2d Cir. 1992)*.

A. Defendants' Motion to Dismiss the Complaint

1. Fraud and Conspiracy to Commit Fraud

Highlands alleges that it was fraudulently induced by defendants to insure the Silver Car [*8] policies. Defendants argue that Highlands' fraud claims fail as a matter of law because they are not pled with particularity. Specifically, defendants argue that plaintiff has only set forth conclusory allegations in the complaint, which fail to identify the time, place, speaker, and content of the alleged misrepresentations.

A fraud claim consists of five elements: 1) a representation of material fact; 2) that was false; 3) scienter; 4) reliance by the plaintiff; and 5) injury. See *Vermeer Owners, Inc. v. Guterman, 78 N.Y.2d 1114, 585 N.E.2d 377, 378-79, 578 N.Y.S.2d 128 (N.Y. 1991)*; *Giffune v. Kavanagh, 302 A.D.2d 878, 753 N.Y.S.2d 784, 784 (N.Y. App. Div. 2003)*. There are heightened pleading standards where fraud is concerned, as *Rule 9(b) of the Federal Rules of Civil Procedure* requires that "the circumstances constituting fraud or mistake shall be stated with particularity." *FED. R. CIV. P. 9(b)* However, "malice, intent, knowledge, and other condition of mind of a person may be averred generally." See *id.*

Fraud allegations in a complaint therefore must: "(1) specify the statements [*9] that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994)*. Although the scienter requirement need not be plead with particularity, "in order to avoid abuse ... plaintiffs are required to allege facts that give rise to a strong inference of fraudulent intent." *Campaniello Imports, Ltd. v. Saporiti Italia S.P.A., 117 F.3d 655, 663 (2d Cir. 1997)*. Mere "puffery" or opinions as to future events are not sufficient to form the basis of a fraud claim. See *Baker v. Dorfman, 239 F.3d 415, 423 (2d Cir. 2000)*; *Cohen v. Koenig, 25 F.3d 1168, 1172 (2d Cir. 1994)*.

In this case, Highlands alleges in its complaint that defendants fraudulently induced Highlands to execute the Silver Car policies by making material misrepresentations and/or omissions of fact. However, Highlands' allegations consist only of broad and general accusations that do not satisfy *Rule 9(b)*'s pleading requirements. For example, Highlands contends that PCS was controlled by [*10] PRG, and that PRG therefore was able to delay PCS's submission and processing of claims so that PRG could falsely understate loss ratios. See Complaint at P 14d. Highlands also argues that defendants never intended to pay all the claims submitted to it by insurers or provide promised ancillary services, such as claims investigation and risk management. See id. at PP 14e, 25d. Highlands, however, presents no specific information in the complaint regarding which particular loss ratio figures were falsely understated, which specific claims were delayed, or for that matter, the source of Highlands' information that PRG was delaying the processing of claims so as to falsely understate loss ratios. Further, Highlands provides no specific factual support for its bald statement that defendants never intended to pay all the claims or provide promised ancillary services.

Highlands also contends that defendants made fraudulent misrepresentations with respect to the amount of premium rates that the New York Insurance Department would approve for the policies. Highlands contends that PRG represented that Highlands' proposed rates were too high for approval by the Insurance Department. [*11] Highlands argues that, in reliance on this representation, it consented to charging a lower rate for the policies. Highlands contends that - PRG induced it to accept filing the lower rates so that PRG could charge

certain ancillary fees to the insureds for PRG's own collection and still keep the total price of insurance competitive. See id. at PP 14h, 37-46. Other than bald contentions, however, Highlands presents no factual assertions to support its allegations that the Insurance Department would have approved the higher proposed rates, and that PRG knew this at the time it made the representation.

Further, Highlands alleges in the complaint that defendants misrepresented the nature, size, and scope of the Silver Car policies. Highlands contends that the drivers and cars in the insurance policies were substantially more risky than PRG represented they would be. In particular, Highlands contends that defendants misrepresented the nature of the last two policies that Highlands agreed to insure, in that those policies included a number of older cars and "gypsy cabs," presenting a greater insurance risk than newer cars or radio cars. See id. at PP 25f, 27-32, 57-58. As with the [*12] allegations above, these too are not pled with particularity as they are nothing more than bald contentions, with no factual support. Highlands has not identified a particular document or speaker as the source of these alleged misrepresentations.

Highlands also contends that defendants misrepresented the profitability of the Silver Car insurance program. Highlands argues that defendants represented that the insurance program had been profitable in the past, and would be profitable for Highlands. Highlands also alleges that defendants provided Highlands with loss information from a prior insurance program that they knew was false, and that defendants concealed adverse loss ratios that other insurance companies had experienced through Silver Car. See id. at PP 25a, 26a-c. To the extent the allegations address defendants' promises about the future profitability of the Silver Car policies, the allegations are not actionable, as they are nothing more than puffery. With respect to the allegations that defendants provided Highlands with inaccurate loss information, plaintiff again has failed to plead with particularity. The complaint is devoid of any specificity regarding the figures [*13] that were provided to plaintiff, how those figures differ from the actual correct figures, or at least, the means by which plaintiff discovered that the numbers provided were inaccurate.

Highlands also contends that defendants represented

that they knew of no pervasive problems with fraud in the livery car insurance business, but in fact knew that the business was rife with fraud. See id. at P 26c. The complaint further alleges that defendants represented that they had extensive expertise in preventing fraudulent claims, but in fact lacked expertise and knew they could not prevent pervasive fraud under the policies. See id. at PP 25b-c. Highlands' mere generalized allegations that defendants "knew" that there was fraud in the industry, however, are not sufficient to allege an inference of scienter. Further, to the extent that defendants made statements that they had expertise in the field of livery car insurance, this again is nothing more than puffery, and is not actionable.

Lastly, Highlands contends that Lawrence Blessinger, the CEO of PRG, concealed the fact that he was convicted of a felony on August 7, 1984 and that he intended to use a sham brokerage known as the Kaitlyn [*14] Agency as a means of obtaining additional compensation Highlands contends that Blessinger held himself out as a licensed insurance broker, but due to his felony conviction, he was not able to obtain a license. See Complaint at PP 26d-e. Highlands' statements regarding the Kaitlyn Agency are wholly irrelevant as Highlands does not contend that the Kaitlyn Agency or Blessinger's relationship with the Kaitlyn Agency contributed in any manner to Highlands' decision to insure the Silver Car policies. Further, Highlands' contention that Blessinger is a convicted felon who falsely held himself out as a licensed insurance broker, - by itself, is not enough to state a claim for fraud. Highlands has not contended that the alleged felony conviction relates to insurance fraud, or anything similarly relevant. At the time Highlands signed the contracts, Blessinger's alleged felony conviction was 15 years old. Even assuming the truth of the allegations regarding the felony conviction and broker license, Highlands does not contend that this alleged omission induced them to enter into the contracts or otherwise led to Highlands' injury. The injury Highlands complains of is, essentially, that it [*15] lost money on the Silver Car policies. However, Blessinger's alleged felony conviction and lack of a broker license are not misstatements or omissions with respect to the *nature* of the Silver Car policies, or Highlands' potential risk exposure under the policies. Even assuming the truth of these allegations, they are not material to the injury about which Highlands complains.

Therefore, Highlands has failed to state a claim for

fraud as it has not pled fraud with particularity. Consequently, defendants' motion to dismiss Counts III (Fraud) and IV (Conspiracy to Commit Fraud) is granted.

2. RICO and RICO Conspiracy

Highlands alleges that the defendants constitute an enterprise engaged in a pattern of racketeering activity, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), *18 U.S.C. §§ 1962(c) and (d)*. The racketeering activity that Highlands alleges is fraud in the livery driver insurance market, including fraud on Highlands by inducing Highlands to offer automobile insurance to Silver Car. Since this Court has dismissed Highlands' fraud claims, the RICO claims, too, necessarily fail as a matter of law. Consequently, [*16] defendants' motion to dismiss Counts I (RICO) and II (RICO Conspiracy) of the complaint is granted.

3. Negligence and Breach of Fiduciary Duty

Highlands contends that PRG was Highlands' agent, by virtue of the fact that it was Highlands' broker. Highlands contends that under common law agency principles, PRG owed Highlands both a duty of care and fiduciary duty which PRG breached. PRG contends, however, that it had only a limited agency relationship with Highlands, and that Highlands is attempting to hold PRG accountable for a duty of care beyond the limited one established by their broker-insurer relationship.

To state a claim for negligence, a plaintiff must allege: 1) the existence of a duty; 2) a breach of the duty; 3) causation; and 4) resulting damages. See *McCarthy v. Olin Corp., 119 F.3d 148, 156 (2d Cir. 1997)*; see also *Fleet Bank v. Pine Knoll Corp., 290 A.D.2d 792, 736 N.Y.S.2d 737, 741 (N.Y.App. Div. 2002)* (claimant must show that a duty of care existed to state a cause of action for negligent misrepresentation).

Under New York law, an insurance broker is in an agency relationship with the insured, and not the insurance carrier. [*17] In *Am. Motorists Ins. Co. v. Salvatore, 102 A.D.2d 342, 476 N.Y.S.2d 897 (N.Y. App. Div. 1984)*, the Appellate Division addressed the difference between an insurance agent and a broker. Salvatore found that: "It has been long recognized in this state [New York] that there is a distinction between insurance agents and brokers. The former acts as agent of an insurance carrier and the latter appears as representative of the insured." *Salvatore, 476 N.Y.S.2d at*

*900* (internal citations omitted). The issue was again revisited in *Evvtex Co. v. Hartley Cooper Assocs, 911 F. Supp. 732 (S.D.N.Y. 1996)*, where the district court reiterated that: "the courts in New York have long held that insurance brokers act as agents on behalf of an insured and not the insurer." *Evvtex, 911 F. Supp. at 738*. The Evvtex court noted that the status of an insurance broker, as agent of the *insured*, is codified at *§ 2101 of the New York Insurance Law. That* statute defines "insurance broker:"

> An "insurance broker" means any person, firm, association or corporation who or which for any compensation, commission or other [*18] thing of value acts or aids in any manner in soliciting, negotiating or procuring the making of an insurance or annuity contract or in placing risks or taking out of insurance, *on behalf of an insured ....*

*Evvtex, 911 F. Supp. at 738*, quoting *N.Y. INS. LAW § 2102(c)*.

