UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————— x

ALICE KRAMER, as Personal Representative of  :     Civil Action No.
the Estate of Arthur Kramer,                 :     08 CV 2429 (DAB)(MHD)
                                           :
               Plaintiff,           :     ECF Case
                                         :
       – against –               :
                                         :

LOCKWOOD PENSION SERVICES, INC., TALL :
TREE ADVISORS, INC., LIFE PRODUCTS     :
CLEARING, LLC, TRANSAMERICA        :
OCCIDENTAL LIFE INSURANCE CO.,      :
PHOENIX LIFE INSURANCE CO., LINCOLN :
LIFE & ANNUITY CO. OF NEW YORK AND  :
JONATHAN S. BERCK,               :
                                       :
            Defendants.        :
——————————————————————:
     Various Third-Party Actions       :
——————————————————————— x

## PLAINTIFF'S AND THIRD-PARTY DEFENDANTS LIZA KRAMER AND ANDREW B. KRAMER'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE TORTIOUS INTERFERENCE CLAIMS ASSERTED BY DEFENDANT LIFE PRODUCT CLEARING LLC IN ITS COUNTERCLAIMS AND THIRD-PARTY COMPLAINT

FRIEDMAN & WITTENSTEIN
A Professional Corporation

600 Lexington Avenue
New York, New York 10022
(212) 750-8700

*Attorneys for Plaintiff and Third-Party Defendants Liza Kramer and Andrew B. Kramer*

## TABLE OF CONTENTS

**Page(s)**

Preliminary Statement ......................................................................................... 1

    The Parties ...................................................................................................... 2

    Background: "Stranger-Owned Life Insurance"
    and the Insurable Interest Rule ..................................................................... 3

    The Lincoln Policy .......................................................................................... 4

    The Present Action ......................................................................................... 6

    Life Product's Counterclaims and Third-Party Claims ........................................... 7

ARGUMENT

LIFE PRODUCT'S CLAIMS FOR TORTIOUS INTERFERENCE
WITH CONTRACT SHOULD BE DISMISSED ........................................................... 8

    A.    Life Product's Allegations Based on the Filing
        of the Present Action Fail to State a Claim
        Upon Which Relief Can be Granted .................................................... 9

    B.    Life Product's Allegations Against Liza Kramer and
        Andrew B. Kramer Based on the Statement That They
        "Proximately Caused" the Estate to File the Present Action
        Fail to State a Claim Upon Which Relief Can be Granted ...................... 13

    C.    Life Product's Allegations Based on the Kramer Parties'
        Alleged Failure to Send a Copy of the Death Certificate
        Fail to State a Claim Upon Which Relief Can be Granted ...................... 14

Conclusion ......................................................................................................... 16

## TABLE OF AUTHORITIES

**Cases**                                                                                              **Page(s)**

Alex. Brown & Sons Inc. v. Marine Midland Banks, Inc.,
    No. 96 CIV. 2549, 1997 WL 97837 (S.D.N.Y. Mar. 6, 1997) ...................................... 9

ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,
    493 F.3d 87 (2d Cir. 2007)............................................................................ 8

Batdorf v. Trans Union,
    No. C 00-0501, 2000 WL 635455 (N.D. Cal. May 8, 2000) ......................................... 9

Bell Atl. Corp. v. Twombly,
    127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) ........................................................ 8-9, 13

Cortec Indus., Inc. v. Sum Holding L.P.,
    949 F.2d 42 (2d Cir. 1991)............................................................................ 5

D.A. Collins Constr. Co., Inc. v. ICOS/NCCA,
    No. 91-CV-933, 1994 WL 328626 (N.D.N.Y. June 28, 1994)................................. 9-10

Finnegan v. Univ. of Rochester Med. Ctr.,
    180 F.R.D. 247 (W.D.N.Y. 1998)...................................................................... 9

Hunt v. Enzo Biochem, Inc.,
    530 F. Supp. 2d 580 (S.D.N.Y. 2008)................................................................ 8

Life Product Clearing LLC v. Angel,
    530 F. Supp. 2d 646 (S.D.N.Y. 2008).......................................................... 4, 10-11

New England Mutual Life Ins. Co. v. Caruso,
    73 N.Y.2d 74, 535 N.E.2d 270, 538 N.Y.S.2d 217 (1989)......................................... 5-6

Tap Publ'ns., Inc. v. Chinese Yellow Pages (New York) Inc.,
    925 F. Supp. 212 (S.D.N.Y. 1996) ............................................................. 9-10, 15

Universal City Studios, Inc. v. Nintendo Co., Ltd.,
    797 F.2d 70 (2d Cir. 1986).................................................................... 9-10, 15

Yak v. Bank Brussels Lambert, BBL,
    252 F.3d 127 (2d Cir. 2001)........................................................................... 5

**<u>Statutes</u>**

Fed. R. Civ. P. 8(d) ........................................................................................ 7

Fed. R. Civ. P. 12(b)(6) .............................................................................. 8, 13

N.Y. Ins. Law § 3203(a)(3) ........................................................................ 4-5

N.Y. Ins. Law § 3205(a)(1) ............................................................................ 3

N.Y. Ins. Law § 3205(b)(2) ............................................................................ 3

N.Y. Ins. Law § 3205(b)(4) ........................................................................ 6-7

## **Preliminary Statement**

Plaintiff Alice Kramer, in her capacity as Personal Representative of the Estate of Arthur Kramer ("Plaintiff" or "Estate"), and Third-Party Defendants Liza Kramer and Andrew B. Kramer (the "Kramer Third-Party Defendants"), respectfully submit this memorandum of law in support of their motion to dismiss the tortious interference claims that Defendant Life Product Clearing LLC ("Life Product") has asserted against them. (The Estate and the Kramer Third-Party Defendants are sometimes referred to collectively herein as the "Kramer Parties"). In particular, Life Product has counterclaimed against Plaintiff for, inter alia, "tortious interference with contractual relations," and has filed a Third-Party Complaint against Liza Kramer and Andrew B. Kramer alleging the same cause of action. The gist of Life Product's tortious interference claims is that the Kramer Parties allegedly interfered with a life insurance contract issued by Defendant Lincoln Life & Annuity Co. of New York ("Lincoln"), pursuant to which Lincoln – according to Life Product – would have paid $10 million in death benefits to Life Product absent the alleged acts of interference. As shown below, Life Product's tortious interference claims are deficient as a matter of law and should be dismissed.

Indeed, when one examines Life Product's pleadings, it is apparent that the alleged acts of tortious interference consist only of (i) the filing of the present action, and (ii) failing to provide Life Product with a copy of Mr. Kramer's death certificate. However, as explained below, the filing of an action cannot constitute tortious interference unless the Plaintiff had no belief whatsoever in the merits of the action and filed it only for purposes of harassment – an allegation that Life Product did not, and could not, assert in this case. Moreover, it is undisputed that Life Product easily obtained a copy of Mr. Kramer's death certificate, and promptly submitted it to Lincoln as part of its demand for payment of the proceeds. Thus, even

if Plaintiff and/or the Kramer Third-Party Defendants did not send a copy of the death certificate to Life Product, it is clear as a matter of law that such failure could not possibly have resulted in any damages to Life Product.

## STATEMENT OF FACTS

### The Parties

Plaintiff Alice Kramer is the widow of Arthur Kramer and the Personal Representative of his Estate. She brings this action in that capacity. Mr. Kramer was a retired attorney at the time of his death on January 26, 2008 at the age of 81. (Amended Complaint, ¶¶ 1, 17).[1]

Defendant Lockwood Pension Services, Inc. ("LPS") is a New York corporation with its principal place of business located in New York, New York. Defendant Tall Tree Advisors, Inc. ("TTA") is a New York corporation with its principal place of business located in Pleasantville, New York. Defendant Life Product Clearing LLC ("Life Product") is a Delaware limited liability company with its principal place of business located in New York, New York. (Id. at ¶¶ 3-5; Life Product's Counterclaims, ¶ 69; Life Product's Third-Party Complaint, ¶ 7).

---

[1] A copy of Plaintiff's Amended Complaint is attached as Exhibit 1 to the accompanying Affidavit of Stuart I. Friedman in Support of Plaintiff's and Third-Party Defendants Liza Kramer and Andrew B. Kramer's Motion to Dismiss the Tortious Interference Claims Asserted by Defendant Life Product Clearing LLC in its Counterclaims and Third-Party Complaint ("Friedman Aff."). Attached as Exhibit 2 to the Friedman Aff. is a copy of Defendant Life Product Clearing LLC's Answer to Amended Complaint with Counterclaims and Cross-Claims, dated June 20, 2008 ("Life Product's Counterclaims"); and attached as Exhibit 3 to the Friedman Aff. is a copy of Defendant-Third-Party Plaintiff Life Product Clearing LLC's Third-Party Complaint, dated June 20, 2008 (without exhibits) ("Life Product's Third-Party Complaint").

The Statement of Facts contained herein is based on the allegations of Life Product's Counterclaims and Third-Party Complaint, which allegations must be accepted as true for the purposes of the present motion. (See p. 8, infra). To the extent that factual statements contained herein are taken from Plaintiff's Amended Complaint, they are based on allegations that are not disputed.

On or about August 29, 2005, Arthur Kramer established the Arthur Kramer 2005 Insurance Trust (the "August Trust"). (Life Product's Counterclaims, ¶ 72; Life Product's Third-Party Complaint, ¶ 12).

Defendant Lincoln, an insurance company, is a New York corporation with its principal place of business located in Syracuse, New York. (Amended Complaint, ¶ 8; Life Product's Counterclaims, ¶ 8). On or about November 23, 2005, Lincoln issued to the August Trust a $10 million life insurance policy (the "Lincoln Policy") on the life of Mr. Kramer. (Life Product's Counterclaims, ¶ 73; Life Product's Third-Party Complaint, ¶ 13).

Life Product alleges that Liza Kramer owned the entire beneficial interest in the August Trust at the time the Lincoln Policy was procured and that she sold her rights to the August Trust's interest in the Lincoln Policy to Life Product on or about November 29, 2005. (Life Product's Counterclaims, ¶¶ 74, 79; Life Product's Third-Party Complaint, ¶¶ 14, 17).

**Background:  "Stranger-Owned Life Insurance" and the Insurable Interest Rule**

As the Court is already aware, this case involves the procurement of what is known as "stranger-owned life insurance" ("SOLI").

New York Insurance Law Section 3205(b)(2) provides that one may not obtain an insurance policy on the life of another without having an "insurable interest" in the insured's life. New York Insurance Law Section 3205(a)(1) defines an "insurable interest" as the type of interest that a relative, loved one or business partner would have in the continued life of the insured. This so-called "insurable interest rule" is a well-settled principle in New York insurance law, and it prevents the issuance of "wager" life insurance policies – i.e., life insurance contracts that give the policy owner an interest in having the insured's life come to an end as

3

soon as possible.  <u>See</u> <u>generally</u> <u>Life Product Clearing LLC v. Angel</u>, 530 F. Supp. 2d 646, 648-54 (S.D.N.Y. 2008).

       A typical SOLI arrangement – which is designed to circumvent the insurable interest rule – is initiated by a stranger investor or an insurance agent who approaches an elderly person and encourages him to purchase life insurance, the death benefits of which will be immediately transferred to the stranger investor.  The common characteristic of all SOLI arrangements is that they are structured so that the elderly person or a family member, rather than the stranger investor, is made to appear as the original beneficiary of the policy in order to try to evade the insurable interest requirement.  (<u>See</u> <u>generally</u> <u>id.</u>).

       Plaintiff alleges in this case that LPS, TTA and Life Product participated in an unlawful SOLI arrangement that was structured for the sole purpose of trying to avoid the insurable interest rule.  (Amended Complaint, ¶ 15).

**The Lincoln Policy**

       New York Insurance Law Section 3203(a)(3) requires that all life insurance policies contain a two-year incontestability clause providing that the insurer is barred from contesting the validity of the policy after it has been continuously in effect for at least two years. As the statute provides:

    (a)    All life insurance policies, except as otherwise stated herein, delivered or issued for delivery in this state, shall contain in substance the following provisions, or provisions which the superintendent deems to be more favorable to policyholders:

                            \* \* \*

    (3)    <u>that the policy shall be incontestable after being in force during the life of the insured for a period of two years from its date of issue</u> . . .

N.Y. Ins. Law § 3203(a)(3) (McKinney 2006) (emphasis added).  Under New York law, the two-year incontestability clause applies even where there may have been no insurable interest in the life of the insured at the time the policy was procured.  See New England Mutual Life Ins. Co. v. Caruso, 73 N.Y.2d 74, 535 N.E.2d 270, 538 N.Y.S.2d 217 (1989).  Thus, even where an insurance company claims that there was no insurable interest in the life of the insured, the insurance company must still pay the death benefits if the policy at issue was in force for at least two years during the life of the insured.  Id.

A copy of the policy that Lincoln issued on the life of Mr. Kramer is attached to the Friedman Aff. as Exhibit 4.[2]  Pursuant to New York Insurance Law Section 3203(a)(3), the Lincoln Policy contained a two-year incontestability clause:

> Incontestability.  Except for nonpayment of Monthly Deductions, this policy will be incontestable after it has been in force during the insured's lifetime for 2 years from its Date of Issue.  This means that Lincoln Life will not use any misstatement in the application to challenge a claim or avoid liability after that time.

(Friedman Aff., Ex. 4, p. 20) (emphasis added).

The Lincoln Policy was issued on November 23, 2005, and pursuant to New York Insurance Law Section 3203(a)(3), the policy became incontestable on November 23, 2007.  Arthur Kramer died on January 26, 2008.

---

[2] Although the Lincoln Policy, as well as the document attached as Exhibit 5 to the Friedman Aff., are not attached to Life Product's Counterclaims or Third-Party Complaint, the Court may consider these documents in ruling on this motion to dismiss.  These documents are specifically referenced in Life Product's pleadings, and are therefore "incorporated by reference" into that pleading.  See Life Product's Counterclaims, ¶¶ 73, 82; Life Product's Third-Party Complaint, ¶¶ 13, 20; see also Yak v. Bank Brussels Lambert, BBL, 252 F.3d 127, 130 (2d Cir. 2001) ("On a motion to dismiss, the court may consider 'any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference.'") (quoting Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991)).

**The Present Action**

        On March 10, 2008, the Estate commenced this action against various defendants, including Life Product. On May 7, 2008, the Estate filed an Amended Complaint.

        As stated above, under New York law, a life insurance policy that is procured by someone without an insurable interest in the life of the insured is not void. Rather, if the two-year period of contestability has passed, the insurance company must pay out the proceeds of the policy. That is the rule of Caruso, supra.

        However, New York effectuates its policy against wager life insurance contracts by including an important provision in its statutory scheme that is designed to prevent the "wagerer" from keeping the benefits of his wager. That provision – New York Insurance Law Section 3205(b)(4) – states, in essence, that if someone receives from an insurer benefits under a policy that was made in violation of the insurable interest rule, then the insured's estate may maintain an action to recover those benefits.[3]

        Plaintiff's Amended Complaint, therefore, contains two claims. First, Plaintiff seeks a declaration that Lincoln and the other insurance company defendants must pay the death benefits under the policies, and that such death benefits must be paid to her. This claim assumes, of course, that the insurance companies have not yet paid the death benefits to anyone, and that a direct claim by Plaintiff under Section 3205(b)(4) has therefore not yet come into play. Plaintiff's second claim – which is pled in the alternative and which is not asserted against the

---

[3] The logic of Section 3205(b)(4) is self-evident. The provision takes the funds out of the hands of the entity that procured the wager policy and had an improper interest in seeing the insured's life come to an end sooner rather than later, and puts those funds back into the hands of the deceased's estate, where it will typically go to a loved one (here, Arthur Kramer's 80-year-old widow, Alice Kramer), who would have had an interest in seeing the life of the insured continue. In this manner, Section 3205(b)(4) serves the salutary public interest of righting the wrong of the wager contract that bets on a person's early demise.

insurance company defendants – is based on Section 3205(b)(4), and asserts that if the insurance companies have already paid out the death benefits, then Plaintiff is entitled to recover those benefits from the entity that received them.[4]

## Life Product's Counterclaims and Third-Party Claims

On June 20, 2008, Life Product served its Answer to Amended Complaint with Counterclaims and Cross-Claims. Life Product's first counterclaim is for a declaratory judgment that the proceeds of the Lincoln Policy should be paid to Life Product, not to the Plaintiff. This counterclaim is an exact mirror image of the declaratory judgment sought by Plaintiff in the First Claim for Relief in her Complaint, in which she seeks a declaration that the proceeds of the Lincoln Policy should be paid to the Estate, not to Life Product. Life Product's third counterclaim is pled "in the hypothetical," and appears to seek damages in the hypothetical event that payment of the Lincoln Policy is impeded because of a misrepresentation regarding Arthur Kramer's "health or capacity" in the procurement of the policy.[5]

Life Product's second counterclaim is for tortious interference with contractual relations. In essence, Life Product claims that the Estate induced Lincoln to breach the Lincoln Policy by refusing to pay out the proceeds to the August Trust, the beneficial interest in which is putatively held by Life Product. However, Life Product's pleading is clear that the only acts of the Estate that allegedly constitute tortious interference are (i) the filing of the present action, and (ii) the failure to send a copy of Mr. Kramer's death certificate to Life Product.

---

[4] Such pleading in the alternative is specifically authorized by Fed. R. Civ. P. 8(d).

[5] Although pleading in the hypothetical is permitted by Fed. R. Civ. P. 8(d), we note for the record that no party has asserted any claim in this case regarding any alleged misrepresentation by Arthur Kramer regarding his "health or capacity" to obtain life insurance.

On June 20, 2008, Life Product also filed a Third-Party Complaint against Liza Kramer and Andrew B. Kramer, two of the three children from Plaintiff's marriage to Arthur Kramer. Life Product's first third-party claim against Liza and Andrew Kramer is the same tortious interference claim that Life Product asserted as a counterclaim against the Estate.

As we now show, Life Product's claims of tortious interference fail as a matter of law and should be dismissed.

## ARGUMENT

### LIFE PRODUCT'S CLAIMS FOR TORTIOUS INTERFERENCE WITH CONTRACT SHOULD BE DISMISSED

This Court recently summarized the applicable standards when deciding a motion to dismiss under Rule 12(b)(6):

> [T]he court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in plaintiff's favor. Even though plaintiff's allegations are taken as true, the claim may still fail as a matter of law if the claim is not legally feasible.

