# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALICE KRAMER, as Personal Representative of the Estate of Arthur Kramer,        :   :   : <br><br>            **Plaintiff,**   : <br> —against—         :   : <br> LOCKWOOD PENSION SERVICES, INC., ET AL.,        :   : <br>           **Defendants.**   : | **Case No.: 08 CV 2429-DAB-MHD** <br><br> **ECF Case** |

---

| | |
|---|---|
| PHOENIX LIFE INSURANCE CO.,      :   : <br>         **Third-Party Plaintiff,**   : <br> —against—      :   : <br> STEVEN LOCKWOOD,      : <br>         **Third-Party Defendant.**   : | |

---

| | |
|---|---|
| LIFE PRODUCT CLEARING LLC, and JONATHAN S. BERCK      :   :   : <br>         **Third-Party Plaintiffs,**   : <br> —against—      :   : <br> LIZA KRAMER and ANDREW B. KRAMER,      :   : <br>         **Third-Party Defendants.**   : | **Oral Argument Requested** |

---

## MEMORANDUM OF LAW OF DEFENDANT LINCOLN LIFE & ANNUITY COMPANY OF NEW YORK IN SUPPORT OF ITS MOTION TO DISMISS THE <u>CROSS-CLAIMS OF DEFENDANT JONATHAN S. BERCK</u>

**DRINKER BIDDLE & REATH LLP**
One Logan Square, 18th and Cherry Sts.
Philadelphia, PA 19103
(215) 988-2700
Attorneys for Defendant Lincoln Life &
Annuity Company of New York

## TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................1

FACTS AND PROCEDURAL HISTORY ...................................................................3

    Procedural History ...............................................................................................3

    The Connecticut Action .......................................................................................4

    Mr. Berck's Cross-Claims ...................................................................................5

ARGUMENT .................................................................................................................7

    I.   The Court Should Abstain From Hearing Mr. Berck's Cross-Claims ................7

        A.  The Abstention Standards ..............................................................................7

        B.  This Court Should Abstain From Providing A Forum For Mr. Berck's
            Cross-Claims Pursuant to *Wilton* ......................................................................9

        C.  This Court Should Abstain From Providing A Forum For Mr. Berck's
            Cross-Claims Pursuant to *Colorado River* ......................................................10

            1.  The *Colorado River* Factor Of "Assumption Of Jurisdiction
               Over A *Res*" Is Inapplicable ..................................................................11

            2.  The *Colorado River* Factor Of "Inconvenience Of The Forum"
               Weighs In Favor Of Abstention ...............................................................11

            3.  The *Colorado River* Factor Of "Avoidance Of Piecemeal
               Litigation" Weighs In Favor Of Abstention ...........................................12

            4.  The *Colorado River* Factor Of The "Order In Which The
               Actions Were Filed" Either Weighs In Favor Of Abstention Or
               Is Neutral .................................................................................................14

            5.  The *Colorado River* Factor Of "The Law That Provides The
               Rule Of Decision" Weighs In Favor Of Abstention ...............................15

            6.  The *Colorado River* Factor Of "Protection Of The Federal
               Plaintiff's Rights" Weighs In Favor Of Abstention ................................15

    II.  The Court Should Dismiss Mr. Berck's Cross-Claims On *Forum Non Conveniens*
       Grounds ..............................................................................................................16

A.  No Deference Should Be Given To Mr. Berck's Chosen Forum ....................16

B.  An Adequate Alternative Forum Exists.........................................................17

C.  The Private Interest Factors Weigh In Favor Of Dismissing Mr.
Berck's Cross-Claims .......................................................................18

D.  The Public Interest Factors Weigh In Favor Of Dismissing Mr.
Berck's Cross-Claims .......................................................................19

III.  Mr. Berck's Fifth Cross-Claim Alleging Violations of New York General
Business Law Section 349 Should be Dismissed For Failure To State A Claim .............20

CONCLUSION....................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Aguas Lenders Recovery Group, LLC v. Suez S.A.*,
  2008 U.S. Dist. LEXIS 16283 (S.D.N.Y. Mar. 7, 2008) .......................................................16

*Alcoa S.S. Co. v. M/V Nordic Regent*,
  654 F.2d 147 (2d Cir. 1980).................................................................................................18

*Allstate Life Ins. Co. v. Linter Group*,
  994 F.2d 996 (2d Cir. 1993).......................................................................................18, 19, 20

*Arkwright- Boston Mfrs. Mut. Ins. Co. v. City of New York*,
  762 F.2d 205 (2d Cir. 1985)........................................................... 10-11, 12, 13, 15

*BFI Group Divino Corp. v. JSC Russian Aluminum*,
  481 F. Supp. 2d 274 (S.D.N.Y. 2007).............................................................................18, 20

*Bank of Credit & Commerce Int'l (Overseas) Ltd. v. State Bank of Pakistan*,
  273 F.3d 241 (2d Cir. 2001).................................................................................................18

*Bernstein v. Hosiery Mfg. Corp.*,
  850 F. Supp. 176 (E.D.N.Y. 1994) .................................................................................11, 15

*Brillhart v. Excess Ins. Co.*,
  316 U.S. 491 (1942)..............................................................................................................8

*Burford v. Sun Oil Co.*,
  319 U.S. 315 (1943)...........................................................................................................7-8

*Colorado River Water Conservation Dist. v. United States*,
  424 U.S. 800 (1976)..............................................................................................................8

*Crosstown Songs U.K. Ltd. v. Spirit Music Group, Inc.*,
  513 F. Supp. 2d 13 (S.D.N.Y. 2007).....................................................................................20

*De Cisneros v. Younger*,
  871 F.2d 305 (2d Cir. 1989)........................................................................................8, 13, 15

*DePasquale v. Allstate Ins. Co.*,
  179 F. Supp. 2d  51 (E.D.N.Y. 2002) ....................................................................................22

*Fekete v. GA Ins. Co.*,
  719 N.Y.S.2d 52 (N.Y. App. Div. 2001) ................................................................................22

*General Star Int'l Indem., Ltd. v. Chase Manhattan Bank*,
2003 U.S. App. LEXIS 2318 (2d Cir. Feb. 7, 2003) ........................................12, 13

*Genesco Entm't, Div. of Lymutt Indus., Inc. v. Koch*,
593 F. Supp. 743 (S.D.N.Y. 1984).................................................................. 23-24

*Goldentree Asset Mgmt., L.P. v. Longaberger Co.*,
448 F. Supp. 2d 589 (S.D.N.Y. 2006).............................................................10, 12

*Gulf Oil Corp. v. Gilbert*,
330 U.S. 501 (1947).................................................................................16, 18, 19

*Highlands Ins. Co. v. PRG Brokerage, Inc.*,
2004 U.S. Dist. LEXIS 83 (S.D.N.Y. Jan. 5, 2004) ............................................23

*Iragorri v. United Techs. Corp.*,
274 F.3d 65 (2d Cir. 2001)....................................................................16, 17, 18, 19

*Jaffee v. Society of the N.Y. Hosp.*,
1997 U.S. Dist. LEXIS 17219 (S.D.N.Y. Oct. 31, 1997) .......................................1

*Korn v. First UNUM Life Ins. Co.*,
717 N.Y.S.2d 606 (N.Y. App. Div. 2000) ............................................................22

*Lake v. Bayer Corp.*,
2006 Conn. Super. LEXIS 2291 (Conn. Super. Ct. July 25, 2006) ........................20

*Lasala v. Lloyds TSB Bank, PLC*,
514 F. Supp. 2d 454 (S.D.N.Y. 2007)...................................................................16

*Lasker v. UBS Sec., LLC*,
2008 U.S. Dist. LEXIS 35462 (E.D.N.Y. Apr. 30, 2008) .......................................1

*Lava Trading, Inc. v. Hartford Fire Ins. Co.*,
326 F. Supp. 2d 434 (S.D.N.Y. 2004)..............................................................23, 24

*Magee v. Paul Revere Life Ins. Co.*,
954 F. Supp. 582 (E.D.N.Y. 1997) ......................................................................24

*Monegasque de Reassurances S.A.M. (Monde Re) v. Nak Naftogaz of Ukraine*,
311 F.3d 488 (2d Cir. 2002)..................................................................................19

*Moses H. Cone Memorial Hospital v. Mercury Constr. Co.*,
460 U.S. 1 (1983).................................................................................................8

*Mouchantaf v. Int'l Modeling & Talent Ass'n*,
    368 F. Supp. 2d 303 (S.D.N.Y. 2005)....................................................................12

*Murray v. BBC*,
    81 F.3d 287 (2d Cir. 1996).........................................................................16, 18

*Nat'l Union Fire Ins. Co. v. Karp*,
    108 F.3d 17 (2d Cir. 1997)..........................................................................8, 10

*Nat'l Union Fire Ins. Co. v. Titeflex Corp.*,
    2008 U.S. Dist. LEXIS 27985 (S.D.N.Y. Mar. 11, 2008) ......................8, 9, 10, 11, 12, 14, 15

*New York University v. Continental Ins. Co.*,
    87 N.Y.2d 308 (1995) ...............................................................................21

*Nieves v. Board of Educ.*,
    2006 U.S. Dist. LEXIS 81238 (E.D.N.Y. Sept. 15, 2006).......................................11

*Omollo v. Citibank, N.A.*,
    2008 U.S. Dist. LEXIS 36917 (S.D.N.Y. May 6, 2008) .......................................17

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*,
    85 N.Y.2d 20 (1995) ................................................................................21

*Piper Aircraft Co. v. Reyno*,
    454 U.S. 235 (1981)..................................................................................16

*Pollux Holding, Ltd. v. Chase Manhattan Bank*,
    329 F.3d 64 (2d Cir. 2003)................................................................. 16, 18, 19-20

*Radioactive, J.V. v. Manson*,
    153 F. Supp. 2d 462 (S.D.N.Y. 2001)...............................................................15

*Railroad Comm'n of Texas v. Pullman Co.*,
    312 U.S. 496 (1941)....................................................................................8

*Sec. Mut. Life Ins. Co. v. DiPasquale*,
    724 N.Y.S.2d 594 (N.Y. App. Div. 2001) ..........................................................22

*Stutman v. Chemical Bank*,
    95 N.Y.2d 24 (2000) .................................................................................21

*Telesco v. Telesco Fuel and Masons' Materials, Inc.*,
    765 F.2d 356 (2d Cir. 1985)..........................................................................15

*Transunion Corp. v. PepsiCo, Inc.*,
    811 F.2d 127 (2d Cir. 1987)................................................................20

*Usha (India), Ltd. v. Honeywell Int'l, Inc.*,
    421 F.3d 129 (2d Cir. 2005)................................................................17

*Village of Westfield v. Welch's*,
    170 F.3d 116 (2d Cir. 1999)................................................................11

*Wilton v. Seven Falls Co.*,
    515 U.S. 277 (1995)................................................................8, 9, 10

*Woodford v. Comty. Action Agency of Greene County, Inc.*,
    239 F.3d 517 (2d Cir. 2001)................................................................1

*Younger v. Harris*,
    401 U.S. 37 (1971)................................................................7

## STATUTES

28 U.S.C. § 2201 *et seq.* (Federal Declaratory Judgment Act)................................................................8

N.Y. General Business Law Section 349................................................9, 20, 21, 22, 23, 24, 25

## INTRODUCTION

Defendant Lincoln Life & Annuity Company of New York ("Lincoln") brings this motion seeking a dismissal of the cross-claims of defendant Jonathan S. Berck ("Mr. Berck")[1] on the grounds of (i) absention, (ii) *forum non conveniens,*[2] and (iii) failure to state a claim upon which relief can be granted with respect to the fifth cross-claim for an alleged violation of New York General Business Law Section 349.

Since April 16, 2008, Mr. Berck has been a defendant in a Connecticut state court lawsuit (the "Connecticut Action") filed by Lincoln, in which Lincoln asserts claims against Mr. Berck, Life Product Clearing, LLC ("Life Product"), Lockwood Pension Services, Inc. ("LPS"), Steven Lockwood, Joel B. Miller, and TD Banknorth ("Banknorth"). In the Connecticut Action, Lincoln asserts claims for breach of contract, fraud, fraudulent concealment, negligent misrepresentation, aiding and abetting fraud, and civil conspiracy – based upon the defendants' fraudulent procurement of two stranger-originated life insurance ("STOLI") policies issued by Lincoln and insuring the lives of Arthur Kramer (the "Kramer policy") and Leon Lobel (the "Lobel policy").

Lincoln's allegations in the Connecticut Action are much more comprehensive than the allegations of plaintiff in this action, where, since inception, plaintiff's claims have been limited to recovering the death benefit under the Kramer policy. Lincoln's claims in the Connecticut Action are not limited to the Kramer policy, but also pertain to the Lobel policy. Moreover, in

---

[1]  Although named in the plaintiff's amended complaint as "Jonathan S. Berck," Mr. Berck identifies himself in his Answer to Amended Complaint with Counterclaims and Cross-Claims ("Mr. Berck's Answer") as "defendant Jonathan S. Berck, sued solely in his capacity as the successor trustee of the Arthur Kramer Insurance Trust and the Arthur Kramer 2005 Insurance Trust." (*See* Mr. Berck's Answer, p. 2).

[2]  Courts in this Circuit have considered the appropriateness of abstention under both Rule 12(b)(1) and Rule 12(b)(6). *See Woodford v. Comty. Action Agency of Greene County, Inc.*, 239 F.3d 517, 520-21 (2d Cir. 2001); *Lasker v. UBS Sec., LLC*, 2008 U.S. Dist. LEXIS 35462, at *1 (E.D.N.Y. Apr. 30, 2008); *Jaffee v. Society of the N.Y. Hosp.*, 1997 U.S. Dist. LEXIS 17219, at *1, 4 (S.D.N.Y. Oct. 31, 1997). Copies of all unpublished opinions are attached hereto, in alphabetical order, as Exhibit 1.

the Connecticut Action, Lincoln has joined Banknorth (the former trustee of the Kramer and Lobel life insurance trusts) and Mr. Miller (one of the brokers on the Lobel policy) as defendants.  Banknorth and Mr. Miller are not parties to this action.

On August 1, 2008 – more than three months after the inception of the Connecticut Action – Mr. Berck filed cross-claims against Lincoln in this action.  In a transparent attempt to force Lincoln to litigate its Connecticut Action claims in this action, Mr. Berck filed cross-claims interjecting the Lobel policy into this action, attempting to negate the relief sought by Lincoln against Mr. Berck and the other Connecticut Action defendants.  Mr. Berck seeks to initiate parallel litigation that will create proceedings duplicative of those ongoing in Connecticut.  In the interest judicial economy and in deference to the Connecticut Action, this Court should abstain from hearing Mr. Berck's cross-claims, none of which involve any federal questions of law.

This Court should also dismiss Mr. Berck's cross-claims based upon the doctrine of *forum non conveniens.*  Connecticut state court – where Lincoln first sought relief for its claims against Mr. Berck and others arising from both the Kramer and Lobel policies – is the appropriate forum to litigate these claims.

Finally, even if this Court decides not to abstain or dismiss Mr. Berck's cross-claims on abstention or *forum non conveniens* grounds, this Court should, nonetheless, dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), Mr. Berck's fifth cross-claim alleging a violation of New York General Business Law Section 349.  This cross-claim fails to establish an essential element of a Section 349 claim because the challenged acts are not "consumer-oriented" within the meaning of the statute.  Indeed, this cross-claim represents nothing more than a dispute between two private parties over specific life insurance policies and, as such, is not actionable under Section 349.

# FACTS AND PROCEDURAL HISTORY

## Procedural History

Plaintiff, Alice Kramer ("Mrs. Kramer"), as Personal Representative of the Estate of Arthur Kramer, filed her original complaint in this action on March 10, 2008 and amended her complaint on May 7, 2008, asserting claims for declaratory judgment and seeking to recover the death benefit under the Kramer policy and under various other policies insuring the life of Mr. Kramer issued by the other insurance company defendants.

On April 16, 2008, Lincoln commenced the Connecticut Action against LPS, Mr. Lockwood, Mr. Miller, Mr. Berck, Life Product, and Banknorth.  (*See* Exhibit 2).[3]  Both the Kramer policy and the Lobel policy are at issue in the Connecticut Action.  Two of the defendants (Banknorth and Mr. Miller) in the Connecticut Action are not parties to this action.

On June 3, 2008, Lincoln filed a motion to dismiss the amended complaint in this action arguing plaintiff lacked standing to assert any claim against Lincoln under the Kramer policy. Plaintiff filed a response to that motion on July 11, 2008, and Lincoln filed a reply memorandum on July 21, 2008.  Also, on July 21, 2008, defendant Life Product filed a memorandum of law agreeing with Lincoln's assertion that plaintiff had no standing to bring an action against Lincoln, and that plaintiff's claims against Lincoln for declaratory judgment should be dismissed.

On August 1, 2008, Mr. Berck filed an answer to the amended complaint with counterclaims and cross-claims against Lincoln (nearly identical to those asserted by defendant Life Product on June 20, 2008) to which Lincoln now responds.

---

[3]    The Connecticut Action is styled *The Lincoln Life & Annuity Company of New York v. Lockwood Pension Services, et al.*, CV-08-501914-S (Conn. Super. Ct., Hartford J.D., filed April 16, 2008).  A copy of the verified complaint in the Connecticut Action is attached hereto as Exhibit 2 and will be referred to as the "Connecticut Complaint."

**The Connecticut Action**

The "Facts" section of the Connecticut Complaint alleges as follows:[4]

- There are two Lincoln life insurance policies at issue in the Connecticut Action – (i) policy number 7214471 in the face amount of $10 million, issued on November 23, 2005 and insuring the life of Arthur Kramer (the "Kramer policy"); and (ii) policy number 7221595 in the face amount of $10 million, issued on December 14, 2005 and insuring the life of Leon Lobel (the "Lobel policy"). (*See* Connecticut Complaint, ¶¶36, 67).

- Messrs. Kramer and Lobel (Connecticut residents) were solicited by the defendants to participate in the fraudulent procurement of these policies. Although Lincoln is a New York company, it has offices and a substantial presence in Connecticut. The policies at issue were administered and underwritten at Lincoln's Hartford, Connecticut office. The policy applications, letters, policy amendment forms, premium payments and a death benefits claim were submitted to Lincoln's Hartford office. (*See id.* at ¶¶1, 8, 23, 32, 35, 37, 41, 44-47, 50-51, 59, 65, 68, 74, 76-79).

- The arrangements in connection with these policies were similarly structured. A trust was created in which either the insured or his children were initially named as the beneficiary. Life insurance was acquired, and the trust/trustee was named as the beneficiary. As part of the plan, immediately following the issuance of the life insurance policy, the beneficial interest was assigned to a stranger investor. At no time did the insured or his family have a true beneficial interest in the insurance policy. (*See id.* at ¶19).

- Mr. Lockwood was the broker for the Kramer policy. Mr. Lockwood and Mr. Miller were the brokers for the Lobel policy. Banknorth and Mr. Berck served as trustees of the trusts that owned the Kramer and Lobel policies. Life Product ultimately acquired the beneficial interest in these trusts. (*See id.* at ¶¶23, 27, 33, 36, 46, 49, 59, 62, 67, 73, 77).

- Mr. Kramer, at the direction of Mr. Lockwood, Mr. Lockwood's business (LPS) and/or other entities engaged in secondary life insurance market transactions, established a trust, naming himself as the depositor and his daughter, Liza Kramer, as the initial beneficiary. Upon issuance of the insurance policy, Mr. Kramer, acting on the direction of Mr. Lockwood, LPS and/or other entities engaged in secondary life insurance market transactions, immediately directed his daughter to execute a putative assignment of her interest in the trust to a stranger investor. The policy was procured on Mr. Kramer's life with the intention of immediately effectuating the assignment of the beneficial interest in the policy to an investor. At no time did Mr. Kramer or any of his family members have a true beneficial interest in the policy. (*See id.* at ¶20).

---

[4]     These factual allegations are provided so that the Court may compare the claims in the Connecticut Action and Mr. Berck's cross-claims as required under *Colorado River*, *infra*.

- Mr. Lobel, at the direction of Mr. Miller, Mr. Lockwood, LPS, Life Product, and/or other entities engaged in secondary life insurance market transactions, established a trust, naming himself as the depositor and as the initial beneficiary. Upon issuance of the insurance policy, Mr. Lobel, acting on the direction of Mr. Miller, Mr. Lockwood, LPS, Life Product, and/or other entities engaged in secondary life insurance market transactions, executed a putative assignment of his interest in the trust to a stranger investor. The policy was procured on Mr. Lobel's life with the intention of immediately effectuating the assignment of the beneficial interest in the policy to an investor. At no time did Mr. Lobel or any of his family members have a true beneficial interest in the policy. (*See id*. at ¶21).

- Messrs. Miller and Lockwood breached their broker agreements with Lincoln, and Messrs. Miller and Lockwood and LPS committed fraud, engaged in fraudulent concealment, and made misrepresentations to Lincoln through their participation in these STOLI transactions. (*See id*. at Counts I-VI, XI-XII).

- Banknorth and its predecessor (Hudson United Bank ("Hudson")), Mr. Berck, and Life Product aided and abetted this fraudulent scheme. (*See id*. at Counts VII-VIII).

- All of these defendants entered into a common law conspiracy to fraudulently induce Lincoln to issue the Kramer and Lobel policies and to conceal the absence of an insurable interest in the policies. (*See id*. at Counts IX-X). Lincoln seeks, *inter alia*, compensatory and punitive damages and declaratory relief. (*See id*. at Prayer for Relief).

### Mr. Berck's Cross-Claims

In his cross-claims, Mr. Berck alleges:

- Successor Trustee is a citizen of the state of New York and is the successor trustee of the Arthur Kramer 2005 Insurance Trust (the "August Trust") pursuant to the Trust Agreement of the Arthur Kramer 2005 Insurance Trust dated August 29, 2005 (the "August Trust Agreement"). (*See* Mr. Berck's Answer at ¶69).

- Arthur Kramer established the August Trust pursuant to the August Trust Agreement. The parties to the August Trust Agreement were Hudson[5] as trustee, Mr. Kramer as depositor, and Liza Kramer, the daughter of Arthur Kramer, as beneficiary. (*See id* at ¶72).

- On or about November 23, 2005, Lincoln issued to the August Trust as owner life insurance policy number 7214471, with a total death benefit of $10,000,000.00, on the life of Arthur Kramer ( the "Kramer policy").[6] (*See id*. at ¶73).

---

[5]     Hudson was acquired by Banknorth in January 2006. (*See* Connecticut Complaint at ¶7).

[6]     In his cross-claims, Mr. Berck refers to this policy as the "Lincoln policy." Because this motion addresses claims arising out of two Lincoln issued policies, one insuring the life of Mr. Kramer and one insuring the

- Liza Kramer owned the entire beneficial interest in the August Trust at the time the Kramer policy was procured.  (*See id*. at ¶75).[7]

- After the Kramer policy was issued, and in consideration for a payment of $100,000.00 (the "Cash Consideration"), Liza Kramer sold her beneficial interest in the August Trust's interest in the Kramer Policy to Defendant Life Product, pursuant to a Beneficial Transfer Agreement dated November 29, 2005 (the "Transfer Agreement").  (*See id*. at ¶79).

Parroting the allegations contained in the Connecticut Complaint, Mr. Berck further alleges

that:

- On April 16, 2008, Lincoln asserted that the Kramer policy was, or should now be deemed to be, void *ab initio* on account of a supposed lack of a proper "insurable interest" at the time when the Kramer policy was issued, and that Lincoln should therefore be excused from making payment of the death benefit under the Kramer policy. (*See* Mr. Berck's Answer at ¶120).

- On April 16, 2008, Lincoln asserted that it was entitled to make setoffs from the death benefit payable under the Kramer policy on the theory it has sustained damages as a result of one or more alleged civil conspiracies among Life Product, third-party defendant Mr. Lockwood, defendant LPS, original (but no longer) defendant Banknorth, Mr. Berck and/or non-party Mr. Miller to fraudulently induce Lincoln to issue the Kramer and/or Lobel policies, and to conceal the purported absence of an "insurable interest" in these policies by, *inter alia*, acquiring and/or participating in the sale of the death benefits under these policies and funding premium payments for these policies.  (*See id*. at ¶125).

- On April 16, 2008, Lincoln asserted that it was entitled to make setoffs against the death benefit payable under the Kramer policy on the theory it has sustained damages as a result of Mr. Berck's supposedly having aided and abetted third-party defendant Mr. Lockwood and defendant LPS in carrying out one or more supposed fraudulent arrangements on their part to deceive and induce Lincoln to issue the Kramer and/or the Lobel policies, and to conceal the purported absence of an "insurable interest" in these policies.  Lincoln asserted that Mr. Berck allegedly aided and abetted these supposed frauds by, *inter alia*, participating in the sale of death benefits under these policies and funding premium payments for these policies.  (*See id*. at ¶131).

---

life of Leon Lobel, those policies will be referred to as the "Kramer policy" and "Lobel policy", respectively.

[7] Mr. Berck makes this assertion despite the facts that (i) Liza Kramer is also alleged to have sold her interest in the $10,000,000 policy for $100,000 only days after the policy was issued, and (ii) Arthur Kramer's Estate readily admits that "[a]t no time were Mr. Kramer or any of his family members the true owners of the beneficial interests in the policies … [and] Mr. Kramer never intended for the death benefits of the insurance policies to benefit his family."  (*See* Plaintiff's Amended Complaint at ¶¶15, 41).

In his cross-claims, Mr. Berck seeks, *inter alia*:

- A declaration that Lincoln breached the Kramer policy and an award of damages in an amount not less than the face amount of the policy, plus interest. (*See* Mr. Berck's Answer at ¶¶106-116 (First Cross-Claim)).

- A declaration that the Kramer policy is valid and enforceable notwithstanding any issue Lincoln might now seek to raise regarding a supposed lack of proper "insurable interest" at the time the Kramer policy was issued, and that Lincoln must pay to the August Trust or Life Product the benefits owed under the Kramer Policy. (*See id.* at ¶¶117-123 (Second Cross-Claim)).

- A declaration that Lincoln has no lawful basis to set-off any amounts from the death benefit payable under the Kramer policy based on its belatedly raised allegations of supposed civil conspiracy. (*See id.* at ¶124-129 (Third Cross-Claim)).

- A declaration that Lincoln has no lawful basis to set-off any amounts from the death benefit payable under the Kramer policy based on its belatedly raised allegations of aiding and abetting fraud. (*See id.* at ¶¶130-134 (Fourth Cross-Claim)).

- Damages in an amount not less than the face value of the Kramer policy, plus interest and attorney's fees. (*See id.* at ¶¶135-139 (Fifth Cross-Claim)).

## ARGUMENT

## I.  The Court Should Abstain From Hearing Mr. Berck's Cross-Claims.

### A.  The Abstention Standards.

In bringing his cross-claims before this Court, Mr. Berck seeks to avoid responding to the Connecticut Complaint and to frustrate Lincoln's attempts to seek redress for its claims in the Connecticut Action. However, in accordance with the abstention doctrine, this Court should abstain from hearing, and dismiss, Mr. Berck's cross-claims against Lincoln in this action.

The doctrine of abstention has long been recognized as a means by which federal courts avoid unnecessary interference with pending state proceedings. Although the Supreme Court historically held that federal courts need not abstain from civil actions solely because there was parallel state litigation,[8] the Court extended and expanded the applicability of the abstention

---

[8]     *See Younger v. Harris,* 401 U.S. 37 (1971) (pending state criminal proceeding); *Burford v. Sun Oil Co.,* 319 U.S. 315 (1943) (abstention appropriate to avoid interference with attempts to establish coherent state

doctrine through a series of decisions beginning in 1942.  In *Brillhart v. Excess Ins. Co.*, 316 U.S. 491 (1942), the Supreme Court upheld a district court's abstention from a diversity suit requesting a declaratory judgment because of similar pending state litigation.  *Id.* at 495.  The Court indicated that it was appropriate for a district court to refrain from exercising jurisdiction when it was convinced the matter would be adequately resolved in the state court proceeding.  *Id.*

The Supreme Court later provided guidance in *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817 (1976) and *Moses H. Cone Memorial Hospital v. Mercury Constr. Co.*, 460 U.S. 1, 15-16 (1983), advising that abstention was appropriate when "exceptional circumstances" existed.  Courts were left with six factors to apply to determine whether exceptional circumstances are present in a case and abstention is proper.  *See De Cisneros v. Younger*, 871 F.2d 305, 307 (2d Cir. 1989).  Those factors, referred to as the *Colorado River* factors, are: "(1) assumption of jurisdiction over a *res*; (2) inconvenience of the forum; (3) avoidance of piecemeal litigation; (4) order in which the actions were filed; (5) the law that provides the rule of decision; and (6) protection of the federal plaintiff's rights."  *Id.*

In *Wilton v. Seven Falls Co.,* 515 U.S. 277, 289-90 (1995), the Court clarified the district courts' broad authority to abstain from actions brought under the Federal Declaratory Judgment Act, 28 U.S.C. Section 2201, *et seq.*  Under *Wilton*, a district court has "greater discretion" to abstain or grant a stay "in declaratory judgment actions than that permitted under the 'exceptional circumstances' test of *Colorado River*."  *Id.* at 286; *see also Nat'l Union Fire Ins. Co. v. Karp*, 108 F.3d 17, 20 (2d Cir. 1997); *Nat'l Union Fire Ins. Co. v. Titeflex Corp.*, 2008 U.S. Dist. LEXIS 27985, at *11-18 (S.D.N.Y. Mar. 11, 2008).  Applying the *Wilton* standard, or

---

policy and issues of peculiarly local concern); *Railroad Comm'n of Texas v. Pullman Co.,* 312 U.S. 496 (1941) (federal court should abstain to avoid unnecessary resolution of a constitutional issue that might be mooted by state court construction of a state law).

even the stricter *Colorado River* standard, to the cross-claims brought by Mr. Berck leads to the conclusion that abstention is appropriate.

>    **B.     This Court Should Abstain From Providing A Forum For Mr. Berck's Cross-Claims Pursuant To *Wilton*.**

In *Wilton,* the Supreme Court clarified the district courts' broad authority to abstain from actions brought under the Federal Declaratory Judgment Act. *See Wilton,* 515 U.S. at 289-90. Under *Wilton*, a district court may abstain from hearing an action brought pursuant to the Federal Declaratory Judgment Act when "considerations of practicality and wise judicial administration" dictate, without the application or consideration of the *Colorado River* factors. *See id.* at 286, 288. Under *Wilton*, a district court need only be convinced that that the claims at issue can be "satisfactorily adjudicated" in the state court in order for abstention to be proper. *Id.*

The relief sought by Mr. Berck in his cross-claims is declaratory in nature.[9] Mr. Berck seeks a declaration that the Kramer policy is valid and enforceable; that the August Trust is entitled to payment of the death benefits under the Kramer policy; and that Lincoln is not entitled to a setoff against such benefits based upon Mr. Berck's participation in a civil conspiracy and aiding and abetting fraud in connection with the procurement of the Kramer and/or Lobel policies. As in *Wilton*, the Connecticut Action provides "another suit involving the same parties and presenting opportunity for ventilation of the same state law issues" in a state court action. *See Wilton*, 515 U.S. at 283; *see also Titeflex Corp.*, 2008 U.S. Dist. LEXIS 27985, at *22 (finding no abuse of discretion in trial court's decision to abstain in an interpleader action when

---

[9]     With the exception of the fifth cross-claim alleging a violation of New York General Business Law Section 349 (for which there are independent grounds for dismissal as set forth in Section II, *infra*), the other cross-claims seek declaratory relief. This is true even though Mr. Berck has titled his first cross-claim as a breach of contract claim because, pursuant to that claim, Mr. Berck seeks declaratory relief as to his rights under the Kramer policy as a precursor to any possible award of damages. To the extent, however, that Mr. Berck should argue that he is seeking a combination of declaratory relief and damages, courts have recognized that the *Wilton* standard still applies where such combined relief is sought. *See Titeflex Corp.*, 2008 U.S. Dist. LEXIS 27985, at *13.

trial court applied the *Wilton* standard and found the state court could satisfactorily adjudicate the claims). Exercising jurisdiction over Mr. Berck's cross-claims would result in a federal court's "gratuitous interference" (at Mr. Berck's request), and would be "uneconomical as well as vexatious" in light of the pending suit in Connecticut "presenting the same issues, not governed by federal law, between the same parties." *Wilton*, 515 U.S. at 282-283. Accordingly, abstention under *Wilton* is appropriate.

### C. This Court Should Abstain From Providing A Forum For Mr. Berck's Cross-Claims Pursuant To *Colorado River*.

Even if the stricter *Colorado River* standard is applied (notwithstanding the declaratory relief sought by Mr. Berck), the *Colorado River* factors weigh in favor of this Court abstaining from hearing the cross-claims against Lincoln, and deferring adjudication of those matters to the ongoing proceedings in the Connecticut Action. Specifically, the desire to avoid piecemeal and duplicative litigation that will invariably result if both actions are permitted to proceed and the lack of the implication of any federal law weigh heavily towards abstention. *See Goldentree Asset Mgmt., L.P. v. Longaberger Co.*, 448 F. Supp. 2d 589, 595 (S.D.N.Y. 2006) (the balance of factors, especially the weight of the avoidance of piecemeal litigation indicates abstention is warranted). Further, no single factor strongly suggests this Court should retain this matter. *See Titeflex Corp.*, 2008 U.S. Dist. LEXIS 27985, at *31 ("although several of the *Colorado River* factors may favor the retention of federal jurisdiction, none can fairly be characterized as 'strongly' suggesting that result").

The initial inquiry under *Colorado River* is to ascertain whether there are, in fact, parallel or concurrent suits. *See Karp*, 108 F.3d at 22. Proceedings are considered "concurrent" or "parallel" for the purposes of abstention when the matters are "essentially the same; that is, there is an identity of parties, and the issues and relief sought are the same." *Id.*; *see also Arkwright-*

*Boston Mfrs. Mut. Ins. Co. v. City of New York,* 762 F.2d 205, 211 (2d Cir. 1985); *Nieves v. Board of Educ.*, 2006 U.S. Dist. LEXIS 81238, at *2 (E.D.N.Y. Sept. 15, 2006); *Bernstein v. Hosiery Mfg. Corp.*, 850 F. Supp. 176, 184 (E.D.N.Y. 1994).

In determining whether there are parallel or concurrent lawsuits, it is important to note the progression of events. Plaintiff's original complaint (filed on March 10, 2008) and amended complaint (filed on May 7, 2008) are limited to asserting claims seeking to recover the death benefit under the Kramer policy. Lincoln's Connecticut Complaint (filed on April 16, 2008) is more expansive than the Kramer complaint. Lincoln asserts claims relating not only to the Kramer policy but also relating to the Lobel policy and joins as defendants Banknorth and Mr. Miller (who are not parties to this action). By asserting its cross-claims against Lincoln in this action more than three months later (on August 1, 2008), Mr. Berck seeks to create a lawsuit duplicative of the Connecticut Action – asserting claims that relate to the identical subject matter of the Connecticut Action and are a mirror image of Lincoln's claims in the Connecticut Action.[10]

### 1.    The *Colorado River* Factor Of "Assumption Of Jurisdiction Over A *Res*" Is Inapplicable.

This factor is inapplicable because Mr. Berck's cross-claims do not involve any *res* or property over which this Court or the Connecticut state court has asserted jurisdiction.

### 2.    The *Colorado River* Factor Of "Inconvenience Of The Forum" Weighs In Favor Of Abstention.

In evaluating this factor, courts have examined the physical proximity of the federal and state court fora to the evidence and witnesses, and the relative convenience of the two fora. *See Village of Westfield v. Welch's,* 170 F.3d 116, 122 (2d Cir. 1999); *Titeflex Corp.*, 2008 U.S. Dist.

---

[10]    Mr. Berck also has the ability to assert his claims against Lincoln as counterclaims in the Connecticut Action.

LEXIS 27985, at *23; *Goldentree Asset Mgmt.*, 448 F. Supp. 2d at 593; *Mouchantaf v. Int'l Modeling & Talent Ass'n*, 368 F. Supp. 2d 303, 306-07 (S.D.N.Y. 2005). As addressed *infra* in connection with Lincoln's motion to dismiss on *forum non conveniens* grounds, although some of the evidence and witnesses relevant to Mr. Berck's cross-claims may be in New York, much of the evidence and many of the witnesses are located in Connecticut. Lincoln's Hartford, Connecticut office handled the underwriting and administration of the policies at issue. Lincoln employees involved with these policies are located in Connecticut and plaintiff Alice Kramer resides in Connecticut.

### 3. The *Colorado River* Factor Of "Avoidance Of Piecemeal Litigation" Weighs In Favor of Abstention.

Courts have routinely placed great emphasis on the desire and need to avoid piecemeal litigation, noting it is the most important of the *Colorado River* factors for consideration. *See Arkwright-Boston*, 762 F.2d at 211 ("the danger of piecemeal litigation is the paramount consideration"); *General Star Int'l Indem., Ltd. v. Chase Manhattan Bank*, 2003 U.S. App. LEXIS 2318, at *5-6 (2d Cir. Feb. 7, 2003) (affirming decision to abstain largely on the basis of the risk of piecemeal litigation even though several factors favored the retention in a case where certain parties in the state court action were not parties to the federal court action); *Goldentree Asset Mgmt.*, 448 F. Supp. 2d at 594 ("the most important factor in our decision to approve the dismissal [in *Colorado River*] was the 'clear federal policy . . . [of] avoidance of piecemeal litigation'") (citation omitted); *Titeflex Corp.*, 2008 U.S. Dist. LEXIS 27985, at *25 ("Maintaining virtually identical suits in two forums under these circumstances would waste judicial resources and invite duplicative effort"). These "problems can best be avoided by having the parties' disputes, which arise out of a single set of facts, heard in a single forum." *Titeflex Corp.*, 2008 U.S. Dist. LEXIS 27985, at *25.

In finding abstention appropriate, the Second Circuit noted that: "[m]aintaining virtually identical suits [arising out of the same set of facts] in two forums . . . would waste judicial resources and invite duplicative effort . . . [A]voidance of piecemeal litigation is best served by leaving these suits in the state court." *Arkwright-Boston*, 762 F.2d at 211.  In *Arkwright-Boston*, the state and federal actions involved the same parties and identical claims. *Id*.  The *Arkwright-Boston* court reasoned that the "existence of such concurrent proceedings creates the serious potential for spawning an unseemly and destructive race to see which forum can resolve the same issues first." *Id*. at 211.

As in *Arkwright-Boston*, allowing Mr. Berck to assert his cross-claims against Lincoln in this action will create duplicative litigation, waste judicial resources, and lead to piecemeal and potentially conflicting results.  If this Court and the Connecticut state court arrived at different results with respect to the claims of Lincoln and Mr. Berck, it would be the exact situation the abstention doctrine was developed to avoid.  *See Arkwright-Boston*, 762 F.2d at 211 ("inconsistent disposition of these claims between two concurrent forums would breed additional litigation on assertions of claim and issue preclusion. This could burden the parties for years to come"); *De Cisneros*, 871 F.2d at 308 ("central problem with piecemeal adjudication in this case, as the district court noted, is that a potential exists for 'inconsistent and mutually contradictory determinations.'"); *General Star Int'l Indemn., Ltd.,* 2003 U.S. App. LEXIS 2318, at *5 (finding abstention proper when there was a real risk of inconsistent outcomes when all parties to the state action were not parties to the federal action).

Courts have recognized that where, as here, the "state proceedings are more comprehensive than the federal proceedings," abstention is proper.  *See De Cisneros*, 871 F.2d at 308.  The issues raised by plaintiff in this action are limited to the Kramer policy and seeking

13

payment of the death benefit under the Kramer policy to the Kramer Estate.  Lincoln's claims in

the Connecticut Action are much broader and relate not only to the Kramer policy, but also to the

Lobel policy, and include defendants (Banknorth and Mr. Miller) who are not even parties to this

action.  Instead of asserting its claims as counterclaims against Lincoln in the Connecticut Action

as he should, Mr. Berck seeks to interject the Lobel policy into this action and burden this Court

and the parties with issues that go well beyond the scope of those raised by plaintiff in her

complaint.  Mr. Berck's cross-claims here are nothing more than a mirror image of Lincoln's

Connecticut claims and simply seek to negate the relief sought by Lincoln in the Connecticut

Action.  This Court should exercise its power to abstain from entertaining the cross-claims of

Mr. Berck, leaving him with the ability to assert his claims as counterclaims against Lincoln in

the Connecticut Action.

**4.    The *Colorado River* Factor Of  The "Order In Which The Actions Were Filed" Either Weighs In Favor Of Abstention Or Is Neutral.**

Although plaintiff's complaint was filed before the Connecticut Action was initiated, the

Connecticut Action should be deemed the "first filed" action for abstention purposes because it

was the first action in which claims arising from the Kramer and Lobel policies were asserted.[11]

It was not until over three months later – on August 1, 2008 – that Mr. Berck decided to assert

cross-claims against Lincoln in this action that are a mirror image of those asserted by Lincoln in

the Connecticut Action.

Moreover, in applying this factor, courts have recognized that "speed does not carry

much weight with regard to abstention" and that the resolution of this factor "does not rest on a

race to the courthouse."  *See Titeflex Corp.*, 2008 U.S. Dist. LEXIS 27985, at *26 (citations

---

[11]    Although plaintiff filed her original complaint in this action on March 10, 2008, her claims were limited to seeking recovery of the death benefits under policies issued by the insurers and insuring the life of Mr. Kramer.

omitted); *Bernstein*, 850 F. Supp. at 184.  Instead, courts examine how much progress has been

made in each action.  *See Arkwright-Boston*, 762 F.2d at 211; *Bernstein*, 850 F. Supp. at 184.

This action has not progressed beyond the Connecticut Action.  Both this action and the

Connecticut Action are at the pleading and preliminary motion stage.[12]  Accordingly this factor

also favors abstention.

> **5.     The *Colorado River* Factor Of "The Law That Provides The Rule Of
> Decision" Weighs In Favor Of Abstention.**

Because Mr. Berck's claims do not implicate any federal law, this factor weighs in favor

of abstention.  *See De Cisneros*, 871 F.2d at 309; *Telesco v. Telesco Fuel and Masons'*

*Materials, Inc.*, 765 F.2d 356, 363 (2d Cir. 1985); *Titeflex Corp.*, 2008 U.S. Dist. LEXIS 27985,

at *27.  In addressing this factor, the Second Circuit has recognized that "although the absence of

federal issues does not require the surrender of jurisdiction, it does favor abstention where 'the

bulk of the litigation would necessarily revolve around the state-law...rights' of

[numerous]…parties."  *See De Cisneros*, 871 F.2d at 309.

> **6.     The *Colorado River* Factor Of "Protection Of The Federal Plaintiff's
> Rights" Weighs In Favor Of Abstention.**

This factor weighs in favor of abstention because Mr. Berck's claims do not invoke any

federal rights.  *See De Cisneros*, 871 F.2d at 309; *Radioactive, J.V. v. Manson*, 153 F. Supp. 2d

462, 476 (S.D.N.Y. 2001).  The cross-claims of Mr. Berck pertain to rights under insurance

contracts, which are governed exclusively by state law.

---

[12]    Currently, the Connecticut court is entertaining motions to dismiss based on jurisdictional challenges and *forum non conveniens* grounds by several defendants, as well as motions to compel discovery related to the jurisdictional motions.  *See* Case History of the Connecticut Action, attached hereto as Exhibit 3.

II.    **The Court Should Dismiss Mr. Berck's Cross-Claims
On *Forum Non Conveniens* Grounds.**

The doctrine of *forum non conveniens* permits a court to "resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute," if dismissal would "best serve the convenience of the parties and the ends of justice." *Murray v. BBC*, 81 F.3d 287, 290 (2d Cir. 1996) (citations omitted). A district court should dismiss a complaint "where, on balance, the resolution of the matter in an adequate alternative forum would be more convenient for the parties and courts and more just." *See Lasala v. Lloyds TSB Bank, PLC*, 514 F. Supp. 2d 454, 455 (S.D.N.Y. 2007).

*Forum non conveniens* determinations rest within the sound discretion of the district court, with the "central purpose" of the analysis being to determine "whether a trial will be most convenient and will serve the interest of justice." *See Aguas Lenders Recovery Group, LLC v. Suez S.A.,* 2008 U.S. Dist. LEXIS 16283, at *12 (S.D.N.Y. Mar. 7, 2008). The three-step *forum non conveniens* analysis examines: (1) the amount of deference owed to plaintiff; (2) whether an adequate alternative forum exists; and, (3) if an alternative forum exists, a balance of the private and public interest factors to decide, based on weighing the relative hardships involved, whether the case should be adjudicated in the plaintiff's chosen forum or in the alternative forum suggested by the defendant. *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981); *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947); *Pollux Holding, Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 70 (2d Cir. 2003).

A.    **No Deference Should Be Given To Mr. Berck's Chosen Forum.**

Although a plaintiff's choice of forum is normally entitled to some degree of deference, the Court should not give any deference to Mr. Berck's selection of this forum for his cross-claims against Lincoln because he has engaged in forum shopping. *See Iragorri v. United Techs.*

16

*Corp.*, 274 F.3d 65, 72 (2d Cir. 2001). Where there are forum shopping indicators, "the less deference the plaintiff's choice commands and, consequently, the easier it becomes for the defendant to succeed on a *forum non conveniens* motion by showing that convenience would be better served by litigating" in another court. *See id.* Indeed, where there are "indicia of forum shopping, the presumption in favor of the plaintiff's choice of forum '*may not apply, either at all or with full force*.'" *See Omollo v. Citibank, N.A.*, 2008 U.S. Dist. LEXIS 36917, at *14 (S.D.N.Y. May 6, 2008) (emphasis added).

Mr. Berck's choice of this forum to assert his cross-claims against Lincoln is demonstrably motivated by forum shopping. Lincoln asserted its STOLI claims in connection with the two life insurance policies at issue – the Kramer and Lobel policies – in the Connecticut Action on April 16, 2008. Lincoln's claims are much more comprehensive (and involve more parties) than the limited claims in this action by plaintiff to compel the payment of a death benefit under the Kramer policy. Instead of asserting his claims against Lincoln as counterclaims in the Connecticut Action, Mr. Berck chose to assert cross-claims in this action more than three months later on August 1, 2008. Mr. Berck's cross-claims are not merely similar to the claims asserted by Lincoln, they are duplicative, mirror-image claims that attempt to rebut and negate Lincoln's claims against Mr. Berck in the Connecticut Action. (*See supra* pp. 4-7).

### B.    An Adequate Alternative Forum Exists.

In deciding whether to dismiss a pleading on *forum non conveniens* grounds, the court must determine if an adequate alternative forum exists for the litigation of the claims at issue. *See Usha (India), Ltd. v. Honeywell Int'l, Inc.*, 421 F.3d 129, 134 (2d Cir. 2005). The *forum non conveniens* doctrine presumes that there are at least two fora in which the action may proceed.

*See BFI Group Divino Corp. v. JSC Russian Aluminum*, 481 F. Supp. 2d 274, 279 (S.D.N.Y. 2007).  An alternative forum is considered adequate "if the defendants are amenable to service of process there, and if it permits litigation of the subject matter of the dispute*." See Pollux Holding*, 329 F.3d at 75; *Bank of Credit & Commerce Int'l (Overseas) Ltd. v. State Bank of Pakistan*, 273 F.3d 241, 246 (2d Cir. 2001); *Murray*, 81 F.3d at 292.  Here, the state court in Hartford is clearly an adequate alternative forum for the litigation of Mr. Berck's cross-claims. Lincoln has initiated the Connecticut Action, and there are no impediments to Mr. Berck asserting his cross-claims against Lincoln as counterclaims in the Connecticut Action.  *See Alcoa S.S. Co. v. M/V Nordic Regent*, 654 F.2d 147 (2d Cir. 1980) (affirming district court's *forum non conveniens* dismissal, holding that dismissal would not leave plaintiff without any remedy because defendant had already commenced an action in another jurisdiction).

### C.     The Private Interest Factors Weigh In Favor Of Dismissing Mr. Berck's Cross-Claims.

After determining whether there is an adequate alternative forum, the court should then "balance private and public interest factors to ascertain whether the case should be adjudicated in plaintiff's chosen forum or in the alternative forum proposed by defendant."  *See Pollux Holding*, 329 F.3d at 74-75; *Iragorri*, 274 F.3d at 73.  This involves weighing the defendant's hardships if jurisdiction is retained in the forum of plaintiff's choice against the plaintiff's hardships if the motion to dismiss is granted and plaintiff is forced to begin suit anew in a different forum. *Pollux Holding*, 329 F.3d at 75.  The private interest factors include "(1) the relative ease of access to sources of proof, (2) availability of compulsory process for attendance of unwilling witnesses, and the cost of obtaining attendance of willing witnesses, and (3) all other practical problems that make trial of a case easy, expeditious and inexpensive."  *See id*.; *Allstate Life Ins. Co. v. Linter Group*, 994 F.2d 996, 1001 (2d Cir. 1993) (citing to *Gilbert*).  The private interest

factors pertain to the convenience of the parties.  *See Monegasque de Reassurances S.A.M. (Monde Re) v. Nak Naftogaz of Ukraine*, 311 F.3d 488, 500 (2d Cir. 2002); *Iragorri*, 274 F.3d at 73.

These private interest factors weigh in favor of the dismissal of Mr. Berck's cross-claims. Although some of the evidence and witnesses relevant to the cross-claims of Mr. Berck may be in New York, much of the evidence and many of the witnesses are located in Connecticut.  As noted above, Lincoln's Hartford office handled the underwriting and administration of the policies at issue, Lincoln employees involved with these policies are located in Connecticut, and plaintiff Alice Kramer resides in Connecticut.  (*See* Connecticut Complaint at ¶¶25-26, 30-32, 35-37, 44-47, 65, 68, 74, 76, 78-79; Plaintiff's Amended Complaint at ¶1).

   **D.     The Public Interest Factors Weigh In Favor Of Dismissing Mr. Berck's Cross-Claims.**

In determining whether to grant a *forum non conveniens* motion, the court also examines public interest factors, which include: (1) practical problems involving the efficiency and expense of a trial; (2) enforceability of judgments; (3) administrative difficulties flowing from court congestion; (4) imposing jury duty on citizens of the forum; (5) the local interest in having controversies decided at home; and (6) the avoidance of unnecessary problems in the application of foreign law.  *See Linter Group*, 994 F.2d at 1001 (citing to *Gilbert*).

These public interest factors also weigh in favor of dismissing Mr. Berck's cross-claims. Connecticut has a strong local interest in the transactions at issue here because, as described *supra* pp. 4-5: (i) the policies at issue insured Connecticut residents; (ii) the underwriting and administration of these policies occurred at Lincoln's offices in Hartford, Connecticut; and (iii) the misrepresentations at issue were directed to Lincoln at its Hartford office.  *See Pollux Holding*, 329 F.3d at 76 (foreign jurisdiction presented stronger local interest where alleged

fraud and misrepresentations primarily occurred there). Under these circumstances, Connecticut clearly has an interest in the claims at issue.

Moreover, the court congestion factor clearly weighs in favor of dismissing Mr. Berck's cross-claims in deference to the Connection Action. It is well-recognized that the Southern District of New York is a congested district in contrast to the docket in Connecticut state court. *Compare BFI Group*, 481 F. Supp. 2d at 284 ("the courts in the Southern District of New York are heavily congested") *with Lake v. Bayer Corp.,* 2006 Conn. Super. LEXIS 2291, *36 (Conn. Super. Ct. July 25, 2006) (recognizing that the Connecticut civil docket was "in remarkably good shape," and noting that the number of jury trials in 2005 represented 13,000 below the level of 1998 and 3,500 cases below the level of 20 years ago).

Finally, the fact that the cross-claims asserted by Mr. Berck arise out of the exact same transactions at issue, and are duplicative of those claims that have already been asserted in the Connecticut Action, *see supra* pp. 4-7, weighs in favor of dismissal. *See Crosstown Songs U.K. Ltd. v. Spirit Music Group, Inc*., 513 F. Supp. 2d 13, 17 (S.D.N.Y. 2007). Mr. Berck's actions in this regard undermine the "economical use of judicial resources" and favor dismissal. *See Linter Group*, 994 F.2d at 1002. Indeed, Mr. Berck could assert his cross-claims as counterclaims in the Connecticut Action, thereby "saving the unwarranted waste of judicial resources that would result from the trial of claims arising out of the same facts" in both jurisdictions. *See Transunion Corp. v. PepsiCo, Inc*., 811 F.2d 127, 129 (2d Cir. 1987).

## III.    Mr. Berck's Fifth Cross-Claim Alleging Violations of New York General Business Law Section 349 Should be Dismissed For Failure To State A Claim.

Even if this Court decides not to abstain or dismiss Mr. Berck's cross-claims on *forum non conveniens* grounds, this Court should, nonetheless, dismiss Mr. Berck's fifth cross-claim pursuant to New York General Business Law Section 349 because it fails to state a claim upon

which relief can be granted against Lincoln.  Courts have unequivocally rejected attempts by litigants to recast garden-variety insurance coverage disputes as violations of New York's Consumer-Protective Deceptive Practices Act.

Mr. Berck's cross-claim fails to set forth the requisite threshold elements of a viable claim under New York General Business Law Section 349.  Asserting a claim under this statute requires, at a minimum, establishing three requisite elements: "first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act."  *See Stutman v. Chemical Bank*, 95 N.Y.2d 24, 29 (2000).

To meet the first element of a valid claim under Section 349, a claimant must, at the outset, "charge conduct of the defendant that is consumer-oriented."  *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 25 (1995).  The New York Court of Appeals has held that for conduct to be adjudged "consumer-oriented," and therefore potentially actionable under Section 349, the acts or practices at issue "must have a broad impact on consumers at large."  *New York University v. Continental Ins. Co.*, 87 N.Y.2d 308, 320 (1995). This is why "[p]rivate contract disputes, unique to the parties … would not fall within the ambit of the statute."  *See Oswego*, 85 N.Y.2d at 25.

The fifth cross-claim asserted by Mr. Berck against Lincoln represents nothing more than a dispute between two private parties over specific life insurance policies and, as such, is not actionable under Section 349.  The requirement that the practices complained of must amount to more than a private contract dispute between the parties is particularly relevant in the context of insurance, as it has become increasingly common for insureds to attempt to masquerade simple coverage disputes as Section 349 claims.  These attempts have been soundly rejected by New

York courts.  As noted by the district court in *DePasquale v. Allstate Ins. Co.*, 179 F. Supp. 2d 51 (E.D.N.Y. 2002), "[s]everal courts have considered whether disputes between policy holders and insurance companies concerning the scope of coverage can amount to conduct falling within Section 349.  *Almost uniformly*, those courts have held that such disputes are nothing more than private contractual disputes that lack the consumer impact necessary to state a claim pursuant to Section 349."  *Id.* at 62  (emphasis added); *see also Sec. Mut. Life Ins. Co. v. DiPasquale*, 724 N.Y.S.2d 594, 594 (N.Y. App. Div. 2001) (affirming the dismissal of a Section 349 counterclaim, on the basis that the case was no more than a private contract dispute, its facts centered upon a "decision as to coverage, made on the basis of facts concerning [a] particular insured"); *Fekete v. GA Ins. Co.*, 719 N.Y.S.2d 52, 53 (N.Y. App. Div. 2001) (affirming trial court's order denying plaintiff's motion to amend his complaint to assert a claim under Section 349 holding that such a claim is "plainly lacking in merit" and that "[p]rivate contract disputes regarding policy coverage and the processing of a claim that is unique to the parties and does not fall within the ambit of General Business Law § 349"); *Korn v. First UNUM Life Ins. Co.*, 717 N.Y.S.2d 606, 606 (N.Y. App. Div. 2000) (because the "complaint essentially alleges a private contract dispute over policy coverage that is unique to the parties, rather than conduct that affects consumers at large, the complaint fails to state a cause of action pursuant" to Section 349).

Mr. Berck is attempting to convert his dispute with Lincoln over two specific life insurance policies into a Section 349 claim and falls far short of the mark because he fails to allege facts sufficient to demonstrate there has been any broad impact on consumers at large. Indeed, Mr. Berck makes no allegation that there has been an effect on consumers at large, but has simply alleged that "policy applicants, holders, purchasers and beneficiaries were led to believe that claims for payment under such policies would be investigated and processed in good

faith and in a timely manner," and that "Lincoln has failed to do so with respect to the policy at issue." (*See* Mr. Berck's Answer at ¶137).

This dispute under the two policies at issue is precisely the sort of "private contract dispute" that the court in *Oswego* held could not form the basis of a Section 349 claim. It is unique to the parties, and, indeed, the only parties affected are the parties to this action, not the public at large. *See Genesco Entm't, Div. of Lymutt Indus., Inc. v. Koch*, 593 F. Supp. 743, 752 (S.D.N.Y. 1984) ("The only parties truly affected by the alleged misrepresentations in this case are the plaintiff and the defendants. 'A breach of a private contract affecting no one but the parties to the contract, whether that breach be negligent or intentional, is not an act or practice affecting the public interest'"). The fact that the only relief sought by Mr. Berck is for the trust's monetary benefit also demonstrates the private nature of this dispute. *See Highlands Ins. Co. v. PRG Brokerage, Inc.*, 2004 U.S. Dist. LEXIS 83, at *30 (S.D.N.Y. Jan. 5, 2004) (in dismissing the Section 349 claims, observing that the damages sought were "purely private in nature and relate[d] only to monetary losses" that plaintiff allegedly suffered).

Moreover, the large monetary amount of the death benefit at issue also evidences that the claims at issue do not involve the type of "modest" transaction that the statute was intended to address. *See Lava Trading, Inc. v. Hartford Fire Ins. Co.*, 326 F. Supp. 2d 434, 439 (S.D.N.Y. 2004) (where plaintiff alleged it was owed millions under the policy, "[c]learly 'this was not the "modest" type of transaction the statute was primarily intended to reach,' but rather is 'essentially a "private" contract dispute over policy coverage and the processing of a claim which is unique to these parties, not conduct which affects the consuming public at large'"); *see also Koch*, 593 F. Supp. at 751-52 ("New York cases where plaintiffs have recovered under

section 349(h) further reflect its consumer orientation since they uniformly involve transactions where the amount in controversy is small").

In an attempt to save his purported claim, Mr. Berck makes two allegations which fail as a matter of law: (1) the policy "issued to the August Trust was a standard form policy sold by Lincoln to other consumers"; and (2) Lincoln has failed to investigate and pay the death benefits in accordance with the terms of the policies on "other similar policies." (*See* Mr. Berck's Answer at ¶¶138-139). The fact that the Lincoln policies were issued on a "standard" policy form has no bearing on the question of whether "consumer conduct" has been established for purposes of an alleged Section 349 claim. The policy forms at issue, like all policy forms, are duly approved by state regulatory agencies in advance of distribution to consumers.

Mr. Berck's reference to hypothetical "other similar policies" also fails to save his Section 349 claim. (*See* Mr. Berck's Answer at ¶137). This is simply a tactical ploy, rejected by other courts, to convert garden-variety coverage disputes into consumer practices claims. *See Magee v. Paul Revere Life Ins. Co.*, 954 F. Supp. 582, 586 (E.D.N.Y. 1997) (dismissing a Section 349 claim, holding that the plaintiff's allegations of a "national policy to terminate unprofitable disability insurance policies" on the part of the defendant – unsupported by any facts that would give rise to such an inference – could not establish broad consumer effect); *Lava Trading*, 326 F. Supp. 2d at 438 (granting motion to dismiss a Section 349 claim, holding that "conclusory allegations, even of the existence of a claim settlement policy designed to deceive the public, are not sufficient to state a claim under Section 349 in the absence of factual allegations in support thereof").

Accordingly, Mr. Berck's fifth cross-claim for an alleged violation of New York General Business Law Section 349 must be dismissed for failure to state a claim upon which relief can be granted.

## **CONCLUSION**

For each of the foregoing reasons, this Court should (i) dismiss Mr. Berck's cross-claims against Lincoln under the doctrines of abstention and *forum non conveniens*; or (ii) even if this Court decides not to abstain or dismiss Mr. Berck's cross-claims on abstention or *forum non conveniens* grounds, this Court should, nonetheless, dismiss Mr. Berck's fifth cross-claim pursuant to New York General Business Law Section 349 because it fails to state a claim upon which relief can be granted.

Respectfully submitted,

Dated: August 25, 2008

DRINKER BIDDLE & REATH LLP

/s/ Elizabeth L. McLachlan
Elizabeth L. McLachlan (*pro hac vice*)
Michael J. Miller (*pro hac vice*)
Charles J. Vinicombe (*pro hac vice*)
Katherine L. Villanueva (KH 5283)
One Logan Square
18th and Cherry Sts.
Philadelphia, PA 19103
(215) 988-2700
*elizabeth.mclachlan@dbr.com*
*michael.miller@dbr.com*
*charles.vinicombe@dbr.com*
*katherine.villanueva@dbr.com*

For Defendant Lincoln Life & Annuity Company of New York

## <u>CERTIFICATE OF SERVICE</u>

I, Elizabeth L. McLachlan, hereby certify that, on the date set forth below, I electronically filed copies of (1) Memorandum of Law of Defendant Lincoln Life & Annuity Company of New York in Support of its Motion to Dismiss the Cross-Claims of Defendant Jonathan S. Berck, and (2) Affidavit of Elizabeth L. McLachlan, using the CM/ECF system, which will send notification of such filings to CM/ECF participants.

I also hereby certify that on the date set forth below, I submitted courtesy copies of the aforementioned, marked as courtesy copies, by overnight Federal Express to the following:

The Honorable Deborah A. Batts, USDJ
United States Courthouse
500 Pearl St., Room 2510
New York, NY 10007
(two copies)


/s/ Elizabeth L. McLachlan
Elizabeth L. McLachlan (*pro hac vice*)
Drinker Biddle & Reath LLP
One Logan Square
18th and Cherry Sts.
Philadelphia, PA 19103


Dated: August 25, 2008

# EXHIBIT 1
# (Part 1)

2008 U.S. Dist. LEXIS 16283, *

**AGUAS LENDERS RECOVERY GROUP, LLC, Plaintiff, -against- SUEZ S.A., SOCIEDAD GENERAL DE AGUAS DE BARCELONA, S.A., AND AGUA Y SANEAMIENTOS ARGENTINOS S.A., Defendants.**

**06 Civ. 7873 (RLC)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2008 U.S. Dist. LEXIS 16283*

**March 3, 2008, Decided**
**March 7, 2008, Filed**

**COUNSEL:** [*1] PROSKAUER ROSE LLP, Attorneys for Plaintiff, New York, NY, LOUIS M. SOLOMON, Of Counsel.

SIMPSON THACHER & BARTLETT LLP, Attorneys for Defendant, New York, NY, JOHN J. KERR, JR., Of Counsel.

**JUDGES:** ROBERT L. CARTER, U.S.D.J.

**OPINION BY:** ROBERT L. CARTER

**OPINION**

ROBERT L. CARTER, District Judge

Currently before the court is Agua y Saneamientos Argentinos, S.A.'s (hereinafter "AySA"), motion to dismiss and motion to stay the lawsuit pursuant to the doctrine of forum non onveniens and *Rule 12(b)(3), F.R. Civ. P.* [1] For the reasons herein, the court grants defendant's motion to dismiss the lawsuit pursuant to forum non conveniens.

> 1 The lawsuit was initially brought against Agua y Saneamientos Argentinos, S.A. (hereinafter "AySA"), Suez, S.A., and Sociedad General de Aguas de Barcelona, S.A. The latter two parties subsequently settled their disputes with the plaintiff.

**BACKGROUND**

2

> 2 The following facts have been gathered by looking to the plaintiff's complaint. However, where appropriate, the court has also looked to the parties' motion papers, affidavits, and declara-

tions, drawing all reasonable inferences and resolving factual conflicts in favor of the plaintiff.

When deciding a motion to dismiss on the basis of improper [*2] venue, the "court must take all allegations in the complaint as true, unless contradicted by the defendants' affidavits. When an allegation is so challenged, a court may examine facts outside the complaint to determine whether venue is proper. The court must draw all reasonable inferences and resolve all factual conflicts in favor of the plaintiff." *E.P.A. ex rel. McKeown v. Port Authority, 162 F. Supp. 2d 173, 183 (S.D.N.Y. 2001)*(Pauley, J.)(citations omitted). The relevant facts are as follows.

The government of Argentina decided to privatize the Buenos Aires water and sewer utility. It offered a thirty year concession to private companies to assume operation of the water and sewer system in Buenos Aires and its suburbs and to collect tariffs from customers. See Compl. P 31. The Argentine government organized the international bidding process to grant the concession in 1992. Id. The winning consortium was composed of seven companies, which became Aguas's initial shareholders: two French companies, Suez S.A., and Compagnie Generale des Eaux S.A.; a Spanish company, Agbar; a British company, Anglican Water Plc; and three Argentine companies, Sociedad Comercial del Plata S.A., Meller [*3] S.A., and Banco de Galicia y Buenos Aires S.A. Aguas was formed by a public deed dated February 16, 1993. Aguas and Argentina entered into a concession agreement on April 28, 1993. On May 16, 1993, Aguas's incorporation was completed in Buenos Aires as a joint stock company with an initial corporate capital of $ 120,000,000. As a company incorporated under Argentine law with its registered seat in Buenos Aires, all business and corporate records are kept in Argentina.

The concession agreement provided that upon commencement of the concession, the Argentine government

would permit Aguas to take possession of certain service assets, including treatment facilities, pipelines, commercial offices, and warehouses, for the purpose of fulfilling its obligations to provide water and sewage services. [3] Concession Agreement at 3.4 (Ex. 1). The concession agreement expressly stated that Aguas received no title to the service assets and would have no ownership rights. [4]

> 3   In relevant part, the concession agreement states: "On the date of Taking Possession, the Concessionaire shall acquire the possession of all assets allocated to the service and the development of the complementary activies used [*4] by OSN. . . ." Concession Agreement at 3.4 (Ex. 1).
> 4   The concession agreement indicates that title was not transferred to Aguas: "All the assets allocated both to the service and to the development of supplementary activities that were used by OSN, shall be transferred to the Concessionaire, *who shall have physical possession thereof but not title thereof.*" Concession Agreement at 6.2.1 (Ex. 1)(emphasis added).

In early 2002, Argentina passed Law N [degrees] .25.561, Ley de Emergencia Publica y de Reforma del Regimen Cambiario of January 6, 2002, and additional regulations that abolished the United States dollar-Argentine peso parity and any tariff indexation. In the following three months, the Argentine peso depreciated in value by seventy percent. The January 6, 2002 law abolished the adjustment of public service tariffs to reflect the increased costs. The law also imposed mandatory renegotiation with the Argentine government, which resulted in four years of negotiations between Aguas and the Argentine government.

In 2004, Aguas restructured its debt with its creditors. This agreement is contained in two interim financial agreements, or "IFAs." The IFAs contain express agreements [*5] to the following: 1) the agreements are governed by New York law; 2) the agents for service of process would be located in New York; 3) legal action arising out of these agreements may be brought in the courts of New York; 4) the parties waived objections based on forum non conveniens; 5) the parties may freely and unconditionally transfer, assign, or otherwise dispose of their rights to another; 6) there is a provision for enforceability of a New York judgment; and 7) the parties may acquire a waiver of sovereign immunity. See Pl.'s Mem. Opp. Mot. to Dismiss, at 10-11.

On July 26, 2005, Aguas initiated a contractually-established procedure for the termination of the concession, claiming that the Argentine state was not fulfilling its obligations under the concession. See Decl. Iriberri P

13. Aguas's termination notice was rejected by the Argentine government on December 22, 2005. Id.

Subsequently, Argentina issued Decree N [degrees] 303/06, terminating its concession with Aguas on March 21, 2006. The government cited an alleged excess in the content of nitrates found in certain subterranean water sources located at the water sites as the cause of the termination. Id. at P 14. On February [*6] 9, 2006, Aguas filed an action before the Argentine federal contentious administrative court N [degrees] 8 in Buenos Aires seeking a judicial confirmation that its termination notice was valid. Id. at P 17. It later amended this action to reflect the Argentine government's subsequent termination of the concession. The issue at stake at this proceeding, which is still pending before the Argentine court system, is a determination of which of the two parties is liable for the termination of the concession and the amount of termination compensation to be paid to Aguas. Id. at 18.

Following Aguas's termination from the concession, Argentina temporarily assumed operation of the sewage and water services that were provided by Aguas on March 21, 2006, the same day that Aguas's concession was terminated. [5] Argentina soon after incorporated a new entity, AySA, for the sole purpose of providing water and sewage services in the city of Buenos Aires. The water and sewage public service concession was then assigned to AySA. The Argentine government owns ninety percent of AySA's stock. AySA's employees own the remaining ten percent of its stock pursuant to an employee stock ownership program, which [*7] is statutorily mandated in Argentina. See Compl. P 21. AySA used the facilities and water lines that both Aguas and the Argentine government possessed while providing the sewage and water services to the Buenos Aires area. Id. at P 21.

> 5   "[T]he Argentine National Government is temporarily taking possession of the facilities. . .in their current state, fully and without dispute. . .and is temporarily reassuming the operation and provision of the drinking water and sewage service." AySA's Mem. In Supp. of Mot. to Dismiss, at 1; Acta de Toma de Posesion, dated Mar. 21, 2006, Ex. 17.

After the concession was terminated by the Argentine government, Aguas filed for protection from its creditors on April 28, 2006. See Decl. Iriberri P 25. The Aguas insolvency proceedings are currently pending before the commercial court N [degrees] 17 in Buenos Aires. Id. at P 27. Eleven unsecured lenders have filed claims against Aguas, in an aggregate principal amount of $ 123 million, arising out of the unsecured financial loans subject to this lawsuit. Id. at P 26. The eleven

2008 U.S. Dist. LEXIS 16283, *

creditors completed their filings in the Argentine proceeding on or before September 21, 2006. Id. at P 27.

Plaintiff, Aguas Lenders [*8] Recover Group, LLC, ("ALRG"), is a New York limited liability company. Its members are the original and successor parties to loans made to Aguas. See Pl.'s Mem. Opp. Mot. to Dismiss, at 5. Plaintiff's members include entities organized under the laws of Delaware, Germany, the Cayman Islands, the British Virgin Islands, and the Bahamas. Id. On September 29, 2006, plaintiff's members assigned to it claims to unpaid amounts due and owing under financing agreements with Aguas. The purpose of ALRG is to "collect and/or take action with respect to Claims, including, but not limited to, disposing of, enforcing, voting, or otherwise dealing with or taking action with respect to, the Claims, including, without limitation, collecting, litigation, holding, selling, exchanging, settling litigation, or otherwise." Id. The assignment also authorized plaintiff "to continue to pursue" claims in Aguas's Argentine insolvency proceeding in the names of the individual members.

This lawsuit was initially brought against AySA, and two of Aguas's original shareholders, Suez and Sociedad General de Aguas de Barcelona, on September 29, 2006--the same date as plaintiff's incorporation and its assignment to the [*9] relevant claims. The latter two defendants in the lawsuit subsequently settled their disputes with the plaintiff on October 24, 2007, and the claims against those parties were terminated on the same date.

As for the remaining claims, plaintiff argues that defendant is the successor in interest to Aguas, and therefore liable to plaintiff for Aguas's contractual and tortious violations to it. Specifically, plaintiff alleges that defendant is liable for the following: 1) breach of the Aguas loan facilities and IFAs as the successor in interest to Aguas; and 2) fraudulent transfer of Aguas's assets to AySA. See Compl. PP 119-122, 144-152.

Plaintiff argues that AySA is the successor to Aguas because Aguas's "entire business and all of Aguas's tangible and intangible assets were transferred, wholesale, to AySA in 2006." See Pl.'s Mem. Opp. Mot. to Dismiss, at 7. Plaintiff alleges that by taking over Aguas's assets, AySA is the successor in interest to Aguas's liabilities, including the financing and loan agreements at issue. Plaintiff originally argued that the defendants were bound to a New York forum because the two settled parties were signatories of the IFAs. Further, plaintiff argued [*10] that New York was a convenient forum because both of those parties are located in Europe, and New York was a convenient midway point for all of the parties.

Defendant counters that the lawsuit should be dismissed pursuant to forum non conveniens because New York is an inappropriate forum for this lawsuit. Defendant states that it is not a signatory to the IFAs that are the basis of plaintiff's argument that New York is a proper venue, noting that it did not even exist when the relevant financial agreements were created.

## DISCUSSION

The primary issue is whether New York is a proper venue for this lawsuit. In a Rule 12(b)(3), F. R. Civ. P., motion to dismiss based on improper venue, the burden of showing that New York is the proper forum for this lawsuit falls on the plaintiff. See E.P.A. ex rel. McKeown v. Port Authority, 162 F. Supp. 2d 173, 183 (S.D.N.Y. 2001)(Pauley, J.)(citations omitted).

Plaintiff argues that the court should not grant the motion to dismiss because the IFAs that were entered into between ALRG's members and Aguas contain waivers of all objections on the basis of forum non conveniens. Plaintiff claims that defendant is bound by these waivers as Aguas's successor in interest. [*11] Plaintiff argues that the court should apply the stricter forum non conveniens analysis required under M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 15, 92 S. Ct. 1907, 32 L. Ed. 2d 513 (holding that contractual forum selection clauses will be enforced absent strong showing of "fraud, undue influence, or overweening bargaining power" with respect to the clause itself), rather than the traditional forum non conveniens analysis.

Neither plaintiff nor defendant are parties to the IFAs. See Whittaker Decl. Ex. 12 and 13. The Second Circuit has suggested that district courts need not afford great deference to waivers of forum non conveniens upon non-signatories, even where the non-signatory is an alleged successor to the waiver. See Yung v. Lee, 160 Fed. Appx. 37, 40 (2d Cir. 2005)("[W]e are not convinced by plaintiffs' argument that a forum selection clause must be accorded special weight against non-signatories to the agreements."). Here, both parties are non-signatories to the IFAs, making an even stronger case for the forum waivers' inapplicability in this matter. Plaintiff cannot hold defendant liable for the forum waivers, where defendant was not a party to the relevant agreements and did not even exist when the [*12] agreements were created. As such, plaintiff's argument that the parties have contracted to use New York as their chosen forum is meritless. Consequently, traditional forum non conveniens analysis is required.

Forum non conveniens determinations are "committed to the sound discretion of the trial court. . .[and] may be reversed only when there has been a clear abuse of discretion." See Piper Aircraft Co. v. Reyno, 454 U.S. 235, 237, 102 S. Ct. 252, 70 L. Ed. 2d 419 (1981); see also R. Maganlal & Co. v. M.G. Chemical Co., 942 F.2d

*164, 167 (2d Cir. 1991)*("A district court has broad discretion in deciding whether to dismiss an action on grounds of forum non conveniens."). "The 'central purpose' of forum non conveniens analysis is to determine whether a trial will be most convenient and will serve the interest of justice." *Virgin Atlantic Airways Ltd. V. British Airways PLC, 872 F. Supp. 52, 61 (S.D.N.Y.1994)*(Cedarbaum, J.). A court may dismiss an action on the basis of forum non conveniens even where it is a "permissible venue with proper jurisdiction over the claim." See *Carey v. Bayerische Hypo-Und Vereinsbank AG, 370 F.3d 234, 237 (2d Cir. 2004)*(citations omitted). In fact, "A district court should dismiss a complaint [*13] where, on balance, the resolution of the matter in an adequate alternative forum would be more convenient for the parties and courts and more just." *La-Sala v. UBS, AG, 510 F. Supp. 2d 213, 221-22 (S.D.N.Y. 2007)*(Haight, J.)(citing *R. Maganlal & Co. v. M.G. Chem. Co., 942 F.2d 164, 167 (2d Cir. 1991))*.

Courts in this circuit engage in a three-step analysis when determining whether a lawsuit should be dismissed on the basis of forum non conveniens. First, the court must assess whether there is an adequate alternative forum for the lawsuit. Second, the court must determine the degree of deference to afford to the plaintiff's choice of forum. Third, the court must weigh the private and public interests to determine which forum would best serve the interests of convenience and justice.

### A. Existence of an Adequate Alternative Forum

The first inquiry in the forum non conveniens analysis is whether there is an adequate alternative forum for this lawsuit. The United States Supreme Court has held that this requirement is usually satisfied when the defendant is "amenable to process" in the alternative forum. See *Piper Aircraft Co. v. Reyno, 454 U.S. 235, 254 n. 22, 102 S. Ct. 252, 70 L. Ed. 2d 419 (1981)*. Specifically, the Second [*14] Circuit has formulated a two-part test to determine whether there is an adequate alternative forum: "An alternative forum is adequate if: (1) the defendants are subject to service of process there; and (2) the forum permits 'litigation of the subject matter of the dispute.'" See *Alfadda v. Fenn, 159 F.3d 41, 45 (2d Cir. 1998)*(citing *Piper Aircraft, 454 U.S. at 254 n. 22*); see also *Pollux Holding Ltd. v. Chase Manhattan Bank, 329 F.3d 64, 75 (2d Cir. 2003)*.

Under Argentine law, defendants are subject to service of process if the tort occurred in Argentina. See Cabanellas Decl. PP 49, 51-52. Here, the alleged tort, fraudulent transfer, took place in Argentina. Therefore, an Argentine court could assert jurisdiction over that cause of action. In a contract lawsuit, an Argentine court could assert jurisdiction over a defendant where the contract was to be performed in Argentina or the defendant

is domiciled in Argentina. See Cabanellas Decl. PP 42, 50. Here, defendant is a corporation that is domiciled in Argentina and ninety percent owned by Argentina. Clearly, defendant would be subject to process in Argentina. As such, defendant would be subject to process for both causes of action in [*15] Argentina, satisfying the first prong of the two-part test.

The next inquiry is whether an Argentine court would permit litigation on the subject matter of this litigation and would provide adequate remedies for the causes of action. Argentine courts provide adequate causes of action and remedies to address the claims in the complaint. See id. at PP 55, 58; see also *Warter, 380 F. Supp. 2d at 1309* ("Each of Plaintiff's claims, fraud, negligent misrepresentation,. . .conspiracy to commit fraud and breach of fiduciary duty, is available under Argentine law."). Argentine law provides a cause of action for the contract action and adequate remedies for the alleged breach of contract. See Cabanellas Decl. PP 55 ("Under Argentine law, a plaintiff allegedly harmed by the violation of non-performance of contractual obligations may bring an action on such violation or non-performance. The plaintiff may request specific performance. . . or damages."). There is also a cause of action for the subject matter of the fraudulent transfer claim. See id. at 62 ("A fraud action may be brought, even as against a bankrupt debtor and its accomplices, under articles 961 to 972 of the Civil Code. . . ."). [*16] Argentine courts also provide remedies for the tort claim. See id. at P 65 ("With regard to tort claims, the plaintiff may request remedies for the injuries caused by the tort (Civil Code, art. 1077)."). Consequently, the courts in Argentina satisfy both prongs of the two-part test, and constitute an adequate alternative forum for this lawsuit.

### B. Level of Deference Granted to Plaintiff's Choice of Forum

The next question in the forum non conveniens analysis is the level of deference to be given to plaintiff's choice of forum. In the Second Circuit, the "degree of deference to be given to a plaintiff's choice of forum moves on a sliding scale depending on several relevant considerations." See *Iragorri v. United Techs. Corp., 274 F.3d 65, 71 (2d Cir. 2001)*(en banc). These considerations include "the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice," which encompasses "convenience of the plaintiff's residence in relation to the chosen forum, the availability of witnesses or evidence to the forum district." *LaSala v. UBS, AG, 510 F. Supp. 2d 213, 223(S.D.N.Y. 2007)*(Haight, J.)(citing *Iragorri, 274 F.3d at 72*).

Less deference is given to [*17] a plaintiff's choice of forum when it is motivated by tactical advantage. See *LaSala, 510 F. Supp. 2d at 223*. Here, the complaint pro-

vides no ties to the United States other than plaintiff's place of incorporation and the location of plaintiff's attorneys. ALRG was incorporated in New York on the same day that this lawsuit was initiated. Plaintiff appears to hold no assets other than the claims at issue in this case. Its members are primarily foreign entities, and its sole connection to New York occurred on the same day that this lawsuit was initiated at its incorporation. Plaintiff's members include entities organized under the law of Delaware, the Cayman Islands, the British Virgin Islands, and the Bahamas. Plaintiff does not appear to have substantial ties to New York, and plaintiff's choice of forum seems to be motivated by tactical advantage for this reason. Moreover, the availability of witnesses in this forum is less than in an Argentine court, and plaintiff appears to have insignificant ties to the United States. See Discussion C.1. infra.

Furthermore, even if plaintiff did have substantial connections to this forum, the Second Circuit has acknowledged that deference is diminished [*18] where "plaintiff is a corporation doing business abroad and can expect to litigate in foreign courts." See *Guidi v. Inter-Continental Hotels Corp.*, 224 F.3d 142, 147 (2d Cir. 2000). The underlying conduct for all of the causes of action that have been brought in this case occurred in Argentina, defendant is an Argentine entity, and plaintiff is comprised of foreign entities and has little business in New York outside of its incorporation on the very day that this lawsuit was initiated. These facts weigh in favor of an Argentine forum. A plaintiff's choice of forum is "given reduced emphasis where. . .the operative facts upon which the litigation is brought bear little material connection to the chosen forum." *Nieves v. Am Airlines*, 700 F. Supp. 769, 772 (S.D.N.Y. 1988)(Leisure, J.). Plaintiff is not only primarily comprised of foreign entities, it is suing on claims that occurred in Argentina. It would not be "reasonable for plaintiff to believe that defendants would be more amenable to suit in New York than anywhere else." *State Street Bank & Trust v. Inverions Errazuriz Limitada*, 230 F. Supp. 2d 313, 320 (S.D.N.Y. 2002)(Carter, J.). For all of the foregoing reasons, the court has [*19] accorded little deference to plaintiff's decision to bring this lawsuit in New York.

## C. Consideration of the Private and Public Factors

The third step in the court's forum non conveniens analysis is the weighing of the private and public factors to determine which forum best serves the interests of convenience and justice.

### 1. Private Factors

The private interests that a district court must consider when making a determination about forum non conveniens are as follows: "the relative ease of access to

sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." See *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 67 S. Ct. 839, 91 L. Ed. 1055 (1947).

Plaintiff has alleged that Aguas's assets were fraudulently transferred to defendant. See Compl. PP 143-152. "Where alleged misconduct is centered in the foreign forum and the majority of evidence resides there, dismissal is favored." *Lasala v. Bank of Cyprus Public Co. Ltd.*, 510 F. Supp. 2d 246, 258 (S.D.N.Y. 2007)(Haight, J.). [*20] In the instant matter, most of the relevant witnesses and evidence are located in Argentina. See Def.'s Mem. Supp. Mot. to Dismiss, at 41. One of the most important entities regarding plaintiff's allegations, Aguas, is a non-party that is found only in Argentina. See id. at 43. A multitude of the non-party witnesses are found in Argentina. See id. at 64-69; see also Suez's Mem. Supp. Mot. to Dismiss 31-35. Specifically, numerous Argentine government officials, court appointed representatives, and Aguas's former officers and employees-all of whom live and work in Argentina-will be necessary to evaluate plaintiff's allegations regarding Aguas's termination of Aguas's concession, and defendant's possession of its assets. These critical non-party fact witnesses are beyond the reach of the court's compulsory process.

The costs of obtaining the attendance of willing and unwilling witness in New York would be substantially larger than the costs of having the trial in Argentina. "[W]here, due to the fact that the majority of evidence must be procured from a foreign country, a substantial cost if passed on to a defendant in order to put on its case, a district court may weigh this fact in favor [*21] of dismissal." *Strategic Value Master Fund, Ltd. V. Cargill Fin. Servs. Corp.*, 421 F. Supp. 2d 741, 768 n.22 (S.D.N.Y. 2006)(Leisure, J.). The vast majority of evidence and witnesses are located in Argentina, and the tremendous expense associated with transporting these individuals to New York weighs in favor of an Argentine forum for this action. The fact that the parties could be required to resort to the Hague Convention and letters rogatory to secure a portion of relevant testimony and documents does not obviate the hardships with having New York instead of Argentina as a forum for this lawsuit. Live testimony is always preferred to documentary testimony. This is the type of inconvenience that forum non conveniens was intended to prevent.

Furthermore, much of the documentary evidence is kept in Argentina. "The official company file of Aguas is kept in the Spanish language at the Superintendency of Companies and Association in Buenos Aires. . . ." See

Irbierri P 5. The need to obtain, transport, and then translate a multitude of these documents from Spanish language to English is a private interest that strongly favors dismissal.

Moreover, plaintiff has failed to identify documents [*22] or witnesses located within this district. Defendant has listed numerous key witnesses who are located in Argentina. Plaintiff has failed to identify any witnesses or entities that are key to this lawsuit that are located in the United States other than itself and its attorneys. Plaintiff's failure to identify any witness (other than itself) that might be found within this district weighs in favor of an Argentine forum.

In sum, the private factors overwhelming indicate that Argentina is the most appropriate forum for this lawsuit.

**2. Public Factors**

The public factors that a district court must consider when making a determination about forum non conveniens are as follows: "(1) having local disputes settled locally; (2) avoiding problems of applying foreign law; and (3) avoiding burdening jurors with cases that have no impact on their community." *Capital Currency Exch., N.V. v. Nat'l Westminster Bank PLC, 155 F.3d 603, 609 (2d Cir. 1998)*.

In the instant matter, Argentina has a far greater local interest than New York in the alleged fraudulent transfer of assets by Argentina in favor of a corporation that is primarily owned by Argentina. As plaintiff points out, the court is aware of New [*23] York's importance as a world financial capital. However, this fact is not adequate to trump Argentina's interests in adjudicating a dispute that involves an entity owned largely by its government, involving witnesses located within its boundaries, and conduct that took place within its jurisdiction.

A "tangential connection" to New York does not alone form a basis for denial of a forum non conveniens dismissal. See *First Union Nat'l Bank v. Paribas, 135 F. Supp. 2d 443, 453 (S.D.N.Y. 2001)*, aff'd, *48 Fed. Appx. 801 (2d Cir. 2002)*. Plaintiff's tort claim against defendant concerns an alleged fraudulent transfer of assets made in Argentina for the provision of water and sewage

services to Argentine citizens, and transferred by one Argentine company to another Argentine company, pursuant to a decree of the Argentine government. See Compl. PP 30-34, 143-52. Plaintiff's contract claims concerns loan agreements that were made to finance the provision of these water and sewage services, and stems from an alleged breach of that contract that occurred in Argentina. See Compl. P 1. These allegations are precisely the types of local issues that should be decided by an Argentine court.

Furthermore, [*24] because the concession is governed by Argentine law, the court would likely have to interpret Argentine law to decide several of the relevant issues. The need to apply Argentine law in this case weighs in favor of dismissal. See *Gilstrap v. Radianz Ltd., 443 F. Supp. 2d 474, 491 (S.D.N.Y. 2006)*, aff'd., *233 Fed.Appx. 83, 2007 WL 1541362 (2d Cir. 2007)*. Finally, this dispute would be burdensome for jurors because it is a lawsuit that would no have impact on their communities. They would be forced to determine what is essentially an Argentine lawsuit. As such, the public factors indicate that dismissal on the basis of forum non conveniens is appropriate.

The court rejects plaintiff's contention that additional discovery should be conducted before determining the issue of forum non conveniens. The factors so overwhelming favor an Argentine forum, that additional discovery is not required.

**CONCLUSION**

For the forgoing reasons, defendant's motion to dismiss the complaint on the basis of forum non conveniens, pursuant to *Rule 12(b)(3), F.R. Civ. P.*, is granted.

**IT IS SO ORDERED**

DATED: New York, New York

March 3, 2008

/s/ ROBERT L. CARTER

ROBERT L. CARTER

U.S.D.J.

57 Fed. Appx. 892, *; 2003 U.S. App. LEXIS 2318, **

**GENERAL STAR INTERNATIONAL INDEMNITY, LTD. and AXA REINSURANCE UK PLC, Plaintiffs-Appellants, -v.- THE CHASE MANHATTAN BANK, Defendant-Appellee.**

**Nos. 02-7659(L), 02-7660(CON), 02-7662(CON), 02-7663(CON)**

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

*57 Fed. Appx. 892; 2003 U.S. App. LEXIS 2318*

**February 7, 2003, Decided**

**NOTICE:** [**1] RULES OF THE SECOND CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** Appeal from the United States District Court for the Southern District of New York (Allen G. Schwartz, Judge).
*Gen. Star Int'l Indem., Ltd. v. Chase Manhattan Bank, 2002 U.S. Dist. LEXIS 7980 (S.D.N.Y. 2002).*

**DISPOSITION:** Affirmed.

**COUNSEL:** Counsel for Appellant General Star: Howard A. Fischer, Schindler Cohen & Hochman LLP (Jeremy M. Weintraub, on the brief), New York, NY.

Counsel for Appellant AXA: Thomas Wilkinson, Cozen O'Connor, Philadelphia, PA (Edward Hayum, Cozen O'Connor, New York, NY, Stephen A. Cozen and Lawrence D. Jackson, Cozen O'Connor, Philadelphia, PA, on the brief).

Counsel for Appellee: John D. Gordan, III, Morgan, Lewis & Bockius LLP (Nora von Stange, on the brief), New York, NY.

**JUDGES:** PRESENT: HON. ELLSWORTH VAN GRAAFEILAND, HON. AMALYA L. KEARSE, and HON. BARRINGTON D. PARKER, JR., Circuit Judges.

**OPINION**

[*892] **SUMMARY ORDER**

ON CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the Memorandum Order of the District Court be and it hereby is AFFIRMED.

Plaintiffs-appellants General Star International Indemnity, Ltd. ("General Star") and AXA Reinsurance

UK PLC ("AXA") appeal from a May 2, 2002 Memorandum [**2] Order of the United States District Court for the Southern District of New York (Allen G. Schwartz, Judge), granting defendant-appellee Chase Manhattan Bank's motion to stay this federal-court action [*893] pending the resolution of a parallel action that Chase had initiated in New York state court. See *Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 47 L. Ed. 2d 483, 96 S. Ct. 1236 (1976).*

For a detailed discussion of the factual background, see the District Court's thorough opinion, *Gen. Star Int'l Indem. Ltd. v. Chase Manhattan Bank, 2002 U.S. Dist. LEXIS 7980, 2002 WL 850012 (S.D.N.Y. May 3, 2002).* In brief, Chase made loans to help finance two slates of films produced by Paramount, and General Star and AXA, among other insurance companies, insured those loans. On November 7, 2001, Chase notified General Star and AXA (as well as the other insurers) that, as of December 2001, it would have claims on three of the Paramount films. General Star brought two actions (each based on a different slate of six films) against Chase in federal court on December 11, 2001. AXA brought two actions (based on the same two slates of films) against Chase in federal court on [**3] December 17, 2001. The four federal-court actions were consolidated into this one action. Chase brought an action in New York state court on December 27, 2001, against General Star, AXA, and seven other insurers, based on the three films on which Chase had indicated it would have claims. Chase moved to dismiss or, in the alternative, to stay the federal action on abstention grounds. The District Court granted Chase's motion and stayed the federal action pending the outcome of the New York Supreme Court litigation.

In adjudicating Chase's motion, the District Court applied the strict abstention standard first articulated in Colorado River. [1] We review a district court's decision to abstain pursuant to Colorado River for an abuse of discretion, but the "standard of review is somewhat rigorous," and "there is little or no discretion to abstain in a case which does not meet traditional abstention requirements." *Woodford v. Community Action Agency of*

57 Fed. Appx. 892, *; 2003 U.S. App. LEXIS 2318, **

*Greene County, Inc., 239 F.3d 517, 523 (2d Cir. 2001)* (internal quotation marks omitted). In determining whether to abstain under Colorado River, a district court should consider:

> (1) whether the controversy [**4] involves a res over which one of the courts has assumed jurisdiction; (2) whether the federal forum is less inconvenient than the other for the parties; (3) whether staying or dismissing the federal actions will avoid piecemeal litigation; (4) the order in which the actions were filed, and whether proceedings have advanced more in one forum than in the other; (5) whether federal law provides the rule of decision; and (6) whether the state procedures are adequate to protect the plaintiff's federal rights.

*Id. at 522* (citations omitted). "The balance [is] heavily weighted in favor of the exercise of jurisdiction," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 16, 74 L. Ed. 2d 765, 103 S. Ct. 927 (1983)*, and "the facial neutrality of a factor is a basis for retaining jurisdiction, not for yielding it," *Woodford, 239 F.3d at 522*. "No single factor is necessarily decisive, and the weight to be given to any one factor may vary greatly from case to case." *Village of Westfield, N.Y. v. Welch's, 170 F.3d 116, 121 (2d Cir. 1999)* (citation and internal quotation marks omitted).

> 1 The District Court believed that it was entitled to apply the more discretionary standard articulated in *Wilton v. Seven Falls Co., 515 U.S. 277, 132 L. Ed. 2d 214, 115 S. Ct. 2137 (1995)*, because "virtually all [of the plaintiffs'] claims stem from the underlying request for declaratory relief." *Gen. Star, 2002 U.S. Dist. LEXIS 7980, 2002 WL 850012*, at *5. Nevertheless, the court analyzed Chase's abstention motion under the Colorado River standard because it determined

that the motion should be granted even under that stricter standard. See id.

[**5]  [*894]  The District Court analyzed the six factors enumerated in Woodford. See *Gen. Star, 2002 U.S. Dist. LEXIS 7980, 2002 WL 850012*, at *6-*11. While the court found that several of the factors slightly favored the retention of federal jurisdiction, the court considered the risk of piecemeal litigation to be the most important factor, and found that this factor strongly favored abstention. *Id. at *7-*8*. The District Court correctly reasoned that, because the insurance companies other than General Star and AXA were not parties to the federal action, "there is a risk of inconsistent outcomes not preventable by principles of *res judicata* and collateral estoppel." *Id. at *7*. "The primary context in which we have affirmed Colorado River abstention in order to avoid piecemeal adjudication has involved lawsuits that posed a risk of inconsistent outcomes not preventable by principles of res judicata and collateral estoppel. The classic example arises where all of the potentially liable defendants are parties in one lawsuit, but in the other lawsuit, one defendant seeks a declaration of nonliability and the other potentially liable defendants are not parties." *Woodford, 239 F.3d at 524*; [**6] see also *De Cisneros v. Younger, 871 F.2d 305, 308 (2d Cir. 1989)*. In light of our precedent, the District Court did not abuse its discretion in deciding to abstain largely on the basis of the risk of piecemeal litigation.

We have reviewed the District Court's balancing of the six Colorado River factors, and we conclude that the court weighed them correctly, placing the appropriate weight on each factor. Therefore, we affirm the District Court's Memorandum Order substantially for the reasons stated by the District Court. We have considered the appellants' objections to the District Court's decision and find them to be without merit.

Accordingly, the judgment of the District Court is AFFIRMED. The motions of General Star and Chase requesting that the Court take judicial notice of various documents are GRANTED.

2004 U.S. Dist. LEXIS 83, *

**HIGHLANDS INSURANCE CO., Plaintiff and Counterclaim Defendant, -against- PRG BROKERAGE, INC., PROMPT CLAIMS SERVICE, INC. and LAWRENCE W. BLESSINGER, Defendants, Counterclaim Plaintiffs and Third Party Plaintiffs, -against- HIGHLANDS INSURANCE COMPANY, Counterclaim Defendant, -and- WILLIS T. KING, Third Party Defendant**

**01 Civ. 2272 (GBD)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2004 U.S. Dist. LEXIS 83*

**January 5, 2004, Decided
January 6, 2004, Filed**

**PRIOR HISTORY:** *Highlands Ins. Co. v. Silver Car Purchasing Group, Inc., 2002 U.S. Dist. LEXIS 3104 (S.D.N.Y., Feb. 25, 2002)*

**DISPOSITION:** [*1] Defendants' motion to dismiss plaintiff's complaint granted in its entirety. Plaintiff's motion to transfer venue denied. Plaintiff's motion to dismiss counterclaims granted in part.

**COUNSEL:** For Highlands Insurance Company, PLAINTIFF: Andrew J Frackman, Paul Robert Koepff, O'Melveny & Myers, LLP, New York, NY USA.

For PRG Brokerage, Inc, Lawrence W Blessinger, DEFENDANTS: Jay S Bielat, Nicoletti, Gonson & Bielat, LLP, New York, NY USA.

For PRG Brokerage, Inc, Prompt Claims Service, Inc, Lawrence W Blessinger, DEFENDANTS: O Peter Sherwood, Manatt, Phelps & Phillips, LLP, New York, NY USA.

For Prompt Claims Service, Inc, DEFENDANT: Stephen C Cunningham, Lustig & Brown, LLP, New York, NY USA.

For PRG Brokerage, Inc, Lawrence W Blessinger, Thirdparty PLAINTIFFS: Jay S Bielat, Nicoletti, Gonson & Bielat, LLP, New York, NY USA.

For Prompt Claims Service, Inc, Thirdparty PLAINTIFF: Stephen C Cunningham, Lustig & Brown, LLP, New York, NY USA.

For PRG Brokerage, Inc, Lawrence W Blessinger, Counter [*2] CLAIMANTS: Jay S Bielat, Nicoletti, Gonson & Bielat, LLP, New York, NY USA.

For Prompt Claims Service, Inc, Counter CLAIMANT: Stephen C Cunningham, Lustig & Brown, LLP, New York, NY USA.

For Highlands Insurance Company, Counter DEFENDANT: Andrew J Frackman, Paul Robert Koepff, O'Melveny & Myers, LLP, New York, NY USA.

**JUDGES:** GEORGE B. DANIELS, United States District Judge.

**OPINION BY:** GEORGE B. DANIELS

**OPINION**

MEMORANDUM OPINION AND ORDER

GEORGE B. DANIELS, DISTRICT JUDGE:

Plaintiff, an insurance company, brought this twelve count action against defendants alleging violations of RICO, fraud, and pendent state law claims in connection with plaintiff's agreement to provide commercial automobile insurance to certain livery drivers in New York City. [1] Defendants joined Willis T. King as a third party defendant, and counterclaimed against both plaintiff and King, alleging RICO violations, as well as breach of contract, and other pendent state law claims. The parties then filed cross-motions to dismiss. [2] For the following reasons, defendants' motion to dismiss the complaint is granted and the complaint is hereby dismissed in its entirety. Highlands' motion to transfer venue [*3] as to the claims against King is denied. Highlands' partial motion to dismiss the counterclaims is granted. [3]

1  Subject matter jurisdiction is proper pursuant to *28 U.S.C. §§ 1331and 1332*, because the action not only arises under the laws of the United States but also involves diversity of citizenship.

2  Defendants PRG Brokerage, Inc and Lawrence Blessinger moved to dismiss Counts I-IV, and VI-XII of the complaint ("PRG's motion"). Defendant Prompt Claims Services moved to dismiss Counts I-IV, and XI-XII of the complaint ("PCS's motion") (collectively, "defendants' motion"). Plaintiff Highlands Insurance Co. and third party defendant Willis T. King filed a motion to dismiss counterclaims I-V, and VIII. ("Highlands' motion").

3  Highlands has not moved to dismiss the state law counterclaims VI (Breach of Contract relating to the policies), VII (*Violation of New York State Insurance Law § 3426(k)*), IX (Defamation) and X (Breach of Contract relating to the supplemental services agreement).

[*4] Background

Plaintiff Highlands Insurance Co. ("Highlands") is in the business of providing commercial property and casualty insurance to regional small business markets. Third party defendant Willis T. King is the CEO of Highlands. Defendant PRG Brokerage Inc. ("PRG") is an insurance broker in New York, and defendant Lawrence Blessinger is the CEO of PRG. Aramarine Brokerage, Inc. ("Aramarine") is also an insurance broker in New York. Silver Car Purchasing Group, Inc. ("Silver Car") is a risk purchasing group for livery car drivers in New York City. Silver Car is organized by Aramarine. Defendant Prompt Claims Services ("PCS") is a claims handler that, *inter alia*, conducts investigations relating to auto accident claims.

In or about 1999, Highlands agreed to provide insurance to livery car drivers in New York City through Silver Car. Around January 26, 2000, Highlands executed 13 different binders of insurance for 13 group policies to Silver Car. PRG and Aramarine, as brokers, underwrote the policies, and received certain commissions for their work. The policies were effective as of March 1, 2000. The terms of the policies provided, *inter alia*, that: 1) the policy [*5] period was three years, from March 1, 2000 through March 1, 2003; and 2) the policies were "non-cancellable" by Highlands, except for either non-payment of premiums or other specific reasons set out in the New York Insurance Law.

Around December 19, 2000, Highlands sent PRG and each of Silver Car's insured members, copies of a "Notice of Nonrenewal," stating that Highlands was not going to renew the policies, effective March 1, 2001, two years short of the termination date. Further, around December 21, 2000, Highlands sent PRG and Aramarine a letter purporting to revoke their authority to bind coverage or issue certificates of insurance to Silver Car members on behalf of Highlands. Highlands then filed the instant action against Silver Car, Aramarine, PCS, PRG, and Blessinger on March 16, 2001 alleging RICO violations, as well as fraud, breach of contract, and other pendent state law claims. One month later, Highlands settled with Silver Car and Aramarine, who were then dismissed from the suit. PRG, Blessinger, and PCS, however, remained as defendants. The remaining defendants then joined King as a third party defendant, and filed counterclaims against Highlands and King asserting [*6] their own RICO claims, as well as breach of contract, and other pendent state law claims. [4]

4  On February 15, 2001, one month before Highlands filed the instant action, Silver Car and Aramarine filed a complaint against Highlands in New York Supreme Court, seeking a Temporary Restraining Order ("TRO") preventing Highlands from, *inter alia*, terminating the Silver Car policies. On February 22, 2001, Highlands joined PRG as a third party defendant. The next day, the Supreme Court granted Silver Car and Aramarine's application for a TRO. Highlands then removed the case to federal court. However, this Court granted PRG's motion to remand on the grounds that Highlands had voluntarily submitted to the jurisdiction of the state court by joining PRG. Thereafter, on March 16, 2001, Highlands commenced the instant separate action against defendants in this Court. The TRO issued by the state court was eventually dissolved and that action was dismissed with prejudice as to the claims between Silver Car, Aramarine, and Highlands, and without prejudice as to the claims by and against PRG.

[*7] Discussion

*Federal Rule of Civil Procedure 12(b)(6)* allows a party to move to dismiss a complaint where the complaint "fails ... to state a claim upon which relief can be granted[.]" *FED. R. CIV. P. 12(b)(6)*. In reviewing a motion to dismiss, this Court accepts the allegations in the complaint as true and draws all reasonable inferences in favor of the non-moving party. See *Patel v. Searles, 305 F.3d 130, 134-35 (2d Cir. 2002)*. However, bald contentions, unsupported characterizations, and legal conclusions are not well-pleaded allegations, and will not suffice to defeat a motion to dismiss. See *Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir. 1996)*. Here, a motion to dismiss will only be granted if the claimant can prove no set of facts in support of its claim that would entitle it to relief.

See *Citibank, N.A. v. K-H Corp., 968 F.2d 1489, 1494 (2d Cir. 1992).*

A. Defendants' Motion to Dismiss the Complaint

1. Fraud and Conspiracy to Commit Fraud

Highlands alleges that it was fraudulently induced by defendants to insure the Silver Car [*8] policies. Defendants argue that Highlands' fraud claims fail as a matter of law because they are not pled with particularity. Specifically, defendants argue that plaintiff has only set forth conclusory allegations in the complaint, which fail to identify the time, place, speaker, and content of the alleged misrepresentations.

A fraud claim consists of five elements: 1) a representation of material fact; 2) that was false; 3) scienter; 4) reliance by the plaintiff; and 5) injury. See *Vermeer Owners, Inc. v. Guterman, 78 N.Y.2d 1114, 585 N.E.2d 377, 378-79, 578 N.Y.S.2d 128 (N.Y. 1991); Giffune v. Kavanagh, 302 A.D.2d 878, 753 N.Y.S.2d 784, 784 (N.Y. App. Div. 2003).* There are heightened pleading standards where fraud is concerned, as *Rule 9(b) of the Federal Rules of Civil Procedure* requires that "the circumstances constituting fraud or mistake shall be stated with particularity." *FED. R. CIV. P. 9(b)* However, "malice, intent, knowledge, and other condition of mind of a person may be averred generally." See *id.*

Fraud allegations in a complaint therefore must: "(1) specify the statements [*9] that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994).* Although the scienter requirement need not be plead with particularity, "in order to avoid abuse ... plaintiffs are required to allege facts that give rise to a strong inference of fraudulent intent." *Campaniello Imports, Ltd. v. Saporiti Italia S.P.A., 117 F.3d 655, 663 (2d Cir. 1997).* Mere "puffery" or opinions as to future events are not sufficient to form the basis of a fraud claim. See *Baker v. Dorfman, 239 F.3d 415, 423 (2d Cir. 2000); Cohen v. Koenig, 25 F.3d 1168, 1172 (2d Cir. 1994).*

In this case, Highlands alleges in its complaint that defendants fraudulently induced Highlands to execute the Silver Car policies by making material misrepresentations and/or omissions of fact. However, Highlands' allegations consist only of broad and general accusations that do not satisfy *Rule 9(b)'s* pleading requirements. For example, Highlands contends that PCS was controlled by [*10] PRG, and that PRG therefore was able to delay PCS's submission and processing of claims so that PRG could falsely understate loss ratios. See Complaint at P 14d. Highlands also argues that defendants never intended to pay all the claims submitted to it by insurers or

provide promised ancillary services, such as claims investigation and risk management. See *id.* at PP 14e, 25d. Highlands, however, presents no specific information in the complaint regarding which particular loss ratio figures were falsely understated, which specific claims were delayed, or for that matter, the source of Highlands' information that PRG was delaying the processing of claims so as to falsely understate loss ratios. Further, Highlands provides no specific factual support for its bald statement that defendants never intended to pay all the claims or provide promised ancillary services.

Highlands also contends that defendants made fraudulent misrepresentations with respect to the amount of premium rates that the New York Insurance Department would approve for the policies. Highlands contends that PRG represented that Highlands' proposed rates were too high for approval by the Insurance Department. [*11] Highlands argues that, in reliance on this representation, it consented to charging a lower rate for the policies. Highlands contends that - PRG induced it to accept filing the lower rates so that PRG could charge certain ancillary fees to the insureds for PRG's own collection and still keep the total price of insurance competitive. See *id.* at PP 14h, 37-46. Other than bald contentions, however, Highlands presents no factual assertions to support its allegations that the Insurance Department would have approved the higher proposed rates, and that PRG knew this at the time it made the representation.

Further, Highlands alleges in the complaint that defendants misrepresented the nature, size, and scope of the Silver Car policies. Highlands contends that the drivers and cars in the insurance policies were substantially more risky than PRG represented they would be. In particular, Highlands contends that defendants misrepresented the nature of the last two policies that Highlands agreed to insure, in that those policies included a number of older cars and "gypsy cabs," presenting a greater insurance risk than newer cars or radio cars. See *id.* at PP 25f, 27-32, 57-58. As with the [*12] allegations above, these too are not pled with particularity as they are nothing more than bald contentions, with no factual support. Highlands has not identified a particular document or speaker as the source of these alleged misrepresentations.

Highlands also contends that defendants misrepresented the profitability of the Silver Car insurance program. Highlands argues that defendants represented that the insurance program had been profitable in the past, and would be profitable for Highlands. Highlands also alleges that defendants provided Highlands with loss information from a prior insurance program that they knew was false, and that defendants concealed adverse loss ratios that other insurance companies had experienced through Silver Car. See *id.* at PP 25a, 26a-c. To the extent the allegations address defendants' promises

about the future profitability of the Silver Car policies, the allegations are not actionable, as they are nothing more than puffery. With respect to the allegations that defendants provided Highlands with inaccurate loss information, plaintiff again has failed to plead with particularity. The complaint is devoid of any specificity regarding the figures [*13] that were provided to plaintiff, how those figures differ from the actual correct figures, or at least, the means by which plaintiff discovered that the numbers provided were inaccurate.

Highlands also contends that defendants represented that they knew of no pervasive problems with fraud in the livery car insurance business, but in fact knew that the business was rife with fraud. See id. at P 26c. The complaint further alleges that defendants represented that they had extensive expertise in preventing fraudulent claims, but in fact lacked expertise and knew they could not prevent pervasive fraud under the policies. See id. at PP 25b-c. Highlands' mere generalized allegations that defendants "knew" that there was fraud in the industry, however, are not sufficient to allege an inference of scienter. Further, to the extent that defendants made statements that they had expertise in the field of livery car insurance, this again is nothing more than puffery, and is not actionable.

Lastly, Highlands contends that Lawrence Blessinger, the CEO of PRG, concealed the fact that he was convicted of a felony on August 7, 1984 and that he intended to use a sham brokerage known as the Kaitlyn [*14] Agency as a means of obtaining additional compensation Highlands contends that Blessinger held himself out as a licensed insurance broker, but due to his felony conviction, was not able to obtain a license. See Complaint at PP 26d-e. Highlands' statements regarding the Kaitlyn Agency are wholly irrelevant as Highlands does not contend that the Kaitlyn Agency or Blessinger's relationship with the Kaitlyn Agency contributed in any manner to Highlands' decision to insure the Silver Car policies. Further, Highlands' contention that Blessinger is a convicted felon who falsely held himself out as a licensed insurance broker, - by itself, is not enough to state a claim for fraud. Highlands has not contended that the alleged felony conviction relates to insurance fraud, or anything similarly relevant. At the time Highlands signed the contracts, Blessinger's alleged felony conviction was 15 years old. Even assuming the truth of the allegations regarding the felony conviction and broker license, Highlands does not contend that this alleged omission induced them to enter into the contracts or otherwise led to Highlands' injury. The injury Highlands complains of is, essentially, that it [*15] lost money on the Silver Car policies. However, Blessinger's alleged felony conviction and lack of a broker license are not misstatements or omissions with respect to the *nature*

of the Silver Car policies, or Highlands' potential risk exposure under the policies. Even assuming the truth of these allegations, they are not material to the injury about which Highlands complains.

Therefore, Highlands has failed to state a claim for fraud as it has not pled fraud with particularity. Consequently, defendants' motion to dismiss Counts III (Fraud) and IV (Conspiracy to Commit Fraud) is granted.

### 2. RICO and RICO Conspiracy

Highlands alleges that the defendants constitute an enterprise engaged in a pattern of racketeering activity, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), *18 U.S.C. §§ 1962(c)and (d).* The racketeering activity that Highlands alleges is fraud in the livery driver insurance market, including fraud on Highlands by inducing Highlands to offer automobile insurance to Silver Car. Since this Court has dismissed Highlands' fraud claims, the RICO claims, too, necessarily fail as a matter of law. Consequently, [*16] defendants' motion to dismiss Counts I (RICO) and II (RICO Conspiracy) of the complaint is granted.

### 3. Negligence and Breach of Fiduciary Duty

Highlands contends that PRG was Highlands' agent, by virtue of the fact that it was Highlands' broker. Highlands contends that under common law agency principles, PRG owed Highlands both a duty of care and fiduciary duty which PRG breached. PRG contends, however, that it had only a limited agency relationship with Highlands, and that Highlands is attempting to hold PRG accountable for a duty of care beyond the limited one established by their broker-insurer relationship.

To state a claim for negligence, a plaintiff must allege: 1) the existence of a duty; 2) a breach of the duty; 3) causation; and 4) resulting damages. See *McCarthy v. Olin Corp., 119 F.3d 148, 156 (2d Cir. 1997)*; see also *Fleet Bank v. Pine Knoll Corp., 290 A.D.2d 792, 736 N.Y.S.2d 737, 741 (N.Y.App. Div. 2002)* (claimant must show that a duty of care existed to state a cause of action for negligent misrepresentation).

Under New York law, an insurance broker is in an agency relationship with the insured, and not the insurance carrier. [*17] In *Am. Motorists Ins. Co. v. Salvatore, 102 A.D.2d 342, 476 N.Y.S.2d 897 (N.Y. App. Div. 1984)*, the Appellate Division addressed the difference between an insurance agent and a broker. Salvatore found that: "It has been long recognized in this state [New York] that there is a distinction between insurance agents and brokers. The former acts as agent of an insurance carrier and the latter appears as representative of the insured." *Salvatore, 476 N.Y.S.2d at 900* (internal citations omitted). The issue was again revisited in *Evvtex Co. v. Hartley Cooper Assocs, 911 F. Supp. 732*

(S.D.N.Y. 1996), where the district court reiterated that: "the courts in New York have long held that insurance brokers act as agents on behalf of an insured and not the insurer." *Evvtex, 911 F. Supp. at 738*. The Evvtex court noted that the status of an insurance broker, as agent of the *insured*, is codified at *§ 2101 of the New York Insurance Law. That* statute defines "insurance broker:"

> An "insurance broker" means any person, firm, association or corporation who or which for any compensation, commission or other [*18] thing of value acts or aids in any manner in soliciting, negotiating or procuring the making of an insurance or annuity contract or in placing risks or taking out of insurance, *on behalf of an insured ....*

*Evvtex, 911 F. Supp. at 738*, quoting *N.Y. INS. LAW § 2102(c)*.

In this case, Highlands is the insurer, and Silver Car is the insured. PRG was the insurance broker. Therefore, PRG, as the insurance broker, was in an agency relationship with Silver Car (the insured) and not Highlands (the insurer).

There is a limited exception to the general rule that an agency relationship does not exist between a broker and insurer. A broker does owe an insurer a limited fiduciary obligation with respect to the handling of funds received from the insured. The New York Insurance Law provides that both an insurance broker and agent owe their principles a fiduciary duty with respect to the handling of funds received or collected.

> Every insurance agent and every broker acting as such in this state shall be responsible in a fiduciary capacity for all funds received or collected as insurance agent or insurance broker, and shall not, without [*19] the express consent of his or its principal, mingle any such funds with his or its own funds or with funds held by him or it in any other capacity.

*N.Y. INS. LAW § 2120(a)*. "In the broker's fiduciary capacity, it holds premiums collected by its insured to be forwarded to the insurance company as an agent of the insurer." *Evvtex, 911 F. Supp. at 739*. Since the funds collected by a broker from the insured are intended for the insurer, *§ 2120* has been interpreted to extend a broker's fiduciary duties with regard to the collection of

funds to insurers, in addition to insureds. See *Evvtex, 911 F. Supp. at 739*.

This exception, however, relates only to the receipt and collection of funds imposed by *§ 2120*. The narrowness of this exception is evident from the fact that both insurance brokers and agents owe a duty of care to their respective principles only to matters specifically entrusted to the broker or agent. They do not owe an affirmative duty to provide general advice or direction. In *Murphy v. Kuhn, 90 N.Y.2d 266, 682 N.E.2d 972, 660 N.Y.S.2d 371 (N.Y. 1997)*, an insured obtained automobile coverage that met his specifications [*20] from his insurance agent, with whom he had a long-standing relationship. After an accident, the insured then sued his agent for professional negligence on the theory that the agent had an affirmative obligation to advise him to obtain additional coverage beyond that which he had requested. The New York Court of Appeals found that the insured could not state a cause of action for professional negligence against his agent as the parties had only a consumer-agent insurance placement relationship. The court found that in spite of the parties' long-standing relationship, no "special relationship" existed between the parties that could impose a duty of care on the agent beyond that of following the insured's instructions of placing the requested insurance. See *Murphy, 90 N.Y.2d at 271*; see also *St. Paul Fire and Marine Ins. Co. v. Heath Fielding Ins. Broking Ltd., 976 F. Supp. 198, 204 (S.D.N.Y. 1996)* ("An ordinary relationship of broker to insurer does not by itself, give rise to a 'special relationship'" that creates a duty of care).

Relying upon the holding in Murphy, the Court of Appeals four years later found that an insured may not state a claim [*21] against an insurance agent for professional malpractice. In *Chase Scientific Research Inc. v. NIA Group, Inc., 96 N.Y.2d 20, 749 N.E.2d 161, 725 N.Y.S.2d 592 (N.Y. 2001)*, the Court of Appeals found that since neither a broker nor agent are required to engage in extensive specialized education or training, nor bound by a standard of conduct for which they might be disciplined, they are not considered "professionals," in that they generally cannot be sued for professional malpractice. See *Chase Scientific Research, 96 N.Y.2d at 30*. The court relied upon its earlier holding in Murphy, and reaffirmed that "an insurance agent has a common-law duty to obtain requested coverage, but generally not a continuing duty to advise, guide or direct a client based on a special relationship of trust and confidence." Id., citing *Murphy, 90 N.Y.2d at 273*.

In this case, Highlands attempts to place a duty of care on PRG beyond that of merely handling funds held in trust from Silver Car. Highlands' alleges, *inter alia,* that PRG breached its duty to Highlands when: (1) PRG failed to "exercise reasonable care in hiring and supervis-

ing employees, whom they knew or [*22] should have known were dishonest;" (2) PRG failed to "have reasonable safeguards to protect against dishonest acts of employees;" and (3) PRG failed to "reasonably or adequately take steps to prevent or discover fraudulent claims and claims practices." Complaint at PP 126c-d, f. Notably absent from Highlands' complaint is any allegation that PRG failed to obtain the requested insurance policies or mishandled proceeds held in trust from the insured. Highlands' generalized allegations that PRG did not exercise reasonable care are an attempt to stretch PRG's duty of care to Highlands beyond that allowed under New York law. As a matter of law, Highlands cannot maintain either a negligence or breach of fiduciary duty cause of action against PRG because it cannot show that the broker-insurer relationship gave rise to a duty of care broad enough to cover the allegations in the complaint. Therefore, PRG's motion to dismiss Counts VII (Negligence) and IX (Breach of Fiduciary Duty) of the complaint is hereby granted.

### 4. Unauthorized Agency

Highlands contends that by letter dated December 21, 2000, it revoked and terminated the authority of PRG to act on behalf of Highlands with respect [*23] to the policies. Highlands contends that despite this notification, PRG continued to purport to act on behalf of Highlands by holding itself out as Highlands' broker and continuing to issue certificates of insurance to Silver Car drivers under the policies.

As noted earlier, PRG's agency relationship with Highlands is limited in scope, and relates only to the procurement of requested policies and the handling of funds received from Silver Car. The basis by which Highlands alleges that PRG unlawfully held itself out as Highlands' agent after December 21, 2000, is PRG's actions of issuing certificates of insurance to drivers under the Silver Car policies after that date. See Complaint at PP 66, 132b. However, when PRG issued the certificates of insurance, it was doing so as the agent of Silver Car (the insured), to whom it owed a duty of care. See *Salvatore, 476 N.Y.S.2d at 900* (broker owes a duty of care to the insured, not the insurer); See also *Evvtex, 911 F. Supp. at 738*. Highlands does not allege that the certificates of insurance were for *new* policies outside of the original 13 that Highlands had agreed to insure. Rather, the certificates [*24] of insurance were issued for *existing* policy holders under the original Silver Car policies, and issued in accordance with PRG's obligations to the Silver Car. Therefore, as a matter of law, PRG's actions do not constitute unauthorized agency as to Highlands. Consequently, PRG's motion to dismiss Count VIII (Unauthorized Agency) is granted.

### 5. Breach of Contract

Highlands alleges that PRG breached the contract. PRG, on the other hand, contends that Highlands has not sufficiently stated a cause of action for breach of contract because Highlands has only alleged a breach in conclusory language, without identifying the purported contract, or identifying the terms of the contract that Highlands claims were breached.

*Federal Rule of Civil Procedure 8(a)* generally governs the pleading standards of a complaint. *Rule 8(a)* requires only that a party assert "a short and plain statement of the claim showing that the pleader is entitled to relief, and ... a demand for judgment[.]" *Fed. R. Civ. P. 8(a)*. In a cause of action for breach of contract, a plaintiff must allege: 1) the existence of a contract; [*25] 2) plaintiff's performance of the contract; 3) a breach by the defendant; 4) and resulting damages. See *Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525 (2d Cir. 1994)*. A breach of contract claim will be dismissed, however, as being "too vague and indefinite," where the plaintiff fails to allege, in nonconclusory fashion, "the essential terms of the parties' purported contract, including the specific provisions of the contract upon which liability is predicated[.]" *Sud v. Sud, 211 A.D.2d 423, 621 N.Y.S.2d 37, 38 (N.Y. App. Div. 1995)*.

Here, the complaint alleges that PRG breached "the obligations and duties ... under the contract of insurance[.]" Complaint at P 120. However, Highlands does not allege in the complaint that PRG was a signatory, or in any other way, a party to the Silver Car policies. Rather, according to the complaint, PRG was responsible for underwriting the policies between Highlands and Silver Car. See Complaint at PP 21-22. Highlands may not hold PRG liable for breaching a contract to which it was not a party. See e.g. *Cruickshank & Co. v. Sorros, 765 F.2d 20, 26 (2d Cir. 1985)* ("[appellant], not a [*26] party to the contract at issue, cannot be found liable for damages resulting from in breach, notwithstanding his status as an agent of one of the parties in breach.")

Further, Highlands' efforts to turn the September 15, 2000 letter it sent to defendants into an enforceable contract is equally unavailing. Highlands contends that on September 15, 2000, it sent a letter to defendants informing them that Highlands would insure no additional Silver Car members under the last two policies, and that PRG in turn agreed that it would issue no new certificates of insurance under these policies. See Complaint at PP 61, 120f.

An agreement that lacks consideration is not enforceable. See *Roth v. Isomed, Inc., 746 F. Supp. 316, 319 (S.D.N.Y. 1990)* ("consideration is a necessary ingredient for an enforceable contract.") Consideration requires either a benefit to the promisor or a detriment to the promisee. See *Ball v. SFX Broadcasting Inc., 236*

*A.D.2d 158, 665 N.Y.S.2d 444, 446 (N.Y. App. Div. 1997)*. Even assuming Highlands' allegations as true, which this court must on a motion to dismiss, this letter does not create a separate enforceable contract between [*27] Highlands and PRG. Essentially, Highlands and PRG both promised not to act. However, neither received a benefit or detriment for Highlands' promise not to insure additional Silver Car members, nor for PRG's promise not to issue new certificates under the policies. The September 15 letter agreement is therefore unenforceable as it is not supported by consideration. Consequently, PRG's motion to dismiss Count VI (Breach of Contract) is granted.

### 6. Conversion

Highlands contends that PRG and Blessinger have in their custody a data tape that contains information about the drivers covered by the Silver Car policies. Highlands argues that it has an ownership right to the data tape, and that defendants refuse to return it. PRG contends that Highlands cannot state a claim for conversion because Highlands is claiming a property interest in intangible property.

A plaintiff stating a claim for conversion must establish "legal ownership of a specific identifiable piece of property and defendants' exercise of dominion over or interference with the property in defiance of plaintiffs' rights." *Gilman v. Abagnale, 235 A.D.2d 989, 653 N.Y.S.2d 176, 177 (N.Y. App. Div. 1997)*, [*28] quoting *Ahles v. Aztec Enters., Inc., 120 A.D.2d 903, 502 N.Y.S.2d 821, 822 (N.Y. App. Div. 1986)*. However, under New York law, a claim for conversion must be for tangible property, as a claim for intangible property is not actionable. See *Rao v. Verde, 222 A.D.2d 569, 635 N.Y.S.2d 660, 661 (N.Y. App. Div. 1995)*; *MBF Clearing Corp. v. Shine, 212 A.D.2d 478, 623 N.Y.S.2d 204, 206 (N.Y. App. Div. 1995)*.

Here, the data tape was never Highlands' property. Rather, Highlands contends that PRG compiled information on Highlands' behalf, and then put that information on a tape that PRG already owned. It is the information that PRG compiled over which Highlands asserts a property interest, not the physical data tape on which the information is stored. See *Rao, 635 N.Y.S.2d at 661*. However, this information is intangible property, and Highlands cannot state a claim under New York law for conversion of intangible property. Consequently, defendants' motion to dismiss Count X (Conversion) is granted.

### 7. *New York General Business Law § 349(a)*

Highlands argues that defendants violated the *New York General Business Law § 349(a)* [*29] ("GBL") by engaging in deceptive acts. *Section 349 of the GBL* makes unlawful "deceptive acts or practices in the con-

duct of any business, trade or commerce or in the furnishing of any service in this state[.]" *N.Y. GEN. Bus. law § 349(a)*. Fundamentally, *§ 349* is a consumer protection device. A plaintiff must not only allege that the defendants engaged in deceptive acts or practices, but also that the conduct was consumer oriented. See *New York Univ. v. Continental Ins. Co., 87 N.Y.2d 308, 662 N.E.2d 763, 770, 639 N.Y.S.2d 283 (N.Y. 1995)*. Consequently, the New York Court of Appeals held that "private contract disputes, unique to the parties ... would not fall within the ambit of the statute." *Id.; Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 85 N.Y.2d 20, 647 N.E.2d 741, 744, 623 N.Y.S.2d 529 (N.Y. 1995)*. "The gravamen of the complaint must be consumer injury or harm to the public interest." *Azby Brokerage, Inc. v. Allstate Ins. Co., 681 F. Supp. 1084, 1089 n.6 (S.D.N.Y. 1988)*.

In this case, Highlands alleges only a private injury, namely that defendants conspired to fraudulently induce Highlands into insuring Silver Car's members Nothing [*30] about the complaint alleges a consumer injury or harm to the public interest. Rather, the complaint is for damages based upon the Silver Car policies Highlands claims it was fraudulently induced to issue. The damages are purely private in nature and relate only to monetary losses that Highlands allegedly suffered. Consequently, defendants' motion to dismiss Count XI (*GBL § 349(a)*) of the complaint is hereby granted.

### 8. Breach of Claims Handling Duty

Lastly, Highlands alleges that PCS breached what Highlands calls a "claims handling duty." Highlands bases this claim on the theory that PCS owed Highlands both contractual and fiduciary obligations, and that PCS breached those obligations. PCS argues that, as a matter of law, claims handlers do not owe insurers a "claims handling duty."

The New York courts, or federal courts applying New York law, have not specifically addressed the issue of whether a claims handler owes an insurer a fiduciary duty. However, New York courts have examined whether a fiduciary relationship exists between an insured and an insurer. In *Rabouin v. Metropolitan Life Ins. Co., 182 Misc. 2d 632, 699 N.Y.S.2d 655 (N.Y. Sup. Ct. 1999)*, the [*31] New York Supreme Court found that the plaintiff policyholder of an insurance contract could not state a claim against his insurer for breach of fiduciary duty because no such duty existed between the insured and the insurer. See *Rabouin, 699 N.Y.S.2d at 657*. The court acknowledged that, under certain circumstances, an insured's relationship with an insurer might transform into a fiduciary relationship. However, the court found that where the plaintiff has only alleged an "ordinary arm's length relationship created by the pay-

ment of premiums to [the insurer] in return for a policy of insurance[,]" there was no fiduciary obligation on the part of the insurer. Id.

Further, in *Batas v. Prudential Ins. Co. of Am., 281 A.D.2d 260, 724 N.Y.S.2d 3 (N.Y. App. Div. 2001)*, the Appellate Division, as well, found no fiduciary relationship between the plaintiff insureds and their insurer. There, the insureds were each hospitalized for serious emergency medical conditions. Their insurance carrier, however, only authorized limited time for hospitalization pursuant to its review of the "Milliman & Robertson Guidelines." The insurance carrier made this determination [*32] despite the fact that the guidelines were contrary to the recommendations provided by the insureds' primary care physicians calling for lengthier hospitalization. The insureds brought an action against their insurance carrier, alleging, *inter alia,* a breach of fiduciary duty for failing to disclose to the insureds that the insurer would make determinations based on a review of the Milliman & Robertson Guidelines, even if the guidelines conflict with the medical opinion of the insureds' primary care physicians. See *Batas, 724 N.Y.S.2d at 9-10*.

The Batas court found, however, that no fiduciary relationship existed between the insureds and the insurer. The court found no evidence of "overreaching" or "special circumstances" between the parties that might lead to the conclusion that anything other than an arm's length association existed between the insureds and the insurer. See *Batas, 724 N.Y.S.2d at 7*. The court noted that generally parties to a contract of insurance do not owe each other a - fiduciary obligation:

Plaintiffs make no showing that their relationship with defendants is unique or differs from that of a reasonable consumer [*33] and offer no reason to depart from the general rule that the relationship between the parties to a contract of insurance is strictly contractual in nature. No special relationship of trust or confidence arises out of an insurance contract between the insured and the insurer; the relationship is legal rather than equitable.

*Batas, 724 N.Y.S.2d at 7*. Consequently, the court found no fiduciary relationship between the insureds and their insurer.

In this case, PCS is a claims handler, and Highlands is the insurer. Highlands has not sufficiently alleged facts to support a claim that its relationship with PCS was one of such trust and confidence that a fiduciary duty existed. The parties merely had an arm's length association, and without more, no fiduciary obligation is created. Nothing

about the nature of the relationship between a claims handler and insurer involves a level of trust or confidence that would inherently lead to a fiduciary duty on behalf of the claims handler. If a fiduciary relationship does not generally flow between an insurer and an insured, then certainly it does not generally flow between a claims handler and an insurer.

Further, Highlands' [*34] allegation that PCS breached their contract cannot support a breach of fiduciary duty. [5] A breach of contract, by itself, does not create a fiduciary duty. "Rather, the focus is on whether a noncontractual duty was violated .... Thus, unless the contract creates a relation, out of which relation springs a duty, independent of the mere contract obligation, though there may be breach of the contract, there is no tort, since there is no duty to be violated." *Apple Records, Inc. v. Capitol Records, Inc., 137 A.D.2d 50, 529 N.Y.S.2d 279, 282 (N.Y. App. Div. 1988)*. As discussed above, Highlands and PCS had an arm's length association, to which no fiduciary duty arose. Therefore, PCS's motion to dismiss Count XII (Claims Handling Duty) is granted.

> 5  Highlands' breach of contract allegations against PCS are solely contained within the "claims handling duty" cause of action and are not alleged as a separate and independent count for breach of contract.

B. Highlands' Motion to Dismiss the Counterclaims

[*35] 1. Venue as to Third Party Defendant King

Highlands and King assert that venue is improper as to the counterclaims against King in this district, as King lives in New Jersey, works in New Jersey, and works for a company whose principal place of business is in New Jersey (Highlands). This argument has no merit. Highlands chose to file its complaint in this district. In its complaint, Highlands asserted that venue is proper pursuant to *28 U.S.C. § 1391 (a)* because "a substantial part of the events giving rise to the claims in this action occurred in this judicial district." Complaint at P 11; see also *28 U.S.C. § 1391(a)*. Defendants admitted this allegation in their Answer. See PRG's Answer at P 11. Defendants then filed counterclaims against Highlands and third party defendant King. Defendants' counterclaims as to Highlands are compulsory as they "arise out of the transaction or occurrence that is the subject matter of the opposing party's [Highlands'] claim[.]" *Fed. R. Civ. P. 13(a)*. The counterclaims against King are identical to those asserted against Highlands and involve [*36] the same transaction or occurrence. Therefore, venue is also proper in this district as to King pursuant to *28 U.S.C. § 1391(a)*, since a substantial part of the events giving rise to the counterclaims against him occurred in this district.

[6] Consequently, Highlands' motion to transfer venue as to the counterclaims against King is hereby denied.

> 6    For the same reasons, venue would also be proper in this district under *28 U.S.C. § 1391(b)*.

## 2. RICO and *RICO* Conspiracy

Similar to plaintiff Highlands' complaint, defendants as well allege violations of the federal RICO statute in their counterclaims. Specifically, defendants contend that Highlands and King devised a scheme to defraud defendants by inducing PRG to market Highlands' insurance so that Highlands and King could gain a dominant market share in the livery insurance market. Highlands and King, on the other hand, contend that defendants have failed to sufficiently allege that any statements they made [*37] were false.

As noted earlier, a fraud claim consists of five elements: 1) a representation of material fact; 2) that was false; 3) scienter; 4) reliance by the plaintiff; and 5) injury. See *Vermeer Owners, Inc. v. Guterman, 78 N.Y.2d 1114, 585 N.E.2d 377, 378-79, 578 N.Y.S.2d 128 (N.Y. 1991)*; *Giffune v. Kavanagh, 302 A.D.2d 878, 753 N.Y.S.2d 784, 784 (N.Y. App. Div. 2003)*. Likewise, as discussed earlier, fraud must be pled with particularity. See *FED. R. CIV. P. 9(b)*.

Defendants allege that around December 19, 2000, Highlands wrongfully sent notices of nonrenewal to all of Silver Car's members under the insurance policies, and that defendants did so to disrupt PRG's business. See Countercl. at PP 35-36. Defendants further contend that around December 21, 2000, Highlands sent a letter to PRG and Aramarine purporting to revoke their authority to bind coverage and to issue certificates of insurance to Silver Car members. Defendants contend that this purported revocation of authority is in direct violation of a June 1999 Letter Agreement between Highlands and Aramarine, as well as the terms of the policies themselves. [*38] See id. at P 39.

Defendants additionally contend that on February 28, 2001, Highlands notified the New York State Department of Motor Vehicles ("DMV") that PRG's authority to act on behalf of -Highlands was revoked, that this action was also in breach of the June 1999 agreement, as well as in breach of the terms of the policies. See id. at P 47. Consequently, defendants contend that the DMV refused to accept evidence of insurance of Silver Car members submitted by PRG, and that certain vehicles of Silver Car's members were subject to being impounded for operating without valid insurance. See id. at P 48. Defendants further contend that Highlands fired PRG as its servicing agent to the DMV's electronic database system of reporting insurance. Defendants contend that this was done without notice and, in any event, in violation of

a TRO issued by the New York Supreme Court. As a result of this revocation, defendants argue that the vehicles of certain Silver Car insured drivers were consequently towed for lack of evidence of insurance. See id. at P 52.

Defendants further argue that on February 28, 2001, Highlands advised Premium Payment Plan ("PPP"), the company that provided [*39] financing of premiums to Silver Car's members, that PRG no longer had a business relationship with Highlands, and that as a result, PPP declined to continue to provide financing of premiums. See id. at P 55-57. Defendants contend that Highlands' statement to PPP in this regard was false. See id. at P 112. Defendants argue that Highlands then filed the instant civil action against defendants alleging that defendants engaged in RICO violations, and that the allegations in the complaint are false, misleading, and intended to harm defendants in their business. See id. at PP 60-61, 118.

Defendants also contend that around the time Highlands' complaint was filed, Highlands appointed NPA Associates, Ltd. ("NPA") as its exclusive managing agent for its New York livery business. See id. at P 58. Defendants argue that NPA held a meeting in which several of Highlands' sub-brokers were invited. At that meeting, defendants contend that a representative from NPA made disparaging comments about defendants. For example, defendants contend that the NPA representative told the sub-brokers that Highlands would file a "RICO case to choke a horse" and that there would be "news media like [*40] you have never seen." Defendants contend that these statements were made for the purpose of causing harm to defendants' business and reputation. See id. at PP 63-66, 117, 120-25.

Defendants contend that by cancelling the Silver Car policies, Highlands planned to destroy PRG's market and subsequently recapture PRG's customers and then charge higher premium rates. See id. at P 110. Defendants further contend that as a result of Highlands' actions, subbrokers have refused to do business with PRG. See id. at P 131. Defendants further contend that Silver Car and Aramarine entered into a "secret" settlement agreement with Highlands around April 29, 2001 which provides for early termination of the policies. See id. at P 68.

These allegations are woefully inadequate to support a claim of racketeering activity based upon fraud. Specifically, defendants have presented no factual support for their theory that Highlands, at the time it executed the Silver Car policies, did not intend to follow through with its obligations under the agreement. Highlands' notices of nonrenewal and all other subsequent actions it took to extract itself from its obligations on the policies, at most, [*41] state a claim for breach of contract, not for fraud.

However, nothing about the statements made by the NPA representative indicate that Highlands, *at the time it contracted*, intended to breach the contract.

Nor does the mere fact that Highlands filed a civil action in this Court, or the fact that Highlands eventually settled with two of the defendants, leads to the conclusion that Highlands and King intended to destroy, and subsequently recapture for its own benefit PRG's business. Nothing about the circumstances or statements that defendants have alleged give rise to an inference of fraudulent intent. Defendants' allegations that Highlands and King intended to destroy defendants' business are nothing more than conclusory statements and bald assertions, which are inadequate to satisfy *Rule 9(b)*'s heightened pleading standard. As defendants' allegations do not state a claim for fraud, and since the criminal racketeering activity alleged is fraud, defendants fail to state a claim for a RICO violation. Consequently, Highlands' motion to dismiss Counterclaims I (RICO) and II (RICO Conspiracy) is hereby granted. [7]

> 7 Defendants' allegations in their counterclaims as to third party defendant King relate only to King's alleged participation and involvement in the RICO conspiracy. Since this Court is dismissing the RICO counterclaims, this Court will also dismiss King from the case on that same basis.

[*42] **3. Declaratory Judgment and Injunctive Relief**

Defendants seek a declaratory judgment that, *inter alia*, Highlands' notices of nonrenewal are invalid, Highlands is bound to provide coverage on the policies through March 1, 2003, and that Highlands' revocation of PRG's authority to issue certificates of insurance was in breach of the policies. Similarly, defendants also seek a preliminary and permanent injunction restraining Highlands from, *inter alia*, canceling or terminating the policies prior to March 1, 2003, and refusing to recognize as valid the certificates of insurance issued by PRG pursuant to the Silver Car policies. Further, defendants allege that Highlands breached the contracts in bad faith.

To have standing to bring suit, a party must allege an injury in fact to a preexisting, legally protected interest. The injury must be: "(a) concrete and particularized ... and (b) actual or imminent, not conjectural or hypothetical." *Altman v. Bedford Cent. School Dist.*, 245 F.3d 49, 69-70 (2d Cir. 2001), quoting *Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 119 L. Ed. 2d 351, 112 S. Ct. 2130 (1992)*. Therefore, a claimant "generally must assert [*43] his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Altman, 245 F.3d at 70*, quoting *Valley Forge Christian College v. Am. United for Separation of Church & State, Inc., 454 U.S. 464, 474, 70 L. Ed. 2d 700, 102 S. Ct. 752 (1982)*.

Here, defendants readily admit that they were not a party to either the Silver Car policies or any agreement discussing the terms of Highlands' obligations under the policies. See Countercl. at P 24. Defendants nevertheless contend that they have standing to enforce the contract as third-party beneficiaries to the agreement.

"A person who is not a party to the contract may bring an action for breach of contract if she or he is an intended beneficiary, and not merely an incidental beneficiary of the contract." *Cauff, Lippman & Co. v. Apogee Finance Group, Inc., 807 F. Supp. 1007, 1020 (S.D.N.Y. 1992)*. "Although a third party need not be specifically mentioned in the contact [sic.] before third-party beneficiary status is found, New York law requires that the parties' intent to benefit a third party must be shown on the face of the agreement." *In re Gulf Oil/Cities Serv. Tender Offer Litig., 725 F. Supp. 712, 733 (S.D.N.Y. 1989)*; [*44] see also *Port Chester Electrical Constr. Corp. v. Atlas, 40 N.Y.2d 652, 357 N.E.2d 983, 986, 389 N.Y.S.2d 327 (N.Y. 1976)*. "Absent such intent, the third party is merely an incidental beneficiary with no right to enforce the contract." *In re Gulf Oil/Cities Service Tender Offer Litig., 725 F. Supp. at 733*.

Defendants do not allege that the Silver Car policies expressly included a provision to pay broker fees to PRG. Rather, defendants contend that the June 1999 Letter agreement, the Silver Car policies, and various correspondence signed by Highlands, when read in combination, confer a third-party beneficiary right upon PRG. However, as indicated above, the face of the agreement itself must show the intent to benefit PRG. Defendants have not alleged that the agreement itself indicates such an intent. Therefore, PRG is not an intended third-party beneficiary to the agreement and it has no standing to raise a claim or seek declaratory or injunctive relief based upon Highlands' obligations to Silver Car that were detailed in that agreement. Consequently, Highlands' motion to dismiss Counterclaims III (Declaratory Judgment) and IV (Injunctive Relief) is granted.

[*45] **4. *New York General Business Law § 349(a)***

Defendants allege that Highlands and King violated *GBL § 349(a)* by making misrepresentations and omissions of material fact for the purpose of inducing PRG to assist Highlands in achieving a dominant position in the livery insurance market in New York. As discussed earlier, *GBL § 349* does not cover private disputes that are unique to the parties. See *Oswego Laborers' Local 214, 647 N.E.2d at 741*. Rather, a party must allege consumer injury or harm to the public. See *Azby Brokerage, 681 F. Supp at 1089 n.6*. Here, defendants have not alleged in their counterclaims consumer injury or harm to the pub-

lic. Consequently, Highlands' motion to dismiss Counterclaim VIII (*GBL § 349(a)*) is hereby granted.

### Conclusion

Defendants' motion to dismiss is GRANTED in its entirety. Plaintiff's complaint is therefore dismissed in its entirety. [8] Highlands' motion to transfer venue as to the counterclaims against third party defendant King is DENIED. Highlands' motion to dismiss the counterclaims is GRANTED with respect to Counterclaims I-V, and VIII. [9] Third party defendant King [*46] is dismissed from the case.

---

8    The only claim in Highlands' complaint that defendants did not move to dismiss is Count V (Rescission). That count, however, is directed only at Silver Car. As noted earlier, both Silver Car and Aramarine are no longer parties to this case, and all counts against them are therefore dismissed as moot.

9    Defendants voluntarily withdrew Counterclaim V (Breach of Contract and Bad Faith). See Defts' Opp. to Counterclaim and Third-Party Defts' Mot. to Dismiss at 2.

Dated: January 5, 2004

SO ORDERED:

GEORGE B. DANIELS

United States District Judge

# EXHIBIT 1
# (Part 2)

1997 U.S. Dist. LEXIS 17219, *

JANE JAFFEE, as Mother and Natural Guardian of JASON CLAIBORNE, an Infant, Plaintiff, -against- THE SOCIETY OF NEW YORK HOSPITAL, Defendant.

96 Civ. 3623 (LAP)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*1997 U.S. Dist. LEXIS 17219*

October 31, 1997, Decided
November 4, 1997, Filed

**DISPOSITION:**    [*1] Defendants' motion to dismiss plaintiff's complaint denied.

**COUNSEL:** For JANE JAFFEE, plaintiff: Jerry Slater, Kreidman and Slater, New York, NY.

For THE SOCIETY OF THE NEW YORK HOSPITAL, defendant: Marc E. Hyman, Heidell, Pittoni, Murphy & Bach, P.C., New York, NY.

**JUDGES:** LORETTA A. PRESKA, U.S.D.J.

**OPINION BY:** LORETTA A. PRESKA

**OPINION**

*MEMORANDUM AND ORDER*

LORETTA A. PRESKA, District Judge:

This action arises out of plaintiff Jane Jaffee's ("Jaffee") attempts to litigate on her infant's behalf certain medical malpractice claims originally brought in the Supreme Court for New York County. Plaintiff seeks a judgment in this court declaring that the ten-year statute of limitations tolling provision applied to infant's claims and set forth in *CPLR § 208* is unconstitutional. Defendant has moved pursuant to *Rule 12(b)(6) of the Federal Rules of Civil procedure* to dismiss this action based on the abstention doctrine. For the reasons set forth below, defendant's motion is denied.

*BACKGROUND*

In May of 1980, infant-plaintiff Jason Claiborne was seen in the New York Hospital ("Hospital") emergency room for complaints including, *inter alia*, fever and vomiting. (Affidavit of [*2]  E. Marc Hyman sworn to on Oct. 11, 1996 ("Hyman Aff.") P 12). The infant returned to the Hospital the following day and tested positive for influenza, meningitis and septic arthritis, (*Id.* P 13). The Hospital admitted and treated the infant until June 30,

1980 and continued to see the infant on an outpatient basis on several occasions in 1980 and 1981. (*Id.* PP 13-14).

Plaintiff Jaffee commenced an action on May 28, 1991 against the Hospital in the Supreme Court of the State of New York, New York County alleging, *inter alia*, medical malpractice for failure to diagnose the condition of meningitis. (*Id.* P 15; Affidavit of Jerry Slater sworn to on Nov. 8, 1996 ("Slater Aff.") P 2). In its verified answer, the Hospital raised the affirmative defense that the action was time-barred under the applicable statute of limitations, *CPLR §§ 208* and *3211(a)*. (Hyman Aff. PP 16-17; Slater Aff. P 2).

The Hospital subsequently moved to dismiss the action as time-barred. (Hyman Aff. P 17; Slater Aff. P 3). Specifically, the Hospital asserted that under *The Matter of Daniel J. v. New York Health and Hosp. Corp., 77 N.Y.2d 630, 571 N.E.2d 704, 569 N.Y.S.2d 396 (1991)*, plaintiff was [*3]  precluded from claiming any toll beyond the ten-year statute of limitations provided for disability and infancy under *CPLR § 208*. (Hyman Aff. PP 17-18; Slater Aff. P 3).

By Order dated December 14, 1992, the Supreme Court, New York County, granted defendant's motion to dismiss all claims of medical malpractice occurring prior to May 28, 1981 and denying the motion with respect to malpractice claims allegedly occurring after May 28, 1991. (Hyman Aff. P 23; Slater Aff. P 6). The Appellate Division affirmed the dismissal of the claims prior to May 28, 1981 in an order dated March 14, 1994. *Jaffee v. New York Hospital, 202 A.D.2d 276, 608 N.Y.S.2d 658* (1st Dep't 1994). The Court of Appeals denied plaintiff's motion for leave to appeal "on the ground that the order sought to be appealed from does not finally determine the action within the meaning of the Constitution." *Jaffee v. New York Hospital, 83 N.Y.2d 953, 615 N.Y.S.2d 877, 639 N.E.2d 418 (1994)*.

On May 15, 1996, plaintiff commenced a declaratory judgment action in this court seeking a declaration

Case 1:08-cv-02429-DAB    Document 100-3    Filed 08/25/2008    Page 3 of 23

Page 2
1997 U.S. Dist. LEXIS 17219, *

that *CPLR § 208* violates the *Equal Protection Clause of the Fourteenth Amendment*. Defendant moves to dismiss plaintiff's declaratory [*4] judgment action pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure* on the ground that this court should exercise its discretion and abstain from exercising jurisdiction. For the reasons that follow, defendant's motion to dismiss is denied.

## DISCUSSION

In *Wilton v. Seven Falls Co, 515 U.S. 277, 115 S. Ct. 2137, 132 L. Ed. 2d 214 (1995)*, the Supreme Court modified the standard by which a district court may determine whether to abstain from adjudicating a declaratory relief claim during the pendency of a parallel state court proceeding. *Id.* The *Wilton* court rejected the "exceptional circumstances" test established in *Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 96 S. Ct. 1236, 47 L. Ed. 2d 483 (1976)*, and revived the discretionary standard originally articulated in *Brillhart v. Excess Ins. Co. of America, 316 U.S. 491, 62 S. Ct. 1173, 86 L. Ed. 1620 (1942)*. *Wilton, 115 S. Ct. at 2140-42*; *accord Quackenbush v. Allstate Ins. Co., 135 L. Ed. 2d 1, 116 S. Ct. 1712, 1722 (1996)*; *see also National Union Fire Ins. Co. of Pittsburgh v. Karp, 108 F.3d 17 (2d Cir. 1997)*; *Certain Underwriters at Lloyd's, London* [*5] *v. St. Joe Minerals Corp., 90 F.3d 671 (2d Cir. 1996)*; *In re Joint Eastern and Southern Dist. Asbestos Litigation, 78 F.3d 764, 775 (2d Cir. 1996)*. *Brillhart* makes clear that a district court possesses "discretion in determining whether and when to entertain an action under the Declaratory Judgment Act." *115 S. Ct. at 2141*. Although *Brillhart* did not establish a fixed list of factors to guide a court's discretion -- such as the four part "exceptional circumstances" test set forth in *Colorado River* -- it did provide the following guidance:

> Ordinarily it would be uneconomical as well as vexatious for a federal court to proceed in a declaratory judgment suit where another suit is pending in a state court presenting the same issues, not governed by federal law, between the same parties. Gratuitous interference with the orderly and comprehensive disposition of a state court litigation should be avoided.

*McDonald's Corp v. 2502 8th Avenue Corp., 920 F. Supp. 67, 68 (S.D.N.Y. 1996)* (quoting *Brillhart, 316 U.S. at 495, 62 S. Ct. at 1175-76*); *see also Quality King Distributors, Inc. v. KMS Research, Inc., 946 F. Supp. 233, 236 (E.D.N.Y. 1996)*; *Haagen-Dazs* [*6] *Shoppe Co. v. Born, 897 F. Supp. 122, 126 (S.D.N.Y. 1995)*. In addition, the Court suggested that a district court should examine "'the scope of the pending state court proceeding

and the nature of the defenses open there,'" "'whether the claims of all parties in interest can satisfactorily be adjudicated in that proceeding, whether necessary parties have been joined, [and] whether such parties are amenable to process in that proceeding.'" *Wilton, 115 S. Ct. at 2141* (quoting *Brillhart, 316 U.S. at 495, 62 S. Ct. 1175-76*). In resurrecting a more discretionary standard for a district court's decision to refrain from adjudicating a claim for declaratory relief, however, *Wilton* declined to "delineate the outer boundaries of that discretion in other cases," expressly refraining from commenting on "cases raising issues of federal law or cases in which there are no parallel state proceedings." *Wilton, 115 S. Ct. at 2144*. This action falls into the latter of the two categories not encompassed by the *Wilton* holding.

The Court of Appeals has had occasion to define what constitutes a "parallel" state proceeding for purposes of applying the holding in *Wilton*. *National* [*7] *Union Fire Ins. Co. of Pittsburgh v. Karp, 108 F.3d 17 (2d Cir. 1997)*. According to the Court of Appeals, a state proceeding is considered "parallel" or "concurrent" for purposes of abstention "when the two proceedings are essentially the same; that is, there is an identity of parties, and the issues and relief sought are the same." *Id.* at 22 (citing *Sheerbonnet, Ltd. v. American Express Bank Ltd., 17 F.3d 46, 49-50 (2d Cir. 1994)* (declining to apply abstention test because state and federal proceedings were not "concurrent"); *Telesco v. Telesco Fuel and Masons' Materials, Inc., 765 F.2d 356, 362 (2d Cir. 1985)* (proceedings are parallel where essentially the same claims and same relief is sought in both actions); *Arkwright-Boston Mfrs. Mut. Ins. Co. v. City of New York, 762 F.2d 205, 211 (2d Cir. 1985)* (parties in state and federal actions must be substantially the same)). Although there is an identity of parties in the federal and state court proceedings, the issues and forms of relief sought are not identical. In plaintiff's state court action, plaintiff seeks the adjudication of various medical malpractice claims on behalf of her infant son. Plaintiff has not raised [*8] the unconstitutionality of *CPLR § 208* in response to defendant's statute of limitations affirmative defense. Not only are the two proceedings not parallel, but abstaining from adjudicating this declaratory relief claim would obviate any opportunity for plaintiff to challenge the constitutionality of *CPLR § 208*. [1] Furthermore, the additional reasons proffered by defendant to abstain from hearing plaintiff's claim do not permit a district court to abdicate its responsibility to adjudicate a claim properly brought before it. Therefore, defendant's motion to dismiss plaintiff's declaratory judgment claim is denied.

---

1 Plaintiff did not raise the issue of the constitutionality of *CPLR § 208* in plaintiff's appeal to the Appellate Division, and the Appellate Division

affirmed the order dismissing a portion of plaintiff's claims. *See Jaffee, 202 A.D.2d 276, 608 N.Y.S.2d 658.* As noted earlier, the New York Court of Appeals denied plaintiff's motion for leave to appeal on the grounds that the decision below did not finally determine the action within the meaning of the New York State Constitution. Plaintiff may have a subsequent opportunity to appeal to the New York Court of Appeals, and that appeal may include the order dismissing a portion of plaintiff's claims. *See CPLR § 5501(a)(1)* (appeals from final judgment include any non-final judgment which "necessarily affects" the final judgment).

However, on that subsequent appeal to the New York Court of Appeals, plaintiff will not have an opportunity to raise a constitutional challenge to *CPLR § 208. See Lichtman v. Grossbard, 73 N.Y.2d 792, 794, 537 N.Y.S.2d 19, 21, 533 N.E.2d 1048, 1050 (1988)* ("The constitutional challenge to the common-law rule was not raised in the trial court and may not be considered by

this court for the first time on appeal."); *see also Motor Vehicle Manufacturers Assoc. of the U.S. v. State of N.Y., 75 N.Y.2d 175, 188, 551 N.Y.S.2d 470, 477, 550 N.E.2d 919, 926 (1990)* (same holding where constitutional challenge was raised for the first time in the Appellate Division). *See generally* Arthur Karger, The Powers of the New York Court of Appeals § 102, at 621-23 (3d ed. 1997) ("The law now appears settled that unless the constitutional question was initially properly raised in the court of first instance, it will not be reviewable by the Court of Appeals. . . .").

[*9] **CONCLUSION**

For the reasons stated above, defendants' motion to dismiss plaintiff's complaint is denied.

Dated: New York, New York

October 31, 1997

LORETTA A. PRESKA, U.S.D.J.

## Michael Lake et ux. v. Bayer Corporation et al.

### X10UWYCV055001416S

### SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF WATERBURY, COMPLEX LITIGATION DOCKET AT WATERBURY

### *2006 Conn. Super. LEXIS 2291*

### July 25, 2006, Decided

**NOTICE:** [*1] THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**JUDGES:** Munro, J.

**OPINION BY:** Lynda B. Munro

**OPINION**

*MEMORANDUM OF DECISION*

This matter is before the court on a motion to dismiss for *forum non conveniens* asserted by all of the defendants, and, a motion to dismiss based on lack of personal jurisdiction filed by the defendant Bayer plc. The plaintiffs are Michael Lake and June Lake ("Lake"). They are U.K. citizens. The defendants are Bayer Corporation, Bayer AG and Bayer, plc. Bayer, plc is a UK corporation. Bayer AG is a German corporation. Bayer Corporation is an American corporation, incorporated in Indiana with its principal place of business in Pennsylvania. It also has a facility in West Haven, Connecticut where pharmaceutical marketing and research is carried on. Bayer AG is the parent corporation to both Bayer Corporation and Bayer plc. Collectively the defendants will be referred to as Bayer; when it is necessary to distinguish the entities, the US entity shall also be referred to as "Bayer Corp," the UK entity shall also be referred to as "Bayer plc," and the German [*2] entity shall also be referred to as "Bayer AG."

Bayer designed and manufactured a statin drug known as Cerivastatin. It was marketed as a pharmaceutical drug product in the United States under the name Baycol and in the U.K. under the name Lipobay. In 2000, Lipobay was prescribed for the plaintiff Lake by his U.K. physician. He took it from June until July 4, 2000. He ceased taking it after being hospitalized with rhabdomyolosis and kidney damage. Both of these conditions were attributed to his use of the

Lipobay. Subsequently in August 2001 AG ordered Cerivastatin withdrawn from the worldwide market. Subsequently, the plaintiffs filed a products liability suit against Bayer Corp and Bayer AG in Philadelphia, Pennsylvania state court as a part of the coordinated Baycol Mass Tort Litigation. The Pennsylvania state court and the federal district court in Minnesota (In re Baycol Product Liability Litigation, M.D.L. 1431) are the sites for most of the consolidated Baycol mass tort litigation in the United States.

The Pennsylvania Bayer defendants filed a motion to dismiss based upon *forum non conveniens*, arguing the U.K. was the most appropriate forum for [*3] the Lakes' litigation. The Pennsylvania judge (Ackerman, J.) granted the motion on the condition that the defendants consent to jurisdiction and accept service of process in the State of Connecticut and the U.K., and, waive the statute of limitation in the two jurisdictions. The defendants Bayer AG and Bayer Corp agreed to those conditions and, therefore, the matter was dismissed. The plaintiffs re-filed the action here in Connecticut and included the defendant Bayer plc in the instant matter.

*I. Motion to dismiss--Bayer plc*

Bayer plc asserts in its motion to dismiss that this court lacks personal jurisdiction over it. Notably, Bayer plc was not a party to the Pennsylvania litigation and, therefore, it did not consent to jurisdiction in Connecticut. For the reasons stated hereinafter, Bayer plc's motion to dismiss is granted.

"A defendant may contest the personal jurisdiction of the court even after having entered a general appearance, but must do so by filing a motion to dismiss within thirty days of the filing of an appearance." (Internal quotation marks omitted.) *Brunswick v. Inland Wetlands Commission, 222 Conn. 541, 551, 610 A.2d 1260 (1992)*. The motion [*4] to dismiss has been filed in a timely manner.

"[I]n ruling upon whether a complaint survives a motion to dismiss, a court must take the facts to be those alleged in the complaint, including those facts necessar-

ily implied from the allegations, construing them in a manner most favorable to the pleader. (Internal quotation marks omitted.) *Lawrence Brunoli, Inc. v. Branford, 247 Conn. 407, 410-11, 722 A.2d 271 (1999)*. "The motion to dismiss . . . admits all facts which are well pleaded, invokes the existing record and must be decided upon that alone . . . Where, however . . . the motion is accompanied by supporting affidavits containing undisputed facts, the court may look to their content for determination of the jurisdictional issue and need not conclusively presume the validity of the allegations of the complaint." (Citation omitted; internal quotation marks omitted.) *Barde v. Board of Trustees, 207 Conn. 59, 62, 539 A.2d 1000 (1988); Shay v. Rossi, 253 Conn. 134, 140, 749 A.2d 1147 (2000)*.

An examination of personal jurisdiction requires a two-fold inquiry. "When a defendant files a motion to dismiss challenging the court's jurisdiction, [*5] a two part inquiry is required. The trial court must first "decide whether the applicable state long-arm statute authorizes the assertion of jurisdiction over the [defendant]. If the statutory requirements [are] met, its second obligation [is] then to decide whether the exercise of jurisdiction over the [defendant] would violate constitutional principles of due process." [Citations omitted.] *Knipple v. Viking Communications, 236 Conn. 602, 606, 674 A.2d 426 (1996)*. "If a challenge to the court's personal jurisdiction is raised by a defendant, either by a foreign corporation or by a nonresident individual, the plaintiff must bear the burden of proving the court's jurisdiction." *Id. 607*.

*Longarm statute*

*Conn. Gen. Stat. 33-929(e)* and *(f)* provide the basis for Connecticut's exercise of jurisdiction over a foreign corporation:

> (e) Every foreign corporation which transacts business in this state in violation of section 33-920 shall be subject to suit in this state upon any cause of action arising out of such business.

> (f) Every foreign corporation shall be subject to suit in this state, by a resident [*6] of this state or by a person having a usual place of business in this state, whether or not such foreign corporation is transacting or has transacted business in this state and whether or not it is engaged exclusively in interstate or foreign commerce, on any cause of action arising as follows: (1) Out of any contract made in this state or to be performed in this state; (2) out of any business solicited in this state by mail or otherwise if the corpora-

tion has repeatedly so solicited business, whether the orders or offers relating thereto were accepted within or without the state; (3) out of the production, manufacture or distribution of goods by such corporation with the reasonable expectation that such goods are to be used or consumed in this state and are so used or consumed, regardless of how or where the goods were produced, manufactured, marketed or sold or whether or not through the medium of independent contractors or dealers; or (4) out of tortious conduct in this state, whether arising out of repeated activity or single acts, and whether arising out of misfeasance or nonfeasance.

The plaintiffs do not claim that Bayer plc, itself, has transacted business in Connecticut, [*7] made a contract in Connecticut or to be performed in Connecticut, solicited business in Connecticut, produced, manufactured or distributed goods to be used in Connecticut, or engaged in tortious conduct in Connecticut. Instead, the plaintiffs argue that Bayer plc, Bayer Corporation and Bayer AG have "such a unity of interest . . . that any individuality or separateness between them has ceased, and these Defendants are the alter-egos of one and another and exert control over each other. Accordingly, the actions of one can and should be attributed to all." (Pl. brief, p.7). The plaintiffs, then, assert this argument to essentially pierce the corporate veil of Bayer Corp so that jurisdiction can be found over Bayer plc.

The following additional facts are cited by the plaintiffs in support of their claim. The plaintiffs assert that the Pennsylvania court's denial of a motion for summary judgment of the plaintiffs' claims against Bayer Corp and Bayer AG must lead this court to the conclusion that there is an issue of fact as to whether the US corporation was involved in the sale, marketing and labeling of Cervastatin in the U.K. However, this court is not bound by that determination. [*8] Further, the pleadings and accompanying documentation regarding that motion for summary judgment are not before this court. Certainly, this cannot comprise a basis for this court to make a determination as a matter of law that there is jurisdiction over a sister U.K. entity who was not a party to the litigation in Pennsylvania.

The following additional facts are available to the court for purposes of this motion to dismiss. Bayer plc is a British public limited company that only does business in the U.K. It is wholly owned by Bayer AG, as is the American Bayer Corp. The global marketing director of

Bayer pharmaceuticals worked at the Bayer West Haven pharmaceutical offices during the times in question for this law suit. The plaintiffs assert that the discovery in the other US Baycol litigation establishes that the Bayer Corp in fact marketed Cervastatin in the U.K. The Bayer Corp conducted 24 clinical trials that involved Cervastatin. These were administered through the Connecticut operation. The Connecticut operation also housed an epidemiologist, Steven Niemcryk, who reported the increased occurrence of the adverse, effect of rhabdomyolosis on Baycol patients. Niemcryk had global [*9] responsibility for collecting adverse incidents related to Cervastatin worldwide.

The plaintiff argues that the above facts and those in the affidavits and accompanying documents submitted to the court are sufficient for the court to pierce the Bayer corporate veils and find that Bayer plc has under a 'unity of interest' doctrine done business in Connecticut pursuant to the longarm statute, and, further, that there are sufficient minimum contacts to satisfy due process considerations. Connecticut recognizes two theories under which a party may seek to pierce a corporate veil. They are the instrumentality test and the identity test. *KLM Industries, Inc. v. Tylutki, 75 Conn.App. 27, 32, 815 A.2d 688 (2003).* [1] Here the plaintiffs seek to accomplish the piercing of the corporate veil through the identity (test or) rule. The identity rule has been stated as follows:

"If the plaintiff can show that there was such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun, an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape [*10] liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise." (Internal quotation marks omitted.) *Davenport v. Quinn, supra, 53 Conn. App. 300-01,* quoting *Angelo Tomasso, Inc. v. Armor Construction & Paving, Inc., supra, 187 Conn. 554.* "The identity rule primarily applies to prevent injustice in the situation where two corporate entities are, in reality, controlled as one enterprise because of the existence of common owners, officers, directors or shareholders and because of the lack of observance of corporate formalities between the two entities." *Angelo Tomasso, Inc. v. Armor Construction & Paving, Inc., supra, 560.* "There must be such domination of finances, policies and practices that the controlled corporation has, so to speak, no

separate mind, will or existence of its own and is but a business conduit for its principal." (Internal quotation marks omitted.)

*Id., 556;* see also *Klopp v. Thermal-Sash, Inc., 13 Conn.App. 87, 89 n.3, 534 A.2d 907 (1987)* (identity doctrine primarily applied to reach beyond veil to another corporation).

*Litchfield Asset Management Corp. v. Howell, 70 Conn.App. 133, 156-7, 799 A.2d 298 (2002).* [*11]

1   This case also found that the principles of law regarding the piercing the corporate veil doctrine that have been long applicable to corporations also apply to limited liability companies.

While the plaintiffs have established that Bayer plc is wholly owned by Bayer AG, they have not provided any evidence that the corporations have failed to observe corporate formalities, or that Bayer plc has not existed as a separate entity from the other two entities. *Id. at 152.* The plaintiffs have provided the court nothing to conclude that Bayer Corp. or Bayer AG exercised such pervasive control over Bayer plc that it ceased to function independently. As to the Cervastatin drug, the British Bayer plc obtained all of the regulatory approval for the same, not Bayer Corporation or Bayer AG.

It cannot be found that, ignoring the defendants' factual assertions and viewing the evidence in a light most favorable to the plaintiffs, that Bayer plc's corporate veil should be pierced such that it should be found [*12] to be subject to jurisdiction in Connecticut's courts. Indeed if Bayer Corp were to have somehow controlled Bayer plc through the evidence provided, that might be a sound basis for jurisdiction over the Bayer Corp in the U.K. courts (assuming they applied principles of law similar to ours on the doctrine). The conclusory language of the plaintiffs' memorandum that there is a unity of interest does not make it so. "A court may pierce the corporate veil only under exceptional circumstances . . ." (Internal quotation marks omitted.) *United Electrical Contractors, Inc. v. Progress Builders, Inc., 26 Conn.App. 749, 755, 603 A.2d 1190 (1992).* No such circumstances have been presented here. The plaintiffs have failed to satisfy their burden.

The motion to dismiss for lack of personal jurisdiction over Bayer plc is granted.

*II. Motion to Dismiss--Forum non conveniens*

The remaining defendants seek the court's dismissal of the plaintiffs' action on the basis of *forum non conveniens.* "[A] plaintiff's choice of forum should rarely be

disturbed. However, when an alternative forum has jurisdiction to hear the case, and when trial in the chosen forum would 'establish [*13] . . . oppressiveness and vexation to a defendant . . . out of all proportion to plaintiffs convenience,' or when the 'chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems,' the court may, in the exercise of its sound discretion, dismiss the case." *Piper Aircraft Co. v. Reyno, 454 U.S. 235, 241, 102 S. Ct. 252, 70 L. Ed. 2d 419 (1981)*, reh. denied, *455 U.S. 928, 102 S. Ct. 1296, 71 L. Ed. 2d 474 (1982)*. *Piper* went on to limit the deference for the plaintiff's choice of forum where the plaintiff is foreign to the jurisdiction in which the action has been brought. "When the plaintiff is foreign, however, this assumption is much less reasonable. Because the central purpose of any *forum non conveniens* inquiry is to ensure that the trial is convenient, a foreign plaintiff's choice deserves less deference "*Id. 454 U.S. at 256* (footnote omitted). That is the case here; therefore while some deference is due to the plaintiff's choice of forum, it is not so much that this court would be loathe to disturb the choice.

> Thus, a . . . judge's *forum non conveniens* inquiry [*14] should proceed in four steps. As a prerequisite, the court must establish whether an adequate alternative forum exists which possesses jurisdiction over the whole case. Next, the trial judge must consider all relevant factors of private interest, weighing in the balance a strong presumption against disturbing plaintiffs' initial forum choice. If the trial judge finds this balance of private interests to be in equipoise or near equipoise, he must then determine whether or not factors of *public* interest tip the balance in favor of a trial in a foreign forum. If he decides that the balance favors such a foreign forum, the trial judge must finally ensure that plaintiffs can reinstate their suit in the alternative forum without undue inconvenience or prejudice.

*Pain v. United Technologies Corporation, 205 U.S. App. D.C. 229, 637 F.2d 775, 784-85 (D.C. Cir. 1980)*. Our own Supreme Court has come to a similar conclusion. It has found that the "downward pressure of the thumb" on the weighing scales, in favor of the plaintiff's choice of forum should be let up somewhat:

> When, as in the present action, the plaintiffs are foreign to their chosen forum, the trial [*15] court must readjust

the downward pressure of its thumb, but not remove it altogether from the plaintiffs' side of the scale. Even though the plaintiffs' preference has a diminished impact because the plaintiffs are themselves strangers to their chosen forum; *Piper Aircraft Co. v. Reyno, supra, 256*; Connecticut continues to have a responsibility to those foreign plaintiffs who properly invoke the jurisdiction of this forum; see *Carlenstolpe v. Merck & Co., supra, 904*; especially in the "somewhat unusual [situation where] it is the forum resident who seeks dismissal. *Schertenleib v. Traum, 589 F.2d 1156, 1164 (2d Cir. 1978)*; *Manu International, S.A. v. Avon Products, Inc., supra, 67*.

*Picketts v. International Playtex, Inc., 215 Conn. 490, 502, 576 A.2d 518 (1990)*.

### a. Existence of another forum.

The defendants have stipulated to process and jurisdiction in the U.K. so those issues are not before this court. They have also stipulated to waive any statute of limitations claims. Therefore these barriers to litigate in another jurisdiction are non-existent.

The defendants argue that the plaintiffs have available [*16] to them the U.K. courts to bring this action. They argue that even if the circumstances of an action for the plaintiff there may be somewhat less favorable, that is not a basis on which to decide the present motion. The plaintiffs resist this claim, arguing that while the U.K. courts are technically available to Mr. Lake, the practical reality is that the factors that weigh in on the pursuit of this action will effectively prevent him from ever filing it in the U.K., and, Mrs. Lake asserts that the U.K. courts do not recognize her claim for loss of consortium arising out of her husband's claimed loss. "[T]he possibility of an unfavorable change in law should *never* be a relevant consideration in a *forum non conveniens* inquiry. Of course, if the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all, the unfavorable change in law may be given substantial weight; the district court may conclude that dismissal would not be in the interests of justice." *Piper, op. cit., at 254* (emphasis in original) (footnote omitted). For the reasons stated hereinafter, after an examination of the supporting documentation submitted [*17] by both sides as to the availability of the U.K. as a forum for these plaintiffs, the court agrees with the plaintiffs.

The plaintiffs and the defendants, respectively submitted affidavits from Queens Court counsel in the U.K. which detail the particulars of the legal system presently operating in the U.K. as it relates to a claim such as these plaintiffs would seek to assert against a pharmaceutical defendant for injuries. Michael Gerald Spencer QC provided comprehensive and extensive affidavit with supporting exhibits on behalf of the moving defendants. He described the existing available products liability law under which Mr. Lake could proceed in the U.K. He then described the framework of the system in place for payment of counsel for plaintiffs. It is this framework and the question of its availability to the plaintiff Mr. Lake that is a major issue here. The plaintiffs' retained expert on U.K. law, Mark Andrew Harvey QC posits that the system of compensation of counsel for plaintiffs as it is currently employed renders it unavailable to the plaintiff Mr. Lake. Therefore, the court will undertake an examination of that framework and the implications of it for the plaintiff with [*18] the backdrop of British law. Thereafter, the court will consider the effects of this on the plaintiff's ability to pursue a remedy in England, in the context of the U.K. 'loser pays' system to determine whether considering such impact is inappropriate, or, will result in the plaintiff having no forum at all in the U.K. *Piper Aircraft, op. cit.*

The affiants credentials are, respectively, highly creditable and it would appear that Messrs. Harvey and Spencer are highly esteemed, learned and experienced barristers in the U.K. At the outset, the respective experts agree that Mrs. Lake cannot bring a loss of consortium claim in the U.K. Therefore, as to her, die court can easily conclude that the U.K. does not offer an alternative forum for her derivative claim.

The British system provides that the losing party in litigation is responsible for the attorney fees and costs of the prevailing party. The fees and costs of a products liability claim against a pharmaceutical company are likely to range in the millions of pounds. There is a program that provides a type of public funding for plaintiffs in the U.K. which insulates an unsuccessful publicly funded plaintiff from the loser pays [*19] system. In 2001, Harvey represented 27 British citizens who wanted to bring an action against Bayer plc and sought public funding for the same. Upon application for public funding for the designated lead plaintiff, the U.K. Court granted only £1500. This is an insufficient sum to pursue a labor and cost intensive products liability action. Harvey stated in his affidavit that the U.K. Government had decided in 2000 to remove public funding from most personal injury claims and have those matters proceed with a Conditional Fee Agreement. That program was intended to provide an opportunity for those cases to proceed by counsel being paid through a contingency fee, more akin to what we are accustomed to seeing as the vehicle for payment of an attorneys fee in a personal injury case. However, the problem for these plaintiffs is that the arrangement does not insulate the plaintiff from the loser pays scenario. Most plaintiffs, it is argued, are risk averse in this situation: they will not jeopardize their life's savings and assets for what would be only the possibility of a very modest recovery. Harvey points out that the products liability law of the U.K. does not provide for punitive damages; [*20] those limited circumstances under which punitive damages are available in England do not cover the plaintiff's claims. The likely range of awards for compensatory damages in the U.K. for pharmaceutical related injuries is 4,000-10,000 pounds, according to a document submitted by Bayer (and prepared by Arnold & Porter in 2002) in opposition to a request for public funding for Lipobay pending before the British Legal Services Commission.

As a practical matter then, Harvey says no claim is available to Mr. Lake in England. He will be in the same boat as the other Baycol plaintiffs who never brought their claim. In a forum case arising out of the massive and tragic incident in Bhopal, India, the court considered the lack of contingency fees and found that it was not an impediment there. "In any event, the lack of contingency fees is not an insurmountable barrier to filing claims in India, as demonstrated by the fact that more than 4,000 suits have been filed by victims of the Bhopal gas leak in India, already." *In Re Union Carbide Corp. Gas Plant, 634 F. Supp. 842, 851 (S.D.N.Y. 1986).* Here, by contrast, no Lipobay claims have been brought against Bayer plc in the British [*21] courts. It would seem improbable there is no such valid claim when Bayer has paid approximately $ 1 billion in claims in the United States for Baycol claims.

The defendants remind the court that the inquiry under *Piper* is not whether the claim will fare as well in England, rather it is whether England affords a forum in which to seek relief. The court's inquiry into the procedural and substantive law here is consistent with *Piper*-- it is only to inquire as to whether, as a result of that law, no forum is actually available. Further, this case is distinguishable from *Miller v. United Techs Corp., 40 Conn.Sup. 457, 463, 515 A.2d 390 (1986),* where the court determined that the absence of contingency fee arrangements in the alternative forum was not "an insurmountable barrier to filing the claim abroad (plural removed)." Here, just as in *Miller,* that problem is only one in an amalgam of many factors that the court must consider.

QC Spencer, the defendant's legal expert--who in his affidavit details the availability of England as a legal forum to this plaintiff--has not always taken the same position. The plaintiffs submitted to the court an affidavit

by QC [*22] Spencer submitted to the New Jersey Vioxx mass tort judge (Higbee, J.) on an almost identical *forum non conveniens* situation. On behalf of U.K. plaintiffs, Spencer detailed, under oath, for the New Jersey court the following points: 1) there are no punitive damages available to the Vioxx U.K. plaintiffs in the U.K., 2) the costs of funding their litigation is 'prohibitive' (aff. Para. 58), 3) the loser pays system is the backdrop for the consideration of funding such litigation, 4) Vioxx claimants were denied public funding in the UK and without it those plaintiffs were not shielded from the loser pays rule.

QC Spencer concluded in his affidavit "From the above it can be seen that the English Plaintiffs have no realistic prospect of pursuing this litigation in the English courts . . . Everything there set out applies even more strongly to the English Plaintiffs for whom law firm support based on contingency fee is unavailable (and unlawful) in England. It would follow from this that the NJ Court is the only available court in which they can maintain their actions and, if entitled, obtain relief." (*Id.*, at para. 20). If Spencer is believable then it is only by reading his two [*23] affidavits in conjunction with each other: his Lipobay affidavit, and the documents supporting the same, says that there are procedures and laws that allow the plaintiffs to pursue their claims in England, but, those procedures and laws in practical reality are inadequate and do not provide plaintiffs in these kinds of cases an alternative or, in reality, available forum to maintain their claims. That reading of his statements is consistent with Harvey's affidavit.

This court in weighing all of the above concludes as to the first inquiry of *Piper* that it is not likely that the plaintiff Mr. Lake would be able to avail himself of the forum in England, that it provides no opportunity under its intermeshed relationship of the process of litigation and the substantive law for him to seek relief. [2]

> 2 Mrs. Lake has no opportunity to pursue her derivative claim in England. While that alone cannot be determinative of the arguments addressed to the forum regarding her husband's case, it would have provided a practical problem for the court, inasmuch as it would be inappropriate to deprive her of her only forum. The court need not face that question given the result today.

[*24] *b. Relevant private interest factors and the plaintiffs' choice of forum.*

The law regarding *forum non conveniens* has traditionally weighted considerations heavily in favor of allowing a plaintiff to proceed with litigation in his chosen forum. *Koster v. Lumbermens Mutual Casualty Co., 330 U.S. 518, 67 S. Ct. 828, 91 L. Ed. 1067 (1947).* Here,

however, the plaintiff is British. The *Piper* court found that this presumption is not necessarily applicable where there is a foreign plaintiff. "When the plaintiff is foreign, however, this assumption is much less reasonable. Because the central purpose of any *forum non conveniens* inquiry is to ensure that the trial is convenient, a foreign plaintiff's choice deserves less deference." *Piper, 454 U.S. at 256.*

The United States Supreme Court has described the private factors to be weighted: "If the combination and weight of factors requisite to given results are difficult to forecast or state, those to be considered are not difficult to name. An interest to be considered, and the one likely to be most pressed, is the private interest of the litigant. Important considerations are the relative ease [*25] of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing witnesses; possibility of view of premises if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive. There may also be questions as to the enforceability of a judgment if one is obtained. The court will weigh relative advantages and obstacles to fair trial. It is often said that the plaintiff may not, by choice of an inconvenient forum, "vex," "harass," or "oppress" the defendant by inflicting upon him expense or trouble not necessary to his own right to pursue his remedy. But unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." (Footnote removed.) *Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508, 67 S. Ct. 839, 91 L. Ed. 1055 (1947).*

In the instance of this litigation, the access to proof in the United States is easy for both parties as a result of the prolific liability discovery that has already ensued in the Pennsylvania and MDL Baycol litigation, to which both sides have easy, affordable [*26] access. The evidence pertaining to Mr. Lake's care, treatment and injuries all is reposed in England. The court is satisfied from the descriptive affidavits of the U.K. counsel that that information is readily available through process whether the case is litigated in the United States or in England. The plaintiff's counsel have already agreed to bring Mr. Lake to the United States for a deposition (at oral argument) so the concerns of associated costs for the same are obviated. This court will observe as well that in this 21st century with the technology available and the institutionalized procedures established, it is not impracticable, burdensome or costly for any other depositions of U.K. individuals to be accomplished by video deposition. [3] The defendants argued in their reply brief more fully as to the inadequacy of the British procedure for the accomplishment of those depositions, and, the inability to force the British witnesses to come to Connecticut for

trial testimony. The defendants argue, therefore, that while the plaintiff has immediate access to all of the Baycol liability evidence in the United States, they will suffer great hardship as a result of their inability [*27] to require the testimony of U.K. witnesses. These are, of course, some of the important private interest factors that the court must weigh. The witnesses that were in England would be all of the medical personnel who have treated the plaintiff, and, lay witnesses who may have salient observations relating to a damages inquiry. The defendants intend to assert claims that the plaintiff suffered from a variety of other health problems that caused or contributed to the adverse health complaints he experienced. This will of course necessitate discovery, which will be governed by the Hague Convention on Taking of Evidence Abroad in Civil and Commercial Matters, 1970.

> 3   The court also observes, that depending on the time of the year, it is often less costly to fly to England than to various locations within the United States.

In the matter of *Durkin v. Intevac, Inc., 258 Conn. 454, 492-3, 782 A.2d 103 (2001)*, the Supreme Court explored the limitations of that authority as it applied, in that instance [*28] to Australia. What is clear from that and the supporting documentation submitted by the parties, is that the discovery that will be available to the parties is no less than that which would be available to them if they were proceeding with this litigation in the U.K. Therefore, the defendants cannot be claimed to be harmed by the matter proceeding, thus, here.

The court in *Durkin* also considered under the *Gilbert* factors regarding private interests, the lack of process available to make compulsory the attendance of British witnesses here. The court notes that the defendants have not satisfied the court that the British doctors they refer to would not come here voluntarily or that there are so many of them that a great burden would be imposed as with the 144 witnesses in *Durkin*. Further, our legislature has specifically carved out a rule in which testimony of medical providers is allowed through their treating reports in lieu of their live testimony. *Gen. Stat. 52-174*. The courts in every such instance instruct the jury that the written testimony is as good as the live testimony. For this court to construe such a matter differently here would be [*29] adverse to expressed legislative intent. If, instead, further opinion testimony is sought from the treaters as to the relationship between the plaintiff's other conditions versus the Baycol, with his manifested adverse symptoms, then deposition testimony can be utilized if the doctor is unavailable. The court notes that the *Durkin* court expressed displeasure with this alternative. This court is faced with weighing this one adverse pri-

vate interest fact that weighs in favor of the matter being in England versus the very real evidence provided by both parties that the forum, as a practical matter is not available. Further, our Supreme Court has found the use of such technology appropriate in the circumstances of an earlier far more on point case.

In regard to the weighing of private factors, the matter before this court is much more akin to *Pickett v. International Playtex, Inc.*, op.cit., than to *Durkin*. In *Pickett*, the plaintiff's decedent and her husband were citizens of British Columbia, Canada who brought a claim here against Playtex in strict liability and other theories claiming liability for the death that resulted from the decedent suffering toxic shock syndrome [*30] after the insertion of one of the defendant's super tampons. Ms. Pickett had purchased the tampon in British Columbia and when she had taken ill she was treated there by Canadian providers. The tampon she utilized, while manufactured in Canada, was manufactured in a manner substantially similar to the American Playtex super tampons. In its motion to dismiss for *forum non conveniens*, the defendants argued that they would be adversely affected in pursuing their medically related affirmative defenses because all of the evidence was in Canada which was beyond the compulsory authority of the Connecticut court. The *Pickett* facts are very similar to the instant matter. Using a *Gilbert* analysis, the trial court there found the Canadian court an adequate alternative forum, and then went on to consider the other factors. The trial court then went on to consider the above referenced private factors and dismissed the case. It was found to have abused its discretion. The Supreme Court concluded that the trial court had erred when it in effect shifted the burden from the defendant to prove that necessary evidence was "irretrievably located in Canada":

> The evidentiary submission [*31] in support of the defendants' contention was limited, in this case, to one affidavit from a physician who was unable, after review of the available medical documents, conclusively to determine whether toxic shock syndrome was the cause of the decedent's death. With respect to the medical personnel who actually attended the decedent, the defendants submitted no affidavits whatsoever regarding their unavailability despite the defendants' assertion that these medical witnesses could offer evidence material to the presentation of a defense concerning the decedent's medical condition and the quality of care.

*Id. at 510.*

No better evidence has been provided here by the defendants. The *Pickett* court went on to note:

> The court furthermore lost sight of modern technological innovations since the United States Supreme Court issued its decision in *Gilbert* in 1947. Just as "[j]et travel and satellite communications have significantly altered the meaning of 'non conveniens' "; *Manu International, S.A. v. Avon Products, Inc., supra,* 65, quoting *Calavo Growers of California v. Belgium,* 632 F.2d 963, 969 (2d Cir. 1980)* (Newman, J., concurring), [*32] cert. denied, 449 U.S. 1084, 101 S. Ct. 871, 66 L. Ed. 2d 809 (1981); see *Dow Chemical Co. v. Castro Alfaro, supra,* 708 (Hecht, J., dissenting), and 684 (Doggett, J., concurring); so too has the advent of the videotaped deposition greatly transformed the meaning of "compulsory process" in a *forum non conveniens* calculus. "[V]ideotaped depositions frequently make corporeal transportation of foreign witnesses unnecessary." *Rudetsky v. O'Dowd, supra,* 347-48. We conclude, therefore, that the trial court abused its discretion when it found that the private interest factors weighed in favor of the defendants sufficiently to overcome the presumption afforded the plaintiffs' chosen forum.

*Id. at 511-12.*

The circumstances of *Pickett* and the instant case involve the medical care of one plaintiff only. The circumstances the court had before it in *Durkin* was an airplane disaster involving many deaths and well over 100 potential witnesses in the foreign jurisdiction.

The court does not find that the plaintiff has brought this litigation in Connecticut to vex, annoy, or harass the defendants. Arguably, in fact, the defendants seek to remove this case [*33] to England to annoy the plaintiffs in that their ability to pursue litigation there will be severely hindered as discussed above. After considering Mr. Spencer's affidavit in the Vioxx litigation, this court infers from all of the evidence presented that it is the defendants that seek to annoy and vex the plaintiffs by seeking dismissal in favor of the U.K. jurisdiction. With that inference being drawn by this court, the court finds that the private interests which otherwise were fairly balanced, tip the scale in favor of retaining jurisdiction here, especially in light of the likely result of the plaintiff

finding himself in the camp of every other prospective U.K. Cervastatin plaintiff: not being able to file an action in U.K.

This court under a *Gilbert* and a *Piper* analysis really need not go on to consider the other two factors. They do raise some important matters though that should be before the court in its decision.

### c. The public interest and weighing the resent forum versus the foreign forum.

The *Gilbert* court also dictated that the trial court, when exercising its discretion as to whether to grant a motion to dismiss under the *forum non conveniens* doctrine [*34] also consider what it referred to as public factors. "Factors of public interest also have place in applying the doctrine. Administrative difficulties follow for courts when litigation is piled up in congested centers instead of being handled at its origin. Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation. In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only. There is a local interest in having localized controversies decided at home." *Id.* 508-9.

Indeed the plaintiffs first brought it in Pennsylvania where all of the American state Baycol cases were. The court in Pennsylvania picked the state of Connecticut as an appropriate forum along with the U.K. forum that the defendants sought solely. The plaintiffs' motivation for being in Connecticut is their perception of favorable substantive law and favorable process.

The defendants argue that under a choice of law analysis the law of the U.K. will be applied. They also urge that, as a public matter, this case will be [*35] a burden to the Connecticut court and a Connecticut jury. They go on to argue that our courts are already burdened and do not need the burden of litigation in which there is no claimed public interest. However, one of the defendants is a U.S. corporation, doing business in Connecticut. Connecticut has a public interest in the business conduct of its resident corporations. The court cannot speculate as to the value of the plaintiffs' claims against the American Bayer, but must consider them valid for purposes of this motion. [4] Therefore, jury duty of Connecticut residents may be expected as a matter of civic course for litigation involving a domestic entity. For a jury, the jury instructions of either Connecticut law or U.K. law will not substantially differ in terms of difficulty: both are common law jurisdictions with specific statutory enactments regarding such products liability claims. Perhaps the most burdened will be the undersigned, if the case is a matter of application of U.K. law; this court is confident in counsel's abilities to provide

such comprehensive argument and filings that it will result perhaps in nothing more than the research of the law of another common law [*36] jurisdiction, which is exactly what the court already does when it instructs on the law of a sister state in other appropriate circumstances. This burden is not so heavy as to outweigh the other considerations discussed herein which tip the scales in favor of the court declining the dismissal of this action.

> 4   As the plaintiffs have reminded the court, the Pennsylvania judge denied a motion for summary judgment against this defendant in the prior litigation. While the court, as stated earlier, is not aware of its contents or what it specifically addressed, it is fair to say there must have been some issues of fact and law for a court to decide by and between Mr. Lake and Bayer Corporation.

Presently, it cannot be argued that this case will unduly burden the Connecticut courts. The civil docket in Connecticut is in remarkably good shape [5] and this case is only a single plaintiff (and spouse) case of a pharmaceutical products liability claim which is housed in the Complex Litigation Docket which was established [*37] to address the needs of litigants such as these without interfering with the orderly flow of other court business.

> 5   Jury trials pending in 2005 are at 10,393. That is 13,000 below the level of 1998 and 3,500 cases below the level of 20 years ago. *See* Thomas B.

Scheffey, "How the Backlog was Crushed," *Connecticut Law Tribune*, July 3, 2006.

*d. The availability of the alternative forum without undue inconvenience or prejudice.*

This is the circular part of the analysis. While a consideration of all the factors leads this court to balancing the factors in favor of the plaintiffs, that fate is sealed when the court goes back to the consideration of the prejudice that is likely to occur if the plaintiff is left to the U.K. forum. While procedural infirmities will not be an issue, the plaintiffs remain inconvenienced and prejudiced by the loss of the Connecticut counsel and the unenviable position of having to seek a British counsel who will take Mr. Lake's case. It is highly unlikely such counsel will [*38]   be found: QC Harvey has described a situation where he is not likely to take the case and QC Spencer has in his Vioxx affidavit made similar conclusions. If two of the most esteemed and trusted counsel in the area of pharmaceutical litigation see no benefit in undertaking the representation of Mr. Lake or someone similarly situated to him, what is the likelihood he will be able to institute an action where no other Cervastatin plaintiff has done so. The court fears it is likely close to nil. That is tantamount to prejudice and inconvenience.

For all of the foregoing reasons, the court finds that the defendants have failed to meet their burden; therefore, the motion to dismiss on the grounds of *forum non conveniens* is denied

Munro, J.

2008 U.S. Dist. LEXIS 35462, *

**Howard Lasker, on behalf of himself and others similarly situated, Plaintiff, - against - UBS Securities LLC and UBS Loan Finance LLC, Defendants.**

**CV-08-0854 (CPS)(RER)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

*2008 U.S. Dist. LEXIS 35462*

**April 30, 2008, Decided**
**April 30, 2008, Filed**

**COUNSEL:** [*1] For Howard Lasker, Plaintiff: David Corey Katz, LEAD ATTORNEY, Weiss & Lurie, New York, NY; Mark Levine, LEAD ATTORNEY, Stull, Stull & Brody, New York, NY.

For UBS Securities LLC, UBS Loan Finance LLC, Defendants: Alexandra Shapiro, LEAD ATTORNEY, Latham & Watkins, New York, NY.

**JUDGES:** Charles P. Sifton, United States District Judge.

**OPINION BY:** Charles P. Sifton

**OPINION**

MEMORANDUM OPINION AND ORDER

SIFTON, Senior Judge.

Howard Lasker ("plaintiff"), on behalf of himself and others similarly situated, filed this purported class action against UBS Loan Finance LLC and UBS Securities LLC (collectively "UBS") on February 1, 2008 [1] for tortious interference with a business relationship arising out of the planned, but aborted, merger between Genesco, Inc. ("Genesco") and The Finish Line, Inc. ("Finish Line"). Now before this court is UBS's motion to dismiss pursuant to *Federal Rules of Civil Procedure 12(b)(3), 12(b)(6)*, and *12(b)(7)* [2]. For the reasons set forth below, defendants' motion is denied.

1    The case was originally filed in New York State Supreme Court and removed to this Court on February 28, 2008. This action was removed to federal court, pursuant to *28 U.S.C. § 1332(d)(2)*, since it is a purported class action. [*2] *28 U.S.C. § 1332(d)(2)(A)* gives federal courts original jurisdiction over class actions where the amount in controversy exceeds $ 5,000,000 and a member of the class of plaintiffs is a citizen of a different state from any defendant.

2    *Fed. R. Civ. Pro. 12(b)(7)* provides for dismissal where there has been a failure to join a party under *Rule 19*. Though referred to in their Notice of Motion, defendants made no arguments to dismiss on this ground in their memoranda of law, and clarified they were not pursuing dismissal on *12(b)(7)* grounds at oral argument.

**Background**

The following facts are taken from plaintiff's complaint in this action ("Complaint") and the parties' papers submitted in connection with this motion. The facts alleged in the Complaint are presumed to be true for the purposes of the 12(b)(6) motion to dismiss.

Plaintiff is a resident of Brooklyn, New York, and a holder of Genesco common stock. Non-party Genesco, a Tennessee corporation that maintains its headquarters [3] in Nashville, Tennessee, is a retailer and wholesaler of branded footwear and a retailer of branded head wear. Genesco's shares are traded on the New York Stock Exchange. Non-party Finish Line, an Indiana corporation [*3] that maintains its headquarters in Indianapolis, Indiana, is a large mall-based retailer of athletic apparel and shoes operating under the Finish Line, Man Alive, and Paiva brand names. Finish line's shares are traded on the NASDAQ Global Select Market. Headwind, Inc. ("Headwind") is a Tennessee corporation and wholly owned subsidiary of Finish Line formed for the sole purpose of completing a merger between Finish Line and Genesco.

3    As Genesco and Finish Line are not parties to this action, I need not determine their principal places of business.

Defendants UBS Securities LLC and UBS Loan Finance LLC are wholly owned subsidiaries of UBS AG and Delaware corporations with their principal places of business in New York. [4] UBS AG is a prominent invest-

ment banking and securities firm headquartered in Zurich, Switzerland.

> 4   According to plaintiff's complaint, UBS Loan Finance LLC maintains offices in Connecticut, but defendants state in their removal papers that UBS Loan Finance LLC's principal place of business is New York. There appears (at least at this point) no dispute that at least one member of the plaintiff class is a citizen of a state other than Delaware, New York, or Connecticut. [*4] *See 28 U.S.C. § 1332(d)(2)(A)*. Such jurisdictional issues will have to be more definitively resolved on any motion for class certification at the latest. *See 28 U.S.C. § 1332(d)(7)*.

On June 17, 2007, Finish Line entered into an Agreement and Plan of Merger ("Merger Agreement") to acquire Genesco. UBS Securities LLC served as Finish Line's financial advisor in connection with the merger and issued an opinion to Finish Line that the merger was fair from a financial point of view to Finish Line and its shareholders. Pursuant to the Merger Agreement, Finish Line was to pay $ 54.50 per share in cash for all the outstanding common stock of Genesco held by plaintiff and other members of the purported class. The merger was to be funded by $ 1.6 billion in debt financing from UBS. The Merger Agreement expressly stated that it conferred no rights upon any party as a third-party beneficiary. Further, pursuant to the Merger Agreement, if Genesco suffered a Material Adverse Effect, UBS would be excused from its obligations. Both the Merger Agreement and Commitment Letter, however, specifically excluded performance shortfalls due to industry-wide fluctuations from the definition of Material Adverse [*5] Effect. [5]

> 5   Section 3.1(a) of the Merger Agreement defines Company Material Adverse Effect, in relevant part, as follows:

> > [A]ny   event,   circumstance, change or effect that, individually or in the aggregate, is materially adverse to the business, condition (financial or otherwise), assets, liabilities or results of operations of the [Genesco] and [Genesco] Subsidiaries, taken as a whole; provided, however, that none of the following shall constitute, or shall be   considered   in   determining whether there has occurred, and no event, circumstance, change or effect resulting from or arising out of any of the following shall constitute a . . . Material Adverse Ef-

fect: . . . (B) changes in the national or world economy or financial markets as a whole or changes in general economic conditions that affect the industries in which [Genesco] and the [Genesco] Subsidiaries, so long as such changes or conditions do not adversely affect [Genesco] and the [Genesco] Subsidiaries . . . in a materially disproportionate manner relative to other similarly situated participants in the industries or markets in which they operate . . . (D) the failure, in and of itself, of the Company to meet any published or [*6] internally prepared estimates of revenues, earnings or other financial projections, performance measures or operating statistics; provided, however, that the facts and circumstances underlying any such failure may, except as may be provided in subsection (A), (B), (C), (E), (F), and (G) of this definition, be considered in determining whether a Company Material Adverse Effect has occurred . . .

Shapiro Decl. Ex. 1, at 8-9 (Merger Agreement).

Finish Line and UBS executed a commitment letter ("Commitment Letter") setting forth the terms of the financing on June 17, 2007. Also on June 17, 2007, Finish Line filed a Form 8-K [6] with the Securities and Exchange Commission ("SEC"), announcing the UBS commitment.

> 6   A Form 8-K is the SEC form used for companies' current reports pursuant to Sections 13 and 15(d) of the Exchange Act, *15 U.S.C. §§ 78m(a)(2), 78o(d)*. A Form 8-K must be filed upon the occurrence of certain significant corporate events as defined by the SEC and may be filed with respect to any other matter the company considers of material importance.

Genesco filed its proxy statement [7] with the SEC on July 11, 2007. On July 23, 2007, the SEC notified Genesco that it would not review [*7] the proxy statement and that Genesco could file and disseminate it. Shortly thereafter, Finish Line informed Genesco that it needed additional time to complete the UBS financing transaction.

7   Congress and SEC proxy rules require that specified information be given to security-holders either before or at the time of a proxy solicitation, regulate the presentation of that information, and prohibit false or misleading statements in proxy materials. *See* 15 U.S.C. § 78n(a); 17 C.F.R. §§ 240.14a-1 -- 240.14b-2.

On August 6, 2007, an article in the *Indianapolis Business Journal* reported that tightening of the credit markets along with a decline in Finish Line's operating performance and stock price "spooked" UBS and that some analysts had begun speculating whether UBS would "pull the plug" on its financing commitment. The article further reported that Finish Line's Chief Financial Officer, Kevin Wampler, stated during a June 29, 2007 conference call with analysts that neither Finish Line's falling share price nor the tightening of the credit markets "give UBS an out" of its financing commitment.

On August 14, 2007, the necessary regulatory approvals for the merger were obtained. On August 30, [*8] 2007 Genesco issued a press release announcing its second quarter 2007 financials. Genesco's earnings were lower than analysts' estimates and reported a loss of $ 0.13 per share.

On September 11, 2007, UBS wrote to Finish Line that UBS was "extremely concerned" about the "apparent deteriorating financial position" of Genesco and that UBS was reserving its rights with respect to its obligation to complete the financing. The financial results announced by Genesco on August 30, 2007, were consistent with results experienced by its peers, including Finish Line. [8] UBS had been receiving weekly updates concerning Genesco's financial results.

8   For example, on September 13, 2007, Finish Line issued a press release noting decreased sales and giving explanations similar to those given by Genesco, including a shift of certain states' sales tax holidays to August and later school start dates in several states.

On September 13, 2007, UBS wrote a second letter to Finish to report that UBS was "not yet satisfied that Genesco has not experienced a Material Adverse Effect." On September 14, 2007, in response to this contention, Genesco issued a press release stating, "no 'material adverse effect' under   [*9] the previously announced merger agreement with Finish Line has occurred with respect to Genesco."

On September 17, 2007 Genesco's shareholders, at a special shareholder meeting concerning the merger, approved the merger. Thus, as of September 17, 2007, Genesco had satisfied all of the pre-conditions to closing set forth in the Merger Agreement. Pursuant to the

Merger Agreement, an obligation to close on or before September 19, 2007 was triggered.

On September 18, 2007, counsel for Finish Line e-mailed counsel for Genesco to advise Genesco that UBS decided to stop any further work towards closing the financing transaction "pending the results of its analyses of Genesco's financial condition and performance."

On September 19, 2007, Genesco issued a press release which contained a letter from its Chairman and Chief Executive Officer, Hal Pennington. Pennington stated Finish Line and UBS had failed to meet deadlines for obtaining the UBS financing needed to consummate the merger and set forth his belief that UBS was looking for a way out of its commitment because certain external factors, including upheaval in the credit markets, made the merger less profitable for UBS. [9]

9   On October 1, 2007, [*10] UBS revealed that it would write down $ 3.6 billion from bad investments related to, among other things, United States sub-prime mortgages. Mark Rohner, UBS AG's Chief Executive Officer, announced that UBS AG was changing the bank's investment focus as it had been too free with its funding in high volume, high grade exposure. Shortly thereafter, UBS AG admitted it was unlikely to be profitable in the fourth quarter of 2007 because of further possible write downs. UBS AG further stated that of the more than $ 40 billion it held in sub-prime paper or collateralized debt obligations ("CDO"), $ 13.8 billion in mezzanine CDO's could be vulnerable (mezzanine classes of investments are usually second to senior classes to receive interest and principal payments in the case of default). UBS reported further negative news in December 2007, including a December 10, 2007 announcement that it would write down $ 10 billion in bad investments.

Also on September 19, 2007, Finish Line issued a press release announcing that UBS had decided to stop work on the closing documents for the financing and that Finish Line would "consider its options" under the Merger Agreement.

On September 21, 2007, Genesco [*11] filed suit in Chancery Court in Nashville, Tennessee ("Chancery Court"), against Finish Line and UBS ("Genesco Action") seeking an order requiring Finish Line to consummate the Merger with Genesco and to enforce Finish Line's rights against UBS under the Commitment Letter. UBS and Finish Line asserted a contract and two tort defenses to closing the merger. First, they argued that Genesco had suffered a Material Adverse Effect. They further argued that Genesco committed securities fraud

and fraudulently induced Finish Line to enter into the Merger Agreement by failing to provide material information concerning Genesco's May performance and updated projections to Finish Line prior to the signing of the Merger Agreement. [10]

> 10  On November 26, 2007, Genesco received a subpoena from the United States Attorney's Office for the Southern District of New York for all documents relating to Genesco's negotiations and Merger Agreement with Finish Line. The subpoena stated that the documents were sought in connection with alleged violations of federal fraud statutes.

On October 9, 2007, plaintiff filed a purported class action in the Chancery Court against Finish Line, Headwind, and UBS ("Lasker [*12] State Action"). The factual predicate for plaintiff's claims against the defendants in the Lasker State Action was the same as the predicate in the instant matter, the aborted Genesco-Finish Line merger. As in the complaint in this case, plaintiff accused UBS of undermining the merger and asserted that UBS's alleged conduct harmed Genesco shareholders by preventing the merger from closing. Plaintiff sought to compel Finish Line's specific performance of the Merger Agreement or, in the alternative, compensatory damages. Against UBS, plaintiff alleged that UBS aided and abetted breach of the Merger Agreement and sought compensatory damages. He later re-characterized his claim as one of procurement of breach of contract. [11] Chancellor Lyle, of the Chancery Court, dismissed these claims on November 30, 2007, ruling that, in light of the express disclaimer in the Merger Agreement of third-party beneficiaries, Genesco's shareholders were not parties to the contract and lacked standing to assert claims based upon the document.

> 11  Under Tennessee Law, procurement of breach of contract requires proof of seven elements: (1) a legal contract to which plaintiff is a party; (2) knowledge of the [*13] existence of the contract; (3) an intention to induce its breach; (4) malice; (5) breach of contract; (6) proximate cause; and (7) damages. *Hauck Mfg. Co. v. Astec Industries, Inc., 376 F. Supp. 2d 808, 832 (E.D.Tenn. 2005)*; *see also Federated Rural Elec. Ins. Exchange v. Hill, 2007 Tenn. App. LEXIS 152, 2007 WL 907717, at \*13 (Tenn. Ct. App. Mar. 26, 2007)*. In Tennessee, the common law action for tortious interference with contract and the statutory action for unlawful procurement of breach of contract, see *Tenn. Code Ann. § 47-50-109*, have the same elements and operate as alternative theories of recovery. *Hauck Mfg., 376 F. Supp.2d at 832*.

Chancellor Lyle tried the Genesco Action from December 10 through December 18, 2007. On December 27, 2007, Chancellor Lyle ruled that all conditions to the Merger Agreement had been met and that UBS had not been defrauded by Genesco. Though the court concluded that a Material Adverse Effect had occurred, it found that it was not grounds to invalidate the Merger Agreement because it was caused by general economic conditions, which had been eliminated as a basis for invalidation in the Merger Agreement itself. Accordingly, the Chancery Court ordered Finish Line specifically [*14] to perform the terms of its Merger Agreement with Genesco. [12] The Chancery Court noted, however, that there was a pending declaratory judgment action in the Southern District of New York between UBS, Finish Line, and Genesco in which UBS sought a declaration that the combined Finish Line-Genesco entity would be insolvent ("Declaratory Judgment Action"), and if that court concluded the combined entity would be insolvent, the merger would be halted. [13]

> 12  Both UBS and Finish Line appealed this decision.
> 13  UBS filed the Declaratory Judgment Action on November 15, 2007. On March 4, 2008, the parties resolved the claims between them and executed a settlement agreement and mutual release. Pursuant to the settlement, UBS and Finish Line transferred to Genesco $ 175 million and 12% of Finish Line stock. Further, Genesco's claims against UBS and Finish Line, including the claims in the Chancery Court, as well as the Merger Agreement, were terminated.

## Discussion

Defendants move to dismiss based on the doctrine of abstention set forth in *Colorado River Water Conservation District v. United States, 424 U.S. 800, 96 S. Ct. 1236, 47 L. Ed. 2d 483 (1976)*, the doctrine of *forum non conveniens,* and a failure to state a claim.

### I. Abstention

Where [*15] there are concurrent state and federal court proceedings, a district court may abstain from exercising its jurisdiction in exceptional circumstances, when the concept of "(w)ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation" so counsels. *Colorado River, 424 U.S. at 817-18* (quoting *Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co., 342 U.S. 180, 72 S. Ct. 219, 96 L. Ed. 200, 1952 Dec. Comm'r Pat. 407 (1952))*. [14] Abstention under *Colorado River* is only appropriate if the concurrent proceedings are parallel, meaning they involve substantially the same parties and

issues. *See Dittmer v. Cty. of Suffolk, 146 F.3d 113, 117-18 (2d Cir. 1998).* If the actions are parallel, the district court next considers six factors in further evaluating whether the exceptional circumstances required for abstention are present:

> (1) whether the controversy involves a res over which one of the courts has assumed jurisdiction;
>
> (2) whether one forum is more inconvenient than the other for the parties;
>
> (3) whether staying the federal action will avoid piecemeal litigation;
>
> (4) whether one action is significantly more advanced than the other;
>
> (5) [*16] whether federal or state law provides the rule of decision;
>
> (6) whether the federal plaintiff's rights will be protected in the state proceeding.

*Moses H. Cone Memorial Hosp. v. Mercury Construction, 460 U.S. 1, 15-16, 19-23, 26, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983).* [15]

14   In *Colorado River,* the United States brought suit in federal district court, on behalf of itself and certain Indian tribes, to settle water rights against private water users. Prior to its filing of the suit in federal court, however, lengthy proceedings concerning these same water rights had been held in Colorado Water Division 7, in which the United States had been joined as a defendant, pursuant to the McCarran Amendment, *43 U.S.C. § 666.* The Supreme Court affirmed the district court's dismissal of the federal proceeding, citing the danger of piecemeal litigation, the absence of any proceedings in the district court beyond the motion to dismiss, the extent to which state water rights were involved, the considerable geographic distance between the district court and the state court, and the government's participation in the state court proceeding. *424 U.S. at 819-20.*

15   In *Cone,* the hospital sued for declaratory judgment regarding rights and liabilities   [*17] under a contract between it and Mercury. Mercury subsequently brought suit in federal court to compel arbitration. The district court stayed the suit pending resolution of the state court action, but the Supreme Court reversed, finding that the above factors counseled against the stay.

The Supreme Court stated that no single factor is necessarily dispositive, and that the test "does not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction." *Moses H. Cone, 460 U.S. at 16; see also Colorado River, 424 U.S. at 818-19.* Thus, the facial neutrality of a factor is a basis for retaining jurisdiction, not for yielding it. For example, with respect to the first *Colorado River* factor, "the absence of a res point[s] toward exercise of federal jurisdiction." *Village of Westfield v. Welch's, 170 F.3d 116, 122 (2d Cir. 1999)* (internal quotation marks omitted).

A. Parallel Chancery Court Proceeding

The Lasker State Action in the Tennessee Chancery Court is parallel to this action. The plaintiff is the same and UBS is a defendant in both actions. [16] Plaintiff alleges [*18] essentially the same facts and seeks the same relief, compensatory damages because the merger did not close, although under a new legal theory. [17] *Telesco v. Telesco, 765 F.2d 356, 362 (2d Cir. 1985)* (district court did not abuse its discretion in abstaining where, despite plaintiff's raising a new legal theory in one action not raised in the other, the federal and state action were "essentially the same," the alterative theory could still be raised in the state court proceeding, and state courts had exercised jurisdiction over the matter for years); [18] *see also Nieves v. Board of Educ., 2006 U.S. Dist. LEXIS 81238, 2006 WL 2989004, at *2 (E.D.N.Y. Sept. 15, 2006)* ("As the suits here raise the same issues as to the defendants' duties arising out of the same events, they are sufficiently parallel to justify the application of *Colorado River*"); *see also Bernstein v. Hosiery Mfg. Corp. of Morganton, 850 F. Supp.176, 184 (E.D.N.Y. 1994)* ("The fact that precisely the same claims are not made in the two proceedings, or that alternative forms of relief are sought in the two actions, does not mean the actions are not duplicative or parallel. What matters is that the claims concern the same events and involve sufficient [*19] overlap of subject matter"). [19]

16   Finish Line and Head Wind are also defendants in the Lasker State Action. But this is not fatal to the argument that the actions are parallel. *Bernstein v. Hoisery Manufacturing Corporation of Morganton, Inc., 850 F. Supp. 176, 184 (E.D.N.Y. 1994)* (Abstention under Colorado River does not require identical parties in the parallel actions).

17   Defendants contend that plaintiff's claim in this action and the Lasker State Action are the same. However, tortious interference with a contract and tortious interference with a business relationship are different torts and thus plaintiff has

presented a new legal theory. *See, e.g., A.F.C. Enterprises, Inc. v. New York City School Construction Auth., 2001 U.S. Dist. LEXIS 24447, 2001 WL 1335010, at *14 (E.D.N.Y. Sept. 6, 2001).*

18  Defendants assert that *Telesco* requires abstention in this case. That reading is incorrect, as the *Telesco* decision noted that the alternative legal theory could be raised in the state court proceeding, which is not the case here because the parallel proceeding has been dismissed and the dismissal is on appeal. Moreover, the *Telesco* court held only that the district court did not abuse its discretion in abstaining.

19  Plaintiff [*20] cites *Vladimir v. Cowperthwait, 2007 U.S. Dist. LEXIS 48524, 2007 WL 196407 (S.D.N.Y. Jul. 3, 2007)* in support of his argument that the actions are not parallel. *Vladimir,* however, appears inconsistent with the cases cited above and the weight of the authority supports the conclusion that the actions are parallel. Plaintiff also cites this Court's decision in *Bailey v. Tricolla, 1996 U.S. Dist. LEXIS 20067, 1996 WL 733078 (E.D.N.Y. Dec. 11, 1996). Bailey* is inapposite, however, because federal claims were present in the case before this Court and because there were no concerns regarding *res judicata.* Should the Chancery Court's decision in the Lasker State Action be upheld, the question of whether plaintiff's current claim is precluded will arise, according to defendants.

In all events, the fact that the concurrent actions in this case may be parallel does not, on its own, demonstrate the "exceptional circumstances" required for abstention. I therefore turn to the factors set forth in Colorado River.

B. *Colorado River Factors*

i. *Res*

There is no *res* at issue in this case. Thus, this factor weighs against abstention. *De Cisneros v. Younger, 871 F.2d 305, 307 (2d Cir. 1989).*

ii. *Convenience*

Defendants contend that the Eastern District of New York [*21] is an inconvenient forum. Given that UBS itself commenced the Declaratory Judgment Action in the Southern District of New York, and both plaintiff and at least one of the defendants is present in New York, this factor weighs against abstention. *Id.* 20

20  I discuss the issue of the convenience of the forum more fully below, as defendants have also moved to dismiss on the grounds of *forum non con veniens.*

iii. *Risk of Piecemeal Litigation*

For plaintiff to bring this claim in Tennessee, he would be required to commence a new action, unless the Chancery Court's decision in the Lasker State Action is reversed. Thus, the concern that there would be a greater danger of piecemeal litigation if this court were to hear plaintiff's claim than if the claim were heard in Tennessee state court is not very persuasive. Moreover, as a claim for tortious interference with business relationships can be raised independently from a claim for tortious interference with contracts, this Court would not be deciding issues already determined, or to be determined, by the Chancery Court.

If the decision in the Lasker State Action is upheld, then the question of claim preclusion will arise, according to defendants. [*22] *McKinney v. Widner, 746 S.W.2d 699, 705 (Tenn. Ct. App. 1987)* (the doctrine of res judicata bars all claims and issues which are relevant and which could reasonably have been litigated in former action). Though such a contingency can be the basis for abstention, *see Arkwright-Boston Mfrs. Mut. Ins. Co. v. City of New York, 762 F.2d 205, 211 (2d Cir. 1985),* this case involves only two parties and there is only one parallel proceeding. There is little risk that several different courts will reach different conclusions concerning the issues of claim preclusion. Litigation with respect to this issue can be accomplished as easily before this court as the Chancery Court.

iv. *Advancement of Actions*

The Lasker State Action has already proceeded to a judgment, which has been appealed. Though the Lasker State Action is more advanced than the instant proceeding, there is no indication that extensive discovery has already been taken in that action, which was dismissed within two months of its filing. Should the Chancery Court's decision be reversed, the proceedings would be at substantially the same stage in both courts.

While I conclude that this factor weighs in favor of abstention, its weight [*23] is limited.

v. *Substantive Law*

Plaintiff's claim is governed by Tennessee law. 21 That fact "does not militate strongly against the exercise of federal jurisdiction." *Prosperity Realty, Inc. v. Haco-Canon, 724 F. Supp. 254, 257 (S.D.N.Y. 1989); see Bethlehem Contracting Co. v. Lehrer/McGovern, Inc., 800 F.2d 325, 328 (2d Cir. 1986)* (only "in some rare circumstances may the presence of state law issues . . . weigh in favor of . . . surrender" of federal jurisdiction). The Second Circuit has held that "the absence of federal issues

does not strongly advise dismissal, unless the state law issues are novel or particularly complex." *Welch's, 170 F.3d at 124.*

    21  No party disputes that Tennessee law is applicable.

The issue of whether Tennessee recognizes a tort of interference with a business relationship under the circumstances present in this case is a novel issue. [22] *See Great South Bay Medical Care, P.C. v. Allstate Ins. Co., 204 F. Supp.2d 492, 498 (E.D.N.Y. 2002)* (abstaining where state law at issue is novel, unsettled, and currently winding its way through the lower courts of the State of New York). However, it is not unprecedented, and arguably it is not only because Tennessee did [*24] not adopt the tort at issue until 2002, in *Trau-Med of America, Inc. v. Allstate Ins. Co., 71 S.W.3d 691 (Tenn. 2002).*

    22  Defendants argue in their motion that Tennessee clearly does not recognize a business relationship in situations such as plaintiff's. Were this the case, such clarity in state law would not favor abstention. At oral argument, defendants argued more persuasively, and admittedly inconsistently, that whether Tennessee recognizes a business relationship based on these facts is a novel issue, and that this novelty favors abstention. It is this argument that I address now.

In *Harger v. Price, 204 F. Supp.2d 699, 709 (S.D.N.Y. 2002),* the court held, interpreting New York law, that plaintiff, who alleged his shares were improperly cancelled prior to a merger, had a "prospective business relationship" with the acquiring company on the theory that negotiations began prior to the date plaintiff's shares were cancelled. [23] Similarly, in *Malpiede v. Townson, 780 A.2d 1075, 1099 (Del. 2001),* the Delaware Supreme Court held that, at the time a bidder misrepresented its ownership interest in the target company which allegedly caused the target's board to not consider a higher, competing [*25] offer, the target corporation's "shareholders could reasonably expect to benefit from the possibility of a higher . . . offer." [24] *See also Tooley v. AXA Financial, Inc., 2005 Del. Ch. LEXIS 67, 2005 WL 1252378, at *5 (Del. Ch. May 13, 2005)* (in dicta, noting that plaintiff shareholders would have had a reasonable expectancy of payment under merger agreement once conditions precedent to closing had been met). While there are distinctions between the above-cited cases and this one, the differences can be as easily resolved here as in Tennessee.

    23  The court further noted, however, that "the question perhaps is not free from doubt." *Harger, 204 F. Supp.2d at 709.*

    24  Though these cases were decided under New York and Delaware law, respectively, the elements of New York's tort of tortious interference with prospective economic advantage and Delaware's tort of tortious interference with business relations are substantially similar to the Tennessee tort at issue. *See Harger, 204 F. Supp.2d at 709; Malpiede, 780 A.2d at 1099; Trau-Med 71 S.W.3d at 701.*

Thus, while this factor weighs in favor of abstention, it does so in a limited manner as the novelty does not equate with uncertainty.

    *vi. Prejudice to Plaintiff*

"This factor, [*26] like choice of law, is more important when it weighs in favor of federal jurisdiction." *Bethlehem Contracting Co., 800 F.2d at 328.* In evaluating this element, "federal courts are to determine whether the parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties." *Welch's, 170 F.3d at 124.* Due to the posture of the parallel state action, plaintiff cannot currently bring his claims there. The cases cited by defendants to show that plaintiff would not be prejudiced are inapposite as in those cases plaintiff could have addressed his claim in the parallel state court action rather than bringing a new action in state court. Thus, this factor weighs against abstention.

    *vii. Vexatious or Reactive Nature of Litigation*

Though not an enumerated factor, I am mindful that the Supreme Court stated there is "considerable merit" to the idea "that the vexatious or reactive nature of either the federal or the state litigation may influence the decision whether to defer to a parallel state litigation under *Colorado River.*" *Cone, 460 U.S. at 17 n. 20.* That plaintiff did not sue in New York until his claims had been dismissed by [*27] the Chancery Court supports an inference that this claim is reactive as it would not have been brought but for the Chancery Court's dismissal. But there were no conclusions in the Chancery Court's ruling that would have precluded plaintiff from bringing his current claim in a new action in that court, so he does not appear to be circumventing an adverse ruling.

## C. Weighing The Factors

Weighing these factors, those that favor abstention weigh only slightly in favor of that course, and combined they do not present the "extraordinary circumstances" required under *Colorado River.* Moreover, they are outweighed by the factors that counsel against abstention, particularly plaintiff's inability at present to bring this claim in the parallel proceeding. Defendants' motion to

2008 U.S. Dist. LEXIS 35462, *

dismiss on the basis of the doctrine of *Colorado River* abstention is denied.

## II. Forum Non Conveniens

The doctrine of *forum non conveniens* permits a court, in its discretion, "to resist the imposition upon its jurisdiction," even though jurisdiction may be lawfully exercised and venue is technically proper, where the convenience of the parties and interests of justice favor trial in another forum. *Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 507, 67 S. Ct. 839, 91 L. Ed. 1055 (1947)*; [*28] *see also Koster v. Am. Lumbermens Mut. Casualty Co., 330 U.S. 518, 527, 67 S. Ct. 828, 91 L. Ed. 1067 (1947).* "Although a district court enjoys broad discretion in applying this principle," the Second Circuit "has outlined a three-step process to guide the exercise of that discretion." *Norex Petroleum Ltd. v. Access Industries, Inc., 416 F.3d 146, 153 (2d Cir. 2005).*

First, the court must determine the degree of deference properly accorded to plaintiff's choice of forum. *Iragorri v. United Techs. Corp., 274 F.3d 65, 72 (2d Cir. 2001).* Second, the court must determine whether an alternative and adequate forum exists. *Id. at 73.* Lastly, the court must balance the private and public interests implicated in the choice of forum. *Id. at 73-74.* To prevail on a motion to dismiss based on *forum non conveniens,* a defendant must demonstrate that an adequate alternative forum exists and that, considering the relevant private and public interest factors set forth in *Gilbert,* discussed *infra,* the balance of convenience tilts strongly in favor of trial in the foreign forum. *R. Maganlal & Co. v. M.G. Chemical Co., Inc., 942 F.2d 164, 167 (2d Cir. 1991).*

Plaintiff resides within the forum. Nevertheless, because he is a plaintiff in [*29] class action, his choice of forum is given less weight than if he were an individual plaintiff. *Eichenholtz v. Brennan, 677 F. Supp. 198, 202 (S.D.N.Y. 1988).* There are also indications that plaintiff filed suit in this court because of the adverse ruling in the Tennessee court. *See Norex Petroleum Ltd. v. Access Indus., Inc., 416 F.3d 146, 155 (2d Cir. 2005)* (sliding scale of deference tilts in favor of dismissal where choice of forum is "indicative of forum shopping"). However, since plaintiff's claim will be decided under Tennessee law he can hardly be said to be seeking local laws that might favor his position.

It is undisputed that an adequate alternative forum exists in Tennessee.

Although plaintiff's choice of forum is entitled to less deference than it otherwise might be and an adequate, alternate forum exists, a balancing of the public and private factors does not persuade me that dismissal is appropriate on the grounds of *forum non conveniens.* As to the private factors, the parties are located in New York

and perhaps Connecticut, process can obtained for unwilling witnesses, and there is no evidence that the cost for obtaining willing witnesses is prohibitive. As to the public [*30] factors, New York has an interest in this litigation as both plaintiff and one of defendants are located in New York, this Court is not unusually burdened, and is capable of applying Tennessee law. Indeed, that these factors counsel in favor of maintaining jurisdiction is demonstrated by UBS's decision to file the Declaratory Judgment Action in the Southern District of New York. Accordingly, defendants' motion to dismiss on *forum non conveniens* grounds is denied.

## III. Failure to State a Claim

### A. 12 (b) (6) Standard

In considering a motion pursuant to *Rule 12(b)(6),* a court should construe the complaint liberally, "drawing all reasonable inferences in the plaintiff's favor," *Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002)* (citing *Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2001)),* although "mere conclusions of law or unwarranted deductions" need not be accepted. *First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 771 (2d Cir. 1994).* Indeed, conclusory allegations "will not suffice to prevent a motion to dismiss." *Smith v. Local 819 I.B.T. Pension Plan, 291 F.3d 236, 240 (2d Cir. 2002).* On a motion to dismiss, "[t]he issue is not whether a plaintiff will ultimately [*31] prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995).*

Nevertheless, to survive a 12(b)(6) motion to dismiss, the allegations in the complaint must meet the standard of "plausibility." *See Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955, 1970, 167 L. Ed. 2d 929 (2007).* Although the complaint need not provide "detailed factual allegations," *id. at 1964*; *see also ATSI Commc'ns v. Shaar Fund, Ltd., 493 F.3d 87, 98 n. 2 (2d Cir. 2007)*(applying the standard of plausibility outside *Twombly's* anti-trust context), it must "amplify a claim with some factual allegations . . . to render the claim plausible." *Iqbal v. Hasty, 490 F.3d 143, 157-158 (2d Cir. 2007)* (emphasis in original) (holding that the plaintiff's complaint adequately alleged the personal involvement of the Attorney General because it was plausible that officials of the Department of Justice would be aware of policies concerning individuals arrested after 9/11). The test is no longer whether there is "no set of facts" that plaintiff could prove "which would entitle him to relief." *Bell Atlantic, 127 S.Ct. at 1969* (quoting *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*) [*32] ("[t]he phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard"). Rather, the complaint must provide "the

grounds upon which [the plaintiff's] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, 493 F.3d at 98* (quoting *Bell Atlantic, 127 S.Ct. at 1965*).

B. Tortious Interference With a Business Relationship

Plaintiff has stated a claim under Tennessee law. Under Tennessee Law, a claim for tortious interference with a business relationship requires the following elements:

> (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's *improper motive or improper means;* and finally, (5) damages resulting from the tortious interference.

*Trau-Med, 71 S.W.3d at 701* (footnotes and citations omitted) (emphasis in original). The *Trau-Med* Court stated that, with regard [*33] to improper motive or means, defendant's predominate purpose must be to injure plaintiff. *Id. at 701, n.5.* It also noted that interference with "a continuing business or other customary relationship not amounting to a formal contract," *id. at 701, n.4* (emphasis removed), was protected. [25]

> 25  Defendants argue in their motion that Tennessee does not recognize a business relationship in situations such as plaintiff's. They cite no authority for this proposition and the tort is not as limited as defendants argue. Indeed, the court in *Trau-Med, 71 S.W.3d at 701, n.4,* adopted *Restatement (Second) of Torts § 766B, cmt. c,* which, as noted, provides that interference with "customary relationship[s] not amounting to a formal contract" are covered by the tort.

Although plaintiff relies on the somewhat novel theory that Genesco's shareholders had an economic expectancy in receiving the $ 54.50 per share once Genesco had satisfied the conditions precedent to closing, as discussed above, courts have recognized such a relationship as constituting a valid business relationship. *Harger, 204 F. Supp.2d at 709; Malpiede 780 A.2d at 1099.*

Defendants' attempts to distinguish these cases are not persuasive. [*34] While the target corporation in *Harger* was closely held and the remaining shareholders

appeared to negotiate directly with the acquiring company, *204 F. Supp.2d at 703,* plaintiff's legal theory was that he was deprived of his rightful share of the contingent compensation paid under a merger agreement. *Id. at 709.* In *Malpiede,* the target company was negotiating with potential acquirers, and the court nevertheless found the shareholders, who were in the same position as Genesco's shareholders, had an expectancy to benefit from an offer, and therefore all the more so from a signed merger agreement. *780 A.2d at 1099.* [26] Accordingly, I conclude that Tennessee would recognize a business relationship on the facts alleged, particularly because Genesco had satisfied the pre-conditions to closing. [27]

> 26  Defendants argue that the merger was structured in such a manner that, unlike a tender offer, Finish Line did not offer to purchase Genesco stock directly from the shareholders. Rather, the Merger Agreement provided that Genesco would cancel its common stock and convert the shares into a right to receive the proceeds Genesco was to receive from Finish Line. The Merger Agreement, however, provides [*35] that Finish Line would deposit the necessary funds with a paying agent for direct transfer to Genesco shareholders. If Finish Line had not done so, Finish Line's counsel in the Genesco Action stated before Chancellor Lyle that under *Tenn. Code Ann. § 48.21.107(b),* plaintiffs would have an "absolute right to sue" Finish Line if for some reason Finish Line decided not pay the required sum into the paying agent. Defs. Ex. 5 at 26:20-27:1.
> 27  Defendants argue that plaintiff has no business relationship because the settlement in the Declaratory Judgment Action terminated the Merger Agreement. This argument misses the point, as it is plaintiff's claim that defendants' interference led to the abandonment of the merger.

Plaintiff has also pleaded the fourth element of the tort. As the court held in *Watson's Carpet & Floor Coverings, Inc. v. McCormick, 247 S.W.3d 169, 2007 WL 134132 (Tenn. Ct. App. 2007),* "either 'improper motive' or 'improper means' will suffice." (emphasis in original).

While I agree with defendants that plaintiff has not alleged an improper motive, plaintiff has alleged improper means. The *Trau-Med* court described "improper means" as means that are illegal, independently tortious, [*36] or that violate an established standard of a trade or profession. *Trau-Med, 71 S.W. at 701, n.5.* Examples of illegal or tortious conduct include violations of statutes, regulations, or recognized common-law rules, violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress,

undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship. *Id.* (citations omitted). Further, the *Trau-Med* court stated that "unethical conduct, such as sharp dealing, overreaching, or unfair competition" could also constitute "improper means." *Id.*

Plaintiff alleges that UBS filed a counterclaim for fraud against Genesco in the Genesco Action. Compl. P 49; *see also* Compl P 51. [28] He also alleges that the Chancery Court concluded Genesco had not defrauded UBS. Compl. P 53. Drawing all inferences in favor or plaintiff, as I must on a motion to dismiss pursuant to *Fed. R. Civ. Pro. 12(b)(6)*, the allegations of the Complaint are sufficient to allege that defendants engaged in unfounded litigation. While this "mudslinging in an attempt to get out of" contractual obligations, Compl. P 49, came after Genesco instituted [*37] its lawsuit seeking specific performance of the Merger Agreement, it may still be found to constitute interference as plaintiff has alleged that Finish Line would have closed on the merger in any event if UBS had provided the financing. [29] Compl. P 64.

[28] Plaintiff cites additional examples of UBS's bad faith during the litigations that have ensued since the merger fell through. Aside from the allegation concerning the counterclaim, these examples were not pleaded in the Complaint, but rather contained only in the plaintiff's legal briefs. Thus, I do not consider them for the purposes of this motion. *See, e.g., Friedl v. City of New York, 210 F.3d 79, 83-84 (2d Cir. 2000)* ("district court

errs when it . . . relies on factual allegations contained in legal briefs or memoranda in ruling on a 12(b)(6) motion to dismiss.").

[29] Defendants contend that, because plaintiff did not have a valid business relationship, plaintiff has failed to satisfy the second, third, and fifth elements of the tort. Because I conclude that plaintiff did have a valid relationship, and because defendants make no other arguments concerning plaintiff's failure to satisfy these elements, I find plaintiff has pleaded [*38] these elements as well.

For these reasons, defendants' motion to dismiss on the grounds that plaintiff has failed to state a claim for tortious interference with a business relationship is denied.

## Conclusion

For the reasons set forth above, defendants' motion to dismiss is denied. The Clerk is directed to transmit a copy of the within to all parties and the assigned Magistrate Judge.

SO ORDERED.

Dated: Brooklyn, New York

April 30, 2008

By: /s/ Charles P. Sifton (electronically signed)

United States District Judge

# EXHIBIT 1

## (Part 3)

2008 U.S. Dist. LEXIS 27985, *

**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.,
Plaintiff, -against- TITEFLEX CORPORATION, Defendant.**

**07 Civ. 2609 (LAK)(FM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

*2008 U.S. Dist. LEXIS 27985*

**March 11, 2008, Decided**

**COUNSEL:** [*1] For National Union Fire Insurance Company of Pittsburgh, PA, New York, NY, Plaintiff: Martin P. Lavelle, Esq., LEAD ATTORNEY, Law Offices of Martin P. Lavelle, New York, NY.

For Titeflex Corporation, Springfield, Massachusetts, Defendant: Matthew J. Watkin, Covington & Burling LLP(NYC), New York, NY.

**JUDGES:** FRANK MAAS, United States Magistrate Judge.

**OPINION BY:** FRANK MAAS

**OPINION**

*REPORT AND RECOMMENDATION TO THE HONORABLE LEWIS A. KAPLAN*

**FRANK MAAS,** United States Magistrate Judge.

In this action, plaintiff National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") seeks money damages and a declaratory judgment that it has no obligation to indemnify its insured, defendant Titeflex Corporation ("Titeflex"), in connection with certain pollution claims. Titeflex has now moved to dismiss the first amended complaint so that the parties' disputes can be resolved as part of another declaratory judgment action, brought by Titeflex against National Union and others, in the Pennsylvania Court of Common Pleas in Philadelphia. In the alternative, Titeflex asks that any further proceedings in this suit be stayed pending the outcome of the state court action. For the reasons, set forth below, I recommend that [*2] Titeflex's motion (Docket No. 22) be granted to the extent of conditionally staying this action until the state court suit has been resolved.

*I. Factual Background*

The following facts, unless otherwise indicated, are undisputed.

Defendant Titeflex is a manufacturer of industrial products, including certain flexible piping that was installed at a Gulf gas station in Blue Bell, Pennsylvania, in or around 1995. In or around 1998, the Pennsylvania Department of Environmental Protection ("DEP") learned of unexplained inventory shortfalls, as well as other indications that gasoline was leaking into the ground in the vicinity of the station. The underground leaks contaminated the drinking water of nearby residents who relied on wells for their water supply; toxic vapors also were detected in the groundwater at other neighboring properties.

In mid-1998, the DEP directed Thomas F. Wagner, Inc. ("TFW"), the owner of the gas station, and TFW's principal, Thomas F. Wagner ("Wagner"), to cease operations. Thereafter, in 2000, the landowners adversely affected by the petroleum leak brought a suit in the Pennsylvania Common Court of Pleas-captioned *Ball v. Bard Pump and Tank Company* -- against the company [*3] that installed the flexible piping, TFW, Wagner, Titeflex, and others. The *Ball* plaintiffs sought to recover compensatory and punitive damages for property damage and bodily injury.

Over the years, Titeflex's parent company (hereinafter also referred to as "Titeflex") acquired insurance to deal with such risks. Specifically, Titeflex purchased a series of Commercial General Liability policies from Lumbermen's Mutual Insurance Company ("Kemper"), each of which provided coverage of $1 million per "occurrence," and $2 million in the aggregate. Titeflex also purchased a series of umbrella liability insurance policies from National Union. The National Union policies provide coverage on a per "occurrence" basis in excess of the Kemper primary coverage. One or more of the National Union policies incorporate a "Named Peril and Time Element Pollution Endorsement" ("Pollution Exclusion"), which excludes coverage for bodily injury, property damage, or personal injury arising out of the "discharge, dispersal, seepage, migration, release or escape of pollutants," subject to certain exceptions which

Titeflex believes are applicable here. Under the Pollution Exclusion, any disagreement as to the "interpretation" [*4] of its terms must be submitted to binding arbitration. National Union commenced such an arbitration before the American Arbitration Association in March 2007.

After the *Ball* action was instituted, Kemper retained counsel to defend TFW and reached a settlement on TFW's behalf with some of the adjoining property owners. Thereafter, before the trial commenced, Titeflex entered into a policy buy-back and commutation agreement with Kemper, pursuant to which Kemper was released from any further obligations under the Titeflex primary policies, and Titeflex assumed the further cost of its own defense in the *Ball* action. [1] National Union contends, and Titeflex denies, that Titeflex assumed all of Kemper's prior obligations under the primary policies by entering into the commutation agreement.

> 1 At the time, Kemper was in difficult financial straits, having been placed under the supervision of the Illinois Insurance Division. The agreement enabled Titeflex to obtain additional funds from Kemper in connection with other unrelated claims. (See Docket No. 6 (Decl. of George E. Petersmarck, Jr., Esq., dated Apr. 18, 2007) P 9).

Given the substantial number of plaintiffs in the *Ball* action, the state [*5] trial court decided to conduct an initial trial of the claims of four representative plaintiffs, of whom two were selected by the plaintiffs and two by the defendants. That trial began on April 2, and concluded on May 3, 2007. On the eve of the verdict, National Union reached a settlement on behalf of Titeflex with all of the property-owner plaintiffs who had not been part of the Kemper settlement. [2] The following day, the jury returned a verdict in favor of the remaining defendants. Neither the settlement nor the verdict resolved certain cross-claims that had been brought against Titeflex by TFW and Wagner to recover their alleged losses arising out of the property damage to the gas station and the remediation costs that the DEP was seeking to recover from them.

> 2 A copy of the settlement agreement has been filed with the Court under seal. (*See* Docket No. 30). In some instances, the plaintiffs evidently agreed to structured settlements to be paid over time. The settlement agreement provides that the total amount paid by National Union to the plaintiffs shall remain confidential. The agreement further calls for each plaintiff to execute a separate copy of the agreement containing a [*6] term sheet applicable solely to that plaintiff. Through this mechanism, National Union sought to ensure that each plaintiff would not know the amounts for which the other plaintiffs had settled.

As part of its settlement with the *Ball* plaintiffs, National Union sought to reserve its right to recoup from Titeflex at least some of the money that it had paid. National Union maintains that it is entitled to have Titeflex participate in the funding of that settlement on at least two theories. First, National Union alleges that the *Ball* plaintiffs' claims triggered coverage under more than one Kemper policy, thereby making available additional primary coverage which was not exhausted by Kemper's settlement with the first group of adjoining property owners. National Union argues that Titeflex must furnish this additional indemnity because it has assumed Kemper's obligations under the primary policies by virtue of the commutation agreement. Indeed, National Union argues that Titeflex must contribute to the settlement with the *Ball* plaintiffs even if coverage under only one Kemper primary policy has been triggered because the limits of that policy have not been exhausted.

National Union's second [*7] argument is that the Pollution Exclusion in its umbrella policies specifically excludes any coverage with respect to the *Ball* plaintiffs' property damage and personal injury claims. On this theory, notwithstanding its settlement of those claims, National Union seeks to recover from Titeflex all of the money it paid in connection with the settlement.

Prior to the commencement of the *Ball* trial, the state judge granted the parties several adjournments so that they could pursue settlement discussions with the assistance of a mediator. National Union commenced its coverage action against Titeflex in this District on March 29, 2007, which was the date of the last scheduled mediation session. In its complaint, among other relief, National Union seeks a declaratory judgment regarding the scope of Titeflex's obligations under the Kemper policies and the scope of National Union's indemnity obligations under its own policies, as well as money damages.

The next day, Titeflex commenced its own declaratory judgment action against National Union in the Pennsylvania Court of Common Pleas in Philadelphia. In keeping with the requirements of Pennsylvania state practice, because the *Ball* plaintiffs had [*8] yet to be paid fully, Titeflex named them as defendants in the Pennsylvania action. Titeflex also named TFW and Wagner as defendants. In its complaint, Titeflex seeks a declaration of the respective rights of National Union and Titeflex under a single National Union policy (for the period August 1, 1997, to August 1, 1998) that it contends must respond to the *Ball* plaintiffs' claims.

Although National Union won the race to the courthouse, both National Union and Titeflex effected service of process in their respective actions on March 30, 2007.

Thereafter, in the Pennsylvania coverage action, National Union interposed "preliminary objections" -- using a procedural device akin to a motion to dismiss -- in an attempt to secure the dismissal of Titeflex's complaint in favor of its action in this District. By order dated September 12, 2007, Judge Albert W. Sheppard, Jr. denied that application, but stayed any further proceedings pending the outcome of the arbitration proceeding concerning the scope of the coverage, if any, available to Titeflex under the Pollution Exclusion. Judge Sheppard also stated that he would, if necessary, address such questions as the number of occurrences and [*9] the exhaustion of policy limits after the arbitration was concluded.

In this action, National Union filed a motion in May 2007 to compel Titeflex to participate in the arbitration. It is unclear why this motion was filed because Titeflex conceded that the Pollution Exclusion required it to arbitrate certain of the parties' disputes and, in fact, agreed to participate in the arbitration. In any event, the parties agree that the motion to compel arbitration was rendered moot by Judge Sheppard's September 2007 decision. Accordingly, with the parties' consent, I denied National Union's motion to compel by order dated September 24, 2007.

In June 2007, Titeflex moved to dismiss National Union's first amended complaint in this action on abstention grounds. (Docket No. 22). Titeflex's primary argument is that abstention is required pursuant to the Supreme Court's decision in *Wilton v. Seven Falls Co., 515 U.S. 277, 115 S. Ct. 2137, 132 L. Ed. 2d 214 (1995)*, because: (a) this is, at heart, a declaratory judgment action; (b) the parties' dispute involves only state law issues; and (c) state court is the only forum in which all of the necessary parties -- including the *Ball* plaintiffs, TFW, and Wagner -- can be joined. [3] Titeflex [*10] also argues in the alternative that, even if *Wilton* is inapplicable, abstention is warranted under *Colorado River Water Conservation District v. United States, 424 U.S. 800, 817, 96 S. Ct. 1236, 47 L. Ed. 2d 483 (1976)*. In that case, the Supreme Court confirmed a federal court's authority to decline to exercise its jurisdiction in a case that does not fall into a previously-recognized category of abstention, provided it is clear that this will advance the interests of wise judicial administration and the avoidance of duplicative litigation. [4]

[3] Under Pennsylvania law, an injured person asserting a claim against an insured is an indispensable party to a declaratory judgment action between the insured and its insurer regarding disputed coverage for that claim. *See Vale Chem. Co. v. Hartford Accident & Indem. Co., 512 Pa. 290, 516 A.2d 684, 687-88 (Pa. 1986)*. Titeflex

argues that the *Ball* plaintiffs, TFW, and Wagner therefore must be joined as parties because they have a continuing interest in the availability of insurance coverage to Titeflex. As National Union correctly observes, however, there is no requirement that a claimant against an insured be named as a party when a declaratory judgment action arising under Pennsylvania law [*11] is brought in federal court in Pennsylvania. *See Liberty Mut. Ins. Co. v. Treasdale, Inc., 419 F.3d 216, 228-29 (3d Cir. 2005)* (Pennsylvania Declaratory Judgment Act requirement of joinder is procedural and jurisdictional, not substantive, and therefore need not be followed in federal court).

[4] Prior to filing its present motion, Titeflex filed a similar motion addressed to National Union's original complaint. The earlier motion became moot when National Union served its first amended complaint. The principal difference between the two pleadings is that National Union's amended complaint seeks to recover from Titeflex the cost of the payments it proposes to make to the *Ball* plaintiffs pursuant to its settlement with them. Titeflex contends that this new claim is a subterfuge because a declaration that National Union had a duty to indemnify it despite the Pollution Exclusion language would "fully dispose of" National Union's money damages claim. (See Titeflex Mem. at 5).

## II. Discussion

### A. General Abstention Principles

Because federal courts have a "'virtually unflagging obligation' to exercise their jurisdiction," *Vill. of Westfield, N.Y. v. Welch's, 170 F.3d 116, 120 (2d Cir. 1999)* (quoting [*12] *Colorado River, 424 U.S. at 817*), abstention by a federal court in favor of a state court proceeding is the exception, not the rule. *Woodford v. Cmty. Action Agency of Green County, Inc., 239 F.3d 517, 522 (2d Cir. 2001)*. There consequently are only "a few 'extraordinary and narrow exception[s]' to a federal court's duty to exercise its jurisdiction." *Id.* (quoting *Colorado River, 424 U.S. at 813*). As noted previously, Titeflex maintains that two such exceptions are applicable here.

### B. Wilton Abstention

The Declaratory Judgment Act provides that in an appropriate case a federal court "*may* declare the rights and other legal relations of any interested party seeking such a declaration, whether or not further relief is or could be sought." *28 U.S.C. § 2201(a)* (emphasis added). Accordingly, a federal court has considerable discretion as to whether declaratory judgment relief should be

awarded to a litigant. *Pub. Serv. Comm'n of Utah v. Wycoff*, 344 U.S. 237, 241, 73 S. Ct. 236, 97 L. Ed. 291 (1952); *Nat'l Nutritional Foods Ass'n v. Califano*, 603 F.2d 327, 336 (2d Cir. 1979). In *Wilton*, the Supreme Court made clear that this discretion extends to the decision to abstain in favor of a state court action even when the federal [*13] suit otherwise satisfies subject matter jurisdictional prerequisites. *Wilton*, 515 U.S. at 283 (citing *Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491, 62 S. Ct. 1173, 86 L. Ed. 1620 (1942)). Thus, a district court has "greater discretion" to abstain or grant a stay "in declaratory judgment actions than is permitted under the 'exceptional circumstances' test of *Colorado River.*" *Id.* at 286.

The Second Circuit has concluded that the discretion that district courts are accorded under *Wilton* nevertheless is inapplicable in circumstances where a plaintiff's prayer for relief seeks both a declaratory judgment and damages. For example, in *Welch's*, the defendant corporation sought a declaration of its rights under a sewer agreement and federal statute, "as well as damages caused by the [plaintiff v]illage's conduct." 170 F.3d at 119. The Second Circuit held that it was error to stay the federal court action while a related state court proceeding was underway based on its analysis of six factors deemed relevant to the decision in *Colorado River* and its progeny. *Id.* at 121-24. In a footnote, the court stated that *Wilton* did not apply because both sides were seeking damages. *Id.* at 124 n.5.

As the late Judge Schwartz noted in [*14] *General Star International Indemnity Ltd. v. Chase Manhattan Bank*, No. 01 Civ. 11379 (AGS), 2002 U.S. Dist. LEXIS 7980, 2002 WL 850012, at *5 (S.D.N.Y. May 3, 2002), the Second Circuit subsequently held in *Fred Ahlert Music Corp. v. Warner Chappell Music, Inc.*, 155 F.3d 17, 25 (2d Cir. 1998), that the Declaratory Judgment Act permits a district court to award further required relief, "including monetary damages," despite the fact that a party's alleged entitlement thereto had not been incorporated into its prayer for relief "or even proved." Judge Schwartz concluded that he could therefore exercise "a greater level of discretion" under *Wilton* because virtually all of the claims before him "stem[med] from the underlying request for declaratory relief." *Gen. Star*, 2002 U.S. Dist. LEXIS 7980, 2002 WL 850012, at *5. He nonetheless chose to analyze the defendant's application to dismiss the federal litigation (or grant a stay) under the stricter *Colorado River* standards because the defendants were entitled to have the federal court abstain even under that rubric. *Id.*

In this case, Titeflex argues that *Wilton* provides the proper standard of review because National Union's request for damages, raised for the first time in its amended complaint, [*15] was interposed solely to keep this Court from exercising its considerable discretion under the Declaratory Judgment Act. (Titeflex Mem. at 1-2, 19-20). As Titeflex explains, "a finding in favor of Titeflex on the numerous coverage issues as to which National Union seeks declaratory relief would fully dispose of National Union's suspect demands for monetary relief." (*Id.* at 19). Conversely, National Union's "claims for monetary relief will be addressed only if the Court [determines] . . . that it did *not* have a contractual obligation to Titeflex to pay the settlement amount, *and* that Titeflex somehow 'assumed' Kemper's obligation as the primary carrier to pay the settlement." (*Id.* at 20) (first emphasis in original; brackets and second emphasis added).

National Union counters that its damages claims will not be fully resolved by the Court's rulings regarding its claims for declaratory relief with respect to its policies. For example, National Union contends that it is entitled to recover the full amount that it expended in connection with the *Ball* settlement on such allegedly independent theories as subrogation, recoupment, and implied indemnity. (National Union Mem. at 9). In its reply [*16] papers, Titeflex argues that these theories do not suffice to distinguish National Union's declaratory judgment claims from its money damages claims because "an insurer has no subrogation right against its own insured" and cannot recover the amounts that it has paid on its insured's behalf "absent express policy language permitting such recoupment, or an express advance agreement that its insured will repay the settlement amount." (Titeflex Reply Mem. at 4-5).

There are at least two problems with Titeflex's analysis. First, the very purpose of abstention is to avoid having a federal court deal with the merits of issues that are more appropriately decided in state court. If, however, the Court were to address the viability of National Union's claim for the recovery of the sums that it has expended (or will in the future expend) in connection with the settlements with the *Ball* plaintiffs, it would be addressing the merits of National Union's claims before ruling on the question of abstention. This does not seem to be an appropriate course at this preliminary stage.

Second, even if the Court were to address the merits of National Union's money damages claims as part of the *Wilton* analysis, [*17] it is by no means clear that National Union's position would lack merit. For example, even if National Union cannot seek subrogation from its insured, Titeflex is in the unusual posture of having entered into a commutation agreement with Kemper, its primary insurer, pursuant to which it has assumed at least some of Kemper's contractual obligations. National Union argues that it consequently is not seeking to recover a portion of the amount that it paid to settle the *Ball* plaintiffs' claims from Titeflex as its insured, but, rather, as a fellow insurer obligated to provide primary coverage. If

National Union is able to recover damages from Titeflex on this theory, it would be hard to argue that its claim is merely a derivative of the declaratory judgment claims it has brought against Titeflex in Titeflex's capacity as an insured.

In any event, as Judge Schwartz suggested in *General Star*, to the extent that the applicability of *Wilton* abstention is not entirely free from doubt, the wiser course is to consider the movant's entitlement to a stay under the stricter abstention criteria set forth in *Colorado River. See Gen. Star, 2002 U.S. Dist. LEXIS 7980, 2002 WL 850012, at *5.* I therefore turn to that task.

C. *Colorado* [*18] *River Abstention*

In *Colorado River,* the Supreme Court held that a district court may abstain from considering a case which is the subject of parallel state proceedings under "exceptional circumstances" not fitting into a previously-established category of abstention. *See DeCisneros v. Younger, 871 F.2d 305, 307 (2d Cir. 1989).* Accordingly, "a finding that the concurrent proceedings are 'parallel' is a necessary prerequisite to abstention under *Colorado River." Dittmer v. County of Suffolk, 146 F.3d 113, 118 (2d Cir. 1998).* Suits are considered parallel when "the same parties are contemporaneously litigating substantially the same issue in another forum." *Id.* (citing *Day v. Union Mines Inc., 862 F.2d 652, 655 (7th Cir. 1988)).* If the suits are parallel, then the court must address a number of other factors in deciding whether to defer to the state court action, including:

> (1) whether either court has assumed jurisdiction over any res or property;

> (2) the inconvenience of the federal forum;

> (3) the avoidance of piecemeal litigation;

> (4) the order in which jurisdiction was obtained;

> (5) whether state or federal law supplies the rule of decision; and

> (6) whether the state court proceeding [*19] will adequately protect the rights of the party seeking to invoke federal jurisdiction.

*Welch's 170 F.3d at 121.*

1. *Are the Suits Parallel?*

The number and identity of the parties participating in the state and federal court suits is, of course, not identical. In the state suit, Titeflex has named as additional parties all of the plaintiffs in the *Ball* litigation, as well as TFW and Wagner. None of these parties are named in any capacity in the federal suit. However, as noted above, these additional parties would not have been considered necessary, much less indispensable, had Titeflex's state court action in the Court of Common Pleas in Philadelphia been brought instead in the United States District Court for the Eastern District of Pennsylvania. *See supra* note 3. Moreover, even if the *Ball* plaintiffs have yet to be paid, or in some instances expect to receive the remainder of the sums they are due over lengthy periods of time, there is no indication that their ability to recover the promised sums turns on the outcome of the coverage litigation between National Union and Titeflex. Accordingly, as a practical matter, the real parties in interest in both the federal and state court [*20] coverage actions are the same: Titeflex and National Union.

Turning to the issues raised in the respective lawsuits, National Union argues that the Pennsylvania action "does not address the underlying Kemper coverage" and fails to "defer[] to the parties' express agreement to arbitrate" an aspect of their dispute. There does not appear to be a factual basis for the first of these arguments since Titeflex expressly notes in its state court complaint that National Union's assertion that "Titeflex has failed properly to exhaust [its] underlying primary insurance" is wrong, and that "the applicable primary limits underlying the National Union Policy are exhausted." (Docket No. 25 (Decl. of Matthew J. Watkins, Esq., dated May 29, 2007, Ex. 1, P 17)). This necessarily implicates the claims that National Union asserts in this suit with respect to the Kemper primary coverage.

There also does not appear to be any basis for National Union's assertion that the Pennsylvania suit fails to take into account the parties' agreement to arbitrate. Indeed, Titeflex is participating in that arbitration. Judge Sheppard also has stayed further proceedings in the state court suit until the arbitral panel rules.

Finally, [*21] although National Union's various theories of recovery against Titeflex under the commutation agreement have yet to be injected into the state court action, this is largely a function of the fact that its preliminary objections were pending for some time, after which any further proceedings in the state case were stayed. Once the arbitration has been decided, National Union can reasonably be expected to raise its subrogation and recoupment-related damages claims in response to Titeflex's assertions in the state court action regarding the Kemper primary coverage, unless the arbitrators in-

terpret the Pollution Exclusion in a manner that denies Titeflex any coverage under the Pollution Exclusion.

The requirement that the two suits be parallel therefore appears to have been satisfied. *See Telesco v. Telesco Fuel & Masons' Materials, Inc.*, 765 F.2d 356, 362 (2d Cir. 1985) ("Merely raising an alternate theory of recovery, which may still be raised in state court, is not enough to differentiate the federal suit from the state suit.").

### 2. *Colorado River Factors*

The next step in the *Colorado River* analysis is to consider the six factors that the Supreme Court has identified. The weight to be given [*22] to each of these factors "may vary greatly from case to case, depending on the particular setting of the case." *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 16, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983). Furthermore, "[n]o one factor is necessarily determinative." *Id. at 15*. Thus, a decision with respect to abstention under *Colorado River* "does not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case." *Id. at 16*. "Only the clearest of justifications will warrant dismissal." *Colorado River, 424 U.S. at 819*.

#### a. *Existence of Jurisdiction Over a Res*

This case does not involve any res or property over which this Court or the state court has asserted jurisdiction. Accordingly, because this factor is neutral, it "point[s] toward exercise of federal jurisdiction." *Welch's, 170 F.3d at 122* (quoting *DeCisneros, 871 F.2d at 307*).

#### b. *Inconvenience of the Federal Forum*

National Union admits in its complaint that it is a Pennsylvania corporation which maintains its principal place of business in New York City. In these circumstances, Philadelphia does not appear to be a geographically inconvenient forum for National Union.

Titeflex is alleged to be a Connecticut [*23] corporation with its principal place of business in Springfield, Massachusetts. Accordingly, neither Philadelphia nor New York City appears to be an inconvenient forum for Titeflex.

The principal argument advanced by Titeflex in favor of the allegedly greater convenience of the state court in Pennsylvania is that the *Ball* claimants and the TFW and Wagner cross-claimants can be joined in a lawsuit there, but not here. However, as noted previously, there has been no showing that the ability of these parties to recover any sums to which they may be entitled hinges on the availability of umbrella insurance coverage for

Titeflex. Furthermore, even if that were an issue, the Titeflex coverage action could have been brought by Titeflex in federal court in Pennsylvania without joining these additional claimants, whose presence in the state action is simply required by Pennsylvania procedural law.

Titeflex therefore has not shown that the inconvenience of the federal forum tips the scales in favor of abstention or a stay.

#### c. *Avoidance of Piecemeal Litigation*

National Union argues that there is no risk of inconsistent results because the Pennsylvania action, in its present posture, focuses solely [*24] on a single umbrella policy, while the suit in this District addresses the underlying Kemper policies and several other National Union policies. However, the state court has indicated that, once the arbitration regarding the scope of the Pollution Exclusion has been completed, it will address such questions as "the number of occurrences, exhaustion of limits, the triggering event, and allocation of damages." (Docket No. 37, Ex. 1 at 1). The state court also noted that the first step in this process will necessarily be to "determine the scope of the policy's coverage." (*Id.* at n.1). Accordingly, assuming that coverage for Titeflex's pollution claim is not absolutely excluded under the Pollution Exclusion, the state court will have to determine whether the limits of the Kemper primary policies have (or should have) been exhausted in order to decide whether one or more of the National Union policies must respond to Titeflex's coverage claim. This, of course, is one of the key issues that National Union seeks to have resolved in this forum.

Moreover, even if the Kemper policies were not at issue in the state court suit, this would largely be a function of the present procedural posture [*25] of that case, in which National Union has yet to interpose an answer. If the arbitration results in a determination that Titeflex potentially is entitled to coverage and the state court stay is lifted, National Union will have an opportunity to assert its claims under the Kemper policies and the remaining National Union policies in its answer. In this manner, if this action is dismissed or stayed, all of the issues between National Union and Titeflex will still be before one court.

Unless this Court abstains, many of the same factual and legal issues would likely be addressed in two separate jurisdictions. "Maintaining virtually identical suits in two forums under these circumstances would waste judicial resources and invite duplicative effort." *See Estee Lauder Cos., Inc. v. Batra, 430 F. Supp. 2d 158, 167-68 (S.D.N.Y. 2006)* (quoting *Arkwright-Boston Mfrs. Mut. Ins. Co. v. City of N.Y., 762 F.2d 205, 211 (2d Cir. 1985))*. Such problems can best be avoided by having the

parties' disputes, which arise out of a single set of facts, heard in a single forum.

### d. *Priority of Lawsuits*

It is undisputed that National Union filed the first action. Nevertheless, as numerous courts have observed, [*26] "speed does not carry much weight with regard to abstention." *See Gen. Star, 2002 U.S. Dist. LEXIS 7980, 2002 WL 850012, at *8* (citing *Great Am. Ins. Co. v. Houston Gen. Ins. Co., 735 F. Supp. 581, 585 (S.D.N.Y. 1990)*, and *Perez v. Ledesma, 401 U.S. 82, 119 n.12, 91 S. Ct. 674, 27 L. Ed. 2d 701 (1971)* (Brennan, J., concurring) ("[F]ederal declaratory judgment is not a prize to the winner of a race . . . ."))*; see also Moses H. Cone, 460 U.S. at 21* ("[P]riority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions.").

Here, National Union's one-day priority of filing is of even less import than usual because (i) service of the complaints in both the federal and state suits was effected on the same day, (ii) issue has yet to be joined in either suit, (iii) discovery has been stayed in the Pennsylvania action pending completion of the arbitration, and (iv) there has been no discovery in this forum pending the resolution of Titeflex's motion to dismiss.

In an effort to argue that the litigation here is further advanced, National Union alleges that this action is the only one in which "issues respecting the enforcement of the parties' obligation to arbitrate [*27] are presented, and as to which one motion on that subject is already fully briefed and before the Court." (National Union Mem. at 17). However, the motion to compel arbitration was entirely unnecessary because Titeflex never opposed participating in the arbitration. The fact that National Union chose to file such a motion, which was denied as moot, consequently does not make this a more suitable forum.

### e. *Which Law is Applicable?*

There is no federal law implicated in this case. In the Second Circuit's view, the fact that state law governs "does not strongly advise dismissal unless the state law issues are novel or particularly complex." *Gen. Star, 2002 U.S. Dist. LEXIS 7980, 2002 WL 850012, at *10* (quoting *Welch's, 170 F.3d at 124*). Still, the "use of the modifier 'strongly' implies that the absence of federal issues could potentially advise dismissal-though not 'strongly.'" *Id.*

National Union's discussion of this *Colorado River* factor sheds light on why it seeks so strenuously to litigate here rather than in Pennsylvania. As National Union explains, under Pennsylvania law "an insured may select the policy or policies under which it is to be indemnified,

subject to the targeted insurer's rights to contribution." [*28] (National Union Mem. at 18 (citing *J.H. France Refractories Co. v. Allstate Ins. Co., 534 Pa. 29, 626 A.2d 502, 508 (Pa. 1993))*. According to National Union, "[u]nder New York substantive law, by contrast, losses in . . . continuing occurrences are allocated on a *pro rata* basis over the years implicated where continuous injuries trigger multiple policies." (*Id.* (citing *Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp., 73 F.3d 1178, 1203 (2d Cir. 1995))*. National Union fears that under allegedly less-settled Pennsylvania choice-of-law rules, the state court may incorrectly decide to apply Pennsylvania substantive law, rather than the New York law that National Union believes is controlling.

Assuming that such a substantive conflict exists, to determine whether to apply New York or Pennsylvania law, a New York court would use a "'center of gravity' or 'grouping of the contacts' approach." *Tri-State Employment Servs., Inc. v. Mountbatten Sur. Co., Inc., 295 F.3d 256, 261 (2d Cir. 2002)*. In doing so, the court would consider "a variety of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place [*29] of business of the contracting parties." *Id.* In the context of insurance contracts, the New York courts might also consider such factors as "the location of the insured risk; the insured's principal place of business; where the policy was issued and delivered; the location of the broker or agent placing the policy; where the premiums were paid; and the insurer's place of business." *Schwartz v. Twin City Fire Ins. Co., 492 F. Supp. 2d 308, 317 (S.D.N.Y. 2007)* (quoting *Olin Corp. v. Ins. Co. of N. Am., 743 F. Supp. 1044, 1049 (S.D.N.Y. 1990)*, *aff'd, 929 F.2d 62 (2d Cir. 1991))*. In addition to these factors, a court in New York might "consider public policy 'where the policies underlying conflicting laws in a contract dispute are readily identifiable and reflect strong government interests.'" *Tri-State, 295 F.3d at 261* (quoting *In re Allstate Ins. Co., 81 N.Y.2d 219, 227, 613 N.E.2d 936, 597 N.Y.S.2d 904 (1993))*.

Notwithstanding National Union's misgivings about Pennsylvania law, it seems clear that the Pennsylvania courts would similarly apply "a flexible choice-of-law rule which permits an 'analysis of the policies and interests underlying the particular issue before the court' and a determination of which jurisdiction [*30] is most intimately concerned with the outcome of the litigation." *Am. Contract Bridge League v. Nationwide Mut. Fire Ins. Co., 752 F.2d 71, 74 (3d Cir. 1985)* (quoting *Griffith v. United Air Lines, 416 Pa. 1, 203 A.2d 796 (Pa. 1964))*; *see also Budtel Assocs., L.P. v. Cont'l Cas. Co., 2006 PA Super 370, 915 A.2d 640, 644 (Pa. Super. Ct. 2006)* (applying " *Griffith* rule" rather than the "obsolete" *lex loci delicti* rule); *Wilson v. Transport Ins. Co., 2005 PA Su-*

*per 401, 889 A.2d 563, 571 (Pa. Super. Ct. 2005)* (applying *Griffith* rule in insurance coverage dispute); *Caputo v. Allstate Ins. Co., 344 Pa. Super. 1, 495 A.2d 959, 961-62 (Pa. Super. Ct. 1985)* (applying *Griffith* rule to find that New Jersey -- not Pennsylvania -- had the most significant contacts with an insurance policy even though the accident giving rise to the dispute occurred in Pennsylvania and involved two of its residents).

Accordingly, there is "nothing to indicate that the [Pennsylvania] state court is incapable of making the appropriate choice of law determination and applying [New York] law if the court determines that that law governs." *Lumbermen's Mut. Cas. Co. v. Conn. Bank & Trust Co., 806 F.2d 411, 415 (2d Cir. 1986), abrogated on other grounds by Youell v. Exxon Corp., 74 F.3d 373 (2d Cir. 1996).* [*31]

### f. *Protection of National Union's Rights*

Finally, National Union contends that its allegedly broader claims in the federal action are not currently part of the Pennsylvania suit, and that National Union cannot be "required" to assert them there. (National Union Mem. at 22). National Union also suggests that its ability to protect its interests adequately in Pennsylvania cannot be predicted with certainty. (*Id.* at 22-23). However, National Union's choice of law concern is misplaced. In addition, National Union has failed to provide a concrete example of a stumbling block it might reasonably be expected to encounter if it subsequently were to assert all of its claims in this action in its answer in the Pennsylvania suit. In any event, to the extent that such uncertainty exists, it can adequately be addressed by conditionally staying this action, rather than dismissing it.

### D. *This Action Should Be Stayed*

In sum, although several of the *Colorado River* factors may favor the retention of federal jurisdiction, none can fairly be characterized as "strongly" suggesting that result. Furthermore, the Pennsylvania court has indicated that it intends to grapple with many, if not all, of the issues  [*32] raised in this lawsuit as soon as the arbitration is completed. Accordingly, if this suit were to go forward, there would be a significant risk of piecemeal litigation. This critical factor tips the scales in favor of abstention. *See Moses H. Cone, 460 U.S. at 16* (describing the risk of piecemeal litigation as "[b]y far the most important" among the *Colorado River* factors).

There nonetheless is a possibility that the ruling of the arbitral panel will eviscerate Titeflex's state law claims. Should that occur, there obviously would no longer be any reason to defer to the state court. To address that possibility, this Court should stay National Union's federal action, rather than dismissing it, so that proceedings can continue here if it becomes apparent that there is no longer a justification for abstention. *See Wilton, 515 U.S. at 288 n.2.* Indeed, the stay should entitle National Union to seek its vacatur at any time if it is able to show that continuance of the stay would lead to unfair prejudice. *See Gen. Reinsurance Corp. v. CIBA-Geigy Corp., 853 F.2d 78, 80 (2d Cir. 1988).*

### III. *Conclusion*

For the reasons set forth above, Titeflex's motion should be granted and this action stayed,  [*33] with the stay subject to vacatur if National Union is able to show that its continuance would lead to unfair prejudice.

### IV. *Notice of Procedure for Filing of Objections to this Report and Recommendation*

The parties are hereby directed that if they have objections to this Report and Recommendation, they must, within ten days from today, make them in writing, file them with the Clerk of the Court, and send copies to the chambers of the Honorable Lewis A. Kaplan, and to the chambers of the undersigned, at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. *See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).* Any requests for an extension of time for filing objections must be directed to Judge Kaplan. The failure to file timely objections will result in a waiver of those objections for purposes of appeal. *See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140, 147-48, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992).*

SO ORDERED.

Dated: New York, New York

March 11, 2008

FRANK MAAS

United States Magistrate Judge

**DELILAH NIEVES, Plaintiff, -against- BOARD OF EDUCATION, CITY OF NEW YORK, JOEL KLEIN, DOMINICK SCAROLA, SUZANNE GARCIA, and FRANK GRUNSEICH, Defendants.**

**06-CV-0603 (CBA)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

*2006 U.S. Dist. LEXIS 81238*

**September 15, 2006, Decided
September 15, 2006, Filed**

**NOTICE:**    [*1] NOT FOR PUBLICATION

**COUNSEL:** For Delilah Nieves, Plaintiff: John Peter Bostany, The Bostany Law Firm, New York, NY.

For Board of Education, City of New York, Joel Klein, Dominick Scarola, Suzanne Garcia, Frank Grunseich, Defendants: Emily Sweet, Corporation Counsel for the City of New York, New York, NY; Joshua Chia-Shih Chao, New York City Law Department, New York, NY.

**JUDGES:** Carol Bagley Amon, United States District Judge.

**OPINION BY:** Carol Bagley Amon

**OPINION**

*MEMORANDUM & ORDER*

Plaintiff Delilah Nieves brings this action pursuant to *42 U.S.C. § 1983* against the defendants for injuries she alleges to have suffered when she was attacked by another student while attending school. Defendants have moved this Court for an order staying the proceedings pending the resolution of an action plaintiff has commenced in state court stemming from the same incident. For the foregoing reasons that motion is denied.

I. *Facts*

Plaintiff alleges that on February 11, 2004, while attending Grover Cleveland High School, she was attacked by another student, Erica Sudgen, who sliced plaintiff's face with a razor blade. In her complaint, plaintiff alleges that defendants [*2] had actual and constructive notice of the danger plaintiff faced from Sugden and other students and that their failure to prevent plaintiff's injuries violated her rights to be free from violence, to bodily integrity, to school and education and to a safe school environment, each of which plaintiff alleges is a right protected by the United States Constitution. Plaintiff alleges defendants acted with deliberate disregard of these dangers and with deliberate indifference to and in callous disregard of these alleged Constitutional rights. Specifically, plaintiff alleges defendants failed to use computerized crime tracking systems, failed to focus on and deal with troublemakers, failed to consider implementing state-wide student violence programs, failed to identify the high school as a possible impact school in order to procure more safety and police officers, failed to remove the threat to plaintiff's safety, and failed to transfer Sugden or plaintiff from the school before the injury occurred.

II. *Procedure*

On April 3, 2006, the date on which, by grant of extension, defendants were to have answered the February 9, 2006 complaint, defendants instead filed a letter motion [*3] seeking a stay of the proceedings on the grounds that there was a state action pending involving the same set of facts as presented in the federal complaint. Defendants urged this court to stay the proceedings because the state action was in the advanced stages of discovery and could have preclusive effects on the present action by application of res judicata and collateral estoppel.

By letter dated April 7, 2006, plaintiff objected to the motion in that it was unsupported by a memorandum of law and did not cite any federal rule of civil procedure. Plaintiff also took issue with defendants' characterization of the status of the state proceedings and withdrew her negligence claim from this federal action, leaving only the *§ 1983* action.

At a status conference on April 12, 2006, this Court set a motion schedule such that defendants could make their motion in full form and plaintiff could oppose. On June 5, 2006, the Court heard oral argument and found that the parties had not sufficiently briefed the issue. The

Court set another briefing schedule and set oral argument, which was held on June 26, 2006.

III. *Discussion*

"The decision as to whether to stay a federal action on [*4] the ground that there is a related action pending in a state court is committed to the sound discretion of the district court." *United States v. Pikna, 880 F.2d 1578, 1582 (2d Cir. 1989) (citing Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983)).* Under *Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 96 S. Ct. 1236, 47 L. Ed. 2d 483 (1976)*, a district court may abstain in order to conserve federal judicial resources in exceptional circumstances, where the resolution of existing concurrent state-court litigation could result in comprehensive disposition of litigation. *Woodford v. Cmty. Action Agency of Greene County, 239 F.3d 517, 522 (2d Cir. 2001).*

Abstention under *Colorado River* is only appropriate if the proceedings are considered "parallel," meaning they involve substantially the same parties and issues. *See Dittmer v. County of Suffolk, 146 F.3d 113, 117-18 (2d Cir. 1998); Day v. Union Mines Inc., 862 F.2d 652, 655 (7th Cir. 1988)* ("Suits are parallel when substantially the same parties are contemporaneously litigating substantially the same issue in another [*5] forum. "). However, abstention under *Colorado River* does not require identical parties in the federal and state proceedings. *Telesco v. Telesco Fuel & Masons' Materials, Inc., 765 F.2d 356, 362 (2d Cir. 1985)* (affirming district court's abstention where "in its essential elements the same cause of action, regardless of theory or pleadings, is asserted in both courts."). Abstention under *Colorado River* may be considered where the "federal and state actions are essentially the same" so that the "same cause of action, regardless of theory or pleadings is asserted in both courts." *Id.* In fact, "[m]erely raising an alternative theory of recovery, which still may be raised in state court, is not enough to differentiate the federal suit from the state suit." *Id.* As the suits here raise the same issues as to the defendants' duties arising out of the same events, they are sufficiently parallel to justify the application of *Colorado River.* [1] See also *Bernstein v. Hosiery Mfg. Corp. of Morganton, Inc., 850 F. Supp.176, 184 (E.D.N.Y. 1994)* ("The fact that precisely the same claims are not made in the two proceedings, or that alternative forms of relief [*6] are sought in the two actions does not mean the actions are not duplicative or parallel. What matters is that the claims concern the same events and involve sufficient overlap of subject matter.").

1   Plaintiff's state complaint alleges that defendants were negligent in failing to provide a safe

premises, failing to prevent persons carrying weapons from entering the premises, failing to adequately screen and monitor its students, failing to keep Sugden from the premises, failing to "sequester" Sugden and plaintiff from one another, failing to properly train or provided adequate security, failing to have adequate or proper security mechanisms in place and failing to prevent the altercation that led to the injury. (State Am. Cmpl. PP 28-53)

Plaintiff's federal complaint alleges defendants have "not properly trained or provided adequate security at the premises", "did not have adequate or proper security mechanisms in place", "failed to properly train and/or supervise security personnel", "could have and should have prevented SUGDEN from entering the premises", "could have and should have removed SUGDEN from the premises", "could have and should have prevented SUDGEN from injuring the plaintiff", "could have and should have prevented SUGDEN from entering the premises with a weapon" and "failed to: respond, break up, disperse, prevent, stop or even discourage an altercation involving Plaintiff and SUGDEN prior to the stabbing of Plaintiff, thereby causing the Constitutional violations of Plaintiff" which acts "taken in bad faith and in abject disregard and deliberate indifference to the safety of students, including DELILAH, amounting to a Constitutional violation of the rights of said students, including those of Plaintiff, to bodily integrity under the *Due Process Clause of the Fourteenth Amendment of the Constitution of the United States* and under *42 U.S.C. § 1983*." (Fed. Compl. PP 40-49)

[*7] Once it is established that the actions are parallel, to decide whether abstention is appropriate, the district court should consider the following six factors: (1) whether the controversy involved a res over which one of the courts has assumed jurisdiction, (2) whether one forum is more inconvenient than the other for the parties, (3) whether staying the federal action will avoid piecemeal litigation, (4) whether one action is significantly more advanced than the other, (5) whether federal or state law provides the rule of decision, and (6) whether the federal plaintiff's rights will be protected in the state proceeding. *Cone, 460 U.S. at 15-16, 19-23, 26.* The court's decision should "not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in the favor of exercising jurisdiction. The weight to be given to any one factor may vary greatly from case to case, depending on the particular setting of the case." *Id. at 21.* Furthermore, "the facial

neutrality of a factor is a basis for retaining jurisdiction, not for yielding it." *Woodford, 239 F.3d at 522* [*8] (internal citations omitted). Accordingly, the Court must consider these factors.

### 1. Res

There is no res at issue in the present case, which weighs against the issuance of a stay. *De Cisneros v. Younger, 871 F.2d 305, 307 (2d Cir. 1989).*

### 2. Convenience

No party has contended that the Supreme Court, Queens County is any more or less convenient than the Eastern District. This also weighs against the issuance of the stay. *Id.*

### 3. Risk of Piecemeal Litigation

This factor weighs in favor of abstention if there is the potential for "inconsistent and mutually contradictory determinations." *De Cisneros, 871 F.2d at 307.* In this case, all of the parties to the present federal action are parties to the state action, but the reverse is not the case. [2] Thus, the "state proceedings are more comprehensive than the federal proceedings," creating a risk of inconsistent results. *De Cisneros, 871 F.2d at 308.*

> 2    The Board of Education and City of New York are named as defendant's in both state and federal actions. Although Joel Klein is named as a defendant in the federal complaint but not in the state complaint, no allegations are ever made against him. Dominick Scarola, Suzanne Garcia and Frank Grunseich, the Principle, Assistant Principle and Dean of Security of Grover Cleveland High School, respectively, are also named in the caption of the federal complaint, but the only allegations made against them are as to the federal negligence claim which has since been withdrawn. Accordingly, plaintiff's federal claim is only brought against defendants (the Board of Education and City of New York) that are also defendants in the state action. Conversely, the state action is brought against Sudgen, Sugden's parents and Grover Cleveland High School itself, none of whom are named in the federal complaint. As to plaintiffs, the state action is brought on behalf of the federal infant plaintiff and her parents as co-plaintiffs, whereas the federal action is only brought by the infant plaintiff.

[*9]  For a state actor to be held liable under *§ 1983* for the actions of a third party, the state actor would have to be found to have "in some way...creat[ed] or increas[ed] the danger to the victim." *Dwares v. City of New York, 985 F.2d 94, 99 (2d Cir. 1993).* As noted above, the state claims require proof of negligence. As a *§ 1983* claim for failure to protect requires the state actor to be more than "merely negligent," if the state actors are held liable in the *§ 1983* action, collateral estoppel would preclude a finding that they were not negligent in state court. *Davidson v. Cannon, 474 U.S. 344, 347, 106 S. Ct. 668, 88 L. Ed. 2d 677 (1986).*

The risk of inconsistent results comes from the fact that a decision by this Court that defendants City and Board of Education were liable under *§ 1983* could be used by the minor plaintiff against those two defendants in the state action to establish negligence, but not against the School or individual defendants, who could then be found not negligent in state court. Likewise, if this Court determines that the Board of Education and City are not liable, this could be asserted only against the individual plaintiff and not her parents in [*10] state court. While a finding that these entities were not liable would not preclude a finding that they were negligent, collateral estoppel could be asserted against the minor plaintiff as to factual findings underlying that conclusion of law, for example whether certain duties were owed, or parties were on notice, but not against the parent plaintiffs as they are not parties to this case. *See Ryan v. New York Telephone Co., 62 N.Y.2d 494, 467 N.E.2d 487, 478 N.Y.S.2d 823 (1984)* (both collateral estoppel and res judicata require that the party against whom either is asserted have been afforded a full and fair opportunity to contest the decision). These would be inconsistent results and would be avoided by allowing the more comprehensive state action, which includes all parties at issue, to proceed first.

However, the risk of inconsistent results is reduced here for a somewhat unusual reason and that is that the Court has concerns about the viability of the plaintiff's *§ 1983* claim. Although the Second Circuit has not addressed the issue, circuits that have addressed this type of case agree that "schools have no duty under the *Due Process Clause* to protect students from assaults by other students, [*11] even where the school knew or should have known of the danger presented. If the state takes a person into custody or holds him against his will, the state assumes some measure of a constitutionally mandated duty of protection. Compulsory attendance laws for public schools, however, do not create an affirmative constitutional duty to protect students from the private actions of third parties while they attend school." *Seamons v. Snow, 84 F.3d 1226, 1235-36 (10th Cir. 1996); Santucci v. Newark Valley Sch. Dist., 2005 U.S. Dist. LEXIS 26202, 2005 WL 2739104, *3 (N.D.N.Y. 2005)* (collecting cases from other circuits). If the Court were to ultimately dismiss the plaintiff's claim for failure to state a claim, the plaintiff obviously would have no find-

ing in its favor to assert against the defendants in the state court action. And the fact that there was no constitutional claim as a matter of law could not be used against the plaintiff in the state negligence action. Moreover, this very significant issue is best resolved early on in the proceedings in federal court.

Accordingly, because the Court finds that there is some risk of piecemeal litigation, this factor weighs slightly in [*12] favor of the issuance of a stay.

### 4. *Advancement of Actions*

Under the fourth factor, "priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions." *Cone, 460 U.S. at 21*. Although plaintiff contests defendant's claim that discovery is almost complete in the state action, the state action is more advanced than this action, which was only filed several month ago and in which defendant has not yet even answered the complaint. Accordingly, this factor weighs slightly toward the issuance of a stay.

### 5. *Whether federal law provides the rule of the decision*

Under the fifth factor, the Court must determine whether federal or state law provides the rule of the decision. In this case, federal law provides the rule of the decision as to the *§ 1983* claim filed in federal court. When the applicable substantive law is federal, abstention is disfavored. *De Cisneros, 871 F.2d at 308 (citing Cone, 460 U.S. at 26)*.

The *§ 1983* claim presented here is constitutional in nature and thus is one which the state court is equally competent to consider. [*13] *See, e.g., Nevada v. Hicks, 533 U.S. 353, 404, 121 S. Ct. 2304, 150 L. Ed. 2d 398 (2001)* (Stevens, J., concurring) (noting that the Supreme Court has never questioned the jurisdiction of state courts to provide relief under *§ 1983*). However, the fact that plaintiffs could have amended its complaint in the state court action to assert the *§ 1983* claim is not "a basis for compelling a party which wishes to bring federal constitutional claims in federal court to present those claims to a state court instead." *Housing Works, Inc. v.*

*City of New York, 72 F. Supp.2d 402, 419 (S.D.N.Y. 1999)* (citations omitted). Thus, this factor weighs heavily against the issuance of a stay.

### 6. *Prejudice to Plaintiff*

Where there is a threat that the plaintiff's rights will not be safeguarded in the state court proceeding, this factor weighs heavily in favor of the federal court exercising jurisdiction over the case. *De Cisneros, 871 F.2d at 309*. This factor is "more important when it weighs in favor of federal jurisdiction." *Bethlehem Contracting Co. v. Lehrer/McGovern, Inc., 800 F.2d 325, 328 (2d Cir. 1986)*.

Plaintiff argues that she is prejudiced because the [*14] state case has proceeded slowly. The delay, two years, is not so unreasonable a length of time to justify "substantial doubt...[that the] parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties." *See Village of Westfield v. Welch's, 170 F.3d 116, 124 (2d Cir. 1999)* (citations omitted) (entertaining such doubt where the pending state proceedings were initiated five years before the federal action was commenced and were part of a larger dispute in which the state court had "invested over thirteen years"). Because this factor is neutral, it is of limited importance.

### IV. *Conclusion*

Accordingly, the first, second, and fifth factors weigh against the issuance of a stay, the third and fourth factors weigh toward the issuance of a stay, and the sixth factor is neutral. Having carefully weighed these factors, the Court finds that the factors support this Court's continued jurisdiction over the federal claim.

SO ORDERED.

Dated: Brooklyn, New York

September 15, 2005

Carol Bagley Amon

United States District Judge

2008 U.S. Dist. LEXIS 36917, *

**JOHN OJWANG' OMOLLO, Plaintiff, - against - CITIBANK, N.A., Defendant.**

**07 Civ. 9259 (SAS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2008 U.S. Dist. LEXIS 36917*

**May 6, 2008, Decided**
**May 6, 2008, Filed**

**COUNSEL:** [*1] John Ojwang' Omollo, Plaintiff, Pro Se, Johannesburg, South Africa.

For Defendant: Kevin Bruce Leblang, Esq., Rachel Mara Manne, Esq., Kramer Levin Naftalis & Frankel, LLP, New York, New York.

**JUDGES:** Shira A. Scheindlin, U.S.D.J.

**OPINION BY:** Shira A. Scheindlin

**OPINION**

**MEMORANDUM OPINION AND ORDER**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

**I. INTRODUCTION**

Plaintiff John Ojwang' Omollo, a citizen of Kenya, is employed by Citibank in South Africa. Omollo asserts that he was fraudulently induced to enter into an employment contract and later coerced into a second contract. Citibank moves to dismiss on the grounds that the statute of limitations on his claim has expired and on the basis of *forum non conveniens*. For the reasons stated below, defendant's motion is granted.

**II. BACKGROUND**

**A. Facts**

¹

1   The facts in this section are taken from plaintiff's Complaint, documents appended to the Complaint, and moving papers, and are assumed to be true for purposes of this motion.

Omollo joined Citibank's Kenya branch as Credit Administration Assistant in December of 1995. In late 2000, his unit relocated to Johannesburg, South Africa. Omollo originally planned to relocate alone, leaving his wife and children in Kenya, but changed his mind after

[*2] he was told by Citibank that it would pay his family's housing and school tuition costs. Additionally, because his unit was relocating, he was told that he would stay in South Africa for longer than the period stipulated by the contract. ²

2   *See* Statement ("Stmt.") at 1, App. C to Complaint ("Compl.").

On November 30, 2000, Omollo signed a new employment contract (the "2000 Contract") for the position of Credit Administration Manager in South Africa. ³ The 2000 Contract provided that if "suitable performance standards" were maintained, the job term would be two years with the possibility of one-year renewals. It further provided that the maximum period of renewal was "three (3) years after which [Omollo would] be expected to return to an assignment in Kenya." ⁴ Under the terms of the 2000 Contract, Omollo was expected to move to South Africa with his wife and three children and was provided housing and utilities "for the first three years" and tuition for his children "for a maximum of two years." If Omollo "accept[ed] a permanent position in [South Africa], the housing and education allowances [would] be phased out slowly to facilitate localization." The 2000 Contract provides that [*3] it "shall be governed by and construed in accordance with the Laws of South Africa." Consequently, Omollo's wife left her job, the children withdrew from their schools, and the family relocated to Johannesburg.

3   *See* 11/30/00 Contract, App. A to Compl.
4   *Id.*

By letter dated September 17, 2002, Citibank offered to change the terms of Omollo's employment (the "2002 Letter"). The 2002 Letter provided that his employment would terminate in two years and that Citibank would no longer provide him and his family with housing and education benefits. ⁵ It was styled as a voluntary modification to the 2000 Contract and bears Omollo's signature. Omollo asserts that he was told that if he did not agree to the modifications set forth in the 2002 Let-

ter, he would not be offered a new contract when the 2002 Contract expired. [6]

> 5   *See* 9/17/02 Letter from Pam Sacree, Head of Human Resources at Citibank, to Omollo, App. B to Compl.
> 6   *See* Stmt. at 2.

In October of 2004, after viewing a company-sponsored tape of Citibank CEO Charles Prince exhorting employees to raise any complaints regarding their employment, Omollo wrote Prince a letter about the change in his benefits. After several months passed without a response, [*4] he contacted an attorney in New York. The attorney, Michael Atadika, corresponded with Citibank regarding Omollo's complaints. Citibank informed Atadika that the United States courts would be an improper forum and reminded him that knowingly filing suit in an improper forum is sanctionable. [7] Atadika sent a response to Citibank explaining the merits of the claim, and then advised Omollo that he should pursue his case in South Africa, not New York. [8]

> 7   *See* 3/31/05 Letter from Richard N. Papper, Vice President and Senior Litigation Counsel, Emerging Markets, Citibank, to Michael Atadika, plaintiff's former counsel, App. G to Compl.
> 8   *See* Stmt. at 3; 6/21/05 Email from Atadika to Omollo, App. I to Compl.

On September 6, 2005, Omollo met with Citibank's local director of Human Resources, Sue Robertson, who offered Omollo three options: (i) to be paid the lost amounts under the original contract; (ii) to have the old contract reinstated; and (iii) to be repatriated to Kenya. Omollo chose the first option and provided Citibank with an estimate of his losses, which he calculated to be $ 840,000. [9] By letter dated September 26, 2005, Citibank informed Omollo that because his proposal demonstrated [*5] an "obstructive approach," it was rejected. [10] Further, he was told that "[t]he meeting was not a settlement meeting as in our view you do not have a claim in terms of South African law." [11] Omollo requested a follow-up meeting, but his request was denied. Citibank's letter also observed that Omollo's claim was barred by South Africa's statute of limitations. [12] Omollo now alleges that these discussions were intended to delay his pursuit of the claims until the statute of limitations expired. [13]

> 9   *See* 9/9/05 Memo from Omollo to Sue Robertson, local director of Human. Resources, Citibank, App. E to Compl.
> 10   *See* 9/26/05 Letter from Robertson to Omollo, App. E to Compl.
> 11   *Id.*

> 12   *See* 9/27/05 Letter from Robertson to Omollo, App. E to Compl.
> 13   *See* Plaintiff's Response to Defendant's Memorandum of Law on Motion to Dismiss at 1.

Omollo continued to raise his concerns with his superiors, and his supervisor asked whether an appointment as director of the South African Credit Risk Management Department would be sufficient redress. He responded that it would. However, Citibank did not appoint Omollo to head the department. After some time, Omollo was offered the number-two spot at the department, but [*6] this was never confirmed in writing. Since that time, Omollo has received undeserved negative performance reviews and reduced compensation as compared to his peers. His superiors at Citibank have also tried to persuade him to drop the lawsuit. [14]

> 14   *See* Stmt. at 6.

## B. Procedure

On September 20, 2007, Omollo filed the instant action. Defendant now asserts that the applicable statute of limitations has expired, and in addition moves to dismiss on the ground of forum non conveniens.

## III. APPLICABLE LAW

### A. Motion to Dismiss

When deciding a defendant's motion to dismiss under *Federal Rule of Civil Procedure 12(b)(6)*, the court must "accept as true all of the factual allegations contained in the complaint" [15] and "draw all inferences in the light most favorable to the non-moving party." [16] Nevertheless, the court need not accord "[l]egal conclusions, deductions or opinions couched as factual allegations . . . a presumption of truthfulness." [17]

> 15   *Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1975, 167 L. Ed. 2d 929 (2007)* (quotation marks omitted). *Accord In re NYSE Specialists Sec. Litig., 503 F.3d 89, 95 (2d Cir. 2007).*
> 16   *In re NYSE Specialists, 503 F.3d at 95.*
> 17   *Id.* (quotation marks omitted).

In deciding a motion to [*7] dismiss, the court is not limited to the face of the complaint, but "may [also] consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference . . . and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." [18] However, "before materials outside the record may become the basis for a dismissal . . . it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." [19]

18   *ATSI Commc'ns v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d.Cir. 2007).*
19   *Faulkner v. Beer, 463 F.3d 130, 134 (2d Cir. 2006).*

"*Federal Rule of Civil Procedure 8(a)(2)* requires . . . 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" [20] To survive a *12(b)(6)* motion to dismiss, the allegations in the complaint must meet the standard of "plausibility." [21] Although the complaint need not provide "detailed factual allegations," [22] it must "amplify a claim with some factual allegations . . . to render the claim *plausible*." [23] The standard is no longer that a complaint can be dismissed only if there us "no set of facts" that plaintiff could prove [*8] "which would entitle him to relief." [24] Rather, the complaint must provide "the grounds upon which [the plaintiff's] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" [25]

20   *Erickson v. Pardus, 127 S. Ct. 2197, 2200, 167 L. Ed. 2d 1081 (2007)* (quoting *Fed. R.Civ. P. 8(a)(2)*).
21   *See Bell Atl., 127 S. Ct. at 1970.*
22   *Id. at 1964. Accord ATSI,   493 F.3d at 98 n.2.*
23   *Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007)* (emphasis in original).
24   *Bell Atl., 127 S. Ct. at 1969* (quoting *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*). Accord id. ("The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard").
25   *ATSI, 493 F.3d at 98* (quoting *Bell Atl., 127 S. Ct. at 1965*).

## B. Statute of Limitations

"Where jurisdiction rests upon diversity of citizenship, a federal court sitting in New York must apply the New York choice-of-law rules and statutes of limitations." [26] New York's borrowing statute requires a court to apply the limitation period of the foreign jurisdiction even if "jurisdiction is unobtainable over a defendant in the foreign jurisdiction." [27] New York courts interpreting the borrowing statute hold that the cause of action [*9] accrues in the place of the injury, and where the 'injury is purely economic, the place of injury is usually where the plaintiff resides and sustains the economic impact of the loss.'" [28]

26   *Stuart v. American Cyanamid Co., 158 F.3d 622, 627 (2d Cir. 1998)* (citing *Guaranty Trust Co. v. York, 326 U.S. 99, 108-09, 65 S. Ct. 1464, 89 L. Ed. 2079 (1945); Klaxon Co. v. Stentor*

*Elec. Mfg. Co., 313 U.S. 487, 496, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941)*).
27   *Insurance Co. of N. Am. v. ABB Power Generation, 91 N.Y.2d 180, 180, 690 N.E.2d 1249, 668 N.Y.S.2d 143 (1997). See also New York Civil Practice Law and Rules § 202* ("An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply.)"
28   *Cantor Fitzgerald Inc. v. Lutnick, 313 F.3d 704, 710 (2d Cir. 2002)* (quoting *Global Fin. Corp. v. Triarc Corp., 93 N.Y.2d 525, 529, 715 N.E.2d 482, 693 N.Y.S.2d 479 (1999)*).

In borrowing a foreign statute of limitations, a court must apply all extensions and tolls that are applicable in that state. When a defendant attempts to use the statute of limitations [*10] as an affirmative defense, the defendant "bears the burden of establishing by prima facie proof that the limitations period has expired since the plaintiff's claims accrued." [29] If the defendant meets this burden, then the plaintiff has the burden to show that the limitations period should be tolled. [30] A motion to dismiss on the basis that a claim is time-barred "may only be granted when the allegations of the complaint make clear that the claim is barred by the limitations period." [31]

29   *Overall v. Estate of Klotz, 52 F.3d 398, 403 (2d Cir. 1995)* (citing *Hoosac Valley Farmers Exch. v. AG Assets, Inc., 168 A.D.2d 822, 563 N.Y.S.2d 954, 955 (3d Dep't 1990)*).
30   *See id.* (citing *Waters v. Saratoga Springs, Inc. v. State, 116 A.D.2d 875, 498 N.Y.S.2d 196, 199 (3d Dep't 1986)*).
31   *Dutton v. Glass, No. 04.Civ. 3496, 2005 U.S. Dist. LEXIS 868, 2005 WL 146503, at *1 (S.D.N.Y. Jan. 20, 2005)* (quotation marks and citation omitted).

## C. *Forum Non Conveniens*

"*Forum non conveniens* is a discretionary device permitting a court in rare instances to dismiss a claim even if the court is a permissible venue with proper jurisdiction over the claim." [32] Courts may decline to exercise jurisdiction under this doctrine when it is determined that, weighing "relative advantages [*11] and obstacles to fair trial" in the alternative fora and practical considerations of which forum will "make trial of a case [more] easy, expeditious and inexpensive," "the balance is strongly in favor" of the defendant's request for dismissal in favor of a more convenient forum. [33] However, "a case cannot be dismissed on grounds of *forum non conveniens*

unless there is presently available to the plaintiff an alternative forum that will permit it to litigate the subject matter of its dispute." [34] Thus, "an adequate forum does not exist if a statute of limitations bars the bringing of the case in that forum." [35]

> 32  *Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 100 (2d Cir. 2000)* (quotation marks omitted).
> 33  *Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508, 67 S. Ct. 839, 91 L. Ed. 1055 (1947).* 2005).
> 34  *Norex Petroleum Ltd. v. Access Indus., 416 F.3d 146, 159* (2d Cir.
> 35  *Bank of Credit & Commerce Int'l (OVERSEAS) Ltd. v. State Bank of Pakistan, 273 F.3d 241, 246 (2d Cir. 2001).*

In deciding whether to dismiss on this ground, courts in this Circuit undertake a three-step analysis. First, courts determine the degree of deference due the plaintiff's choice of forum. [36] Next, courts examine whether there is an adequate alternative [*12] forum for the dispute. [37] Finally, courts engage in a balanced assessment of the competing private interests of the parties in the choice of forum, and the public interests of the alternative fora under consideration. [38] Throughout, the defendant bears the burden of showing that *each* stage of the analysis "tilt[s] strongly in favor of trial in the foreign forum." [39] The action should be dismissed only if the chosen forum is shown to be genuinely inconvenient and the selected forum significantly preferable." [40]

> 36  *See Iragorri v. United Techs. Corp., 274 F.3d 65, 73 (2d Cir. 2001)* (en banc).
> 37  *See id.*
> 38  *See id. at 73-74.*
> 39  *Wiwa, 226 F.3d at 108* (emphasis added). *Accord P.T. United Can Co. v. Crown Cork & Seal Co., 138 F.3d 65, 74 (2d Cir. 1998).*
> 40  *Iragorri, 274 F.3d at 74-75.*

## 1. The Degree of Deference Accorded a Plaintiff's Choice of Forum

"Any review of a *forum non conveniens* motion starts with 'a strong presumption in favor of the plaintiff's choice of forum.'" [41] However, the strength of this presumption and the degree of deference due the plaintiff's selection "var[y] with the circumstances." [42] The degree of deference to be accorded the plaintiff's choice of forum is not determinative [*13] of the final outcome; rather, it merely re-calibrates the scales for the remaining two steps of the analysis. [43] "[T]he greater the degree of deference to which the plaintiff's choice of forum is entitled, the stronger a showing of inconvenience the defendant must make to prevail in securing forum non conven-

iens dismissal. [44] Conversely, the less deference is granted the plaintiff's choice, "the easier it becomes for the defendant to succeed on a *forum non conveniens* motion by showing that convenience would be better served by litigating in another country's courts." [45]

> 41  *Norex Petroleum Ltd. v. Access Indus., 416 F.3d 146, 154 (2d Cir. 2005)* (quoting *Piper Aircraft Co. v. Reyno, 454 U.S. 235, 255, 102 S. Ct. 252, 70 L. Ed. 2d 419 (1981)*).
> 42  *Iragorri, 274 F.3d at 71.*
> 43  *See id. at 73-74.*
> 44  *Id. at 74.*
> 45  *Id. at 72.*

A "plaintiff's choice of forum is generally entitled to great deference when the plaintiff has sued in the plaintiff's home forum." [46] The choice of a United States forum by a foreign plaintiff is entitled to less deference. [47] "The reason great deference is generally afforded a plaintiff's choice of its home forum 'is [that] it is presumed to be convenient.'" [48]

> 46  *Piper Aircraft, 454 U.S. at 255.*
> 47  *See id. at 255-56.*
> 48  *Norex Petroleum, 416 F.3d at 154* [*14] (quoting *Iragorri, 274 F.3d at 71*).

A court must, however, consider whether the plaintiff's choice of forum appears to be "motivated by desire to impose tactical disadvantage on the defendant." [49] Where there are indicia of forum shopping, the presumption in favor of the plaintiff's choice of forum "may not apply, either at all or with full force." [50] Indicia of forum shopping may include: "attempts to win a tactical advantage resulting from local laws that favor the plaintiff's case . . . [and] the inconvenience and expense to the defendant resulting from litigation in that forum." [51]

> 49  *Iragorri, 274 F.3d at 73.*
> 50  *Norex Petroleum, 416 F.3d at 154.*
> 51  *Iragorri, 274 F.3d at 72. Accord Norex Petroleum, 416 F.3d at 155.*

A court may accord diminished deference to a plaintiff's choice of forum where a plaintiff voluntarily enters into a transaction outside the United States, and "the cause of action does not have significant ties to the plaintiff's home forum." [52] A court will determine whether, in the "particular circumstances," the plaintiff had the "expectation . . . that any litigation arising from [the transaction] will be conducted" in the foreign jurisdiction. [53]

> 52  *Carey v. Bayerische Hypo-Und Vereinsbank, A.G., 370 F.3d 234, 237 (2d Cir. 2004).*
> 53  *Id. at 238.*

## 2. [*15] Adequacy of the Alternate Forum

After determining the appropriate degree of deference, "the court must consider whether an adequate alternative forum exists." [54] The movant bears the burden to demonstrate the adequacy of the alternate forum. [55] "Ordinarily, this requirement will be satisfied when the defendant is amenable to process in the other jurisdiction. In rare circumstances, however, where the remedy offered by the other forum is clearly unsatisfactory, the other forum may not be an adequate alternative, and the initial requirement may not be satisfied." [56] The mere fact that the substantive law in the alternative forum is less favorable to the plaintiffs is not sufficient to show that the alternative forum is inadequate. [57] However, the alternative forum has been ruled inadequate "where the alternative forum does not permit litigation of the subject matter of the dispute," [58] and where "a statute of limitations bars the bringing of a case in a foreign forum that would be timely in the United States." [59]

> 54  *Iragorri, 274 F.3d at 73.*
> 55  *See Norex Petroleum, 416 F.3d at 157.*
> 56  *Piper Aircraft, 454 U.S. at 255 n.22.*
> 57  *See id. at 247.*
> 58  *Id.*
> 59  *Norex Petroleum, 416 F.3d at 159.*

## 3. Balancing [*16] Public and Private Factors

The private interests that courts must consider relate to the relative convenience to the litigants of the alternative fora. [60] These factors include: "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling [witnesses], and the cost of obtaining attendance of willing[] witnesses . . . and all other practical problems that make trial of a case easy, expeditious and inexpensive." [61] In undertaking this analysis, courts should examine the specifics of the claims: "[r]ather than simply characterizing the case as one in negligence, contract, or some other area of law, the court should focus on the precise issues that are likely to be actually tried." [62] However, courts need not undertake to identify all "the rights, remedies, and procedures available under the law that would be applied in each forum." [63] "Public interest factors include: court congestion; the interest of forums in having local disputes decided at home; and, the interest in having issues of law decided by courts of the nation whose law is involved." [64]

> 60  *See Iragorri, 274 F.3d at 73.*
> 61  *Id. at 73-74* (quoting *Gulf Oil Corp., 330 U.S. at 508).*
> 62  *Id. at 74.*
> 63  *Piper Aircraft, 454 U.S. at 252.*

> 64  *Carey, 370 F.3d at 237.*

## IV. [*17] DISCUSSION

### A. Statute of Limitations

Citibank asserts, and Omollo apparently concedes, that the statute of limitations that would apply under South African law has lapsed. [65] Omollo asserts that South African law permits equitable tolling of the statute of limitations where the defendant has misled the plaintiff into allowing the claim to lapse. Normally it would be Omollo's burden to prove that South African law permits equitable tolling. However, because Omollo is proceeding *pro se* and because this case presents complex legal issues, the Court asked Citibank to investigate whether Omollo would be able to file this action in South Africa. Citibank has not given a satisfactory answer. I therefore assume for purposes of this motion that South African law permits equitable tolling in a manner similar to that of New York.

> 65  *See* Defendant's Memorandum of Law in Support of Motion to Dismiss at 8 ("Plaintiffs claim is similarly barred [by] the relevant South African statute of limitations period because claims for fraudulent inducement into a contract under South African law must be initiated within three years from the date the alleged damages were discovered.").

Omollo has pled facts that, [*18] if true, would entitle him to equitable tolling. [66] As per Omollo's version of events, he was told by Citibank that it was prepared to resolve his claims on September 6, 2005, within three years of the events at issue. Omollo then filed this action within a reasonable period of time after it became evident that no resolution was forthcoming. Based on the possibility of equitable tolling in South Africa, Citibank's motion to dismiss for failure to file within the statute of limitations is denied.

> 66  In New York, a "defendant may be estopped from asserting the Statute of Limitations as a defense where he or she has wrongfully induced the plaintiff to refrain from timely commencing an action by deception, concealment, threats or other misconduct." *Zoe G. v. Frederick F.G., 208 A.D.2d 675, 617 N.Y.S.2d 370 (2d Dep't 1994).*

### B. *Forum Non Conveniens*

Omollo's choice of forum is not entitled to the significant level of deference afforded to residents of this forum. Further, while there is no evidence of a "desire to impose tactical disadvantage" on Citibank, Omollo nonetheless had no reasonable expectation that litigation aris-

2008 U.S. Dist. LEXIS 36917, *

ing from his employment contract would be conducted in this forum. [67]

> 67  *Iragorri, 274 F.3d at 73.*

The [*19] second step of the *forum non conveniens* analysis is the determination of whether there is an adequate alternative forum. Clearly South Africa is the potential alternative forum. If this action were barred by the statute of limitations in South Africa, there would be no adequate alternative. However, because I have assumed for purposes of this motion that equitable tolling is available under South African law, South Africa is available as an alternative forum.

With the first two steps in the *forum non conveniens* analysis weighing in favor of defendant, dismissal rests on the balancing of certain public and private factors. Relevant evidence, including witnesses, is more easily accessible in South Africa. South Africa has a strong interest in the resolution of South African legal claims in its own courts. Omollo is a resident of South Africa, and the events in question and the injury occurred there. Indeed, the only connection to this forum -- that defendant's corporate headquarters is located here -- is relatively inconsequential in terms of its impact on the litigation. The balance is strongly in favor of dismissal. Therefore, Citibank's motion to dismiss on the ground of *forum non* [*20] *conveniens* is granted. [68]

> 68  Had I found that equitable tolling was not available in South Africa, Omollo's claims would have been dismissed for failure to file within the statute of limitations. Regardless of the outcome, Omollo cannot proceed in this Court. If South Africa is unavailable, then the statute has lapsed and the Court must grant defendant's motion to dismiss on the statute of limitation ground. If South Africa is available, then this is an improper forum and the Court must grant defendant's motion to dismiss on the *forum non conveniens* ground.

## V. CONCLUSION

For the reasons stated above, defendant's motion to dismiss is granted. While I am sympathetic to plaintiff's plight, the proper forum for this litigation is South Africa, not New York. The Clerk of the Court is directed to close this motion (document no. 17 on the docket sheet) and this case.

/s/ Shira A. Scheindlin

U.S.D.J.

Dated: New York, New York

May 6, 2008

# EXHIBIT 2

Rome McGuigan, P.C.  •  Attorneys at Law

One State Street  •  Hartford, Connecticut  06103-3101  •  (860) 549-1000  •  Fax (860) 724-3921  •  Juris No. 27726

| | | |
|---|---|---|
| RETURN DATE:     MAY 6, 2008 | : | SUPERIOR COURT |
| | : | |
| THE LINCOLN LIFE & ANNUITY | : | JUDICIAL DISTRICT OF HARTFORD |
| COMPANY OF NEW YORK, | : | |
| | : | AT HARTFORD |
| V. | : | |
| | : | |
| | : | |
| LOCKWOOD PENSION SERVICES, INC., | : | |
| STEVEN LOCKWOOD, JOEL B. MILLER, | : | |
| JONATHAN S. BERCK (individually and as | : | |
| Trustee of the Arthur Kramer 2005 | : | |
| Insurance Trust dated August 29, 2005) | : | |
| LIFE PRODUCT CLEARING, LLC, | : | |
| and TD BANKNORTH, N.A. | : | APRIL 16, 2008 |

## VERIFIED COMPLAINT

Plaintiff, The Lincoln Life & Annuity Company of New York, as successor by merger to

Jefferson Pilot LifeAmerica Insurance Company ("Lincoln"), by and through its attorneys, hereby files

this Complaint, and in support thereof, avers as follows:

## PARTIES

1.    Plaintiff Lincoln is a life insurance company organized and existing under the laws of

the State of New York with offices located at 350 Church Street, Hartford, CT 06103-1106.

2.    Upon information and belief, Defendant Lockwood Pension Services, Inc. ("LPS") is a

corporation organized under the laws of the State of New York with its principal place of business

located at 75 Rockefeller Plaza, New York, New York 10019.

*Rome McGuigan, P.C.* • *Attorneys at Law*
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

3.      Upon information and belief, Defendant Steven Lockwood ("Lockwood") is an individual residing at 2 Tall Tree Lane, Pleasantville, New York 10570.  At all times relevant hereto, Lockwood was the Chairman of the Board and/or Chief Executive Officer of LPS.

4.      Upon information and belief, Defendant Joel B. Miller ("Miller") is an individual residing at 721 NW 108 Ave., Plantation, Florida 33324.

5.      Upon information and belief, Defendant Jonathan S. Berck ("Berck") is an individual residing at 604 Ramapo Road, Teaneck, New Jersey 07666.  At all times relevant hereto, Berck was the sole member of Jonathan S. Berck, LLC, a limited liability company organized under the laws of the State of New York with its principal place of business located at 75 Rockefeller Plaza, New York, New York 10019.  Upon information and belief, Berck is the Trustee of the Arthur Kramer 2005 Insurance Trust dated August 29, 2005 and the Trustee of the Leon Lobel Insurance Trust dated November 15, 2005.

6.      Upon information and belief, Defendant Life Product Clearing, LLC ("Life Product") is a limited liability company organized under the laws of the State of Delaware with its principal place of business located at 75 Rockefeller Plaza, New York, New York 10019. Upon information and belief, Life Product was formed on November 7, 2005.  Life Product consists of a group of investors who purchase, acquire, or otherwise participate in the sale of beneficial interests in life insurance policies and shares office space with Lockwood.

2

7.      Upon information and belief, Defendant TD Banknorth, N.A. ("TD Banknorth") is a national association with its principal place of business located at One Portland Square, Portland, Maine 04112.  Upon information and belief, TD Banknorth acquired Hudson United Bank ("Hudson") in January 2006 and is the successor-in-interest to Hudson.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction pursuant to *Conn. Gen. Stat.* § 52-59b and *Conn. Gen. Stat.* § 33-929(f) because (i) the defendants transact business in Connecticut; (ii) the defendants committed tortious acts in Connecticut; (iii) the defendants committed tortious acts outside the State of Connecticut which caused damage to Lincoln in Connecticut and the defendants expected or reasonably should have expected their actions to have consequences in Connecticut and the defendants derive substantial revenue from interstate commerce; and (iv) the claims set forth in this Complaint against arise out of contracts made and/or performed in Connecticut.

9.      Venue properly lies before this Court and in this Judicial District pursuant to *Conn. Gen. Stat.* § 51-345 because Lincoln is located, the injury and damage to Lincoln occurred, and the contracts at issue were performed in this Judicial District.

Rome McGuigan, P.C. • *Attorneys at Law*
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

3

## BACKGROUND

### Stranger-Originated Life Insurance

10.     Over the last decade, an insurance market has emerged in which investors have begun

to use traditional life insurance as a morbid and speculative investment vehicle, rather than for the

income protection and estate planning purposes for which such insurance was created.

11.     In its simplest form, such an investment vehicle is created when a life insurance policy

is applied for and issued at the behest of individuals or entities – with no insurable interest in the life of

the insured – who later acquire or participate in the sale of some, if not all, of the interest in the death

benefit payable upon the death of the insured.  Such arrangements are commonly referred to as IOLI,

which stands for "investor-originated life insurance," or STOLI, which stands for "stranger-originated

life insurance."  For ease of reference, these transactions are referred to as "STOLI" herein.

12.     Though the STOLI market is relatively new, the underlying concept is not; indeed, in

the late nineteenth and early twentieth centuries, the United States Supreme Court opined against

unlawful "wagering policies," and the "sinister counter interest" in the death of the insured that results

from the issuance of such policies.

13.     State insurable interest laws, which protect the integrity of life insurance by requiring

that a policy owner have a cognizable interest in the longevity of the insured at the time the policy is

issued, provide another safeguard against STOLI arrangements.  However, STOLI speculators attempt

4

to circumvent these laws by carefully constructing their transactions to hide the fact that the policies are not being procured to satisfy legitimate insurance needs, but instead are being procured as impermissible investments.

14.    Logically, STOLI speculators seek out the highest anticipated rates of return when choosing the individuals to apply for life insurance in which they will invest. This often means the typical life insurance policy that such speculators endeavor to initiate insures the life of an individual aged seventy or older, with a net worth of over one million dollars. Such an individual can obtain large value policies, and, actuarially speaking, is expected to have a relatively limited lifespan.

15.    The perverse result is that the shorter the expected lifetime of the insured, the more valuable the policy becomes to those who would gamble on his or her life; in short, a "sinister counter interest" in the death of the insured, of the sort condemned by the Supreme Court, arises.

16.    Once the speculators locate an individual who meets their investment profile and, more importantly, will agree to collaborate in the STOLI arrangement, an application is made for one or more insurance policies. The speculators typically pay most or all of the prospective insured's costs, including premium payments. Some speculators even agree to pay the prospective insured a fee or other compensation upon the issuance of the policy.

17.    In many cases, the policy application indicates that a third-party entity, such as a trust, a shell corporation, or a limited partnership, will be the policy owner and/or beneficiary of the policy

proceeds. Alternatively, the applicant may designate a legitimate beneficiary, such as a close family member or the insured's estate, at the outset, but after the policy is issued, the applicant will submit a request to change the beneficiary to a STOLI entity. It is anticipated at the inception of these transactions that there will be some form of change of beneficiary, such that the STOLI entity ultimately becomes the beneficiary of the life insurance policy proceeds. In any event, the manipulation of the beneficiary designation often permits the speculators to acquire an interest in either the policy itself or the holding entity – and, most importantly, in the death benefit that will later be disbursed by the insurer – without disclosing their interest to the insurer. References to policy proceeds, beneficial interests, and death benefits herein include payment of policy proceeds by insurers to trusts and other shell entities that then pay or otherwise share or transfer such proceeds to or with the trust/shell entity beneficiaries.

18.    While there are many variations, all STOLI schemes have one thing in common: their objective is to give investors with no insurable interest in the life of the insured a stake in a life insurance policy on the life of a complete stranger.

19.    The arrangements in connection with the life insurance policies issued by Lincoln and insuring the lives of Arthur Kramer ("Kramer") and Leon Lobel ("Lobel") were similarly structured. A trust was created in which either the insured or his children were initially named as the beneficiary. The insured applied for life insurance in which the trust/trustee was named as the beneficiary. As part

6

*Rome McGuigan, P.C.* • *Attorneys at Law*
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

of the plan, the beneficial interest was immediately assigned to a stranger investor following the issuance of the life insurance policy. At no time did the insured or his family have a true beneficial interest in the insurance policy.

20.     Kramer, at the direction of Lockwood, LPS, and/or other entities engaged in secondary life insurance market transactions, established a trust, naming himself as the depositor and his daughter, Liza Kramer ("Liza"), as the initial beneficiary. Upon issuance of the insurance policy, Kramer, acting on the direction of Lockwood, LPS, and/or other entities engaged in secondary life insurance market transactions, immediately directed his daughter to execute a putative assignment of her interest in the trust to a stranger investor. The policy was procured on Kramer's life with the intention of immediately effectuating the assignment of the beneficial interest in the policy to an investor. At no time did Kramer or any of his family members have a true beneficial interest in the policy.

21.     Lobel, at the direction of Miller, Lockwood, LPS, Life Product, and/or other entities engaged in secondary life insurance market transactions, established a trust, naming himself as the depositor and as the initial beneficiary. Upon issuance of the insurance policy, Lobel, acting on the direction of Miller, Lockwood, LPS, Life Product, and/or other entities engaged in secondary life insurance market transactions, executed a putative assignment of his interest in the trust to a stranger investor. The policy was procured on Lobel's life with the intention of immediately effectuating the

assignment of the beneficial interest in the policy to an investor. At no time did Lobel or any of his family members have a true beneficial interest in the policy.

## The Kramer Policy

22.     On or around April 6, 1999, Lockwood entered into a Broker Agreement with Lincoln (the "Lockwood Broker Agreement"). Pursuant to the Lockwood Broker Agreement, Lockwood agreed, *inter alia*, "to comply with all applicable state and federal laws and with all rules and regulations of the regulatory agencies having jurisdiction with respect to the sales of the Policies"; to offer "Policies for sale in accordance with all [Lincoln's] rules and procedures then in effect"; to review insurance applications "for completeness and suitability"; that "all policyholder files, records and premium accounts are the property of" Lincoln; and that "all such property shall be returned to" Lincoln "upon termination of" the Lockwood Broker Agreement. Pursuant to the Lockwood Broker Agreement, Lockwood also agreed to indemnify and hold Lincoln harmless "for all costs, expenses, losses, claims, damages or liabilities (or actions in respect thereof), including reasonable attorneys' fees, resulting from any negligent, fraudulent or unauthorized acts or omissions by" Lockwood or "any unlawful sales practices" by Lockwood in connection with the sale of Lincoln policies.

23.     Upon information and belief, in early 2003, Lockwood, LPS, and/or other entities engaged in secondary life insurance market transactions, solicited  Kramer's participation in a STOLI arrangement. Subsequently, Kramer began applying for life insurance with several insurance

*Rome McGuigan, P.C.* • *Attorneys at Law*
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

companies including Lincoln.  The insurance was placed through M&M Brokerage Services, Inc.

("M&M") with Lockwood as the producer.

24.     In October 2003, Lockwood sent correspondence to Kramer's doctor, Thomas Nash,

M.D., indicating that Kramer was applying for life insurance coverage and enclosing a signed

authorization form to forward Kramer's medical history.

25.     On or about July 11, 2005, an informal inquiry as to insurance on the life of Kramer

was submitted to Lincoln at its offices in Hartford, Connecticut by M&M.  The informal inquiry is

primarily used to conduct limited underwriting concerning the health condition of an applicant, so as to

provide the applicant and the insurance producer a preliminary indication of the type and amount of

coverage available, along with an estimate of premium costs.  For coverage to be issued, however, a

formal application must be submitted by the prospective insured and/or on the prospective insured's

behalf.

26.     In July 2005, Lincoln initially, from its offices in Hartford, Connecticut, declined to

make an offer on a policy for Kramer based on the medical information provided.

27.     On August 29, 2005, Kramer, at the direction of Lockwood, LPS, and/or other entities

engaged in secondary life insurance market transactions, established the Arthur Kramer 2005

Insurance Trust dated August 29, 2005 (the "Kramer Trust"), in which Hudson was named as the

trustee.  The original beneficiary of the Kramer Trust was Kramer's daughter, Liza.

*Rome McGuigan, P.C.* • *Attorneys at Law*

One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

28.    Lockwood and one of his associates (David Capitelli) were witnesses to the execution of the Kramer Trust documents by Kramer.  Upon information and belief, the Kramer Trust documents were prepared by legal counsel for LPS at the direction of Lockwood, LPS, and/or other entities engaged in secondary life insurance market transactions.

29.    Upon information and belief, at the time the Kramer Trust was created, Hudson and LPS had a pre-existing business relationship and shared the same business address at 75 Rockefeller Plaza, New York, New York 10019.  Berck also had a business address at 75 Rockefeller Plaza, New York, New York 10019, and Life Product (once it was formed) had its address there as well.

30.    On September 30, 2005, Lincoln, from its offices in Hartford, Connecticut, again declined to make an offer on a policy for Kramer based on the medical information provided.

31.    On October 5, 2005, Lincoln, from its offices in Hartford, Connecticut, made a tentative offer to insure Kramer's life based upon updated medical information provided.

32.    On October 24, 2005, Kramer submitted an application (the "Kramer Application") for the Lincoln policy with the Kramer Trust (Hudson United Bank as trustee) as the policy owner and beneficiary and an owner's address of 75 Rockefeller Plaza, New York, New York 10019.  The Application was submitted to Lincoln at its offices in Hartford, Connecticut.

33.    The Kramer Application was witnessed by Lockwood.  In the agent's certification to the Kramer Application, Lockwood (i) "recommend[ed] this risk to the Company without reservation";

10

and (ii) represented that the purpose of the insurance policy was for estate planning; that the client did not intend to use the policy for any type of viatical settlement, senior settlement, life settlement or for any other secondary market; and that Kramer's total net worth (exclusive of life insurance) was $70 million plus $3 million in other income.

34.    On or about November 7, 2005, Life Product was formed; Martin Fleisher ("Fleisher") is one of the principals of Life Product.

35.    On or around November 11, 2005, Fleisher, a principal of Life Product, sent a letter regarding the net worth estimates for Kramer. In the letter, Fleisher states that he is an attorney and financial advisor to Kramer, has known him for over 20 years, and is familiar with his net worth, which he estimates to be in excess of $70 million, with an annual unearned income in excess of $2 million a year. The letter was received by Lincoln at its Hartford, Connecticut offices.

36.    On or about November 23, 2005, in reliance upon the actions and conduct of the defendants and Kramer, Lincoln issued, from its offices in Hartford, Connecticut, a universal life insurance policy number 7214471 in the face amount of $10 million insuring Kramer's life (hereinafter the "Kramer Policy"). The Kramer Policy identifies "HUDSON UNITED BANK, TRUSTEE OF THE ARTHUR KRAMER 2005 INSURANCE TRUST, DATED AUGUST 29, 2005, OR THE SUCCESSOR(S) IN SAID TRUST" as the owner and beneficiary.

**Rome McGuigan, P.C.** • *Attorneys at Law*
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

37.    The underwriting and administration for the Kramer Policy, and for that matter all Lincoln universal life policies issued before April of 2007, was conducted at Lincoln's offices in Hartford, Connecticut.

38.    Upon information and belief, at no time did Kramer intend to purchase insurance for the benefit of any person or entity having an insurable interest in Kramer's life.  Rather, at all relevant times, Kramer expected and understood that the right to receive the death benefit payable under any policy acquired from Lincoln would be sold to a third party having no insurable interest in Kramer's life.

39.    Upon information and belief, at no time did Liza intend to retain her beneficial interest in the Kramer Trust and, consequently, of the right to receive the death benefit payable under the Kramer Policy.

40.    Upon information and belief, at no time did Kramer believe that the premiums due would be paid by Kramer or the Kramer Trust.  Kramer expected and understood that the premiums due under the Kramer Policy would be advanced and/or financed by a third party.

41.    The submission of the Kramer Application and the Kramer Policy that resulted were part of a collaborative effort by Lockwood, LPS, Life Product, and/or other entities engaged in secondary life insurance market transactions, to profit at Lincoln's expense from a gamble upon the life of Kramer.  Though this gamble would also produce, in the short term, a significant amount of

cash for Kramer, the party which stood to gain by far the most from the payment by Lincoln of the death benefit was Life Product.

42.     Upon information and belief, upon issuance of the Kramer Policy, from its offices in Hartford, Connecticut, at the direction of Lockwood, LPS, Life Product and/or other entities engaged in secondary life insurance market transactions, Kramer instructed his daughter, Liza, to execute putative assignments of her beneficial interest in the Kramer Trust to a stranger investor, Life Product.

43.     At no time did Kramer or Liza make any premium payments on the Kramer Policy.

44.     On December 1, 2005, Hudson submitted a premium payment to Lincoln in the amount of $140,450.00 on the Kramer Policy.  The premium payment was received by Lincoln at its Hartford, Connecticut offices.  Upon information and belief, Life Product funded this premium payment.

45.     The above payment was also accompanied by an amendment form signed by Kramer, Lockwood, and Hudson, which stated, "I hereby amend my application for the above numbered policy or annuity so that: BENEFICIARY IS AS SPECIFIED ON THE POLICY/CERTIFICATE SPECIFICATIONS PAGE OF THE POLICY/CERTIFICATE, AS DELIVERED TO ME."  The amendment form was received by Lincoln at its Hartford, Connecticut offices.

46.     On January 31, 2006, Hudson was acquired by and merged with TD Banknorth, and TD Banknorth became the successor trustee to the Kramer Trust.  Hudson sent a Certificate of Merger to Lincoln at its Hartford, Connecticut offices.

13

47.    On or about February 1, 2006, LPS forwarded to M&M a premium payment check from Hudson payable to Lincoln in the amount of $399,550.00. The premium payment was received by Lincoln at its Hartford, Connecticut offices. Upon information and belief, Life Product funded this premium payment.

48.    TD Banknorth subsequently resigned as trustee of the Kramer Trust.

49.    On or about July 10, 2006, Berck succeeded TD Banknorth as trustee to the Kramer Trust.

50.    On September 5, 2006, Berck submitted a premium payment to Lincoln in the amount of $400,000 on the Kramer Policy. The premium payment was received by Lincoln at its Hartford, Connecticut offices. Upon information and belief, Life Product funded this premium payment.

51.    On December 17, 2007, TD Banknorth sent a letter to Lincoln informing Lincoln that trustee for the Kramer Trust had been changed to Berck. The letter was received by Lincoln at its Hartford, Connecticut offices.

52.    Lincoln has learned since receiving the December 17, 2007 letter that Berck serves, upon information and belief, as trustee for numerous insurance trusts created for the purpose of cloaking STOLI transactions, and indeed acts as a funding source for some of those transactions. Indeed, several of these STOLI transactions where Berck is the trustee involve Lincoln policies that were underwritten and administered at Lincoln's office in Hartford, Connecticut. Lincoln has

14

moreover learned that Berck's place of business is located, upon information and belief, in the same office building as the respective offices of Lockwood, LPS, and Life Product.

53.     On January 26, 2008, Kramer died.

54.     Upon information and belief, subsequent to Kramer's death, the Estate of Arthur Kramer received various communications from representatives of LPS and certain stranger investors demanding copies of Kramer's death certificate so they could submit claims to Lincoln and other insurance companies for the payment of death benefits on policies insuring the life of Kramer.

55.     Upon information and belief, the Estate of Arthur Kramer refused such requests.

56.     On February 27, 2008, Berck submitted a Claimant's Statement for the payment of death benefits under the Kramer Policy.

57.     On or around March 10, 2008, Alice Kramer, as Personal Representative of the Estate of Arthur Kramer (the "Kramer Estate"), commenced a legal action entitled *Alice Kramer, as Personal Representative of the Estate of Arthur Kramer v. Lockwood Pension Services, Inc. et al.*, in the United States District Court for the Southern District of New York, Civil Action No. 08 CV 2429. In this action, the Kramer Estate alleges that the Kramer Policy was procured as part of a STOLI transaction and that the policy lacks an insurable interest and seeks a declaratory judgment that the Kramer Estate is entitled to recover the $10 million death benefit on the Kramer Policy issued by Lincoln and on

*Rome McGuigan, P.C.* • *Attorneys at Law*
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

other life insurance policies issued by Transamerica Occidental Life Insurance Company and Phoenix

Life Insurance Company with death benefits totaling $56,200,000.

### The Lobel Policy

58.    On or around April 27, 2005, Miller entered into a Broker Agreement with Lincoln (the

"Miller Broker Agreement"). Pursuant to the Miller Broker Agreement, Miller agreed, *inter alia*, "to

comply with all applicable state and federal laws and with all rules and regulations of the regulatory

agencies having jurisdiction with respect to the sales of the Policies"; to offer "Policies for sale in

accordance with all [Lincoln's] rules and procedures then in effect"; to review insurance applications

"for completeness and suitability"; that "all policyholder files, records and premium accounts are the

property of" Lincoln; and that "all such property shall be returned to [Lincoln] upon demand or upon

termination of" the Miller Broker Agreement. Pursuant to the Miller Broker Agreement, Miller also

agreed to indemnify and hold Lincoln harmless "for all costs, expenses, losses, claims, damages or

liabilities (or actions in respect thereof), including reasonable attorneys' fees, resulting from any

negligent, fraudulent or unauthorized acts or omissions by" Miller or "any unlawful sales practices" by

Miller in connection with the sale of Lincoln policies.

59.    Upon information and belief, in the first half of 2005, Miller, Lockwood, LPS, and/or

other entities engaged in secondary life insurance market transactions, solicited Lobel's participation in

a STOLI arrangement. Subsequently, Lobel began applying for life insurance with several insurance

Rome McGuigan, P.C. • Attorneys at Law
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

*Rome McGuigan, P.C.* • *Attorneys at Law*
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

companies including Lincoln.  The insurance was placed through Freundt & Associates Insurance Services, Inc. d/b/a The Producers Group (hereinafter "Producers Group") with Miller and Lockwood as producers.

60.     In September and October of 2005, an informal inquiry as to insurance on the life of Lobel was submitted to Lincoln by L. Michelle Kepler, Director of New Business at Producers Group.

61.     In October of 2005, Lincoln provided a quote for a life insurance policy insuring Lobel's life.

62.     On November 15, 2005, Lobel, at the direction of Miller, Lockwood, LPS, Life Product, and/or other entities engaged in secondary life insurance market transactions, established the Leon Lobel Insurance Trust dated November 15, 2005 (the "Lobel Trust"), in which Hudson was listed as trustee.

63.     Upon information and belief, the Lobel Trust documents were prepared by legal counsel for Life Product at the direction of Miller, Lockwood, LPS, Life Product, and/or other entities engaged in secondary life insurance market transactions.

64.     Although the original beneficiary of the Lobel Trust was Lobel, the intent in setting up the Lobel Trust was to immediately assign Lobel's beneficial interest in the Lobel Trust to a stranger investor, Life Product, as evidenced by the reference to Life Product in the Lobel Trust documents that Lobel executed.

17

65.    On November 15, 2005, Lobel submitted an application (the "Lobel Application") for the Lincoln policy with the Lobel Trust (with Hudson as trustee) as the policy owner and beneficiary and an owner's address of 75 Rockefeller Plaza, New York, New York 10019. The Application was submitted to Lincoln at its offices in Hartford, Connecticut.

66.    The Lobel Application was witnessed by Miller. In the agent's certification to the application, Miller represented that the purpose of the insurance policy was for estate planning and that Lobel's total net worth (exclusive of life insurance) was approximately $8 million to $10 million.

67.    On or about December 14, 2005, in reliance upon the actions and conduct of the defendants and Lobel, Lincoln issued a universal life policy number 7221595 in the face amount of $10 million insuring Lobel's life (hereinafter the "Lobel Policy"). The Lobel Policy identifies "HUDSON UNITED BANK, TRUSTEE OF THE LEON LOBEL INSURANCE TRUST, DATED NOVEMBER 15, 2005, OR THE SUCCESSOR(S) IN SAID TRUST" as the owner and beneficiary.

68.    The underwriting and administration for the Lobel Policy, and for that matter all Lincoln universal life policies issued prior to April of 2007, was conducted at Lincoln's offices in Hartford, Connecticut.

69.    Upon information and belief, at no time did Lobel intend to purchase insurance for the benefit of any person or entity having an insurable interest in Lobel's life. Rather, at all relevant times,

Rome McGuigan, P.C. • Attorneys at Law
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

Lobel expected and understood that the right to receive the death benefit payable under any policy acquired from Lincoln would be sold to a third party having no insurable interest in Lobel's life.

70.    Upon information and belief, at no time did Lobel intend to retain his beneficial interest in the Lobel Trust and, consequently, of the right to receive the death benefit payable under the Lobel Policy.

71.    Upon information and belief, at no time did Lobel believe that the premiums due would be paid by Lobel or the Lobel Trust. Lobel expected and understood that the premiums due under the policy would be advanced and/or financed by a third party.

72.    The submission of the Lobel Application and the Lobel Policy that resulted were part of a collaborative effort by Miller, Lockwood, LPS, Life Product, and/or other entities engaged in secondary life insurance market transactions, to profit at Lincoln's expense from a gamble upon the life of Lobel. Though this gamble would also produce in the short term a significant amount of cash for Lobel, the party which stood to gain by far the most from the payment by Lincoln of the death benefit was Life Product.

73.    At the direction of Miller, Lockwood, LPS, Life Product, and/or other entities engaged in secondary life insurance market transactions, on or around December 19, 2005, Lobel signed a transfer agreement, pursuant to which Lobel received $300,000 from Life Product in exchange for the transfer of his beneficial interest in the Lobel Trust to Life Product. Upon information and belief, the

19

transfer agreement documents were prepared by legal counsel for Life Product at the direction of Miller, Lockwood, LPS, Life Product, and/or other entities engaged in secondary life insurance market transactions.

74.      On December 22 2005, Hudson submitted a premium payment to Lincoln in the amount of $143,000 on the Lobel Policy. The premium payment was received by Lincoln at its Hartford, Connecticut offices. Upon information and belief, Life Product funded this premium payment.

75.      On January 10, 2006, Lobel died.

76.      On February 7, 2006, Hudson submitted a Claimant's Statement for the payment of death benefits under the Lobel Policy.   The Claimant's Statement was received by Lincoln at its Hartford, Connecticut offices.

77.      On or about August 15, 2006, Berck succeeded Hudson as trustee to the Lobel Trust.

78.      On August 18, 2006, Berck sent a letter to Lincoln informing Lincoln that he was the successor trustee to the Lobel Trust and inquiring as to the status of payment of the death benefit under the Lobel Policy.   The letter was received by Lincoln at its Hartford, Connecticut offices.

79.      From August through October of 2006, Lincoln's Hartford, Connecticut offices sent letters to Hudson regarding the status of Lincoln's review of the claim for death benefits under the Lobel Policy.

80.      In December 2006, Lincoln terminated its agreements with Miller and Lockwood.

20

Rome McGuigan, P.C. • Attorneys at Law
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

81.    On or about January 11, 2007, Lincoln paid a death benefit in the amount of

$10,712,328.77 to the Lobel Trust.  Upon information and belief, those funds have been transferred by

Berck to Life Product.

82.    On or around March 13, 2007, Linda Angel, as Personal Representative of the Estate of

Leon Lobel (the "Lobel Estate") filed a third-party complaint against the Lobel Trust and Berck, *Life

Product Clearing LLC v. Linda Angel, Personal Representative of the Estate of Leon Lobel v. Leon

Lobel Insurance Trust and Jonathan S. Berck, as Trustee of the Leon Lobel Insurance Trust*, in the

United States District Court for the Sourthern District of New York, Civil Action No. 07 CV 0475.  In

the third-party complaint, the Lobel Estate seeks entry of a judgment in its favor in the sum of

$10,712,328.77, and it seeks a declaratory judgment that the Lobel Trust is void, the transfer of the

beneficial interest in the Lobel Trust to Life Product is void, the Lobel Estate is entitled to receive the

proceeds of the Lobel Policy, and that Linda Angel, as personal representative, has the exclusive right

to such funds.

## COUNT I

### BREACH OF CONTRACT
### (Against Lockwood)

83.    Lincoln hereby incorporates by reference each and every averment of fact contained in

the preceding paragraphs as if set forth herein at length.

84.    Lockwood breached the Lockwood Broker Agreement, *inter alia*, by:

21

(i)      soliciting Kramer's participation in a STOLI arrangement;

(ii)     submitting to Lincoln an application for the Kramer Policy that Lockwood knew lacked an insurable interest;

(iii)    falsely certifying in the agent's certification that, *inter alia*, the purpose of the Kramer Policy was for estate planning;

(iv)    falsely certifying in the agent's certification that, *inter alia*, Kramer did not intend to use the Kramer Policy for any type of viatical settlement, senior settlement, life settlement, or for any other secondary market;

(v)     recommending the risk of the Kramer Policy "without reservation" when Lockwood knew that the Kramer Policy lacked an insurable interest and was unsuitable;

(vi)    participating in, facilitating, and directing the establishment of the Kramer Trust to conceal the absence of an insurable interest in connection with the Kramer Policy;

(vii)   directing LPS's counsel to prepare the trust documents for the Kramer Trust to conceal the absence of an insurable interest in connection with the Kramer Policy;

(viii)  soliciting and/or facilitating Life Product's acquisition of the Kramer Policy;

(ix)    concealing from Lincoln that there was a lack of an insurable interest at the inception of the Kramer Policy;

*Rome McGuigan, P.C.* • *Attorneys at Law*
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

Rome McGuigan, P.C. • Attorneys at Law

One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

(x)     immediately upon issuance of the Kramer Policy, directing Kramer to have his

daughter, Liza, execute putative assignments of her beneficial interest in the Kramer Trust to a stranger

investor, Life Product;

(xi)    soliciting Lobel's participation in a STOLI arrangement;

(xii)   participating in, facilitating, and directing the establishment of the Lobel Trust to

conceal the absence of an insurable interest in connection with the Lobel Policy;

(xiii)  directing Life Product's counsel to prepare the trust documents for the Lobel Trust to

conceal the absence of an insurable interest in connection with the Lobel Policy;

(xiv)   soliciting and/or facilitating Life Product's acquisition of the Lobel Policy;

(xv)    concealing from Lincoln that there was a lack of an insurable interest at the inception of

the Lobel Policy;

(xvi)   upon issuance of the Lobel Policy, directing Lobel to execute a transfer agreement

transferring his beneficial interest in the Lobel Trust to a stranger investor, Life Product; and

(xvii)  failing to return Lincoln's property upon termination of the Lockwood Broker

Agreement.

85.    As a proximate result of Lockwood's breach of the Lockwood Broker Agreement,

Lincoln has sustained damages and may sustain damages in the future.

Rome McGuigan, P.C. • Attorneys at Law
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

86.     Pursuant to the Lockwood Broker Agreement, Lincoln is entitled to indemnification of such damages by Lockwood.

## COUNT II

### BREACH OF CONTRACT
### (Against Miller)

87.     Lincoln hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

88.     Miller breached the Miller Broker Agreement, *inter alia*, by:

(i)     soliciting Lobel's participation in a STOLI arrangement;

(ii)    submitting to Lincoln an application for the Lobel Policy that Miller knew lacked an insurable interest;

(iii)   falsely certifying in the agent's certification, that the purpose of the Lobel Policy was for estate planning;

(iv)    recommending the risk of the Lobel Policy "without reservation" when Miller knew that the Lobel Policy lacked an insurable interest and was unsuitable;

(v)     participating in, facilitating, and directing the establishment of the Lobel Trust to conceal the absence of an insurable interest in connection with the Lobel Policy;

(vi)    directing Life Product's counsel to prepare the trust documents for the Lobel Trust to conceal the absence of an insurable interest in connection with the Lobel Policy;

24

Rome McGuigan, P.C. • Attorneys at Law
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

(vii)    soliciting and/or facilitating Life Product's acquisition of the Lobel Policy;

(viii)    concealing from Lincoln that there was a lack of an insurable interest at the inception of the Lobel Policy;

(ix)    upon issuance of the Lobel Policy, directing Lobel to execute a transfer agreement transferring his beneficial interest in the Lobel Trust to a stranger investor, Life Product; and

(x)    failing to return Lincoln's property upon termination of the Miller Broker Agreement.

89.    As a proximate result of Miller's breach of the Miller Broker Agreement, Lincoln has sustained damages and may sustain damages in the future.

90.    Pursuant to the Miller Broker Agreement, Lincoln is entitled to indemnification of such damages by Miller.

## COUNT III

### FRAUD: KRAMER POLICY
### (Against Lockwood And LPS)

91.    Lincoln hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

92.    In the agent's certification to the Kramer Policy, Lockwood (i) represented to Lincoln that the purpose of the Kramer Policy was for estate planning and Kramer did not intend to use the Kramer Policy for any type of viatical settlement, senior settlement, life settlement, or for any other

secondary market; and (ii) recommended to Lincoln the risk of the Kramer Policy "without reservation."

93.     At the time that Lockwood made these representations to Lincoln, Lockwood knew that his representations in the agent's certification were false, that the Kramer Policy was unsuitable and lacked an insurable interest, that the purpose of the Kramer Policy was not for estate planning, and that Kramer intended to sell the Kramer Policy on the secondary market.  At the time that Lockwood made these representations, Lockwood knew that the Kramer Application was being submitted to Lincoln as part of a fraudulent STOLI scheme inasmuch as he had already solicited Kramer's participation in the STOLI arrangement; participated in, facilitated and directed the establishment of the Kramer Trust to conceal the absence of an insurable interest in connection with the Kramer Policy; directed LPS's counsel to prepare the trust documents for the Kramer Trust to conceal the absence of an insurable interest in connection with the Kramer Policy; and solicited and/or facilitated Life Product's acquisition of the Kramer Policy.

94.     Lockwood made these misrepresentations to Lincoln with the intent to deceive Lincoln and to induce Lincoln to issue the Kramer Policy, which Lockwood knew lacked an insurable interest.

95.     Lincoln reasonably relied upon the truth of Lockwood's representations by issuing the Kramer Policy.

*Rome McGuigan, P.C.* • *Attorneys at Law*
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

26

96.    Acting with the intent to perpetrate a fraud and in furtherance of the fraud perpetrated on Lincoln in connection with the Kramer Policy, Lockwood, LPS, and/or other entities engaged in secondary life insurance market transactions solicited Kramer's participation in the STOLI arrangement; participated in, facilitated and directed the establishment of the Kramer Trust to conceal the absence of an insurable interest in connection with the Kramer Policy; directed LPS's counsel to prepare the trust documents for the Kramer Trust to conceal the absence of an insurable interest in connection with the Kramer Policy; solicited and/or facilitated Life Product's acquisition of the Kramer Policy; and immediately upon issuance of the Kramer Policy, directed Kramer to have his daughter, Liza, execute putative assignments of her beneficial interest in the Kramer Trust to a stranger investor, Life Product.

97.    As a proximate result of the fraudulent misrepresentations made by Lockwood and the fraudulent acts of Lockwood and LPS, Lincoln has sustained damages and may sustain damages in the future.

**COUNT IV**

**FRAUD: LOBEL POLICY**
**(Against Miller, Lockwood, And LPS)**

98.    Lincoln hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

27

99.     In the agent's certification to the Lobel Policy, Miller (i) represented to Lincoln that the purpose of the Lobel Policy was for estate planning; and (ii) recommended to Lincoln the risk of the Lobel Policy "without reservation."

100.    At the time that Miller made these representations to Lincoln, Miller knew that his representations in the agent's certification were false, that the Lobel Policy was unsuitable and lacked an insurable interest, and that the purpose of the Lobel Policy was not for estate planning.  At the time that Miller made these representations, Miller knew that the Lobel Application was being submitted to Lincoln as part of a fraudulent STOLI scheme inasmuch as he had already solicited Lobel's participation in the STOLI arrangement; participated in, facilitated and directed the establishment of the Lobel Trust to conceal the absence of an insurable interest in connection with the Lobel Policy; directed Life Product's counsel to prepare the trust documents for the Lobel Trust to conceal the absence of an insurable interest in connection with the Lobel Policy; and solicited and/or facilitated Life Product's acquisition of the Lobel Policy as evidenced by the reference to Life Product in the Lobel Trust documents that were prepared by Life Product's counsel at Miller's direction.

101.    Miller made these misrepresentations to Lincoln with the intent to deceive Lincoln and to induce Lincoln to issue the Lobel Policy which Miller knew lacked an insurable interest.

102.    Lincoln reasonably relied upon the truth of Miller's representations by issuing the Lobel Policy.

*Rome McGuigan, P.C.* • *Attorneys at Law*
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

Rome McGuigan, P.C. • Attorneys at Law
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

103.    Acting with the intent to perpetrate a fraud and in furtherance of the fraud perpetrated

on Lincoln in connection with the Lobel Policy, Miller, Lockwood, LPS, and/or other entities engaged

in secondary life insurance market transactions, solicited Lobel's participation in the STOLI

arrangement; participated in, facilitated and directed the establishment of the Lobel Trust to conceal

the absence of an insurable interest in connection with the Lobel Policy; directed Life Product's

counsel to prepare the trust documents for the Lobel Trust to conceal the absence of an insurable

interest in connection with the Lobel Policy; solicited and/or facilitated Life Product's acquisition of

the Lobel Policy; and, upon issuance of the Lobel Policy, directed Lobel to execute a transfer

agreement transferring his beneficial interest in the Lobel Trust to a stranger investor, Life Product.

104.    As a proximate result of the fraudulent misrepresentations made by Miller and the

fraudulent acts of Miller, Lockwood, and LPS, Lincoln has sustained damages and may sustain

damages in the future.

**COUNT V**

**FRAUDULENT CONCEALMENT: KRAMER POLICY**
**(Against Lockwood And LPS)**

105.    Lincoln hereby incorporates by reference each and every averment of fact contained in

the preceding paragraphs as if set forth herein at length.

106.    Lockwood and LPS intentionally and fraudulently concealed from Lincoln material

information in connection with the Kramer Policy including, *inter alia*, the facts that:

*Rome McGuigan, P.C.* • *Attorneys at Law*
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

(i)     Lockwood and LPS had solicited Kramer's participation in a STOLI arrangement;

(ii)    Kramer intended for his daughter's beneficial interest to be immediately assigned to a stranger investor following the issuance of the life insurance policy;

(iii)   the Kramer Trust had been established to conceal the absence of an insurable interest in connection with the Kramer Policy;

(iv)   Lockwood and LPS had directed LPS's counsel to prepare the trust documents for the Kramer Trust to conceal the absence of an insurable interest in connection with the Kramer Policy;

(v)    Lockwood and LPS had solicited and/or facilitated Life Products' acquisition of the Kramer Policy; and

(vi)   the owner of the Kramer Policy lacked an insurable interest in the life of Kramer.

107.    Lockwood and LPS intentionally and fraudulently concealed this information from Lincoln with the intent to deceive Lincoln and to induce Lincoln to issue the Kramer Policy which they knew lacked an insurable interest.

108.    As a proximate result of the fraudulent concealment of material facts in connection with the Kramer Policy by Lockwood and LPS, Lincoln has sustained damages and may sustain damages in the future.

**COUNT VI**

**FRAUDULENT CONCEALMENT: LOBEL POLICY**
**(Against Miller, Lockwood, And LPS)**

109.    Lincoln hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

110.    Miller, Lockwood, and LPS intentionally and fraudulently concealed from Lincoln material information in connection with the Lobel Policy including, *inter alia*, the facts that:

(i)    Miller, Lockwood, and LPS had solicited Lobel's participation in a STOLI arrangement;

(ii)    Lobel intended to assign his beneficial interest to a stranger investor following the issuance of the life insurance policy;

(iii)    the Lobel Trust had been established to conceal the absence of an insurable interest in connection with the Lobel Policy;

(iv)    Miller, Lockwood, and LPS had directed Life Product's counsel to prepare the trust documents for the Lobel Trust to conceal the absence of an insurable interest in connection with the Lobel Policy;

(v)    Miller, Lockwood, and LPS had solicited and/or facilitated Life Products' acquisition of the Lobel Policy; and

(vi)    the owner of the Lobel Policy lacked an insurable interest in the life of Lobel.

*Rome McGuigan, P.C.  •  Attorneys at Law*
One State Street  •  Hartford. Connecticut 06103-3101  •  (860) 549-1000  •  Fax (860) 724-3921  •  Juris No. 27726

*Rome McGuigan, P.C.* • Attorneys at Law
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

111.    Miller, Lockwood, and LPS intentionally and fraudulently concealed this information from Lincoln with the intent to deceive Lincoln and to induce Lincoln to issue the Lobel Policy which they knew lacked an insurable interest.

112.    As a proximate result of the fraudulent concealment of material facts in connection with the Lobel Policy by Miller, Lockwood, and LPS, Lincoln has sustained damages and may sustain damages in the future.

### COUNT VII

### AIDING AND ABETTING FRAUD: KRAMER POLICY
### (Against TD Banknorth, Berck, And Life Product)

113.    Lincoln hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

114.    The Kramer Policy lacks an insurable interest and is the product of a STOLI arrangement.

115.    As alleged herein, Lockwood made fraudulent misrepresentations to Lincoln ,and Lockwood and LPS engaged in fraudulent acts and/or fraudulently concealed from Lincoln facts material to the risk on the Kramer Policy.

116.    Acting with the intent to perpetrate a fraud and in furtherance of the fraud perpetrated on Lincoln, Hudson (TD Banknorth's predecessor-in-interest) substantially aided and assisted Lockwood and LPS in carrying out this fraudulent STOLI arrangement by serving as a trustee for the

*Rome McGuigan, P.C.* • *Attorneys at Law*
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

Kramer Trust which was established to conceal the absence of an insurable interest in connection with the Kramer Policy; and submitting to Lincoln premium payments on the Kramer Policy in the amounts of $140,450.00 and $399,550.00, which were funded by Life Product. At all times relevant hereto, Hudson knew that the aforementioned actions were in furtherance of the fraudulent STOLI arrangement carried out by Lockwood and LPS.

117.    Acting with the intent to perpetrate a fraud and in furtherance of the fraud perpetrated on Lincoln, Berck substantially aided and assisted Lockwood and LPS in carrying out this fraudulent STOLI arrangement by serving as a trustee for the Kramer Trust which was established to conceal the absence of an insurable interest in connection with the Kramer Policy; and submitting to Lincoln a premium payment on the Kramer Policy in the amount of $400,000.00, which was funded by Life Product. At all times relevant hereto, Berck knew that the aforementioned actions were in furtherance of the fraudulent STOLI arrangement carried out by Lockwood and LPS.

118.    Acting with the intent to perpetrate a fraud and in furtherance of the fraud perpetrated on Lincoln in connection with the Kramer Policy, Life Product substantially aided and assisted Lockwood and LPS in carrying out this fraudulent STOLI arrangement by acquiring and/or participating in the sale of the death benefits of the Kramer Policy; accepting, upon immediate issuance of the Kramer Policy, the assignment of the beneficial interest of Kramer's daughter in the Kramer Trust; and funding the premium payments for the Kramer Policy. At all times relevant hereto, Life

Product knew that the aforementioned actions were in furtherance of the fraudulent STOLI

arrangement carried out by Lockwood and LPS.

119.    As a proximate result of the actions of Hudson, Berck, and Life Product in substantially

aiding and assisting Lockwood and LPS in carrying out this fraudulent STOLI arrangement in

connection with the Kramer Policy, Lincoln has sustained damages and may sustain damages in the

future.  In the event that any death benefit is found to be payable under the Kramer Policy, Lincoln is

entitled to offset the damages that it has incurred in connection with the Kramer Policy against any

benefits payable under Kramer Policy.

## COUNT VIII

### AIDING AND ABETTING FRAUD: LOBEL POLICY
### (Against TD Banknorth, Berck, And Life Product)

120.    Lincoln hereby incorporates by reference each and every averment of fact contained in

the preceding paragraphs as if set forth herein at length.

121.    The Lobel Policy lacks an insurable interest and is the product of a STOLI arrangement.

122.    As alleged herein, Miller made fraudulent misrepresentations to Lincoln, and Miller,

Lockwood, and LPS engaged in fraudulent acts and/or fraudulently concealed from Lincoln facts

material to the risk on the Lobel Policy.

123.    Acting with the intent to perpetrate a fraud and in furtherance of the fraud perpetrated

on Lincoln, Hudson (TD Banknorth's predecessor-in-interest) substantially aided and assisted Miller,

*Rome McGuigan, P.C.* • *Attorneys at Law*
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

Lockwood, and LPS in carrying out this fraudulent STOLI arrangement by serving as a trustee for the Lobel Trust which was established to conceal the absence of an insurable interest in connection with the Lobel Policy; and submitting to Lincoln a premium payment on the Lobel Policy in the amounts of $143,000.00, which was funded by Life Product. At all times relevant hereto, Hudson knew that the aforementioned actions were in furtherance of the fraudulent STOLI arrangement carried out by Miller, Lockwood, and LPS.

124.    Acting with the intent to perpetrate a fraud and in furtherance of the fraud perpetrated on Lincoln, Berck substantially aided and assisted Miller, Lockwood, and LPS in carrying out this fraudulent STOLI arrangement by serving as a trustee for the Lobel Trust which was established to conceal the absence of an insurable interest in connection with the Lobel Policy. At all times relevant hereto, Berck knew that the aforementioned actions were in furtherance of the fraudulent STOLI arrangement carried out by Miller, Lockwood, and LPS.

125.    Acting with the intent to perpetrate a fraud and in furtherance of the fraud perpetrated on Lincoln in connection with the Lobel Policy, Life Product substantially aided and assisted Miller, Lockwood, and LPS in carrying out this fraudulent STOLI arrangement by participating in, facilitating, and directing the establishment of the Lobel Trust to conceal the absence of an insurable interest in connection with the Lobel Policy; directing Life Product's counsel to prepare the trust documents for the Lobel Trust to conceal the absence of an insurable interest in connection with the Lobel Policy;

acquiring and/or participating in the sale of the death benefits of the Lobel Policy; accepting, upon immediate issuance of the Lobel Policy, the assignment of the beneficial interest of Lobel in the Lobel Trust; and funding the premium payments for the Lobel Policy. At all times relevant hereto, Life Product knew that the aforementioned actions were in furtherance of the fraudulent STOLI arrangement carried out by Miller, Lockwood, and LPS.

126.    As a proximate result of the actions of Hudson, Berck, and Life Product in substantially aiding and assisting Miller, Lockwood, and LPS in carrying out this fraudulent STOLI arrangement in connection with the Lobel Policy, Lincoln has sustained damages and may sustain damages in the future. In the event that any death benefit is found to be payable under the Kramer Policy, Lincoln is entitled to offset the damages it has incurred in connection with the Lobel Policy against any benefits payable under the Kramer Policy.

**COUNT IX**

**COMMON LAW CONSPIRACY: KRAMER POLICY**
**(Against Lockwood, LPS, TD Banknorth, Berck, And Life Product)**

127.    Lincoln hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

128.    Lockwood, LPS, Hudson (TD Banknorth's predecessor-in-interest), Berck, and Life Product conspired among themselves to fraudulently induce Lincoln to issue the Kramer Policy and to conceal the absence of an insurable interest in the Kramer Policy.

*Rome McGuigan, P.C.* • *Attorneys at Law*
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

129.    Acting with the intent to perpetrate a fraud on Lincoln in connection with the Kramer Policy and in furtherance of this conspiracy, Lockwood:

(i)    solicited Kramer's participation in the STOLI arrangement;

(ii)    misrepresented to Lincoln that the purpose of the Kramer Policy was for estate planning and that Kramer did not intend to use the Kramer Policy for any type of viatical settlement, senior settlement, life settlement or for any other secondary market;

(iii)    recommended to Lincoln the risk of the Kramer Policy "without reservation";

(iv)    participated in, facilitated, and directed the establishment of the Kramer Trust to conceal the absence of an insurable interest in connection with the Kramer Policy;

(v)    directed LPS's counsel to prepare the trust documents for the Kramer Trust to conceal the absence of an insurable interest in connection with the Kramer Policy;

(vi)    solicited and/or facilitated Life Product's acquisition of the Kramer Policy;

(vii)    immediately upon issuance of the Kramer Policy, directed Kramer to have his daughter, Liza, execute putative assignments of her beneficial interest in the Kramer Trust to a stranger investor, Life Product; and

(viii)    concealed from Lincoln that Lockwood and LPS had solicited Kramer's participation in a STOLI arrangement; Kramer intended for his daughter's beneficial interest to be immediately assigned to a stranger investor following the issuance of the life insurance policy; the Kramer Trust

37

had been established to conceal the absence of an insurable interest in connection with the Kramer

Policy; Lockwood and LPS had directed LPS's counsel to prepare the trust documents for the Kramer

Trust to conceal the absence of an insurable interest in connection with the Kramer Policy; Lockwood

and LPS had solicited and/or facilitated Life Product's acquisition of the Kramer Policy; and the owner

of the Kramer Policy lacked an insurable interest in the life of Kramer.

130.    Acting with the intent to perpetrate a fraud on Lincoln in connection with the Kramer

Policy and in furtherance of this conspiracy, LPS:

(i)    solicited Kramer's participation in the STOLI arrangement;

(ii)    participated in, facilitated and directed the establishment of the Kramer Trust to conceal

the absence of an insurable interest in connection with the Kramer Policy;

(iii)    directed LPS's counsel to prepare the trust documents for the Kramer Trust to conceal

the absence of an insurable interest in connection with the Kramer Policy;

(iv)    solicited and/or facilitated Life Product's acquisition of the Kramer Policy;

(v)    immediately upon issuance of the Kramer Policy, directed Kramer to have his daughter,

Liza, execute putative assignments of her beneficial interest in the Kramer Trust to a stranger investor,

Life Product; and

(vi)    concealed from Lincoln that Lockwood and LPS had solicited Kramer's participation in

a STOLI arrangement; Kramer intended for his daughter's beneficial interest to be immediately

assigned to a stranger investor following the issuance of the life insurance policy; the Kramer Trust had been established to conceal the absence of an insurable interest in connection with the Kramer Policy; Lockwood and LPS had directed LPS's counsel to prepare the trust documents for the Kramer Trust to conceal the absence of an insurable interest in connection with the Kramer Policy; Lockwood and LPS had solicited and/or facilitated Life Product's acquisition of the Kramer Policy; and the owner of the Kramer Policy lacked an insurable interest in the life of Kramer.

131.    Acting with the intent to perpetrate a fraud on Lincoln in connection with the Kramer Policy and in furtherance of this conspiracy, Hudson (TD Banknorth's predecessor-in-interest) served as a trustee for the Kramer Trust which was established to conceal the absence of an insurable interest in connection with the Kramer Policy; and submitted to Lincoln premium payments on the Kramer Policy in the amounts of $140,450.00 and $399,550.00, which were funded by Life Product.

132.    Acting with the intent to perpetrate a fraud on Lincoln in connection with the Kramer Policy and in furtherance of this conspiracy, Berck served as a trustee for the Kramer Trust which was established to conceal the absence of an insurable interest in connection with the Kramer Policy; and submitted to Lincoln a premium payment on the Kramer Policy in the amount of $400,000.00, which was funded by Life Product.

133.    Acting with the intent to perpetrate a fraud on Lincoln in connection with the Kramer Policy and in furtherance of this conspiracy, Life Product acquired and/or participated in the sale of the

*Rome McGuigan, P.C.* • *Attorneys at Law*
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

Rome McGuigan, P.C.  •  Attorneys at Law
One State Street  •  Hartford, Connecticut  06103-3101  •  (860) 549-1000  •  Fax (860) 724-3921  •  Juris No. 27726

death benefits of the Kramer Policy; accepted, upon immediate issuance of the Kramer Policy, the assignment of the beneficial interest of Kramer's daughter in the Kramer Trust; and funded the premium payments for the Kramer Policy.

134.    As a proximate result of the conspiracy among Lockwood, LPS, Hudson, Berck, and Life Product to fraudulently induce Lincoln to issue the Kramer Policy and to conceal the absence of an insurable interest in the Kramer Policy, Lincoln has sustained damages and may sustain damages in the future.  In the event that any death benefit is found to be payable under the Kramer Policy, Lincoln is entitled to offset the damages it has incurred in connection with the Kramer Policy against any benefits payable under the Kramer Policy.

**COUNT X**

**COMMON LAW CONSPIRACY: LOBEL POLICY**
**(Against Miller, Lockwood, LPS, TD Banknorth, Berck, And Life Product)**

135.    Lincoln hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

136.    Miller, Lockwood, LPS, Hudson (TD Banknorth's predecessor-in-interest), Berck, and Life Product conspired among themselves to fraudulently induce Lincoln to issue the Lobel Policy and to conceal the absence of an insurable interest in the Lobel Policy.

137.    Acting with the intent to perpetrate a fraud on Lincoln in connection with the Lobel Policy and in furtherance of this conspiracy, Miller:

    (i)      solicited Lobel's participation in the STOLI arrangement;

    (ii)     misrepresented to Lincoln that the purpose of the Lobel Policy was for estate planning;

    (iii)    recommended to Lincoln the risk of the Lobel Policy "without reservation";

    (iv)    participated in, facilitated, and directed the establishment of the Lobel Trust to conceal the absence of an insurable interest in connection with the Lobel Policy;

    (v)     directed Life Product's counsel to prepare the trust documents for the Lobel Trust to conceal the absence of an insurable interest in connection with the Lobel Policy;

    (vi)    solicited and/or facilitated Life Product's acquisition of the Lobel Policy;

    (vii)   upon issuance of the Lobel Policy, directed Lobel to execute a transfer agreement transferring his beneficial interest in the Lobel Trust to a stranger investor, Life Product;

    (viii)  concealed from Lincoln that Miller, Lockwood, LPS, and Life Product had solicited Lobel's participation in a STOLI arrangement; Lobel intended to assign his beneficial interest to a stranger investor following the issuance of the life insurance policy; the Lobel Trust had been established to conceal the absence of an insurable interest in connection with the Lobel Policy; Miller, Lockwood, LPS, and Life Product had directed Life Product's counsel to prepare the trust documents for the Lobel Trust to conceal the absence of an insurable interest in connection with the Lobel Policy; Miller, Lockwood, and LPS had solicited and/or facilitated Life Product's acquisition of the Lobel Policy; and the owner of the Lobel Policy lacked an insurable interest in the life of Lobel.

138. Acting with the intent to perpetrate a fraud on Lincoln in connection with the Lobel

Policy and in furtherance of this conspiracy, Lockwood:

(i)    solicited Lobel's participation in the STOLI arrangement;

(ii)    participated in, facilitated, and directed the establishment of the Lobel Trust to conceal

the absence of an insurable interest in connection with the Lobel Policy;

(iii)    directed Life Product's counsel to prepare the trust documents for the Lobel Trust to

conceal the absence of an insurable interest in connection with the Lobel Policy;

(iv)    solicited and/or facilitated Life Product's acquisition of the Lobel Policy;

(v)    upon issuance of the Lobel Policy, directed Lobel to execute a transfer agreement

transferring his beneficial interest in the Lobel Trust to a stranger investor, Life Product;

(vi)    concealed from Lincoln that Miller, Lockwood, LPS, and Life Product had solicited

Lobel's participation in a STOLI arrangement; Lobel intended to assign his beneficial interest to a

stranger investor following the issuance of the life insurance policy; the Lobel Trust had been

established to conceal the absence of an insurable interest in connection with the Lobel Policy; Miller,

Lockwood, LPS, and Life Product had directed Life Product's counsel to prepare the trust documents

for the Lobel Trust to conceal the absence of an insurable interest in connection with the Lobel Policy;

Miller, Lockwood, and LPS had solicited and/or facilitated Life Product's acquisition of the Lobel

Policy; and the owner of the Lobel Policy lacked an insurable interest in the life of Lobel.

42

139.    Acting with the intent to perpetrate a fraud on Lincoln in connection with the Lobel

Policy and in furtherance of this conspiracy, LPS:

(i)    solicited Lobel's participation in the STOLI arrangement;

(ii)    participated in, facilitated, and directed the establishment of the Lobel Trust to conceal

the absence of an insurable interest in connection with the Lobel Policy;

(iii)    directed Life Product's counsel to prepare the trust documents for the Lobel Trust to

conceal the absence of an insurable interest in connection with the Lobel Policy;

(iv)    solicited and/or facilitated Life Product's acquisition of the Lobel Policy;

(v)    upon issuance of the Lobel Policy, directed Lobel to execute a transfer agreement

transferring his beneficial interest in the Lobel Trust to a stranger investor, Life Product; and

(vi)    concealed from Lincoln that Miller, Lockwood, LPS, and Life Product had solicited

Lobel's participation in a STOLI arrangement; Lobel intended to assign his beneficial interest to a

stranger investor following the issuance of the life insurance policy; the Lobel Trust had been

established to conceal the absence of an insurable interest in connection with the Lobel Policy; Miller,

Lockwood, LPS, and Life Product had directed Life Product's counsel to prepare the trust documents

for the Lobel Trust to conceal the absence of an insurable interest in connection with the Lobel Policy;

Miller, Lockwood, and LPS had solicited and/or facilitated Life Product's acquisition of the Lobel

Policy; and the owner of the Lobel Policy lacked an insurable interest in the life of Lobel.

43

*Rome McGuigan, P.C.* • *Attorneys at Law*
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

140.    Acting with the intent to perpetrate a fraud on Lincoln in connection with the Lobel Policy and in furtherance of this conspiracy, Hudson (TD Banknorth's predecessor-in-interest) served as a trustee for the Lobel Trust which was established to conceal the absence of an insurable interest in connection with the Lobel Policy; and submitted to Lincoln a premium payment on the Lobel Policy in the amount of $143,000.00, which was funded by Life Product.

141.    Acting with the intent to perpetrate a fraud on Lincoln in connection with the Lobel Policy and in furtherance of this conspiracy, Berck served as a trustee for the Lobel Trust which was established to conceal the absence of an insurable interest in connection with the Lobel Policy.

142.    Acting with the intent to perpetrate a fraud on Lincoln in connection with the Lobel Policy and in furtherance of this conspiracy, Life Product participated in, facilitated, and directed the establishment of the Lobel Trust to conceal the absence of an insurable interest in connection with the Lobel Policy; directed Life Product's counsel to prepare the trust documents for the Lobel Trust to conceal the absence of an insurable interest in connection with the Lobel Policy;  acquired and/or participated in the sale of the death benefits of the Lobel Policy; accepted, upon immediate issuance of the Lobel Policy, the assignment of Lobel's beneficial interest in the Lobel Trust; and funded the premium payments for the Lobel Policy.

143.    As a proximate result of the conspiracy among Miller, Lockwood, LPS, Hudson, Berck, and Life Product to fraudulently induce Lincoln to issue the Lobel Policy and to conceal the

44

absence of an insurable interest in the Lobel Policy, Lincoln has sustained damages and may sustain damages in the future. In the event that any death benefit is found to be payable under the Kramer Policy, Lincoln is entitled to offset the damages it has incurred in connection with the Lobel Policy against any benefits payable under the Kramer Policy.

## COUNT XI

### NEGLIGENT MISREPRESENTATION: KRAMER POLICY
### (Against Lockwood)

144.    Lincoln hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

145.    In the agent's certification to the Kramer Policy, Lockwood (i) represented to Lincoln that the purpose of the Kramer Policy was for estate planning and Kramer did not intend to use the Kramer Policy for any type of viatical settlement, senior settlement, life settlement or for any other secondary market; and (ii) recommended to Lincoln the risk of the Kramer Policy "without reservation."

146.    At the time that Lockwood made these representations to Lincoln, Lockwood knew or should have known that these representations were false and that the proposed policy lacked an insurable interest.

147.    Lincoln reasonably relied upon the truth of Lockwood's representations by issuing the Kramer Policy.

45

*Rome McGuigan*, P.C. • *Attorneys at Law*
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

148.    As a proximate result of the negligent misrepresentations made by Lockwood, Lincoln has sustained damages and may sustain damages in the future.

## COUNT XII

### NEGLIGENT MISREPRESENTATION: LOBEL POLICY
#### (Against Miller)

149.    Lincoln hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

150.    In the agent's certification to the Lobel Policy, Miller (i) represented to Lincoln that the purpose of the Kramer Policy was for estate planning; and (ii) recommended to Lincoln the risk of the Kramer Policy "without reservation."

151.    At the time that Miller made these representations to Lincoln, Miller knew or should have known that these representations were false and that the proposed policy lacked an insurable interest.

152.    Lincoln reasonably relied upon the truth of Miller's representations by issuing the Lobel Policy.

153.    As a proximate result of the negligent misrepresentations made by Miller, Lincoln has sustained damages and may sustain damages in the future.

46

*Rome McGuigan, P.C.* • *Attorneys at Law*
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

## COUNT XIII

## DECLARATORY JUDGMENT

154.     Lincoln hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

155.     The Kramer Policy lacks an insurable interest and is the product of a STOLI arrangement.

## COUNT XIV

## EQUITABLE ACCOUNTING
### (Against Miller And Lockwood)

156.     Lincoln hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

157.     Pursuant to the terms of their contracts with Lincoln, Miller and Lockwood were obligated to return Lincoln's property (including but not limited to policyholder files, records and premium accounts) upon termination of the agreements.

158.     At the time of the events at issue, Miller and Lockwood acted in a manner that concealed the true nature of the transactions at issue and that was intended to deceive, and did deceive, Lincoln.

159.    The foregoing portions of this Complaint involve two policies issued by Lincoln and properly plead claims for relief against the defendants regarding those two policies. Lincoln has reason to believe that it may have been damaged by additional instances of unlawful activity by the defendants similar to the Kramer and Lobel situations. At this time, Lincoln does not have a complete and adequate remedy at law for the consequences of those similar situations.

160.    Under such circumstances, an equitable accounting is appropriate.

161.    Absent an accounting, there is a risk that evidence may be spoliated and that Lincoln will suffer immediate and irreparable harm

Rome McGuigan, P.C. • Attorneys at Law
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

WHEREFORE, the Plaintiff claims:

As to Counts I through XII:

    1.      Compensatory damages;

    2.      Punitive damages;

    3.      Interest;

    4.      Costs;

    5.      Such other and further relief as deemed appropriate.

As to Count XIII:

    1.      A declaratory judgment that:

        (i)      the Kramer Policy lacked an insurable interest at the time of policy issuance;

        (ii)      the Kramer Policy is void *ab initio*;

        (iii)      no death benefit is payable under the Kramer Policy; and

        (iv)      if any death benefit is found to be payable under the Kramer Policy, Lincoln is

entitled to offset any damages it has incurred in connection with the Kramer Policy and/or the

Lobel Policy against any benefits payable under the Kramer Policy.

As to Count XIV:

    1.      An order declaring that Lincoln is entitled to an equitable accounting, consisting of the

disclosure by Miller and Lockwood of (i) all Lincoln policyholder records including but not limited to

*Rome McGuigan, P.C.* • *Attorneys at Law*
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

**Rome McGuigan, P.C.** • *Attorneys at Law*
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

records relating to the underwriting, acquisition and maintenance of life insurance policies issued by Lincoln; and (ii) the amount of commissions and other funds that they received directly or indirectly in connection with the placement of each such policy with Lincoln.

50

<u>VERIFICATION</u>

I verify that I am the Assistant Vice President-Market Conduct Compliance for Lincoln

Financial Group; that I am authorized to make this verification on behalf of Plaintiff The Lincoln

Life & Annuity Company of New York; that I have read the foregoing Complaint; and that the

allegations in the Complaint are true and correct to the best of my knowledge, information and

belief.

I declare, under penalty of perjury, that the foregoing is true and correct.

Kenneth Elder
Assistant Vice President-
Market Conduct Compliance
Lincoln Financial Group

Sworn to before me this
15th day of April, 2008

NOTARY PUBLIC
My Commission Expires June 13, 2008



*Rome McGuigan, P.C.* • *Attorneys at Law*
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

| | | |
|---|---|---|
| RETURN DATE: | MAY 6, 2008 | : | SUPERIOR COURT |

RETURN DATE:    MAY 6, 2008          :      SUPERIOR COURT
                                     :
THE LINCOLN LIFE & ANNUITY           :      JUDICIAL DISTRICT OF HARTFORD
COMPANY OF NEW YORK,                 :
                                     :      AT HARTFORD
V.                                   :
                                     :
                                     :
LOCKWOOD PENSION SERVICES, INC.,     :
STEVEN LOCKWOOD, JOEL B. MILLER,     :
JONATHAN S. BERCK (individually and as :
Trustee of the Arthur Kramer 2005    :
Insurance Trust dated August 29, 2005) :
LIFE PRODUCT CLEARING, LLC,          :
and TD BANKNORTH, N.A.               :      APRIL 16, 2008

### STATEMENT OF AMOUNT IN DEMAND

The Plaintiff, The Lincoln Life & Annuity Company of New York, claims damages in excess

of Fifteen Thousand and 00/100 Dollars ($15,000), exclusive of costs and interests.

PLAINTIFF,
THE LINCOLN LIFE & ANNUITY
COMPANY OF NEW YORK

BY _____
Jeffrey L. Mertl
Rome McGuigan, P.C.
One State Street, 17th Floor
Hartford, CT 06103
(860) 549-1000

51

*Of Counsel*

Stephen C. Baker
Michael J. Miller
Charles J. Vinicombe
Drinker Biddle & Reath LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA  19103-6996
(215) 988-2700

*Attorneys for Plaintiff*
*The Lincoln Life & Annuity*
*Company of New York*

**Rome McGuigan, P.C.** • *Attorneys at Law*
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

# EXHIBIT 3



State of Connecticut
# Judicial Branch

Civil Inquiry Home   Prev Page   Site Help   Comments Page   Calendar Notic   Case Look-up

**Screen Section Help:** Detail Party Motions

View
Docket Number/Case History

# Case Detail

View
Scheduled Court Dates



**Data Updated as of: 8/22/2008**

| Plaintiff Name | VS | Defendant Name |
|---|---|---|
| LINCOLN LIFE & ANNUI | v. | LOCKWOOD PENSION  ET AL |

| | |
|---|---|
| **Docket Number:** HHD-CV-08-5019142-S | **Court Location:** Hartford |
| **File Date:** Apr 16 2008 | **Return Date:** May 06 2008 |
| ***Last Action Date:** Aug 22 2008 | **ADR Status:** Not Applicable |
| **Case Type:** CONTRACTS - INSURANCE POLICY | |

| | |
|---|---|
| **List Type:** . | |
| **Disposition Date:** | |
| **Judge/Magistrate:** | **Trial List Claim:** |
| **Disposition:** | |

* 'Last Action Date' is a data entry date, not actual date

## Parties / Attorneys

| Party Name & Address | Pty No. | Pltf / Def | Self-Rep. | Non Appear | No Fee Party |
|---|---|---|---|---|---|
| LINCOLN LIFE & ANNUITY COMPANY OF NEW YORK | 01 | P | . | . | . |

**Attorney:** ROME MCGUIGAN P.C. (Juris No. 027726)

> 1 STATE STREET
> HARTFORD , CT 06103 3101

**Attorney:** PHV VINICOMBE CHARLES J. 05/28/08 (Juris No. 428715)

> 105 COLLEGE ROAD EAST
> PRINCETON , NJ 08542

**Attorney:** PHV MILLER MICHAEL J. 05/28/08 (Juris No. 428716)

> ONE LOGAN SQUARE
> 18TH AND CHERRY STREETS
> PHILADELPHIA , PA 19103

**Attorney:** PHV BAKER STEPHEN C. 05/28/08 (Juris No. 428717)

> ONE LOGAN SQUARE
> 18TH AND CHERRY STREETS
> PHILADELPHIA , PA 19103

LOCKWOOD
PENSION SERVICES   50          D
INC

**Attorney:** PEPE & HAZARD (Juris No. 101812)

       GOODWIN SQUARE
       HARTFORD , CT 06103

STEVEN LOCKWOOD  51          D

**Attorney:** PEPE & HAZARD (Juris No. 101812)

       GOODWIN SQUARE
       HARTFORD , CT 06103

JOEL B MILLER       52          D

**Attorney:** TYLER COOPER & ALCORN (Juris No. 000362)

       CITYPLACE/35TH FLOOR
       HARTFORD , CT 06103

JONATHAN S BERCK   53          D

**Attorney:** PULLMAN & COMLEY LLC (Juris No. 047892)

       850 MAIN STREET
       PO BOX 7006
       BRIDGEPORT , CT 06601 7006

JONATHAN S BERCK   54          D
TRUSTEE

**Attorney:** PULLMAN & COMLEY LLC (Juris No. 047892)

       850 MAIN STREET
       PO BOX 7006
       BRIDGEPORT , CT 06601 7006

LIFE PRODUCT
CLEARING LLC        55          D

**Attorney:** HURWITZ SAGARIN SLOSSBERG & KNUFF L (Juris No. 026616)

       147 NORTH BROAD STREET
       PO BOX 112
       MILFORD , CT 06460

TD BANKNORTH N A   56          D

**Attorney:** COHN BIRNBAUM & SHEA PC (Juris No. 010163)

       100 PEARL STREET
       HARTFORD , CT 06103

## Motions / Pleadings / Objections

| Entry No | Entry Date | Description | Initiated By | Argu able | Result | Result Date | Ordered By |
|----------|-----------|-------------|--------------|-----------|--------|-------------|------------|
| 100.30 | Apr 16 2008 | PJR EX PARTE | P | No | | | |
| 100.31 | Apr 16 2008 | CONTINUATION OF PARTIES | P | No | | | |
| 100.32 | Apr 16 2008 | PJR APPLICATION | P | Yes | Continuance | May 05 2008 | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 100.33 | Apr 16 2008 | PROPOSED WRIT SUM COM | P | No | | | |
| 100.34 | Apr 16 2008 | PRE-SVR ORD HEAR/NOTICE | P | No | | | |
| 100.35 | Apr 16 2008 | AFFIDAVIT | P | No | | | |
| 101.00 | Apr 16 2008 | MOT EXPARTE TEMP INJNCTN | P | No | Denied | Apr 16 2008 | Hon. ROBERT MCWEENY |
| 102.00 | Apr 17 2008 | MOT EXPARTE TEMP INJNCTN | P | Yes | Continuance | May 05 2008 | |
| 103.00 | Apr 23 2008 | RETURN | P | No | | | |
| 104.00 | May 02 2008 | MOT PERMISSION TO APPEAR | P | No | Granted | May 23 2008 | Hon. JAMES GRAHAM |
| 105.00 | May 02 2008 | MOT PERMISSION TO APPEAR | P | No | Granted | May 23 2008 | Hon. JAMES GRAHAM |
| 106.00 | May 02 2008 | MOT PERMISSION TO APPEAR | P | No | Granted | May 23 2008 | Hon. JAMES GRAHAM |
| 107.10 | May 05 2008 | STIPULATION | P | No | Order | May 05 2008 | Hon. JAMES GRAHAM |
| 108.00 | May 12 2008 | MOT PERMISSION TO APPEAR | D | No | Granted | May 30 2008 | Hon. JAMES GRAHAM |
| 109.00 | May 12 2008 | MOT PERMISSION TO APPEAR | D | No | Granted | May 30 2008 | Hon. JAMES GRAHAM |
| 110.00 | May 22 2008 | MOT PERMISSION TO APPEAR | D | No | Granted | May 30 2008 | Hon. JAMES GRAHAM |
| 111.00 | May 23 2008 | AFFIDAVIT | D | No | | | |
| 112.00 | May 23 2008 | MOT PERMISSION TO APPEAR | D | No | | | |
| 113.00 | May 23 2008 | MOT PERMISSION TO APPEAR | D | No | | | |
| 114.00 | May 20 2008 | STIPULATION | P | No | | | |
| 115.00 | May 20 2008 | STIPULATION | P | No | | | |
| 116.00 | Jun 06 2008 | MOTION TO DISMISS | D | No | | | |
| 117.00 | Jun 06 2008 | SUPPORTING MEMORANDUM | D | No | | | |
| 118.00 | Jun 06 2008 | AFFIDAVIT | D | No | | | |
| 119.00 | Jun 05 2008 | AFFIDAVIT | D | No | | | |
| 120.00 | Jun 04 2008 | MOTION TO DISMISS | D | Yes | | | |
| 121.00 | Jun 04 2008 | MOTION TO DISMISS | D | Yes | | | |
| 122.00 | Jun 05 2008 | AFFIDAVIT | D | No | | | |
| 123.00 | Jun 05 2008 | SUPPORTING MEMORANDUM | D | No | | | |

| 124.00 | Jun 05 2008 | MOTION TO DISMISS | D | Yes | | | |
| 124.10 | Jun 05 2008 | MOTION FOR STAY | D | No | | | |
| 125.00 | Jun 05 2008 | MOTION TO DISMISS | D | Yes | | | |
| 126.00 | Jun 05 2008 | SUPPORTING MEMORANDUM | D | No | | | |
| 127.00 | Jun 13 2008 | MOT EXTEND TIME | P | No | Granted | Jul 10 2008 | Hon. GRANT MILLER |
| 128.00 | Jun 13 2008 | MOT EXTEND TIME | P | No | Granted | Jul 10 2008 | Hon. GRANT MILLER |
| 129.00 | Jun 13 2008 | MOT EXTEND TIME | P | No | Granted | Jul 10 2008 | Hon. GRANT MILLER |
| 130.10 | Jun 19 2008 | SUPPLEMENTAL RETURN | P | No | | | |
| 131.10 | Jun 19 2008 | SUPPLEMENTAL RETURN | P | No | | | |
| 132.10 | Jun 19 2008 | SUPPLEMENTAL RETURN | P | No | | | |
| 133.10 | Jun 19 2008 | SUPPLEMENTAL RETURN | P | No | | | |
| 134.00 | Jun 16 2008 | MEMORANDUM | D | No | | | |
| 135.00 | Jun 19 2008 | SUPPORTING MEMORANDUM | D | No | | | |
| 136.00 | Jun 30 2008 | SUPPORTING MEMORANDUM | D | No | | | |
| 137.00 | Jun 30 2008 | AFFIDAVIT | D | No | | | |
| 138.00 | Jun 30 2008 | MOTION TO DISMISS | D | Yes | | | |
| 139.00 | Jul 03 2008 | MOT EXTEND TIME | P | No | | | |
| 140.00 | Jul 11 2008 | MOT PROTECTIVE ORDER | D | No | | | |
| 140.10 | Jul 11 2008 | MOTION FOR STAY | D | No | | | |
| 141.00 | Jul 15 2008 | OBJECTION RE DISCOVERY | D | No | | | |
| 142.00 | Jul 15 2008 | MOT PROTECTIVE ORDER | D | No | | | |
| 143.00 | Jul 14 2008 | OBJECTION TO REQUEST | D | No | | | |
| 144.00 | Jul 14 2008 | SUPPORTING MEMORANDUM | D | No | | | |
| 145.00 | Jul 14 2008 | AFFIDAVIT | D | No | | | |
| 146.00 | Jul 14 2008 | MOT PROTECTIVE ORDER | D | No | | | |
| 147.00 | Jul 15 2008 | MOT PROTECTIVE ORDER | D | No | | | |

| 147.10 | Jul 15 2008 | MOTION FOR STAY | D | No | | | |
|--------|-------------|-----------------|---|----|---|---|---|
| 148.00 | Jul 15 2008 | MOT PROTECTIVE ORDER | D | No | | | |
| 148.10 | Jul 15 2008 | MOTION FOR STAY | D | No | | | |
| 149.00 | Jul 14 2008 | REQUEST | D | No | | | |
| 150.00 | Jul 21 2008 | OBJECTION TO DISCOVERY | D | No | | | |
| 151.00 | Jul 21 2008 | OBJECTION TO DISCOVERY | D | No | | | |
| 152.00 | Jul 18 2008 | MOTION TO COMPEL | P | No | | | |
| 153.00 | Jul 18 2008 | OPPOSING MEMORANDUM | P | No | | | |
| 154.00 | Jul 24 2008 | OBJECTION TO DISCOVERY | D | No | | | |
| 155.00 | Jul 22 2008 | MOTION TO COMPEL | P | No | | | |
| 156.00 | Jul 22 2008 | OPPOSING MEMORANDUM | P | No | | | |
| 157.00 | Jul 22 2008 | OPPOSING MEMORANDUM | P | No | | | |
| 158.00 | Jul 21 2008 | MOTION TO COMPEL | P | No | | | |
| 159.00 | Jul 21 2008 | OPPOSING MEMORANDUM | P | No | | | |
| 160.00 | Jul 22 2008 | MOTION TO COMPEL | P | No | | | |
| 161.00 | Jul 31 2008 | OBJECTION TO DISCOVERY | D | No | | | |
| 162.10 | Aug 07 2008 | LETTER | P | No | | | |
| 163.00 | Aug 05 2008 | MOTION FOR CONTINUANCE | P | No | | | |
| 164.00 | Aug 18 2008 | REPLY MEMORANDUM | D | No | | | |
| 165.00 | Aug 21 2008 | REPLY MEMORANDUM | D | No | | | |
| 166.00 | Aug 21 2008 | REPLY MEMORANDUM | D | No | | | |
| 167.00 | Aug 22 2008 | AFFIDAVIT | D | No | | | |
| 168.00 | Aug 22 2008 | WITHDRAWAL | D | No | | | |

### LINCOLN LIFE & ANNUI v. LOCKWOOD PENSION ET AL

The following table lists events that have been individually scheduled for this case for today, or for a date in the future*. Other court activity may be separately scheduled on short calendars.

This table was last updated on **8/22/2008**.

| # | Date | Time | Event Description | Status |
|---|------|------|-------------------|--------|
| **Individually Scheduled Court Dates** | | | | |
| 1 | 8/25/2008 | 2:00 PM | Status Conference | Proceeding |

*Note: Individually scheduled events for the Regional Family Trial Docket in Middletown and Complex Litigation Dockets may not be included.

Periodic changes to terminology may be made which do not affect the status of the case. In accordance with the Federal Violence Against Women Act of 2005, cases for relief from physical abuse, foreign protective orders, and motions that would be likely to publicly reveal the identity or location of a protected party may not be displayed and may be available only at the courts.

Attorneys | Case Look-up | Courts | Directories | Educational Resources | E-Services | FAQ's | Juror Information | News & Updates | Opinions | Opportunities | Self-Help | Home

Common Legal Terms | Contact Us | Site Map | Website Policies

Copyright © 2008, State of Connecticut Judicial Branch