**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| ALICE KRAMER, as Personal Representative of the Estate of Arthur Kramer,<br><br>          Plaintiff,<br><br>    v.<br><br>LOCKWOOD PENSION SERVICES, INC., TALL TREE ADVISORS, INC., LIFE PRODUCTS CLEARING, LLC, TRANSAMERICA OCCIDENTAL LIFE INSURANCE CO., PHOENIX LIFE INSURANCE CO., LINCOLN LIFE & ANNUITY CO. OF NEW YORK, and JONATHAN S. BERCK,<br><br>          Defendants. | **Civil Action No.**<br>**08 CV 2429 (DAB)(MHD)**<br><br>**ECF Case**<br><br>**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO INTERVENE** |

---

Lifemark S.A. ("Lifemark"), by its attorneys, respectfully submits its Memorandum of Law in support of its Motion to Intervene.

## BACKGROUND

### *1. Arthur Kramer Procures and Transfers the Policy*

As set forth more fully in the proposed Complaint,[1] *see* Affirmation of Hector Gonzalez, affirmed on September 4, 2008 ("Gonzalez Affidavit"), Exh. A, Lifemark, a Luxembourg company, is the lawful and duly recorded owner of Phoenix Life Insurance Co. ("Phoenix")

---

[1] "When considering a motion to intervene, the court must accept as true the non-conclusory allegations of the motion." *United States v. Palermino*, 238 F.R.D. 118, 121 (D. Conn. 2006) (internal quotations omitted). See also *Cole Mechanical Corp. v. National Grange Mutual Ins. Co.,* 2007 WL 2593000, *2 (S.D.N.Y. Sep. 7, 2007) ("applicant's well pleaded allegations must be accepted as true for purposes of considering a motion to intervene").

policy number 97303913 ("the Policy").  Based on documentation that Lifemark obtained in connection with its purchase, the Policy was issued and delivered in or about October 2005 to Arthur Kramer, the insured, who placed the Policy in an insurance trust (the Arthur Kramer 2005 Insurance Trust Dated August 29, 2005, or "the August Trust") he created to own several life insurance policies that he procured around the same time.  Mr. Kramer's daughter, Liza Kramer, was the initial beneficiary of the August Trust.  In August 2007, the August Trust—with the knowledge and consent of Arthur Kramer—sold the Policy to Lifemark for $1.9 million. Phoenix duly recorded the change of ownership and beneficiary for the Policy and began communicating with Lifemark as the owner of the Policy.

### 2.  *Phoenix Denies Lifemark's Claim*

Arthur Kramer, the insured, died on January 26, 2008.   Lifemark, as owner and beneficiary of the Policy, submitted a claim for the Policy proceeds in February 2008 but Phoenix has twice refused, in April and May 2008, to pay the claim.  This motion has been prompted by Phoenix's denial of Lifemark's policy claim.    Correspondence relating to Lifemark's claim, and Phoenix's denial, is attached to the Gonazlez Affidavit as Exhibit B.

As set forth in the two letters denying Lifemark's claim, Phoenix has not based its refusal to pay Lifemark's claim on any action or omission by Lifemark (as noted, Phoenix duly recorded Lifemark as the owner and beneficiary of the Policy upon Lifemark's purchase in August 2007). Rather, Phoenix has claimed that it has no obligation to honor the Policy because it was originally procured as part of a scheme by Arthur Kramer and others to obtain "Stranger Owned Life Insurance" ("SOLI") for parties that had no insurable interest in Mr. Kramer's life.

### *3. Lifemark's Claims against Phoenix*

Phoenix's purported grounds for denying Lifemark's claim have no merit. Phoenix does not—and cannot—claim that Lifemark played any role in the purported SOLI scheme. Lifemark purchased the Policy in good faith, more than two years after it was issued, and in reliance on the representations of Phoenix, Arthur Kramer, the August Trust, and Jonathan S. Berck (Trustee of the August Trust) that indicated that the Policy was In Force, transferable to Lifemark, and that as the registered owner of the Policy, Lifemark would succeed to all rights under the Policy, including but not limited to the right to designate a beneficiary to receive the proceeds of the Policy. Lifemark played no role in, and had no knowledge of, the circumstances of the original procurement of the Policy by Arthur Kramer in 2005.

