Patrick J. Feeley (PF-4931)
Christopher G. Karagheuzoff (CK-1122)
Stephen M. Raab (SR-0742)
DORSEY & WHITNEY LLP
250 Park Avenue
New York, New York 10177
(212) 415-9200

*Attorneys for Defendant and Third-Party Plaintiff
Phoenix Life Insurance Co.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALICE KRAMER, as Personal Representative of the Estate of Arthur Kramer,<br><br>                Plaintiff,<br><br>   – against –<br><br>LOCKWOOD PENSION SERVICES, INC., TALL TREE ADVISORS, INC., LIFE PRODUCTS CLEARING, LLC, TRANSAMERICA OCCIDENTAL LIFE INSURANCE CO., PHOENIX LIFE INSURANCE CO., LINCOLN LIFE & ANNUITY CO. OF NEW YORK, and JONATHAN S. BERCK,<br><br>                Defendants.<br><br>---<br><br>      Various Third-Party Actions | Case No. 08 CV 2429 (DAB) (MHD)<br><br>ECF CASE |

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS PHOENIX LIFE INSURANCE COMPANY'S COUNTERCLAIMS

**DORSEY & WHITNEY LLP**
**250 Park Avenue**
**New York, NY 10177**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...........................................................................................1

FACTUAL BACKGROUND ..............................................................................................4

LEGAL STANDARD..........................................................................................................6

ARGUMENT.......................................................................................................................7

POINT ONE

    PHOENIX'S COUNTERCLAIMS ARE NOT BARRED BY THE POLICIES'
    CONTESTABILITY PROVISIONS: KRAMER WAS NEVER A TRUE
    HOLDER OR BENEFICIARY OF THE POLICIES, NEVER PAID
    PREMIUMS ON THE POLICIES, AND KNOWINGLY SERVED AS A
    STRAW MAN IN A FRAUDULENT TRANSACTION TO PROCURE
    THE POLICIES FOR OTHERS' BENEFIT ................................................................7

POINT TWO

    WHILE IT WOULD BE PREMATURE, IN THE CONTEXT OF PLAINTIFF'S
    MOTION TO DISMISS COUNTERCLAIMS, TO ADJUDICATE THE
    ULTIMATE ISSUE OF LIABILITY UNDER THE POLICIES, *CARUSO*,
    IN ANY EVENT, DOES NOT PRECLUDE LITIGATION OF THE ALLEGED
    STOLI SCHEMES ...................................................................................................11

        A.    Any Determination Of Phoenix's Liability Under The Policies
               Would Be Premature....................................................................................11

        B.    In Any Event, *Caruso* Does Not Support The Application Of
               The Incontestability Clause To STOLI Schemes.......................................13

                1.    The Facts Of *Caruso* Bear No Material Resemblance
                        To Those Alleged Here...................................................................13

                2.    *Caruso* Adopted A Balancing Approach ..................................14

                3.    *Caruso* Does Not Bar Phoenix's Counterclaims .....................16

                4.    In Any Event, Plaintiff's Position Is Contrary To The
                        Policy Prohibiting The Use Of Statutory Protections
                        And Courts As Instruments Of Fraud.............................................20

POINT THREE

    EVEN IF THE COURT WERE INCLINED TO RULE ON THE ULTIMATE
    ISSUE OF INCONTESTABILITY NOW, AND IN SO DOING WERE TO
    ENDORSE PLAINTIFF'S READING OF *CARUSO*, CONNECTICUT LAW,
    WHICH TRUMPS NEW YORK'S, REQUIRES DENIAL OF THE MOTION...................21

    A.    The Law Of The Insured's Domicile Governs ......................................21

    B.    If The Court Were To Interpret *Caruso* In The Manner
            Plaintiff Suggests, A Conflict Between New York And
            Connecticut Law Emerges, And Connecticut Law Applies .................................23

POINT FOUR

    PLAINTIFF'S REMAINING ARGUMENTS IN SUPPORT OF DISMISSAL FAIL:
    PHOENIX PLEADED FACTS SUFFICIENT TO SUPPORT ITS BREACH
    OF FIDUCIARY DUTY AND UNJUST ENRICHMENT CLAIMS....................................26

    A.    Because Phoenix Has Pleaded Facts That Raise An Inference
            Of Actual Knowledge, Plaintiff's Motion To Dismiss Phoenix's
            Aiding And Abetting Breach Of Fiduciary Duty Claim Must Be Denied.............26

    B.    Plaintiff's Motion To Dismiss Phoenix's Unjust Enrichment
            Claim Is Not Susceptible To Summary Disposition ..............................................28

    CONCLUSION.............................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Tel. & Util. Consultants, Inc. v. Beth Israel Med.*,
 763 N.Y.S.2d 466 (App. Div. 2003) ............................................................................28

*Ambrose v. New England Ass'n of Schs. & Colls.*,
 252 F.3d 488 (1st Cir. 2001) .......................................................................................23

*Bell Atl. Corp. v. Twombly*,
 — U.S —, 127 S.Ct. 1955 (2007) ................................................................................6

*Carr v. Hoy*,
 2 N.Y.2d 185 (1957) ....................................................................................................17

*Certain Underwriters at Lloyd's, London v. Foster Wheeler Corp.*,
 822 N.Y.S.2d 30 (App. Div. 2006) ..............................................................................22

*Chrysler Capital Corp. v. Century Power Corp.*,
 778 F. Supp. 1260 (S.D.N.Y. 1991) ............................................................................29

*Cornwall Press v. Ray Long & Richard R. Smith, Inc.*,
 75 F.2d 276 (2d Cir. 1935) ..........................................................................................20

*Cox v. Microsoft Corp.*,
 778 N.Y.S.2d 147 (App. Div. 2004) .............................................................................30

*Cromer Fin. Ltd. v. Berger*,
 137 F. Supp. 2d 452 (S.D.N.Y. 2001) ..........................................................................26

*Dagen v. CFC Group Holdings, Ltd.*,
 No. 00 Civ. 5682 (DAB), 2003 WL 194208 (S.D.N.Y. Jan. 28, 2003) ......................29

*Finkelman v. Greenbaum*,
 No. 8998-06, 2007 WL 102464 (N.Y. Sup. Ct. Jan. 10, 2007) ..................................26

*Finkelstein v. Mardkha*,
 495 F. Supp. 2d 329 (S.D.N.Y. 2007) ..........................................................................29

*Fuller v. Metro. Life Ins. Co.*,
 41 A. 4 (Conn. 1898) ...................................................................................................24

*Global Network Communications, Inc. v. City of New York*,
 458 F.3d 150 (2d Cir. 2006) ..........................................................................................6

*Gordon v. Oster*,
   829 N.Y.S.2d 49 (App. Div. 2007) .......................................................................................29

*Griffin v. McCoach*,
   313 U.S. 498 (1941).............................................................................................................21

*Halo Tech Holdings, Inc. v. Cooper*,
   No. 3:07-CV-489, 2008 WL 877156 (D. Conn. Mar. 26, 2008) ..........................................27

*Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co.*,
   649 A.2d 518 (Conn. 1994) ..................................................................................................28

*Ins. Co. of N. Am. v. Kaplun*,
   713 N.Y.S.2d 214 (App. Div. 2000) .......................................................................................7

*Jo-Ann Stores, Inc. v. Prop. Operating Co.*,
   880 A.2d 945 (Conn. App. Ct. 2005)...............................................................................27, 28

*Kittay v. Kornstein*,
   230 F.3d 531 (2d Cir. 2000)..................................................................................................12

*Krauss v. Manhattan Life Ins. Co. of New York*,
   643 F.2d 98 (2d Cir. 1981)........................................................................................21, 22, 24

*Lewis v. Phoenix Mut. Life Ins. Co.*,
   39 Conn. 100, 1872 WL 1451 (1872) ...................................................................................24

*Liberty Mut. Ins. Co. v. Grand Transp., Inc.*,
   No. 06 CV 3433, 2007 WL 764542 (E.D.N.Y. Mar. 12, 2007) ..............................................8

*Marchisella v. Gov't of Japan*,
   No. 02 Civ. 10023 (DC), 2004 WL 307248 (S.D.N.Y. Feb. 17, 2004)............................12, 13

*Mayo v. Hartford Life Ins. Co.*,
   354 F.3d 400 (5th Cir. 2004) ................................................................................................21

*McConnell v. Commonwealth Pictures Corp.*,
   7 N.Y.2d 465 (1960) .............................................................................................................17

*McGrath v. Hilding*,
   41 N.Y.2d 625 (1977) ...........................................................................................................28

*Michalski v. Home Depot, Inc.*,
   225 F.3d 113 (2d Cir. 2000)..................................................................................................23

*Midwest Oilseeds, Inc. v. Limagrain Genetics Corp.*,
   387 F.3d 705 (8th Cir. 2004) ................................................................................................23

*Minn. Mut. Life Ins. Co. v. Ricciardello*,
    No. 3:96CV2387, 1997 WL 631027 (D. Conn. 1997).............................................24

