Patrick J. Feeley (PF-4931)
Christopher G. Karagheuzoff (CK-1122)
Stephen M. Raab (SR-0742)
DORSEY & WHITNEY LLP
250 Park Avenue
New York, New York 10177
(212) 415-9200

*Attorneys for Defendant and Third-Party Plaintiff*
*Phoenix Life Insurance Co.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALICE KRAMER, as Personal Representative of the Estate of Arthur Kramer, | Case No. 08 CV 2429 (DAB) (MHD) |
| Plaintiff, | ECF CASE |
| – against – | |
| LOCKWOOD PENSION SERVICES, INC., TALL TREE ADVISORS, INC., LIFE PRODUCTS CLEARING, LLC, TRANSAMERICA OCCIDENTAL LIFE INSURANCE CO., PHOENIX LIFE INSURANCE CO., LINCOLN LIFE & ANNUITY CO. OF NEW YORK, and JONATHAN S. BERCK, | |
| Defendants. | |
| Various Third-Party Actions | |

**MEMORANDUM OF LAW IN OPPOSITION TO  THE
LOCKWOOD DEFENDANTS' MOTION TO DISMISS PHOENIX LIFE
INSURANCE COMPANY'S CROSS-CLAIMS AND THIRD-PARTY COMPLAINT**

**DORSEY & WHITNEY LLP**
**250 Park Avenue**
**New York, NY 10177**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT .................................................................................1

FACTUAL BACKGROUND .....................................................................................3

LEGAL STANDARD..................................................................................................8

ARGUMENT ..............................................................................................................8

POINT ONE

    THE ALLEGED STOLI SCHEMES ARE ILLEGAL....................................8

        A.    Wagering Contracts Are Illegal .........................................................9

            1.    New York Insurance Law § 3205 Prohibits Wagering Contracts...............9

            2.    For Over 100 Years, The Case Law Has Prohibited Wagering Contracts. ...............................................................11

            3.    The Insurance Department Has Concluded That When A Life Insurance Transaction Contemplates Transfer of The Policy To A Stranger Investor, It Is Illegal. ...................................13

        B.    In Any Event, Because Phoenix Has Alleged That The Policies Were Not Procured By Kramer On His Own Initiative, There Can Be No Dispute That Phoenix Has Properly Alleged Violation of the Insurable Interest Rule. ...................................................................................15

POINT TWO

    PHOENIX HAS ALLEGED THE LOCKWOOD DEFENDANTS' FRAUDULENT CONDUCT WITH PARTICULARITY ................................................16

        A.    The Representations And Omissions At Issue Have Been Alleged In Detail.....................................................................................18

        B.    Phoenix Has Alleged, With Particularity, Lockwood's Duty to Disclose.............19

        C.    Phoenix Has Alleged In What Respects the Representations And Omissions Were Fraudulent And Described The STOLI Schemes In Detail.........................................................................22

        D.    There Is An Adequate Factual Basis For Phoenix's Allegations Made On Information And Belief, And Those Facts Raise A Strong Inference Of Fraudulent Intent.........................................................22

        E.    Phoenix Has Identified The Uses Of The Mails And Wires In Detail And Described Their Respective Roles In The Fraudulent STOLI Schemes...............28

        F.    Phoenix Has Pleaded, With Particularity, Its Aiding and Abetting Claims..........28

G.   In Sum, Phoenix Has Provided Adequate Basis For And Notice Of Its Claims ...................................................................................................30

POINT THREE ......................................................................................................31

PHOENIX HAS PLEADED THE NECESSARY ELEMENTS OF ITS RICO CLAIMS ...............................................................................................................31

A.   Phoenix Pleaded That Lockwood Defendants Engaged In A Pattern Of Racketeering. .....................................................................................31

1.   The Predicate Acts Are Related. ...............................................32

2.   Phoenix Has Pleaded Facts That Show Closed-Ended Continuity. ...........35

3.   Phoenix Has Shown Open-Ended Continuity. ..........................36

B.   Phoenix Has Properly Alleged Three Enterprises. .............................40

1.   The STOLI Enterprise Has All The Necessary Features Of An Association-In-Fact And Phoenix Has Described The  Participation Of The Lockwood Defendants In That Enterprise. ...................40

2.   Phoenix May Plead Enterprises In The Alternative. .................43

POINT FOUR .......................................................................................................44

PHOENIX HAS PLEADED THE NECESSARY ELEMENTS OF ITS BREACH OF CONTRACT, NEGLIGENCE AND UNJUST ENRICHMENT CLAIMS .....................44

A.   Breach Of Contract .............................................................................44

B.   Negligence ..........................................................................................45

C.   Unjust Enrichment. .............................................................................46

POINT FIVE .........................................................................................................47

PHOENIX'S MAY ASSERT CONTINGENT  CROSS-CLAIMS AND THIRD-PARTY CLAIMS ...................................................................................................47

CONCLUSION .....................................................................................................49

## TABLE OF AUTHORITIES

Page(s)

CASES

*Aiu Ins. Co. v. Olmecs Medical Supply, Inc.*,
No. 04-CV-2934, 2005 WL 3710370 (E.D.N.Y. Feb. 22, 2005) .....................................40, 41

*Allstate Ins. Co. v. Seigel*,
312 F. Supp. 2d 260 (D. Conn. 2004) ...............................................................................34, 35

*Andrea Doreen, Ltd. v. Bldg. Materials Local Union 282*,
299 F. Supp. 2d 129 (E.D.N.Y. 2004) .....................................................................................39

*Andrulonis v. United States*,
26 F.3d 1224 (2d Cir. 1994) .....................................................................................................48

*Azrielli v. Cohen Law Offices*,
21 F.3d 512 (2d Cir. 1994) .................................................................................................31, 32

*Baisch v. Gallina*,
346 F.3d 366 (2d Cir. 2003) ...............................................................................................34, 41

*Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*,
No. 93-CV-6876, 2000 WL 1694322 (S.D.N.Y. Nov. 13, 2000) ............................................43

*Bank of India v. Trendi Sportswear, Inc.*,
239 F.3d 428 (2d Cir. 2000) .....................................................................................................47

*Bankers' Reserve Life Co. v. Matthews*, ,
39 F.2d 528 (8th Cir. 1930) ......................................................................................................13

*Beauford v. Helmsley*,
865 F.2d 1386 (2d Cir. 1989) (en banc) ............................................................................33, 39

*Bell Atl. Corp. v. Twombly*,
— U.S —, 127 S.Ct. 1955 (2007) .........................................................................................8, 24

*Brass v. Am. Film Techs., Inc.*,
987 F.2d 142 (2d Cir. 1993) .....................................................................................................19

*Burgundy Basin Inn, Ltd. v. Watkins Glen Grand Prix Corp.*,
379 N.Y.S.2d 873 (App. Div. 1976) ........................................................................................48

*Cadle, Co. v. Flanagan*,
271 F. Supp. 2d 379 (D. Conn. 2003) ......................................................................................41

*Chubb & Sons, Inc. v. Kelleher*,
    No. 92 CV 4484, 95 CV 0951, 2006 WL 1789118 (E.D.N.Y. Mar. 28, 2006) ......................38

*City of New York v. Cyco.Net, Inc.*,
    383 F. Supp. 2d 526 (S.D.N.Y. 2005) ...............................................................................17, 31

*City of New York v. Pollock*,
    No. 03-CV-0253, 2006 WL 522462 (S.D.N.Y. Mar. 3, 2006) .........................................37, 39

*City of New York v. Smokes-Spirits.Com, Inc.*,
    -- F.3d --, 2008 WL 4058373 (2d Cir. 2008) .............................................................34, 42, 43

*Com-Tech Assocs. v. Computer Assocs. Int'l, Inc.*,
    753 F. Supp. 1078 (E.D.N.Y. 1990) ...............................................................................34, 35

*Cofacredit, S.A. v. Windsor Plumbing Supply Co.*,
    187 F.3d 229 (2d Cir. 1999) ..............................................................................................37

*Cox v. Microsoft Corp.*,
    778 N.Y.S.2d 147 (App. Div. 2004) ....................................................................................46

*Crigger v. Fahnestock and Co.*,
    443 F.3d 230 (2d Cir. 2006) ..............................................................................................17

*Cromer Fin. Ltd. v. Berger*,
    137 F. Supp. 2d 452 (S.D.N.Y. 2001) .................................................................................29

*Diamond State Ins. Co. v. Worldwide Weather Trading LLC.*,
    No. 02 Civ. 2900, 2002 WL 31819217 (S.D.N.Y. Dec. 16, 2002) .........................................30

*DiVittorio v. Equidyne Extractive Indus., Inc.*,
    822 F.2d 1242 (2d Cir. 1987) ............................................................................................16

*Federman v. Empire Fire and Marine Ins. Co.*,
    597 F.2d 798 (2d Cir. 1979) ..............................................................................................47

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
    458 U.S. 141 (1982) ..........................................................................................................11

*Finnie v. Walker*,
    257 F. 698 (2d Cir. 1919) .................................................................................................12

*Finkelstein v. Mardkha*,
    495 F. Supp. 2d 329 (S.D.N.Y. 2007) .................................................................................12

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*,
    385 F.3d 159 (2d Cir. 2004) ..............................................................................................12

*First Interregional Advisors Corp. v. Wolff*,
    956 F. Supp. 480 (S.D.N.Y. 1997) .....................................................................................12

*Frank v. Meadowlakes Development Corp.*,
    6 N.Y.3d 687 (2006) ................................................................................................11

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC.*,
    376 F. Supp. 2d 385 (S.D.N.Y. 2005) .....................................................................24

*Fresh Meadow Food Servs., LLC v. RB 175 Corp.*,
    Nos. 06-4905-CV(L), 07-0269-CV, 2008 WL 2566731 (2d Cir. June 24, 2008) ..................24

*Friedman v. Arizona World Nurseries Ltd. Partnership*,
    730 F. Supp. 521 (S.D.N.Y. 1990) .........................................................................37

*Fuller v. Metro. Life Ins. Co.*,
    41 A. 4, 15 (Conn. 1898)) .....................................................................................37

*Global Network Communications, Inc. v. City of New York*,
    458 F.3d 150 (2d Cir. 2006) ....................................................................................8

*Goren v. New Vision Int'l, Inc.*,
    No. 97 C 1771, 1997 WL 321673 (N.D. Ill. 1997) ..................................................8

*Hecht v. Commerce Clearing House, Inc.*,
    897 F.2d 21 (2d Cir. 1990) ......................................................................................8

*H.J., Inc. v. Northwestern Bell Tel. Co.*,
    492 U.S. 229 (1989) ........................................................................................31, 35

*Highlands Ins. Co. v. PRG Brokerage, Inc.*,
    No. 01-CV-2272, 2004 WL 35439 (S.D.N.Y. Jan. 6, 2004) ...........................45, 46

*Kaufman v. Cohen*,
    No. 06 CV 3433(JG), 2007 WL 764542 (E.D.N.Y. Mar. 12, 2007) ................20, 45

*Liberty Mut. Ins. Co. v. Grand Transp., Inc.*,
    No. 06 CV 3433(JG), 2007 WL 764542 (E.D.N.Y. Mar. 12, 2007) ................20, 45

*Life Prod. Clearing, LLC v. Angel*,
    530 F. Supp. 2d 646 (S.D.N.Y. 2008) ........................................................11, 13, 24

*Local 857 I.B.T. Pension Fund v. Pollack*,
    992 F. Supp. 545 (S.D.N.Y. 1998) .............................................................11, 13, 24

*Lumbermens Mut. Cas. Co. v. Franey Muha Alliant Ins. Services*,
    388 F. Supp. 2d 292 (S.D.N.Y. 2005) ...................................................................21

*Maersk, Inc. v. Neewra, Inc.*,
    554 F. Supp. 2d 424 (S.D.N.Y. 2008) ...............................................................22, 41

*Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*,
    244 F.R.D. 204 (S.D.N.Y. 2007) ......................................................................22, 41

*Maritime Ventures Int'l., Inc. v. Caribbean Trading & Fid., Ltd.*,
  689 F. Supp. 1340 (S.D.N.Y. 1988)..............................................................47

*In re Marsh & McLennan Cos. Secs. Litig.*,
  501 F. Supp. 2d 452 (S.D.N.Y. 2006)..........................................................23

*McDermott v. City of New York*,
  50 N.Y.2d 211 (1980)...................................................................................23

*Metromedia v. Fugazy*,
  983 F.2d 350 (2d Cir. 1992)..........................................................................35

*Metropolitan Transp. Authority v. Contini*,
  No. 04-CV-0104, 2005 WL 1565524 (E.D.N.Y. July 6, 2005)...................29, 42

*Moore v. PaineWebber, Inc.*,
  189 F.3d 165 (2d Cir. 1999)..............................................................17, 18, 30

*Morin v. Trupin*,
  778 F. Supp. 711 (S.D.N.Y. 1991)....................................................17, 18, 30

*In re MTC Elec. Techs. Shareholder Litig.*,
  74 F. Supp. 2d 276 (E.D.N.Y. 1999) ...........................................................35

*Muller-Paisner v. TIAA*,
  No. 06-4307-cv, 2008 WL 3842899 (2d Cir. Aug. 15, 2008) .....................21

*New York Univ. v. Continental Ins. Co.*,
  87 N.Y.2d 308 (1995) ..................................................................................45

*In re Northern Telecom Ltd. Secs. Litig.*,
  42 F. Supp. 2d 234 (S.D.N.Y. 1998).............................................................24

*In re NTL, Inc. Secs. Litig.*,
  347 F. Supp. 2d 15 (S.D.N.Y. 2004)..............................................................24

*P.T. Bank Central Asia v. ABN AMRO Bank N.V.*,
  754 N.Y.S.2d 245 (App. Div. 2003) .............................................................21

*Panepinto v. Allstate Ins. Co.*,
  439 N.Y.S.2d 240 (Sup. Ct. 1981).....................................................20, 45, 46

*Patane v. Clark*,
  508 F.3d 106 (2d Cir. 2007)............................................................................8

*Pavlov v. Bank of New York Co., Inc.*,
  25 Fed. Appx. 70 (2d Cir. 2002) ..................................................................40

*Penato v. George*,
  383 N.Y.S.2d 900 (App. Div. 1976) ............................................................35

*People ex rel. Cuomo v. Coventry First LLC*,
    861 N.Y.S.2d 9 (App. Div. 2008) ........................................................................35

*Rahl v. Bande*,
    328 B.R. 387 (S.D.N.Y. 2005) ...........................................................................35

*Rothberg v. Chloe Foods Corp.*,
    No. 06-CV-5712, 2007 WL 2128376 (E.D.N.Y. July 25, 2007) ............................36

*SCS Communications., Inc. v. Herrick Co.*,
    360 F.3d 329 (2d Cir. 2004) ..............................................................................23

*S.E.C. v. Ballesteros Franco*,
    253 F. Supp. 2d 720 (S.D.N.Y. 2003) .................................................................23

*S.E.C. v. O'Meally*,
    2008 WL 4090461 (S.D.N.Y. Sept. 3, 2008) ........................................................23

*Shamis v. Ambassador Factors Corp.*,
    No. 95 Civ. 9818, 1997 WL 473577 (S.D.N.Y. Aug. 18, 1997) ............................23

*SKS Constructors, Inc. v. Drinkwine*,
    458 F. Supp. 2d 68 (E.D.N.Y. 2006) ..........................................................33, 35, 40

*Standish-Parkin v. Lorillard Tobacco Co.*,
    786 N.Y.S.2d 13 (App. Div. 2004) ..............................................................33, 35, 40

