**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ALICE KRAMER, as Personal Representative of the Estate of Arthur Kramer,<br><br>          Plaintiff,<br><br>     v.<br><br>LOCKWOOD PENSION SERVICES, INC., TALL TREE ADVISORS, INC., LIFE PRODUCTS CLEARING, LLC, TRANSAMERICA OCCIDENTAL LIFE INSURANCE CO., PHOENIX LIFE INSURANCE CO., LINCOLN LIFE & ANNUITY CO. OF NEW YORK, and JONATHAN S. BERCK,<br><br>          Defendants. | **ECF Case**<br><br>08 CV 2429 (DAB) (MHD)<br><br>**INTERVENOR-THIRD-PARTY PLAINTIFF LIFEMARK S.A.'S COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

|  |  |
|---|---|
| LIFEMARK S.A.,<br><br>          Intervenor-Plaintiff,<br><br>     v.<br><br>ALICE KRAMER, as Personal Representative of the Estate of Arthur Kramer,<br>THE ARTHUR KRAMER 2005 INSURANCE TRUST DATED AUGUST 29, 2005,<br>LIZA KRAMER,<br>JONATHAN S. BERCK, and<br>PHOENIX LIFE INSURANCE CO.,<br><br>          Defendants. |  |

## COMPLAINT

Intervenor-Plaintiff Lifemark S.A. ("Lifemark"), by its attorneys, Mayer Brown LLP, asserts the following claims against Defendants Alice Kramer, as Personal Representative of the Estate of Arthur Kramer ("Kramer Estate"), the Arthur Kramer 2005 Insurance Trust, dated August 29, 2005 ("August Trust"), Liza Kramer, and Jonathan Berck, and Phoenix Life Insurance Company ("Phoenix"):

### NATURE OF LIFEMARK'S CLAIMS

1.      Lifemark brings this third-party complaint for breach of contract and violation of New York General Business Law § 349 against Phoenix to recover monetary damages and obtain other relief from Phoenix's failure to pay the proceeds of a life insurance policy. Phoenix issued Policy No. 97303913 ("Policy"), on or about July 10, 2005. The insured under the Policy, Arthur Kramer, died on January 26, 2008, but Phoenix has refused to pay the death benefit set forth in the Policy ($10,000,000) to Lifemark, which was the lawful owner and beneficiary of the Policy on the date of Mr. Kramer's death and has remained so to the present.

2.      Lifemark brings this third–party complaint for declaratory judgment against the Kramer Estate, which has in this matter alleged that it is entitled to the proceeds of the Policy under New York Insurance Law § 3205(b)(4) because the Policy was issued as part of a fraudulent "Stranger Owned Life Insurance" ("SOLI") scheme in which Arthur Kramer participated. If, as the Kramer Estate alleges, the Policy was issued as part of a SOLI scheme in which Arthur Kramer participated, then Arthur Kramer's participation in the fraud must be imputed to his estate and that fraud bars the Kramer Estate from asserting a claim for the proceeds of the Policy. If, on the other hand,  the Policy was not issued as part of a SOLI scheme, then the claim for the Policy proceeds asserted by the Kramer Estate fails by its own

2

terms.  In either case, Lifemark is entitled to a declaratory judgment that the Kramer Estate has

no right to obtain the proceeds of the Policy.

3.      In the alternative, Lifemark also brings a claim for breach of warranty against

Arthur Kramer and the August Trust, based on explicit representations and warranties of good

title each made as part of the transaction by which Lifemark acquired the Policy.  If it is

determined in this Action that Lifemark is not entitled to the entire death benefit of the Policy,

then Mr. Kramer and the August Trust will have breached the warranties they provided and

Lifemark will be entitled to monetary damages.

4.      Lifemark similarly brings a claim in the alternative for fraud against Arthur

Kramer, the August Trust, and Jonathan S. Berck based on the representations each made to

Lifemark in connection with its acquisition of the Policy.  If it is determined in this Action that

Lifemark is not entitled to the entire death benefit of the Policy, then Mr. Kramer and the August

Trust will have breached the warranties they provided and Lifemark will be entitled to monetary

damages.