In this case, Highlands is the insurer, and Silver Car is the insured. PRG was the insurance broker. Therefore, PRG, as the insurance broker, was in an agency relationship with Silver Car (the insured) and not Highlands (the insurer).

There is a limited exception to the general rule that an agency relationship does not exist between a broker and insurer. A broker does owe an insurer a limited fiduciary obligation with respect to the handling of funds received from the insured. The New York Insurance Law provides that both an insurance broker and agent owe their principles a fiduciary duty with respect to the handling of funds received or collected.

> Every insurance agent and every broker acting as such in this state shall be responsible in a fiduciary capacity for all funds received or collected as insurance agent or insurance broker, and shall not, without [*19] the express consent of his or its principal, mingle any such funds with his or its own funds or with funds held by him or it in any other capacity.

*N.Y. INS. LAW § 2120(a)*. "In the broker's fiduciary

capacity, it holds premiums collected by its insured to be forwarded to the insurance company as an agent of the insurer." *Evvtex, 911 F. Supp. at 739.* Since the funds collected by a broker from the insured are intended for the insurer, *§ 2120* has been interpreted to extend a broker's fiduciary duties with regard to the collection of funds to insurers, in addition to insureds. See *Evvtex, 911 F. Supp. at 739.*

This exception, however, relates only to the receipt and collection of funds imposed by *§ 2120.* The narrowness of this exception is evident from the fact that both insurance brokers and agents owe a duty of care to their respective principles only to matters specifically entrusted to the broker or agent. They do not owe an affirmative duty to provide general advice or direction. In *Murphy v. Kuhn, 90 N.Y.2d 266, 682 N.E.2d 972, 660 N.Y.S.2d 371 (N.Y. 1997),* an insured obtained automobile coverage that met his specifications [*20] from his insurance agent, with whom he had a long-standing relationship. After an accident, the insured then sued his agent for professional negligence on the theory that the agent had an affirmative obligation to advise him to obtain additional coverage beyond that which he had requested. The New York Court of Appeals found that the insured could not state a cause of action for professional negligence against his agent as the parties had only a consumer-agent insurance placement relationship. The court found that in spite of the parties' long-standing relationship, no "special relationship" existed between the parties that could impose a duty of care on the agent beyond that of following the insured's instructions of placing the requested insurance. See *Murphy, 90 N.Y.2d at 271;* see also *St. Paul Fire and Marine Ins. Co. v. Heath Fielding Ins. Broking Ltd., 976 F. Supp. 198, 204 (S.D.N.Y. 1996)* ("An ordinary relationship of broker to insurer does not by itself, give rise to a 'special relationship'" that creates a duty of care).

Relying upon the holding in Murphy, the Court of Appeals four years later found that an insured may not state a claim [*21] against an insurance agent for professional malpractice. In *Chase Scientific Research Inc. v. NIA Group, Inc., 96 N.Y.2d 20, 749 N.E.2d 161, 725 N.Y.S.2d 592 (N.Y. 2001),* the Court of Appeals found that since neither a broker nor agent are required to engage in extensive specialized education or training, nor bound by a standard of conduct for which they might be disciplined, they are not considered "professionals," in that they generally cannot be sued for professional

malpractice. See *Chase Scientific Research, 96 N.Y.2d at 30.* The court relied upon its earlier holding in Murphy, and reaffirmed that "an insurance agent has a common-law duty to obtain requested coverage, but generally not a continuing duty to advise, guide or direct a client based on a special relationship of trust and confidence." Id., citing *Murphy, 90 N.Y.2d at 273.*

In this case, Highlands attempts to place a duty of care on PRG beyond that of merely handling funds held in trust from Silver Car. Highlands' alleges, *inter alia,* that PRG breached its duty to Highlands when: (1) PRG failed to "exercise reasonable care in hiring and supervising employees, whom they knew or [*22] should have known were dishonest;" (2) PRG failed to "have reasonable safeguards to protect against dishonest acts of employees;" and (3) PRG failed to "reasonably or adequately take steps to prevent or discover fraudulent claims and claims practices." Complaint at PP 126c-d, f. Notably absent from Highlands' complaint is any allegation that PRG failed to obtain the requested insurance policies or mishandled proceeds held in trust from the insured. Highlands' generalized allegations that PRG did not exercise reasonable care are an attempt to stretch PRG's duty of care to Highlands beyond that allowed under New York law. As a matter of law, Highlands cannot maintain either a negligence or breach of fiduciary duty cause of action against PRG because it cannot show that the broker-insurer relationship gave rise to a duty of care broad enough to cover the allegations in the complaint. Therefore, PRG's motion to dismiss Counts VII (Negligence) and IX (Breach of Fiduciary Duty) of the complaint is hereby granted.

4. Unauthorized Agency

Highlands contends that by letter dated December 21, 2000, it revoked and terminated the authority of PRG to act on behalf of Highlands with respect [*23] to the policies. Highlands contends that despite this notification, PRG continued to purport to act on behalf of Highlands by holding itself out as Highlands' broker and continuing to issue certificates of insurance to Silver Car drivers under the policies.

As noted earlier, PRG's agency relationship with Highlands is limited in scope, and relates only to the procurement of requested policies and the handling of funds received from Silver Car. The basis by which Highlands alleges that PRG unlawfully held itself out as Highlands' agent after December 21, 2000, is PRG's

actions of issuing certificates of insurance to drivers under the Silver Car policies after that date. See Complaint at PP 66, 132b. However, when PRG issued the certificates of insurance, it was doing so as the agent of Silver Car (the insured), to whom it owed a duty of care. See *Salvatore, 476 N.Y.S.2d at 900* (broker owes a duty of care to the insured, not the insurer); See also *Evvtex, 911 F. Supp. at 738*. Highlands does not allege that the certificates of insurance were for *new* policies outside of the original 13 that Highlands had agreed to insure. Rather, the certificates [*24] of insurance were issued for *existing* policy holders under the original Silver Car policies, and issued in accordance with PRG's obligations to the Silver Car. Therefore, as a matter of law, PRG's actions do not constitute unauthorized agency as to Highlands. Consequently, PRG's motion to dismiss Count VIII (Unauthorized Agency) is granted.

5. Breach of Contract

Highlands alleges that PRG breached the contract. PRG, on the other hand, contends that Highlands has not sufficiently stated a cause of action for breach of contract because Highlands has only alleged a breach in conclusory language, without identifying the purported contract, or identifying the terms of the contract that Highlands claims were breached.

*Federal Rule of Civil Procedure 8(a)* generally governs the pleading standards of a complaint. *Rule 8(a)* requires only that a party assert "a short and plain statement of the claim showing that the pleader is entitled to relief, and ... a demand for judgment[.]" *Fed. R. Civ. P. 8(a)*. In a cause of action for breach of contract, a plaintiff must allege: 1) the existence of a contract; [*25] 2) plaintiff's performance of the contract; 3) a breach by the defendant; 4) and resulting damages. See *Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525 (2d Cir. 1994)*. A breach of contract claim will be dismissed, however, as being "too vague and indefinite," where the plaintiff fails to allege, in nonconclusory fashion, "the essential terms of the parties' purported contract, including the specific provisions of the contract upon which liability is predicated[.]" *Sud v. Sud, 211 A.D.2d 423, 621 N.Y.S.2d 537, 38 (N.Y. App. Div. 1995)*.

Here, the complaint alleges that PRG breached "the obligations and duties ... under the contract of insurance[.]" Complaint at P 120. However, Highlands does not allege in the complaint that PRG was a signatory, or in any other way, a party to the Silver Car

policies. Rather, according to the complaint, PRG was responsible for underwriting the policies between Highlands and Silver Car. See Complaint at PP 21-22. Highlands may not hold PRG liable for breaching a contract to which it was not a party. See e.g. *Cruickshank & Co. v. Sorros, 765 F.2d 20, 26 (2d Cir. 1985)* ("[appellant], not a [*26] party to the contract at issue, cannot be found liable for damages resulting from in breach, notwithstanding his status as an agent of one of the parties in breach.")

Further, Highlands' efforts to turn the September 15, 2000 letter it sent to defendants into an enforceable contract is equally unavailing. Highlands contends that on September 15, 2000, it sent a letter to defendants informing them that Highlands would insure no additional Silver Car members under the last two policies, and that PRG in turn agreed that it would issue no new certificates of insurance under these policies. See Complaint at PP 61, 120f.

An agreement that lacks consideration is not enforceable. See *Roth v. Isomed, Inc., 746 F. Supp. 316, 319 (S.D.N.Y. 1990)* ("consideration is a necessary ingredient for an enforceable contract.") Consideration requires either a benefit to the promisor or a detriment to the promisee. See *Ball v. SFX Broadcasting Inc., 236 A.D.2d 158, 665 N.Y.S.2d 444, 446 (N.Y. App. Div. 1997)*. Even assuming Highlands' allegations as true, which this court must on a motion to dismiss, this letter does not create a separate enforceable contract between [*27] Highlands and PRG. Essentially, Highlands and PRG both promised not to act. However, neither received a benefit or detriment for Highlands' promise not to insure additional Silver Car members, nor for PRG's promise not to issue new certificates under the policies. The September 15 letter agreement is therefore unenforceable as it is not supported by consideration. Consequently, PRG's motion to dismiss Count VI (Breach of Contract) is granted.

6. Conversion

Highlands contends that PRG and Blessinger have in their custody a data tape that contains information about the drivers covered by the Silver Car policies. Highlands argues that it has an ownership right to the data tape, and that defendants refuse to return it. PRG contends that Highlands cannot state a claim for conversion because Highlands is claiming a property interest in intangible property.