Hunt v. Enzo Biochem, Inc., 530 F. Supp. 2d 580, 591 (S.D.N.Y. 2008) (internal quotations and footnotes omitted) (emphasis added).

In order to survive a Rule 12(b)(6) motion to dismiss, "the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007)). A complaint may be dismissed where it fails to plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic, 127 S. Ct. at 1974. As a result, "more than labels and conclusions" are required to satisfy "a plaintiff's obligation to provide the grounds of his entitlement to relief," and a "formulaic recitation of the elements of a cause of action will not

8

do." <u>Id.</u> at 1964-65. Where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." <u>Id.</u> at 1974. Under these standards, Life Product's claims for tortious interference should be dismissed.[6]

**A.**   **Life Product's Allegations Based on the Filing of the Present**
**Action Fail to State a Claim Upon Which Relief Can be Granted**

To establish a claim against the Estate for tortious interference with contractual relations under New York law, Life Product must show: (i) a valid contract between Lincoln and Life Product; (ii) the Estate's knowledge of the contract and inducement of a breach, and (iii) resulting damages to Life Product. <u>See, e.g.,</u> <u>Universal City Studios, Inc. v. Nintendo Co., Ltd.,</u> 797 F.2d 70, 75 (2d Cir. 1986); <u>Tap Publ'ns., Inc. v. Chinese Yellow Pages (New York) Inc.,</u> 925 F. Supp. 212, 222 (S.D.N.Y. 1996); <u>D.A. Collins Constr. Co., Inc. v. ICOS/NCCA,</u> No. 91-CV-933, 1994 WL 328626, at *16-17 (N.D.N.Y. June 28, 1994). The same requirements obviously apply to Life Product's tortious interference claims against Liza and Andrew Kramer.

Although the commencement of litigation can give rise to a claim for tortious interference under New York law, such a claim is viable only under extremely limited circumstances. Specifically, the institution of litigation can constitute an act of tortious interference only if the litigation is "wrongful." <u>Universal City Studios,</u> 797 F. 2d at 75; <u>Tap Publ'ns.,</u> 925 F. Supp. at 222; <u>D.A. Collins,</u> 1994 WL 328626 at *17. As the Second Circuit explained in <u>Universal City Studios</u>:

---

[6] It is well-settled that a motion to dismiss some, but not all, counts of a complaint (or counterclaim) pursuant to Rule 12(b)(6) extends defendant's time to answer the entire complaint (or counterclaim) until the court rules on the motion. <u>See, e.g.,</u> <u>Batdorf v. Trans Union,</u> No. C 00-0501, 2000 WL 635455, at *5 (N.D. Cal. May 8, 2000); <u>Finnegan v. Univ. of Rochester Med. Ctr.,</u> 180 F.R.D. 247, 249-50 (W.D.N.Y. 1998); <u>Alex. Brown & Sons Inc. v. Marine Midland Banks, Inc.,</u> No. 96 CIV. 2549, 1997 WL 97837, at *6-7 (S.D.N.Y. Mar. 6, 1997). Copies of unreported decisions cited in this memorandum are annexed hereto in alphabetical order.

> [T]he *Guard-Life* decision [by the New York Court of Appeals]
> expressly endorsed the provisions in the *Reinstatement (Second) of
> Torts* establishing this tort. *Id.* Under the *Restatement*, a lawsuit
> or the threat of a lawsuit is wrongful "if the actor has <u>no belief in
> the merit of the litigation</u>." *Restatement, supra,* § 767, comment c.
> It is also wrongful if the actor, having some belief in the merit of
> the suit, "<u>nevertheless institutes or threatens to institute the
> litigation in bad faith, intending only to harass the third parties and
> not to bring his claim to definitive adjudication. *Id.*</u>"

<u>Id.</u> at 75 (underscoring added) (italics in original); <u>see</u> <u>also</u> Tap Publ'ns., 925 F. Supp. at 222;

D.A. Collins, 1994 WL 328626 at *17.

Life Product has utterly failed to allege any of these required elements.

Specifically, Life Product has failed to allege that the Kramer Parties had no belief in the merits

of this action; failed to allege that the Kramer Parties instituted this action in bad faith; failed to

allege that the Kramer Parties intended only to harass third parties by bringing this action; and

failed to allege that the Kramer Parties had no intention of ever bringing this action to a

definitive adjudication.

Nor would it be possible – even by an amendment – for Life Product to make

such assertions. It is important to remember that under New York law, if a life insurance

policy is taken out with a view to its <u>immediate assignment</u> to a stranger investor – and the

insured never had even an initial intent to benefit a family member, loved one or business partner

– then a SOLI scheme is involved and the insurable interest rule is violated. <u>Life Product

Clearing LLC v. Angel</u>, 530 F. Supp. 2d 646, 653-54 (S.D.N.Y. 2008). In order to demonstrate

the existence of such a SOLI scheme, the insured's estate must show that the insured and his

family members never had any true interest in the policy, and that – to the extent that the

transaction facially exhibited such an interest – it was a mere sham designed to evade the

insurable interest rule. <u>Id.</u>

It is worth noting at the outset that Defendant Life Product is the same party that was involved in <u>Life Product Clearing LLC v. Angel</u>, 530 F. Supp. 2d 646 (S.D.N.Y. 2008), which is cited above and was decided by this Court (per Judge Chin) earlier this year. (<u>See</u> pp. 4, 10, <u>supra</u>). In that case, Life Product was accused of participating in a SOLI scheme through which Leon Lobel, a 77-year-old retired butcher, took out a $10 million life insurance policy that he had no intention of retaining and that he immediately transferred to an investor, which was Life Product. The Court in <u>Life Product</u> denied Life Product's motion for judgment on the pleadings, finding that Lobel's estate had stated a valid claim that a SOLI scheme was involved and that the estate – rather than Life Product – would be entitled to the insurance proceeds if such a scheme were proven. <u>Id.</u> at 648-52. Here, the facts surrounding Arthur Kramer's procurement of the life insurance policies at issue are similar to those of the <u>Life Product</u> case.

Indeed, it is virtually impossible to imagine that the transactions at issue here did <u>not</u> constitute a SOLI arrangement. Apparently, Life Product would have the Court believe that Arthur Kramer, <u>at the age of 79</u>, suddenly decided to take out $56 million in life insurance for the benefit of his family (seven different policies from three different insurance companies) and to pay the exorbitant premiums (millions of dollars per year), and that he then immediately decided to transfer his interests in those policies to stranger investors whose only interest in him would be to see his early demise. Rather, the timing of the applications and putative transfers, as well as Mr. Kramer's advanced age and the sheer number and value of the policies, provide compelling evidence that a SOLI arrangement was involved, and that the sale of his interests in the policies was contemplated from the very outset. Thus, under no circumstances could Life Product ever assert – consistent with its attorneys' obligations under Rule 11 – that the Kramer Parties had no belief in the merits of this case, which is an element of a tortious interference

claim that is based on the commencement of litigation. Similarly, it is inconceivable – given the overwhelming evidence of a SOLI arrangement – that the Kramer Parties brought this case only to harass other parties, and that they had no intention of ever seeking a final adjudication. Indeed, the very idea that the 80-year-old widow of Arthur Kramer – the Plaintiff in this proceeding – had the intent to "harass" three large insurance companies and a multi-million dollar investment fund is ludicrous on its face.

It is also significant that the Estate is not the only party in this case that has alleged the existence of a SOLI scheme on the part of Life Product and certain other defendants. For example, Defendant Phoenix Life Insurance Co. ("Phoenix") has asserted in its pleading, inter alia, that "all of the insurance policies at issue in this lawsuit were procured by means of fraudulent SOLI schemes formulated and perpetuated by" Life Product and others. (Phoenix's Answer to Amended Complaint with Counterclaims, Cross-Claims and Third-Party Complaint, dated May 29, 2008, p. 11, ¶ 7). Similarly, Defendant Lincoln has filed an action in Connecticut state court in which it alleges, inter alia, that Life Product participated in an illegal SOLI scheme regarding the Lincoln Policy. (See Affidavit of Stuart I. Friedman in Opposition to Defendant Lincoln Life & Annuity Co. of New York's Motion to Dismiss the Amended Complaint, filed on July 11, 2008, Ex. 3, ¶¶ 113-19, 127-34).

In sum, Life Product has not alleged – and there could be no good faith basis for alleging – that Plaintiff had no belief in the merits of this action, or that Plaintiff filed the action merely for purposes of harassment, and with no intention of seeing her claims through to a conclusion. Under these circumstances, Life Product's claim of tortious interference based on the mere filing of an action in court is deficient as a matter of law and should be dismissed.

**B.**  **Life Product's Allegations Against Liza Kramer and**
**Andrew B. Kramer Based on the Statement That They**
**"Proximately Caused" the Estate to File the Present Action**
**Fail to State a Claim Upon Which Relief Can be Granted**

Life Product asserts in its Third-Party Complaint against Liza and Andrew

Kramer that "[t]he Estate's filing of this action" constituted an act of tortious interference.

However, Alice Kramer, as the personal representative of the Estate of Arthur Kramer, filed the

present action, and neither Liza nor Andrew Kramer have ever filed any action relating to this

matter. (See Friedman Aff., Ex. 3, ¶¶ 27-28). Nevertheless, Life Product states that "[u]pon

information and belief, Liza Kramer and/or Andrew Kramer proximately caused the Estate to file

the main action." (Id. at ¶ 29).

This conclusory statement falls dismally short of what is required to survive a

motion to dismiss under Rule 12(b)(6). As noted above (see pp. 8-9, supra), a complaint may be

dismissed where it fails to plead "enough facts to state a claim to relief that is plausible on its

face." Bell Atlantic, 127 S. Ct. at 1974 (emphasis added). As a result, "more than labels and

conclusions" are required to satisfy "a plaintiff's obligation to provide the grounds of his

entitlement to relief," and a "formulaic recitation of the elements of a cause of action will not

do." Id. at 1964-65 (emphasis added).

Here, Life Product does not plead any facts at all with respect to how Liza Kramer

or Andrew Kramer allegedly caused the Estate to file this case. All that Life Product provides –

in one brief sentence – is the "conclusion" and "formulaic recitation" that Liza and Andrew

Kramer "proximately caused" the Estate to commence the action. (Life Product's Third-Party

Complaint, ¶ 29). For this reason as well, Life Product's tortious interference claim against Liza

and Andrew Kramer should be dismissed.

13

**C.     Life Product's Allegations Based on the Kramer Parties'**
**Alleged Failure to Send a Copy of the Death Certificate**
<u>**Fail to State a Claim Upon Which Relief Can be Granted**</u>

Life Product also claims that the Kramer Parties tortiously interfered with Life

Product's insurance contract with Lincoln by failing to send a copy of Arthur Kramer's death

certificate to Life Product. (Life Product's Counterclaims, ¶¶ 97-98; Life Product's Third-Party

Complaint, ¶¶ 31-32).  However, Life Product specifically alleges in its counterclaims that:

> 81.     Arthur Kramer died on January 26, 2008.

> 82.     On February 27, 2008, the trustee of the August Trust
> submitted to Lincoln a Claimant's Statement requesting that
> Lincoln process the August Trust's claim under the Lincoln Policy
> and pay the death benefit to the August Trust.

(Life Product's Counterclaims, ¶¶ 81-82; <u>see also</u> Life Product's Third-Party Complaint, ¶¶ 19-

20).[7]

A copy of the Claimant's Statement that the August Trust, on behalf of Life

Product, submitted to Lincoln is attached to the accompanying Friedman Aff. as Exhibit 5.  In

that Claimant's Statement, which is dated February 27, 2008 (about one month after Mr.

Kramer's death), the Trustee of the August Trust stated:

> Along with the Claimant's Statement and Distinctive Payee
> Arrangement forms, <u>I have enclosed a certified copy of the</u>
> <u>Insured's Certificate of Death obtained from the City of New</u>
> <u>York</u>.

(Friedman Aff., Ex. 5) (emphasis added) (a copy of the actual certificate of death for Mr. Kramer

is included as the second page of the exhibit).  In short, it is absolutely undisputed that Life

Product promptly obtained a copy of Mr. Kramer's death certificate from the City of New York,

---

[7] As noted above, Life Product putatively holds the beneficial interest in the August Trust.  (<u>See</u>
p. 3, <u>supra</u>).  Thus, in effect, the demand to Lincoln was a request that the proceeds of the
Lincoln Policy be paid to Life Product.

14

and that Life Product included a copy of the death certificate when it submitted its claim to Lincoln for the $10 million in proceeds.

It is axiomatic that alleged acts of tortious interference must <u>result</u> in damages to the Plaintiff in order for a tortious interference claim to be cognizable.  See, e.g., <u>Universal City Studios, Inc.</u>, 797 F.2d at 75; <u>Tap Publ'ns., Inc.</u>, 925 F. Supp. at 222.  Here, it is obvious that any alleged failure by the Kramer Parties to send Life Product a copy of Mr. Kramer's death certificate could not possibly have caused any damage to Life Product, because Life Product was always free to, and, in fact did, obtain a copy of it directly from the City of New York.  Accordingly, the alleged failure by the Kramer Parties to send Life Product a copy of the death certificate cannot form the basis of a claim by Life Product for tortious interference with contract.

Finally, Life Product's argument – reduced to its essence – is that if it could have obtained a copy of the death certificate sooner, it might have (i) been able to submit its claim to Lincoln sooner, (ii) received payment from Lincoln, and (iii) thereby gotten away with its unlawful SOLI arrangement.  Such an argument makes no sense, however, because the issue of whether or not a SOLI arrangement was involved in this case is squarely before the Court.  If the Court determines – contrary to what we believe the evidence will show – that there was no SOLI arrangement, then Life Product will end up with the proceeds of the Lincoln Policy and will not have been damaged in any way by any facts relating to the death certificate.  If, on the other hand, the Court finds that there <u>was</u> a SOLI arrangement involved, then the Estate – and not Life Product – will, as a matter of law, be entitled to the life insurance proceeds.  In that latter event – where Life Product would have been adjudicated to have <u>no</u> legal entitlement to such proceeds – it surely could not claim that it was "damaged" by not receiving a copy of the death certificate

from the Kramer Parties. Life Product's claim of tortious interference based on the death

certificate should therefore be dismissed on this ground as well.

## Conclusion

For all the foregoing reasons, Defendant Life Product Clearing LLC's

counterclaims and third-party claims for tortious interference with contract fail to state a claim

upon which relief can be granted, and should be dismissed.

Dated: New York, New York
      August 1, 2008

                                       FRIEDMAN & WITTENSTEIN
                                       A Professional Corporation

                                       By:    *Andrew A. Wittenstein*
                                                Stuart I. Friedman (SF-9186)
                                                  Andrew A. Wittenstein (AW-1943)
                                                    Claire L. Chau (CC-0125)

                                         600 Lexington Avenue
                                       New York, New York 10022
                                       (212) 750-8700

                                       *Attorneys for Plaintiff and Third-Party Defendants*
                                       *Liza Kramer and Andrew B. Kramer*

Westlaw.

Not Reported in F.Supp.                                              Page 1
Not Reported in F.Supp., 1997 WL 97837 (S.D.N.Y.), Fed. Sec. L. Rep. P 99,440
1997 WL 97837 (S.D.N.Y.)

▷Alex. Brown & Sons Inc. v. Marine Midland Banks, Inc.
S.D.N.Y.,1997.

United States District Court,S.D. New York.
ALEX. BROWN & SONS INCORPORATED,
Plaintiff,
v.
MARINE MIDLAND BANKS, INC., Defendant.
**No. 96 CIV. 2549 RWS.**

March 6, 1997.

Ross & Hardies, New York City (<u>Yvette Harmon</u>, <u>Carol A. Dunning</u>, <u>Kenneth Zuckerbrot</u>, <u>Lawrence R. Samuels</u>, of counsel), for Plaintiff.
Baker & Mckenzie, New York City (<u>Robert B. Davidson</u>, <u>Grant Hanessian</u>, of counsel), for Defendant.

*OPINION*

<u>SWEET</u>, District Judge.
**\*1** Defendant Marine Midland Bank ("Marine") has moved to dismiss the first claim in the complaint filed by Plaintiff Alex. Brown & Sons Incorporated ("Alex.Brown") for failure to state a claim under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. Alex. Brown has moved for (a) a default judgment against Marine on counts IV through VIII of the complaint because of Marine's failure to submit an answer to those counts and (b) an order compelling commencement of discovery.

For the reasons set forth below, Marine's motion to dismiss will be granted, and Alex. Brown's cross-motions for default and to compel discovery will be denied.

*Parties*

Plaintiff Alex. Brown is a member of the New York Stock Exchange and the National Association of Securities Dealers and a registered and licensed broker/dealer.

Defendant Marine Midland is a national banking association with offices in New York, New York.

*Prior Proceedings*

The complaint in this action was filed on April 12, 1996, alleging claims against Marine for securities fraud, state law fraud, breach of contract and breach of the duty of good faith and fair dealing. By letter dated April 15, 1996, Marine's in-house counsel requested that Alex. Brown withdraw its securities fraud claims, based on this Court's recent decision in *Ernst & Co. v. Marine Midland, 920 F.Supp. 58 (S.D.N.Y.1996)* (RWS) ("*Ernst*"). Counsel for Alex. Brown thereafter notified Marine that Alex. Brown would not withdraw its securities fraud claims, based on their belief that *Ernst* was distinguishable.

Marine requested the Honorable Shira S. Scheindlin transfer this case to this court, based on its being "related" to *Ernst.* Alex. Brown opposed Marine's transfer request, but agreed to extend Marine's time to answer pending a determination by Judge Scheindlin of Marine's transfer request. The action was transferred on June 28, 1996.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 2
Not Reported in F.Supp., 1997 WL 97837 (S.D.N.Y.), Fed. Sec. L. Rep. P 99,440
1997 WL 97837 (S.D.N.Y.)

On August 6, 1996, Marine moved to dismiss the securities fraud claim. Marine refused to answer the remaining claims until after its motion to dismiss was decided. On August 30, 1996, Alex. Brown filed a cross-motion for default and to compel discovery. Argument on Marine' 5 motion to dismiss and Alex. Brown's cross-motions was heard on October 16, 1996, at which time the motions were considered fully submitted.

*Facts*

For the purpose of this motion to dismiss, the allegations of the complaint are taken as true. In September 1994, Alex. Brown was a clearing broker for Monness, Crespi, Hardt & Co., Inc. ("Monness Crespi"), a securities brokerage firm. In its capacity as a clearing broker, Alex. Brown performed various functions in connection with securities transactions initiated through Monness Crespi, including the receipt and delivery of securities and of payment therefor on the Depository Trust Company ("DTC") automated trading settlement system.