Beyond Lifemark's status as an innocent purchaser, even if Mr. Kramer had procured the Policy as part of a SOLI scheme that was unlawful (and, as discussed further below, based on the pleadings filed in this case to date, it was not), Phoenix would still not be entitled to avoid its obligation to Lifemark, as owner of the Policy, because the two-year period in which Phoenix was permitted to contest the validity of the Policy ("the contestability period") had expired before Mr. Kramer's death. Phoenix apparently asserts that the Policy, as the product of a SOLI scheme, was void *ab initio*, but the New York Court of Appeals unanimously rejected that argument in *New England Mutual Life Insurance Co. v. Caruso*, holding that an insurance contract issued without an insurable interest is not void *ab initio*, but rather is merely voidable— and even then only during the contestability period. 73 N.Y.2d 74, 79-81 (N.Y. 1989) ("the legislative history, considered with the language of similar statutory provisions, leads us to conclude that nothing in the statutory scheme makes void *ab initio* policies acquired by one lacking an insurable interest or forecloses the application of an incontestable clause to bar an

insurer's disclaimer of liability"). The contestability period for the Policy ended on July 10, 2007. Phoenix never contested the validity of the Policy before that time and, indeed, did not do so until after Mr. Kramer's death and after his estate commenced this action.

### 4. *Lifemark's Claims against the Kramer Estate*

Plainly, Lifemark has viable claims against Phoenix to recover the Policy proceeds. In this case, however, the Kramer Estate has also brought claims against Phoenix and others under New York Insurance Law § 3205(b)(4) to obtain the Policy proceeds. Remarkably, Mr. Kramer's own estate—which stands in his shoes—also alleges (like Phoenix) that Mr. Kramer procured the Policy (along with several other policies) as part of an unlawful SOLI scheme. Mr. Kramer's estate therefore contends that, having procured insurance policies unlawfully and having sold them for a profit, Mr. Kramer is now entitled also to receive the benefits of those policies in the form of proceeds paid to his heirs.

There are many grounds on which the Kramer Estate's effort to have its cake and eat it too must fail. Most importantly, Mr. Kramer's knowing and voluntary actions to procure the Policy (and, if true, to orchestrate the alleged SOLI scheme) defeat the Kramer Estate's claim. Section 3205(b)(1) explicitly permits any person of lawful age to procure on his own initiative a policy on *himself and to assign that policy immediately* to any other person without regard to whether that person has an insurable interest in the insured's life. The Kramer Estate and Phoenix agree that Mr. Kramer voluntarily participated in an effort to take out a series of policies on his own life and to sell those policies, or the beneficial interests therein, to third parties shortly thereafter; neither party alleges that Mr. Kramer procured these policies under any form of coercion, duress, incapacity, or other infirmity that might render his actions involuntary. Thus, even if their allegations are true, there is nothing at all unlawful about Mr. Kramer's

4

course of conduct and it would not provide a basis to reap the windfall that both the Kramer Estate and Phoenix wrongly seek to obtain.

Both the Kramer Estate and Phoenix protest that the New York Insurance Law proscribes "wagering" by strangers on the lives of others, but—as § 3205(b)(1) reflects—that concern does not arise where, as here, the policy in question was procured by the insured himself. In this situation, there is simply no risk that "strangers" are creating incentives that might put unsuspecting insureds at risk; so long as the insured himself procures the policy, the New York Insurance Law permits the insured to transfer or assign that policy to anyone at all, even a "stranger."

It is only when a stranger procures a policy on an insured without the insured's knowledge that the policy concerns behind "wagering" insurance contracts are implicated. In such situations, § 3205(b)(2) of the New York Insurance Law does require that the beneficiary of such a policy be a person with an insurable interest in the life of the insured. But, as the pleadings of both the Kramer Estate and Phoenix acknowledge, that is not the situation here, where Arthur Kramer, the insured, "took out several policies," including the Policy that is now owned by Lifemark. Amended Complaint at ¶ 15.