*Mooney v. Nationwide Mut. Ins. Co.*,
    577 N.Y.S.2d 506 (App. Div. 1991) ..................................................................7, 8

*New England Mut. Life Ins. Co. v. Caruso*,
    73 N.Y.2d 74 (1989) ........................................................................ passim

*New England Mut. Life Ins. Co. v. Doe*,
    93 N.Y.2d 122 (1999) ....................................................................9, 20

*Patane v. Clark*,
    508 F.3d 106 (2d Cir. 2007)...........................................................................6

*People ex rel. Cuomo v. Coventry First LLC*,
    861 N.Y.S.2d 9 (App. Div. 2008) ..................................................................26

*People v. Alexander*,
    171 N.Y.S. 881 (App. Div. 1918) ..................................................................8

*Philo Smith & Co. v. Uslife Corp.*,
    420 F. Supp. 1266 (S.D.N.Y. 1976)...............................................................20

*Provident Life & Cas. Inc. Co. v. Ginther*,
    No. 96-CV-0315E, 2002 WL 1020775 (W.D.N.Y. Mar. 4, 2002) ...........................8

*R.A.C. Group, Inc. v. Bd. of Educ. of City of New York*,
    799 N.Y.S.2d 559 (App. Div. 2005).................................................................17

*Rabin v. MONY Life Ins. Co.*,
    No. 06 Civ. 775, 2007 WL 737474 (S.D.N.Y. Mar. 8, 2007) ...............................28

*Reliastar Life Ins. Co. of New York v. Leopold*,
    745 N.Y.S.2d 810 (Sup. Ct. 2002)..................................................................10

*Riggs v. Palmer*,
    155 N.Y. 506 (1889) ...............................................................16, 17, 20

*Routier v. Waldeck*,
    708 N.Y.S.2d 270 (Dist. Ct. 2000) ..................................................................9

*Simpson v. Phoenix Mut. Life Ins. Co.*,
    24 N.Y.2d 262 (1969) ..................................................................19, 20

*Spear v. Guardian Life Ins. Co. of Am.*,
    493 N.Y.S.2d 322 (App. Div. 1985)...............................................................20

*Spivak v. Sachs*,
   16 N.Y.2d 163 (1965) ...........................................................................................17

*In re Thompson's Estate*,
   231 N.Y.S.2d 718 (Sur. Ct. 1962) .....................................................................10


**STATUTES, SESSION LAWS, AND RULES**

Act effective Oct. 1, 2008, 2008 Conn. Legis. Serv. P.A. 08-175 (West) ....................................25

Fed. R. Civ. P. 12(b)(6).................................................................................................1, 2, 6

N.Y. Ins. Law § 3205(b)(4) ..........................................................................................17, 18


**OTHER AUTHORITIES AND SOURCES**

17 Couch on Insurance 3d § 240:82 ..............................................................................23

Jeffrey W. Stempel, Law of Insurance Contract Disputes § 1.04[e] (2d ed.)..............................23

Matthew Goldstein, *Profiting From Mortality*, Bus. Week, July 30, 2007, at 44,
   *available at* http://www.businessweek.com/magazine/content/07_31/b4044001.htm............16

5 N.Y. Jur. 2d Arbitration and Award § 21 ..................................................................10

6A N.Y. Jur. 2d Assignments § 64 ..............................................................................10

Restatement (Second) of Conflict of Laws § 192.................................................................21, 22

Defendant and Third-Party Plaintiff Phoenix Life Insurance Company ("Phoenix"), by its attorneys, Dorsey & Whitney LLP, respectfully submits this memorandum of law in opposition to Plaintiff's motion, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss the three counterclaims asserted by Phoenix in its Answer to Amended Complaint with Counterclaims, Cross-Claims and Third-Party Complaint[1].

## PRELIMINARY STATEMENT

Plaintiff Alice Kramer, as Personal Representative of the Estate of Arthur Kramer (the "Estate"), has staked her claim to $56 million in life insurance proceeds by alleging that Arthur Kramer ("Kramer") participated in a series of fraudulent stranger-owned life insurance ("STOLI") transactions. As Plaintiff and Phoenix agree, such transactions are characterized by the insured's procurement of life insurance, not for the benefit of his family, but for immediate resale to an outside investor, who in essence makes a wager on the duration of the insured's life. Such arrangements are both illegal and objectionable for a host of reasons, including the longstanding public policy against the issuance of "wager" policies.

Plaintiff acknowledges that Kramer never intended to hold the life insurance policies that he procured from Phoenix; never paid premiums; and never had any interest in these policies beyond the fees he received to wrongfully procure them for others. Remarkably, Plaintiff now suggests that a provision of the policies, designed to give security to *bona fide* policyholders, not only entitles the Estate to a windfall profit from Kramer's fraud, but also insulates the Estate from any liability for any damages that Kramer has caused.

---

[1]   Phoenix shall generally refer to this pleading as the "Counterclaims," except it shall refer to the "Answer" when referring those allegations and defenses responsive to the Amended Complaint. The Answer and Counterclaims are filed under Docket No. 43. The Amended Complaint ("Am. Compl.") is filed under Docket No. 31.

In support of such contentions, Plaintiff invokes the incontestability clauses of the policies-in-suit, arguing that such clauses establish Phoenix's liability *per se* against any claimant, regardless of the character of the fraudulent scheme by which the policies were procured or the claimant's participation in that fraud.  Plaintiff then argues that even if the Estate's affirmative claim to the proceeds fails, the incontestability clause insulates the Estate from all liability and mandates dismissal of Phoenix's first two counterclaims.

Plaintiff's  contentions are wrong as a matter of law and have deeply disturbing policy implications.   Indeed, Plaintiff asks this Court, in the context of *a motion to dismiss counterclaims*, not only to find that she is allowed to plead fraud for gain without consequence, but to decide Phoenix's ultimate liability on the policies.  Plaintiff asks that the Court issue such a sweeping decision by misinterpreting the New York Court of Appeals' decision in *New England Mutual Life Insurance Company v. Caruso*, 73 N.Y.2d 74 (1989) ("*Caruso*"), as one which provides safe-haven for sophisticated insurance fraudsters.   In sum, Plaintiff asks this Court to legitimize conduct that would render New York the capital of a fraud-based industry on the basis of a court decision that it wrongly claims permits such fraud.

There is, of course, no reason for this Court to do any of that.  The only issue presented by Plaintiff's motion to dismiss is whether Phoenix's counterclaims satisfy the liberal pleading standards of Rule 12(b)(6).  New York law permits the assertion of independent tort claims against persons who are not protected by the incontestability clauses of the policies-in-suit.  Because Kramer is not – and was never – the owner or beneficiary of the Policies and acted only as a straw man in procuring the Policies for the benefit of outside investors, he does not fall within the class of persons entitled to the protection incontestability clauses afford.

Even if a decision on Plaintiff's motion did depend on whether Phoenix could contest any claim for the proceeds, this is not the appropriate context for the Court to decide, as Plaintiff asks, the application of *Caruso* to STOLI.  That interpretive task, if and when properly presented by an affirmative claim for the proceeds, will involve policy analysis, an evaluation of the equities involved in a particular claim, and, potentially, a conflict-of-law analysis.  Sweeping all those issues aside, as Plaintiff seeks to do by litigating them in the context of this motion to dismiss counterclaims, would hand parties to STOLI transactions a license to defraud, and leave the New York life insurance market burdened under the weight of a large and growing number of STOLI policies.

If the Court nevertheless elects to adjudicate, on this preliminary motion, the issue of whether the contestability clauses preclude fraud-based litigation of STOLI policies, it will conclude that such litigation is permitted under New York law.   In particular, a careful application of *Caruso*'s balancing approach to the STOLI schemes at issue in this case leads to the conclusion that the incontestability clause cannot, under New York law, be given the effect Plaintiff proposes.  Moreover, even if this Court were to hold that New York law mandates the perverse result that Plaintiff advocates, its inquiry does not end; in that event, conflicts-of-law principles would require that the Court apply the law of the insured's residence, *i.e.*, that of the State of Connecticut.   Connecticut law would allow Phoenix to pursue its fraud claims notwithstanding the expiration of the contestability period.

Because Plaintiff's incontestability argument is both prematurely presented and wrong on the merits, it does not justify dismissal of Phoenix's first two counterclaims.   Plaintiff's remaining arguments – largely based on form rather than substance – are easily dismissed. While Plaintiff argues that Phoenix's aiding and abetting counterclaim requires an allegation of

actual knowledge, pleadings with respect to state of mind are liberally construed; an inference of actual knowledge can be – and has been raised by Phoenix's – factual allegations.  Similarly, Phoenix's unjust enrichment claim is not susceptible to dismissal where Phoenix has sufficiently alleged that Plaintiff's enrichment was at Phoenix's expense, and where Phoenix's entitlement to recovery is not premised on contractual obligation, but is a matter of statutory interpretation and public policy.