*Steinback v. Diepenbrock*,
    158 N.Y. 24 (1899) ...........................................................................................12

*Thomas H. Lee Equity Fund V, L.P. v. Grant Thornton LLP*,
    No. 07 Civ. 8663(GEL), 2008 WL 3166536 (S.D.N.Y. Aug. 6, 2008) ....................12

*Travelers Ins. Co. v. Reiziz*,
    13 F. Supp. 819 (E.D.N.Y. 1935) .......................................................................13

*United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*,
    216 F. Supp. 2d 198 (S.D.N.Y. 2002) .................................................................20

*United States. v. All Right, Title and Interest in Contents of Following Accounts at
    Morgan Guar. Trust Co. of New York*,
    No. 95 Civ. 10929, 1996 WL 695671. (S.D.N.Y. Dec. 5, 1996) .........................1, 48

*United States. v. Aulcino*,
    44 F.3d 1102 (2d Cir. 1995) ..............................................................................39

*United States v. Autuori*,
    212 F.3d 105 (2d Cir. 2000) ..............................................................................9

*United States v. Coonan,*
   938 F.2d 1553 (2d Cir. 1991)................................................................40

*United States v. Falkowitz,*
   214 F. Supp. 2d 365 (S.D.N.Y. 2002)..................................................28

*United States v. Indelicato,*
   865 F.2d 1370 (2d Cir. 1989)................................................................28

*United States v. Kaplan,*
   886 F.2d 536 (2d Cir. 1989)..................................................................36

*United States v. Mazzei,*
   700 F.2d 85 (2d Cir. 1983)....................................................................42

*United States v. Tocco,*
   135 F.3d 116 (2d Cir. 1998)..................................................................28

*United States v. Turkette,*
   452 U.S. 576 (1981)..............................................................................40

*United States Fire Ins. Co. v. United Limousine Service, Inc.,*
   303 F. Supp. 2d 432 (S.D.N.Y. 2004)..................................................23

*USA Certified Merchants, LLC v. Koebel,*
   262 F. Supp. 2d 319 (S.D.N.Y. 2003)..................................................23

*In re Veeco Instruments, Inc. Secs. Litig.,*
   235 F.R.D. 220 (S.D.N.Y. 2006) ..........................................................24

*VTech Holdings, Ltd. v. Pricewaterhouse Coopers, LLP,*
   348 F. Supp. 2d 255 (S.D.N.Y. 2004)..................................................19

*Watts v. Jackson Hewitt Tax Service Inc.,*
   No. 06-cv-6042, 2008 WL 3852166 (E.D.N.Y. Aug. 16, 2008) ............19

*Wells Fargo Century, Inc. v. Hanakis,*
   No. 04-CV-1381, 2005 WL 1523788 ................................................33, 38

*Wexner v. First Manhattan Co.,*
   902 F.2d 169 (2d Cir. 1990)........................................................7, 18, 22

*Wiener v. Lazard Freres & Co.,*
   672 N.Y.S.2d 8 (1st Dep't 1998) ..........................................................21

*Williams v. Sidley Austin Brown & Wood, L.L.P.,*
   832 N.Y.S.2d 9 (App. Div. 2007)..........................................................21

*Zito v. Leasecomm Corp.,*
   No. 02-CV-8074, 2003 WL 22251352 (S.D.N.Y. 2003)........................21

S<small>TATUTES</small>

New York Insurance Law § 3205 ............................................................9, 10, 11

O<small>THER</small> A<small>UTHORITIES</small>

Fed. R. Civ. P. 8 ....................................................................................... 40, 43-46

Fed. R. Civ. P. 9 .........................................................................................16, 17, 31

Fed. R. Civ. P. 12 ....................................................................................................8

Fed. R. Civ. P. 13 .................................................................................................47

Fed R. Civ. P. 14 .................................................................................................47

44 *Am. Jur. 2d Insurance* § 1000 (2003) ...........................................................13

44 *C.J.S. Insurance* § 353 (2007) .......................................................................13

Ins. Dep't Op. No. 05-12-15 (Dec. 19, 2005), *available at*
    http://www.ins.state.ny.us/ogco2005/rg051215.htm .........................................14, 15

Jed S. Rakoff and Eric H. Queen, *RICO: Civil and Criminal Law*, § 7.04[1][b] .........................43

New York State Legislative Annual 1991, Chapter Law Memoranda, Ch. 334 ...........................10

5 Wright & Miller, *Federal Practice and Procedure: Civil 2d* § 1283 (2008) ...........................44

Phoenix Life Insurance Company ("Phoenix"), by its attorneys, Dorsey & Whitney LLP, respectfully submits this memorandum of law in opposition to the motion of Steven Lockwood ("Lockwood"), Lockwood Pension Services, Inc. ("LPS"), and Tall Tree Advisers, Inc. ("Tall Tree") (collectively, the "Lockwood Defendants") to dismiss all of the cross-claims and third-party claims asserted by Phoenix in its Answer to Amended Complaint with Counterclaims, Cross-Claims and Third-Party Complaint.[1]

## PRELIMINARY STATEMENT

The Lockwood Defendants take an "everything but the kitchen sink" approach in support of their motion to dismiss, arguing that Phoenix has not stated a *single* cause of action against them for their roles in procuring illegal wager policies worth over $28 million, in violation of Lockwood's fiduciary, common law, and contractual duties to Phoenix. Their attempt to dismiss *all* of Phoenix's claims before any discovery has occurred in this case includes a slew of arguments that mischaracterize or ignore the actual pleadings and relevant law.

The Lockwood Defendants begin by declaring that nothing illicit has occurred in this case ("There is nothing to see here!"). Unable to develop a genuine argument from this fallow starting ground, they proceed to erect "straw man" arguments around it. Casting those aside, they are left with little to say about whether, given Phoenix's allegations, Kramer actually procured the Phoenix policies on his own initiative. They know he did not. The Court of Appeals, the Second Circuit, and the New York Insurance Department are in unanimous agreement that an insured's willingness to participate in stranger-originated life insurance ("STOLI") schemes – in which the insured agrees to procure a policy on behalf of a stranger (with the intention of transferring it upon issuance) in exchange for easy cash – does not satisfy

---

[1]   Phoenix shall generally refer to this pleading, filed under Docket No. 43, as the "Third-Party Complaint," except it shall refer to the "Answer" when referring those allegations and defenses responsive to the Amended Complaint.

New York's requirement that the insured procure the policy "on his own initiative," nor does it otherwise legitimize wagering policies.

The Lockwood Defendants then state that Phoenix has failed to plead certain claims with particularity.[2]   In fact, Phoenix has described, in detail, the precise misrepresentations and omissions at issue, Lockwood's duties to disclose the information at issue, the mechanics of the STOLI schemes, the Lockwood Defendants' uses of mails and wires, and LPS's and Tall Tree's knowledge of, and substantial participation in, Lockwood's fraud and breach of fiduciary duty. While the Lockwood Defendants highlight that several allegations made by Phoenix were based on information on belief, such allegations are permissible in this case because many details of the fraudulent STOLI schemes remain peculiarly within the knowledge of the Lockwood Defendants, and there is otherwise an adequate basis for the allegations.   Accordingly, Phoenix's claims are sufficiently pleaded at this stage of the proceedings for the purposes of Rule 9(b).

With respect to Phoenix's RICO claims, the Lockwood Defendants argue – again without merit – that Phoenix has failed to plead a pattern of racketeering, an enterprise, or the Lockwood Defendants' participation in an enterprise.   In fact, Phoenix has alleged a pattern of 22 predicate acts of mail and wire fraud that (a) are related in their purpose, participants, and method; (b) occurred over a substantial period of time (i.e., 29 months); (c) were in furtherance of an inherently unlawful enterprise; (d) reflect the routine (and illegal) way in which LPS and Tall Tree have operated; and (e) given the formulaic nature of the illegal STOLI schemes, and amount of racketeering activity likely to be involved in perpetrating each scheme, pose a threat of continued racketeering.   Phoenix has also, notwithstanding the Lockwood Defendants' boilerplate arguments to the contrary, provided a robust description of the organization and

---

[2]   The Lockwood Defendants organized their brief mainly by claims, although some of their arguments apply to more than one claim.   To avoid duplication in its argument, Phoenix has organized its opposition according to the legal issues in dispute.

operation of an association-in-fact (the "STOLI Enterprise"), and of the Lockwood Defendants' respective roles in that enterprise.  Phoenix has also properly pleaded, in the alternative, LPS and Tall Tree as enterprises in a separate RICO claim.

The Lockwood Defendants' remaining arguments deserve scant attention.  Having identified Lockwood as the producer of the policies, as well as the particular contractual and common law duties he owed Phoenix in that capacity, Phoenix has clearly satisfied the liberal pleading standards of Rule 8 with respect to its claims for breach of contract, indemnification, and negligence.  Phoenix may also properly assert contingent cross-claims and third-party claims with respect to the policy proceeds at issue in this lawsuit.  Finally, Phoenix's claim for unjust enrichment is not suitable for summary disposition on a Rule 12(b) motion where the Lockwood Defendants have challenged only a portion of the relief sought by Phoenix and have not demonstrated that the claim is precluded by a particular contract provision.

To stand at a vantage point for a moment – the arguments advanced by the Lockwood Defendants continue a theme advanced in other pleadings in this and similar STOLI cases.  They urge this Court to endorse a hyper-technical approach to the law (from pleading requirements to the interpretation of the insurance statutes to the effect of the incontestability clause) that elevates form over substance. This misplaced reliance on the view that the law ought to be interpreted and applied, without any sense of purpose or reason, so as to leave insurers "holding the bag," is ingrained in the design of STOLI schemes.  As Phoenix demonstrates below, the Lockwood Defendants are wrong both as to what the law is and how it should be applied to the facts of this case.  Their motion should be dismissed in its entirety.

## FACTUAL BACKGROUND

Between late-August 2005 and mid-November 2005, three elderly men living in Florida and Connecticut – Leon Lobel ("Lobel"), Irwin Levinson ("Levinson"), and Arthur Kramer

("Kramer") – established trusts in New York for the purpose of procuring life insurance policies. Eight policies, worth a total of $71 million, were issued on their lives.  Shortly after each policy was issued, the interest in it was transferred to an outside investor.  By the end of the year, those trusts – and thus the policies – were all in the hands of strangers.  All three men, now deceased, were clients of Lockwood.[3]

Less than two years after these events, revelations about their true, illegal nature began to emerge.  In March 2007, Linda Angel ("Angel"), as the daughter and personal representative of Lobel, filed claims against Life Product Clearing LLC ("Life Product") and Jonathan S. Berck ("Berck"), as trustee of the Leon Lobel Trust ("Lobel Trust"), alleging that Lobel had participated in a fraudulent STOLI scheme under the direction of Lockwood.  Angel alleges that Lincoln Life & Annuity Company ("Lincoln Life") issued a $10 million policy on the life of Lobel, and that Lobel never intended to hold the policy, that he could not afford the premiums on the policy, and that he had agreed ahead of time to transfer the policy in exchange for cash.[4]

A few months later, Berck, as Trustee of the Irwin Levinson Insurance Trust II ("Levinson Trust"), submitted a claim to Phoenix for the proceeds of a $5 million policy issued on the life of Levinson.  An insurance investigator met with Dede Levinson (Levinson's widow) on or about September 5, 2007, and on or about February 15, 2008, to obtain information relevant to the processing of the claim.  Lockwood flew down to Florida on both occasions to monitor and manage the interview.  Although she was purportedly named as the original beneficiary of the Levinson Trust, Mrs. Levinson said she was unaware that the policy and that the Levinson Trust even existed until after her husband's death.  Lockwood ultimately informed

---

[3]    This paragraph summarizes numerous allegations in the pleadings in this case.  (*See, e.g.*, Phoenix's RICO Statement ("RS") at 5-24; 3d-Party Compl. ¶¶ 11, 17-20, 26, 31, 125, 132, 140, 144, 150, 154, 156, 160, 171; Am. Compl., Docket No. 31, ¶¶ 17-43; Life Product Answer, Docket No. 59, ¶ 79.)

[4]    Angel's pleadings are filed under Docket Nos. 8 and 9 in civil case No. 07-0475.

Phoenix in a February 7, 2008 letter that he was "aware" that "within a few weeks after the policy was issued" Mr. Levinson was contacted by an investment group "inquiring whether the family would be interested in selling its rights in the policy," and that the "transaction did take place between the relevant parties." (*See* RS at 10, 18-19; 3d-Party Compl. ¶¶ 140-43, 147(k).)

In March 2008, plaintiff Alice Kramer, as Personal Representative of the Estate of Arthur Kramer (the "Estate"), filed the complaint in this action, alleging that Kramer participated in a series of fraudulent STOLI transactions targeting three different insurers – identical in form to the Lobel transaction – worth at least $56 million. (Compl. ¶¶ 13-44.) Plaintiff alleges that Kramer never intended to hold, or benefit from, the $56 million in life insurance that he procured from Phoenix, Lincoln Life, and Transamerica Occidental Life Insurance Company (Transamerica"); never paid premiums; and never had any interest in these policies beyond the fee that he received to wrongfully procure them on behalf of others. (*Id.*; Am. Compl. ¶¶ 17-43.) Plaintiff alleges that the interests in all of the policies procured by Kramer were transferred immediately to either Life Product or Tall Tree. (*Id.*) On April 28, 2008, plaintiff served her Complaint on Life Product by personal delivery on "Steve Lockwood, Owner, who informed deponent that he is an officer authorized to receive service." (Aff. of Service, Docket No. 28.) On June 20, 2008, Life Product filed pleadings in this case confirming that, on November 23, 2005, a $10 million policy was issued by Lincoln Life on the life of Kramer, and that such policy was purchased by Life Product on November 29, 2005. (Life Product Answer, Docket No. 59, ¶¶ 73, 79.)

Phoenix alleges that the Lockwood Defendants have participated in at least five STOLI schemes – one involving Lincoln Life's issuance of a policy on Lobel's life, one involving Phoenix's issuance of a policy on Levinson's life, and at least three others involving the issuance of three policies by Phoenix, two policies by Transamerica, and one policy by Lincoln Life, on

Kramer's life.  (RS at 2-4.)

Phoenix asserts that Lockwood conspired with potential insureds and others to allow investors, *including himself*, to gamble millions of dollars on the insureds' lives, in violation of state law.  Knowing that Phoenix would never agree to issue policies for the benefit of investors who had no valid insurable interest in an insured's life, Lockwood and other STOLI scheme participants hid the true policyholder and true beneficiary of the target policy behind the screen of an insurance trust *during the two-year contestability period*.  Phoenix alleges that this fraud was accomplished in the following manner:

- Shortly before submitting an insurance application, an insured establishes a trust bearing his name.  The trust is portrayed as the actual policyholder and beneficiary of the policy.

- Immediately after the policy is issued, the insured transfers the beneficial interest in the trust – and thus the rights to the policy – from himself (or a family member) to one or more investment companies owned, affiliated, and/or controlled by Lockwood (the "Lockwood Investors"), without disclosing such transfer to Phoenix (the "First Transfer").

- The Lockwood Investors, behind the front of the trust, hold the interest in the policy during the two-year policy contestability period.  If the insured dies within the contestability period (e.g., Levinson), the Lockwood Investors seek to collect the death benefits, and hence a windfall profit on their investment.  If the insured is still living when the contestability period expires, the Lockwood Investors sell the policies to (often foreign) investment companies (e.g., Lifemark S.A. and CSSEL Bare Trust) (the "Second Transfer"), thereby securing a handsome profit for soliciting, procuring and holding the policy during the two-year contestability period.