5.      Finally, and also in the alternative, Lifemark brings claims for unjust enrichment

and constructive trust against the August Trust and Liza Kramer because Lifemark paid the

August Trust $1,900,000 for the Policy.  Upon information and belief, Liza Kramer was the

beneficiary of the August Trust at the time of payment. (Lifemark is aware that allegations have

been made by parties to this Action to the effect that, in November 2005, Liza Kramer sold some

or all of her interest in the August Trust to Defendant Life Products Clearing LLC.  In the event

that there is evidence adduced to support such allegations, Lifemark will amend this cause of

action to reflect the parties that benefited from the sale of the Policy).  If despite Lifemark's

purchase of the Policy, it is determined that Lifemark is not entitled to the Policy death benefit,

then the August Trust will have transferred nothing of value to Lifemark in exchange for $1,900,000. This inequitable result entitles Lifemark to recoup the $1,900,000 plus interest from the August Trust and Liza Kramer.

## THE PARTIES

6.     Lifemark S.A. is a Luxembourg company authorized and regulated by the Commission de Surveillance du Secteur Financier. Lifemark is one of Europe's largest portfolio investors in American senior life settlement policies. A life settlement is a financial transaction in which a policy owner possessing an unneeded or unwanted life insurance policy sells the policy to a third party for more than the cash value offered by the life insurance company. The seller receives immediate cash for the policy from the purchasing entity, which becomes the new owner and beneficiary of the policy. Life settlements have opened a secondary market for life insurance in which policy owners can access fair market value for their policies, rather than accepting the lower cash surrender values offered by the issuing life insurance company. In addition, since life settlements have proven to be pro-consumer, they are opening many new possibilities for financial advisors to present to their senior clients. Due in part to this increasingly competitive secondary market, life insurance is no longer regarded as simply a death benefit, but as an important wealth management tool.

7.     Phoenix is a New York corporation with its principal place of business in East Greenbush, New York. At all relevant times, Phoenix was licensed to do business in New York and was engaged in the business of selling and administering contracts of insurance in New York.

8.     Alice Kramer is the widow of Arthur Kramer and the Personal Representative of his Estate. Mrs. Kramer, a resident of Connecticut, initiated this action in this Court, invoking New York law, on behalf of the Kramer Estate.

4

9.     Upon information and belief, the August Trust has its principal office at 75 Rockefeller Plaza, New York, NY 10019.  The Trust Agreement creating the August Trust was signed by Arthur Kramer, Liza Kramer, and a representative of Hudson United Bank as the original Trustee.

10.     Upon information and belief, Jonathan S. Berck is a resident of New Jersey.  Mr. Berck was appointed as the successor trustee of the August Trust in or about June 2006.

11.     Upon information and belief, Liza Kramer is the daughter of Arthur B. Kramer and a resident of the state of California.  Ms. Kramer was designated by Mr. Kramer as the initial beneficiary of the August Trust.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, excluding interests and costs, and there is complete diversity of citizenship between Lifemark, on the one hand, and Phoenix, the Kramer Estate, the August Trust, Jonathan S. Berck, and Liza Kramer, on the other hand.

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) and (c) because the Kramer Estate filed its original complaint in this judicial district, Phoenix is doing business and is subject to jurisdiction in this judicial district, and because a substantial part of the events or omissions giving rise to the claims at issue occurred in New York.

## THE POLICY

14.     In consideration of premiums paid and/or other consideration, Phoenix issued the Policy, a copy of which is attached as Exhibit A.

15.     The Policy Date is July 10, 2005.

16.     The insured under the Policy is Arthur Kramer.

17.     The face value of the Policy is $10,000,000.

18.    The Policy required an initial premium payment of $446,023, and quarterly planned premium payments of $135,000.  As of January 26, 2008, all premiums due under the Policy had been paid.

19.    On information and belief, Phoenix received premium payments in excess of $1,000,000 while the Policy was In Force, per the Policy definition.

20.    Among other terms, the Policy expressly permits transfer of ownership and allows the owner of the Policy to change the beneficiary.

21.    Among other terms, the Policy contains a contestability provision permitting Phoenix to contest the validity of the Policy based on misrepresentations by the insured for two years after the Policy Date.  The Policy expressly provides that Phoenix "cannot contest the validity of the original face amount of this policy after it has been In Force during the insured's lifetime for two years from the Policy Date."

## ARTHUR KRAMER PROCURES THE POLICY

22.    On or about August 29, 2005, Arthur Kramer—a prominent New York attorney—established an insurance trust ("August Trust") to own and administer several insurance policies (including the Policy) that he was in the process of procuring.  Hudson United Bank ("Hudson") was named as the original trustee of the August Trust.  In or about January 2006, Hudson merged with TD Banknorth, N.A., which thereby succeeded to Hudson's position as trustee of the August Trust.  Liza Kramer, Arthur Kramer's daughter, was designated as the initial beneficiary of the August Trust.