A plaintiff stating a claim for conversion must establish "legal ownership of a specific identifiable piece of property and defendants' exercise of dominion over or interference with the property in defiance of plaintiffs' rights." *Gilman v. Abagnale, 235 A.D.2d 989, 653 N.Y.S.2d 176, 177 (N.Y. App. Div. 1997),* [*28] quoting *Ahles v. Aztec Enters., Inc., 120 A.D.2d 903, 502 N.Y.S.2d 821, 822 (N.Y. App. Div. 1986).* However, under New York law, a claim for conversion must be for tangible property, as a claim for intangible property is not actionable. See *Rao v. Verde, 222 A.D.2d 569, 635 N.Y.S.2d 660, 661 (N.Y. App. Div. 1995); MBF Clearing Corp. v. Shine, 212 A.D.2d 478, 623 N.Y.S.2d 204, 206 (N.Y. App. Div. 1995).*

Here, the data tape was never Highlands' property. Rather, Highlands contends that PRG compiled information on Highlands' behalf, and then put that information on a tape that PRG already owned. It is the information that PRG compiled over which Highlands asserts a property interest, not the physical data tape on which the information is stored. See *Rao, 635 N.Y.S.2d at 661.* However, this information is intangible property, and Highlands cannot state a claim under New York law for conversion of intangible property. Consequently, defendants' motion to dismiss Count X (Conversion) is granted.

### 7. *New York General Business Law § 349(a)*

Highlands argues that defendants violated the *New York General Business Law § 349(a)* [*29] ("GBL") by engaging in deceptive acts. *Section 349 of the GBL* makes unlawful "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state[.]" *N.Y. GEN. Bus. law § 349(a).* Fundamentally, *§ 349* is a consumer protection device. A plaintiff must not only allege that the defendants engaged in deceptive acts or practices, but also that the conduct was consumer oriented. See *New York Univ. v. Continental Ins. Co., 87 N.Y.2d 308, 662 N.E.2d 763, 770, 639 N.Y.S.2d 283 (N.Y. 1995).* Consequently, the New York Court of Appeals held that "private contract disputes, unique to the parties ... would not fall within the ambit of the statute." Id.; *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 85 N.Y.2d 20, 647 N.E.2d 741, 744, 623 N.Y.S.2d 529 (N.Y. 1995).* "The gravamen of the complaint must be consumer injury or harm to the public interest." *Azby Brokerage, Inc. v. Allstate Ins. Co., 681 F. Supp. 1084, 1089 n.6 (S.D.N.Y.*

*1988).*

In this case, Highlands alleges only a private injury, namely that defendants conspired to fraudulently induce Highlands into insuring Silver Car's members Nothing [*30] about the complaint alleges a consumer injury or harm to the public interest. Rather, the complaint is for damages based upon the Silver Car policies Highlands claims it was fraudulently induced to issue. The damages are purely private in nature and relate only to monetary losses that Highlands allegedly suffered. Consequently, defendants' motion to dismiss Count XI (*GBL § 349(a)*) of the complaint is hereby granted.

### 8. Breach of Claims Handling Duty

Lastly, Highlands alleges that PCS breached what Highlands calls a "claims handling duty." Highlands bases this claim on the theory that PCS owed Highlands both contractual and fiduciary obligations, and that PCS breached those obligations. PCS argues that, as a matter of law, claims handlers do not owe insurers a "claims handling duty."

The New York courts, or federal courts applying New York law, have not specifically addressed the issue of whether a claims handler owes an insurer a fiduciary duty. However, New York courts have examined whether a fiduciary relationship exists between an insured and an insurer. In *Rabouin v. Metropolitan Life Ins. Co., 182 Misc. 2d 632, 699 N.Y.S.2d 655 (N.Y. Sup. Ct. 1999),* the [*31] New York Supreme Court found that the plaintiff policyholder of an insurance contract could not state a claim against his insurer for breach of fiduciary duty because no such duty existed between the insured and the insurer. See *Rabouin, 699 N.Y.S.2d at 657.* The court acknowledged that, under certain circumstances, an insured's relationship with an insurer might transform into a fiduciary relationship. However, the court found that where the plaintiff has only alleged an "ordinary arm's length relationship created by the payment of premiums to [the insurer] in return for a policy of insurance[,]" there was no fiduciary obligation on the part of the insurer. Id.

Further, in *Batas v. Prudential Ins. Co. of Am., 281 A.D.2d 260, 724 N.Y.S.2d 3 (N.Y. App. Div. 2001),* the Appellate Division, as well, found no fiduciary relationship between the plaintiff insureds and their insurer. There, the insureds were each hospitalized for serious emergency medical conditions. Their insurance

carrier, however, only authorized limited time for hospitalization pursuant to its review of the "Milliman & Robertson Guidelines." The insurance carrier made this determination [*32] despite the fact that the guidelines were contrary to the recommendations provided by the insureds' primary care physicians calling for lengthier hospitalization. The insureds brought an action against their insurance carrier, alleging, *inter alia,* a breach of fiduciary duty for failing to disclose to the insureds that the insurer would make determinations based on a review of the Milliman & Robertson Guidelines, even if the guidelines conflict with the medical opinion of the insureds' primary care physicians. See *Batas, 724 N.Y.S.2d at 9-10.*

The Batas court found, however, that no fiduciary relationship existed between the insureds and the insurer. The court found no evidence of "overreaching" or "special circumstances" between the parties that might lead to the conclusion that anything other than an arm's length association existed between the insureds and the insurer. See *Batas, 724 N.Y.S.2d at 7.* The court noted that generally parties to a contract of insurance do not owe each other a - fiduciary obligation:

> Plaintiffs make no showing that their relationship with defendants is unique or differs from that of a reasonable consumer [*33] and offer no reason to depart from the general rule that the relationship between the parties to a contract of insurance is strictly contractual in nature. No special relationship of trust or confidence arises out of an insurance contract between the insured and the insurer; the relationship is legal rather than equitable.

*Batas, 724 N.Y.S.2d at 7.* Consequently, the court found no fiduciary relationship between the insureds and their insurer.

In this case, PCS is a claims handler, and Highlands is the insurer. Highlands has not sufficiently alleged facts to support a claim that its relationship with PCS was one of such trust and confidence that a fiduciary duty existed. The parties merely had an arm's length association, and without more, no fiduciary obligation is created. Nothing about the nature of the relationship between a claims handler and insurer involves a level of trust or confidence

that would inherently lead to a fiduciary duty on behalf of the claims handler. If a fiduciary relationship does not generally flow between an insurer and an insured, then certainly it does not generally flow between a claims handler and an insurer.

Further, Highlands' [*34] allegation that PCS breached their contract cannot support a breach of fiduciary duty. [5] A breach of contract, by itself, does not create a fiduciary duty. "Rather, the focus is on whether a noncontractual duty was violated .... Thus, unless the contract creates a relation, out of which relation springs a duty, independent of the mere contract obligation, though there may be breach of the contract, there is no tort, since there is no duty to be violated." *Apple Records, Inc. v. Capitol Records, Inc., 137 A.D.2d 50, 529 N.Y.S.2d 279, 282 (N.Y. App. Div. 1988).* As discussed above, Highlands and PCS had an arm's length association, to which no fiduciary duty arose. Therefore, PCS's motion to dismiss Count XII (Claims Handling Duty) is granted.

> 5    Highlands' breach of contract allegations against PCS are solely contained within the "claims handling duty" cause of action and are not alleged as a separate and independent count for breach of contract.

B. Highlands' Motion to Dismiss the Counterclaims

[*35] 1. Venue as to Third Party Defendant King

Highlands and King assert that venue is improper as to the counterclaims against King in this district, as King lives in New Jersey, works in New Jersey, and works for a company whose principal place of business is in New Jersey (Highlands). This argument has no merit. Highlands chose to file its complaint in this district. In its complaint, Highlands asserted that venue is proper pursuant to *28 U.S.C. § 1391 (a)* because "a substantial part of the events giving rise to the claims in this action occurred in this judicial district." Complaint at P 11; see also *28 U.S.C. § 1391(a).* Defendants admitted this allegation in their Answer. See PRG's Answer at P 11. Defendants then filed counterclaims against Highlands and third party defendant King. Defendants' counterclaims as to Highlands are compulsory as they "arise out of the transaction or occurrence that is the subject matter of the opposing party's [Highlands'] claim[.]" *Fed. R. Civ. P. 13(a).* The counterclaims against King are identical to those asserted against Highlands and involve [*36] the same transaction or occurrence.

Therefore, venue is also proper in this district as to King pursuant to *28 U.S.C. § 1391(a)*, since a substantial part of the events giving rise to the counterclaims against him occurred in this district. [6] Consequently, Highlands' motion to transfer venue as to the counterclaims against King is hereby denied.

> 6    For the same reasons, venue would also be proper in this district under *28 U.S.C. § 1391(b)*.

2. RICO and *RICO* Conspiracy

Similar to plaintiff Highlands' complaint, defendants as well allege violations of the federal RICO statute in their counterclaims. Specifically, defendants contend that Highlands and King devised a scheme to defraud defendants by inducing PRG to market Highlands' insurance so that Highlands and King could gain a dominant market share in the livery insurance market. Highlands and King, on the other hand, contend that defendants have failed to sufficiently allege that any statements they made [*37] were false.

As noted earlier, a fraud claim consists of five elements: 1) a representation of material fact; 2) that was false; 3) scienter; 4) reliance by the plaintiff; and 5) injury. See *Vermeer Owners, Inc. v. Guterman, 78 N.Y.2d 1114, 585 N.E.2d 377, 378-79, 578 N.Y.S.2d 128 (N.Y. 1991)*; *Giffune v. Kavanagh, 302 A.D.2d 878, 753 N.Y.S.2d 784, 784 (N.Y. App. Div. 2003)*. Likewise, as discussed earlier, fraud must be pled with particularity. See *FED. R. CIV. P. 9(b)*.