Pursuant to contractual agreements, Marine acted as a custodian and paying agent for Stanley I. Berk and for Armor Pension Managers ("Armor") and Westside Partners ("Westside") (collectively, "Berk"), two entities controlled by Berk. Marine extended credit to Berk and paid for securities purchased by Berk, holding them on Berk's behalf in Berk's custody accounts at Marine. These transactions were collateralized by the securities kept in Berk's accounts.

*2 In September 1994, Berk directed Monness Crespi to make several trades of over-the-counter biotechnological securities on Berk's behalf. The five trades which are the subject of this action were among those trades, and Alex. Brown acted as the clearing broker to facilitate the trades via the DTC system. All of these trades were "affirmed" by Marine, meaning that Marine reviewed the trades on the DTC system, determined that the quantity and price of securities being purchased, the net purchase money, and the account instructions comported with its instructions from Berk. Marine also represented to Alex. Brown, through its affirmations on the DTC system, that the trades would settle as scheduled.

Two of the trades, one on behalf of Armor for 150,000 shares of Intelligent Surgical Lasers, Inc. ("ISLS") and the other on behalf of Westside for 100,000 shares of Biosepra ("BSEP"), settled as scheduled on September 21, 1994. The securities were delivered electronically via DTC from Alex. Brown to Marine. Marine was debited in the amount of the purchase price and Alex. Brown was credited with the purchase price. On September 22, 1994, however, Blech & Company ("Blech"), a major underwriter and market-maker in over-the-counter biotechnological securities, closed its operations, causing the value of the stocks which it had underwritten, including ISLS, BSEP, Ariad Pharmaceuticals, Inc. ("Ariad") and La Jolla Pharmaceuticals Co. ("LJPC"), to decrease dramatically.

Alex. Brown alleges that Marine, having determined that the decline in the value of the Blech underwritten securities would cause a deficit in Berk's custody accounts, thereby decreasing the value of Marine's securities collateral, reversed the ISLS and BSEP settlements by sending a "new" delivery to Alex. Brown via DTC of the same securities which Marine had previously purchased. Marine allegedly thereby caused Alex. Brown's account to be debited and Marine's account to be credited for the monies Marine had previously paid to Alex. Brown. Marine did not convey its reason for the deliveries to Alex. Brown at this time, but Alex. Brown alleges Marine' motive was to "jam" Alex. Brown with the depreciating stock and to regain control over the purchase monies.

At approximately 10:30 a.m. on September 23, Marine's

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 97837 (S.D.N.Y.), Fed. Sec. L. Rep. P 99,440
1997 WL 97837 (S.D.N.Y.)

Vice President of Securities Client Services, Louis Pilato ("Pilato"), notified Berk that Berk's accounts were overdrawn by $4,554,647.89 and that if Marine did not receive funds to cover the overdraft by 10:45 a.m. that day, Marine would not honor any of Berk's trades. Berk did not cover the overdraft.

Not knowing why Marine had reversed the ISLS and BSEP trades, Alex. Brown contacted Marine on September 23, 1996 to discuss the matter. Pilato stated that he needed time to investigate the matter and would call Alex. Brown back later that day with an answer. Alex. Brown next heard from Marine on September 27, 1994, at which time Pilato informed Alex. Brown that as of September 23 Marine did not honor any of Berk's trades.

*3 Between September 23 and September 27, Alex. Brown held the ISLS and BSEP securities, allegedly in reliance on Marine's failure to inform Alex. Brown that the value of the securities had plummeted as of September 23. When Alex. Brown attempted to deliver the ISLS and BSEP securities again to Marine on September 26 and to settle three other trades which Marine had previously affirmed, Marine DK'd [FN1] those deliveries without comme.

   FN1. According to the Complaint, "DK" means that the purchasing Participant, in this case, Marine, does not know the trade-*i.e.,* it will not accept (settle) the securities trade because of a problem with the trade as billed or formatted or because the stock was delivered altogether in error.

Alex. Brown alleges that, as a result of its reliance on Marine's failure to disclose the reason for the new deliveries, Alex. Brown suffered substantial losses. First, had Alex. Brown known on September 23 that Marine did not intend to take the ISLS and BSEP securities back, it

could have protected itself by DK'ing the deliveries from Marine, or it could have immediately liquidated the securities by selling them on the market before the stock value continued to decrease. Instead, Alex. Brown held the securities until their value had substantially decreased, and was then forced to sell them at a substantial loss.

In addition, on September 23, the date on which Marine determined that it would not honor any of Berk's trades, Marine affirmed two more trades on Berk's behalf, one for 75,000 shares of ISLS securities and the other for 100,000 shares of LJPC securities, both of which trades were due to settle on September 26, 1994, the day before Marine ultimately informed Alex. Brown that it would not honor any of Berk's trades. However, after waiting three days without telling Alex. Brown that it had no intention of consummating these trades, Marine DK'd both trades. According to Alex. Brown, the trades were wrongfully DK'd because a DK is inconsistent with a prior affirmation and because there was nothing objectively incorrect about the trades. Between September 23 and September 26, the value of the securities continued to plummet and Alex. Brown was left in the position of liquidating them at a depressed price, thereby incurring substantial losses.

Alex. Brown was also in the process of facilitating a fifth sale on behalf of Armor on September 23, when Marine made its decision not to pay for any of Berk's trades. This trade was for 65,000 units of Ariad securities. Marine had affirmed the trade on September 9, 1996 and it was originally due to settle on September 14, 1996. However, after affirming the trade, Marine notified Alex. Brown that it would not accept delivery of the securities in unit form and insisted that Alex. Brown have the units broken down into stocks and warrants acceptable for DTC delivery. Alex. Brown followed Marine's instructions. Then, Marine waited until September 26 to notify Alex. Brown that it would not settle the Ariad trade, despite the fact that Marine knew since September 23 that it would not be settling any of Berk's trades because of the decline in the value of the securities. Again, Alex. Brown was forced to

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 4
Not Reported in F.Supp., 1997 WL 97837 (S.D.N.Y.), Fed. Sec. L. Rep. P 99,440
1997 WL 97837 (S.D.N.Y.)

liquidate the securities at a depressed price.

*Discussion*

I. *Standards for Evaluating a 12(b)(6) Motion*

*4 On a Rule 12(b)(6) motion to dismiss, the factual allegations of the complaint are presumed to be true and all factual inferences must be drawn in the plaintiffs' favor and against the defendants. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 5. Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989); *Dwyer v. Regan,* 777 F.2d 825, 828-29 (2d Cir.1985). Accordingly, the factual allegations set forth and considered herein are taken from the Plaintiffs' complaint and do not constitute findings of fact by the Court. They are presumed to be true only for the purpose of deciding the present motion to dismiss.

Rule 12(b)(6) imposes a substantial burden of proof upon the moving party. A court may not dismiss a complaint unless the movant demonstrates "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *H.J., Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 249-50, 109 S.Ct. 2893, 2905-06, 106 L.Ed.2d 195 (1989); *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232-33, 81 L.Ed.2d 59 (1984); *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-02, 2 L.Ed.2d 80 (1957).

II. *Section 10-b and Rule 10b-5*

Section 10 of the 1934 Act makes it "unlawful for any person ... (b) [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange]

Commission may prescribe as necessary or appropriate in the public interest for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5, a general anti-fraud provision promulgated by the Securities and Exchange Commission in 1942 states:

Employment of manipulative and deceptive devices.

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security. 17 C.F.R. 240.10(b)-5.

In *Ernst & Co. v. Marine Midland Bank, N.A.,* 920 F.Supp. 58 (S.D.N.Y.1996), also an action against Marine based on their failure to pay for Berk's securities, this Court dismissed Plaintiffs' securities fraud claims for two reasons: (1) Marine's affirmations that funds would be available to consummate Berk's trades did not relate to the attributes of the securities that would induce the purchase or sale of those securities; and (2) the Plaintiffs sold the securities prior to the affirmations, and therefore the sale

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 5
Not Reported in F.Supp., 1997 WL 97837 (S.D.N.Y.), Fed. Sec. L. Rep. P 99,440
1997 WL 97837 (S.D.N.Y.)

of securities could not have been induced by the allegedly fraudulent affirmations. *See* 920 F.Supp. at 60.

**\*5** Here, Marine contends that Alex. Brown has failed to state a claim for securities fraud for three reasons: Alex. Brown, as a clearing broker, is neither a purchaser nor a seller of securities, and therefore lacks standing; Alex. Brown has not properly alleged a fraud "in connection with" the sale of securities; and Alex. Brown has not properly alleged that the omissions and misrepresentations at issue fraudulently induced them to enter the transactions.

A. *The Alleged Fraud Was Not "In Connection With" the Sale of Securities*

Section 10(b) and Rule 10b-5 proscribe the use of any deceptive or manipulative device, scheme or artifice "in connection with the purchase or sale of any security." 15 U.S.C. § 78(j)(b); 17 C.F.R. 240.10b-5. This standard is met "where accomplishment of the alleged scheme is 'directly related to the trading process.'" *United States v. Newman,* 664 F.2d 12, 18 (2d Cir.1981); *Perez-Rubio v. Wyckoff,* 718 F.Supp. 217, 236 (S.D.N.Y.1989). In *Ernst,* this Court held as follows:

the Court of Appeals has held that misrepresentations or omissions involved in securities transactions, but not pertaining to the securities themselves, cannot form the basis of a Section 10b or Rule 10b-5 claim. *Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 943 (2d Cir.1984), *cert. denied* 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984). The "in connection with" requirement mandates that the alleged fraud concern the "fundamental nature of the (securities): namely, characteristics and attributes that would induce and [sic] investors to buy or sell the particular [securities]." *Manufacturers Hanover Trust Co. v. Smith Barney, Harris Upham & Co.,* 770 F.Supp. 176, 181 (S.D.N.Y.1991).

Assuming that the affirmation sent by Marine told the broker dealer either that there was or would be funds available to effectuate the purpose, the affirmation does not implicate the "characteristics" or "attributes" of any particular security, and thus a claim under this section has not been stated.

*Ernst,* 920 F.Supp. at 61.

Like the alleged misrepresentations in *Ernst,* Marine's alleged misrepresentations and omissions here were not made "in connection with" the purchase and purchase and sale of the securities in question, because they do not relate to the fundamental investment attributes of the securities. Instead, the alleged misrepresentations here relate to whether Berk had funds available to effectuate the purchases.

Alex. Brown's Complaint is based, in part, on precisely the same affirmations which this Court held were not connected to the sale of securities in *Ernst.* Here, Alex. Brown alleges that Marine not only affirmed trades, but also fraudulently omitted to disclose that it returned the ISLS and BSEP securities to Alex. Brown because their value, and therefore the value of Marine's securities collateral, had declined. Alex. Brown further alleges that Marine failed to disclose the fact that, based on Marine's own dealings with Berk, Marine did not intend to honor Berk's trades.

**\*6** In spite of the differences between Alex. Brown's and the *Ernst* plaintiff's complaints, Alex. Brown fails to state a claim for securities fraud because the alleged misrepresentations and omissions pertain not to the securities themselves, but to the status of Berk's credit and the availability of funds in his account. Marine's affirmations are identical to the affirmations upon which the Ernst plaintiffs relied. Marine's alleged omissions-that the value of the securities, and therefore Marine's

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                        Page 6
Not Reported in F.Supp., 1997 WL 97837 (S.D.N.Y.), Fed. Sec. L. Rep. P 99,440
1997 WL 97837 (S.D.N.Y.)

collateral, had declined, and that Marine did not intend to honor Berk's trades-were also related to Marine's intent or ability to pay for the securities at issue and not to the characteristics of the securities themselves, as is required to state a claim for securities fraud. Accordingly, Alex. Brown has not met the "in connection with" test set forth in *Manufacturers Hanover Trust, 770 F.Supp. at 181,* and in *Ernst.*

### B. *Alex. Brown Has Not ProRerlv Alleged Causation*

To state a claim under Section 10(b), a plaintiff must establish both "loss causation" and "transaction causation." *Perez-Rubio,* 718 F.Supp. at 238. Transaction causation focuses on whether the alleged fraud induced the plaintiff to purchase or sell the security, while loss causation focuses on whether the fraud was responsible for the plaintiff's damages (*i.e.,* the damages were the foreseeable consequence of the fraud). *Id.* at 238-39.

Marine contends that Alex. Brown has not properly alleged "transaction causation," *i.e.,* that it relied on Marine's conduct in entering into the transactions in question. Marine cites *Ernst,* in which the Court held that the plaintiffs could not allege reliance on Marine's affirmations of the trades because the sale of securities took place prior to Marine's-affirmations. *Ernst,* 920 F.Supp. at 61 (citing *Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374, 380 (2d Cir.1974)).

Here too, Alex. Brown has failed to properly allege transaction causation. The sale of securities here took place well before the alleged misrepresentations and omissions were made. Alex. Brown alleges that it relied on Marine's omissions in holding the ISLS and BSEP securities and in attempting to settle the ensuing ISLS, LJPC and Ariad transactions, rather than liquidating those securities on September 23. Alex. Brown's holding of securities, and its attempt to settle transactions, even if

they were in fact conducted in reliance on Marine, do not constitute the sale or purchase of securities as required to state a claim for securities fraud. The sale here, like the sale in *Ernst,* occurred prior to Marine's allegedly fraudulent omissions and misrepresentations. Accordingly, Alex. Brown has failed to properly allege reliance on Marine's omission, which post-dated the sale and purchase of the securities at issue.

### III. *Alex. Brown's Motion for Default Will Be Denied*

Alex. Brown has moved for a default judgment with respect to the claims Marine has not moved to dismiss, based on Marine's refusal to answer those claims prior to a decision on the instant motion to dismiss. In *Alfred Ricciuti v. New York City Transit Authority,* No. 90 Civ. 2823 1991 U.S. Dist. LEXIS 13981, (S.D.N.Y. October 1, 1991), the Honorable Charles S. Haight, Jr. held that service of a motion to dismiss a portion of a complaint suspends a defendant's time to answer the remainder of the complaint until the motion to dismiss is decided. Judge Haight stated:

*7 Rule 12(a) provides that "the service of a motion permitted under this rule alters the period of time [for service of a responsive pleading] as follows, unless a different time is fixed by order of the court ..." Any motion, particularly when the motion addresses a significant portion of the complaint (as in the present case), will suspend the time to answer any claim. As a matter of policy and judicial economy such a conclusion is required.

1991 U.S. Dist. LEXIS 13981 at *3. *See also Brocksopp Engineering, Inc. v. Bach-Simpson, Ltd.,* 136 F.R.D. 485 (E.D.Wisc.1991) (partial motion to dismiss extends defendant's time to answer all claims); *see also* C. Wright & A. Miller, *5A Federal Practice & Procedure* § 1346 (stating the view that "a partial Rule 12(b) motion expands

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 97837 (S.D.N.Y.), Fed. Sec. L. Rep. P 99,440
1997 WL 97837 (S.D.N.Y.)

the time for answering the entire pleading....").

In light of the available precedent from this District, the Court declines to follow the sole authority cited by Alex. Brown in support of the proposition that default is appropriate under the circumstances here. *See Gerlach v. Michigan Bell Tel. Co.,* 448 F.Supp. 1168 (E.D.Mich.1978).

However, Marine will be directed to answer Alex. Brown's remaining claims within twenty days of the issuance of this opinion.

### IV. *Alex. Brown's Motion to Compel Discovery Will Be Denied*

Alex. Brown, noting that discovery is not stayed automatically by the filing of a motion to dismiss, *Moran v. Flaherty,* 1992 WL 276913 (S.D.N.Y. No. 92 CIV 3200); In Re: *Chase Manhattan Corporation Securities Litigation,* 1991 WL 79432 (S.D.N.Y. No. 90 CIV 6092), and that no motion for a stay has been filed, argues that no basis exists for a stay of discovery here, because Alex. Brown's seeks the same information in discovery with respect to those counts Marine has moved to dismiss and the counts which it had not moved to dismiss.

Notwithstanding the authorities relied on by Alex. Brown, which establish that discovery is not automatically stayed during the pendency of a motion to dismiss, Rule 8 of this Court's Individual Rules does effectively stay discovery during the pendency of a motion. Rule 8 provides, in relevant part: "a pending motion ... extends deadlines for completion of discovery." With respect to the present circumstances, no deadline has yet beer set. Rule 8 nonetheless applies here, as it was intended to impose a stay of discovery during the pendency of a dispositive motion.

Accordingly, Alex. Brown's motion to compel discovery and for sanctions will be denied. The parties have agreed to participate in, and are free to proceed with, an exchange of documents and initial interrogatories with Alex. Brown. However, Marine will not be required to defend depositions until issue has been joined.

### V. *The Remaining Claims will be Dismissed for Lack of an Independent Basis of Jurisdiction*

A district court may decline to exercise supplemental jurisdiction when it dismisses all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). Since the parties are in the earliest stages of this case and the federal claim has been dismissed leaving no independent basis of jurisdiction over the remaining state claims, they will also be dismissed. *See Purgess v. Sharrock,* 33 F.3d 134, 138 (2d Cir.1994); *Modeste v. Local 1199,* 850 F.Supp. 1156, 1167 (S.D.N.Y.1994), *aff'd* 38 F.3d 626 (2d Cir.1994).

### VI. *Disclosure Regarding Alex. Brown*

**\*8** It has come to this Court's attention that a brokerage firm where I have an account uses Plaintiff Alex. Brown as its clearing agent. It is the opinion of this Court that this fact does not raise any disqualification issues under applicable federal law.

Under 28 U.S.C. § 455(a), a federal judge must disqualify himself if his impartiality might reasonably be questioned. "[T]he test of impartiality is what a reasonable person, knowing and understanding all the facts and circumstances, would believe." *In re Drexel Burnham Lambert Inc.,* 861 F.2d 1307, 1309 (2d Cir.1988). The test is objective. *Id.* at 1313.

More specifically, under 28 U.S.C. § 455(b)(4), a judge

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 8
Not Reported in F.Supp., 1997 WL 97837 (S.D.N.Y.), Fed. Sec. L. Rep. P 99,440
1997 WL 97837 (S.D.N.Y.)

must disqualify himself if "he knows that he ... has a
financial interest in ... a party to the proceeding." The
Second Circuit has held that "where an interest is not
direct, but is remote, contingent, or speculative, it is not
the kind of interest which reasonably brings into question
a judge's impartiality." *In re Drexel Burnham, supra* at
1313.