Barring the estate's attempt to profit from Mr. Kramer's SOLI scheme, moreover, clearly serves the public policy underlying the New York's insurable interest rule, namely, preventing the issuance of "wagering" policies. Section 3205(b)(4), on which the Estate bases its claims, furthers that policy by precluding a third party who procures such a policy without the knowledge of the insured from retaining the policy proceeds. Instead, it awards the proceeds to the insured's heirs. But when, as the Kramer Estate and Phoenix acknowledge, the insured knew of, participated in, and profited by, the issuance of the policy, permitting the insured's heirs to

obtain the policy proceeds would actually *reward* rather than deter such transactions by permitting the insured to obtain up front compensation for the sale of the policy while simultaneously ensuring that the heirs will nevertheless reap the benefits of the policy. It is for this reason that § 3205(b)(1) controls in these situations and prevents the double windfall to the heirs of the alleged wrongdoer himself.

It must also be noted that since the Kramer Estate stands in the shoes of Arthur Kramer, the conduct of Mr. Kramer—whether lawful or unlawful—must be imputed to his estate. Thus, equitable doctrines of estoppel and *in pari delicto* will bar the estate's effort to profit from Mr. Kramer's allegedly unlawful actions. Moreover, if Mr. Kramer's representations and warranties that Lifemark was obtaining good title to the Policy prove to be false, then the Kramer Estate (along with the August Trust and Jonathan Berck, who made the same representations and warranties) will be liable to Lifemark for breach of warranty and fraud. The Estate's efforts in this case to obtain the Proceeds of the Policy are therefore unfounded and Lifemark seeks a declaratory judgment to that effect.

## ARGUMENT

Intervention is a procedural tool that allows courts to "efficiently administ[er] legal disputes by resolving all related issues in one lawsuit." *United States v. Pitney Bowes, Inc.*, 25 F.3d 66, 69 (2d Cir. 1994). A court's inquiry on intervention should be a flexible one and should focus on the facts and circumstances of each application. *United States v. Hooker Chemicals & Plastics, Corp.*, 749 F.2d 968, 983 (2d. Cir. 1984). In view of Lifemark's claim to the Policy proceeds and the procedural posture of this case, the requirements for both intervention as of right and permissive intervention are easily satisfied.

## I. Lifemark May Intervene In This Action As Of Right.

The Federal Rules of Civil Procedure permit Lifemark to intervene in this action as of

right to protect its property interest in the proceeds of the Policy.  Fed. R. Civ. Proc. 24(a)(2)

provides, in relevant part:

> On timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Lifemark's motion satisfies each of these criteria.[2]

### A.    Lifemark's Motion to Intervene Is Timely.

"The purpose of the [timeliness] requirement is to prevent a tardy intervenor from

derailing a lawsuit within sight of the terminal." *Sokaogon Chippewa Community. v. Babbitt*, 214

F.3d 941, 949 (7th Cir. 2000).  Lifemark's motion to intervene in this Action, by contrast, comes

at a point in the Action where the train has not even pulled out of the station:  initial pleadings

have not been completed, discovery has not yet begun, there have been no court proceedings or

substantive rulings, and there will be no prejudice to the original parties from Lifemark's entry

into the Action.  As such, Lifemark's motion, which Lifemark sought permission to file less than

three months after the filing of the Amended Complaint in this action, is clearly timely.  See,

e.g., *Mountain Top Condominium Ass'n v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, 371

---

[2]    In addition to the criteria set forth in Rule 24, "petitions to intervene must have an independent basis of subject matter jurisdiction."  6 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 24.22[1] at 24-94 (3d ed. 2008). See 28 U.S.C. § 1367.  As set forth above and in the proposed Complaint, Gonazlez Affidavit Exh. A, Lifemark S.A. is a Luxembourg company and none of the other parties are foreign entities.  Thus, Lifemark's intervention will not impair this Court's diversity jurisdiction over the case pursuant to 28 U.S.C. § 1332.

(3d Cir. 1995) (motion to intervene filed four years after initiation of case deemed timely where "there were no depositions taken, dispositive motions filed, or decrees entered during the four year period"); *Bohne v. Closings of Tulsa, LLC*, 2006 WL 965382, *2 (N.D. Okla. April 12, 2006) (seven month delay in filing intervention motion "is not a particularly long period of time, considering that the Court has not yet permitted discovery on the merits"); *Miller v. Silbermann*, 832 F. Supp. 663, 669-70 (S.D.N.Y. 1993) (holding delay of intervention of over three years, which caused no prejudice to defendants, was timely; "[a]bsent any such prejudice, [a] motion for intervention will usually be deemed timely."); *Oneida Indian Nation of New York v. New York*, 201 F.R.D. 64, 67-69 (N.D.N.Y. 2001) (finding timely a motion to intervene filed 26 years after law suit began in the absence of any substantial court rulings, discovery, or prejudice to existing parties).