For these reasons, which are more fully set forth below, Plaintiff's motion to dismiss Phoenix's counterclaims should be denied in its entirety.

## FACTUAL BACKGROUND

Phoenix alleges in its Counterclaims that Kramer agreed – in exchange for substantial cash payments – to participate in a series of fraudulent insurance transactions.  Those transactions were expressly designed to violate insurable interest laws by inducing Phoenix to issue three policies – worth $28 million – for the benefit of undisclosed third party investors (the "Policies").  Put simply, Phoenix alleges that Kramer conspired with others to allow investors, who were strangers to Phoenix, to gamble millions of dollars on Kramer's life, in violation of state law.  (Counterclaims ¶¶ 6-34.)

Knowing that Phoenix would never agree to issue policies for the benefit of investors who had no valid insurable interest in Kramer's life, Kramer and other STOLI scheme participants hid the true policyholder and true beneficiary of the Policies behind the screen of an insurance trust *during the two-year Policy contestability period*.  Phoenix alleges (and in key respects, Plaintiff appears to agree) that this fraud was accomplished in the following manner:

- Just a few days before submitting his insurance application in September 2005, Kramer established the Arthur Kramer 2005 Insurance Trust (the "Trust").  (Counterclaims ¶ 11.)  The Trust was portrayed as the actual policyholder of the Policies, and a Kramer family member was named beneficiary of the Trust.  (Counterclaims ¶¶ 17, 22; Am. Compl. ¶ 32.)

- In October 2005, just after the Policies were issued, Kramer arranged to transfer the beneficial interest in the Trust – and thus the rights to the Policies – from a Kramer family member to third-party investors controlled by his insurance broker, Steven Lockwood (the "First Investors"), without disclosing such transfer to Phoenix (the "First Transfer").  (Counterclaims ¶¶ 12, 26, 31; Am. Compl. ¶ 38.)

- The First Investors, behind the front of the Trust, held the interest in the Policies during the two-year policy contestability period.  In August 2007, after the contestability period expired, the Policies were again transferred (Am. Compl. ¶ 39) to two foreign investment companies, Lifemark SA and CSSEL Bare Trust (the "Second Transfer").

Because of the steps taken by the parties to conceal the true owner and beneficiary of the Policies, Phoenix did not become aware of the STOLI scheme until March 2008, when the Estate filed its complaint.

Why did Kramer, Lockwood, and the corporate entities that Lockwood controlled, engage in this fraudulent scheme?  *Easy money*.

- **First Transfer Payoff**.  Life Product Clearing LLC alleges that it paid Kramer $100,000 for the initial transfer of Lincoln Life's $10 million policy.  (Life Product's Answer ¶ 79, Docket No. 59.)  Common sense (and basic math) suggests that Kramer therefore received approximately $280,000 ($28 million/$10 million x $100,000) in exchange for the First Transfer of the three Phoenix policies.

- **Second Transfer Payoff**.  In its motion to intervene, Lifemark disclosed that it paid $1.9 million to the Trust to purchase one Phoenix $10 million Policy.  Again, basic math suggests that Lifemark and CSSEL paid the First Investors approximately $5.32 million ($28 million/$10 million x $1.9 million) in exchange for the Second Transfer of the three Phoenix Policies.  Discovery will reveal how much of that $5.32 million was paid to Kramer to effectuate the Second Transfer.

- **Commissions**.  Lockwood also was paid about $807,000 in commissions by Phoenix in his role as broker of the initial sales of the Policies.

Kramer died on January 26, 2008.  (Am. Compl. ¶ 2.)  On March 10, 2008, the Estate, already having benefited to the tune of several hundred thousand dollars from Kramer's procurement and transfers of policies that he never intended to hold, filed the instant complaint.

As set forth above, Plaintiff asserts that all of the insurance policies were procured as part of a STOLI scheme, and demands that the proceeds of those policies be paid to the Estate.  (Am. Compl. ¶¶ 15, 20-22, 55.)

Phoenix's Counterclaims allege that Kramer's fraudulent conduct, *inter alia*, has caused Phoenix substantial damages by wrongfully causing it to issue the Policies and to pay commissions to Lockwood, who arranged and financed these fraudulent schemes in violation of his contractual, fiduciary, and other common law duties to Phoenix.  (Counterclaims ¶ 35-52.) Phoenix, based in no small measure on Plaintiff's own allegations with respect to the fraudulent scheme in which Kramer, Lockwood, and certain Lockwood entities engaged, asserted counterclaims for fraud, aiding and abetting a breach of fiduciary duty, and unjust enrichment. Although under the liberal pleading standards of the Federal Rules these counterclaims are clearly cognizable, Plaintiff has moved to dismiss all of them.

## LEGAL STANDARD

The purpose of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is to "test, in a streamlined fashion, the formal sufficiency of the [non-moving party's] statement of a claim for relief *without* resolving a contest regarding its substantive merits."  *Global Network Communications, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006) (emphasis in original).  On such a motion, the Court "assesses the legal feasibility of the complaint, but does not weigh the evidence that might be offered to support it."  *Id.*  The question is simply whether the pleading alleges "'enough facts to state a claim for relief that is plausible on its face.'" *Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) (*quoting Bell Atl. Corp. v. Twombly*, — U.S —, 127 S.Ct. 1955, 1974 (2007)).

**ARGUMENT**

**POINT ONE**

**PHOENIX'S COUNTERCLAIMS ARE NOT BARRED BY THE POLICIES' CONTESTABILITY PROVISIONS: KRAMER WAS NEVER A TRUE HOLDER OR BENEFICIARY OF THE POLICIES, NEVER PAID PREMIUMS ON THE POLICIES, AND KNOWINGLY SERVED AS A STRAW MAN IN A FRAUDULENT TRANSACTION TO PROCURE THE POLICIES FOR OTHERS' BENEFIT.**

As an initial matter, an insurer may properly pursue claims against parties, including insureds, who, as Phoenix alleges in its Counterclaims, wrongfully caused it to issue policies and suffer damages. For example, in *Mooney v. Nationwide Mutual Insurance Co.*, 577 N.Y.S.2d 506, 509 (App. Div. 1991), the court held that "a suit by an insurer against its insured to recover damages the insurer was obligated to pay to an injured third party as a result of the insured having fraudulently obtained the insurance is cognizable."[2]

Plaintiff contends, however, that Phoenix's right to assert its Counterclaims is abrogated by the incontestability clauses in the Policies, which require Phoenix to bring rescission actions within a two-year limitations period. Plaintiff's position lacks merit for three reasons.

*First*, an incontestability period is not an unqualified protection for insureds and/or policyholders engaged in fraud. *See Ins. Co. of N. Am. v. Kaplun*, 713 N.Y.S.2d 214, 218 (App. Div. 2000) ("An insurance carrier that is precluded from rescinding a policy retroactively due to fraud is not without means of redress. For example, if the insurer is required to pay benefits under the policy to a third party, it may bring an action against its insured to recover such losses."); *accord Mooney*, 577 N.Y.S.2d at 509-10. As the *Mooney* Court explained:

---

[2]     To demonstrate that Plaintiff's motion should be denied even on its own terms, Phoenix indulges, for the sake of this first argument point, Plaintiff's assumptions that New York law (a) governs the application of the incontestability clauses of the Policies to the claims in this case and (b) prohibits an insurer from contesting the claim of a *bona fide* policyholder. As discussed in points two and three of Phoenix's argument, Plaintiff's assumptions are incorrect. *See infra* pp. 13-25.

> If it is established, as defendant here affirmatively alleges, that plaintiff acquired his policy by fraudulent means, denying plaintiff the right to recover would not impinge in any way upon the protection the policy accords innocent victims, would not subvert the statutory proscription against retroactive cancellation and would comport with elementary fairness.

577 N.Y.S.2d at 510.[3]  Like the insurer's fraud defense in *Mooney*, Phoenix's counterclaims are consistent with the purpose and operation of the incontestability clause.

*Second*, incontestability clauses do not prohibit insurers from pursuing claims against brokers or strangers to the policy.  *See*, *e.g.*, *Provident Life & Cas. Inc. Co. v. Ginther*, No. 96-CV-0315E, 2002 WL 1020775, at *7 (W.D.N.Y. Mar. 4, 2002) (holding that the incontestability clause did not bar an insurer's claims for fraud and breach of fiduciary duty against a salesperson who facilitated the policy applications); *Liberty Mut. Ins. Co. v. Grand Transp., Inc.,* No. 06 CV 3433, 2007 WL 764542, at *5-6 (E.D.N.Y. Mar. 12, 2007) (holding that an insurer could pursue a misrepresentation claim against a broker even though it was precluded from rescinding the policy).