(*See* 3d-Party Compl. ¶¶ 6-8, 30, 145, 153, 177-78.)

Because the Lockwood Investors would hold the beneficial interest in the policy during the contestability period only indirectly through the trust vehicle, it was important to choose the trustee carefully.  Accordingly, the trustees of the trusts (first Hudson United Bank and then Berck) reside or resided in the same office building as Lockwood and, by virtue of their proximity and repeated dealings, had an ongoing relationship with Lockwood.  (*See* RS at 4, 16;

3d-Party Compl. ¶¶ 5, 29, 178.)

What drove these sophisticated schemes?  Easy money.  As set forth in Phoenix's Memorandum of Law In Opposition to Plaintiff's Motion to Dismiss, the "money trail" on just the Phoenix-Kramer policies is as follows:

- **First Transfer Payoff**.  Life Product alleges that it paid Kramer $100,000 for the initial transfer of Lincoln Life's $10 million policy.  Common sense (and basic math) suggests that Kramer therefore received approximately $280,000 ($28 million/$10million x $100,000) in exchange for the First Transfer of the three Phoenix policies.

- **Second Transfer Payoff**.  In its motion to intervene, Lifemark S.A. disclosed that it paid $1.9 million to the Trust to purchase one Phoenix $10 million Policy.  Again, basic math suggests that Lifemark and CSSEL paid the Lockwood Investors approximately $5.32 million ($28 million/$10 million x $1.9 million) in exchange for the Second Transfer of the three Phoenix policies.

- **Commissions**.  The Lockwood Investors did not merely profit from the sale of the policies.  Lockwood also was paid about $807,000 in commissions by Phoenix in his role as broker of the initial sales of the policies.

These, of course, are merely the figures associated with the $28 million *in Phoenix policie*s issued on the life of Kramer.  As set forth above, Phoenix's Third-Party Complaint identifies several different schemes involving one or more of the Lockwood Defendants and Berck to fraudulently procure *$71 million* in insurance.  Thus, multiplying the above-referenced figures approximately two and one-half times will give the Court a sense of just how lucrative it was for the Lockwood Investors to fraudulently procure the Kramer, Levinson and Lobel policies. Discovery in this lawsuit is likely to reveal many more such schemes and payoffs.

During the time period in question, and especially in 2005, those with money desperately sought alternative investments.  The explosive growth of STOLI transactions during this time period was just one aspect of this trend, but it was a lucrative one for those without scruples.

## LEGAL STANDARD

The purpose of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is to "test, in a streamlined fashion, the formal sufficiency of the [non-moving party's] statement of a claim for relief *without* resolving a contest regarding its substantive merits." *Global Network Communications, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006). On such a motion, the court may "assess the legal feasibility of the complaint, but does not weigh the evidence that might be offered to support it." *Id.* The court therefore must accept the factual allegations of the non-moving party as true and draw all reasonable inferences in its favor. *Id.* at 154. The question is simply whether the pleading alleges "'enough facts to state a claim for relief that is plausible on its face.'" *Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) (*quoting Bell Atl. Corp. v. Twombly*, — U.S —, 127 S.Ct. 1955, 1974 (2007)).

## ARGUMENT

## POINT ONE

## THE ALLEGED STOLI SCHEMES ARE ILLEGAL

The Lockwood Defendants' memorandum of law ("LM") essentially begins with a declaration that there is no wrongdoing at issue in this case because (1) Kramer has an absolute right under the New York Insurance Law to procure, on his own initiative, life insurance policies for the benefit of anyone (regardless of the true character of the transactions) and (2) he did so on his own initiative here. That position bespeaks a stunning ignorance (if not a willful mischaracterization) of the facts pleaded and the law.

Preliminarily, Phoenix notes that the Lockwood Defendants incorrectly appear to assume that if their STOLI schemes were legal, Phoenix's fraud-based claims, including its RICO claims, fail. While the illegality of such schemes is almost conclusive evidence of their fraudulent nature and demonstrates a threat of continued illegal activity, all that Phoenix must

allege to show fraudulent conduct is that the schemes involved a material misrepresentation or omission – that is, that they were designed so as to cause the insurers to issue policies they would not have issued if they had known the true nature of these transactions. *See United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000) ("The fraud statutes are violated by affirmative misrepresentations or by omissions of material information that the defendant has a duty to disclose."). A showing of such conduct meets Phoenix's obligations with respect to its common law fraud claims and with respect to the conduct underlying its RICO claims.

In any event, the alleged STOLI schemes are illegal. New York has a longstanding policy against the issuance of wager contracts. That policy is set forth by statute. It is discussed repeatedly in the cases. And it has been made clear in an opinion issued by the New York Insurance Department.

More importantly, even if the Lockwood Defendants' contention that Kramer procured a wager contract on his own initiative were correct, it would be, at the pleadings stage, beside the point. There is no dispute that if Kramer did <u>not</u> procure the policies-in-suit on his own initiative and the policies were in fact nothing more than wager contracts, the insurable interest rule was violated. Those are the allegations made by Phoenix, with ample factual support, in its Answer. Because whether Kramer did or did not act on his own initiative – an issue of fact – is not susceptible to resolution in the context of a motion to dismiss, the Lockwood Defendants' arguments concerning the supposed legality of the Phoenix policies cannot support their motion.

## A. Wagering Contracts Are Illegal

### 1. New York Insurance Law § 3205 Prohibits Wagering Contracts.

At the outset, it is worth noting that Phoenix and the Lockwood Defendants appear to agree that an insured may, *on his own initiative*, procure a policy on his own life for the benefit of another person (LM at 13) and establish a trust to be the owner and beneficiary of a life

insurance policy (*id.* at 13-14); the beneficial interest in a trust or validly procured policy is assignable (*id.* at 14); and that, under New York law, an insurable interest need only exist at the time the policy is issued (*id.* at 15).  None of those contentions made by the Lockwood Defendants, however, are actually implicated by this case.

Section 3205(b) of the New York Insurance Law states, in relevant part, as follows:

> (1) Any person of lawful age may on his own initiative procure or effect a contract of insurance upon his own person for the benefit of any person, firm, association or corporation.  Nothing herein shall be deemed to prohibit the immediate transfer or assignment of a contract so procured or effectuated.

> (2) No person shall procure or cause to be procured, directly or  by assignment or otherwise any contract of insurance upon the person of another unless the benefits under such contract are  payable to the person insured or his personal representatives, or to a person having, at the time when such contract is made, an insurable interest in the person insured.

The second sentence of Subsection (b)(1) allows an insured to assign a validly procured policy to someone who would otherwise would not have an insurable interest in the insured, *see* § 3205(b)(1) ("Nothing herein shall be deemed to prohibit the immediate transfer or assignment of a contract *so procured* or effectuated.")[5] (emphasis added).

However, Subsection 3205(b)(1) cannot be read in isolation as permitting third-party investors to procure wagering contracts merely because they pay off the insured and get him or her to "voluntarily" participate in the scheme.  Indeed, such a reading would not square with Subsection (b)(2), which provides in relevant part that "*no person* shall procure or cause to be

---

[5]   The legislative history indicates this sentence, added by a 1991 amendment, was intended to "clarify" existing law in light of an erroneous IRS private letter ruling, which disallowed a charitable deduction for taking out a life insurance policy and immediately assigning the policy to a charity.  *See* New York State Legislative Annual 1991, Chapter Law Memoranda, Ch. 334 at 179 (attached as Ex. A to the Declaration of Stephen M. Raab in Opposition to the Lockwood Defendants' Motion to Dismiss ("Raab Decl.")).  In any event, Kramer would not have been permitted to procure an illegal wager contract if his intent at the time of doing so was immediate resale to a stranger.  *See Life Product Clearing, LLC v. Angel*, 530 F. Supp. 2d 646, 653-54, 656 (S.D.N.Y. 2008) (instructing that one who obtains a life insurance policy to disguise what would otherwise be a gambling transaction by a stranger on his life lacks good faith and may not freely assign the policy, because "the law prohibits gaming the system to procure wager policies, regardless of the creativity of the form.")

procured, directly *or by assignment or otherwise*, any contract of insurance upon the person of another unless the benefits are payable" to a person who, at the time that contract was made, had "an insurable interest in the person insured." (emphasis added)

Rather, subsections (b)(1) and (b)(2) must be read together to prohibit wagering contracts, as well as attempts to circumvent that prohibition. The contrary reading urged by the Lockwood Defendants – i.e., that a third-party investor is free to gamble on the life of an insured so long as the investor induces the cooperation of the insured in the scheme so as to masquerade that the insured procured the policy "on his own initiative" – would eviscerate the statute and the insurable interest requirement. Such a reading would also require that the prohibitions contained in Subsection (b)(2) be read out of the statute, violating the long-established rule of construction that all statutory provisions must be given effect and together read in a manner that is consistent rather than contradictory.[6] As set forth below, such reading would also violate New York's longstanding prohibition of wagering contracts and more than 100 years of prior case precedent, and be at odds with the New York Insurance Department's reading of the law.

## 2. For Over 100 Years, The Case Law Has Prohibited Wagering Contracts.

Section 3205 reflects the principles established and applied at common law. *See Angel*, 530 F. Supp. 2d at 653. Indeed, for over 100 years, New York law has required that insureds procure life insurance policies in good faith and on their own initiative, and condemned sham transactions in which an insured procures a policy with the intention of immediately assigning it to a stranger who has offered to pay the insured to gamble on his life. *See Steinback v. Diepenbrock*, 158 N.Y. 24, 31 (1899) (distinguishing policies "taken out in good faith" from

---

[6] *See Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 163 (1982) (declining to render statutory provisions nugatory); *Frank v. Meadowlakes Dev. Corp.*, 6 N.Y.3d 687, 691 (2006) ("A statute or legislative act is to be construed as a whole, and all parts of an act are to be read and construed together to determine the legislative intent.").

those serving as "a gambling transaction").[7]   In *Steinback*, the Court of Appeals acknowledged

that if a policy is taken out in good faith, then "the payee should be permitted to . . . go to the

best market he can find, either to sell it or borrow money on it."  *Id.*  But the court continued:

> On the other hand, it is said that, if the payee of a policy be allowed to assign it, a safe
> and convenient method is provided by which a wagering contract can be safely made.
> The insured, instead of taking out a policy payable to a person having no insurable
> interest in his life, can take it out to himself, and at once assign it to such person.  But
> such an attempt would not prove successful, for a policy issued and assigned, under
> such circumstances, would be none the less a wagering policy . . . .  *The intention of the
> parties procuring the policy would determine its character, which the courts would
> unhesitatingly declare in accordance with the facts, reading the policy and the
> assignment together, as forming part of one transaction.*

*Id.* (emphasis supplied).

The Second Circuit subsequently affirmed the holding of *Steinback*.  In *Finnie v. Walker*,

257 F. 698 (2d Cir. 1919), an insured obtained five policies and assigned them soon thereafter to

persons having no insurable interest in his life.  The Second Circuit found those assignments to

be invalid, holding:

> Contemporaneous assignments of life insurance policies are wagering contracts, and
> should be treated as such, just as the policies are where the beneficiary has no insurable
> interest.  Here the policy was taken out with a view of its assignment.  The assignment
> was contemporaneous with the issuance of the policy, and the facts disclosed in this
> record permit a fair inference that it was the intent of the appellees to obtain just such a
> result as the issuance of a wagering contract.

*Id.* at 700.  As recently as this year, federal courts have continued to apply these principles.  *See*

*Angel*, 530 F. Supp. 2d at 653-54.[8]  In *Angel*, the court rejected the very arguments proffered by

---

[7]   Phoenix relies on New York law in this section to correct the Lockwood Defendants'
mischaracterization of that law and because there is no conflict with Connecticut law as to the
illegality of the alleged STOLI schemes.  It is the long-standing rule in Connecticut, as in New York,
that wager policies are prohibited by strong public policy.  *See Fuller v. Metro. Life Ins. Co.*, 41 A. 4,
15 (Conn. 1898).

[8]   The *Angel* case involves the same STOLI scheme that was used to procure the Lobel policy and many
of the same STOLI participants.  In fact, the particulars of that scheme form part of the basis of the
RICO claims alleged in this case.

the Lockwood Defendants here[9] and held:

> Only one who obtains a life insurance policy on himself 'on his own initiative' *and in good faith* – that is, with a genuine intent to obtain insurance protection for a family member, loved one, or business partner, rather than an intent to disguise what would otherwise be a gambling transaction by a stranger on his life – may freely assign the policy to one who does not have an insurable interest in him.

*Id.* at 653 (emphasis supplied).[10]   Similarly, in *Travelers Ins. Co. v. Reiziz*, 13 F. Supp. 819, 820

(E.D.N.Y. 1935), the court observed:

> It is undoubtedly true that, if the policy was taken out by the parties with a view to its immediate assignment, the transaction would be nothing more than a mere subterfuge to avoid the well-settled rule that a party cannot procure insurance upon the life of one in whom he has no insurable interest.

13 F. Supp. at 820.   This principle – judicial scrutiny of the entire transaction, including the

circumstances of procurement through assignment of the policies – is universally accepted.[11]

### 3. The Insurance Department Has Concluded That When A Life Insurance Transaction Contemplates Transfer Of The Policy To A Stranger Investor, It Is Illegal.

The New York Insurance Department's views, contrary to the Lockwood Defendants'

contention, are in harmony with these authorities.[12]   In an opinion issued on behalf of the

---

[9]   In the *Angel* case, these same arguments were made by Life Product.  (*See* Life Product Mem. in Support of its Motion for Judgment on Pleadings, Docket No. 20 in civil case No. 07-0475, at 10-17.)

[10]   The Lockwood Defendants' cannot distinguish this holding on the grounds that Lobel was unable to afford the premiums.  (*See* LM at 16 n.8.)  While an inability to afford premiums or an insured's need for money would be evidence indicating a wager, neither the *Angel* decision nor any other decision cited by the Lockwood Defendants suggests that wealthy individuals such as Kramer are exempt from the prohibition against wager policies.

[11]   *See, e.g.*, 44 *C.J.S. Insurance* § 353 (2007) (observing that a life insurance policy is void if "procured under a scheme, purpose, or agreement to transfer or assign the policy to a person without an insurable interest in order to evade the law against wagering contracts"); 44 *Am. Jur. 2d Insurance* § 1000 (2003) ("[A]ssignments made in bad faith and intended to circumvent the law, as where there was a preconceived agreement that the policy was to be assigned, will not be upheld."); *see also Bankers' Reserve Life Co. v. Matthews*, 39 F.2d 528, 529 (8th Cir. 1930).

[12]   The two Insurance Department opinions relied on by the Lockwood Defendants (*see* LM at 14) are inapposite because they do not address wager policies or the requirement that an insured procure a policy on his own initiative.  The August 17, 2004 Opinion stands for the unremarkable proposition that that life insurance proceeds may be paid to a trust if the grantor of the trust instructs the trust to

13

Department on December 19, 2005,[13] the Office of General Counsel ("OGC") analyzed a proposed transaction in which hedge funds and banks would agree to loan high net worth individuals money to purchase insurance policies and pay premiums during the incontestability period, in exchange for an option to acquire the policies after the contestability period (the "Transaction").   *See* N.Y. Ins. Dep't Op. No. 05-12-15 (Dec. 19, 2005), *available at* http://www.ins.state.ny.us/ogco2005/rg051215.htm.  Once the policies became incontestable, the insureds would have to assign the policies to the hedge fund, or else retain the policies and repay the loan plus interest.  The OGC stated that in such a transaction, the insureds would not obtain the policies on their own initiative (in fact, there would almost certainly be "an inducement to enter into the transaction") and that the transferees would not have an insurable interest in the lives of the insureds.  *Id.*  Therefore, the OGC concluded that the Transaction was "intended to facilitate the procurement of policies solely for resale," was tantamount to "a speculative investment for the ultimate benefit of a disinterested third party," and would be illegal and "contrary to the long established public policy against 'gaming' through life insurance

---

purchase a life insurance policy on the life of the grantor.  The August 29, 2001 Opinion states that a viatical settlement company may solicit and purchase, and an individual may assign, a life insurance policy that has been validly issued.  This latter opinion follows from Section 3205(b) which provides: "Nothing herein shall be deemed to prohibit the immediate transfer or assignment of a contract [procured by an insured on his own initiative]."  Phoenix has not suggested that an insured cannot establish a life insurance trust, or that he may not assign a life insurance policy that he validly and in good faith procured on his own initiative.