23.    Arthur Kramer signed an Application for Insurance ("Application") for the Policy in New York on September 2, 2005.  Upon information and belief, Mr. Kramer completed the Application, and procured the Policy, on his own initiative.

24.     In the Application, Mr. Kramer represented that he had income of $3,000,000 and that his net worth was $70,000,000.  Mr. Kramer also represented that he had other life insurance policies in force with an aggregate face value of $22,000,000.

25.     In the Application, Mr. Kramer stated that the owner and beneficiary of the Policy would be the August Trust.  Thus, if Mr. Kramer died, the proceeds of the Policy would be paid to the August Trust, of which Mr. Kramer's daughter Liza, was the beneficiary.

26.     Thus, at the time the Policy was issued, the beneficiary of the Policy was the August Trust and the beneficiary of the August Trust was Liza Kramer.  Because Liza Kramer had an insurable interest in the life of her father, there was an insurable interest in the Policy at the time it was issued.

27.     Arthur Kramer signed the Policy Acceptance Form as insured, in New York, on October 21, 2005.  Hudson, on behalf of the August Trust, signed the Policy Acceptance Form as owner of the Policy on or about the same date.  In signing the Policy Acceptance Form, Mr. Kramer represented that all of the statements he had made in the Application were "full, complete, and true."

28.     On or about June 1, 2006, TD Banknorth, N.A. resigned as trustee of the August Trust.  Jonathan S. Berck was appointed as the successor trustee.

## TWO YEARS LATER, LIFEMARK PURCHASES THE POLICY

29.     In August 2007, more than two years after the Policy Date, the August Trust sold the Policy to Lifemark through a broker, Montage Financial Group ("Montage").  Lifemark paid $1,900,000 to the August Trust to obtain the Policy.

30.     In connection with the sale of the Policy to Lifemark, Arthur Kramer signed an Acknowledgment attesting that he was entering into the life settlement "freely and voluntarily

with no constraint or undue influence." In addition, Mr. Kramer and the August Trust, by Jonathan Berck, the trustee of the August Trust, entered into a Senior Facilitation Agreement ("SFA") with Montage. In the SFA, Messrs. Kramer and Berck each warranted and represented (among other things) that:

> A.   The Seller [the August Trust] is the owner of the Policy, and has the absolute right to sell, assign, or otherwise convey the Policy;
>
> B.   The Seller and the Insured [Arthur Kramer] do not require the consent, approval or authorization of a third party in connection with the execution or delivery of this Agreement; [and]
>
> C.   The face amount of the Policy is $10,000,000.00, *ten million dollars* [emphasis in original], and the Seller owns all rights, title and interest in and to the Policy. The Seller has and will continue to have, until the Change of Ownership and Change of Beneficiary of the Policy is completed and approved, good and marketable title to the Policy, and free and clear of all liens, pledges, restrictions, charges, encumbrances or other interests of any nature whatsoever . . . .
>
> \* \* \* \* \*
>
> F.   The purchase price in Exhibit "A" [$1,900,000] is adequate and fair consideration for the Policy;
>
> G.   The Seller [the August Trust] and the Insured [Arthur Kramer] agree to:
>
> (i)   Take any and all actions necessary or appropriate to confirm purchasers title in the Policy; and
>
> (ii)   Execute any and all documents, agreements, certificates, or other instruments required or necessary under law or otherwise (including authorizations for Montage to obtain the Insured's medical records), in order to effectuate the purposes and provisions of this Agreement;
>
> \* \* \* \* \*

8

K.  No representation or warranty made by the Seller or the Insured, nor any statement, certificate, or instrument furnished or to be furnished to Montage pursuant to this Agreement or in conjunction with the transaction contemplated by this Agreement contains, or will contain, any untrue statement of material fact, or omits or will omit to state a material fact necessary to make the statements contained herein not misleading;

L.  **NO REPRESENTATION OR WARRANTY MADE BY THE SELLER OR THE INSURED, NOR ANY STATEMENT OR CERTIFICATE OR INSTRUMENT FURNISHED OR TO BE FURNISHED TO THE INSURANCE COMPANY IN CONNECTION WITH THE INSURANCE POLICY, INCLUDING, WITHOUT LIMITATION, THE APPLICATION FOR SUCH POLICY, OR IN CONJUNCTION WITH THIS AGREEMENT, OR THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT CONTAINED, CONTAINS, OR WILL CONTAIN ANY UNTRUE STATEMENT OF MATERIAL FACT OR OMITS OR WILL OMIT TO STATE A MATERIAL FACT NECESSARY TO MAKE THE STATEMENTS CONTAINED THEREIN NOT MISLEADING;**

(Emphasis in original).  These warranties and representations are referred to collectively herein as the "Warranties of Good Title."