Defendants allege that around December 19, 2000, Highlands wrongfully sent notices of nonrenewal to all of Silver Car's members under the insurance policies, and that defendants did so to disrupt PRG's business. See Countercl. at PP 35-36. Defendants further contend that around December 21, 2000, Highlands sent a letter to PRG and Aramarine purporting to revoke their authority to bind coverage and to issue certificates of insurance to Silver Car members. Defendants contend that this purported revocation of authority is in direct violation of a June 1999 Letter Agreement between Highlands and Aramarine, as well as the terms of the policies themselves. [*38] See id. at P 39.

Defendants additionally contend that on February 28, 2001, Highlands notified the New York State Department of Motor Vehicles ("DMV") that PRG's authority to act on behalf of Highlands was revoked, that this action was also in breach of the June 1999 agreement, as well as in breach of the terms of the policies. See id. at P 47. Consequently, defendants contend that the DMV refused to accept evidence of insurance of Silver Car members submitted by PRG, and that certain vehicles of Silver Car's members were subject to being impounded for operating without valid insurance. See id. at P 48. Defendants further contend that Highlands fired PRG as its servicing agent to the DMV's electronic database system of reporting insurance. Defendants contend that this was done without notice and, in any event, in violation of a TRO issued by the New York Supreme Court. As a result of this revocation, defendants argue that the vehicles of certain Silver Car insured drivers were consequently towed for lack of evidence of insurance. See id. at P 52.

Defendants further argue that on February 28, 2001, Highlands advised Premium Payment Plan ("PPP"), the company that provided [*39] financing of premiums to Silver Car's members, that PRG no longer had a business relationship with Highlands, and that as a result, PPP declined to continue to provide financing of premiums. See id. at P 55-57. Defendants contend that Highlands' statement to PPP in this regard was false. See id. at P 112. Defendants argue that Highlands then filed the instant civil action against defendants alleging that defendants engaged in RICO violations, and that the allegations in the complaint are false, misleading, and intended to harm defendants in their business. See id. at PP 60-61, 118.

Defendants also contend that around the time Highlands' complaint was filed, Highlands appointed NPA Associates, Ltd. ("NPA") as its exclusive managing agent for its New York livery business. See id. at P 58. Defendants argue that NPA held a meeting in which several of Highlands' sub-brokers were invited. At that meeting, defendants contend that a representative from NPA made disparaging comments about defendants. For example, defendants contend that the NPA representative told the sub-brokers that Highlands would file a "RICO case to choke a horse" and that there would be "news media like [*40] you have never seen." Defendants contend that these statements were made for the purpose of causing harm to defendants' business and reputation. See id. at PP 63-66, 117, 120-25.

Defendants contend that by cancelling the Silver Car policies, Highlands planned to destroy PRG's market and

subsequently recapture PRG's customers and then charge higher premium rates. See id. at P 110. Defendants further contend that as a result of Highlands' actions, sub-brokers have refused to do business with PRG. See id. at P 131. Defendants further contend that Silver Car and Aramarine entered into a "secret" settlement agreement with Highlands around April 29, 2001 which provides for early termination of the policies. See id. at P 68.

These allegations are woefully inadequate to support a claim of racketeering activity based upon fraud. Specifically, defendants have presented no factual support for their theory that Highlands, at the time it executed the Silver Car policies, did not intend to follow through with its obligations under the agreement. Highlands' notices of nonrenewal and all other subsequent actions it took to extract itself from its obligations on the policies, at most, [*41] state a claim for breach of contract, not for fraud. However, nothing about the statements made by the NPA representative indicate that Highlands, *at the time it contracted,* intended to breach the contract.

Nor does the mere fact that Highlands filed a civil action in this Court, or the fact that Highlands eventually settled with two of the defendants, leads to the conclusion that Highlands and King intended to destroy, and subsequently recapture for its own benefit PRG's business. Nothing about the circumstances or statements that defendants have alleged give rise to an inference of fraudulent intent. Defendants' allegations that Highlands and King intended to destroy defendants' business are nothing more than conclusory statements and bald assertions, which are inadequate to satisfy *Rule 9(b)*'s heightened pleading standard. As defendants' allegations do not state a claim for fraud, and since the criminal racketeering activity alleged is fraud, defendants fail to state a claim for a RICO violation. Consequently, Highlands' motion to dismiss Counterclaims I (RICO) and II (RICO Conspiracy) is hereby granted. [7]

> 7    Defendants' allegations in their counterclaims as to third party defendant King relate only to King's alleged participation and involvement in the RICO conspiracy. Since this Court is dismissing the RICO counterclaims, this Court will also dismiss King from the case on that same basis.

[*42] 3. Declaratory Judgment and Injunctive

Relief

Defendants seek a declaratory judgment that, *inter alia,* Highlands' notices of nonrenewal were invalid, Highlands is bound to provide coverage on the policies through March 1, 2003, and that Highlands' revocation of PRG's authority to issue certificates of insurance was in breach of the policies. Similarly, defendants also seek a preliminary and permanent injunction restraining Highlands from, *inter alia,* canceling or terminating the policies prior to March 1, 2003, and refusing to recognize as valid the certificates of insurance issued by PRG pursuant to the Silver Car policies. Further, defendants allege that Highlands breached the contracts in bad faith.

To have standing to bring suit, a party must allege an injury in fact to a preexisting, legally protected interest. The injury must be: "(a) concrete and particularized ... and (b) actual or imminent, not conjectural or hypothetical." *Altman v. Bedford Cent. School Dist., 245 F.3d 49, 69-70 (2d Cir. 2001),* quoting *Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 119 L. Ed. 2d 351, 112 S. Ct. 2130 (1992).* Therefore, a claimant "generally must assert [*43] his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Altman, 245 F.3d at 70,* quoting *Valley Forge Christian College v. Am. United for Separation of Church & State, Inc., 454 U.S. 464, 474, 70 L. Ed. 2d 700, 102 S. Ct. 752 (1982).*

Here, defendants readily admit that they were not a party to either the Silver Car policies or any agreement discussing the terms of Highlands' obligations under the policies. See Countercl. at P 24. Defendants nevertheless contend that they have standing to enforce the contract as third-party beneficiaries to the agreement.

"A person who is not a party to the contract may bring an action for breach of contract if she or he is an intended beneficiary, and not merely an incidental beneficiary of the contract." *Cauff, Lippman & Co. v. Apogee Finance Group, Inc., 807 F. Supp. 1007, 1020 (S.D.N.Y. 1992).* "Although a third party need not be specifically mentioned in the contact [sic.] before third-party beneficiary status is found, New York law requires that the parties' intent to benefit a third party must be shown on the face of the agreement." *In re Gulf Oil/Cities Serv. Tender Offer Litig., 725 F. Supp. 712, 733 (S.D.N.Y. 1989);* [*44] see also *Port Chester Electrical Constr. Corp. v. Atlas, 40 N.Y.2d 652, 357 N.E.2d 983, 986, 389 N.Y.S.2d 327 (N.Y. 1976).* "Absent

such intent, the third party is merely an incidental beneficiary with no right to enforce the contract." *In re Gulf Oil/Cities Service Tender Offer Litig., 725 F. Supp. at 733.*

Defendants do not allege that the Silver Car policies expressly included a provision to pay broker fees to PRG. Rather, defendants contend that the June 1999 Letter agreement, the Silver Car policies, and various correspondence signed by Highlands, when read in combination, confer a third-party beneficiary right upon PRG. However, as indicated above, the face of the agreement itself must show the intent to benefit PRG. Defendants have not alleged that the agreement itself indicates such an intent. Therefore, PRG is not an intended third-party beneficiary to the agreement and it has no standing to raise a claim or seek declaratory or injunctive relief based upon Highlands' obligations to Silver Car that were detailed in that agreement. Consequently, Highlands' motion to dismiss Counterclaims III (Declaratory Judgment) and IV (Injunctive Relief) is granted.

## [*45]  4. *New York General Business Law § 349(a)*

Defendants allege that Highlands and King violated *GBL § 349(a)* by making misrepresentations and omissions of material fact for the purpose of inducing PRG to assist Highlands in achieving a dominant position in the livery insurance market in New York. As discussed earlier, *GBL § 349* does not cover private disputes that are unique to the parties. See *Oswego Laborers' Local 214, 647 N.E.2d at 741.* Rather, a party must allege consumer injury or harm to the public. See *Azby Brokerage, 681 F. Supp at 1089 n.6.* Here, defendants

have not alleged in their counterclaims consumer injury or harm to the public. Consequently, Highlands' motion to dismiss Counterclaim VIII (*GBL § 349(a)*) is hereby granted.

Conclusion

Defendants' motion to dismiss is GRANTED in its entirety. Plaintiff's complaint is therefore dismissed in its entirety. [8] Highlands' motion to transfer venue as to the counterclaims against third party defendant King is DENIED. Highlands' motion to dismiss the counterclaims is GRANTED with respect to Counterclaims I-V, and VIII. [9] Third party defendant King [*46] is dismissed from the case.

> 8    The only claim in Highlands' complaint that defendants did not move to dismiss is Count V (Rescission). That count, however, is directed only at Silver Car. As noted earlier, both Silver Car and Aramarine are no longer parties to this case, and all counts against them are therefore dismissed as moot.
> 9    Defendants voluntarily withdrew Counterclaim V (Breach of Contract and Bad Faith). See Defts' Opp. to Counterclaim and Third-Party Defts' Mot. to Dismiss at 2.

Dated: January 5, 2004

SO ORDERED:

GEORGE B. DANIELS

United States District Judge

LEXSEE 2005 U.S. DIST. LEXIS 30250

**PREMIER PYROTECHNICS, INC., Plaintiff, v. ZAMBELLI FIREWORKS MANUFACTURING CO., Defendant.**

**No. 05-3112-CV-S-FJG**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI, SOUTHERN DIVISION**

*2005 U.S. Dist. LEXIS 30250*

**May 31, 2005, Decided**
**May 31, 2005, Filed**

**COUNSEL:** [*1] For Premier Pyrotechnics, Inc., Plaintiff: Jay M Dade, Shughart Thomson & Kilroy, P.C., Springfield, MO; Karen Glickstein, Shughart Thomson & Kilroy, PC, Kansas City, MO.