Applying this law to the present situation leads this Court
to conclude that my interest in Plaintiff is remote and
speculative at best. Therefore, a reasonable person would
not question this Court's impartiality. The disclosure is
made at the Court's initiative and solely out of fairness to
the parties.

*Conclusion*

For the reasons set forth above, Marine's motion to
dismiss is hereby granted. Alex. Brown' cross-motions for
default, to compel discovery and for sanctions are hereby
denied.

Marine is hereby be directed to answer counts IV through
VIII within twenty days of issuance of this Court's opinion
and Alex. Brown's state law claims are hereby dismissed
for lack of subject matter jurisdiction.

It is so ordered.

S.D.N.Y.,1997.
Alex. Brown & Sons Inc. v. Marine Midland Banks, Inc.
Not Reported in F.Supp., 1997 WL 97837 (S.D.N.Y.),
Fed. Sec. L. Rep. P 99,440

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 635455 (N.D.Cal.)
2000 WL 635455 (N.D.Cal.)

Page 1

**H**Batdorf v. Trans Union
N.D.Cal.,2000.
Only the Westlaw citation is currently available.
United States District Court, N.D. California.
Thomas BATDORF, Plaintiff,
v.
TRANS UNION, et al., Defendants.
**No. C 00-0501 CRB.**

May 8, 2000.

MEMORANDUM AND ORDER

BREYER, J.

*1 This is a Fair Credit Reporting Act ("FCRA") lawsuit.
Now before the Court are defendants' motions to dismiss
and plaintiff's cross-motion for summary judgment. After
carefully considering the papers filed by the parties, the
Court concludes that oral argument is unnecessary, *see*
Local Rule 7-1(b), and GRANTS the motions to dismiss
and DENIES plaintiff's cross-motion for summary
judgment.

BACKGROUND

A. The FCRA

The purpose of the FCRA is to "require that consumer
reporting agencies adopt reasonable procedures for
meeting the needs of commerce for consumer credit,
personnel, insurance, and other information in a manner
which is fair and equitable to the consumer, with regard to
the confidentiality, accuracy, relevancy, and proper

utilization of such information." 15 U.S.C. § 1681(b). "The
FCRA provides for compensation in the form of actual
damages and attorneys' fees if a consumer reporting
agency negligently fails to comply with any provision of
the FCRA." *Guimond v. Trans Union Credit Information
Co.*, 45 F.3d 1329, 1332 (9th Cir.1995) (citing 15 U.S.C.
§ 1681o). The FCRA also permits a consumer to recover
punitive damages if the defendant's non-compliance with
the Act was willful. *See id.*(citing 15 U.S.C. § 1681n).

B. Allegations of the Complaint

Security Savings Bank denied plaintiff's application for
credit on November 17, 1999. The letter denying
plaintiff's application identified defendant Trans Union as
the company that provided the bank with plaintiff's credit
report. Over the course of the next month, plaintiff
attempted unsuccessfully on at least ten occasions to
contact defendant Trans Union by telephone to discuss the
matter. Plaintiff also sent four written notices of dispute to
Trans Union during December 1999. By letter dated
January 3, 2000, Trans Union acknowledged receipt of
plaintiff's dispute and deleted the disputed information.

The disputed information reported that plaintiff has a
delinquent account with ITT Financial Services and that
his previous address of 3600 Aolele Street, Honolulu,
Hawaii, is a "res taurant/bar/nightclub."

C. Plaintiff's Lawsuit

Plaintiff's first amended complaint includes sixteen causes
of action against (1) Trans Union, (2) its Chief Executive
Officer Harry Gambill ("Gambill"), (3) its parent
corporation, Marmon Group, Inc. ("Marmon"), and (4)
Robert Pritzker, the Chief Executive Officer of Marmon

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 635455 (N.D.Cal.)
2000 WL 635455 (N.D.Cal.)

Group, Inc. ("Pritzker").

Plaintiff's first cause of action alleges that defendants violated FCRA section 1681e(b) by negligently maintaining unreasonable procedures that resulted in the inaccurate ITT information. The second cause of action alleges that the violation alleged in the first cause of action was willful under FCRA section 1681n.

The third cause of action alleges that defendant negligently violated section 1681c by erroneously reporting the ITT information even though it was more than seven years old. The fourth cause of action alleges that the above violation was willful.

**\*2** The fifth and sixth causes of action challenge the erroneous reporting of plaintiff's previous address as a ' 'restaurant/bar/nightclub, with the sixth cause of action alleging that defendants' maintenance of unreasonable procedures was willful.

The seventh and eighth causes of action make claims for common law libel and slander, while the ninth and tenth causes of action allege that defendants willfully intruded on plaintiff's privacy with respect to the reporting of the ITT information. The eleventh and twelfth causes of action allege that as a result of the ITT information, defendants willfully placed plaintiff in a "false light." Similarly, the thirteenth, fourteenth, fifteenth and sixteenth causes of action allege that defendants negligently intruded on plaintiff's privacy and negligently placed plaintiff in a false light by publishing that plaintiff's previous address was a Restaurant/Bar/Nightclub.

Now pending before the Court are (1) the motion to dismiss of defendants Gambill, Pritzker and Marmon Group, and (2) Trans Union's motion to dismiss the second, fourth, sixth, seventh, eighth, ninth, tenth,

eleventh, twelfth, fourteenth and sixteenth causes of action. (Trans Union is not named as a defendant in the thirteenth and fifteenth causes of action). Plaintiff has filed a counter-motion for summary judgment against Trans Union on the claims Trans Union has not moved to dismiss, namely, the claims that Trans Union negligently violated the FCRA (first, third and fifth causes of action).

DISCUSSION

I. The Motions To Dismiss

A. Legal Standard

On a motion to dismiss, the Court must accept plaintiff's allegations as true and construe them in a light most favorable to the plaintiffs. See _Parks School of Business v. Symington_, 51 F.3d 1480, 1484 (9th Cir.1995). The Court should not dismiss for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [the plaintiff's] claims which would entitle [the plaintiff] to relief." _Barnett v. Centoni_, 31 F.3d 813, 816 (9th Cir.1994) (per curiam).

B. The Gambill, Pritzker, Marmon Group Motion to Dismiss

Plaintiff's first amended complaint alleges that defendant Trans Union erroneously reported the ITT information and description of plaintiff's previous address. The complaint does not allege that Gambill or Pritzker did anything in particular. "[D]irectors or officers of a corporation do not incur personal liability for torts of the corporation merely by reason of their official position, unless they participate in the wrong or authorize or direct that it be done." _United States Liability Ins. Co. v. Haidinger-Hayes, Inc._, 1 Cal.3d 586, 595 (1970). As plaintiff apparently premises the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 635455 (N.D.Cal.)
2000 WL 635455 (N.D.Cal.)

liability of these individual defendants solely on the basis of their positions as CEO of Trans Union and Trans Union's parent, respectively, all the claims against them must be dismissed. Moreover, in his pleadings, plaintiff does not contend that he has any basis, let alone a good faith basis, for amending his complaint to allege that each individual defendant actually participated in Trans Union's reporting of the allegedly false information. Accordingly, the claims against the individual defendants will be dismissed without leave to amend.

*3 The claims against Marmon Group, Trans Union's parent corporation, fail for a similar reason. A parent company is not liable for the acts or omissions of its subsidiary based merely on the parent/subsidiary relationship. See *Walker v. Signal Companies, Inc.*, 84 Cal.App.3d 982, 1001 (1978). Yet, that is all plaintiff alleges; that Marmon Group is Trans Union's parent. Accordingly, the claims against Marmon Group must be dismissed for failure to state a claim. As plaintiff does not contend that he can allege facts that demonstrate that Marmon Group is liable for Trans Union's acts and omissions, the claims against Marmon will also be dismissed without leave to amend.

C. Trans Union Motion to Dismiss

1. The "Willful" FCRA Claims

Trans Union moves to dismiss plaintiff's FCRA claims that allege that Trans Union willfully failed to maintain reasonable procedures on the ground that the first amended complaint does not sufficiently allege that Trans Union acted willfully.

The FCRA does not impose strict liability for reporting an inaccurate item. Section 1681e(b) provides: "Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."If a consumer presents evidence "tending to show that a credit reporting agency prepared a report containing inaccurate information," he has made out a prima facie violation under section 1681e(b).*Guimond, 45 F.3d at 1333*. However, "an agency can escape liability if it establishes that an inaccurate report was generated despite the agency's following reasonable procedures. The reasonableness of the procedures and whether the agency followed them will be jury questions in the overwhelming majority of cases."*Id.*

"To show willful noncompliance with the FCRA," a plaintiff must demonstrate that the defendant " 'knowingly and intentionally committed an act in conscious disregard for the rights of others,' but need not show 'malice or evil motive." *Philbin v. Trans Union Corporation*, 101 F.3d 957, 970 (3rd Cir.1996). A showing of "reckless disregard" of one's important responsibilities under the FCRA may also be sufficient to support a finding of willfulness. See *Mathews v. Government Employees Ins., Co.*, 23 F.Supp.2d 1160, 1164 (S.D.Cal.1998).

Trans Union cites *Mathews* for the proposition that plaintiff's punitive damages claims must be dismissed because his complaint fails to allege that Trans Union acted in "conscious disregard" or "reckless disregard" of its responsibilities under the FCRA. Trans Union contends that plaintiff's allegations show that Trans Union did not act willfully given that it promptly deleted the disputed information. The first amended complaint, however, alleges that defendant maintained unreasonable procedures with respect to the initial reporting of the inaccurate information. The fact that Trans Union promptly deleted the inaccurate information does not demonstrate that it had reasonable procedures with respect to what was reported in the first place.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 4
Not Reported in F.Supp.2d, 2000 WL 635455 (N.D.Cal.)
2000 WL 635455 (N.D.Cal.)

*4 Moreover, Trans Union has not cited any case that suggests that in order to survive a motion to dismiss a plaintiff must allege facts that show that the FCRA defendant acted willfully. *Mathews* was decided at the summary judgment stage. Trans Union's willfulness argument is likewise more appropriate for a summary judgment motion.

2. The Common Law Claims

Trans Union contends that plaintiff's common law slander, libel, and privacy claims are barred by the qualified privilege of California Civil Code section 47(c). That section provides that a privileged publication or broadcast is one made "[i]n a communication, without malice, to a person interested therein ... [by one] who is requested by the person interested to give the information."Cal.Civ.Code § 47(c)(3).Section 47(c) applies to credit reporting agencies such as Trans Union. *SeeStationers Corp. v. Dun & Bradstreet, Inc., 62 Cal.2d 412, 418 (1965).*

As it is apparent from the face of the complaint and the attached documents that Trans Union provided the disputed information to Security Savings Bank at the Bank's request, the section 47(c) privilege does not apply here only if Trans Union provided the information to Security Savings Bank "with malice." "Malice," for the purposes of section 47(c), is " 'a state of mind arising from hatred or ill will, evidencing a willingness to vex, annoy or injure another person.' " *Lundquist v. Reusser, 7 Cal.4th 1193, 1204 (1994)* (citation omitted). To survive a motion to dismiss based on the section 47(c) privilege "[a]ctual facts of malice must be alleged or be apparent from the communication themselves." *Martin v. Kearny, 51 Cal.App.3d 309, 312 (1975).*

Plaintiff's first amended complaint does not allege any facts that suggest Trans Union acted with malice or that

Trans Union had any idea who plaintiff was at the time it furnished his credit report to Security Savings Bank, let alone that Trans Union harbored ill will toward plaintiff. Indeed, the fact that Trans Union deleted the disputed information within a month of receiving plaintiff's complaint suggests there was no malice.

As plaintiff does not contend that he could amend his complaint to allege facts that suggest Trans Union acted with malice toward plaintiff, plaintiff's common law claims will be dismissed without leave to amend.

III. Plaintiff's Summary Judgment Motion

In response to defendant Trans Union's motion to dismiss, plaintiff moved for summary judgment on the three claims Trans Union did not move to dismiss: (1) the first cause of action for negligently violating FCRA section 1681e(b) with respect to reporting the ITT account, (2) the third cause of action for negligently reporting the ITT account even though it had been written off seven years earlier, and (3) the fifth cause of action for negligently reporting that plaintiff's previous address was a restaurant/bar/nightclub in violation of FCRA section 1681e(b). Plaintiff contends that Trans Union has admitted the allegations of plaintiff's complaint with respect to these three causes of action because Trans Union has not denied them. Instead of filing an answer, Trans Union moved to dismiss the other causes of action in plaintiff's complaint.

*5 Plaintiff's motion for summary judgment fails because Trans Union has not admitted plaintiff's allegations with respect to the first, third and fifth causes of action. Trans Union was not required to file an answer to the causes of action it was not moving to dismiss while its motion to dismiss is pending. The filing of a motion to dismiss the other causes of action enlarged the time for Trans Union to respond to the entire complaint, including those causes of action it did not move to dismiss. *SeeFinnegan v.*

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 5
Not Reported in F.Supp.2d, 2000 WL 635455 (N.D.Cal.)
2000 WL 635455 (N.D.Cal.)

*University of Rochester Medical Center,* 180 F.R.D. 247,                  Not Reported in F.Supp.2d, 2000 WL 635455 (N.D.Cal.)
249-50 (W.D.N.Y 1998); *Oil Express National, Inc. v.*
*D'Allessandro,* 173 F.R.D. 219, 221 (N.D.Ill.1997). To                    END OF DOCUMENT
hold otherwise would create the possibility of duplicative
pleading in the event the motion to dismiss is denied and
the moving party is then required to answer the causes of
action it had moved to dismiss. *See Oil Express National,*
*Inc.,* 173 F.R.D. at 221;5A Wright & Miller, *Federal*
*Practice and Procedure* § 1346 (1999). Accordingly,
plaintiff's motion for summary judgment is denied without
prejudice to his making a new motion based on the
evidence in the record rather than Trans Union's purported
admissions.

CONCLUSION

For the foregoing reasons, the Court rules as follows:

1. The motion to dismiss of defendants Marmon Group,
Pritzker and Gambill is GRANTED for failure to state a
claim, without leave to amend.

2. Trans Union's motion to dismiss is GRANTED in part
and DENIED in part. Plaintiff's common law libel,
slander, and privacy claims are DISMISSED without leave
to amend.

3. Plaintiff's motion for summary judgment is DENIED
without prejudice to plaintiff renewing his motion based
on evidence in the record rather than Trans Union's
purported admission of plaintiff's allegations.

IT IS SO ORDERED.

N.D.Cal.,2000.
Batdorf v. Trans Union

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                  Page 1
Not Reported in F.Supp., 1994 WL 328626 (N.D.N.Y.)
1994 WL 328626 (N.D.N.Y.)

**C**D.A. Collins Const. Co., Inc. v. ICOS/NCCA a Joint
Venture
N.D.N.Y. 1994
Only the Westlaw citation is currently available.
United States District Court,N.D. New York.
D.A. COLLINS CONSTRUCTION CO., INC. and
Palette Stone Corp., Plaintiffs,
v.
ICOS/NCCA A JOINT VENTURE, ICOS Corporation
of America and NCC America, Inc., Defendants.
**No. 91-CV-933.**

June 28, 1994.

Gleason Dunn Walsh & O'Shea, Albany, NY (Frank C.
O'Connor, III, of counsel), for plaintiffs.
Couch White Brenner Howard & Feigenbaum, Albany,
NY (Leslie F. Couch, of counsel), for defendants.

MEMORANDUM-DECISION AND ORDER

McCURN, Senior District Judge.

*INTRODUCTION*

**\*1** This litigation arises out of construction improvements
made on the Stewarts Bridge Hydro Project ("the
project"). Defendant, ICOS/NCCA a Joint Venture
comprised of co-defendants, ICOS Corporation of
America and NCC America, Inc. (collectively referred to
throughout as "ICOS"), was the primary contractor on that
project. Plaintiff D.A. Collins Construction Company, Inc.
("Collins") had a subcontract with ICOS for the project,

and plaintiff Pallette Stone Corporation ("Pallette") was
one of ICOS' suppliers. Originally the plaintiffs
commenced this action in New York Supreme Court on
approximately July 19, 1991. Pursuant to 28 U.S.C. §
1446(b), on the basis of diversity jurisdiction,[FN1] ICOS
removed the case to this court. The amended complaint
(hereinafter "the complaint") sets forth twelve separate
causes of action, variously based upon breach of contract,
*quantum meruit,* for money had and received, and for
punitive damages based upon alleged violations of the
New York Lien Law. ICOS in turn filed an amended
answer (hereinafter "the answer") asserting six affirmative
defenses and four counterclaims. The counterclaims
purport to assert civil rights violations under 42 U.S.C. §§
1983 and 1988, as well as claims for breach of contract,
tortious interference with contract, and abuse of process.
The only affirmative defense with which the court is
concerned on these motions is for tender of payment.

This case is not completely unfamiliar to the court. Shortly
after being removed to this court, the plaintiffs brought an
order to show cause, which eventually resulted in the court
issuing a preliminary injunction on December 14, 1991,
requiring, *inter alia,* that ICOS post a bond to insure the
proper distribution of trust funds received by it from
Niagara Mohawk Power Corporation ("NiMo"), the
project owner. *See* Affidavit in Opposition of Thomas F.
Gleason (Aug. 17, 1992), exh. G thereto (copy of Dec. 14,
1991 order). The preliminary injunction order further
required that all trust monies received from NiMo be used
to pay the outstanding claims of the trust beneficiaries,
including those of plaintiffs. *Id.* In addition, the order
required that any remaining balance be held in trust
pending a final determination of plaintiffs' claims for
extras.[FN2] *Id.* The maintenance of a separate trust
account was mandated by the court based upon a finding
of a trust fund diversion in excess of one million dollars
by ICOS. *Id.*

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 2
Not Reported in F.Supp., 1994 WL 328626 (N.D.N.Y.)
1994 WL 328626 (N.D.N.Y.)

Presently before the court is a motion by ICOS for partial summary judgment against plaintiff Pallette only. Despite the breadth of the complaint, only one relatively narrow claim is at issue on this motion by ICOS, and that is Pallette's claim for extras in connection with the disposal of material excavated from the project site. ICOS does not on this motion challenge any of the other claims brought by Pallette; nor does it challenge any of the claims brought by plaintiff Collins. ICOS is also seeking to vacate the December 14, 1991 court order; or, in the alternative, to have the sum of $143,111.00, which represents security for Pallette's claim for extras, released from that order. Lastly, ICOS seeks sanctions against the plaintiffs pursuant to Fed.R.Civ.P. 11 and 28 U.S.C. § 1927. Further, before the court is a motion for partial summary judgment by the plaintiffs on three of the four counterclaims asserted by ICOS. Plaintiffs also move to strike defendants' second affirmative defense, tender of payment.