### B.      Lifemark Has a Legal Interest in the Property Subject to the Proceeding.

Based on its ownership of the Policy and its status as beneficiary of the Policy, Lifemark has a "direct, substantial, [and] legally protectable'" interest in this Action. *Brennan v. N.Y.C. Bd. of Educ.*, 260 F.3d 123, 129 (2d Cir. 2001) (*quoting Washington Elec. Coop., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 922 F.2d 92, 97 (2d Cir. 1990). "Motions to intervene in which the proposed intervenor advances a clear property interest present the easiest cases for intervention. If an action involves a dispute about a particular property or fund, and a movant claims a direct, substantial, and legally protectable right to this property or fund, the existence of a sufficient interest is apparent." 6 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 24.03[2][a] at 24-26 to 24-27 (3d ed. 2008). Lifemark—which claims the proceeds from one of the same policies that the plaintiff's claims target—presents just such a claim and clearly satisfies the property interest element of Rule 24(a)(2). Even a constructive claim on insurance

proceeds constitutes a sufficient property interest to justify intervention as of right.  See, e.g., *Calvert Fire Ins. Co. v. Environs Dev. Corp.*, 601 F.2d 851, 858 (5th Cir. 1979) (equitable lien holder on insurance proceeds meets property requirement of Rule 24(a)(2)); *Counihan v. Allstate Ins. Co.*, 907 F. Supp. 54, 56 (E.D.N.Y. 1995) (government's constructive trust on insurance proceeds satisfied property interest requirement of Rule 24(a)(2)).  *Cf. Mountain Top Condominium Ass'n*, 72 F.3d at 367 (beneficiaries with a claim on monies in a fund have a direct property interest in the fund that satisfies Rule 24(a)).

### C.    Disposition of this Action will Impair and Impede Lifemark's Ability to Protect Its Legal Interest.

Intervention as of right is also required here because a judgment in this Action may impair and impede Lifemark's ability to protect its interest in the Policy proceeds.  The claims asserted in this Action will produce a judgment as to (1) Phoenix's obligation to pay the proceeds of the Policy, and (2) the Kramer Estate's right to obtain the proceeds of the Policy pursuant to New York Insurance Law § 3205(b)(4).  While such a judgment would not be binding on Lifemark, as a non-party, it would as a practical matter impair and impede Lifemark's ability to protect its claims to the proceeds of the Policy.  If Phoenix has already been required to pay the proceeds of the Policy to another party, Lifemark's claims against Phoenix would effectively be mooted.  And if the proceeds were awarded to the Kramer Estate, Lifemark's ability to recover the proceeds from the estate could be impaired by the adverse precedent that this Court's judgment would present.

A judgment on the same issues of law or fact that govern the applicant's claim will make it more difficult for another party to obtain a different result.  Consequently, the Second Circuit and other courts routinely recognize that "an intervenor's interest can be impaired or impeded as a practical matter if a pending action will cause a stare decisis impact that is harmful to the

applicant." MOORE'S FEDERAL PRACTICE § 24.03[3][b] at 24-44. See, e.g., *Oneida Indian Nation of Wisconsin v. New York*, 732 F.2d 261, 265 (2d Cir 1984) (reversing denial of intervention and holding that applicants could intervene as of right where "there is a substantial likelihood that [their] claims concerning the disputed lands may be adversely affected at least by principles of *stare decisis*"); *New York Public Interest Research Group, Inc. v. Regents of the University of the State of New York*, 516 F.2d 350, 352 (2d Cir. 1975) (reversing denial of intervention motion and holding that "the possible stare decisis effect of an adverse decision" constituted sufficient impairment under Rule 24(a)(2)). See also, e.g., *Kansas Public Employees Retirement Sys. v. Reimer & Koger Assocs.*, 60 F.3d 1304, 1307-08 (8th Cir. 1995) (finding that adverse judgment "may" create adverse precedent sufficient to require intervention under Rule 24(a)(2)). "Where, as here, the potential of additional litigation involving the same resources looms large, a putative intervenor should be allowed to prevent the development of adverse precedents that undoubtedly will be wielded against it in the future." *Klamath Irrigation Dist. v. United States*, 64 Fed. Cl. 328, 336 (Fed. Cl. 2005).