In *Caruso* – the case upon which Plaintiff premises its motion – the New York Court of Appeals instructed that the statutory requirement that insurers include incontestability clauses in their life insurance policies "rests on the legislative conviction that *a policyholder should not indefinitely pay premiums* to an insurer, under the belief that benefits are available, only to have it judicially determined after the death of the insured that the policy is void."  73 N.Y.2d at 78 (emphasis added).  More recently, the Court of Appeals has explained that the purpose of the incontestability clause is "to provide *policyholders and beneficiaries* with security that *their*

---

[3]   *Cf. People v. Alexander*, 171 N.Y.S. 881, 887 (App. Div. 1918) (holding that a stranger was not entitled to the benefit of the incontestability provision and stating "Public policy, I think, requires that such provisions of a policy be limited to legitimate policies actually taken out by the insured for the protection of his named beneficiary, and should not be deemed intended to apply to a policy fraudulently taken out by and for the benefit of others, as in the case at bar.").

premiums were buying the protection that *they believed they were paying for*."  *New England Mut. Life Ins. Co. v. Doe*, 93 N.Y.2d 122, 128 (1999) (emphasis added).   In sum, the incontestability clause protects the expectations and reliance interests of legitimate policyholders and beneficiaries.

Kramer was never a *bona fide* policyholder.  Indeed, Plaintiff has declared that Kramer "never intended for the death benefits of the insurance policies to benefit his family" and "never paid any premiums on the Phoenix Policies."   (Am. Compl. ¶¶ 15, 40.)   By Plaintiff's own admissions, Kramer was merely a straw man who, acting on behalf of outside investors, willfully procured a life insurance policy in exchange for a fee.  His relation to the Policies is thus more akin to that of a broker than to that of a typical insured, and his limited interest in the Policies falls outside the scope of those reliance interests protected by the incontestability clause.[4]   A contrary holding would simply serve the interests of (and in fact encourage) those insureds who participate in STOLI schemes, without achieving any redeeming public good, thereby violating public policy.[5]

Put simply, the incontestability clause is not an instrument for strangers, speculators, or straw men to reap unjust profits.  Plaintiff argues in favor of a perversion of the incontestability clauses contained in life insurance policies – clauses designed to protect insureds who have

---

[4]   Plaintiff will undoubtedly protest that it is entitled to the protection of the incontestability provision simply because Kramer was the insured under the Policies.  But policyholders are protected by the incontestability provision precisely for the reasons set forth above; they hold policies, pay premiums, and/or rely on the incontestability provision for the legitimate purposes of financial planning and security.  As Plaintiff has made plain, Kramer, in the context of these Policies, was nothing like a typical insured – he was merely the measuring stick for a wager, *i.e.*, someone who, in exchange for a cash payment, agreed to allow others to gamble on his life.

[5]   *See Doe*, 93 N.Y.2d at 131("It would be difficult for us to conclude that the Legislature knowingly enacted a statute that would encourage fraud."); *see also Routier v. Waldeck*, 708 N.Y.S.2d 270, 271-73 (Dist. Ct. 2000) (finding that a speculator who had no intention of residing in a home was not a true "owner" within the meaning of the code at issue, and thus refusing to allow a statutory shield intended for consumers to become a sword in the hands of investors).

procured life insurance upon which they and their families, after *their* payment of years of premiums, rely – by suggesting that such clauses may serve as pure instrumentalities of fraud without any redeeming purpose.  Plaintiff has not cited (and cannot legitimately cite) *any case* that stands for such proposition.[6]

*Third*, the Kramer Estate is not entitled to invoke the protections of the incontestability provisions, even if the Court were inclined to otherwise treat Kramer as any other true policyholder, because Kramer no longer holds the Policy or the beneficial interest in the Trust that held it.  He transferred his interest, and the protections his Estate now wishes to invoke, in exchange for hundreds of thousands of dollars.  Declining to extend the benefit of the incontestability clause to Plaintiff in these circumstances is consistent with the general rule that once a party to a contract assigns his rights to the contract, he no longer may claim the benefits of that contract.  It is well settled in New York that "[a] valid assignment operates to transfer to the assignee all the right, title or interest of the assignor in the thing assigned and passes the whole right of the assignor, nothing remaining in him capable of being assigned . . . ."  *In re Thompson's Estate*, 231 N.Y.S.2d 718, 720 (Sur. Ct. 1962) (internal quotation marks omitted); *accord* 6A N.Y. Jur. 2d Assignments § 64; *cf.* 5 N.Y. Jur. 2d Arbitration and Award § 21 (noting that when a contract providing for arbitration is assigned, the assignor thereby loses the right to arbitrate).

---

[6]   The cases cited by Plaintiff as support in support of the extension of *Caruso* to the facts and claims in this case (*see* Pl.'s Mem. at 13-14) are inapposite because they are garden-variety misrepresentation cases, not insurable interest cases.  Indeed, in *Reliastar Life Insurance Co. of New York v. Leopold*, 745 N.Y.S.2d 810 (Sup. Ct. 2002) the insurer's fraud claim was essentially just an attempt to rescind an in-force policy based on a misrepresentation.  To the extent the fraud claim presented a separate and independent claim from the insurer's declaratory judgment claims, it was dismissed for other reasons, including failure to plead any injury and failure to plead the fraud with particularity.  Insurable interest cases – particularly those based upon STOLI allegations – present a host of unique issues.  Such issues are discussed, in the analytical framework set forth by the court in *Caruso*, below.

Because New York law does not prevent an insurer from prosecuting a fraud action in circumstances where a party seeks to use a contractual provision as a pure instrumentality of fraud, because Kramer never was a bona fide policyholder, and because in any event Kramer assigned his rights under the contract long ago, the incontestability provision of the Policies does not act as a bar to Phoenix's claims.  Plaintiff's motion therefore must be denied.

## POINT TWO

**WHILE IT WOULD BE PREMATURE, IN THE CONTEXT OF PLAINTIFF'S MOTION TO DISMISS COUNTERCLAIMS, TO ADJUDICATE THE ULTIMATE ISSUE OF LIABILITY UNDER THE POLICIES, *CARUSO*, IN ANY EVENT, DOES NOT PRECLUDE LITIGATION OF THE ALLEGED STOLI SCHEMES.**

**A.      Any Determination Of Phoenix's Liability Under The Policies Would Be Premature.**

As an initial matter, what Plaintiff seeks is, in essence, a decision that *Caruso* requires payment by Phoenix of the Policies' proceeds, regardless of the fraudulent scheme in which the parties engaged to induce Phoenix to issue policies that lacked an insurable interest.  If Plaintiff wanted a decision on *Caruso* and the ultimate issue in this case, it should have moved for summary judgment on its claim against Phoenix and all of the other defendants.  It has not done so, and indeed the procedural posture of this case does not lend itself to adjudication of such ultimate issue.

The issue of whether the proceeds of the Policies must be paid, and if so, to whom, is properly presented in the context of a particular claimant's dispositive motion for a declaration that it is entitled to the proceeds.  In such a context, the parties and the Court would be able to address all the factors that would be relevant to a particular claimant's right to the proceeds, including (a) the balance that must be struck in particular circumstances between protecting the justifiable expectations of legitimate policyholders and discouraging wager policies, (b) equitable and public policy principles that could preclude a particular party from invoking the

incontestability clause or from seeking the assistance of the Court to reap the fruits of a fraud, and (c) any attendant conflicts-of-law analysis. All such issues and competing considerations are not raised in the context of a motion to dismiss Phoenix's counterclaims, because such motion does not implicate the competing interests of all of the affected parties to this suit. Indeed, if the Court were to seek to resolve them in the context of this motion, the parties will likely seek to re-litigate these issues (in the context of subsequent motions that implicate their interests) as the action continues. Indeed, no matter what the Court decides here, Lifemark has already moved to intervene and lay claim to the Policies' proceeds, and Phoenix will prosecute its various claims against Lockwood and the Lockwood-entities involved in the STOLI scheme.

Moreover, adopting Plaintiff's construction of *Caruso* at this early stage of the litigation entails serious and troubling public policy consequences. Such a decision would assure STOLI parties in the most certain terms possible that their fraud will succeed because, no matter what the circumstances, their entitlement to the policy proceeds is assured. In so doing, the Court would effectively endorse the use of *Caruso* purely as an instrument of fraud, without considering all of the factors that weigh against the summarial perversion of *Caruso* in such manner, including the threat STOLI schemes present to the life insurance arena; the insurer's practical inability to investigate or discover STOLI schemes within the contestability period; that those seeking the protection of the incontestability clause fall outside the class of persons entitled to protection by the clause; and that none of the overall policies behind the *Caruso* holding apply to STOLI schemes. Phoenix is entitled to litigate these issues on a full record and against the appropriate parties. [7]

---

[7]  *See Kittay v. Kornstein*, 230 F.3d 531, 542 (2d Cir. 2000) (declining to decide the ultimate issue in the case on a motion to dismiss and emphasizing that a plaintiff is not required to prove his case at the pleading stage); *Marchisella v. Gov't of Japan*, No. 02 Civ. 10023 (DC), 2004 WL 307248, at *4

**B.     In Any Event, *Caruso* Does Not Support The Application
        Of The Incontestability Clause To STOLI Schemes.**

Even if the Court were to somehow decide, at this early stage of the litigation, to engage
in a full-blown analysis of *Caruso* and its application to the case at bar, Plaintiff's motion must
be denied.   The balancing approach to the enforcement of incontestability clauses adopted by
*Caruso* requires the denial of such enforcement where an insurer prosecutes claims against the
insured and others involved in a fraudulent STOLI scheme.