[13]   The date of this opinion is not without significance – it was issued around the time that hedge funds entered the STOLI "market" with enthusiasm (and thus at a time they would be seeking guidance on how best to structure STOLI transactions).  *See* Matthew Goldstein, *Profiting From Mortality*, Bus. Week, July 30, 2007, at 44, *available at* http://www.businessweek.com/magazine/content/07_31/b4044001.htm (discussing the recent growth of the life settlement market, the securitization of life insurance policies, and the recent explosion of STOLI with the involvement of hedge funds) (attached as Ex. A to the Declaration of Stephen M. Raab in Opposition to Plaintiff's Motion to Dismiss Phoenix's Counterclaims, Docket No. 113).  It is also the year all of the policies at issue in this lawsuit were procured.

purchases." *Id.*[14]

Just as the insureds in the Transaction were induced to procure and transfer their policies to stranger investors and thus did not act "on their own initiative," Kramer was induced to procure and transfer the Kramer policies to stranger investors and thus did not act "on his own initiative." The Transaction and the Kramer policies lack an insurable interest and violate well-settled public policy. In both "transactions," stranger investors are "gaming through life insurance purchases."

In sum, there is no question that alleged STOLI schemes are illegal; the only question is whether Phoenix (or plaintiff) can prove that they occurred.[15] That question is not susceptible to resolution in the context of a motion to dismiss. Accordingly, all aspects of the Lockwood Defendant's motion premised upon the supposed legality of the policies because they were procured by Kramer, must be denied.

**B.      In Any Event, Because Phoenix Has Alleged That The Policies Were *Not* Procured By Kramer On His Own Initiative, There Can Be No Dispute That Phoenix Has Properly Alleged Violation of the Insurable Interest Rule**

For the reasons set forth above, the Lockwood Defendants' contention that because Kramer procured the policies on his own initiative, the policies did not constitute a "wager contract" and there could be no violation of insurable interest law, is just plain wrong on the

---

[14]   More recently, in analyzing a proposed charitable transaction involving life insurance, the OGC again highlighted the essential aspects of an illegal wager contract. Although it ultimately found the charitable transaction to be valid, the OGC, in reaching its conclusion, emphasized that "there are no unrelated third parties who stand to reap the vast majority of the benefits of the insurance procured" and that "the Plan does not involve or contemplate a life settlement or other prearranged assignment of the policy as a means of evading the Insurance Law's insurable interest requirement." *See* N.Y. Ins. Dep't Op. No. 08-05-02 (May 6, 2008), *available at* http://www.ins.state.ny.us/ogco2008/rg080502.htm.

[15]   *See Reiziz*, 13 F. Supp. at 820 (finding that there is no conflict in authority in the illegality of sham transactions intended "as a mere cover for a wager policy" and that "the question whether the insured lent himself to one without an insurable interest in his life as a cloak to a gambling transaction is not a question of law, but rather is a question of fact") (internal citation omitted).

law.[16]   It is also beside the point.

Phoenix has alleged that policies were not procured on Kramer's own initiative.  In fact,
Phoenix contends that the Lockwood Defendants induced insureds, including Kramer, to
participate in a pre-conceived plan to procure wager life insurance policies worth at least tens
(and, as discovery may reveal, hundreds) of millions of dollars for the benefit of the Lockwood
Defendants themselves and other outside investors.  Phoenix further alleges that the defendants
have engaged in such conduct repeatedly with respect to policies that Phoenix and other insurers
issued.  These well-founded allegations are not susceptible to resolution in the context of a
motion to dismiss.  For this reason, the Lockwood Defendants' motion, to the extent premised
upon a contrary version of the facts that they claim supports the legality of the policies-in-suit,
must be denied.

## POINT TWO

### PHOENIX HAS ALLEGED THE LOCKWOOD DEFENDANTS' FRAUDULENT CONDUCT WITH PARTICULARITY

Federal Rule of Civil Procedure 9(b) provides that a party alleging fraud "must state with
particularity the circumstances constituting fraud."  Rule 9(b) is designed to provide a defendant
fair notice of the claim to enable preparation of defense; protect a defendant's reputation and
goodwill from unfounded allegations; and reduce the number of strike suits.  *DiVittorio v.
Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987).  It is not designed to
insulate fraudsters from liability by erecting insurmountable barriers to injured parties.

The Lockwood Defendants claim that Phoenix has not satisfied the requirements of Rule

---

[16]   Specifically, the Lockwood Defendants appear to take the position that because no one appears to
have coerced Kramer to participate in the arrangements that Phoenix alleges, the policies were, as a
matter of law, procured by Kramer "on his own initiative." (LM at 15.)  The notion that an insured
induced by the promise of an easy cash payment acts on his own initiative merely because he
voluntarily participates in such pre-arranged scheme is, on its face, patently absurd.  As set forth
above, it is also contrary to the views expressed by the New York Insurance Department.

9(b) with respect to its allegations of mail and wire fraud,[17] common law fraud,[18] and breach of fiduciary duty[19] (to the extent those allegations involve or arise from conduct that may be characterized as fraudulent for purposes of Rule 9(b)). Phoenix's pleadings, however, more than meet the federal pleading standard.

To the extent Phoenix relies on misrepresentations and omissions as a basis for its claims, Phoenix has (a) specified the statements and omissions it claims were false or misleading, (b) explained in particular how those statements and omissions were false or misleading, (c) stated when and where the statements and omissions occurred, and (d) identified the persons responsible for the statements and omissions. *See Moore v. PaineWebber, Inc.*, 189 F.3d 165, 173 (2d Cir. 1999). With respect to claims of fraud or breach of fiduciary duty that are based on omissions, Phoenix has identified the duties of disclosure giving rise to liability. *See Manhattan Motorcars*, 244 F.R.D. at 213. With respect to the predicate acts of mail and wire fraud, Phoenix

---

[17]   The elements of mail or wire fraud are: (1) a scheme to defraud; (2) money or property as the object of the scheme; and (3) the use of mails or wires to further the scheme. *See City of New York v. Cyco.Net, Inc.*, 383 F. Supp. 2d 526, 552 (S.D.N.Y. 2005) (citing *Autori*, 212 F.3d at 115). "The fraud statutes are violated by affirmative misrepresentations or by omissions of material information that the defendant has a duty to disclose." *Autuori*, 212 F.3d at 118.

[18]   The elements of a fraud claim under New York law are: "(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." *Crigger v. Fahnestock and Co.*, 443 F.3d 230, 234 (2d Cir. 2006). It is well settled in New York that fraud can be based omissions where a person has a duty to disclose. *Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*, 244 F.R.D. 204, 213 (S.D.N.Y. 2007); *Standish-Parkin v. Lorillard Tobacco Co.*, 786 N.Y.S.2d 13, 15 (App. Div. 2004) (*citing Kaufman v. Cohen*, 760 N.Y.S.2d 157, 165 (App. Div. 2003)). The elements of an aiding and abetting fraud claim, which Phoenix also asserts against LPS and Tall Tree, are: "(1) the existence of a fraud; (2) a defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." *Thomas H. Lee Equity Fund V, L.P. v. Grant Thornton LLP*, No. 07 Civ. 8663(GEL), 2008 WL 3166536, at *10 (S.D.N.Y. Aug. 6, 2008) (internal quotation marks omitted).

[19]   The elements of a breach of fiduciary duty under New York law are "breach by a fiduciary of a duty owed to plaintiff; defendant's knowing participation in the breach; and damages." *SCS Commc'ns., Inc. v. Herrick Co.*, 360 F.3d 329, 342 (2d Cir. 2004). The elements of an aiding and abetting breach of fiduciary duty are: "(1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach." *Kaufman*, 760 N.Y.S.2d at 169.

has shown how each mailing or use of the wires furthered the relevant fraudulent scheme. *See Moore*, 189 F.3d at 173.

Phoenix may plead scienter generally and may allege facts on information and belief where those facts are peculiarly within the opposing parties' knowledge, so long as it alleges facts that give rise to a strong inference of fraudulent intent. *See Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990).

**A.    The Representations And Omissions At Issue Have Been Alleged In Detail**

Phoenix has unquestionably provided the who, what, where, and when of the alleged material misrepresentations and omissions.

With respect to the content of the misleading statements and omission at issue and the persons responsible for them, Phoenix has alleged that:

- Lockwood and Kramer represented to Phoenix that the Kramer August Trust was the true owner and beneficiary of the policies, that the Kramer August Trust and its intended beneficiary had an insurable interest in Kramer's life, and that the Kramer August Trust was not just a straw man for an illegal wagering contract (3d-Party Compl. ¶¶ 17, 19-22; RS at 14-15);

- After having already transferred the interest in the policies, Kramer signed Policy Acceptance Forms on October 21, 2005, representing that his application remained "full, complete, and true" (3d-Party Compl. ¶¶ 27-28, 31);

- Levinson and Lockwood represented to Phoenix that the Levinson Trust was the true owner and beneficiary of the Levinson Policy, that the Levinson Trust and its intended beneficiary had an insurable interest in Mr. Levinson's life, and that the Levinson Trust was not just a straw man for an illegal wagering contract (3d-Party Compl. ¶¶ 125-28; RS at 16-17);

- Lobel and Lockwood represented to Lincoln Life that the Lobel Trust was the true owner and beneficiary of the Lobel Policy, that the Lobel Trust and its intended beneficiary had an insurable interest in Mr. Lobel's life, and that the Lobel Trust was not just a straw man for an illegal wagering contract (3d-Party Compl. ¶¶156-57, 160-61; RS at 21-22); and

- In all these cases, Lockwood failed to disclose to the insurers the lack of insurable interest, and misrepresented the true nature of risk to be underwritten, the structure and existence of the STOLI transactions, and all material facts related to the foregoing (3d-Party Compl. ¶¶ 130, 163; RS at 14-17, 21-22).

Phoenix has also identified the documents where the misrepresentations and omissions occurred, to whom the documents were submitted, and the dates of those documents. (*See* 3d-Party Compl. ¶¶ 13, 17-18, 20, 125-26, 156, 160; RS at 12, 14, 16, 20-21.)[20]

**B.      Phoenix Has Alleged, With Particularity, Lockwood's Duty To Disclose**

Liability for failure to fully disclose material information can arise in at least three situations: (1) "where [one] party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party, it cannot give only half of the truth;" (2) "when the parties stand in a fiduciary or confidential relationship with each other;" and (3) "where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Manhattan Motorcars*, 244 F.R.D. at 213 (*citing Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)). Phoenix has adequately pleaded facts giving rise to an inference of Lockwood's duty to disclose under all of these circumstances.

First, Phoenix has clearly alleged that the representations on the applications concerning the owner and beneficiary of the policies were, at best, half-truths. (*See* 3d-Party Compl. ¶¶ 16, 22, 37-38, 73-74, 128-31, 161-64.)  "A statement that is ambiguous or a half-truth may ground liability in fraud if the speaker knows it to be materially misleading and does nothing to correct the misunderstanding." *VTech Holdings, Ltd. v. Pricewaterhouse Coopers, LLP*, 348 F. Supp. 2d 255, 272 (S.D.N.Y. 2004) (holding plaintiff could base its fraud claim on certain representations that while "literally accurate" were nonetheless alleged to be deliberately

---

[20]   Phoenix need not plead dates, times, and places with absolute precision, so long as its allegations, as here, give fair and reasonable notice to the Lockwood Defendants of its claims and the grounds upon which they are based. *Rahl v. Bande*, 328 B.R. 387, 415 (S.D.N.Y. 2005).

misleading).[21]   Thus, whether Lockwood's representations are characterized as "half-truths"
giving rise to a duty to disclose, or implied misrepresentations (*see* 3d-Party Compl. ¶¶ 22, 73,
128-29; RS at 14, 16-17, 21-22), it is clear that he cannot evade liability merely because he
employed misleading statements that, while cleverly designed to defraud Phoenix, may
technically fall somewhere between a paradigm misrepresentation and a paradigm omission.

Second, Phoenix has identified the specific fiduciary duties giving rise to Lockwood's
duty to disclose.  (*See* 3d-Party Compl. ¶¶ 10, 78, 83-87.)  As stipulated in the Independent
Producer Contract executed by Lockwood (the "IPC"), Phoenix relied on Lockwood to provide
"a careful and frank presentation of the facts necessary for the proper underwriting and
acceptance of the requested insurance coverages," to comply with all relevant laws, and to
recommend insurance products that were appropriate for the applicants' insurable needs.  A
producer's obligation to submit truthful and appropriate applications is also established under the
common law.  *See*, *e.g.*, *Panepinto v. Allstate Ins. Co.*, 439 N.Y.S.2d 240, 242 (Sup. Ct. 1981)
("[I]t is established under the common law that the agent or broker who acts as a salesperson has
a duty to supply correct information to the insurer and to make full disclosure of the nature of the
risk whether or not he is an agent of the insurer."); *accord Liberty Mut. Ins. Co. v. Grand
Transp., Inc.*, No. 06 CV 3433(JG), 2007 WL 764542, at *3 (E.D.N.Y. Mar. 12, 2007).

Although the Lockwood Defendants claim that Lockwood owed no fiduciary duty to
Phoenix as a matter of law (*see* LM at 43-44), a fiduciary relationship may be found in any case
"in which influence has been acquired and abused, in which confidence has been reposed and
betrayed."  *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F. Supp. 2d
198, 218 (S.D.N.Y. 2002) (*quoting Penato v. George*, 383 N.Y.S.2d 900, 904 (App. Div. 1976)).

---

[21]   *See also*, *e.g.*, *Williams v. Sidley Austin Brown & Wood, L.L.P.*, 832 N.Y.S.2d 9, 11 (App. Div. 2007)
(holding a defendant's fraud liability could be based on "a misleading partial disclosure" arising from
its failure to disclose the role of other defendants in connection with a disallowed tax shelter).

Whether a party reposed confidence in another and reasonably relied on the other's superior expertise or knowledge is a fact-specific inquiry.  *Lumbermens Mut. Cas. Co. v. Franey Muha Alliant Ins. Services*, 388 F. Supp. 2d 292, 305 (S.D.N.Y. 2005); *Wiener v. Lazard Freres & Co.*, 672 N.Y.S.2d 8, 14 (App. Div. 1998) (noting that whether a fiduciary duty exists "is necessarily fact-specific to the particular case").  Some of the factors to consider in determining whether or not a fiduciary relationship exists include whether the alleged fiduciary was aware of the use to which information would be put, and the purpose for which the information was supplied.  *See Muller-Paisner v. TIAA*, No. 06-4307-cv, 2008 WL 3842899, at *3 (2d Cir. Aug. 15, 2008). Here, Phoenix has alleged that Lockwood knew that Phoenix relied on his submission of truthful, complete, appropriate, and lawful applications.  (*See* 3d-Party Compl. ¶¶ 68, 78-79, 83-85.)