31.  The purpose of the Warranties of Good Title was to assure Montage and Lifemark that the August Trust held good title to the Policy and that the August Trust had the legal right and authority to transfer to Lifemark all of the rights that the Policy provided to the owner and beneficiary of the Policy, including but not limited to the beneficiary's rights to receive the face value of the Policy upon Mr. Kramer's death and to assign that right.

32.  Montage and Lifemark relied on the Warranties of Good Title in purchasing the Policy.

33.  In addition to the documents he signed attesting to his own knowledge and consent to the sale of the Policy, Arthur Kramer also certified that he had advised Alice Kramer, his wife, and Liza Kramer, his daughter, of his desire to assign his interest in the Policy to

Montage and had "urged [them] to discuss with Montage Financial Group, or any authorized third party appointed by Montage Financial Group of my medical status, residence, and whereabouts."

34.     The sale of the Policy to Lifemark was completed on or about August 22, 2007. On the same date, notice of the change in ownership of the Policy to Lifemark and the designation of Lifemark as the 100% beneficiary of the Policy was provided to Phoenix using the forms provided by Phoenix for that purpose.  Phoenix notified Montage on August 24, 2007, that it had recorded the change in ownership and beneficiary of the Policy.

35.     Following the sale of the Policy to Lifemark, Phoenix communicated with Lifemark, as owner of the Policy, through Lifemark's designated agent, The Bank of New York ("BONY").

## PHOENIX REFUSES TO HONOR THE POLICY

36.     Arthur Kramer died on January 26, 2008.  At the time of his death, Lifemark was the sole beneficiary of the Policy and the Policy was, and had been, "In Force" per its definition for more than two years.  Therefore, per the terms of the contestability provision of the Policy, Phoenix was precluded from contesting a claim for the Policy death benefit by asserting that the Policy was invalid.

37.     On or about February 28, 2008, Lifemark, via its agent, BONY, submitted a claim to Phoenix for the proceeds of the Policy.  Phoenix denied the claim by letter of April 23, 2008. Notwithstanding the two-year contestability provision of the Policy, Phoenix based its refusal to pay Lifemark's claim on an assertion that the Policy was invalid because it was allegedly procured as part of "a fraudulent SOLI scheme."  Phoenix did not identify any other ground for denying Lifemark's claim.

38.     Lifemark, via counsel, sent another letter to Phoenix and its counsel on May 30, 2008, reasserting its claim to the Policy proceeds. In this letter, Lifemark explained that, even if the Policy had been procured by Mr. Kramer as part of a SOLI scheme, that fact would not relieve Phoenix of its obligation under the Policy to pay the proceeds to Lifemark because Lifemark had played no role in the alleged SOLI scheme and the contestability period of the Policy had expired before Mr. Kramer's death:

> As you are no doubt aware, the New York Court of Appeals has held unequivocally and unanimously that neither the New York State Insurance Law nor public policy "makes void *ab initio* policies acquired by one lacking an insurable interest or forecloses the application of an incontestable clause to bar an insurer's disclaimer of liability." *New England Mutual Life Ins. Co. v. Caruso*, 73 N.Y.2d 74, 80-81, 535 N.E.2d 270, 2273 (1989). Thus, even assuming for the sake of argument that the Policy was, as Phoenix asserts, procured as part of a SOLI scheme, the Policy was not void, but voidable, at the time it was issued. Once the contestability period expired, moreover, so did any right Phoenix may have had to void the Policy.

39.     Phoenix responded by letter on June 18, 2008, again declining to pay the proceeds of the Policy to Lifemark. In its response, Phoenix did not deny that the contestability period had expired, nor did it address the holding by New York's highest court in *Caruso* that an insurer cannot deny claims by asserting, after expiration of the contestability period, that a Policy was not supported by a valid insurable interest at the time of issuance. Instead, Phoenix again failed to identify any basis for denying  Lifemark's claim other than the allegation that the Policy had been procured by means of a SOLI scheme and that the Kramer Estate had also asserted a claim in this Court for the Policy proceeds. Phoenix invoked the Kramer claims as a purported excuse not to pay the Policy proceeds to Lifemark despite the fact that Phoenix has asserted in this Court that the Kramer Estate's claim to the Policy proceeds has no merit and must be dismissed.