For Zambelli Fireworks Manufacturing Co., Defendant: Brian J. Finucane, Fisher & Phillips, LLP, Kansas City, MO; David H. Acker, New Castle, PA.

**JUDGES:** Fernando J. Gaitan, Jr., United States District Judge.

**OPINION BY:** Fernando J. Gaitan, Jr.

**OPINION**

**ORDER**

Pending before the Court is Defendant's Motion to Dismiss Case (Doc. No. 8). Defendant moves to dismiss because it believes (1) plaintiff lacks standing to pursue a declaratory judgment action seeking interpretation of a contract to which plaintiff is not a party; and (2) there is no case or controversy raised by the complaint sufficient for the Court to exercise its discretionary jurisdiction over this declaratory judgment action.

**I. Background**

In January of 2001, defendant and non-party David Karpinski entered into an employment contract, which included a non-compete agreement. [1] In December 2004, Karpinski left his employment with defendant and entered employment with plaintiff. Defendant and Karpinski then became involved in a dispute regarding whether [*2] the non-compete provisions of the employment contract applied in this instance. Pursuant to the terms of the employment contract, defendant filed a "Complaint" for arbitration as to Karpinski on March 10, 2005. Karpinski and defendant are now in the process of arbitrating their dispute, with a hearing anticipated for sometime in July.

> 1    The parties dispute whether the non-compete agreement was still in place at the time Karpinski left his employment with defendant.

On March 21, 2005, plaintiff filed this action seeking a declaratory judgment interpreting the terms of the contract between defendant and Karpinski. Prior to filing the pending complaint, plaintiff had received letters from defendants' counsel threatening legal action if plaintiff tortiously interfered with defendant's employment contract with Karpinski. Plaintiff is not a party to the contract. [2] To-date, defendant has not filed any action against plaintiff.

> 2    However, it is notable that Karpinski is represented in the arbitration hearings by the same counsel as plaintiff.

**[*3] II. Discussion**

A. Lack of Standing

Article III, Section 2 of the U.S. Constitution allows

Case 1:08-cv-02429-DAB    Document 74-2    Filed 07/21/2008    Page 18 of 29

Page 2
2005 U.S. Dist. LEXIS 30250, *3

federal courts to hear only "actual cases and controversies." *County of Mille Lacs v. Benjamin, 361 F.3d 460, 463 (8th Cir. 2004), cert. denied, 543 U.S. 956, 125 S. Ct. 454, 160 L. Ed. 2d 318 (2004)*. A party has standing to bring a claim "if it has suffered some actual or threatened injury." *Id.* A declaratory judgment plaintiff, to demonstrate standing, must "demonstrate that he has suffered [an] injury in fact, that the injury is fairly traceable to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." *Bennett v. Spear, 520 U.S. 154, 162, 117 S. Ct. 1154, 137 L. Ed. 2d 281 (1997)*.

Defendant argues that plaintiff does not have standing because it is not a party to the contract or a third party beneficiary to the contract. *See Farmers Ins. Co., Inc. v. Miller, 926 S.W.2d 104, 107 (Mo. App. 1996)*. It is undisputed that plaintiff is not a party to the contract. Defendant notes that "only those third parties for whose primary benefit the contracting parties intended to make the contract may sue on the contract. . . . [and] the terms [*4] of the contract must clearly express an intent to benefit the third party." *In re Scott, 913 S.W.2d 104, 105 (Mo. App. E.D. 1995)*(citations omitted); *see also Aufenkamp v. Grabill, 112 S.W.3d 455, 459 (Mo. App. W.D. 2003)*, citing *Applegate v. Quincy, O. & K.C.R. Co., 252 Mo. 173, 158 S.W. 376, 379 (1913)*("Before a promise made by A. to B. can be sued on by C., a stranger to the contract, it must be made for the benefit of C., and be so intended by the contracting parties."); *Defiance Hospital, Inc. v. Fauster-Cameron, Inc., 344 F. Supp. 2d 1097 (N.D. Ohio 2004)*(finding that plaintiff, a hospital seeking a declaratory judgment that defendant's non-compete agreements were unenforceable, did not have standing to sue because it was not a party or third-party beneficiary to the non-compete agreements).

Plaintiff responds that defendant is focusing on the incorrect "controversy" in this instance. Plaintiff states that defendant is mischaracterizing this as a contract dispute, when plaintiff has not alleged in its complaint that plaintiff has a protected interest under the contract. Instead, plaintiff states that the gravamen [*5] of its complaint is that defendant has threatened legal action against plaintiff for impermissibly interfering with defendant's allegedly protected interests. Plaintiff also indicates that, in dicta, the court in *Defiance Hospital* indicated that disputes involving allegations of tortious interference with business relationships or contracts might provide sufficient basis for standing under the

Declaratory Judgment Act. *See Defiance Hospital, 344 F. Supp. 2d 1097, 1118 n.12 (N.D. Ohio 2004)*.

Defendant replies that the specific relief sought in plaintiff's complaint is:

> A. That this Court enter an Order declaring that the terms of Mr. Karpinski's non-compete agreement with Defendant, as set forth by the 2001 Initial Employment Agreement and amended by the March 2001 Modified Agreement, expired one (1) year following the commencement of Mr. Karpinski's employment with Defendant, or, at the latest, by January 31, 2003, and thus, does not prevent Mr. Karpinski's current employment with Plaintiff; and/or in the alternative that [sic]

> B. That this Court enter an Order declaring that Plaintiff has not infringed the Defendant's legitimate contractual expectations [*6] under the 2001 Initial Employment Agreement due to the fact that it is sufficiently overbroad so as to deny enforcement. . . .

*See* Doc. No. 2, P20. Therefore, defendant states that plaintiff is seeking the "same contract interpretation relief that will be sought by Karpinski in the upcoming arbitration case between the real parties to the contract." *See* Doc. No. 12, p. 1. Additionally, defendant notes that, to demonstrate standing, a plaintiff must be in "immediate danger of sustaining threatened injury," *Mille Lacs, 361 F.3d at 465*. Here, defendant notes that plaintiff's fear that defendant may, at some time in the future, file a lawsuit against plaintiff for employing Karpinski and/or soliciting defendant's customers and employees, is not indicative of immediate danger.

The Court agrees with the points and authorities cited by defendant. In particular, the Court believes that the situation presented in the present complaint is, for all practical purposes, the same as that in *Defiance Hospital, Inc. v. Fauster-Cameron, Inc., 344 F. Supp. 2d 1097 (N.D. Ohio 2004)*. Plaintiff's protestations that this case is not about interpretation [*7] of the employment contract between Karpinski and defendant are unavailing; defendant correctly points out that the relief requested is

the interpretation of a contract to which plaintiff is not a party. Plaintiff does not have standing to pursue this declaratory judgment action. Accordingly, defendant's motion to dismiss (Doc. No. 8) should be **GRANTED.**

B. Lack of Actual Case or Controversy

In the alternative, defendant also states that there is no actual case or controversy for the Court to adjudicate. The Declaratory Judgment Act does not grant federal jurisdiction. Instead, the facts of the case must present an actual controversy and be ripe for adjudication. Additionally, courts undertake an inquiry into prudential considerations before deciding whether to exercise jurisdiction over a declaratory judgment action.

"To satisfy the actual controversy requirement of the Declaratory Judgment Act, there must exist 'a substantial controversy between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Gopher Oil Co. v. Bunker, 84 F.3d 1047, 1050 (8th Cir. 1996).* "Both the immediacy [*8] and the size of the threatened harm impact the ripeness calculus - they must be significant." *Neb. Pub. Power Dist. v. Midamerican Energy Co., 234 F.3d 1032, 1038 (8th Cir. 2000).* "The difference between an abstract question and a 'case or controversy' is one of degree, of course, and is not discernible by any precise test.' The Supreme Court has directed that the ripeness inquiry requires examination of both the 'fitness of the issues for judicial decision' and 'the hardship to the parties of withholding court consideration.'" *Neb. Pub. Power Dist., 234 F.3d at 1038.*

In addition to determining whether a case or controversy is present, courts are to undertake a prudential inquiry to determine whether or not declaratory relief is proper in a given situation, examining the following two criteria: (1) whether the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) whether it will terminate and afford relief from the uncertainty and controversy giving rise to the proceedings. *See American Federation of State, County & Municipal Employees v. Moore, 1992 U.S. Dist. LEXIS 1737, 1992 WL 118742, *5 (W.D. Mo. 1992)*(Gaitan, [*9] J.).

Defendant states that plaintiff has suffered no injury in fact; instead, defendant states that plaintiff alleges only that it is concerned that it may be sued at some future point for tortious interference with the contract between

defendant and Karpinski. Defendant also points out that for these same reasons, this case is not ripe for adjudication. *See Public Water Supply Dist. No. 8 v. City of Kearney, 401 F.3d 930, 932-33 (8th Cir. 2005)*(noting that federal courts are prohibited from "resolving cases based on hypothetical facts" or issuing advisory opinions).

Plaintiff responds that the threat of litigation is sufficient to demonstrate a real controversy. *See Simms v. Exeter Architectural Products, Inc., 868 F. Supp. 677, 684 (M.D. Pa. 1994); Deichmann v. Boeing Company, 38 F. Supp. 2d 783, 788 (E.D. Mo. 1998).* Furthermore, plaintiff states that it is not a party to the arbitration proceeding pending between defendant and Karpinski, and that arbitration proceeding will not resolve plaintiff's interests as stated in this declaratory judgment action.