*I. ICOS SUMMARY JUDGMENT MOTION*

*BACKGROUND*[FN3]

**\*2** ICOS and NCCA were a joint venture formed for the limited purpose of contracting with NiMo to construct improvements on the project.[FN4] After entering into a contract with NiMo to act as primary contractor on that project, ICOS subcontracted with plaintiff Collins to provide certain services in connection therewith. ICOS also had a supply subcontract with plaintiff Pallette. Under their respective contracts, Collins was to be paid $366,953.00 and Pallette was to be paid $465,539.92.[FN5]

Plaintiffs allege that they have timely satisfied all of their contractual obligations. In fact, according to plaintiffs, they completed work above and beyond that called for in the contracts. Still, ICOS has allegedly failed to fully compensate plaintiffs for their performance. After

unsuccessfully demanding payment from ICOS for payment under the contracts, as well as for compensation for the additional work they purportedly did ("extras"), plaintiffs commenced this action.

As previously mentioned, plaintiffs assert a number of claims against ICOS. However, because ICOS' motion for partial summary judgment is confined to Pallette's claim for extras in connection with the removal of excavated material from the project site, only the facts relevant to that claim will be set forth herein. On approximately July 26, 1990, ICOS verbally directed Collins to proceed with certain work on the project. *See* Couch Affidavit, exh. C thereto. That oral direction was formalized in a letter of intent signed by ICOS' general manager and dated August 7, 1990. *Id.* That letter expressly stated that it was to serve as a "temporary contract" with Collins. *Id.* Slightly more than two months later, on October 16, 1990, a formal subcontract was entered into between ICOS and Collins, detailing the work the latter was to perform in connection with the project. Longe Opposition Affidavit, exh. C thereto. Part of that subcontract with Collins included offsite disposal of excavated materials.

Prior to execution of the formal subcontract, in approximately mid-September, 1990, Collins and ICOS requested that Pallette find a place to dispose of the excavated material. Gleason Opposition Affidavit, exh. D thereto (Deposition of William Beers at 37-39). Pallette's vice president, William Beers located three possible sites: the Town of Hadley landfill, the Town of Corinth landfill, and property in South Corinth.[FN6] *Id.* at 45-46. Based upon Pallette's understanding that the excavated material would consist of 99% glacial fill and 1% bentonite, *see* Longe Opposition Affidavit at ¶ 9; and exh. D thereto (Beers Deposition at 45), Mr. Beers advised the prospective landfill supervisors that that would be the composition of the material to be deposited. *Id.*, exh. D thereto (Beers Deposition at 45-49).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 328626 (N.D.N.Y.)
1994 WL 328626 (N.D.N.Y.)

Sometime in early October, 1990, Collins began to haul the excavated material off site to the Town of Hadley landfill. Soon after, Collins encountered some difficulties. As a result of inordinately high levels of liquid and bentonite in the excavated material, Collins could not dispose of the material at the Town of Hadley landfill. After just three days, the Town of Hadley suspended Collins' permit to dispose of the material in its landfill, citing the completely different nature of the material than had been represented when permission was first granted. *Id.,* exh. D thereto (Beers Deposition at 55). As Mr. Beers describes it, "[t]he Bentonite was entirely too wet, the moisture content was extremely high[,] so an engineering firm advised the highway superintendent to close the Hadley landfill to Collins. *Id.* at 56. When the Town of Hadley rejected the excavated material, Mr. Beers then inquired into the possibility of disposing of the material at the Town of Corinth landfill. The Town of Corinth similarly refused to accept the material on the basis that it was not in the state originally represented by Beers. *Id.* at 49. As a last resort, Pallette consented to disposal of the excavated material at its South Corinth sand plant. According to Mr. Longe, president of both plaintiff corporations, he had no choice but to allow this dumping because ICOS threatened to terminate Collin's subcontract if a disposal cite was not promptly found. Longe Opposition Affidavit at ¶¶ 30-31. Rather than risk losing the entire job contract, Mr. Longe decided to go ahead and use the South Corinth property for disposal of the excavated material, with a view toward later asserting a claim for, among other things, breach of contract and misrepresentation. *Id.* at ¶ 31.

*3 Before disposal began at the South Corinth property, on October 24, 1990, at the request of ICOS, Pallette, through Vice President Beers, executed a release in connection with disposal of the excavated material. *See id.,* exh. B thereto (copy of the release). Beers signed this release with the permission of Mr. Longe who avers that he "specifically advised Pallette's Vice President, William Beers, that he could sign a release *in that form,* and also that I would pursue this matter in any action against

ICOS/NCCA based on the differing nature of the excavated material and slurry mixture, which D.A. Collins was being requested to handle and dispose of." Longe Opposition Affidavit at ¶ 12 (emphasis in original). An ICOS employee also executed that release.  *See id.* Given the controversy surrounding this release, and because it is not lengthy, that release is set forth below in its entirety:

*RELEASE*

Know All Men By These Present:

That I, William L. Beers, County of Saratoga, State of New York, of the Pallette Stone Corp., does [sic] hereby agree to allow the disposal of excavated material consisting of approximately 99% glacial fill and fine sand and 1% bentonite at our Corinth Sand Plant, located in South Corinth, NY.

I, William L. Beers, do hereby release the D.A. Collins Construction Co., Inc., Niagara Mohawk Power Corporation, and ICOS, its officers and employees from all claims for damages that may occur as a result of this disposal. It is my understanding that no permit is required for the purpose stated above.

*Id.* (emphasis added).

Before Mr. Beers executed this release, he told a representative of ICOS, "[t]hat the material was not really what I wanted." Gleason Opposition Affidavit, exh. D thereto at 68. In response to Beers' concern about the nature of the excavated material, ICOS purportedly said that it would attempt to devise some methods to make the material less "sloppy and soupy," indicating that they had a means of injecting the material with chemicals to stiffen

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 328626 (N.D.N.Y.)
1994 WL 328626 (N.D.N.Y.)

Page 4

it up. *Id.* Apparently that was not done however. *Id.*

Although it was contemplated that the excavation process would be completed by November 30, 1990,[FN7] it was not completed until sometime later.[FN8] From the plaintiffs' perspective, the excavation process was not without difficulty. As earlier noted, the glacial fill was too moist causing it to become semi-liquid. Therefore, despite ICOS' previous assurances that the excavation material would contain one percent bentonite and as such would be "easily handled," with "no special requirements whatsoever" needed, as it turned out Collins could not use a front end loader for removal, as the subcontract specified. *See* Longe Opposition Affidavit, exh. D thereto (Beers Deposition at 54) and Gleason Opposition Affidavit, exh. C thereto (Pierce Deposition at 70). Instead Collins had to use a backhoe for removal. Gleason Opposition Affidavit, exh. C thereto (Pierce Deposition at 70). As an aside, Collins was not the only one who encountered difficulties with this excavation process; when ICOS began excavating, it too experienced some problems, which eventually led to renegotiation of the ICOS/NiMo contract. Gleason Opposition Affidavit, exh. E thereto (Deposition of Arturo Ressi Di Cervia at 33). Ultimately NiMo paid ICOS an additional one million dollars for the excavation portion of the project. *Id.*

*4 Eventually the excavation and removal process did come to an end and by letter to Collins dated April 30, 1991, Pallette acknowledged that "[t]he bentonite material that was disposed of at our South Corinth pit is acceptable material to us." Couch Affidavit, exh. I thereto. Relying primarily upon this letter ICOS strongly suggests that all of the excavated material deposited at the South Corinth sand plant was acceptable to Pallette. Mr. Beers, the author of that letter, avers, however, that it "related solely to the disposal of approximately 600 cubic yards of bentonite slurry, which had been delivered from the ... [p]roject to the South Corinth pit on or about April 20, 1991." Affidavit in Opposition of William Beers (Aug. 17, 1992) at ¶ 5. As opposed to the other material which

was excavated from the project site, this particular substance was never stored at the South Corinth sand plant property, but instead was used by Pallette in various concrete mixtures which it subsequently produced. *Id.* at ¶ 6. Pallette maintains that this particular bentonite material "was consistent with the limited amount of bentonite material which [it] anticipated receiving and had agreed to receive under a part of the D.A. Collins subcontract with ICOS...." *Id.* at ¶ 7. Pallette emphatically states that the bentonite material just described does not form the basis of its claims for extras in this lawsuit; it is wholly separate and distinct from the bentonite substance which was deposited at the South Corinth property and remains there to this day. *See id.* at ¶ 8. Obviously, given the context in which this April 30, 1991 letter was apparently written, it does not as ICOS asserts "speak[ ] for itself." Defendants' Memorandum in Reply to Plaintiffs' Papers in Opposition to Motion for Summary Judgment at 5, ¶ 3.

According to Mr. Longe, placement of the excavated material on the South Corinth property has caused "substantial damage" to the property because "[t]he material is not useable, is not naturally occurring and must either be treated or removed from the property in order to return the Premises to the condition which it was in when Pallette Stone first occupied the property." Longe Opposition Affidavit at ¶ 5. On June 26, 1991, Collins, on behalf of itself and Pallette, presented ICOS with a charge of $143,111.00 for the extra costs incurred "to remove and landfill excavated material and slurry on the Premises." *Id.* at ¶ 7, and exh. A thereto. This claim for extras is based upon Pallette's contention that the material which ICOS eventually excavated was not the same composition and consistency as that represented by ICOS at the outset of the excavation process.

*DISCUSSION*

By now it goes without saying that these summary

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 5
Not Reported in F.Supp., 1994 WL 328626 (N.D.N.Y.)
1994 WL 328626 (N.D.N.Y.)

judgment motions are governed by Fed.R.Civ.P. 56(c), which provides that "judgment shall be rendered forthwith if ... there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Several other general principles governing summary judgment motions also bear repeating at this juncture, as they sometimes tend to become obscured in the heat of litigation:

    **\*5** [T]he burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists.... In considering that, ..., all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought.... [T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case.... When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper.

Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1223 (2d Cir.1994) (citations omitted). It is against this procedural backdrop which the court must consider the motions currently before it.

*A. Pallette's Claim for Extras*

ICOS offers four separate reasons as to why it is entitled to summary judgment on Pallette's claim for extras. First, it argues that the October 24, 1990 release operates as a complete bar to this claim. Second, characterizing Pallette's extras claim as one based upon fraud and/or misrepresentation, ICOS asserts that Pallette has failed to allege such claim with sufficient particularity as Fed.R.Civ.P. 9(b) requires. Third, ICOS believes that Pallette's extras claim is insufficient as a matter of a law because of a lack of privity between it and Pallette.

Fourth, ICOS contends that Pallette's alleged damages for this claim are "noncompensable." ICOS Memorandum of Law in Support of Motion for Summary Judgment ("ICOS Supporting Memorandum") at 10. The court will address these arguments *seriatim*.

*1. Release*

" 'It is well-settled that a valid release constitutes a complete bar to an action on a claim which is the subject of the release.' " Allen v. Westpoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir.1991) (other citation omitted) (quoting National Union Fire Ins. Co. v. Walton Ins. Ltd., 696 F.Supp. 897, 901 (S.D.N.Y.1988)).[FN9] Furthermore, "[w]here 'the [release's] language admits of only one reasonable interpretation, the court need not look to extrinsic evidence of the parties' intent or to rules of construction to ascertain the [release's] meaning.' " National Union Fire Ins. Co.., 696 F.Supp. at 901 (quoting American Home Products Corp. v. Liberty Mutual Insurance Co., 748 F.2d 760, 765 (2d Cir.1984)) (other citation omitted). Thus, " '[w]here....'the intention of the parties may be gathered from the four corners of the instrument'...' interpretation of the [release] is a question of law ... [and] no trial is necessary to determine the legal effect of the [release].' ' " Id.(quoting Leslie Fay, Inc. v. Rich, 478 F.Supp. 1109, 1113-1114 (S.D.N.Y.1979) (quoting in turn General Phoenix Corp. v. Cabot, 300 N.Y. 87, 92, 89 N.E.2d 238, 241 (1949)). The obvious corollary to this rule is that "where [release] language is subject to more than one interpretation, a triable issue of fact is presented by the differing interpretations and summary judgment is inappropriate." Id. (citation omitted). Under those circumstances, "[p]arole and other extrinsic evidence may be introduced to facilitate the resolution of the factual question presented." Id. (citation omitted).

**\*6** In the present case, the parties have differing views as to the scope and effect of the October 24, 1990 release.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 328626 (N.D.N.Y.)
1994 WL 328626 (N.D.N.Y.)

Page 6

ICOS contends that it is a general release, broad enough to encompass Pallette's claim for extras and thus serves as a complete bar to that claim. Pallette is adamant, however, that the release is limited, and was not intended to bar Pallette's extras claim for damage to its property interest caused by the excavated material. Undeniably, by the express terms of this release, Pallette agreed to allow the disposal of "excavated material consisting of approximately 99% glacial fill and fine sand and 1% bentonite" at its South Corinth property. Longe Opposition Affidavit, exh. B thereto (emphasis added). The release further states, in no uncertain terms, that Pallette, through Mr. Beers, released ICOS, among others, "from all claims for damages that may occur as a result of this disposal." *Id.* (emphasis added).

At first glance those statements might appear to be unequivocal. The court is forced to conclude, however, that ICOS cannot prevail on its argument that the October 24, 1990 release bars Pallette's claim for extras. First, even assuming for the moment that the release is unambiguous, there is a factual issue as to what the excavated material consisted of when it was disposed of at the South Corinth property. ICOS maintains that the excavated material was in the form described in the release, and thus the release bars Pallette's claim for extras. Yet ICOS, as the moving party, wholly failed to meet its burden of proof on this issue. Conspicuously absent from the record is any proof that the excavated material was in the form described in the release. In fact, Daryl Cox, ICOS' Director of Contracts and Estimates, testified at his deposition that he could not determine from his observations whether the excavated material was 99% glacial fill [FN10] or fine sand. Gleason Opposition Affidavit, exh. A thereto (Cox Deposition) at 99.

On the other hand, Pallette vigorously responds that such material was not of the nature described by the release, thus rendering the release inapplicable to its claim for extras. In support of its position, Pallette relies upon the affidavit of Mr. Longe wherein he avers that the excavated

material disposed of at the South Corinth property was "bentonite slurry, water and soil in a semi-liquid state." Longe Opposition Affidavit at ¶ 15. He further avers that the material was "not 99% glacial fill and sand." [FN11] Clearly then, under these circumstances, ICOS is not entitled to summary judgment on Pallette's claim for extras on the basis of the release.

Second, there is an inherent ambiguity in the release given the use of the word approximately. What did Pallette and ICOS, the parties to that release, intend when they employed the word "approximately" in that particular setting? *See In re Schaefer,* 18 N.Y.2d 314, 317, 274 N.Y.S.2d 869, 872, 221 N.E.2d 538, ---- (1966) (citation omitted) ("The meaning and scope of a release must be determined within the context of the controversy being settled...."). ICOS contends that the phrase "consisting of approximately 99% glacial fill and fine sand and 1% bentonite" was intended to apply to the excavated material which plaintiffs have variously described as "soupy" and "semi-liquid;" whereas it is Pallette's position that the just quoted release language was not intended to include material in such a moist state. In light of this ambiguity, and the parties' differing interpretations, it is impossible for the court to ascertain the scope and meaning of this release. Thus, clearly the provisional remedy of summary judgment is not proper at this juncture. *See In re Thomson McKinnon Secur. Inc.,* 132 B.R. 9, 13 (Bankr.S.D.N.Y.1991) (citing *Ruskay v. Waddell,* 552 F.2d 392, 395 (2d Cir.), *cert. denied,* 434 U.S. 911, 98 S.Ct. 312 (1977)) ("In construing the scope and meaning of a release, consideration must be given to the intent of the parties which is a question of fact.") [FN12] Accordingly, because there are factual issues both as to the nature of the excavated material which was deposited at the South Corinth property, and as to what the parties intended when they executed the October 24, 1990 release, insofar as ICOS' summary judgment motion is premised upon that release, it is denied. [FN13]

*2. Failure to Plead With Particularity* [FN14]

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 7
Not Reported in F.Supp., 1994 WL 328626 (N.D.N.Y.)
1994 WL 328626 (N.D.N.Y.)

*7 Characterizing Pallette's seventh cause of action for extras as one based upon fraud and/or misrepresentation, ICOS asserts that Pallette has failed to allege such a cause of action in conformity with Fed.R.Civ.P. 9(b). That rule dictates that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b) (emphasis added). By the same token, however, under that Rule it is permissible to "generally" aver "[m]alice, intent, knowledge, and other conditions of mind[.]" Id. According to the Second Circuit, the purpose of Rule 9(b) is threefold: "it is designed to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from 'improvident charges of wrongdoing,' and to protect a defendant against the institution of a strike suit." O'Brien v. National Property Analysts Partners, 936 F.2d 674, 676 (2d Cir.1991) (citations omitted).

As just indicated, by its express terms Rule 9(b) applies only to claims of mistake and fraud. Rule 9(b)"is a special pleading rule, contrary to the general philosophy of simplified pleading of the Federal Rules of Civil Procedure," FN15 causing two noted commentators to opine that "its scope of application should be construed narrowly and not extended to other legal theories or defenses." 5 C. Wright & A. Miller, Federal Practice and Procedure § 1297 at 615 (1990). Despite the foregoing, courts have not hesitated to apply Rule 9(b) to cases "where the gravamen of the claim is fraud even though the theory supporting the claim is not technically termed fraud." Toner v. Allstate Ins. Co., 821 F.Supp. 276, 283 (D.Del.1993) (citation omitted). Thus, for example, "Rule 9(b)'s requirements have been found to apply to claims for misrepresentation, ..., conspiracy to commit fraud, ... and negligent misrepresentation...." Id. (citations omitted).