### D. Lifemark's Interests in the Policy Are Not Adequately Represented by the Present Parties.

With regard to the final requirement for intervention as of right under Rule 24(a)(2), adequacy of representation, courts look to see whether the interests of the parties to the suit are "so similar" to the interests of the party seeking to intervene "that adequacy of representation [is] assured." *Brennan*, 260 F.3d at 133. Here, it is clear that Lifemark's interests are not adequately represented by the existing parties. Phoenix, of course, contests Lifemark's claim to the Policy Proceeds and the Kramer Estate has asserted a competing claim to those proceeds. None of the other existing parties to this Action has an interest in the Policy proceeds at all, much less one that is the same as Lifemark's. Accordingly, Lifemark's motion plainly satisfies the final

element of intervention as of right as well.  See, e.g., *Purnell v. City of Akron*, 925 F.2d 941, 950 (6th Cir. 1991) (prospective litigants competing for share of same funds not adequately represented by interests of other claimants); *United States Fidelity & Guar. Co. v. Eastern Contractors, Inc.*, 2008 WL 190758, at *2 (D. Mass January 15, 2008) (competing creditor does not adequately represent interest of other creditor).

## II.  Permissive Intervention

Even if Lifemark could not satisfy the requirements for intervention as of right under Rule 24(a), the Court should permit Lifemark to intervene pursuant to Rule 24(b), which provides (in relevant part) that "anyone may be permitted to intervene in an action . . . when an applicant's claim or defense and the main action have a question of law or fact in common." Here, Lifemark's claims relate to one of the same insurance policies as to which the Kramer Estate has asserted its claims and raise fact and legal issues common to Lifemark's proposed claims as well as the existing claims of the Kramer Estate and Phoenix.  Common fact issues include the knowledge of the Kramer family regarding the Policy, Mr. Kramer's participation in the alleged SOLI scheme, and the circumstances relating to the sale of the Policy to Lifemark in 2007.  Common legal issues include questions as to the validity of the Policy, the effect of the contestability provision in the Policy, the effect of Mr. Kramer's participation in the alleged SOLI scheme, and the proper construction of New York Insurance Law § 3205(b).  Resolution of these common issues of fact and law in a single proceeding promotes the goals of judicial economy and efficiency that underlie the rules governing intervention.  See, e.g., *BS Sun Shipping Monrovia v. Citgo Petroleum Corp.*, 509 F. Supp. 2d 334, 342-43 (S.D.N.Y. 2007) (noting that permissive intervention would "mercifully hasten the resolution of the issues" between the existing parties and the intervenor); *Jamie Music Publishing Co. v. Roc-A-Fella*

*Records LLC,* 2007 WL 1129333, at *3 (S.D.N.Y April 12, 2007) (noting that presence of issues common to all claims means that intervention will aid development of more complete record for all parties).

Further, there is no countervailing reason to deny intervention. In granting permissive intervention, courts must consider "whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights," Rule 24(b)(3), and whether there is an independent basis for jurisdiction of the intervenor's claims, 28 U.S.C. § 1367, but neither requirement poses an obstacle to Lifemark's intervention. As noted above, Lifemark's intervention will not delay the proceedings in this case or prejudice the existing parties in any way. Moreover, Lifemark is a Luxembourg company, so its intervention will not impair this Court's diversity jurisdiction over the existing action.

## CONCLUSION

For all of the foregoing reasons, Lifemark respectfully requests that the Court grant its Motion to Intervene. As required by Fed. R. Civ. P. 24(c), Lifemark's proposed Complaint is attached to the Gonazlez Affidavit as Exhibit A.

Dated: September 4, 2008
     New York, New York     Respectfully Submitted,

                      MAYER BROWN LLP

                      By: _____
                          Hector Gonzalez

                      1675 Broadway
                      New York, New York 10019-5820
                      (212) 506-2500
                      (212) 262-1910 (fax)

John J. Tharp, Jr. (*pro hac vice* application forthcoming)
Thomas A. Lidbury (*pro hac vice* application forthcoming)
Robert T. Howell (*pro hac vice* application forthcoming)

71 South Wacker Drive
Chicago, Illinois 60606-4637
(312) 782-0600
(312) 701-7711 (fax)

*Attorneys for Lifemark S.A.*