**1.     The Facts Of *Caruso* Bear No Material Resemblance To Those Alleged Here.**

First and foremost, this case does not resemble the garden-variety misrepresentation case
that in essence is *Caruso*.   This case involves a sophisticated scheme in which, for a quick buck,
an insured, a broker, and Wall Street investors collude to induce insurance companies to issue
wager policies that the insured never intends to hold.

In contrast, the defendant in *Caruso* was an individual policyholder who had held the
policy for his own benefit since the inception of the policy.   At the time of the application, the
defendant represented that he and the insured were business partners, and that the policy would
be used either to obtain a loan and/or to secure the defendant in the event the insured defaulted
on the loan.   At all times, the *true policyholder and beneficiary were disclosed to the insurer*, and
the disclosed policyholder had paid the policy premiums.

After the death of the insured, the insurer attempted to avoid the policy on the ground that
the claims of insurable interest in the application were insufficient to establish such an interest.
Unlike in the case at bar, no one alleged that the insured, his broker, and a policyholder and
beneficiary had committed fraud, and that the insured had been induced with a cash pay-off to

(S.D.N.Y. Feb. 17, 2004) (finding it would be premature to decide the question of liability on a
motion to dismiss).

enter the transaction for an illegitimate purpose.  No transfer of the policy or of the beneficial interest therein had been concealed from the insurer.  If the insurer had chosen to do so, it could have satisfied itself concerning the presence of an insurable interest with a straightforward inquiry at the time of application.

The question in *Caruso* was whether, in those *particular* circumstances, the insurer could use the public policy behind the insurable interest requirement to reopen its inquiry into the insurance policy and deny the benefits to a legitimate policyholder who had paid the premiums and had relied on the policy.  In other words, were policies lacking an insurable interest void *ab initio*, and thus a *per se* exception to the incontestability clause?

### 2.      *Caruso* Adopted A Balancing Approach.

In *Caruso*, the Court of Appeals rejected the *per se* rule proposed by the insurer, finding that life insurance policies are not, as a general matter, void *ab initio* on the basis of the disclosed policyholder's lack of an insurable interest at the time of application.  But the court did not, as Plaintiff suggests, lay down a contrary *per se* rule in favor of the incontestability clause as an absolute bar to any and every fraud claim, no matter how egregious; rather, the court endorsed a case-by-case balancing approach to the enforcement of the incontestability clause.  In the words of the court:

> "The policy determination depends upon *a balancing* of society's interest in enforcement of a particular provision in a contract, the incontestability clause in this case, against its interest in preventing gambling.  In doing so, the court must consider *the parties' justified expectations*, the forfeiture resulting from denial of enforcement and *the public interest in enforcement of the particular provision*. These considerations are weighed against the strength of the public policy, as manifested by statute and judicial decision, and *the likelihood that denial of enforcement will further that policy*."

*Caruso*, 73 N.Y.2d at 81 (emphasis added).

In applying this balancing approach, the Court of Appeals carefully addressed only the facts before it: finding that it would not be against public policy to enforce the incontestability clause "*in these circumstances*," *id.* at 81 (emphasis added), and stating "*In the case before us* it is difficult to conclude that enforcement of the claim is contrary to public policy," *id.* (emphasis added).  Simply put, in circumstances where the true policyholder and beneficiary were known to the insurer and the insurable interest was ascertainable at the time of the application, the insurer could not belatedly contest the disclosed policyholder's claim based on a lack of insurable interest.

In reaching this result, the *Caruso* Court weighed four policy considerations: whether (1) the inability of insurers to raise defenses after the contestability period posed a new or substantial threat to insureds or insurance companies; (2) other provisions of law would uphold the public policy against wager policies and prevent wrongdoers from profiting from such policies; (3) the policyholder, and similarly situated policyholders, would be unfairly prejudiced by the requirement that they prove the business arrangement that existed with the insured and yielded the insurable interest; and (4) the insurer could have best served the interests of both the insurable interest requirement and the contestability period by conducting a prompt investigation prior to its expiration.  *Id.* at 82-83.

The *Caruso* Court, conducting a careful balancing on the facts of the case, of policy interests, and in particular by expressly relying on the ability of the insurer to investigate the presence of an insurable interest, did not view the incontestability clause in the manner advocated by the Estate – an automatic trump card to be played in all circumstances in which an insurer uncovers fraud.  Indeed, the court's analysis demonstrates that *Caruso* intended to *further* the policy behind the insurable interest requirement because it expressly found that its holding

(a) provided the proper incentive for insurers to investigate the presence of an insurable interest, and (b) the court assumed that other legal doctrines would prevent wrongdoers from profiting from wager policies.

As set forth below, the considerations articulated by, and that formed the basis of the holding of, the *Caruso* Court, when applied to the facts of this case, lead to a different outcome.

### 3.      *Caruso* Does Not Bar Phoenix's Counterclaims.

As set forth above, the *Caruso* Court asked whether the inability of insurers to raise defenses after the contestability period posed a new or substantial threat to insureds or insurance companies.  Since the court's decision in Caruso nearly 20 years ago, a new and substantial threat has emerged: STOLI fraud.  STOLI schemes exploded during the recent credit bubble (and in 2005 in particular) as hedge funds and investment banks sought to create novel and exotic securities out of what were once very traditional assets.[8]  As a result of the significance of the threat posed by these STOLI schemes, the majority of state legislatures and insurance departments around the country have recently placed STOLI on their agendas, and a number of bills affirming the illegality of STOLI schemes and/or imposing additional liabilities to counteract them have either been enacted or are in the process of becoming law.[9]  Extending the result reached in *Caruso* to STOLI policies would thus have "adverse consequences" well beyond what insurers confronted at the time *Caruso* was decided.

---

[8]     *See* Matthew Goldstein, *Profiting From Mortality*, Bus. Week, July 30, 2007, at 44, *available at* http://www.businessweek.com/magazine/content/07_31/b4044001.htm (discussing the recent growth of the life settlement market, the securitization of life insurance policies, and the recent explosion of STOLI with the involvement of hedge funds) (attached as Ex. A to the Declaration of Stephen M. Raab in Opposition to Plaintiff's Motion to Dismiss Phoenix's Counterclaims ("Raab Decl.")).

[9]     *See* Raab Decl., Ex. B, Issue Status Chart: STOLI-Related Legislation and Regulation, *previously available at* http://www.naifa.org/advocacy/stolialert/pdf/acli_stoli_chart.pdf (last visited Sept. 5, 2008).

*Second*, the *Caruso* Court asked whether other legal checks would uphold public policy against wager policies and prevent wrongdoers from profiting from them.  The Court suggested that two legal checks on the otherwise negative implication of enforcement of the incontestability clause in the circumstances of that case existed, namely, *Riggs v. Palmer*, 155 N.Y. 506 (1889), and its progeny, which stand for the proposition that a party is prohibited from profiting from his or her own wrong,[10] and Section 3205(b)(4) of the New York Insurance Law, which allows heirs to pursue the proceeds of policies awarded to the beneficiary of a wager contract.

On these facts, neither *Riggs* nor Section 3205(b)(4) acts as deterrent.  *First*, the *Caruso* Court, in citing *Riggs*, had conduct far more nefarious in mind than violation of the insurable interest law by insureds, brokers and investors looking to make a quick buck.  (The insurer all but argued outright that the policyholder had procured the policy so that he could cause, and then profit from, the insured's demise.)  The court had contemplated, in those egregious circumstances, the affirmative use of *Riggs* by innocent plaintiffs laying claim to proceeds otherwise ceded to unlawful defendant policyholders and/or beneficiaries.  Here, because STOLI schemes are the product of collaboration between the insureds and policyholders, there is no

---

[10]   S*ee, e.g.*, *Spivak v. Sachs*, 16 N.Y.2d 163, 168 (1965) ("This was an illegal transaction and under our settled rules we refuse to aid in it but leave the parties where they are."); *McConnell v. Commonwealth Pictures Corp.*, 7 N.Y.2d 465, 469 (1960) ("Proper and consistent application of a prime and long-settled public policy closes the doors of our courts to those who sue to collect the rewards of corruption. . . . No one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his iniquity, or to acquire property by his own crime.") (internal quotation marks omitted); *Carr v. Hoy*, 2 N.Y.2d 185, 187-88 (1957) ("It is the settled law of this State (and probably every other State) that a party to an illegal contract cannot ask a court of law to help him carry out his illegal object, nor can such a person plead or prove in any court a case in which he, as a basis for his claim, must show forth his illegal purpose. . . . We are closing our doors to one who would prove his own wrongdoing as a basis for his supposed 'rights.'") (internal quotation marks omitted); *R.A.C. Group, Inc. v. Bd. of Educ. of City of New York*, 799 N.Y.S.2d 559, 563-64 (App. Div. 2005) (dismissing a contractor's breach of contract claim because it would be against public policy to allow recovery in circumstances where the contractual arrangement was "permeated with fraud and deceit").