The above-referenced IPC provisions, as well as Lockwood's own acknowledgements of his authority (*see* LM at 26 (discussing "Lockwood's ability to act on behalf of Phoenix")), provide a sufficient basis for Phoenix's allegation that Lockwood, at a minimum, owed Phoenix a fiduciary duty with respect to the submission of insurance applications.  Accordingly, Phoenix's allegations are sufficient, at the initial pleading stage, to support claims premised on a breach of fiduciary duty.

Finally, Phoenix has also alleged that Lockwood, as producer of the policies, and manager of, investor in, and primary perpetrator of the STOLI schemes, had knowledge of essential facts regarding the nature of the transaction and that, by his failure to disclose such facts, he rendered the transactions not just inherently unfair, but illegal.  (*See* RS at 1-3, 12-16; 3d-Party Compl. ¶¶ 6-7, 30, 130, 145, 159, 163-64, 177-78.)  Lockwood may be held liable for such fraudulent failure to disclose.  *See P.T. Bank Central Asia v. ABN AMRO Bank N.V.*, 754 N.Y.S.2d 245, 252 (App. Div. 2003) (holding plaintiff had adequately alleged circumstances falling within the "Special Facts" doctrine: "a duty to disclose arises when one party's superior

knowledge of essential facts renders a transaction without disclosure inherently unfair").

**C.     Phoenix Has Alleged In What Respects The Representations And Omissions Were Fraudulent And Described The STOLI Schemes In Detail**

Phoenix has described in sufficient detail how the above-referenced representations and omissions were false, misleading, and/or in violation of Lockwood's duties.  (*See* RS at 12-23; 3d-Party Compl. ¶¶ 6-34, 62-63, 69, 73-75, 78-80, 125-31, 138-40, 144-45, 153, 158-59, 161-64, 166-68).  In addition to those allegations, Phoenix has further described how the STOLI schemes functioned.  (*See* RS at 1-4, 26-28; 3d-Party Compl. ¶¶ 145-49, 152-73, 177-205.)  While some of these allegations are made on the basis of information and belief, such allegations are sufficient because (1) they concern the inner workings of the schemes and the participants' intent, not the circumstances of the misrepresentations and omissions (which have been alleged with particularity); (2) as a result, many of these details are peculiarly within the knowledge of opposing parties (*i.e.*, the Lockwood Defendants, the insureds, Berck, and others); and (3) Phoenix has set forth facts upon which its belief is based and which raise a strong inference of fraud.  *See, e.g.*, *Wexner*, 902 F.2d at 172 (holding that where a defendant peculiarly possesses knowledge, the complaint need only provide circumstantial facts supporting a strong inference of fraud).[22]

**D.     There Is An Adequate Factual Basis For Phoenix's Allegations Made On Information And Belief, And Those Facts Raise A Strong Inference Of Fraud**

A strong inference of fraudulent intent is raised where the facts alleged (a) show the defendants had a motive and opportunity to commit fraud, or (b) constitute strong circumstantial evidence of conscious misbehavior or recklessness.  *Maersk, Inc. v. Neewra, Inc.*, 554 F. Supp.

---

[22]     In addition, see *In re Northern Telecom Ltd. Secs. Litig.*, 42 F. Supp. 2d 234, 249-51 (S.D.N.Y. 1998) (plaintiff's pleading, which included allegations on information and belief, was sufficient where plaintiff identified the statements, speaker, time frame, and how the statements were false; the allegations raised an inference of scienter; and the allegations had a colorable basis).

2d 424, 458 (S.D.N.Y. 2008). Phoenix's factual allegations easily satisfy both standards.

As stipulated in the IPC, Phoenix relied on Lockwood to provide "a careful and frank presentation of the facts necessary for the proper underwriting and acceptance of the requested insurance coverages." Thus, in his role as producer, Lockwood had a clear opportunity to present false and/or incomplete information to Phoenix (in this case, by concealing the wager transactions behind the front of trusts purportedly created for the benefit of the individual insureds) and thereby induce it to issue policies it would not otherwise have issued. *See S.E.C. v. O'Meally*, No. 06-CV-6483, 2008 WL 4090461, at *3 (S.D.N.Y. Sept. 3, 2008) (finding the defendants (securities brokers) had the ability to "trick mutual funds into accepting trades the funds would not have otherwise accepted" by concealing their identities behind various account names). Since Lockwood is the owner and principal for both LPS and Tall Tree, the Lockwood Defendants shared this opportunity in common.

Their motive to submit the fraudulent life insurance applications, and take all the other alleged acts in furtherance of the fraudulent STOLI schemes, as set forth above, was to make easy money. *See O'Meally*, 2008 WL 4090461 at *3 (defendants (securities brokers) could earn commissions and fees off of each trade effected by means of their scheme); *United States Fire Ins. Co. v. United Limousine Service, Inc.*, 303 F. Supp. 2d 432, 444-45 (S.D.N.Y. 2004) (insurance broker's "motive was to obtain commissions and other compensation in the form of pocketed excessive premiums for the insurance").

Beyond the motive and opportunity to commit the alleged torts, ample circumstantial evidence of conscious misbehavior exists, including allegations that the Lockwood Defendants engaged in "deliberately illegal behavior." *See In re Marsh & McLennan Cos. Secs. Litig.*, 501 F. Supp. 2d 452, 480-81 (S.D.N.Y. 2006) (noting that a plaintiff may satisfy the scienter standard where it alleges that the defendants engaged in "deliberately illegal behavior").

First, close family members of Lobel and Kramer have come forward with factual allegations that directly support Phoenix's allegations and claims.  Because these parties were close to the insureds during the events at issue – and ought to have been the ones protected by any *legitimate* policies taken out by the insureds – their allegations provide unique insight into (a) Lockwood's role in proposing the schemes, drafting the trust agreements, and introducing the insureds to the scheme and the other STOLI participants; (b) the purpose of the trusts; (c) the immediate assignment of the beneficial interest in the trusts (and thus the policies); and (d) the intentions and motives of the insureds.  *Cf. In re NTL, Inc. Secs. Litig.*, 347 F. Supp. 2d 15, 24 (S.D.N.Y. 2004) (finding plaintiff's allegations were properly founded on personal sources (former employees) who would likely possess the information alleged); *In re Veeco Instruments, Inc. Secs. Litig.*, 235 F.R.D. 220, 229-30 (S.D.N.Y. 2006) (same); *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC.*, 376 F. Supp. 2d 385, 395 (S.D.N.Y. 2005) (finding allegations adequately sourced where they were based in part on an SEC complaint).

Second, Phoenix's pleadings contain ample facts giving rise to a strong inference that the STOLI schemes were in fact perpetrated.  Summarized below are Phoenix's factual allegations, along with certain facts incorporated by reference in Phoenix's Third-Party Complaint, taken from opposing parties' admissions/pleadings, and/or otherwise subject to judicial notice,[23] that together provide a proper foundation, for Phoenix's claims.

The Lobel-Lincoln Life STOLI Scheme [24]

- The Lobel Trust was established on November 15, 2005 – the same day Lobel signed the

---

[23]  The Court must consider Phoenix's pleadings in their entirety, and may also consider documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. *See Tellabs*, 127 S. Ct. at 2509; *Patane*, 508 F.3d at 112.

[24]  As indicated by paragraphs 150-51 of Phoenix's Third-Party Complaint, the allegations in Phoenix's pleadings, whether stated affirmatively or on information and belief, are derived from the pleadings and evidentiary submissions made in the applicable lawsuit.

life insurance application.  (RS at 20; 3d-Party Compl. ¶¶ 154, 156.)

- The terms of the Lobel Trust agreement contemplated a transfer of the beneficial interest to Life Product; accordingly, that transfer must have been contemplated *even before the application for life insurance was submitted*.  (RS at 22; Hans Aff. in Support of Life Product's Motion for Judgment on the Pleadings ("Hans Aff."), Docket No. 19 in civil case No. 07-0475, Ex. 7.)

- By letter dated December 16, 2005, Lockwood forwarded the Lincoln Life policy to Lobel.  (RS at 11; 3d-Party Compl. ¶¶ 171(a).)

- *In that same letter*, and despite the fact that the transfer was already contemplated in the Lobel Trust agreement, Lockwood "advised" Lobel of an investor willing to purchase the beneficial interest in the Lobel Trust and enclosed a "Beneficial Interest Transfer Agreement."  (RS at 11; 3d-Party Compl. ¶¶ 171(a).)

- The investor was – as contemplated in the trust agreement – Life Product.  (RS at 11; 3d-Party Compl. ¶¶ 171(b).)  Life Product is a Lockwood entity.  (Aff. of Service, Docket No. 28.)

- By letter dated January 3, 2006, Lockwood forwarded a check for $300,000 from Life Product to Lobel in exchange for the beneficial interest in the Lobel Trust.  (RS at 11; 3d-Party Compl. ¶¶ 171(b).)

- The trustees of the Lobel Trust were Hudson United Bank and then Berck, both of whom reside (or resided) in the same office building as LPS and Lockwood.  (RS at 4; 3d-Party Compl. ¶¶ 4-5, 151, 168; Hans Aff., Ex. 7.)

- Lobel's daughter has alleged that Life Product's counsel prepared the Lobel Trust Agreement, and that Lockwood nominated/recommended the trustee.  (Angel's Answer, Docket No. 8 in civil case No. 07-0475, ¶¶ 66-68.)

- Lobel's daughter has also alleged that Lobel never paid a single premium.  (*Id.* ¶ 79.)

The Kramer-Phoenix STOLI Scheme

- The Kramer August Trust was established on August 29, 2005.  (RS at 12; 3d-Party Compl. ¶ 11.)

- Lockwood was approved by Phoenix as a producer on August 30, 2005.  (RS at 12; 3d-Party Compl. ¶ 10.)

- Kramer and Lockwood signed the life insurance application on September 2, 2005.  (RS at 14; 3d-Party Compl. ¶ 18.)

- The policies were issued in or about October 2005.  (RS at 15; 3d-Party Compl. ¶ 25.)

- The beneficial interest was transferred before Kramer even acknowledged receipt of the

25

policies and before the first premium was paid.  (3d-Party Compl. ¶ 31.)

- After having already transferred the interest in the policies, Kramer signed Policy Acceptance Forms on October 21, 2005, representing that his application remained "full, complete, and true."  (RS at 15; 3d-Party Compl. ¶ 27.)

- The trustees of the Kramer August Trust were Hudson United Bank and then Berck, both of whom reside (or resided) in the same office building as LPS and Lockwood.  (Phoenix's Answer ¶ 72; RS at 4, 8, 16; 3d-Party Compl. ¶ 119(d); Berck's Answer, Docket No. 90, ¶ 72.)

- Kramer's widow has alleged that, in the span of five months, Kramer applied for six policies worth a total of $56 million; that he transferred the beneficial interests in *every single one* of these policies immediately after each policy was issued to outside investors; that he never intended to hold these policies for his benefit or for his family's benefit; and that he never paid a single premium on these policies.  (Am. Compl. ¶¶ 17-43.)

The Kramer-Lincoln Life STOLI Scheme

- Having already procured and then transferred five policies worth $46 million within the prior few months, Kramer again used the Kramer August Trust to procure yet another multi-million-dollar policy from Lincoln Life.  (Am. Compl. ¶¶ 17-43; Life Product's Answer ¶ 73.)

- A $10 million Lincoln Life policy was issued to the Kramer August Trust on or about November 23, 2005.  (Life Product's Answer ¶ 73.)

- Once again, the beneficial interest was transferred to a Lockwood entity (Life Product) within days of the policy's issuance– *i.e.*, on November 29, 2005.  (Life Product's Answer ¶ 79.)

The Levinson-Phoenix STOLI Scheme

- By letter dated September 27, 2005, Lockwood offered to put Levinson in contact with companies specializing in the sale and purchase of life insurance policies.  (RS at 9; 3d-Party Compl. ¶ 147(d).)

- By letter dated October 24, 2005, Lockwood enclosed a draft trust agreement and offered to recommend a trustee of the trust.  (RS at 9; 3d-Party Compl. ¶ 147(e).)

- The Levinson Trust was established on November 4, 2005.  The Levinson Policy was issued in late November 2005.  (RS at 17; 3d-Party Compl. ¶¶ 132, 134.)

- Lockwood has represented that Levinson transferred the beneficial interest shortly thereafter to outside investors.  (RS at 18-19; 3d-Party Compl. ¶¶ 140, 144.)

- Although she was designated as the initial beneficiary of the Levinson Trust, Mrs. Levinson has represented that she knew nothing about the policy or the trust.  (RS at 18-

19; 3d-Party Compl. ¶ 143.)

- The trustees of the Levinson Trust were Hudson United Bank and then Berck, both of whom reside in the same office building as LPS and Lockwood.  (RS at 4, 10; 3d-Party Compl. ¶¶ 139, 147(j).)

- Phoenix was not notified of the trustee succession, which Lockwood witnessed, until after Levinson had died and just before Berck submitted his claim for the proceeds.  (RS at 10; 3d-Party Compl. ¶¶ 147(j)-(k).)

- Lockwood interfered with Phoenix's attempts to investigate the claim on the policy through his repeated interference with Phoenix's interview of Mrs. Levinson.  (RS at 18-19; 3d-Party Compl. ¶¶ 141-42.)

In sum, indisputably there are at least four instances in which a trust was established shortly before, or on the same day that, the insurance application was submitted, and where the beneficial interest was transferred immediately after the policy was issued.  In at least two (and perhaps all of) those cases, a *Lockwood-affiliated* investment company purchased the beneficial interest immediately after the policy was issued.  There are at least two documented instances of Lockwood and the insured contemplating a transfer *before* the application was submitted; and at least one document substantiating plaintiff's and Phoenix's allegations that Lockwood provided the form trust agreement.  The trustees of the trusts (first Hudson United Bank, and then Berck) reside or resided in the same office building as Lockwood and, by virtue of their proximity and repeated dealings, appear to have had a relationship with Lockwood.  Members of the Kramer and Lobel family have substantiated these alleged STOLI schemes, and credibly denied that Kramer or Lobel ever intended to hold the policies for their benefit.

These substantiated, repeated instances of the features of the alleged STOLI scheme, occurring precisely during the time period STOLI schemes generally were exploding, raise a strong inference that the Lockwood Defendants intended to, and did in fact, perpetrate the STOLI schemes alleged by Phoenix.  Indeed, on these facts, it would be pure fantasy to imagine otherwise, *i.e.*, that each of these insureds decided, in seriatim, on their own initiative to

(a) procure policies through Lockwood in 2005 for purposes of protecting their families and/or for financial planning, (b) establish trusts to hold the policies (using forms and trustees provided by Lockwood), and (c) then in a sudden change of heart, elect to sell the beneficial interests in the trusts to Lockwood-owned entities.

**E.    Phoenix Has Identified The Uses Of The Mails and Wires In Detail And Described Their Respective Roles In The Fraudulent STOLI Schemes**

Phoenix has alleged the Lockwood Defendants' uses of mails and wires with particularity, setting forth the content, date, persons involved, and purpose of each mailing or telephone call.  (*See* RS at 7-11.)