40.     To date, Phoenix has refused to pay any of the Policy proceeds to Lifemark (or any other party).  On information and belief, Phoenix has retained all of the premiums paid on the Policy.

### THE KRAMER ESTATE TRIES TO RECAPTURE
### THE POLICY SOLD BY ARTHUR KRAMER

41.     Following Mr. Kramer's death, Alice Kramer, in her capacity as Representative of Mr. Kramer's estate, filed claims (the "Kramer claims") in this Court seeking to obtain the proceeds of the Policy (as well as the proceeds of other insurance policies that Mr. Kramer had procured in 2005).

42.     The Kramer Estate claims allege that the Policy was issued as part of a SOLI scheme in which Arthur Kramer participated.  They allege (among other things) that "Mr. Kramer never intended for the death benefits of the insurance policies to benefit his family," and that "[a]t no time were Mr. Kramer or any of his family members the true owners of the beneficial interests in the policies."  Amended Complaint of Alice Kramer, as Personal Representative of the Estate of Arthur Kramer, at ¶ 15.

43.     Notwithstanding Mr. Kramer's own participation in the procurement of the Policy, and his voluntary consent to the both the transfer of the Policy to the August Trust and the sale—two years later—of the Policy by the August Trust to Lifemark, Mr. Kramer's Estate has now brought a claim in this Court asserting that it is entitled to the proceeds of the Policy.

44.     In opposition, Phoenix has moved to dismiss the Kramer claims.  Phoenix has taken the position that, despite its receipt and retention of the Policy premiums, and despite the expiration of the contestability period provided for in the Policy, it has no obligation to pay the Policy proceeds to anyone.

45.     Neither the claims of the Kramer Estate nor any other claims that have been asserted in this Court relating to any of the policies procured by Arthur Kramer allege that Lifemark played any role whatsoever in, or had any knowledge of, Mr. Kramer's alleged SOLI scheme.

## COUNT I

### (Breach of Contract by Phoenix)

46.     Lifemark incorporates the averments of paragraphs 1 through 45 as if fully set forth herein.

47.     Lifemark paid $1,900,000 to obtain the Policy and was the lawful owner and beneficiary of the Policy at the time of Mr. Kramer's death and is currently the lawful owner and beneficiary of the Policy.

48.     The Policy was In Force at the time of Arthur Kramer's death.

49.     Lifemark provided due proof of Arthur Kramer's death to Phoenix.

50.     The two-year contestability period provided for in the Policy had expired before Arthur Kramer's death.

51.     Lifemark has not breached any obligation it owes under the Policy.   Any condition precedent to payment of the face amount of the Policy by Phoenix has been satisfied, waived, or is otherwise inapplicable.

52.     Any defense, excuse, or other avoidance to payment of the face amount of the Policy has been waived or is otherwise inapplicable.

53.     Phoenix is obligated to pay the face amount of the Policy to Lifemark.

54.     Phoenix has refused to pay, and has not paid, the face amount of the Policy to Lifemark.

55.     Phoenix's refusal to pay the proceeds of the Policy to Lifemark based on its claim that the Policy was procured as part of a SOLI scheme is contrary to well-established New York law, of which Phoenix had knowledge at the time it denied Lifemark's claim.   Accordingly, Phoenix has breached the implied covenant of good faith and fair dealing in the Policy and has denied Lifemark's claim in bad faith.

56.     Phoenix, moreover, has effectively affirmed the Policy, and its own obligations thereunder, by its retention of the premiums paid on the Policy, which is inconsistent with its effort to rescind the Policy unilaterally.

57.     As a result of the aforesaid breaches, Lifemark has been injured.

58.     Phoenix is liable to Lifemark for damages, including but not limited to the face amount of the Policy, attorneys fees and costs, and interest, caused by its breach of the terms of the terms of the Policy.

## COUNT II

### (Violation of New York Gen. Bus. Law § 349 By Phoenix)

59.     Lifemark incorporates the averments of paragraphs 1 through 58 as if fully set forth herein.

60.     On information and belief, the Policy was a standard form policy sold by Phoenix to other consumers.

61.     Phoenix's representations and omissions, including representations in the Policy, were misleading in a material respect, in that policy applicants, holders, purchasers and beneficiaries were led to believe that claims for payment under such policies would be investigated and processed in good faith and in a timely manner, and that benefits would be paid

in accordance with the terms of such policies.  In fact, however, Phoenix has failed to do so with respect to the Policy.