The Court agrees with defendant that the threat of litigation in this matter [*10] is too attenuated to demonstrate a real controversy. Plaintiff has not demonstrated that it is being or about to be injured by defendant. [3] Additionally, this Court believes it should exercise its discretion to not hear this declaratory judgment action. After making the prudential inquiry, the Court believes that the issues surrounding the interpretation of the contract at hand are better resolved in the pending arbitration proceeding between the parties to the contract. A decision by this Court in the pending matter would not clarify or settle the legal relations in issue because such a decision would not be binding upon the arbitrator in Pennsylvania, and for the same reasons any decision by this Court would not terminate the uncertainty and controversy giving rise to these proceedings. Instead, the Court agrees with defendant that any decision made in this case would only complicate the pending arbitration proceeding; there is a definite possibility of inconsistent results if this Court were to proceed and hear this case. Therefore, defendant's motion to dismiss (Doc. No. 8) should be **GRANTED.**

3   In fact, depending on the interpretation given the contract in the arbitration between Karpinski and defendant, defendant might not have a basis for suing plaintiff following arbitration.

[*11] C. Request for Attorney's Fees

Defendant seeks an award of attorney's fees for defending what it calls a frivolous action, under *28 U.S.C. § 2201, 28 U.S.C. § 2412,* or the inherent power of

the Court. However, the Court believes that an award of attorney's fees is not warranted in this instance. Therefore, defendant's request for attorney's fees (Doc. No. 8) is **DENIED.**

### III. Conclusion

For the foregoing reasons:

(1) Defendant's motion to dismiss (Doc. No. 8) is **GRANTED;**

(2) Plaintiff's complaint for declaratory judgment is **DISMISSED WITHOUT PREJUDICE;** and

(3) Defendant's request for attorney's fees (Doc. No. 8) is **DENIED.**

**IT IS SO ORDERED.**

Fernando J. Gaitan, Jr.

United States District Judge

Dated: May 31, 2005

Kansas City, Missouri

### *JUDGMENT IN A CIVIL CASE*

**Decision by Court.** This action came before the Court. The issues have been determined and a decision has been rendered.

IT IS ORDERED AND ADJUDGED that

(1) Defendant's motion to dismiss (Doc. No. 8) is **GRANTED;**

(2) Plaintiff's complaint for declaratory judgment is **DISMISSED** [*12] **WITHOUT PREJUDICE;** and

(3) Defendant's request for attorney's fees (Doc. No. 8) is **DENIED.**

May 31, 2005

Date

LEXSEE 2008 U.S. DIST. LEXIS 9809

**WILLIAM T. WULIGER, Receiver, Plaintiff, -vs- MANUFACTURERS LIFE INSURANCE COMPANY, Defendant.**

**Case No. 3:03 CV 7457**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO, WESTERN DIVISION**

*2008 U.S. Dist. LEXIS 9809*

**February 11, 2008, Filed**

**PRIOR HISTORY:** *Liberte Capital Group v. Capwill, 229 F. Supp. 2d 799, 2002 U.S. Dist. LEXIS 25236 (N.D. Ohio, 2002)*

**COUNSEL:** [*1] For William T Wuliger, Plaintiff: Andrew C. Storar, Pickrel, LEAD ATTORNEY, Schaeffer & Ebeling, Dayton, OH; Gerald R. Kowalski, LEAD ATTORNEY, Cooper & Walinski - Toledo, Toledo, OH.

For Manulife Financial Corporation, Defendant: Nelson M. Reid, Randolph C Wiseman, LEAD ATTORNEYS, Bricker & Eckler, Columbus, OH.

For Manufacturers Life Insurance Company of America, Defendant: Randolph C Wiseman, Bricker & Eckler, Columbus, OH.

For Manufacturers Life Insurance Company (USA), Defendant: Nelson M. Reid, Randolph C Wiseman, Bricker & Eckler, Columbus, OH.

For Manufacturers Life Insurance Company, The, Defendant: Randolph C Wiseman, Bricker & Eckler, Columbus, OH.

**JUDGES:** DAVID A. KATZ, U. S. DISTRICT JUDGE.

**OPINION BY:** DAVID A. KATZ

**OPINION**

MEMORANDUM OPINION

KATZ, J.

This matter is before the Court on the parties cross-motions for summary judgment, opposition and attendant replies thereto. This Court has jurisdiction pursuant to *28 U.S.C. § 1332*. For the reasons that follow, Plaintiff's motion is well taken and the Defendant's motion is denied.

**BACKGROUND**

This case is one of many related to a universe of litigation created by a viatical insurance debacle initiated in *Liberte v. Capwill,* Case. No. 5:99 CV 818 (N.D. Ohio). [1] [*2] In that case Liberte Capital Group ("Liberte") and Alpha Capital Group ("Alpha" charged that James A. Capwill ("Capwill") through the entities Viatical Escrow Services, LLC ("VES") an Capital Fund Leasing ("CFL") unlawfully diverted investor funds escrowed for insurance premiums or awaiting placement in viatical contracts. The Court-appointed General Receiver, Victor M. Javitch [2] ("Javitch") initiated suits against agents, brokers, brokerage houses, banks and various insurers all with an eye towards marshalling assets on behalf of the investors, the ultimate victims in this debacle.

    1  For a case history, *see Liberte v. Capwill, 229 F.Supp.2d 799, 800-801 (N.D. Ohio 2002).*

    2  Initially Frederick M. Luper was appointed Receiver on July 15, 1999; however, effective July 26, 2000, Javitch replaced Luper in that capacity. On August 3, 2004, pursuant to a Court order, the duties of the General Receiver were modified, transferred and assumed by the Alpha Receiver, William T. Wuliger. (*Liberte,* Doc. No. 2243.)

In the above-captioned action, the Plaintiff seeks a declaratory judgment and rescission of three life insurance policies [3] issued by Defendant Manufacturers Life Insurance Company (USA) ("Manufacturers"). [*3] The Plaintiff requests the policies be declared void *ab initio* and demands return of premiums paid including interest thereon. Manufacturers moves for summary judgment on the basis that: (1) the Receiver is without standing to assert the claims; (2) the Receiver may not raise the issue of a lack of insurable interest; (3) the policies were not void; and (4) the doctrine of unclean hands precludes equitable relief. In contrast, the Plaintiff seeks summary judgment asserting (1) that the policies were void *ab initio;* (2) that a lack of insurable interest may be raised as a defense to the formation of a valid contract of insurance; (3) that the Receiver is empowered to bring this action; and (4) that the doctrine of unclean hands does not, in this circumstance, preclude equitable relief.

> 3  Policy No. 5865984 issued to Harry Brooks; Policy No. 58429531 issued to Febus Grunberg; and Policy No. 58142993 issued to Alfred Leibert.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is  [*4] entitled to judgment as a matter of law." *FED. R. CIV. P. 56(c)*. The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986)*. The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id. at 323-25*. Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986) (quoting FED. R. CIV. P. 56(e))*.

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).* [*5] Rather, *Rule 56(e)* "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex, 477 U.S. at 324, 106 S. Ct. at 2553; see also Harris v. General Motors Corp., 201 F.3d 800, 802 (6th Cir. 2000).* Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex, 477 U.S. at 322, 106 S. Ct. at 2552.*

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing 60 Ivy Street Corp. v. Alexander, 822 F.2d 1432, 1435 (6th Cir. 1987)).* However, "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,'" *Wiley v. U.S., 20 F.3d 222, 227 (6th Cir. 1994)* (quoting *Anderson, 477 U.S. at 249*); therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact." *Williams, 154 F. Supp. 2d at 1071.* [*6] The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc., 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999).* Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson, 477 U.S. at 251-52; see also Atchley v. RK Co., 224 F.3d 537, 539 (6th Cir. 2000).*

## DISCUSSION AND ANALYSIS

*A. Standing of the Receiver*

1. Applicable Standard

The party invoking federal jurisdiction has the burden of establishing the elements of standing. *Lujan v. Defenders of Wildlife, 504 U.S. 555, 561-562, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)*. The nature of the

2008 U.S. Dist. LEXIS 9809, *6

standing doctrine encompasses both constitutional and prudential requirements. Failure to establish standing is a jurisdictional defect. *Stupak-Thrall v. Glickman, 346 F.3d 579 (6th Cir. 2003)*. Moreover, standing is determined as of the date the suit is filed. *Senter v. General Motors Corp., 532 F.2d 511, 518 (6th Cir.) cert. denied, 429 U.S. 870, 97 S. Ct. 182, 50 L. Ed. 2d 150 (1976)*.

With regard to the constitutional aspects, in order to meet [*7] this burden the plaintiff must establish the requirements set forth to satisfy Article III standing requirements, which require a plaintiff to show:

> "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*Cleveland Branch, N.A.A.C.P. v. City of Parma, Oh., 263 F.3d 513, 523-524 (6th Cir. 2001), cert. denied, 535 U.S. 971, 122 S. Ct. 1438, 152 L. Ed. 2d 382 (2002)* (citations omitted).

The prudential standing considerations require the court to consider: (1) whether the alleged injury to plaintiff falls within the "zone of interests" protected by the statute or constitutional provision at issue; (2) whether the complaint raises nothing more than abstract questions amounting to generalized grievances that are more appropriately resolved by the legislative and executive branches; and (3) whether the plaintiff is asserting its own legal rights and interests rather than those of a third party. *See In re Cannon III, 277 F.3d 838, 853 (6th Cir. 2002)*. With [*8] this framework in mind, the Court now turns to the parties contentions.

2. Receiver History

Before delving into the legal analysis as to standing, the Court deems it necessary to outline the history of the Receivership and its odyssey to this juncture. The *Liberte* case was initiated in early April 1999. On July 2, 1999, the Court approved the appointment of a receiver based upon the following conclusions of law:

> 1. There is an imminent danger that the funds managed by Capital [Fund Leasing

("CFL")] for the benefit of the investors, Liberte and Alpha will be lost, concealed, or diminished in value to the detriment of the plaintiff, the intervening plaintiff and the investors in viatical contracts.

> 2. The investors, Alpha and Liberte have no adequate remedy at law.

> 3. The denial of the appointment of a Receiver has the probability of causing Liberte and Alpha more harm than the appointment of a Receiver will cause the Capwill interests who oppose the appointment of a Receiver.

> 4. There exists the probability of success on the part of Liberte and Alpha in this action along with the strong probability of irreparable harm if the appointment of a Receiver is denied.