Application of these principles to the present case mandates the conclusion that, for the most part, Rule 9(b) has no applicability here. As Pallette is quick to point out,

its seventh cause of action is not, as ICOS depicts it, one for misrepresentation and/or fraud, rather it is based on a theory of unjust enrichment. See Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment at 20. Specifically, Pallette maintains that although there were alleged "misstatements" regarding the nature and consistency of the excavated material, the thrust of its seventh cause of action is that ICOS has been "[u]njustly enriched as a result of the acceptance by the Plaintiffs of this unsuitable material contrary to the contract between D.A. Collins and Defendants." FN16 Id. Thus, because Pallette is not pleading fraud and/or fraudulent misrepresentation, the stricter pleading requirements for such cause of action are inapplicable and cannot provide a basis for granting ICOS' summary judgment on Pallette's extras claim. The inapplicability of Rule 9(b) is made all the more apparent by the fact, as previously mentioned, that this cause of action is one for unjust enrichment, FN17 and at least one court at least has expressly held that Rule 9(b)'s stricter pleading requirements do not apply to such a claim. See Zucker, 708 F.Supp. at 530. Therefore, because Pallette has specifically disavowed that its seventh cause of action is based upon fraud, ICOS' reliance on Rule 9(b) as support for its summary judgment motion is misplaced. FN18 Thus, insofar as ICOS is seeking summary judgment based upon Pallette's supposed failure to comply with the pleading requirements of Rule 9(b), that motion must be denied.

*8 As to ICOS' related argument that the complaint fails to allege a claim for "misrepresentation," the court need not address that argument because, as just explained, in responding to this motion Pallette has repeatedly stated that this cause of action is for unjust enrichment and/or quantum meruit. Therefore, whether Pallette has adequately set forth a claim for fraud and/or misrepresentation is nor relevant because Pallette has specifically chosen not to couch its seventh cause of actions in those terms.

*3. Privity*

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 328626 (N.D.N.Y.)
1994 WL 328626 (N.D.N.Y.)

Another argument advanced by ICOS in support of its summary judgment motion is that of privity, or, more accurately, lack of privity between Pallette and ICOS. ICOS asserts that because Collins and not Pallette had the contractual obligation to dispose of the excavated material, Pallette's extras claim in relation thereto must fail for lack of privity. ICOS correctly states the rule of law, but misapplies it to the present case. True, a "subcontractor, because it is not in privity with the owner,[FN19] may not assert a cause of action that is contractual in nature against it[.]" *Mariacher Contracting, Co. v. Kirst Constr. Inc.,* 187 A.D.2d 986, ----, 590 N.Y.S.2d 613, 614 (4th Dep't 1992) (citations omitted); *see also Bubonia Holding Corp. v. Jeckel,* 189 A.D.2d 957, ----, 592 N.Y.S.2d 499, 500 (3rd Dep't 1993) (citations omitted) ("It is well established that a subcontractor may not assert a contractual claim against an owner with whom it is not in privity...."). Pallette responds, however, that the cases relied upon by ICOS do not stand for the proposition that "[a] subcontractor's real estate may be damaged with impunity." Plaintiffs' Opposition Memorandum at 20-21. Pallette further responds that ICOS is conveniently disregarding the fact that the cases relied upon by ICOS merely hold that "a cause of action which is contractual in nature will not be sustained in the absence of privity if there is no showing that the Defendants' ... assumed an obligation, by its action, to pay the respondent.'" *Id.* at 21 (quoting *Delta Elec., Inc. v. Ingram and Greene,* 123 A.D.2d 369, 370-371, 506 N.Y.S.2d 594, ---- (2nd Dep't' 1986)) (emphasis added).

Even a quick perusal of Pallette's seventh cause of action herein demonstrates that it is not based on a theory of breach of contract. Instead, as already discussed, it is based on *quantum meruit* and/or unjust enrichment. More specifically, Pallette asserts that ICOS knew that Pallette was Collins' subcontractor, and that Pallette's leasehold interest was being used to dispose of the excavated material, which plaintiffs contend was unsuitable.

Therefore, in the absence of a contractual claim, the privity concept which forms the bases of the few cases relied upon by ICOS has no applicability to Pallette's seventh cause of action, which is most decidedly not contractual in nature. Accordingly, insofar as ICOS' summary judgment motion is premised upon lack of privity, it must be denied.[FN20]

*4. Damages*

*9 Finally, ICOS asserts that Pallette's seventh cause of action for extras fails as a matter of law because Pallette has "no compensable damages." ICOS' Supporting Memorandum at 10. ICOS takes this position even though it concedes that "[a]t most, Pallette could claim $1,500.00 in damages for the construction of a berm on their property to contain the material." *Id.* at 11. Given that concession, ICOS' argument that Pallette's seventh cause of action cannot be sustained because Pallette has no compensable damages seems disingenuous at best.

Moreover, evidently ICOS failed to completely read plaintiffs' answers to interrogatories because therein Pallette specifically states that it is seeking $111,600.00 for the disposal of the unacceptable excavated material, as well as $30,783.72 for financing services Pallette allegedly incurred in connection with the project. *See* Gleason Opposition Affidavit, exh. I thereto (portion of plaintiffs' answers to interrogatories at 17-18). At least at this juncture then, Pallette has alleged compensable damages, and thus is able to withstand ICOS' summary judgment motion urging the contrary. Consequently, the court denies ICOS' motion for summary judgment on Pallette's extras claim.

*B. Sanctions*

In light of the foregoing, plainly there is no merit to ICOS'

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                      Page 9
Not Reported in F.Supp., 1994 WL 328626 (N.D.N.Y.)
1994 WL 328626 (N.D.N.Y.)

request for sanctions, and the court denies the same.

## II. PLAINTIFFS' SUMMARY JUDGMENT MOTION

### BACKGROUND

The common thread running through all of plaintiffs' challenges to certain of ICOS' counterclaims is that those counterclaims arise out of state court litigation which preceded this action. Therefore, a detailed recitation of that litigation is necessary to a full understanding of plaintiffs' arguments herein.

As previously mentioned, plaintiffs originally commenced this action in state court in July, 1991. Approximately one month later, ICOS filed a Notice of Removal to this court. Prior to removal, however, the plaintiffs had sought in state court relief which they describe as virtually identical to that later sought it their request for a preliminary injunction before this court in October, 1991. Affirmation of Frank C. O'Connor III (July 30, 1992) at ¶ 13, and exhs. B and F thereto. Before the scheduled return date in the state court action, however, ICOS removed that action to this court, thus staying all proceedings therein.

In the meantime, on August 9, 1991, plaintiffs commenced another related but separate state court action against NiMo, the project owner, seeking to impose a constructive trust. Id. at ¶ 15, and exh. C thereto. In that action, on the "Request for Judicial Intervention Form," plaintiffs mentioned the existence of, inter alia, the earlier state court action against ICOS. See id. at ¶ 19, exh. E thereto. Plaintiffs based this second action on article 3-A of the Lien Law allowing trust beneficiaries to bring an action to preserve trust assets, which includes a right of action for contract balances due. Id. at ¶ 18. The NiMo action was commenced by the service of a complaint and an order to show cause including a temporary restraining order,

restraining NiMo from paying or otherwise transferring the contract balances due with respect to the project. Id. at ¶ 15, and exh. C thereto.

*10 As that order to show cause required, NiMo was served with a copy of the same, along with the papers upon which it was based, via telecopier on August 9, 1991-the same day the state court justice signed that order to show cause. Reply Affidavit of Frank C. O'Connor III (Aug. 14, 1992), exh. L thereto (Affidavit of Brain K. Billinson (Aug. 12, 1991) at ¶ 1). The state court justice who signed the order to show cause was not the assigned judge. Therefore, before setting a return date, he asked plaintiffs' counsel to contact the assigned judge, Judge Viscardi, as to a return date for plaintiffs' request for a preliminary injunction. Id. at ¶ 31. Judge Viscardi's clerk indicated that the show cause order should be made returnable on August 12, 1991 at 9:30 a.m. Id. at ¶ 32. The clerk further informed plaintiffs' counsel that NiMo could either appear on that date or submit papers from counsel. Id. at ¶ 33; see also exh. L thereto at ¶ 2.

NiMo elected to submit an opposing affidavit in lieu of a personal appearance. Id., exh. L thereto at ¶ 2. In opposing plaintiffs' request for a preliminary injunction, NiMo recognized the existence of a "legitimate dispute" between plaintiffs and ICOS, and in the alternative requested that it be allowed to retain the funds currently held by it in the amount of approximately $455,941 until the resolution of the litigation between ICOS and plaintiffs. Id., exh. L thereto at 2-3. Following oral argument on the NiMo order to show cause, the state court reserved decision and continued the temporary restraining order. Affidavit of Mary Beth Hynes (Aug. 17, 1992) at ¶ 4.

Some time thereafter, ICOS moved to intervene in the NiMo state court action, and on September 10, 1991, plaintiffs filed papers opposing that motion. O'Connor Reply Affidavit at ¶ 37; and exh. M thereto. In those opposition papers, plaintiffs' counsel advised the court of

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 328626 (N.D.N.Y.)
1994 WL 328626 (N.D.N.Y.)

Page 10

his intent to discontinue the NiMo state court action. *Id.* at ¶ 40, and exh. M thereto (Affirmation of Frank C. O'Connor, III (Sept. 10, 1991) at ¶ 46). Shortly thereafter, prior to the September 16, 1991 return date for the motion to intervene, on September 13, 1991, plaintiffs' counsel mailed a proposed stipulation of dismissal "without prejudice" to NiMo. *Id.* at ¶¶ 42 and 43. The "without prejudice" language was included because plaintiffs intended to amend their complaint in this federal court action to add NiMo as a defendant. *Id.* at ¶ 44. The stipulation was filed by the Saratoga County Clerk's Office on October 4, 1991, and NiMo was served with a copy of the same on October 9, 1991. *Id.* at ¶ 45. The filing of that stipulation of discontinuance obviously resulted in the restraining order against NiMo being vacated. *Id.* at ¶ 46. When plaintiffs realized that adding NiMo as a defendant in this action would destroy diversity and perhaps result in a remand to state court causing further delay, they decided not to pursue NiMo as a defendant in any forum. *Id.* at ¶ 44.

*A. Counterclaims*

**\*11** As mentioned at the outset, plaintiffs are moving for summary judgment with respect to three of the four counterclaims alleged by ICOS. Plaintiffs steadfastly maintain that there is no basis, legally or factually, for ICOS' counterclaims premised upon alleged violations of 42 U.S.C. §§ 1983 and 1988, tortious interference with contract, and abuse of process because those counterclaims all arose out of "Plaintiffs' commencement of a legitimate legal proceeding in state court against Niagara Mohawk." Plaintiffs' Memorandum of Law at 3. Through this motion plaintiffs are also seeking to strike ICOS' affirmative defense of "tender of payment" because there is also no factual basis for such defense. The court will first consider plaintiffs' motion as to the counterclaims enumerated above. It will then go on to consider the tender of payment defense.

*I. Section 1988*

Preliminarily it should be noted that although ICOS specifically alleges that its second counterclaim "arises under," *inter alia,* 42 U.S.C. § 1988, [FN21] that statute cannot form an independent basis for a cause of action. *See Reeves v. American Optical Co.,* 408 F.Supp. 297, 302 (W.D.N.Y.1976). As one court so bluntly put it, "Anyone who troubles to read it [section 1988] must recognize it does not create any substantive rights to a cause of action, but rather deals with the procedure to be followed in civil rights actions over which jurisdiction is conferred by other statutory provisions." *Amos v. Lane,* 605 F.Supp. 775, 777 (N.D.Ill.1985). Therefore, the court will read ICOS' counterclaim for alleged violations of its civil rights as one arising solely under 42 U.S.C. § 1983.

*2. Section 1983*

Plaintiffs offer three separate reasons as to why ICOS' section 1983 cause of action must fail as a matter of law. First they contend that ICOS has no constitutionally protected property interest capable of being protected under that statute. Second, ICOS has failed to either plead or establish that plaintiffs' actions were done "under color of state law," [FN22] a necessary element of any section 1983 cause of action. Third, even assuming that plaintiffs are wrong on these first two arguments, they still believe that ICOS' section 1983 cause of action cannot survive this summary judgment motion because it is predicated upon plaintiffs' use of the state court judicial process, which plaintiffs claim is a protected activity under the First Amendment.

ICOS responds first that it has a constitutionally protectible property interest, in the form of the payment of monies owed it under the NiMo contract. Second, ICOS counters that plaintiffs acted under color of state law because they employed the coercive power of the state in

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 328626 (N.D.N.Y.)
1994 WL 328626 (N.D.N.Y.)

the NiMo state court action to obtain a temporary restraining order without giving ICOS notice and an opportunity to be heard. Third, as to the first amendment argument, ICOS cavalierly asserts that it is a "non-issue." Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment at 11.

**\*12** At oral argument the plaintiffs stressed the first amendment argument, almost to the exclusion of their other two arguments. As the Second Circuit has recently reiterated, however, because "[a]n action under § 1983 cannot, ..., be maintained unless the challenged conduct was attributable at least in part to a person acting under color of state law[,]" the court will first consider plaintiffs' state action argument.[FN23] *See Chan v. City of New York,* 1 F.3d 96, 106 (2d Cir.), *cert. denied,--- U.S. ----,* 114 S.Ct. 466, 126 L.Ed.2d 418 (1993) (citations omitted). Only if the present record supports a finding of state action, or, at the very least shows that a genuine issue of material fact exists as to that particular element, will it be necessary for the court to consider plaintiffs' remaining two arguments with respect to the section 1983 counterclaim.

*a. "Under Color of Law"*

To state a cause of action under section 1983, first a claimant must show a deprivation of a right secured by the Constitution and law of the United States; second, a claimant must show that that deprivation occurred while the opposing party was acting under color of state law. *See Flagg Bros, Inc. v. Brooks,* 436 U.S. 149, 155-56, 98 S.Ct. 1729, 1732-33, 56 L.Ed.2d 185 (1978). In *Edmonson v. Leesville Concrete Co., Inc.,* 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991), the Supreme Court reminded lower courts that the framework for state action analysis, as enunciated in *Lugar,* requires both that the claimed constitutional deprivation result from the exercise of a right or privilege having its source in state authority and that the private party charged with the

deprivation could be described in all fairness as a state actor. *Id.* at ----,111 S.Ct. at 2082.

Whether ICOS has established the first part of the *Lugar* test need not detain the court for long. Describing the plaintiff's section 1983 claim as one based upon "private misuse of a state statute, the Second Circuit in *Dahlberg v. Becker,* 748 F.2d 85 (2d Cir.1984), *cert. denied,*470 U.S. 1084, 105 S.Ct. 1845, 85 L.Ed.2d 144 (1985), expressly held that the deprivation of plaintiff's constitutional rights "was not caused by the exercise of some right or privilege created by the State." *Id.* at 90 and 91.  In reaching that conclusion, the Court soundly reasoned that:

> It is one thing to hold a State accountable for the unconstitutional acts of its legislature, but quite another to charge that State with responsibility where private parties abuse an otherwise valid state law. In the latter case, the State does not sanction such abuse, nor can it prevent it any more than it can stop a private party from committing a crime or tort.

*Id.* at 90-91.

In the present case, ICOS' section 1983 counterclaim can also fairly be characterized as alleging that plaintiffs misused state statutes authorizing litigants to proceed by order to show cause and to obtain temporary restraining orders.[FN24]  After *Dahlberg,* however, it cannot be said that ICOS' alleged constitutional deprivation [FN25] resulted from the exercise of a right having its source in state authority. Consequently, the first prong of the *Lugar* test is not satisfied in this case.

**\*13** Nor can ICOS satisfy the second prong of the *Lugar* test. ICOS strenuously argues that section 1983's under color of state law requirement is met here because in the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 328626 (N.D.N.Y.)
1994 WL 328626 (N.D.N.Y.)

NiMo action the state court issued a temporary restraining order resulting, for a time, in ICOS not being paid the contract balance of $455,411.00. In making that argument, ICOS is ignoring the well settled rule however that "merely by holding its courts open to the litigation of complaints, regardless of how baseless they eventually prove to be, [a state] does not clothe persons who use its judicial process with the authority of the state...." *Stevens v. Frick,* 372 F.2d 378, 381 (2d Cir.), *cert. denied,* 387 U.S. 920, 89 S.Ct. 2034, 18 L.Ed.2d 973 (1967) (citations omitted); *see also Sam & Mary Housing Corp. v. New York State,* 632 F.Supp. 1448, 1450-51 (S.D.N.Y.1986) ("one does not become a state actor merely by being a litigant in a state court action"); *Merrick v. Merrick,* 441 F.Supp. 143, 146 (S.D.N.Y.1977) (same).

Stated somewhat differently, "merely calling upon the judicial process is not generally sufficient to transform a private party into a state actor." *Mahoney v. National Organization for Women,* 681 F.Supp. 129, 132 (D.Conn.1987) (citing, *inter alia, Lugar,* 457 U.S. at 940, 102 S.Ct. at 2755). Indeed, in *Mahoney,* the court went so far as to reject plaintiff's argument that an exception to that rule should be made where the prior lawsuit is allegedly brought in "bad faith, with an improper purpose, and knowing that the remedy ... sought was unconstitutional." *Id.* at 133. In granting the defendants' motion to dismiss plaintiff's *Bivens* claim,[FN26] the court in *Mahoney* reasoned, *inter alia,* that the defendants (plaintiffs in the prior litigation) were not seeking "to have the state court apply the weight of governmental authority to an inherently unlawful private covenant[,][FN27] but instead "the prior lawsuit ... was aimed only to have the court declare the parties' lawful rights under the Constitution." *Id.* at 133.

Likewise in *Dahlberg,* previously mentioned, the Second Circuit concluded that due to the absence of state action, plaintiff failed to plead a cause of action under section 1983. *Dahlberg* arose out of a prior state court matrimonial proceeding wherein the plaintiff was eventually incarcerated for one night due to his alleged failure to make maintenance payments. Following his incarceration, plaintiff commenced a civil rights action against his former wife and her attorneys, who had instituted an order to show cause in state court seeking to have plaintiff held in contempt for failing to make the agreed upon maintenance payments. Plaintiff alleged that the defendants prepared and submitted a false affidavit in support of the order to show cause; that they omitted statutorily required notice provisions from that order; that they violated the New York Judiciary Law "by serving an order to show cause for contempt upon an attorney whose authority had expired;" and by failing to include with the commitment order the actual financial documents or an adequate description thereof so that the judge could properly assess whether the plaintiff had complied with his obligation to make maintenance payments. *Id.* at 88. As he did in the lower court, plaintiff argued on appeal that the defendant attorneys had acted under color of state law "through their joint participation with a state official as well as their independent exercise of power allegedly ceded to them by a state official[.]" *Id.*

**\*14** The Second Circuit did not find that argument persuasive. Distinguishing the seminal case of *Lugar,*[FN28] the Court found that "[a] private party's misuse of New York's Judiciary Law that causes plaintiff to be imprisoned overnight is not fairly attributable to New York State." *Id.* at 90. Further distinguishing *Lugar,* the Court pointed out that the plaintiff did not "allege[ ] that New York's procedure for notice and adjudication of contempt is constitutionally defective." *Id.* The Court also rejected any suggestion that the defendants had acted based upon a rule of conduct imposed by New York. Reasoning that "since defendants' actions were not encouraged by any rule of New York-regardless of whether they were intentional or malicious-they may not be viewed as caused by a rule of conduct imposed by the State or a person for whom the State is responsible[,]" the Court held that defendants' actions were "not attributable to the State." *Id.* at 91.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 13
Not Reported in F.Supp., 1994 WL 328626 (N.D.N.Y.)
1994 WL 328626 (N.D.N.Y.)