party – other than duped insurers like Phoenix – incentivized to deter violation of insurable interest law through the prosecution of fraud claims.   Moreover, the Court of Appeals' assumption that Section 3205(b)(4) would deter wager policies is completely upended in the STOLI context because, when entering into STOLI transactions, insureds and their estates voluntarily relinquish their rights to the proceeds of the policies, *i.e.*, insureds and their families make written representations, and offer releases and indemnifications to, sophisticated investment companies that purchase the policies.[11]   As a result, family members give up whatever rights they may have otherwise had under Section 3205(b)(4).[12]

*Third*, the *Caruso* Court considered whether Caruso, and similarly situated policyholders, would be unfairly prejudiced by the requirement that they prove the business arrangement that existed with the insured and that yielded the insurable interest.  Here, the legitimate expectations of the parties in that regard are not implicated.  As discussed above, insureds such as Kramer, who act as straw men for outside investors, have no expectations relating to policies that are worth protecting.  In light of the *Riggs* line of cases, STOLI participants who hold interests in, or pay premiums on, STOLI policies during the contestability period also do not have any justified expectations with respect to such policies.  Finally, the ultimate policyholders in STOLI cases, including the current holders of the Phoenix Policies, are investors *seeking* risk, not individuals mitigating their risk and relying on the Policies to do so.  There would be no unfairness in

---

[11]   Life Product has already asserted a tortious interference claim against Plaintiff based on alleged representations made and waivers signed by Kramer and his daughter (*see* Life Product's Answer ¶¶ 80, 90-99., Docket No. 59), and Lifemark intends to assert claims of breach of warranty and fraud based on similar warranties and representations (*see* Gonzalez Aff. Supp. Lifemark's Motion to Intervene, Ex. A, ¶¶ 3-4, 77-86. Docket No. 110).

[12]   Even if there were a basis to conclude that the protections offered by Section 3205(b)(4) are not waived through the execution of releases, common sense suggests that, ordinarily, STOLI policy beneficiaries, in the face of such representations, will not stake their claims to the proceeds (and thus deter STOLI transactions).

denying these parties the protection of the incontestability clause, particularly in circumstances where they knew or should have known of the fraudulent nature of the policies when they acquired them.

*Fourth*, Caruso considered whether insurers were in the better position to balance the insurable interest requirement against incontestability by conducting a prompt investigation. However, both Plaintiff and Phoenix have alleged that the STOLI schemes at issue employed sophisticated structures and transactions to conceal the true nature of the Policies from Phoenix. In particular, Phoenix and Plaintiff allege that the Trust served as an effective front for the sham transaction during the contestability period.  (*See* Counterclaims ¶¶ 8, 12 16, 29; Am. Compl. ¶¶ 15, 20.)   Because the Policies were held by a trust controlled by the STOLI parties, and because the key elements of the STOLI schemes (the oral or side agreements, cash payments, initial transfers) were not disclosed, these STOLI schemes were not reasonably ascertainable by Phoenix.   By contrast, the insurer in *Caruso* was obligated to investigate a relatively straightforward, positive proposition – that there was a business relation between the insured and a policyholder known to the insurer.  Because the policyholder was known to the insurer, the Court declined to allow the insurer to disavow a risk that it previously accepted.

Under Plaintiff's proposed rule, Phoenix would be required to prove a negative – that the trusts at issue are *not* concealing sham transactions.  If insurers cannot provide the screening function envisioned by the *Caruso* Court, then enforcing the incontestability clause against the insurers in this case will not serve the policy goals discussed in *Caruso*.[13]

---

[13]   The New York Court of Appeals has confronted the tension between discoverability and incontestability in a slightly different context.  In *Simpson v. Phoenix Mut. Life Ins. Co.*, 24 N.Y.2d 262, 266 (1969), the Court observed "[t]he troublesome problem in interpreting the precise reach of the incontestable provision is to determine what defenses are barred to the insurer and those which may still be raised after the expiration of the contestable period."  The Court explained that the difference between conditions of risk (which fall within the incontestability clause) and limitations on

4.      In Any Event, Plaintiff's Position Is Contrary To The Policy Prohibiting
        The Use Of Statutory Protections And Courts As Instruments Of Fraud.

One of the most remarkable features of STOLI schemes is that they are designed to exploit the holding in *Caruso* for fraudulent purposes.  Therefore, the issue in this case is not only whether the Policies, as both Phoenix and Plaintiff contend, lack an insurable interest – they clearly do – but whether STOLI participants should be able to pervert *Caruso* in order to use the incontestability clause as a sword rather than a shield.  As the Court of Appeals stated in *Doe*, "[i]t would be difficult for us to conclude that the Legislature knowingly enacted a statute that would encourage fraud."  93 N.Y.2d at 131.  Plaintiff asks this Court to condone the use of the incontestability clause and *Caruso* for precisely that purpose.  To do so would be contrary to *Riggs* and its progeny (*see* cases cited *supra* note 10) and to public policy.[14]

In sum, the misreading of *Caruso* advanced by Plaintiff, which prohibits, on an absolute basis, the assertion of fraud-based claims upon the expiration of the contestability period, serves

---

risk (which are not within the scope of the incontestability clause) is one of discoverability.  *Id.* at 267.  Risks that can be ascertained by investigation at the time of contracting cannot be raised as a defense after the contestability period has elapsed, but risks that could not have reasonably been discovered and assessed by the insurer at the time of contracting may still be contested after the contestability period.  *Id.*

Similarly, in *Spear v. Guardian Life Insurance Co. of America*, 493 N.Y.S.2d 322 (App. Div. 1985), the court rejected the insured's request to apply the incontestability clause as a *per se* bar to all of the insurer's counterclaims on a motion to dismiss.  Where there were allegations that the insured and others prevented the insurer from discovering the facts upon which it could rescind the policy within the contestability period, the court held "a question of fact is presented as to whether plaintiffs should be estopped from reliance upon the incontestable clause."  *Id.* at 326.

*Caruso* did not make new law.  It, among other things, balanced the risk presented and, on the facts before it, determined that the insurer had accepted the conditions of risk associated with issuance of the policy in suit because it had the ability to investigate them.  For the reasons set forth above and below, *Simpson, Caruso* and *Spear* all counsel in favor of a different result here.

[14]  *See, e.g.*, *Cornwall Press v. Ray Long & Richard R. Smith, Inc.*, 75 F.2d 276, 277 (2d Cir. 1935) (holding that a court in equity "cannot be compelled to, nor will it, exercise its powers in aid of a fraud" and "may protect itself from being used as an instrument of fraud"); *Philo Smith & Co. v. Uslife Corp.*, 420 F. Supp. 1266, 1274 (S.D.N.Y. 1976) ("New York courts have long held that the statute of frauds cannot be used as an 'instrument of fraud.'").

only the interests of those seeking to profit from fraud and no public interest.  Such a result should not be endorsed by this Court.

<u>**POINT THREE**</u>

**EVEN IF THE COURT WERE INCLINED TO RULE ON THE ULTIMATE ISSUE OF INCONTESTABILITY NOW, AND IN SO DOING WERE TO ENDORSE PLAINTIFF'S READING OF *CARUSO*, CONNECTICUT LAW, WHICH TRUMPS NEW YORK'S, REQUIRES DENIAL OF THE MOTION.**

**A.      The Law Of The Insured's Domicile Governs.**

Even if the Court were inclined to rule on the ultimate issue of incontestability in the context of this motion, and in so doing were to endorse Plaintiff's reading of *Caruso*, Phoenix's counterclaims may not be dismissed.  New York law does not automatically govern the issue of incontestability.  *See*, *e.g.*, *Krauss v. Manhattan Life Ins. Co. of New York*, 643 F.2d 98, 100 n.1 (2d Cir. 1981).