Phoenix does not have to allege that these mailings and telephone calls themselves contained misrepresentations.  Rather, it merely has to allege that they furthered the fraudulent STOLI schemes.  *See United States v. Tocco*, 135 F.3d 116, 125-26 (2d Cir. 1998) (holding mailings in connection with the processing, investigation, and facilitation of an insurance claim were in furtherance of an insurance fraud scheme); *U.S. v. Falkowitz*, 214 F. Supp. 2d 365, 386 (S.D.N.Y. 2002) ("A mailing is in furtherance of a scheme to defraud if the scheme's completion or the prevention of its detection . . . depended in some way on the charged mailing.") (internal quotations omitted).  Phoenix also has to allege that these mailings were caused by the Lockwood Defendants – that is, that they acted "with knowledge that the use of the mails will follow in the ordinary course of business," or that "such use can reasonably be foreseen, even though not actually intended."  *Id.*  It has done so based on the identity of the person responsible for the mailings and calls, as well as by descriptions of the fraudulent STOLI schemes and the purpose of the mailings and telephone calls in furtherance of them – descriptions that show the mailings and calls were reasonably foreseeable elements of the operation of the schemes.

**F.    Phoenix Has Pleaded, With Particularity, Its Aiding and Abetting Claims**

The Lockwood Defendants contend that Phoenix has not alleged facts supporting an

28

inference that LPS and Tall Tree (a) knew of Lockwood's fraud and breach of fiduciary duty, and (b) substantially participated in his wrongful conduct.[25]   Their contention is belied by Phoenix's pleadings.

First, Phoenix has alleged that Lockwood is the owner and principal of both LPS and Tall Tree.  (*See* 3d-Party Compl. ¶ 2; RS at 27.)[26]  It is therefore impossible for LPS and Tall Tree not to have acted knowingly, or rendered mere inadvertent assistance, with respect to the alleged fraud and breach of fiduciary duty.  *See*, *e.g.*, *Metropolitan Transp. Authority v. Contini*, No. 04-CV-0104, 2005 WL 1565524, at *5 (E.D.N.Y. July 6, 2005) (holding that where the owner/operator of a corporation was an alleged participant in a RICO enterprise, knowledge of wrongdoing could be imputed to the corporation).[27]

Second, given that many of the details are peculiarly within the knowledge of the Lockwood Defendants, Phoenix has alleged the role of LPS and Tall Tree in the STOLI schemes in as much detail as possible, and, at this stage of the proceedings, has provided a more than an adequate foundation for its claims.  LPS's participation in the Kramer-Phoenix STOLI scheme is

---

[25]   While many of Phoenix's allegations concerning these elements were *not* made on information and belief (*see* 3d-Party Compl. ¶ 57-59, 64, 69-70), the relevant inquiry is whether Phoenix's factual allegations support an inference of knowledge and substantial participation.  *See*, *e.g.*, *People ex rel. Cuomo v. Coventry First LLC*, 861 N.Y.S.2d 9, 11 (App. Div. 2008) (denying a broker's motion to dismiss an insurer's claim for aiding and abetting breach of fiduciary duty because the broker's actual knowledge could be "fairly inferred from the allegations that defendants participated in and covered up" the alleged wrongdoing); *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 497 (S.D.N.Y. 2001) (noting that a claimant can satisfy its pleading burden by alleging circumstances indicating conscious behavior, and finding that plaintiff had alleged facts giving rise to a "fair inference" of knowledge of defendant's fraud).

[26]   See also entity information records for LPS and Tall Tree (attached as Ex. B to the Raab Decl.), maintained by the New York Department of State, Division of Corporations and publicly available at http://appsext8.dos.state.ny.us/corp_public/corpsearch.entity_search_entry.

[27]   *See also S.E.C. v. Ballesteros Franco*, 253 F. Supp. 2d 720, 725 (S.D.N.Y. 2003) (where the individual defendant, although not designated as the trustee, allegedly controlled and/or dominated the defendant trusts – and used the assets of the trusts to generate illegal profits – his knowledge could be imputed to the trusts such that they could be found liable); *In re Marsh & McLennan Cos. Secs. Litig.*, 501 F. Supp. 2d at 481 (noting "courts have readily attributed the scienter of management-level employees to corporate defendants").

evident from the fact that Lockwood is the owner and principal of LPS (indeed, the company is called "*Lockwood* Pension Services") (*see* RS at 27); its proximity to the offices of the other STOLI participants (*see* RS at 4); its facilitation and administration of the premium payments for the policies (*see* RS at 7-8, 26-27); and its similar activities and role in other, identical STOLI schemes, including (a) offers to put Levinson in contact with investors, establish a trust, and recommend a trustee (*see* RS at 9-10) and (b) facilitating the immediate transfer of the interest in the Lobel Trust and the payment to Lobel from Life Product (*see* RS at 11).   Similarly, Tall Tree's participation is sufficiently substantiated at this stage by Lockwood's ownership of Tall Tree (RS at 27), plaintiff's allegations of Tall Tree's involvement in the scheme (Am. Compl. ¶ 38), and the similar role played by Life Product (another Lockwood entity) in other, identical STOLI schemes (*see* RS at 11; Life Product Answer ¶ 79).

The above-referenced activities of LPS and Tall Tree constitute "substantial assistance" in Lockwood's primary wrongdoing.   For example, in *Diamond State Ins. Co. v. Worldwide Weather Trading LLC.*, No. 02 Civ. 2900, 2002 WL 31819217 (S.D.N.Y.  Dec. 16, 2002), the plaintiff insurer alleged that an insurance agent/broker and two companies he owned implemented a scheme to cause plaintiff to insure inappropriate risks behind the front of certain dummy policies that the insurer believed were appropriate policies.   First, the defendants issued unauthorized and undisclosed reinsurance policies to an insured known only to them; then, the defendants covered those unauthorized policies with dummy policies issued in one of their own names (Worldwide Weather Trading LLC ("WWT")).   Essentially, WWT knowingly agreed to submit claims on behalf of the undisclosed insured and to pass through any proceeds received under the dummy policies to the true insured.   In light of such allegations, the court found the plaintiff had adequately stated an aiding and abetting claim against WWT. *See id.* at *2, 4-5.

**G.     In Sum, Phoenix Has Provided Adequate Basis For And Notice Of Its Claims**

Taking all these factual allegations together, Phoenix has clearly provided a foundation for its claims that satisfies Rule 9(b).  *See Moore*, 189 F.3d at 173 (finding plaintiffs had described the fraudulent scheme, identified mailings, identified fraudulent representations, explained the role of the misrepresentations in the fraudulent scheme, and raised an inference of fraudulent intent).[28]  Accordingly, the Lockwood Defendants' motion to dismiss Phoenix's Cross-Claims, RICO Claims, and first and second Third-Party Claims for failure to comply with Rule 9(b) must be denied.

## POINT THREE

## PHOENIX HAS PLEADED THE NECESSARY ELEMENTS OF ITS RICO CLAIMS

In attempting to avoid litigation of Phoenix's RICO claims, the Lockwood Defendants have made arguments without pausing to consider whether they have any bearing on Phoenix's actual pleadings, or even whether they accurately reflect the law.  Phoenix's pleadings adequately allege a pattern of racketeering activity, three enterprises, and the Lockwood Defendants' participation in those enterprises.  As such, Phoenix's RICO claims are not subject to dismissal.

**A.    Phoenix Pleaded That The Lockwood Defendants Engaged
In A Pattern Of Racketeering**

To plead a pattern of racketeering, Phoenix must allege at least two predicate acts within a ten-year period.  *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 520 (2d Cir. 1994).  The predicate acts must be related and reveal continued, or the threat of continued, unlawful conduct.  *Id.*  The

---

[28]  *See also Maersk, Inc*, 554 F. Supp. 2d at 464-65 (finding plaintiff had alleged fraud, conspiracy to commit fraud, and mail and wire fraud with sufficient particularity in light of the purposes of Rule 9(b)); *Watts v. Jackson Hewitt Tax Service Inc.*, No. 06-cv-6042, 2008 WL 3852166, at *11 (E.D.N.Y. Aug. 16, 2008) ("To prevent plaintiffs from making allegations based on information and belief in this case would reward the defendants for their allegedly deceptive practices."); *City of New York v. Cyco.Net, Inc.*, 383 F. Supp. 2d 526, 540 (S.D.N.Y. 2005) (finding plaintiff had adequately alleged RICO claims).

continuity of such conduct may be either "open-ended" or "closed-ended." *H.J., Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 241 (1989). The ultimate issue in evaluating a proposed set of predicate acts, regardless of the type of continuity, is whether the pleadings provide "a basis from which it could be inferred that the acts of racketeering activity were neither isolated nor sporadic." *Beauford v. Helmsley*, 865 F.2d 1386, 1391 (2d Cir. 1989) (en banc), *vacated and remanded mem.*, 492 U.S. 914, *adhered to on remand*, 893 F.2d 1433 (2d Cir. 1989).[29] Phoenix's pleadings easily meet these standards.

### 1.  The Predicate Acts Are Related.

For purposes of the pattern analysis, the Lockwood Defendants propose that the Court consider only those acts that they deem relevant to the issuance of the insurance policies issued by Phoenix. (*See* LM at 21-23 (listing a few allegations and incorrectly characterizing them as "[a]ll of the events connected to the alleged injury" and "[a]ll of the predicate acts relevant to the alleged scheme").) In doing so, the Lockwood Defendants conflate two distinct inquiries: whether predicate acts are sufficiently related so as to form a pattern, and whether the Lockwood Defendants have injured Phoenix "by reason of" their RICO violations. That position suffers from at least two fatal flaws.

First and foremost, such position is inconsistent with the definition of relatedness adopted by the Supreme Court and the Second Circuit. "Relatedness may be established by proof of 'criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *Azrielli*, 21 F.3d at 520 (*quoting H.J., Inc.*, 492 U.S. at 240).[30] Accordingly, the

---

[29]   *See also Fresh Meadow Food Servs., LLC v. RB 175 Corp.*, Nos. 06-4905-CV(L), 07-0269-CV, 2008 WL 2566731, at *5 (2d Cir. June 24, 2008).

[30]   *See also United States v. Indelicato*, 865 F.2d 1370, 1382 (2d Cir. 1989) (en banc) (noting relatedness may be established in a number of ways, including "temporal proximity, or common goals, or

Lockwood Defendants' articulation of the pattern requirement – *i.e.*, that the predicate acts demonstrating the pattern must all be causally related to the RICO claimant's injury to establish relatedness – has been squarely rejected by courts in this Circuit. *See, e.g., SKS Constructors, Inc. v. Drinkwine*, 458 F. Supp. 2d 68, 80 (E.D.N.Y. 2006) ("While Plaintiff may not be able to collect damages with respect to the injuries of other, unnamed parties, it does not necessarily follow that Plaintiff may not allege injury to others in support of allegations of an ongoing fraudulent scheme, or pattern of racketeering activity."); *Wells Fargo Century, Inc. v. Hanakis*, No. 04-CV-1381, 2005 WL 1523788, at *5 (E.D.N.Y. June 28, 2005) (reasoning that if only those acts involving the named plaintiff could be considered when determining the continuity of any scheme, "then schemes could remain in force, provided the orchestrators changed targets prior to the actual accrual of a 'substantial' period of time").[31]

Second, the Lockwood Defendants misconstrue Phoenix's allegations concerning its injuries and the cause of them.[32]  Phoenix has indeed already been injured: it has had to pay commissions to Lockwood on policies it never would have issued.  Moreover, issuance of the policies has subjected, and continues to subject, Phoenix to various expenses in administering, investigating, and litigating these policies (including the ongoing expense of this action).  Of course, Phoenix's most significant injury will occur if plaintiff or outside investors are ultimately

---

similarity of methods, or repetitions"); *Beauford*, 865 F.2d at 1392 (finding mailings related because they had the same goal and targeted a number of similarly situated persons).

[31]  The Lockwood Defendants' position is not even well-supported by the cases they cite.  For example, *Shamis v. Ambassador Factors Corp.*, No. 95 Civ. 9818, 1997 WL 473577, at *15 (S.D.N.Y. Aug. 18, 1997), merely stands for the unremarkable proposition that *unrelated* acts do not count.

[32]  The Lockwood Defendants seem unable to make up their minds about whether Phoenix has sustained any injury.  Initially, they argue Phoenix's injury was complete upon the issuance of the policies, and that all further efforts to collect on the policies are thus irrelevant. (LM at 23-24.)  Later, they claim Phoenix has suffered *no* injury because the investors in these wager policies have not actually collected on them.  (LM at 35.)  Neither claim is accurate.

33

allowed to collect on these wager policies.[33]  Phoenix has alleged that the Lockwood Defendants are responsible for all of these injuries, and that their racketeering activity caused Phoenix to issue the policies and conceal the policies' lack of insurable interest.  According to well-established principles, the alleged predicate acts proximately caused Phoenix's injuries because (a) they were a substantial factor in a sequence of direct causation[34] and (b) such injuries were reasonably foreseeable (indeed, they were intended).  *See City of New York v. Smokes-Spirits.Com, Inc.*, -- F.3d --, 2008 WL 4058373, at *8-9 (2d Cir. 2008) (finding the City's lost tax revenue was directly caused by defendants' uses of the mails and wires in furtherance of a scheme to deprive the City of information needed to collect certain taxes, and that the City was a target of the scheme).[35]

---

[33]   In this regard, Phoenix may be damaged by having to pay the $28 million in death benefits, less the premiums paid to date.  Phoenix may properly assert contingent claims arising from that potential liability in this action.  See *infra* at pages __.

[34]   For purposes of its RICO claims, Phoenix's injuries may be caused by either individual predicate acts *or* the pattern of racketeering as a whole.  *See Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir. 1990); *see also Com-Tech Assocs. v. Computer Assocs. Int'l, Inc.*, 753 F. Supp. 1078, 1092 (E.D.N.Y. 1990) ("The injury must result from the 'pattern of racketeering activity,' not necessarily from each isolated predicate act.").  Phoenix's injuries resulted not merely from the alleged pattern of racketeering, but also from the predicate acts individually.  For example, with respect to the Levinson STOLI scheme, mailings of Policy Acceptance Forms and premium payments were necessary to keep the policies in force and ultimately sell or collect on them.  In causing such mailings, LPS served as a middleman (or active participant) in illegal wagering transactions.  Notification of the change in trustee, and documentation submitted in support thereof, was necessary to enable Berck (i.e., to endow him with authority) to assign the policies to outside investors and to submit a claim on the Levinson Policy.  Lockwood's letters to Dr. Harris and Levinson, regarding Levinson's medical history and net worth, were necessary steps in the completion and submission of the Levinson application.  Letters from Lockwood to Levinson concerning outside investors and establishment of the Levinson Trust were also essential steps in the Levinson STOLI scheme.  Berck's submission of a claim on the Levinson Policy was also an obviously an essential – and climactic – step in the Levinson STOLI scheme.  Given the foregoing, *Morin v. Trupin*, 778 F. Supp. 711, 719 (S.D.N.Y. 1991), cited by the Lockwood Defendants (see Mem. at 24) is inapposite.  In *Morin*, the court found the plaintiffs had not properly alleged a single predicate act and also noted that some of the proposed acts, unlike the predicate acts here, could not have caused or contributed to the plaintiffs' alleged injury.