62.    Accordingly, Phoenix's conduct with respect to the issuance of the Policy constitutes deceptive acts or practices within the meaning of New York General Business Law § 349.

63.    As a direct and proximate result of Phoenix's deceptive acts or practices, Lifemark has been injured in an amount not less than the face value of the Policy and Lifemark is entitled to recover damages, including but not limited to the face amount of the Policy, attorneys' fees and costs, and interest.

## COUNT III

### (Declaratory Judgment Against the Kramer Estate)

64.    Lifemark incorporates the averments of paragraphs 1 through 63 as if fully set forth herein.

65.    Upon information and belief, Arthur Kramer applied for and procured the Policy freely and voluntarily, without coercion or duress, and on his own initiative.

66.    Mr. Kramer was of lawful age at the time he procured the Policy.

67.    New York Insurance Law § 3205(b)(1) provides, among other things, that a person who on his own initiative procures an insurance policy upon his own person may do so for the benefit of any person, firm, association or corporation, without regard to whether such person, firm, association or corporation has an insurable interest in the life of the insured. Accordingly, Mr. Kramer's action in applying for the Policy and vesting ownership of the Policy in the August Trust was lawful and did not violate § 3205(b)(1).

15

68.     Further, § 3205(b)(1) permits any person, firm, association or corporation that is the beneficiary of a policy procured by a person upon his own person to immediately transfer or assign the policy to any other person or entity, without regard to whether such person or entity has an insurable interest in the life of the insured.  Accordingly, the August Trust's sale of the Policy to Lifemark in August 2007 was lawful and did not violate § 3205(b)(1).

69.     At the time the Policy was issued and delivered, the beneficiary of the August Trust was Liza Kramer, Arthur Kramer's daughter.  As such, at the time the Policy became effective, the proceeds of the Policy were payable to a person having an insurable interest in Arthur Kramer's life.  Thus, even if Mr. Kramer's procurement of the Policy had not satisfied the requirements of § 3205(b)(1) (and it did), the procurement of the Policy satisfied the requirements of New York Insurance Law § 3205(b)(2), which provides in relevant part that another person may procure a policy upon the person of another if the benefits under such policy are payable to a person with an insurable interest in the life of the insured.

70.     Notwithstanding the foregoing, in this Action the Kramer Estate has asserted claims to the proceeds of the Policy.  The Kramer Estate purports to base its claims upon New York Insurance Law § 3205(b)(4), which provides that the executor or administrator of the estate of an insured may "maintain an action to recover" proceeds of a policy "made in violation of" the provisions of § 3205(b) of the New York Insurance Law.  As set forth in the paragraphs above, however, Arthur Kramer's procurement of the Policy was in accordance with the provisions of § 3205(b) and therefore the Kramer Estate has no basis under § 3205(b)(4) to claim the proceeds of the Policy.

71.     Further, the Kramer Estate stands in the shoes of Arthur Kramer and is bound by the representations, agreements, warranties, and waivers Mr. Kramer executed in regard to the

16

Policy.  Specifically, in the Warranties of Good Title, Mr. Kramer agreed and represented (among other things) that the August Trust owned "all rights, title and interest in and to the Policy"; that its ownership of the Policy was "free and clear of all liens, pledges, restrictions, charges, encumbrances or other interests of any nature whatsoever"; and that it had "the absolute right" to transfer the Policy to Lifemark.  Mr. Kramer's estate is bound by these agreements and representations and cannot now maintain that the August Trust did not own "all rights, title, and interest in and to the Policy" or that the right to collect the proceeds of the Policy was restricted and compromised by virtue of the operation of § 3205(b)(4).

72.    Further, Mr. Kramer represented, agreed and warranted in the Warranties of Good Title that (among other things) he would "not do anything which will reduce in the amount of the full value of the Policy"; that he would "[t]ake any and all actions necessary or appropriate to confirm purchaser's [Lifemark's] title in the Policy"; and that he would "[e]xecute any and all documents, agreements, certificates, or other instruments required or necessary under law or otherwise . . . in order to effectuate the purposes and provisions" of the SFA.  Mr. Kramer's estate is bound by these agreements and representations and cannot now compromise and diminish the value of the Policy by asserting claims that contest and challenge Lifemark's right to receive the proceeds of the Policy—the very antithesis of taking "any and all actions necessary" to confirm Lifemark's right to the Policy proceeds.