> 5. The interests of Liberte [*9] and Alpha will be served by the appointment of a Receiver.

*Liberte,* Doc. 121, p. 15.

The judgment entry appointing the Receiver states in pertinent part:

> that it is beneficial for a Receiver to be forthwith appointed as requested by Intervenors to take charge of the assets belonging to VES and CFL, to manage those assets and to see to the proper administration and, where appropriate, eventual sale of said assets and distribution to creditors in order to the legal priorities and that, in the interim, litigation among the parties to this action be stayed except upon conditions that may be set by the Court.

*Id.* Doc. No. 132. The entry further states the Receiver is "to take charge of the property of Defendants Viatical Escrow Services, LLC ("VES") and Capital Fund Leasing ("CFL")" with the overall goal of the receivership as "preserv[ing], and increas[ing] the estate for the benefit of all the creditors, investors, owners and parties to this case." *Id.* While the entry of appointment states that the

2008 U.S. Dist. LEXIS 9809, *9

Receivership is to "oversee and to administer the business and assets of VES and CFL," those actions were delineated in part as follows:

(b) if advisable, to obtain an appraisal of some or all of [*10] the assets of VES and CFL:

(c) to sell the assets of VES and CFL, including real property, on terms, provisions and conditions as shall be prescribed pursuant to further order of the Court;

(d) to satisfy the claims of creditors, including investors and other parties, in order of legal priority;

(e) to perform an accounting of VES and CFL property, including the making of recommendations to the Court regarding findings of fact and conclusions of law on claims among the parties with respect to VES and CFL.

. . .

(h) upon application and approval by the Court, to *institute, prosecute,* defend, intervene in, become party to, compromise or settle all such cases and proceedings as are in the Receiver's property or to carry out the terms of this Order, whether such cases and proceedings are now pending or hereafter brought by or against the Receiver in his capacity as Receiver of VES and/or CFL, against VES, or against CFL in state or federal courts or administrative agencies or other forums.

*Id.* at pp. 2-3. (Emphasis added.)

In November 1999, upon motion by the Receiver and with the consent of Capwill, the Court ordered the following:

The scope of the Receivership is hereby extended to cover all [*11] interests in any and all insurance policies funded by investors which Liberte Capital, LLC or Alpha Capital, LLC contacted, which are or were in the name of James A. Capwill,

Capwill & Co., CWN Group or any other name, either as nominee owner or as trustees (or any other capacity) (the "Subject Policies"), for the purpose of managing and administering insurance policies in which one of the foregoing either is named as owner, beneficiary or Trustee, including, but is not limited to death claims, rescission issues, premium payment issues and anything else reasonably necessary in the management of these insurance policies. . . The scope of the receiver ship is further extended to cover any and all interests in any bank accounts or brokerage accounts which are or were in the name of James A. Capwill, Capwill & Co., CWN Group, or any other name into which the estate funds went, except the accounts listed in A and B.

(*Liberte,* Doc. No. 272, p.3 at P 1.)

As the case against Capwill (in *Liberte*) was evolving, the federal government filed a forfeiture action against J. Richard Jamieson, Liberte Capital Group, LLC and related entities. *United States v. Jamieson,* 3:00 CV 7312 (N.D. Ohio). In the [*12] *Jamieson* action, the government sought and obtained an injunction enjoining the *Jamieson* defendants from defrauding insurance companies as well as the investors. On October 17, 2000, Victor M. Javitch, Receiver, was directed to administer the sales of non-fraudulent Liberte policies, *thereby expanding the scope of the estate to cover the interests in those policies funded by the Liberte investors. Liberte,* Doc. No. 777.

With that history in mind, the Court now turns to the parties' contentions.

3. Discussion

Federal equity receivers are appointed to take control, custody, and/or management of property involved in litigation. It is generally recognized that a receiver may bring suit to "accomplish the objective of the suit for which he or her appointment was made, or under the specific directions of the appointing court, or pursuant to his general duties to receive, control, and manage the receivership property." 12 Wright, Miller & Marcus, Federal Practice & Procedure § 2984 (2d ed. 1997). *See also, 65 Am. Jur.2d Receivers § 129* (2d ed)

(powers of a receiver flow from statute, court rules, orders of appointment and subsequent orders of appointing court).

In the *Liberte case,* the VES, CFL [*13] and Alpha entities are all defunct. Additionally, both receivers operate under the Court's directive, which is generally aimed at marshaling assets for the benefit of the class/investors [4], among others. The evolving nature of the *Liberte* action is evident from the orders regarding the Receiver's responsibilities following his initial appointment. For example, in October 2000, the Receiver was authorized by the Court to "take control over and to be provided with authority to dispose of and protect said policies in the best interests of investors." *Liberte,* Doc. No. 777. Approximately three months later, in a settlement agreement entered into between Capwill, Liberte and Alpha (an intervening plaintiff), it was agreed that, "Victor Javitch will remain in place as the Receiver and *he will continue to act on behalf of the plaintiffs, intervening plaintiff, and their investors for purposes of obtaining recovery of money and assets* and to take direction of the U.S. District Courts in Akron and Toledo to enhance the economic interests of the plaintiffs, intervening plaintiffs as well as their investors with the goal of protecting the economic interests of same." *Liberte,* Doc. No. 925. (Emphasis [*14] added.)

> 4    The Liberte investors were certified a class as of March 2001. *Liberte,* Doc. Nos. 991 and 992.

Considering the expanding scope of the receivership estate and attendant responsibilities, the grant of authority vested in the General Receiver is broad and encompasses the interests of the entities, Liberte, VES, CFL which includes the present insurance policies. To the extent that the Receiver represents the interests of Liberte and seeks to recover those premiums on its behalf, the Plaintiff has alleged an injury in fact. Since Liberte acquired the policies, established and placed them in trust accounts, and paid the premiums thereon, Liberte has sustained a distinct and palpable injury. *See Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L. Ed. 2d 343 (1974)* ("plaintiff still must allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants"). In addition, the purchase and sale agreement lists the insured as the seller and Liberte as the purchaser. *See* Doc. Nos. 42, Ex. B; 44, Ex. 14; 45, Ex.7. The viators assigned their policies to an irrevocable trust naming Capwill & Co. as the trustee. It is

undisputed that Liberte [*15] paid the premiums. Therefore, the premiums at issue are a recoverable injury by the Receiver, as a representative of Liberte and the Capwill entities.

Next, turning to whether a causal connection exists between the injury and conduct complained of, the complaint alleges the Defendant is not lawfully entitled to the premium payments as the policies were secured through fraudulent representations and that those premiums were paid with investor monies. Defendants contend Liberte's participation in the "loss" was created as a result of its own conduct and since investor funds were applied after issuance of the policy, a causal connection is lacking herein. This Court disagrees because although Defendants issued what it thought were valid life insurance policies, the Defendants' conduct which prompted this suit was the refusal of the insurer to refund the policy premiums upon the request of the Receiver. Stated differently, the harm to the Receivership entities was the failure to return premiums on an allegedly void policy. It is this connection, the failure to refund policy premiums to the funding party, which satisfies the causal connection.

Finally, as the Receivership is the proper party [*16] to assert this cause of action, rather than the investors [5], the injury, the return of premiums, is not speculative and would likely be redressed by a favorable decision.

> 5    The Sixth Circuit recently held the Receiver lacked standing to represent investors on tortious conduct claims. *Liberte Capital Group v. Capwill, 248 Fed. Appx. 650, 2007 WL 2733335 (6th Cir. 2007).* The Court does not address the issue of standing of the investors based upon the Circuit's ruling which negates discussion of that issue.

On this basis, the Court finds the Receiver has standing to assert the stated causes of action herein on behalf of the Receivership entities.

*B. Doctrine of Unclean Hands*

The doctrine of unclean hands has been characterized as follows:

> It means that equity refuses to lend its aid in any manner to one seeking its active imposition, who has been guilty of unlawful or inequitable conduct in the

manner with relation to which he seeks relief.

*McClanahan v. McClanahan, 79 Ohio App. 231, 234, 72 N.E.2d 798, 800 (1946)* (citation omitted). Therefore, a party may not profit by their fraud and a court considering relief by the offending party may deny it under this doctrine. The Defendant contends the Plaintiff cannot [*17] prevail as Liberte, the party which was complicit in perpetrating this fraud, is a party to this proceeding albeit through the Receiver.

While the Defendants assert the defense of unclean hands, this defense must fail for two reasons.

First, an exception to the general rule occurs where the questioned conduct of the plaintiff affects third persons, not the defendant, and where application would result in unjust enrichment of the party asserting the defense. *Id.* In this instance, Liberte, through its principal, J. Richard Jamieson, was responsible for the pursuit of these policies. Jamieson's ability to control Liberte ceased in mid-2000 and as noted previously, the Receivership was authorized to represent the interests of the entities for the purpose of marshalling funds for the defrauded investors. Jamieson was ultimately convicted of multiple money-laundering crimes and the Receivership was authorized to sell the non-fraudulent policies. It is the Receivership, representing the defunct entities, which is seeking this declaratory judgment for the benefit of its creditors. The failure of the Defendants to return those premiums would not impact Liberte or Jamieson but Liberte's creditors, [*18] and would allow a windfall to the Defendant.

Second, although the Receiver stands in the shoes of Liberte, the removal of Jamieson and other principals involved in the wrongdoing removes the imputation of misconduct to the Receiver. In an analogous defense, that of *in pari delicto,* the removal of the malfeasant was key. For example, in *Scholes v. Lehmann, 56 F.3d 750, 754-755 (7th Cir.), cert. denied sub. nom, African Enterprise Inc. v. Scholes, 516 U.S. 1029 (1995),* Judge Posner provided this explanation:

> Though injured by the [corporate agent] Douglas, the corporations would not be heard to complain as long as they were controlled by him, not only because he would not permit them to complain but

also because of their deep, their utter, complicity in Douglas's fraud. . . But the reason, of course, . . . is that the wrongdoer must not be allowed to profit from his wrong by recovering property that he had parted with in order to thwart his creditors. That reason falls out now that Douglas has been ousted from control of and beneficial interest in the corporations. The appointment of the receiver removed the wrongdoer from the scene. The corporations were no more Douglas's evil zombies. [*19] Freed from his spell they became entitled to the return of the moneys--for the benefit not of Douglas but of innocent [creditors]--that Douglas had made the corporations divert to unauthorized purposes. That the return would benefit the [creditors] is just to say that anything that helps a corporation helps those who have claims against its assets. The important thing is that the [creditors] were not complicit in Douglas's fraud; they were its victims.