After finding no state action, the Court went on to consider whether the defendants were state actors. The Court enumerated four separate theories under which a private party may be held liable for violating another's constitutional rights because the private actor is so closely tied to governmental action:

> [a] private party may be held a state actor when the complained of conduct results from a state agent's encouragement or command, the state and private actor jointly participate in depriving plaintiff of his rights, the granting of benefits to a private actor by the state inseparably links them together, or the private actor undertakes to perform activities ordinarily exclusively engaged in by government.

*Id.* at 92. In *Dahlberg* the Court found none of those theories applicable to the facts before it.

As to the first theory, the Court reasoned that "nothing before us suggests that the state judicial officers commanded or encouraged defendants in their decision to invoke state process against plaintiff." *Id.* The Court similarly rejected a joint participation theory, distinguishing cases where that theory had proved successful on the basis that in *Dahlberg* the record did not support a finding that "the different state judges actually entered into a conspiracy or had a meeting of the minds with the attorney defendants...." *Id.* at 93 (citation omitted). Furthermore, the Court tersely stated, "[t]he mere invocation by defendants of New York's legal procedures does not constitute joint participation so as to satisfy the statutory requirement under § 1983 that there be a state actor." *Id.* (citing *Lugar,* at 939 n. 21, 102 S.Ct. at 2755 n. 21). Third, the *Dahlberg* Court also could not find an "inseparable link[ ] or symbiotic relationship arising from any benefits granted by the state to these defendants...." *Id.* Nor did the exclusivity doctrine have any applicability there because the parties' matrimonial dispute did not, in the Court's view, involve matters

exclusively relegated to the state, in that such matters are typically resolved by resort to litigation between private parties. *Id.* Thus, in the end the Court found that plaintiff wholly failed to state a cause of action under section 1983 because he could not show either state action or a state actor. The Court did, however, leave open the possibility of a state court tort action, although it did not elaborate on the precise nature of such an action.[FN29]

**\*15** As in *Dahlberg,* whether analyzed in terms of state action or state actors, clearly ICOS has failed to allege,[FN30] let alone establish, the requisite state action, or that plaintiffs were state actors. Plaintiffs are strictly private entities, and they invoked available state court procedures in the NiMo action in that capacity. ICOS is not arguing that the procedures for obtaining an order to show cause or temporary restraining in state court are constitutionally infirm. Rather, ICOS' section 1983 counterclaim is premised upon its assertion that, just as in *Mahoney,* plaintiffs acted in bad faith when they employed the state judicial process in the NiMo action. Even assuming *arguendo* that the plaintiffs did act in bad faith in bringing that action,[FN31] there is still no basis for finding that the plaintiffs acted under color of state law. Plaintiffs simply employed a mechanism provided by the state, the order to show cause and temporary restraining order procedures. *See LeBlanc-Sternberg v. Fletcher,* 781 F.Supp. 261, 268 (S.D.N.Y.1991) (citing *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 358, 95 S.Ct. 449, 457, 42 L.Ed.2d 477 (1974) ("If the state does nothing to encourage a particular practice, the provision of a mechanism to exercise a right does not turn the private action into state action.").

Relying upon *Stevens,* ICOS contends that the state was actively involved in the NiMo action in that a state court justice issued the order to show cause with a temporary restraining order. Although the *Stevens* Court did note that "no order or judgment ha[d] been entered under which the power of the state [was] invoked," the court is not convinced that the existence of an order or judgment is

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 328626 (N.D.N.Y.)
1994 WL 328626 (N.D.N.Y.)

Page 14

dispositive of the state action issue. *See Stevens*, 372 F.2d at 381. In fact, as already discussed, the *Dahlberg* Court found no state action even where there were claimed procedural deficiencies in both the order to show cause and the subsequent commitment order, which eventually resulted in plaintiff's incarceration. Therefore, in the court's opinion ICOS cannot avoid the clear impact of *Dahlberg* simply because a state court judge issued an order in connection with the NiMo action.

Moreover, not only has ICOS failed to demonstrate state action, but again, as in *Dahlberg*, it has also failed to show that plaintiffs should be deemed state actors under section 1983. There is absolutely nothing in this record even tending to show that either the judge who signed the original order to show cause with temporary restraining order, or the assigned judge who left intact the temporary restraining order pending a determination on plaintiffs' application for a preliminary injunction, encouraged or commanded plaintiffs in any way to conduct the NiMo litigation in any particular fashion. Nor is there any indication that either of those judges encouraged or commanded plaintiffs' to institute that action in the first place. There is also no showing of joint participation by the state and these plaintiffs. At the risk of sounding repetitive, a finding that plaintiffs are state actors cannot be premised upon the fact that plaintiffs' invoked New York State legal procedures. *See Dahlberg*, 748 F.2d at 93. If the invocation of State legal procedures was sufficient to confer state actor status on an otherwise private party, then the scope of section 1983 would be broadened far beyond its original purpose.

*16 In addition, obviously there is no "inseparable link" arising from any benefits granted by the state, by making legal procedures available to the plaintiffs. Lastly, ICOS cannot rely on the exclusivity doctrine to confer state actor status on these plaintiffs. A contractual dispute is not a matter relegated exclusively to the state. Instead, as with the matrimonial dispute in *Dahlberg*, such business disputes are quite often resolved by private parties

instituting a legal proceeding. For all of these reasons, the court concludes that there is simply not a sufficiently close nexus between the state and plaintiffs' use of the state judicial process, even taking into account that a state court justice signed the order to show cause temporarily restraining NiMo from paying ICOS the balance due on the project contract, such that plaintiffs, which are indisputably private entities, and who invoked the state judicial process in that capacity, can be deemed state actors. *See Chan*, 1 F.3d at 106.

ICOS' inability to establish either state action or that plaintiffs were state actors is fatal to its section 1983 counterclaim. Consequently, the plaintiffs' motion for summary judgment dismissing ICOS' second counterclaim predicated upon 42 U.S.C. § 1983 is granted.[FN32] In light of the foregoing, the court need not consider the other two grounds advanced by plaintiffs for granting summary judgment on this counterclaim.

*3. Tortious Interference With Contractual Relations*

ICOS' third counterclaim for tortious interference with contractual relations is also premised upon plaintiffs' state court action against NiMo. ICOS alleges that plaintiffs brought that action for the sole purpose of "willfully, intentionally and without justification" interfering with the ICOS/NiMo contract. *See* Answer at 16, ¶ 99. Plaintiffs contend that they are entitled to summary judgment dismissing this counterclaim because under New York law [FN33] a cause of action for tortious interference with a contract may not be predicated upon the fact that a party petitioned the courts for relief. Further plaintiffs contend that summary judgment is proper because ICOS has failed to establish the elements of a claim for tortious interference with contract. The court will address these arguments in turn.

The plaintiffs' first argument as to this interference

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 15
Not Reported in F.Supp., 1994 WL 328626 (N.D.N.Y.)
1994 WL 328626 (N.D.N.Y.)

counterclaim is tenuous. New York courts have recognized on public policy grounds "that the tort of interference [may] not be extended to those situations wherein a citizen petitions an agency of [the] government." *Rudoff v. Huntington Symphony Orchestra Inc.,* 91 Misc.2d 264, 397 N.Y.S.2d 863 (Sup.Ct.1977). Plaintiffs did not cite to a case, nor did the court's research, albeit not exhaustive, reveal any case where that rule has been applied to a case factually analogous to the present one however. Indeed both of the New York cases upon which plaintiffs rely are readily distinguishable from the present case so as to render them inapposite. For example, *Rudoff* did not involve a claim for tortious interference with contractual relations *per se,* but instead presented the issue of "whether an action lies for interference with a government grant," which the court noted was "one of first impression in this, or any other, jurisdiction." *Id.* at ----, 397 N.Y.S.2d at 864. The court there dismissed defendant's counterclaim based upon that theory where the plaintiff had written a letter to the director of the Nassau County Office of Cultural Development voicing his opinion that due to the defendant symphony's poor management, it should not receive a subsidy from the county. *Stillwell Theatre, Inc. v. Kaplan,* 259 N.Y. 405, 182 N.E.63 (1932), is likewise readily distinguishable. The Court of Appeals in *Stillwell* held, in the context of a labor dispute, that peaceful picketing may not be enjoined on the basis that it was motivated by a desire to cause a breach of contract.

**\*17** Plaintiffs fare better with their second argument though, and that is that ICOS has failed to establish the necessary elements to support a counterclaim for tortious interference with contractual relations. The elements of such a claim are well established under New York law. Here, ICOS must show: "(1) a valid contract between [it] and a third party; (2) [plaintiffs'] knowledge of that contract; (3) [plaintiffs'] intentional procurement of the breach of that contract; and (4) damages." *G.D. Searle & Co. v. Medicore Communications, Inc.,* 843 F.Supp. 895, 910 (S.D.N.Y.1994) (citations omitted) (footnote omitted). Courts have slightly expanded upon the third

element, explaining that there must be a showing of "intentional[ ] and improper[ ] interference with the performance of that contract[,]" [FN34] which occurs when "[a] party ... induc[es] or otherwise caus[es] a third person not to perform his contractual obligation to plaintiff." [FN35]

As the parties to this litigation are aware, the Second Circuit has specifically recognized that "under New York law litigation or the threat of litigation can give rise to a claim for tortious interference with contractual relations." *Universal City Studios, Inc. v. Nintendo Co., Ltd.,* 797 F.2d 70, 75 (2d Cir.), *cert. denied,* 479 U.S. 987, 107 S.Ct. 578, 93 L.Ed.2d 581 (1986). Relying upon the *Restatement (Second) of Torts,* the Court went on to state that a "lawsuit is wrongful 'if the actor has no belief in the merit of the litigation.' " *Id.* (quoting *Restatement,* § 767, comment c). Most important for purposes of the present action, the Court in *Universal City Studios* also acknowledged that a lawsuit is "wrongful if the actor, having some belief in the merit of the suit, 'nevertheless institutes or threatens to institute the litigation in bad faith, intending only to harass the third parties and not to bring his claim to definitive adjudication.' " *Id.* (quoting *Restatement,* § 767, comment c) (other citations omitted).

After scrupulously combing the record in this case, the court is left with the inescapable conclusion that, as a matter of law, plaintiffs did not "intentionally and improperly interfere" with the ICOS/NiMo contract. Nor is there any proof that plaintiffs commenced the NiMo action to harass ICOS, without intending to bring that action to "definitive adjudication." In direct contrast to ICOS, plaintiffs placed more than ample proof before the court as to the context in which the NiMo litigation arose. From that evidence the motivating factor for plaintiffs' action against NiMo is plain: they were seeking to insure that they were paid under their respective contracts with ICOS for services and supplies rendered in connection with the Stewarts Bridge project. In connection therewith, and perhaps more importantly, they were also seeking to prevent a diversion of trust fund assets, which had occurred in the past. As the Second Circuit so cogently stated, "Implicit in [tortious interference with contractual

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                       Page 16
Not Reported in F.Supp., 1994 WL 328626 (N.D.N.Y.)
1994 WL 328626 (N.D.N.Y.)

relations] is the notion of some wrongful or improper conduct." *Enercomp*, 873 F.2d at 542. Simply put, missing here is any evidence of wrongful or improper conduct on the part of plaintiffs when they sought legal redress against NiMo in state court.

**\*18** Moreover, insofar as it can be argued that plaintiffs did not bring the NiMo action to "definitive adjudication" because they eventually dismissed that action "without prejudice," the court still is unable to find that plaintiffs' acted in bad faith with intent to harass ICOS. This conclusion is supported by the fact that the NiMo action most certainly was not groundless, as is evidenced by the fact that one state court judge initially entered a temporary restraining order, which a second state court judge decided not to vacate after oral argument on plaintiffs' application for a preliminary injunction. Underlying those decisions is the notion that plaintiffs' NiMo action was at least meritorious in some respects, otherwise provisional relief would not have been granted.

In short, plaintiffs as the moving party have met their burden of demonstrating the absence of a genuine issue of material fact on this particular element of ICOS' counterclaim for tortious interference with contractual relations. In the court's opinion, "[n]o rational juror could find in favor of the nonmoving party [ICOS]" because the evidence to support its assertion that plaintiffs acted in bad faith is so slight as to be practically non-existent. *See Gallo*, at \*9-\*10. Thus, plaintiffs' motion for summary judgment dismissing ICOS' third counterclaim is granted.[FN36]

### *4. Abuse of Process*

The remaining counterclaim upon which plaintiffs are seeking summary judgment is that for abuse of process-ICOS' fourth counterclaim. That counterclaim too is rooted in the NiMo state court action, and more

particularly, the fact that plaintiffs obtained a temporary restraining order in that action which had the effect, *inter alia,* of delaying payments to ICOS under the contract which it had with NiMo for the Stewarts Bridge project. ICOS alleges that plaintiffs acted "intentional[ly], wrongful[ly] and malicious[ly]" in obtaining that restraining order. Amended Answer with Counterclaims at ¶ 103. As they argued with respect to the interference with contract claim, plaintiffs also argue that this abuse of process counterclaim cannot survive a motion for summary judgment because ICOS has failed to demonstrate the elements essential to such a claim.

The parties agree that the three elements of an abuse of process claim are as follows. "First, there must be regularly issued process, civil or criminal, compelling the performance or forbearance of some prescribed act." *Board of Educ. of Farmingdale Union Free School v. Farmingdale Classroom Teachers Ass'n,* 38 N.Y.2d 397, 403, 380 N.Y.S.2d 635, 642, 343 N.E.2d 278, ---- (1975). Second, "the person activating the process must be moved by a purpose to do harm without that which has been traditionally described as economic or social excuse or justification." *Id.* (citations omitted). Third, "defendant must be seeking some collateral advantage or corresponding detriment to the plaintiff which is outside the legitimate ends of the process." Stated more succinctly, "[t]o state a claim for abuse of process, [a party] must allege that [the other party] misused the court's process to accomplish some ulterior purpose unrelated to the proper purpose of that process." *Mayer v. Morgan Stanley & Co.,* 703 F.Supp. 249, 255 (S.D.N.Y.1988) (citation omitted).

**\*19** Insofar as the second and third elements are concerned, there is simply no proof before the court that plaintiffs obtained a temporary restraining order in the NiMo action without excuse or justification. The court agrees with plaintiffs that when the entire history of the NiMo litigation is examined this was not a situation where plaintiffs were attempting to obtain a collateral advantage

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 17
Not Reported in F.Supp., 1994 WL 328626 (N.D.N.Y.)
1994 WL 328626 (N.D.N.Y.)

"without social excuse or justification." Indeed, ICOS has not articulated any such supposed collateral advantage which plaintiffs allegedly gained through that litigation. The NiMo litigation arose out of plaintiffs' attempt to secure payments which they believed were due them in connection with the project. Given ICOS' history of violating the trust fund provision of the New York Lien Law, plaintiffs were simply attempting to take whatever legal action they deemed necessary to insure that they would eventually get paid. In that regard, this case is not unlike *Piep v. Baron*, 133 Misc.2d 248, 506 N.Y.S.2d 838 (N.Y. City Civ.Ct.1986), wherein the court rejected defendant's argument "that plaintiffs' ulterior purpose (in filing the lis pendens) was to tie up defendant's property in order to coerce defendant to convey the property to plaintiffs or their assigns...." *Id.* at ----, 506 N.Y.S.2d at 840. Certainly given the context in which the NiMo litigation arose, plaintiffs had economic justification for instituting the same and resorting to seeking a temporary restraining order. Finally, to hold plaintiffs liable for abuse of process under the particular facts of this case would run directly afoul of the established rule "that the mere institution of a civil action which has occasioned a party trouble, inconvenience and expense of defending, will not support an action for abuse of process.... Public policy requires that parties be permitted to avail themselves of the courts to settle their grievances and that they may do so without unnecessary exposure to a suit for damages in the event of an unsuccessful prosecution[.]" *Scully v. Genesee Milk Producer's Coop., Inc.*, 78 A.D.2d 982, ----, 434 N.Y.S.2d 48, 49-50 (4th Dep't 1980) (citation omitted), *appeal dismissed,* 52 N.Y.2d 969, 437 N.Y.S.2d 972, 419 N.E.2d 875 (1981). Thus, in light of the foregoing, plaintiffs are also entitled to summary judgment dismissing ICOS' fourth counterclaim alleging abuse of process.

*B. Affirmative Defense*

As previously mentioned, of the six affirmative defenses asserted by ICOS, only one is the subject of plaintiffs'

motion herein, and that is the second affirmative defense of tender of payment.

*1. Tender of Payment*

ICOS contends that on June 26, 1991 it "tendered to Pallette Stone payment in full of all sums owing and claimed to be owing as of that date in exchange for a waiver of lien." Amended Answer with Counterclaims at ¶ 62. ICOS further alleges that Pallette refused that tender, and thus the debt, if any, has been canceled and extinguished. *Id.* at ¶¶ 63-64.

**\*20** In response to plaintiffs' motion to strike this defense, ICOS, among other things, faults plaintiffs for citing no law in support of their position that this defense is insufficient as a matter of law. Yet ICOS too fails to provide the court with any law to support it claims and instead argues strictly the facts. Not until plaintiffs filed their Reply Memorandum of Law did any party offer a legal framework by which to assess the tender of payment defense.