Section 192 of the Restatement (Second) of Conflict of Laws ("Section 192") provides that the validity of life insurance policies should be determined "by the local law of the state where the insured was domiciled at the time the policy was applied for," unless some other state has a more significant relationship to the transaction and parties.  Section 192 is consistent with conflicts case law regarding disputes involving allegations of a lack of insurable interest.  In *Griffin v. McCoach*, 313 U.S. 498, 503 (1941), the Supreme Court held, with respect to a life insurance policy on a Texas insured, but delivered in New York and owned by a New York syndicate, that "it is for Texas to say whether its public policy permits a beneficiary of an insurance policy on the life of a Texas citizen to recover where no insurable interest [exists]").  In *Mayo v. Hartford Life Insurance Co.*, 354 F.3d 400, 405 (5th Cir. 2004), the court held that the law of the state where the insured resided governed the question of whether a policy lacking an insurable interest in the insured was valid, and further noted that the same would be true,

pursuant to Section 192, if, as here, the insured had used a trust in another state to procure the policy).[15]

Kramer was a domiciliary of Connecticut.   That fact alone strongly suggests that Connecticut law should apply to the insurable interest and public policy issues in this case.   For example, in *Krauss*, the Second Circuit applied Illinois law in allowing a New York insurer to defend against a claim brought by an Illinois resident outside the contestability period.   643 F.2d at 101.   In so doing, the Second Circuit carefully evaluated the policies behind the differing approaches New York and Illinois took to the effect of the incontestability clause in connection with the defense asserted by the insurer that the insured was ineligible for full coverage under the terms of a master group policy.   It found that New York would allow the insured to recover if she were a New York domiciliary, but that New York "has expressed no interest in allowing recovery by nondomiciliaries."   *Id.* (stating that the New York Court of Appeals aimed to provide "New York residents greater security in planning their estates" but that the court was not "concerned with making New York a more desirable place to obtain insurance").   Since "New York has expressed no interest in protecting nondomiciliaries with its restriction on insurance companies' available defenses," the Second Circuit found, in the circumstances of that case, that only the interests of Illinois would be advanced.   *Id.*

---

[15]   Section 192 is also consistent with the emphasis that New York courts have placed on the location of the risk in deciding insurance disputes.   *See*, *e.g.*, *Certain Underwriters at Lloyd's, London v. Foster Wheeler Corp.*, 822 N.Y.S.2d 30, 33 (App. Div. 2006) (endorsing the Restatement's position that a liability insurance policy should generally be governed by the law of the state which the parties understood to be the principal location of the insured risk).

**B.     If The Court Were To Interpret *Caruso* In The Manner Plaintiff Suggests, A Conflict Between New York And Connecticut Law Emerges, And Connecticut Law Applies.**

The New York Court of Appeals recognized in *Caruso* that its holding, even in the context of the less compelling facts than those presented in the instant lawsuit, was outside the norm: the majority of states hold that an insurer can contest a policy for lack of an insurable interest, even after the contestability period has set forth in the policy has expired.  *See Caruso*, 73 N.Y.2d at 77; *see also* 17 Couch on Insurance 3d § 240:82; Jeffrey W. Stempel, Law of Insurance Contract Disputes § 1.04[e] (2d ed.).  If this Court were to interpret the *Caruso* decision as one which imposes a *per se* rule against rescission of a policy outside the contestability period even on STOLI grounds, it would push New York law into an even more extreme camp with respect to the enforcement of fraudulently-procured insurance contracts.  It would also deem there to be a conflict between New York and Connecticut law.

Although no Connecticut court has ruled directly on the tension between the insurable interest requirement and an incontestability clause, there is ample reason to conclude that, under Connecticut law, Phoenix would be permitted to litigate the STOLI schemes at issue in this case.[16]

It is the long-standing rule in Connecticut that if a life insurance policy is found to constitute a wager, "the contract is void," because Connecticut courts "will not apportion the

---

[16]   When the state's highest court or intermediate appellate courts have not directly decided an issue, federal courts must consider decisions from other states (especially the majority rule), treatises and restatements, and indications from analogous cases.  *See Michalski v. Home Depot, Inc.*, 225 F.3d 113, 117-19 (2d Cir. 2000); *see also Midwest Oilseeds, Inc. v. Limagrain Genetics Corp.*, 387 F.3d 705, 715 (8th Cir. 2004) ("As the Iowa Supreme Court has not directly answered the question, we must predict how that Court would decide this unresolved issue of state law, using decisions from other jurisdictions as aids."); *Ambrose v. New England Ass'n of Schs. & Colls.*, 252 F.3d 488, 498 (1st Cir. 2001) ("In making this informed prophecy, we are guided, *inter alia*, by persuasive case law from other jurisdictions and relevant public policy considerations.").

spoils of gamblers." *Fuller v. Metro. Life Ins. Co.*, 41 A. 4, 15 (Conn. 1898); *see also Lewis v. Phoenix Mut. Life Ins. Co.*, 39 Conn. 100, 1872 WL 1451, at *2 (1872) ("The law not only refuses to enforce such a contract, but will decline to aid a party, knowingly entering into it, in recovering money paid in pursuance of it from the party upon whom the fraud was attempted to be practised."). More recently, a federal district court in Connecticut noted that the incontestability clause is generally held "not to bar the defense that the policy was void *ab initio*, or the defense of lack of insurable interest." *Minn. Mut. Life Ins. Co. v. Ricciardello*, No. 3:96CV2387, 1997 WL 631027, at *2 n.2 (D. Conn. 1997).

These authorities suggest that Connecticut – for the reasons set forth above and articulated by the courts of the majority of states that have resolved the tension between incontestability clauses and enforcing the insurable interest rule in favor of the latter – permits litigation of the counterclaims asserted by Phoenix.

Thus, if the Court were to somehow endorse Plaintiff's interpretation of *Caruso*, a conflict of New York and Connecticut law must be resolved before the Court can decide this motion on the merits.[17] Plaintiff's view of *Caruso*, if endorsed by this Court, would, as an immediate matter, inure to the benefit of a Connecticut resident who participated in a fraud, and, more broadly, encourage STOLI participants to establish trusts in New York for the purpose of procuring millions of dollars of life insurance on insureds across the country. As set forth above, the Second Circuit, however, has already held that New York has no interest in protecting nondomiciliaries or in "making New York a more desirable place to obtain insurance." *Krauss*, 643 F.2d at 101. If New York has expressed no interest in protecting the interests of

---

[17] New York choice-of-law rules apply in this diversity case. *See Krauss*, 643 F.2d at 100. The balancing of public policies at issue here should be resolved pursuant to Section 192 and the analysis in *Krauss*. *See id.* (identifying the state with the superior interest in seeing its law applied).

nondomiciliary parties to insurance transactions, it certainly has no interest in attracting, or protecting the interests of those engaged in, *fraudulent* insurance transactions.  In sum, the expectations of STOLI participants, and those who seek to profit from STOLI policies, carry no weight in the Court's conflict-of-law analysis.

Connecticut, on the other hand, has a strong interest in protecting its resident seniors from STOLI schemes.  Indeed, Connecticut takes this accelerating threat to its citizens very seriously; the State has recently enacted legislation affirming that STOLI arrangements violate its insurable interest requirement and are fraudulent and illegal.  *See* Act effective Oct. 1, 2008, 2008 Conn. Legis. Serv. P.A. 08-175 (West) (amending Conn. Gen. Stat. §§ 38a-465 & 38a-465j).

Kramer was a Connecticut resident.  The Complaint acknowledges his participation in a STOLI scheme.  On the facts of this case, Connecticut's interest in resolving the tension between the insurable interest requirement and the incontestability clause is superior to that of New York's.  Connecticut resolves it in favor of the insurable interest requirement.  Accordingly, even if the Court were to somehow determine that New York law prohibits it from prosecuting its counterclaims,  Connecticut law, which trumps New York's, leads to a different result.  Phoenix may pursue its counterclaims against the Estate [18]

---

[18]   Although Plaintiff may suggest that it would be ironic to apply Connecticut law to deny a Connecticut resident a windfall that the Estate would otherwise obtain under New York law, such suggestion would be misplaced.  Connecticut has no legitimate interest in seeing its domiciliaries obtain as much money as possible (particularly on the basis of their participation in fraudulent schemes); rather, it's interest is in suppressing STOLI schemes, the threat that they pose to senior citizens, and their destabilizing effect on the availability of affordable insurance.  Applying Connecticut law to void these Policies achieves that end.  In contrast, the notion that New York (or any state) has a strong interest in ensuring that the money winds up in the hands of a party seeking to profit from the fraud alleged in this case is patently ridiculous.

**POINT FOUR**

**PLAINTIFF'S REMAINING ARGUMENTS IN SUPPORT OF DISMISSAL FAIL: PHOENIX PLEADED FACTS SUFFICIENT TO SUPPORT ITS BREACH OF FIDUCIARY DUTY AND UNJUST ENRICHMENT CLAIMS.**

**A.      Because Phoenix Has Pleaded Facts That Raise An Inference Of Actual Knowledge, Plaintiff's Motion To Dismiss Phoenix's Aiding And Abetting Breach Of Fiduciary Duty Claim Must Be Denied.**

Plaintiff argues that Phoenix's counterclaim for aiding and abetting a breach of fiduciary duty should be dismissed because Phoenix pleaded that Kramer "knew or should have known," rather than simply that Kramer "knew" about the fraud that he was aiding.