[35]   *See also Baisch v. Gallina*, 346 F.3d 366, 374-75 (2d Cir. 2003) (finding defendants' frauds directed at plaintiff and Nassau County were a pattern that injured plaintiff directly and plaintiff was a target and intended victim of the racketeering enterprise); *Allstate Ins. Co. v. Seigel*, 312 F. Supp. 2d 260,

Because all of the predicate acts alleged by Phoenix share a common purpose, are connected to the alleged enterprises, manifest a common method of perpetrating the STOLI schemes, perpetrate frauds on similarly situated victims (i.e., life insurers), and involve common participants (predominantly Lockwood and LPS), they all must be considered in evaluating the continuity of the predicate acts.  *See Drinkwine*, 458 F. Supp. 2d at 80 (considering allegations concerning non-party victims). [36]

### 2.     Phoenix Has Pleaded Facts That Show Closed-Ended Continuity.

In order to show close-ended continuity, a plaintiff must establish a "series of related predicates extending over a substantial period of time."  *H.J. Inc.*, 492 U.S. at 230.  Although the Lockwood Defendants contend that two years is a minimum or threshold, there is in fact no bright-line test as to what constitutes a "substantial" time period.  *Metromedia v. Fugazy*, 983 F.2d 350, 369 (2d Cir. 1992); *accord In re MTC Elec. Techs. Shareholder Litig.*, 74 F. Supp. 2d 276, 285-86 (E.D.N.Y. 1999).  As the Lockwood Defendants recognize (*see* LM at 20-21), other factors, such as the number and variety of predicate acts, the number of participants and victims, and the presence of separate schemes, are also relevant in determining whether closed-ended continuity exists.  *See Fresh Meadow*, 2008 WL 2566731 at *4.  Courts also consider the character of the perpetrator's goals and the scheme's complexity in examining the overall context in which the acts took place.  *See MTC Elec. Techs. Shareholder Litig.*, 74 F. Supp. 2d at 286.

---

266-68 (D. Conn. 2004) (finding plaintiff, along with other insurers, was the intended target of the fraudulent scheme and its injuries were directly caused by the defendant's fraud, although he used other individuals as "vehicles" and "mere conduits" to extract funds to which he was not entitled).

[36]  *See also Com-Tech Assocs.*, 753 F. Supp. at 1092 (considering a mailing despite defendants' argument that injury did not result from that mailing in particular); *Schmuck v. U.S.*, 489 U.S. 705, 710-11 (1989) (holding that it is not necessary for a use of the mails or wires to be "an essential element of the scheme" as long as such use is "incident to an essential part of the scheme" or "a step in the plot") (citations and internal quotation marks omitted).  As further discussed below, these predicate acts exhibit both closed-ended and open-ended continuity.

Phoenix has alleged that Lockwood and LPS committed 22 instances of mail and wire fraud over a 29-month period.  Their predicates acts facilitated at least five alleged separate STOLI schemes, targeted at least three victims (i.e., Phoenix, Lincoln Life, and Transamerica) , and implicated at least five perpetrators (i.e., Lockwood, LPS, Tall Tree, LPC, and Berck).  The context in which these specific acts of mail and wire fraud are alleged shows that other schemes and victims exist,[37] the schemes are sophisticated, and that it is necessary for a variety of participants to execute different types of actions over the course of at least two years in order to carry any particular scheme through to completion.  These allegations are sufficient to establish closed-ended continuity.  *See Rothberg v. Chloe Foods Corp.*, No. 06-CV-5712, 2007 WL 2128376, at *14 (E.D.N.Y. July 25, 2007) (acts spanned 25 months and impacted at least four creditors).[38]

### 3.      Phoenix Has Shown Open-Ended Continuity.

To establish open-ended continuity, Phoenix's allegations must show a threat of continuing racketeering activity.  *See United States v. Kaplan*, 886 F.2d 536 (2d Cir. 1989). Because the STOLI Enterprise's objective – to profit from the procurement of wager policies – is

---

[37] For example, Lincoln Life has filed four complaints alleging a series of four different schemes involving Lockwood and Berck, copies of which are attached to the Affidavit of Robert Schwinger, Docket No. 116)  Predicate acts that cause injuries to multiple/other victims, if related by purpose, participants, and/or method (as Phoenix has pleaded), also count *in favor of* a finding of closed-ended continuity.  *See, e.g.*, *Drinkwine*, 458 F. Supp. 2d at 80 (finding closed-ended continuity based in part on the alleged number of victims and plaintiff's reference to a broader scheme to defraud other homeowners); *First Interregional Advisors Corp. v. Wolff*, 956 F. Supp. 480, 486 (S.D.N.Y. 1997) (closed-ended continuity established where plaintiff alleged similar schemes to defraud non-named parties).

[38] *See also Drinkwine*, 458 F. Supp. 2d at 80 (17 months sufficient given the number of victims, separate incidents, and plaintiff's reference to a broader scheme to defraud other homeowners); *USA Certified Merchants, LLC v. Koebel*, 262 F. Supp. 2d 319, 340 (S.D.N.Y. 2003) (acts spanned 26 months); *MTC Elec. Techs. Shareholder Litig.*, 74 F. Supp. 2d at 287 (15 months sufficient given complexity of the scheme and the number of participants, victims, and acts); *First Interregional Advisors*, 956 F. Supp. at 486 (14 months sufficient where plaintiff pleaded several acts with particularity and alleged other lenders were targeted as well).

inherently unlawful, a threat of continued racketeering in furtherance of that objective may be naturally inferred from the predicate acts alleged by Phoenix. *See Indelicato*, 865 F.2d at 1383-84 ("Where the enterprise is an entity whose business is racketeering activity, an act performed in furtherance of that business automatically carries with it the threat of continued racketeering activity.").[39]

Open-ended continuity may also be demonstrated with respect to a "legitimate business" if the allegations provide some basis "from which it may be inferred that the predicate acts were the regular way of operating that business." *City of New York v. Pollock*, No. 03-CV-0253, 2006 WL 522462, at *9 (S.D.N.Y. Mar. 3, 2006) (*quoting Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 243 (2d Cir. 1999)). Phoenix has provided a basis for inferring that Lockwood's uses of the mails and wires in furtherance of fraudulent STOLI schemes were "not sporadic or isolated," but rather a regular way in which he operated LPS and Tall Tree, given (a) Lockwood's control of LPS and Tall Tree; (b) the number of schemes, policies, and predicate acts at issue in this case alone – and thus the large number of acts likely to be involved in additional schemes; (c) LPS's involvement in the STOLI schemes from inception through claims processing and the similar role played by Tall Tree in other schemes; (d) the total amount of money involved in the schemes at issue in this lawsuit; and (e) the explosion of STOLI schemes in recent years and the opportunity to make windfall profits from STOLI policies. *See id.; Friedman v. Ariz. World Nurseries Ltd. P'ship*, 730 F. Supp. 521, 548 (S.D.N.Y. 1990) (plaintiffs allegations that defendants were involved in similar fraudulent transactions raised an inference that the predicates were part of the defendants' regular way of doing business, even

---

[39] In addition, see *Maersk, Inc.* 554 F. Supp. 2d at 464 (finding open-ended continuity as a result of "the inherently illegal nature and purposes" of an association-in-fact formed to defraud international shipping companies, particularly in light of plaintiff's allegation that the defendants engaged in other, similar schemes beyond the three it alleged with particularity).

where the specific and limited predicate acts alleged by plaintiffs related to one investment and spanned only a few months).[40]    At a minimum, Phoenix is entitled to the opportunity to prove this element of its RICO claim.  *See Fresh Meadow Food Servs.*, 2008 WL 2566731, at *6 (vacating dismissal of plaintiffs' RICO claim and holding they "are entitled to an opportunity to prove that [the defendant's] alleged fraudulent acts . . . were a regular way of conducting defendant's ongoing legitimate business"); *see also Wells Fargo Century*, 2005 WL 1523788, at *6 (noting that the determination of whether the predicate acts were a regular way of conducting the enterprise's business "is inherently fact bound").

There are several additional factors that support a finding of open-ended continuity in this case.  The STOLI scheme is formulaic in nature and thus susceptible to repetition.  *See Chubb & Sons, Inc. v. Kelleher*, No. 92 CV 4484, 95 CV 0951, 2006 WL 1789118, at *4 (E.D.N.Y. Mar. 28, 2006) (finding defendant's acts of mail or wire fraud in connection with fraudulent insurance claims "posed a threat of repetition and there was no natural ending point to the scheme").  Given the nature of the businesses of the Lockwood Defendants, there is no reason to believe that the various STOLI schemes described in Phoenix's Third-Party Complaint reflect isolated transactions.[41]    Indeed, the opportunity to earn substantial amounts of money in generating STOLI policies supports an inference that the Lockwood Defendants will continue their

---

[40]    In addition, see *Wells Fargo Century*, 2005 WL 1523788, at *6-7 (finding open-ended continuity where the defendant fraudulently applied for and received more than $8 million dollars from three lenders over a five-year period); *First Interregional Advisors*, 956 F. Supp. at 486 (finding open-ended continuity where defendants committed several acts of mail and wire fraud within a fourteen-month period to obtain several million dollars of financing for their otherwise legitimate business by misrepresenting the health and success of that business).

[41]    *See Kaplan*, 886 F.2d at 543 (noting that defendant's participation in several schemes, including one that he was pursuing at the time his activities were brought to a halt, demonstrated the defendant's "continuing intent and ability to participate in various ways in the corruption of the enterprise"); *Maersk*, 554 F. Supp. 2d at 464-65 (finding open-ended continuity where a sophisticated and unlawful enterprise was likely ongoing and pursuing its schemes).

racketeering activities.[42]

The Lockwood Defendants argue that further racketeering activity is precluded by Phoenix's termination of Lockwood as an independent producer (*see* LM at 26-27). Again, they are wrong on the facts and the law. First, even though he may no longer procure additional policies for Phoenix, Lockwood almost certainly continues to use the mails and wires in furtherance of the schemes alleged in this case, as well as other schemes either undetected or currently being investigated. Second, only Lockwood's role as a producer of the Phoenix policies has been terminated. Lockwood may also initiate, direct, fund, or participate in additional STOLI schemes, whether as a producer or otherwise, and whether he targets Phoenix or other insurers. In any event, the relevant question – as recognized by the authorities cited by the Lockwood Defendants (*see* LM at 26) – is whether the racketeering activity is *inherently terminable*, not whether it has in fact terminated. *See United States v. Aulcino*, 44 F.3d 1102, 1112-14 (2d Cir. 1995) (stating "the analysis of the threat of continuity cannot be made solely from hindsight" and finding there was no natural end to the defendants' ability to continue such activities).[43]

For all of the foregoing reasons, Phoenix has met its pleading obligations with respect to establishing a pattern of racketeering.

---

[42]   *Cf. Beauford*, 865 F.2d at 1386 (previous mailings of an offering plan containing material misrepresentations and omissions in connection with a condominium conversion plan together with the existence of unsold apartments supported an inference of further mailings).

[43]   In addition, *see Pollock*, 2006 WL 522462, at *9 ("Had it not been for HRA's discovery of the scheme, CLA could have continued its racketeering activity."); *Wells Fargo*, 2005 WL 1523788, at *6 (rejecting defendant's contention that "termination of the alleged scheme precludes a finding of open-ended continuity"); *Andrea Doreen, Ltd. v. Bldg. Materials Local Union 282*, 299 F. Supp. 2d 129, 157 (E.D.N.Y. 2004) (finding open-ended continuity was shown despite the fact that "the potential threat of continued activity was stymied" by a consent decree).

**B.      Phoenix Has Properly Alleged Three Enterprises**

**1.      The STOLI Enterprise Has All The Necessary Features Of An Association-In-Fact And Phoenix Has Described The Participation Of The Lockwood Defendants In That Enterprise.**

In pleading the element of "enterprise" under RICO, a plaintiff need satisfy only the notice pleading requirements of Fed. R. Civ. P. 8(a). *Drinkwine*, 458 F. Supp. 2d at 79; *Aiu Ins. Co. v. Olmecs Med. Supply, Inc.*, No. 04-CV-2934, 2005 WL 3710370, at *6 (E.D.N.Y. Feb. 22, 2005).  In addition, the Second Circuit has construed "enterprise" liberally, noting that RICO's "language and the history suggest that Congress sought to define the term as broadly as possible." *Indelicato*, 865 F.2d at 1382.

While courts will look to the "hierarchy, organization, and activities" of an association-in-fact to determine whether "its members functioned as a unit," *see United States v. Coonan*, 938 F.2d 1553, 1560-61 (2d Cir. 1991), the existence of an association-in-fact enterprise is often more readily proven by what it does, rather than by abstract analysis of its structure, *see id.* at 1559.  Accordingly, this requirement is satisfied by a "group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981); *Pavlov v. Bank of New York Co., Inc.*, 25 Fed. Appx. 70, 2002 WL 63576, at *2 (2d Cir. Jan. 14, 2002) ("We have repeatedly found a sufficient enterprise where the complaint alleges a group without centralized hierarchy formed for the sole purpose of carrying out a pattern of racketeering acts.").

In *Aiu*, plaintiffs alleged that the defendants perpetrated a fraudulent scheme to submit inflated (i.e., fraudulent) reimbursement claims to insurers pursuant to New York's No-Fault laws.  2005 WL 3710370, at *2.  The plaintiffs first described the general role of each category of defendant.  Plaintiffs then provided examples of how the defendants would conduct the fraudulent reimbursement scheme.  *Id.* at *1-2.   The court found that an enterprise was

adequately alleged because the defendants shared "a common purpose to engage in a fraudulent course of conduct," plaintiffs described in detail "each defendant's necessary and symbiotic contribution to the overall scheme," and alleged some further connections among the doctors, including that they worked at the same clinics.  *Id.* at *7.

Like the plaintiffs in *Aiu*, Phoenix has identified the purpose and general functions of the STOLI Enterprise (RS at 25, 28; 3d-Party Compl. ¶¶ 6, 177-79), and described the general roles of each of the STOLI Enterprise participants (*see* RS at 2-4; 3d-Party Compl. ¶¶ 180-84). Phoenix has also alleged facts substantiating those roles in the context of the perpetration of particular STOLI schemes.  *See* RS at 7-25; 3d-Party Compl. ¶¶ 8-30, 54-64, 67-70, 73, 88, 110-11, 188-205; *see also Maersk,* 554 F. Supp. 2d  at 464-65 (finding plaintiffs had alleged "a compelling *modus operandi* involving shifting identities, dummy corporations, and fraudulent legal claims on carriers").  Many of the STOLI Enterprise participants, like the doctors in *Aiu*, work in the same building.  (*See* 3d-Party Compl. ¶ 5; RS at 4.)  And, of particular significance, Lockwood owns and controls several of the STOLI participants.  *See Cadle, Co. v. Flanagan*, 271 F. Supp. 2d 379, 387 (D. Conn. 2003) (finding that the defendant's participation in various business entities through a pattern of racketeering thereby connected those entities to form an enterprise).

Moreover, Phoenix's allegations concerning the roles of the Lockwood Defendants are more than adequate to show that each of them had "some part in directing the enterprise's affairs."[44]  *See Baisch*, 346 F.3d at 376 ( "conduct" element satisfied by allegations that

---

[44]   Phoenix's detailed and descriptive allegations are a far cry from the Lockwood Defendants' contention that Phoenix has merely strung together a list of defendants and labeled them an enterprise (*see* LM at 27).  Phoenix's extensive allegations also belie the Lockwood Defendants' assertions that "no facts are alleged" as to the organization of the STOLI Enterprise and that there is a "total absence of any allegation as to each participant's role in the management and control of the enterprise." *Compare* LM at 28 *with Maersk*, 554 F. Supp. 2d at 464-65 (dismissing the defendant's "feeble accusation that Plaintiffs merely 'restate the legal standard in an attempt to allege an enterprise'" and

insurance brokers helped other participants fraudulently obtain insurance policies, recruited

financing for the enterprise, and concealed deceptive payroll practices).[45]  Corporations, such as

LPS and Tall Tree, may be deemed participants if their principals act as participants.  *See*

*Contini*, 2005 WL 1565524, at *5 ("In determining whether a corporation may bear RICO

liability for the actions of its employee the critical question is whether the illegal conduct alleged

was known to and participated in by sufficiently high-level employees within a corporation

and/or was sufficiently pervasive within the corporation as to be fairly attributed to the

corporation.") (internal quotations omitted.)