73.    The purpose of § 3205(b)(4) is to eliminate the incentives for strangers to wager on the lives of others by procuring insurance payable to the would-be gamblers without the knowledge and consent of the insured.  As the Kramer Estate has acknowledged in its own pleadings in this case, § 3205(b)(4) was designed "to prevent the 'wagerer' from keeping the benefits of his wager."  Plaintiff's and Third-Party Defendants Liza Kramer and Andrew B.

Kramer's Memorandum of Law in Support of Their Motion to Dismiss the Tortious Interference Claims Asserted by Defendant Life Product Clearing LLC in Its Counterclaims and Third-Party Complaint at 6.

74.     The anti-wagering objective, however, has no relevance where—as here—the insured person himself procures the policy.  In such a case, § 3205(b)(1) permits the making of the policy *even if the original, or subsequent, beneficiary of the policy does not have an insurable interest in the life of the insured.*  Indeed, when the insured knew of, and participated in, the procurement of a policy upon his person, and then transfers the policy to another as permitted by § 3205(b)(1), permitting the insured's heirs to obtain the policy proceeds would produce a windfall that would actually *increase* the incentives for individuals to enter into such transactions and thereby undermine the anti-wagering effect of § 3205(b)(4).

75.     Apart from Mr. Kramer's alleged SOLI scheme, the Kramer Estate has not identified any other purported basis for asserting a claim on the proceeds of the Policy.

76.     There is a present, justiciable controversy between Lifemark and the Kramer Estate concerning, at least, to whom the Policy proceeds are properly payable.  Accordingly, Lifemark is entitled to a declaration that (1) the Kramer Estate has no lawful claim to the proceeds of the Policy and (2) Lifemark is entitled to the Policy proceeds.

## COUNT IV

**(In the alternative, Breach of Warranty by Arthur Kramer and the August Trust)**

77.     Lifemark incorporates the averments of paragraphs 1 through 76 as if fully set forth herein.

78.     Arthur Kramer and the August Trust entered into the SFA with Montage on or about August 13, 2007.  The SFA provides, among other things, that "[a]ll representations, warranties, and promises set forth in this Agreement will survive the transfer of ownership and change of beneficiary of the Policy.  Montage transferred the Policy to Lifemark on or about August 22, 2007.  Accordingly, the warranties and representations made by Mr. Kramer and the August Trust in the SFA, including but not limited to the Warranties of Good Title, extend to Lifemark.

79.     The right to recover the face value of the Policy in the event of Arthur Kramer's death was one of the principal rights conferred to, and relied upon, by Lifemark in connection with its purchase of the Policy from the August Trust.

80.     If it is determined in this Action that Lifemark is not entitled to all of the proceeds of the Policy, by virtue of the application of New York Insurance Law § 3205(b)(4) or for any other reason, then Mr. Kramer and the August Trust will have breached the Warranties of Good Title.  In that event, Lifemark will have been injured by those breaches of warranty and will be entitled to recover damages from the Kramer Estate and the August Trust, jointly and severally, in an amount not less than the face amount of the Policy, attorney's fees and costs, and interest.

## COUNT V

**(In the alternative, Fraud by Arthur Kramer, the August Trust, and Jonathan S. Berck)**

81.     Lifemark incorporates the averments of paragraphs 1 through 80 as if fully set forth herein.

82.     In the Kramer claims, Alice Kramer has alleged that her husband, Arthur Kramer, participated in a fraudulent SOLI scheme.  If Mrs. Kramer's allegation is found to be true, then

Arthur Kramer, the August Trust, and Jonathan S. Berck will be liable to Lifemark for knowingly misrepresenting the ownership and provenance of the Policy.

83.     If the Policy was procured in violation of § 3205(b) of the New York Insurance Law, then Arthur Kramer, the August Trust, and Jonathan S. Berck knew, or recklessly disregarded the truth, that the representations set forth in the Application for the Policy that the August Trust was the true owner and beneficiary of the Policy were false and incomplete when made. If the Policy was procured in violation of § 3205(b), then Arthur Kramer, the August Trust, and Jonathan S. Berck knew that the representations set forth in the Warranties of Good Title were materially false and misleading, and omitted information necessary to render them not misleading, because they failed to disclose (among other things) that:

(i)     Arthur Kramer had not procured the Policy on his own initiative;

(ii)    the Policy had been issued to a person without an insurable interest, as part of an unlawful SOLI scheme;

(iii)   other potential claimants to the Policy proceeds, such as members of Arthur Kramer's family, had not been advised of, or consented to, the sale of the Policy; and

(iv)    the Policy was subject to a claim by Arthur Kramer, his estate, and his heirs pursuant to New York Insurance Law § 3205(b)(4).