> Put differently, the defense of *in Pari Delicto* loses its sting when the person who is *in Pari Delicto* is eliminated. Now that the corporations created and initially controlled by Douglas are controlled by a receiver whose only object is to maximize the value of the corporations for the benefit of their . . . creditors, we cannot see any objections to the receiver's bringing suit to recover corporate assets unlawfully dissipated by Douglas.

*See also, McCandless v. Furlaud, 296 U.S. 664, 56 S.Ct. 304, 80 L.Ed. 473 (1935)* (participation by debtor's management or agents in wrongful conduct does not bar a receiver's action under the doctrine of *in parti delicto*).

Even in the context of a bankruptcy dispute, the imputation of wrongdoing to an [*20] innocent successor estate does not comport with the equitable doctrine of *in pari delicto*:

> A receiver, like a bankruptcy trustee and unlike a normal successor in interest, does not voluntarily step into the shoes of the

[debtor]; it is thrust into those shoes. It was neither a party to the original inequitable conduct nor is it in a position to take action prior to assuming the [debtor]'s assets to cure any associated defects. . . In light of these considerations we conclude that the equities between a party asserting an equitable defense and a [debtor] are at such variance with the equities between a party and a receiver of the [debtor] that equitable defenses good against the [debtor] should not be available against the receiver. To hold otherwise would be to elevate form over substance--something courts sitting in equity traditionally will not do. . . [T]he [debtor]'s inequitable conduct is not imputed to [a receiver].

*F.D.I.C. v. O'Melveny & Myers, 61 F.3d 17, 19 (9th Cir. 1995). See also Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., 267 F.3d 340, 358 (3d Cir. 2001).*

As the Receiver in this instance seeks relief to the benefit of the creditors, to allow the Defendant [*21] to profit at the expense of third parties would be contrary to the notions of equity. For these reasons, the Defendant's arguments on this defense is not well taken.

*C. Insurable Interest*

The Defendant next contends only the insurer may raise the issue of an insurable interest. The concept of an insurable interest is to be considered when there is a *valid* policy at issue. *See* 3 Couch on Insurance § 41:1 (ed. 2005) ("it is universally held, either by force of statute or upon public policy grounds that insurable interest is necessary to the validity of a policy, no matter what the subject matter"). Likewise, an insurable interested is defined as, "a real and substantial interest in specific property as will prevent a contract to indemnify the person interested against its loss from being a mere wager policy." Black's Law Dictionary 802 (6th ed. 1990). *See also Union Central Life Ins. Co. v. Harp, 203 La. 806, 824, 14 So.2d 643, 649 (1943)* (lack of an insurable interest is a genuine issue where validity of the contract is concerned).

In this instance, the Plaintiff does not seek the collection of insurance proceeds but challenges the validity of the policies. Therefore, the issue of who [*22] can assert an insurable interest is of little consequence if the policy is deemed void. Accordingly, the Defendant's arguments on this issue are without merit.

*D. Whether Policies are Void Ab Initio*

Plaintiff seeks to have these policies declared *void ab initio* on the basis that they were wagering contracts which are contrary to public policy. The Defendant argues that the policies were valid as they were taken out by the viators who had valid insurable interests in their own lives. What complicates this generally valid legal assertion is that the viators in this case were predisposed to assign their policies in return for a fee.

It is generally accepted that everyone has an insurable interest in their own life. Both Florida and Ohio 6 hold that where an insured does not have an insurable interest in the property or the risk insured the transaction constitutes a wager contract and is invalid as it is against public policy. *Knott v. State ex rel. Guarany Income Life Ins. Co., 136 Fla. 184, 186 So. 788 (1939); Westfall v. American States Ins. Co., 43 Ohio App.2d 176, 334 N.E.2d 523 (1974).* The issue of a wager policy was addressed by the United States Supreme Court as follows:

It is not [*23] easy to define with precision what will in all cases constitute an insurable interest, so as to take the contract out of a class of wager policies. It may be stated generally, however, to be of such an interest, arising from the relations of the party obtaining the insurance, either as creditor of or surety for the assured, or from the ties of blood or marriage to him, as will justify a reasonable expectation of advantage or benefit from the continuance of life. . .

But in all cases there must be a reasonable ground, founded upon the relations of the parties to each other, either pecuniary or of blood or affinity, to expect some benefit or advantage from the continuance of the life of the assured. Otherwise the contract is a mere wager, by which the party taking the policy is directly interested in the early death the assured. Such policies have a tendency to create a desire for the event. They are,

therefore, independently of any statute on the subject, condemned, as being against public policy.

*Warnock v. Davis, 104 U.S. 775, 779, 26 L.Ed. 924, 4 Ky. L. Rptr. 67 (1881).*

    6  As noted by the Defendants, the Receiver, who resides in this forum, brought the action in Ohio and the viators live in Florida. As [*24] there is little difference between Ohio an Florida on the determinative issues, either case law is applicable.

The test for whether such a contract falls within the ambit of a wagering contract was addressed by the Eighth Circuit in *Bankers' Reserve Life Co. v. Matthews, 39 F.2d 528, 529 (8th Cir. 1930),* "The crux is whether the policy was a wagering contract at the time it became effective as a contract. If, at the time, such assignment was contemplated by the insured, it is a wagering contract, otherwise, it is not." That was the exact issue before the appellate court in *Bankers'* and the Eighth Circuit upheld the jury's verdict on that factual dispute.

The authorities on this subject make clear that a contract made contrary to public policy is deemed invalid. *See* Willison on Contracts § 17:5 (4th ed. 2007) ("in the absence of a prohibitory statute, a person may take out a policy on his own life, pay the premiums, and designate as a beneficiary any person he chooses, even though the beneficiary chosen would otherwise have no insurable interest in the life of the insured. Such a policy is not a wagering contract, unless the transaction is for the purpose of speculation and is mere cover [*25] for a wagering transaction."); 30A Fla. Jur 2d Insurance § 1501 (2007) ("While there are generally no restrictions on the right of a person to insure himself or herself against all losses from any peril not occasioned by his or her own personal fraud, contracts which under the guise of insurance are actually nothing more than wagers are illegal.")

In this case, the insurer does not dispute that the viators undertook secure policies in their name with the intent of assigning them for a fee. Both sides agree that the insurer "had no knowledge of the fraudulent scheme or the true intention of the viators in obtaining the life policies from Manulife USA." If the undisputed facts are supported by the Plaintiff via the depositions and affidavit, then it was the intent of the viators to obtain policies for a fee. This is an example of a wagering

contract as it is "but a speculative interest in the death of another, without any interest in his life to counterbalance it." *Aetna Life Insurance Co. v. France, 94 U.S. 561, 565, 24 L. Ed. 287 (1876).* The wagering aspect was assumed by Liberte for the purpose of marketing these policies to investors. The viators were seeking an immediate financial benefit for themselves. [*26] It is difficult to characterize this type of transaction as anything less than a wagering contract. Both Ohio and Florida have deemed wagering contracts as void for public policy. *Knott, supra; Westfall, supra. See also* 57 O Jur 3d § 436 (2005) ("A wager policy has been defined as an insurance policy in name and form only, in which the insured has no interest whatever in the subject matter insured but only an interest in its loss or destruction.") In this case, the viators were merely a pass-through for the viatical broker and derived a financial benefit for their service of securing the policy. It seems difficult to imagine such a situation can fall outside the definition of a wagering contract.

As the Defendant does not dispute the facts as presented by the Plaintiff through the depositions and affidavit, the Court finds there is an absence of a genuine issue of material fact regarding the viator's predisposition to sell the policies upon procurement of the same. Each of the viators took out policies of insurance to transfer for a fee to Liberte which, in turn, marketed them to their investors. As the procurement of these policies was tantamount to wagering contracts, the Court finds [*27] that the policies at issue are void *ab initio* and subject to rescission.

### E. Unjust Enrichment

Plaintiff seeks recovery of the premiums paid on the policies under the theory of unjust enrichment.. To establish those elements, the movant must establish: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant had knowledge of the benefit; and (3) the defendant retained the benefit under circumstances where it would be unjust for him to retain that benefit without repayment. *Hambleton v. R. G. Barry Corp., 12 Ohio St.3d 179, 183, 465 N.E.2d 1298 (1984).*

Here, following the assignment, Liberte made all of the premium payments sufficient to confer a benefit upon the Defendant. The Defendant does not dispute that this benefit was conferred by Liberte nor that the premiums were paid by Liberte or those entities under the Receivership's control. The payment of premiums on a void policy and retention of those premiums by the

insurer is contrary to the notions of fairness. Allowing the insurer to retain these payments undermines the public policy against wager contracts and denies the Plaintiff the right to reclaim those premiums which were paid by Liberte for the benefit of their [*28] creditors. *See e.g. Diaz v. Florida Insurance Guaranty Association, Inc., 650 So.2d 675, 676 (Fla. 1995)* (insurer required to return premiums under void policy).

On this basis, the Plaintiff is entitled to the return of premiums under the theory of unjust enrichment.

**CONCLUSION**

For the reason stated above, the Defendant's motion for summary judgment (Doc. No. 34) is denied. The Plaintiff's motion for summary judgment (Doc. No. 39) is granted. The subject policies, Policy Nos. 5865984; 58429531; and 58142993 are held to be void *ab initio*. The premiums previously paid are to be returned to the Receiver with interest for the benefit of the Liberte creditors.

IT IS SO ORDERED.

S/ *David A. Katz*

DAVID A. KATZ

U. S. DISTRICT JUDGE