As plaintiffs correctly stated, the requirements of an accord and satisfaction, as well as a tender to accomplish the same, are specifically set forth in General Obligations Law §§ 15-501 and 15-503. Under a section entitled "Offer of accord followed by tender," the General Obligations Law provides in relevant part:

> An offer in writing, signed by the offeror or by his agent, to accept a performance therein designated in satisfaction or discharge in whole or in part of any claim, cause of action, contract, obligation, or lease, or any mortgage or other security interest in personal or real property, followed by tender of such performance by the offeree or by his agent before revocation of the offer, shall not be denied effect as a defense or as the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                           Page 18
Not Reported in F.Supp., 1994 WL 328626 (N.D.N.Y.)
1994 WL 328626 (N.D.N.Y.)

basis of an action or counterclaim by reason of the fact that such tender was not accepted by the offeror or by his agent.

N.Y.Gen.Oblig. Law § 15-503(1) (McKinney 1989). The General Obligations Law defines an "executory accord" as follows:

[a]n agreement embodying a promise express or implied to accept at some future time a stipulated performance in satisfaction or discharge in whole or in part of any present claim, cause of action, contract, obligation, or lease, or any mortgage or other security interest in personal or real property, and a promise express or implied to render such performance in satisfaction or in discharge of such claim, cause of action, contract, obligation, lease, mortgage or security interest.

N.Y.Gen.Oblig. Law § 15-501(1) (McKinney 1989). That section goes on to provide, in pertinent part:

An executory accord shall not be denied effect as a defense or as the basis of an action or counterclaim by reason of the fact that the satisfaction or discharge of the claim, cause of action, contract, obligation, lease, mortgage or other security interest which is the subject to the accord was to occur at a time after the making of the accord, provided the promise of the party against whom it is sought to enforce the accord is in writing and signed by such party or by his agent.

N.Y.Gen.Oblig. Law § 15-501(2) (McKinney 1989) (emphasis added).

Based upon the just quoted statutes the court agrees with plaintiffs that to sustain a tender of payment defense thereunder, ICOS "would actually have to allege and establish an 'agreement' by *both* parties to the accord that a certain payment amount would be acceptable in satisfaction of a claim or obligation." Reply Memorandum in Support of Plaintiffs' Motion for

Summary Judgment at 24 (emphasis in original). The court further agrees that ICOS has failed to either allege or offer proof to establish the same. The proof before the court shows only that negotiations took place which ultimately proved unfruitful. Furthermore, ICOS has not shown that section 15-501's requirement that the accord be in writing and signed by the party against whom enforcement is sought.

*21 In addition, there is no proof in the record which would support a finding of an offer of accord followed by tender, as defined by section 15-503 because there is a complete lack of proof showing an agreement. Further, as just mentioned, there is no proof of an "offer" in writing, signed by the offeror or his or her agent to accept a performance specifically designated therein, which was actually followed by a "tender" of the specifically designated performance. In the end, while perhaps there is a dispute as to the amount of payment, that is insufficient to defeat plaintiffs' motion on this affirmative defense because ICOS has not shown that it unconditionally tendered the amount of payment which the plaintiffs had agreed to accept. Consequently, plaintiffs' motion to strike ICOS' second affirmative defense for tender of payment is granted.

To summarize, the motion for partial summary judgment by the defendants, ICOS/NCCA a joint venture, ICOS Corporation of America and NCC America, Inc. is DENIED in all respects, including ICOS' alternative request to release the sum of $143,111.00 from this court's prior order of December 14, 1991. The motion for summary judgment by plaintiffs, D.A. Collins Construction Co., Inc. and Pallette Stone Corporation, is GRANTED in all respects. Therefore judgment should be entered in favor of plaintiffs and against defendants on defendants' second, third and fourth counterclaims, and those counterclaims are hereby dismissed. Plaintiffs' motion to strike defendants' second affirmative defense is also hereby GRANTED.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 328626 (N.D.N.Y.)
1994 WL 328626 (N.D.N.Y.)

Page 19

IT IS SO ORDERED.

FN1. The plaintiffs are both domestic corporations, whereas ICOS and NCC America are both foreign corporations. Amended Complaint at ¶¶ 1, 2, 5, and 7.

FN2. In accordance with this order, ICOS deposited $321,831.00 in a trust account. Affidavit of Leslie F. Couch (July 6, 1992) at ¶¶ 6 and 7.

FN3. These facts, which ICOS is willing to deem as true for purposes of this motion only, are taken primarily from plaintiffs' papers. *See* Couch Affidavit at ¶ 4.

FN4. It is not clear from the papers before the court whether or not this joint venture is still in existence, but presumably it is not given the limited purpose for which it was formed.

FN5. The plaintiffs are separate and distinct corporations, although they have the same president, Thomas Longe. Affidavit in Opposition of Thomas Longe (Aug. 17, 1992) at ¶ 2.

FN6. This property is owned in fee by Collins, but Pallette operates its sand plant thereon and has a possessory leasehold interest in it pursuant to an agreement between it and Collins. Longe Opposition Affidavit at ¶ 4.

FN7. Gleason Opposition Affidavit, exh. F thereto. Given the poor copy of this exhibit, it is

practically impossible for the court to verify this as the anticipated completion date, but the court has no reason to question it, especially because ICOS does not challenge it.

FN8. The date the excavation process was actually completed seems to be in dispute. ICOS mentioned April 1991 in its memorandum of law, but does not reference the record. Similarly, plaintiffs make a passing reference to late December, 1990, and then cite to a page of Mr. Beers deposition which was not included in the record. *See* Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Plaintiffs' Opposition Memorandum") at 7, n. 1. The plaintiffs also refer to January, 1991 as the completion date, but they too fail to cite to the record. In any event, the completion date of the dumping is not critical to the resolution of ICOS' motion herein.

FN9.*See also DuFort v. Aetna Life Ins. Co.,* 818 F.Supp. 578, 581 (S.D.N.Y.1993) ("It is well established in New York that ' 'a valid release which is clear and unambiguous on its face and which is knowingly and voluntarily entered into will be enforced as a private agreement between parties.' '") (quoting *Skluth v. United Merchants & Manufacturers, Inc.,* 163 A.D.2d 104, ----, 559 N.Y.S.2d 280, 282 (1st Dep't 1990) (quoting in turn *Appel v. Ford Motor Company,* 111 A.D.2d 731, ----, 490 N.Y.S.2d 228, 229 (2d Dep't 1985)).

FN10. He testified the same when asked about glacial "till." Gleason Opposition Affidavit, exh. A thereto (Deposition of Daryl Cox) at 99-100.

FN11. In an effort to diminish the impact of

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 328626 (N.D.N.Y.)
1994 WL 328626 (N.D.N.Y.)

these statements, at oral argument ICOS made much of the fact that Longe was not an active participant on the job site, and further that he is not an expert in soil composition. Based upon the former, ICOS argued that Longe's affidavit does not meet the personal knowledge requirement of Fed.R.Civ.P. 56(e). That is not evident on the face of Longe's affidavit, however. Therefore, in the court's opinion, these challenges to the proof offered through Longe are best left for cross-examination at trial. As to ICOS' assertion that Longe is not an expert on soil composition, while that may be true, the court finds it somewhat ironic that ICOS faults plaintiffs for not providing a supporting affidavit from such an expert when ICOS, as the moving party, also failed to provide any such affidavit.

ICOS also pointedly notes that plaintiffs did not provide affidavits from Messrs. Beers and Pierce on the issue of the consistency and/or composition of the excavated soil, and instead relies on portions of their depositions. Plaintiffs had no obligation to provide affidavits from those two individuals, however, on that issue. Rule 56(c) specifically allows a number of items to be considered in connection with a summary judgment motion including depositions. It does not state a preference for one form of proof or another. Furthermore, if ICOS believed that the portions of those depositions plaintiffs supplied to the court were insufficient, for whatever reason, in replying it could always have supplemented the record with additional parts of those depositions. Finally, this argument too strikes the court as somewhat disingenuous when ICOS did not even bother to submit portions of the depositions upon which it relies and instead relies upon deposition summaries, presumably prepared by defense counsel or someone under his

supervision.

FN12. The court acknowledges that neither ICOS nor Pallette directly presented the issue of the scope of the release vis-a-vis what they each intended at the time the release was executed. But, given the nature of their respective arguments-the release is general (ICOS) and the release is limited (Pallette)-the court is compelled to address this issue.

FN13. The court observes that Pallette was able to survive ICOS' summary judgment motion on this point primarily because ICOS failed to meet is burden of proof. Pallette should keep in mind, however, that insofar as the release may be considered to be of "general effect," it must be construed "most strongly" against Pallette as the releasor. *Middle East Banking Co. v. State Street Bank Int'l.*, 821 F.2d 897, 907 (2d Cir.1987) (quoting *Mt. Read Terminal, Inc. v. LeChase Constr. Corp.*, 58 A.D.2d 1034, 1035, 396 N.Y.S.2d 959, 960 (4th Dep't 1977)). Furthermore, Pallette, as the releasor, "must sustain the burden of persuasion if [it] is to establish that the general language of the release, valid on its face and properly executed, is to be limited because ... [it] does not represent the intent of the parties.' " *Olin Corp. v. Consolidated Aluminum Corp.*, 5 F.3d 10, 17 (2d Cir.1993) (quoting *Mangini v. McClurg*, 24 N.Y.2d 556, 563, 301 N.Y.S.2d 508, 513-514 (1969)) (other citation omitted).

FN14. The court observes that this aspect of ICOS' motion could just as easily have been brought as a motion to dismiss under Fed.R.Civ.P. 9(b) and/or Fed.R.Civ.P. 12(b)(6) with the obvious advantage that there would have been no need to await the completion of

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 21
Not Reported in F.Supp., 1994 WL 328626 (N.D.N.Y.)
1994 WL 328626 (N.D.N.Y.)

discovery.

FN15.*Zucker v. Katz,* 708 F.Supp. 525, 530 (S.D.N.Y.1989).

FN16. In the complaint Pallette alleges that the purported misrepresentations were "material." *See* Amended Complaint at 22, ¶ 11. Because misrepresentation of a material fact is one of the "traditional elements of fraud," *Maywalt v. Parker & Parsley Petroleum Co.,* 808 F.Supp. 1037, 1046 n. 5 (S.D.N.Y.1992) (citation ⋅omitted), ICOS' reading of the seventh cause of action as one based upon fraud is understandable. However, the court accepts Pallette's representations both in its papers and at oral argument that it is not seeking to recover on a fraud theory in this cause of action. The court will hold Pallette to these representations and will not construe, in any manner, the seventh cause of action as one sounding in fraud.

FN17. At one point during oral argument, Pallette also stated that this seventh cause of action is based on a theory of *quantum meruit.* Although similar, there is a difference between the elements of a *quantum meruit* claim and those of a claim for unjust enrichment. *Compare Longo v. Shore & Reich, Ltd.,* No. 93-9202, 1994 WL 201734, at *2, 1994 U.S.App. LEXIS 12255, at *10 (2d Cir. May 24, 1994)* ("to recover in quantum meruit, New York Law requires a claimant to establish ' '(1) the performance of the services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services [ ],' '") (citations omitted); *with Barr Lab., Inc. v. Quantum Pharmics, Inc.,* 827 F.Supp. 111, 119 (E.D.N.Y.1993) (citations

omitted) ("Under New York law, an unjust enrichment claim will only lie if the plaintiff can show that (1) defendant was enriched; (2) the enrichment was at plaintiff's expense; and (3) the circumstances were such that equity and good conscience require defendant to make restitution."). In any event, the court need not concern itself with these differences at this point, because ICOS is challenging Pallette's seventh cause of action only insofar as it can be read as asserting a claim sounding in fraud.

FN18. ICOS mentions that this action was originally commenced in state court, and that New York has similar strict pleading requirements for fraud based actions. Actually, New York's pleading requirements arguably are more restrictive than Rule 9(b)'s in that they also apply where misrepresentation, willful default, breach of trust and undue influence are alleged. *See*N.Y.Civ.Prac.L. & R. § 3016(b) (McKinney 1991). Regardless, because this action was removed and an amended complaint filed well after removal, those state pleading requirements have no bearing on this federal case. *See*Fed.R.Civ.P. 81(c) ("These rules apply to civil actions removed to the United States district courts from the state courts and govern procedure after removal.").

FN19. It is ICOS' belief that it is an owner for purposes of this analysis. As will be seen, however, because the court does not find this rule of law applicable here, it need not consider the accuracy of this position.

FN20. It should be noted that insofar as both plaintiffs are seeking to recover for property damage allegedly resulting from disposal of the excavated material, the amount recovered, if any,

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 22
Not Reported in F.Supp., 1994 WL 328626 (N.D.N.Y.)
1994 WL 328626 (N.D.N.Y.)

must be based upon their respective property interests in the South Corinth property. In other words, if plaintiffs recover on this claim for damage to the South Corinth property, then any such recovery should be on a *pro rata* share according to the nature and extent of their respective property interests. In the end, this might not make a difference due to the close association of the two plaintiff corporations, i.e. a president in common. On the other hand, if eventually only one plaintiff recovers on this extras claim, then recovery will be limited depending upon the nature of that plaintiff's possessory interest in the property.

FN21. Amended Answer to Amended Complaint with Counterclaims at 14, ¶ 78.

FN22. Section 1983 reads in relevant part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983 (West 1981).

FN23. The Supreme Court has held that the "under color of law" requirement of section 1983 is equivalent to the constitutional doctrine of state action required under the fourteenth amendment. *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 929-30, 102 S.Ct. 2744, 2749-50, 73 L.Ed.2d 482 (1982); *see also United States v. Price,* 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 1157 n. 7, 16 L.Ed.2d 267 (1966). So the court's references to state action herein may properly be read as encompassing the "under color of law" component of 42 U.S.C. § 1983.

FN24. *See* N.Y.Civ.Prac.L. & R. § 2214(d) (McKinney 1991) (order to show cause procedure) and N.Y.Civ.Prac.L. & R. § 6301 (McKinney 1980) ("Grounds for preliminary injunction and temporary restraining order").

FN25. The court stresses that at this point in its analysis, it is assuming for the sake of argument only that ICOS has shown the deprivation of a constitutional right.

FN26. Such a claim is based upon the Supreme Court's decision in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), wherein the Court recognized a federal common law cause of action for damages caused by a federal agent acting "under color of his authority" in violation of a claimant's fourteenth amendment rights. *Id.* at 389, 91 S.Ct. at 2001. As "a nonstatutory counterpart" to section 1983, state action is also necessary to sustain a *Bivens* action. *Mahoney,* 681 F.Supp. at 132. Thus, even though *Mahoney* did not involve a section 1983 action *per se,* nonetheless its analysis of state action is instructive in this case.

FN27. Such was the case in the landmark case of *Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), wherein the Supreme Court

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                   Page 23
Not Reported in F.Supp., 1994 WL 328626 (N.D.N.Y.)
1994 WL 328626 (N.D.N.Y.)

found state action because private parties had employed state court process to enforce a racially restrictive covenant in a real property deed.

FN28. For a thorough discussion of *Lugar* see *Dahlberg,* 748 F.2d at 89-90.

FN29. Although the court did not analyze the under color of state law issue nearly as comprehensively as did the Court in *Dahlberg,* one other case where a similar result was reached is worth noting and that is *Winslow v. Romer,* 759 F.Supp. 670 (D.Colo.1991). The court there squarely held that use of state garnishment proceedings by a private attorney and a private law firm will not support a finding of state action for section 1983 purposes. *Id.* at 676 (citing *Winslow v. Bauer,* 585 F.Supp. 1048, 1054 (D.Col.1984)).

FN30. In its answer, ICOS makes the conclusory allegation that the deprivation of its property was "under color of state law." Amended Answer with Counterclaims at 15, ¶ 89. There are no facts alleged in that counterclaim, however, to support that allegation. And, as will be discussed above, the record is likewise bare on this critical point.

FN31. The court emphasizes that this is only an assumption for the sake of argument. The court observes, without deciding, that the record does not appear to support a finding of bad faith. In fact, when pressed at oral argument, ICOS was unable to point to any specific proof in the record which would support such a finding. ICOS repeatedly stated that it had no notice of the NiMo order to show cause and temporary restraining order, and thus no opportunity to be

heard, but ICOS was not a party to that action.

FN32. Because ICOS' second counterclaim cannot be sustained on the merits, insofar as that counterclaim also includes a request for attorney's fees under 42 U.S.C. § 1988, it too cannot be allowed to stand.

FN33. As mentioned at the outset, the court's jurisdiction here is based upon diversity of citizenship, and thus New York substantive law applies. *See Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). No party has suggested otherwise.

FN34. *Walther v. Bank of New York,* 772 F.Supp. 754, 769 (S.D.N.Y.1991) (citing, *inter alia, Enercomp, Inc. v. McCorhill Pub., Inc.,* 873 F.2d 536, 541 (2d Cir.1989)).

FN35. *Id.* (internal quotations omitted).

FN36. The court is fully aware that plaintiffs focused more heavily upon the lack of a breach of contract, as opposed to whether or not they acted intentionally, improperly or in bad faith with respect to the NiMo state court action. As Judge Munson accurately stated, however, "the case law is somewhat muddled" on the issue of whether it is necessary to allege a breach of contract in order to state a valid claim for interference with contractual relations." *J & J Sheet Metal Works, Inc. v. Picarazzi,* 793 F.Supp. 1104, 1114 (N.D.N.Y.1992). Quoting from the Court of Appeals decision in *Jack L. Inselman & Co. v. FNB Fin. Co.,* 41 N.Y.2d 1078, ----, 396 N.Y.S.2d 347, 348, 364 N.E.2d 1119, ---- (1977), Judge Munson held that breach

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                              Page 24
Not Reported in F.Supp., 1994 WL 328626 (N.D.N.Y.)
1994 WL 328626 (N.D.N.Y.)

of contract is essential to a claim for tortious interference with contractual relations. *Id.* By the same token though, as the court in *G.D. Searle & Co. v. Medicore Communications, Inc.,* 843 F.Supp. 895 (S.D.N.Y.1994), recently noted, some courts have modified this requirement, allowing a contract interference claim to stand where "performance of the contract is rendered more difficult or a party's enjoyment of the contract's benefits is lessened by the wrongdoer's actions." *Id.* at 910 n. 9 (quoting *Goodall v. Columbia Ventures, Inc.,* 374 F.Supp. 1324, 1332 (S.D.N.Y.1974)) (other citations omitted). This court need not decide which of these two lines of cases to follow, however, in light of its finding that ICOS' interference with contractual relations counterclaim cannot withstand plaintiffs' motion for summary judgment for the reasons set forth above.

N.D.N.Y. 1994
D.A. Collins Const. Co., Inc. v. ICOS/NCCA a Joint Venture
Not Reported in F.Supp., 1994 WL 328626 (N.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.