Neither federal nor state law supports such a formalistic view of pleading requirements. The relevant practical inquiry is whether Phoenix has alleged facts which raise an inference of actual knowledge.  *See*, *e.g.*, *People ex rel. Cuomo v. Coventry First LLC*, 861 N.Y.S.2d 9, 11 (App. Div. 2008) (denying a broker's motion to dismiss an insurer's claim for aiding and abetting breach of fiduciary duty because the broker's actual knowledge could be "fairly inferred from the allegations that defendants participated in and covered up" the alleged wrongdoing).[19]

Phoenix's factual allegations satisfy this pleading requirement.[20]   It has alleged, among other things, that:

---

[19]   *See also Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 497 (S.D.N.Y. 2001) (noting that a claimant can satisfy its pleading burden by alleging circumstances indicating conscious behavior, and finding that plaintiff had alleged facts giving rise to a "fair inference" of knowledge of defendant's fraud); *Finkelman v. Greenbaum*, No. 8998-06, 2007 WL 102464, at *4 (N.Y. Sup. Ct. Jan. 10, 2007) (finding that the plaintiff's allegations regarding the defendant's involvement with the primary wrongdoers gave rise to a sufficient inference, at the pleading stage, that the defendant (an attorney) "knew or should have known or reasonably expected that [the primary wrongdoers] were violating their fiduciary duty to [plaintiff]").

[20]   The cases cited by Plaintiff, which essentially hold that a party does not have a duty to investigate whether another person is committing fraud or a breach of fiduciary duty (*see* Pl.'s Mem. at 19), are inapposite.   In those cases, there was no allegation or evidence that the defendant had actual knowledge of the primary wrong or that it rendered substantial, as opposed to inadvertent, assistance to the underlying breach.

- Kramer colluded with Lockwood with respect to multiple STOLI transactions (Counterclaims ¶ 8.);

- Lockwood entered into an Independent Producer Contract with Phoenix at the same time as and as a necessary part of the STOLI scheme (*id.* ¶¶ 8-13);

- Lockwood signed the application, representing that he was "qualified *and authorized* to discuss the contract herein applied for" (*id.* ¶¶ 20-21) (emphasis added);

- Kramer knew his representations were incomplete and false and that he intended to deceive Phoenix (*id.* ¶¶ 37-38); and

- Kramer's participation in these transactions was not an isolated occurrence, but required intimate and repeated involvement – including establishing the Trust, submitting the application, transferring the beneficial interest in the Trust, and signing the Policy Acceptance Form (*id.* ¶¶ 11-15).

The fact that Kramer – a sophisticated corporate attorney – participated in multiple STOLI transactions to procure $56 million in insurance coverage under the direction of an insurance producer who signed Kramer's application as a "qualified and authorized" producer and who only acquired that authority as part of the agreed-upon STOLI scheme, belies any suggestion that he was not aware of the nature of the transactions or that they were contrary to law and to Lockwood's duties to Phoenix.  Indeed, if the transactions were reasonably viewed as legitimate, such elaborate measures would have been unnecessary.

On these allegations, Phoenix has not only raised an inference that Kramer knowingly aided Lockwood's breach of fiduciary duty, but it has actually pleaded his knowing participation.[21]

---

[21]   Connecticut law does not conflict with that of New York with respect to the material elements of an aiding and abetting a breach of fiduciary duty claim.  *See Halo Tech Holdings, Inc. v. Cooper*, No. 3:07-CV-489, 2008 WL 877156, at *20 (D. Conn. Mar. 26, 2008) ("To sustain a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must allege that: (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation.") (internal quotation marks omitted).  No conflicts of law analysis is therefore required.  Similarly, the elements of unjust enrichment, though differently stated, do not conflict with New York's or suggest a different result in the case at bar.  *See Jo-Ann Stores, Inc. v. Prop. Operating Co.*, 880 A.2d 945, 955 (Conn. App. Ct.

**B.  Plaintiff's Motion To Dismiss Phoenix's Unjust Enrichment Claim Is Not Susceptible To Summary Disposition.**

Phoenix alleges that the Estate would be unjustly enriched if it were permitted to collect the proceeds of the policies and permitted to retain the fees paid to Kramer to transfer the Policies.  This claim presents factual issues not amenable to disposition on this motion.  *See McGrath v. Hilding*, 41 N.Y.2d 625, 629 (1977) ("[W]hether there is unjust enrichment may not be determined from a limited inquiry confined to an isolated transaction.  It must be a realistic determination based on a broad view of the human setting involved.").

With respect to the death benefit proceeds to which the Estate claims it is entitled, Plaintiff claims, erroneously, that Phoenix does not allege that the Estate would be unjustly enriched by the death benefits.  Phoenix asserts exactly that proposition in its third affirmative defense.  (Answer ¶ 61.)  Plaintiff has not cited and cannot cite any authority for the proposition that this is an improper defense to Plaintiff's claim in the circumstances of this case.

As an initial matter, Plaintiff's claim, and the effect of Plaintiff's conduct on such claim, are not determined by the terms of the Policies, but rather by the statutes and public policy of New York.  Thus, the subject matter of the dispute between Plaintiff and Phoenix is not governed by the terms of a contract so as to preclude Phoenix's affirmative defense.  *See Rabin v. MONY Life Ins. Co.*, No. 06 Civ. 775 (LTS), 2007 WL 737474, at *5 (S.D.N.Y. Mar. 8, 2007) (denying a motion to dismiss an unjust enrichment claim where there was a dispute as to whether the terms of the agreement covered the matters at issue in the lawsuit); *Am. Tel. & Util. Consultants, Inc. v. Beth Israel Med.*, 763 N.Y.S.2d 466, 466 (App. Div. 2003) (holding it was premature to

_____

2005) (noting that (a) unjust enrichment is "a broad and flexible remedy;" (b) "Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment;" and (c) "the determination of whether a particular failure to pay was unjust and whether the defendant was benefited are essentially factual findings") (*quoting Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co.*, 649 A.2d 518 (Conn. 1994)).

dismiss an unjust enrichment claim where there was a dispute as to whether the claim was covered by the terms of the contract).

In any event, because Phoenix has taken the position that the Policies do not constitute valid, enforceable agreements, there can be no contract-based prohibition on Phoenix's assertion of an unjust enrichment claims.  *See Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1272 (S.D.N.Y. 1991) (holding that it would be improper to dismiss an unjust enrichment claim where there was a factual dispute whether the agreement was "void or may be voided for fraudulent inducement").[22]

Plaintiff further argues that the fee paid to Kramer in exchange for his role in causing Phoenix to wrongfully issue the Policies, as matter of law was not, as it must be for Phoenix to sustain an unjust enrichment claim, "at Phoenix's expense."  However, none of the authorities cited by Plaintiff stand for this proposition; they merely recite the elements of an unjust enrichment claim.  First, the Policies themselves were a valuable commodity in the hands of Kramer, and thus a benefit conferred by Phoenix to Kramer.[23]  Moreover, given Lockwood's alleged role in the STOLI schemes, the fee paid to Kramer was either derived directly from the commissions paid to Lockwood, or indirectly from the value of the Policies as a Phoenix liability.  The mere fact that the money passed from Phoenix to Kramer through indirect means does not support the conclusion that the benefits enjoyed by Kramer were not at Phoenix's

---

[22]   *See also Gordon v. Oster*, 829 N.Y.S.2d 49, 50 (App. Div. 2007) ("Inasmuch as plaintiff's allegations present a bona fide question as to whether the parties' agreement was valid and enforceable, the unjust enrichment claim should have been permitted."); *Dagen v. CFC Group Holdings, Ltd.*, No. 00 Civ. 5682 (DAB), 2003 WL 194208, at *3 (S.D.N.Y. Jan. 28, 2003) (finding it premature to dismiss an unjust enrichment claim where there were questions concerning the scope and enforceability of the contract at issue).

[23]   *See*, *e.g.*, *Finkelstein v. Mardkha*, 495 F. Supp. 2d 329, 344 (S.D.N.Y. 2007) (finding a triable claim for unjust enrichment where plaintiff had alleged he had provided valuable services relating to a diamond design and where defendant profited from that design by licensing it to Tiffany and receiving payments (including royalties on sales) from Tiffany – not plaintiff – for over $1 million).

expense.  *See Cox v. Microsoft Corp.*, 778 N.Y.S.2d 147, 149 (App. Div. 2004) (holding that a benefit can be conveyed indirectly by a plaintiff and reversing dismissal of unjust enrichment claim).

 For the foregoing reasons, the Court should deny Plaintiff's motion to dismiss Phoenix's claim and affirmative defense of unjust enrichment.

## CONCLUSION

 For the foregoing reasons, Plaintiff's motion to dismiss Phoenix's Counterclaims should be dismissed in its entirety.


Dated: New York, New York        Respectfully submitted,
    September 8, 2008

                **DORSEY & WHITNEY LLP**


                By: /s/Patrick J. Feeley
                  Patrick J. Feeley (PF-4931)
                  Christopher G. Karagheuzoff (CK-1122)
                  Stephen M. Raab (SR-0742)

                250 Park Avenue
                New York, New York  10177
                (212) 415-9200

                *Attorneys for Defendant and Third-Party*
                *Plaintiff Phoenix Life Insurance Co.*