Finally, the Lockwood Defendants' suggestion that Phoenix has not adequately

distinguished the enterprise from the pattern of racketeering reflects a failure to comprehend

either Phoenix's pleadings or the law.  While the enterprise and the pattern are separate elements

(*i.e.*, it is possible to adequately plead one but not the other), there may be a substantial overlap

in the allegations and evidence establishing those elements.  *See Indelicato*, 865 F.2d at 1384

---

observing that it was defendant's lawyers "who have merely restated a boilerplate argument against the allegation of a RICO enterprise that clearly has no application to the well-pleaded facts of the case")

[45]  *See also Drinkwine*, 458 F. Supp. 2d at 74, 79 (plaintiff's salesman participated in enterprise where he allegedly wrongfully converted funds for his own benefit and for the benefit of other defendants and fraudulently obtained credit under various names); *Zito v. Leasecomm Corp.*, No. 02-CV-8074, 2003 WL 22251352, at *17-18 (S.D.N.Y. 2003) (finding "conduct" element was satisfied by allegations that defendants formulated, encouraged, enabled, and financed deceptive lease transactions and further noting that "there is no heightened pleading requirement for the 'conduct' element of a RICO claim" and that "the precise role of these defendants is information peculiarly within their knowledge"); *Smokes-Spirits.Com*, 2008 WL 4058373, at *16-17 (finding plaintiff had sufficiently alleged "the roles that relevant defendants had in operating or managing the Nexicon association-in-fact enterprise" where the defendants allegedly had entered profit sharing and employment agreements, transferred assets and funds between them, and had "interlocking financial and management agreements"); *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 178 (2d Cir. 2004) (observing "it is no great leap to find that one who assists in the fraud also conducts or participates in the conduct of the affairs of the enterprise"); *Local 857 I.B.T. Pension Fund v. Pollack*, 992 F. Supp. 545, 568 (S.D.N.Y. 1998) (finding that a defendant who prepared and submitted a false document, who made misrepresentations that were forwarded to the plaintiffs, and who facilitated the transfer of funds was not a ministerial actor, but one who took an active role in "the operation or management" of the enterprise).

42

(noting that the same piece of evidence may help establish both elements); *United States v. Mazzei*, 700 F.2d 85, 88 (2d Cir. 1983) (holding that the proof of the two elements need not be separate and distinct).   Here, because the nature of the enterprise affects the analysis of relatedness and continuity, and the alleged racketeering acts manifest the roles of the participants, there is such overlap.   In any event, Phoenix has alleged facts concerning the enterprise that go beyond the alleged predicate acts of mail and wire fraud.   (*See* 3d-Party Compl. ¶¶ 62-63, 69-70, 79, 88, 142, 177-84; RS at 2-4, 28.)

### 2.       Phoenix May Plead Enterprises In The Alternative.

The Lockwood Defendants are dead wrong when they argue that Phoenix cannot plead RICO claims (and enterprises) in the alternative.   Rule 8(d) expressly permits Phoenix to "set out [two] or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones," and it may do so regardless of their consistency with one another.   *See* Fed. R. Civ. P. 8(d)(2) & (d)(3).   Consistent with the liberal pleading standards of Rule 8 and case law in this district, Phoenix has pleaded separate and alternative theories of RICO liability premised on different enterprises.   *See*, *e.g.*, *Smokes-Spirits.Com, Inc.*, 2008 WL 4058373, at *14-17 (allowing plaintiff to plead alternative RICO theories in which a corporation was the alleged enterprise in one count and, in another, was alleged to be both a person and a member of an association-in-fact);[46] *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, No. 93-CV-6876, 2000 WL 1694322, at *4, 6-7 (S.D.N.Y. Nov. 13, 2000) (allowing plaintiffs to proceed by pleading, in the alternative, three enterprises). [47]

---

[46]   This Court found that the corporation was a legitimate enterprise for purposes of the first RICO claim, despite the fact that the corporation was a defendant in the second RICO claim; however, the Court dismissed the claim on other grounds (namely, because the individual defendants could not have committed the alleged predicate acts).

[47]   *See also* Jed S. Rakoff and Eric H. Queen, *RICO: Civil and Criminal Law*, § 7.04[1][b] (emphasizing that a civil RICO plaintiff should plead in the alternative, and explaining that a complaint "may

The authorities cited by the Lockwood Defendants (*see* LM at 30-31) do not apply to Phoenix's Seventh Third-Party Claim for Lockwood's violation of the RICO statute because they address (1) the well-established rule that a person must be distinct from the enterprise *within a particular RICO claim*, and (2) certain artificial attempts to evade that requirement.[48]   Here, Phoenix has proposed separate theories of RICO liability, subject to distinct analyses.   The evaluation of continuity, in particular, is different for a legitimate enterprise (such as LPS) than it is for an illegitimate enterprise (such as the STOLI Enterprise).   In these circumstances, the purpose of Rule 8(d) would be undermined by limiting Phoenix to only one of two possible theories at the pleading stage, and forcing it to forego a potentially meritorious claim.  *See* 5 Wright & Miller, *Federal Practice and Procedure: Civil 2d* § 1283 (2008).

For all of the foregoing reasons, the Lockwood Defendants' motion to dismiss Phoenix's Seventh Third-Party Claim should be denied.

### POINT FOUR

### PHOENIX HAS PLEADED THE NECESSARY ELEMENTS OF ITS BREACH OF CONTRACT, NEGLIGENCE AND UNJUST ENRICHMENT CLAIMS

**A.    Breach Of Contract**

Phoenix has specified the precise contract provisions which Lockwood has breached. (*See* 3d-Party Compl. ¶¶ 83-86.)  Lockwood does not dispute the validity of those provisions and obligations; he questions only whether Phoenix has alleged a breach of those provisions pursuant to the liberal pleading standards of Rule 8.

---

identify several possible enterprises" and "may allege in one count defendant's corporation as the enterprise and in another count allege as the enterprise an 'association in fact' of individuals").

[48]   For example, in *Goren v. New Vision Int'l, Inc.*, No. 97 C 1771, 1997 WL 321673, at *4 (N.D. Ill. 1997), the plaintiff pleaded alternative RICO enterprises in circular fashion.  ("[I]n each count, she leaves one defendant out of the list of enterprises, and identifies that omitted defendant as the person in that count.  In the next count, a different defendant is then subjected to the same treatment.").  The court rejected this formulaic/circular pleading as "a naked attempt to evade the rule requiring that persons be distinct from enterprises."  *Id.*

Phoenix's allegations of Lockwood's breach are set forth in detail in its pleadings and could not be more clear. With respect to Sections 1(d) and 10 of the IPC, Lockwood did not comply with all applicable laws. In particular, he willfully attempted to circumvent the insurable interest requirements of Connecticut and New York law. Nor did Lockwood provide "a careful and frank presentation of the facts necessary for the proper underwriting and acceptance of the requested insurance coverages;" "give complete and accurate answers" in the applications he submitted; or "promptly transmit to [Phoenix] any and all information that will enable [Phoenix] to determine if the insurance applied for should be issued," as required by Section 11 of the IPC. In particular, he misrepresented the true owner and beneficiary, failed to disclose the true owner and beneficiary, failed to disclose the true nature of the transaction, and even facilitated the creation of the trust to *conceal* the true nature of the transaction from Phoenix. His submission of Kramer's application was also a violation of his obligation to recommend a suitable insurance product for Kramer; illegal wager policies are never suitable.

Phoenix's allegations detailing Lockwood's wrongful conduct are, for the reasons set forth above, sufficient to satisfy Rule 9(b). They therefore are certainly sufficient to satisfy the liberal standards of Rule 8.

## B.    Negligence

The Lockwood Defendants rest their argument for the dismissal of Phoenix's negligence claim on the notion that Lockwood owes Phoenix no duty. This argument fails for the same reason their argument regarding fiduciary duty fails – "it is established under the common law that the agent or broker who acts as a salesperson has a duty to supply correct information to the insurer and to make full disclosure of the nature of the risk whether or not he is an agent of the insured." *Panepinto*, 439 N.Y.S.2d at 242; *accord Liberty Mut. Ins. Co.*, 2007 WL 764542 at *3.

The cases cited by the Lockwood Defendants have no bearing on the precise duties at

45

issue in this claim.  *See New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 316-17 (1995) (involving a claim by an insured against an insurer with respect to claims processing); *Highlands Ins. Co. v. PRG Brokerage, Inc.*, No. 01-CV-2272, 2004 WL 35439, at *7 (S.D.N.Y. Jan. 6, 2004) (involving a negligent hiring and supervision claim).  Here, Phoenix is not claiming that Lockwood should have supervised his employees better for Phoenix's sake.  Phoenix argues that Lockwood should either (a) not have submitted a STOLI policy to Phoenix or (b) disclosed the true nature of the transaction and the risk to Phoenix.  Those duties are more squarely addressed by *Panepinto* than by *Highlands*.

## C.    Unjust Enrichment

Phoenix's claim for unjust enrichment may not be dismissed where the elements have been properly pleaded.  Phoenix has alleged that "Lockwood has received benefits from his wrongful actions described herein, *including but not limited to* commissions that he received from Phoenix for procuring the Phoenix Policies."  (3d-Party Compl. ¶ 101 (emphasis added).) Under the notice pleading standards of Rule 8, Phoenix has sufficiently alleged that Lockwood, in connection with the policies, has enjoyed, at Phoenix's expense, benefits beyond commissions.[49]   Because Lockwood addresses only commissions in his motion, he has not negated any element of Phoenix's unjust enrichment claim.[50]

---

[49]   For example, Phoenix alleges that the Lockwood Defendants were enriched by proceeds it received in connection with the Second Transfer.  Such proceeds were paid, at Phoenix's expense, because (1) the policies themselves were a valuable commodity in the hands of the Lockwood Defendants, and thus a benefit (unwittingly) conferred by Phoenix for their benefit, *see, e.g., Finkelstein v. Mardkha*, 495 F. Supp. 2d 329, 344 (S.D.N.Y. 2007) (finding a triable claim for unjust enrichment where plaintiff had alleged he had provided valuable services relating to a diamond design and where defendant profited from that design by licensing it to Tiffany and receiving payments from Tiffany - not plaintiff - for over $1 million (including royalties on sales)), and (2) the proceeds paid to the Lockwood Defendants derived indirectly from the value of the policies as a Phoenix liability.  *See Cox v. Microsoft Corp.*, 778 N.Y.S.2d 147, 149 (App. Div. 2004) (holding that a benefit can be conveyed indirectly by a plaintiff and reversing dismissal of unjust enrichment claim).

[50]   Lockwood's motion should also be denied because it fails to specify which contract provisions govern the issue in dispute – *i.e.*, Phoenix's right to recover his commissions or other profits from his

**POINT FIVE**

**PHOENIX MAY ASSERT CONTINGENT
CROSS-CLAIMS AND THIRD-PARTY CLAIMS**

Disregarding basic civil procedure, the Lockwood Defendants argue that Phoenix's cross-claims and third-party claims should be dismissed to the extent that they seek recovery for Phoenix's liability under the policies, because Phoenix has not yet paid the policy proceeds to anyone.  (LM at 35-36, 39 n.11, 48, 52.)  That position is contrary to law.

Fed. R. Civ. P. 13(g) authorizes claims against co-parties arising out of the same "transaction or occurrence" as the main claim.[51]  A cross-claim for indemnity is a paradigm claim under this Rule.  *See Maritime Ventures Int'l, Inc. v. Caribbean Trading & Fid., Ltd.*, 689 F. Supp. 1340 (S.D.N.Y. 1988); *Federman v. Empire Fire and Marine Ins. Co.*, 597 F.2d 798, 811-12 (2d Cir. 1979).  Likewise, Rule 14(a) of the Federal Rules of Civil Procedure provides that a defendant may bring a third-party into a lawsuit "who is *or may be* liable to the third-party plaintiff for all or part of the plaintiff's claim against that third-party plaintiff."  Fed R. Civ. P. 14(a) (emphasis added); *see also Bank of India v. Trendi Sportswear, Inc.*, 239 F.3d 428, 436-37 (2d Cir. 2000) ("It is well-settled that a third-party action for indemnification comes within a court's ancillary jurisdiction."); *Andrulonis v. United States*, 26 F.3d 1224, 1233 (2d Cir. 1994) (observing "the rule permits a defendant to bring in a third-party defendant even though the

---

participation in the STOLI schemes that have injured Phoenix.  Moreover, at this stage of the pleadings, the court has not (and is not in a position to) rule on the validity of Phoenix's breach of contract claims.  Since pleading in the alternative is permitted under the Federal Rules, there is no basis at this time to preclude Phoenix's assertion of unjust enrichment claims against Lockwood on the grounds that they are covered by contract.

[51]  The Second Circuit has identified three factors courts use to determine whether a claim arises out of the same transaction or occurrence as the main claim, no one of which is conclusive: (1) identity of facts between original claim and cross-claim; (2) mutuality of proof; and (3) logical relationship between original claim and cross-claim.  *Federman*, 597 F.2d at 811-12.  The Lockwood Defendants do not – and could not – dispute that Phoenix's Cross-Claims and Third-Party Claims arise aout of the same transactions as the main claim.

defendant's claim is purely inchoate – *i.e.*, has not yet accrued under the governing substantive law").[52]

In this action, plaintiff seeks a declaration of Phoenix's liability under the policies and a declaration of her right to the proceeds based on allegations that the policies were procured pursuant to an illegal STOLI scheme.  Lifemark S.A. has recently moved to intervene and assert a claim to the proceeds of one of the policies.  In such circumstances, Phoenix may assert cross-claims and third-party claims that are contingent on its liability on the main claims and that are factually and legally intertwined with the main claims.  Doing so serves the interests of judicial economy, and avoids the potential inconsistent fact-finding and adjudication of issues that may otherwise occur if the issues raised by this lawsuit are litigated in multiple actions before different courts.  *See, e.g., U.S. v. All Right, Title and Interest in Contents of Following Accounts at Morgan Guar. Trust Co. of N.Y.*, No. 95 Civ. 10929, 1996 WL 695671, at *10 (S.D.N.Y. Dec. 5, 1996) (observing that the underlying policy of Rule 13(g) is "to settle as many related claims as possible in a single action").

---

[52]  It is also settled under New York state law that an indemnity claim may be asserted, by a third-party action, in the main case.  *McDermott v. City of New York*, 50 N.Y.2d 211, 218 n.3 (1980); s*ee Burgundy Basin Inn, Ltd. v. Watkins Glen Grand Prix Corp.*, 379 N.Y.S.2d 873, 880 (App. Div. 1976) (observing that for the sake of judicial economy and fairness, New York courts allow parties to establish their rights and liabilities in one action by impleading a third party or filing cross-claims against co-defendants).

## <u>CONCLUSION</u>

For the foregoing reasons, the Lockwood Defendants' motion to dismiss Phoenix's cross-claims and third-party claims should be dismissed in its entirety.


Dated: New York, New York                                   Respectfully submitted,
       September 29, 2008


                                               **DORSEY & WHITNEY LLP**


                                               By: <u>/s/Patrick J. Feeley</u>
                                                   Patrick J. Feeley (PF-4931)
                                                   Christopher G. Karagheuzoff (CK-1122)
                                                   Stephen M. Raab (SR-0742)

                                           250 Park Avenue
                                           New York, New York  10177
                                           (212) 415-9200

                                           Attorneys for Defendant and Third-Party
                                           Plaintiff Phoenix Life Insurance Co.