84.     If the Policy was procured on or about July 10, 2005 in violation of § 3205(b), then Arthur Kramer, the August Trust, and Jonathan S. Berck made the representations set forth in the Warranties of Good Title, above, with the intent to deceive others, including future potential purchasers of the Policy, as to the existence of an insurable interest when the Policy was issued and the lawfulness and validity of the Policy.

85.    Lifemark reasonably relied on the Warranties of Good Title when it determined to purchase the Policy.

86.    If Lifemark is not awarded the proceeds of the Policy, then Lifemark will have been injured and will have suffered damages as a result of the fraudulent misrepresentations of Arthur Kramer, the August Trust, and Jonathan S. Berck, including but not limited to the face amount of the Policy, attorneys fees and costs, interest and punitive damages.

## COUNT VI

### (In the alternative, Unjust Enrichment against the August Trust and Liza Kramer)

87.    Lifemark incorporates the averments of paragraphs 1 through 86 as if fully set forth herein.

88.    Lifemark paid the August Trust $1,900,000 for the Policy.

89.    Upon information and belief, Liza Kramer was the beneficiary of the August Trust at the time of this payment.  (Lifemark is aware that allegations have been made by parties to this Action to the effect that, in November 2005, Liza Kramer sold some or all of her interest in the August Trust to Defendant Life Products Clearing LLC.  In the event that there is evidence adduced to support such allegations, Lifemark will amend this cause of action to reflect the parties that benefited from the sale of the Policy).

90.    If, despite Lifemark's purchase of the Policy, it is determined that Lifemark is not entitled to the proceeds of the Policy, then:  (a) the August Trust will have transferred nothing of value to Lifemark in exchange for the payment of $1,900,000; and (b) Liza Kramer will have acquired the policy proceeds unjustly through fraud.

91.    In that case, it would be inequitable and unjust for the August Trust and/or Liza Kramer to retain the policy proceeds and the monies paid by Lifemark to purchase the Policy, and Lifemark is therefore entitled to recoup from the August Trust and Liza Kramer the policy proceeds, or alternatively, the payment made to purchase the Policy, plus interest.

## COUNT VII

### (In the alternative, Constructive Trust)

92.    Lifemark incorporates the averments of paragraphs 1 through 91 as if fully set forth herein.

93.    If the policy proceeds are by operation of law payable to the Kramer Estate and/or Liza Kramer, then either the Kramer Estate and/or Liza Kramer will have retained or acquired those proceeds by operation of a fraud perpetrated by Arthur Kramer, in whose shoes the Estate now stands.

94.    Allowing the Kramer Estate and/or Liza Kramer to retain the Policy proceeds will unjustly enrich the Kramer Estate and/or Liza Kramer by allowing them to profit from fraud by Arthur Kramer to the detriment of Lifemark to which the policy proceeds rightfully belong.

95.    Under the circumstances, it would be inequitable for the Kramer Estate and/or Liza Kramer to be permitted to receive or retain the policy proceeds and the Policy Proceeds should be subject to a constructive trust.

96.    Without imposition of a constructive trust, Lifemark will be wrongfully deprived of the Policy proceeds to which it is entitled.

**PRAYER FOR RELIEF**

**WHEREFORE**, Lifemark requests that this Court enter a judgment:

a.      Awarding Lifemark all direct and consequential money damages it has suffered as a consequence of Phoenix's breach of the terms of the Policy;

b.      Declaring that the Kramer Estate has no claim to the proceeds of the Policy, or, alternatively, entering judgment against the Kramer Estate, August Trust, Liza Kramer and Jonathan Berck, and in favor of Lifemark for damages including but not limited to the amount of the Policy proceeds, punitive damages, attorneys fees and costs, and interest, and imposing a constructive trust on the policy proceeds providing that those proceeds, to whomever they may be payable in the first instance, are held in trust for the benefit of, and shall be forthwith conveyed over to Lifemark.

c.      Awarding Lifemark pre- and post-judgment interest; and

d.      Awarding Lifemark any and all other relief that the Court deems just and proper.

**A JURY TRIAL IS DEMANDED AS TO ALL COUNTS AND ISSUES SO TRIABLE.**

Dated:  September 4, 2008
       New York, New York

Respectfully submitted,

MAYER BROWN LLP

By: *Hector Gonzalez*
    Hector Gonzalez

1675 Broadway
New York, New York 10019-5820
(212) 506-2500
(212) 262-1910 (fax)

23

